No. 25-761

In the United States Court of Appeals for the Ninth Circuit

NICHOLAS ROLOVICH,
Plaintiff-Appellant,

v.

WASHINGTON STATE UNIVERSITY, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Washington
Honorable Thomas O. Rice
(2:22-cv-319-TOR)

## PLAINTIFF-APPELLANT'S OPENING BRIEF

ERIC N. KNIFFIN
KNIFFIN LAW, PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903

ERIC J. SEESE
FROST BROWN TODD LLP
1801 California St., Ste. 2700
Denver, CO 80202

JOSEPH C. DAVIS
  *Counsel of Record*
LUKE W. GOODRICH
ANGELA WU HOWARD
REED M. BARTLEY
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*jdavis@becketfund.org*

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 5

STATEMENT OF ISSUES................................................................. 5

STATEMENT OF THE CASE ........................................................... 6

I.  Factual Background.................................................................... 6

    A. Rolovich's Hiring ............................................................... 6

    B. COVID-19 and Vaccines................................................... 6

    C. Rolovich's Religious Objection to COVID-19 Vaccines................... 9

    D. WSU's Vaccine Mandate ................................................. 10

    E. The "Rolo Strategy" and Rolovich's Firing ..................... 12

    F. COVID-19's Impact at WSU and in College Football
       at the Time of Rolovich's Request ................................. 18

II. Procedural Background ...................................................... 19

STANDARD OF REVIEW................................................................ 21

SUMMARY OF ARGUMENT .......................................................... 22

ARGUMENT ................................................................................. 25

I.  The district court erred in granting summary
    judgment to WSU on Rolovich's Title VII claims............................ 25

    A. Rolovich sincerely asserted a religious objection. ........... 25

B. A reasonable jury could find that WSU could have accommodated Rolovich's religious objection without undue hardship............................................... 32

    1. WSU's community health and safety concerns do not undisputably establish undue hardship. ...................... 34

    2. WSU's financial concerns do not undisputably establish undue hardship. ....................................... 39

    3. WSU's success and reputation concerns do not undisputably establish undue hardship. ................................. 42

C. At minimum, Rolovich's disparate-treatment claim should have survived summary judgment. ................................... 45

II. The district court erred in granting summary judgment to WSU on Rolovich's breach-of-contract and wage-withholding claims............................................. 49

III. The district court erred in dismissing Rolovich's free-exercise claim against Defendant Chun. ......................................... 55

CONCLUSION ....................................................................... 62

CERTIFICATE OF COMPLIANCE....................................... 64

CERTIFICATE OF SERVICE ................................................ 65

ADDENDUM ......................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. Hill,*
518 F.3d 1152 (9th Cir. 2008) ........................................................ 49

*Anderson v. Gen. Dynamics Convair Aerospace Div.,*
589 F.2d 397 (9th Cir. 1978) .......................................................... 39

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................ 21

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................ 22

*Bacon v. Woodward,*
104 F.4th 744 (9th Cir. 2024) ........................................................ 34

*Baldwin v. Sisters of Providence in Wash., Inc.,*
769 P.2d 298 (Wash. 1989) ............................................ 50, 52, 55, 62

*Barnett v. Inova Health Care Servs.,*
125 F.4th 465 (4th Cir. 2025) ........................................................ 31

*Baugh v. Austal USA, LLC,*
No. 1:22-cv-329, 2025 WL 28453
(S.D. Ala. Jan. 3, 2025) .................................................................. 42

*Bellard v. Univ. of Tex. MD Anderson Cancer Ctr.,*
716 F.Supp.3d 503 (S.D. Tex. 2024) ............................................... 39

*Beuca v. Wash. State Univ.,* No. 2:23-cv-69,
2023 WL 3575503 (E.D. Wash. May 19, 2023)................................ 33

*Beuca v. Wash. State Univ.,*
No. 23-35395, 2024 WL 3450989
(9th Cir. July 18, 2024)................................................................... 33

*Bolden-Hardge v. Office of Cal. State Controller,*
63 F.4th 1215 (9th Cir. 2023) ........................................... 26, 32, 44

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ................................................................ 45

*Bowen v. Roy*,
476 U.S. 693 (1986) ................................................................ 61

*Brandon v. Bd. of Educ. of the City of St. Louis*,
No. 4:22-cv-635, 2025 WL 1360684
(E.D. Mo. May 8, 2025) ........................................................ 36

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......................................................... 26, 57

*Callahan v. Woods*,
658 F.2d 679 (9th Cir. 1981) ......................... 26, 27, 30, 31

*Carter v. Local 556, Transp. Workers Union of Am.*,
___F.4th___, 2025 WL 1340536
(5th Cir. May 8, 2025) ...................................................... 33, 45

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.*,
225 F.3d 1115 (9th Cir. 2000) ............................................ 45

*Civil Serv. Comm'n of City of Kelso v. City of Kelso*,
969 P.2d 474 (Wash. 1999) .................................................. 51

*Cordova v. State Farm Ins. Cos.*,
124 F.3d 1145 (9th Cir. 1997) ............................................ 47

*Cox v. Nw. Reg'l Educ. Serv. Dist.*,
No. 3:22-cv-1073, 2024 WL 777598
(D. Or. Feb. 23, 2024) .......................................................... 37

*Denoia v. Roche Diagnostics Corp.*,
No. 1:23-cv-344, 2024 WL 5186873
(S.D. Ind. Dec. 20, 2024) .................................................... 37

*Dep't of Lab. & Indus. v. Overnite Transp. Co.*,
834 P.2d 638 (Wash. Ct. App. 1992) ................................ 53

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
  100 F.4th 1251 (10th Cir. 2024) .......................................46-47, 58, 60

*Does 1-3 v. Mills*,
  142 S. Ct. 17 (2021).............................................................8, 35

*Does 1-6 v. Mills*,
  566 F.Supp.3d 34 (D. Me. 2021) .......................................................35

*Dominguez-Curry v. Nev. Transp. Dep't*,
  424 F.3d 1027 (9th Cir. 2005) ........................................................46

*Earl v. Nielsen Media Research, Inc.*,
  658 F.3d 1108 (9th Cir. 2011) .........................................................48

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
  575 U.S. 768 (2015)..................................................................60

*EEOC v. Alamo Rent-A-Car LLC*,
  432 F.Supp.2d 1006 (D. Ariz. May 26, 2006) ....................................39

*EEOC v. Sambo's of Ga., Inc.*,
  530 F.Supp. 86 (N.D. Ga. 1981) ......................................................41

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021)..........................................................56, 61, 62

*Gaglidari v. Denny's Rests., Inc.*,
  815 P.2d 1362 (Wash. 1991) ...........................................................54

*Godwin v. Hunt Wesson, Inc.*,
  150 F.3d 1217 (9th Cir. 1998).........................................................47

*Groff v. DeJoy*,
  600 U.S. 447 (2023)................................. 3, 20, 23, 32-33, 38, 40-41, 42

*Havens v. C & D Plastics, Inc.*,
  876 P.2d 435 (Wash. 1994) ............................................................50

*Hayslett v. Tyson Foods, Inc.*,
  No. 1:22-cv-1123, 2023 WL 11897503
  (W.D. Tenn. Sept. 20, 2023)........................................................34, 36

*Hebrew v. Tex. Dep't of Crim. Justice,*
   80 F.4th 717 (5th Cir. 2023) .................................................. 33-34, 37

*Heller v. EBB Auto Co.,*
   8 F.3d 1433 (9th Cir. 1993) .................................................... 26

*Hertel v. Thornell,*
   No. 3:21-cv-8044, 2024 WL 3236828
   (D. Ariz. Apr. 9, 2024) ........................................................... 27

*Jones v. Williams,*
   791 F.3d 1023 (9th Cir. 2015) .............................................. 55

*Keates v. Koile,*
   883 F.3d 1228 (9th Cir. 2018) ............................................... 55-56

*Keene v. City & County of San Francisco,*
   No. 22-16567, 2023 WL 3451687
   (9th Cir. May 15, 2023) ......................................................... 26

*Kennedy v. Bremerton Sch. Dist.,*
   597 U.S. 507 (2022) ............................................................... 58

*Khachatryan v. Blinken,*
   4 F.4th 841 (9th Cir. 2021) .................................................... 60

*Kidd v. Univ. Med. Ctr. of S. Nev.,*
   No. 2:22-cv-1990, 2024 WL 4046249
   (D. Nev. July 2, 2024) ........................................................... 38

*Lillig v. Becton-Dickinson,*
   717 P.2d 1371 (Wash. 1986) ................................................. 53

*Lund v. Grant Cnty. Pub. Hosp. Dist. No. 2,*
   932 P.2d 183 (Wash. Ct. App. 1997) .................................... 50, 54-55

*Martin v. Wheeler,*
   No. 3:19-cv-6002, 2020 WL 5544346
   (W.D. Wash. Sept. 15, 2020) ................................................. 53

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
   584 U.S. 617 (2018) .....................................................57, 58-59, 60-61

*McGinest v. GTE Serv. Corp.,*
   360 F.3d 1103 (9th Cir. 2004) ...............................................45-46

*Mullenix v. Sysco Spokane, Inc.,*
   No. 2:13-cv-305, 2014 WL 3587581
   (E.D. Wash. July 21, 2014) ...................................................51

*NFIB v. Dep't of Lab.,*
   595 U.S. 109 (2022) ............................................................54

*Oppenheimer & Co. Inc. v. Mitchell,*
   135 F.4th 837 (9th Cir. 2025) .................................................21

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser,*
   945 F.3d 1076 (9th Cir. 2019) ..............................................49

*Passarella v. Aspirus, Inc.,*
   108 F.4th 1005 (7th Cir. 2024) .......................................31, 32

*Payette v. Safety-Kleen Corp.,*
   34 F.3d 1073, 1994 WL 461661 (9th Cir. 1994) .................51

*Peterson v. Hewlett-Packard Co.,*
   358 F.3d 599 (9th Cir. 2004) .................................................45

*Ramirez v. Collier,*
   595 U.S. 411 (2022) ............................................................30

*Ringhofer v. Mayo Clinic, Ambulance,*
   102 F.4th 894 (8th Cir. 2024) ..............................................31

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ............................................................56

*Smith v. City of Atlantic City,*
   ___F.4th___, 2025 WL 1537927
   (3d Cir. May 30, 2025) .......................................................40

vii

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ................................................................ 21

*Spencer v. World Vision, Inc.*,
    633 F.3d 723 (9th Cir. 2011) ................................................................ 27

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ................................................................... 22

*Sturgill v. Am. Red Cross*,
    114 F.4th 803 (6th Cir. 2024) ........................................................ 31-32

*Sturgill v. United Parcel Serv., Inc.*,
    512 F.3d 1024 (8th Cir. 2008) .............................................................. 39

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981) ................................................... 26, 56, 57, 61

*Thornton v. Ipsen Biopharmaceuticals, Inc.*,
    126 F.4th 76 (1st Cir. 2025) ........................................................ 31, 32

*Tolan v. Cotton*,
    572 U.S. 650 (2014) .............................................................................. 21

*Tooley v. Martin-Marietta Corp.*,
    648 F.2d 1239 (9th Cir. 1981) .............................................................. 39

*Trainer v. Kitsap County*,
    107 Wash. App. 1035, 2001 WL 873826
    (Wash. Ct. App. 2001) .......................................................................... 52

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) .............................................................................. 62

*Tripoli v. KPMG Peat Marwick*,
    92 Wash. App. 1014, 1998 WL 549391
    (Wash. Ct. App. 1998) .......................................................................... 52

*UnifySCC v. Cody*,
    No. 5:22-cv-1019, 2025 WL 215524
    (N.D. Cal. Jan. 15, 2025) ..................................................................... 36

*United States v. Seeger*,
  380 U.S. 163 (1965) ................................................................ 27

*United States v. Zimmerman*,
  514 F.3d 851 (9th Cir. 2007) ................................................. 27

*Varkonyi v. United Launch All., LLC*,
  No. 2:23-cv-359, 2024 WL 1677523
  (C.D. Cal. Feb. 21, 2024) ............................................... 36, 40

*Waln v. Dysart Sch. Dist.*,
  54 F.4th 1152 (9th Cir. 2022) ............................................... 62

*Wash. State Nurses Ass'n v. Sacred Heart Med. Ctr.*,
  287 P.3d 516 (Wash. 2012) ................................................... 53

*Zetwick v. County of Yolo*,
  850 F.3d 436 (9th Cir. 2017) ................................................ 27

**Statutes**

28 U.S.C. §1291 ......................................................................... 5

28 U.S.C. §1331 ......................................................................... 5

28 U.S.C. §1367 ......................................................................... 5

42 U.S.C. §2000e-2 ............................................................. 25, 45

42 U.S.C. §2000e-5 ................................................................... 5

Wash. Rev. Code §49.52.050 ................................................... 53

Wash. Rev. Code §49.52.070 ................................................... 53

**Other Authorities**

*2021 Football Schedule*, Wash. State Univ. ...................... 18, 40

Alabama Governor Kay Ivey, Exec. Order No. 724,
  *Combating Overreaching COVID-19 Vaccination*
  *Mandates* (Oct. 25, 2021) ..................................................... 43

Dr. Jay Bhattacharya et al., *Great Barrington Declaration*
(Oct. 4, 2020) ....................................................................... 7

*Catholic Medical Association Opposes Vaccine Mandates
Without Conscience and Religious Exemptions*,
89 Linacre Q. 343 (Sept. 7, 2021) ...................................... 8

Nathan S. Chapman, *Adjudicating Religious Sincerity*,
92 Wash. L. Rev. 1185 (2017) ........................................... 31

Vivek P. Chavda et al., *mRNA-Based Vaccine for COVID-19:
They Are New but Not Unknown!*, 11 Vaccines (Basel),
no. 507 (2023) ...................................................................... 7

EEOC Compliance Manual: Religious Discrimination
(Jan. 15, 2021) ................................................................... 26

Fed. R. Civ. P. 56 ..................................................................... 21

Georgia Governor Brian Kemp, Exec. Order, *Prohibition of
COVID-19 Vaccine Passports* (May 25, 2021) .................. 43

*History of COVID-19: Outbreaks and vaccine timeline*,
Mayo Clinic ......................................................................... 7

*Immunization Data*, Washington State
Department of Health ........................................................ 35

Office of Strategy, Planning, and Analysis, *Student
Dashboards: Total Student Enrollment*, Wash. State Univ. ............. 37

Pew Research Center, *Report: More Americans Than People
in Other Advanced Economies Say COVID-19 Has
Strengthened Religious Faith* (Jan. 27, 2021) .................... 9

UGA Today, *Reports of COVID-19 and positivity rate hit new
semester low*, University of Georgia (Oct. 13, 2021) ......... 43

University Medical Center, *Dean's Message*, University of
Alabama (Oct. 1, 2021) ...................................................... 43

*Washington State Cougars School History*, Sports Reference ............. 43

RJ Wolcott, *WSU launches new COVID-19 dashboard*,
WSU Insider (Jan. 22, 2021) ........................................................... 18

WSU Institutional Research, *Employee headcount and FTE*
(Fall 2021), Wash. State Univ. ....................................................... 37

# INTRODUCTION

Washington State University fired Plaintiff-Appellant Nick Rolovich, its head football coach, because of his religious objection to taking a COVID vaccine. The question in this appeal is whether a reasonable jury could conclude that the firing was unlawful.

"Nick Rolovich is," according to the Catholic Bishop of Spokane, "a man of faith who sincerely tries to live his life in a manner that seeks God's will." In this case, Rolovich's faith led him to the firm conviction, after months of study, prayer, and discernment with his priest, that he could not in good conscience take a COVID vaccine due to Catholic teachings on therapeutic proportionality and complicity with abortion. Accordingly, he followed WSU's standard procedure for requesting a religious exemption from WSU's vaccine mandate.

WSU granted hundreds of religious exemptions for a wide variety of employees and students. WSU's President stated, "I have the greatest respect for those individuals whose religious convictions prevent them from taking the vaccine," and that the University "appropriately allows for religious exemptions to the mandate." In fact, 97% of all religious exemption requests like Rolovich's were granted. Fourteen of Rolovich's football players were exempted. And WSU's own blind-review committee approved Rolovich's request and judged it to be sincere.

Nevertheless, Rolovich's supervisors—including the Athletic Director, University President, and Chair of the Board of Regents—were concerned that having a "high profile employee" request a religious exemption "tarnished WSU['s] brand." When they found out he would be requesting a religious exemption, they said they were "pissed" and "so angry … that we cannot see straight." They said getting vaccinated "was an opportunity for the coach to display leadership," but that he had "fallen short." And privately, they mocked Rolovich's religious beliefs, asking "can you pls tell me his devoted religion?" and quipping, "I have no $&$@@ idea. Probably searching on the internet as we speak."

Weeks before Rolovich submitted his request, they decided that denying that request would "be a great lesson for current or future coaches about decisions you can or cannot make as a head coach." Accordingly, they devised what they called the "Rolo strategy." They breached their own protocols by reversing the blind-review committee's finding that Rolovich was sincere. And they rejected a list of proposed accommodations from their own health experts—the same sorts of accommodations used for the 97% of religious exemption requests that were granted—and claimed no accommodation would work for Rolovich. Then they fired him—and refused to pay the liquidated damages required by his contract, claiming they fired him for "just cause."

WSU's actions violated Title VII, Rolovich's contract, and the Free Exercise Clause. The district court's contrary rulings must be reversed.

2

At the outset, the district court granted summary judgment against Rolovich's Title VII claim on the ground that his objection to the vaccine wasn't sincerely religious. But that conclusion is exactly the kind of adverse credibility determination that is forbidden on summary judgment. Moreover, Rolovich's religious objection was supported by extensive references to Catholic teaching, corroborated by his priest and bishop, and reaffirmed in sworn testimony. So the district court's conclusion wasn't just a forbidden credibility determination but an ill-founded one at that.

Alternatively, the district court held that accommodating Rolovich would cause undue hardship by imposing on WSU "more than a de minimis" burden. But the Supreme Court in *Groff v. DeJoy*, 600 U.S. 447 (2023), rejected the "de minimis" standard as too lenient for employers, precisely to better protect religious employees like Rolovich. And although the district court later shrugged off its departure from *Groff* as a "clerical mistake," under the proper standard, WSU came nowhere close to showing that accommodating Rolovich was unreasonable as a matter of law. Indeed, WSU was able to accommodate 97% of religious objectors (along with 14 unvaccinated football *players*); its campus vaccination rate of 95% sufficed to protect the vaccinated and unvaccinated alike; and its annual budget dwarfed the alleged cost of accommodating Rolovich by many orders of magnitude. So Rolovich's Title VII failure-to-accommodate claim should have at least gone to a

3

jury—as such claims in similar vaccine-mandate cases around the country already have.

But the district court also committed three other reversible errors. First, the district court's (incorrect) finding of undue hardship didn't dispose of all Rolovich's Title VII claims; Rolovich also had a claim for intentional religious discrimination, which isn't subject to that defense, and which the district court simply ignored. Second, a reasonable jury could find that WSU's decision to not only fire Rolovich but to deny him the liquidated damages provided in his contract violated Washington law, since the contract's "just cause" exception doesn't cover unwarranted and irregular decisions like WSU's here. And third, the district court erred in dismissing on the pleadings Rolovich's Free Exercise Clause claim against WSU's Athletic Director, Defendant Chun. The complaint's well-pled allegations—including that Chun denigrated Rolovich's beliefs by comparing them to those of "cults" and arbitrarily overrode WSU's ordinary review policy to reject Rolovich's exemption claim—easily state a plausible claim for relief.

The record leaves no doubt about why WSU fired Rolovich: It thought his religious conviction "tarnished WSU['s] brand" with donors, who opposed his religious beliefs as "anti-science and anti-authority." But under binding Supreme Court precedent, "adverse customer reaction" or "hostility to a religious practice" isn't undue hardship. And far from rejecting "authority," Rolovich was in fact seeking to obey the *highest*

4

authority—the dictates of his faith—without forfeiting his job. That is precisely what Title VII and the First Amendment protect. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1367 and 42 U.S.C. §2000e-5(f)(3). The district court entered final judgment on January 6, 2025, and amended its judgment on January 8. The notice of appeal was timely filed on February 4. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES

1. Whether a reasonable jury could find that Rolovich sincerely asserted a religious objection to WSU's vaccine mandate.

2. Whether a reasonable jury could find that WSU could have accommodated Rolovich's religious practice without undue hardship.

3. Whether, even assuming undue hardship, Rolovich's claim for intentional religious discrimination should have survived summary judgment.

4. Whether a reasonable jury could find that WSU lacked "just cause" for terminating Rolovich or a good-faith basis for withholding his liquidated damages.

5. Whether Rolovich adequately alleged a Free Exercise Clause claim against Chun.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Rolovich's Hiring

On January 14, 2020, WSU, following a losing season, hired Nicholas Rolovich to be its head football coach. 5-ER-787. WSU considered Rolovich "'a genuine person'" and "'the exact fit to lead Cougar Football.'" *Id.*

Rolovich's contract allowed WSU to terminate him at any time "without cause," but if it did so, it had to pay "liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of [the] Agreement." 6-ER-1374. If WSU terminated Rolovich for "Just Cause," "all obligations of the University to make further payments under th[e] Agreement and/or to provide any other consideration … [would] cease." 6-ER-1374.

#### B. COVID-19 and Vaccines

Less than two months into Rolovich's tenure, COVID-19 appeared on the scene. On February 29, 2020, Governor Inslee declared a State of Emergency for Washington. 2-ER-59. WSU operated remotely that spring and fall, 2-ER-60, but Rolovich coached four games, 2-ER-64–65, ending the season with WSU convinced he "was the right person to lead the football program through these difficult times." 5-ER-799.

COVID vaccines became widely available in early 2021. Many in the public were hesitant about them. Until late 2021, the vaccines were not

6

FDA-approved but were instead available under the FDA's "emergency use authorization," which is "based on less data than is normally required." *History of COVID-19: Outbreaks and vaccine timeline*, Mayo Clinic, https://perma.cc/A6RV-9BUY; 2-ER-70. The vaccines were developed with "unprecedented speed," 4-ER-661, and two of the three—Pfizer and Moderna—were "mRNA-based," "a new approach to formulating a vaccine." Vivek P. Chavda et al., *mRNA-Based Vaccine for COVID-19: They Are New but Not Unknown!*, 11 Vaccines (Basel), no. 507, at 2 (2023), https://perma.cc/EA9W-ZATL. It was "undisputed" that "the vaccines ha[d] side effects, some of which are severe," and there was a "possibility of" other "severe side effects … yet to be identified," since "the vaccines ha[d] been in use in human populations for less than a year." 6-ER-1313–14.

In addition, months before the vaccines became available, tens of thousands of epidemiologists and medical professionals had concluded that reaching herd immunity—a point of COVID-19 stability where community-wide immunity had risen and risk to the vulnerable had fallen—"is not dependent upon" a vaccine, since the vulnerable could be protected while those "who are at minimal risk" would "build up immunity … through natural infection." Dr. Jay Bhattacharya et al., *Great Barrington Declaration* (Oct. 4, 2020), https://perma.cc/D9VR-PB2N; 6-ER-1307

Accordingly, most states maintained significant freedom in their citizens' choice to become vaccinated. Some declined to mandate vaccines at all—even for healthcare professionals. Brief for The Becket Fund for Religious Liberty as Amicus Curiae Supporting Applicants at 13, *Does 1-3 v. Mills*, 142 S. Ct. 17 (2021) (No. 21A90), https://perma.cc/XXE7-NCXP. And when states did implement mandates, exemptions for objectors were the norm. *Id.* at 13-14; *see Does 1-3*, 142 S. Ct. at 21 (Gorsuch, J., dissenting from denial).

For some, objection to the vaccines stemmed from religious belief. All three of the initially available vaccines were tested or produced using cell lines derived from aborted babies, and "[m]any people of religious faith have a deeply held objection to benefitting from abortion." 6-ER-1326–27; *cf.* 4-ER-681–82. Further, many Catholic organizations, including "the largest association of Catholic physicians and healthcare professionals in the United States," advised against vaccination when it violated the principle of therapeutic proportionality—a religious teaching requiring abstention from acts against "one's free and informed conscience" after assessing "the medical risk/benefit of a particular intervention." *Catholic Medical Association Opposes Vaccine Mandates Without Conscience and Religious Exemptions*, 89 Linacre Q. 343 (Sept. 7, 2021), https://perma.cc/N8WP-XBNK.

8

**C. Rolovich's Religious Objection to COVID-19 Vaccines**

Rolovich was among those with concerns. Some of his concerns stemmed from his understanding of the medicine, science, and politics behind the vaccines. 2-ER-74–75. But he did not view the vaccines through a purely secular lens. Like the "nearly three-in-ten Americans [who] report stronger personal faith because of the pandemic," Pew Research Center, *Report: More Americans Than People in Other Advanced Economies Say COVID-19 Has Strengthened Religious Faith* (Jan. 27, 2021), https://perma.cc/ZH38-55K9, Rolovich reconnected with his Catholic faith during the pandemic and began asking how his faith related to the vaccines.

Rolovich grew up in a Mass-attending Catholic family and led retreats for his high-school campus ministry. 6-ER-1095. In Washington, he reestablished a relationship with the Catholic Bishop of Spokane, Bishop Daly, whom he had known as a youth. 6-ER-1095. And in July 2021, he befriended Father Paul Heric, a Catholic priest and the Chaplain of the St. Thomas More Catholic Cougs Student Center at WSU. 6-ER-1159. From Fr. Paul, Rolovich received counsel regarding his Catholic faith; his obligations as a father, husband, and coach; and mentoring athletes through adversity and loss. 6-ER-1160. Rolovich credits Fr. Paul with helping him to "reconnect with the Catholic faith of [his] youth and grow closer to God." 6-ER-1156; *see also* 6-ER-1100.

9

Rolovich also brought to Fr. Paul his concerns about the vaccines. Over their discussions, Fr. Paul came to understand that Rolovich was deeply troubled in his conscience by the idea of being vaccinated. 6-ER-1160–61; 6-ER-1113. Fr. Paul pointed Rolovich to the "fundamental element of Christian moral teaching" on the conscience and sent him related materials from the Catholic Catechism, as well as moral guidance on the vaccines from the Diocese of Spokane. 6-ER-1113–14 6-ER-1156. Rolovich "stud[ied]" these materials and ultimately concluded it was his religious obligation to remain unvaccinated. 6-ER-1161. Convinced of his sincerity, Fr. Paul "encouraged" him to "submit a request for religious exemption," if needed. 6-ER-1118; 6-ER-1161.

Rolovich similarly sought Bishop Daly's counsel. 6-ER-1161. The Bishop agreed with Fr. Paul, concluding that Rolovich was "a man of faith who [was] sincerely [trying] to live his life in manner that seeks God's will." 6-ER-1095.

### D. WSU's Vaccine Mandate

COVID-19 vaccines became widely available to the public in March and April of 2021. 5-ER-799. Given Rolovich's concerns about the vaccines, 5-ER-800, and the "prominence of [his] position," 3-ER-431–32, WSU immediately began pressuring him to become vaccinated.

In April, for example, WSU arranged a meeting between Rolovich and a WSU "expert on infectious diseases." 5-ER-800. In May, WSU Athletics Director Pat Chun insisted in a meeting that Rolovich get "vaccinated for

10

[the] team," given "the power of [his] position." 4-ER-781. When Rolovich continued to hesitate, telling him "the only thing I put above this team is my faith and my family," Chun questioned his "mental health"; said Rolovich's "beliefs are making [him] incapable of leading" his team; and "offered his wife as a person to talk to because she has been involved in a couple different religions he referred to as a cult." 4-ER-781–82.

On June 30, 2021, Governor Inslee issued Proclamation 20-12.3, requiring universities to mandate vaccines for students, staff, and faculty, "subject to any medical exemptions required by law and any religious or philosophical exemptions." 3-ER-413. In response, WSU issued a policy requiring employees to be vaccinated by August 23, but exempting employees who had "a 'non-medical (religious or philosophical/personal) reason' for declining" vaccination. 3-ER-413.

Meanwhile, the "media day" for WSU's athletics conference, the Pac-12, was scheduled for July 27. 5-ER-802. Because the Pac-12 required in-person attendees to be vaccinated, Rolovich planned to attend via Zoom. 5-ER-802–03. In response, Chun and other WSU officials convened a meeting and convinced Rolovich that he needed to publicly announce his vaccination status, to "explain[] the reason for his" remote attendance. 5-ER-803; *see* 4-ER-782–83. WSU then drafted statements it had Rolovich post on Twitter (now X) and—after incorporating suggestions from the Governor—read to the media, saying he had not received a

COVID vaccine for reasons which "will remain private." 2-ER-88; Dkt.120-8; 2-ER-207; Dkt.128-1 at 9-10.

The WSU-drafted statement "caught the attention" of some in the media and public. 2-ER-89–90. Rolovich received "positive comments from many in the WSU community." 2-ER-207. But members of the Board of Regents expressed "disappointment with our football coach and his decision to not get vaccinated," viewing it as "send[ing] a bad message." 2-ER-287. Donors "expressed concern" that Rolovich "was … anti-science and anti-authority," demanding he either "reverse his decision and very publicly and repeatedly encourage everyone to get vaccinated" or "be replaced." 2-ER-317; 3-ER-362–63. The *Seattle Times* insisted that WSU hold Rolovich "accountable." 2-ER-256. And an article cited as relevant by WSU below called Rolovich "morally bankrupt" and an "anti-science clown," finding the "arrogance that oozes out of" the WSU-drafted "statement … particularly infuriating." 5-ER-804, 5-ER-841–42.

### E. The "Rolo Strategy" and Rolovich's Firing

With the deadline for WSU's employee vaccine mandate approaching, Rolovich on August 5 claimed the "non-medical" exemption through the required process, checking the "religious or philosophical/personal" reason box in WSU's online human-resources platform. 3-ER-413–14. This left WSU out of options for forcing Rolovich to vaccinate under then-current policy, since—as WSU's President Kirk Schulz put it—"whatever

12

penalties we impose on Coach Rolovich for exercising the personal exemption will apply to every other employee at WSU who has also exercised the personal exemption option." 2-ER-256.

So WSU sought a "game plan in dealing with Rolovich" that would allow it to compel him to be vaccinated. 2-ER-292. They soon arrived at one, which President Schulz dubbed the "Rolo strategy." 2-ER-266. Executing it, WSU "worked closely" with Governor Inslee on a new mandate that eliminated the "personal" exemption. 2-ER-257; 2-ER-292; 3-ER-414. The idea, according to President Schulz, was that "once the personal exemption was lifted … Coach Rolovich would agree to the vaccine." 2-ER-257; *see also* 2-ER-292.

The new mandate, issued on August 20, 2021, as Proclamation 21-14.1, prevented WSU from employing anyone after October 18, 2021, who was not fully vaccinated unless the employee qualified for a religious exemption under Title VII or a medical exemption under the Americans with Disabilities Act of 1990 or Rehabilitation Act of 1973. 3-ER-549–61; 2-ER-96–97.

Rolovich had previously hesitated to discuss "the nature of [his] religious objection" with WSU, believing that "[r]eligion is very personal, private, and intimate for each person." 2-ER-209. At an August 16 meeting, however, WSU informed him of the coming mandate. 4-ER-783. Meeting with Rolovich again three days later, Chun "demanded" to know whether he intended to seek an exemption. 4-ER-784. Abiding by his

conscience, Rolovich disclosed that he planned to seek a religious exemption. 2-ER-250; 4-ER-783–84.

WSU's leadership responded with fury. At the August 19 meeting, Chun told Rolovich "he would forever question [Rolovich's] character." 4-ER-784. That night, President Schulz messaged the Chair of WSU's Board of Regents, Marty Dickinson: "Not to be too depressing this evening – but it appears Nick is going to file a religious exemption claim … . Right now we are so angry ([Chun] and myself) that we cannot see straight." 2-ER-269. When Dickinson mocked his beliefs, asking "can you pls tell me his devoted religion," Schulz quipped: "I have no $&$@@ idea. Probably searching on the internet as we speak." 2-ER-269.

Despite "know[ing] I have to be careful," 2-ER-289, President Schulz drafted a statement to WSU's Board of Regents stating that Rolovich had "fallen short" in his "eyes" by "opt[ing] to use the exemption process." 2-ER-250. And although he claimed to have "the greatest respect" for religious objectors, he was "deeply disappointed that [Rolovich] has opted to use the exemption process" because he missed the "opportunity … to display leadership." 2-ER-257. Chair Dickinson was "so disappointed and pissed … [and] so bummed that Nick doesn't see the bigger picture. What an incredibly massive let down on his being in it for Cougar Nation!" 2-ER-269–70.

In Chair Dickinson's view, it was "time to take the reigns [*sic*] and … no longer protect Nick who has tarnished WSU's brand." 2-ER-

14

271. President Schulz agreed, 2-ER-272, as did Chun, who concluded—eleven days before Rolovich submitted his exemption request—that WSU's response to Rolovich would "be a great lesson for current or future coaches about decisions you can or cannot make as a head coach." 2-ER-254. Chair Dickinson recognized that "firing" would require "paying $$$"—"yet want the coach gone!!!!" 2-ER-271.

WSU had a two-step review process for evaluating exemption requests. 5-ER-1036; 2-ER-249. Step one involved blind review by Human Resource Services ("HRS"), which was responsible for determining whether the employee articulated a sincere religious belief conflicting with vaccination. 2-ER-239–40; 2-ER-252. If so, HRS would contact the employee's supervisor, initiating step two. 2-ER-252–53. Then, anonymity was dropped, and the supervisor would determine whether the objector could be accommodated without undue hardship. 2-ER-252–53.

Rolovich submitted his exemption request to HRS on October 4, 2021, attaching a detailed letter explaining how his "sincerely held religious beliefs prohibit [him] from accepting the vaccine, and why I am compelled to do so by the teachings of the Roman Catholic Church." 6-ER-1089–1092; *see* 5-ER-1043 (letter adapted from form produced by National Catholic Bioethics Center). This was so, the letter explained, because his "conscience ha[d] come to [a] sure judgment" that accepting it would

15

make him "complicit in … abortion[]" and violate the principle of "therapeutic proportionality." 6-ER-1092.

Conducting its blind review, HRS determined the letter "support[ed] the accommodation request based on a sincerely held religious belief" and considered it "approv[ed]" subject to the undue-hardship determination. 5-ER-1024; 5-ER-1009. HRS thus emailed Rolovich's supervisor, Chun, on October 6 to make the undue-hardship determination. 5-ER-1024–25.

But after "talk[ing] through some scenarios and [their] plan" with President Schulz and Chair Dickinson, 2-ER-281, Chun sent a "supplement[al]" email to HRS, challenging HRS's sincerity determination on the ground that Rolovich's anti-vaccine views were based on his own "independent research," not his religion. 5-ER-1022–23. Because Rolovich voiced the religious nature of his views only after the new mandate, Chun alleged, his religious beliefs could not be sincere. 5-ER-1022–23.

Chun's view prevailed. HRS denied Rolovich's request on October 18, 2021, because the "University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement." 5-ER-1004. Rolovich's exemption request was one of only two applications at WSU—out of 595 (or 0.3%)—where HRS's blind sincerity determination did not govern. 2-ER-242–43; 8-ER-1396–1412.

WSU also denied Rolovich's request on undue-hardship grounds. 5-ER-1004. Responding to HRS's email recommending proposed

16

accommodations, the Athletics Department rejected them, citing donor pressure and negative media coverage. 5-ER-888. WSU's Environmental Health and Safety Department—WSU's health experts—then sent Chun a list of their own proposed accommodations. 5-ER-895–902. Again, the Athletics Department denied them, noting that Rolovich was a "high profile employee[]" and the "damage to the mission and reputation of the University posed by this situation cannot be understated." 5-ER-905. Like his unique sincerity treatment, Chun's undue-hardship conclusion was abnormal—WSU granted 461 out of 475 (97%) religious accommodation requests of employees who, like Rolovich, were determined sincere by HRS. 8-ER-1396–1412.

Nonetheless, on October 18, 2021, Chun informed Rolovich of his intent to terminate with "just cause," stating Rolovich had "put[] the University and the Football program in a negative national spotlight." 5-ER-910, 912. Per his contract, Rolovich appealed first to Chun, who denied the appeal. 5-ER-914–19.

Rolovich then appealed to President Schulz, 3-ER-397–405, presenting a report from Dr. Jay Bhattacharya, former Professor of Medicine and Health Policy at Stanford Medical School, and now Director of the National Institutes of Health. 3-ER-402–03; 6-ER-1190. Dr. Bhattacharya's report explained that the median infection survival rate for COVID-19 was 99.7%; that vaccinated individuals are at least as likely as unvaccinated individuals to shed live virus; and that

17

asymptomatic spread of COVID-19 is rare. 6-ER-1285–1288. Dr. Bhattacharya therefore wrote: "There is no good public health case for WSU to terminate employees who have a sincere medical or religious objection to vaccination." 6-ER-1328.

President Schulz denied Rolovich's appeal, and WSU terminated his contract on December 6, 2021, paying him nothing. 3-ER-407–10.

## F. COVID-19's Impact at WSU and in College Football at the Time of Rolovich's Request

At the time WSU evaluated Rolovich's request, "infection rates involving the Pullman campus" had "declin[ed] dramatically compared to a year ago," 5-ER-1034, with just eight active cases compared to about 200 at the same time in 2020, 5-ER-1034–35; *compare* RJ Wolcott, *WSU launches new COVID-19 dashboard*, WSU Insider (Jan. 22, 2021), https://perma.cc/363D-LWGA (graph). WSU's vaccination push had also succeeded, with a systemwide vaccination rate of 95%. *See* 2-ER-248; 2-ER-216; 5-ER-1035.

Likewise, WSU's 2021 football season was proceeding with minimal COVID-19-related disruptions compared to 2020. When Rolovich was fired, the team hadn't had any games canceled, and Rolovich had led them to a winning record. *2021 Football Schedule*, Wash. State Univ., https://perma.cc/PZG3-3H3S. WSU had permitted 14 unvaccinated players to play that fall, 2-ER-308, allowing them to travel and lodge with vaccinated players. 2-ER-201; 2-ER-198. WSU's experience reflected that

of college football in general—not one game had been canceled across the country due to COVID-19 at the time of Rolovich's firing, nor were any canceled throughout the entire regular season. 5-ER-940.

## II. Procedural Background

On November 14, 2022, Rolovich sued WSU and Chun in state court. Dkt.1-1 at 4.[1] Rolovich later filed an amended complaint raising seven claims, including those relevant here: breach of contract; Washington Law Against Discrimination; Title VII; and the Free Exercise Clause. Dkt.1-1 at 73.

Defendants removed the case and filed a motion to dismiss all claims. Dkt.22. Judge Rice declined to dismiss the Title VII, WLAD, and breach-of-contract counts but granted the motion as to Rolovich's free-exercise claim against Chun, concluding the complaint failed to allege that Chun substantially burdened Rolovich's religious exercise. 1-ER-23–33, 1-ER-39–40.

The parties then moved into extensive discovery on the remaining claims. By the time Rolovich moved for partial summary judgment in September 2024, Dkt.88, the parties had taken 13 depositions, exchanged 7 expert reports, and produced hundreds of thousands of pages of documents. Between Rolovich's motion and WSU's cross-motion, Dkt.93, the summary-judgment record totaled over 4,000 pages. 1-ER-5.

---

[1] Rolovich also sued Governor Inslee in his official capacity; Governor Inslee was later dismissed without opposition. 1-ER-18.

Judge Rice granted summary judgment to WSU, disposing of the entire case in an eight-page order. 1-ER-5. Judge Rice rejected Rolovich's Title VII religious-accommodation claim on the ground that "[i]n the thousands of pages of discovery, Plaintiff does not invoke a religious objection to the vaccine," 1-ER-9—ignoring the 54 exhibits supporting Rolovich's religious objection, including communications of support from his priest and bishop, 6-ER-1113–15, 6-ER-1118; 6-ER-1095, and the form where he detailed the Catholic teachings that formed the basis of his objection, 6-ER-1092–93.

Judge Rice also said that WSU had offered "unrebutted" evidence that accommodating Rolovich "would cause undue hardship"—resolving this complex factual dispute in just five sentences by ignoring every piece of evidence Rolovich offered. 1-ER-11–12.

Judge Rice also applied the wrong legal standard to Rolovich's claim—concluding that a religious accommodation "may result in an undue hardship if there is '*more than a de minimis cost* to the employer … [or] *more than a de minimis impact* on coworkers.'" 1-ER-10 (emphasis added). But two years earlier, the Supreme Court expressly rejected the "*de minimis*" standard as insufficiently protective of religious employees and "erroneous." *Groff*, 600 U.S. at 468-73. When WSU notified Judge Rice of this error, he issued an order calling it a "clerical mistake[ ]" that "does not change the conclusion of the Court." 1-ER-2.

Having rejected Rolovich's Title VII claim,[2] Judge Rice also rejected the contract claim with one sentence of analysis. 1-ER-12. This appeal followed.

## STANDARD OF REVIEW

***Summary judgment.*** This Court reviews a grant of summary judgment de novo. *Oppenheimer & Co. Inc. v. Mitchell*, 135 F.4th 837, 844 (9th Cir. 2025). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In determining whether a material fact is in dispute, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence," *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007), but instead simply "determine[s] whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

---

[2] Judge Rice also rejected the WLAD claim as "substantially similar to Title VII." 1-ER-9. The parties below assumed this overlap; Rolovich does not dispute it on appeal.

***Motion to dismiss.*** This Court "review[s] de novo" a 12(b)(6) dismissal, taking all factual allegations as true and construing them in the light most favorable to the nonmoving party. *State v. Su*, 121 F.4th 1, 6 (9th Cir. 2024). A 12(b)(6) motion will be denied where the plaintiff alleges "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

**I.** The district court erred in granting summary judgment to WSU on Rolovich's Title VII claims.

**A.** First, the district court concluded that Rolovich's religious objection wasn't sincerely religious. But Rolovich submitted an explicit request for a religious exemption; his objection was based on detailed theological reasoning and Catholic Church documents and was supported by his priest and bishop; and he reaffirmed the religiosity of his objection in sworn testimony. Under established law, sincerity is a credibility determination that (when genuinely disputed) is a quintessential question for the factfinder. The district court unambiguously erred by taking the issue out of the factfinder's hands.

**B.** Second, the district court held that allowing Rolovich to remain unvaccinated would have posed an "undue hardship" for WSU, explaining that an undue hardship is one that imposes "more than a de minimis cost to the employer … [or] more than a de minimis impact on

22

coworkers." 1-ER-9–11. But the district court ignored that the Supreme Court two years ago repudiated this "more than a *de minimis*" burden test as "erroneous," "mistaken," and "very different" from the proper standard. *Groff*, 600 U.S. at 469, 471, 472.

Applying the proper standard, courts around the country have sent the "undue hardship" question to juries in cases like this. And none of the three forms of undue hardship WSU claimed below—**(a)** "community health and safety"; **(b)** finances; and **(c)** the success and "reputation" of its football program—supports a different result here. Given, *inter alia*, WSU's willingness to accommodate other vaccine exceptions in the football program; its near-total vaccination rate at the time of Rolovich's firing; and the miniscule costs involved in light of "the overall context" of WSU's "business," *id.* at 468, a reasonable jury could easily find that WSU could have accommodated Rolovich without undue hardship.

**C.** Third, even if Rolovich's failure-to-accommodate claim failed (it didn't), the district court gave no justification for also entering judgment for WSU on Rolovich's Title VII claim for intentional religious discrimination. A reasonable jury could find that WSU engaged in such discrimination, given, *inter alia*, its decisionmakers' explicit denigration of Rolovich's beliefs.

**II.** The district court also erred in granting summary judgment to WSU on Rolovich's claims under Washington law for (1) breach of contract; and (2) wage withholding. Under Rolovich's contract, WSU

23

owed him liquidated damages if it terminated him absent "just cause." A reasonable jury could find that WSU lacked "just cause," because its actions were disproportionate, not reasonably foreseeable under the contract's terms, and arbitrary; a reasonable jury could also find that WSU's actions constituted unlawful wage-withholding, for similar reasons.

The district court's conclusion to the contrary seems to have rested on the notion that "just cause" is coterminous with Title VII. But that conclusion is legal error. An employer can still lack "just cause" for termination even if the termination doesn't violate Title VII (as it did here).

**III.** Finally, the district court erred in dismissing Rolovich's Free Exercise Clause claims against Defendant Chun on the pleadings. The complaint more than adequately alleged that Chun pressured Rolovich to forgo his religious exercise on pain of losing his job and that Chun failed to treat Rolovich's beliefs neutrally or in a generally applicable manner, instead expressing hostility toward those beliefs, breaching protocol in evaluating Rolovich's exemption request, and exercising discretion to categorize Rolovich's firing as for "just cause." And Chun never attempted to satisfy strict scrutiny.

## ARGUMENT

## I. The district court erred in granting summary judgment to WSU on Rolovich's Title VII claims.

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's," *inter alia*, "religion." 42 U.S.C. §2000e-2(a). It then defines "religion" to "include[] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's … religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* §2000e(j).

A Title VII plaintiff can therefore show a claim of religious discrimination in either of two ways—(1) by showing that the employer discriminated against him based on his religious beliefs or (2) by showing that the employer failed to accommodate his "religious observance" where the accommodation would not cause undue hardship. A reasonable jury could find for Rolovich on both theories here.

### A. Rolovich sincerely asserted a religious objection.

**1.** Start with failure to accommodate. To establish a prima-facie case for failure to accommodate under Title VII—and thus to shift the burden to the employer to demonstrate undue hardship—the employee must show "(1) he had a bona fide religious belief, the practice of which

conflicted with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993). Here, all agree that Rolovich informed WSU he couldn't take the vaccine for religious reasons and was fired for not complying. Thus, the only disputed element of the prima-facia case is whether Rolovich's asserted religious belief was "bona fide"—*i.e.*, sincere.

"A bona fide religious belief is one that is 'sincerely held.'" *Keene v. City & County of San Francisco*, No. 22-16567, 2023 WL 3451687, at *1 (9th Cir. May 15, 2023) (citing EEOC Compliance Manual: Religious Discrimination, §12-I(A)(2) (Jan. 15, 2021)). To assess sincerity, a court doesn't ask whether the belief is "reasonable[ ]" or "tru[e]," *Callahan v. Woods*, 658 F.2d 679, 685 (9th Cir. 1981), because "[c]ourts are not arbiters of scriptural interpretation." *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981). Instead, their "'narrow function … in this context is to determine' whether" the asserted religious belief reflects the claimant's "honest conviction." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (quoting *Thomas*, 450 U.S. at 716); *see Bolden-Hardge v. Office of Cal. State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023) (Title VII case, citing *Thomas* and *Hobby Lobby*).

Here, Rolovich submitted WSU's religious-exemption request form, explaining in detail why his religious beliefs "prohibit [him] from

26

accepting the vaccine" and certifying his truthfulness. 6-ER-1085–89. So the only question is whether that assertion was "sincere"—that is, whether he "sincerely holds those [religious] views." *Callahan*, 658 F.2d at 683, 686.

Sincerity isn't often disputed, but when it is, it is a "question of fact," turning "heavily" on the claimant's "credibility and demeanor." *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007); *see also United States v. Seeger*, 380 U.S. 163, 185 (1965) (religious sincerity "is, of course, a question of fact"). And such "[c]redibility determinations," like any other "factual determination," are impermissible on summary judgment. *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017); *see also Spencer v. World Vision, Inc.*, 633 F.3d 723, 731 n.7 (9th Cir. 2011) (question "whether an individual's religious beliefs are sincerely held" "focuses on the credibility of the individual's testimony"); *Hertel v. Thornell*, No. 3:21-cv-8044, 2024 WL 3236828, at *12 (D. Ariz. Apr. 9, 2024) ("Defendant … cannot obtain summary judgment by asserting that Plaintiff's religious beliefs are insincere because that is both a question of fact and a credibility determination that cannot be decided on a Motion for Summary Judgment." (collecting cases)).

**2.** The district court cited no case to the contrary. And WSU *conceded* that the "sincerity of [Rolovich's] religious beliefs" "is a question of fact." Dkt.93 at 21 (emphasis omitted). Yet the district court granted summary judgment to WSU on this element of the prima-facie case anyway, stating

"the record does not support Plaintiff's claim of religious objection." 1-ER-9. That was error; a reasonable jury could (and should) determine that Rolovich's exemption request was truthful.

For one thing, the district court's stated rationale is flatly false. The district court said that "[i]n the thousands of pages of discovery, Plaintiff does not invoke a religious objection to the vaccine," which "alone is a basis for denying Plaintiff's claimed religious objection." 1-ER-9. But *of course* Rolovich invoked a religious objection to the vaccine: a central (undisputed) fact in this case is that Rolovich submitted WSU's "Religious Exemption Request Form" and attached a letter whose sole purpose was to explain "why my sincerely held religious beliefs prohibit me from accepting the vaccine, and why I am compelled to do so by the teachings of the Roman Catholic Church." 6-ER-1089–94. That letter explained that Rolovich was "a baptized Catholic" and that under Catholic teaching (supported by citations to Church documents) he is "required to refuse a medical intervention" when his "conscience has come to sure judgment" that accepting it will make him "complicit in … abortion[]" or violate the principle of "therapeutic proportionality." 6-ER-1092.

The letter further explained that both conditions were met in this case. 6-ER-1092–94. As for abortion, the letter noted that the "currently available vaccines are ultimately derived" from human cell lines produced from abortions. 6-ER-1092. And as for therapeutic

28

proportionality, the letter noted that under that doctrine "the potential recipient" of a medical intervention must make "an assessment of whether [its] benefits … outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods." 6-ER-1092. Rolovich therefore requested "a reasonable accommodation to [his] sincerely held religious objection to these vaccines." 6-ER-1093. WSU's own review committee determined that the letter "support[ed] the accommodation request based on a sincerely held religious belief." 5-ER-1024.

Nor is the exemption request the only evidence supporting Rolovich's religious objection. Rather, Rolovich reaffirmed in sworn testimony his "religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination." 6-ER-1161; 2-ER-210. He explained that he came to understand this religious objection through "spiritual direction and advice" from Fr. Paul—a Catholic priest and chaplain of WSU's Catholic student-center. 6-ER-1160–61. He provided months' worth of his and Fr. Paul's written communications bearing this out. 6-ER-1098–1152. He noted that he had likewise spoken with his bishop on the subject, 6-ER-1161, who then issued a letter (provided to the district court) affirming that "Nick Rolovich is a man of faith who sincerely tries to live his life in a manner that seeks God's will." 6-ER-1095. And he testified that his understanding of his religious objection derived from his study of Church teaching documents, including the "Catholic Catechism"

29

and his diocese's "moral guidance related to COVID-19 vaccines." 6-ER-1161. That is more than enough to create a fact question. *See Ramirez v. Collier*, 595 U.S. 411, 425-26 (2022) (plaintiff likely to succeed on sincerity where he was seeking to engage in "traditional forms of religious exercise," his request stated the exercise was "part of [his] faith," and his pastor "agree[d]").

Alternatively, the district court noted that Rolovich "frequently expressed secular concerns about the COVID-19 vaccine to friends, family members, and coworkers"—implying his objection was secular, not religious. 1-ER-9. But that conclusion is foreclosed by *Callahan*, which holds that "a coincidence of religious and secular" objections "in no way extinguishes the weight appropriately accorded the religious one." 658 F.2d at 684. There, the plaintiff objected to obtaining a social security number for his daughter, and the district court granted summary judgment against him, reasoning that because his "aversion to identification numbers predated by many years his religious awakening," it was "'rooted in' secular and philosophical concerns," not religion. *Id.* at 684. But this Court reversed. *Callahan* rejected the notion "that a long-held secular belief invalidates First Amendment protection for a related but newly-alleged religious belief." *Id.* at 684-85. And it rejected the notion that it matters which came first: "the correct standard is not whether Callahan's beliefs have always been religious; they need only be religious in the context of his life as he now lives it." *Id.* at 687.

30

Just so here. No doubt Rolovich also has medical, scientific, and philosophical reasons for refusing the vaccine. But because his "[r]eligious motivation" *also* "requires [him] to" refuse it—and certainly a reasonable jury could easily find as much—his objection "merits … protection." *Id.* at 684-85; *see also* Nathan S. Chapman, *Adjudicating Religious Sincerity*, 92 Wash. L. Rev. 1185, 1233 (2017) ("[S]o long as the claimant establishes that he is sincere about his religious exercise, any other motives he may have for seeking an accommodation are legally beside the point.").

Title VII decisions from Circuits around the country have repeatedly applied *Callahan*'s reasoning to the specific context here—objections to the COVID-19 vaccine. *See Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 80-84 (1st Cir. 2025) (reversing decision holding that vaccine objection was "merely a personal," rather than a religious, "belief"); *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469-72 (4th Cir. 2025) (same); *Sturgill v. Am. Red Cross*, 114 F.4th 803, 807-11 (6th Cir. 2024) (same; "medical in nature"); *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1008-12 (7th Cir. 2024) (same; "medical judgment rather than religious conviction"); *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901-02 (8th Cir. 2024) (same).

As these courts have explained, that a COVID vaccine objector has "both religious and secular reasons" for declining the vaccine "does not elevate the latter over the former." *Sturgill*, 114 F.4th at 810 (citing

31

*Callahan*). What matters is whether the exemption request is based "at least in part on an aspect of [the employee's] religious belief or practice." *Passarella*, 108 F.4th at 1009. And while these decisions have arisen at the motion-to-dismiss stage, their reasoning fully applies here, where Rolovich has provided not only *allegations* but *evidence* showing this requirement is met. To sustain the district court's decision, then, would depart not only from *Callahan* but from "kindred principles" adopted by five "sister circuits." *Thornton*, 126 F.4th at 83.

## B. A reasonable jury could find that WSU could have accommodated Rolovich's religious objection without undue hardship.

With Rolovich's prima-facie case shown, "the burden shifts to the employer to show … that it could not reasonably accommodate the employee without undue hardship." *Bolden-Hardge*, 63 F.4th at 1224. WSU claimed below that accommodating Rolovich would impose various undue hardships: damaging its "community health and safety," its finances, and its football program's success and reputation. Dkt.93 at 36. Without engaging Rolovich's arguments or record evidence, the district court perfunctorily agreed, applying the now defunct "more than … de minimis" standard. 1-ER-10–11.

But the Supreme Court in *Groff v. DeJoy* rejected that standard as too lenient. Instead of requiring the employer to show that an accommodation would impose "more than a de minimis cost," the Court concluded that demonstrating undue hardship requires employers to

show the accommodation imposes "a burden [that] is substantial in the overall context of an employer's business." 600 U.S. at 456, 468. To qualify, the hardship must be "more severe than a mere burden … and adding the modifier 'undue' means that the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level" considering "the nature, size and operating cost of an employer." *Id.* at 469-71 (cleaned up).

The Justices meant *Groff* to matter; indeed *Groff* explained that its understanding of "undue hardship" is "very different" from the previously prevailing *de minimis* standard. *Id.* at 469. Thus, this Court has already once reversed a vaccine-mandate decision from Judge Rice that "erred in applying the de minimis standard" contrary to *Groff*—there, in an opinion written before *Groff* came down. *Beuca v. Wash. State Univ.*, No. 23-35395, 2024 WL 3450989, at *1-2 (9th Cir. July 18, 2024). Judge Rice has now made the same mistake again—this time, more than a year after *Groff* was issued. *Compare Beuca v. Wash. State Univ.*, No. 2:23-cv-69, 2023 WL 3575503, at *3 (E.D. Wash. May 19, 2023), *with* 1-ER-10.

Moreover, the district court deeming its nearly exclusive reliance on a now-defunct legal standard a "clerical mistake[]" only underscores the problem. 1-ER-2. *Groff* wasn't merely a clerical change. It "raised the threshold an employer must satisfy to show undue hardship." *Carter v. Local 556, Transp. Workers Union of Am.*, ___F.4th___, 2025 WL 1340536, at *15 (5th Cir. May 8, 2025); *see also Hebrew v. Tex. Dep't of*

*Crim. Justice*, 80 F.4th 717, 722 (5th Cir. 2023) (undue hardship under *Groff* "is a heavy burden and requires something far greater than *de minimis*"). And its more rigorous standard isn't satisfied by the threadbare analysis the district court offered here. Indeed, this Court already reversed Judge Rice in yet another case involving Governor Inslee's vaccine mandate, holding that he failed to "grapple with the [religious objectors'] arguments in any meaningful way" and offered just "a single sentence" of analysis that "fell short." *Bacon v. Woodward*, 104 F.4th 744, 748 (9th Cir. 2024). The same is true here.

*Groff*'s inquiry is "fact-specific," 600 U.S. at 468, and thus "ill-suited for determination as a matter of law at summary judgment." *Hayslett v. Tyson Foods, Inc.*, No. 1:22-cv-1123, 2023 WL 11897503, at *13 (W.D. Tenn. Sept. 20, 2023). For the following reasons, this case is no exception.

### 1. WSU's community health and safety concerns do not undisputably establish undue hardship.

Under *Groff*, a reasonable jury could conclude that accommodating Rolovich posed no unjustifiable risk to WSU's "community[] health and safety." It could reach this conclusion based on four key facts: (1) WSU's 95% vaccination rate; (2) WSU's acceptance of 14 unvaccinated football players; (3) WSU's permissive masking regulations for the unvaccinated, and (4) WSU's decision to accommodate approximately 97% of sincere religious objectors.

First, WSU's 95% vaccination rate, *supra* p.18, creates a genuine dispute regarding whether accommodating Rolovich would impose an undue hardship, even by WSU's own scientific standards. As WSU's experts explained, as people become vaccinated, "both the vaccinated person *and all of those around them* are at much lower risk of infection." 4-ER-681 (emphasis added); *see also* 3-ER-449. Thus, when a population is highly vaccinated (or naturally immunized), "'herd immunity' protects" even "those who … are not fully immunized," "by reducing how much of the illness is circulating in the community." *Immunization Data*, Washington State Department of Health, https://perma.cc/GL36-FYVH.

Accordingly, in *Does 1-3 v. Mills*, three Justices argued that denying a religious exemption to a vaccine objector when over 90% of employees were vaccinated "borders on the irrational." 142 S. Ct. at 22 (Gorsuch, J., joined by Thomas and Alito, JJ., dissenting from denial). No Justice contested this point, *id.* at 17, and the State of Maine agreed, asserting that a 90% vaccination rate satisfied its safety interests of combatting COVID spread *in hospitals*. *Id.* at 21; *see also Does 1-6 v. Mills*, 566 F.Supp.3d 34, 40 (D. Me. 2021) ("with the emergence of the Delta variant," "projected vaccination rate needed to achieve herd immunity" was "90%"). If a 90% vaccination rate satisfies the government's safety interest *in hospitals*, a reasonable jury could easily conclude that WSU's 95% vaccination rate allowed it to accommodate Rolovich.

Other post-*Groff* decisions have repeatedly denied summary judgment to employers on precisely this ground. *See Varkonyi v. United Launch All., LLC*, No. 2:23-cv-359, 2024 WL 1677523, at *5-6 (C.D. Cal. Feb. 21, 2024) (defendants' evidence of COVID-19 dangers pre-vaccination did not allow "the Court [to] determine the negative health ramifications of 3.8 percent of employees remaining unvaccinated and taking other precautionary measures"); *UnifySCC v. Cody*, No. 5:22-cv-1019, 2025 WL 215524, at *10 (N.D. Cal. Jan. 15, 2025) (plaintiffs created dispute of material fact by "show[ing] that the overwhelming majority of County residents were vaccinated" when mandate was adopted); *Hayslett*, 2023 WL 11897503, at *12 (a "jury will need to decide the reasonableness of Defendants' policy" where "96% of Defendants' workforce was already vaccinated"); *Brandon v. Bd. of Educ. of the City of St. Louis*, No. 4:22-cv-635, 2025 WL 1360684, at *33 (E.D. Mo. May 8, 2025) ("the Board's employee vaccination rate still would have exceeded 93% had the Board granted every request for religious exemption"). The same logic requires denying summary judgment here.

In short, none of WSU's evidence shows that the supposed risks of Rolovich spreading COVID are significant *in an overwhelmingly vaccinated population*. And indeed, at the time of Rolovich's firing, the number of COVID-19 cases had "declined dramatically" compared to the year before, with only 8 active cases at the Pullman campus (out of a campus population of over 25,000) the week before Rolovich was fired—

a 96% decrease from the same time in 2020. 5-ER-1034–35; Office of Strategy, Planning, and Analysis, *Student Dashboards: Total Student Enrollment*, Wash. State Univ., https://perma.cc/M4MY-WS6Q (19,114 students); WSU Institutional Research, *Employee headcount and FTE* (Fall 2021), Wash. State Univ., https://perma.cc/6WPB-3G9X (6,251 employees); *supra* p.18.

Beyond that, WSU's decision to exempt fourteen football players from its vaccine mandate also undermines its undue-hardship defense. 2-ER-307-11. Courts recognize that permitting similar risks elsewhere can defeat undue hardship claims. *Hebrew*, 80 F.4th at 723 ("TDCJ's exception for other individuals undermines its stated rationale"). And they have repeatedly applied this point in vaccine cases. *See*, *e.g.*, *Cox v. Nw. Reg'l Educ. Serv. Dist.*, No. 3:22-cv-1073, 2024 WL 777598, at *12 (D. Or. Feb. 23, 2024) ("A jury could conclude from the fact that in person work was allowed for other student-facing employees that it would not have been an undue hardship to allow Plaintiffs to do so as well."); *Denoia v. Roche Diagnostics Corp.*, No. 1:23-cv-344, 2024 WL 5186873, at *18 (S.D. Ind. Dec. 20, 2024) (employer's "accommodations of other customer-facing employees undermine its contention that doing so for [plaintiff] would have caused an undue hardship").

Here, WSU's expert acknowledged that these players posed an even higher transmission risk than Rolovich given the physical nature of football. 3-ER-447. Yet WSU deemed this risk acceptable, allowing the

players to travel with the team and participate in team life, contrary to the restrictions WSU now claims would have applied to Rolovich. *See* 2-ER-201; 2-ER-198. Clearly, this decision accorded with WSU's "priority" of ensuring "the health and well-being of the young men on our team." 2-ER-247. Accommodating the less-risky Rolovich, then, would not be "unjustifiable." *Groff*, 600 U.S. at 469.

Similarly, WSU has emphasized Rolovich's occasionally removing his mask to communicate in noisy environments and to drink, but WSU allowed precisely this for students. *See* 2-ER-309–10 (permitting unvaccinated students to remove mask when "communicating with a … hard of hearing person," when "actively engaged in eating or drinking," and when "outside and [able to] maintain six feet of social distance from others"). A reasonable jury could thus infer that Rolovich's occasionally doing likewise does not create an undue hardship.

Finally, WSU granted 461 out of 475 (97%) religious accommodation requests for *other* employees who, like Rolovich, were determined to be sincere by HRS. 8-ER-1396–1412. That is more than enough to create a factual dispute over whether WSU could have also accommodated Rolovich. *See Kidd v. Univ. Med. Ctr. of S. Nev.*, No. 2:22-cv-1990, 2024 WL 4046249, at *6 (D. Nev. July 2, 2024) (granting 85% of exemption requests but denying plaintiff's created a dispute of material fact on undue hardship).

38

## 2. WSU's financial concerns do not undisputably establish undue hardship.

WSU asserted below that accommodating Rolovich would impose "significant financial costs," due to (1) a supposed need "to charter separate flights and buses" for "unvaccinated coaches," (2) a "risk" of "canceled games" from COVID outbreaks, and (3) "threatened" loss of donations from disgruntled donors. Dkt.93 at 30-33. But these supposed costs are speculative, contradicted by record evidence, and far from sufficient to take this disputed issue away from a jury.

"[U]ndue hardship cannot be supported by merely conceivable or hypothetical hardships." *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981). Nor can it be "proved by assumptions nor by opinions based on hypothetical facts." *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1033 n.4 (8th Cir. 2008); *see also Bellard v. Univ. of Tex. MD Anderson Cancer Ctr.*, 716 F.Supp.3d 503, 515-16 (S.D. Tex. 2024). Yet that is all WSU has offered here.

The alleged travel costs are chimerical because WSU in fact opted *against* providing separate travel or lodging for unvaccinated members of the football program. *See* 2-ER-201; 2-ER-198. WSU cannot prove undue hardship by making "assumptions about accommodations which have never been put into practice." *EEOC v. Alamo Rent-A-Car LLC*, 432 F.Supp.2d 1006, 1016 (D. Ariz. May 26, 2006) (quoting *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978)).

39

The claimed cost of canceled games also rests on speculation that has since proven unfounded. While WSU had three games canceled in the *pre-vaccination* 2020 season, 5-ER-939, that doesn't establish a likelihood of cancellation in the *post-vaccination* 2021 season, at a 95%-vaccinated university. *See Varkonyi*, 2024 WL 1677523, at *5 (millions of dollars in COVID costs *before* vaccine availability did not establish future hardship where employer had 96% vaccination rate); *see also, e.g.*, *Smith v. City of Atlantic City*, ___F.4th___, 2025 WL 1537927, at *7 (3d Cir. May 30, 2025) ("theoriz[ing] a vanishingly small risk," even as to "employee safety," "does not establish undue hardship").

In fact, WSU treated the risk of cancellation as so low that it allowed 14 unvaccinated football players to continue playing, finding the risk "[]justifiable." *Groff*, 600 U.S. at 469. That judgment proved correct— WSU didn't cancel a single game all season—before or after firing Rolovich. *2021 Football Schedule*, Wash. State Univ., https://perma.cc/PZG3-3H3S. Indeed, only five out of many hundreds of games were canceled across *all of college football* in 2021. 5-ER-951. Thus, a jury could reasonably conclude that any risk from accommodating Rolovich was remote.

WSU's claim that it lost donations from "angry" donors who were concerned that Rolovich "was … anti-science and anti-authority," 2-ER-317, fares no better. Indeed, "[i]f bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable

40

accommodation claim, Title VII would be at war with itself … [because] such an approach would be giving effect to religious hostility." *Groff*, 600 U.S. at 472 (internal quotation marks omitted); *see also* EEOC Guidance, *supra* p.26 ("an employer's action based on the discriminatory preferences of others, including … customers, is unlawful"). *Groff* specifically disapproved of a case finding undue hardship based on "[a]dverse customer reaction" to the employee's religious exercise, even where it was undisputed that prohibiting the exercise was "essential to attracting and holding customers in that market." *EEOC v. Sambo's of Ga., Inc.*, 530 F.Supp. 86, 89 (N.D. Ga. 1981), *abrogated by Groff*, 600 U.S. at 472-73. If donors were "angry" and threatened to withhold funds over a coach's wearing a yarmulke or kneeling to pray at the 50-yard-line after games, courts would have no trouble rejecting the undue-hardship defense; the result here should be no different.

But even if the Court could consider donors' hostility toward Rolovich's religious observance, the factual record on that issue is disputed—with evidence that some alumni and donors supported Rolovich and were upset with WSU's decision to fire him. A "bunch of folks" thought that President Schulz "should have defied the governors order" to require vaccinations and fire Rolovich. 2-ER-294. And a "[b]ig business leader" who "[h]a[d] been a COUG through and through," responded to the firing by stating that WSU would "never get a dime from me." 2-ER-294–95.

41

The jury could infer that WSU lost significant donor funding by *failing* to accommodate Rolovich.

Even if WSU's alleged costs were more than disputed speculation, *Groff* requires courts to consider those costs in light of the employer's size and budget. 600 U.S. at 470-71. In FY2021, WSU's endowment was $1.308 billion, its research expenses were $357.6 million, and its fundraising produced $120.9 million. 2-ER-216; 2-ER-214. In FY2022, WSU football earned $47.6 million in revenue on $22.8 million in expenses—netting $24.8 million. 5-ER-985. Against this backdrop, a reasonable jury could find that even a very large cost to accommodate WSU's highest-paid employee was neither "excessive" nor "unjustifiable." *Groff*, 600 U.S. at 469; *see also Baugh v. Austal USA, LLC*, No. 1:22-cv-329, 2025 WL 28453, at *7 (S.D. Ala. Jan. 3, 2025) ($1 million per year may not constitute hardship for a $1 billion company).

### 3. WSU's success and reputation concerns do not undisputedly establish undue hardship.

WSU also asserted that accommodating Rolovich would cause "non-economic harms"—namely, undermining "the football program's long-term success" and generating "negative … public reaction." Dkt.93 at 26-29. But as for negative reaction, Title VII would (again) be "at war with itself" if animosity towards Rolovich's religious practice could create an undue hardship. *Groff*, 600 U.S. at 472. And even if it could, the evidence shows that *firing* Rolovich undermined WSU's reputation with "a bunch

of folks"—creating a factual dispute over whether the net reputational damage of accommodating Rolovich (if any) rises to the level of undue hardship. 2-ER-294; 2-ER-285.

Nor did WSU prove any harm to its football program's success. To start, the Court need look no further than football's ultimate metric—wins and losses. Rolovich had a winning record (and three-game winning streak) at the time of his firing, while WSU had losing records in 10 of the 14 previous seasons, including the year before his hire. *Washington State Cougars School History*, Sports Reference, https://perma.cc/SLW3-MSBN. Nor did other schools require a vaccine mandate to succeed. For example, neither Georgia nor Alabama—the two schools who ultimately played each other *for the national championship* the year Rolovich was fired—had a mandate, despite both being far less vaccinated than WSU.[3]

WSU claims Rolovich's mid-COVID recruiting lagged behind that of his post-COVID "successor," arguing this was "at least partially attributable" to his lack of vaccination. Dkt.93 at 26-27. But this, too, is

---

[3] *See* UGA Today, *Reports of COVID-19 and positivity rate hit new semester low*, University of Georgia (Oct. 13, 2021), https://perma.cc/8YX9-W6J7 (campus vaccination rate around 55%); Georgia Governor Brian Kemp, Exec. Order, *Prohibition of COVID-19 Vaccine Passports* (May 25, 2021), https://perma.cc/24FR-3VLP (no mandate); University Medical Center, *Dean's Message*, University of Alabama (Oct. 1, 2021), https://perma.cc/E93M-DHMV (student vaccination rate of 61%); Alabama Governor Kay Ivey, Exec. Order No. 724, *Combating Overreaching COVID-19 Vaccination Mandates* (Oct. 25, 2021), https://perma.cc/8UCQ-TJAR (no mandate).

disputed. Indeed, due to a combination of the NCAA's COVID regulations (barring any in-person recruiting between March 2020 and May 31, 2021) and its ordinary recruiting schedule (imposing a series of "quiet," "dead," and "evaluation" periods between June 1 and November 27, 2021), Rolovich was *barred* from engaging in any in-person, off-campus recruiting for the entire period between the time the vaccine became available and the date of his firing on October 18, 2021—for reasons entirely independent of his vaccination status. Dkt.117 at 26-29; 2-ER-302; 2-ER-299; 2-ER-296–97.

WSU also claims that requiring Rolovich to quarantine for five days upon his return to campus from trips would impose an undue hardship. Dkt.93 at 34. But any such hardship would be self-imposed. The five-day quarantine policy was WSU's own—the Pac-12 required quarantine only after "non-team related travel," a requirement inapplicable to off-campus trips taken in Rolovich's capacity as head coach. 4-ER-632. WSU could have thus exempted Rolovich from its own policy, eliminating any hardship. *See Bolden-Hardge*, 63 F.4th at 1225 (no undue hardship for a state agency to violate state law by accommodating employee's religious practice where the state government was responsible for creating and enforcing the law).

\* \* \*

In sum, each of WSU's alleged undue hardships is at best hotly disputed; none supports summary judgment.

44

## C. At minimum, Rolovich's disparate-treatment claim should have survived summary judgment.

**1.** The district court treated undue hardship as a complete defense to Rolovich's Title VII claim. 1-ER-14–16. But "[a] claim for religious discrimination under Title VII can be asserted under several different theories." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). Undue hardship is a defense only to failure-to-accommodate claims. *Id.* at 606. It is not a defense to a "disparate treatment" theory, *id.* at 603-05—*i.e.*, that Rolovich was "intentionally treat[ed] … worse because of" his religious beliefs. *Bostock v. Clayton County*, 590 U.S. 644, 658 (2020); *Carter*, 2025 WL 1340536, at *9. The district court failed entirely to address Rolovich's disparate-treatment claim. 1-ER-11. That alone is reversible error.

The disparate-treatment claim also survives summary judgment, because a reasonable jury could find that Rolovich's "religion" was at least "a motivating factor" for WSU's decision. 42 U.S.C. §2000e-2(m). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000). A plaintiff can establish her case by "simply produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103,

1122 (9th Cir. 2004). And this Circuit has "repeatedly held" that even "a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005).

Here, Rolovich has produced far more than a single comment. The mere fact that Rolovich was "going to file a religious exemption claim" made his supervisors and WSU decisionmakers "disappointed," "depress[ed]," "pissed," and "so angry … that [they] cannot see straight." 2-ER-269. The Board of Regents Chair and President mocked Rolovich's beliefs: "[C]an you pls tell me his devoted religion?" "I have no $&$@@ idea. Probably searching the internet as we speak." *Id.* Likewise, Chun denigrated Rolovich's religion by saying his "beliefs [we]re making [him] incapable of leading" his players and by comparing his beliefs to those of "religio[us] … cult[s]." 4-ER-781–82.

Behind-the-scenes comments aside, even Chun's notice of decision to terminate criticized Rolovich for citing his "own 'scientific' research" in opposing the vaccine, saying this made his "claim" that his "concerns were actually religious in nature … simply not credible." 5-ER-991. But this assessment merely reflects its own "sort[] of religious disparagement": "deeming certain religious views"—those, like Rolovich's, turning on an individual's own assessment of the benefits and burdens of a medical intervention—"to be *per se* insincere." *Does 1-11 v.*

46

*Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1281 (10th Cir. 2024); *see* 6-ER-1092. That is, to "presuppose[] the illegitimacy of certain religious beliefs" is itself a form of "discriminatory religious animus"— even if the government purports to be merely "'determin[ing] whether the applicant's religious belief underlying the exemption request was sincerely held.'" *Does 1-11*, 100 F.4th at 1269, 1275, 1281.

Chun's appeal denial also invoked his own Catholicism, 5-ER-993, and WSU later retained an "expert" in "Roman Catholic moral theology" to render an opinion that it is theologically "incorrect" to believe that Rolovich was "required" by his faith "to refuse the COVID-19 vaccine." 5-ER-1040, 5-ER-1043. Just as in *Does 1-11*, then, a reasonable jury could find that WSU had illicitly decided "what Catholic … 'policy'" on COVID vaccination "is"—a determination "not for the state." 100 F.4th at 1271-72.

Such "direct evidence of discriminatory motive" itself creates "a triable issue." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998). Nor can WSU defeat summary judgment by articulating the failure of Rolovich's exemption request as a legitimate, nondiscriminatory reason for its action. That's not only so because of the evidence of discrimination just recounted, *see Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1150 (9th Cir. 1997), but also because WSU had decided to reject that request and fire Rolovich before it had even received it. 2-ER-254.

47

Indeed, before the relevant vaccine mandate was even issued, WSU officials had already landed on what President Schulz called their "Rolo strategy." 2-ER-290. Immediately upon learning that Rolovich intended to seek a religious exemption—but before actually seeing the request— Chair Dickinson was already thinking through the strategy's implications, including that "firing" would require "paying $$$"—"yet want the coach gone!!!!" 2-ER-271. And eleven days before Rolovich had even submitted his exemption request, Chun already knew what the decision would be: "Our head coach has put himself in a bad situation by not getting Vax. It's going to be a great lesson for current or future coaches about decisions you can or cannot make as a head coach." 2-ER-254. To accomplish this result, WSU overrode its own review committee's finding of sincerity, breaching protocol, and treating Rolovich's exemption request differently than virtually any other. 2-ER-242–43; 2-ER-233.

Given WSU's "deviation from established policy or practice" and its foreordained conclusion, a reasonable jury would have no trouble finding that WSU's alleged reason for the firing was "pretext." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13, 1117 (9th Cir. 2011); *see also id.* at 1113 ("burden to raise a triable issue of pretext is 'hardly an onerous one'").

**2.** Below, WSU argued that Rolovich "pleaded only a failure-to-accommodate theory" and thus waived a disparate-treatment claim.

Dkt.126 at 24. Not so. The complaint squarely presents the allegations underlying Rolovich's disparate-treatment theory, including discriminatory comments, 6-ER-1234, the allegation that "WSU's disapproval of Mr. Rolovich's sincerely-held religious reasons for refusing to receive a COVID-19 vaccine was one of the University's motives for its discriminatory treatment of Mr. Rolovich," 6-ER-1235, and that "WSU's discriminatory actions were intentional and/or reckless and in violation of Title VII," 6-ER-1235.

"'A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case.'" *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1086-87 (9th Cir. 2019); *see also Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories."). WSU "had notice of and the opportunity to challenge" Rolovich's disparate-treatment claim. *Id.* at 1158. "Consequently, that claim was properly before the district court at summary judgment and the court erred in not addressing it." *Id.*

## II. The district court erred in granting summary judgment to WSU on Rolovich's breach-of-contract and wage-withholding claims.

The district court also erred in granting summary judgment to WSU on Rolovich's state-law claims for (1) breach of contract; and (2) wage withholding. The district court offered no reasoning on these claims, but

49

only a bare conclusion: "Defendant had just cause to terminate Plaintiff's employment." 1-ER-12. A reasonable jury could find otherwise.

***Breach of contract.*** First, WSU breached Rolovich's employment agreement by firing him without paying liquidated damages. Under that agreement, if WSU terminated Rolovich before the expiration of five years, it would have to pay Rolovich 60% "of the remaining base salary due." 6-ER-1207–14. The only way for WSU to avoid liquidated damages was to fire Rolovich for "Just Cause." 6-ER-1207–12.

The district court deemed WSU to have "had just cause" as a matter of law. 1-ER-12. But under Washington law, "whether an employer properly determined it had just cause for termination is a question for the trier of fact." *Lund v. Grant Cnty. Pub. Hosp. Dist. No. 2*, 932 P.2d 183, 228-29 (Wash. Ct. App. 1997) (citing *Havens v. C & D Plastics, Inc.*, 876 P.2d 435, 439-40 (Wash. 1994)). That question turns on whether the employer had "a fair and honest cause or reason, regulated by good faith," and that was not "arbitrary, capricious, or illegal." *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d 298, 304 (Wash. 1989). Here, a reasonable jury could easily conclude that WSU's actions were arbitrary, capricious, or in bad faith for at least three reasons.

First, Rolovich's firing was allegedly based on Governor Inslee's vaccine mandate. But Governor Inslee's guidance issued with that mandate stated that "[e]mployees who refuse will be subject to *non-disciplinary dismissal* from employment." 2-ER-230 (emphasis added).

50

And a WSU Human Resources witness confirmed that this guidance precludes WSU from firing a vaccine objector for cause. 2-ER-226–27 ("Correct, that's what that's stating."). WSU now says the Governor's guidance lacked "the force of law." 2-ER-187–88. But even so, "just cause" includes an assessment of "whether the punishment was appropriate in proportion to [the] offense." *Civil Serv. Comm'n of City of Kelso v. City of Kelso*, 969 P.2d 474, 479 (Wash. 1999). And this guidance from the mandate's issuer about how mandate violations should be treated suggests that WSU's punitive denial of the agreed-upon damages was a disproportionate response to Rolovich's religious inability to obtain a novel and controversial vaccine.

Second, "the duty of good faith limits the employer's discretion to interpret or define cause for termination in a manner which undermines the employee's reasonable expectations as to what 'cause' means." *Mullenix v. Sysco Spokane, Inc.*, No. 2:13-cv-305, 2014 WL 3587581, at *4 (E.D. Wash. July 21, 2014). But here, Rolovich couldn't possibly have been "on notice" at the time he entered the agreement—January 2020— that failing to comply with an unprecedented COVID-19 vaccination mandate "might result in his termination." *Payette v. Safety-Kleen Corp.*, 34 F.3d 1073, 1994 WL 461661, at *2, 4 (9th Cir. 1994). The contract identifies several specific varieties of "just cause," 6-ER-1372–73, but declining to accept an as-yet-nonexistent vaccine for a novel coronavirus isn't on the list. Meanwhile, for *other* employees, WSU added a contract

51

provision—in boldface type—specifying that the employee must "**follow all federal, state, and local health directives as well as university policies related to health and safety**." 2-ER-218. But WSU did *not* add this contract provision for Rolovich. 6-ER-1182. From that, a reasonable jury could infer that Rolovich's contract didn't cover that situation.

Third, just cause "require[s] a finding that the employer reached its decision in good faith." *Tripoli v. KPMG Peat Marwick*, 92 Wash. App. 1014, 1998 WL 549391, at *2-3 (Wash. Ct. App. 1998); *see Baldwin*, 769 P.2d at 304. Yet here, WSU departed from the process followed in evaluating 593 out of the 594 other religious-exemption requests, overturning its own blind-review committee's determination of Rolovich's sincerity. 5-ER-1024. That's because, as explained, the decision to fire Rolovich didn't turn on any good-faith application of the exemption process but on WSU's already-made decision to fire him. *Supra* p.48.

All this indicates that Rolovich's firing was a conclusion in search of a rationale—not a good-faith application of WSU policy. *See Trainer v. Kitsap County*, 107 Wash. App. 1035, 2001 WL 873826, at *8-9 (Wash. Ct. App. 2001) (affirming jury verdict of no just cause where supervisor "conspired to terminate" plaintiff and "failed to follow" employer "policies"). At minimum, a reasonable jury could so conclude—so the breach-of-contract claim should proceed to trial.

***Wage withholding.*** Under Washington law, an employer who "[w]ilfully and with intent to deprive [an] employee of any part of his or her wages" withholds wages it is "obligated to pay … by … contract" "shall be liable in a civil action by the aggrieved employee … for twice the amount." Wash. Rev. Code §§49.52.050(2), 49.52.070. As just explained, WSU withheld liquidated damages it was obligated to pay under Rolovich's contract. Whether it did so "willfully" "is a question of fact," *Lillig v. Becton-Dickinson*, 717 P.2d 1371, 1375 (Wash. 1986)—one a reasonable jury could easily resolve in Rolovich's favor.

Withholding isn't willful only where a "bona fide dispute exists as to obligation of payment." *Dep't of Lab. & Indus. v. Overnite Transp. Co.*, 834 P.2d 638, 643 (Wash. Ct. App. 1992). And the "burden falls on the employer to show the bona fide dispute exception applies." *Wash. State Nurses Ass'n v. Sacred Heart Med. Ctr.*, 287 P.3d 516, 521-22 (Wash. 2012). WSU hasn't carried that burden here—certainly not sufficiently to be entitled to summary judgment. Just as a jury could find that WSU's actions don't fall within the "just cause" exception, "issues of material fact exist as to whether there was a bona fide dispute over [Rolovich's] severance." *Martin v. Wheeler*, No. 3:19-cv-6002, 2020 WL 5544346, at *5 (W.D. Wash. Sept. 15, 2020).

***The district court's rationale.*** While the district court's summary-judgment order offered no reason at all for rejecting Rolovich's state-law claims, WSU's motion had invited the court to reiterate its motion-to-

dismiss order. Dkt.93 at 45. At that stage, the court had concluded that "Plaintiff's breach of contract claim rests on the determination of whether Plaintiff's exemption and accommodation would have imposed an undue hardship," 1-ER-39–40—*i.e.*, that it rises or falls with the Title VII claim.

But that conclusion is wrong. A contract claim asserting no "just cause" is not duplicative of a Title VII claim for religious discrimination. Title VII permits employers to fire employees for any reason—however unjust or arbitrary—other than the specified characteristics (religion, race, sex, etc.). A "just cause" provision, by contrast, requires the reason to be proportionate, non-arbitrary or capricious, and regulated by good faith. *Supra* p.50.

In determining otherwise, the district court noted that "Plaintiff's contract required him to 'abide by all provisions of law,'" including the vaccine mandate. 1-ER-39. But there was no vaccine mandate at the time Rolovich entered the contract, and even when the vaccine mandate was put in place, it included an exemption for people like Rolovich. Thus, he couldn't possibly have anticipated that such a "significant encroachment into the lives—and health—of a vast number of employees" was forthcoming. *NFIB v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) (per curiam). In any event, Washington's general definition of "just cause" applies even "where the contract provides specific grounds for dismissal." *Gaglidari v. Denny's Rests., Inc.*, 815 P.2d 1362, 1369 (Wash. 1991). In *Lund*, for instance, there was no dispute that the employee had violated employer

policy, but the court remanded for trial on the question whether the policy was "arbitrarily enforced." 932 P.2d at 229-30.

So there's no escaping an independent inquiry into whether WSU's termination-without-liquidated-damages decision met the general "just cause" standard—*i.e.*, was "fair and honest," "regulated by good faith," and not "arbitrary" or "capricious." *Baldwin*, 769 P.2d at 304. As explained, a reasonable jury could conclude that it did not.

## III. The district court erred in dismissing Rolovich's free-exercise claim against Defendant Chun.

Rolovich's complaint alleges that Chun pressured him to violate his religious beliefs, overrode WSU's blind-review process to deny his accommodation request, and fired him based on religious hostility. The district court nonetheless dismissed Rolovich's Free Exercise Clause claim against Chun on the pleadings, determining Chun was "entitled to qualified immunity" and "amendment would be futile." 1-ER-33. That was error.

"Government officials are not entitled to qualified immunity if (1) the facts taken in the light most favorable to the party asserting the injury … show that the defendants' conduct violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." *Jones v. Williams*, 791 F.3d 1023, 1032-34 (9th Cir. 2015) (cleaned up). "If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established

constitutional right," the claim must proceed. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (internal quotation marks omitted).

Here, Rolovich's complaint plainly passes this standard by alleging multiple acts violating clearly established free-exercise law.

**1.** Under clearly established free-exercise law, state action that "burden[s]" a claimant's "religious exercises" and is not "neutral and generally applicable" is unconstitutional unless it survives "the strictest scrutiny." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533, 541 (2021). Addressing "burden" first, and taking the complaint's allegations as true, Chun clearly burdened Rolovich's religious exercise.

The Supreme Court has long held that putting an "employee" "to a choice between fidelity to religious belief or cessation of work" burdens his religious exercise. *Thomas*, 450 U.S. at 717. In such instances, the "'pressure upon [the employee] to forego[] that [religious] practice is *unmistakable.*'" *Id.* (emphasis added) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).

The complaint alleges that Chun imposed exactly that burden here. Rolovich was "put to a choice" between following his religion or keeping his job. *Thomas*, 450 U.S. at 717. And Chun's conduct was instrumental in the "imposition of such a choice." *Sherbert*, 374 U.S. at 404. According to the complaint, Chun confidently told Rolovich he would be fired with cause if he did not get vaccinated, 6-ER-1214, attacked his character when he raised accommodation, 6-ER-1217, and admitted to trying to

56

"coerc[e]" him into vaccination, 6-ER-1215. Despite the supposed availability of the accommodation, Chun told him "that his request for a religious exemption would be denied and he would be fired with cause" unless he took the vaccine. 6-ER-1213. This "pressure[d]" Rolovich to forgo his religious exercise, thereby imposing the very burden the mandate's accommodation sought to alleviate. *Thomas*, 450 U.S. at 717.

The complaint then alleges that Chun followed through by breaching the exemption protocol, overturning the blind sincerity finding, and denying Rolovich's appeal. 6-ER-1208, 6-ER-1223, 6-ER-1229. Chun's actions thus cost Rolovich his job and millions of dollars in liquidated damages, 6-ER-1208, "clearly impos[ing] a substantial burden" according to established law. *Hobby Lobby*, 573 U.S. at 710, 726.

**2.** Chun's alleged actions towards Rolovich also fail the clearly established requirements of neutrality and generally applicability.

*Neutrality.* First, the complaint alleges that Chun impermissibly targeted and acted with hostility towards Rolovich's religious beliefs and practice. Government officials are "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [individuals'] religious beliefs." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638-39 (2018). This requirement "bars even '"subtle departures from neutrality"'" on matters of religion." *Id.* Thus, the government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* And

57

where government action is accompanied by "'official expressions of hostility' to religion," such action must be "'set aside' … without further inquiry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) (quoting *Masterpiece*, 584 U.S. at 639).

In *Masterpiece*, the Court held that a religious objector was entitled "to a neutral decisionmaker who would give full and fair consideration to his religious objection as he sought to assert it in all of the circumstances in which [the] case was presented, considered, and decided." *Masterpiece*, 584 U.S. at 640. But instead of remaining neutral, adjudicators expressed hostility towards the religious objector, failed to provide "due consideration for [the objector's] free exercise rights and the dilemma he faced," and treated his claim differently than the claims of other objectors. *Id.* at 634-37. As *Masterpiece* explained, "religious neutrality … must be strictly observed." *Id.* at 639.

Similarly, in *Does 1-11*, the Tenth Circuit applied *Masterpiece* to the vaccine-mandate context, explaining that when a government actor "passes judgment upon and presupposes the illegitimacy of certain" religious objections to the COVID-19 vaccine, it acts with "discriminatory religious animus" in violation of "clearly established" free-exercise law. 100 F.4th at 1269, 1275, 1281.

Chun's treatment of Rolovich—like the behavior of the *Does 1-11* university officials—falls squarely within *Masterpiece*. Chun was "obliged … to proceed in a manner neutral toward and tolerant of

58

[Rolovich's] religious beliefs." *Masterpiece*, 584 U.S. at 638. But the complaint alleges that he showed repeated hostility.

For example, when Rolovich told Chun he was not planning on getting a COVID vaccine, Chun responded that Rolovich's "beliefs were making him incapable of leading his players," indicated he should talk to Chun's wife who "had been in a couple different religio[us] … 'cults,'" and pushed counseling for supposed "mental health issues." 6-ER-1214. Later, after Rolovich requested information about the religious exemption process from WSU's human-resources department and checked a box indicating he had a religious/personal objection, Chun warned Rolovich that "any religious exemption request he submitted would be scrutinized to no end" and "confidently told Mr. Rolovich that if he did not get the vaccine, he could be expected to be fired with cause." 6-ER-1214, 6-ER-1216.

After Rolovich had spoken directly with Chun about his religious objection in an August 19 meeting, Chun got "even more heated," stated that he would "forever question [Rolovich's] character" if he "got the religious exemption," and indicated that the exemption would be "hard to get." 6-ER-1217. And Chun took it a step further "before Governor Inslee issued his vaccine Mandate, [telling] Mr. Rolovich that his request for a religious exemption would be denied and he would be fired with cause unless he agreed to comply with the vaccine mandate." 6-ER-1213.

Judge Rice wrote off all of Chun's alleged actions prior to August 19, saying they couldn't support a free-exercise violation because Rolovich

hadn't communicated his religious objection directly to Chun before then. 1-ER-28–29. But as the Supreme Court has held under Title VII, a supervisor needn't have "actual knowledge" of an employee's religious practice to engage in "disparate treatment" based on that practice; even "unsubstantiated suspicion" can suffice. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771-74 (2015). In any event, "examin[ing] the allegations of the complaint as a whole," *Khachatryan v. Blinken*, 4 F.4th 841, 854 (9th Cir. 2021), a jury could reasonably infer that Chun *did* already know of the religious nature of Rolovich's vaccine objection based on the prior conversations with Chun comparing Rolovich's beliefs to those of religious "cults," Rolovich's decision to check the religious/personal box on the informational form, Rolovich's prior attempt to obtain information on the religious exemption from HRS, and Chun's prior warning that any religious exemption request would be "scrutinized to no end." This Court must "draw all reasonable inferences" in Rolovich's favor at the motion-to-dismiss stage. *Id.*

Regardless, even after August 19, Chun engaged in further "disparate consideration" of Rolovich's request by inserting himself into WSU's otherwise blind review process, *Masterpiece*, 584 U.S. at 638-39, making good on the promise that Rolovich's request would be "scrutinized to no end" and result in termination. 6-ER-1214; *see Does 1-11*, 100 F.4th at 1270 (clearly unlawful animus where government attempts to play a "role in deciding or even suggesting whether the religious ground for [a]

conscience-based objection is legitimate or illegitimate"). This provides still "[a]nother indication of hostility." *Masterpiece*, 584 U.S. at 636.

***General applicability.*** Chun's actions likewise weren't "generally applicable" because he burdened Rolovich using individualized "discretion." *Fulton*, 593 U.S. at 533-34, 536-37. In *Sherbert* and *Thomas*, the Court concluded that denying benefits to former employees "terminated … because of the[ir] religious convictions" violated the Free Exercise Clause because the denial rested on the employees' failure to satisfy a discretionary "good cause" standard. *Thomas*, 450 U.S. at 711, 716. "The 'good cause' standard created a mechanism for individualized exemptions," and failing "to consider a religiously motivated resignation to be 'without good cause' tend[ed] to exhibit hostility, not neutrality, towards religion." *Bowen v. Roy*, 476 U.S. 693, 708 (1986) (plurality) (discussing *Sherbert* and *Thomas*). *Fulton* held likewise, concluding that strict scrutiny was triggered by a city official's use of the "discretion" vested in him under a contract to deny a religious agency an exemption. *Fulton*, 593 U.S. at 532-38.

So too for Chun's discretionary decision to fire Rolovich for "just cause" here. 6-ER-1208, 1229–30. Rolovich alleged his conduct did not violate any contractual ground expressly constituting just cause, 6-ER-1211–12, leaving Chun to apply the term's "normally understood meaning in employment contracts." 6-ER-1211–12. And that meaning is inherently

discretionary. *Baldwin*, 769 P.2d at 304 ("fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.").

Chun was therefore "'invite[d]' … to decide which reasons for not complying with [a] policy are worthy of solicitude." *Fulton*, 593 U.S. 537. So as in *Sherbert*, *Thomas*, and *Fulton*, Chun was obligated to conclude that the "just cause" standard did not encompass Rolovich's "'religious hardship' without compelling reason." *Fulton*, 593 U.S. at 535.

**3.** State action "targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 n.4 (2017). Even assuming Chun could avoid a free-exercise violation by showing that his conduct satisfies strict scrutiny, however, that is an affirmative defense he never pressed below. Dkt.22; Dkt.31; *see Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1163-64 (9th Cir. 2022).

## CONCLUSION

This Court should reverse and remand for trial.

Dated: June 12, 2025                    Respectfully submitted,

                                        */s/ Joseph C. Davis*

ERIC N. KNIFFIN                         JOSEPH C. DAVIS
KNIFFIN LAW, PLLC                          *Counsel of Record*
102 S. Tejon St.                        LUKE W. GOODRICH
   Suite 1100                           ANGELA WU HOWARD
Colorado Springs, CO 80903              REED M. BARTLEY
(719) 212-4391                          THE BECKET FUND FOR
*eric@kniffin.law*                         RELIGIOUS LIBERTY
                                        1919 Pennsylvania Ave. NW
ERIC J. SEESE                              Suite 400
FROST BROWN TODD LLP                    Washington, DC 20006
1801 California St., Ste. 2700          (202) 955-0095
Denver, CO 80202                        *jdavis@becketfund.org*


               *Counsel for Plaintiff-Appellant*

63

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,983 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

*/s/ Joseph C. Davis*
Joseph C. Davis

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2025, the foregoing brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's ACMS system. I certify that all participants in the case who are registered ACMS users will be served by the appellate ACMS system.

*/s/ Joseph C. Davis*
Joseph C. Davis

## ADDENDUM

Pertinent Constitutional Provisions, Treaties, and Statutes

# Table of Contents

**Page**

First Amendment to the United States Constitution............................68

Title VII provisions.................................................................69

    42 U.S.C. §2000e(j) ........................................................69

    42 U.S.C. §2000e-2(a)(1) ................................................69

    42 U.S.C. §2000e-2(m) ...................................................69

Provisions of Revised Code of Washington
Title 49: Labor Regulations..................................................70

    Wash. Rev. Code §49.52.050.............................................70

    Wash. Rev. Code §49.52.070.............................................70

**First Amendment to the United States Constitution**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## Title VII Provisions

**42 U.S.C. §2000e(j)**

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

\* \* \*

**42 U.S.C. §2000e-2(a)(1)**

**(a) Employer practices**

It shall be an unlawful employment practice for an employer--

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

\* \* \*

**42 U.S.C. §2000e-2(m)**

**(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices**

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

69

## Provisions of Revised Code of Washington Title 49: Labor Regulations

### Wash. Rev. Code §49.52.050

#### Rebates of wages – False records – Penalty

Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, who(1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee; or

(2) Wilfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract; or

(3) Shall wilfully make or cause another to make any false entry in any employer's books or records purporting to show the payment of more wages to an employee than such employee received; or

(4) Being an employer or a person charged with the duty of keeping any employer's books or records shall wilfully fail or cause another to fail to show openly and clearly in due course in such employer's books and records any rebate of or deduction from any employee's wages; or

(5) Shall wilfully receive or accept from any employee any false receipt for wages;

Shall be guilty of a misdemeanor.

\* \* \*

### Wash. Rev. Code §49.52.070

#### Civil liability for double damages

Any employer and any officer, vice principal or agent of any employer who shall violate any of the provisions of RCW 49.52.050 (1) and (2) shall be liable in a civil action by the aggrieved employee or

70

his or her assignee to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees: PROVIDED, HOWEVER, That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations.

\* \* \*