No. 25-761

## In the United States Court of Appeals for the Ninth Circuit

NICHOLAS ROLOVICH,
Plaintiff-Appellant,

v.

WASHINGTON STATE UNIVERSITY, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Washington
Honorable Thomas O. Rice
(2:22-cv-319-TOR)

## EXCERPTS OF RECORD
## VOLUME 3 OF 8

ERIC N. KNIFFIN
KNIFFIN LAW, PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903

ERIC J. SEESE
FROST BROWN TODD LLP
1801 California St., Ste. 2700
Denver, CO 80202

JOSEPH C. DAVIS
    *Counsel of Record*
LUKE W. GOODRICH
ANGELA WU HOWARD
REED M. BARTLEY
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*jdavis@becketfund.org*

*Counsel for Plaintiff-Appellant*

1    ROBERT W. FERGUSON
     Attorney General
2
3    SPENCER W. COATES, WSBA #49683
     Assistant Attorney General
     800 Fifth Avenue, Suite 2000
4    Seattle, WA 98104-3188
     (206) 464-7744
5
6    ZACHARY J. PEKELIS, WSBA #44557
     Special Assistant Attorney General
     PACIFICA LAW GROUP LLP
7    1191 2nd Avenue, Suite 2000
     Seattle, WA 98101-3404
8    (206) 245-1700

9

10              **UNITED STATES DISTRICT COURT**
              **EASTERN DISTRICT OF WASHINGTON**
11

12   NICHOLAS ROLOVICH,              NO. 2:22-cv-00319-TOR

                    Plaintiff,       DECLARATION OF
13                                   KIRK SCHULZ IN SUPPORT OF
           v.                        DEFENDANT'S CROSS-MOTION
14                                   FOR SUMMARY JUDGMENT
     WASHINGTON STATE
15   UNIVERSITY,

16                  Defendant.

17

18

19

20

21

22

23

DECLARATION OF KIRK SCHULZ              1
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0335**

(3 of 247), Page 3 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 3 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4199    Page 2
of 76

I, KIRK SCHULZ, declare as follows:

1.    I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

2.    I am currently serving as the President of Washington State University (WSU or the University), a position that I have held since June 2016. I am also a professor of chemical engineering at WSU. While serving as WSU's President, I have also sat on the Pac-12 Board of Directors, was a member of the Executive Committee, and was the Pac-12 representative for the College Football Playoff Board of Managers.

3.    Prior to joining WSU, I served as the President of Kansas State University from February 2009 to March 2016.

4.    From 2001 to 2009, I worked as a faculty member and administrator at Mississippi State University. During my time at Mississippi State University, I served as Vice President for Research and Economic Development, Dean of the Bagley College of Engineering, and Director for the Dave Swalm School of Chemical Engineering.

5.    Earlier in my career, I was a faculty member and held various leadership positions at Michigan Technological University and the University of North Dakota.

6.    I have a B.A. and a doctoral degree in chemical engineering from Virginia Tech.

DECLARATION OF KIRK SCHULZ
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

2

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0336

(4 of 247), Page 4 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 4 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4200    Page 3
of 76

**WSU's Football Program**

1    7.     Like many other public universities, WSU's football program plays a pivotal role in the overall success of WSU's Athletics Department and the University more generally. Among other things, the football program has historically generated significant revenue for the Athletics Department through ticket sales, branding, broadcasting rights, and direct program donations.

8.     Additionally, the football program has more indirect but equally significant impacts on the University, including raising WSU's national profile, generating excitement among students, alumni, and donors, and building a sense of community in Whitman County, Eastern Washington, and beyond. I believe the success of WSU's athletics programs, including the football program, may also impact enrollment and prospective student decisions.

9.     Considering how vital the football program is to both the Athletics Department and the University, it has always been important to find the right person to serve as WSU's head football coach. In my view, the role of a head football coach is not only to win games, but also to publicly represent the University—the head coach is essentially the enduring public face of the football program—and to mentor young student-athletes.

10.    In January 2020, Nick Rolovich was announced as WSU's 33rd head football coach. I was personally excited to welcome Coach Rolovich to Cougar Nation and looked forward to watching him build on the momentum of the football program's recent seasons.

DECLARATION OF KIRK SCHULZ
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

3

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0337

(5 of 247), Page 5 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 5 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4201    Page 4
of 76

## Managing the Pandemic at WSU

11.    Just a few months after hiring Coach Rolovich, the world was abruptly catapulted into the COVID-19 pandemic.

12.    Starting in March 2020, all WSU campuses moved to distance learning and remote work in an effort to increase social distancing and limit the spread of COVID-19. The educational disruptions from the COVID-19 pandemic were immediate and immense.

13.    The financial impacts of COVID-19 on the University, as well as our students, faculty, and staff, were also immediate. In April 2020, the University made various financial decisions intended to mitigate the fiscal impact of COVID-19, including freezing the salaries for WSU executive leadership, freezing non-mission-critical hiring of new faculty and staff, and directing all employees to implement measures to reduce operating expenditures with the exception of those needed to support remote instructional delivery and staff and faculty working at home. A true and correct copy of the University's announcement of those financial decisions is attached hereto as **Exhibit A**.

14.    Through the summer of 2020, the University continued to reckon with the COVID-19 pandemic, including its educational and financial impacts. In June 2020, I took a voluntary 10% pay cut for one year and declined a $50,000 retention bonus, along with other contractual benefits, as the University continued to navigate the pain of the difficult financial situation brought on by COVID-19.

15.    During the 2020–2021 academic year, WSU students remained in a

DECLARATION OF KIRK SCHULZ
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

4

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(6 of 247), Page 6 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 6 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4202    Page 5
of 76

1    distance learning program, and most faculty and staff continued to work

2    remotely.

3        16.    However, despite transitioning to distance learning, an unexpected

4    number of students returned to Pullman for the 2020–2021 academic year—many

5    participating in intercollegiate athletics, which continued during the academic

6    year (without spectators), and living in university housing, private apartments,

7    fraternities, or sororities—and COVID-19 cases remained persistent.

8        17.    In approximately March of 2021, a COVID-19 outbreak emerged on

9    WSU's Pullman campus that infected a significant number of student-athletes,

10    including members of the football team. The University faced criticism from the

11    public and government officials, including with Whitman County Public Health,

12    over the outbreak.

13    **The Availability of COVID-19 Vaccines**

14        18.    In early 2021, safe and effective COVID-19 vaccines became

15    available to the public and, as more people became inoculated, we saw glimpses

16    of the public health crisis receding. The availability of COVID-19 vaccines

17    marked a turning point in the University's management of the pandemic.

18        19.    On April 28, 2021, I announced that WSU would be requiring proof

19    of COVID-19 vaccination for the 2021–2022 academic year for all students

20    engaging in activities at a WSU campus or location, as well as for all employees

21    and volunteers engaged in activities on a WSU worksite. Exemptions were

22    available for medical, religious, or personal reasons. A true and correct copy of

23    my April 28 announcement is attached hereto as **Exhibit B**.

DECLARATION OF KIRK SCHULZ    5
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0339**

20.     Around this same time period, Governor Inslee issued new proclamations easing up on previously imposed restrictions. It appeared—at least for a time—that mass illness and death were on the downward slope.

21.     On May 11, 2021, I announced that all WSU campuses would start a phased reopening process no later than July 12, 2021, as WSU prepared for a robust in-person learning experience for the fall 2021 semester. A true and correct copy of my May 11 announcement is attached hereto as **Exhibit C**.

22.     As Washington State's land-grant research university, WSU has an obligation to serve the public good and promote the health and safety of its communities, which was particularly important during the pandemic. WSU's support of the COVID-19 vaccines was in keeping with that obligation—in 2021, the science showed that the COVID-19 vaccines significantly reduced the risk of contracting or transmitting the virus and nearly eliminated the chances of death or serious illness related to a COVID-19 infection. The vaccines were therefore a critical element in protecting public health locally and worldwide.

**The Delta Surge and Mr. Rolovich's Vaccination Status**

23.     In the summer of 2021, after what appeared to be a decline in COVID-19 cases and hospitalizations, the arrival of the Delta variant reversed that trend. The timing of the Delta variant was particularly challenging for the University, as we were in the throes of preparing for the start of a new academic year—which would be in-person for the first time since the pandemic started—while facing the increasing threat of the Delta variant, particularly for those who were unvaccinated.

DECLARATION OF KIRK SCHULZ          6
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0340**

24.    It was around this same time period that WSU's then-head football coach, Mr. Rolovich, made national news by publicly announcing he was declining to be vaccinated against COVID-19. Specifically, on July 21, 2021, Mr. Rolovich released a statement via his Twitter account indicating that he was not vaccinated against COVID-19 and, as a result, would be attending remotely the upcoming Pac-12 football media day. At the time of Mr. Rolovich's announcement, I was on a two-week vacation in Yellowstone—without cellular or email service—so it was not until a few days later that I first learned of Mr. Rolovich's announcement (and of his unvaccinated status).

25.    Following Mr. Rolovich's announcement, I received numerous calls and messages from WSU alumni and donors, government officials, and others in the community expressing concerns, disappointment, and outrage with Mr. Rolovich's decision not to be vaccinated, especially at such a precarious point in the pandemic.

26.    On July 26, 2021, I met by videoconference with Governor Jay Inslee and his staff to discuss Mr. Rolovich's decision not to get vaccinated and how WSU could continue to promote the vaccine among its students and employees, particularly in response to the surging Delta variant. Over the next few weeks, I had follow-up conversations with Governor Inslee or his staff regarding those same issues.

27.    Mr. Rolovich's announcement resulted in significant negative media attention relating to WSU and Mr. Rolovich's decision not to get vaccinated, both locally and nationally.

DECLARATION OF KIRK SCHULZ
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

7

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0341**

(9 of 247), Page 9 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 9 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4205    Page 8
of 76

28.   Mr. Rolovich's announcement and the resulting media coverage caught the attention of alumni, donors, and others in our community, who contacted me directly to express their disappointment with Mr. Rolovich's decision not to receive the COVID-19 vaccination. Many donors expressed their disapproval of Rolovich's stance and threatened to withhold donations to WSU over his decision. For example, one major WSU donor, Gordon MacArthur, informed me in an email that, because of Mr. Rolovich's refusal to get vaccinated, he had cancelled his bequest to WSU for scholarships that he had set up earlier in the year, with a current value of $1 million. A true and correct copy of my email exchange with Mr. MacArthur is attached as **Exhibit D**.

### Proclamation 21-14

29.   In response to surging Delta variant, on August 9, 2021, Governor Inslee issued Proclamation 21-14 (the Proclamation), which prohibited most state employees—although not yet those in higher education—from working beyond October 18, 2021, without being vaccinated against COVID-19, unless they received a religious or medical accommodation.

30.   That same day, I was forwarded an email from Governor Inslee's Chief of Staff, Jamila Thomas, which provided additional context for Governor Inslee's decision to issue the Proclamation. Ms. Thomas's email stated that the Governor was strongly encouraging higher education institutions and other branches of state government to follow the Proclamation as well. A true and correct copy of the email is attached hereto as **Exhibit E**.

DECLARATION OF KIRK SCHULZ          8
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0342

(10 of 247), Page 10 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 10 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4206    Page 9
of 76

31.    On August 18, 2021, Governor Inslee announced that he would be expanding the Proclamation to include all state employees working in 4-year institutions of higher education. In addition, he reintroduced a state-wide mask mandate, regardless of an individual's vaccination status.

32.    I was not surprised by Governor Inslee's announcement that the Proclamation would be extended to higher education, as the presidents of the four public universities in Washington—including myself—had worked closely with the Governor's Office on higher education policies as it related to vaccines. Indeed, it was widely anticipated in the week before the Governor's announcement that he would expand the Proclamation to encompass educational workers. For example, on August 13, 2021, the Seattle Times reported that the State Superintendent of Public Instruction said he was "confident" that the Governor would expand the Proclamation to apply to school employees.[1]

33.    I fully supported the Governor's decision to extend the Proclamation to educational workers. At that time, I believed the COVID-19 vaccine was essential to help protect the health and safety of WSU's students, faculty, and staff, especially as we returned to in-person learning for the fall 2021 semester while battling the Delta surge.

_____

[1] Monica Velez, *State superintendent is 'confident' Inslee will expand mandate, require teachers to be vaccinated*, Seattle Times, Aug. 13, 2021, https://www.seattletimes.com/seattle-news/state-superintendent-is-confident-inslee-will-expand-mandate-require-teachers-to-be-vaccinated/.

DECLARATION OF KIRK SCHULZ                9
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0343

**Mr. Rolovich's Religious Accommodation Request**

34.     On or around August 19, 2021, I learned from then-WSU Athletics Director Pat Chun that Mr. Rolovich intended to seek a religious accommodation from the Proclamation.

35.     My initial reaction to learning that Mr. Rolovich still did not intend to be vaccinated against COVID-19 was disappointment. In August 2021, we were very focused around preparing for a fall semester with in-person interactions and creating a safe environment on campus for all of our students, faculty, and staff. As a leader at WSU, I was concerned that Mr. Rolovich's continued (and public) opposition to the COVID-19 vaccines would work directly against our efforts to provide that safe environment.

36.     I was also concerned about the impact that Mr. Rolovich's opposition to the COVID-19 vaccines would have on the reputation of the University, the Athletics Department, and the football program. WSU is classified as an R1 University (i.e., a Doctoral University with "very high research activity") by the Carnegie Classification of Institutions of Higher Education—with a medical school, school for global heath, and significant science-based research funding. In my view, Mr. Rolovich's opposition to the COVID-19 vaccines was in direct conflict with, and capable of causing significant damage to, the University's reputation as an R1 land-grant research university.

37.     Once vaccination against COVID-19 became a condition of continued employment at WSU due to the Governor's mandate, I understood that

DECLARATION OF KIRK SCHULZ
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

10

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0344**

1    there were essentially three potential paths forward for Mr. Rolovich. One path

2    was that Rolovich would receive the vaccine, which at that point I still genuinely

3    hoped and believed was a real possibility. Alternatively, if Rolovich ultimately

4    declined to receive the vaccine, and if his religious accommodation request was

5    approved, Mr. Rolovich would continue in his position as head football coach.

6    Finally, if it were determined by Mr. Chun (as his supervisor) that Mr. Rolovich

7    could not be accommodated without undue hardship to the University,

8    Mr. Rolovich would likely be separated from his employment for just cause.

9    Knowing that, under Mr. Rolovich's employment agreement, he would have the

10   right to appeal any just cause termination ultimately to me as University

11   President, I was careful throughout this period to avoid providing my

12   recommendations to Mr. Chun regarding the accommodation decision. At the

13   same time, I periodically checked in with Mr. Chun regarding the many issues

14   pertaining to the Athletics Department, such as our efforts to promote vaccination

15   among student-athletes and staff and employee accommodation requests

16   (including Mr. Rolovich's).

17        38.    By October 13, 2021, it appeared to me—based on my discussions

18   with Mr. Chun—that a termination for just cause was the scenario with the

19   highest probability if Mr. Rolovich continued to decline to be vaccinated prior to

20   the October 18 deadline. Nonetheless, I remained hopeful that Mr. Rolovich

21   would elect to get vaccinated before the deadline and that WSU could keep their

22   head football coach, in whom we had invested so much.

23

DECLARATION OF KIRK SCHULZ                11
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0345

**Rolovich's Termination from Employment**

39.     On November 26, 2021, after Mr. Rolovich's accommodation request was denied and he was notified of WSU's intent to terminate his employment, Rolovich sent me a letter as part of his second-level appeal of the termination decision, with various supporting documents. A true and correct copy of that correspondence is attached hereto as **Exhibit F**.

40.     After carefully reading through counsel's letter and supporting documents, I ultimately agreed with Mr. Chun's decision to terminate Rolovich for just cause.

41.     On December 6, 2021, I sent Rolovich a letter informing him that his appeal had been denied and outlining my reasons for denying his appeal, which was the final decision of the University. A true and correct copy of that correspondence is attached hereto as **Exhibit G**.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this _8th day of October, 2024, at Pullman, Washington.

s/ *Kirk H. Schulz*
KIRK SCHULZ

DECLARATION OF KIRK SCHULZ
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

12

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

**CERTIFICATE OF SERVICE**

2

On the <u>14th</u> day of October, 2024, 1 caused to be served, via ECF

3

electronic service, a true copy of the foregoing document upon all counsel

4

registered for e-service.

5

6

DATED this <u>14th</u> day of October, 2024.

7

8

9

10

Lrica Knerr, Legal Assistant

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF KIRK SCHULZ
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

13

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0347**

# EXHIBIT A

**From:** Office of the President <presidentsoffice@wsu.edu>
**To:** "letter@lists.wsu.edu" <letter@lists.wsu.edu>
**Subject:** Financial planning in the wake of COVID-19
**Date:** Wed, 1 Apr 2020 16:00:11 +0000
**Importance:** Normal

# Financial planning in the wake of COVID-19



Dear Students, Faculty, and Staff:

As we all continue to adjust to the new reality created by COVID-19, we want you to know we deeply appreciate your patience and support as we address the complexities of the University's current day-to-day operations and future plans. We are seeking solutions applicable system-wide while acknowledging that the implementation of some decisions may vary across the system.

We know that you are dealing with unexpected and challenging issues. We know that many of you are hurting and worried. While we don't have answers to all of your WSU-related questions yet, please know that we are working on them. We cannot—and should not—make decisions lightly or hastily given the short-term and long-term impacts they likely will have on our community.

As the University moves forward with institutional-level decisions in the coming weeks, we are continuing to listen closely to our students, faculty, and staff to ensure our decisions are as compassionate, equitable, and practical as possible under the circumstances.

One of the areas that worries everyone is finances. National economies worldwide are struggling to determine the human

**ER0349**

WSU_00040280

and fiscal impacts of this constantly evolving situation. Governments, corporations, and businesses large and small are scaling back investments, frequently opting to reduce their operations and workforces.

As we consider the University's finances over the next several months and beyond, we are striving to minimize the fiscal impact of COVID-19 on our students, faculty, and staff. Nonetheless, we must begin to plan for a short-term future in which the University's revenues and state appropriations are reduced. The good news is that we are in a better position today to manage a temporary reduction because WSU's finances are greatly improved due to the recent successful efforts to balance revenues and expenditures.

Although many decisions remain, we have made a number of financial decisions affecting our community.

## For our students

- Refunds for spring 2020 semester tuition and course fees will not be issued due to the change in delivery method from face-to-face to distance instruction. The vast majority of students will be able to complete their coursework for the semester. WSU's existing petition process for late-term withdrawal is available if extraordinary circumstances, such as a documented medical emergency, prevent completion of courses.

- Prorated housing and dining refunds or credits will be issued to students who wish to terminate residential housing and dining contracts for the remainder of the spring 2020 semester. There will be no termination fees. **Students must elect a refund or credit by April  10, 2020.** Students also may donate Residential Dining Account (RDA) balances to Cougs Feeding Cougs.

- We will announce our plans regarding Service and Activity (S&A) and other mandatory fees by April 30. Several factors, including services being offered remotely, salaries of

WSU_00040281

(18 of 247), Page 18 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 18 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4214    Page 17
of 76

including services being offered remotely; salaries of students and full-time employees, and building debt service, will be considered when making the decision.

## For our employees

- Effective immediately, we are freezing the current salaries for all WSU executive leadership at the dean, chancellor, vice chancellor, vice president, provost, and president level at least through fiscal year 2021 (June 30, 2021).

- Effective immediately, the hiring of new faculty and staff will be limited to mission-critical hires. Documented justification is required for exceptions. All faculty and academic area staff hiring must be approved by the interim provost and executive vice president and/or campus chancellor. All non-academic area staff hiring must be approved by the appropriate vice president and/or chancellor.

- All areas should immediately implement measures to reduce operating expenditures such as travel and supplies, with the exception of those needed to support remote instructional delivery and staff and faculty working at home. Expenditures needed to support distance delivery of instruction and to provide remote support for our students are the two highest priorities.

- We are reviewing the financial impacts on all operations based on the significant reductions in on-campus activities as COVID-19 affects the WSU system. All auxiliary areas are estimating the impact of reduced revenues and expenditures on their operations.

Preserving the jobs of our faculty and staff is one of our top priorities. In fact, we currently are investing in staff development by encouraging everyone who can to complete the valuable online professional development courses offered through our online learning system SkillSoft while they work from home.

WSU_00040282

We know that you still have many questions. The University's [COVID-19 website](#) continues to be a great source of current information, and we plan to introduce a new monthly email to keep you up-to-date about the University's financial picture. You may also send fiscal-related questions and concerns to [COVID-19.info@wsu.edu](mailto:COVID-19.info@wsu.edu). We will also address them in future communications and through the COVID-19 website's [FAQs webpage](#).

Our Cougar family is known for its resiliency, teamwork, and commitment to serving the greater good. This historic event may test our spirits, but we know that the resolve of Cougars is unbreakable.

Thanks for all that you do.

**Kirk Schulz**
President

**Bryan Slinker**
Interim Provost and Executive Vice President

**Stacy Pearson**
Vice President for Finance and Administration

**Mary Jo Gonzales**
Vice President of Student Affairs

Office of the President, Washington State University
PO Box 641048, Pullman, WA 99164-1048

View in Browser



*Crimson Communiqué* is an electronic communications service provided to Washington State University faculty and staff for distribution of HTML emails.

WSU_00040283

# EXHIBIT B

**From:** President Kirk Schulz <president@wsu.edu>
**To:** "letter@lists.wsu.edu" <letter@lists.wsu.edu>
**Subject:** WSU to require COVID-19 vaccines for fall 2021
**Date:** Wed, 28 Apr 2021 18:12:07 +0000
**Importance:** Normal

STATEMENT FROM WSU PRESIDENT KIRK SCHULZ

# Vaccine Requirements for Students and Employees for Fall 2021



April 28, 2021

Washington State University (WSU), as the state's land-grant university, has an obligation to serve the public good and promote the health and safety of the communities it serves. The COVID-19 vaccine, now widely available, has been shown to nearly eliminate the chances of death or serious illness related to a COVID-19 infection, and is a critical element in protecting public health locally and worldwide.

- **Vaccine requirements for students**

    WSU system-wide will require proof of the COVID-19 vaccination for the 2021–2022 academic year for all students engaging in activities at a WSU campus or location.

    Exemptions will be allowed for medical, religious, or personal reasons. Information about how to submit proof of vaccination and the process to request an exemption will be provided in the coming months.

    Students whose programs are fully online and/or for which

**ER0354**

WSU_00040277

(22 of 247), Page 22 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 22 of 247
Case 2:22-cv-00319-TOR   ECF No. 108   filed 10/14/24   PageID.4218   Page 21
of 76

an on-campus/location presence does not occur are automatically exempted from this requirement.

In order to participate in any on-site or in-person courses and activities, students at all WSU locations will be expected to be vaccinated by the start of the fall semester. Some programs may designate an earlier date for proof of vaccination or an exemption based on when fall semester in-person activities begin. All WSU Pullman students living in university-owned housing will need to provide proof of vaccination, or have an approved exemption, by Friday, August 6, 2021. For students who have been granted exemptions, the university retains discretion to modify housing assignments as it deems necessary to protect public health and safety.

Beginning Monday, November 1, 2021, students not living in university housing or with program-specific requirements will be required to have documented proof of vaccine or an approved exemption. Students who fail to meet this requirement will be prevented from registering for spring semester courses and/or face other restrictions. Students with approved exemptions may be required to participate in regular COVID-19 testing and/or other COVID-19 public health measures.

- ## Vaccine requirements for employees

  WSU system-wide intends to extend the requirement to all employees and volunteers engaging in activities on a WSU worksite. Exemptions will be allowed for medical, religious, or personal reasons. Any employees and volunteers who receive exemptions may be subject to COVID-19 testing and/or other COVID-19 public health measures. More information, including how to submit proof of vaccination or an exemption, will be provided in the coming months.

- ## Acceptable vaccines

**ER0355**

WSU_00040278

WSU will accept proof of any vaccine that was authorized for use in the United States at the time of administration. For vaccinations requiring two doses, students and employees must have received both doses of the vaccine to meet the requirement. Proof of vaccination will also be required for anyone with a prior diagnosis of COVID-19. WSU will work with any international students and employees who may have received a vaccine that is not approved for use in the United States.

The University reserves the right to modify this policy at any time in accordance with changing public health guidance or directives, best practices, and/or university needs.

Additional information about the requirement process will be made available this summer. For employee-related questions, please contact Human Resources Services at hrs@wsu.edu or 509-335-4521. For student-related questions and all other inquiries, please email covid-19.info@wsu.edu.

Office of the President, Washington State University
PO Box 641048, Pullman, WA 99164-1048

View in Browser



WSU_00040279

# EXHIBIT C

(25 of 247), Page 25 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 25 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4221    Page 24
of 76

**From:** Office of the President <presidentsoffice@wsu.edu>
**To:** "letter@lists.wsu.edu" <letter@lists.wsu.edu>
**Subject:** Phased reopening process at WSU
**Date:** Tue, 11 May 2021 16:04:23 +0000
**Importance:** Normal

# Phased reopening process at WSU



May 11, 2021

Dear Cougar Family:

Throughout the pandemic, much of the WSU community shifted to a remote work environment. While most were able to work from home, let's also acknowledge those employees who continued to deliver essential services in person at our campuses and other locations. On behalf of the University, we thank everyone for their perseverance and commitment to WSU during these immensely challenging times.

As the availability and distribution of the COVID-19 vaccine improves, we look forward to our phased reopening across the state. We will prioritize those in-person activities that best enhance our ability to support our students, promote equity, and meet our land-grant mission.

Though some employees already have begun transitioning back to WSU work locations, **all WSU campuses, areas, and units will be expected to start the phased reopening process no later than July 12**.

This does not mean that all faculty and staff will need to return to on-site work locations full time on July 12. There still will be a need for some employees to continue working remotely for all or part of their schedules. Doing so will ensure compliance with

WSU_00002436

(26 of 247), Page 26 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 26 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4222    Page 25
of 76

current physical distancing guidelines and will meet the guidelines established by some areas or units within their respective plans.

Decisions about who is to work where (on-site or remote) and when (traditional, hybrid, or flexible schedule) will be made by managers and supervisors, in conjunction with their leadership. Supervisors and employees should review the Returning to a WSU Work Location information and all employees are encouraged to participate in the appropriate training to help prepare for the transition to on-site work. Please log in to your online learning account to access those trainings.

Until all pandemic measures have been lifted by federal, state, and local governments, we ask all supervisors to offer compassion and flexibility when making these staffing decisions.

Though most employees will be expected to be available to return to regular on-site work starting July 12, exceptions will continue to be made if they have entered into a telework agreement in accordance with BPPM 60.34, or have obtained an approved accommodation for a disability that limits their ability to work on-site.

As WSU prepares for a robust in-person experience this fall, the University encourages all faculty, staff, and volunteers to get vaccinated as soon as possible to protect the health and safety of all. Decisions on the vaccination requirement for employees are still being reviewed. We appreciate your patience as we wait for confirmation on how this requirement will apply to employees. Subsequent guidance on how to submit vaccination information, exemption requests, and the appropriate secure maintenance of information will be communicated before the fall semester. Employee COVID-19 vaccination information is available online.

Employee questions may be directed to hrs@wsu.edu or by calling 509-335-4521.

ER0359

WSU_00002437

Thank you again for your resiliency and unwavering Cougar
spirit.

Regards,

**Kirk Schulz**
President

**Elizabeth Chilton**
Provost and Executive Vice President

**Theresa Elliot-Cheslek**
Vice President and Chief Human Resource Officer

Office of the President, Washington State University
PO Box 641048, Pullman, WA 99164-1048

View in Browser



ER0360

WSU_00002438

# EXHIBIT D

(29 of 247), Page 29 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 29 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4225    Page 28
of 76

**From:** WSU President's Office <presidentsoffice@wsu.edu>
**To:** "macgl777@yahoo.com" <macgl777@yahoo.com>
**Cc:** "Winfree, Nickole M" <nikki.winfree@wsu.edu>, "Ryan, Elizabeth" <lizryan@wsu.edu>
**Subject:** FW: Bequest cancelled Rolovich.
**Date:** Tue, 17 Aug 2021 19:19:13 +0000
**Importance:** Normal

---

Dear Mr. MacArthur,

Thank you for your note and thank you for your interest in supporting students at WSU.  The university's land-grant mission is rooted in accessibility, and scholarships supported by donors help the university make dreams of higher education a reality.  Liz let me know that your generosity is motivated by personal experience.  Thank you for bringing your story full circle, giving others a "hand-up."

I am disappointed to hear that you have decided to cancel your bequest because of Coach Rolovich's decision regarding COVID vaccinations.  As you have noted, he is an important leader at WSU.  I have urged Coach Rolovich to reconsider and get vaccinated.  I reminded him that he must be diligent in public settings including the following statement - *"As the most high-profile employee of Washington State University and one of the most highly compensated state employees in Washington, you do not have the luxury of disregarding legal requirements in a public setting. Your public behavior reflects on the University, the Athletic Department, and the Football program at all times.  Further, violation of law (other than minor traffic offenses) are a breach of your employment contract, particularly when those violations endanger others and place the university and the football program in a negative light. I expect that you will adhere to federal and state directives and guidance at public and private events both on and off campus."*

I sincerely hope that you will stay in communication with us as we continue to cope with the evolving pandemic complexities, with the health and well-being of our students and the entire WSU community at the forefront of our thoughts each day.  Thank you again for reaching out to me.

Sincerely,
Kirk


Kirk H. Schulz
President
Washington State University

---

**From:** Gordon MacArthur <macgl777@yahoo.com>
**Sent:** Wednesday, August 11, 2021 2:28 PM
**To:** WSU President's Office <presidentsoffice@wsu.edu>; Cvercko, Jason M <jason.cvercko@wsu.edu>; Dickert, Jacob H. <jacob.dickert@wsu.edu>; Smith, Brian M <brian.m.smith@wsu.edu>; Ryan, Elizabeth <lizryan@wsu.edu>
**Subject:** Bequest cancelled Rolovich.

This spring I had worked with Elizabeth Ryan to set up a bequest to WSU for scholarships.  It has a current value of about one million dollars.  Because of Rolovich's refusal to get vaccinated and the negative message it sends to so many who look up to the coaches I have cancelled it.  His decision will result in the death of some of those who listen to him or those with whom they  have contact.  This is not a personal decision that affects him alone.

Rolovich is the highest paid and most visible person on staff at WSU.  WSU is already in the bottom third of PAC12 schools for team vaccination rates.  Rolovich is the only PAC12 coach refusing to get vaccinated.  What he says and does on the subject of covid carries waeight with players, students, and others not just at WSU but throughout the PAC12 and nationally.  For students and staff at WSU he just showed them how to evade the vaccine requirement.  For everyone else, he sends the message the vaccine is not necessary.

                                                    WSU_00035317

I had a call with Elizabeth this morning to discuss, but have seen nothing that would change my mind.  At the very least, I would need to see Rolovich reverse his decision and very publicly and repeatedly encourage everyone to get vaccinated. Alternatively, he could resign and be replaced by a coach who may not win as many games, but who would put health and safety of WSU students, faculty and staff first.

The university policies on covid should have no exclusion for "personal or religious reasons".  That gives everyone a cop out to make a decision that will result in the death of others.  Rolovitch just showed students and faculty alike how to avoid getting vaccinated.  He is displaying a total disregard for the safety and well being of the students and faculty of WSU.

Please let me know if this gets resolved and I will reinstate the bequest.  Thank you.

Sincerely,

Gordon MacArthur

WSU_00035318

# EXHIBIT E

(32 of 247), Page 32 of 247   Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 32 of 247
Case 2:22-cv-00319-TOR     ECF No. 108     filed 10/14/24     PageID.4228     Page 31
of 76

**From:** Paul Francis <pfrancis@councilofpresidents.org>
**To:** "Ana Mari Cauce " <cauce@uw.edu>, "Barbara Sandoval (Barbara.Sandoval@wwu.edu)" <Barbara.Sandoval@wwu.edu>, Chandalin Bennett <cmbennett@ewu.edu>, "Colleen Kerr " <colleen.kerr@wsu.edu>, Darshan Robertson <drobertson@councilofpresidents.org>, David May <dmay@ewu.edu>, "Ginger Druffel " <gkdruffel@wsu.edu>, Jim Wohlpart <Jim.Wohlpart@cwu.edu>, "John Carmichael " <carmichj@evergreen.edu>, "Kim Dawson " <dawsonk@cwu.edu>, "Kirk Schulz (kirk.schulz@wsu.edu)" <kirk.schulz@wsu.edu>, "Linda Schactler " <schactler@cwu.edu>, "Margaret Shepherd " <mshep@uw.edu>, Pat Barte <bartep@evergreen.edu>, Paul Francis <pfrancis@councilofpresidents.org>, "Sabah Randhawa (sabah.randhawa@wwu.edu)" <sabah.randhawa@wwu.edu>, Stephanie Court <shcourt@uw.edu>, Susan Harris <harriss@evergreen.edu>
**Subject:** FW: EMBARGOED: Governor Inslee's Announcement Today
**Date:** Mon, 9 Aug 2021 20:12:56 +0000
**Importance:** High
**Attachments:** Vax_Mandate_FAQ.pdf
**Inline-Images:** image001.png; image002.png; image003.png; image004.png; image005.png; image006.jpg

---

FYI

Paul T Francis (He/Him/His)
Executive Director | Council of Presidents
Tel: 360.292.4101 | pfrancis@councilofpresidents.org
| councilofpresidents.org | Twitter: @CouncilofPresWA

WASHINGTON STATE
*Council of* Presidents

**From:** Aultman, John (GOV) <john.aultman@gov.wa.gov>
**Sent:** Monday, August 9, 2021 1:00 PM
**To:** Paul Francis <pfrancis@councilofpresidents.org>; Yoshiwara, Jan <jyoshiwara@sbctc.edu>; Standish-Kuon, Terri <terri@icwashington.org>; Meotti, Michael (WSAC) <MichaelM@wsac.wa.gov>; Papadakis, Eleni (WTB) <eleni.papadakis@wtb.wa.gov>
**Subject:** FW: EMBARGOED: Governor Inslee's Announcement Today
**Importance:** High

Hi All,
Higher education is not included in today's announcement but will be highly encouraged to follow the changes moving forward.
Thanks,
John

**From:** Thomas, Jamila (GOV) <Jamila.Thomas@gov.wa.gov>
**Sent:** Monday, August 9, 2021 11:42 AM
**To:** GOV dist Executive Cabinet <GOVdistExecutiveCabinet@gov.wa.gov>; GOV dist Small Agency Cabinet <GOVdistSmallAgencyCabinet@gov.wa.gov>; Gov dist GOV <GovdistGOV@GOV.WA.GOV>
**Subject:** EMBARGOED: Governor Inslee's Announcement Today
**Importance:** High

Dear Cabinet and staff,

**ER0365**

(33 of 247), Page 33 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 33 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4229    Page 32
of 76

*\*\*\*As always, this information is **EMBARGOED** until the Governor begins speaking at approximately 1pm today.\*\*\**

Today the governor will announce a requirement for all state employees who work in governor-appointed Cabinet agencies to be fully vaccinated against COVID-19 by October 18, 2021. The governor will also mandate vaccination in some private health and long-term care services. He will take this action through a proclamation.

The governor made this decision after talking to stakeholders, including labor organizations and agency leadership, to understand the many challenges facing state government as we respond to the impact of the COVID-19 pandemic. Among the details the governor will announce today are:

- The State of Washington is requiring most state workers and workers in private health care/long-term care and other congregate settings to be vaccinated as a condition of employment. State employees will have until October 18 to be fully vaccinated under this new requirement. If they refuse, then they will no longer be employed with the state or applicable private business.

- City of Seattle and King County will announce they are doing the same for their employees.

- There will **not** be an option to test regularly in lieu of getting vaccinated. This has not worked well in congregate care settings such as DOC facilities and long-term care. It has not reduced spread of COVID. It would also cost an estimated $66 million annually if applied across agencies.

- There will be medical and religious exemptions. The exact language is still being finalized. These will be narrowly defined exemptions.

- This only applies to governor-appointed cabinet agencies. The requirement does not extend to higher ed., K-12, legislative branch, judicial branch and employees of separately elected officials. However, the governor is strongly encouraging leaders of these branches to take action as well. He has spoken to the separately elected and legislative leaders about it.

- The governor has the authority to do this for most state employees and workers in private health care/long-term care/congregate settings through his emergency powers due to the COVID-19 pandemic.

- There will not be a mask mandate announcement. Two weeks ago the governor encouraged people to wear masks indoors in areas of high transmission and in K-12 schools. This has not changed, will continue and won't be expanded tomorrow. However, a mask mandate will be an option if rates continue to skyrocket.

Attached is an FAQ that provides more information on this decision and how it impacts your employees.

After more than a year of fighting the pandemic with other measures, we now have the most effective tools available to operate safe workplaces and strengthen our commitment to the public – the COVID-19 vaccines. The COVID-19 vaccines have been deemed safe and effective by the U.S. Food and Drug Administration and comparable agencies around the world. This announcement comes as we are also facing a new strain of the disease that is more easily transmitted and more aggressive, especially for unvaccinated persons. Hospitals are jammed and health care personnel are exhausted.

Thank you all for your continued efforts during these uniquely challenging times.

Best regards,

**Jamila B. Thomas**
Chief of Staff | Office of Governor Jay Inslee
Desk: 360-902-0648 | Cell: 360-790-3738
www.governor.wa.gov | jamila.thomas@gov.wa.gov

# ER0366

WSU_00026836

*Email communications with state employees are public records and may be subject to disclosure, pursuant to Ch. 42.56 RCW.*

WSU_00026837

# Jay Inslee
WASHINGTON GOVERNOR

August 9, 2021

# FAQs for vaccine mandate for some state employees and certain private employers

### Who does the Proclamation apply to?

All Cabinet Agency worksites and employees and Health Care employees in private sector health care and in long term care settings including but not limited to nursing homes, adult family homes, assisted living, enhanced services facilities, RTFs, and other treatment facilities. This includes most contractors, volunteers and other positions that have any onsite presence in a workplace setting. The proclamation does not cover separately elected officials, boards and commissions or K-12 and higher education institutions, but those organizations are encouraged to adopt a similar approach.

### What does the Proclamation do?

The proclamation requires all state employees and most health and long-term care providers to be fully vaccinated with a recommended COVID-19 vaccine by October 18, 2021 as a condition of employment. Employers will need to verify vaccination status of all employees.

## For state employees:

### With so many state employees working remotely, does the requirement only apply if/when they return to the office?

No. The requirement applies to all state workers regardless of their work setting. All workers need to be prepared to come to a worksite at any time necessary to meet business needs.

### Staff have been successful keeping infection rates low with safety precautions such as social distancing, hand washing, and mask wearing, why is this needed?

Frontline workers in state service and across the private sector have continued working since the initial "Stay home, Stay Healthy" order. They, rightfully, are becoming weary of the day to day stress of high and dangerous caseloads. Significant efforts have been made to address workplace safety in the face of COVID, a new workplace hazard. Even with all of those safety efforts we did not curtail all outbreaks. The threat of COVID-19 is evolving as new more easily transmitted and aggressive variants become prevalent in our state. We now have the tool of vaccine, which is the single most effective resource to combat spread, prevent illness and death. The state of Washington has a duty to our employees to provide a safe work environment free of known hazards, and to reduce risk to the public we serve. This safety measure is equally important to fight the spread of COVID generally and statewide because it will help to protect the communities in which we live and interact before and after our state work hours. Private employers operate under the same workplace safety standards as the state.

### When will this be in effect?

The order is effective immediately, the deadline to become fully vaccinated will be October 18, 2021.

ER0368

WSU_00026838

**Is there any avenue to opt out of vaccination?**

Under the proclamation, employees must show proof of vaccination by October 18, 2021. State employees may work with their agency's human resources office if they need a reasonable accommodation for medical or religious reasons. Private sector employers may choose a different process.

**What is the mechanism for proving vaccination?**

The Department of Labor and Industries (L&I) and the Department of Health (DOH) have published requirements and guidance that all employers must adhere to. State agencies already have protocols in place per the Healthy WA – Roadmap to Recovery Guide v11 to develop vaccination verification. Many are in the early stages of implementation while others have been doing this work for the entire COVID response period. Updates to the protocol will be made as needed to meet any new requirements.  For state employees, proof of vaccination is required; attestation is not allowed. Private employers may choose a different process.

**How will agencies safeguard my vaccination information?**

State agencies have protocol in place for safeguarding confidential information.  Vaccination information will meet these requirements.

**What if someone refuses to get vaccinated?**

All employees must be fully vaccinated by October 18, 2021 as a qualification of fitness for continued employment. Employees who refuse will be subject to non-disciplinary dismissal from employment for failing to meet the qualifications of the job. Those employees granted a reasonable accommodation for medical or religious reasons may not be subject to non-disciplinary dismissal. There may be continued or additional safety requirements for employees who are granted accommodations.

**What if an employee is vaccinated but refuses to provide verification?**

State employees must provide proof of vaccination. Employees who refuse will be subject to non-disciplinary dismissal from employment for failing to meet the qualifications of the job.

**Will employees have any recourse to losing employment?**

Any post dismissal dispute over a dismissal action would follow any applicable collective bargaining agreement, civil service rules, and/or agency policy and procedure.

**On what legal grounds can this be imposed?**

In response to the emerging COVID-19 threat, the Governor declared a state of emergency on February 29, 2020, using his broad emergency authority under RCW 43.06.  More specifically, under RCW 43.06.220, after a state of emergency has been declared, the Governor may suspend statutes and prohibit any activity that he believes should be prohibited to help preserve and maintain life, health, property or the public peace. Under an emergency such as this, the Governor's paramount duty is to focus on the health and safety of our communities. In addition, the Governor is also a large employer and needs to meet the obligation to provide a safe workplace for government employees. This Proclamation answers both of those obligations.

**How will the state be engaging with labor on this issue?**

We understand that there will be many questions about the processes that agencies, and other employers, will use to implement this direction. Employers value their relationships with labor organizations and will discuss the impacts of this directive as requested.

ER0369

WSU_00026839

**What stakeholders were consulted in arriving at this decision?**

The state engaged with labor organizations, local governments, and private healthcare, and received communications from various associations representing segments of private healthcare settings. These engagements revealed differing viewpoints and perspectives. Many organizations expressed an interest in implementation of a "vaccination or test" approach. Many other settings have taken this approach. We considered this feedback in great depth and deemed that approach infeasible in state government and across our health systems. The state and some private entities have used a "vaccination or test" system in various congregate care settings and many recognized it to have not stopped the threat to our communities and places of work, as outbreaks have persisted. The cost and administrative process to sustain, or expand, this model long-term is significant. Ultimately, the state made the tough decision to proceed with a mandate for the healthcare workforce and the state employee workforce.

**Given the spread of the Delta variant, what other steps is the state taking to protect the workforce and the community?**

The state continues to assess what measures need to be in place in state agencies and community settings. L&I and DOH are engaged daily on disease data analytics, health requirements, and workplace safety requirements to determine what is working well and what is not. The current variant is very rapidly spreading amongst unvaccinated populations that were previously a lesser target for the virus.

Younger unvaccinated people are getting sicker faster and more often.  Grounded in the Healthy WA – Roadmap to Recovery Guide for state agencies, monthly updates are provided to state Cabinet agencies to meet CDC, DOH, and L&I requirements and to determine agency implementation directions.  We take into consideration business, customer, and employee impacts as we develop our implementation strategies to keep people healthy and safe in our worksites.  This includes planning for return to work that emphasizes a new hybrid model of service delivery.

We continue to update masking and physical distancing requirements in a way that best protects our employees and the people we serve. We have increased options for customers to get services online or remotely to decrease the need for in person contact and travel. We have also prioritized closing business gaps where in person services are needed as we pay attention to equity in our approach to customer access.

**Will the state provide additional guidance regarding this directive?**

The state will establish additional resources as needed to help employees and employers move into compliance with this directive.

**ER0370**

WSU_00026840

# EXHIBIT F

**From:** Brian Fahling <bfahling@fahlinglaw.com>
**To:** "PresidentsOffice@wsu.edu" <PresidentsOffice@wsu.edu>
**Cc:** Athletics.Director@wsu.edu, "Hess, Danielle A" <danielleh@wsu.edu>, "Kniffin, Eric N." <EKniffin@lewisroca.com>, Nick Rolovich <nrolo21@hotmail.com>
**Subject:**
**Date:** Fri, 26 Nov 2021 15:30:56 -0800
**Importance:** Normal
**Attachments:** EX_A_Rolovich_Notice_of_Intent_to_Terminate.pdf; Rolovich_Pres_Appeal.pdf; EX_D_Rolovich_Employment_Contract.pdf; EX_C_Decision_to_Terminate_Rolovich.pdf; EX_B_Rolovich_Appeal_with_Attachments.pdf

---

President Schultz:

Please find attached Coach Rolovich's appeal, with attachments, of his termination by Mr. Chun. To simplify document management, I will be forwarding you Mr. Chun's email notices of termination to Coach Rolovich (and the Coaches we represent), along with the attachments to Mr. Chun's email. Best regards,

Brian Fahling
Law Office of Brian Fahling
8124 NE 166th St. (by appointment only)
Kenmore, WA 98028
T: 425.802.7326
E: bfahling@fahlinglaw.com
E: fahlinglaw@protonmail.com
W: bfahlinglaw.com

---

The information contained in this electronic message is protected by the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., attorney - client privilege and/or attorney work product doctrine. It is intended for the use of the individual and/or entity named above and the privileges are not waived by virtue of this having been sent electronically. If the person actually receiving this message or any other reader of this message is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination distribution, or copying of this communication in error, please immediately notify us via email, or via U.S. Mail to the above address.

**ER0372**

ROLOVICH00000067

(40 of 247), Page 40 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 40 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4236    Page 39
of 76

# EXHIBIT A

ROLOVICH00000068

# WASHINGTON STATE
**A T H L E T I C S**

Hand Delivered

October 18, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA 99163

Re:    Written Notice of Intent to Terminate for Just Cause

Coach Rolovich:

Pursuant to Paragraphs 4.1 through 4.3 of your Employment Agreement as Head Men's Football Coach, this letter constitutes notice of the University's intent to terminate your employment for just cause.

- You were notified on September 1, 2021, and September 23, 2021, that per Proclamation 21-14.1, all state employees, including those in higher education, would be required to be fully vaccinated against COVID-19 via one of the FDA approved vaccines by October 18, 2021.

- The notice stated that if not vaccinated, you could apply for a medical or religious exemption and accommodation through WSU Human Resources (HRS). The University provided notice of the process on August 31, 2021, September 8, 2021, September 29, 2021, and October 4, 2021.

- You requested an exemption from the vaccine requirement on religious grounds. Your request was denied on October 18, 2021.

This action is in accordance with the terms of your contract, signed in April 2020, and amended in April 2021. The specific provisions violated include the following:

- Paragraph 1.2.1 requires you to devote your best efforts to the performance of your duties. In particular, you are required to "comply with and support all rules, regulations, policies, and decisions established or issued by the University." Further, you must "abide by all provisions of law." Your failure to comply with the vaccination requirement, which is both a University policy and requirement of law under the Governor's Proclamation, violates these provisions and has rendered you legally unable to perform your duties as Head Coach. Your non-compliance with the vaccine requirement, and the fact that you are now legally unable to fulfill your obligations to the University as Head Coach, also violates Section 4.1.5 of your Employment Agreement, conduct of Employee seriously prejudicial to the best interests of the University or its athletic program, and Paragraph 4.1.1.

- Paragraph 4.1.1 prohibits you from engaging in "deliberate and serious violations" of your duties, or "refusal or unwillingness to perform such duties in good faith and to the best of your abilities." As noted in my July 26, 2021, warning letter to you, your contract

Washington State University | Department of Intercollegiate Athletics | Office of the Director
Bohler Athletic Complex 110, PO Box 641602, Pullman, WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501 | www.wsucougars.com

ER0374

ROLOVICH00000069

Nicholas R. Rolovich
Page 2

requires you to participate in events, activities, and efforts to foster support for the
Football program, and your personal decision to forego a COVID-19 vaccination has
impacted your ability to do so, interfering with your ability to meet with donors and
others. These activities are a critical part of being a head football coach at a Pac-12
school. See 1.2.1.2.h. Because of your decisions, WSU, the Football program, and the
Athletics programs have been subject to several damaging events. These events include
the following:

- Your inability to attend in-person Pac-12 Football Media Day in Los Angeles on July
  27, 2021. Because of your decision to not get vaccinated, you were the only coach
  who did not attend in person. Your decision became the primary story concerning
  football and put our student athletes and other attendees in the position of having to
  address your absence. This was, and continues to be, a major distraction for the
  University, Athletics department, and the Football team.

- Your inability to attend any of the regularly scheduled Friday donor lunches. Section
  1.2.1.2.h requires that you participate in events, activities, and/or efforts to foster
  support for the University's Athletic Department and/or the Football program. You
  have not actively participated in donor engagement, foster program support, or
  fundraising. The Friday donor lunch is a critical component of donor outreach, and
  your absence has been prejudicial to the Football program and the Athletics
  department.

- Your inability to attend the WSU Football Coaches Show in person that broadcasts
  live from Zeppoz. This is another critical component of donor and fan outreach. By
  not attending the show in person, interest from fans has been negatively impacted.
  Further, you are unable to attend other coaching speaking engagements in person,
  and you are limited in your ability to attend other campus events such as pep rallies
  and other fall sports. Your lack of presence as the Head Coach of WSU's most
  popular and well-known sport is pronounced and has been prejudicial to the Football
  program and the Athletics program.

- Your inability to attend live donor meetings, including several donor interactions
  scheduled for July. These events were subsequently canceled. Further, donors have
  declined to engage in personal meetings or remote meetings out of concern for their
  personal safety and the disappointment in the lack of leadership your handling of this
  matter has portrayed. Further, the University and the Athletics department has not
  been able to schedule future donor meetings based on your actions. Several donors
  have revoked gifts or put them on hold until further notice because of your decision.

- Paragraph 1.2.1.2 requires you to "Evaluate, recruit, train, and develop student-athletes."
  You also are responsible for establishment of a program identity and approach to
  competition, and the game planning for individual games and the season. You have
  failed to fulfill these obligations by engaging in the following behavior:

  - You are unable to attend individual position meetings or engage one-on-one with
    players or assistant coaches during practices, team meetings, and other preparatory
    functions. Interactions with assistant coaches and players has been limited and has
    led to poor planning, lack of communication, and a void in leadership.

**ER0375**

ROLOVICH00000070

(43 of 247), Page 43 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 43 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4239    Page 42
of 76

Nicholas R. Rolovich
Page 3

- Your ability to travel extensively and recruit has been impacted by your decision.
  Recruiting has been significantly impacted this year, as evidenced by a notable
  decline in the number of verbal commitments.

As the most high-profile employee of WSU and one of the most highly compensated state
employees in Washington, your choices and behavior also reflect on the University, the Athletics
Department, and the Football program at all times. In addition to the above, the voicing of
physical threats regarding a coach we talked about related to our contingency plan was
completely unacceptable.

Your conduct has been seriously prejudicial to the best interests of the University and the
Football program, including putting the University and the Football program in a negative
national spotlight, and is a violation of your contract. (See paragraph 4.1.5).

Per Section 4.2 of your Employment Agreement, you have fifteen (15) calendar days to respond
to me, in writing, with reasons why you should not be terminated. I will respond accordingly
consistent with the terms of your Employment Agreement.

Effective immediately you have been placed on paid administrative leave pending the outcome of
this notice of intent to terminate for just cause. You are not to perform any work on behalf of the
University. Your WSU email account has been disabled and systems access removed.

For information regarding your benefits, please visit
http://hrs.wsu.edu/employees/benefits/separating-employee-information/. If you have specific
benefits questions, such as options for continuing medical and dental coverage beyond your
separation date, please contact Human Resource Services at 509.335.4521.

Sincerely,

Patrick Chun
Director of Athletics

cc:     Athletics Employment File
        HRS Personnel File
        HRS Employment Services

**ER0376**

ROLOVICH00000071



WASHINGTON STATE UNIVERSITY
**Human Resource Services**

**Important Benefits Information**
**Separation of Employment**

As you leave employment with Washington State University, the following are some topics we encourage you to review to ensure you are aware of how your outplacement from the University impacts your benefits and retirement program(s).

For additional information, including links to various forms and paperwork referenced in this handout, please visit: hrs.wsu.edu/employees/benefits/separating-employee-information/. If you have questions, contact HRS Pullman at (509) 335-4521 or by email at hrs@wsu.edu.

**Contact and Address Information**

- **WSU:** It is important to update your personal address online through Workday. This will ensure WSU is able to mail important information you may need after you separate, such as your W2 form.

- **Retirement Program(s):** Contact TIAA and/or the DRS directly (at the phone numbers listed below) to report the updated address for retirement accounts, and to receive future mailings from them.

**Medical and Dental Coverage**

- Medical and dental coverage ends on the last day of the month in which you are paid for at least 8 hours or more in your benefit-eligible appointment with WSU. You may be eligible for continuation of your medical coverage under COBRA for at least 18 months. The Health Care Authority in Olympia will mail a COBRA packet to your home address.  Employees can also access COBRA information by calling (800) 200-1004 or online at hrs.wsu.edu/employees/benefits/separating-employee-information/. ***You have 60 days from the date your coverage ends to pursue this benefit.***

- In the event your spouse or registered domestic partner (RDP) works for WSU, they have the option of adding you onto their insurance as a dependent for a lower premium rate than the COBRA rates. ***You have 60 days from the end of your coverage to pursue this option, and should contact HRS-Pullman within that 60-day period.  Postponing making this request could result in a gap in or loss of coverage.***

- Upon separation, you can also review coverage options through the Marketplace as an alternative to pursuing COBRA.  Please visit www.healthcare.gov for additional information.

  *Refer to **WAC 182 Chapter 12 Section 131** for information regarding benefit eligibility or contact HRS.  If you do not agree with the benefit eligibility decision WSU has made, you have the right to request HRS to re-evaluate your benefit eligibility at any time. Should you disagree with the eligibility decision made by HRS, you also have the right to appeal through PEBB Appeals Process at www.pebb.hca.wa.gov.*

**Retirement Plans (including Voluntary Investments Plans)**

- Employees have several options regarding their retirement account(s), including:  leaving funds in the account; rolling-over funds into another investment vehicle; or withdrawing some or all retirement funds. Employees should contact their retirement plan directly and speak with a tax advisor to understand the implications of their choice, such as taxes, possible penalties, etc.

  Contact information for the various retirement vendors follows:
  - **TIAA (for the WSURP and VIP Accounts):** Contact TIAA at (800) 842-2252 or visit their website at www.tiaa.org/wsu for additional information.

PO Box 641014, Pullman, WA 99164-1014
509-335-4521 | Fax: 509-335-1259 | hrs@wsu.edu | www.hrs.wsu.edu

**ER0377**

ROLOVICH00000072

(45 of 247), Page 45 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 45 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4241    Page 44
of 76

- o **PERS/TRS/LEOFF:** Contact the Department of Retirement Systems (DRS) at (800) 547-6657 or visit their website at www.drs.wa.gov.   Before deciding to withdraw/rollover your contributions, consider the information provided at www.drs.wa.gov/publications, "Withdrawals".
  - **PERS 3 & TRS 3:** In addition to DRS, contact VOYA at (888) 327-5596 or visit their website at www.drs.wa.gov/plan3 for additional information.

- o **Deferred Compensation, State of Washington:** Contact Deferred Compensation at (888) 327-5596 or visit www.drs.wa.gov/dcp for additional information.

NOTE: *In the event you are eligible to retire, contact HRS-Benefits and your retirement plan to review your options, including pursuing retirement.*

## Life Insurance

Life insurance coverage ceases after your employment ends.  You have the option to convert the insurance into an individual policy or transfer coverage to a spouse or registered domestic partner (RDP).  Contact MetLife at 1-866-548-7139 or log onto your account at mybenefits.metlife.com/wapebb. *You have 31 days from the end of your appointment to pursue these options.*

## Long Term Disability Insurance

Both the optional and basic long term disability (LTD) coverage cease after your employment ends.

## Flexible Spending Account(FSA)/DCAP

If you participate(d) in a Flexible Spending Account (FSA) and/or Dependent Care Assistant Program (DCAP) through your employment with WSU, you are encouraged to contact Navia Benefit Solutions directly to review your options regarding these accounts.  They may be reached at (800) 669-3539 or pebbapp.naviabenefits.com. If your appointment is not yet over, you have the option to accelerate or pre-pay your contributions into the FSA account prior to separation so you can continue to use the benefit for the remainder of the calendar year. Contact HRS to pursue this option.

## Health Savings Account (HSA)

If you participated in a Consumer Directed Health Plan with the attached Health Savings Account through your employment with WSU, you are encouraged to contact Health Equity directly to see what your options are regarding your Health Savings Account, and any questions you have regarding this benefit at 877-873-8823 or www.healthequity.com/pebb.

## Leave Payout

**(For employees who accrue annual and/or sick leave)**
If the appointment is eligible for annual leave payout, WSU will process the leave payout after the employee's leave/time reports are received from your department and audited. Normally individuals on temporary appointments are not eligible for annual leave cash out. Sick leave is not eligible for payout, unless a qualified employee is retiring from the university. Contact HRS at (509) 335-4521 or hrs@wsu.edu if you have questions.

## Unemployment Benefits

You may be eligible for unemployment benefits. Visit www.esd.wa.gov for more information and to apply.

ER0378

ROLOVICH00000073

(46 of 247), Page 46 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 46 of 247
Case 2:22-cv-00319-TOR ECF No. 108 filed 10/14/24 PageID.4242 Page 45
of 76

# EXHIBIT C

ROLOVICH00000074

(47 of 247), Page 47 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 47 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4243    Page 46
of 76



# WASHINGTON STATE
### A T H L E T I C S

November 12, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA 99163

**RE:    Notice of Decision to Terminate for Just Cause**

Mr. Rolovich:

Pursuant to Paragraph 4.2 of your employment agreement, this letter constitutes notice of termination for just cause from your employment as head football coach at Washington State University, effective immediately.

This decision has been made after careful review and consideration of your lengthy and detailed response, which includes many inaccurate statements and legal claims.  I did not find your response persuasive and will not respond to each and every contention. However, please note the following:

- **Background:** Per the Governor's Proclamation 21-14.1, all state employees, including those in higher education, were required to be fully vaccinated against COVID-19 by October 18, 2021, unless they had an approved medical or religious accommodation. You requested an exemption/accommodation on religious grounds, which the University denied on October 18, 2021, thereby rendering you in violation of the Proclamation and ineligible for continuing employment at Washington State University. On October 18, 2021, the University issued you written notice of its intent to terminate your employment for just cause in accordance with the Proclamation and your contract of employment.

- **Regarding the University's decision that granting an exemption would cause undue hardship to the Athletic Department and the University:** You claim that your ability to fulfill your duties as head football coach has not been and would not be impacted by your vaccination status.  This is false.  Your performance of your duties has been significantly hindered and would continue to be as long as you are unvaccinated, notwithstanding any reasonable accommodations that might be implemented.  Your activities have had to be continually and severely limited to a much greater extent than if you had been vaccinated, in order to mitigate the risk of you becoming infected or infecting others. In addition to the information WSU provided you and your attorney in

**ER0380**

ROLOVICH00000075

(48 of 247), Page 48 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 48 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4244    Page 47
of 76

previous documents, including the October 18, 2021, Notice of Intent to
Terminate for Just Cause, I note the following:

- The Pac-12 Conference, not the University, barred you from attending
  Pac-12 Media Day in person due to the vaccination requirement for head
  coaches. You were the only Pac-12 head coach unvaccinated and unable
  to attend in-person.  Instead of showcasing our student athletes and the
  WSU football program, you became the story.  You claim this was not
  your choice and that other conferences operate differently.  This
  completely misses the point.  It was your choice not to get vaccinated,
  and your job required you to be successful and operate as a *Pac-12 head
  football coach*, which means adhering to Pac-12 rules.

- You have been significantly hindered in your ability to successfully contact
  and recruit prospective student-athletes, because you have been
  restricted from attending any locale that has vaccine requirements,
  including high schools, high school sporting events, junior colleges, other
  universities' sporting events, or other prospect camps.  Vitally important
  recruiting areas, especially on the west coast, including California and
  western Washington, which are historically WSU's most significant
  geographical areas for recruiting, are essentially inaccessible to you as a
  recruiter. Moreover, Hawaii, a state where you have extensive ties and
  should be able to recruit in-person with a high level of success, also has
  very stringent COVID-19 restrictions, which have limited your ability to
  successfully recruit in that state. Over 2/3 of our current football roster
  has student-athletes who reside from the states of Washington, California,
  Oregon, and Hawaii.  WSU cannot sustain a successful football program if
  coaches are limited in recruiting locations.

- Aside from the restrictions noted above, non-competition travel by
  unvaccinated coaches requires a quarantine upon return to campus.  This
  has limited your ability to be on the road during key recruiting periods and
  reduced the number of days you can spend traveling for recruiting
  purposes.  Also, WSU cannot risk losing recruits who refuse to visit
  campus because Athletics is accommodating unvaccinated coaches.

- As a result of your recruiting limitations, the football program's recruiting
  statistics and verbal commitments for the 2022 recruiting cycle have been
  directly impacted and are unacceptably low. You personally stated your
  expectation of signing a full class, which would mean a minimum of 25
  initial signees. Contrary to your claim, NCAA regulations would not have
  prevented you from signing more prospective student-athletes; it was

ROLOVICH00000076

(49 of 247), Page 49 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 49 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4245    Page 48
of 76

your responsibility to manage the roster to incorporate a full class of new student-athletes. Recruiting at the level of a Pac-12 Conference institution requires a robust recruiting plan and effort.

o   Because you are unvaccinated, you were required to quarantine after travel, which limited your participation in many important activities, including donor meetings.  You appear to acknowledge this by explicitly stating you deliberately chose not to attend certain in-person donor events, which you had previously agreed to attend and were on your schedule. However, every Pac-12 head football coach must be able to regularly attend donor visits and events and actively engage in marketing efforts, in addition to other duties. Because you were unvaccinated, your ability to interact with key constituents, including students, donors, fans, and others, was severely impacted.

o   The Athletic Department has incurred significant costs associated with the need to test you and other unvaccinated football coaches for COVID-19 on a daily basis.  The Pac-12 requires a minimum of three (3) tests per week for unvaccinated staff, in addition to pre-competition testing, and the Athletic Department policy requires daily testing.  PCR testing, which must occur at least weekly for unvaccinated individuals and 72 hours prior to competition or travel, costs approximately $100 per test.  The cost for testing alone of unvaccinated staff from August 2021 through final tests on October 18, 2021, was $10,000. In addition to that cost, because of the workload of increased testing caused by you and other unvaccinated coaches, the Athletics Department was required to hire additional staff to assist in COVID-19 testing, at considerable expense.  It is important to note that these testing requirements do not apply to vaccinated players and staff, and that football was the only intercollegiate athletic program at WSU to have unvaccinated coaching staff.

o   Overwhelming scientific evidence establishes the efficacy of the vaccine in mitigating the spread of COVID-19 and preventing severe disease. By refusing to support, and by you and your staff at times actively opposing, the University's COVID-19 education and vaccination efforts, and by setting a very public example, you have undermined the University's efforts to promote student safety.  Although numbers are gradually improving, the football program has the lowest student-athlete vaccination rate of any intercollegiate athletics team at WSU and among the lowest rate in the Pac-12.  The football program experienced COVID-19 outbreaks in fall 2020 and spring 2021 that far exceeded any outbreaks among other intercollegiate athletics teams at WSU. In addition, WSU had

ROLOVICH00000077

(50 of 247), Page 50 of 247   Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 50 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4246    Page 49
of 76

to miss or reschedule several of the seven scheduled games in the
restructured fall 2020 football season, including two cancellations.

- **Regarding the University's decision that you do not have a sincerely
held religious belief that conflicts with the University's vaccine
requirement:**
  - ○ Prior to the Governor's proclamation, and since the beginning of the
    pandemic, you openly and freely expressed your opposition to the vaccine
    and other COVID-19 mitigation efforts on numerous occasions to
    numerous people, citing your own "scientific" research and making
    statements mirroring several specific online conspiracy theories, which
    included demonstrably false claims. In addition, at no point did you ever
    mention any religious concerns (ex: regarding fetal tissue). Therefore,
    your current claim that your private, unexpressed concerns were actually
    religious in nature is simply not credible. Your statement that you and
    some of your staff had unsuccessfully tried to secure documentation for a
    medical exemption undermines your claim. Only *after* it became clear that
    a religious exemption was your only other option did you claim to have
    religious beliefs that conflict with the vaccine requirement. It is
    understandable that you would want the University's review to exclude
    information regarding your own prior statements in its decision; however,
    under EEOC Guidance, these are appropriate considerations, and your
    assertion to the contrary is false. Further, under EEOC Guidance, personal
    or philosophical beliefs do not give an individual a basis to claim a
    religious exemption.

- **Regarding the University's exemption process:**
  - ○ Contrary to your claims, the University followed its process. You claim the
    University guaranteed a blind review of your request for a religious
    exemption and that it was improper for the Athletics Department to
    provide information contradicting your claim.  Nothing in WSU's policy
    states or implies that it was improper for the Athletics Department to
    provide additional information bearing on this question.  The committee's
    initial review is "blind" and based solely on information provided by the
    employee; however, once the committee makes its initial determination,
    the employee's unit is informed of the initial determination and has an
    opportunity to provide information specific to that employee and their job
    duties. The Athletics Department did not receive information about your
    request until it was appropriate for it to do so in accordance with the

**ER0383**

(51 of 247), Page 51 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 51 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4247    Page 50
of 76

process. Further, the religious exemption request form is clear that "additional follow up information" may be sought, and there is nothing that limits WSU to information provided by the employee.

○ You claim that if WSU had concerns about the sincerity of your religious beliefs, it was required to allow you to submit additional information. Again, however, the religious exemption request form uses the permissive "may," not "shall." Moreover, your November 2, 2021, response to the notice of intent to terminate provides ample additional information regarding your request for a religious exemption, and I do not find this information persuasive. As discussed above, your prior statements, as well as the timing of your request for a religious exemption, indicate that your objection to the vaccine requirement was based on factors other than religion.

○ Finally, you claim that the Athletics Department and I "overturned" the accommodation recommendations of WSU's Environmental Health and Safety (EHS). This is false. As part of the normal process, EHS provided information regarding possible accommodations but, consistent with the University's process, did not make a decision on this issue or even a recommendation regarding undue hardship. The October 14, 2021, memorandum from EHS clearly states, "EHS will not determine whether these interventions and countermeasures fundamentally alter the employee's job and cannot be accommodated."

- **Regarding your insubordination and threat of violence:**

  ○ You claim you were merely expressing your "frustration with, and dislike of June Jones," and that you would never physically harm him. However, your exact words were, "I don't want to see that mother f*cker and will fight him if you bring him out to practice." Your tone and profanity during that interaction were deeply concerning and demonstrated a lack of self-control. The clear implication was that violence was in fact possible and actually intended against your former mentor and coach. Although you may have been frustrated, this is clearly a threat of physical violence and an attempt to obstruct the Athletics Department's contingency plans for the football program.

Finally, your claims of "bias" or "hostility" towards your religion are misguided. My primary concern, as the WSU Director of Athletics, has always been the well-being of the student-athletes under your supervision as we attempt to build a successful WSU football program. Diversity and inclusion are in our Department's core values and

ROLOVICH00000079

(52 of 247), Page 52 of 247   Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 52 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4248    Page 51
of 76

adhered to on a daily basis. This includes respect for people's personal religious practices (like you, I am also a practicing Catholic), which further reinforces the baseless nature of this claim.

Based on the above, as well as the information in the October 18, 2021, Notice of Intent to Terminate for Cause and the other documents submitted in the religious exemption process and provided to your attorney, which are attached and incorporated herein, I find that you violated each of the sections of your contract outlined in the Notice of Intent to Terminate for Cause and that these violations were deliberate, serious, and seriously prejudicial to the University and the football program, thereby warranting termination for just cause.

Pursuant to Paragraph 4.3 of your employment agreement, you have fifteen (15) calendar days to appeal this decision to the University President.  However, your right to receive any payment under your employment agreement shall cease November 15, 2021, the day after this letter is issued, and you are not entitled to receive any compensation pending the appeal.

Sincerely,

Patrick Chun
Director of Athletics

Enc.
1.  Notice of Intent to Terminate for Just Cause
2.  September 28, 2021, email from HRS with instructions for completing the religious exemption form
3.  October 6, 2021, notification to Athletics from HRS Exemptions
4.  October 13, 2021, memorandum from Athletics regarding undue hardship
5.  October 13, 2021, supplemental memorandum from Athletics regarding sincerely held religious belief
6.  October 14, 2021, memorandum from EHS
7.  October 18, 2021, memorandum from Athletics to HRS/EHS
8.  October 18, 2021, email from HRS exemptions with notice of denial of religious exemption

cc:    Brian Fahling, Attorney for Nicholas Rolovich
       Danielle Hess, WSU Division Chief, Office of the Attorney General
       Personnel File

**ER0385**

ROLOVICH00000080

# EXHIBIT D

ROLOVICH00000081

(54 of 247), Page 54 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 54 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4250    Page 53
of 76

# EMPLOYMENT AGREEMENT

This Employment Agreement (Agreement) is made between Washington State University (University) and Nicholas R. Rolovich (Employee), and it cancels and replaces any and all prior employment agreements or understandings, whether in writing or otherwise, between these two parties.

1. **Employment Position**

    1.1. **Employment as Employee of University**. Employee shall serve as the Head Coach of the University's Intercollegiate Football Program (Football) and shall perform the duties outlined in Section 1.2 herein during the term of this Agreement. Employee is subject to and governed by the terms and conditions of the Agreement.

    1.2 **Description of Employee's responsibilities**

    1.2.1 **Recognition of duties**. Employee agrees to devote Employee's best efforts to the performance of their duties for the University, and to comply with and support all rules, regulations, policies, and decisions established or issued by the University. Employee agrees to abide by all provisions of law, including the Washington State Ethics in Public Service Law, RCW 42.52. Employee also agrees during the term of this Agreement that Employee will not engage, directly or indirectly, in any business that would detract from Employee's ability to apply their best efforts to the performance of their duties hereunder. Employee also agrees not to usurp any economic opportunities of the University.

    1.2.1.1 **General duties and responsibilities**. Employee agrees to undertake and perform properly, efficiently, to the best of Employee's ability, and consistent with the standards of the University all duties and responsibilities (as defined in Section **1.2.1.2** and/or Athletic Director) attendant to the position of Head Coach of the University's Football Program. Employee further agrees to abide by and comply with the constitution, bylaws, and interpretations of the National Collegiate Athletic Association (NCAA) and Pac-12 Conference (Pac-12), Title IX of the Education Amendments Act of 1972 (Title IX) including, but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA, Pac-12 and University policy, and all NCAA, Pac-12, and University rules and regulations relating to the conduct and administration of the Football Program as now constituted or as may be amended during the term hereof. In the event Employee becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, Employee shall promptly report the same to the Athletic Director, Director of Compliance, or Faculty Athletic Representative of the University, and cooperate and comply with any related inquiries or investigations. Employee agrees to adhere to, respect, and to follow the academic standards and requirements of the University in regard to the recruitment and eligibility of prospective and current student-athletes for the Football Program. All academic standards, requirements, and policies of the University shall also be observed by Employee at all times.

    1.2.1.2 **Specific duties and responsibilities.** Employee is accountable for the following list of specific duties and responsibilities. This list supplements Employee's other general duties and responsibilities provided elsewhere in this Agreement.

    a. Integrate the Football program into the whole spectrum of academic life to complement the University and its mission in the state and community;

    b. Evaluate, recruit, train, and develop student-athletes to compete successfully against major college competition in a quality Division I Football program;

1

**ER0387**

ROLOVICH00000082

c. Maintain a competitive Football program consistent with the Athletic Director's goals, which will reasonably be established upon consultation with Employee;

d. Cooperate with and support the University's faculty and administrative officials to ensure that student-athletes participating in the Football program meet all academic requirements;

e. Conduct the Football program with integrity and maintain financial responsibility consistent with the Football program budget, standards, and reasonable expectations of the Athletic Department and the University;

f. Recommend to the Athletic Director the appointment and discharge of assistant Football coaches and all other contracted staff specific to Football. Employee and the Athletic Director shall consult regarding those issues and make reasonable efforts to reach agreement. The Athletic Director shall then make the final decision;

g. Manage the Football program, including, but not limited to, assisting the Athletic Director, or his designee, with Football budget preparation and administration, and the supervision and evaluation of the Football program's staff;

h. Under the direction of the Athletic Director, participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program;

i. Serve as director of instructional youth Football programs to be held in athletic facilities at the University's Pullman campus if deemed applicable;

j. The Athletic Director or his designee may reasonably assign other duties from time to time that are consistent with customary duties of a Head Football Coach at a Division I Football program;

k. Cooperate with any investigation relating to the University's athletic programs, including the Football Program;

l. Ensure full compliance with Title IX of the Education Amendments Act of 1972 (Title IX), including but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA and Pac-12 policy and univeristy policies and regulations; and

m. Any other reasonable duties as assigned by the Athletic Director.

1.3 **Employee subject to discipline for violations of NCAA rules and regulations.** If Employee is found to be in violation of NCAA rules and regulations, including, but not limited to, the ethical conduct expectations as stated in NCAA Bylaws 10.1, 11.1.1, 11.1.2, 11.1.2.1, and 19.01.2, whether while employed by the University or during prior employment at another NCAA member institution, Employee shall be subject to disciplinary or corrective action as set forth through the NCAA enforcement procedures. Further, the University may suspend Employee for a period of time, without pay, or may terminate employment as provided in Section 4.1 hereof if Employee is found to have been involved in or condoned a major violation or a pattern of uncorrected secondary violations of NCAA, Pac-12, or University rules and regulations.

2

**ER0388**

ROLOVICH00000083

1.4    **Reporting relationship.** Employee shall report to the Athletic Director, or to such other person as the Athletic Director may designate.

1.5    **Staffing.** The University will provide Employee with a full-time staff as allowed by NCAA and Pac-12 rules.

## 2.    Term of Employment

The University hereby employs and Employee accepts employment for the period beginning on January 14, 2020 and ending on June 30, 2025, subject, however, to prior termination in accordance with the provisions set forth in Section 4. Employee is solely responsible for obtaining legal employment status in the United States and is required to report legal status to University. Employee must immediately inform University if legal employment status is denied or revoked. The University may terminate this agreement if Employee is unable to maintain legal employment status in the U.S. On or before May 31, 2025, Employee will receive written notification from the University of its intent to renew or not renew the Agreement. If Employee obtains new employment commencing prior to June 30, 2025, Employee shall notify University immediately, and all payments and fringe benefits under this Agreement shall cease on the date Employee's new employment commences.

## 3.    Compensation

In consideration for the promises he has made in entering into this Agreement, Employee shall be entitled to the compensation set forth herein. All payments from the University are subject to normal deductions and withholding for state, local, and federal taxes and for any retirement or other benefits to which Employee is entitled or in which Employee participates, and are subject to the terms and conditions of Section 4 concerning termination of this Agreement.

3.1    **Base salary**. The base salary paid by the University to Employee for services and satisfactory performance of the terms and conditions of this Agreement shall be at the annual salary rate of $2,000,000 payable by the University in accord with payroll dates and procedures applicable to University employees generally. Employee shall be eligible for consideration for salary increases to the base salary that are authorized and funded by the state of Washington, subject to a determination by the Athletic Director.

3.2    **Compensation for all collateral opportunities.** University shall pay Employee supplemental compensation in the amount of $1,000,000 each employment year for the term of this contract in consideration of any collateral opportunity available to Employee as a Head Coach of the Football team. This supplemental compensation is intended to reflect income paid by third parties to the University for the types of collateral opportunities described herein. Employee is entitled to receive additional compensation directly from third parties for collateral opportunities not arranged by or in conflict with arrangements made previously by the University with the understanding that Employee must receive prior written approval from the University, which approval shall not be unreasonably withheld. University agrees to pay Employee said compensation in accordance with payroll dates and procedures applicable to general University employees.

3.3    **Fringe benefits**. During the term of this Agreement, the University will provide Employee with the fringe benefits described in this Section 3.2 and no others.

   3.3.1    **Standard University fringe benefits**. Employee shall be entitled to the standard University fringe benefits, including group life insurance, family medical coverage, and retirement plan contributions. Retirement contributions shall be made in accordance with the retirement plan selected by Employee and offered through the University. If any benefit/consideration is based in whole or in part upon the salary paid to Employee, such benefit/consideration shall be made without including any collateral compensation or

3

**ER0389**

ROLOVICH00000084

incentive or supplemental compensation. Notwithstanding the above, Employee shall not accrue nor be entitled to use annual leave.

3.3.2   **Expenses**.  The University will reimburse Employee at the rate authorized by state law and University regulations for all travel and out-of-pocket expenses reasonably incurred by Employee for the purpose of and in connection with the performance of Employee's duties under this Agreement.

3.3.3   **Vehicle**. During the term of this Agreement, the University may provide Employee with either: (a) a donated vehicle on a loan basis; or (b) a stipend in the amount of $450 per month in lieu of a donated vehicle. The University has the sole discretion to determine whether to provide the use of the loaned vehicle or the stipend. Employee shall use, maintain, and service any vehicle provided in compliance with the University's written policies and procedures regarding courtesy cars, as those policies now exist or may be amended. The University's courtesy car program is structured as an "accountable plan" for tax purposes, and Employee understands and agrees that Employee shall be taxed on the annual percentage of personal use of the vehicle, which will be calculated from the mileage records submitted by Employee. Employee shall not remove any dealer identification markings placed on the vehicle for promotional purposes.

3.3.4   **Tickets**. University will provide Employee with use of a 12-seat family suite in Martin Stadium for each WSU home Football contest, and up to twenty (20) tickets for each home, away and post-season Football contest in which the University's Football team competes during the term of this Agreement. Tickets to each home game of each of the University's other varsity intercollegiate athletic teams will be provided in non-priority seating sections according to the provisions of the athletic department's ticket policy for staff members. Employee understands and acknowledges that the value of tickets and passes may be considered income to Employee and will be so reported by the University. Employee also understands that the use of tickets and passes will be subject to normal compliance review for complimentary tickets.

3.3.5   **Guest Travel**. Employee may bring spouse and two guests with the Football team on all away team travel trips; or, Employee may bring spouse and dependent children on all away team travel trips on a space available basis. Employee cannot bring two guests and dependent children on the same away team travel trip, however, dependent children can be considered as part of the permissible two guests. Employee, spouse and any guests or children must be traveling with team on the same trip. The University will pay as compensation to Employee all travel and lodging costs associated with bringing spouse and guests or children on the road trips and related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 Conference regulations. Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and guests or children to the contest, including airfare, ground transportation, lodging, and cost of admission to the games and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University. Travel expenses shall be paid in accordance with applicable IRS regulations.

3.3.6   **Guest travel for post-season competition**. Whenever Employee attends post-season athletic competition because the Football team is participating in the event, Employee may elect to bring their spouse and dependent children, regardless of age, to the event and related activities. The University will pay as compensation to Employee all costs associated with bringing Employee's spouse or partner and dependent children to the event and its related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 regulations.  Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and dependent children to the event, including, but not limited to, airfare, other travel costs such as rental car or bus fare,

4

**ER0390**

ROLOVICH00000085

(58 of 247), Page 58 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 58 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4254    Page 57
of 76

lodging, subsistence, and cost of admission to the game and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University.

3.3.7    **Alaska Lounge**. The University will pay Employee's membership dues to the Alaska Airlines Lounge. Employee understands and acknowledges that the value of this membership may be considered income to the Employee and will be so reported by the University.

3.3.8    **Parking**. The University will provide Employee with two (2) permits for parking purposes for each of the University's home Football contests in Pullman, Washington. Employee understands and acknowledges that the value of tickets and passes may be considered income to the Employee and will be so reported by the University.

3.3.9    **One-time payment.** The University will pay Employee a one-time payment of $561,803 (five hundred sixty-one thousand, eight hundred and three dollars) in order to reimburse Employee for payment of contractual buy-out obligation to former employer. Employee is solely responsible for satisfying any contractual obligations to the former employer. Employee understands and acknowledges that this payment shall be subject to standard withholding applicable to salary payments for Employee's position at the University.

3.3.10   **Golf club membership.** The University, as additional compensation, will pay Employee's membership dues at the Palouse Ridge Country Club. The University will also pay the Employee's fee for joining the club, if any. Employee understands and acknowledges that the value of such membership may be considered income to the Employee and will be so reported by the University.

3.3.11   **On-campus summer camp**. The University has the exclusive right to operate summer youth Football camps on its campus using University facilities. Pursuant to Section 1.2.1.2(i) hereof and subject to Section 3.3.11 hereof, Employee shall direct and participate in the University's summer Football camps. Notwithstanding the provisions of Section 4.3.2 hereof, the coaches of the University's Football program will be compensated for their performance of duties in said on-campus summer camps consistent with athletic department policies.

3.3.12   **Outside income**. Employee may be compensated for outside activities appropriate to the promotion of athletic programs, provided such activities do not conflict or interfere with the discharge of duties under this Agreement. Employee must receive prior approval from the Athletic Director, or from such other person as the Athletic Director may designate, for all such outside compensation. Such activities must comply with the state ethics law and University policy.

3.4    **Incentive Compensation.** Each employment year during the term of this Agreement, in addition to the base salary and supplemental compensation, the University shall pay Employee any applicable incentive compensation as provided in Section 3.4. The University shall pay Employee incentive compensation for an employment year within a reasonable time (generally, 30 days) after the University has determined the amount of the payment and whether the conditions of payment have been met. The University shall annually pay Employee the incentive compensation for the following achievement(s):

| Achievement | Amount of Incentive Payment |
|---|---|
| • Pac-12 North Champion * | $50,000 |
| • Pac-12 Conference Champion * | $100,000 (non-inclusive) |
| | |
| • Final National Ranking Top 25 (CFP, AP, USA Today) * | $50,000 |
| • Final National Ranking Top 10 (CFP, AP, USA Today,) * | $100,000 (non-inclusive) |

5

ROLOVICH00000086

(59 of 247), Page 59 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 59 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4255    Page 58
of 76

| | |
|---|---|
| • Pac-12 Public School Graduation Rate #1 * *(based on the WSU Football NCAA GSR)* | $25,000 |
| • Pac-12 Public School Graduation Rate Top 4 * *(based on the WSU Football NCAA GSR)* | $15,000 (non-inclusive) |
| • 7+ Regular Season wins <u>and</u> participation in Bowl Game <u>not</u> Sugar, Rose, Orange, Cotton, Peach, Fiesta * | $25,000 |
| • Sugar, Rose, Orange, Cotton, Peach or Fiesta Bowl Game * | $100,000 (non-inclusive) |
| • College Football Playoff appearance * | $200,000 (non-inclusive) |
| • National Championship Game appearance* | $300,000 (non-inclusive) |
| • National Championship Game victory* | $400,000 (non-inclusive) |
| • Pac-12 Coach of the Year | $25,000 |
| • National Coach of Year (AP, AFCA)** | $50,000 |

*One Payment only in each incentive category for highest level reached
**One Payment only, even if multiple awards

4. **Termination**

4.1 **Termination by University for just cause**. The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as examples of its normally understood meaning in employment contracts, any of the following:

4.1.1 Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

4.1.2 Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

4.1.3 Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

4.1.4 An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation

6

**ER0392**

ROLOVICH00000087

(60 of 247), Page 60 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 60 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4256    Page 59
of 76

by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

**4.1.5** Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

**4.1.6** Prolonged absence from duty without the consent of Employee's supervisor.

**4.2** **Determination of Just Cause and hearing provision**. Just Cause sufficient to satisfy the provisions of Section 4.1 shall initially be determined in good faith by the Athletic Director of the University. The Athletic Director shall give Employee written notice of the provisions of the Agreement alleged to have been violated, together with a statement of the factual basis for those allegations. Employee will have fifteen (15) calendar days within which to respond to the Athletic Director, in writing, with reasons Employee should not be terminated. The Athletic Director, after considering any response provided by Employee, will issue a decision regarding termination for Just Cause. If a summary suspension has been issued in accordance with paragraph 4.3.1, the Athletic Director must issue a decision regarding termination within five (5) calendar days of receipt of Employee's response. If a summary suspension has not been ordered, the Athletic Director shall issue a decision regarding termination within ten (10) calendar days of receipt of Employee's response.

Employee's right to receive any payment under this Agreement, including all portions of Section 3, shall cease the day following the issuance of the decision to terminate for Just Cause.

**4.3** **Appeal of termination for Just Cause**. Employee may appeal the Athletic Director's decision to terminate for Just Cause to the University President or designee. Such appeal must be made in writing within fifteen (15) calendar days' notice of the Athletic Director's determination and must contain a statement of the reasons Employee requests the President to set aside the decision to terminate for Just Cause. Employee must provide a copy of the appeal to the Athletic Director at the time it is delivered to the Office of the President. The Athletic Director may, within seven (7) calendar days of receipt of the notice of appeal, provide to the President an additional written statement supporting the Athletic Director's decision and shall provide the President with: 1) the written notice of termination sent to Employee; 2) Employee's written response, if any; and 3) the written decision of termination. The President may allow oral statements in the President's discretion. The President shall render a final decision within thirty (30) calendar days of receiving the materials provided by the Athletic Director, which shall be the final decision of the University.

Employee shall not be entitled to receive any compensation under this Agreement pending the appeal. Should Employee be reinstated by the President, Employee shall be entitled to back pay for compensation not paid during the pendency of the appeal.

**4.3.1** **Summary suspension**. Once the preliminary determination of intent to terminate for Just Cause is made, the Athletic Director shall have the administrative authority to order suspension of Employee from Employee's duties and salary pending termination of this Agreement, provided that notice of any such suspension shall be delivered to Employee in writing, detailing the reasons for such suspension. This notice may be contained in the same document as the written notice of termination. Summary suspension may also be imposed if the Athletic Director finds that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. The Athletic Director has the authority to issue immediate summary suspension if facts show that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. Employee may respond to the notice of summary suspension together with Employee's response, if any, to the notice of termination.

Employee shall not be entitled to receive any compensation under this Agreement during the summary suspension period.

7

**ER0393**

ROLOVICH00000088

(61 of 247), Page 61 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 61 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4257    Page 60
of 76

4.3.2 **University's obligations upon termination for Just Cause**. In the event this Agreement is terminated for Just Cause in accordance with the provisions of Sections 4.1 and 4.2, all obligations of the University to make further payments under this Agreement and/or to provide any other consideration shall cease. In no case shall the University be liable to Employee for the loss of any collateral business opportunities or any other benefits, perquisites, or athletically-related income from any other source, nor shall Employee be liable to the University for the loss of any such collateral business opportunities. Employee will be paid all compensation earned up to the date of termination for Just Cause.

4.4 **Termination by University without Just Cause**. The University reserves the right to terminate this Agreement prior to its normal expiration without cause. Termination by the University without cause shall be effectuated by delivering to Employee written notice, signed by the President of the University or by the Athletic Director or such other person as the President may designate, of the University's intent to terminate this Agreement without cause. In such event, University will pay Coach liquidated damages, in lieu of any and all other legal remedies or equitable relief.

4.4.1 **Liquidated damages upon termination by University without Just Cause**. The parties agree that actual damages resulting from termination without just cause would be difficult to calculate and that the payment of liquidated damages by University to Employee shall constitute sufficient and reasonable compensation to Employee for any loss, damages, or injury suffered by Employee because of termination without just cause by University. The parties further agree that the payment of liquidated damages shall not be construed as a penalty.

If the University terminates this Agreement without just cause at any time prior to June 30, 2025, the University shall pay Employee liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of this Agreement specifically in Section 3.1. This payment shall be paid in full, either in one lump sum or a series of payments at the discretion of the University, by no later than March 15 of the calendar year following the effective date of termination, In no case shall the University be liable for the loss of any business opportunities or any other benefits, perquisites, supplemental income or athletically related income from any other source. The parties intend that the provisions of this Agreement comply with, or meet an exemption from, Section 409A of the Code, and the regulations thereunder and all provisions of this Agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties thereunder, and neither party shall have the right to accelerate, defer or otherwise modify the manner of payment of any amount set forth in this Section 5.01(e), except for the University's right to determine the payment schedule. Employee shall have no mitigation obligation and WSU shall have no offset rights against any compensation earner or received by Employee subsequent to such termination.

4.5 **Termination by Employee**

4.5.1 **Written notice by Employee**. Employee may terminate this Agreement during its term by giving the University fourteen (14) calendar days' advance written notice of the termination, or affirmatively communicates to the Director of Athletics or their delegate of an intention to leave or accept a coaching position elsewhere. Payment of remaining salary will cease on the date Employee submits a resignation, fails to report to work, or otherwise engages in actions that clearly establish employment with another party.

4.5.2 **Liquidated damages upon termination by employee.** Employee recognizes that University is making a highly valuable investment in their continued employment by entering into this Agreement and that investment would be lost if they were to resign prior to the expiration of this Agreement. The parties agree actual damage to University in such case would be extremely difficult to calculate. The parties further agree that the payment

8

**ER0394**

ROLOVICH00000089

(62 of 247), Page 62 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 62 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4258    Page 61
of 76

of liquidated damages by Employee and acceptance by University shall constitute sufficient and reasonable compensation to University for injury and that it shall be enforceable as liquidated damages and not as a penalty.

If Employee terminates this Agreement during the initial term of this Agreement, Employee shall pay liquidated damages to the University as follows:

- On or before June 30, 2021: $8,000,000
- July 1, 2021, through June 30, 2022 (inclusive): $6,000,000
- July 1, 2022, through June 30, 2023 (inclusive): $5,000,000
- July 1, 2023, through June 30, 2024 (inclusive): $2,000,000
- July 1, 2024, through June 30, 2025 (inclusive): $1,000,000

## 5.    Restriction on Competition

Employee agrees and specifically promises that Employee will neither directly nor indirectly through an agent actively seek, negotiate for, or accept employment, under any circumstances, as a coach or in any other capacity related to intercollegiate athletics with any member institution of the NCAA or with any football team participating in any professional league or conference in the United States or elsewhere requiring performance of duties prior to the expiration date of the term of this Agreement or any extension without first notifying the Athletic Director and obtaining permission from the Athletic Director to seek such described employment opportunities, such permission to not be unreasonably withheld.

## 6.    Choice of Law

This Agreement has been entered into under, and shall be governed by, the laws of the State of Washington. In the event that either party for the enforcement or construction of any of the provisions of this Agreement commences litigation, the actions shall be brought in the Superior Court of the State of Washington and the venue shall be in Whitman County, Washington.

## 7.    Alternate Dispute Resolution

Except as otherwise provided in this Agreement, when a dispute arises between the parties and it cannot be resolved by direct negotiation, the parties agree to participate in good faith mediation.  The mediator shall be chosen by agreement of the parties.  If the parties cannot agree on a mediator, the parties shall use a mediation service that selects the mediator for the parties. The cost of the mediation, if any, shall be shared equally by the parties, unless otherwise agreed. The parties agree that mediation shall precede any action in a judicial tribunal.

Nothing in this Agreement shall be construed to limit the parties' choice of a mutually acceptable alternative resolution method such as a disputes hearing, a Disputes Resolution Panel, or arbitration.

## 8.    Merger Clause

This Agreement supersedes all prior understandings and agreements, oral or written, regarding Employee's employment by the University, including University handbooks or manuals.

## 9.    Amendments to Agreement

This Agreement may be amended at any time only by a written instrument duly approved by the University through its designated representative and accepted by Employee, such approval and acceptance to be acknowledged in writing.

9

**ER0395**

ROLOVICH00000090

(63 of 247), Page 63 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 63 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4259    Page 62
of 76

10. **Acknowledgment**

Employee acknowledges that Employee has read and understands the foregoing provisions of this Agreement and that such provisions are reasonable and enforceable and that Employee agrees to abide by this Agreement and the terms and conditions set forth herein. Employee further acknowledges that Employee has been provided an opportunity to seek the advice of legal counsel before entering into this Agreement.

11. **Severability**

If any provision of this Agreement is found to be unenforceable, either in whole or in part, then such provision shall be deemed amended to delete or modify, as necessary, the offending provision or provisions or to alter the bound thereof in order to render said provision valid and enforceable. The remainder of this Agreement will not be affected, and will remain in full force and effect to the extent provided by law.

**IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT.**

WASHINGTON STATE UNIVERSITY                    EMPLOYEE

_____                        _____
Patrick Chun                                   Nicholas R. Rolovich
Director of Athletics
Date:    April 7, 2020                          Date:    Apr 6, 2020

_____
Kirk H. Schulz
Office of the President
Date:

Approved as to form:
_____
Office of the Attorney General
Date:    4/10/20

10

ROLOVICH00000091

(64 of 247), Page 64 of 247   Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 64 of 247
Case 2:22-cv-00319-TOR     ECF No. 108     filed 10/14/24     PageID.4260     Page 63
of 76



November 26, 2021

Kirk H. Schulz
President
Washington State University
E: PresidentsOffice@wsu.edu
T: 509-335-0200

Re: Appeal of Chun's Termination of Nicholas Rolovich

Dear President Schulz:

As counsel for Nicholas Rolovich, Brian Fahling of the Law Office of Brian Fahling and Eric Kniffin of Lewis Roca submit this letter under Paragraph 4.3 of Coach Rolovich's Employment Contract with the University to offer you the opportunity to reevaluate Patrick Chun's November 12, 2021, decision to terminate Coach Rolovich, and his contemporaneous claim that the University has the legal right to avoid paying Coach Rolovich liquidated damages as required under Paragraph 4.4.1 of his Contract.

Along with this appeal we attach the following:

Ex. A: Mr. Chun's Oct. 18 letter to Coach Rolovich, Notice of Intent to Terminate for Just Cause
Ex. B: Coach Rolovich's Nov. 2 letter to Mr. Chun appealing Oct. 18 Notice, with attachments;
Ex. C: Mr. Chun's November 12 letter to Coach Rolovich, Notice of Decision to Terminate for Just Cause, with attachments; and
Ex. D: Coach Rolovich's Employment Contract with WSU.

As specified in Paragraph 4.3 of Coach Rolovich's Contract, the primary purpose of this letter is to explain why Mr. Chun was wrong to claim that he had "just cause" to terminate Coach Rolovich. To that end, it is important that we highlight for you the myriad ways in which Mr. Chun has violated University policy and Coach Rolovich's legal and constitutional rights.

We presume you are aware that Mr. Chun has been exhibiting extremely poor judgment and self-control as of late. Since deciding to terminate Coach Rolovich, he has been caught violating masking regulations at a donor event[1] and with WSU football players in the locker room.[2] When a local politician pointed out Mr. Chun's rank hypocrisy, Mr. Chun

---

[1] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/.

[2] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664. Mr. Chun's conduct violated both the University's and host Arizona State University's masking policies. See Arizona State University,

President Kirk H. Schulz
November 26, 2021
Page 2

went to the City Councilor's place of business and launched a vulgar tirade and threatened violence in front of the City Councilor's teenage daughter. Mr. Chun was so unhinged that the police got involved and decided that Chun would be "permanently trespassed" from the City Councilor's businesses.[3] But not even police action has been enough to quell Mr. Chun's misconduct: on November 19 a local reporter noted that Mr. Chun was openly flaunting masking rules at a WSU basketball game in Idaho.[4]

We presume that you condemn Mr. Chun's misconduct and his public violations of State, WSU, and host school COVID-19 safety policies. In that same spirit, we want to bring to your attention the manner in which Mr. Chun mishandled Coach Rolovich's request for a religious exemption from the Governor's vaccine mandate. That conduct and its illegality is detailed in our appeal, attached as Exhibit B, and we will reference it only in passing here.

We are confident that a neutral decisionmaker, familiar with the facts and caselaw relevant to Mr. Chun's decision to deny Coach Rolovich's request for a religious exemption, will come to see that there are two basic options in this matter. Option one is to embrace the University's processes, affirm Coach Rolovich's rights, and reject Mr. Chun's conduct in this affair. Option two is to defend Mr. Chun's conduct and turn a blind eye to University policy and Coach Rolovich's rights. These choices are clear because the relevant facts and legal principles are clear and unassailable.

Below we set out five points that succinctly state the strength of Coach Rolovich's position. While we understand the decision to uphold or reverse Mr. Chun's termination decision resides solely with you at this final stage of WSU's administrative process, we would not object to your seeking legal counsel on the legal issues presented in Coach Rolovich's November 2 appeal to Mr. Chun and Mr. Chun's November 12 decision to deny the appeal and reassert his stance that the University had grounds to terminate Coach Rolovich with just cause.

**First, Mr. Chun's claimed "just cause" to terminate Coach Rolovich rests entirely on his conclusion that Coach Rolovich was insincere.**

Mr. Chun claimed in his October 18 letter that the University had just cause to terminate Coach Rolovich because he had violated paragraphs 4.1.1 and 4.1.5 of his employment contract. Ex. A at 1, 2. Paragraph 4.1.1 applies when an employee is guilty of "[d]eliberate and serious violations" of his contractual duties or demonstrates a "refusal or unwillingness

---

Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

[3] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-trespassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html; Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/.

[4] Katie Daviscourt, WSU athletic director caught violating COVID protocols after firing head football coach for refusing vaccine, Post Millennial, Nov. 19, 2021, https://thepostmillennial.com/wsu-athletic-director-violating-covid-firing-coach/?utm_source=pocket_mylist.

116098490.9

ROLOVICH00000093

(66 of 247), Page 66 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 66 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4262    Page 65
of 76

President Kirk H. Schulz
November 26, 2021
Page 3

to perform such duties in good faith and to the best of Employee's abilities." Ex. D.
Paragraph 4.1.5 applies when an employee is guilty of conduct "seriously prejudicial to the
best interests of the University or its athletics program." *Id.* Even after our appeal showed
Mr. Chun the errors in his analysis, he doubled down: his November 15 letter referred to
the paragraphs cited in his October 18 letter and did not cite any additional grounds for
finding just cause. Ex. C. at 6.

Each of Mr. Chun's arguments implicitly relies on Mr. Chun's assertion that Coach
Rolovich filed a request for a religious exemption in bad faith. Put another way, if Mr.
Chun's claim that the University found Coach Rolovich insincere fails, so does his claim
that the University had just cause to terminate Rolovich.

Washington caselaw, more than half a century of civil rights law, and common sense all
confirm that an employee who raises a sincere religious objection is not *deliberately*
violating his contract. An employee who believes his obligations to his Creator preclude
him from complying with a company policy is not *refusing* or *unwilling* to perform his
duties "in good faith and to the best of his abilities" any more than an employee who
cannot comply with a company mandate for medical reasons.[5] It is impossible to imagine
that a court would agree with Mr. Chun that an employee who sincerely seeks a religious
exemption and accommodation is *guilty* of conduct "seriously prejudicial to the best
interests of the University or its athletics program." An employer cannot have just cause
"where the termination resulted because the employee exercised a legal right or privilege,"
such as the fundamental right to religious exercise.[6] To the contrary, terminating an
employee over a bona fide religious objection is a textbook prima facie case of religious
discrimination.[7]

In short, if the University found that Coach Rolovich had a sincere religious objection to
the Governor's vaccine mandate, the University cannot plausibly claim that it had grounds
to terminate him for just cause.

**Second, the University established a "blind review process" to determine sincerity,
and that process unquestionably found Coach Rolovich sincere.**

There is no doubt that the University established a "blind review process" to determine the
sincerity of employees that applied for a religious exemption. The University's stated
policy, media reports on the University's policy, and Washington State's VP for
Communications Phil Weiler all confirm this. Ex. B. at 6-8.

---

[5] *See* Ex. B at 11-12. Government actions "are not neutral and generally applicable, and therefore trigger
strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more
favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).,

[6] *Farnam v. CRISTA Ministries*, 807 P.2d 830, 834 (Wash. 1991).; *see also* Ex. B. at 18, 33.

[7] *Kennedy v. Bremerton Sch. Dist.*, 991 F.3d 1004, 1022 (9th Cir. 2021) (A prima facie case of religious
discrimination requires the plaintiff to show "that (1) he had a bona fide religious belief, the practice of which
conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the
employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his
inability to fulfill the job requirement.").

116098490.9

ROLOVICH00000094

(67 of 247), Page 67 of 247   Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 67 of 247
Case 2:22-cv-00319-TOR   ECF No. 108   filed 10/14/24   PageID.4263   Page 66
of 76

President Kirk H. Schulz
November 26, 2021
Page 4

The University followed the process described by each of these sources, and its review committee concluded that Coach Rolovich had demonstrated a "sincerely held religious belief." Ex. B. at 4, 8, 17-18 (citing HRS' Oct. 6 email to Chun, Ex. C-3 at 1). HRS' October 6 email to the Athletics Department did not invite Mr. Chun to comment on, let alone attempt to overturn the review committee's determination that Coach Rolovich was entitled to an exemption. This is further evidence that Coach Rolovich's reading of the University's policy is correct.

HRS' October 6 email only sought input from Mr. Chun and the Athletics Department on the accommodation question, not the sincerity question. Mr. Chun was simply asked whether he believed Coach Rolovich could perform the essential functions of his position under its proposed accommodations:

> Next Steps - Review Job Duties. The department is to review the employee's position description or essential job functions, to determine if the employee is able to perform essential functions of the position and meet the COVID-19 safety measures consistent with the recommendations of the state and protect the health and safety of the WSU community as part of this accommodation request.[8]

The University's own policy, testimony from media reports and State officials, and HRS' own conduct all confirm that the University had established a blind review process to determine whether an employee had shown a sincere religious objection to the Governor's vaccine requirement. There is no doubt that the University's established process ran its course and that it found Coach Rolovich sincere. This definitive determination means that the University has no plausible grounds on which to argue that it had just cause to terminate Coach Rolovich's employment contract.

**Third, Mr. Chun's interference with the University's "blind review process," and the subsequent actions of other University officials who bowed under pressure from Chun, violated University policy and Coach Rolovich's rights.**

Had the University followed its policies, Mr. Chun would not have been told that Coach Rolovich had applied for a religious exemption. Ex. B. at 6-8. However, that error pales in comparison to those that followed. First, Mr. Chun saw that the University's sincerity determination frustrated his goal of firing Coach Rolovich without having to pay liquidated damages. So he inserted himself into the already-completed process in order to interfere with and overturn the University's conclusion. Ex. B. at 5, 8-9. Second, HRS bowed to this pressure from Mr. Chun and allowed his bias to infect and override its "blind review process": HRS' October 18 email to Coach Rolovich cites Mr. Chun's input in support of its new conclusion that it "questions" Coach Rolovich's sincerity. *Id*. at 6.

As explained in Coach Rolovich's appeal to Mr. Chun, by allowing Mr. Chun to interfere with the University's "blind review process" and overturn that process' conclusion that Coach Rolovich was sincere, the University violated its own policies and Coach Rolovich's statutory and constitutional rights. A partial and preliminary list of those rights

---

[8] Ex. C-3 at 1.

116098490.9

ROLOVICH00000095

(68 of 247), Page 68 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 68 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4264    Page 67
of 76

President Kirk H. Schulz
November 26, 2021
Page 5

include Coach Rolovich's Fourteenth Amendment to procedural due process, his First
Amendment right to free exercise, his Title VII right to freedom from religious
discrimination, and his rights under the unconstitutional conditions doctrine. *Id*. at 6-15,
18.[9]

**Fourth, the University's decision on the accommodation question is legally irrelevant
to whether the University had "just cause" to terminate Coach Rolovich.**

As stated above, the University's decision on the accommodation issue is not relevant to
the central question of whether the University had just cause to terminate Coach Rolovich.
Even if the University's process, reasoning, and conclusion on the accommodation
question were legally defensible, an employer does not have just cause to terminate an
employee with sincere religious objections to a new employer requirement that was not
foreseen when his contract was entered into.[10]

It is also important to note that Mr. Chun's November 12 letter to Coach Rolovich
misrepresents the Governor's Proclamation 21-14.1. Mr. Chun claims:

> Per the Governor's Proclamation 21-14.1, all state employees, including
> those in higher education, were required to be fully vaccinated against
> COVID-19 by October 18, 2021, *unless they had an approved medical or
> religious accommodation*.[11]

This statement fundamentally misrepresents the Governor's Proclamation, which instead
states:

> Workers for State Agencies, Workers for operators of Educational Settings,
> and Health Care Providers *are not required to get vaccinated* against
> COVID-19 under this Order if they are unable to do so because of a
> disability or *if the requirement to do so conflicts with their sincerely held
> religious beliefs, practice, or observance*.[12]

The Proclamation is clear: "if the requirement . . . conflicts with" a football coach's
"sincerely held religious beliefs, practice, or observance," the coach is "not required to get

---

[9] Even if the University could show that Mr. Chun's animus did not infect its decisions regarding Coach
Rolovich's religious exemption and termination, Coach Rolovich's Free Exercise claims would still survive.
*See, e.g., Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1144–45 (10th Cir. 2006) ("[T]he Free Exercise
Clause has been applied numerous times when government officials interfered with religious exercise not out
of hostility or prejudice, but for secular reasons, such as saving money, promoting education, obtaining
jurors, facilitating traffic law enforcement, maintaining morale on the police force, or protecting job
opportunities. Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged
governmental action is not neutral, but the Free Exercise Clause is not confined to actions based on
animus.").

[10] *Supra* at 3; *see also* Ex. B. at 15, 17-18.

[11] Ex. C at 1 (emphasis added).

[12] Gov. Inslee Proclamation 21-14.1 at ¶2.a., Aug. 20, 2021 (emphases added), available at
https://www.governor.wa.gov/sites/default/files/proclamations/21-14.1%20-%20COVID-
19%20Vax%20Washington%20Amendment.pdf.

116098490.9

**ER0401**

ROLOVICH00000096

(69 of 247), Page 69 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 69 of 247
Case 2:22-cv-00319-TOR ECF No. 108 filed 10/14/24 PageID.4265 Page 68
of 76

President Kirk H. Schulz
November 26, 2021
Page 6

vaccinated against COVID-19 under this Order." As applied here, because the University
concluded that Coach Rolovich had demonstrated a "sincerely held religious belief," he is
"not required to get vaccinated" under Proclamation 21-14.1.

You may decide for yourself whether Mr. Chun's misrepresentation of the Governor's
Proclamation was intentional or just sloppy. Either way, Mr. Chun's assertion that he
would not accommodate Coach Rolovich's sincere religious beliefs does not magically, or
legally, transform Coach Rolovich's sincere religious beliefs into insincere religious
beliefs. Mr. Chun's analysis muddles the important procedural and legal differences
between the University's sincerity analysis and its accommodation analysis. If Mr. Chun's
error was unintentional, it is easily corrected. If it was intentional, it is a  bad faith effort to
escape buying out Coach Rolovich's contract.

To be sure, WSU may terminate Coach Rolovich for no reason, or for any reason, but what
it cannot do is terminate Coach Rolovich for just cause because, as the University
determined, he acted upon his sincerely held religious beliefs. To the extent Mr. Chun
claims otherwise, his position is indefensible. Like so many choices Mr. Chun has made in
recent months, the University would do well to distance itself from it.

**Fifth, if the University finds it necessary to defend Mr. Chun's decision to deny Coach
Rolovich's request for an accommodation, it will be required to defend even more
unreasonable, biased, and illegal conduct.**

If the University does nonetheless seek to defend Mr. Chun's conduct and ultimate
decision on the accommodation question, it will have to deal with another slate of
procedural, statutory, and constitutional problems. *Id*. at 17-34. Apart from these legal
problems, many of Mr. Chun's assertions in denying Coach Rolovich's request for an
accommodation are demonstrably false and scientifically indefensible. *Id*. at 20-30.

The same applies to the additional reasons Mr. Chun introduced in his November 15 letter
denying Coach Rolovich's appeal. Ex. C at 1-6. We will not take time to refute each of Mr.
Chun's assertions here because they are irrelevant to the central issues before you in this
appeal. We will, however, respond briefly to three of them.[13]

### 1. Mr. Chun's Unsupported and Inaccurate Claims of "Overwhelming Scientific Evidence"

The scientific claims that Mr. Chun has made to support his decision to terminate Coach
Rolovich were wrong when they were made and are even more unsupportable now. Mr.
Chun's undocumented claim that "[o]verwhelming scientific evidence establishes the
efficacy of the vaccine in mitigating the spread of COVID-19," Ex. C. at 3, flies in the face
of actual scientific studies on the subject, as Dr. Bhattacharya explains in his attached

---

[13] It is noteworthy, too, that Mr. Chun, in his termination of Coach Rolovich, does not deny any of Coach
Rolovich's accounts of Mr. Chun's statements in section IA of his Letter Appeal. Ex. B at 2-4. These
statements are strong evidence that Mr. Chun demonstrated animus towards Coach Rolovich's religious
beliefs.

116098490.9

**ER0402**

ROLOVICH00000097

(70 of 247), Page 70 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 70 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4266    Page 69
of 76

President Kirk H. Schulz
November 26, 2021
Page 7

declaration.[14] And whether or not the vaccine(s) prevent severe disease for the vaccinated is irrelevant to the Governor's and the University's stated purpose of mitigating the spread of COVID-19.[15]

Coach Rolovich has always been willing to undergo COVID testing. Ex. B at 24 n.16. Governor Inslee considered a "testing strategy option" in August, but rejected it because he was aware it would make it easier for State employees with religious objections, like Rolovich, to secure a religious accommodation. *Id*. at 24 n.17. Three days after Mr. Chun terminated Coach Rolovich, Governor Inslee announced he would allow employees to undergo testing in lieu of vaccinations.[16] As Dr. Bhattacharya demonstrates, it would be better for employers to require daily symptom checking paired with periodic PCR or antigen testing for *all* employees, not just the unvaccinated, given how easily vaccinated persons can contract and spread COVID. Ex. B-1 ¶9. However, the Governor's announcement is a good step in the right direction, and enough to undermine Mr. Chun's rationale.

### 2. Mr. Chun Cites Coach Rolovich's June Jones Comment

Mr. Chun suggests that a comment Coach Rolovich made about June Jones is itself grounds for termination with just cause. Ex. C. at 5. First, these comments were not made to Mr. Chun or in his presence, so Mr. Chun is not in a position to judge their context or Coach Rolovich's tone. Second, Mr. Chun had previously evaluated Coach Rolovich's conduct in this instance and found them to be grounds for a reprimand, not termination— let alone termination for just cause. Third, Coach Rolovich's conduct in this instance pales in comparison to the tirade that Mr. Chun visited upon Pullman City Councilor Al Sorensen on September 29.[17] If Mr. Chun sincerely believed that Coach Rolovich's conduct was "deeply concerning and demonstrated a lack of self-control," and therefore

---

[14] Ex. B-1 ¶¶ 21-28. *See also* Press Release: Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html ("the Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people"); Sanjay Mishra, Evidence mounts that people with breakthrough infections can spread Delta easily, National Geographic, Aug. 20, 2021, https://www.nationalgeographic.com/science/article/evidence-mounts-that-people-with-breakthrough-infections-can-spread-delta-easily ("A preliminary study has shown that in the case of a breakthrough infection, the Delta variant is able to grow in the noses of vaccinated people to the same degree as if they were not vaccinated at all. The virus that grows is just as infectious as that in unvaccinated people, meaning vaccinated people can transmit the virus and infect others.").

[15] Gov. Proc. 21-14.1 at 3 ("to further our individual and collective duty to reduce the spread of COVID-19 in our communities, I issued Proclamation 21-14 requiring all employees . . . to be fully vaccinated against COVID-19 on or before October 18, 2021"); Ex. C at 1, 3 ("Your activities had had to be continually and severely limited to a much greater extent than if you had been vaccinated, in order to mitigate the risk of you becoming infected or infecting others." "Overwhelming scientific evidence establishes the efficacy of the vaccine in mitigating the spread of COVID-19[.]"). Pullman Police enforcing Gov. Inslee proclamations to combat spread of COVID-19, WSU Insider, Aug. 19, 2020, https://news.wsu.edu/news/2020/08/19/pullman-police-enforcing-gov-inslee-proclamations-combat-spread-covid-19/ (Governor's Proclamations are "aimed at mitigating the spread of COVID-19").

[16] Liz Brazile, WA to allow employers to test for Covid in place of mandatory vaccinations, KUAW, Nov. 18, 2021, https://www.kuow.org/stories/wa-employers-may-be-able-to-test-for-covid-in-place-of-mandatory-vaccination.

[17] *See* supra, n.3.

116098490.9

ROLOVICH00000098

(71 of 247), Page 71 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 71 of 247
Case 2:22-cv-00319-TOR     ECF No. 108     filed 10/14/24     PageID.4267     Page 70
of 76

President Kirk H. Schulz
November 26, 2021
Page 8

grounds for termination with just cause, then he would have resigned immediately after his conduct on September 29. If the University sincerely held Mr. Chun's alleged standards about vulgarity and "threat[s] of violence," it would have required Mr. Chun to resign or be fired for just cause soon thereafter. That Mr. Chun still holds his job speaks for itself.

### 3. Mr. Chun Cites Coach Rolovich's Masking Practices

Finally, Mr. Chun rejected HRS' proposed accommodations and also EHS' individualized assessment and proposed accommodations in part based upon his alleged concerns about Coach Rolovich's inability to follow WSU's masking and social distancing rules. Ex. C-4 at 2, Ex. C-7 at 1 n.1. Coach Rolovich disputes Mr. Chun's accusations. But more importantly, Mr. Chun's conduct, both before and after he submitted these memoranda, violates his own standards. As documented above, Mr. Chun has violated the State's, WSU's, and other universities' public safety policies on numerous occasions. He has done so at home, at WSU, and at other schools. He has done so indoors and outdoors. He had done so with WSU athletes and with WSU donors. WSU will be in a terribly compromised position if it has to defend Mr. Chun's reasoning, while tolerating Mr. Chun's own conduct.

*     *     *

116098490.9

**ER0404**

(72 of 247), Page 72 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 72 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4268    Page 71
of 76

President Kirk H. Schulz
November 26, 2021
Page 9

As described above, we suggest that you have two basic options on how to handle this appeal. Option one is to embrace the University's religious exemption policy, affirm Coach Rolovich's rights, and reject Mr. Chun's conduct in this affair. If you choose this option, we are open to discussing with you and your counsel how the University can quickly and efficiently resolve this matter by discussing the liquidated damages Coach Rolovich is entitled to under his employment contract with the University. Option two is to defend Mr. Chun's conduct and turn a blind eye to University policy and Coach Rolovich's rights. If you choose this option, we will look forward to arguing the merits of Coach Rolovich's case before a truly neutral decisionmaker.

We look forward to your response.

Law Office of Brian Fahling                    Lewis Roca

By: _____                                By: _____
Brian Fahling                                  Eric N. Kniffin, Special Counsel
Attorney for Nicholas Rolovich                 Attorney for Nicholas Rolovich

cc:     Danielle Hess
        Chief Counsel
        Washington State University
        E: danielleh@wsu.edu

        Patrick Chun
        Director of Athletics
        Washington State University
        Athletics.Director@wsu.edu

ATTACHMENTS

116098490.9

ER0405

ROLOVICH00000100

# EXHIBIT G

(74 of 247), Page 74 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 74 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4270    Page 73
of 76

| | |
|---:|:---|
| **From:** | "Druffel, Ginger K" <gkdruffel@wsu.edu> |
| **To:** | "nrolo21@hotmail.com" <nrolo21@hotmail.com> |
| **Cc:** | "bfahling@fahlinglaw.com" <bfahling@fahlinglaw.com>, "Chun, Patrick" <patrick.chun@wsu.edu>, "Hess, Danielle A" <danielleh@wsu.edu> |
| **Subject:** | Letter from President Kirk Schulz |
| **Date:** | Mon, 6 Dec 2021 23:41:00 +0000 |
| **Importance:** | Normal |
| **Attachments:** | 12.6.21_Appeal_Response.pdf |
| **Inline-Images:** | image003.png |

---

Dear Mr. Rolovich,

Please see the attached letter from President Kirk Schulz.  A copy of this letter will be sent to your mailing address on file as well.

Thank you
Ginger



**GINGER DRUFFEL**
SENIOR EXECUTIVE ASSISTANT TO THE PRESIDENT
Office of the President
Washington State University
Office: 509-335-7932
Mobile: 509-432-9019
Email: gkdruffel@wsu.edu
wsu.edu

**ER0407**

WSU_00031303

(75 of 247), Page 75 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 75 of 247
Case 2:22-cv-00319-TOR    ECF No. 108    filed 10/14/24    PageID.4271    Page 74
of 76



Office of the President

December 6, 2021

Nicholas Rolovich
1815 SW Casey Court
Pullman, WA 99163

Re: Decision on Appeal of Termination for Just Cause

Dear Mr. Rolovich,

By letter dated November 26, 2021, you timely appealed the Decision to Terminate for Just Cause issued by Athletic Director Patrick Chun, consistent with Paragraph 4.3 of the Employment Agreement (Agreement) between Washington State University (University) and Nicholas Rolovich. I have carefully reviewed and considered all the written materials that were provided to me, including the November 26, 2021, Appeal of Patrick Chun's Termination of Nicholas Rolovich and the following exhibits:

- Ex A. Letter of October 18, 2021, from Patrick Chun to Nicholas Rolovich, Notice of Intent to Terminate for Just Cause
- Ex. B. Letter of November 2, 2021, from Nicholas Rolovich to Patrick Chun responding to Notice of Intent to Terminate
- Ex. C. Letter of November 12, 2021, from Patrick Chun to Nicholas Rolovich, Notice of Decision to Terminate for Just Cause, with attachments
- Ex. D. Employment Agreement between Washington State University and Nicholas Rolovich

Under the terms of the Agreement, the University has the right to terminate the Agreement for just cause, which includes, but is not limited to, various examples set forth in Paragraphs 4.1.1 through 4.1.6. Under paragraph 1.2.1, the employee agrees to comply with and support all rules, regulations, policies, and decisions established or issued by the University, and to abide by all provisions of law.

State law, pursuant to Governor's Proclamation 21-14.1, requires all state employees to have been fully vaccinated against COVID-19 by October 18, 2021, unless they were unable to do so because of a disability or if the requirement conflicts with a sincerely-held religious belief, practice, or observance, and their employer could provide them with an accommodation that would not create an undue hardship for the employer. You do not have an approved exemption and the University was unable to accommodate you without creating an undue hardship. You also are not fully vaccinated. Therefore under the terms of the Proclamation, you are no longer eligible to



Office of the President

December 6, 2021
Page 2 of 3

engage in work for the University.  This, by itself, provides just cause for termination under the terms of the Agreement.

My review of the materials provided leads me to conclude that, contrary to your voluminous rebuttal arguments, you have been limited in your ability to fully perform certain essential job duties as set forth in the Notice of Intent to Terminate and Notice of Decision to Terminate. I further conclude that these limitations have resulted in contract violations as stated in above-referenced documents, including conduct seriously prejudicial to the best interests of the University and its football program in violation of Paragraph 4.1.5 of the Agreement.

The record in the written materials establishes that the University had a legitimate basis to question whether you have a sincerely held religious belief, practice, or observance that conflicts with the vaccination requirement.  I disagree with the arguments that seek to limit the information available to the University in considering this issue.

The record further supports the University's determination that, even if you have a sincerely held religious belief, practice, or observance that conflicts with the vaccination requirement, the University was unable to find a reasonable accommodation that did not pose an undue hardship. An accommodation that simply continues the measures that were in place during the past year, including the time the university was largely shut down to in-person operation and prior to the widespread availability of COVID-19 vaccines, is not reasonable.  I concur with Athletic Director Chun that maintaining the prior status quo would result in an undue hardship on the University by creating unnecessary risk to the safety of its students and staff, as well as the safety of other individuals you would need to interact with (including, but not limited to members of the press, potential athletic recruits, donors, and students and staff of other universities), given the myriad duties and close contacts necessary to perform your job duties.  Continuing to perform while unvaccinated, even with the risk mitigation measures in place during the last year, would continue to unduly compromise your ability to fully perform your essential job and leadership functions, and continue to impose additional monetary costs on the University.  This unprecedented pandemic, with new variants emerging, continues to challenge this University's ability to safely operate and carry out its mission with maximum safety to students and employees.

In brief response to your arguments that vaccination is unnecessary to enhance the safety of the WSU community, under Proclamation 21-14.1, "widespread vaccination is the primary means we have as a state to protect our health care system, to avoid the return of stringent public health measures, and to put the pandemic behind us."  Additionally, "increasing vaccination rates at educational settings is the strongest protective measure against COVID-19 available and,

**ER0409**

WSU_00031305

(77 of 247), Page 77 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 77 of 247
Case 2:22-cv-00319-TOR     ECF No. 108     filed 10/14/24     PageID.4273     Page 76
of 76



Office of the President

*December 6, 2021*
*Page 3 of 3*

together with masking, vital to providing in-person instruction in as safe a manner as possible."
According to the CDC, getting vaccinated is the best way to slow the spread of COVID-19 and to
prevent infection by Delta or other variants.  https://www.cdc.gov/coronavirus/2019-
ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html

In conclusion, your appeal is denied.  Under Paragraph 4.3 of the Agreement, this is the final
decision of the University.

Sincerely,

Kirk H. Schulz
President

cc:     Brian Fahling, Attorney for Nicholas Rolovich
        Patrick Chun, Athletic Director
        Danielle Hess, Sr. Assistant Attorney General

ER0410                                    WSU_00031306

1    ROBERT W. FERGUSON
     Attorney General
2

3    SPENCER W. COATES, WSBA #49683
     Assistant Attorney General
     800 Fifth Avenue, Suite 2000
4    Seattle, WA 98104-3188
     (206) 464-7744
5

6    ZACHARY J. PEKELIS, WSBA #44557
     Special Assistant Attorney General
     PACIFICA LAW GROUP LLP
7    1191 2nd Avenue, Suite 2000
     Seattle, WA 98101-3404
8    (206) 245-1700

9

10            **UNITED STATES DISTRICT COURT**
           **EASTERN DISTRICT OF WASHINGTON**

11

| | |
|---|---|
| NICHOLAS ROLOVICH, | NO. 2:22-cv-00319-TOR |
|          Plaintiff, | DECLARATION OF TEDDI PHARES IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |
|    v. | |
| WASHINGTON STATE UNIVERSITY, | |
|          Defendant. | |

DECLARATION OF TEDDI PHARES
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

1

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0411

(79 of 247) Page 79 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 79 of 247
Case 2:22-cv-00319-TOR    ECF No. 107    filed 10/14/24    PageID.4186    Page 2
of 13

I, Teddi Phares, declare as follows:

1.      I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

2.      I graduated from the University of Idaho in 2013 with a bachelor's degree in Broadcasting and Digital Media.

3.      After graduating from the University of Idaho, in November 2013, I accepted a position with Washington State University (WSU or the University), Human Resources Services (HRS), as a Human Resources Assistant.

4.      I have worked for WSU for the past eleven years. During my time at WSU, I have held various roles at HRS, including Senior Human Resources Assistant (2014-2015),Human Resources Analyst (2015-2016), Human Resource Consultant (2016-2022), and Senior Human Resource Consultant (2022-2023).

5.      I am currently a Senior Human Resources Strategic Partner at WSU, a role that I have held since May 2023.

6.      Since July 2023, I have also been serving as an at-large member of the College and University Professional Association for Human Resources' Western Region Board of Directors.

**WSU's Initial COVID-19 Vaccine Requirement**

7.      On April 28, 2021, WSU announced that it would be requiring, for the first time, proof of COVID-19 vaccination for all students, employees, and volunteers engaging in activities at a WSU campus or location for the 2021-2022 academic year. Exemptions to the vaccine requirement were allowed for medical, religious, or philosophical reasons. On May 21, 2021, Governor Inslee issued

DECLARATION OF TEDDI PHARES
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

2

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0412**

(80 of 247), Page 80 of 247, Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 80 of 247

Proclamation 20-25.13, which allowed fully vaccinated people to no longer wear a face covering or socially distance in most public settings.

8.      On May 26, 2021, WSU announced that fully vaccinated students, employees, and visitors were no longer required to wear a face covering or socially distance on WSU campuses.

9.      On June 30, 2021, Governor Inslee issued Proclamation 20-12.3, which prohibited universities from holding in-person instruction unless they implemented, among other things, (i) a policy requiring all students, staff, and faculty to be fully vaccinated against COVID-19, "subject to any medical exemptions required by law and any religious or philosophical exemptions" provided by the university, and (ii) a policy and procedure to verify the vaccination status of students, staff, and faculty.

10.     On August 2, 2021, WSU announced that all WSU employees were required to either declare themselves fully vaccinated or claim an exemption by August 23. To identify themselves as fully vaccinated, WSU employees attested through Workday, a cloud-based software platform used by WSU to manage human resources.

11.     At that point, WSU employees could claim an exemption to the vaccination requirement by declaring that they had a "medical reason" or a "non-medical (religious or philosophical/personal) reason" for declining the COVID-19 vaccination. No comment or documentation was then required or requested to claim an exemption. Masking in WSU facilities continued to be required for unvaccinated individuals, including those who claimed an exemption.

DECLARATION OF TEDDI PHARES
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

3

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0413

(81 of 247) Page 81 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 81 of 247
Case 2:22-cv-00319-TOR   ECF No. 107   filed 10/14/24   PageID.4188   Page 4
of 13

12.     On August 5, 2021, Nicholas Rolovich declared a "non-medical (religious or philosophical/personal) reason for declining COVID-19 vaccination" in Workday.

**WSU's Implementation of the Proclamation**

13.     After Governor Inslee issued Proclamation 21-14.1 (the Proclamation), HRS developed systems and processes to implement the Proclamation, including processes for vaccination verification and religious accommodation requests.

14.     In connection with that work, HRS reviewed and considered various materials, including the Proclamation, internal policies and procedures, and non-binding guidance documents created by the Governor's Office and the Office of Financial Management (OFM), among other things.

15.     On September 1, 2021, HRS sent out an email to all WSU employees outlining the requirements of the Proclamation and HRS's vaccination verification and religious accommodation process. A true and correct copy of that email is attached hereto as **Exhibit A**.

16.     To implement the Proclamation, WSU instructed employees to provide proof of vaccination or request an accommodation by October 4, 2021, the last day to get the final dose to be considered fully vaccinated by the October 18 deadline.

17.     Employees who declared that they were fully vaccinated for COVID-19 were required to provide proof of their vaccination status (i.e., vaccination cards, but not self-attestation) to their supervisors for review.

DECLARATION OF TEDDI PHARES
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

4

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0414

(82 of 247), Page 82 of 247, Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 82 of 247
Case 2:22-cv-00319-TOR    ECF No. 107    filed 10/14/24    PageID.4189    Page 5
of 13

18.    If an employee indicated via Workday that they were requesting a religious exemption, HRS was notified of the request via Workday and emailed a religious exemption request form directly to the employee's work email, which the employee was required to complete and return to HRS via email.

19.    After redacting all identifying information from the employee's religious exemption request form, a redacted version of the form was submitted to two members of a four-person committee for a "blind" review. I served as one of the members of that review committee, along with Lisa Gehring (then-Assistant Vice President of Human Resources), Bonnie Dennler (then-Human Resources Manager), and Daniel Records (then-Assistant Director for Civil Rights and Compliance).

20.    If the committee determined the employee's religious exemption request form did not contain sufficient information, the committee had the option to request additional information from the employee, at which point the employee's identity was revealed.

21.    If the committee determined that the employee's religious exemption request form—as well as any additional information provided by the employee at the committee's request—appeared to state a religious reason for declining COVID-19 vaccination, the employee's request proceeded to the second phase of the review process, the reasonable accommodation review.

22.    In the second phase of the religious accommodation process, HRS requested that the employee's department make a determination of whether accommodating the employee would impose an undue hardship on the

DECLARATION OF TEDDI PHARES
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

5

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(83 of 247) Page 83 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 83 of 247

1    University.

2          23.    Because the Proclamation prohibited employers from providing

3    accommodations that they knew were "based on false, misleading, or dishonest

4    grounds or information" or "based on the personal preference of the individual

5    and not on an inability to get vaccinated because of a disability or a conflict with

6    a sincerely held religious belief, practice, or observance," HRS specifically

7    invited employing departments to ask questions about the religious

8    accommodation request, discuss the request further, or share any concerns about

9    the employee's request. Thus, managing departments were permitted to provide

10   information relevant to those issues during this phase of the religious

11   accommodation review process.

12         24.    HRS also notified WSU Employee Health & Safety (EH&S) of the

13   employee's accommodation request in many cases, and EH&S provided HRS

14   and the employing department with a health and safety review of the requested

15   accommodation. Specifically, EH&S provided recommendations for reasonable

16   and necessary interventions and countermeasures that were the minimum

17   recommendations that WSU had to employ to be in compliance with applicable

18   regulatory guidelines and policies.

19         25.    After reviewing the employee's position description, essential job

20   functions, and any other pertinent information, the employing department

21   notified HRS whether an accommodation would pose an undue hardship to the

22   employing department or the University.

23         26.    HRS would then notify the employee of WSU's decision.

DECLARATION OF TEDDI PHARES                    6
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(84 of 247)  Page 84 of 247  Case: 25-361, 06/12/2025, DktEntry: 26.4, Page 84 of 247
Case 2:22-cv-00319-TOR    ECF No. 107    filed 10/14/24    PageID.4191    Page 7
of 13

27.     Notably, the process described above only applied to WSU employees, but not WSU students. For WSU students, exemption requests were reviewed by a committee separate from HRS.

**Nick Rolovich's Religious Accommodation Request**

28.     On October 4, 2021, Nick Rolovich submitted to HRS his request for a religious accommodation from WSU's COVID-19 vaccine requirement.

29.     Thereafter, Mr. Rolovich's anonymized religious exemption request form was reviewed by two members of the review committee, who made the initial determination that the information contained in his religious exemption request form adequately stated a religiously based conflict with COVID-19 vaccination. Mr. Rolovich's requested accommodation then proceeded to the second phase of the review process—the reasonable accommodation review.

30.     On October 6, 2021, HRS requested feedback on Mr. Rolovich's religious accommodation request from his employing department, the Athletics Department. HRS asked for feedback by the end of day on October 8, 2021. This was not a mandatory deadline, and departments quite commonly provided feedback after the requested response date.

31.     On October 13, 2021, then-WSU Athletics Director Pat Chun provided to HRS two letters containing information related to Mr. Rolovich's religious accommodation request.

32.     The first letter detailed the Athletics Department's analysis of the requested accommodation and undue hardship, including its ultimate conclusion that the requested accommodation would create an undue hardship on the

DECLARATION OF TEDDI PHARES
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

7

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0417**

Athletic Department and the University as a whole.

33.    The second letter contained information relevant to HRS's initial determination that Mr. Rolovich had adequately demonstrated a sincerely held religious belief against being vaccinated for COVID-19. The information contained in the second letter was not known by or available to HRS during the first phase of the review process—which involved reviewing information that Mr. Rolovich self-selected for inclusion in his religious exemption request form—but was relevant to the Proclamation's directive that employers not grant accommodations "based on the personal preference of the individual and not on an inability to get vaccinated because of . . . a conflict with a sincerely held religious belief."

34.    Also on October 13, 2021, HRS requested feedback from EH&S regarding Mr. Rolovich's requested accommodation. On October 14, 2021, EH&S sent HRS and the Athletics Department a letter containing recommendations for necessary interventions and countermeasures that were the minimum recommendations that WSU had to employ to be in compliance with regulatory guidelines. EH&S did not, however, determine whether the recommended interventions or countermeasures could be accommodated without undue hardship to the Athletics Department or the University.

35.    On October 18, 2021, Mr. Chun provided a response to the EH&S letter.

36.    Later that day, HRS informed Mr. Rolovich via email that it was unable to approve his religious accommodation request.

DECLARATION OF TEDDI PHARES
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

8

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(86 of 247), Page 86 of 247, Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 86 of 247
Case 2:22-cv-00319-TOR    ECF No. 107    filed 10/14/24    PageID.4193    Page 9
of 13

1    37.    Rolovich's last day as a WSU employee was November 15,

2  2021, and WSU issued his final paycheck on November 24.

3    I declare under penalty of perjury that the foregoing is true and correct.

10/9/2024

4    EXECUTED this ___ day of October, 2024, at Washington, D.C.

5    S/

6    TEDDI PHARES

DECLARATION OF TEDDI PHARES                    9
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0419

1

## CERTIFICATE OF SERVICE

2

3        On the 14th day of October, 2024, I caused to be served, via ECF

4 electronic service, a true copy of the foregoing document upon all counsel

5 registered for e-service.

6

7        DATED this 14th day of October, 2024.

8

9

10                                    Erica Knerr, Legal Assistant

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF TEDDI PHARES                    10
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0420**

# EXHIBIT A

(89 of 247), Page 89 of 247  Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 89 of 247
Case 2:22-cv-00319-TOR    ECF No. 107    filed 10/14/24    PageID.4196    Page 12
of 13

**From:** "Elliot-Cheslek, Theresa L" <telliot@wsu.edu>
**To:** "hrs.contacts@wsu.edu" <hrs.contacts@wsu.edu>, "HRS.Vancouver@wsu.edu" <HRS.Vancouver@wsu.edu>
**Subject:** WSU Employee COVID-19 Vaccination Verification Requirement
**Date:** Wed, 1 Sep 2021 16:48:53 +0000
**Importance:** Normal

---

Hello HRS:

The following communication was sent to all WSU employees this morning.

Regards,
Theresa

Department of Human Resources Washington State University

---

## *WSU Employee Vaccination Verification Requirement*

September 1, 2021

---

**State of Washington Governor's [Proclamation 21-14.1](#) mandates all employees, including graduate assistants, regardless of work location, to be fully vaccinated by October 18, 2021, or obtain a medical or religious exemption.**

To be fully vaccinated by October 18. 2021, you must receive the last dose of the selected vaccine no later than October 4, 2021.  See the schedule below for important series dosing dates.

| Vaccine | Series dose requirement | First dose no later than | Second dose | Completed series | Fully vaccinated = two weeks past final dose (must be by October 18, 2021) |
|---|---|---|---|---|---|
| Pfizer | 2 doses, 21 days apart | 09/13/21 | 10/04/21 | 10/04/21 | 10/18/21 |
| Moderna | 2 doses, 28 days apart | 09/06/21 | 10/04/21 | 10/04/21 | 10/18/21 |
| Janssen/Johnson & Johnson | Single dose | 10/04/21 | **N/A** | 10/04/21 | 10/18/21 |

Employees must complete, and supervisors must validate, the COVID-19 Vaccination Verification process in Workday confirming completion of the COVID-19 vaccine regimen or request for a medical or religious exemption by October 4, 2021.  Failure to do so may subject employees to possible disciplinary action, including separation.

The COVID-19 vaccination is a condition of employment.  Employees, who are not fully vaccinated or do not obtain a medical or religious exemption, will be prohibited from engaging in work after October 18, 2021.

**ER0422**

*Note: The previous declaration process does not meet the state mandate. The vaccination verification requirement supersedes the previous declaration process in Workday. Employees must complete the new vaccination verification process in Workday.*

For instructions on completing the COVID-19 Vaccination Verification in Workday refer to COVID-19 Vaccination Verification for Workers. Additional information regarding the Governor's proclamation can be found at hrs.wsu.edu/ vax-verification or by contacting Human Resource Services at hrs@wsu.edu or 509-335-4521.

You are receiving this email as a WSU employee or graduate assistant.

View as a Web Page

**Human Resource Services - Washington State University**
PO Box 641014, Pullman WA 99164-1014
509-335-4521

Pullman • Spokane • Tri-Cities • Vancouver • Everett • Global Campus • Extension

WSU_00022475

(91 of 247), Page 91 of 247, Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 91 of 247
Docusign Envelope ID: D4DAF664-C480-4308-960A-E679DD1C8482
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4028    Page 1
of 157

1    ROBERT W. FERGUSON
     Attorney General
2

3    ZACHARY J. PEKELIS, WSBA #44557
     Special Assistant Attorney General
4    PACIFICA LAW GROUP LLP
     1191 2nd Avenue, Suite 2000
5    Seattle, WA  98101-3404
     (206) 245-1700
6

7    SPENCER W. COATES, WSBA #49683
     Assistant Attorney General
8    800 Fifth Avenue, Suite 2000
     Seattle, WA  98104-3188
9    (206) 464-7744

10

11              UNITED STATES DISTRICT COURT
12              EASTERN DISTRICT OF WASHINGTON

13   NICHOLAS ROLOVICH,                  NO. 2:22-cv-00319-TOR

14              Plaintiff,               DECLARATION OF DR. GUY
                                         H. PALMER IN SUPPORT OF
15   v.                                  DEFENDANT'S CROSS-
                                         MOTION FOR SUMMARY
16   WASHINGTON STATE                    JUDGMENT
     UNIVERSITY,
17

18              Defendant.

19

20

21       I, DR. GUY H. PALMER, declare as follows:

22       1.    I am over the age of eighteen, competent to testify, and make this

23   declaration based on my personal knowledge.

24   DECL. OF DR. GUY PALMER IN
     SUPPORT OF DEF.'S CROSS-MSJ – 1
25   No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2.      I am a board-certified pathologist and Regents Professor of Pathology and Infectious Disease at Washington State University (WSU). I also hold an appointment as a Special Government Employee of the National Institutes of Health, where I serve as a member of the Council for the National Institute of Allergy and Infectious Diseases, representing the Division of Microbiology and Infectious Diseases (my commentary here does not reflect any viewpoint associated with my federal appointment).

3.      I was the Chief Science Advisor for the COVID-19 response at WSU from June 2020 through May 2023, when the role was no longer required. My role involved providing the scientific basis for decision-making at the university and coordination for implementing on-campus diagnostic testing, wastewater surveillance, and vaccine storage and distribution. On campus, I coordinated efforts with Cougar Student Health Services, Environmental Health and Safety, the One Health Diagnostic Laboratory, Human Resources, and Intercollegiate Athletics. I also communicated and coordinated efforts with Pullman Regional Hospital, Whitman County Public Health, the Washington State Department of Health (DOH), Insight Diagnostics, the Pullman School District, and Schweitzer Engineering. I attended the weekly briefings and coordinating sessions of the Pullman COVID-19 Task Force with the physicians at Pullman Regional Hospital, Cougar Health Services, Whitman County Public Health, and WSU Athletic Medicine.

4.      I was retained as an expert by WSU in this case and authored an expert report based on my training, professional experience, and research in pathology and infectious diseases and as Chief Science Advisor for WSU's COVID-19 task force.

DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 2
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(93 of 247), Page 93 of 247, Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 93 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4030    Page 3
of 157

DocuSign Envelope ID: 3A206E9E-C480-435B-9868-F1E79DA8A4FE

1  My report and its supporting exhibits are attached as **Exhibit A**. My report contains

2  a complete statement of the opinions to which I would testify if called as a witness

3  at trial.

4  **WSU's COVID-19 Response and Vaccine Policies**

5      5.      COVID-19 affected every aspect of life at WSU. Starting in early 2020,

6  we had to figure out how we could keep our community: students, researchers,

7  educators, administrators, employees, neighbors safe. And when it became clear

8  that COVID-19 was not going to be a short-lived pandemic, we had to figure out

9  how to continue to function as a world-class university while continuing to keep our

10  community safe. Relatedly, we had to comply with public health policies coming

11  from the State and Whitman County.

12      6.      On March 11, 2020, WSU announced that most courses would move

13  online starting on March 23, 2020 (the Monday after Spring Break).

14      7.      On March 13, 2020, Governor Inslee issued Proclamation 20-12.

15  Following up on the earlier statewide declaration of emergency, this Proclamation

16  prohibited colleges and universities from conducting in person classes. A true and

17  accurate copy of this proclamation is attached as **Exhibit B**.

18      8.      On July 23, 2020, WSU announced that the Fall Semester of 2020

19  would use what we called a "distance delivery model." For the Pullman campus, we

20  asked all students to live at their permanent residences, though we allowed students

21  with demonstrated need to seek approval to live on campus.

22      9.      During this time, WSU also complied with all relevant State and

23  County public health policies. This meant limiting any in-person gatherings to very

24  DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 3
25  No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0426**

1    small numbers, social distancing, and masking. WSU also trained employees in

2    contract tracing protocols, so that when infections were discovered, we could alert

3    others who may have been exposed and limit the spread.

4        10.    In the spring semester of 2021 we still had serious concerns about the

5    spread of COVID-19. We were concerned both with the public health implications

6    and the safety of our community. We were also concerned with the budget issues

7    caused by continued outbreaks and implementing the protocols that we had in place

8    to deal with those outbreaks, i.e., frequent testing, quarantining after exposure or

9    positive tests, and contract tracing.

10        11.    Compliance with COVID-19 protocols was especially difficult to

11    achieve in the student population. Two groups: Athletics (and the football program

12    in particular) and Greek life (fraternities and sororities) were especially problematic

13    and tied to outbreaks in 2020 and early 2021.

14        12.    One of the football outbreaks that occurred in March of 2021 was

15    particularly bad. It spread among the football team, to coaches, to family members,

16    and to members of other athletic teams. As a result of the outbreak, practices were

17    cancelled and coaches' children stayed home from school to try to prevent us from

18    spreading COVID-19 from WSU into the K-12 school system. One football coach

19    was hospitalized in the aftermath. The volleyball team, which also had athletes

20    sickened by the outbreak, had to cancel their rivalry matches against UW because of

21    the infections. WSU incurred over $200,000 in expenses for contact tracing as a

22    result of that outbreak. I discuss this outbreak in more detail in my expert report.

23

24    DECL. OF DR. GUY PALMER IN
      SUPPORT OF DEF.'S CROSS-MSJ – 4
25    No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

13.     The outbreaks at WSU were driving Whitman County's COVID-19 case counts up in the spring of 2021.  Officials in Whitman County and in the Governor's Office expressed concern over these outbreaks at WSU.

14.     As I discuss in my expert report, Whitman County was one of only three counties in the entire state that failed to meet certain case count benchmarks in April of 2021, and the entire County had to move backward in the state's phased reopening plan and implement more restrictive public health measures.  Both State and Whitman County officials reached out to WSU expressing frustration with the continued outbreaks.

15.     On April 28, 2021, WSU announced that it would require proof of COVID-19 vaccination for all students engaging in activities on WSU campuses in the 2021-2022 school year.  Students whose programs were wholly online were exempted from the requirement.  Students could also be allowed medical, religious, or personal exemptions from the requirement.  On that same day, WSU announced its intent to require vaccination for all employees, also noting that exemptions would be allowed for medical, religious, or personal reasons.

16.     On June 30, 2021, Governor Inslee issued Proclamation 20-12.3.  That proclamation allowed for institutes of higher education ("IHEs"), including WSU, to resume in-person education if they, among other things, implemented a policy requiring all students, staff, and faculty who attended in-person activities to be vaccinated against COVID-19. This proclamation also provided for medical, religious, or philosophical exemptions.  A true and accurate copy of that proclamation is attached as **Exhibit C**.

DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 5
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(96 of 247), Page 96 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 96 of 247
Case 2:22-cv-00319-TOR   ECF No. 106   filed 10/14/24   PageID.4033   Page 6
of 157

17.     On August 9, 2021, Governor Inslee issued Proclamation 21-14 and on August 21, 2021, he issued Proclamation 21-14.1 ("Proclamation").  A true and accurate copy of the updated version, Proclamation 21-14.1 is attached as **Exhibit D.**

18.     The Vaccine Proclamation applied to employees of State Agencies, educational settings, and health care providers across the State.  It stated that to continue their employment they need to be fully vaccinated against COVID-19 by October 18, 2021.  (By that date, the number of COVID-19 deaths had exceeded 751,409 in the United States and 4,955,000 globally.[1])  It also provided that employers were required to "provide any disability-related reasonable accommodations and sincerely held religious belief accommodations to the requirements of this Order that are required under the [ADA], [Rehabilitation Act], [Title VII], [WLAD], and any other applicable law."  It further noted that employers were "not required to provide accommodations if they would cause an undue hardship."

19.     The Proclamation was one of many vaccine mandates imposed by state and local governments, as well as private employers, across the country during this

[1] *See* CDC, COVID Data Tracker, *Trends in United States COVID_19 Deaths, Emergency Department (ED) Visits, and Test Positivity by Geographic Area*, https://covid.cdc.gov/covid-data-tracker/#trends_totaldeaths_select_00 (last visited Oct. 7, 2024); World Health Org., WHO COVID-19 dashboard, https://data.who.int/dashboards/covid19/deaths?n=o (last visited Oct. 7, 2024).

DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 6
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0429

time in the COVID-19 pandemic. According to one report, in fall of 2021, COVID-19 vaccine mandates covered at least 12 million people, including 8 million people covered by state or local government vaccine mandates.[2] A true and correct copy of that report is attached as **Exhibit E**. As the report acknowledges, that estimate is likely an undercount. It also does not include the federal vaccine mandates issued by the U.S. Center for Medicare and Medicaid Services (which covered 17 million healthcare workers) and the Occupational Health and Safety Administration (which covered 84 million workers, and was later struck down by the U.S. Supreme Court).[3]

20.    WSU wanted to ensure that it was both following the Proclamation and that it was providing consistent policies for everyone in the University community.

21.    On August 25, 2021, WSU announced that it would align both its student and employee COVID-19 vaccination protocols with the Proclamation. Students who had previously requested a personal exemption were required to either present proof of vaccination or request a religious or medical exemption by October 18, 2021.

---

[2] *See* Danielle Ivory et al, *Where 12 Million U.S. Employees Are Affected by Government Vaccine Mandates*, N.Y. Times, Dec. 18, 2021, https://www.nytimes.com/interactive/2021/12/18/us/vaccine-mandate-states.html.

[3] *See* White House, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies, https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/04/fact-sheet-biden-administration-announces-details-of-two-major-vaccination-policies/.

DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 7
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

22.     On August 27, 2021, Governor Inslee issued Emergency Proclamation 20-12.5.  That Proclamation removed the ability of IHEs to provide for "philosophical exemptions" for students.  WSU's policies were already in line with this proclamation before it was issued.  A true and accurate copy of this proclamation is attached as **Exhibit F**.

### Conversations With Nick Rolovich and Athletics Staff

23.     In the spring and summer of 2021 we had serious concerns about the spread of COVID-19 and the Athletics Department, and the football program in particular.  We were concerned both with the public health implications and the safety of the broader community.  We were also concerned with the budget issues caused by continued outbreaks and implementing the protocols that we had in place to deal with those outbreaks, i.e., frequent testing, quarantining after exposure or positive tests.

24.     We reviewed the evidence that vaccination was a highly effective way to alleviate some of those concerns.  I explain this in more detail in my expert report.

25.     As Chief Science Advisor for the COVID-19 Response at WSU, I was asked by Athletics Director Patrick Chun to meet with Mr. Rolovich to provide scientific background on development, safety, and efficacy of COVID-19 vaccines.

26.     On April 21, 2021, I met with Mr. Rolovich by Zoom to discuss the COVID-19 vaccines.  Our hope was that, by reviewing the scientific evidence supporting the effectiveness and safety of vaccines, we could address any questions Mr. Rolovich may have and alleviate any concerns.  Having an unvaccinated head football coach—given the prominence of that position on campus and the role model

DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 8
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(99 of 247), Page 99 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 99 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4036    Page 9
of 157

1  he serves as for student-athletes and others—could have undermined any attempt to

2  return to "normal" after all of the changes we had implemented to prevent the spread

3  of COVID-19.

4       27.    Over the course of that meeting with Mr. Rolovich, he expressed

5  various questions and concerns about the COVID-19 vaccines. These concerns were

6  those that were commonly circulating on social media and included: i) that the

7  vaccines had been authorized as "experimental" by the FDA and their deployment

8  had been "rushed"; ii) that mRNA vaccines were "new" and "untested" for safety;

9  iii) that mRNA vaccines would "change one's genes"; iv) that mRNA vaccines were

10 contaminated with SV40; v) if vaccines could themselves cause COVID-19; and

11 vi) "chronic" effects of vaccination. I explained to him that these concerns were not

12 supported by medical research. For example, I discussed how mRNA vaccines

13 work, and how they are the products of years of research that had occurred before

14 the first human was infected with COVID-19. I also discussed the emergency

15 authorization process for the COVID-19 vaccines, and how, based on all available

16 research at the time, the COVID-19 vaccines were both safe and effective. The

17 conversation lasted approximately 60 minutes and was collegial. The conversation

18 ended with Mr. Rolovich having no additional questions. I provided him with my

19 contact information and let him know I would provide him with any information if

20 he had additional questions and provide scientific evidence to support safety and

21 efficacy of approved COVID-19 vaccines.

22      28.    During the conversation, Mr. Rolovich also asked about the

23 effectiveness of masks. I remember explaining to him that masks are only effective

24 DECL. OF DR. GUY PALMER IN
   SUPPORT OF DEF.'S CROSS-MSJ – 9
25 No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(100 of 247), Page 100 of 247 Cases: 25-761, 06/12/2025, DktEntry: 26.4, Page 100 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4037    Page 10
of 157

if worn correctly and consistently by everyone in close proximity, and this was a challenge in all environments, and particularly challenging for athletics. In an athletic environment, coaches and players are constantly pressured to remove them to more effectively compete, communicate, breathe, and eat/drink. For these reasons, I explained that masks were not enough on their own to effectively curb the spread, and that is an additional reason why vaccines were necessary.

29.    Mr. Rolovich did not ask me any questions that seemed to be based on religious beliefs or concerns, and he did not mention religion at all. He also did not ask any questions, or raise the topic of, fetal stem cells' role in the development or production of the vaccines.

30.    I followed up on the conversation by providing Mr. Rolovich in an email with the most recent data on adverse chronic effects of COVID-19 (now known as "Long COVID") in contrast to the safety of the vaccine. I encouraged him to respond if he had any additional questions regarding this issue. He did not respond. At no point did Mr. Rolovich ask me any additional questions.

31.    Subsequently, I was asked by Mr. Chun to provide a presentation on development, safety, and efficacy of COVID-19 vaccines to a larger group of Athletics staff. On April 30, 2021, I gave that presentation (also by Zoom), with an emphasis on mRNA vaccines, to a wider group of employees in the Athletics Department. My presentation is attached an exhibit to my expert report.

32.    In that presentation, as in my conversation with Mr. Rolovich, I explained that the ideas that the vaccine was "experimental" or a "shortcut" based on a rushed process was false. In reality, the key antigen had been identified

DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 10
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    subsequent to a SARS-CoV (now known as SARS-CoV-1) outbreak in 2002-2004,

2    and there had been extensive animal trials by the NIH on that antigen over the past

3    15 years.  Though the FDA's Phase I and Phase II trials had been combined for the

4    approved COVID-19 vaccines, both trials followed the normal FDA guidelines.

5        33.    I also explained how remarkable effective the vaccines were, with 96%

6    efficacy in preventing infections, 94% effectiveness in preventing hospitalizations

7    in the most vulnerable groups, and almost 100% effectiveness in preventing death.

8        34.    I also discussed the risks associated with COVID-19.  At that time, 1 in

9    1,600 infected individuals died, 52% of recovered individuals reported impaired

10   lung function, and 24% of recovered individuals had heart, lung, or brain issues.

11       35.    I also explained how the vaccines cannot give an individual COVID-19

12   and that it does not affect reproduction or the placenta.  I also explained that the

13   vaccine is not derived from aborted fetuses.  There were (and are) no fetal cells in

14   the available COVID-19 vaccines, and no human or animal cells are used at any

15   point in the manufacturing process.  This was a commonly raised question about the

16   vaccines in the public discourse, although no one at the April 30 presentation

17   (including Rolovich) specifically asked about the fetal stem cell link.

18       36.    Mr. Rolovich did not ask questions during the April 30 presentation.

19   One employee of the football program, David Fox, was particularly agitated.  He

20   was particularly concerned with alleged adverse health effects of the vaccines—

21   especially with relation to pregnant individuals and potential effects on fertility.  I

22   explained that none of those concerns were supported by medical or scientific

23

24   DECL. OF DR. GUY PALMER IN
     SUPPORT OF DEF.'S CROSS-MSJ – 11
25   No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(102 of 247), Page 102 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 102 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4039    Page 12
of 157

1    research.    Neither Mr. Fox, Mr. Rolovich, nor anyone else in the room asked

2    questions based on any religious concerns with the vaccines.

3        I declare under penalty of perjury that the foregoing is true and correct.

4        EXECUTED this 14th day of October, 2024, at Grangeville, Idaho
        _____.

6        Signed by:
        s/ [signature]
7        A1DC601B30C2455.
        DR. GUY H. PALMER

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0435

(103 of 247)

1

## CERTIFICATE OF SERVICE

2    On the 14th day of October, 2024, I caused to be served, via ECF electronic

3 service, a true copy of the foregoing document upon all counsel registered for e-

4 service.

5

6    DATED this 14th day of October, 2024.

7

8    _____

9    Erica Knerr, Legal Assistant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 DECL. OF DR. GUY PALMER IN
SUPPORT OF DEF.'S CROSS-MSJ – 13
25 No.2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0436**

# EXHIBIT A

# Expert Report of Guy H. Palmer, DVM, PhD

**Prepared for Defendant Washington State University in Eastern**

**District of Washington Case No. 2:22-cv-00319-TOR**

***Nicholas Rolovich*, plaintiff**

*v.*

***Washington State University*, defendant.**

Dated: August 11, 2024    Signed: _____

Guy H. Palmer, DVM, PhD

Expert Report of Guy H. Palmer, DVM, PhD – Page 1

ER0438

(106 of 247), Page 106 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 106 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4043    Page 16
of 157

## BACKGROUND AND QUALIFICATIONS

1.      I am a board-certified pathologist and Regents Professor of Pathology and Infectious Disease at Washington State University (WSU).  I also hold an appointment as a Special Government Employee of the National Institutes of Health, where I serve as a member of the Council for the National Institute of Allergy and Infectious Diseases, representing the Division of Microbiology and Infectious Diseases (my commentary here does not reflect any viewpoint associated with my federal appointment).

2.      I currently hold the Creighton Endowed Chair in Global Health at WSU and I was also the founding director of the Paul G. Allen School for Global Health.  I currently lead global health programs for the WSU campuses as the Senior Director of Global Health.  I also head the National Institute for Health's Training Program in Emerging and Zoonotic Infectious Diseases at WSU and the University of Nairobi Faculty of Health Sciences.

3.      I earned my Doctorate in Veterinary Medicine (DVM) from Kansas State University in 1980.  In 1983 I completed my residency in anatomic pathology (board certified in 1984) and I received my Ph.D. in Microbiology and Immunology from WSU, also in 1984.  I completed a post-doctoral fellowship in vaccine immunology under the National Institutes of Health Immunology Training Program.

4.      The focus of my research, scholarship, and teaching has been human public health and zoonotic diseases.  Zoonotic diseases are those, like SARS-CoV-2 (commonly referred to as COVID-19), that emerge in animals and are then transmitted to and among humans.

5.      I have published over 280 peer reviewed articles on infectious diseases, approximately 200 of these address vaccine development and/or immune responses to infection.  I

Expert Report of Guy H. Palmer, DVM, PhD – Page 2

currently serve as an Editor for the journal Infection and Immunity and also for npj Vaccines, a part of the Nature Partner Journals series.

6.     I have been a member of the National Academy of Medicine since 2006 and a Medical Science Fellow of the American Association for the Advancement of Science since 2008.  In 2024, I was elected to the American Academy of Microbiology.  I was also a founding member of the Washington State Academy of Sciences, served on that Academy's Board of Directors from 2006-2014, served as President from 2012-2013, and was a member of its COVID-19 Steering Committee from 2020-2021.

7.     A copy of my CV, which contains additional information regarding my qualifications and a list of publications authored or co-authored, is attached as Exhibit A.

8.     I am being compensated $300 per hour for my expert work on this matter. I have not testified as an expert at trial or by deposition in any case in the past ten years.

## FACTS OR DATA CONSIDERED

9.     In addition to the data, medical studies, news reports, and other materials cited herein and the knowledge I have gained in my decades of working in pathology and infectious diseases, I considered the following materials in forming the opinions set forth in this report:

- The expert report of Dr. John Lynch.
- The exhibits attached to this report.

## OPINIONS OF DR. JOHN LYNCH

10.     I have reviewed the expert report that Dr. John Lynch prepared for this case.  I agree with his conclusions generally and in their particulars.  My agreement is based on my decades of experience working in vaccine immunology and public health, as well as my familiarity with WSU and the health and safety policies it developed in response to the COVID-19 pandemic.

Expert Report of Guy H. Palmer, DVM, PhD – Page 3

ER0440

(108 of 247), Page 108 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 108 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4045    Page 18
of 157

## THE COVID-19 PANDEMIC AT WSU

11.     I was the Chief Science Advisor for the COVID-19 response at WSU from June 2020 through May 2023, when the role was no longer required.  My role involved providing the scientific basis for decision-making at the university and coordination for implementing on-campus diagnostic testing, wastewater surveillance, and vaccine storage and distribution.  On campus, I coordinated efforts with Cougar Student Health Services, Environmental Health and Safety, the One Health Diagnostic Laboratory, Human Resources, and Intercollegiate Athletics.  I also communicated and coordinated efforts with Pullman Regional Hospital, Whitman County Public Health, the Washington State Department of Health (DOH), Insight Diagnostics, the Pullman School District, and Schweitzer Engineering.  I attended the weekly briefings and coordinating sessions of the Pullman COVID-19 Task Force with the physicians at Pullman Regional Hospital, Cougar Health Services, Whitman County Public Health, and WSU Athletic Medicine.

12.     On February 29, 2020, Governor Jay Inslee issued Emergency Proclamation 20-05, declaring a State of Emergency in all counties and in the State of Washington in response to the COVID-19 pandemic.[1]

13.     On March 13, 2020, Governor Inslee issued Emergency Proclamation 20-12, which prohibited in-person learning at public and private universities in Washington due to rapidly spreading COVID-19.[2]  WSU suspended all in-person classes at all campuses as of March 23, 2020 (following the return from Spring break).

---

[1] Office of Washington Governor Jay Inslee, *Proclamations*, Procl. 20-05, Feb. 29, 2020, https://governor.wa.gov/sites/default/files/2023-01/20-05%20Coronavirus%20%28final%29.pdf.
[2] Office of Washington Governor Jay Inslee, *Proclamations*, Procl. 20-12, Mar. 12, 2020, https://governor.wa.gov/sites/default/files/proclamations/20-12.3%20-%20HigherEd.pdf.

Expert Report of Guy H. Palmer, DVM, PhD – Page 4

ER0441

(109 of 247), Page 109 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 109 of 247
Case 2:22-cv-00319-TOR     ECF No. 106     filed 10/14/24     PageID.4046     Page 19
of 157

14.    I was initially asked to serve on the WSU COVID-19 Research Mobilization Group
on April 1, 2020.  Like many universities, WSU was considering strategies to allow in-person
classes for the fall semester of 2020, relying initially on symptom- and exposure-based attestation
(implemented June 19, 2020).

15.    I was asked to serve as Chief Science Advisor for WSU's COVID-19 response team
in June of 2020.  Initially, I was tasked with developing a mass testing plan for returning students
in the fall of 2020.  In Pullman, there was significant community concern about student return and
full campus activities, including intercollegiate athletics.  Both WSU and the Pullman community
are served by Pullman Regional Hospital, which has a small number of ICU beds.  So the risk of
high levels of transmission spreading from the students and visitors at WSU into the broader
community was a special concern, especially for the members of the Pullman community who
were of increased susceptibility for severe COVID-19.

16.    WSU partnered with Incyte Diagnostics for Clinical Laboratory Improvement
Amendments ("CLIA") certification and initiated COVID-19 testing in July 2020 with full roll-
out in September of that year.  My role was to ensure there was sufficient funding for the
instrumentation, reagents, and staffing needed for development of the WSU One Health Diagnostic
Laboratory; increase capacity and throughput for COVID-19 testing; and communicate with the
Whitman County Department of Health, Cougar Health Services, the Pullman Regional Hospital,
and the Washington State Department of Health.  This testing was done under the U.S. Food and
Drug Administration (FDA)-issued Emergency Use Authorization (EUA) for diagnostic testing
and conducted at both the WSU One Health Laboratory (capacity 1,500 tests per day) and Incyte
Diagnostics in Spokane (capacity 3,000 diagnostic tests per day).  Urgent and emergency turn-

Expert Report of Guy H. Palmer, DVM, PhD – Page 5

around for pre-surgical patients at Pullman Regional Hospital was 12 hours and 24-36 hours for all tests.

17.     WSU initiated free testing for both symptomatic and asymptomatic infections for all students, faculty, and staff in September 2020.  Although for the fall semester of 2020, WSU implemented a "distance delivery model" and encouraged students not to return to campus, a significant number of students did return to campus given their off-campus housing contracts. Testing for students who were not athletes participating in intercollegiate sports was voluntary. WSU Athletic Medicine testing for athletes was directed by Dr. Sunday Henry, MD, and followed Pac-12 testing guidelines.  I communicated with Dr. Henry as part of our weekly Pullman COVID-19 Task Force meetings as well as on an *ad hoc* basis when she had specific questions regarding testing processes and interpretation.

18.     All university personnel (faculty, staff employees, and students) were notified of the need for compliance with the Governor's Amended Proclamations 20-05 and 20-12. These Proclamations included specific protocols for minimizing viral transmission, including wearing of face coverings, physical distancing, and other methods intended to minimize spread of COVID-19.  In October of 2020, the Pac-12 announced there would be an abbreviated, seven-game football season that year.  WSU participated in this season, but three of the seven games were cancelled due to COVID-19 outbreaks among players.

19.     WSU continued to adapt its strategies for the spring semester of 2021.  On January 4, 2021, WSU initiated mandatory arrival testing for all students returning to the Pullman campus who either lived on-campus in residence halls or lived off-campus and accessed the campus.  Free voluntary testing for asymptomatic infections was offered to all students, faculty, and staff starting January 18.  My role was to assist in coordinating the sample flow and reporting,

Expert Report of Guy H. Palmer, DVM, PhD – Page 6

(111 of 247), Page 111 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 111 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4048    Page 21
of 157

20.    On January 11, 2021, WSU's Environmental Health and Safety department, in coordination with Whitman County Public Health, started the testing of wastewater with case-tracking for all residence halls on the Pullman campus and for elementary schools in the Pullman School District.  This was later expanded to the middle and high schools.  My role was to arrange funding for staffing, sampling, and analysis, work with the technical team to coordinate results with case-tracking, and to report results to the Pullman COVID-19 Task Force.

21.    In December 2020, WSU established secure freezer storage for the first EUA approved vaccine (Pfizer) which required -70$^{\circ}$C storage.  WSU established the certifications and processes required to receive, store, and distribute the vaccines for Whitman County.  This capacity was subsequently extended to additional rural counties in central and eastern Washington.  My role was to identify the storage space, ensure certification and monitoring, and coordinate secure delivery of vaccines to providers.

22.    Vaccination was initiated according to the guidelines of DOH with the first vaccinations in late December 2020 with increased availability in late January and February 2021. Early mass vaccination clinics utilized the facilities of Schweitzer Engineering Laboratories and later transitioned to Pullman Regional Hospital with subsequent broad availability at multiple service providers as vaccine availability continued to increase from March 2021.  On April 2, 2021, WSU launched free COVID-19 vaccination for all students and faculty on a voluntary basis. On April 28, WSU announced that vaccination would be required for all students and employees returning to campuses for the Fall semester 2021, with some exemption possibilities.[3]  In tandem

---

[3] Statement from WSU President Kirk Schulz, *Vaccine Requirements for Students and Employees for Fall 2021*, Apr. 28, 2021, https://from.wsu.edu/president/2021/covid-19-vaccine-requirement/email.html.

Expert Report of Guy H. Palmer, DVM, PhD – Page 7

**ER0444**

with these requirements, it was announced that WSU would begin a phased in-person reopening process on July 12, 2021.[4]

23.    Free asymptomatic testing was terminated April 27, 2021, due to the widespread availability of vaccination.   Although testing, masking, social distancing, and contact tracing/isolating were effective in reducing transmission, the availability of vaccination introduced a much more effective level of both individual and community protection.   Consistent with Dr. Lynch's report, vaccination provides continuous protection that testing, masking, and social distancing cannot.   It also does not rely on continuous compliance the way that testing, masking, and social distancing do.   While it was difficult to achieve compliance with non-vaccine protection measures everywhere, it was particularly difficult in a university environment (and, as noted later in my report, particularly difficult to achieve for the football program).   For these reasons, as well as the other reasons described in Dr. Lynch's report, vaccination, especially when working in combination with other protective measures, was the most important public health tool when it came to safely returning WSU to normal operations.

24.    In August of 2021, Governor Inslee issued Proclamation 21-14, along with some amendments.   That Proclamation prohibited most state employees, healthcare workers, and educational workers (which includes WSU employees) from working after October 18, 2021 unless they were fully vaccinated against COVID-19.[5]   Proclamation 20-14 provided for medical and religious exemptions.[6]

---

[4] Letter from WSU President Kirk Schulz, Provost Elizabeth Chilton, and Human Resources Officer Theresa Elliot-Cheslek, *Phased Reopening Process at WSU*, May 11, 2021, https://from.wsu.edu/president/2021/phased-reopening-process/email.html.

[5] Office of Washington Governor Jay Inslee, *Proclamations*, Procl. 21-14.1 at 4, Aug. 20, 2021, https://governor.wa.gov/sites/default/files/proclamations/21-14.1%20-%20COVID-19%20Vax%20Washington%20Amendment.pdf.

[6] *Id.*

Expert Report of Guy H. Palmer, DVM, PhD – Page 8

(113 of 247), Page 113 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 113 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4050    Page 23
of 157

25.     WSU complied with the Governor's Proclamation by implementing a vaccination policy for its employees.  The mandatory vaccination policy for on-campus students had been announced on April 22, 2021, and was in place for students who were returning to campus.  The requirement for employee compliance was October 18, 2021, in accordance with the Governor's Proclamation.

26.     In my expert opinion, the policies implemented by the State and WSU were supported by the available public health data.  In the late Spring and Summer of 2021, COVID-19 cases were increasing both statewide and in Whitman County.  For example, while there were only 23 new cases in the week of February 7-13, 2021, there were 148 cases the week of March 7-13, 2021.[7] In the late Summer, we had a sustained increase, with weekly new case counts exceeding 75 from August 8, 2021 through October 23, 2021.  The peak for Whitman County in 2021 was September 12-18, where we had 171 new cases and 17 new hospitalizations.  While these numbers may not seem huge relative to the statewide numbers, it is important to keep in mind that Whitman County has a population of approximately 47,000, which is about 0.6% of the State population, and Pullman Regional Hospital has only 25 beds.

27.     Even with our other protective measures and our distance delivery model, WSU still had several outbreaks over the course of 2021 which contributed to these spikes.  These included large outbreaks in March, August, and September of 2021.

28.     One recent study concluded that state employee and school vaccine mandates were the most effective COVID-19 mitigation strategies and that, had they been universally adopted (along with universal mask mandates), there would have been a 10%-21% decrease in the excess

---

[7] I was regularly reviewing case counts for Whitman County and WSU during this time.  In preparation for this report, I obtained summary case counts and hospitalizations for Whitman County over the course of 2021 from the Washington Department of Health.  These numbers are attached as Exhibit B.

Expert Report of Guy H. Palmer, DVM, PhD – Page 9

deaths dues to COVID-19. This would have reduced excess deaths by between 188,000 and 248,000 between July 2020 and July 2022.[8]

29.     In my expert opinion, it would not have been safe to return to in-person operations from our hybrid model without implementing the vaccine policies outlined in both sets of Proclamations. There would likely have been dramatically more infections, hospitalizations, patients with serious health consequences, and even deaths without the vaccination policies.

## COVID-19 AND WSU'S ATHLETICS DEPARTMENT

30.     The Department of Intercollegiate Athletics ("Athletics Department") presented a particular challenge for WSU's COVID-19 response as athletics is, by definition, a group activity and requires close contact among student athletes, trainers, coaches, and others as part of their practice, travel, and competition. It has also been well-documented that exercise, especially when combined with proximity, can heighten the risk of spreading COVID-19.[9]

31.     These challenges reduced the effectiveness of our non-vaccination protective measures. For example, rapid antigen testing at this time resulted in very few "false positives," and it was generally effective at identifying individuals infected with COVID-19 when they were symptomatic. But if an individual was infected but had not yet developed symptoms, there was a reasonably high chance of them receiving a "false negative" result. In a setting where coaches, staff, and players are in close proximity to one another essentially every day for training, practice, and competition, these false negative results can create a dangerous environment, where a coach

---

[8] Ruhm, Christopher, *US State Restrictions and Excess COVID-19 Pandemic Deaths*, JAMA Health Forum, 2024;5(7):e242006. doi:10.1001/jamahealthforum.2024.2006, available at https://jamanetwork.com/journals/jama-health-forum/fullarticle/2821581.

[9] *See Indoor Air and Coronavirus (COVID-19)*, EPA, https://www.epa.gov/indoor-air-quality-iaq/indoor-air-and-coronavirus-covid-19.

Expert Report of Guy H. Palmer, DVM, PhD – Page 10

(115 of 247), Page 115 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 115 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4052    Page 25
of 157

or player is confident they are not infected but is still at risk of infecting their teammates, coworkers, or classmates.

32.     These challenges were exacerbated by compliance issues.  Despite our best efforts, there were compliance issues with the COVID-19 safety protocols, both in the general student population and in the Athletics Department.  For example, a COVID-19 outbreak occurred after members of the football team hosted a birthday party for one of their teammates on March 6, 2021.  By March 9, 18 football players and football staff had tested positive.  Some football staff family members tested positive, and coaches kept their children home from school to prevent spread to the K-12 school system.  Football practices were cancelled.  That outbreak sickened several members of the team and coaches.  It also spread to the volleyball program, which temporarily shut down and was unable to play in its rivalry series against the University of Washington.[10]

33.     This outbreak among WSU's student-athletes and Athletics staff was a large contributor to an uptick in cases at WSU in March of 2021.

34.     On April 12, 2021, Governor Inslee announced that, based on data from the last few weeks, Whitman County would be one of three counties in the entire state that would return to Phase Two of the Healthy Washington phased reopening plan.[11]  This meant that Whitman County had to return to complying with stricter public health measures, including 25% capacity for most indoor workplaces, worship services, and restaurants, as well as a limiting outdoor sporting events to 200 individuals, including spectators.

---

[10] *Washington, Washington State volleyball series canceled because of COVID-19*, Seattle Times (March 17, 2021).

[11] Office of the Governor, *Inslee announces three counties rollback to Phase 2*, Apr. 12, 2021, https://governor.wa.gov/news/2021/inslee-announces-three-counties-rollback-phase-2.

Expert Report of Guy H. Palmer, DVM, PhD – Page 11

ER0448

35.     Compliance was also an issue with several members of the football coaching staff, including Head Football Coach Nicholas Rolovich.  I have been made aware of several instances of Mr. Rolovich failing to comply with social distancing and masking requirements.  Several documented examples are attached as Exhibit C, which includes a series of screenshots taken from videos of WSU's football games during the fall of 2021 provided to me by WSU's counsel.  Under WSU and Pac-12 protocols for unvaccinated individuals, Mr. Rolovich was required to wear his mask during the entirety of all football games and practices.[12]  As is also apparent from the screenshots, Mr. Rolovich was consistently unmasked while in very close proximity to players, other coaches, and game officials.

36.     In my expert opinion, the failure to comply with these requirements was a serious issue for WSU that jeopardized the health and safety of the community.  These compliance issues made vaccination all the more important in ensuring the safety of the community.  Just as vaccination presented an excellent opportunity for WSU to increase safety and return to some semblance of normalcy, it presented an opportunity for the Department of Intercollegiate Athletics and the various athletic teams within it to safely move toward some semblance of normal operations by reducing both the spread of the virus, and critically important, the impact of the disease on the health of student-athletes.

37.     As part of my role as Chief Science Advisor for the COVID-19 Response at WSU, I was asked by Athletics Director Patrick Chun to meet with Mr. Rolovich to provide scientific background on development, safety, and efficacy of COVID-19 vaccines.  Subsequently, I was asked by Mr. Chun to provide a presentation on development, safety, and efficacy of COVID-19

---

[12] *See* WSU Athletics, *WSU COVID-19 Guidelines*, Aug. 31, 2021 (produced as WSU_00002840 and attached as Exhibit D); Pac-12 Conference Covid-19 Medical Advisory Committee, *Health and Well Being Considerations for Pac-12 Institutions: Guidance for Local Planning for Return to Sporting Activity*, Aug. 1, 2021 (produced as WSU_00002840 and attached as Exhibit E).

Expert Report of Guy H. Palmer, DVM, PhD – Page 12

**ER0449**

vaccines to a larger group of Athletics staff in a mandatory attendance meeting. The scientific basis for the information I shared in these discussions is outlined in the following section.

## DEVELOPMENT OF COVID-19 VACCINES

38.     The advances underlying the development of the COVID-19 vaccines include: i) knowledge gained from NIH-funded research on SARS-CoV-1 following the 2002-2004 SARS outbreak that established the viral spike protein as the target of neutralizing antibody; and ii) research that established that proline substitution stabilized the pre-fusion domain of the viral spike protein, making it an effective immunogen to induce neutralizing antibody. This information led to the development of the EUA approved COVID-19 vaccines available in the U.S. in 2021: Pfizer, Moderna, and Johnson & Johnson.

39.     The Pfizer and Moderna vaccines are based on mRNA. Contrary to common misperception, mRNA vaccine technology is neither "new" or limited to vaccine development for COVID-19, but rather based on research initiated in the 1980s. The key breakthrough was led by Katalin Karikó and Drew Weissman who identified that nucleoside base substitutions both reduced inflammation and increased production of the immunogen. Following injection, the mRNA is taken up by antigen presenting cells and translated into protein (in this case the stabilized pre-fusion domain of the spike protein), which induces the immune response. Notably, this translation into protein occurs in the cytoplasm of the cell, where the machinery for translation (ribosomes) is present. Once the protein is produced, the immune response to a mRNA vaccine is no different than that to a traditional "killed" vaccines (in which the inactivated virus or specific viral proteins are directly injected)—the immune system is responding to the protein immunogen, here the COVID-19 spike protein.

40.     The vaccine mRNA itself is short-lived and degraded within the cytoplasm of the cell. Beyond this rapid degradation, mRNA cannot alter the DNA of the cell. This is for three reasons:

Expert Report of Guy H. Palmer, DVM, PhD – Page 13

i) it cannot enter the nucleus of the cell (where the DNA is present) as it lacks a nuclear localization signal; ii) it cannot be "reverse transcribed" into DNA as the human cell lacks this enzyme; and iii) it cannot integrate into the DNA as the human cell lacks the integrase required. To quote Dr. Paul Offit of the Children's Hospital of Philadelphia on the concern that mRNA will change a vaccine recipient's DNA, "The chance of that happening is not small — it's zero. It is not possible."

41.    Both the Pfizer and Moderna vaccine mRNA are produced without the use of human or animal cells. Simplified, the process involves four key steps: i) insert a plasmid that contains the DNA encoding the stabilized spike protein into the harmless bacteria *E. coli*; ii) the *E. coli* multiplies the plasmid; iii) the plasmid is extracted from the bacteria, cut with enzymes to linearize the plasmid DNA encoding the spike protein; and then purified; and iv) the linearized DNA is transcribed to mRNA. The mRNA is then packaged in a lipid nanoparticle and processed to be placed in vials. The concern that SV-40 transformed mammalian cells are a risk is unfounded, they are not involved at any step of the manufacturing process.

42.    The Johnson & Johnson vaccine, available as a one-dose immunization in 2021, is based on an adenovirus 26 technology platform. The DNA encoding the stabilized spike protein is inserted into the genome of human adenovirus 26 modified to be replication-incompetent (meaning it cannot replicate and spread within the body) by deletion of the E1/E3 segments using a cosmid and adaptor plasmid transfection and homologous recombination in a packaging cell line, PER.C.6. The virus enters the cell cytoplasm, the viral DNA is transcribed into mRNA, and the spike protein translated using the ribosomal machinery—at that point, similar to the mRNA vaccines. The adenovirus itself cannot enter the cell nucleus and does not replicate. The concern

that SV-40 transformed mammalian cells are a risk is unfounded, they are not involved at any step of the manufacturing process.

43.   The adenoviral vaccine (AdVac) safety database report version 4.0 (14 May 2019) contains data from 23 clinical studies, for a total of 3912 study participants, using multiple Ad26-based vaccines (HIV, Ebola, RSV, Malaria, HPV, Filovirus, Zika virus).  There were no serious side-effects reported in the AdVac database 4.0.

## VACCINE PRESENTATIONS TO NICHOLAS ROLOVICH AND THE ATHLETICS DEPARTMENT

44.   On April 21, 2021, I met with Mr. Rolovich to discuss the COVID-19 vaccines.  The details of that meeting will be discussed more thoroughly in my fact witness declaration.

45.   Over the course of that meeting with Mr. Rolovich, he expressed various questions and concerns about the COVID-19 vaccines.  These concerns were those that were commonly circulating on social media and included: i) that the vaccines had been authorized as "experimental" by the FDA and had been "rushed"; ii) that mRNA vaccines were "new" and "untested" for safety; iii) that mRNA vaccines would "change one's genes"; iv) that mRNA vaccines were contaminated with SV40; v) if vaccines could themselves cause COVID-19; and vi) "chronic" effects of vaccination.  I explained to him that these concerns were not supported by medical research. For example, I discussed how mRNA vaccines work, and how they are the products of years of research that had occurred before the first human was infected with COVID-19.[13] I also discussed the emergency authorization process for the COVID-19 vaccines,[14] and how,

---

[13] Pardi, N., Hogan, M., Porter, F. et al. mRNA vaccines - a new era in vaccinology. Nat Rev Drug Discov 2018;17: 261-279; Laura Blackburn: RNA vaccines: an introduction. October 2018, https://www.phgfoundation.org/briefing/rna-vaccines; Centers for Disease Control and Prevention: Understanding mRNA COVID-19 Vaccines. Updated Dec. 18, 2020; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mrna.html.

[14] Emergency Use Authorization for Vaccines Explained, FDA, https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained; Bassler D, et al.,

Expert Report of Guy H. Palmer, DVM, PhD – Page 15

(120 of 247), Page 120 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 120 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4057    Page 30
of 157

based on all available research at the time, the COVID-19 vaccines were both safe and effective.[15] The conversation lasted approximately 60 minutes and was collegial. The conversation ended with Mr. Rolovich having no additional questions. I provided him with my contact information and let him know I would provide him with any information if he had additional questions and provide scientific evidence to support safety and efficacy of approved COVID-19 vaccines.

46.    I followed the conversation by providing Mr. Rolovich in an email with the most recent data on adverse chronic effects of COVID-19 (now known as "Long COVID") in contrast to the safety of the vaccine. I encouraged him to respond if he had any additional questions regarding this issue. He did not respond.

47.    It is my expert opinion that the concerns expressed by Mr. Rolovich about the COVID-19 vaccines in that meeting were not supported by any credible medical research, either at the time he expressed them or after.

48.    It is my expert opinion that the information I expressed to Mr. Rolovich in that April 21, 2021, meeting and in the subsequent email was accurate and based on up-to-date medical research at the time.

49.    On April 30, 2021, I presented a scientific overview of development, safety, and efficacy of COVID-19 vaccines, with an emphasis on mRNA vaccines, to a wider group of employees in the Athletics Department. That presentation is attached as Exhibit F.

50.    In that presentation, as in my conversation with Mr. Rolovich, I explained that the ideas that the vaccine was "experimental" or a "shortcut" based on a rushed process was false. In

---

*Stopping randomized trials early for benefit and estimation of treatment effects: systematic review and meta-regression analysis*, JAMA. 2010 Mar 24;303(12):1180-7. doi: 10.1001/jama.2010.310. PMID: 20332404.

[15] Bade LR, et al., *Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine.* N Engl J Med 2021; 384:403-416; Polack FP, et al, *Safety and Efficacy of the BNT162b2 mRNA Covid-19 Vaccine*, N Engl J Med 2020; 383:2603-2615.

Expert Report of Guy H. Palmer, DVM, PhD – Page 16

(121 of 247), Page 121 of 247Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 121 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4058    Page 31
of 157

reality, the key antigen had been identified subsequent to a SARS-CoV (now known as SARS-CoV-1) outbreak in 2002-2004, and there had been extensive animal trials by the NIH on that antigen over the past 15 years. Though the FDA's Phase I and Phase II trials had been combined for the approved COVID-19 vaccines, both trials followed the normal FDA guidelines.

51.    I also explained how remarkable effective the vaccines were, with 96% efficacy in preventing infections, 94% effectiveness in preventing hospitalizations in the most vulnerable groups, and almost 100% effectiveness in preventing death.[16]

52.    I also discussed the risks associated with COVID-19. At that time, 1 in 1,600 infected individuals died. 52% of recovered individuals reported impaired lung function. 24% of recovered individuals had heart, lung, or brain issues.[17]

53.    I also explained how the vaccines cannot give an individual COVID-19 and that it does not affect reproduction or the placenta. I also explained that the vaccine is not derived from aborted fetuses. There were (and are) no fetal cells in the available COVID-19 vaccines, and no human or animal cells are used at any point in the manufacturing process.

54.    In my expert opinion, the information I conveyed to the Athletics Department was accurate and based on up-to-date scientific research at that time.

55.    It is true that the virus has evolved over time, and this has effected the efficacy of some vaccines. The vaccines have been updated several times in response. But even with the

---

[16] Mark W. Tenforde, et al.; *Effectiveness of Pfizer-BioNTech and Moderna Vaccines Against COVID-19 Among Hospitalized Adults Aged ≥65 Years — United States, January–March 2021*, MMWR, May 7, 2021, https://www.cdc.gov/mmwr/volumes/70/wr/mm7018e1.htm?s_cid=mm7018e1_w.

[17] Desgranges et al., *Post-COVID-19 Syndrome in Outpatients a Cohort Study*, Apr. 20, 2021, https://www.medrxiv.org/content/10.1101/2021.04.19.21255742v2.

Expert Report of Guy H. Palmer, DVM, PhD – Page 17

evolving virus, some things have remained true from the spring and summer of 2021 through today. These include:

- The COVID-19 vaccines are safe, and remain the most effective public health tool in our arsenal for resisting the virus.

- Unlike other COVID-19 preventative measures, the vaccines provide protection around the clock and non-susceptible to non-compliance issues (e.g., removing a mask, not complying with social distance guidance).

- No fetal stem cells are contained in the Moderna or Pfizer COVID-19 vaccines, and they have never been used in the manufacturing process for those vaccines.

- At the time of my conversations with Mr. Rolovich and the Athletics Department, the health benefits of COVID-19 vaccination, both for the vaccinated individual and for the community, far outweighed any risk. The strong evidence in support of this has only grown over time, especially with what he have learned about the chronic effects of "long COVID."

## THE DECISION DENYING THE ACCOMMODATION REQUESTS OF NICHOLAS ROLOVICH AND OTHER FOOTBALL COACHES

56.    It is my understanding that Nicholas Rolovich requested a religious exemption and accommodation from the vaccine requirement. It is also my understanding that seven other members of Mr. Rolovich's football staff—including six assistant football coaches—also requested religious exemptions and accommodations.

57.    In my expert opinion, accommodating Mr. Rolovich and the other football staff in October of 2021 by allowing to continue doing their jobs unvaccinated would have posed a serious risk of them contracting COVID-19 and transmitting it to others—including other coaches, the

Expert Report of Guy H. Palmer, DVM, PhD – Page 18

ER0455

(123 of 247), Page 123 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 123 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4060    Page 33
of 157

members of the football team, donors, other individuals they regularly came into contact with, and the university and Pullman community at large.

58.    This is especially true if the University had accommodated the seven assistant football coaches and staff who also requested religious exemptions from the vaccine requirement.  Had all eight of these individuals been unvaccinated, it would have dramatically increased the risk of infections among the coaches and on the football team.  It also would have increased the risk of another outbreak similar to the one that occurred in March of 2021, with the football team again at the epicenter.

59.    Had the Athletics Department decided to accommodate Mr. Rolovich and the other football staff by allowing them to continue in their positions unvaccinated, I would have recommended that they follow all requirements from the Athletics Department and the Pac-12. For the Athletics Department, these requirements included:[18]

- Wearing masks during all training, practice, and competition.

- Wearing masks during all travel.

- Wearing masks and maintaining distancing in all settings such as team meetings and any other in-person interactions.

For the Pac-12, these requirements included:[19]

- Surveillance testing of one PCR test or three antigen tests per week.

- Negative PCR test prior to any games.

- Refraining from returning to campus from non-team related travel unless they had received a negative PCR test result within 72 hours of their return to WSU.

---

[18] *See* Exhibit D (WSU Athletics policies).
[19] *See* Exhibit E (Pac-12 policies).

Expert Report of Guy H. Palmer, DVM, PhD – Page 19

(124 of 247), Page 124 of 247Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 124 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4061    Page 34
of 157

- Quarantining upon return to campus from any non-team related travel until receiving a negative PCR test administered 3-5 days after their return.

60.    I would also have recommended that they employ the following protective measures:

- That the football team no longer travel on commercial flights.

- That all unvaccinated coaches fly on smaller chartered flights separate from the team and the rest of the coaching staff.

- That all unvaccinated coaches use separate chartered buses or cars for all transportation.

- That each unvaccinated coach stay in a separate hotel room (as opposed to "bunking" with another coach, whether vaccinated or not).

- That all unvaccinated coaches refrain from any in-person recruitment efforts.

- That all unvaccinated coaches refrain from in-person meetings with donors, boosters, and other supporters of the football team, Athletics Department, and University.

61.    Even with these protective measures, it is my opinion that granting accommodations to Mr. Rolovich and the other coaches would have resulted in a significantly greater risk of them getting infected with COVID-19 and transmitting it to others. These recommendations would have been an attempt to mitigate those risks had the Athletics Department decided to grant accommodations to the coaches (which I would not have recommended). I do not view any of those mitigation measures (whether viewed in isolation or together) as an adequate substitute to vaccination.

62.    Apart from the health risks of infection, the increased testing requirements would have increased the risk of a positive test result for unvaccinated coaches, simply based on the laws

Expert Report of Guy H. Palmer, DVM, PhD – Page 20

of probability.  (More frequent testing will, all else being equal, yield more positive results.)  This would have resulted in quarantining and contact tracing measures, including more testing of players on the football team.  This would have been extremely disruptive to the football team, and would have increased the likelihood that they would be unable to play regularly scheduled football games, or would have had to play them with key coaches or players absent.

# EXHIBIT A

OMB No. 0925-0001 and 0925-0002 (Rev. 10/2021 Approved Through 01/31/2026)

NAME:  Guy Hughes Palmer

eRA COMMONS USER NAME (credential, e.g., agency login):  gpalmer

POSITION TITLE:  Regents Professor of Pathology and Infectious Diseases; Jan & Jack Creighton Endowed Chair and Senior Director of Global Health, Paul G. Allen School for Global Health, Washington State University; International Scientist, Center for Health Sciences, Universidad del Valle de Guatemala

EDUCATION/TRAINING *(Begin with baccalaureate or other initial professional education, such as nursing, include postdoctoral training and residency training if applicable. Add/delete rows as necessary.)*

| INSTITUTION AND LOCATION | DEGREE *(if applicable)* | Completion Date MM/YYYY | FIELD OF STUDY |
|---|---|---|---|
| Kansas State University College of Arts & Sciences, Manhattan | BS *summa cum laude* | 05/1977 | Biology |
| Kansas State University College of Veterinary Medicine, Manhattan | DVM | 05/1980 | Veterinary Medicine |
| Washington State University, Pullman | Board Certification | 09/1984 | Residency in Pathology |
| Washington State University, Pullman | PhD | 05/1984 | Infectious Diseases |
| Washington State University, Pullman | NIH Post-doctoral Fellowship | 12/1985 | Vaccine Immunology |

## A.  Personal Statement

My background is in infectious diseases and global health with an emphasis on zoonotic infectious diseases surveillance, diagnostics, and mitigation.  In addition to my research appointments, I directed the NIH Infectious Diseases and Microbial Immunology Post-doctoral Training Program at WSU from 2004-2018 and currently direct the NIH Fogarty Training Program in Emerging and Zoonotic Infectious Disease for physicians and veterinarians in Kenya (NIAID & Fogarty).  From June 2020 through May 2023, I served as the Science Advisor for Washington State University's Covid-19 response—this involved counsel and coordination for diagnostic testing, wastewater surveillance, and vaccine storage and delivery.  Coordinating units within the university included Cougar Student Health Services, Environmental Health and Safety, the One Health Diagnostic Laboratory, Human Resources, and Intercollegiate Athletics. Coordinating units within the community, region, and state included Pullman Regional Hospital, Whitman County Public Health, the Washington State Department of Health, Schweitzer Engineering Laboratories, and Insight Diagnostics.

*Disclosure:* I currently serve as Special Government Employee of the National Institutes of Health for service as a member of Council for the National Institute of Allergy and Infectious Diseases, specifically representing the Division of Microbiology and Infectious Diseases (through 2025).

## B.  Positions, Scientific Appointments, and Honors
### Positions
| | |
|---|---|
| 1980-1983 | Resident in Pathology and Laboratory Medicine, Washington State University |
| 1983-1985 | NIH Postdoctoral Fellow, Immunology Training Program |
| 1985-1988 | Assistant Professor, Departments of Experimental Pathology and Infectious Diseases, University of Florida |
| 1988-1993 | Associate Professor, Department of Microbiology and Pathology, Washington State University |
| 1995-1996 | Senior Research Fellow, Institute of Pathology, University of Bern, Switzerland |
| 2004-2005 | Senior Research Fellow, Department of Pathology, University of Zaragoza, Spain |
| 1993-present | Professor (1993-2006), Regents Professor (2007-present), and Director, NIH Infectious Diseases/Microbial Immunology Training Program (2003-2018), Washington State University |

Expert Report of Guy H. Palmer, DVM, PhD – Page 23

## ER0460

| | |
|---|---|
| 2007-2015 | Founding Director, Paul G. Allen School for Global Health, Washington State University |
| 2007-present | Jan and Jack Creighton Endowed Chair in Global Health |
| 2015-present | Senior Director of Global Health, Washington State University System |
| 2016-present | Director, Rabies Free Africa |
| 2017-present | President, Global Animal Health-Tanzania (Arusha, Tanzania) |
| 2017-present | Chair, Washington State University Global Health-Kenya (Nairobi, Kenya) |
| 2020-2022 | Chief Science Advisor, Washington State University Covid-19 Taskforce |
| 2020-present | Program Director, NIH Fogarty International Training Program in Emerging and Zoonotic Infectious Disease (Kenya) |
| 2023-present | Research Professor, Institute of Tropical Infectious Diseases, Faculty of Health Sciences, University of Nairobi (Kenya) |

**Current Adjunct/Affiliate Appointments:**

| | |
|---|---|
| 2012-present | School of Life Sciences and Bioengineering, Nelson Mandela African Institute of Science and Technology |
| 2015-present | Department of Pathobiology and Diagnostic Medicine, Kansas State University |
| 2018-present | Centro de Estudios en Salud, Universidad del Valle de Guatemala |

**Honors and Awards:** Member, National Academy of Medicine (2006); Medical Sciences Fellow of the American Association for the Advancement of Science (2008). *Doctoris honoris causa*, Universität Bern (2011) and Honorary Doctorate (Ph.D.), Kansas State University (2016). Distinguished Lecturer, Science in Medicine, University of Washington (2007); Schalm Distinguished Lecturer at the University of California (2007); NIH Distinguished Scientist Lecturer (2008); Class of 1964 Endowed Lectureship at Oklahoma State University (2011); George C. Poppensiek Professorship at Cornell University (2012); IBM Visiting Professorship at Colby College (2014); Merck Award for Creativity (1995); Sahlin Award for Outstanding Achievement in Research (2008); Eminent Faculty Award (2013) and Distinguished Lifetime Service (2021), Washington State University; Distinguished Alumnus (2009) and Alumni Fellow (2011), Kansas State University, American Association of Veterinary Medical Colleges Excellence in Research Award (2019); Honorary Diplomate, American Veterinary Epidemiology Society (2020); Fellow, American Academy of Microbiology (2024).

**Service to the National Academies of Science, Engineering, and Medicine:** Chair, Committee on Community Wastewater-based Infectious Disease Surveillance (2022-present); Chair, Long-term Health and Economic Effects of Antimicrobial Resistance in the United States (2020-2021); Member, Board on Animal Health Sciences, Conservation, and Research (2019-present); Vice-Chair (2012-13) and Chair (2014-2015), National Academy of Medicine Membership Committee-10; Member, Board on Global Health (2012-2018); Chair, Section on Microbiology and Global Health (2014-2016); Chair, Assessment of the BLM Wild Horse and Burro Management Program (2011-2013); Member, Committee on Lyme Disease and Tick-Borne Diseases (2010).

**Service to the Washington State Academy of Science:** Founding Member (2006); Board of Directors (2006-2014); President (2012-2013); Chair, Study on Impact of I-522 (2013); Member, COVID-19 Steering Committee (2020-2021).

**Current External Advisory Positions:** National Institute of Allergy and Infectious Diseases Council (NIH) (2022-present); International Advisory Board, Udayana University, Bali, Indonesia (2022-present); International Scientific Advisory Board for the Nelson Mandela African Institute of Science and Technology (2013-present); Advisory Board for USAID Feed the Future Program-Kenya (2020-present).

**Extramural Program Review:** NIH Board of Scientific Councilors (*ad hoc* 2018); External Advisory Review Board for CDC Bacterial Pathogens Branch (2009); NIH Host Interaction with Bacterial Pathogens Study Section (Chair, 2007-2009; Permanent Member, 2004-2009); NIH Targeted Prevention for Tick-borne Diseases (Chair, 2020); NIH College of Scientific Review (2010-2012); External Advisory Board of the NIH-NIAID Northwest Regional Center of Excellence for Biodefense and Emerging Infectious Diseases (2007-2012); NIH IDeA Network of Biomedical Research Excellence (2008-2023; Chair 2010-2016); NIH Center of Biomedical Research Excellence (2009-2019; Chair 2013-2019); NIH-NIAID Microbiology and Infectious Diseases Review Committee (2009); NIH Clinical and Pediatric Fellowships (2005, 2006); NIH Tropical Medicine and Parasitology (Member 1999; Chair 2202-2003); NIH-NIAID Centers of Excellence for Biodefense and Emerging Infectious Diseases (2003); USDA

(129 of 247), Page 129 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 129 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4066    Page 39
of 157

National Research Initiative Competitive Grants Program, Mechanisms of Animal Disease (Member 1991-1993; Chair, 1992-93); Member, Research Advisory Committee for the Grayson Foundation (1998-2000).

**Current Scientific Organization and Society Memberships:** American Association for the Advancement of Science (Fellow, Medical Sciences); American Society of Microbiology (Fellow); American Society for Rickettsiology (President 2010-2012); American Veterinary Medical Association; American College of Veterinary Pathologists (Diplomate); National Academy of Medicine; Washington State Academy of Science (President 2012-2013).

**Journal Editorial Boards:** Cellular Microbiology (2005-present); Infection and Immunity (Editorial Board 2008-2015; Editor 2015-2025); PLoS Global Public Health (Associate Editor 2021-present); Nature Vaccines (2016-present); American Journal of Veterinary Research (1988-1994); Veterinary Microbiology (2006-2012).

**Research Training Programs:** Director and Trainer, National Institutes of Health, Fogarty International Center and Institute of Allergy and Infectious Diseases, Emerging Zoonotic Infectious Diseases Training Program (2020-present); Director and Trainer, National Institutes of Health, Institute of Allergy and Infectious Diseases, Infectious Diseases and Microbial Immunology Training Program (2003-2018); Institutional Director and Trainer, Bill & Melinda Gates Program in Enhancing the Health and Productivity of Livestock in East Africa (2015-2019); Trainer, National Institutes of Health, Protein Biochemistry and Biotechnology Training Program (1989-present; Executive Steering Committee 2001-2009); Trainer, National Institutes of Health, Division of Research Resources.  Short-term Professional Student Health Scientist (DVM) Training Program (1988-2000); Director (1995-96) and Trainer (1990-96), National Institutes of Health, Institute of Allergy and Infectious Diseases, Pathobiology Training Program; Program Director, Food and Agricultural Science National Needs Graduate Fellowship Program: Animal Biotechnology (1989-1997).

**C.  Contributions to Science** https://www.ncbi.nlm.nih.gov/pubmed/?term=palmer+gh

*Disease Surveillance.* These programs focus on using multiple approaches to emerging disease surveillance including wastewater-based approaches, digital technologies, and community engagement.
- Mello, M.M., Meschke, J.S., and Palmer, G.H. Mainstreaming wastewater surveillance of infectious disease.  New England Journal of Medicine, 388:1441-1444, 2023.
- Iles, R.A., Thumbi, S.M., Palmer, G.H., and Marsh, T.L. Effects of changes in short-term human cognition on reported healthcare utilization.  PLoS Global Public Health, 2(11):e0000690. doi:10.1371, 2022.
- Thumbi, S.M., Njenga, M.K., Otiang, E., Ochieng, L., Munyua, P., Eichler, S., Widdowson, M-A., McElwain, T.F., and Palmer, G.H.  Mobile phone based surveillance for animal disease in rural communities: implications for detection of zoonoses spillover. Philosophical Transactions of the Royal Society B, doi.org/10.1098/rstb.2019.0020, 2019.
- Cerón, A., Ortiz, M.R., Álvarez, D., Palmer, G.H., and Cordón-Rosales, C. Local disease concepts relevant to the design of a community-based surveillance program for influenza in rural Guatemala. International Journal for Equity in Health, 15:69-71, 2016.

*Persistence of microbial pathogens.* Together with colleagues, our research identified two independent mechanisms that allow pathogen persistence. Using *Theileria parva* infection of T lymphocytes as a model, our research at the University of Bern was seminal in identifying subversion of the NF-kB pathway by a microbial pathogen, allowing longterm persistence in the immunocompetent host.  Subsequent research at Washington State University, using *Anaplasma marginale* as the experimental system, revealed that generation of antigenic variants was dramatically expanded beyond the genomic repertoire of alleles encoding surface protein to include expression site mosaics assembled from multiple donor alleles (segmental gene conversion).  Both mechanisms were subsequently shown to be broadly represented in numerous human microbial pathogens.
- Palmer, G.H., Machado, J., Fernandez, P., Heussler, V., Perinat, T., and Dobbelaere, D.A.E. Parasite mediated NF$\kappa$B regulation in lymphoproliferation caused by *Theileria parva* infection. Proceedings of the National Academy of Sciences, USA, 94:12527-12532, 1997.
- Brayton, K.A., Knowles, D.P., McGuire, T.C., and Palmer, G.H.:  Efficient use of a small genome to generate antigenic diversity in tick-borne ehrlichial pathogens.  Proceedings of the National Academy of Sciences, USA, 98:4130-4135, 2001.

Expert Report of Guy H. Palmer, DVM, PhD – Page 25

**ER0462**

- Futse, J.E., Brayton, K.A., Dark, M.J., Knowles, D.P., Palmer, G.H. Superinfection as a driver of genomic diversification in antigenically variant pathogens. Proceedings of the National Academy of Sciences, USA, 105:2123-2127, 2008.
- Palmer, G.H., Bankhead, T., and Seifert, H.S. Antigenic variation in bacterial pathogens. Microbiology Spectrum, 4:10.1128, 2016.

***Antimicrobial Resistance in Rural and Urban Settings in Central America.*** This program focuses on antibiotic use and development and spread of antibiotic resistance in urban and rural settings in Central America and East Africa.

- Caudell, M.A., Castillo, C., Santos, L.F., Grajeda, L., Romero, J.C., Lopez, M.R., Omulo, S., Freitas Ning, M., Palmer, G.H., Call, D.R., Cordon-Rosales, C., Smith, R.M., Herzig, C.T.A., Styczynski, A., and Ramay, B.M., Risk factors for colonization with extended-spectrum cephalosporin-resistant and carbapenem-resistant Enterobacterales among hospitalized patients in Guatemala: An Antibiotic Resistance in Communities and Hospitals (ARCH) study. IJID Regions. 2024 https://doi.org/10.1016/j.ijregi.2024.100361
- Rojop, N., Moreno, P., Grajeda, L., Romero, J., Reynoso L., Palmer, G.H., Cordon-Rosales, C., Call, D.R., and Ramay, B.M. Informal sale of antibiotics in Guatemalan convenience stores before and after implementation of federal antibiotic dispensing legislation. BMC Pharmacology and Toxicology, 25:11, 2024. https://doi.org/10.1186/s40360-023-00720-8
- Ramay, B.M., Castillo, C., Grajeda, L., Santos L.F., Romero, J.C., Lopez, M.R., Gomez, A., Caudell, M., Smith, R.M., Styczynski, A., Herzig, C.T.A., Bollinger, S., Ning, M.F., Horton, J., Omulo, S., Palmer, G.H., Cordon-Rosales, C., and Call, D.R. Colonization with antibiotic-resistant bacteria in a hospital and associated communities in Guatemala: An Antibiotic Resistance in Communities and Hospitals (ARCH) study. Clinical Infectious Diseases, 77(S1): S82-88, 2023.
- Ramay B.M., Caudell, M.A., Cordón-Rosales, C., Archila, L.D., Palmer, G.H., Jarquin, C., Moreno, P., McCracken, J.P., Rosenkrantz, L., Amram, O., Omulo, S., and Call, D.R. Antibiotic use and hygiene interact to influence the distribution of antimicrobial-resistant bacteria in low-income communities in Guatemala. Nature Scientific Reports, 10(1):13767. doi: 10.1038/s41598-020-70741-4, 2020.

***Antimicrobial Resistance in Informal Settlements in East Africa.*** This program focuses on antibiotic use and development and spread of antibiotic resistance in high-density, low-sanitation communities in East Africa.

- Caudell, M.A., Ayodo, C., Ita, T., Smith, R.M., Luvsansharav, U.-O., Styczynski, A., Ramay, B.M., Kariuki, S., Palmer, G.H., Call, D.R., and Omulo, S. Risk factors for colonization with multidrug-resistant bacteria in urban and rural communities in Kenya: An Antibiotic Resistance in Communities and Hospitals (ARCH) Study. Clinical Infectious Diseases, 77(S1): S014-110, 2023.
- Omulo, S., Ita, T., Mugoh, R., Ayodo, C., Luvsansharav, U., Bollinger, S., Styczynski, A., Ramay, B.M., Caudell, M.A., Palmer, G.H., Kariuki, S., Call, D.R., and Smith, R.M. Risk factors for colonization with extended-spectrum cephalosporin-resistant and carbapenem-resistant *Enterobacterales* among hospitalized patients in Kenya: An Antibiotic Resistance in Communities and Hospitals (ARCH) Study. Clinical Infectious Diseases, 77(S1): S97-103, 2023.
- Ita, T., Luvsansharav, U-O., Smith, R.M., Mugoh, R., Ramay, B., Caudell, M., Ndegwa, L., Verani, J.R., Bollinger, S., Sharma, A., Palmer, G.H., Call, D.R., and Omulo, S. Prevalence of colonization with multidrug-resistant bacteria in communities and hospitals in Kenya. Scientific Reports, 12(1):22290. doi: 10.1038/s41598-022-26842-3, 2022.
- Omulo, S., Lofgren, E.T., Lockwood, S., Thumbi, S.M., Bigogo, G., Ouma, A., Bonventure J., Njenga, M.K., Kariuki, S., McElwain, T.F., Palmer, G.H., and Call, D.R. Carriage of antimicrobial-resistant bacteria in a high density informal settlement in Kenya is associated with environmental risk factors. Antimicrobial Resistance and Infection Control, 10:18, 2021.

*All Refereed Publications:*

1.    Caudell, M.A., Castillo, C., Santos, L.F., Grajeda, L., Romero, J.C., Lopez, M.R., Omulo, S., Freitas Ning, M., Palmer, G.H., Call, D.R., Cordon-Rosales, C., Smith, R.M., Herzig, C.T.A., Styczynski, A., and Ramay, B.M. Risk factors for colonization with extended-spectrum cephalosporin-resistant and carbapenem-resistant Enterobacterales among hospitalized patients in Guatemala: An Antibiotic Resistance in Communities and Hospitals (ARCH) study.  IJID Regions. 2024 https://doi.org/10.1016/j.ijregi.2024.100361

2.    Ramay, B.M., Caudell, M.A., Castillo, C., Grajeda, L., Santos, L.F., Romero, J.C., Lopez, M.R., Omulo, S., Freitas Ning, M., Palmer, G.H., Smith, R.M., Herzig, C.T.A., Styczynski, A., Cordon-Rosales, C., and Call, D.R. Risk factors associated with colonization of extended-spectrum cephalosporin-resistant Enterobacterales (ESCrE) in Guatemalan communities: An antibiotic resistance in communities and hospitals (ARCH) study. Scientific Reports, submitted 2024.

3.  Futse, J.E., Zumor-Baligi, S., Ashiagbor, C.N.K., Noh, S.M., Fox, C.B., and Palmer, G.H. An adjuvant formulation containing Toll-like Receptor 7 agonist stimulates protection against morbidity and mortality due to *Anaplasma marginale* in a highly endemic region of west Africa.  PLoS One, submitted 2024.

4.    Rojop, N., Moreno, P., Grajeda, L., Romero, J., Reynoso L., Palmer, G.H., Cordon-Rosales, C., Call, D.R., and Ramay, B.M. Informal sale of antibiotics in Guatemalan convenience stores before and after implementation of federal antibiotic dispensing legislation.   BMC Pharmacology and Toxicology, 25:11, 2024. *https://doi.org/10.1186/s40360-023-00720-8*

5.   Mello, M.M., Meschke, J.S., and Palmer, G.H. Mainstreaming wastewater surveillance of infectious disease. New England Journal of Medicine, 388:1441-1444, 2023.

6.    Thumbi, S.M., Muema, J., Mutono, N., Njuguna, J., Jost, C., Boyd, E., Tewoldeberhan, D., Mutua, I., Gacharamu, G., Wambua, F., Allport, R., Olesambu, E., Osman, A.M., Souza, D., Kimani, I., Oyugi, J., Bukania, Z., Oboge, H., Palmer, G.H., Yoder, J. The Livestock for Health Study: A field trial on livestock interventions to prevent acute malnutrition among women and children in pastoralist communities in northern Kenya. Food and Nutrition Bulletin 44 (S2):S119-S123, 2023. doi: 10.1177/03795721231195427.

7.    Caudell, M.A., Ayodo, C., Ita, T., Smith, R.M., Luvsansharav, U.-O., Styczynski, A.,  Ramay, B.M., Kariuki, S., Palmer, G.H., Call, D.R., and Omulo, S.  Risk factors for colonization with multidrug-resistant bacteria in urban and rural communities in Kenya: An Antibiotic Resistance in Communities and Hospitals (ARCH) Study. Clinical Infectious Diseases, 77(S1): S014-110, 2023.

8.    Omulo, S., Ita, T., Mugoh, R., Ayodo, C., Luvsansharav, U., Bollinger, S., Styczynski, A., Ramay, B.M., Caudell, M.A., Palmer, G.H., Kariuki, S., Call, D.R., and Smith, R.M. Risk factors for colonization with extended-spectrum cephalosporin-resistant and carbapenem-resistant *Enterobacterales* among hospitalized patients in Kenya: An Antibiotic Resistance in Communities and Hospitals (ARCH) Study.  Clinical Infectious Diseases, 77(S1): S97-103, 2023.

9.    Ramay, B.M., Castillo, C., Grajeda, L., Santos L.F., Romero, J.C., Lopez, M.R., Gomez, A., Caudell, M., Smith, R.M., Styczynski, A., Herzig, C.T.A., Bollinger, S., Ning, M.F., Horton, J., Omulo, S., Palmer, G.H., Cordon-Rosales, C., and Call, D.R. Colonization with antibiotic-resistant bacteria in a hospital and associated communities in Guatemala: An Antibiotic Resistance in Communities and Hospitals (ARCH) study. Clinical Infectious Diseases, 77(S1): S82-88, 2023.

10. Koku, R., Futse, J.E., Morrison, J., Brayton, K.A., Palmer, G.H., and Noh, S.M.  The use of the antigenically variable Major Surface Protein 2 in the establishment of superinfection during natural transmission of *Anaplasma marginale* in southern Ghana.  Infection and Immunity, e0050122. doi: 10.1128/iai.00501-22 2023.

11. Iles, R.A., Thumbi, S.M., Palmer, G.H., and Marsh, T.L. Effects of changes in short-term human cognition on reported healthcare utilization.   PLoS Global Public Health, 2(11):e0000690. doi:10.1371, 2022.

12. Ita, T., Luvsansharav, U-O., Smith, R.M., Mugoh, R., Ramay, B., Caudell, M, Ndegwa, L., Verani, J.R., Bollinger, S., Sharma, A., Palmer, G.H., Call, D.R., and Omulo, S.  Prevalence of colonization with multidrug-resistant bacteria in communities and hospitals in Kenya.  Scientific Reports, 12(1): 22290, 2022.

13. Otiang, E., Yoder, J., Manian, S., Campbell, Z.A., Thumbi, S.M., Njagi, L.W., Nyaga, P.N., and Palmer, G.H. Vaccination of household chickens results in a shift in young children's diet and improves child growth in rural Kenya.  Proceedings of the National Academy of Sciences, 119(24):e2122389119,  2022.

14. Omulo, S., Oluka, M., Achieng, L., Osoro, E., Kinuthia, R., Guantai, A., Opanga, S.A., Ongayo, M., Ndegwa, L., Verani, J.R., Wesangula, E., Nyakiba, J., Makori, J., Sugut, W., Kwobah, C., Osuka, H., Njenga, M.K., Call, D.R., Palmer, G.H., VanderEnde, D., and Luvsansharav, U.-O.  Point-prevalence survey of antibiotic use at three public referral hospitals in Kenya.  PLoS One 17(6):e0270048, 2022.

15. Koku, R., Herndon, D.R., Avillan, J., Morrison, J., Futse, J.E., Palmer, G.H., Brayton, K.A., and Noh, S.M. Both infection and superinfection drive complex *Anaplasma marginale* strain structure in a natural transmission

setting.  Infection and Immunity, 89:1-10 e00166-21,  2021.

16. Moreno, P., Cordón, C., Ramay, B.M, Grajeda, L., Palmer, G.H., Lopez, M.R., Morales, M., Sosa, K.,  Cerón, A., and Call, D.R.  Disponibilidad de antibióticos en tiendas de Guatemala.  Salud Publica Mexicana 63:335-336, 2021.

17. Omulo, S., Lofgren, E.T., Lockwood, S., Thumbi, S.M., Bigogo, G., Ouma, A., Bonventure J., Njenga, M.K., Kariuki, S., McElwain, T.F., Palmer, G.H., and Call, D.R.  Carriage of antimicrobial-resistant bacteria in a high density informal settlement in Kenya is associated with environmental risk factors.  Antimicrobial Resistance and Infection Control, *10:18* https://doi.org/10.1186/s13756-021-00886-y, 2021.

18. Otiang, E., Thumbi, S.M., Campbell, Z.A., Njagi, L.W., Nyaga, P.N., and Palmer, G.H. Impact of routine Newcastle disease vaccination on chicken flock size in smallholder farms in western Kenya.  PLoS One 16(3):e0248596, 2021.  https://doi.org/10.1371/journal.pone.0248596

19. Otiang, E., Campbell, Z.A., Thumbi, S.M., Njagi, L.W., Nyaga, P.N., and Palmer, G.H. Mortality as the primary constraint to enhancing nutritional and financial gains from poultry: A multi-year longitudinal study of smallholder farmers in western Kenya.  PLoS One 15(5):e0233691, 2020.

20. Moreno, P., Cerón, A., Sosa, K., Morales, M., Grajeda, L., Lopez, M.R., McCraken, J., Cordón, C., Palmer, G.H., Call, D.R., Ramay, B.M. Availability of over-the-counter antibiotics in Guatemalan corner stores.  PLoS One, doi.org/10.1371/journal.pone.0239873, 2020.

21. Ramay B.M., Caudell, M.A., Cordón-Rosales, C., Archila, L.D., Palmer, G.H., Jarquin, C., Moreno, P., McCracken, J.P., Rosenkrantz, L., Amram, O., Omulo, S., and Call, D.R. Antibiotic use and hygiene interact to influence the distribution of antimicrobial-resistant bacteria in low-income communities in Guatemala.  Nature Scientific Reports, 10(1):13767. doi: 10.1038/s41598-020-70741-4, 2020.

22. Yoder, J., Younce, E., Lankester, F.J., and Palmer, G.H. Human rabies exposure reports and treatment rates rise as dog rabies drops: Accounting for healthcare demand toward rabies elimination.  PLoS Neglected Tropical Diseases, 13(9):e0007630, 2019.

23. DeLay, N.D., Thumbi, S.M., Vanderford, J., Otiang, E., Ochieng, L., Njenga, M.K., Palmer, G.H., and Marsh, T.L. Linking calving intervals to milk production and household nutrition in Kenya.  Food Security, 12:309-325, doi.org/10.1007/s12571-019-01006-w, 2020.

24. Lankester, F., Davis, A., Kinung'hi S., Yoder, J., Bunga, C., Alkara S., Mzimbiri I., Cleaveland, S., and Palmer, G.H.  An integrated health delivery platform, targeting soil-transmitted helminths (STH) and canine mediated human rabies, results in cost savings and increased breadth of coverage for STH in remote rural communities in Tanzania.  BMC Public Health, 19:1398, 2019. https://doi.org/10.1186/s12889-019-7737-6

25. Campbell, Z.A., Thumbi, S.M., Marsh, T.L., Quinlan, M.B., Shirima, G.M., and Palmer, G.H.  Why isn't everyone using the thermotolerant vaccine?  Preferences for Newcastle disease vaccines by chicken-owning households in Tanzania.  PLoS One, 14(8):e0220963, 2019.

26. Thumbi, S.M., Njenga, M.K., Otiang, E., Ochieng, L., Munyua, P., Eichler, S., Widdowson, M-A., McElwain, T.F., and Palmer, G.H.  Mobile phone based surveillance for animal disease in rural communities: implications for detection of zoonoses spillover.  Philosophical Transactions of the Royal Society B, doi.org/10.1098/rstb.2019.0020, 2019.

27. Futse, J.E., Buami, G., Kayang, B.B., Koku, R., Palmer, G.H., Graça, T, and Noh, S.M.  Sequence and immunologic conservation of *Anaplasma marginale* OmpA within strains from Ghana as compared to the predominant OmpA variant.  PLoS One, 14(7):e0217661, 2019.

28. Graça, T., Ku, P-S., Hammac, G.K., Silva, M.G., Turse, J., Brown, W.C., Palmer, G.H., and Brayton, K.A. Segmental variation in a duplicated *msp2* pseudogene generates *Anaplasma marginale* antigenic variants. Infection and Immunity, 87:e00727-18, 2019.

29. Campbell, Z.A., Otieno, L., Shirima, G., Marsh, T.L., and Palmer, G.H.  Drivers of vaccination preferences to protect a low-value livestock resource: Willingness to pay for Newcastle disease vaccines by smallholder households.  Vaccine, 37:11-18, 2019.

30. Campbell, Z.A., Marsh, T.L., Mpolya, E.A., Thumbi, S.M., and Palmer, G.H.  Newcastle disease vaccine adoption by smallholder households in Tanzania: Identifying determinants and barriers.  PLoS One 13(10):e0206058, 2018.

31. Railey, A.F., Lembo, T., Palmer, G.H., Shirima, G.M., and Marsh, T.L. Spatial and temporal risk as drivers for adoption of Foot and Mouth Disease vaccination.   Vaccine, 36:5077-5083, 2018.

32. Mosites, E.M., Sammons, M., Otiang, E., Eng, A., Noecker, C., Manor, O., Hilton S., Thumbi, S.M., Onyango, C., Garland Lewis, G., Call, D.R., Njenga, M.K., Wasserheit, J., Zambriski, J., Walson, J.A., Palmer, G.H., Montgomery, J.M., Borenstein, E., Omore, R., and Rabinowitz, P.M.  Microbiome sharing between children, livestock and household surfaces in western Kenya. PLoS One, http://dx.doi.org/10.1371/journal.pone.0171017,

2017.

33. Brown, W.C., Deringer, J., Forero-Becerra, E., Ueti, M.W., Turse, J., Futse, J.E., Noh, S.M., and Palmer, G.H. Identification of a T-cell epitope that is globally conserved among outer membrane proteins (OMPs) OMP7, OMP8, and OMP9 of *Anaplasma marginale* strains and with OMP7 from the *A. marginale* subsp. *centrale* vaccine strain. Clinical and Vaccine Immunology, 24:e00406-16, 2017.

34. Mosites, E.M., Aol, G., Otiang, E., Bigogo G., Munyua, P., Montgomery, J.M., Neuhouser, M.L., Palmer, G.H., and Thumbi, S.M. Child height gain is associated with consumption of animal-source foods in livestock-owning households in western Kenya. Public Health Nutrition 12:1-10, 2017.

35. Marsh, T.L., Yoder, J., Deboch, T., McElwain, T.F., and Palmer, G.H. Livestock vaccinations translate into increased human capital and school attendance by girls. Science Advances, 2(12):e1601410, 2016.

36. Copin R., Wang, X., Louie, E., Escuyer, V., Coscolla, M., Gagneux, S., Palmer, G.H., and Ernst J.D. Within host evolution selects for a dominant genotype of Mycobacterium tuberculosis while T cell increase pathogen genetic diversity. PLoS Pathogens, 12(12):e1006111, 2016.

37. Lankester, F.J., Wouters, P.A., Czupryna, A., Palmer, G.H., Mzimbiri, I., Cleaveland, S., Francis, M.J., Sutton, D.J., and Sonnemans, D.G. Thermotolerance of an inactivated rabies vaccine for dogs. Vaccine, 34:5504-5511, 2016.

38. Graca, T., Silva, M.G., Kostyukova, A.S., and Palmer, G.H. Structural basis for recombinatorial permissiveness in the generation of *Anaplasma marginale* Msp2 antigenic variants. Infection and Immunity, 84:2740-2747, 2016.

39. Mosites, E.M., Thumbi, S.M., Otiang, E., McElwain, T.F., Njenga, M.K., Rabinowitz, P.M., Rowhani-Rahbar, A., Neuhouser, M.L., May, S., Palmer, G.H., and Walson, J.L. Relations between household livestock ownership, livestock disease, and young child growth. Journal of Nutrition 146:1118-1124, 2016.

40. Cerón, A., Ortiz, M.R., Álvarez, D., Palmer, G.H., and Cordón-Rosales, C. Local disease concepts relevant to the design of a community-based surveillance program for influenza in rural Guatemala. International Journal for Equity in Health, 15:69-71, 2016.

41. Beckley, C.S., Shaban, S., Palmer, G.H., Hudak, A.T., Noh, S.M., and Futse, J.E. Disaggregating tropical disease prevalence by climatic and vegetative zones within tropical West Africa. PLoS One, 11:e0152560, 2016.

42. Noh, S.M., Dark, M.J., Reif, K.E., Ueti, M.W., Kappmeyer, L.S., Scoles, G.A., Palmer, G.H., and Brayton, K.A. Superinfection exclusión of the ruminant pathogen *Anaplasma marginale* in the tick vector is dependent on time between exposures to the strains. Applied and Environmental Microbiology, 82:3217-24, 2016.

43. Palmer, G.H., Bankhead, T., and Seifert, H.S. Antigenic variation in bacterial pathogens. Microbiology Spectrum, 4:10.1128, 2016.

44. Graca, T., Paradiso, L., Boschat, S.L., Noh, S.M., and Palmer, G.H. Primary structural variation in *Anaplasma marginale* Msp2 efficiently generates immune escape variants. Infection and Immunity, 83:4178-4184, 2015.

45. Mosites, E.M., Rabinowitz, P.M., Thumbi, S.M., Montgomery, J.M., Palmer, G.H., May, S., Rowhani-Rahbar, A., Neuhouser, M.L., and Walson, J.L. The relationship between livestock ownership and child stunting in three countries in eastern Africa using national survey data. PLoS One 10:e0136686, 2015.

46. Ducken, D.R., Brown, W.C., Alperin, D.C., Brayton, K.A., Reif, K.E., Turse, J.E., Palmer, G.H., and Noh, S.M. Subdominant outer membrane protein antigens in *Anaplasma marginale*: conservation, antigenicity, and protective capacity using recombinant protein. PLoS One 10:e0129309, 2015.

47. James, A.E. and Palmer, G.H. The role of animal source foods in improving nutritional health in urban informal settlements: Identification of knowledge gaps and implementation barrier. International Journal of Child Health and Nutrition, 4:94-102, 2015.

48. Thumbi, S.M., Njenga, M.K., Marsh, T.L., Noh, S., Otiang, E., Munyua, P., Ochieng, L., Ogola, E., Yoder, J., Audi, A., Montgomery, J.M., Bigogo, G., Breiman, R.F., Palmer, G.H., and McElwain, T.F. Linking human health and livestock health: a "one-health" platform for integrated analysis of human health, livestock health, and economic welfare in livestock dependent communities. PLoS One 10:e0120761, 2015.

49. Castañeda-Ortiz, E.J., Ueti, M.W., Camacho-Nuez, M., Mosqueda, J., Mousel, M.R., Johnson, W.C., and Palmer, G.H. Association of *Anaplasma marginale* strain superinfection with infection prevalence within tropical regions. PLoS One 10:e0120748, 2015.

50. Lankester, F., Hampson, K., Lembo, T., Palmer, G.H., Taylor, T., and Cleaveland, S. Implementing Pasteur's vision for rabies elimination. Science, 345:1562-1564, 2014.

51. Vallejo, E., Herndon D.R., Alpirez Mendoza, F., Mosqueda, J., and Palmer, G.H. *Anaplasma marginale* superinfection attributable to pathogen strains with distinct genomic backgrounds. Infection and Immunity, 82:5286-5292, 2014.

(134 of 247), Page 134 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 134 of 247
Case 2:22-cv-00319-TOR ECF No. 106 filed 10/14/24 PageID.4071 Page 44
of 157

52. Mercado-Curiel, R.F., Ávila-Ramírez, Palmer, G.H., and Brayton, K.A. Identification of *Rhipicephalus microplus* genes that modulate the infection rate of the rickettsia *Anaplasma marginale.* PLoS One, 9(3):e91062, 2014.

53. Reif, K.E., Palmer, G.H., Crowder, D.W., Ueti, M.W., and Noh, S.M. Restriction of *Francisella novicida* genetic diversity during infection of the vector midgut. PLoS Pathogens 10:e1004499, 2014.

54. Mercado-Curiel, R.F., Ávila-Ramírez, Palmer, G.H., and Brayton, K.A. Identification of *Rhipicephalus microplus* genes that modulate the infection rate of the rickettsia *Anaplasma marginale.* PLoS One, 9(3):e91062, 2014.

55. Palmer, G.H. and Brayton, K.A. Antigenic variation and transmission fitness as drivers of bacterial strain structure. Cellular Microbiology, 15:1969-1975, 2013.

56. Hammac, G.K., Ku, P.-S., Galletti, M.F., Noh, S.M., Scoles, G.A., Palmer, G.H., and Brayton, K.A. Protective immunity induced by immunization with a live, cultured *Anaplasma marginale* strain. Vaccine, 31:3617-3622, 2013.

57. Noh, S.M., Turse, J., Brown, W.C., Norimine, N., and Palmer, G.H. Linkage between *Anaplasma marginale* outer membrane proteins enhances immunogenicity, but is not required for protection from challenge. Clinical and Vaccine Immunology, 20:651-656, 2013.

58. Herndon, D., Ueti, M.W., Reif, K.E., Noh, S.M., Brayton, K.A., Agnes, J.A., and Palmer, G.H. Identification of multi-locus heterogeneity in *Anaplasma marginale* ss. *centrale* and its restriction following tick-borne transmission. Infection and Immunity, 81:1852-1858, 2013.

59. Pierle, S.A., Hammac, G.K., Palmer, G.H. and Brayton, K.A. Transcriptional pathways associated with the slow growth phenotype of transformed *Anaplasma marginale.* BMC Genomics, 14:272-282, 2013.

60. Pierle, S.A., Dark, M.J., Dahmen, D., Palmer, G.H. and Brayton, K.A. Comparative genomics and transcriptomics of trait-gene association. BMC Genomics, 13:669, 2012.

61. Palmer, G.H. and Noh, S.M. Rickettsial entry into host cells: finding the keys to unlock the doors. Infection and Immunity 80:3746-3748, 2012.

62. Ueti, M.W., Tan, Y., Broschat, S.L., Castañeda Ortiz, E.J., Camacho-Nuez, M., Mosqueda, J.J., Scoles, G.A., Grimes, M., Brayton, K.A., and Palmer, G.H. Expansion of variant diversity associated with high prevalence of pathogen strain superinfection under conditions of natural transmission. Infection and Immunity, 80:2354-2360, 2012.

63. Albarrak, S.M., Brown, W.C., Noh, S.M., Reif, K.E., Scoles, G.A., Turse, J.E., Norimine, J., Ueti, M.W., and Palmer, G.H. Subdominant antigens in bacterial vaccines: AM779 is subdominant in the *Anaplasma marginale* outer membrane vaccine but does not associate with protective immunity. PLoS One, 7(9):e4637, 2012.

64. Palmer, G.H., Brown, W.C., Noh, S.M., and Brayton, K.A. Genome-wide screening and identification of antigens for rickettsial vaccine development. FEMS Immunology and Medical Microbiology, 64:115-119, 2012.

65. Njongmeta, L.M., Bray, J., Davies, C.J., Davis, W.C., Howard, C.J., Hope, J.C., Palmer, G.H., Brown, W.C. and Mwangi, W. CD205 antigen targeting combined with dendritic cell recruitment factors and antigen-linked CD40L activation primes and expands significant antigen-specific antibody and CD4+ T cell responses following DNA vaccination of outbred animals. Vaccine, 30:1624-1635, 2012.

66. Caballero, M.C., Pedroni, M.J., Palmer, G.H., Suarez, C.E., Davitt, C., and Lau, A.O.T. Characterization of acyl carrier protein and LytB in *Babesia bovis* apicoplast. Molecular and Biochemical Parasitology, 181:125-133, 2012.

67. Morse, K., Norimine, J., Palmer, G.H., Sutten, E., Baszler, T.V., and Brown, W.C. Association and evidence for linked recognition of type IV secretion system proteins VirB9-1, VirB9-2, and VirB10 in *Anaplasma marginale.* Infection and Immunity, 80:215-227, 2012.

68. Agnes, J.A., Brayton, K.A., LaFollett, M., Norimine, J., Brown, W.C. and Palmer, G.H. Identification of *Anaplasma marginale* outer membrane protein antigens conserved between *sensu stricto* strains and the live *Anaplasma marginale ss. centrale* vaccine. Infection and Immunity, 79:1311-1318, 2011.

69. Noh, S.M., Ueti, M.W., Munderloh, U.G., Felsheim, R.F., Palmer, G.H., and Brayton, K.A. Stability and tick transmission phenotype of transformed *Anaplasma marginale* through a complete *in vivo* infection cycle. Applied and Environmental Microbiology, 77:3330-334, 2011.

70. Ramabu, S., Schneider, D.A., Brayton, K.A., Ueti, M.W., Graca, T., Futse, J.E., Noh, S.M., Baszler, T.V., and Palmer, G.H. Expression of *Anaplasma marginale* ankyrin repeat-containing proteins during infection of the mammalian host and tick vector. Infection and Immunity, 79:2847-2855, 2011.

71. Mercado-Curiel, R.F., Palmer, G.H., Guerrero, F.D., and Brayton, K.A. Temporal characterization of the organ-specific *Rhipicephalus microplus* transcriptional response to *Anaplasma marginale* infection. International Journal for Parasitology, 41:851-860, 2011.

72. Mesplet, M., Palmer, G.H., Pedroni, M.J., Echaide, I., Florin-Christensen, M., Schnittger, L., and Lau, A.O.T. Genome-wide analysis of peptidase content and expression in a virulent and attenuated *Babesia bovis* strain pair.  Molecular and Biochemical Parasitology, 179:111-113, 2011.

73. Lau, A.O.T., Kalyanaraman, A., Echaide, I., Palmer, G.H., Bock, R., Pedroni, M.J.,  Rameshkumar, M., Ferreira, M.B., Fletcher, T.I., and McElwain, T.F.  Attenuation of virulence in an apicomplexan hemoparasite results in reduced genome diversity at the population level.  BMC Genomics, 12:410-422, 2011.

74. Reif, K.A., Palmer, G.H., Ueti, M.W., Scoles, G.A., Margolis, J.J., Monack, D.M., and Noh, S.M. 2011. *Dermacentor andersoni* transmission of *Francisella tularensis* subsp. *novicida* reflects bacterial colonization, dissemination, and replication coordinated with tick feeding.  Infection and Immunity, 79:2847-2855, 2011.

75. Noh, S.M., Zhuang, Y., Futse, J.E., Brown, W.C., Brayton, K.A., and Palmer, G.H.  The immunization-induced antibody response to the *Anaplasma marginale* Major Surface Protein 2 and its association with protective immunity.  Vaccine, 28:3741-3747, 2010.

76. Agnes, J.A., Herndon, D., Ueti, M.W., Ramabu, S., Evans, M., Brayton, K.A., and Palmer, G.H. Association of pathogen strain-specific gene transcription and transmission efficiency phenotype of *Anaplasma marginale*. Infection and Immunity, 78 2446-2453, 2010.

77. Ramabu, S., Ueti, M.W., Brayton, K.A., Baszler, T.V., and Palmer, G.H. Identification of *Anaplasma marginale* proteins specifically up-regulated during colonization of the tick vector.  Infection and Immunity, 78:3047-3052, 2010.

78. Lau, A.O.T., Cereceres K., Palmer, G.H., Fretwell, D.L., Pedroni, M.J., Mosqueda, J.J., and McElwain, T.F. Genotypic diversity of merozoite surface antigen 1 of *Babesia bovis* within an endemic population.  Molecular and Biochemical Parasitology, 172:107-112, 2010.

79. Herndon, D.R., Palmer, G.H., Shkap, V., Knowles, D.P., and Brayton, K.A. Complete genome sequence of *Anaplasma marginale ss. centrale*.  Journal of Bacteriology, 192:379-380, 2010.

80. Felsheim, R.F., Oliva Chavez, A.S., Palmer, G.H., Crosby, L., Barbet, A.F., Kurtti, T.J., and Munderloh, U.G. Transformation of *Anaplasma marginale*.  Veterinary Parasitology, 167:167-174, 2010.

81. Han, S., Norimine, J., Brayton, K.A., Palmer, G.H., Scoles, G.A., and Brown, W.C. *Anaplasma marginale* infection with persistent high load bacteremia induces a dysfunctional memory CD4+ T lymphocyte response but sustained high IgG titers.  Clinical and Vaccine Immunology, 17:1881-1890, 2010.

82. Futse, J.E., Brayton, K.A., Nydam, S.D., and Palmer, G.H.  Generation of antigenic variants by gene conversion: Evidence for recombination fitness selection at the locus level in *Anaplasma marginale*.  Infection and Immunity, 77: 3181-3187, 2009.

83. Dark, M.J., Herndon, D.R., Kappmeyer, L.S., Gonzales, M.P., Nordeen, E., Palmer, G.H., Knowles, D.P., and Brayton, K.A. Conservation in the face of diversity: multistrain analysis of an intracellular bacterium.  BMC Genomics, 10:16-28, 2009.

84. Palmer, G.H.  Sir Arnold Theiler and the discovery of anaplasmosis: A centennial perspective. Onderstepoort Journal of Veterinary Research 76:75-79, 2009.

85. Schwint, O.N., Ueti, M.W., Palmer, G.H., Kappmeyer, L.S., Hines, M.T., Cordes R.T., Knowles, D.P., and Scoles, G.A. Imidocarb dipropionate clears persistent *Babesia caballi* infection with elimination of transmission potential.  Antimicrobial Agents and Chemotherapy, 53:4327-4332, 2009.

86. Palmer, G.H., Bankhead, T., and Lukehart, S.A. Nothing is permanent but change: Antigenic variation in persistent bacterial pathogens. Cellular Microbiology, 11:1697-1705, 2009. Ueti, M.W., Knowles, D.P. , Davitt, C.M., Scoles, G.A., Baszler, T.V., and Palmer, G.H.  Quantitative differences in salivary pathogen load during tick transmission underlie strain-specific variation of *Anaplasma marginale*.  Infection and Immunity, 77-70-75, 2009.

87. Galletti, M.F.B.M., Ueti, M.W., Knowles, D.P., Brayton, K.A., and Palmer, G.H. Independence of high and low transmission efficiency of *Anaplasma marginale* strains in the tick vector following simultaneous acquisition by feeding on a superinfected mammalian reservoir host.  Infection and Immunity, 77:1459-1464, 2009.

88. Futse, J.E., Brayton, K.A., Dark, M.J., Knowles, D.P., and Palmer, G.H.  Superinfection as a driver of genomic diversification in antigenically variant pathogens.  Proceedings of the National Academy of Sciences, USA, 105:2123-2127, 2008.

89. Leverich, C.K., Palmer, G.H., Knowles, D.P., and Brayton, K.A.  Tick-borne transmission of two genetically distinct *Anaplasma marginale* strains following superinfection of the mammalian reservoir host.  Infection and Immunity, 76:4066-4070, 2008.

90. Macmillan, H., Norimine, J., Brayton, K.A., Palmer, G.H., and Brown, W.C. Physical linkage of naturally complexed bacterial outer membrane proteins enhances immunogenicity. Infection and Immunity, 76:1223-1229, 2008.

91. Lopez, J.E., Beare, P.A., Heinzen, R.A., Norimine; J., Lahmers, K.K., Palmer, G.H., Brown, W.C. High-throughput identification of T-lymphocyte antigens from *Anaplasma marginale* expressed using in vitro transcription and translation. Journal of Immunological Methods, 332:129-141, 2008.

92.    Noh, S.M., Brayton, K.A., Brown, W.C., Norimine, J., Munske, G.R., Davitt, C.M., and Palmer, G.H. Composition of the surface proteome of *Anaplasma marginale* and its role in protective immunity induced by outer membrane immunization. Infection and Immunity, 76:2219-2226, 2008.

93. Massung, R.F., Hiratzka, S.L., Brayton, K.A., Palmer, G.H., and Lee, K.N. Succinate dehydrogenase gene arrangement and expression in *Anaplasma phagocytophilum*. Gene, 414:41-48, 2008.

94. Ueti, M.W., Palmer, G.H., Scoles, G.A., Kappmeyer, L.S., and Knowles, D.P. Persistently infected horses are reservoirs for intrastadial tick-borne transmission of the apicomplexan parasite *Babesia equi*. Infection and Immunity, 76 3525-3529, 2008.

95. Goff, W.L., Johnson, W.C., Molloy, J.B., Jorgensen, W.K., Waldron, S.J., Figueroa, J.V., Matthee, O., Adams, D.S., McGuire, T.C., Pino, I., Mosqueda, J., Palmer, G.H., Suarez, C.E., Knowles, D.P., and McElwain, T.F. Validation of a competitive ELISA for detection of *Babesia bigemina* antibodies in cattle. Clinical and Vaccine Immunology 15:316-321, 2008.

96. Han, S., Norimine, J., Palmer, G.H., Mwangi, W., Lahmers, K.K., and Brown, W.C. Rapid deletion of antigen-specific CD4+ T 1 cells following infection represents a strategy of immune evasion and persistence for *Anaplasma marginale*. Journal of Immunology, 181: 7759-7769, 2008.

97.    Palmer, G.H., Futse, J.E., Leverich, C.K., Knowles, D.P., Rurangirwa, F.R., and Brayton, K.A. Selection for simple MSP2 variants during *Anaplasma marginale* transmission to immunologically naïve animals. Infection and Immunity, 75:1502-1506, 2007.

98. Palmer, G.H. and Brayton, K.A. Gene conversion is a convergent strategy for pathogen antigenic variation. Trends in Parasitology, 23:408-413, 2007.

99. Howell, J., Ueti, M.W., Palmer, G.H., Scoles, G.A., and Knowles, D.P. Transovarial transmission efficiency of *Babesia bovis* tick stages acquired by *Rhipicephalus (Boophilus) microplus* during acute infection. Journal of Clinical Microbiology, 45:426-431, 2007.

100.    Mwangi, W., Brown, W.C., Splitter, G.A., Davies, C.J., Howard, C.J., Hope, J.C., Aida, Y., Zhuang, Y., Hunter, B.J., and Palmer, G.H. Priming immune responses in outbred animals using a single DNA vaccination. Clinical and Vaccine Immunology, 14:304-311, 2007.

101.    Scoles, G.A., Ueti, M.W., Noh, S.M., Knowles, D.P., and Palmer, G.H. Conservation of the transmission phenotype of *Anaplasma marginale* (Rickettsiales: Anaplasmataceae) strains among *Dermacentor* and *Rhipicephalus* ticks (Acari: Ixodidae). Journal of Medical Entomology, 44:484-491, 2007.

102.    Herrmann-Hoesing, L., Palmer, G.H., and Knowles, D.P. Evidence of proviral clearance following postpartum transmission of an ovine lentivirus. Virology, 362:226-234, 2007.

103.    Lopez, J.E., Palmer, G.H., Brayton, K.A., Dark, M.J., Leach, S.E., and Brown, W.C. Immunogenicity of *Anaplasma marginale* type IV secretion 1 system proteins in a protective outer membrane vaccine. Infection and Immunity, 75:2333-2342, 2007.

104.    Carreño, A.D., Alleman, A.R., Barbet, A.F., Palmer, G.H., Noh, S.M., and Johnson, C.M. 2006. *In vivo* endothelial cell infection by *Anaplasma marginale*. Veterinary Pathology, 44:116-118, 2007.

105.    Ueti, M.W., Reagan, J.O., Knowles, D.P., Scoles, G.A., Shkap, V., and Palmer, G.H. Identification of midgut and salivary gland as specific and distinct barriers to efficient tick-borne transmission of *Anaplasma marginale*. Infection and Immunity 75:2959-2964, 2007.

106.    Howell, J., Ueti, M.W., Palmer, G.H., Scoles, G.A., and Knowles, D.P. Persistently infected calves as reservoirs for acquisition and transovarial transmission of *Babesia bovis* by *Rhipicephalus (Boophilus) microplus*. Journal of Clinical Microbiology, 45:3155-3159, 2007.

107.    Zhuang, Y., Futse, J.E., Brown, W.C., Brayton, K.A., and Palmer, G.H. Maintenance of antibody to pathogen epitopes generated by segmental gene conversion is highly dynamic during long-term persistent infection. Infection and Immunity, 75:5185-5190, 2007.

108.    Noh, S.M., Brayton, K.A., Knowles, D.P., Agnes, J.T., Dark, M.J., Brown, W.C., Baszler, T.V., and Palmer, G.H. Differential expression and sequence conservation of the *Anaplasma marginale msp2* gene superfamily outer membrane proteins. Infection and Immunity, 74:3471-3479, 2006.

109.    Zhuang, Y., Mwangi, W., Brown, W.C., Davis, W.C., Hope, J.C., and Palmer, G.H. Characterization of a phenotypically unique population of CD13+ dendritic cells resident in the spleen. Clinical and Vaccine Immunology, 13:1064-1069, 2006.

110.    Brayton, K.A., Brown, W.C., and Palmer, G.H. Genomic and proteomic approaches to candidate vaccine antigen identification for *Anaplasma marginale*. Expert Reviews in Vaccines, 5:95-101, 2006.

111.    Macmillan, H., Brayton, K.A., Palmer, G.H., McGuire, T.C., Munske, G., Siems, W.F., and Brown, W.C. Analysis of the *Anaplasma marginale* Major Surface Protein (MSP)1-complex protein composition by tandem mass spectrometry.  Journal of Bacteriology, 188:4983-4991, 2006.

112.    Norimine, J., Ruef, B.J., Palmer, G.H., Knowles, D.P., Herndon, D.R., Rice-Ficht, A.C., and Brown, W.C. 2006.  A novel 78-kDa fatty acyl-CoA synthetase (ACS1) of *Babesia bovis* stimulates memory CD4(+) T lymphocyte responses in B. bovis-immune cattle.  Molecular and Biochemical Parasitology, 147:20-29, 2006.

113.    Brayton, K.A., Kappmeyer, L.S., Herndon, D.R., Dark, M.J., Tibbals, D.L., Palmer, G.H., McGuire, T.C., and Knowles, D.P.: Complete genome sequencing of *Anaplasma marginale* reveals that the surface is skewed to two superfamilies of outer membrane proteins.  Proceedings of the National Academy of Sciences, USA, 102: 844-849, 2005.

114.    Lahmers, K.K., Norimine, J., Abrahamsen, M.S., Palmer, G.H., and Brown, W.C.: The CD4[+] T cell immunodominant *Anaplasma marginale* major surface protein 2 stimulates γ/δ T cell clones that express unique T cell receptors.  Journal of Leukocyte Biology, 77:199-208, 2005.

115.    Scoles, G.A., Ueti, M.W., and Palmer, G.H.:  Variation among geographically separated populations of *Dermacentor andersoni* (*Acari: Ixodidae*) in midgut susceptibility to *Anaplasma marginale* (*Rickettsiales: Anaplasmataceae*).  Journal of Medical Entomology, 42:153-162, 2005.

116.    Abbott, J.R., Palmer, G.H., Kegerreis, K.A., Hetrick, P.F., Howard, C.J., Hope, J.C., and Brown, W.C.: Rapid and long-term disappearance of CD4[+] T-lymphocyte responses specific for *Anaplasma marginale* major surface protein-2 (MSP2) in MSP2 vaccinates following challenge with live *A. marginale*.  Journal of Immunology, 174:6702-6715, 2005.

117.    Mwangi, W., Brown, W.C., Splitter, G.A., Zhuang, Y., Kegerreis, K., and Palmer, G.H.  Enhancement of antigen acquisition by dendritic cells and MHC class II-restricted epitope presentation to CD4+ T-cells using VP22 DNA vaccine vectors that promote intercellular spreading following initial transfection.  Journal of Leukocyte Biology, 78:401-411, 2005.

118.    Barbet, A.F., Agnes, J.T., Moreland, A.L., Lundgren, A.M., Alleman, A.R., Noh, S.M., Brayton, K.A., Munderloh, U.G., and Palmer, G.H.  Identification of functional promoters in the *msp2* expression loci of *Anaplasma marginale* and *Anaplasma phagocytophilum*.  Gene, 353:89-97, 2005.

119.    Ueti, M.W., Palmer, G.H., Kappmeyer, L.S. Stadtfield, M., Scoles, G.A., and Knowles, D.P.  Ability of the vector tick *Boophilus microplus* to acquire and transmit *Babesia equi* following feeding on chronically infected horses with low level parasitemia.  Journal of Clinical Microbiology, 43:3755-3759, 2005.

120.    Scoles, G.A., Broce, A.B., Lysyk, T.J., and Palmer G.H.: Relative efficiency of biological transmission of *Anaplasma marginale* (Rickettsiales: Anaplasmataceae) by *Dermacentor andersoni* Stiles (Acari: Ixodidae) compared to mechanical transmission by the stable fly, *Stomoxys calcitrans* (L.) (Diptera: Muscidae). Journal of Medical Entomology, 42:668-675, 2005.

121.    Futse, J.E., Brayton, K.A., Knowles, D.P., and Palmer, G.H.: Structural basis for segmental gene conversion in generation of *Anaplasma marginale* outer membrane protein variants.  Molecular Microbiology, 57:212-221, 2005.

122.    Rodriguez, J.L., Palmer, G.H., Knowles, D.P., and Brayton, K.A.  Distinctly different msp2 pseudogene repertoires in *Anaplasma marginale* strains that are capable of superinfection. Gene, 361:127-132, 2005.

123.    Hope, J.C, Kwong, L.S., Thom, M., Sopp, P., Mwangi, W., Brown, W.C., Palmer, G.H., Wattegedera, S., Entrican, G., and Howard, C.J.  Development of detection methods for ruminant interleukin (IL)-4.  Journal of Immunological Methods, 301:114-123, 2005.

124.    Lopez, J.E., Siems, W.F., Palmer, G.H. Brayton, K.A., McGuire, T.C., and Brown, W.C.: Identification of novel antigenic proteins in a complex *Anaplasma marginale* outer membrane immunogen by mass spectrometry and genomic mapping. Infection and Immunity, 73:8109-8118, 2005.

125.    Löhr, C.V., Brayton, K.A., Barbet, A.F., and Palmer G.H.: Characterization of the *Anaplasma marginale msp2* locus and its synteny with the *omp1/p30* loci of *Ehrlichia chaffeensis* and *E. canis*.  Gene, 325:115-121, 2004.

126.    Norimine, J., Mosqueda, J., Palmer, G.H., Lewin, H.A., and Brown, W.C.: Conservation of *Babesia bovis* small heat shock protein (Hsp20) among strains and definition of T helper cell epitopes recognized by cattle with diverse MHC class II haplotypes. Infection and Immunity, 72:1096-1106, 2004.

127.    Brown, W.C., Palmer, G.H., Brayton, K.A., Meeus, P.F.M., Barbet, A.F., Kegerreis, K.A., and McGuire, T.C.:  CD4[+] T lymphocytes from *Anaplasma marginale* major surface protein 2 (MSP2) vaccinees recognize naturally processed epitopes conserved in MSP3.  Infection and Immunity, 72:3688-3692, 2004.

128.    Stich, R.W., Olah, G., Brayton, K.A., Brown, W.C., Fecheimer, M., Green-Church, K., Jittapalapong, S., Kocan, K.M., McGuire, T.C., Rurangirwa, F.R., and Palmer, G.H. Identification of a novel *Anaplasma marginale*

appendage-associated protein that localizes with actin filaments during intraerythrocytic infection. Infection and Immunity, 72:7257-7264, 2004.

129.    Suarez, C.E., Palmer, G.H., LeRoith T., Florin-Christensen, M., Crabb, B., and McElwain, T.F.: Intergenic regions in the rhoptry associated protein-1 (rap-1) locus promote exogenous gene expression in *Babesia bovis*. International Journal for Parasitology, 34:1177-1184, 2004.

130.    Molad, T., Brayton, K.A., Palmer, G.H., Michaeli, S., and Shkap, V.: Molecular conservation of MSP4 and MSP5 in *Anaplasma marginale* and *A. centrale* vaccine strain. Veterinary Microbiology, 100:55-64, 2004.

131.    Abbott, J.R., Palmer, G.H., Howard, C.J., Hope, J.C., and Brown, W.C.: *Anaplasma marginale* major surface protein 2 CD4[+] T-cell epitopes are evenly distributed in conserved and hypervariable regions (HVR), whereas linear B-cell epitopes are predominantly located in the HVR. Infection and Immunity, 72:7360-7366, 2004.

132.    Palmer, G.H., Knowles, D.P., Rodriguez, J.L., Gnad, D.P., Hollis, L.C., Marston, T., and Brayton, K.A.: Stochastic transmission of multiple genotypically distinct *Anaplasma marginale* strains within an endemic herd. Journal of Clinical Microbiology, 42:5381-5384, 2004.

133.    Brown, W.C., Brayton, K.A., Styer, C.M., and Palmer, G.H.: The hypervariable region of *Anaplasma marginale* major surface protein 2 (MSP2) contains multiple immunodominant CD4[+] T lymphocyte epitopes that elicit variant-specific proliferative and IFN-$\gamma$ responses in MSP2 vaccinates. Journal of Immunology, 170:3790-3798, 2003.

134.    Suarez, C.E., Palmer, G.H., Florin-Christensen, M., Hines, S.A., Hötzel, I., and McElwain, T.F.: Organization, transcription, and expression of rhoptry associated protein genes in the *Babesia bigemina rap-1* locus. Molecular and Biochemical Parasitology, 127:101-112, 2003.

135.    Zhang, Y., Palmer, G.H., Abbott, J.R., Howard, C.J., Hope, J.C., and Brown, W.C.: CpG ODN 2006 and IL-12 are comparable for priming Th1 lymphocyte and IgG responses in cattle immunized with a rickettsial outer membrane protein in alum. Vaccine, 21:3307-3318, 2003

136.    Lopez, M.A., Hines, M.T., Palmer, G.H., Knowles, D.P., Alperin, D.C., and Hines, S.A.: Analysis of anamnestic immune responses in adult horses and priming in neonates induced by a DNA vaccine expressing the *vapA* gene of *Rhodococcus equi*. Vaccine, 21:3815-3825, 2003.

137.    Meeus, P.F.M., Brayton, K.A., Palmer, G.H., and Barbet, A.F.: Conservation of a gene conversion mechanism in two distantly related paralogues of *Anaplasma marginale*. Molecular Microbiology, 47:633-643, 2003.

138.    Norimine, J., Mosqueda, J., Suarez, C.E., Palmer, G.H., McElwain, T.F., Mbassa, G., and Brown, W.C.: Stimulation of T helper cell IFN-$\gamma$ and IgG responses specific for *Babesia bovis* rhoptry associated protein-1 (RAP-1) or a RAP-1 protein lacking the carboxy terminal repeat region is insufficient to provide protective immunity against virulent *B. bovis* challenge. Infection and Immunity, 71:5021-5032, 2003.

139.    Futse, J.E., Ueti, M.W., Knowles, D.P., and Palmer, G.H.: Transmission of *Anaplasma marginale* by *Boophilus microplus*: Retention of vector competence in the absence of vector-pathogen interaction. Journal of Clinical Microbiology, 41:3829-3834, 2003.

140.    Ueti, M.W., Palmer, G.H., Kappmeyer, L.S., Scoles, G.A., and Knowles, D.P.: Expression of Equi Merozoite Antigen-2 during development of *Babesia equi* in the midgut and salivary gland of the vector tick *Boophilus microplus*. Journal of Clinical Microbiology, 41:5803-5809, 2003.

141.    Brayton, K.A., Meeus, P.F.M., Barbet, A.F., and Palmer, G.H.: Simultaneous variation of the immunodominant outer membrane proteins MSP2 and MSP3 during *Anaplasma marginale* persistence *in vivo*. Infection and Immunity, 71:6627-6632, 2003.

142.    Löhr, C.V., Rurangirwa, F.R., McElwain, T.F., Stiller, D., and Palmer G.H.: Specific expression of *Anaplasma marginale* major surface protein 2 salivary gland variants occurs in the midgut and is an early event during tick transmission. Infection and Immunity, 70:114-120, 2002.

143.    Mosqueda, J., McElwain, and Palmer G.H.: *Babesia bovis* MSA-2 proteins are expressed on the merozoite and sporozoite surface and specific antibodies inhibit attachment and invasion of erythrocytes. Infection and Immunity, 70:6448-6455, 2002.

144.    Shkap, V., Molad, T., Brayton, K.A., Brown, W.C., and Palmer, G.H.: Expression of Major Surface Protein-2 variants with conserved T cell epitopes in *Anaplasma centrale* vaccinates. Infection and Immunity, 70:642-648, 2002.

145.    Mosqueda, J., McElwain, T.F., Stiller, D., and Palmer G.H.: *Babesia bovis* MSA-1 and RAP-1 are expressed in sporozoites and specific antibodies inhibit sporozoite attachment to erythrocytes. Infection and Immunity, 70:1599-1603, 2002.

146.    Brayton, K.A., Palmer, G.H., Lundgren, A., Yi, J., and Barbet, A.F.: Antigenic variation of *Anaplasma*

*marginale msp2* occurs by combinatorial gene conversion.  Molecular Microbiology, 43:1151-1159, 2002.

147.    Rurangirwa, F.R., Brayton, K.A., McGuire, T.C., Knowles, D.P., and Palmer, G.H.:  Conservation of the unique rickettsial rRNA gene arrangement in *Anaplasma*. International Journal of Systematic and Evolutionary Microbiology, 52:1405-1409, 2002.

148.    Florin-Christensen, M., Suarez, C.E., Hines, S.A., Palmer, G.H., Brown, W.C., and McElwain, T.F.: The *Babesia bovis* Merozoite Surface Antigen-2 locus contains four tandemly arranged and expressed genes encoding immunologically distinct proteins.  Infection and Immunity, 70:3566-3575, 2002.

149.    Henderson, S., Leibnitz, G., Turnbull, M., and Palmer, G.H.: False-positive Human Immunodeficiency Virus seroconversion is not common following rabies vaccination. Clinical and Diagnostic Laboratory Immunology, 9:942-943, 2002.

150.    Shkap, V., Molad, T., Fish, L., and Palmer, G.H.: Detection of the *Anaplasma centrale* vaccine strain and specific differentiation from *Anaplasma marginale* in vaccinated and infected cattle.  Parasitology Research, 88:546-552, 2002.

151.    Brown, W.C., McGuire, T.C., Mwangi, W., Kegerreis, K.A., Macmillan, H., Lewin, H.A., and Palmer, G.H.: MHC class II DR restricted memory CD4+ T lymphocytes recognize conserved immunodominant epitopes of *Anaplasma marginale* Major Surface Protein 1a (MSP1a). Infection and Immunity, 70:5521-5532, 2002.

152.    Löhr, C.V., Brayton, K.A., Shkap, V., Molad, T., Barbet, A.F., Brown, W.C., and Palmer G.H.: Expression of *Anaplasma marginale msp2* Operon-Associated Proteins during mammalian and arthropod infection. Infection and Immunity, 70:6005-6012, 2002.

153.    Palmer, G.H.: The highest priority: What microbial genomes are telling us about immunity. Veterinary Immunology and Immunopathology, 85:1-8, 2002.

154.    Lopez, M.A., Hines, M.T., Palmer, G.H., Alperin, D.C., and Hines, S.A.: Identification of pulmonary T-lymphocyte and serum antibody isotype responses associated with protection against *Rhodococcus equi*. Clinical and Diagnostic Laboratory Immunology, 9:1270-1276, 2002.

155.    Mwangi, W., Brown, W.C., Lewin, H.A., Howard, C.J., Hope, J.C., Caplazi, P., Baszler, T.V., Abbott, J.R., and Palmer, G.H.  DNA encoded FLT3 Ligand and GM-CSF increase dendritic cell recruitment to the inoculation site and enhance antigen-specific CD4+ T cell responses induced by DNA vaccination of outbred animals. Journal of Immunology, 169:3837-3846, 2002.

156.    Byrne, B.A., Prescott, J.F., Palmer, G.H., Takai, S., Nicholson, V.M., Alperin, D.C., and Hines, S.A.:  The virulence plasmid of *Rhodococcus equi* contains an inducible gene family encoding secreted proteins.  Infection and Immunity, 69:650-656, 2001.

157.    Highly conserved regions of the immunodominant Major Surface Protein 2 (MSP2) of the ehrlichial pathogen *Anaplasma marginale* are rich in naturally derived CD4+ T lymphocyte epitopes that elicit strong recall responses.  Journal of Immunology, 166:1114-1125, 2001.

158.    Brayton, K.A., Knowles, D.P., McGuire, T.C., and Palmer, G.H.:  Efficient use of a small genome to generate antigenic diversity in tick-borne ehrlichial pathogens.  Proceedings of the National Academy of Sciences, USA, 98:4130-4135, 2001.

159.    Florin-Christensen, J., Suarez, C.E., Florin-Christiansen, M., Brown, W.C., McElwain, T.F., and Palmer, G.H.: A unique phospholipid organization in bovine erythrocyte membranes. Proceedings of the National Academy of Sciences, USA, 98:7736-7741, 2001.

160.    Palmer, G.H., Rurangirwa, F.R., and McElwain, T.F.  Strain composition of the ehrlichia *Anaplasma marginale* within persistently infected cattle, a mammalian reservoir for tick-transmission.  Journal of Clinical Microbiology, 39:631-635, 2001.

161.    Snekvik, K.R., Beyer, J.C., Bertoni, G., Von Beust, B.R., Baszler, T.V. Palmer, G.H., McElwain, T.F., and Cheevers, W.P.  Characterization of caprine interleukin 4.  Veterinary Immunology and Immunopathology, 78:219-229, 2001.

162.    Fisher, T.G., McElwain, T.F., and Palmer, G.H.: Molecular basis for variable expression of merozoite surface protein gp45 among American isolates of *Babesia bigemina*. Infection and Immunity, 69:3782-3790, 2001.

163.    Hines, M.T., Paasch, K.M., Alperin, D.C., Palmer, G.H., Westhoff, N.C., and Hines, S.A.: Immunity to *Rhodococcus equi*: antigen-specific recall responses in the lungs of adult horses.  Veterinary Immunology and Immunopathology, 79:101-113, 2001.

164.    Brown, W.C., Palmer, G.H., Zhu, D., Lewin, H.A., Sosnow, J., and McGuire, T.C.,: CD4+ T lymphocytes from calves immunized with *Anaplasma marginale* Major Surface Protein 1 (MSP1), a heteromeric complex of MSP1a and MSP1b, preferentially recognize the MSP1a carboxyl terminus that is conserved among strains. Infection and Immunity, 69:6853-6862, 2001.

165.    Dumler, J.S., Barbet, A.F., Bekker, C.P.J., Dasch, G.A, Palmer, G.H., Ray, S.C., Rikihisa, Y., and

Rurangirwa, F.R.: Reorganization of genera in the Families *Rickettsiaceae* and *Anaplasmataceae* in the Order *Rickettsiales*; unification of some Species of *Ehrlichia* with *Anaplasma*, *Cowdria* with *Ehrlichia*, and *Ehrlichia* with *Neorickettsia*; descriptions of six new species combinations; and designation of *Ehrlichia equi* and "HGE agent" as subjective synonyms of *Ehrlichia phagocytophila*. International Journal of Systematic and Evolutionary Microbiology, 51:2145-2165, 2001.

166.    Zhang, Y., Shoda, L.K.M., Brayton, K.A., Estes, D.M., Palmer, G.H., and Brown, W.C.: Induction of Interleukin-6 and Interleukin-12 in bovine B lymphocytes, monocytes, and macrophages by CpG oligodeoxynucleotide (ODN 2059) containing the GTCGTT motif. Journal of Interferon and Cytokine Research, 21:871-881, 2001.

167.    Florin-Christensen, J., Suarez, C.E., Florin-Christiansen, M., Hines, S.A., McElwain, T.F., and Palmer, G.H.: Phosphatidylcholine formation is the predominant lipid biosynthetic event in the hemoparasite *Babesia bovis*. Molecular and Biochemical Parasitology 106:147-156, 2000.

168.    Tuo, W., Palmer, G.H., McGuire, T.C., Zhu, D., and Brown, W.C.: Interleukin-12 as an adjuvant promotes immunoglobulin G (IgG) and type 1 cytokine recall responses to the major surface protein-2 (MSP-2) of the ehrlichial pathogen *Anaplasma marginale*. Infection and Immunity, 68: 270-280, 2000.

169.    Palmer, G.H., Brown, W.C., and Rurangirwa, F.R. Antigenic variation in the persistence and transmission of the ehrlichia *Anaplasma marginale*. Microbes and Infection, 2:167-176, 2000.

170.    Rurangirwa, F.R., Stiller, D.S., and Palmer, G.H.  Strain diversity in MSP2 expression during tick transmission of *Anaplasma marginale*. Infection and Immunity, 68: 3023-3027, 2000.

171.    Shoda, L.K.M., Palmer, G.H., Florin-Christiansen, J., Florin-Christiansen, M., Godson, D.L., and Brown, W.C.: *Babesia bovis* stimulated macrophages express interleukin-1β, interleukin-12, tumor necrosis factor-α, and nitric oxide and inhibit parasite replication in vitro. Infection and Immunity, 68:5139-5145, 2000.

172.    Barbet, A.F., Lundgren, A., Yi, J., Rurangirwa, F.R., and Palmer, G.H.: Antigenic variation of *Anaplasma marginale* by expression of MSP2 sequence mosaics. Infection and Immunity, 68:6133-6138, 2000.

173.    Mwangi, W., Brown, W.C., and Palmer, G.H. Identification of flt3-ligand isoforms required for receptor binding and function using naturally occurring ligand isoforms. Journal of Immunology, 165:6966-6974, 2000.

174.    Suarez, C.E., Florin-Christiansen, M., Hines, S.A., Palmer, G.H., Brown, W.C., and McElwain, T.F.: Characterization of allelic variation in the *Babesia bovis* merozoite surface antigen-1 (*msa-1*) locus and identification of a cross-reactive, inhibition-sensitive MSA-1 epitope. Infection and Immunity, 68:6865-6870, 2000.

175.    Camacho-Nuez, M., Muñoz, M. de Lourdes, Suarez, C.E., McGuire, T.C., Brown, W.C., and Palmer, G.H.: Expression of polymorphic *msp1β* genes during acute *Anaplasma marginale* rickettsemia. Infection and Immunity, 68:1946-1952, 2000.

176.    Rurangirwa, F.R., Stiller, D.S., French, D.M., and Palmer, G.H. Restriction of Major Surface Protein 2 (MSP2) variants during tick transmission of the ehrlichiae *Anaplasma marginale*. Proceedings of the National Academy of Sciences, USA, 96:3171-3176, 1999.

177.    Brown, W.C. and Palmer, G.H. Designing blood-stage vaccines against *Babesia bovis* and *B. bigemina*. Parasitology Today, 15:275-281, 1999.

178.    Von Beust, B.R., Brown, W.C., Estes, D.M., Zarlenga, D.S., McElwain T.F., and Palmer, G.H.: Development and in vitro characterization of recombinant vaccinia viruses expressing BLV gp51 in combination with bovine IL4 or IL12. Vaccine, 17:384-395, 1999.

179.    Mahan, S.M., Allsopp, B.A., Kocan, K.M., Palmer, G.H., and Jongejan, F.: Vaccine strategies for *Cowdria ruminantium* infections and their application to other ehrlichial infections. Parasitology Today, 15, 290-294, 1999.

180.    Palmer, G.H., Rurangirwa, F.R., Kocan, K.M., and Brown, W.C. Molecular basis for vaccine development against the ehrlichial pathogen *Anaplasma marginale*. Parasitology Today, 15:281-286, 1999.

181.    Brown, W.C., McElwain, T.F., Palmer, G.H., Chantler, S.E., and Estes, D.M.: Bovine CD4+ T lymphocyte clones specific for rhoptry associated protein-1 (RAP-1) of *Babesia bigemina* provide cognate help for IgG1 and IgG2 synthesis. Infection and Immunity, 67:155-164, 1999.

182.    French, D.M., Brown, W.C., and Palmer, G.H.: Emergence of *Anaplasma marginale* antigenic variants during persistent rickettsemia. Infection and Immunity, 67:5834-5840, 1999.

183.    Fernandez, P., Machado, J., Heussler, V., Botteron, C., Palmer, G.H., and Dobbelaere, D.A.E. The inhibition of NFκB activation pathways and the induction of apoptosis by dithiocarbamates in T-cells are blocked by the glutathione precursor N-acetyl-L-cysteine. Biological Chemistry, 380:1383-1394, 1999.

184.    Machado, R.Z., McElwain, T.F., Pancracio, H.P., Freschi, C.R., and Palmer, G.H. *Babesia bigemina*: Immunization with purified rhoptries induces protection against acute parasitemia. Experimental Parasitology, 93:105-108, 1999.

185.    Brown, W.C., McElwain T.F., Hotzel, I., Suarez, C.E., and Palmer, G.H.: Helper T cell epitopes encoded

(141 of 247), Page 141 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 141 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4078    Page 51
of 157

by the *Babesia bigemina rap-1* gene family in the constant and variant domains are conserved among parasite strains.  Infection and Immunity, 66:1561-1569, 1998.

186.   Hotzel, I., Suarez, C.E., McElwain T.F. and Palmer, G.H.:  Genetic variation in the dimorphic regions of *rap-1* genes and rap-1 loci in *Babesia bigemina*.  Molecular and Biochemical Parasitology, 90:479-489, 1998.

187.   French, D.F., McElwain, T.F., McGuire, T.C. and Palmer, G.H.:  Expression of *Anaplasma marginale* Major Surface Protein 2 variants during persistent cyclic rickettsemia.  Infection and Immunity, 66:1200-1207, 1998.

188.   Torioni de Echaide, S., Knowles, D.P., McGuire, T.C., Palmer, G.H., Suarez, C.E. and McElwain, T.F.:  Detection of cattle naturally infected with *Anaplasma marginale* in an endemic region using nested PCR and recombinant MSP5-cELISA.  Journal of Clinical Microbiology, 36:777-782, 1998.

189.   Echaide, I., Hines, S.A., McElwain T.F., McGuire, T.C. and Palmer, G.H.:  In vivo binding of IgM to the surface of *Babesia bigemina* infected erythrocytes.  Infection and Immunity, 66:2922-2927, 1998.

190.   McElwain, T.F., Hines, S.A. and Palmer, G.H.:  Persistence of antibodies against epitopes encoded by a single gene copy of the *Babesia bovis* Merozoite Surface Antigen-1 (MSA-1). Journal of Parasitology, 84:449-452, 1998.

191.   Munodzana, D., McElwain, T.F., Knowles, D.P., and Palmer, G.H.:  Conformational dependence of *Anaplasma marginale* MSP 5 surface exposed B cell epitopes. Infection and Immunity, 66:2619-2624, 1998.

192.   Suarez, C.E., Palmer, G.H., Hotzel, I. and McElwain, T.F.:  Structure, sequence, and transcriptional analysis of the *Babesia bovis rap-1* multigene locus. Molecular and Biochemical Parasitology, 93:215-224, 1998.

193.   Suarez, C.E., Palmer, G.H., Hotzel, I., Hines, S.A., and McElwain, T.F.:  Sequence and functional analysis of the intergenic regions separating babesial rhoptry associated protein-1 (*rap-1*) genes.  Experimental Parasitology, 90:189-194, 1998.

194.   Trueblood, E.S., Brown, W.C., Palmer, G.H., Davis, W.C., Stone, D.M. and McElwain T.F.: B-lymphocyte proliferation during BLV-induced persistent lymphocytosis is dependent on T-lymphocyte derived IL2.  Journal of Virology, 72:3169-3177, 1998.

195.   Palmer, G.H., Abbott, J.R., French, D.M., and McElwain, T.F.: Persistence of *Anaplasma ovis* infection and conservation of the *msp-2* and *msp-3* multigene families within the genus *Anaplasma*.  Infection and Immunity, 66:6035-6039, 1998.

196.   Brown, W.C., Zhu, D., Shkap, V., McGuire, T.C., Blouin, E.F., Kocan, K.M., and Palmer, G.H.: The repertoire of *Anaplasma marginale* antigens recognized by CD4+ T lymphocyte clones from protectively immunized cattle is diverse and includes major surface protein 2 (MSP-2) and MSP-3.  Infection and Immunity, 66:5414-5422, 1998.

197.   Brown, W.C., Shkap, V., Zhu, D., McGuire, T.C., Tuo, W., McElwain T.F., and Palmer, G.H.:  CD4+ T lymphocyte and IgG2 responses in calves immunized with *Anaplasma marginale* outer membranes and protected against homologous challenge. Infection and Immunity, 66:5406-5413, 1998.

198.   Palmer, G.H., Machado, J., Fernandez, P., Heussler, V., Perinat, T., and Dobbelaere, D.A.E. Parasite-mediated NFκB regulation in lymphoproliferation caused by *Theileria parva* infection. Proceedings of the National Academy of Sciences, USA, 94:12527-12532, 1997.

199.   Alleman, A.R., Palmer, G.H., McGuire, T.C., McElwain, T.F., Perryman, L.E. and Barbet, A.F.:  *Anaplasma marginale* major surface protein-3 (MSP-3) is encoded by a polymorphic multigene family.  Infection and Immunity, 65:156-163, 1997.

200.   Ruef, B.J., Tuo, W., Rodriguez, S.D., Roussel, A.J., Chitko-McKown, C.G., Palmer, G.H., McElwain T.F., Canals, A., Zarlenga, D.S., Gasbarre, L.C. and Brown, W.C.:  Immunization with *Babesia bigemina* Rhoptry Associated Protein-1 induces a type 1 cytokine response.  Journal of Interferon and Cytokine Research,17:45-54, 1997.

201.   Hines, S.A., Kanaly, S.T., Byrne, S.A. and Palmer, G.H.:  Immunity to *Rhodococcus equi*. Veterinary Microbiology, 56:177-185, 1997.

202.   Brown, W.C., McElwain TF, Ruef, B.J., Suarez, C.E., Shkap, V., Chitko-McKown, C.G., Rice-Ficht, A.C. and Palmer, G.H.:  *Babesia bovis* rhoptry associated protein-1 (RAP-1) is immunodominant for T helper cells of immune cattle and contains T cell epitopes conserved among geographically distant strains.  Infection and Immunity, 64:3341-3350, 1996.

203.   Madruga, C.R., Suarez, C.E., McElwain, T.F. and Palmer, G.H.:  Conservation of merozoite membrane and apical complex B cell epitopes among *Babesia bigemina* and *Babesia bovis* strains isolated in Brazil.  Veterinary Parasitology, 61:21-30, 1996.

204.   Eid, G., French, D.M., Lundgren, A., Barbet, A.F., McElwain, T.F. and Palmer, G.H.:  Expression of Major Surface Protein 2 antigenic variants during acute *Anaplasma marginale* rickettsemia.  Infection and Immunity, 64:836-841, 1996.

205.    Kanaly, S.T., Hines, S.A. and Palmer, G.H.:  Transfer of a CD4+ Th1 cell line to nude mice effects clearance of *Rhodococcus equi* from the lung.  Infection and Immunity, 64:1126-1132, 1996.

206.    Rodriguez, S.D., Palmer, G.H., McElwain, T.F., McGuire, T.C., Ruef, B.J., Chitko-McKown, C.G. and Brown, W.C.:  CD4+ T helper lymphocyte responses against *Babesia bigemina* Rhoptry Associated Protein-1 (RAP-1).  Infection and Immunity, 64:2079-2087, 1996.

207.    Musoke, A.J., Palmer, G.H., McElwain, T.F., Nene, V. and McKeever, D.:  Prospects for subunit vaccines against tick-borne diseases.  British Veterinary Journal, 152:621-639, 1996.

208.    Hotzel, I., Brown, W.C., McElwain T.F., Rodriguez, S.D. and Palmer, G.H.:  Dimorphic sequences of *rap-1* genes encode B and CD4+ T helper lymphocyte epitopes in the *Babesia bigemina* Rhoptry Associated Protein-1 (RAP-1).  Molecular and Biochemical Parasitology, 81:89-99, 1996.

209.    Knowles, D.P., Torioni de Echaide, S., Palmer, G.H., McGuire, T.C., Stiller, D. and McElwain, T.F.:  Antibody against an *Anaplasma marginale* MSP-5 epitope common to tick and erythrocyte stages identifies persistently infected cattle.  Journal of Clinical Microbiology, 34:2225-2230, 1996.

210.    Kocan, K.M., Blouin, E.F., Palmer, G.H., Eriks, I.S., Edwards, W.L. and Claypool, L.:  Preliminary studies on the effect of *Anaplasma marginale* antibodies ingested by *Dermacentor andersoni* ticks (Acari: Ixodidae) with their bloodmeal on infections in salivary glands.  Experimental and Applied Acarology, 20:297-311, 1996.

211.    Cantor, G.H., Stone, D.M., McElwain, T.F. and Palmer, G.H.:  Comparison of the antiviral efficacy of ribozymes and antisense directed against bovine leukemia virus *rex/tax*.  Antisense Research and Development, 6:301-304, 1996.

212.    Hines, M.T., Palmer, G.H., Byrne, K.M., Brassfield, A.L. and McGuire, T.C.  Quantitative characterization of lymphocyte populations in bronchoalveolar lavage fluid and peripheral blood of normal adult Arabian horses.  Veterinary Immunology and Immunopathology, 51:29-37, 1996.

213.    Wyatt, C.R., Davis, W.C., Knowles, D.P., Goff, W.L., Palmer, G.H. and McGuire, T.C.:  Effect on intraerythrocytic *Anaplasma marginale* of soluble factors from infected calf blood mononuclear cells.  Infection and Immunity, 64:4846-4849, 1996.

214.    Ndung'u, L.W., Aguirre, C., Rurangirwa, F.R., McElwain, T.F., McGuire, T.C., Knowles, D.P. and Palmer, G.H.:  Detection of *Anaplasma ovis* infection in goats using the MSP5 competitive inhibition ELISA.  Journal of Clinical Microbiology, 33:675-679, 1995.

215.    Hines, S.A., Palmer, G.H., Brown, W.C., McElwain, T.F., Suarez, C.E., Vidotto, O., and Rice-Ficht, A.C.:  Genetic and antigenic characterization of *Babesia bovis* merozoite spherical body protein Bb-1.  Molecular and Biochemical Parasitology, 69:149-159, 1995.

216.    Knowles, D.P., Perryman, L.E., McElwain, T.F., Kappmeyer, L.S., Stiller, D., Palmer, G.H., Visser, E.S., Hennager, S.G., Davis, W.C. and McGuire, T.C.:  Conserved recombinant antigens of *Anaplasma marginale* and *Babesia equi* for serologic diagnosis.  Veterinary Parasitology, 57:93-96, 1995.

217.    Kanaly, S.T., Hines, S.A. and Palmer, G.H.:  Cytokine modulation alters pulmonary clearance of *Rhodococcus equi* and development of granulomatous pneumonia.  Infection and Immunity, 63:3037-3041, 1995.

218.    Hines, S.A., Palmer, G.H., Jasmer, D.P., Goff, W.L. and McElwain, T.F.:  Immunization of cattle with recombinant *Babesia bovis* merozoite surface antigen-1.  Infection and Immunity, 63:349-352, 1995.

219.    Palmer, G.H. and McElwain, T.F.:  Molecular basis for vaccine development against anaplasmosis and babesiosis.  Veterinary Parasitology, 57:233-253, 1995.

220.    Vidotto, O., McElwain, T.F., Machado, R.Z., Perryman, L.E., Suarez, C.E., and Palmer, G.H.:  *Babesia bigemina*: Identification of B cell epitopes associated with parasitized erythrocytes.  Experimental Parasitology, 81:491-500, 1995.

221.    Hines, S.A., Eriks, I.S. and Palmer, G.H.:  An evolutionary approach to curricular reform: development of an integrated semester and a cross-disciplinary simulation.  Journal of Veterinary Medical Education 25:21-25, 1995.

222.    Suarez, C.E., Thompson, S.M., McElwain, T.F., Hines, S.A. and Palmer, G.H.:  Conservation of oligopeptide motifs in rhoptry proteins from different genera of erythroparasitic protozoa.  Experimental Parasitology, 78:246-251, 1994.

223.    Palmer, G.H., Eid, G., Barbet, A.F., McGuire, T.C. and McElwain, T.F.:  The immunoprotective *Anaplasma marginale* major surface protein-2 (MSP-2) is encoded by a polymorphic multigene family. Infection and Immunity, 62:3808-3816, 1994.

224.    Palmer, G.H., Munodzana, D., Tebele, N., Ushe, T. and McElwain, T.F.:  Heterologous strain challenge of cattle immunized with *Anaplasma marginale* outer membranes.  Veterinary Immunology and Immunopathology, 42:265-273, 1994.

225.    Vidotto, M., McGuire, T.C., McElwain, T.F., Palmer, G.H. and Knowles, D.P.:  Intermolecular relationships of major surface proteins of *Anaplasma marginale*.  Infection and Immunity, 62:2940-2946, 1994.

226.    Shkap, V., Pipano, E., McElwain, T.F., Herzberg, U., Krigel, Y., Fish, L. and Palmer, G.H.: Cross-protective immunity induced by *Babesia bovis* clones with antigenically unrelated variable merozoite surface antigens (VMSA). Veterinary Immunology and Immunopathology, 41:367-374, 1994.

227.    Suarez, C.E., McElwain, T.F., Echaide, I., Toriani de Echaide, S. and Palmer, G.H.:  Interstrain conservation of babesial RAP-1 surface exposed B-cell epitopes despite *rap-1* genomic polymorphism.  Infection and Immunity, 62:3576-3579, 1994.

228.    McGuire, T.C., Stephens, E.B., Palmer, G.H., McElwain, T.F., Lichtensteiger, C.A., Leib, S.R. and Barbet, A.F.:  Recombinant vaccinia virus expression of *Anaplasma marginale* surface protein MSP-1a: effect of promoters, leader sequences, and GPI anchor sequence on enhancement of antibody response. Vaccine, 12:465-471, 1994.

229.    McGarey, D.J., Barbet, A.F., Palmer, G.H., McGuire, T.C. and Allred, D.R.:  Putative adhesins of *Anaplasma marginale* major surface polypeptides (MSP) 1a and 1b. Infection and Immunity 62:4594-4601, 1994.

230.    Birkebak, T.A., Palmer, G.H., Davis, W.C. and McElwain, T.F.:  Quantitative characterization of the CD5 bearing lymphocyte population in the peripheral blood of normal sheep.  Veterinary Immunology and Immunopathology, 41:181-186, 1994.

231.    Ushe, T.C., Palmer, G.H., Sotomayor, L., Figueroa, J.V., Buening, G.M., Perryman, L.E. and McElwain, T.F.:  Antibody response to a *Babesia bigemina* RAP-1 surface exposed and neutralization sensitive epitope in immune cattle.  Infection and Immunity, 62:5698-5701, 1994.

232.    Chaichanasiriwithaya, W., Rikihisa, Y., Yamamoto, S., Reed, S., Crawford, T.B., Perryman, L.E. and Palmer, G.H.:  Antigenic, morphologic, and molecular characterization of new *Ehrlichia risticii* isolates.  Journal of Clinical Microbiology 38:3026-3033, 1994.

233.    Eriks, I.S., Stiller, D., Goff, W.L., Panton, M., Parish, S.M., McElwain, T.F. and Palmer, G.H.: Molecular and biological characterization of a new isolated *Anaplasma marginale* strain.  Journal of Veterinary Diagnostic Investigation 6:435-441, 1994.

234.    Birkebak, T.A., Palmer, G.H., Davis, W.C., Knowles, D.P. and McElwain, T.F.:  Association of GP51 expression and persistent CD5+ B-lymphocyte expansion with lymphomagenesis in bovine leukemia virus infected sheep. Leukemia 8:1890-1899, 1994.

235.    Cantor, G.H., McElwain, T.F., Birkebak, T.A. and Palmer, G.H.:  Ribozyme cleaves *rex/tax* mRNA and inhibits bovine leukemia virus expression.  Proceedings of the National Academy of Sciences, USA, 90:10932-10936, 1993.

236.    Eriks, I.S., Stiller, D. and Palmer, G.H.:  Impact of persistent *Anaplasma marginale* rickettsemia on tick infection and transmission.  Journal of Clinical Microbiology, 31:2091-2096, 1993.

237.    Suarez, C.E., Palmer, G.H., Hines, S.A. and McElwain, T.F.:  Immunogenic B-cell epitopes of *Babesia bovis* RAP-1 are distinct from interspecies conserved sequences.  Infection and Immunity, 61:3511-3517, 1993.

238.    Brown, W.C., Palmer, G.H., McElwain, T.F., Hines, S.A. and Dobbelaere, D.A.E.:  *Babesia bovis*: Characterization of the T helper cell response against the 42kD merozoite surface antigen (MSA-1) in cattle. Experimental Parasitology, 77:97-110, 1993.

239.    Kanaly, S.T., Hines, S.A. and Palmer, G.H.:  Failure of clearance of pulmonary *Rhodococcus equi* infection in CD4+ deficient transgenic mice.  Infection and Immunity, 61:4929-4932, 1993.

240.    Machado, R.M., McElwain, T.F., Suarez, C.E., Hines, S.A. and Palmer, G.H.:  *Babesia bigemina*: Isolation and characterization of merozoite rhoptries.  Experimental Parasitology, 77:315-325, 1993.

241.    Cantor, G.H., Pontzer, C.H. and Palmer, G.H.: Opsonization of *Anaplasma marginale* mediated by bovine antibody against surface protein MSP-1.  Veterinary Immunology and Immunopathology, 37:343-350, 1993.

242.    Oberle, S.M., Palmer, G.H., and Barbet, A.F.:  Expression and immune recognition of the conserved *Anaplasma marginale* surface protein MSP-4.  Infection and Immunity, 61:5245-5251, 1993.

243.    Cantor, G.H. and Palmer, G.H.:  Antisense oligonucleotide inhibition of bovine leukemia virus *tax* expression in a cell-free system.  Antisense Research and Development, 2:147-152, 1992.

244.    Hines, S.A., Palmer, G.H., Jasmer, D.P., McGuire, T.C. and McElwain, T.F.:  Neutralization-sensitive merozoite surface antigens of *Babesia bovis* are encoded by members of a polymorphic gene family.  Molecular and Biochemical Parasitology, 55:85-94, 1992.

245.    Visser, E.S., McGuire, T.C., Palmer, G.H., Davis, W.C., Shkap, V., Pipano, E. and Knowles, D.P.:  The *Anaplasma marginale msp5* gene encodes a 19-Kilodalton protein conserved in all recognized *Anaplasma* species. Infection and Immunity, 60:5139-5144, 1992.

246.    McGuire, T.C., Davis, W.C., Brassfield, A.L., McElwain, T.F. and Palmer, G.H.: Identification of *Anaplasma marginale* long-term carrier cattle by detection of serum antibody to isolated MSP-3. Journal of Clinical Microbiology, 29:788-793, 1991.

247.    Suarez, C.E., Palmer, G.H., Jasmer, D.P., Hines, S.A., Perryman, L.E. and McElwain, T.F.: Characterization

(144 of 247), Page 144 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 144 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4081    Page 54
of 157

of the gene encoding a 60kD *Babesia bovis* merozoite protein with conserved and surface exposed epitopes. Molecular and Biochemical Parasitology, 46:45-52, 1991.

248.   Kaylor, P.S., Crawford, T.B., McElwain, T.F. and Palmer, G.H.: Passive transfer of antibody to *Ehrlichia risticii* protects mice against ehrlichiosis.  Infection and Immunity, 59:2058-2062, 1991.

249.   Trueblood, E.S., McGuire, T.C. and Palmer, G.H.: Detection of *Anaplasma marginale* rickettsemia prior to onset of clinical signs by using an antigen-capture enzyme-linked immunosorbent assay.  Journal of Clinical Microbiology, 29:1542-1544, 1991.

250.   Tebele, N., McGuire, T.C. and Palmer, G.H.:  Induction of protective immunity using *Anaplasma marginale* initial body membranes.  Infection and Immunity, 59:3199-3204, 1991.

251.   Palmer, G.H., McElwain, T.F., Perryman, L.E., Davis, W.C., Reduker, D.R., Jasmer, D.P., Shkap, V., Pipano, E., Goff, W.L. and McGuire, T.C.: Strain variation of *Babesia bovis* merozoite surface exposed epitopes.  Infection and Immunity, 59:3340-3342, 1991.

252.   Shkap, V., Pipano, E., McGuire, T.C. and Palmer, G.H.: Identification of immunodominant polypeptides common between *Anaplasma centrale* and *Anaplasma marginale*.  Veterinary Immunology and Immunopathology, 29:31-40, 1991.

253.   Tebele, N. and Palmer, G.H.:  Crossprotective immunity between the Florida and a Zimbabwe stock of *Anaplasma marginale*.  Tropical Animal Health and Production, 23:197-202, 1991.

254.   Suarez, C.E., McElwain, T.F., Stephens, E.B., Mishra, V.S. and Palmer, G.H.:  Sequence conservation among merozoite apical complex proteins of *Babesia bovis*, *Babesia bigemina*, and other apicomplexa.  Molecular and Biochemical Parasitology, 49:329-332, 1991.

255.   Stich, R.W., Bantle, J.A., Kocan, K.M., Eriks, I.S. and Palmer, G.H.:  Preliminary development of a polymerase chain reaction assay for *Anaplasma marginale* in ticks. Biotechnology Techniques, 5:269-274, 1991.

256.   Allred, D.R., McGuire, T.C., Palmer, G.H., Leib, S.R., Harkins, T.M., McElwain, T.F. and Barbet, A.F.: Molecular basis for surface antigen size polymorphisms and conservation of a neutralization-sensitive epitope in *Anaplasma marginale*.  Proceedings of the National Academy of Sciences, USA, 87:3220-3224, 1990.

257.   Kieser, S.T., Eriks, I.S. and Palmer, G.H.:  Cyclic rickettsemia during persistent *Anaplasma marginale* infection of cattle.  Infection and Immunity, 58:1117-1119, 1990.

258.   Richey, E.J. and Palmer, G.H.: Bovine Anaplasmosis.  Compendium on Continuing Education, 12:1661-1669, 1990

259.   Eriks, I.S., Palmer, G.H., McGuire, T.C. and Barbet, A.F.:  Detection and quantitation of *Anaplasma marginale* in carrier cattle by using a nucleic acid probe.  Journal of Clinical Microbiology, 27:279-284, 1989.

260.   Cantor, G.H., Palmer, G.H. and Fenwick, B.F.:  Analysis of postmortem aqueous humor chemistry in the horse, with particular reference to urea nitrogen and creatinine.  Equine Veterinary Journal, 21:288-291, 1989.

261.   Palmer, G.H., Barbet, A.F., Cantor, G.H. and McGuire, T.C.:  Immunization of cattle with the MSP-1 surface protein complex induces protection against a structurally variant *Anaplasma marginale* isolate.  Infection and Immunity, 57:3666-3669, 1989.

262.   Hines, S.A., McElwain, T.F., Buening, G.M. and Palmer, G.H.:  Molecular characterization of *Babesia bovis* merozoite surface proteins bearing epitopes immunodominant in protected cattle.  Molecular and Biochemical Parasitology, 37:1-10, 1989.

263.   Stich, R.W., Kocan, K.M., Palmer, G.H., Ewing, S.A., Hair, J.A. and Barron, S.J.:  Transstadial and attempted transovarial transmission of *Anaplasma marginale* by *Dermacentor variablis*.  American Journal of Veterinary Research, 50:1377-1380, 1989.

264.   Hidalgo, R.J., Palmer, G.H., Jones, E.W., Brown, J.E. and Ainsworth, A.J.:  Infectivity and antigenicity of *Anaplasma marginale* from tick cell culture.  American Journal of Veterinary Research, 50:2033-2036, 1989.

265.   Oberle, S.M., Palmer, G.H., Barbet, A.F. and McGuire, T.C.:  Molecular size variations in an immunoprotective protein complex among isolates of *Anaplasma marginale*. Infection and Immunity, 56:1567-1573, 1988.

266.   Goff, W., Barbet, A., Stiller, D., Palmer, G.H., Knowles, D., Kocan, K., Gorham, J. and McGuire, T.C.: Detection of *Anaplasma marginale* infected tick vectors using a cloned DNA probe.  Proceedings of the National Academy of Sciences USA, 85:919-923, 1988.

267.   Palmer, G.H., Barbet, A.F., Musoke, A.J., Rurangirwa, F., Katende, J., Pipano, E., Shkap, V., Davis, W.C. and McGuire, T.C.:  Recognition of conserved surface protein epitopes on *Anaplasma centrale* and *Anaplasma marginale* isolates from Israel, Kenya and the United States.  International Journal for Parasitology, 18:33-38, 1988.

268.   McElwain, T.F., Palmer, G.H., Goff, W.L. and McGuire, T.C.:  Identification of *Babesia bigemina* and *Babesia bovis* merozoite proteins with isolate and species common epitopes recognized by antibodies in bovine immune sera.  Infection and Immunity, 56:1658-1660, 1988.

269.    Palmer, G.H., Oberle, S.M., Barbet, A.F., Davis, W.C., Goff, W.L. and McGuire, T.C.: Immunization with a 36-kilodalton surface protein induces protection against homologous and heterologous *Anaplasma marginale* challenge. Infection and Immunity, 56:1526-1531, 1988.

270.    Goff, W.L., Davis, W.C., Palmer, G.H., McElwain, T.F., Johnson, W.C., Bailey, J.F. and McGuire, T.C.: Identification of *Babesia bovis* merozoite surface antigens using immune bovine sera and monoclonal antibodies. Infection and Immunity, 56:2363-2368, 1988.

271.    Palmer, G.H., Waghela, S.D., Barbet, A.F., Davis, W.C. and McGuire, T.C.: Characterization of a neutralization-sensitive epitope on the Am 105 surface protein of *Anaplasma marginale*. International Journal for Parasitology, 17:1279-1285, 1987.

272.    Garmendia, A.E., Palmer, G.H., DeMartini, J.C. and McGuire, T.C.: Failure of passive immunoglobulin transfer: a major determinant of mortality in newborn alpacas (Lama pacos). American Journal of Veterinary Research, 48:1472-1476, 1987.

273.    Barbet, A.F., Palmer, G.H., Myler, P.J. and McGuire, T.C.: Characterization of an immunoprotective protein complex of *Anaplasma marginale* by cloning and expression of the gene coding for polypeptide Am 105L. Infection and Immunity, 55:2428-2435, 1987.

274.    Palmer, G.H., Barbet, A.F., Kuttler, K.L. and McGuire, T.C.: Detection of an *Anaplasma marginale* common surface protein present in all stages of infection. Journal of Clinical Microbiology, 23:1078-1083, 1986.

275.    Palmer, G.H., Barbet, A.F., Davis, W.C. and McGuire, T.C.: Immunization with an isolate-common surface protein protects cattle against anaplasmosis. Science 231:1299-1302, 1986.

276.    Miller, L.M., Reed, S.M., Gallina, A.M. and Palmer, G.H.: Ataxia and weakness associated with fourth ventricle vascular anomalies in horses. Journal of the American Veterinary Medical Association, 186:601-603, 1985.

277.    Palmer, G.H., Kocan, K.M., Barron, S.J., Hair, J.A., Barbet, A.F., Davis, W.C. and McGuire, T.C.: Presence of common antigens, including major surface protein epitopes, between the cattle (intraerythrocytic) and tick stages of *Anaplasma marginale*. Infection and Immunity, 50:881-886, 1985.

278.    McGuire, T.C., Palmer, G.H., Goff, W.L., Johnson, M.I. and Davis, W.C.: Common and isolate restricted antigens of *Anaplasma marginale* detected with monoclonal antibodies. Infection and Immunity, 45:697-700, 1984.

279.    Palmer, G.H. and McGuire, T.C.: Immune serum against *Anaplasma marginale* initial bodies neutralizes infectivity for cattle. Journal of Immunology, 133:1010-1015, 1984.

280.    Barbet, A.F., Anderson, L.W., Palmer, G.H. and McGuire, T.C.: Comparison of proteins synthesized by two different isolates of *Anaplasma marginale*. Infection and Immunity, 40:1068-1074, 1983.


**Publications (*Books and Book Chapters*):**
Palmer, G.H., Bankhead, T., and Seifert, H.S. Antigenic variation in bacterial pathogens. In, Virulence Mechanisms of Bacterial Pathogens, 5th edition (Eds: I.T. Kudva, N.A. Cornick, P.J., Q. Zhang, T.L. Nicholson, J.P. Bannantine, B.H. Bellaire). American Society for Microbiology, Washington, DC. 2016.

Intracellular Pathogens II: Rickettsiales. (Eds: G.H. Palmer, A.F. Azad). American Society for Microbiology, Washington, DC. 2012.


**Current Extramural Research Support as Principal Investigator:**
Core Funding (Palmer)                                    12/01/10-11/30/25
Paul G. Allen Family Foundation
*Human Health and Opportunity in east Africa*
This philanthropic funding supports research and implementation to address the health, food, and economic security impacts of animal and zoonotic infectious diseases in east Africa.


Core Funding (Palmer)                                    07/01/15-06/30/25
Scheumann Fund
*Emergence, persistence, and dissemination of antibiotic resistance from global to local*
The goal of this work is to understand the drivers of antibiotic resistance in the context of a low-income country with widespread and poorly regulated access to antibiotics.


R01 AI141712 (Palmer)                                    04/01/20-03/31/24
NIH-FIC
Zoonotic and Emerging Infectious Diseases Training Program

This program provides integrated training for physicians and veterinarians in emerging infectious diseases, including antimicrobial resistance.  The training combines laboratory and community studies in urban and rural Kenya.

**Current Extramural Research Support as Co-Investigator:**
R01 AI141712 (Lankester)                    10/01/18-09/30/23
NIH-NIAID
*Eliminating human rabies: impact of enhanced vaccination coverage*
This project examines the impact of community-led dog vaccination on coverage and delivery costs in prevention of human rabies in Tanzania.

1 NU2HGH000031 (Njenga)                    09/30/20-09/29/25
Centers for Disease Control and Prevention
*Enhancing Preparedness and Response to Communicable Diseases in Kenya*
This Global Health Security Agenda project supports development and implementation of a country-wide surveillance system for emerging pathogens

U01GH002346 (Njenga)                    09/30/21-09/29/26
Centers for Disease Control and Prevention
*Advancing public health research in Kenya*
This project supports various infectious disease platform in Kenya, including the population-based infectious disease surveillance (PBIDS) and health demographic surveillance system (HDSS). The CoAg includes supporting KEMRI as the institute works to assume management of the platforms in future.

1 UO1GH002241 (Call)                    09/17/18-09/29/23
Centers for Disease Control and Prevention
*An integrated surveillance platform for infectious diseases and their burden on antibiotic resistance*
This project supports research on the prevalence of antibiotic resistant (ESBL, CRE, MRSA) in low income urban and rural communities and identifies the drivers of antibiotic use.

**Prior Extramural Research Support as Principal Investigator:**
National Institutes of Health, Institute of Allergy and Infectious Diseases.  NIH R01/R37 AI 44005.  Antigenic variation in microbial transmission. December 1, 1998 –November 30, 2019.
Bill & Melinda Gates Foundation.  Program Enhancing Health and Productivity of Livestock in East Africa. January 1, 2015-December 31, 2019.
USDA-ARS 58-5348-8-340.  Endemic and outbreak strain guidance in the development of an *Anaplasma marginale* vaccine. August 1, 2008 – July 31, 2013.
Global Alliance for Livestock Medicines.  Impact assessment of East Coast Fever vaccine. April 1, 2010 – March 31, 2011.
The Bill and Melinda Gates Foundation.  Development of a School for Global Animal Health. January 1, 2011-December 31, 2012.
The Wellcome Trust GR075800M.  Development of effective live vaccines for prevention of anaplasmosis and babesiosis.  July 1, 2005 –June 30, 2012.
National Institutes of Health, Institute of Allergy and Infectious Diseases.  NIH R01 AI 45580.  Molecular mechanisms of msp2 variation in rickettsiae. July 1, 2003 –June 30, 2008.
National Institutes of Health, Institute of Allergy and Infectious Diseases.  NIH T32 AI07025. Immunology Training Program. July 1, 2004 – June 30, 2009.
USDA-ARS 58-5348-3-212.  Vaccine development through genomics. August 1, 2003 – May 31, 2008.
USDA National Research Initiative Competitive Research Grants Program.  Enhancing antigen presentation for DNA vaccines. January 1, 2004 –December 31, 2007.
USDA Binational Agricultural Research and Development Fund US-3315-02C. Control of bovine anaplasmosis: cytokine enhancement of vaccine efficacy. December 1, 2003 – December 31, 2006.
USDA National Research Initiative Competitive Research Grants Program.  Enhancing antigen presentation for DNA vaccines. January 1, 2004 –December 31, 2006.
USDA National Research Initiative Competitive Research Grants Program.  Enhancing antigen presentation for DNA vaccines. September 1, 1999 -August 31, 2003.

USDA National Research Initiative Competitive Research Grants Program.  Importance of emergent genetic variants in rickettsial disease outbreaks. September 1, 1997 -August 31, 2002

USDA Binational Agricultural Research and Development Fund US-2799-96C. Control of bovine anaplasmosis: cytokine enhancement of vaccine efficacy. September 1, 1997 - August 31, 2001.

USAID University/International Agricultural Research Centers Linkages Program.  Transfection of babesial parasites. September 30, 1998 – September 30, 2001.

USDA National Research Initiative Competitive Research Grants Program.  Immunologic significance of polymorphism in babesial rhoptry proteins. September 15, 1996 - September 15, 2000.

USDA National Research Initiative Competitive Research Grants Program.  Antigenic variation in *Anaplasma marginale* rickettsemia.  September 1, 1995 -August 31, 1998.

USAID Program in Science and Technology Cooperation.  Molecular-based diagnostics: development of a widely applicable, simplified assay for infectious diseases of cattle. July 15, 1991 - July 14, 1998.

Grayson-Jockey Club Research Foundation.  Cytokine enhancement of equine immunity. July 1, 1995 - June 30, 1997.

USDA National Research Initiative Competitive Research Grants Program.  Post-transcriptional control of bovine leukemia virus infection. September 1, 1994 -August 31, 1998.

USDA Binational Agricultural Research and Development Fund US-1561-92. Development of a recombinant multivalent vaccine against bovine anaplasmosis. September 1, 1993 - December 1, 1996.

USDA National Research Initiative Competitive Research Grants Program. Significance of conserved peptide motifs in babesial apical complex proteins. September 15, 1992 - September 30, 1996.

USDA National Research Initiative Competitive Research Grants Program. Post-transcriptional control of bovine leukemia virus infection. September 1, 1991 - August 31, 1994.

USDA Binational Agricultural Research and Development Fund US-1561-88.  Protection of cattle against anaplasmosis: Vaccine development on a molecular basis. September 1, 1989 - August 31, 1992.

American Veterinary Medical Association Foundation.  Potomac Horse Fever: molecular basis for protective immunity. January 1, 1991 - December 31, 1991.

USAID Cooperative Agreement DAN-4178-A-00-7056-00.  Improved animal vaccines through biotechnology: phase II-anaplasmosis and babesiosis.  Subcontract to G.H. Palmer as P.I.  through University of Florida, M.J. Burridge as overall Program Director.  September 30, 1987 - September 30, 1993.

USDA Competitive Research Grants Program 86-CRCR-1-2281.  Generation of synthetic peptides capable of inducing protection against bovine anaplasmosis. January 8, 1988 - July 31, 1991.

USDA Competitive Research Grants Program 85-CRCR-1-1921.  Development of a bovine leukemia virus subunit vaccine.  July 1, 1985 - June 30, 1989.

USAID Competitive Biotechnology DPE-5542-G-SS-7008-00.  Synthetic peptide immunogens against Zimbabwe strains of *Anaplasma marginale*. July 1, 1987 - December 31, 1990.

USDA Office of International Cooperation and Development.  Assay development for foreign isolates of *Anaplasma marginale*.  July 1, 1987 - July 31, 1987.

USDA Competitive Research Grants Program 88-34135-3508.  Development of a subunit diagnostic test for bovine babesiosis.  July 1, 1986 - June 30, 1989.

USDA Special Animal Health Competitive Research Grants Program 85-CRSR-2-2619.  Development of a subunit diagnostic test for bovine anaplasmosis. September 15, 1985 - September 30, 1988.


**Prior Extramural Support for Post-graduate Education:**

National Institutes of Health, Institute of Allergy and Infectious Diseases.  NIH T32 AI07025. Infectious diseases and Microbial Immunology Training Program. G.H. Palmer is P.I.  July 1, 2003 – June 30, 2018.

National Security Education Program.  Enhancing International Animal Health Education.  G.H. Palmer is P.I.  January 1, 1996 - December 31, 1999.

US Department of Education FIPSE.  Curricular development in international veterinary medicine (U.S.-E.U. collaboration).  G.H. Palmer is P.I.  September 1, 1997-August 31, 1998.

USDA CSREES Higher Education Grants program.  Enhancing international veterinary education through curricular development.  G.H. Palmer is P.I. September 15, 1995 - September 14, 1998.

USDA Food and Agricultural Sciences National Needs Graduate Fellowship Program/ Animal Biotechnology 94-38420-0815.  G.H. Palmer is P.I. September 1, 1994 - August 31, 1999.

NIH-NIAID Institutional National Research Service Award No. T32-AI07367.  Pathobiology Training Program.  L.E. Perryman, P.I. 1990-95; G.H. Palmer, P.I. 1995-96. September 1, 1990 -August 31, 1996.

USDA Food and Agricultural Sciences National Needs Graduate Fellowship Program/ Animal Biotechnology 89-38420-4411. G.H. Palmer is P.I. September 1, 1989 - August 31, 1994

**Prior Extramural Research Support as Co-Principal Investigator:**

Centers for Disease Control and Prevention 3 UO1GH002143 Conducting communicable disease research in Kenya. M.K. Njenga is P.I. August 14, 2016-August 14, 2021.

Food and Agriculture Organization OSRO/KEN/USA. Livestock programing for nutritional improvements in children under 5 years of age. S.M. Thumbi is P.I. September 15, 2018-September 14, 2021.

Wellcome Trust UNS100929. Determining the effects of pediatric vaccination status on the burden of antimicrobial-resistant commensal organisms in a Guatemalan community. D.R. Call is P.I. April 20, 2020-April 19, 2021.

The Fleming Fund/PATH MML.574394-01681726. Epidemiology of antibiotic resistance in Kenya. S. Omulo is P.I. October 1, 2019-February 28, 2021.

National Science Foundation DEB-12160940 Ecological and socio-economic factors affecting the emergence, persistence, and dissemination of antibiotic resistance. D.R. Call is P.I. September 15, 2012-August 31, 2018.

Bill & Melinda Gates Foundation Grand Challenges. Integrated control of neglected tropical diseases. F.J. Lankester is P.I. January 1, 2015-June 30, 2016.

Bill & Melinda Gates Foundation Grand Challenges. Integrated control of syndemic diseases: Malaria/ECF and worms. S.M. Thumbi is P.I. January 1, 2013-June 30, 2014.

Bill & Melinda Gates Foundation Grand Challenges. One Metric for One Health: A new approach. A. Mokdad is P.I. January 1, 2013-June 30, 2014.

Bill & Melinda Gates Foundation Grand Challenges. One House-One Health approach to child growth and development. P. Rabinowitz is P.I. January 1, 2013-June 30, 2014.

National Institutes of Health, Institute of Allergy and Infectious Diseases. NIH R01 AI 053692. Immunogenicity of the type IV secretion system. W.C. Brown is P.I. June 1, 2008 – May 31, 2013.

National Institutes of Health, Institute of Allergy and Infectious Diseases. NIH R21 AI 09352. Identification of bacterial genes required for transmission of tick-borne pathogens. S.M. Noh is P.I. July 1, 2011 – June 30, 2013.

National Institutes of Health, Institute of Allergy and Infectious Diseases. NIH R21 AI 097974. Molecular mechanisms of *Yersinia pestis* persistence in the flea. V. Vadyvaloo is P.I. December 1, 2011 – November 30, 2013.

USDA Binational Agricultural Research and Development Fund US-4187-09C. Control of bovine anaplasmosis. K.A. Brayton is P.I. December 1, 2009 – November 30, 2013.

National Institutes of Health, Institute of Allergy and Infectious Diseases. NIH R01 AI 01057768. Identification of T cell antigens for Q fever vaccination. J. Samuel is Project P.I.; W.C. Brown is P.I. at WSU. April 1, 2005 – March 31, 2010.

USDA Microbial Genetics 2004-05488. Functional genomics of the tick vector-pathogen interface. K.A. Brayton is P.I. March 15, 2005 – March 14, 2010.

National Institutes of Health, Institute of Allergy and Infectious Diseases. NIH R01 AI 053692. Identification of T cell immunogens in *Anaplasma*. W.C. Brown is P.I. August 1, 2003 – July 31, 2008.

USDA National Research Initiative Competitive Research Grants Program. Improving vaccine efficacy by directed priming of CD4[+] and CD8[+] T lymphocytes. Waithaka Mwangi is P.I. September 1, 2004 – August 31, 2008.

Morris Animal Foundation D04EQ-27. Cellular immunity and age-associated susceptibility to *Rhodococcus equi*. S.A. Hines is P.I. December 1, 2004 –November 30, 2007.

NSF-USDA Microbial Genetics 2003-0546. Comparative genomics for phenotype mapping of intracellular bacteria. K.A. Brayton is P.I. December 1, 2003 – November 30, 2006.

NSF-USDA Microbial Genome Sequencing Program 2001-52100-11342. *Anaplasma marginale* genome sequencing. K.A. Brayton is P.I. September 1, 2001 – February 28, 2004.

USDA National Research Initiative Competitive Research Grants Program. In vivo model using *E. coli* DNA as an adjuvant to induce type 1 cytokine and antibody responses. W.C. Brown is P.I. September 1, 1999 -August 31, 2004.

USDA National Research Initiative Competitive Research Grants Program. Cytokine modulation of reciprocal T cell-APC signaling. W.C. Brown is P.I. September 1, 1997 -August 31, 2000.

USDA Office of International Cooperation and Development. Control of anaplasmosis in the United States and Brazil through DNA vaccination with major surface protein-1. D.P. Knowles is P.I.. January 1, 1998 - December 31, 2001.

USDA National Research Initiative Competitive Research Grants Program. Acquisition of rickettsial infectivity in ticks. F.R. Rurangirwa is P.I. September 1, 1996 -August 31, 2000.

Grayson-Jockey Club Research Foundation. Pulmonary immunity to *Rhodococcus equi*. S.A. Hines is P.I. September 1, 1997 - August 31, 1999.

USDA Binational Agricultural Research and Development Fund US-2496-94C. Protection of cattle against babesiosis: immunization against *Babesia bovis* with an optimized RAP-1/apical complex construct. T.F. McElwain is P.I. January 1, 1996 - August 15, 1999.

USDA National Research Initiative Competitive Research Grants Program. In vitro model for the use of cytokine adjuvants in cattle. W.C. Brown is P.I. September 1, 1995 -August 31, 1998.

USDA Office of International Cooperation and Development. Control of *Anaplasma marginale* infection of cattle in the United States and Brazil. D.P. Knowles is P.I. January 1, 1995 - December 31, 1997.

Grayson-Jockey Club Research Foundation. Prevention of *Rhodococcus equi* pneumonia: antigen targeted immunization. S.A. Hines is P.I. September 1, 1994 - August 31, 1997.

American Veterinary Medical Foundation. Antigenic variation during persistent *Anaplasma marginale* infection. D.M. French is P.I. January 1, 1996- December 31, 1996.

USDA Binational Agricultural Research and Development Fund. Protection of cattle against babesiosis: immunization with recombinant DNA derived apical complex antigens of *Babesia bovis*. T.F. McElwain is P.I. August 15, 1991 - August 14, 1994.

USDA National Research Initiative Competitive Research Grants Program. Characterization of T-cell epitopes required for protective immunity to *Anaplasma marginale*. W.C. Davis is P.I. August 15, 1991 - August 31, 1993.

USAID DAN-1328-G-SS-4093-115-09. Small Ruminant Collaborative Research Support Program, Kenya Animal Health Component. T.C. McGuire is P.I. October 1, 1989 - September 30, 1995.

American Veterinary Medical Association Foundation. Detection of *Anaplasma marginale* carrier cattle using polymerase chain reaction. I.S. Eriks is P.I. January 1, 1991 - December 31, 1991.

USDA Binational Agricultural Research and Development Fund. Development of a recombinant derived vaccine against *Babesia bovis*. T.F. McElwain is P.I. at WSU; A.F. Barbet is overall project P.I. September 1, 1990 - December 31, 1990.

USDA Special Animal Health Competitive Research Grants Program 83-CRSR-2-2194. Development of an effective subunit vaccine for bovine anaplasmosis. T.C. McGuire is P.I. July 1, 1983 - June 30, 1986

NIH RO1-AI24339. Mechanisms of antigenic diversity in *Trypanosoma brucei*. A.F. Barbet is P.I. October 1, 1985 - March 31, 1989.

USDA Competitive Research Grants Program 85-CRCR-1-1908. Development of a recombinant DNA derived vaccine against bovine anaplasmosis. A.F. Barbet is P.I. September 1, 1985 - August 31, 1988.

Binational Agricultural Research and Development US-846-84. Subunit vaccine. T.C. McGuire is P.I. October 1, 1985 - September 30, 1988.

Norden Corporation. Development of an effective subunit vaccine and diagnostic test for bovine anaplasmosis. T.C. McGuire is P.I. October 1, 1985 - September 30, 1989.

USDA Competitive Research Grants Program 86-CRCR-1-1921. Genes of malignant catarrhal fever coding for protective immunogens. L. Hutt-Fletcher is P.I. September 15, 1986 - September 30, 1989.

# EXHIBIT B

COVID-19 Data for Whitman County Received from Washington Department of Health

| MMWR Year | MMWR Week | Dates | Case Counts* | | Hospitalization counts** | |
|---|---|---|---|---|---|---|
| | | | Statewide | Whitman county | Statewide | Whitman county |
| 2020 | 53 | Jan 01-Jan 02, 2021 | 3530 | 19 | 107 | 0 |
| 2021 | 1 | Jan 03-Jan 09, 2021 | 19805 | 107 | 548 | Less than 10 |
| 2021 | 2 | Jan 10-Jan 16, 2021 | 13893 | 84 | 616 | Less than 10 |
| 2021 | 3 | Jan 17-Jan 23, 2021 | 11034 | 85 | 539 | Less than 10 |
| 2021 | 4 | Jan 24-Jan 30, 2021 | 9738 | 64 | 508 | Less than 10 |
| 2021 | 5 | Jan 31-Feb 06, 2021 | 8446 | 45 | 439 | Less than 10 |
| 2021 | 6 | Feb 07-Feb 13, 2021 | 5912 | 23 | 303 | Less than 10 |
| 2021 | 7 | Feb 14-Feb 20, 2021 | 5499 | 43 | 327 | Less than 10 |
| 2021 | 8 | Feb 21-Feb 27, 2021 | 5205 | 86 | 262 | Less than 10 |
| 2021 | 9 | Feb 28-Mar 06, 2021 | 4909 | 101 | 215 | 0 |
| 2021 | 10 | Mar 07-Mar 13, 2021 | 4907 | 148 | 252 | 0 |
| 2021 | 11 | Mar 14-Mar 20, 2021 | 5373 | 76 | 249 | 0 |
| 2021 | 12 | Mar 21-Mar 27, 2021 | 6794 | 118 | 256 | Less than 10 |
| 2021 | 13 | Mar 28-Apr 03, 2021 | 7614 | 96 | 339 | Less than 10 |
| 2021 | 14 | Apr 04-Apr 10, 2021 | 8348 | 64 | 352 | Less than 10 |
| 2021 | 15 | Apr 11-Apr 17, 2021 | 10203 | 76 | 432 | Less than 10 |
| 2021 | 16 | Apr 18-Apr 24, 2021 | 10543 | 60 | 558 | Less than 10 |
| 2021 | 17 | Apr 25-May 01, 2021 | 10045 | 57 | 537 | Less than 10 |
| 2021 | 18 | May 02-May 08, 2021 | 8695 | 38 | 506 | Less than 10 |
| 2021 | 19 | May 09-May 15, 2021 | 7165 | 20 | 462 | Less than 10 |
| 2021 | 20 | May 16-May 22, 2021 | 5804 | 17 | 446 | Less than 10 |
| 2021 | 21 | May 23-May 29, 2021 | 4781 | Less than 10 | 369 | Less than 10 |
| 2021 | 22 | May 30-Jun 05, 2021 | 3866 | 22 | 340 | Less than 10 |
| 2021 | 23 | Jun 06-Jun 12, 2021 | 3325 | 21 | 272 | 0 |
| 2021 | 24 | Jun 13-Jun 19, 2021 | 2874 | 14 | 206 | Less than 10 |
| 2021 | 25 | Jun 20-Jun 26, 2021 | 2683 | 11 | 230 | Less than 10 |
| 2021 | 26 | Jun 27-Jul 03, 2021 | 2641 | Less than 10 | 220 | Less than 10 |
| 2021 | 27 | Jul 04-Jul 10, 2021 | 3354 | 16 | 238 | Less than 10 |
| 2021 | 28 | Jul 11-Jul 17, 2021 | 4644 | Less than 10 | 314 | 0 |
| 2021 | 29 | Jul 18-Jul 24, 2021 | 7127 | 11 | 291 | Less than 10 |
| 2021 | 30 | Jul 25-Jul 31, 2021 | 11596 | 39 | 586 | Less than 10 |
| 2021 | 31 | Aug 01-Aug 07, 2021 | 16960 | 52 | 776 | Less than 10 |
| 2021 | 32 | Aug 08-Aug 14, 2021 | 20719 | 86 | 1024 | Less than 10 |
| 2021 | 33 | Aug 15-Aug 21, 2021 | 22468 | 85 | 1182 | Less than 10 |
| 2021 | 34 | Aug 22-Aug 28, 2021 | 24286 | 96 | 1364 | Less than 10 |
| 2021 | 35 | Aug 29-Sep 04, 2021 | 24423 | 159 | 1308 | 10 |
| 2021 | 36 | Sep 05-Sep 11, 2021 | 23556 | 153 | 1286 | 10 |
| 2021 | 37 | Sep 12-Sep 18, 2021 | 21342 | 171 | 1094 | 17 |
| 2021 | 38 | Sep 19-Sep 25, 2021 | 20664 | 144 | 959 | 16 |
| 2021 | 39 | Sep 26-Oct 02, 2021 | 18928 | 141 | 883 | 15 |
| 2021 | 40 | Oct 03-Oct 09, 2021 | 15764 | 89 | 824 | Less than 10 |
| 2021 | 41 | Oct 10-Oct 16, 2021 | 15064 | 90 | 774 | 10 |
| 2021 | 42 | Oct 17-Oct 23, 2021 | 15459 | 86 | 816 | 11 |
| 2021 | 43 | Oct 24-Oct 30, 2021 | 13736 | 68 | 743 | Less than 10 |
| 2021 | 44 | Oct 31-Nov 06, 2021 | 12312 | 51 | 670 | Less than 10 |
| 2021 | 45 | Nov 07-Nov 13, 2021 | 12029 | 46 | 661 | Less than 10 |
| 2021 | 46 | Nov 14-Nov 20, 2021 | 10746 | 80 | 569 | Less than 10 |
| 2021 | 47 | Nov 21-Nov 27, 2021 | 8064 | 15 | 468 | Less than 10 |
| 2021 | 48 | Nov 28-Dec 04, 2021 | 11317 | 56 | 494 | 10 |
| 2021 | 49 | Dec 05-Dec 11, 2021 | 8939 | 26 | 497 | Less than 10 |
| 2021 | 50 | Dec 12-Dec 18, 2021 | 13826 | 32 | 497 | Less than 10 |
| 2021 | 51 | Dec 19-Dec 25, 2021 | 31270 | 33 | 617 | Less than 10 |
| 2021 | 52 | Dec 26-Dec 31, 2021 | 54024 | 101 | 802 | 13 |

| Death counts in 2021 | |
|---|---|
| Statewide: | 6414 |
| Whitman county: | 54 |

* Cases are counted based on specimen collection date.
** Hospitalizations are counted based on admission date.

(152 of 247), Page 152 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 152 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4089    Page 62
of 157

# EXHIBIT C

Exhibit C to the Expert Report of Guy Palmer

**Documented Instances of Mr. Rolovich Removing Mask During the 2021 Football Season**

**Utah State v. WSU (Home, 9/04/2021)**

<u>**Source:**</u> *Washington State University parts ways with former UH football coach Nick Rolovich*, khon2, Oct. 18, 2021, https://www.khon2.com/sports/washington-state-university-parts-ways-with-former-uh-football-coach-nick-rolovich/



*Washington State head coach Nick Rolovich speaks with an official, not pictured, during the second half of an NCAA college football game against Utah State, Saturday, Sept. 4, 2021, in Pullman, Wash. (AP Photo/Young Kwak)*

**Read Less**

Exhibit C to the Expert Report of Guy Palmer

**Portland State v. WSU (Home, 9/11/2021)**

**Source:** WSU_00035742-43; *Washington State fires its football coach over COVID-19 vaccine mandate*, KUOW, Oct. 19, 2021, https://www.kuow.org/stories/washington-state-fires-its-football-coach-over-covid-19-vaccine-mandate.

**Part 1**

    1. **26:13**



2

Expert Report of Guy H. Palmer, DVM, PhD – Page 50

Exhibit C to the Expert Report of Guy Palmer

2.   **1:26:32**



3.   **1:47:59 − 1:48:04**



Exhibit C to the Expert Report of Guy Palmer





Expert Report of Guy H. Palmer, DVM, PhD – Page 52

ER0489

Exhibit C to the Expert Report of Guy Palmer

4. **1:50:34-37**





Expert Report of Guy H. Palmer, DVM, PhD – Page 53

**ER0490**

(158 of 247), Page 158 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 158 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4095    Page 68
of 157

Exhibit C to the Expert Report of Guy Palmer



Expert Report of Guy H. Palmer, DVM, PhD – Page 54

ER0491

Exhibit C to the Expert Report of Guy Palmer

5.   **1:52:14**



**Part 2**

6.   **1:47:48**



7

Expert Report of Guy H. Palmer, DVM, PhD – Page 55

Exhibit C to the Expert Report of Guy Palmer

7.  **1:49:17**



8.  KUOW - Washington State fires its football coach over COVID-19 vaccine mandate



Washington State University head coach Nick Rolovich speaks to his players before an NCAA college football game against Portland State on Sept. 11, 2021, in Pullman, Wash.

AP

8

Expert Report of Guy H. Palmer, DVM, PhD – Page 56

**ER0493**

(161 of 247), Page 161 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 161 of 247
Case 2.22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4098    Page 71
of 157

Exhibit C to the Expert Report of Guy Palmer

**WSU v. Utah (Away, 9/25/2021)**

**Source:** WSU_00035746

1. **1:28:09-15**





Exhibit C to the Expert Report of Guy Palmer





Expert Report of Guy H. Palmer, DVM, PhD – Page 58

ER0495

(163 of 247), Page 163 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 163 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4100    Page 73
of 157

Exhibit C to the Expert Report of Guy Palmer

**WSU v. Cal (Away, 10/02/2021)**

**Source:** WSU_00035748-49

>   **PART 1**
>
>   1. **25:03-05**





11

Expert Report of Guy H. Palmer, DVM, PhD – Page 59

**ER0496**

Exhibit C to the Expert Report of Guy Palmer

2.  **1:37:23-37**





Exhibit C to the Expert Report of Guy Palmer





Expert Report of Guy H. Palmer, DVM, PhD – Page 61

(166 of 247), Page 166 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 166 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4103    Page 76
of 157

Exhibit C to the Expert Report of Guy Palmer



3. 1:37:49-53



Expert Report of Guy H. Palmer, DVM, PhD – Page 62

**ER0499**

Exhibit C to the Expert Report of Guy Palmer

**PART 2**

4.  **53:26**



5.  **1:26:09-10**



Expert Report of Guy H. Palmer, DVM, PhD – Page 63

Exhibit C to the Expert Report of Guy Palmer



6.  1:37:14



Expert Report of Guy H. Palmer, DVM, PhD – Page 64

**ER0501**

Exhibit C to the Expert Report of Guy Palmer



7. **1:39:08**



Expert Report of Guy H. Palmer, DVM, PhD – Page 65

ER0502

(170 of 247), Page 170 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 170 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4107    Page 80
of 157

Exhibit C to the Expert Report of Guy Palmer

**OSU v. WSU (Home, 10/09/2021)**

**Source:** WSU_00035750 and WSU_00036298

**PART 1**

1. **1:31:05-07**





18

Expert Report of Guy H. Palmer, DVM, PhD – Page 66

**ER0503**

Exhibit C to the Expert Report of Guy Palmer





Expert Report of Guy H. Palmer, DVM, PhD – Page 67

**ER0504**

Exhibit C to the Expert Report of Guy Palmer

**PART 2**

2.   **1:01:40**



3.   **1:32:30**



20

Expert Report of Guy H. Palmer, DVM, PhD – Page 68

Exhibit C to the Expert Report of Guy Palmer

**Stanford v. WSU (10/16/2021)**

**Source:** WSU_00035751

    1. **1:52:18-19**



    2. **1:52:23-28**



21

Expert Report of Guy H. Palmer, DVM, PhD – Page 69

Exhibit C to the Expert Report of Guy Palmer



Expert Report of Guy H. Palmer, DVM, PhD – Page 70

ER0507

# EXHIBIT D

(176 of 247), Page 176 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 176 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4113    Page 86
of 157



### WSU COVID-19 Guidelines – Fall 2021

*Written in accordance with Washington State University, NCAA, and Pac-12 Guidelines*

The following guidelines will be modified according to the level of community (Whitman County) spread as well as guidance from the Pac-12, NCAA, WSU, and state/local health officials. Please be aware that the NCAA, Pac-12 Conference and WSU Athletics may put forth additional guidelines and restrictions for undeclared and unvaccinated individuals. This is a working document subject to change frequently. As previously shared, COVID-19 vaccination remains the most effective means to achieve control of the pandemic.

The tables below provide health and safety considerations for Tier 1 individuals for fall training and competition. Tier 1 individuals are those with the highest exposure (e.g., student-athletes, coaches, athletic trainers, physical therapists, medical staff, equipment staff and officials).

Individuals are considered "fully vaccinated" beginning 14 days after their final dose of a Pfizer, Moderna, Johnson & Johnson or AstraZeneca vaccination. The equivalent of "fully vaccinated" is documented COVID-19 infection in the past 90 days (or more than 90 days if allowed by local authorities). The CDC recommends that individuals who have a prior history of COVID-19 infection should become vaccinated, and it is recommended to wait until 90 days after the infection before commencing the vaccination process.

Because vaccination against COVID-19 can result in personal health benefits for vaccinated individuals and because the risks of adverse outcome with COVID-19 infection are higher in unvaccinated individuals, considerations for these two categories of individuals are different.

Updated 8.31.2021

Expert Report of Guy H. Palmer, DVM, PhD – Page 72

**ER0509**

WSU_00033866



WASHINGTON STATE
A T H L E T I C S

|  | | UNDECLARED OR NON-VACCINATED | FULLY VACCINATED OR DOCUMENTED INFECTION IN THE PAST 90 DAYS |
|---|---|---|---|
| QUARANTINE & ISOLATION | Close Contacts | Quarantine for the locally **REQUIRED** time following high-risk COVID-19 exposure.<br><br>NOTE: Student-athletes, employees, or staff who are not experiencing or exhibiting symptoms of COVID-19, should quarantine upon arrival to campus until receiving the results of a negative PCR test performed 3 – 5 days after completed travel and may also consider obtaining a negative PCR test within 72 hours prior to travel back to campus. | Masking in public indoor settings for 14 days with discontinuation if a COVID-19 test is performed three to five days after exposure and is negative, or if assessment does not reveal a high risk. HOWEVER, WE ARE CURRENTLY IN AN INDOOR MASK MANDATE SO MASKS WILL BE **REQUIRED** AT ALL TIMES. |
| | Positive Test Protocol | Athletic Medicine to alert positive student-athlete, coach, or staff member.<br><br>Isolation for 10 days and at least 24 hours have passed since resolution of fever without the use of fever-reducing medications and other symptoms have improved. | |
| ATHLETIC ACTIVITIES | Training and Competition | Masking **REQUIRED** for student-athletes when training (weights), but not practice or competition.<br><br>Masking REQUIRED for coaches/staff during training, practice, and competition. | NO RESTRICTIONS |
| | Team Travel | Masking during travel **REQUIRED.**<br>Travel party will be provided a Kn95 mask to be used while travelling (e.g., bus/car, airplane, etc.) | |

Updated 8.31.2021

Expert Report of Guy H. Palmer, DVM, PhD – Page 73

**ER0510**

WSU_00033867



| | Other Athletic Activities (e.g., team meetings) | Universal masking and social distancing **REQUIRED.** | Masking in indoor settings **REQUIRED.** |
|---|---|---|---|
| **NON-ATHLETIC ACTIVITIES** | Nonathletic Activities | Universal masking and social distancing **STRONGLY ENCOURAGED.** | Masking in public indoor settings **REQUIRED.** |
| | In-Person Interactions | Universal masking and social distancing **STRONGLY ENCOURAGED.** | Masking in indoor settings **REQUIRED.** |

Updated 8.31.2021

Expert Report of Guy H. Palmer, DVM, PhD – Page 74

**ER0511**

WSU_00033868



**Declared Vaccinated (to COVID-19) Student-Athletes, Coaches and Staff:**

- ➢ Testing:
    - ○ No surveillance testing required (except as indicated in the Sustained Increased Transmission section in Pac-12 Conference Guidelines: positive cases in 5% or more of a team cohort within a two-week period).
    - ○ Note: Subject to change
- ➢ Masking:
    - ○ Student-Athletes: Masks are currently **REQUIRED** in public indoor settings, including but not limited to travel, team meetings, in addition to Gray W, weight room, and locker room.
        - ▪ Note: Masks are **NOT REQUIRED for student-athletes** during weights, practice and competition.
    - ○ Coaches and Staff: Masks are currently **REQUIRED** indoors except when alone in your office.
    - ○ Note: Neck gaiters are **NOT ACCEPTABLE** forms of face coverings.
    - ➢ No social distancing.
- ➢ Quarantine:
    - ○ No quarantine required after exposure to an individual with COVID-19 necessary for asymptomatic individuals.
    - ○ Note: Mask must be worn after exposure to an individual with COVID-19 for 5 days for those who are declared vaccinated as long as they remain asymptomatic.
- ➢ Contact Tracing:
    - ○ No contact tracing.
- ➢ Travel (Domestic):
    - ○ Any individual who returns from travel should continue to monitor symptoms for 14 days post-travel. Any symptoms including but not limited to the following should prompt a COVID-19 test or evaluation by a physician.
        - ▪ Fever or chills
        - ▪ Cough
        - ▪ Shortness of breath or difficulty breathing
        - ▪ Fatigue
        - ▪ Muscle or body aches
        - ▪ Headache
        - ▪ New loss of taste or smell
        - ▪ Sore throat
        - ▪ Congestion or runny nose
        - ▪ Nausea or vomiting
        - ▪ Diarrhea
- ➢ Travel (International):
    - ○ Fully Vaccinated:
        - ▪ Get tested 3-5 days after travel. If you test positive, isolate yourself to protect others. If negative, then you can return after 5 days of quarantine.

Updated 8.31.2021

Expert Report of Guy H. Palmer, DVM, PhD – Page 75

**ER0512**

WSU_00033869



**WASHINGTON STATE**
A T H L E T I C S

**Undeclared or Unvaccinated** (to COVID-19) Student-Athletes, Coaches and Staff:
- Testing:
  - Weekly PCR Test:
    - Student-Athletes, Coaches, and Staff who test positive will be informed by their athletic trainer and should alert their respective coach or sport administrator immediately.
  - Daily Antigen Testing + PCRs REQUIRED for Team Travel and Activities:
    - No antigen on day off and/or day of PCR testing.
    - Student-Athletes, Coaches, and Staff who test positive will be informed by their athletic trainer and should alert their respective coach or supervisor immediately.
  - Note: Times for testing ARE NOT subject to change. If you miss your testing window you will be ineligible for the day's activities until you are able to complete your testing protocol.
  - Testing and quarantine upon return to campus following non-team related travel is **REQUIRED**.
  - Quarantine for the locally **REQUIRED** period of time following high-risk COVID-19 exposure.
- Masking:
  - Student-Athletes: Masks are **REQUIRED** in public indoor settings, including but not limited to travel, team meetings, in addition to Gray W, weight room, and locker room.
    - Note: Masks are **NOT REQUIRED for student-athletes** during practice and competition but are **REQUIRED** for weights.
  - Coaches and Staff: Masks are **REQUIRED** indoors, and outside during practice and games, as well as other circumstances where physical distancing is not possible/reasonable.
  - Note: Per WSU guidelines: Individuals inside a WSU facility must wear a face mask if they are not fully vaccinated or if they decline to provide proof of vaccination.
  - Note: Neck gaiters are **NOT ACCEPTABLE** forms of face coverings.
  - Social Distancing:
    - Social distance measures will be **REQUIRED** indoors including, but not limited to, the Gray W, weight room, meeting rooms, locker room, etc.
- Contact Tracing:
  - Subject to contact tracing if found to be in close contact with a person who tests positive for COVID-19 or is symptomatic.
  - Athletic Medicine will oversee all contact tracing on positive cases for student-athletes, coaches, and staff.
  - Close contact tracing will occur if an undeclared or unvaccinated student-athlete, coach, or staff member has direct contact with a positive individual with mitigation factors considered such as masking and social distancing. Undeclared or unvaccinated student-athletes, coaches, and staff would need to have less than 6 feet contact for 15 minutes or more to be placed in quarantine. Cases will be evaluated by Athletic Medicine.
  - Failure to properly disclose information will be reported to your coaching staff and sport administrator.
- Quarantine
  - **NEED TO COMPLETE THIS**
- Travel (Domestic):
  - If traveling domestically (*outside of WA, OR, and ID*) for but not limited to work-related, recruiting, or camp activities, upon your return non-vaccinated student-athletes, coaches, and staff must quarantine.
    - Student-athletes, coaches, and staff leaving campus for **5 days or less**:
      - PCR on day 3 of self-isolation (travel back to Pullman is day 0)
      - Clearance with negative PCR test (turnaround time as of May 2021 is 1-3 days).
    - Student-athletes, coaches, and staff leaving campus for **6 or more days**:
    - PCR on day 5 of self-isolation (travel back to Pullman is day 0)
    - Clearance with negative PCR test.

Updated 8.31.2021

Expert Report of Guy H. Palmer, DVM, PhD – Page 76

**ER0513**

(181 of 247), Page 181 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 181 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4118    Page 91
of 157



- Second PCR to be completed between days 7-10.  Test results must be negative.
➢ Travel (International):
  ○ Undeclared and Unvaccinated:
    ▪ Tested 3-5 days after travel and stay home and self-quarantine for a full 7 days after travel. Even if you test negative, stay home and self-quarantine for full 7 days.
  ○ If you do not get tested, stay home and self-quarantine for 10 days after travel.

**Disciplinary Measures for WSU Athletics Employees, Student-Workers, and Temporary Employees:**
➢ Undeclared or Unvaccinated coaches and staff will be dismissed for the day if found to be in non-compliance of COVID-19 state, university, and department health and safety guidelines.
➢ Multiple offenses will result in formal corrective actions being documented in your personnel file, both internally and with Washington State University, in addition to being dismissed from campus if found to be in non-compliance of COVID-19 state, university, and department health and safety guidelines for each offense.

**Miscellaneous for Declared/Vaccinated & Undeclared/Unvaccinated:**
➢ Gray W Meals for ALL vaccinated, undeclared, and unvaccinated (high risk activity) – to-go or distanced until further notice.
  ○ Masks are **REQUIRED** for all student-athletes, coaches, and staff in the Gray W, unless you are actively eating.
  ○ Coach/Staff meals are **TO-GO ONLY**, to free up limited, distanced Gray W seating for student-athletes.
➢ Weight Room – Everyone will be **REQUIRED** to mask while in the weight room.  This will be subject to change depending on the community transmission levels.
➢ Indoor Meetings – Everyone will be **REQUIRED** to mask while in the meeting spaces.  This will be subject to change depending on the community transmission levels.
➢ Locker Room – Student-Athletes will be limited to less than 15 minutes, no loitering.
  ○ Coaches and staff will be responsible for ensuring health and safety guidelines are being followed. If violations occur, coaches and staff may be subject to disciplinary action.
  ○ Note: Masks are **REQUIRED** in the locker room. Neck gaiters **WILL NOT** be acceptable.

**Deadlines to Comply with WSU Vaccine Requirements:**
Student Information
➢ All WSU students must be compliant with the vaccine requirement by Friday, September 10, 2021.
  ○ The process for compliance is available on the Cougar Health Services website.
  ○ As of Monday, August 23, 2021, students can no longer file personal exemptions.
  ○ Any students not in compliance by September 10 will face academic holds.
➢ Any WSU student with a personal exemption currently on file must provide proof of full vaccination, or request a religious or medical exemption **by Monday, October 18, 2021.**
➢ The updated process to request a medical or religious exemption will be released next week.
➢ Student employees will have to provide proof of vaccination to **both** Cougar Health Services and Workday. WSU is working on a streamlined process for student employee exemptions and will provide more information next week.
➢ To find a vaccine provider near you, please visit vaccines.gov. Pullman students can schedule their vaccine on campus, through Cougar Health Services.
Employee Information
➢ All WSU employees must be fully vaccinated or have obtained a medical or religious exemption **by Monday, October 18, 2021.**
  ○ Per Proclamation 20-14.1, personal exemptions are not permitted for employees.

Updated 8.31.2021

Expert Report of Guy H. Palmer, DVM, PhD – Page 77

**ER0514**

WSU_00033871



➢ The vaccination verification requirement will supersede the previous vaccination declaration process in Workday. More information on the verification process will be released next week.

➢ To find a vaccine provider near you, please visit vaccines.gov.

Updated 8.31.2021

# EXHIBIT E

**Pac-12 Conference Covid-19 Medical Advisory Committee**

**Health and Well Being Considerations for Pac-12 Institutions:**
**Guidance for Local Planning for Return to Sporting Activity**

**Effective Date: August 1, 2021**

The Pac-12 COVID-19 Medical Advisory Committee has continued to engage in calls and discussions reviewing and analyzing developing information regarding the COVID-19 pandemic. The Committee includes the Pac-12 Student-Athlete Health and Well-being Initiative (SAHWBI) Board and national experts in public health, infectious disease, laboratory medicine, epidemiology, and cardiology. In addition, Pac-12 SAHWBI board members are also involved in discussions at the national level including the Autonomy 5 Medical Group, the NCAA COVID Advisory Group, the AMSSM-NCAA COVID Working Group, and the Autonomy 5 Physicians Discussion Group. Finally, SAHWBI board members have been liaising with other stakeholder groups in the Pac-12 infrastructure including the broader group of Pac-12 physicians and athletic trainers, strength and conditioning groups, coaches, administrator groups, operations, officials' groups, and student-athletes and their parents. The following recommendations have been informed by these collaborations.

This document is based on the most up-to-date information available as of July 28, 2021, and reflects current and projected trends and replaces previous documents: *Health and Well Being Considerations for Pac-12 Institutions in The Local Planning for Return to Sporting Activity* (5/22/20) and subsequent updates (8/10/20), (9/17/2020), (12/4/2020) and (5/21/21).

The Pac-12 COVID-19 Medical Advisory Committee continues to recommend unanimously that all student athletes, staff, and personnel associated with athletics be vaccinated unless there is a medical or religious reason not to do so. With the increase in number and prevalence of variants, the role of vaccinations continues to remain a key mitigation step in sport participation. CDC unequivocally states that all currently available vaccines in the United States are safe and effective. One is considered fully vaccinated beginning at two weeks after the second dose of a two-dose of an mRNA vaccine (Pfizer or Moderna) or two weeks after a one-dose vaccine (Janssen/Johnson and Johnson).  Medical staffs are encouraged to provide education and address questions regarding vaccines for student athletes, staff, and personnel. Vaccination status should be communicated with each institution's medical staff so that appropriate surveillance can be maintained.

**Each institution remains subject to the applicable restrictions, regulations, and laws; policies of the individual institution; and federal, local and state health departments. These may be stricter or add additional elements not contained in this document.**

### SUMMARY OF KEY CHANGES FOR 2021-2022

- <u>Fully vaccinated (to COVID-19) individuals</u>:
    - No surveillance testing required (except as indicated in the Sustained Increased Transmission section below).
    - No quarantine required after exposure to an individual with COVID-19 necessary for asymptomatic individuals.
    - Mask must be worn after exposure to an individual with COVID-19 for 14 days or until a negative PCR test on day 3-5 following exposure
- <u>Unvaccinated individuals</u>:
    - Testing and quarantine upon return to campus following non-team related travel.

1

(185 of 247), Page 185 of 247
Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 185 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4122    Page 95
of 157

- o   Quarantine for the locally required period of time following high-risk COVID-19 exposure.

- o   Regular surveillance testing, minimum of one molecular PCR test per week (or 3 times a week antigen testing on non-consecutive days).

- o   Mask while indoors.

- <u>Team vaccination rates</u>: Mitigation guidance for teams regarding masking, travel protocols, and indoor facility use may be modified if 85% of team is vaccinated.

- <u>Single risk standard</u>: Sport risk of transmission categories eliminated.

**GENERAL PRINCIPLES APPLIED THROUGHOUT**

- Teams and institutions should recognize that uncertainties remain with regard to the evolution of the pandemic, mitigation strategies, and vaccination.  Public Health guidance has and will continue to change.
- Nothing contained herein is intended to restrict team medical staff from following any additional practices that they deem appropriate in light of the conditions existing in their respective locales, information received from their local, state, and national public health officials, and/or their own medical judgment.
- Institutions may do more than any minimum standard outlined and may create additional institutional standards in areas not identified below.
- Consistent with NCAA Constitution 3.2.4.19, the institution's medical staff has unchallengeable autonomous authority to determine medical management and return-to-play decisions related to student-athletes.
- Testing of symptomatic individuals is required, regardless of vaccination status.

**RETURN TO CAMPUS FOLLOWING NON-TEAM RELATED TRAVEL**

Consistent with current CDC guidelines, when using public forms of transportation (planes, buses, trains, etc.), a mask must be worn over the nose and mouth. Individuals should not travel back to campus following personal or non-team related travel if symptomatic or positive for Covid-19 unless arrangements have been made by with the university for isolation and care.

*Unvaccinated individuals* who are not experiencing or exhibiting symptoms of Covid-19, should quarantine upon arrival to campus until receiving the results of a negative PCR test performed 3-5 days after completed travel and may also consider obtaining a negative PCR test within 72 hours prior to travel back to campus.

*Vaccinated individuals* who are asymptomatic do not need to test prior to travel, quarantine or receive a PCR test upon arrival to campus unless otherwise required to do so by university, local, or state requirements.

**MENTAL HEALTH SCREEN RECOMMENDATIONS**

The impact of the COVID-19 pandemic on mental health is under study. Devoting resources for assessment and treatment of negative consequences on mental health due to the stressors of the COVID-19 pandemic are recommended.

**COVID-19 TESTING RECOMMENDATIONS**

Anyone who has regular close physical interaction with student-athletes, including student-athletes, coaches, sport support staff, team travel party (those travelling with the team or regularly having close

2

physical interactions with the team while travelling) is considered "Tier 1" for purposes of this document. Tier 1 individuals are subject to the following testing requirements:

- Symptomatic: Anyone who exhibits symptoms of COVID-19 must be tested regardless of previous infection or vaccination status.

- Unvaccinated: Unvaccinated individuals must be tested a minimum of once per week by molecular PCR test *or* three times per week antigen testing.

- Vaccinated:

    o Fully vaccinated individuals are not required to receive surveillance testing (except as indicated below).

    o Fully vaccinated people who have a known exposure to someone with suspected or confirmed COVID-19 are to be tested 3-5 days after exposure and wear a mask in public indoor settings until they receive a negative test.

- Sustained Increased Transmission: a) 3 or more positive cases or b) positive cases in 5% or more of a team cohort (whichever is greatest) within a two-week period may indicate a sustained increase in transmission. In the event of a sustained increase in transmission, testing all members of a team *regardless of vaccination status* should be considered depending on updated variant information and community spread. Daily monitoring of symptoms is also recommended. Contact tracing and the nature of the cases will determine the frequency of repeat testing and need for quarantine. "Team cohort" includes team players, team coaches, and team-specific staff. A single household is considered one case.

- Testing Exemption Period: An individual who tests positive with surveillance testing is not subject to further surveillance testing for 90 days from the positive test.

- Confirmatory Testing: Antigen tests are considered presumptive positives.  If an athlete has a positive antigen test the athlete is to be isolated and a PCR test used to confirm the diagnosis.

- Officials and other operations staff who cannot distance from Tier 1 individuals in the course of their duties who are unvaccinated  a minimum of one molecular PCR test per week which must be within 72 hours prior to competition.


**ISOLATION, QUARANTINE AND CONTACT TRACING**

- Member institutions should follow contact tracing protocols per institution, federal, local and state guidelines. Note: The CDC defines close contact as within 6 feet for a cumulative total of 15 consecutive minutes or more in a 24-hour period.

- Vaccinated Individuals:

    o Fully vaccinated individuals who have a known exposure to someone with suspected or confirmed COVID-19 and remain asymptomatic for symptoms of COVID-19 do not need to quarantine. (See above for masking and testing guidance.)

- Unvaccinated Individuals:

    o Duration of quarantine for unvaccinated individuals following exposure to someone with suspected or confirmed COVID-19 is determined by local guidelines. The following are consistent with current CDC guidelines:

        ▪ Quarantine may end after day 10 without testing if patient is asymptomatic.

        ▪ Quarantine may end after 7 days if patient is asymptomatic *and* obtains a negative molecular PCR test on days 5-7.

3

Expert Report of Guy H. Palmer, DVM, PhD – Page 82

**ER0519**

- Infected Individuals (Vaccinated or Unvaccinated): Isolation is required for anyone who tests positive for COVID-19. Isolation is maintained for at least 10 days from the onset of either positive test or symptoms of COVID-19 AND minimum of 24 hours afebrile without use of antipyretics and improvement of respiratory symptoms. An isolated individual may not participate in physical training or team training activities.

- Notice of Positive Result: If an individual participating in a competition or intersquad scrimmage tests positive within 48 hours following the competition, the following communications will be made to allow for the determination and performance of necessary contact tracing:

    o Team Member: If a team member, that team's physician or athletic trainer will immediately notify 1) the opposing team's physician or athletic trainer, and 2) the Conference medical liaison.

    o Officiating or Conference Personnel: If an official or conference personnel, the Conference medical liaison or sport administrator will immediately notify the team physician or athletic trainer of each participating team.

    o Notice of High-Risk Contact: If any high-risk contacts are identified through contact tracing, each institution will be responsible for notifying its affiliated individuals who are identified as high-risk contacts (e.g., designated institution staff will notify any impacted team player, staff, etc.; designated Conference staff will notify any impacted official or Conference personnel.)


**RESPONSE TO INFECTION / PRESUMED INFECTION**

Infected Person

Individuals with infection must isolate as described above. The individual should be remotely monitored for worsening or development of symptoms and managed medically as indicated.  Student-athletes who become infected with COVID-19 should not exercise until they are cleared from isolation.  Particularly in young persons, many infections will either not have symptoms or only have mild symptoms.  Currently, CDC guidelines for asymptomatic, mildly, or moderately symptomatic persons is isolation for 10 days.  Asymptomatic individuals may be released from isolation 10 days after their positive test.  Symptomatic patients should have improvement in symptoms and should be afebrile for 24 hours without the aid of fever reducing agents.  For those with severe symptoms or immunocompromised persons, a minimum of 20 days isolation is recommended, and the student-athlete must have resolution of fever and improvement in symptoms prior to return.  The student-athlete should be evaluated and cleared by the team physician prior to beginning a return to exercise.  Those that have more prolonged or severe illness should have individualized management.

Diagnosis While Traveling

If a member of the travel party is diagnosed while traveling, they are to be isolated upon diagnosis and may not travel back with the team or use public forms of transportation.  The host medical staff should assist the visiting institution regarding transportation, access to testing and medical evaluation as appropriate.  The Pac-12 has contracted with AirMed as an option for institutions to use for transportation of individuals diagnosed with COVID-19.   High-risk contacts unable to travel by private vehicle should be placed in a surgical mask, KN95 or N95 mask and transported back to school.  Every attempt should be made to minimize contact with others.

Post-Infection

Once cleared from isolation, the student-athlete should meet with a team physician for clearance prior to return to activity, return to exercise should include a gradual, graded return.  Current recommendations for return to exercise can be found here.

4

**ER0520**

WSU_00002843

**USE OF ATHLETIC FACILITIES**

Activities completed outdoors or in larger indoor spaces with increased ventilation (HVAC adjustments, open windows) are less likely to promote viral transmission.  To accommodate for increasing numbers of student-athletes without increasing density in the facility, utilizing outdoor spaces as the primary workout location and creative use of larger spaces such as indoor practice facilities and fieldhouses should be considered whenever possible. Local and institutional guidelines should be followed for capacity limitations.

Unvaccinated individuals must mask while indoors when not engaged in training and competition. All individuals—regardless of vaccination—should consider masking indoors when variants or local community prevalence is at high transmission.

Daily monitoring for symptoms of COVID-19 is recommended.

No one who is ill or has symptoms should report to campus for any activities without prior approval from the medical staff.

Team Vaccination Rates: If Covid-19 vaccination rates of Tier 1 individuals of a single team reach 85% *and* there are no active cases within the team, mitigation standards may be relaxed as determined by the sports medicine staff and subject to institutional, local, state, and federal guidelines. Note: Local prevalence of COVID-19 disease should be considered in this recommendation.

**TRAVEL**

Travel enhances close contact between individuals. Certain mitigation standards were put in place during the 2020 season to enhance physical distancing prior to vaccine availability.  Moving forward, travel guidelines may be determined by the local institution.

It is recommended that these interventions be continued if < 85% of a team is vaccinated.:

- Single seats on buses or decreased capacity in vehicles

- Limited travel party for away events

- Single rooms when in hotels

- Single serving take-out food or single-line buffets

- Modified or virtual team meetings

If ≥ 85% of the team is vaccinated, these standards may be relaxed as determined by medical personnel. Consideration should still be given to large, well-ventilated meeting rooms and large rooms for team meals or eating in shifts.

**COMPETITION**

Sidelines/team areas are encouraged to be limited to the team cohort and personnel with a working purpose.  Extended sidelines are recommended where possible.  Unvaccinated persons located on sidelines or within facilities are to remain physically distanced from Tier 1 individuals and wear a face covering.

**Officials**

Officials regularly interact closely with student-athletes and team staff in the course of their duties. All officials are encouraged to be vaccinated.  Unvaccinated officials must have a negative PCR test within 72 hours prior to an event and at least once a week if covering multiple events in the same location. Unvaccinated officials are to use face coverings and remain physically distanced from Tier 1 individuals whenever possible.

5

Expert Report of Guy H. Palmer, DVM, PhD – Page 84

**ER0521**

(189 of 247), Page 189 of 247Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 189 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4126    Page 99
of 157

*Discordant Results*

*Positive Antigen Test Confirmation or Clearance:* Obtain a PCR test within 24 hours of a positive antigen test result. If the PCR test is negative, the student-athlete may be reinstated to daily antigen testing cadence and may return to activity (subject to local/state regulations and if deemed appropriate by institution's medical staff).

**Figure 1:  Example of the positive antigen test confirmation/clearance cadence**.
    Red = confirmation of infection/placement into institution's isolation/quarantine protocol.
    Green = "false positive" and clearance to return to activity/resume regular antigen testing cadence.

| A | | B | |
|---|---|---|---|
| Day 1* | Day 2 | Day 1 | Day 2 |
| Antigen (+) | X | Antigen (+) | Antigen (-) |
| PCR (+) | | PCR (-) | |

*\*PCR should be administered within 24 hours of first Antigen (+), which may occur the day following Day 1. Second antigen should not be administered until after PCR results are received.*

*Incongruent Antigen/PCR Tests:*  If it appears that there are rare individuals who repeatedly have positive antigen tests which are not confirmed by PCR.  These individuals are eligible for alternative testing.  To qualify, they should have multiple positive antigen tests followed by at least two consecutive PCR negative tests administered over the subsequent 48 – 72 hours.  These individuals may switch to a minimum 3x/week PCR testing cadence in lieu of antigen testing (subject to local/state regulations and if deemed appropriate by institution's medical staff).  A negative PCR completed within 48 hours of game time is required to participate in competition.

**Figure 2:  Example of the incongruent antigen/PCR tests cadence.**
    Yellow = incongruent antigen/PCR.
    Red = confirmation of infection.
    Green = "false positive" and clearance to return to activity and begin alternative min. 3x/week PCR cadence.

| C | | | D | | | E | | |
|---|---|---|---|---|---|---|---|---|
| Day 1* | Day 2-3 | Day 3-4 | Day 1 | Day 2-3 | Day 3-4 | Day 1 | Day 2-3 | Day 3-4 |
| Antigen (+) | Antigen (+) | PCR (-) | Antigen (+) | Antigen (+) | X | Antigen (+) | Antigen (+) | PCR (+) |
| PCR (-) | PCR (-) | | PCR (-) | PCR (+) | | PCR (-) | PCR (-) | |

Results from testing will be recorded in the Presagia system and de-identified results will be available to inform on-going testing strategy.  In addition, results from consented student-athletes will imported into the research portal for further review and analysis.

Frequent testing can present enormous logistical challenges for the medical staff, in particular the athletic training staff.  Athletic departments should consider augmenting the sports medicine staffs with additional personnel or managing current staff workload by limiting the number of student-athletes participating.

6

# EXHIBIT F

# Coronavirus Vaccines: Fact & Fiction

The vaccine is "experimental"; the vaccine was rushed, there were "shortcuts": False

- the key vaccine "antigen" was identified in 2004 in SARS-CoV outbreak in Hong Kong
- extensive animal trials by NIH in the past 15 years
- the same antigen was identified on the Covid-19 virus in February 2021 (1 week)
- the mRNA vaccine technology has been developed over decades

Expert Report of Guy H. Palmer, DVM, PhD – Page 87

**ER0524**

WSU_00033716

Case 2:22-cv-00319-TOR   ECF No. 106   filed 10/14/24   PageID.4128   Page 101 of 157



Case 2:22-cv-00319-TOR     ECF No. 106     filed 10/14/24     PageID.4129     Page 102 of 157

Expert Report of Guy H. Palmer, DVM, PhD – Page 88

WSU_00033717



Case 2:22-cv-00319-TOR   ECF No. 106   filed 10/14/24   PageID.4130   Page 103 of 157

Expert Report of Guy H. Palmer, DVM, PhD – Page 89

**ER0526**

WSU_00033718

Case 2:22-cv-00319-TOR     ECF No. 106     of 157     filed 10/14/24     PageID.4131     Page 104



Expert Report of Guy H. Palmer, DVM, PhD – Page 90

**ER0527**

# Coronavirus Vaccines: Fact & Fiction

The vaccine is "experimental"; the vaccine was rushed, there were "shortcuts": False

- Phase I and II trials were combined but followed normal FDA guidelines
- Phase III trial gave immediate evidence of efficacy due to the high incidence of infection

Expert Report of Guy H. Palmer, DVM, PhD – Page 91

WSU_00033720



Expert Report of Guy H. Palmer, DVM, PhD – Page 92

**ER0529**

# Coronavirus Vaccines: Fact & Fiction

The vaccine is highly effective: True

- Efficacy in preventing infections is >96% (45,000 individuals)
- Effectiveness in preventing hospitalization is 94% in the most vulnerable groups
- Effectiveness in preventing death is nearly 100%

Expert Report of Guy H. Palmer, DVM, PhD – Page 93

Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4134    Page 107 of 157

WSU_00033722

# What does 95% efficacy mean?

- It does not mean that 5% of vaccinated people will get infected!

- The actual % of vaccinated people that were infected with Covid-19 in the phase III Pfizer & Moderna trials was 0.04%

- <u>It does mean that vaccinated people have a 95% lower risk of getting infected (20x less likely)</u>

Expert Report of Guy H. Palmer, DVM, PhD – Page 94

WSU_00033723

# Coronavirus Vaccines: Fact & Fiction

Covid-19 is "just a normal flu": False

- 1 in 1,600 infected individuals will die
- 52% of recovered individuals report impaired lung function
- 24% of recovered individuals have heart, lung, or brain issues
- We are seeing more disease in younger individuals
- We are seeing more chronic effects

Expert Report of Guy H. Palmer, DVM, PhD – Page 95

WSU_00033724

# Coronavirus Vaccines: Fact & Fiction

- The vaccine cannot give you Covid
- mRNA vaccines cannot change your DNA
  - mRNA does not enter the nucleus
  - mRNA cannot integrate into DNA
- The vaccine is not derived from aborted fetuses: there are no cells in the vaccine and no human or animal cells at any point in the process
- There is no SV40 virus in the vaccine
- The vaccine does not affect reproduction or the placenta

Expert Report of Guy H. Palmer, DVM, PhD – Page 96

WSU_00033725

# Coronavirus Vaccines: Fact & Fiction

- The vaccine does not cross the blood-brain barrier (the virus can!)
- The side effects of the vaccine are transient & are similar to other vaccines
- There is more safety data on these vaccines than any previous vaccine

https://www.nytimes.com/interactive/2021/health/pfizer-coronavirus-vaccine.html

Expert Report of Guy H. Palmer, DVM, PhD – Page 97

Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4138    Page 111    of 157

WSU_00033726

# The pathway to normal: Impact of >60% vaccination coverage



Source: Our World in Data

Case 2:22-cv-00319-TOR     ECF No. 106     filed 10/14/24     PageID.4139     Page 112
of 157

Expert Report of Guy H. Palmer, DVM, PhD – Page 98

**ER0535**

# EXHIBIT B



**JAY INSLEE**
Governor

**STATE OF WASHINGTON**
**OFFICE OF THE GOVERNOR**
*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

## PROCLAMATION BY THE GOVERNOR
### AMENDING PROCLAMATIONS 20-05, 20-06, 20-07, 20-08, 20-09, 20-10, and 20-11

### 20-12

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06, 20-07, 20-08, 20-09, 20-10, and 20-11, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS,** COVID-19 continues to spread throughout Washington State with no expectation of ending soon, and is currently expected to result in the confirmed number of cases doubling in the Puget Sound region every five to seven days; and

**WHEREAS,** the World Health Organization has classified the global spread of COVID-19 as a pandemic and urges immediate action to stem the spread of the disease; and

**WHEREAS,** to curtail the spread of COVID-19 in Washington State, it is necessary to implement additional stringent social distancing and other measures to limit opportunities for disease transmission, especially in those areas of our state experiencing the most severe outbreaks; and

**WHEREAS,** many public and private universities, colleges, technical schools, apprenticeship programs, and similar schools and programs have already cancelled classes or implemented alternative learning options to address social distancing recommendations; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continues to threaten the life and health of our people as well as the economy of Washington State, and remains a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health (DOH) continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

ER0537

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the DOH and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the DOH in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim that a state of emergency continues to exist in all counties of Washington State, that Proclamations 20-05, 20-06, 20-07, 20-08, 20-09, 20-10, and 20-11, remain in effect, and that Proclamation 20-05 is amended to prohibit all public and private universities, colleges, technical schools, apprenticeship programs, and similar schools and programs from conducting in-person classes in all counties of Washington State. I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

As a result of this event, I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the DOH, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

**FURTHERMORE,** based on the above situation and under the provisions of RCW 43.06.220(1)(h), to help preserve and maintain life, health, property or the public peace, I hereby prohibit the following activities in all counties of Washington State related to the operation of all public and private public and private universities, colleges, technical schools, apprenticeship and similar programs, which restrictions shall remain in effect from 12:01 a.m. on March 17, 2020, until 12:00 p.m. on April 24, 2020, unless extended beyond that date:

> All public and private universities, colleges, technical schools, apprenticeship and similar programs are prohibited from conducting in-person classroom instruction and lectures related to all educational and apprenticeship related programs.

> This prohibition does not apply to the conduct and operation of school and program affiliated labs and clinics, if either (1) social distancing measures are strictly implemented and monitored by designated school officials or (2) clinical protocols that are in alignment with public health guidelines are followed.

> Nothing in this Proclamation shall be construed to apply to the conduct and operation of dormitory services, general administrative services, safety programs, research or medical facilities.

Nothing in this Proclamation is intended to prevent institutions from taking appropriate steps to preserve accreditation, student financial aid or student visa status.

Violators of this of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

Signed and sealed with the official seal of the state of Washington on this 13th day of March, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

# EXHIBIT C



## STATE OF WASHINGTON
### ━ OFFICE OF GOVERNOR JAY INSLEE ━

### PROCLAMATION BY THE GOVERNOR
### AMENDING PROCLAMATIONS 20-05, 20-12, et seq., AND 20-25, et seq.

### 20-12.3
### Higher Education

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout Washington State as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its persistence in Washington State, and the high risk it continues to pose to our most vulnerable populations, I have subsequently issued several amendatory proclamations, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person, which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, continues to persist in the state of Washington; and

**WHEREAS**, despite an increase in infections, hospitalizations, and deaths in the latter half of 2020, Washington State has avoided overwhelming the state's health care systems throughout this pandemic by implementing rigorous safety and prevention measures, such as physical distancing, masking, social and economic prohibitions and, since December 2020, the administration of vaccinations to prevent infection with the coronavirus that causes COVID-19 symptoms; and

**WHEREAS**, the U.S. Centers for Disease Control and Prevention (CDC) and the Washington State Department of Health (DOH) have determined that the COVID-19 vaccines that have received emergency approval by the U.S. Food & Drug Administration are safe and effective against infection with the coronavirus that causes COVID-19; and

**WHEREAS**, everyone age 12 and older is currently eligible to receive a vaccination against the coronavirus causing COVID-19 symptoms, and Washington health care providers, in collaboration with public health and other community partners, have successfully administered millions of vaccine doses, but have millions more doses to administer, and it is necessary to achieve the highest rate of vaccination of the United States population as possible; and

**WHEREAS,** on March 13, 2020, in recognition of experts' warnings that continued normal operation of public and private universities, colleges, community colleges, and technical colleges could increase the spread of COVID-19 throughout Washington State, I issued Emergency Proclamation 20-12

### ER0541

prohibiting public and private universities, colleges, community colleges, and technical colleges from conducting in-person classroom instruction and lectures related to all educational programs; and

**WHEREAS,** the prohibitions in Proclamation 20-12 expired on April 24, 2020, but public and private universities, colleges, community colleges, and technical colleges remained in modified operation, including remote learning and certain programs for essential workers; and

**WHEREAS**, Washington's public and private universities, colleges, community colleges, and technical colleges are an important part of our economy and are vital to the educational, social, and economic needs of Washingtonians; and

**WHEREAS,** using remote learning to replace most classroom instruction creates challenges to access for many Washingtonians; and

**WHEREAS**, the progression of COVID-19 in Washington State shows ethnic disparities in health impacts which are likely to increase ethnic disparities in access and success in post-secondary education, requiring the State and all of our campuses and programs to understand how these challenges affect our students and to work to minimize these impacts; and

**WHEREAS,** although public and private universities, colleges, community colleges, and technical colleges made tremendous efforts to continue to function through remote learning, in-person learning benefits Washington; and

**WHEREAS,** the nature of COVID-19 viral transmission, including both asymptomatic and symptomatic spread as well as the relatively high infectious nature, suggests it is appropriate to provide in-person learning at public and private universities, colleges, and technical schools only through a science-based approach that incorporates safety, sanitation, and physical distancing guidelines; and

**WHEREAS,** during the initial return to campus in the fall of 2020, there were more than 35 COVID-19 outbreaks linked to public and private institutions of higher education, and some higher education institutions have seen a substantial increase in COVID-19 positive cases that are tied to both congregate living arrangements, including fraternities and sororities, and also large social gatherings of students, thereby triggering the need to increase safety measures to address these outbreaks; and

**WHEREAS,** I issued Proclamations 20-12.1 and 20-12.2 to permit Washington's public and private universities, colleges, community colleges, and technical colleges to resume in-person instruction, lectures and similar educational gatherings, provided that extensive safety requirements were implemented, and to impose certain safety requirements on shared housing; and

**WHEREAS,** the widespread availability of safe and effective COVID-19 vaccinations makes it appropriate to lift legally-mandated safety requirements for public and private universities, colleges, community colleges, and technical colleges that have committed to implementing vaccination requirements on their campuses; and

2

**ER0542**

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace, and

**WHEREAS,** students attending public and private universities, colleges, community colleges, and technical colleges are largely in the age demographic with the highest rate of COVID-19 cases and the lowest rate of vaccinations of those over the age of 18, which, taken with the foregoing, justifies continuing to mandate certain safety measures for public and private universities, colleges, community colleges, and technical colleges that choose not to implement vaccination requirements on their campuses; and

**WHEREAS,** DOH continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS,** the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support DOH and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with DOH in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE,** I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-05 and 20-12, et seq., and 20-25, et seq., continue in effect except as amended herein, to allow for in-person classroom instruction, lectures and similar educational gatherings at public and private universities, colleges, community colleges, and technical colleges (referred to hereafter collectively as institutions of higher education, or IHEs), provided certain requirements are and continue to be satisfied.

**FURTHERMORE,** IHEs that do not have fully vaccinated campuses are prohibited from providing in-person classroom instruction, lectures and similar educational gatherings, except when they implement, follow, and enforce the requirements specified below. IHEs with fully vaccinated campuses are wholly exempt from this proclamation and encouraged, but not required, to follow DOH's COVID-19 recommendations for higher education.

IHEs WITH FULLY VACCINATED CAMPUSES
An IHE has a fully vaccinated campus and is exempt from this proclamation when it meets all of the following requirements:
- The IHE implements a policy requiring all of its students, staff, and faculty who participate in or attend IHE courses, operations, or other activities in person at IHE locations to be fully vaccinated against COVID-19, subject to any medical exemptions required by law and any religious or philosophical exemptions the IHE provides.

3

**ER0543**

(211 of 247), Page 211 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 211 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4148    Page 121
of 157

- o For purposes of this proclamation, a person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use by the FDA (e.g., Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose COVID-19 vaccine authorized for emergency use by the FDA (e.g., Johnson & Johnson (J&J)/Janssen). For purposes of this proclamation, an IHE may consider a person fully vaccinated against COVID-19 two weeks after they have received all recommended doses of a COVID-19 vaccine that is listed for emergency use by the World Health Organization (WHO).
- The IHE implements a policy and procedure to verify the vaccination status of students, staff, and faculty who are not exempt from the vaccination requirement:
  - o The IHE must verify the vaccination status of all staff and faculty who do not wear face coverings in the workplace, as required by the Department of Labor & Industries (L&I).
  - o The IHE must verify the vaccination status of all students by obtaining or observing documentary proof of full vaccination, such as a CDC vaccination card, documentation of vaccination from a health care provider, or a state immunization information system record, or obtaining a hard copy or electronically signed self-attestation from the student. Any student self-attestation must include the following information:
    - ▪ The dates when each dose of the COVID-19 vaccine was administered to the student;
    - ▪ Language stating that the student is attesting to the truthfulness of their self-attestation and will be subject to disciplinary action if their self-attestation is determined to be untruthful in violation of the IHE's code of conduct or equivalent; and
    - ▪ Language stating that the IHE and state and local public health officials may require further verification of the student's vaccination status, including observing the student's CDC vaccination card, state immunization information system record, or other documentation.
- The IHE implements a policy requiring every student, staff member, and faculty member who claims an exemption to the vaccination requirement and every volunteer, contractor, and visitor to wear a face covering at IHE locations in accordance with the Secretary of Health's face covering order and to comply with any applicable L&I workplace safety requirements. For people claiming exemptions to the Secretary of Health's face covering order, the IHE's policy must include putting in place other safety measures to protect the safety of the exempt people and others.

REQUIREMENTS FOR IHEs WITHOUT FULLY VACCINATED CAMPUSES

**Campus Safety**
- Adhere to all federal, state and local public health and workplace safety requirements;
- Develop a comprehensive COVID-19 infection control plan incorporating the requirements below, applicable workplace safety requirements, and best practices in CDC and DOH guidance for IHEs, and make available a copy of the plan at each location on campus;
- Implement a policy and procedure requiring students, staff, and faculty to provide information about their vaccination status:
  - o The IHE must verify the vaccination status of all staff and faculty who do not wear face coverings in the workplace, as required by L&I.

4

**ER0544**

(212 of 247), Page 212 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 212 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4149    Page 122
of 157

     ○ The IHE must ascertain the vaccination status of all students. From students who are not fully vaccinated, the IHE must obtain a hard copy or electronically signed self-attestation that they are not fully vaccinated. From fully vaccinated students, the IHE must obtain or observe documentary proof of full vaccination, such as a CDC vaccination card, documentation of vaccination from a health care provider, or a state immunization information system record, or obtain a hard copy or electronically signed self-attestation from the student. Any student self-attestation must include the following information:

          ■ The dates when each dose of the COVID-19 vaccine was administered to the student;

          ■ Language stating that the student is attesting to the truthfulness of their self-attestation and will be subject to disciplinary action if their self-attestation is determined to be untruthful in violation of the IHE's code of conduct or equivalent; and

          ■ Language stating that the IHE and state and local public health officials may require further verification of the student's vaccination status, including viewing the student's CDC vaccination card, state immunization information system record, or other documentation;

- Enforce compliance with the Secretary of Health's [face covering order](#) and L&I's requirements inside IHE facilities;
- To the extent permitted by law, require all students, regardless of vaccination status, to wear face coverings when meeting with a faculty member for office hours or similar purposes, if requested by the faculty member;
- Maintain minimum physical distancing, whenever possible, of three feet between all non-household members indoors on campus, including students, faculty, staff, volunteers, contractors, and visitors, and where physical distancing cannot be maintained, implement administrative or engineering controls to minimize exposure;
- Implement and maintain hand washing policies to ensure frequent and adequate hand washing and maintain adequate supplies;
- Implement and maintain adequate sanitization protocols consistent with CDC's *Cleaning and Disinfecting Your Facility* guidance and *Guidance for Institutions of Higher Education (IHEs)* and the U.S. Environmental Protection Agency's *list* of disinfectants for COVID-19;
- Implement and maintain a self-certification COVID-19 screening program for students and personnel consistent with DOH's *Guidance for Daily COVID-19 Symptom Screening of Staff and Guests*;
- Develop response protocols for students, personnel, and visitors reporting symptoms and/or confirmed to have COVID-19;
- If students or personnel are experiencing any known COVID-19 symptoms, are confirmed to have COVID-19, or have been exposed to a confirmed case of COVID-19, require them to follow the direction of the local health jurisdiction and, to the extent not inconsistent with that direction, DOH's *Evaluation and Management of Persons with New Unexplained Symptoms of COVID-19*, *What to do if you were potentially exposed to someone with COVID-19*, and *What to do if you have confirmed or suspected COVID-19* and CDC's *What to Do If You Are Sick* guidance;

(213 of 247), Page 213 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 213 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4150    Page 123
of 157

- Make diligent efforts to monitor and enforce compliance with the requirements of this proclamation by students and personnel within the institution's disciplinary authority and procedures and any other applicable authority;
- Develop a plan with the relevant local health jurisdiction to address the isolation and quarantine needs of any personnel and students who have confirmed or suspected COVID-19 or exposure to an individual confirmed to have COVID-19 and are unable to isolate or quarantine in their usual place of residence; and
- Assess recognized hazards, including COVID-19, as part of the ongoing requirement to provide a safe and healthy workplace and, where appropriate, take additional steps to protect unvaccinated employees. Appropriate steps could include but are not limited to maximizing fresh air and providing a mask that is more protective than a cloth face covering. These should be considered as part of the IHE's comprehensive infection control plan.

**Student Worker and Personnel Support**
- Provide student workers and personnel with PPE such as gloves, goggles, face shields, and/or masks as appropriate or required for student workers/personnel not working alone (e.g. any public-facing job and/or those whose responsibility includes operating within physical distancing limits), and shut down or suspend any activity if PPE cannot be provided;
- Comply and require compliance with L&I requirements for face coverings and the Secretary of Health's face covering order as applicable to the workplace except where this order is more stringent;
- Identify available alternative arrangements for student workers and personnel upon requests or refusals to work due to concerns related to campus safety. Priority should be given for student workers/personnel who are considered high-risk or vulnerable as defined by public health officials (following state guidelines for COVID-19 scenarios and benefits); and
- Educate students and personnel on symptom detection, sources of high risk to COVID-19, prevention measures, and leave benefits/policies.

**Visitor Expectations**
- Post visible entry point signage for students, personnel, and visitors describing shared on-campus responsibilities and requirements, including those regarding proper hygiene and sanitization, physical distancing and face coverings, staying home if feeling sick, information on how and when to report concerns, and other information as appropriate or required.

**Food Services**
- Implement floor markings to promote physical distancing;
- Post signs to remind patrons of physical distancing and face covering requirements and to use hand sanitizer;
- Complete routine sanitization of high-touch surfaces and shared resources (e.g., door handles, points of sales); and
- Enforce compliance with the Secretary of Health's face covering order and L&I's requirements inside IHE food service facilities

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are

6

**ER0546**

directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

This Proclamation, and the prohibitions and orders contained herein, takes effect at 12:01 a.m. on July 1, 2021, and remains in effect until rescinded or otherwise amended. Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

Signed and sealed with the official seal of the state of Washington on this 30th day of June, A.D., Two Thousand and Twenty-One at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

7

ER0547

(215 of 247), Page 215 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 215 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4152    Page 125
of 157

# EXHIBIT D



STATE OF WASHINGTON
━ OFFICE OF GOVERNOR JAY INSLEE ━

## PROCLAMATION BY THE GOVERNOR
## AMENDING PROCLAMATIONS 20-05 and 20-14

### 21-14.1

### COVID-19 VACCINATION REQUIREMENT

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout Washington State as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations and our health care system, I have subsequently issued several amendatory proclamations, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations, including issuance of Proclamations 20-25, et seq., which limit Washingtonians' ability to participate in certain activities unless certain conditions are met; and

**WHEREAS,** during early stages of the COVID-19 pandemic, health professionals and epidemiological modeling experts indicated that the spread of COVID-19, if left unchecked, threatened to overwhelm portions of Washington's public and private health-care system; and

**WHEREAS,** to protect some of our most vulnerable populations—persons in health care facilities, long-term care facilities (which includes nursing homes), and similar congregate care facilities—and to protect our health and congregate care systems themselves, I issued several proclamations imposing heightened protections on workers, residents, and visitors in those facilities; and

**WHEREAS,** although COVID-19 continues as an ongoing and present threat in Washington State, the measures we have taken together as Washingtonians over the past 18 months, including the willingness of most Washingtonians to take advantage of the remarkable, life-saving vaccines being administered throughout the state, have made a difference and have altered the course of the pandemic in fundamental ways; and

**WHEREAS,** after months of improving COVID-19 epidemiological conditions in Washington State, the emergence of highly contagious COVID-19 variants, including the "Delta" variant that is at least twice as transmissible as the virus that emerged in late 2019, coupled with the continued significant numbers of unvaccinated people, have caused COVID-19 cases and hospitalizations to rise sharply among unvaccinated populations and have resulted in breakthrough infections in some fully vaccinated individuals; and

(217 of 247), Page 217 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 217 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4154    Page 127
of 157

**WHEREAS,** COVID-19 vaccines are effective in reducing infection and serious disease, and widespread vaccination is the primary means we have as a state to protect everyone, including persons who cannot be vaccinated for medical reasons, youth who are not eligible to receive a vaccine, immunocompromised individuals, and vulnerable persons including persons in health care facilities, long-term care facilities and other congregate care facilities from COVID-19 infections; and

**WHEREAS,** widespread vaccination is also the primary means we have as a state to protect our health care system, to avoid the return of stringent public health measures, and to put the pandemic behind us; and

**WHEREAS,** COVID-19 vaccinations have been available in Washington State from December 2020 to the present, and since April 15, 2021, all Washingtonians over the age of 16 have been eligible to receive free COVID-19 vaccinations from a wide variety of providers at many locations; and

**WHEREAS,** as of August 4, 2021, nearly 4.4 million Washingtonians, about 70% of those eligible and 58% of the total population, had initiated their vaccine series, leaving 2.1 million eligible Washingtonians who were unvaccinated; and

**WHEREAS,** according to the U.S. Centers for Disease Control and Prevention (CDC), as of August 1, 2021, approximately 67% of staff in Washington state nursing homes were fully vaccinated; and

**WHEREAS,** healthcare workers face COVID-19 exposures in a variety of healthcare settings, with those involving direct patient care likely at higher risk; and

**WHEREAS,** COVID-19 vaccines are safe and effective. COVID-19 vaccines were evaluated in clinical trials involving tens of thousands of participants and met the U.S. Food & Drug Administration's (FDA) rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support emergency use authorization; and, to date, more than 346 million doses of COVID-19 vaccines have been given in the United States with 8.2 million of those doses administered in Washington, and serious safety problems and long-term side effects are rare; and

**WHEREAS,** on July 6, 2021, the Office of Legal Counsel of the United State Department of Justice issued a legal opinion stating that federal and state governments were not prohibited by federal law from imposing vaccination mandates, even when the only vaccines available are those authorized under the FDA's Emergency Use Authorizations; and

**WHEREAS,** on July 26, 2021, approximately 60 medical groups, including the American Medical
Association, the American College of Physicians, the American Academy of Pediatrics, the American Academy of Family Physicians, the American Nurses Association, the American Academy of Physician Assistants, the Association of Professionals in Infection Control and

**ER0550**

(218 of 247), Page 218 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 218 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4155    Page 128
of 157

Epidemiology, the American Public Health Association, the Infectious Diseases Society of America, LeadingAge, the National Hispanic Medical Association, the National Medical Association, and the Society of Infectious Disease Pharmacists, issued a memorandum supporting mandatory, universal vaccination of all public and private health care and long-term care workers, noting that such a requirement is the "fulfillment of the ethical commitment of all health care workers to put patients as well as residents of long-term care facilities first and take all steps necessary to ensure their health and well-being"; and on August 2, 2021, the Washington State Society of Post-Acute and Long-Term Care Medicine submitted a letter in support of the above noted July 26, 2021 memorandum; and

**WHEREAS,** on July 15, 2021, the American College of Obstetricians and Gynecologists, together with the Society for Maternal-Fetal Medicine, posted a formal opinion stating that medical professionals have an ethical obligation to be vaccinated against COVID-19 to prevent the spread of harmful infectious diseases, and that women who are or may become pregnant should be vaccinated against COVID-19; and

**WHEREAS,** it is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and by requiring all employees to comply with health and safety measures; and

**WHEREAS,** state employees live in and provide services to the public in every county in our state, and many interact with the public on a regular basis, and they all interact with some portion of the community at large to varying degrees before and/or after state work hours; and

**WHEREAS,** to further our individual and collective duty to reduce the spread of COVID-19 in our communities, I issued Proclamation 21-14 requiring all employees, on-site independent contractors, volunteers, goods and services providers, and appointees of designated state agencies to be fully vaccinated against COVID-19 on or before October 18, 2021; and

**WHEREAS,** child-care settings, K-12 schools, colleges, universities, and community colleges, (collectively, "educational settings") are foundations of Washington's communities and its future, and provide a variety of vital services to students, families, and communities, thereby making providing childcare services and in-person instruction in the fall 2021 a priority; and

**WHEREAS,** increasing vaccination rates at educational settings is the strongest protective measure against COVID-19 available and, together with masking, vital to providing in-person instruction in as safe a manner as possible; and

**WHEREAS,** on July 12, 2021, I issued Proclamation 20-12.4 prohibiting institutions of higher education from providing in-person instruction unless the institutions comply with specific requirements related to vaccination, masking, and operations; and

**WHEREAS,** on July 30, 2021, I issued Proclamation 20-9.4, prohibiting K-12 schools from providing in-person learning unless the schools comply with masking instructions provided by the Department of Health and the Office of the Superintendent of Public Instruction; and

3

ER0551

**WHEREAS,** the sharp increase in COVID-19 cases and hospitalizations, primarily among unvaccinated populations but also in breakthrough infections in some fully vaccinated individuals, makes it vital to expand the vaccination requirement to workers in educational settings; and

**WHEREAS,** to provide additional clarity I am extending the prohibition to additional groups and providing additional guidance relating to the vaccination requirement imposed in Proclamation 21.14; and

**WHEREAS,** the worldwide COVID-19 pandemic and its persistence in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS,** the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS,** the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the state Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05, as amended, remains in effect, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), and (3), I hereby amend and supersede the prohibitions in 20-14 as set out below, subject to the conditions, exceptions, and circumstances also set forth below, for the following activities:

1. <u>Prohibitions</u>.  This order prohibits the following:

   a.  Any Worker from engaging in work for a State Agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19;
   b.  Any State Agency from permitting any Worker to engage in work for the agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19 and provided proof thereof as required below;
   c.  Any Worker from engaging in work for the operator of an Educational Setting after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19;
   d.  Any operator of an Educational Setting from permitting a Worker to engage in work for the operator after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19 and provided proof thereof as required below;

    e.   Any Health Care Provider from failing to be fully vaccinated against COVID-19 after October 18, 2021; and

    f.   Any operator of a Health Care Setting from permitting a Health Care Provider to engage in work for the operator as an employee, contractor, or volunteer in their capacity as a Health Care Provider after October 18, 2021 if the Health Care Provider has not been fully vaccinated against COVID-19 and provided proof thereof as required below. Providers who do not work in a Health Care Setting must provide proof of vaccination to the operator of the facility in which the Provider works, if any, or, if requested, to a lawful authority. A lawful authority includes, but is not limited to, law enforcement, local health jurisdictions, and the state Department of Health.

2.  <u>Exemptions from Vaccine Requirement</u>.

    a.   Disability and Religious Accommodations

- Workers for State Agencies, Workers for operators of Educational Settings, and Health Care Providers are not required to get vaccinated against COVID-19 under this Order if they are unable to do so because of a disability or if the requirement to do so conflicts with their sincerely held religious beliefs, practice, or observance. Workers for State Agencies, Workers for operators of Educational Settings, and Health Care Providers are prohibited from claiming an exemption or accommodation on false, misleading, or dishonest grounds, including by providing false, misleading, or dishonest information to a State Agency, operator of an Educational Setting, or operator of a Health Care Setting when seeking an accommodation.

- In implementing the requirements of this Order, State Agencies, operators of Educational Settings, and operators of Health Care Settings:

    o   Must provide any disability-related reasonable accommodations and sincerely held religious belief accommodations to the requirements of this Order that are required under the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (Rehabilitation Act), Title VII of the Civil Rights Act of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), and any other applicable law. As provided in the above-noted laws, State Agencies, operators of Educational Settings, and operators of Health Care Settings are not required to provide accommodations if they would cause undue hardship.

    o   Must comply with the procedures required under the above-noted laws and any other applicable law when considering and deciding whether to provide accommodations;

    o   Must, to the extent permitted by law, before providing a disability-related reasonable accommodation to the requirements of this order, obtain from the individual requesting the accommodation documentation from an appropriate health care or rehabilitation professional stating that the individual has a disability that

**ER0553**

necessitates an accommodation and the probable duration of the need for the accommodation;

o Must, to the extent permitted by law, before providing a sincerely held religious belief accommodation to the requirements of this Order, document that the request for an accommodation has been made and include a statement in the document explaining the way in which the requirements of this order conflict with the sincerely held religious belief, practice, or observance of the individual;

o Must, to the extent permitted by law, require an individual who receives an accommodation to take COVID-19 safety measures that are consistent with the recommendations of the state Department of Health for the setting in which the individual works; and

o Are prohibited from providing accommodations:

- That they know are based on false, misleading, or dishonest grounds or information;

- That they know are based on the personal preference of the individual and not on an inability to get vaccinated because of a disability or a conflict with a sincerely held religious belief, practice, or observance; or

- Without conducting an individualized assessment and determination of each individual's need and justification for an accommodation; i.e., "rubberstamping" accommodation requests.

c. Any individual who is unable to get fully vaccinated against COVID-19 by October 18, 2021 due to the requirements of their participation in a COVID-19 vaccine clinical trial is exempt from this Order. Any such individual who is a Worker for a State Agency or a Worker for an operator of an Educational Setting must provide documentary proof of their participation in the COVID-19 vaccine clinical trial to any State Agency or operator of an Educational Setting for which they engage in work. Any such individual who is a Health Care Provider must provide documentary proof of their participation in the COVID-19 vaccine clinical trial to any operator of a Health Care Setting for which they engage in work as an employee, contractor, or volunteer in their capacity as a Health Care Provider. A State Agency, operator of an Educational Setting, or operator of a Health Care Setting is prohibited from permitting any such individual to engage in work for them after October 18, 2021 if the individual fails to provide such proof.

d. Individuals who are too young to receive any COVID-19 vaccine, as authorized for emergency use, licensed, or otherwise approved by the FDA, are exempt from this Order. Any individual who becomes old enough to receive any COVID-19 vaccine, as authorized for emergency use, licensed, or otherwise approved by the FDA, while this Order is in effect must come into compliance with the requirements of this Order within 60 days of the day they became eligible. Any State Agency, operator of an Educational Setting, or operator of a Health Care Setting for which such an individual engages in work must also come into

6

ER0554

compliance with the requirements of this Order with respect to the individual by that deadline.

3.  Proof of Full Vaccination Against COVID-19:
    a.  Where required above, Workers for State Agencies, Workers for operators of Educational Settings, and Health Care Providers must provide proof of full vaccination against COVID-19 by providing one of the following:
        ▪ CDC COVID-19 Vaccination Record Card or photo of the card;
        ▪ Documentation of vaccination from a health care provider or electronic health record;
        ▪ State immunization information system record; or
        ▪ For an individual who was vaccinated outside of the United States, a reasonable equivalent of any of the above.
    b.  A State Agency, operator of an Educational Setting, or an operator of a Health Care Setting must obtain a copy of or visually observe proof of full vaccination against COVID-19 for every individual who is engaged in work for them and required to provide such proof under this Order.
    c.  Personal attestation is not an acceptable form of verification of COVID-19 vaccination.

4.  Election to Require Employers of Contractors to Assume Responsibility for Vaccination Verification and Accommodation Requirements
    a.  Notwithstanding anything to the contrary in this Order, a State Agency, an operator of an Educational Setting, or an operator of Health Care Setting may elect to require the employer of a contractor who is subject to this Order to assume responsibility for the vaccination verification and accommodations requirements in this Order. This election may be made with respect to any or all of an employer's contractor-employees who are subject to this Order.
    b.  If such an election is made, after October 18, 2021, the employer's contractor-employees are prohibited from engaging in work for the State Agency, operator of the Educational Setting, or operator of the Health Care Setting, and the State Agency, operator of the Educational Setting, or operator of the Health Care Setting is prohibited from permitting such employee to engage in work for them, unless the following requirements are met:
        ▪ By October 18, 2021, the employer must obtain a copy of or visually observe proof of full vaccination against COVID-19 for every current employee who is subject to the vaccination requirement in this Order;
        ▪ The employer must obtain a copy of or visually observe proof of full vaccination against COVID-19 for every employee hired after October 18, 2021 who is subject to the vaccination requirement in this Order;
        ▪ The employer must follow the requirements for granting disability and religious accommodations to its current and future employees that apply to State Agencies, operators of Educational Settings, and operators of Health Care Settings under this Order;
        ▪ By October 18, 2021, the employer must submit to the State Agency, operator of the Educational Setting, or operator of the Health Care Setting

7

**ER0555**

a signed declaration in substantially the form prescribed in RCW 5.50.050 declaring that the employer has met the above requirements;

- The employer must submit additional signed declarations upon the request of and by the date designated by the State Agency, operator of the Educational Setting, or operator of the Health Care Setting;

- If an employer is also a contractor subject to this Order, the employer must include in their declaration that the employer is fully vaccinated against COVID-19 or is unable to get vaccinated because of a disability or a conflict between the vaccination requirement and their sincerely held religious beliefs, practice, or observance, as applicable; and

- The employer must cooperate with any investigation or inquiry the State Agency, operator of the Educational Setting, or operator of the Health Care Setting makes into the employer's compliance with these requirements, including by providing information and records upon request, except any information or records that the employer is prohibited by law from disclosing.

c. Any State Agency, operator of an Educational Setting, or operator of Health Care Setting who makes the election above retains the right to investigate or inquire into the employer's compliance with the above requirements, to obtain proof of vaccination directly from any contractor-employee, and to withdraw the election in whole or in part at any time.

5. <u>Public and Private Entities and Employers May Exceed These Requirements</u>:  Nothing in this order prohibits State Agencies, operators of Educational Settings, and operators of Health Care Settings from implementing requirements that exceed the requirements of this Order.

6. <u>Definitions</u>.
   a. "Worker":
      - "Worker" includes:
        - A person engaged to work as an employee, on-site volunteer, or on-site contractor for a State Agency, an operator of an Educational Setting, or an operator of a Health Care Setting, as applicable;
        - The director, secretary, or other executive officer of a State Agency; and
        - A person appointed to serve on a board, commission, or similar body that is an executive cabinet agency listed at https://www.governor.wa.gov/office-governor/office/executive-cabinet or a small cabinet agency listed at https://www.governor.wa.gov/officegovernor/office/small-cabinet, the State Board for Community and Technical Colleges, a board of trustees for a community or technical college, or a governing board of a four-year institution of higher education.
      - The following exceptions apply to the definition of "Worker":
        - Visitors and patrons are not Workers.
        - In Educational Settings:

**ER0556**

   o  Students of, persons attending, and persons receiving services at or from an Educational Setting are not Workers.

   o  On-site contractors are not Workers if they do not work in places where students or persons receiving services are present.

   o  Family, friend, and neighbor (FFN) child care providers are not Workers.

- For any State Agency that is listed as an agency under the authority of a board, council, or commission at https://ofm.wa.gov/sites/default/files/public/publications/2021_State_Org_.Chart.pdf and that is not also listed as an executive cabinet agency at https://www.governor.wa.gov/office-governor/office/executive-cabinet or a small cabinet agency at https://www.governor.wa.gov/officegovernor/office/small-cabinet, other than the State Board for Community and Technical Colleges, the boards of trustees for community and technical colleges, and the governing boards of four-year institutions of higher education, only the State Agency's compensated employees are "Workers" subject to the requirements of this proclamation.

b.  "Contractor" includes any person who provides goods, services, or public works services pursuant to a contract with another person or entity, including, for purposes of this Order, a State Agency, an operator of an Educational Setting, or an operator of a Health Care Setting. The term includes subcontractors. The term does not include parties to a lease or rental agreement, unless the agreement requires a party to provide services, in which case only the persons who provide those services are "contractors."

c.  "Contract" is defined as provided under Washington law. Generally, a contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty, regardless of the particular form, title, or description is not relevant.

d.  "Health Care Provider" includes:

- Individuals with credentials listed in the Healthcare Professional Credentialing Requirements list;
- Individuals who are permitted by law to provide health care services in a professional capacity without holding a credential;
- Long-term care workers unless specifically excluded in this order; and
- Workers in any Health Care Setting, as defined herein.

"Health Care Provider" does not include, for purposes of this order:

- Individual providers, as defined in RCW 74.39A.240;
- Individuals who provide only personal care services, as defined in RCW 74.39A.009(24), in people's homes;
- Providers who are not actively practicing or providing services; and

**ER0557**

- Providers who provide services only at one or more of the settings that are expressly excluded from the list of Health Care Settings under this order.

e. "Health Care Setting" is any public or private setting that is primarily used for the delivery of in-person health care services to people, except as specifically exempted below. If located at a facility that is primarily used for the delivery of health-care services, such as a hospital, then the entire facility is a Health Care Setting. If located at a facility that is primarily used for another purpose, such as a pharmacy within a grocery store, school nurse's office, or vaccination clinic within a business establishment, the Health Care Setting includes only the areas that are primarily used for the delivery of health care, but not the other areas of the facility.

"Health Care Setting" includes, but is not limited to:
- Acute care facilities, including, but not limited to, hospitals;
- Long-term acute care facilities;
- Inpatient rehabilitation facilities;
- Inpatient behavioral health facilities, including, but not limited to, evaluation and treatment facilities, residential treatment facilities, secure detox facilities;
- Residential long-term care facilities, including, but not limited to, nursing homes, assisted living facilities, adult family homes, settings where certified community residential services and supports are provided, and enhanced services facilities;
- Mobile clinics or other vehicles where health care is delivered;
- Outpatient facilities, including, but not limited to, dialysis centers, physician offices, and behavioral health facilities (including offices of psychiatrists, mental health counselors, and substance use disorder professionals);
- Dental and dental specialty facilities;
- Pharmacies (not including the retail areas);
- Massage therapy offices (this includes designated areas where massage is administered within non-health care settings like spas and wellness/fitness centers);
- Chiropractic offices;
- Midwifery practices and stand-alone birth centers;
- Isolation and/or quarantine facilities;
- Ambulatory surgical facilities;
- Urgent care centers; and
- Hospice care centers.

"Health Care Setting" does not include:
- Settings where sports and spectator events or other gatherings are held (including when credentialed athletic trainers are providing care to players), other than areas primarily used for the delivery of health care

10

**ER0558**

services, such as designated first aid areas (which are Health Care Settings);

- Department of Children, Youth & Families (DCYF)-licensed foster homes that do not primarily provide health care services;
- Research facilities where no health care is delivered to people;
- Veterinary health care settings;
- Animal control agencies; and
- Non-profit humane societies.

d. "State Agency" includes:
- Every agency listed at https://www.governor.wa.gov/officegovernor/office/executive-cabinet;
- Every agency listed at https://www.governor.wa.gov/officegovernor/office/small-cabinet; and
- Every agency under the authority of a board, council, or commission listed at https://ofm.wa.gov/sites/default/files/public/publications/2021_State_Org_Ch art.pdf.

e. "Educational Setting" includes:
- All public and private universities, colleges, community colleges, and technical colleges and private career/vocational schools subject to licensure by the Workforce Training & Education Coordinating Board;
- All public schools, public school districts, charter schools, private schools, educational service districts, the Washington School for the Deaf, the Washington State School for the Blind, and the Washington Youth Academy; and
- All early learning and child care programs serving groups of children from multiple households, including, but not limited to, Early Childhood Education and Assistance Programs, Family Home Child Care, Child Care Centers, Outdoor, Nature-based Child Care, School-aged Child Care, license-exempt preschools, and license-exempt youth development programs (e.g., municipal parks & recreation programs, YMCA, Boys & Girls Clubs).

e. "Fully Vaccinated against COVID-19": A person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine (e.g., Pfizer-BioNTech or Moderna) or a single-dose COVID-19 vaccine (e.g., Johnson & Johnson (J&J)/Janssen) authorized for emergency use, licensed, or otherwise approved by the FDA or listed for emergency use or otherwise approved by the World Health Organization.

f. "On-site volunteer" and "on-site contractor" includes:
- A volunteer or contractor who is reasonably likely or contractually obligated to engage in or in fact engages in work while physically present at a building, facility, jobsite, project site, unit, or other defined

11

ER0559

(227 of 247), Page 227 of 247Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 227 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4164    Page 137
of 157

area owned, leased, occupied by, or controlled by a State Agency, an operator of an Educational Setting, or an operator of a Health Care Setting.

"On-site volunteer" and "on-site contractor" does not include:
- A volunteer or contractor who is reasonably likely or contractually obligated to engage in or in fact engages in work during which they are physically present at a site for only a short period of time and any moments of close physical proximity to others on site are fleeting. Examples include contractors delivering supplies by truck to a construction site where they remain physically distanced from others on the site or a driver for a contracted shipping and delivery service briefly entering a site to pick up parcels for shipping.

g. "Operator of an Educational Setting" and "operator of a Health Care Setting" do not include clients, patients, patrons, customers, or similar individuals served by Worker for a State Agency, Worker for an Educational Setting, or Health Care Provider.

**ADDITIONALLY**, the specific prohibitions in this Proclamation are severable and do not apply to the extent that compliance with a prohibition would violate (1) any U.S. or Washington constitutional provision; (2) federal statutes or regulations; (3) any conditions that apply to the state's receipt of federal funding; (4) state statutes; or (5) applicable orders from any court of competent jurisdiction.

**ADDITIONALLY**, nothing in this Proclamation limits otherwise applicable requirements related to personal protective equipment, personnel training, and infection control policies and procedures.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

**ER0560**

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required facial coverings, social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

This order is effective immediately. Unless extended or amended, upon expiration or termination of this amendatory proclamation the provisions of Proclamation 20-25, et seq., will continue to be in effect until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded.

Signed and sealed with the official seal of the state of Washington on this 20th day of August, A.D., Two Thousand and Twenty-One at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

13

**ER0561**

(229 of 247), Page 229 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 229 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4166    Page 139
of 157

# EXHIBIT E

# See Where 12 Million U.S. Employees Are Affected by Government Vaccine Mandates

Dec. 18, 2021

## Which states have Covid-19 vaccination mandates

Mandates for some workers     Mandates banned or blocked     No statewide policy



Note: Mandates shown are requirements from state governments only. When a group is indicated as being under a vaccine requirement, there could still be subgroups that are not covered. In some cases, local governments or private employers may still have requirements, even in states where mandates are blocked. The number of people covered by mandates in each state represents the maximum number of people confirmed by state and city governments, plus federal employees and members of the military.

Government orders requiring coronavirus vaccinations have been expanding across the United States but have not provided the significant boost to state and local vaccination rates that some experts had hoped for, according to a New York Times analysis. Meanwhile, at least 49,000 people have left their jobs or have been disciplined at work because they did not comply.

Mandates requiring shots cover at least 12 million people, according to a Times survey of every state and the nation's 100 largest cities. At least 8 million people employed by state or city



governments must get vaccinated. In every state, even those that have banned some vaccine requirements, at least some people are mandated to be vaccinated because they are members of the military or federal employees, two groups totaling some 4.1 million people.

Millions more would be covered by federal requirements for health workers, employees of large private companies and federal contracting employees. Portions of those mandates have been stalled in court over the past several weeks. A new requirement in New York City for on-site employees at all of the city's approximately 184,000 private businesses to get vaccinated by late December would cover hundreds of thousands of additional people. Many private companies across the country have also instituted their own vaccine rules.

To arrive at the total estimate of at least 8 million people covered by state and city requirements, The New York Times identified vaccine requirements, beyond those mandated by the federal government, that apply to health care workers, long-term care workers, city or state public employees, correctional workers and education employees in the kindergarten-through-12th-grade system. At least 25 states and 39 cities have required shots for some portion of these employees, who otherwise would face ongoing testing requirements or, in some cases, disciplinary action or termination.

The estimate is an undercount because some states and cities did not respond to questions about their vaccination requirements. The Times also removed people from the state estimates who might have been counted multiple times under different mandates. Many of the people covered by these requirements had already been vaccinated before the mandates were announced, but it is not clear how many.

In almost all of these states and in all of the counties surrounding the cities with mandates, a majority of the residents voted for President Biden. Statewide mandates tend to be most popular along the West Coast and in the Northeast, whereas states banning some mandates tend to be clustered in the South.

ER0564

(232 of 247), Page 232 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 232 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4169    Page 142
of 157

Many of the deadlines for vaccination compliance are still in the future. Among those that have already passed, some are not actively being enforced yet.

Across many different ways of analyzing the data, states and cities with vaccination mandates did not seem to see any significant increase in the rate of vaccinations after the mandates, possibly because many of those areas already had relatively high vaccination rates.

### Vaccination rates for adults in states with and without vaccine mandates

States that imposed vaccine requirements have had higher vaccination rates throughout, and creating the requirements did not lead to any clear increase in rates there.



Source: Centers for Disease Control and Prevention • Note: This analysis excluded 13 states because they had unreliable timeseries data for percent of population vaccinated. The Times identified the earliest dates when mandates were announced in each state and the latest deadlines for compliance in each state.

To try to measure the impact of vaccine requirements on vaccination rates, The Times analyzed the shares of adults with at least one shot in 15 states, plus Washington, D.C., and in 15 counties surrounding big cities where compliance deadlines passed on or

before Dec. 1. The analysis excluded states and counties for which the Centers for Disease Control and Prevention lacked adequate historical data.

To determine the requirements' effects in a state or county, The Times found how many adults received at least one shot before the earliest mandate was announced, then measured the rate of growth in that number by the latest deadline for compliance with mandates. That rate of growth was then compared with the overall change in vaccinated adults across the nation in the same time period.

The Times also measured growth in each location and across the nation from the date of the earliest mandate to Dec. 1. This alternative analysis was made on the presumption that people might not prioritize getting shots in places where the consequence for not getting vaccinated is regular testing, rather than discipline or job loss, or where the appeals process for a termination is lengthy. Some places, like Mississippi, also announced mandates requiring vaccination or regular testing that went into effect almost immediately and, in those cases, The Times only measured the time period ending in Dec. 1.

In most locations, the number of adults with at least one shot grew at a slower pace after states and cities announced mandates than it did nationwide in the same time periods.

Of the 31 locations analyzed by The Times, eight places outpaced the country by more than one percentage point in the period between the earliest mandate announcement and the latest date of compliance — Washington, D.C.; Mississippi; Nevada; New York City; Fresno County in California; Miami-Dade County in Florida; Orleans Parish in Louisiana and St. Louis in Missouri. New York State also outpaced the country when the analysis was extended to Dec. 1.

Though state- and city-level mandates may have contributed to the rise in adults getting shots in those areas, other factors may also help explain some of the increases.

(234 of 247), Page 234 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 234 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4171    Page 144
of 157

In the nation's capital, for example, the federal employee mandate may have played a role since those workers make up a significant portion of the population. New York City, in addition to job-based mandates, has also restricted access to some businesses unless customers can provide proof of vaccination. Mandates in Orleans Parish, St. Louis and Miami were announced as coronavirus infections were surging in Louisiana, Missouri and Florida, and Mississippi's requirement for long-term care staff has coincided with a roughly 60 percent surge in cases there.

The Times also compared the growth rate in vaccinations in the 31 states and counties to the growth in the directly previous comparable time period to see if any locations outpaced themselves by more than one percentage point after mandate announcements. Only Mississippi outpaced itself in a significant way. Maine, Fresno County and Orleans Parish did, but by fewer than two percentage points.

It can be challenging for a place with a vaccination rate that is already high to increase that rate substantially, and The Times found that states with mandates tended to be vaccinated at levels above the national rate when their requirements were announced. Thirteen states with vaccination mandates, as well as Washington, D.C., already had surpassed the national adult vaccination rates when their mandates were announced, according to the analysis. In those places, 78 percent of adults on average had at least one shot when mandates were announced, higher than the national rates at the same time by 8.1 percentage points, on average.

Dr. Lisa Cooper, director of the Johns Hopkins Center for Health Equity, said she thought it was possible that mandates still might help raise vaccination rates as time wears on and more government agencies enforce the rules with disciplinary action or termination. But she doubts that those consequences will be enough to sway people who are deeply against getting vaccinated.

"Mandates might help for people who are just finding it inconvenient, but have no really legitimate reason to not get the vaccine," she said. "But then you have people who have strong beliefs against it or who really have significant other struggles, and the mandates are not going to do anything for those people."

(235 of 247), Page 235 of 247    Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 235 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4172    Page 145
of 157

Dr. Cooper said that vaccine requirements for domestic travel or access to businesses or places where people can socialize might have more of an impact than job-based mandates.

"People feel like, 'I don't have to do that. I can just get another job,'" she said.

| Number of workers covered | Industry |
| --- | --- |
| 4,798,000 | Healthcare and long-term care |
| 2,144,000 | Federal employees |
| 1,978,000 | Armed forces |
| 108,000 | Corrections |
| 1,644,000 | Public employees |
| 2,017,000 | K-12 employees |
| **12,689,000** | **Total** |

Source: State agencies, U.S. Department of Defense, U.S. Office of Personnel Management  •  Note: Because some states and cities did not provide information or provided rough estimates, figures are likely to be an undercount and are rounded. However, there is some overlap between these groups listed, so some individuals may be counted in multiple groups. Data is as recent as of Dec. 16.

The Times survey also found that more than 49,000 people across the country have been disciplined or left jobs — either by quitting or being fired — because they did not comply with vaccine orders from state or city governments. This is an underestimate because most states and cities did not answer questions about employees who had been punished or had quit. Some provided numbers of people who left their jobs, but did not say whether the departures were related to mandates; The Times did not include those people in the analysis.

Debra Furr-Holden, an epidemiologist at Michigan State University, said it was possibly too late for employers or the government to compel the unvaccinated with a mandate because vaccine hesitancy and refusal have been reinforced over time. She pointed to the proliferation of myths about vaccines causing fertility problems, being microchipped or magnetizing people, and to safety concerns about the Johnson & Johnson vaccine after a small number of cases of a rare blood-clotting disorder emerged.

ER0568

"Incentives and lotteries and money and all of that isn't going to change their mind, and having their hands forced isn't going to change their mind," she said. "It's confirming their bias. People are thinking, 'Well, if this vaccine was good, they wouldn't have to force me to take it.'"

Dr. Furr-Holden added that government pressure to get vaccinated might actually be having the opposite effect, driving some people who may be distrustful of authority away from getting a shot.

There is modern precedent for vaccine mandates in the United States, most commonly applied to children in order to enter schools or day care centers, but also applied to employees in health care settings.

All 50 states, plus Washington, D.C., require children to get immunized for diphtheria, tetanus, pertussis, polio, measles, rubella and chickenpox in order to attend school or daycare, with varying exemptions.

**From approval to requirement**
For vaccines developed recently, the process from first approval to universal requirement for school attendance has been ongoing



Source: Immunization Action Coalition, Centers for Disease Control and Prevention • Note: The Hepatitis A vaccine was first recommended in certain states with higher rates of the disease before added to national recommendation. An earlier rotavirus vaccine was approved in 1998 and then withdrawn. States include the District of Columbia.

The most recent inoculation to be required in every state was the chickenpox vaccine, which was approved in 1995. Most states began requiring it in the late 1990s and early 2000s. The last state to require it, Montana, did so in 2015.

Only three states and Washington, D.C., require the human papillomavirus (or H.P.V.) vaccine, which has been available since 2006. Efforts to require that vaccine quickly led to pushback from some parents who associated the virus with sexual activity.

Even if government vaccine orders do not, in the end, give a major boost to vaccination rates across the board, vaccination requirements can still make a significant impact.

The Times measured the percentage of unvaccinated people who got at least one shot in each state during the period from the earliest mandate announcement to the latest compliance deadline. Of the 15 states, plus Washington, D.C., that were analyzed, nine had given at least one shot to a larger percentage of unvaccinated adults, compared with those at the national level. The Times excluded states with compliance deadlines after Dec. 1 and those lacking robust C.D.C. historical data.

Washington, D.C., Maryland and Virginia, for instance, saw about half or more of their unvaccinated adults get at least one shot after Mr. Biden announced a mandate for federal employees, who make up a large portion of both populations.

In Tucson, Ariz., a requirement for city employees to get vaccinated by Dec. 1 survived challenges by state lawmakers and the governor, who issued an executive order banning city and town vaccine mandates. As of Dec. 2, the city said 3,513 out of 3,923 permanent employees had been fully vaccinated and an additional 399 had obtained medical exemptions or religious accommodations.

Eleven did not comply with the requirement and received notices of termination, meaning that they were placed on paid leave as part of a normal appeals process.

The vaccinations of almost 4,000 people, some of whom had gotten their shots before the city's mandate, did not have a major impact on the adult vaccination rate in surrounding Pima County, which

has about one million people.

But Lane Mandle, a spokeswoman for Tucson, explained that the requirement was put in place to protect the health of employees and maintain staffing levels, particularly in critical areas, so that public services would not be negatively affected by a Covid-19 outbreak. "If 40 people get sick at our 9-1-1 call center, that would impact service to the community," Ms. Mandle said. "It could be a fatal incident if someone doesn't pick up the phone."

Sources: State and local agencies, U.S. Department of Defense, U.S. Office of Personnel Management, state governor's offices, U.S. Centers for Disease Control and Prevention, state legislatures, state hospital associations, trade associations, New York Times case and death data

By Danielle Ivory, Albert Sun, Cierra S. Queen, Brandon Dupré, Kristine White, Lauryn Higgins, Chloe Reynolds, Jess Ruderman, Derek M. Norman, Bonnie G. Wong, Laney Pope, Matt Craig, Rachel Sherman, Yves De Jesus, Maura Turcotte and Yuriria Avila.

# EXHIBIT F



**STATE OF WASHINGTON**
**OFFICE OF GOVERNOR JAY INSLEE**

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATIONS 20-05, 20-12, et seq., AND 20-25, et seq.**

**20-12.5**
**Higher Education**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout Washington State as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its persistence in Washington State, and the high risk it continues to pose to our most vulnerable populations, I have subsequently issued several amendatory proclamations, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person, which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, continues to persist in the state of Washington; and

**WHEREAS**, despite an increase in infections, hospitalizations, and deaths in the latter half of 2020, Washington State has avoided overwhelming the state's health care systems throughout this pandemic by implementing rigorous safety and prevention measures, such as physical distancing, masking, social and economic prohibitions and, since December 2020, the administration of vaccinations to prevent infection with the coronavirus that causes COVID-19 symptoms; and

**WHEREAS**, the U.S. Centers for Disease Control and Prevention (CDC) and the Washington State Department of Health (DOH) have determined that the COVID-19 vaccines that have received emergency approval, or full approval, by the U.S. Food & Drug Administration are safe and effective against infection with the coronavirus that causes COVID-19; and

**WHEREAS**, everyone age 12 and older is currently eligible to receive a vaccination against the coronavirus causing COVID-19 symptoms, and Washington health care providers, in collaboration with public health and other community partners, have successfully administered millions of vaccine doses, but have millions more doses to administer, and it is necessary to achieve the highest rate of vaccination of the United States population as possible; and

**WHEREAS,** on March 13, 2020, in recognition of experts' warnings that continued normal operation of public and private universities, colleges, community colleges, and technical colleges could increase the spread of COVID-19 throughout Washington State, I issued Emergency Proclamation 20-12

ER0573

prohibiting public and private universities, colleges, community colleges, and technical colleges from conducting in-person classroom instruction and lectures related to all educational programs; and

**WHEREAS,** the prohibitions in Proclamation 20-12 expired on April 24, 2020, but public and private universities, colleges, community colleges, and technical colleges remained in modified operation, which included remote learning and certain programs for essential workers; and

**WHEREAS**, Washington's public and private universities, colleges, community colleges, and technical colleges are an important part of our economy and are vital to the educational, social, and economic needs of Washingtonians; and

**WHEREAS,** using remote learning to replace most classroom instruction creates challenges to access for many Washingtonians; and

**WHEREAS**, the progression of COVID-19 in Washington State shows ethnic disparities in health impacts which are likely to increase ethnic disparities in access and success in post-secondary education, requiring the State and all of our campuses and programs to understand how these challenges affect our students and to work to minimize these impacts; and

**WHEREAS,** although public and private universities, colleges, community colleges, and technical colleges made tremendous efforts to continue to function through remote learning, in-person learning benefits Washington; and

**WHEREAS,** the nature of COVID-19 viral transmission, including both asymptomatic and symptomatic spread as well as the relatively high infectious nature, suggests it is appropriate to provide in-person learning at public and private universities, colleges, and technical schools only through a science-based approach that incorporates safety, sanitation, and physical distancing guidelines; and

**WHEREAS,** during the initial return to campus in the fall of 2020, there were more than 35 COVID-19 outbreaks linked to public and private institutions of higher education, and some higher education institutions have seen a substantial increase in COVID-19 positive cases that are tied to both congregate living arrangements, including fraternities and sororities, and also large social gatherings of students, thereby triggering the need to increase safety measures to address these outbreaks; and

**WHEREAS,** I issued Proclamations 20-12.1 and 20-12.2 to permit Washington's public and private universities, colleges, community colleges, and technical colleges to resume in-person instruction, lectures and similar educational gatherings, provided that extensive safety requirements were implemented, and to impose certain safety requirements on shared housing; and

**WHEREAS,** the widespread availability of safe and effective COVID-19 vaccinations makes it appropriate to lift legally-mandated safety requirements for public and private universities, colleges, community colleges, and technical colleges that have committed to implementing vaccination requirements on their campuses; and

2

**ER0574**

(242 of 247), Page 242 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 242 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4179    Page 152
of 157

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace, and

**WHEREAS,** students attending public and private universities, colleges, community colleges, and technical colleges are largely in the age demographic with the highest rate of COVID-19 cases and the lowest rate of vaccinations of those over the age of 18, which, taken with the foregoing, justifies continuing to mandate certain safety measures for public and private universities, colleges, community colleges, and technical colleges that choose not to implement vaccination requirements on their campuses; and

**WHEREAS,** after months of improving COVID-19 epidemiological conditions in Washington State, the emergence of highly contagious COVID-19 variants, including the "delta" variant that is at least twice as transmissible as the virus that emerged in late 2019, coupled with continued significant numbers of unvaccinated people, have caused COVID-19 cases and hospitalizations to rise sharply among unvaccinated populations, have resulted in breakthrough infections in some fully vaccinated individuals, and continue to rise; and

**WHEREAS,** we now know that several factors increase the risk for person-to-person COVID-19 transmission; such factors include (1) the more that people and groups interact, (2) the longer those interactions last, (3) the closer the contact between individuals, (4) the denser the occupancy for indoor facilities, and (5) the lack of use of face coverings; and

**WHEREAS,** COVID-19 vaccines are effective in reducing infection and serious disease, widespread vaccination is the primary means we have as a state to protect everyone, including persons who cannot be vaccinated for medical reasons, youth who are not eligible to receive a vaccine, immunocompromised individuals, and vulnerable persons including persons in health care facilities, long-term care facilities and other congregate care facilities from COVID-19 infections; and

**WHEREAS,** widespread vaccination is also the primary means we have as a state to protect our health care system, to avoid the return of stringent public health measures, and to put the pandemic behind us; and

**WHEREAS,** COVID-19 vaccines were first available in Washington State in December 2020, and since April 15, 2021, all Washingtonians over the age of 16 have been eligible to receive free COVID-19 vaccinations from a wide variety of providers at many locations; and

**WHEREAS,** COVID-19 vaccines are safe and effective. COVID-19 vaccines were evaluated in clinical trials involving tens of thousands of participants and met the U.S. Food & Drug Administration's rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support emergency use authorization and now even full authorization in some circumstances; and, to date, more than 346 million doses of COVID-19 vaccines have been given in the United States with 8.2 million of those doses administered in Washington, and serious safety problems and long-term side effects are rare; and

**WHEREAS,** it is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and by requiring all employees to comply with health and safety measures; and

3

**ER0575**

**WHEREAS**, on August 9, 2021, due, in part, to the above described conditions, I issued Proclamation 21-14, which prohibits, with limited exceptions, certain workers from continuing to engage in their work after October 18, 2021 unless that worker is fully vaccinated, and also prohibits certain employers from continuing to employ any worker from engaging in work for that employer unless the worker is fully vaccinated by October 18, 2021; and

**WHEREAS**, DOH continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support DOH and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with DOH in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-05 and 20-12, et seq., and 20-25, et seq., continue in effect except as amended herein, to allow for in-person classroom instruction, lectures and similar educational gatherings at public and private universities, colleges, community colleges, and technical colleges (referred to hereafter collectively as institutions of higher education, or IHEs), provided certain requirements are and continue to be satisfied.

**FURTHERMORE**, IHEs that do not have fully vaccinated campuses are prohibited from providing in-person classroom instruction, lectures and similar educational gatherings, except when they implement, follow, and enforce the requirements specified below. IHEs with fully vaccinated campuses are wholly exempt from this proclamation and encouraged, but not required, to follow DOH's COVID-19 recommendations for higher education.

IHEs WITH FULLY VACCINATED CAMPUSES
An IHE has a fully vaccinated campus and is exempt from this proclamation when it meets all of the following requirements:
- By October 18, 2021, the IHE is in full compliance with Proclamation 21-14.1 et seq. (Vaccination Requirement).
- The IHE implements a policy requiring all of its students who participate in or attend IHE courses, operations, or other activities in person at IHE locations to be fully vaccinated against COVID-19, subject to any medical exemptions required by law and any religious exemptions the IHE provides.
  - For purposes of this proclamation, a person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use by the FDA (e.g., Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose COVID-19 vaccine authorized for emergency use by the FDA (e.g., Johnson & Johnson (J&J)/Janssen). For purposes of

4

**ER0576**

(244 of 247), Page 244 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 244 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4181    Page 154
of 157

this proclamation, an IHE may consider a person fully vaccinated against COVID-19 two weeks after they have received all recommended doses of a COVID-19 vaccine that is listed for emergency use by the World Health Organization (WHO).

- The IHE implements a policy and procedure to verify the vaccination status of students who are not exempt from the vaccination requirement:
  - The IHE must verify the vaccination status of all students by obtaining or observing documentary proof of full vaccination, such as a CDC vaccination card, documentation of vaccination from a health care provider, or a state immunization information system record, or obtaining a hard copy or electronically signed self-attestation from the student. Any student self-attestation must include the following information:
    - The dates when each dose of the COVID-19 vaccine was administered to the student;
    - Language stating that the student is attesting to the truthfulness of their self-attestation and will be subject to disciplinary action if their self-attestation is determined to be untruthful in violation of the IHE's code of conduct or equivalent; and
    - Language stating that the IHE and state and local public health officials may require further verification of the student's vaccination status, including observing the student's CDC vaccination card, state immunization information system record, or other documentation.
- The IHE implements a policy requiring every student, staff member, and faculty member who claims an exemption to the vaccination requirements in this Order and Proclamation 21-14.1 et seq. and every volunteer, contractor, and visitor to wear a face covering at IHE locations in accordance with the Secretary of Health's face covering order and to comply with any applicable L&I workplace safety requirements. For people claiming exemptions to the Secretary of Health's face covering order, the IHE's policy must include putting in place other safety measures to protect the safety of the exempt people and others.

REQUIREMENTS FOR IHEs WITHOUT FULLY VACCINATED CAMPUSES
An IHE without a fully vaccinated campus must meet all of the following requirements:

**Campus Safety**
- By October 18, 2021, be in full compliance with Proclamation 21-14.1 et seq. (Vaccination Requirement).
- Adhere to all federal, state and local public health and workplace safety requirements;
- Develop a comprehensive COVID-19 infection control plan incorporating the requirements below, applicable workplace safety requirements, and best practices in CDC and DOH guidance for IHEs, and make available a copy of the plan at each location on campus;
- Implement a policy and procedure requiring all fully vaccinated students who participate in or attend IHE courses, operations, or other activities in person at IHE locations to provide documentary proof of full vaccination. The IHE must obtain or observe documentary proof of full vaccination, such as a CDC vaccination card, documentation of vaccination from a health care provider, or a state immunization information system record, or obtain a hard copy or electronically signed self-attestation from the student. Any student self-attestation must include the following information:
  - The dates when each dose of the COVID-19 vaccine was administered to the student;

5

**ER0577**

(245 of 247), Page 245 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 245 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4182    Page 155
of 157

- o Language stating that the student is attesting to the truthfulness of their self-attestation and will be subject to disciplinary action if their self-attestation is determined to be untruthful in violation of the IHE's code of conduct or equivalent; and
- o Language stating that the IHE and state and local public health officials may require further verification of the student's vaccination status, including viewing the student's CDC vaccination card, state immunization information system record, or other documentation;
- The IHE must presume all persons on campus are unvaccinated until proof of vaccination is provided.
- Enforce compliance with the Secretary of Health's face covering order and L&I's requirements inside IHE facilities;
- To the extent permitted by law, require all students, regardless of vaccination status, to wear face coverings when meeting with a faculty member for office hours or similar purposes, if requested by the faculty member;
- Maintain minimum physical distancing, whenever possible, of three feet between all non-household members indoors on campus, including students, faculty, staff, volunteers, contractors, and visitors, and where physical distancing cannot be maintained, implement administrative or engineering controls to minimize exposure;
- Implement and maintain hand washing policies to ensure frequent and adequate hand washing and maintain adequate supplies;
- Implement and maintain adequate sanitization protocols consistent with CDC's *Cleaning and Disinfecting Your Facility* guidance and *Guidance for Institutions of Higher Education (IHEs)* and the U.S. Environmental Protection Agency's list of disinfectants for COVID-19;
- Implement and maintain a self-certification COVID-19 screening program for students and personnel consistent with DOH's *Guidance for Daily COVID-19 Symptom Screening of Staff and Guests*;
- Develop response protocols for students, personnel, and visitors reporting symptoms and/or confirmed to have COVID-19;
- If students or personnel are experiencing any known COVID-19 symptoms, are confirmed to have COVID-19, or have been exposed to a confirmed case of COVID-19, require them to follow the direction of the local health jurisdiction and, to the extent not inconsistent with that direction, DOH's *Evaluation and Management of Persons with New Unexplained Symptoms of COVID-19*, *What to do if you are potentially exposed to someone with COVID-19*, and *What to do if you have confirmed or suspected COVID-19* and CDC's *What to Do If You Are Sick* guidance;
- Make diligent efforts to monitor and enforce compliance with the requirements of this proclamation by students and personnel within the institution's disciplinary authority and procedures and any other applicable authority;
- Develop a plan with the relevant local health jurisdiction to address the isolation and quarantine needs of any personnel and students who have confirmed or suspected COVID-19 or exposure to an individual confirmed to have COVID-19 and are unable to isolate or quarantine in their usual place of residence; and
- Assess recognized hazards, including COVID-19, as part of the ongoing requirement to provide a safe and healthy workplace and, where appropriate, take additional steps to protect unvaccinated employees. Appropriate steps could include but are not limited to maximizing

6

**ER0578**

(246 of 247), Page 246 of 247 Case: 25-761, 06/12/2025, DktEntry: 26.4, Page 246 of 247
Case 2:22-cv-00319-TOR    ECF No. 106    filed 10/14/24    PageID.4183    Page 156
of 157

fresh air and providing a mask that is more protective than a cloth face covering. These should be considered as part of the IHE's comprehensive infection control plan.

**Student Worker and Personnel Support**
- Provide student workers and personnel with PPE such as gloves, goggles, face shields, and/or masks as appropriate or required for student workers/personnel not working alone (e.g. any public-facing job and/or those whose responsibility includes operating within physical distancing limits), and shut down or suspend any activity if PPE cannot be provided;
- Comply and require compliance with L&I requirements for face coverings and the Secretary of Health's face covering order as applicable to the workplace except where this order is more stringent;
- Comply with all applicable laws providing protections for high risk workers, including, but not limited to, the Health Emergency Labor Standards Act; and
- Educate students and personnel on symptom detection, sources of high risk to COVID-19, prevention measures, and leave benefits/policies.

**Visitor Expectations**
- Post visible entry point signage for students, personnel, and visitors describing shared on-campus responsibilities and requirements, including those regarding proper hygiene and sanitization, physical distancing and face coverings, staying home if feeling sick, information on how and when to report concerns, and other information as appropriate or required.

**Food Services**
- Implement floor markings to promote physical distancing;
- Post signs to remind patrons of physical distancing and face covering requirements and to use hand sanitizer;
- Complete routine sanitization of high-touch surfaces and shared resources (e.g., door handles, points of sales); and
- Enforce compliance with the Secretary of Health's face covering order and L&I's requirements inside IHE food service facilities

**FURTHERMORE**, if a conflict exists between this proclamation (20-12.5) and proclamation 21-14.1 et seq., the provisions of proclamation 21-14.1 et seq., shall control.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak.

7

**ER0579**

Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

This Proclamation, and the prohibitions and orders contained herein are effective immediately and will remain in effect until rescinded or otherwise amended. Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

Signed and sealed with the official seal of the state of Washington on this 27th day of August, A.D., Two Thousand and Twenty-One at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

'

BY THE GOVERNOR:

_____/s/_____

Secretary of State

8

**ER0580**