No. 25-761

# In the United States Court of Appeals for the Ninth Circuit

NICHOLAS ROLOVICH,
Plaintiff-Appellant,

v.

WASHINGTON STATE UNIVERSITY, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Washington
Honorable Thomas O. Rice
(2:22-cv-319-TOR)

## EXCERPTS OF RECORD
## VOLUME 5 OF 8

ERIC N. KNIFFIN
KNIFFIN LAW, PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903

ERIC J. SEESE
FROST BROWN TODD LLP
1801 California St., Ste. 2700
Denver, CO 80202

JOSEPH C. DAVIS
  *Counsel of Record*
LUKE W. GOODRICH
ANGELA WU HOWARD
REED M. BARTLEY
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*jdavis@becketfund.org*

*Counsel for Plaintiff-Appellant*

1    ROBERT W. FERGUSON
     Attorney General

2

3    SPENCER W. COATES, WSBA #49683
     Assistant Attorney General
     800 Fifth Avenue, Suite 2000

4    Seattle, WA 98104-3188
     (206) 464-7744

5

6    ZACHARY J. PEKELIS, WSBA #44557
     Special Assistant Attorney General
     PACIFICA LAW GROUP LLP

7    1191 2nd Avenue, Suite 2000
     Seattle, WA 98101-3404

8    (206) 245-1700

9

10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

11

| | |
|---|---|
| NICHOLAS ROLOVICH, | NO. 2:22-cv-00319-TOR |
|           Plaintiff, | DECLARATION OF PATRICK CHUN IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |
|    v. | |
| WASHINGTON STATE UNIVERSITY, | |
|           Defendant. | |

18   I, PATRICK CHUN, declare as follows:

19      1.     I am over the age of eighteen, competent to testify, and make this

20 declaration based on my personal knowledge.

21      2.     I was the Director of Athletics at Washington State University

22 (WSU or the University) from January 2018 until March 2024.

23

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

1

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0790

3.     I graduated from Ohio State University (Ohio State) in 1997 with a bachelor's degree in journalism. I received a master's degree in Sports Leadership from Duquesne University in 2008.

4.     I began my career in the Athletics Department at Ohio State and worked there from 1997 until 2012. I worked in media relations, revenue generation, development, and fundraising for the Ohio State Athletics Department before serving as the Executive Associate Athletics Director, which was a leadership role just under the Athletics Director.

5.     In July 2012, I joined Florida Atlantic University as the Athletics Director, working in this role until February 2018.

6.     In February 2018, I was hired as the Athletics Director at WSU and worked in that role until March 2024, when I became the Athletics Director at the University of Washington.

7.     I previously served as the President of the National Association of Collegiate Directors of Athletics and on the NCAA Division I Council. I also co-founded the Asian American & Pacific Islander Athletics Alliance.

## Nick Rolovich's Hiring as Head Football Coach at WSU

8.     As at most Division I universities, at WSU the head football coach role is an integral part of the culture and business of the University. The coach is often the face of the University and represents it as a public figure both in athletics and non-athletics environments. Therefore, hiring the right person to take on the head football coach position following coach Mike Leach's departure was extremely important to the Athletics Department and the University.

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

2

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

9.     I led the process to search for, interview, and hire the head football coach that would replace Leach at WSU and I was responsible for making the ultimate decision on whom to hire.

10.     Nick Rolovich, then the University of Hawaii's head coach, was one of the top candidates for the position. My initial impression was that Rolovich was very personable and charismatic and was a quintessential "players' coach" who worked closely with his players and staff to build strong relationships. Like Leach, Rolovich was an offensive-minded coach, having previously served as an offensive coordinator and been a quarterback as a player.

11.     Rolovich was officially announced as the WSU head football coach on January 14, 2020. As I stated in the announcement of Rolovich's hiring, I believed he was "a genuine person, a program builder, an innovator and the exact fit to lead Cougar Football."[1]

## **Key Duties of a Head Football Coach**

12.     The role of head football coach is challenging and multidimensional and includes responsibilities that extend beyond the football field.

13.     A head football coach is entrusted with the holistic development of his student-athletes—academically, athletically, and socially. A head football coach at the college level uses sports to complement what is taught in the

---

[1] WSU Insider, *WSU hires Nick Rolovich as head football coach*, Jan. 15, 2020, https://news.wsu.edu/news/2020/01/15/wsu-hires-nick-rolovich-head-football-coach/.

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

3

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    academic classroom. Great head football coaches see the potential in a young

2    person and help put that same person on a pathway to personal growth.

3        14.    A head football coach must invest time in building relationships

4    with each and every member of the team and coaching staff. WSU would

5    typically have between 110 and 120 student-athletes as members of the football

6    team. It is imperative for the head coach to have a personal relationship and

7    connection with each member of the team. This is done through a long process

8    of multiple interactions, both individually and in group settings. A personal

9    relationship with a head coach is critical part of the student-athlete experience.

10        15.    The head football coach must lead the football team, develop

11    strategy, and improve performance through practices and strategy meetings,

12    which require the coach to engage in close contact both on and off the field with

13    players, other coaches, and program personnel. During practices, the head

14    football coach must work closely with players and other coaches to organize,

15    direct, explain, and demonstrate how he wants the players to execute plays and

16    fundamentals of the game. The head coach must also closely evaluate players and

17    coaches to ensure that they are implementing his instruction and guidance.

18        16.    Beyond the practice field, the head coach meets with players and

19    other coaches and personnel often, both individually and in groups, to review and

20    evaluate game film, discuss game plans and strategy, and prepare the team for

21    upcoming games.

22        17.    In order to continually develop the football program, the head coach

23    serves as the lead recruiter for the football team and must be actively involved in

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

4

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    recruiting new players, which requires the coach to travel to meet with

2    prospective players in their homes and at high schools and to host prospective

3    players and their families on campus when they visit the university. Recruiting is

4    a critical part of any Division I football program, and it is the head coach's

5    responsibility to oversee and lead recruiting. As Nick Saban—one of the most

6    successful college football coaches of all time—once said, "Everything we do is

7    about recruiting. Everything we do."[2]

8    18.    The head football coach is required to travel often with the team to

9    attend practices, games, and other events. This travel may be by charter bus, car,

10    or plane.

11    19.    For example, during the 2021 season, the WSU football team

12    traveled to Salt Lake City, UT; Tempe, AZ; Eugene, OR; Berkeley, CA; and

13    Seattle, WA for its away games. The team also traveled to El Paso, TX, for the

14    Sun Bowl on December 31, 2021. This consisted of over 7,000 miles of travel for

15    one season. Other seasons required cross-country travel to participate in games

16    on the East Coast.

17    20.    When traveling to other schools for games, the head coach often

18    interacts closely with players, coaches, and staff to prepare for games with

19    meetings, meals, and informal discussions. The head coach also interacts with

20    players, coaches, and other personnel from opposing schools before, during, and

21    after games.

22    ───────────────

23    [2] John Talty, *The Leadership Secrets of Nick Saban* 19 (2022).

DECLARATION OF PATRICK CHUN    5
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    21.    The head football coach also meets often with Athletics Department

2    personnel, including the Athletics Director, academic support staff, the sports

3    information team, recruiting team, and marketing team to coordinate

4    development of the football program and address program needs.

5    22.    The head football coach is required to represent the university by

6    attending and participating in conference and National Collegiate Athletic

7    Association (NCAA) meetings and media events, which often occur in person.

8    The coach is also required to attend various media events coordinated by the

9    university, including in-person interviews and appearances to promote the

10    university and the football program.

11    23.    The head football coach plays an important role in fundraising for

12    the Athletics Department and the university and is often required to attend in-

13    person donor events to interact with potential donors. Often, the head football

14    coach will be expected to make remarks and "work the room" to chat with donors,

15    answer their questions, or pose for photos. Head football coaches routinely

16    participate in dozens of donor events each year. These events are critical because

17    the Athletics Department depends significantly on donor contributions to sustain

18    its programs. To engage in successful donor cultivation, the head football coach

19    must build meaningful relationships with donors and supporters. This can only

20    be accomplished through consistent personal interactions over the course of

21    years.

22

23

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

6

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

24.     Additionally, the head football coach often meets with members of the community to cultivate support for the football program and for the university.

### The COVID-19 Pandemic at WSU

25.     Due to the emergence of the COVID-19 pandemic, by March 2020, WSU moved all academic classes to distance learning and non-essential employees to remote work to try to limit the spread of COVID-19 throughout the community.

26.     At first, WSU limited fan attendance at athletics events, but then canceled all sporting events and activities entirely. As a result of these cancellations, the Athletics Department lost significant revenue that it would have realized from ticket sales, parking and concessions, merchandise sales, and participation at tournaments.

27.     Rolovich and I both attended the last men's basketball game of the season before the season was cancelled, which was part of the Pac-12 Conference tournament and occurred in Las Vegas on March 11, 2020. During this trip, as news about the COVID-19 pandemic was circulating, Rolovich made comments to me indicating that he did not believe that the COVID-19 pandemic was a genuine public health emergency. Instead, Rolovich stated that he believed the pandemic was related to a child sex-trafficking conspiracy involving Oprah Winfrey, the actor Tom Hanks, and other influential people, whom Rolovich stated would all soon be arrested. He seemed excited at this prospect because he thought it would validate his suspicions about COVID-19. I remember being

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

7

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

extremely confused to hear Rolovich's comments about this, as it was the first time I had ever heard him talk in this way or about such far-fetched plots. At the time, I was completely unaware of QAnon or any other conspiracy theories related to the COVID-19 pandemic.

28.    Over the next year or so, Rolovich continued to openly discuss such conspiracy theories with me and other Athletics Department staff, including suggesting that there were "sex tunnels" under Disneyland, that sex traffickers were utilizing Wal-Mart and Wayfair to traffic children, and that "the grid" would be imminently compromised. It is my understanding that Rolovich even went so far as to coordinate with football staff to prepare for an imminent shutdown of the grid that he believed would occur, but that never happened.

29.    During this time, Rolovich never mentioned his religious beliefs to me or that he was a member of or attended any church. Nor do I recall ever seeing Rolovich at mass when we both lived in Pullman. (I am a lifelong Catholic and attend mass regularly throughout the year.)

30.    By September 2020, the WSU Athletics Department had sustained significant financial losses. In order to mitigate the ongoing losses, we implemented furloughs and salary reductions across the WSU Athletics Department. Both Rolovich and I, in addition to other head coaches of other sports, took voluntary salary reductions to help further mitigate the financial losses to the Athletics Department and university.

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

8

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## **The 2020 Football Season**

31.     The 2020 football season was shortened due to the pandemic, with only seven games scheduled for each Pac-12 team. Fans were not permitted to attend any games in the Pac-12. WSU only participated in four games that season, however, due to game cancellations resulting from COVID-19 outbreaks.

32.     In November 2020, there was a COVID-19 outbreak throughout the WSU football team that resulted in the cancellation of the team's game against Stanford University (scheduled for November 20, 2020) and WSU's highly anticipated Apple Cup game against rival the University of Washington (scheduled for November 27, 2020). As I stated at the time, the "Apple Cup is one of the most sacred rivalries in all of sports and one of the most meaningful days of the year for all Washingtonians."[3] These cancellations caused further reductions in revenue for the WSU Athletics Department and the football program. Fortunately, in 2020, Pac-12 rules did not yet require teams to forfeit any football games cancelled due to COVID-19 outbreaks.

33.     During this time, I felt that Rolovich was not taking seriously the danger posed by COVID-19 and the policies and rules that were implemented to prevent transmission, such as masking, testing, and social distancing. In my view, Rolovich did not consistently enforce these policies among his coaches or his

_____

[3] Pacific-12 Conference, *Pac-12 statement on Washington at Washington State football game*, https://pac-12.com/news/2020/11/22/boeing-apple-cup-update (Nov. 22, 2020).

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

9

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

players. Rather, Rolovich undermined such policies by questioning the science behind them. For example, Rolovich expressed to me his belief that nasal swab antigen tests would yield false positives if you swabbed too many times. Rolovich often did not comply with masking and social distancing requirements and was photographed at events without his mask on, which set a bad example for the football program and the community and made it more difficult to enforce these policies. I believe that Rolovich's recalcitrance and noncompliance served as a bad example for his players, leading many of them to similarly question the benefits of such protective measures and to disregard them, potentially contributing to the outbreaks I've described.

34.    WSU football only played four games during the 2020 season because of cancellations related to the COVID-19 pandemic, finishing the season with one win and three losses. Despite this disappointing season, I continued to support Rolovich and believed he was the right person to lead the football program through these difficult times.

## **COVID-19 Vaccines**

35.    COVID-19 vaccines eventually became widely available to the public in March and April of 2021. Rolovich expressed to me his fears that the COVID-19 vaccines were unsafe and were developed not to help defend against COVID-19 but for nefarious purposes. In the first conversation I ever had with Rolovich about vaccines, he was very emotional and asked whether I was worried about my daughters having kids someday if they took the vaccine. Rolovich told me that he believed taking the COVID-19 vaccines would negatively impact his

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

10

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    mortality and stated that he "needed to be alive for his children." Rolovich also

2    stated to me that he believed the COVID-19 vaccines would endanger his

3    daughter's fertility.

4        36.    Shortly after the vaccines became available, because Rolovich

5    expressed concerns about the safety and effectiveness of the COVID-19 vaccines,

6    I arranged for him to meet one-on-one with Dr. Guy Palmer, a WSU professor

7    and world-renowned expert on infectious diseases who was leading WSU's

8    response to the COVID-19 pandemic.

9        37.    On April 30, 2021, the Athletics Department held a meeting for

10   athletics coaches and staff to meet with Dr. Palmer to discuss the COVID-19

11   vaccines.

12       38.    David Fox, then the director of football operations, asked several

13   questions of Dr. Palmer regarding what he believed to be the potential adverse

14   health effects of the COVID-19 vaccines. Fox's pontificating questions and

15   aggressive tone were, in my opinion, extremely confrontational and rude to

16   Dr. Palmer, one of Washington State's foremost scientific authorities on

17   infectious diseases.

18       39.    On May 21, 2021, Governor Inslee issued a proclamation providing

19   that fully vaccinated people no longer had to wear a face covering or socially

20   distance in most public settings. WSU adopted similar policies a few days later.

21       40.    In addition, the NCAA announced that, starting June 1, 2021, in-

22   person recruiting could resume after having been prohibited for more than a year

23   due to COVID-19. This meant that football coaches were again permitted to

DECLARATION OF PATRICK CHUN    11
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(13 of 299), Page 13 of 299   Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 13 of 299
Case 2:22-cv-00319-TOR   ECF No. 97   filed 10/14/24   PageID.1685   Page 12
of 130

1   conduct in-person recruiting visits with prospective players. However, WSU still

2   had quarantine requirements in place for unvaccinated people who returned to

3   campus after traveling out of the county, which meant that Rolovich would have

4   to quarantine for five days whenever he traveled to recruit and would be unable

5   to participate in football practices, meetings, and other football activities during

6   that quarantine. Attached as **Exhibit A** is a true and correct copy of the WSU

7   Athletics COVID-19 Guidelines detailing the quarantine requirements.

8         41.   With in-person recruiting set to resume on June 1, 2021, I met with

9   Rolovich on May 24, 2021. I told him I was concerned for his well-being based

10   on the conspiracy theories he had repeatedly promoted. During this meeting,

11   Rolovich again told me that he was afraid to get the COVID-19 vaccine because

12   he believed it was not approved by the FDA and he had doubts about the origins

13   of COVID-19. Rolovich did not mention religion to me during this meeting.

14         42.   At our meeting on May 24, 2021, I also informed Rolovich that,

15   consistent with public health guidance and WSU policies, unvaccinated Athletics

16   Department personnel who leave Whitman County for recruiting would have to

17   quarantine for five days upon their return to campus. Attached as **Exhibit B** is a

18   true and correct copy of an email I sent to WSU coaches and staff on May 29,

19   2021, describing that same policy.

20         43.   On May 27, 2021, I again met with Rolovich to discuss the COVID-

21   19 pandemic and vaccination. During this meeting, I again expressed my

22   concerns about Rolovich's mental health and tried to advise him to seek

23   counseling because I was worried about him. Rolovich again expressed

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

12

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(14 of 299), Page 14 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 14 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1686    Page 13
of 130

1  objections to the COVID-19 vaccines based on his belief that they were not safe,

2  but did not mention religion or any religious objections to vaccination. I

3  explained my concerns that him not being vaccinated would affect his ability to

4  effectively coach and lead the football team.

5      44.    Despite his objections, throughout the summer of 2021, I continued

6  to hope that Rolovich would come around and would ultimately decide to be

7  vaccinated to protect himself and the WSU community.

8  **Pac-12 Media Day and Reaction**

9      45.    Each year, every NCAA athletics conference holds a football media

10  day before the start of the season for teams to discuss the upcoming season and

11  promote their football programs. The conference media day is a significant event

12  and is attended by coaches and player representatives from each of the teams in

13  the conference. In 2021, the Pac-12 football media day was scheduled to take

14  place in Los Angeles on July 27.

15      46.    On June 10, 2021, the Pac-12 determined that all media day

16  attendees would be required to be vaccinated against COVID-19. Later that day,

17  I met with Rolovich to notify him of the vaccination requirement. I hoped that

18  the requirement might motivate Rolovich to get vaccinated. As the University of

19  Hawaii's head football coach, Rolovich was known for his colorful approach to

20  the Mountain West conference's media days in Las Vegas, bringing oddball

21  guests such as Elvis and Britney Spears impersonators and tarot card readers.

22  Unfortunately, Rolovich continued to object to vaccination, so we had to plan for

23

DECLARATION OF PATRICK CHUN          13
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    how to approach his decision, knowing that it would now almost certainly

2    become public.

3        47.    On July 19, 2021, I met with Rolovich, Associate Athletic Director

4    for Athletic Communications Bill Stevens, and others to discuss the Pac-12

5    football media day and communications regarding Rolovich's decision not to

6    attend in person. We all agreed, including Rolovich, that his absence from media

7    day would generate significant public curiosity and, to avoid having the WSU

8    players in attendance face media questions about it, that it would be best for

9    Rolovich to put out a statement explaining the reason for his attending media day

10   via Zoom.

11       48.    When I was in Los Angeles for the Pac-12 football media day,

12   Rolovich sent me a text saying "I need two weeks." Attached as **Exhibit C** is a

13   true and correct copy of that text message. On a follow-up call with me later that

14   day, Rolovich said something along the lines of "give me two weeks and I'll have

15   this solved," referring to the vaccination controversy. Rolovich also indicated

16   that he was pursuing documentation establishing a medical basis for him not to

17   be vaccinated, but he did not provide any details. Later, when I followed up to

18   see if anything had come of it, Rolovich said that he'd had someone look at his

19   heart but there was nothing there. Again, Rolovich did not express any religious

20   objection to the COVID-19 vaccine during these conversations.

21       49.    On July 21, 2021, Rolovich released a public statement via his

22   personal Twitter (now X) account stating that he was not vaccinated against

23

DECLARATION OF PATRICK CHUN          14
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(16 of 299), Page 16 of 299   Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 16 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1688    Page 15
of 130

1  COVID-19 and would not be attending the Pac-12 football media day in person.

2  Attached as **Exhibit D** is a true and correct copy of Rolovich's tweet.

3      50.    This announcement caused a lot of negative media attention. The

4  Athletics Department and I received numerous calls and messages from the WSU

5  community and donors who were angry about Rolovich's refusal to be

6  vaccinated, including many who threatened to withhold donations.

7      51.    Attached as **Exhibit E** is a true and correct copy of an article

8  published on July 22, 2021 on the SB Nation Cougcenter website titled "Nick

9  Rolovich's anti-vax stance is an embarrassment to WSU."

10      52.    Attached as **Exhibit F** is a true and correct copy of an article

11  published on July 23, 2021 on the 247Sports website titled "Commentary: Only

12  one logical outcome to RoloGate so let's get on with it."

13      53.    Attached as **Exhibits G, H, I, J,** and **K** are true and correct copies

14  of emails I received from WSU fans, donors, and alumni expressing

15  disappointment and anger about Rolovich's refusal to be vaccinated.

16      54.    Maintaining positive relationships with donors is critical to the

17  ongoing success of any athletics department, so I was concerned about the

18  negative response resulting from Rolovich's Pac-12 football media day

19  announcement. WSU worked with a crisis management firm, Paradigm Four, to

20  manage the fallout and response to the announcement.

21      55.    On the day of the Pac-12 football media day event, Rolovich was

22  the only participant out of thirty-six football coaches and athletes to participate

23  remotely; all other coaches and players attended the event in person.

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

15

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

56.    On or about July 18, 2021, it came to my attention that Rolovich had been photographed at a Spokane Shock game (an indoor football team) while not wearing a mask, including one of him blowing into a vuvuzela. These photographs were later shared on Twitter. Attached as **Exhibits L** and **M** are true and correct copies of two such tweets.

57.    On July 29, 2021, I sent Rolovich a letter reiterating the legal requirements for individuals in Washington who remained unvaccinated, detailing WSU's expectations of him as head football coach, and reminding him of his contractual obligations. Attached as **Exhibit N** is a true and correct copy of this letter.

58.    It is my understanding that Rolovich's refusal to be vaccinated against COVID-19 strongly influenced other football coaches on his staff at WSU. In particular, I understand that he told the football coaching staff that it was not their job to enforce masking with the football team and that he told some members of the team that "administration is working against us." I believe that Rolovich's vaccine opinions influenced his players and, as of August 2021, of the ten conference teams reporting vaccination rates for their football teams, WSU had the lowest rate of vaccination. Attached as **Exhibit O** is a true and correct copy of an article describing the vaccination rates of Pac-12 football teams.

**The Governor's Proclamation and Rolovich's Response**

59.    On August 9, 2021, Governor Inslee issued an emergency proclamation requiring healthcare workers and most state employees to be

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

16

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1   vaccinated against COVID-19 as a condition of employment. Accommodations

2   could only be granted for medical reasons or sincerely held religious objections

3   to the COVID-19 vaccines. In the immediate aftermath of that proclamation, it

4   was widely anticipated that Governor Inslee would soon expand the vaccine

5   mandate to apply to educational workers. As a result, WSU employees would be

6   prohibited from working beyond October 18, 2021, unless they were vaccinated

7   against COVID-19 or received an approved accommodation.

8       60.   On August 16, 2021, Deputy Athletics Director Bryan Blair and I

9   met with Rolovich. Blair and I shared that we expected the Governor to extend

10   the vaccine mandate to educational workers, including WSU employees. We

11   advised Rolovich of his options and explained that, based on the Proclamation,

12   his employment would be terminated if he did not receive the COVID-19 vaccine

13   or an approved accommodation by the October 18 deadline. During this meeting,

14   Rolovich did not state that he had any religious objection to the COVID-19

15   vaccine or that he would seek an accommodation.

16       61.   On August 19, 2021, Blair and I met with Rolovich again to discuss

17   the vaccine requirement. During this meeting, Rolovich stated that he intended

18   to request a religious accommodation. I was surprised that Rolovich was planning

19   to seek a religious accommodation. Although I had heard Rolovich many times

20   express his concerns with the safety or efficacy of the vaccines—as well as his

21   beliefs of some sort of nefarious government plot to use the vaccines to harm

22   people—this was the first time I had heard Rolovich suggest he had any religious

23   objection to the vaccines. Even in this meeting, Rolovich did not say anything

DECLARATION OF PATRICK CHUN       17
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1   about his religious beliefs or explain how they conflicted with the COVID-19

2   vaccines in any way. (Nor did he at any point ever explain such a conflict to me

3   or otherwise elaborate on what his vaccine-related religious beliefs might be.)

4       62.   On August 20, 2021, Governor Inslee officially extended the

5   vaccination requirement to educational workers. Shortly after, WSU announced

6   procedures for evaluating accommodation requests that required employees to

7   submit accommodation requests by October 4. Under WSU's procedures, it was

8   the Athletics Department's responsibility to determine whether coaches and other

9   Athletics Department employees could be reasonably accommodated without

10   imposing an undue hardship on the Department and WSU.

11   **Challenges of Having an Unvaccinated Head Football Coach**

12       63.   By late September 2021, even before COVID-19 vaccination

13   became a legal condition of employment at WSU, Rolovich's unvaccinated status

14   posed various logistical burdens on WSU due to the COVID-19 protocols set by

15   the University, the NCAA, the Pac-12, and the State of Washington.

16       64.   For example, Rolovich was unable to travel to meet with potential

17   recruits in their homes, which was the main way that coaches met with and

18   recruited new players. Based on my understanding from the Pac-12 football

19   media day, all other head football coaches in the conference were vaccinated

20   against COVID-19 so were able to recruit through in-person home visits.

21   Rolovich, however, did not make any in-person recruiting home visits in 2021

22   and I was not aware that he had any plans to do so during 2021 because of the

23   limits in place based on his vaccination status.

DECLARATION OF PATRICK CHUN       18       PACIFICA LAW GROUP LLP
IN SUPPORT OF DEF.'S CROSS-MSJ               1191 SECOND AVENUE
NO. 2:22-cv-00319-TOR                       SUITE 2000
                                      SEATTLE, WASHINGTON 98101-3404
                                      TELEPHONE: (206) 245-1700
                                      FACSIMILE: (206) 245-1750

(20 of 299), Page 20 of 299   Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 20 of 299
Case 2:22-cv-00319-TOR   ECF No. 97   filed 10/14/24   PageID.1692   Page 19
of 130

65.     Specifically, Pac-12 Conference and WSU policies would have required Rolovich to quarantine for 3 to 5 days upon his return to Pullman from any recruiting trips, which would have interfered with his ability to work with his players and coaches for long periods of time during an important part of the season when training, practicing, and meetings are all essential. WSU had already received a low ranking for recruiting compared to other Pac-12 conference schools in 2020 and we were concerned that multiple years of poor recruiting would damage the future of the program. Attached hereto as **Exhibit P** is a true and correct copy of a news story ranking WSU's 2020 recruiting class tenth out of twelve teams.

66.     I was also concerned about Rolovich's ability to effectively coach and develop his team due to his vaccination status. Because he was unvaccinated and therefore required to abide by social distancing restrictions in the summer and fall of 2021, Rolovich was unable to attend individual position meetings or to engage one-on-one with players or other coaches to provide instruction and guidance without risking exposing players and coaches to COVID-19, which are central aspects of the coach's role. As a result of the restrictions on Rolovich's participation, other than practices and games Rolovich appeared to spend most of his time in his home office. Needless to say, this was not a viable path forward: the head coaching job cannot be performed effectively via Zoom.

67.     Rules and regulations from the NCAA, Pac-12 conference, WSU, and the state required Rolovich to keep a mask covering his nose and mouth while coaching games and practices. However, on multiple occasions, Rolovich was

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

19

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(21 of 299), Page 21 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 21 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1693    Page 20
of 130

1    seen and photographed blatantly disregarding these rules, removing his mask to

2    speak closely with players and coaches during games. This was caught on

3    national game broadcasts and the Athletics Department received numerous calls

4    from people who were angry that Rolovich continually flouted COVID-19 rules

5    meant to keep the team and community safe, damaging WSU's reputation.

6        68.    Based on all of the information available to me, it was clear that

7    having an unvaccinated head coach would be a danger to the health of our

8    student-athletes, staff within the Athletics Department, and wider WSU

9    community. With the prior outbreaks within the football team, we saw how

10    quickly one positive COVID-19 case could spread. All football coaches—

11    assistants included—must routinely engage in many close interactions with

12    people in the course of their job duties. The head football coach, in particular,

13    must have close contacts with countless individuals in order to effectively do his

14    job, which would have put many others at risk. Data and guidance from

15    recognized public health authorities, including the CDC, the Washington

16    Department of Health, and WSU's own public health experts like Dr. Palmer,

17    clearly demonstrated that the risk of contracting or spreading COVID-19 was far

18    greater at that time among unvaccinated individuals, compared with vaccinated

19    individuals. I relied on such public health information in making my decision on

20    Rolovich's and the other football coaches' accommodation requests.

21        69.    Public health guidance at the time also showed that unvaccinated

22    individuals were much more likely to develop severe disease from and be

23    hospitalized or die due to COVID-19. If the head football coach were to contract

DECLARATION OF PATRICK CHUN              20
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    COVID-19 and become seriously ill such that he would have to be away from the

2    team for an extended period of time, this would be extremely detrimental to the

3    football team's success, which relies on the direction and leadership of the head

4    coach. I hired Rolovich because I believed him to be the best available candidate

5    to take on the extremely demanding and intricate job of leading WSU's football

6    team. The head football coach is not a fungible, easily replaceable position. The

7    risk of our head football coach contracting COVID-19, potentially developing

8    severe disease, and needing to take significant time away from work, would have

9    been seriously harmful to the football team.

10    70.    Because he was unvaccinated, Rolovich was not able to attend many

11    in-person promotional and fundraising events that are important for fostering

12    support for the football program from donors, students, fans, and the community.

13    These included regular Friday donor lunches that Rolovich was unable to

14    participate in. Rolovich also could not participate in-person at the WSU Football

15    Coach's Show at Zeppoz Restaurant and Bowling Alley in Pullman, which

16    included live interviews and was critical for donor and fan engagement with the

17    football program. Rolovich's absence caused a significant loss of engagement

18    and attendance at the Coach's Show. We even had to entirely cancel certain donor

19    events because Rolovich was unable to attend in person. For example, Rolovich

20    cancelled an in-person event in July of 2021 with a couple that had previously

21    donated around $7 million.

22    71.    As head football coach, Rolovich was the highest paid and most

23    visible employee at WSU, so his attendance at promotional events, other WSU

DECLARATION OF PATRICK CHUN                21
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(23 of 299), Page 23 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 23 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1695    Page 22
of 130

1    sporting events, and media appearances in order to engage the public and wider

2    WSU community was integral to building support for the Athletics Department

3    and the University. I became very concerned about the impact to the university

4    of Rolovich's inability to participate in these key events.

5                    **Rolovich's Accommodation Request**

6        72.    My understanding of WSU's process for reviewing employee

7    requests for religious accommodations with respect to the COVID-19 vaccination

8    requirement is that a committee within WSU's Human Resources Services (HRS)

9    first reviewed all requests anonymously to determine whether the employee

10   described a religious belief precluding vaccination against COVID-19.

11       73.    On October 6, 2021, I received an email from HRS stating that the

12   committee had made an initial determination that "the information submitted

13   through written and/or oral communications . . . support[ed Rolovich's]

14   accommodation request based on a sincerely held religious belief." The email

15   also stated that HRS was considering approving Rolovich's accommodation

16   request subject to certain masking, testing, and social distancing requirements.

17   The email asked the Athletics Department to review Rolovich's "position

18   description or essential job functions" to determine whether he could perform the

19   essential functions of his job while complying with the recommendations for

20   mitigating the spread of COVID-19. The email also asked us to let HRS know if

21   we had "no concern with this request" or if we had "any questions or would like

22   to meet to discuss further." Based on this email and my discussions with

23   Associate Athletic Director Anne McCoy, I understood that we should provide

DECLARATION OF PATRICK CHUN          22
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1　any additional information relevant to Rolovich's accommodation request,

2　including whether he had a sincerely held religious belief that prevented him from

3　being vaccinated against COVID-19. A true and correct copy of this email is

4　attached hereto as **Exhibit Q**.

5　　74.　Seven other football coaches or staff also requested religious

6　accommodations. The HRS notifications we received regarding the other

7　employees' accommodation requests were substantively identical, although some

8　were sent earlier and others were sent a few days later than the one regarding

9　Rolovich. In consultation with HRS, Blair, McCoy, and the WSU Division of the

10　Washington Attorney General's Office, I spent significant time over the course

11　of over a week deliberating whether WSU could reasonably accommodate

12　Rolovich and the other football staff who requested accommodations.

13　　75.　On October 13, 2021, the Athletics Department responded to HRS

14　with two memoranda addressing Rolovich's exemption and accommodation

15　requests.

16　　76.　The first memorandum explained that, upon review and

17　consideration of Rolovich's essential job functions as head football coach, the

18　Athletics Department determined that it could not accommodate Rolovich

19　without undue hardship. A true and correct copy of this memorandum is attached

20　hereto as **Exhibit R**.

21　　77.　The second memorandum questioned the sincerity of Rolovich's

22　stated religious objections to the COVID-19 vaccines. The memo pointed to the

23　various conversations Rolovich had had with me and other Athletics Department

DECLARATION OF PATRICK CHUN　　　　23
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    staff over many months in which he objected to the vaccines based on medical

2    concerns, skepticism about the origins and severity of COVID-19, conspiracy

3    theories, and criticism about the government. A true and correct copy of this

4    memorandum is attached hereto as **Exhibit S**.

5          78.    On October 14, 2021, I received a memo from Shawn Ringo and

6    Jason Sampson, the Directors of WSU Environmental Health and Safety

7    (EH&S). This memo provided an assessment of Rolovich's role based on the

8    information available to EH&S and a list of the minimum accommodations that

9    should be considered for Rolovich to remain unvaccinated in his role as head

10    football coach. A true and correct copy of this memo is attached hereto as **Exhibit**

11    **T**.

12          79.    I further evaluated Rolovich's accommodation request in light of

13    EH&S's memo, consulting with McCoy, Blair, and AGO. EH&S's analysis only

14    reinforced my initial assessment—described in the first October 13 memo to

15    HRS—that Rolovich could not be accommodated without unduly jeopardizing

16    the health of others because of his unvaccinated status.

17          80.    I agreed with the EH&S memo's notation of the multiple in-person

18    contacts required in Rolovich's role. These necessary contacts heightened the risk

19    that Rolovich and the other unvaccinated football personnel would transmit

20    COVID-19 to others if they remained in their positions unvaccinated. I can

21    conceive of no more urgent duty in the fall of 2021 than protecting our student-

22    athletes and Athletics Department employees from the deadly virus again

23    spreading exponentially and causing hospitals to fill up. Allowing unvaccinated

DECLARATION OF PATRICK CHUN        24
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1  football coaches to continue in their positions at that alarming moment in the

2  pandemic would have been a dereliction of that duty.

3      81.    I recognize that some student-athletes themselves declined to be

4  vaccinated against COVID-19 (including members of the football team), despite

5  the fact that WSU had adopted a vaccination requirement for students. But as

6  Athletics Director, I had no involvement in or authority over the student

7  vaccination requirement or the process by which they applied for and received

8  religious or medical exemptions. In contrast, I did have the responsibility to

9  determine whether unvaccinated Athletics Department *employees* could safely

10  perform their job duties without endangering the health and safety of others with

11  whom they interacted—including student-athletes, whether vaccinated or

12  unvaccinated. The fact that some football players were also unvaccinated only

13  heightened the importance that football coaches and staff were vaccinated so as

14  to reduce the overall risk of transmission within the entire football community,

15  which was certainly higher among unvaccinated persons.

16      82.    Given the constant close interactions between coaches and players

17  on the football team, the risk that an infected coach would spread the virus to a

18  player was highly material. And an outbreak among the football team during the

19  2021 season would have had catastrophic consequences. Unlike in 2020, Pac-12

20  conference rules in 2021 provided that games missed due to COVID-19

21  outbreaks would result in forfeitures for the responsible team if, in the

22  Commissioner's sole discretion, he determined that the institution was primarily

23  at fault. I have no doubt that then-Commissioner George Kliavkoff would have

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

25

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

found WSU at fault in the event of any such outbreak, particularly because of the team's low vaccination rate compared with other Pac-12 football teams. As one contemporary news account noted, the "vaccination status of players and coaches, as well as the team's ability to follow social distancing and masking protocols, will almost certainly be what drives the determination about whether a game will be forfeited by a team should they be unable to field a full team due to positive Covid tests or contact tracing."[4] Obviously, the forfeiture of even a single football game would have been a tremendous detriment to WSU, not only in terms of the massive revenue lost from foregone ticket sales and other sources, but in the impact on its win-loss record, bowl opportunities, and team and University morale.

83.    The EH&S memo also emphasized the importance of vigilant masking and social distancing if Rolovich were to continue in his position unvaccinated. For example, the memo stated that unvaccinated persons "shall wear a cloth facial covering or higher level of protective mask" in any WSU locations where other people may be present. Any interactions within six feet for longer than 10 minutes would have required an N95 respirator or equivalent. Given the necessity of extended, close contacts with others that the head coaching position entails, as well as Rolovich's frequent disregard for the masking

---

[4] Andy Patton, *Pac-12 releases statement on 2021-2022 forfeiture policy*, USA Today, Aug. 12, 2021, https://duckswire.usatoday.com/2021/08/12/pac-12-releases-statement-on-2021-2022-forfeiture-policy.

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

26

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(28 of 299), Page 28 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 28 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1700    Page 27
of 130

1  requirements he was already supposed to be following, I feared that any

2  accommodation requiring Rolovich to mask and social distance while coaching

3  games or practices (or performing other duties) would not be strictly followed.

4      84.    The EH&S memo also recommended that, if unvaccinated coaches

5  were to receive accommodations, it "may require rental of additional buses,

6  booking additional flights, or other options where the unvaccinated individual

7  travels in [a] separate vehicle." I understand that Dr. Palmer has stated in his

8  expert report in this case that he also would have recommended making separate

9  travel arrangements for any unvaccinated coaches, had the Athletics Department

10  decided to accommodate them. When traveling to away games, the WSU football

11  team used charter buses and charter flights. Chartering separate buses and flights

12  for not only Rolovich but all the unvaccinated coaches would thus have

13  significantly increased the costs of away games.

14      85.    After reviewing the recommendations from EH&S, on October 18,

15  2021, I sent a letter on behalf of the Athletics Department to HRS and EH&S

16  explaining that, based on the expectations and contractual requirements of a head

17  football coach, we did not believe Rolovich could be accommodated without

18  causing undue hardship to the Athletics Department and the University. A true

19  and correct copy of this letter is attached hereto as **Exhibit U**.

20      86.    On October 17, 2021, I sent an email to Rolovich summarizing the

21  next steps regarding his accommodation request. A true and correct copy of this

22  email is attached hereto as **Exhibit V**.

23

DECLARATION OF PATRICK CHUN      27
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    87.    On October 18, 2021, HRS emailed Rolovich notifying him that his

2    religious accommodation request was not approved. I then met with Rolovich

3    that afternoon and provided him with a letter stating WSU's intent to terminate

4    him for just cause based on his inability to meet his contractual obligations. A

5    true and correct copy of the termination letter is attached hereto as **Exhibit W**.

6    88.    Up until the deadline for Rolovich to comply with the Proclamation,

7    I hoped that he would change his mind and decide to get vaccinated. If he had

8    changed his mind and decided to get vaccinated on October 18, I would have

9    been happy to keep him on as the head football coach. Indeed, had Rolovich

10   changed his mind and decided to get vaccinated on October 19—or at any time

11   thereafter while the decision was in my hands—I would have rescinded the notice

12   of intent to terminate and found a way to keep Rolovich as head football coach.

13   89.    Pursuant to the terms of his employment contract, Rolovich had a

14   right to appeal the termination decision. Through his counsel, Rolovich submitted

15   an appeal to me detailing his position and reasons why he believed he should be

16   accommodated. After reviewing this letter and the applicable facts surrounding

17   Rolovich's exemption and accommodation request, I sent a letter to Rolovich on

18   November 12, 2021, denying his appeal. A true and correct copy of my letter

19   denying Rolovich's appeal is attached hereto as **Exhibit X**.

20   90.    Ultimately, Rolovich was terminated from his position as head

21   football coach because it would have caused WSU an undue hardship to

22   accommodate Rolovich by allowing him to remain unvaccinated in his role,

23   which required frequent, close personal interaction with numerous individuals

DECLARATION OF PATRICK CHUN           28
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1  within and beyond the WSU community. Additionally, based on the numerous

2  instances in which Rolovich told me and others that he objected to the COVID-

3  19 vaccines based on his concerns about potential side effects, conspiracy

4  theories about the origin of the pandemic and vaccines, his own supposed

5  scientific research, and other reasoning that had no relation to religious beliefs, I

6  did not believe that Rolovich had sincerely held religious objections to the

7  COVID-19 vaccines.

8        I declare under penalty of perjury that the foregoing is true and correct.

9        EXECUTED this  9  day of October, 2024, at  Seattle  , Washington.

10

11        s/

12        PATRICK CHUN

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF PATRICK CHUN          29
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**CERTIFICATE OF SERVICE**

On the 14th day of October, 2024, I caused to be served, via ECF

electronic service, a true copy of the foregoing document upon all counsel

registered for e-service.

DATED this 14th day of October, 2024.

_____

Erica Knerr, Legal Assistant

DECLARATION OF PATRICK CHUN
IN SUPPORT OF DEF.'S CROSS-MSJ
NO. 2:22-cv-00319-TOR

30

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# EXHIBIT A

(33 of 299), Page 33 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 33 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1705    Page 32
of 130



### WSU COVID-19 Guidelines – Fall 2021
*Written in accordance with Washington State University, NCAA, and Pac-12 Guidelines*

The following guidelines will be modified according to the level of community (Whitman County) spread as well as guidance from the Pac-12, NCAA, WSU, and state/local health officials. Please be aware that the NCAA, Pac-12 Conference and WSU Athletics may put forth additional guidelines and restrictions for undeclared and unvaccinated individuals. This is a working document subject to change frequently. As previously shared, COVID-19 vaccination remains the most effective means to achieve control of the pandemic.

The tables below provide health and safety considerations for Tier 1 individuals for fall training and competition. Tier 1 individuals are those with the highest exposure (e.g., student-athletes, coaches, athletic trainers, physical therapists, medical staff, equipment staff and officials).

Individuals are considered "fully vaccinated" beginning 14 days after their final dose of a Pfizer, Moderna, Johnson & Johnson or AstraZeneca vaccination. The equivalent of "fully vaccinated" is documented COVID-19 infection in the past 90 days (or more than 90 days if allowed by local authorities). The CDC recommends that individuals who have a prior history of COVID-19 infection should become vaccinated, and it is recommended to wait until 90 days after the infection before commencing the vaccination process.

Because vaccination against COVID-19 can result in personal health benefits for vaccinated individuals and because the risks of adverse outcome with COVID-19 infection are higher in unvaccinated individuals, considerations for these two categories of individuals are different.

Updated 8.31.2021

**ER0821**

WSU_00033866

(34 of 299), Page 34 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 34 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1706    Page 33
of 130



**WASHINGTON STATE**

**A T H L E T I C S**

| | | UNDECLARED OR NON-VACCINATED | FULLY VACCINATED OR DOCUMENTED INFECTION IN THE PAST 90 DAYS |
|---|---|---|---|
| **QUARANTINE & ISOLATION** | Close Contacts | Quarantine for the locally **REQUIRED** time following high-risk COVID-19 exposure.<br><br>NOTE: Student-athletes, employees, or staff who are not experiencing or exhibiting symptoms of COVID-19, should quarantine upon arrival to campus until receiving the results of a negative PCR test performed 3 – 5 days after completed travel and may also consider obtaining a negative PCR test within 72 hours prior to travel back to campus. | Masking in public indoor settings for 14 days with discontinuation if a COVID-19 test is performed three to five days after exposure and is negative, or if assessment does not reveal a high risk.  HOWEVER, WE ARE CURRENTLY IN AN INDOOR MASK MANDATE SO MASKS WILL BE **REQUIRED** AT ALL TIMES. |
| | Positive Test Protocol | Athletic Medicine to alert positive student-athlete, coach, or staff member.<br><br>Isolation for 10 days and at least 24 hours have passed since resolution of fever without the use of fever-reducing medications and other symptoms have improved. | |
| **ATHLETIC ACTIVITIES** | Training and Competition | Masking **REQUIRED** for student-athletes when training (weights), but not practice or competition.<br><br>Masking REQUIRED for coaches/staff during training, practice, and competition. | NO RESTRICTIONS |
| | Team Travel | Masking during travel **REQUIRED.**<br>Travel party will be provided a Kn95 mask to be used while travelling (e.g., bus/car, airplane, etc.) | |

Updated 8.31.2021

**ER0822**

WSU_00033867



|  | Other Athletic Activities (e.g., team meetings) | Universal masking and social distancing **REQUIRED.** | Masking in indoor settings **REQUIRED.** |
|---|---|---|---|
| **NON-ATHLETIC ACTIVITIES** | Nonathletic Activities | Universal masking and social distancing **STRONGLY ENCOURAGED.** | Masking in public indoor settings **REQUIRED.** |
|  | In-Person Interactions | Universal masking and social distancing **STRONGLY ENCOURAGED.** | Masking in indoor settings **REQUIRED.** |

Updated 8.31.2021

**ER0823**

WSU_00033868



**WASHINGTON STATE**
A T H L E T I C S

<u>Declared Vaccinated (to COVID-19) Student-Athletes, Coaches and Staff:</u>

- ➢ Testing:
  - ○ No surveillance testing required (except as indicated in the Sustained Increased Transmission section in Pac-12 Conference Guidelines: positive cases in 5% or more of a team cohort within a two-week period).
  - ○ Note: Subject to change
- ➢ Masking:
  - ○ Student-Athletes: Masks are currently <u>**REQUIRED**</u> in public indoor settings, including but not limited to travel, team meetings, in addition to Gray W, weight room, and locker room.
    - ▪ Note: Masks are <u>**NOT REQUIRED for student-athletes**</u> during weights, practice and competition.
  - ○ Coaches and Staff: Masks are currently <u>**REQUIRED**</u> indoors except when alone in your office.
  - ○ Note: Neck gaiters are <u>**NOT ACCEPTABLE**</u> forms of face coverings.
  - ➢ No social distancing.
- ➢ Quarantine:
  - ○ No quarantine required after exposure to an individual with COVID-19 necessary for asymptomatic individuals.
  - ○ Note: Mask must be worn after exposure to an individual with COVID-19 for 5 days for those who are declared vaccinated as long as they remain asymptomatic.
- ➢ Contact Tracing:
  - ○ No contact tracing.
- ➢ Travel (Domestic):
  - ○ Any individual who returns from travel should continue to monitor symptoms for 14 days post-travel. Any symptoms including but not limited to the following should prompt a COVID-19 test or evaluation by a physician.
    - ▪ Fever or chills
    - ▪ Cough
    - ▪ Shortness of breath or difficulty breathing
    - ▪ Fatigue
    - ▪ Muscle or body aches
    - ▪ Headache
    - ▪ New loss of taste or smell
    - ▪ Sore throat
    - ▪ Congestion or runny nose
    - ▪ Nausea or vomiting
    - ▪ Diarrhea
- ➢ Travel (International):
  - ○ Fully Vaccinated:
    - ▪ Get tested 3-5 days after travel. If you test positive, isolate yourself to protect others. If negative, then you can return after 5 days of quarantine.

Updated 8.31.2021

**ER0824**

WSU_00033869

(37 of 299), Page 37 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 37 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1709    Page 36
of 130



**Undeclared or Unvaccinated** (to COVID-19) **Student-Athletes, Coaches and Staff:**
- Testing:
  - Weekly PCR Test:
    - Student-Athletes, Coaches, and Staff who test positive will be informed by their athletic trainer and should alert their respective coach or sport administrator immediately.
  - Daily Antigen Testing + PCRs **REQUIRED** for Team Travel and Activities:
    - No antigen on day off and/or day of PCR testing.
    - Student-Athletes, Coaches, and Staff who test positive will be informed by their athletic trainer and should alert their respective coach or supervisor immediately.
  - Note: Times for testing **ARE NOT** subject to change. If you miss your testing window you will be ineligible for the day's activities until you are able to complete your testing protocol.
  - Testing and quarantine upon return to campus following non-team related travel is **REQUIRED**.
  - Quarantine for the locally **REQUIRED** period of time following high-risk COVID-19 exposure.
- Masking:
  - Student-Athletes: Masks are **REQUIRED** in public indoor settings, including but not limited to travel, team meetings, in addition to Gray W, weight room, and locker room.
    - Note: Masks are **NOT REQUIRED for student-athletes** during practice and competition but are **REQUIRED** for weights.
  - Coaches and Staff: Masks are **REQUIRED** indoors, and outside during practice and games, as well as other circumstances where physical distancing is not possible/reasonable.
  - Note: Per WSU guidelines: Individuals inside a WSU facility must wear a face mask if they are not fully vaccinated or if they decline to provide proof of vaccination.
  - Note: Neck gaiters are **NOT ACCEPTABLE** forms of face coverings.
    - Social Distancing:
      - Social distance measures will be **REQUIRED** indoors including, but not limited to, the Gray W, weight room, meeting rooms, locker room, etc.
- Contact Tracing:
  - Subject to contact tracing if found to be in close contact with a person who tests positive for COVID-19 or is symptomatic.
  - Athletic Medicine will oversee all contact tracing on positive cases for student-athletes, coaches, and staff.
  - Close contact tracing will occur if an undeclared or unvaccinated student-athlete, coach, or staff member has direct contact with a positive individual with mitigation factors considered such as masking and social distancing. Undeclared or unvaccinated student-athletes, coaches, and staff would need to have less than 6 feet contact for 15 minutes or more to be placed in quarantine. Cases will be evaluated by Athletic Medicine.
  - Failure to properly disclose information will be reported to your coaching staff and sport administrator.
- Quarantine
  - **NEED TO COMPLETE THIS**
- Travel (Domestic):
  - If traveling domestically (*outside of WA, OR, and ID*) for but not limited to work-related, recruiting, or camp activities, upon your return non-vaccinated student-athletes, coaches, and staff must quarantine.
    - Student-athletes, coaches, and staff leaving campus for **5 days or less**:
      - PCR on day 3 of self-isolation (travel back to Pullman is day 0)
      - Clearance with negative PCR test (turnaround time as of May 2021 is 1-3 days).
    - Student-athletes, coaches, and staff leaving campus for <u>6 or more days</u>:
    - PCR on day 5 of self-isolation (travel back to Pullman is day 0)
    - Clearance with negative PCR test.

Updated 8.31.2021

**ER0825**

(38 of 299), Page 38 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 38 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1710    Page 37
of 130

**WASHINGTON STATE**

A T H L E T I C S

- Second PCR to be completed between days 7-10.  Test results must be negative.
- Travel (International):
  - Undeclared and Unvaccinated:
    - Tested 3-5 days after travel and stay home and self-quarantine for a full 7 days after travel. Even if you test negative, stay home and self-quarantine for full 7 days.
  - If you do not get tested, stay home and self-quarantine for 10 days after travel.

**Disciplinary Measures for WSU Athletics Employees, Student-Workers, and Temporary Employees:**
- Undeclared or Unvaccinated coaches and staff will be dismissed for the day if found to be in non-compliance of COVID-19 state, university, and department health and safety guidelines.
- Multiple offenses will result in formal corrective actions being documented in your personnel file, both internally and with Washington State University, in addition to being dismissed from campus if found to be in non-compliance of COVID-19 state, university, and department health and safety guidelines for each offense.

**Miscellaneous for Declared/Vaccinated & Undeclared/Unvaccinated:**
- Gray W Meals for ALL vaccinated, undeclared, and unvaccinated (high risk activity) – to-go or distanced until further notice.
  - Masks are <u>REQUIRED</u> for all student-athletes, coaches, and staff in the Gray W, unless you are actively eating.
  - Coach/Staff meals are <u>TO-GO ONLY</u>, to free up limited, distanced Gray W seating for student-athletes.
- Weight Room – Everyone will be <u>REQUIRED</u> to mask while in the weight room.  This will be subject to change depending on the community transmission levels.
- Indoor Meetings – Everyone will be <u>REQUIRED</u> to mask while in the meeting spaces.  This will be subject to change depending on the community transmission levels.
- Locker Room – Student-Athletes will be limited to less than 15 minutes, no loitering.
  - Coaches and staff will be responsible for ensuring health and safety guidelines are being followed. If violations occur, coaches and staff may be subject to disciplinary action.
  - Note: Masks are <u>REQUIRED</u> in the locker room. Neck gaiters <u>WILL NOT</u> be acceptable.

**Deadlines to Comply with WSU Vaccine Requirements:**
Student Information
- All WSU students must be compliant with the vaccine requirement by Friday, September 10, 2021.
  - The process for compliance is available on the <u>Cougar Health Services website</u>.
  - As of Monday, August 23, 2021, students can no longer file personal exemptions.
  - Any students not in compliance by September 10 will face academic holds.
- Any WSU student with a personal exemption currently on file must provide proof of full vaccination, or request a religious or medical exemption **by Monday, October 18, 2021.**
- The updated process to request a medical or religious exemption will be released next week.
- Student employees will have to provide proof of vaccination to **both** Cougar Health Services and Workday. WSU is working on a streamlined process for student employee exemptions and will provide more information next week.
- To find a vaccine provider near you, please visit <u>vaccines.gov</u>. Pullman students can schedule their vaccine on campus, through <u>Cougar Health Services</u>.
Employee Information
- All WSU employees must be fully vaccinated or have obtained a medical or religious exemption **by Monday, October 18, 2021.**
  - Per Proclamation 20-14.1, personal exemptions are not permitted for employees.

Updated 8.31.2021

**ER0826**

WSU_00033871



➢ The vaccination verification requirement will supersede the previous vaccination declaration process in Workday. More information on the verification process will be released next week.

➢ To find a vaccine provider near you, please visit vaccines.gov.

Updated 8.31.2021

ER0827

WSU_00033872

# EXHIBIT B

**From:** "Chun, Patrick" <patrick.chun@wsu.edu>
**To:** "athleticdirector@wsu.edu" <athleticdirector@wsu.edu>
**Subject:** Recruiting Reminders
**Date:** Sat, 29 May 2021 01:02:31 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png

---

WSU Coaches and Staff:

Finally, the recruiting dead period will end!! Another step to normalcy in college athletics.

As we approach June 1, we have a few important reminders as you start travelling, recruiting, and hosting official visits again.

- Any WSU employees, students, or visitors, who wish to no longer wear facial coverings or socially distance while on a WSU work location, or quarantine upon return from travel must be fully vaccinated and declare their fully vaccinated status through Workday. Information regarding the processes for employee vaccination declaration and supervisory responsibilities are found here.

  Supervisors will have access, through Workday, to the names of employees who have declared full vaccination status only. If vaccinated, log-in to your Workday account to provide those details.

- If an employee declines to provide declaration of their fully vaccinated status through Workday, they must continue to wear a facial covering and maintain distance. Employees who are fully vaccinated and have declared that status through Workday, but still wish to wear a facial covering are welcome to do so.

  Additionally, if traveling domestically for but not limited to work-related, recruiting, or camp activities, upon your return non-vaccinated employees must also quarantine for five days. It is highly recommended that prior to resuming day to day responsibilities that non-vaccinated employees undergo a PCR test on day five. Employees are responsible for doing so through your personal healthcare provider.

  Test results are to be provided to your respective sport athletic trainer prior to return to work similar to what is required of our student-athletes. For those who do not provide a confirmation of negative test on day five, it is recommended that you quarantine for 14 days before resuming on-campus work activities. International travel has different requirements. Please contact your sport administrator for additional information related to international travel.

If you have not yet made an appointment to receive your vaccine and are interested in doing so, please visit the COVID-19 Vaccine Locator website to set up an appointment.

All employees should continue to monitor symptoms for 14 days post-travel. Again, we look forward to the return of recruiting and on-campus visits and must do our part to keep our student-athletes and community as safe as possible.

Please contact your sport administrator if you have any specific questions or need additional information.

Go Cougs!

-Pat

**PAT CHUN**
DIRECTOR OF ATHLETICS

ER0829

WSU_00033426

Washington State University Athletics
Bohler Athletic Complex, 110
Office: 509-335-0200
patrick.chun@wsu.edu
www.wsucougars.com

TOGETHER, WE WILL ACHIEVE WHAT WAS ONCE DEFINED AS IMPOSSIBLE

WSU_00033427

# EXHIBIT C

Nick Rolovich

NR

I need two weeks

10:28:05 pm

Pat Chun

I'll call you after this meeting. Did they have you zoom or conference call in for this?

10:32:18 pm

PC

Nick Rolovich

Audio is on my phone

10:55:11 pm

 1  Pat Chun

Video is zoom

10:56:04 pm

NR

Pat Chun

Sent an attachment
Filename: 64903494768__C6322535-5F4C-4251-AB08-3F1468885577.HEIC
URL: https://p25-content.icloud.com/M393325707508A79CE94338C838142171B95258A6E2A32283C4C
C4FAC51DCC84D.C01USN00
Path: ~/Library/SMS/Attachments/78/08/4B454E95-01CE-406D-840A-
CF019332ECC0/64903494768__C6322535-5F4C-4251-AB08-3F1468885577.HEIC
Size: 1 MB
Type: image/heic

11:29:48 pm

PC

Nick Rolovich

NR

What a world

11:47:14 pm

**ER0832**

WSU_00028610

(45 of 299), Page 45 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 45 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1717    Page 44
of 130

# EXHIBIT D

(46 of 299), Page 46 of 299   Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 46 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1718    Page 45
of 130



**Nick Rolovich** ✔
6,667 Tweets

## LOADING...

**Nick Rolovich** ✔
@NickRolovich

I heard the bird is the word again.  Former Head Football Coach.  Big fan of Fabian Perez, Iron Chef Sakai, and Truth.  Always listen to rattlesnakes.

📍 Parts unknown   📅 Joined April 2012

**1,048** Following   **38.2K** Followers

Not followed by anyone you're following

| Tweets | Tweets & replies | Media | Likes |

✦ **Popular Tweet**

**Nick Rolovich** ✔ @NickRolovich · Oct 28
Let's see what @elonmusk bird is all about.  A year full of mentions to go thru, and some of you for sure need your mouth washed out with soap.  Apologies currently being accepted for a limited time only.

💬 104        ↻ 70        ♡ 538        ⬆

**Nick Rolovich** ✔ @NickRolovich · 17h
non parlo molto bene l'italiano

CuogsBeCuoging @CuogsC · 19h

**ER0834**

WSU_00037236



Replying to @NickRolovich and @elonmusk

yahoo.com/news/italy-rei...

Hey Nick, wanna be an OC soon?

💬          ⇄          ♡ 8          ⬆

⇄ **Nick Rolovich Retweeted**

**Bo Jackson** ✓ @BoJackson · Oct 28

Replying to @NBCSports and @SNFonNBC

0:27  649.2K views

From **This Day In Sports Clips**

💬 72          ⇄ 154          ♡ 1,521          ⬆

# Who to follow

**UnlimitEd**
@Unlimitourkids

**Follow**

WSU_00037237



We are working to provide more educational options that promote the unique gifts of every kid in Washington. Join the movement

↗ Promoted

**Craig K. Stutzmann**
@CoachStutzmann

**Follow**

Offensive Coordinator, Play Caller & QB Coach Utah Tech University, Washington State University, Hawai'i, E&H | Spread & Shred | #QBHui |

**Brian Smith**
@coachsmitttty

**Follow**

Passing Game Coordinator | Running Backs Coach | Ohio University

Show more

⇄ Nick Rolovich Retweeted

**Gina Carano** 🕯️ ✔️  @ginacarano · Oct 28

Thinking of the people who were fired, endlessly shamed, bullied, those who lost everything & forced to uproot there lives simply for having good questions & concerns. I feel you, I know you need healing. I really hope you are finding some in your new lives My heart to yours. ❤️

💬 1,323        ⇄ 6,576        ♡ 56K        ⬆️

⇄ Nick Rolovich Retweeted

**Aarik** @AarikLong · Oct 28

WSU_00037238

(49 of 299), Page 49 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 49 of 299
Case 2:22-cv-00319-TOR ECF No. 97 filed 10/14/24 PageID.1721 Page 48
of 130



**GIF** **ALT**

**Nick Rolovich** ✔ @NickRolovich · Oct 28

Let's see what @elonmusk bird is all about. A year full of
mentions to go thru, and some of you for sure need your
mouth washed out with soap. Apologies currently being
accepted for a limited time only.

💬          ⟲ 2          ♡ 16          ⬆

**Nick Rolovich** ✔ @NickRolovich · Oct 28          ···

Apology accepted.

> **Reno** @HapaPake808 · Oct 28
> Replying to @NickRolovich and @elonmusk
> I'm sorry for yelling horrible names about you at the TV when
> you didn't cover the spread. That was a lot of money I lost.

💬 2          ⟲ 2          ♡ 50          ⬆

**Nick Rolovich** ✔ @NickRolovich · Oct 28          ···

$929 a week, but only but only for 6 months.

> **Nick Beatty** @nickbeatty72 · Oct 28
> Replying to @NickRolovich and @elonmusk
> What does unemployment pay these days?

💬 7          ⟲ 4          ♡ 76          ⬆

**Nick Rolovich** ✔ @NickRolovich · Jul 21, 2021          ···

**ER0837**

WSU_00037239



"As the Pac-12 Conference has required that all in-person participants at next week's Pac-12 Football Media Day be fully vaccinated, I will participate remotely and look forward to talking about our football team and the incredible young men in our program. I have elected not to receive a COVID-19 vaccine for reasons which will remain private. While I have made my own decision, I respect that every individual—including our coaches, staff and student-athletes—can make his or her own decision regarding the COVID-19 vaccine. I will not comment further on my decision."

**NICK ROLOVICH**
WSU HEAD FOOTBALL COACH

💬 1,595    🔁 1,294    ♡ 2,048    ⬆

**Nick Rolovich** ✔ @NickRolovich · Jul 18, 2021
Tell Kirby let's line it up.

You're unable to view this Tweet because this account owner limits who can view their Tweets. Learn more

💬 62    🔁 13    ♡ 336    ⬆

**Nick Rolovich** ✔ @NickRolovich · Jul 18, 2021
Please spread the word and any help is appreciated.
twitter.com/MamaCracraft/s...

This Tweet was deleted by the Tweet author. Learn more

💬 23    🔁 65    ♡ 196    ⬆

**Nick Rolovich** ✔ @NickRolovich · Jul 17, 2021
Free tacos! Thanks to @SpokaneShock for a great atmosphere.
Nice job by the lefty center @JRHensley17

**ER0838**
WSU_00037240





WSU_00037241

# EXHIBIT E

(53 of 299), Page 53 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 53 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1725    Page 52
of 130



CougCenter, a Washington State Cougars community

**WSU COUGARS FOOTBALL**

# Nick Rolovich's anti-vax stance is an embarrassment to WSU

*Spare me your "individualism" arguments. We're in a damn pandemic.*

By Jeff Nusser | @PodvsEveryone | Jul 22, 2021, 3:05pm PDT



▶ 🔊                                      -0:08



Last night, **Washington State Cougars** football coach Nick Rolovich **announced he had elected not to receive one of the three free, safe, and effective COVID**

**vaccines** approved for use in the United States, and as such would not be allowed to attend **Pac-12** media day next week with the other 35 participants.

What a colossal embarrassment. And I'm a lot more angry than I imagined I'd be when this news — which I expected to surface in one way or another — finally came out.

I find Rolovich's stance to be morally bankrupt in the midst of a pandemic, but the arrogance that oozes out of his statement is what is particularly infuriating. When you're the face of the most prominent part of a large public university — particularly one that is a research institution that features both a medical college and pharmacy college — you don't get to skate on this one and preemptively shut down questions about your decision.

And let's be clear: Unless Rolovich has a preexisting medical condition that has led his doctor to recommend against receiving the vaccine, *there isn't a valid reason for his decision.* Every reason to not get the vaccine can be either quickly debunked as false or easily exposed for its flawed logic. Those who have reservations should talk to their doctors, who will answer all their questions and make the best choice clear to that individual, which in the overwhelming majority of cases will be "get the vaccine."

Maybe Rolovich has a preexisting condition. Wouldn't that be an easy thing for him to clear up? Through his words and actions*, Rolovich has allowed us to independently reach the only logical conclusion: That he's an anti-science clown whose head is filled with the brain worms served up by the anti-vax crowd.

*Not sure if he's cleaned this up, but when he was hired, he had a bunch of Q-adjacent folks in the list of accounts he followed on Twitter ...*

Nick Rolovich is not a child. He's a grown-ass man who, like many football coaches, has built his brand on accountability and developing his players into worldly men/husbands/fathers/etc. I think it sends a pretty clear message about

leadership when you duck accountability by saying you're doing this for "reasons which will remain private" and "I will not comment further on my decision."

You know who *will* be forced to face questions about vaccinations and Rolovich? Max Borghi and Jahad Woods, who will be in Los Angeles without their coach. What a profile in courage this guy is!

Personally, I hope every reporter during every interview asks Rolovich about his vaccination status for the entire duration of the season.

Furthermore, this decision is likely to have repercussions beyond just him — this is not merely an individual decision, no matter what anyone says. Beyond that fact that he remains, himself, a potential vector for COVID, consider this: If a player's coach clearly doesn't support vaccination, is that player more or less likely to get vaccinated?

Every person who gets the vaccine puts us one step closer to ending a pandemic that has killed nearly 3.5 million people worldwide and more than 600,000 people in the United States. Heck, **Nick Saban recorded a PSA in Alabama to encourage all citizens to get vaccinated**. A coach is in a unique position to lead, and while I doubt Rolovich's vaccination status leads a player to a concrete decision, it's impossible to make a case that it *helps* with vaccination efforts.

At this point, this is a **pandemic of the unvaccinated**, which includes people who don't have a choice about the vaccine — people like like my youngest child, who is not yet eligible. And although the risk to him is small, there's still a risk, **and that risk is rising with the current rise in community spread**. It's a risk that could be virtually eliminated by widespread vaccination.

**Maybe Rolovich could turn down OANN long enough to read this.**

> Dr. Brytney Cobia said Monday that all but one of her COVID patients in Alabama did not receive the vaccine. The vaccinated patient, she said, just needed a little

ER0843

oxygen and is expected to fully recover. Some of the others are dying.

> "I'm admitting young healthy people to the hospital with very serious COVID infections," wrote Cobia, a hospitalist at Grandview Medical Center in Birmingham, in an emotional **Facebook post Sunday**. "One of the last things they do before they're intubated is beg me for the vaccine. I hold their hand and tell them that I'm sorry, but it's too late."

And if all you're concerned about is the football side of this — and to be clear, that's well down the list of my personal concerns here, but it's a concern — well, not having vaccination rates as high as possible on the team and coaching staff puts the Cougars at a clear competitive disadvantage. **Intelligent coaches** know this.

At this point, do you think you can trust this guy — our unvaccinated coach potentially spraying COVID everywhere at an event where he was supposed to be masked — to adhere to the protocols necessary to make it through this season unscathed by COVID?

> .**@NickRolovich** in the stands for the **@SpokaneShock** game tonight and he is fully embracing being a fan **pic.twitter.com/aNNndVnXt6**
>
> — Brenna Greene (@BrennaGreene_) **July 18, 2021**

Rolovich has coached precisely four games since being hired a year and a half ago, winning one, and we're already going on our **second public embarrassment**.

I'm reminded that when Rolovich spoke about reinstituting Jayden de Laura following his DUI arrest, the coach used the phrase "play stupid games, win stupid prizes." I have a feeling it's not the last time we'll be using that idiom with regards to Rolovich's program.

What a long fall it's been from **here**. Sigh.

---

**What do you think?**                    ⚑    ⋮

**How closely have you been following men's college basketball news lately?** 🏀

○  Very closely

○  Somewhat closely

○  Hardly at all

○  Not at all

○  Other / Does not apply

* By clicking "NEXT" I submit my answers and consent to the use of cookies for research and advertising purposes; I have read and agree to the CivicScience Privacy Policy and Terms of Service

[ NEXT * ]

---

# EXHIBIT F



LOG IN    JOIN

JOIN  ▶  **BeaverBlitz VIP Special: 1 Month For ONLY $1**



JOIN

**JOIN TODAY! 1st month of BeaverBlitz.com for ONLY $1**

# Commentary: Only one logical outcome to RoloGate so let's get on with it

All sides need to end this now

 By **GREG WITTER**

Jul 23rd, 2021, 11:38 AM

54



WSU coach Nick Rolovich (Photo: Cougfan.com/Rod Commons)

**LET'S GET THIS** out of the way. As RoloGate enters Day Three with no white smoke leaking out of the French Administration Building, there is only one logical outcome: **Nick Rolovich** gets vaccinated and Washington State's football program — and Coug Nation generally — moves on with 2021.

The distraction is roiling the faithful, making headlines across the nation and about to subsume Max Borghi and Jahad Woods' Media Day in the sun.

This needs to end right now.

ADVERTISEMENT



Published Oct 8, 2024

Big Ten power rankings set stage for Ohio State, Oregon showdown; Michigan, USC slide after upsets

Read More

Washington State is a major research university that includes a medical school, nursing school, pharmacy school, vet school and the Paul G. Allen School for Global Health. A university with that much scientific and medical firepower — and an accompanying

BEAVERBLITZ.COM

LOG IN    JOIN

Moreover, WSU President **Kirk Schulz** has made clear for months that students, staff and faculty be vaccinated by the start of fall semester unless rare exceptions can be proven. Rolo has offered no explanation so the presumption is he just doesn't believe vaccines are safe. In other words, he's being insubordinate. He's a good man and by all accounts a good coach. This cannot and should not be a defining moment for him or WSU.



SPEAK YOUR MIND.
GET REWARDED.

SHOPPER'S voice

Coupons, samples and sp
offers tailored to yo

START SURVEY

The embarrassment to the university already is considerable. It will grow worse each passing day a resolution is not reached.

Unless we discover Rolo is of a religious persuasion heretofore unknown, he needs to meet with WSU's constellation of science and medical experts to boost his comfort level and confidence in the vaccine -- and then get the jab. Period.

That's the only outcome that works for both him, for WSU, and for athletic director Pat Chun if he wants to one day succeed mentor Gene Smith at Ohio State.

There is only one logical outcome. So let's get on with it.

*This article originates on* [Cougfan.com](Cougfan.com).

You May Like

Sponsored Links by Taboola

Fall's Hottest Barefoot Shoe: It's Leaving Neurologists Baffled

Barefoot Vitality

Seniors Can Now Fly Business Class For the Price Of Economy

Americans, you'll want to check this out ASAP

Online Shopping Tools

The best walking shoes are suitable for men to wear all day.

Made in USA

Bestbestones

Shop Now





LOG IN   JOIN

## media ahead of Nevada

Offensive Line Coach Kyle DeVan, WR Jeremiah Noga, TE Jermaine Terry and OL Van Wells met with the media Tuesday



By **JAKE HEDBERG**

23 mins

0

Oregon State escaped with a thrilling double overtime win over Colorado State last Saturday, beating the Rams 39-31. The Beavers will now pivot to Nevada, as they face the Wolf Pack in Reno this weekend. Offensive Line Coach Kyle DeVan, Wide Receiver Jeremiah Noga, Tight End Jermaine Terry and Offensive Lineman Van Wells met with the media Tuesdaymet with the media Tuesday to discuss last weeks win and preview the matchup against Nevada.

*Videos courtesy of Oregon State Athletics

**WATCH:**

ADVERTISEMENT

# EXHIBIT G

**From:** Yvette Holman <yvette.holman@yahoo.com>
**To:** "patrick.chun@wsu.edu" <patrick.chun@wsu.edu>
**Subject:** Rolovich vaccine status
**Date:** Fri, 23 Jul 2021 17:25:02 -0700
**Importance:** Normal

---

Hello Pat,

I have met you a handful of times in Pullman and at Cougars of the Desert in Palm Springs.  I don't expect you to remember me, but I feel the need to communicate my feelings about Mr. Rolovich publicly announcing his poor choice to not get a COVID-19 vaccination.

I have been a Coug fan my whole life.  I graduated from WSU's College of Pharmacy in 1990.  I work for a large hospital in Portland OR, Legacy Health.  As a healthcare provider, I am incredibly disappointed and appalled that a leader at my alma matter would embarrass our school, instead of stand up for public health measures and our healthcare providers who are fighting so hard to save those who are admitted into the hospital and not vaccinated.  Ninety-seven percent of those hospitalized with COVID-19 are unvaccinated.

As a result of Mr. Rolovich's selfish decision, we will be the only school represented at the Pac-12 media day with a remote participant.  How embarrassing.  I feel so upset about this coach that I will not be coming to Pullman for any football games this year, nor travel to our away games.

Please feel free to communicate this to Mr. Rolovich.  People like him don't care about healthcare workers and he is setting a poor example for our student athletes.

Respectfully,

Dr. Yvette Grando Holman
WSU Pharmacy Class of 1990


Sent from Mail for Windows 10

(66 of 299), Page 66 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 66 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1738    Page 65
of 130

# EXHIBIT H

**From:** Doug Burr <dlburr@yahoo.com>
**To:** "kirk.schulz@wsu.edu" <kirk.schulz@wsu.edu>, "patrick.chun@wsu.edu" <patrick.chun@wsu.edu>
**Subject:** Rolovich Going Around the Bend
**Date:** Thu, 22 Jul 2021 22:37:54 +0000 (UTC)
**Importance:** Normal

---

It is ridiculous for WSU football coach, Nick Rolovich, to be allowed to refuse to be vaccinated against Covid-19. All university administration, staff, and students should be required to be vaccinated against this virus. This is science on trial and every American institution should help with the enormous task of beating back this virus.

Please convince the coach that the purpose of a university is the promotion of a fact-based approach to life. His refusal fosters the notion that there are alternative views of reality which is dangerous beyond belief. If he refuses to vaccinate, he should be suspended.

Doug Burr
Spokane, WA

WSU_00003878

# EXHIBIT I

**From:** Diane Hamilton <diane_h1@hotmail.com>
**To:** "patrick.chun@wsu.edu" <patrick.chun@wsu.edu>
**Subject:** Coach Rolovich
**Date:** Mon, 26 Jul 2021 20:26:25 +0000
**Importance:** Normal

---

I am writing as a proud 1989 grad, season ticket holder for football, monthly donor and die hard Coug and words cannot describe how disappointed I am that coach Rolovich is refusing to be vaccinated for Covid-19.

How can he lead these young athletes and be an example to them when he won't do everything in his power to end this pandemic?  It should be required of every single person on this planet to get vaccinated and prove we each care more about others than ourselves.

Please implore him to speak to the experts to alleviate any fears or mis-information ASAP but if he won't get vaccinated then he should not have the privilege to coach at the greatest school in the world and he should be fired.

Sincerely,

Diane C. Hamilton, '89
#228854

ER0857

WSU_00004168

**From:** Scott Woodward <woodfish24@gmail.com>
**To:** "Chun, Patrick" <patrick.chun@wsu.edu>
**Cc:** "Straub, Mitchell H" <mitch.straub@wsu.edu>, "Ganders, Adam Lawrence" <aganders@wsu.edu>
**Subject:** rolovich
**Date:** Tue, 27 Jul 2021 08:35:49 -0700
**Importance:** Normal

---

7/27/2021

My record speaks for itself when it comes to the support of WSU.

- Gray W
- WSU Heritage Society
- WSU President's Associate
- WSU Advocate/Trustee
- VP of the WSU Tri-Cities Alumni Assoc.
- Member of the Bobo Brayton Endowment Fund Board of Trustees
- Alumni Coordinator for Cougar Baseball

I think that level of support grants me some space to comment on recent events involving Coach Rolovich. I will preface my comments with a huge thanks to you and your staff for the tremendous job you all have done to get WSU Athletics back on track financially and laying the foundation for the national respect of Cougar athletics. I would venture to say that in the 50+ years I have been part of the Cougar family your leadership is the best that our university has experienced.

That being said I feel Coach Rolovich's recent decision to not follow national, state, and university guidelines concerning Covid vaccination is an embarrassment to the institution breaking down the hard-earned respect we have all worked to establish at WSU. I have endured a self-inflicted cooling-off period since he first tweeted his decision. My cooling off period did not work as a matter of fact over the 7 days my temperature has increased. Daily discussions with my wife produced talking points I would like to share with you.

- Coach Rolovich has slapped our new medical school and research on diseases in the face.
- Coach Rolovich has divided the Cougar nation just when we were getting excited about returning to campus.
- No proof on this but if I was a parent of a recruit, I would be moving WSU down the list of considered schools.
- The daily regional and national media images of Coach Rolovich alongside images of our campus accompanying the ugly story of his non-vaccination stand makes me sick.
- Rolovich has created a huge distraction for the team
- The silence is deafening from the administration.

So, what about solutions? I am confident that you have been in contact with President Schulz trying to find a solution. Perhaps that accounts for the administrative radio silence since your initial responses. I keep going back to the WSU Covid vaccination policy, all students and staff must be vaccinated with exceptions for personal, religious, or health reasons. If one is to apply any of the exceptions then they must be masked and maintain social distancing. So, if Coach Rolovich has a personal reason that stands up to that protocol then he must be masked at all times and must maintain his social distance, no exceptions. If he is not willing to abide by the rules that the students and staff are required to follow then he should catch the next wave to Hawaii. If that is the case your administrative wisdom will dictate the direction of his contract. If he does abide then our university saves its $3 million investment and Rolovich continues to coach.

I have been waiting for the needle to move one way or the other on this matter. I just can't wait any longer to share my thoughts. I have confidence you and President Schulz will find a solution. No response needed just action.

Scott Woodward class of 1972

509 627 3621

WSU_00003980

(71 of 299), Page 71 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 71 of 299
Case 2:22-cv-00319-TOR ECF No. 97 filed 10/14/24 PageID.1743 Page 70
of 130

# EXHIBIT J

**From:** Scott Woodward <woodfish24@gmail.com>
**To:** "Chun, Patrick" <patrick.chun@wsu.edu>
**Cc:** "Straub, Mitchell H" <mitch.straub@wsu.edu>, "Ganders, Adam Lawrence" <aganders@wsu.edu>
**Subject:** rolovich
**Date:** Tue, 27 Jul 2021 08:35:49 -0700
**Importance:** Normal

---

7/27/2021

My record speaks for itself when it comes to the support of WSU.

- Gray W
- WSU Heritage Society
- WSU President's Associate
- WSU Advocate/Trustee
- VP of the WSU Tri-Cities Alumni Assoc.
- Member of the Bobo Brayton Endowment Fund Board of Trustees
- Alumni Coordinator for Cougar Baseball

I think that level of support grants me some space to comment on recent events involving Coach Rolovich. I will preface my comments with a huge thanks to you and your staff for the tremendous job you all have done to get WSU Athletics back on track financially and laying the foundation for the national respect of Cougar athletics. I would venture to say that in the 50+ years I have been part of the Cougar family your leadership is the best that our university has experienced.

That being said I feel Coach Rolovich's recent decision to not follow national, state, and university guidelines concerning Covid vaccination is an embarrassment to the institution breaking down the hard-earned respect we have all worked to establish at WSU. I have endured a self-inflicted cooling-off period since he first tweeted his decision. My cooling off period did not work as a matter of fact over the 7 days my temperature has increased. Daily discussions with my wife produced talking points I would like to share with you.

- Coach Rolovich has slapped our new medical school and research on diseases in the face.
- Coach Rolovich has divided the Cougar nation just when we were getting excited about returning to campus.
- No proof on this but if I was a parent of a recruit, I would be moving WSU down the list of considered schools.
- The daily regional and national media images of Coach Rolovich alongside images of our campus accompanying the ugly story of his non-vaccination stand makes me sick.
- Rolovich has created a huge distraction for the team
- The silence is deafening from the administration.

So, what about solutions? I am confident that you have been in contact with President Schulz trying to find a solution. Perhaps that accounts for the administrative radio silence since your initial responses. I keep going back to the WSU Covid vaccination policy, all students and staff must be vaccinated with exceptions for personal, religious, or health reasons. If one is to apply any of the exceptions then they must be masked and maintain social distancing. So, if Coach Rolovich has a personal reason that stands up to that protocol then he must be masked at all times and must maintain his social distance. If he is not willing to abide by the rules that the students and staff are required to follow then he should catch the next wave to Hawaii. If that is the case your administrative wisdom will dictate the direction of his contract. If he does abide then our university saves its $3 million investment and Rolovich continues to coach.

I have been waiting for the needle to move one way or the other on this matter. I just can't wait any longer to share my thoughts. I have confidence you and President Schulz will find a solution. No response needed just action.

Scott Woodward class of 1972

509 627 3621

WSU_00003980

(73 of 299), Page 73 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 73 of 299
Case 2:22-cv-00319-TOR ECF No. 97 filed 10/14/24 PageID.1745 Page 72
of 130

# EXHIBIT K

**From:** kathy kathymorrow.com <kathy@kathymorrow.com>

**To:** "kirk.schulz@wsu.edu" <kirk.schulz@wsu.edu>, "patrick.chun@wsu.edu" <patrick.chun@wsu.edu>

**Cc:** "elizabeth.chilton@wsu.edu" <elizabeth.chilton@wsu.edu>, "lisa.calvert@wsu.edu" <lisa.calvert@wsu.edu>, "christine.hoyt@wsu.edu" <christine.hoyt@wsu.edu>

**Subject:** Football coach needs to go

**Date:** Fri, 23 Jul 2021 17:09:30 +0000

**Importance:** Normal

---

I will no longer support anything that WSU does until the removal of the current football coach or he is vaccinated and states so publicly.

My three children all graduated from WSU and we have been  supporters for 20 years. That is longer true. My adult children are also embarrassed by this person.

Take a stand and get him vaccinated. He should represent the University well or not allowed on campus or to coach.

Sincerely,

Kathy Morrow

**Kathy Morrow** REALTOR, CRS, ABR, ASP, CNE, GRI, PMN, SRES, WCR

Managing Broker

RE/MAX Integrity

24401 104th Ave SE Suite #201

Kent, WA 98030

**206-295-9503**

**ER0862**

WSU_00003953

(75 of 299), Page 75 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 75 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1747    Page 74
of 130

# EXHIBIT L

(76 of 299), Page 76 of 299   Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 76 of 299
Case 2:22-cv-00319-TOR     ECF No. 97    filed 10/14/24     PageID.1748     Page 75
of 130

 **Brenna Greene** ✓
@BrennaGreene_                                                          • • •

This, uh, doesn't seem so funny now in light of today's news.

 **Brenna Greene** ✓  @BrennaGreene_ · Jul 17, 2021
.@NickRolovich in the stands for the @SpokaneShock game tonight and he is
fully embracing being a fan 😂😂



WSU_00040275



5:18 PM · Jul 21, 2021

💬 14          🔁 8          ♡ 116          🔖 2          ⬆️

10:32:09 AM 9/27/2024
https://x.com/BrennaGreene_/status/1418002567993315328

WSU_00040276

(78 of 299), Page 78 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 78 of 299
Case 2:22-cv-00319-TOR ECF No. 97 filed 10/14/24 PageID.1750 Page 77
of 130

# EXHIBIT M

(79 of 299), Page 79 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 79 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1751    Page 78
of 130

← Post

 陳威廷 **Jonathan Chen**
@jonchen50                                        ⋯

A couple of former 'Bows reunite at a @SpokaneShock game 🌈👍🌈

#BowsInThePros @JRHensley57 @NickRolovich
Photo posted to Warrior Nation FB group by @MarciHensley10





JR Hensley and Spokane Shock

8:20 AM · Jul 18, 2021

💬          ⟲ 3          ♡ 14          🔖          ⬆️

8:26:45 AM 10/8/2024
https://x.com/jonchen50/status/1416779931065872385

# EXHIBIT N

(82 of 299), Page 82 of 299   Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 82 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1754    Page 81
of 130

| | |
|---|---|
| **From:** | "Chun, Patrick" </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0B33E78FA0174977B71E6413480ADBA3-PATRICK.CHU> |
| **To:** | "Rolovich, Nicholas R" <nick.rolovich@wsu.edu> |
| **Cc:** | "Schulz, Kirk" <kirk.schulz@wsu.edu>, "Theresa L Elliot-Cheslek (telliot@wsu.edu)" <telliot@wsu.edu>, "Hess, Danielle A" <danielleh@wsu.edu> |
| **Date:** | Thu, 29 Jul 2021 00:37:27 -0000 |
| **Importance:** | Normal |
| **Attachments:** | Rolovich_7.28.21_Final_.pdf |
| **Inline-Images:** | image001.png; image002.png |

---

Nick,

Attached is a copy of the letter I shared with your today.

Please let me know if you have any questions.

-Pat



**PAT CHUN**
DIRECTOR OF ATHLETICS
Washington State University Athletics
Bohler Athletic Complex, 110
Office: 509-335-0200
patrick.chun@wsu.edu
www.wsucougars.com

*TOGETHER, WE WILL ACHIEVE WHAT WAS ONCE DEFINED AS IMPOSSIBLE*

**ER0870**

(83 of 299), Page 83 of 299   Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 83 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1755    Page 82
of 130



July 28, 2021


Nick Rolovich
Head Football Coach
Washington State University

Dear Nick:

This letter is sent to provide some clear guidelines and expectations based on your decision to not receive the COVID-19 vaccine at this time.

First, I appreciated your comments at Pac-12 Football Media Day encouraging Washington residents and WSU students to consider a COVID-19 vaccination. Our expectation for you is to continue the work of encouraging our student-athletes and staff to become vaccinated prior to the start and throughout the 2021-22 academic year. My expectation is that you will work towards an improved partnership with our WSU Athletics Administration and medical staff in delivering this messaging and that you will hold your team and staff accountable for following all applicable guidelines.

As a reminder, the Washington State Department of Health (DOH) requires unvaccinated individuals to wear a mask that covers their nose and mouth when they are indoors in a place accessible to people outside their household, with certain limited exceptions. Failure to comply with this order is a criminal misdemeanor offense that may subject an individual to fines or imprisonment. With the Washington DOH guidelines in mind, WSU has enacted policies requiring employees to declare their vaccination status. For those unvaccinated individuals, attached is a link to the masking guidelines: WSU Guidance on Face Coverings | Our COVID-19 Response | Washington State University. Please be aware the Pac-12 Conference and WSU Athletics may put forth additional guidelines and restrictions for unvaccinated individuals.

As the highest profile employee of Washington State University and one of the most highly compensated state employees in Washington, you do not have the luxury of disregarding legal requirements in a public setting. Your public behavior reflects on the University, the Athletic Department, and the Football program at all times. Further, violation of law (other than minor traffic offenses) is a breach of your employment contract, particularly when those violations endanger others and place the university and the football program in a negative light. I expect that you will adhere to federal and state directives and guidance at public and private events both on and off campus.

Washington State University | Department of Intercollegiate Athletics | Athletic Director
Bohler Athletic Complex 110, PO Box 641602, Pullman WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501

ER0871

WSU_00016349

(84 of 299), Page 84 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 84 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1756    Page 83
of 130

This letter serves as a reminder that any conduct in violation of Department of Health or other government orders or laws, or violation of Washington State University policies, may lead to discipline, up to and including termination for cause in accordance with your employment contract.

This upcoming season will present numerous challenges and opportunities. As a reminder, your contract requires you to participate in events, activities, and efforts to foster support for the football program, and your personal decision to forego a COVID-19 vaccination has already impacted your ability to do so (see Paragraph 1.2.1.2.h). As the pacing of these types of events increases and public health protocols evolve, I strongly urge you to reconsider receiving the vaccine so that you may participate fully in these events, protect our Coug community, and serve as a role model as a very public state employee and national figure. While your choice on the matter is a personal decision, protocols are expected to be followed should you remain unvaccinated. I look forward to working with you in navigating them and supporting the goals of our 2021 football team.

Sincerely,

Patrick Chun
Director of Athletics


CC: President Kirk Schulz

WSU_00016350

# EXHIBIT O

https://tucson.com/sports/pac-12-hotline/pac-12-hotline-wildcats-are-100-vaccinated-asu-wont-disclose-numbers/article_7eb1de82-0111-11ec-965d-c74107efe30e.html

EDITOR'S PICK    TOP STORY

PAC-12 HOTLINE

# Pac-12 Hotline: Wildcats are 100% vaccinated; ASU won't disclose numbers

**Jon Wilner The San Jose (Calif.) Mercury News**

Aug 19, 2021



Arizona ranks first in the Pac-12 with a 100% COVID-19 vaccination rate.

Rebecca Sasnett, Arizona Daily Star

(87 of 299), Page 87 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 87 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1759    Page 86
of 130

Jon Wilner The San Jose (Calif.) Mercury News

**T**wo weeks from the 2021 season, the majority of Pac-12 football programs are approaching a COVID vaccination rate that could limit the disruption caused by the Delta variant.

At least seven teams have reached or surpassed the 90% mark, while two more have topped 85%, according to data provided to the Hotline by the schools.

The vaccination rates for Arizona State and Cal were not made available. ASU cited university policy in declining to provide vaccination data. Coach Herm Edwards, whose program is under NCAA investigation for alleged recruiting violations during the COVID-19 shutdown, has not revealed a vaccination rate in any public comments the Hotline was able to locate.

Of the 10 schools for which data is available, Washington State has the lowest rate: The Cougars have vaccinated 80% of their players, according to a school spokesperson.

## People are also reading...

1   **Hotline Mailbag: The Pac-12 and Mountain West merger that wasn't, Gonzaga's impact and more**

2   **5 takeaways from the Arizona Wildcats' 28-22 loss to Texas Tech | Michael Lev**

3   **What does 'nearly free' mandate mean for AZ universities' tuition?**

4   **Tucson man killed in pickup truck attack was pinned against wall, court document says**

WSU coach Nick Rolovich initially declined to get vaccinated, citing reasons that will remain private. However, a vaccine mandate by Washington governor Jay Inslee has left Rolovich with no choice, and he told reporters Thursday that he planned to get vaccinated.

"For sure," he said.

Arizona announced Thursday night that the team is 100% vaccinated, posting to Twitter that "our players, our staff and all who are affiliated with our program have worked very hard to accomplish this goal." Coach Jedd Fisch announced two weeks ago that the team was at 97%.

"We take our healthy very seriously, and we are committed to a 12-game season and beyond," the UA posted. "We are also committed to staying healthy and are hopeful that campus can follow our lead."

UCLA, has a vaccination rate of 98% — a notable development because the Bruins have an earlier deadline than everyone else: Their season opener is Aug. 28, one week before the rest of the conference. Colorado is at 94.5%.

"The health and safety of our student-athletes is the number one priority of the Pac-12 and our athletic programs," Merton Hanks, the conference's head of football operations, told the Hotline via email.

"We have consistently focused on education and encouraged vaccinations. It's a great credit to our football programs, coaches and student-athletes that our football vaccination rates are very strong. Our football student-athletes continue to take the steps to reduce risk as we prepare for a full, competitive schedule in 2021."

The rates are significant from a health-and-safety standpoint, of course, but also for financial and competitive reasons.

Each game broadcast on ESPN or Fox is worth approximately $6 million for the conference; if a team is unable to play, the loss of revenue will be shared equally — about $500,000 per school. And unlike last year, when canceled games were recorded as no-contests, commissioner George Kliavkoff has the authority to declare forfeitures this fall.

Pac-12 football vaccination rates

(89 of 299), Page 89 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 89 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1761    Page 88
of 130

**Arizona:** 100% (as of Thursday night)

**UCLA:** 98%

**Washington:** above 95%

**Colorado:** 94.5%

**Oregon:** 90% to 95%

**Utah:** above 90%

**USC:** above 90%

**Oregon State:** 88%

**Stanford:** 85%

**Washington State:** 80%

**Arizona State:** not available

**Cal:** not available

Per a statement from the conference: "If an institution is unable to play a contest through its own fault, it shall forfeit such contest to its opponent. Any forfeited contest shall be regarded as a conference loss for the team making the forfeit and a conference win for its opponent.

"The Pac-12 rule provides the Commissioner with discretion to determine whether an institution is at fault or primarily at fault for an inability to play a contest based on the facts of the situation."

Put another way: If a team cannot play because of COVID and didn't take the proper precautions, then it likely will be slapped with a loss.

Ad 1 of 1 (0:07)



## Notes about the data

• The figure cited for USC was taken from public comments made recently by coach Clay Helton. According to an athletic department spokesperson, the Trojans are "100 percent compliant with the university's vaccine policy." That policy allows for exceptions for medical and religious reasons.

• Cal declined to provide team-specific vaccination data, a disappointing stance from a university that claims to value transparency and was willing to release its team-specific COVID testing data last year. Coach Justin Wilcox said recently that his program is vaccinated "almost completely." Additionally, an athletic department spokesperson said all players are "in compliance with UC Berkeley's COVID-19 vaccine requirements."

(91 of 299), Page 91 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 91 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1763    Page 90
of 130

# EXHIBIT P

(92 of 299), Page 92 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 92 of 299
Case 2:22-cv-00319-TOR     ECF No. 97     filed 10/14/24     PageID.1764     Page 91
of 130



JOIN ▶  FREE 247Sports.com Newsletter - Join Today

# 2020 Recruit Pac-12 Football Team Rankings

Last updated on 09/24/24 at 5:30 PM CST ⓘ



| Rank | | Team | Total | 5-stars | 4-stars | 3-stars | Avg | Points |
|---|---|---|---|---|---|---|---|---|
| 1 / 2 | | Oregon | 23 Commits | 3 | 10 | 9 | 90.44 | 261.30 |
| 2 / 1 | | Washington | 25 Commits | 1 | 10 | 11 | 88.44 | 256.38 |
| 3 / 3 | | Stanford | 25 Commits | 0 | 10 | 12 | 87.43 | 241.34 |
| 4 / 4 | | Arizona State | 21 Commits | 0 | 8 | 13 | 88.32 | 234.08 |
| 5 / 5 | | Utah | 22 Commits | 0 | 4 | 17 | 86.82 | 215.71 |
| 6 / 6 | | UCLA | 20 Commits | 0 | 5 | 15 | 87.27 | 211.97 |

**ER0880**

| 8 | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 / 7 |  California | 26 Commits | 0 | 1 | 25 | 86.02 | 202.34 |
| 9 / 10 | Oregon State | 20 Commits | 0 | 0 | 20 | 85.30 | 186.31 |
| 10 / 9 | Washington State | 28 Commits | 0 | 0 | 25 | 84.52 | 184.41 |
| 11 / 12 | USC | 13 Commits | 0 | 3 | 10 | 87.52 | 181.23 |
| 12 / 11 | Arizona | 24 Commits | 0 | 0 | 22 | 83.98 | 178.56 |



Your firm deserves the best DMS.

World-class security, indexed search, and built-in AI.


Check out iManage

| 5-Stars | 2+ commits | 1 commit |
| 4-Stars | 7+ commits | 3 - 6 commits |







ABOUT   CONTACT US   ADVERTISERS   HELP CENTER   CAREERS   PRIVACY POLICY   CALIFORNIA NOTICE

TERMS OF USE   SUBSCRIPTION TERMS   TOGGLE FULL/MOBILE

YOUR PRIVACY CHOICES

© 2005-2024 CBS INTERACTIVE ALL RIGHTS RESERVED. CBS Sports is a registered trademark of CBS Broadcasting Inc.

The content on this site is for entertainment purposes only and 247Sports makes no representation or warranty as to the accuracy of the information given or the outcome of any game or event.

There is no gambling offered on this site. This site contains commercial content and 247Sports may be compensated for the links provided on this site.

(96 of 299), Page 96 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 96 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1768    Page 95
of 130

# EXHIBIT Q

**From:** HRS Exemptions <hrs.exemptions@wsu.edu>
**To:** "Chun, Patrick" <patrick.chun@wsu.edu>, "McCoy, Anne R" <amccoy@wsu.edu>
**Cc:** "Wilmoth, Bonnie" <bonnie.wilmoth@wsu.edu>, "Warren, Stephanie C" <stephanie.warren@wsu.edu>, HRS Exemptions <hrs.exemptions@wsu.edu>
**Subject:** RESPONSE NEEDED | Religious Accommodation Request | Nick Rolovich
**Date:** Wed, 6 Oct 2021 21:04:42 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.jpg

---

Human Resource Services received a Religious Accommodation request regarding one of your employees:

**Employee:** Nick Rolovich
**TITLE:** Head Football Coach
**WSU ID:** 011732256
**Effective Date:** Upon Approval

Nick Rolovich has requested an accommodation from Washington State University's (WSU) COVID-19 vaccine requirement based upon a religious belief, practice, and/or observance. WSU has engaged in a good faith review of the information submitted through written and/or oral communications, which support the accommodation request based on a sincerely held religious belief.

After review, we are considering approving the employee's request subject to the following terms and conditions:

- Employee must wear a face covering that covers the employee's nose and mouth, and fits snugly a at all times unless 1) the employee is outside and can maintain 6 feet of social distance from all other individuals; 2) while working alone indoors. (note - a person is working alone if they are isolated from interactions with others and have little or no expectation of in-person interruptions (e.g. in a closed office).

- Employee must social distance from others on WSU property when possible.

- If WSU adopts a COVID-19 testing requirement for unvaccinated workforce members, employee will be required to submit to such testing as required by WSU.

- The terms and conditions are subject to change and are amended to conform to any federal, state and local public health orders or other lawful government orders, and/or WSU adoption of additional occupational health and safety interventions or countermeasures to prevent the spread of COVID-19 in the workplace.

**Next Steps -** Review Job Duties
The department is to review the employee's position description or essential job functions, to determine if the employee is able to perform essential functions of the position and meet the COVID-19 safety measures consistent with the recommendations of the state and protect the health and safety of the WSU community as part of this accommodation request.

**RESPONSE NEEDED:**
Please contact the HRS Exemptions team at hrs.exemptions@wsu.edu by the end of the day **Friday, October 8, 2021** to let us know:
1. You have no concern with this request
2. If you are **NOT** able to accommodate this request with the above recommendations
3. If you are able to accommodation the request but believe additional measures may be necessary to meet health and safety standards (e.g. relocation of office space to a non-open/shared or less central/populated work area,

**ER0885**

safety barriers such as plexi-glass or heightened cubical walls; telework agreement. etc)

4. If you have any questions or would like to meet to discuss further.

Once a decision on the Religious Accommodation is finalized, HRS will send out the final accommodation notification to the employee and the department.

Thank you,

*Teddi*

Teddi Phares, PHR
HR Consultant | Washington State University Human Resource Services
Pronouns: She/Her/Hers
PO Box 641014 | French Administration Building, Room 139| Pullman, WA 99164-1014
e: teddi.phares@wsu.edu |  t: (509) 335-8331 or  (509) 335-4521| f: (509) 335-1259
*Connect with Human Resource Services!*
Main Website : hrs.wsu.edu |Jobs: wsu.edu/jobs



IMPORTANT NOTICE: This communication, including any attachment, contains information that may be confidential or privileged, and is intended solely for the entity or individual to whom it is addressed.  If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message is strictly prohibited.  Nothing in this email, including any attachment, is intended to be a legally binding signature.

# EXHIBIT R



## WASHINGTON STATE
### A T H L E T I C S

RECEIVED

OCT 1 3 2021

HUMAN RESOURCE SERVICES

October 13, 2021
Re: Religious Accommodation Request | Nicholas Rolovich

The Athletic Department (Department) submits this response to the notice that Nicholas Rolovich (Employee) has submitted a request for a religious exemption and related accommodation. As directed in the notice, the Department reviewed the Employee's Employment Agreement to determine if Employee is able to perform the essential functions of his position and meet the COVID-19 safety measures consistent with appropriate health regulations. The Department concludes Employee would not be able to perform the essential functions of his job consistent with the terms and conditions of his Agreement by wearing a snugly fitting mask and engaging in social distancing and this would create an undue hardship on the Athletic Department and WSU as a whole.

Further, WSU is an R-1 major research university with a medical school, a school for global health, and a veterinary school. Football plays a vital role in being the 'front door' to the university. However, because of Employee's position, the university has attracted significant negative publicity. This negative publicity has damaged relationships with donors, diminished media exposure, reduced attendance at football-related events, and hindered the ability to recruit future student athletes.

According to the terms of Employee's contract, Employee is responsible for the following duties, and as demonstrated by the following:

**Integrate the Football program into the whole spectrum of academic life to complement the University and its mission in the state and community (Contract Section 1.2.1.2.a);**
- Employee is unable to participate fully in the spectrum of duties required by the Football program and as such cannot integrate the Football program into academic life to complement the University. Employee cannot fully participate in recruiting, fundraising or media events. Employee is not able to adequately lead coaching staff and train and develop student athletes. Employee is not able to effectively manage the Football program.

**Evaluate, recruit, train, and develop student-athletes to compete successfully against major college competition in a quality Division I Football program (Contract Section 1.2.1.2.b);**
- Employee cannot recruit at a Pac-12 level due to restrictions placed on unvaccinated visitors by various states, counties and school districts. For example, San Francisco and Los Angeles are prohibiting unvaccinated individuals from entering virtually all indoor spaces and attending large gathering events. WSU recruits California, specifically southern California and the Bay Area heavily. Furthermore, Employee is unable to reasonably entertain official recruit visitors to WSU's campus while masked and socially distanced, given space constraints, travel accommodations and the nature of college athletics recruiting.

WSU_00016417

Maintain a competitive Football program consistent with the Athletic Director's goals, which will reasonably be established upon consultation with Employee (Contract Section 1.2.1.2.c);

- Employee is unable to adequately lead the coaching staff, and train and develop student athletes due to masking and distancing restrictions for unvaccinated individuals. The Employee is unable to attend and/or has not been attending individual position meetings, and has been unable to safely engage one-on-one with players or assistant coaches during practices, team meetings, and other preparatory functions. Interactions with assistant coaches and players have been limited and has led to poor planning, lack of communication, and a void in leadership. Employee often does not attend position meetings and has limited football staff meeting attendance due to fears regarding contact tracing.

Recommend to the Athletic Director the appointment and discharge of assistant Football coaches and all other contracted staff specific to Football. Employee and the Athletic Director shall consult regarding those issues and make reasonable efforts to reach agreement. The Athletic Director shall then make the final decision (Contract Section 1.2.1.2.f);

- Employee is unable to manage the Football program, including, but not limited to, assisting the Athletic Director, or his designee, with Football budget preparation and administration, and the supervision and evaluation of the Football program's staff. In addition, Employee's absence from in person events and meetings, which regularly occur in coaching, frustrates his ability to effectively evaluate staff in their one on one and in person coaching interactions.

Under the direction of the Athletic Director, participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program (Contract Section 1.2.1.2.h);

- Employee is unable to fulfill media and fundraising obligations due to masking and distancing restrictions for unvaccinated individuals, as well as concerns regarding contact tracing. Employee is unable to attend the regularly scheduled Friday donor lunch. Employee has not actively participated in donor engagement, program support, or fundraising.

- The Friday donor lunch is a critical component of donor outreach, and Employee's absence has been prejudicial to the Football program and the Athletics Department. Employee has been unable to attend live donor meetings, including several donor interactions scheduled for the 2021 summer. These events were subsequently canceled. Further, donors have declined to engage in personal meetings or remote meetings out of concern for their personal safety and the disappointment in the lack of leadership Employee's handling of this matter has portrayed. Further, the University and the Athletics Department has not been able to schedule future donor meetings based on Employee's actions. Several donors have revoked gifts or put them on hold based on Employee's actions.

ER0889

WSU_00016418

**Under the direction of the Athletic Director, participate in media events, sponsorship efforts, and engage the public to foster support for the University's Athletic Department and/or the Football program (Contract Section 1.2.1.2.h):**

- Employee was unable to attend in-person Pac-12 Football Media Day in Los Angeles on July 27, 2001. Because of Employee's decision to not get vaccinated, he was the only coach who did not attend in person. This decision became the primary story concerning football and put student athletes and other attendees in the position of having to address Employee's absence. This was, and continues to be, a major distraction for the University, Athletics Department, and the Football team. This will be an on-going issue until the pandemic is over or otherwise controlled.

- Employee is unable to attend the WSU Football Coaches Show in person that broadcasts live from Zeppoz. This is another critical component of donor and fan outreach. By not attending the show in person, interest from fans has dropped off significantly. Further, Employee is unable to attend other coaching speaking engagements or other campus events such as pep rallies and other fall sports. Employee's lack of presence as the Head Coach of WSU's most popular and well-known sport is pronounced and has been prejudicial to the Football program and the other Athletic programs. Continued absence from these critical events is not sustainable and will have a long-term effect on WSU's ability to market the football program, raise funds, and recruit student athletes.

**Serve as director of instructional youth FB programs to be held in athletic facilities at the University's campus if deemed applicable (Contract Section 1.2.1.2.i);**

- Employee is unable to participate and engage in person in camps/clinics due to inability to train and develop participants due to masking and distancing restrictions for unvaccinated individuals.

Further, the Athletic Department has concerns regarding the Employee's ability to comply with the requirement of wearing a snugly fitting face covering at all times. The Employee has frequently removed mask to coach with individuals in close proximity (< 6 ft.) to other vaccinated and unvaccinated individuals. Coaching duties require close contact with student-athletes as well as other Department personnel and the public. This activity has been documented during televised games, and is noticed by viewers, staff and any guests who attend football team activities, including practice.

Given the above concerns, the department is not able accommodate this request.

WSU_00016419

(103 of 299), Page 103 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 103 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1775    Page 102
of 130

# EXHIBIT S

HUMAN RESOURCE SERVICES
OCT 13 2021
RECEIVED

# WASHINGTON STATE
## A T H L E T I C S

October 13, 2021
Re: Religious Accommodation Request | Nicholas Rolovich

This response is a supplement to the earlier response to the request received from HRS on October 6, 2021, regarding a religious accommodation request for Nick Rolovich (Employee). The initial response focused on the essential functions of Rolovich's job and the inability to perform those functions with the requested accommodations.

Underlying the request for an accommodation is the initial conclusion that Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being vaccinated for COVID-19. Rolovich has made several statements that cast doubt on his claimed sincerely held religious belief. The statements and the timing of Rolovich's statements with respect to religious beliefs as they relate to COVID-19 vaccinations are summarized below.

- In numerous formal and informal meetings between March and August, Rolovich made it clear to Pat Chun, his supervisor, and many within the Athletics Department, that he was unwilling to take the vaccine based on his independent research. He stated on multiple times he had done his own research, made an independent decision and came to a conclusion that he would not take the vaccine. It was clear from these statements that his decision not to be vaccinated was based on the conclusions he reached following his own research. On May 24, 2021, Rolovich firmly restated to Pat Chun his stance on not taking the vaccine based on his research in a meeting in Pat Chun's office.

- On August 19, 2021, Rolovich personally reiterated and reaffirmed directly to Pat Chun his ongoing stance of not receiving a COVID-19 vaccination. He disclosed he attempted to seek a medical exemption but was unable to secure the necessary documentation. He then disclosed he would elect to pursue a religious based exemption to meet the employment requirements stated in the Governor's Proclamation 21-14-1.
  - In that meeting, Pat Chun stated directly to Rolovich that since the start of this pandemic, Rolovich had been vocal and consistent in his opinions and skepticisms about the COVID-19 virus and the full nature of the public health emergency. He has continuously been critical of the role the government and communicated a multitude of baseless theories with respect to vaccination.

- The following are examples of his reasoning:
  - COVID-19 Vaccine was not fully FDA approved, and therefore not safe
  - The vaccine could and would negatively impact women and fertility rates
  - The vaccine would negatively impact his mortality

The government and therefore the vaccine could not be trusted. Rolovich participated in Pac-12 Conference sponsored and WSU Athletics mandated education sessions relative to the merits of

WSU_00011850

the COVID-19 vaccine. In addition, WSU Athletics arranged a one-on-one meeting with Dr. Guy Palmer, a world-renowned infectious disease expert. Notwithstanding information shared by the experts in these sessions, Rolovich continued to rely on the results of his own research.

In sum, throughout the multiple individual and group meetings, Rolovich made it clear that he refused to be vaccinated based on the conclusions he reached through his own research, he only mentioned religion after the Governor issued the Proclamation requiring vaccination, and then only mentioned religion in reference to seeking an exemption from the vaccination requirement. We believe these facts support re-evaluation of the claimed sincerely held religious belief.

WSU_00011851

# EXHIBIT T



WASHINGTON STATE UNIVERSITY                                    Environmental Health and Safety

**Date:** October 14, 2021
**To:** Patrick Chun
       Director of Athletics
**From:** Shawn Ringo
       Director, WSU Environmental Health and Safety
**From:** Jason Sampson
       Director, WSU Environmental Health and Safety
**Cc:** HRS Exemptions

## I.    Introduction

Pursuant to Proclamation 21-14.2, employees and certain contractors in educational and health care settings are required to have a COVID-19 vaccine unless they qualify for an exemption due to a legitimate medical condition/disability or they have a sincerely held religious belief.  After determining an employee qualifies to be exempt from the COVID-19 vaccine, WSU will determine whether the employee can be accommodated or whether they pose an undue hardship or direct threat.

WSU Environmental Health & Safety ("EH&S"), who has expertise in environmental and occupational health and safety, will evaluate the employees assigned work areas and perform an individualized assessment of reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with.  EH&S will not determine whether these interventions and countermeasures fundamentally alter the employee's job and cannot be accommodated.   Please contact EH&S for any questions or clarifications regarding our recommendations.

## II.    COVID-19 Pandemic

COVID-19 has caused a worldwide pandemic resulting in a public health emergency since January of 2020. WHO reports there have been over 4.8 million deaths worldwide and the CDC reports there have been over 7,000,000 deaths in the United States and over 3 million hospital admissions.  The Washington Department of Health (DOH) data shows there have been over 686,000 cases, over 37,950 hospitalizations and 8,062 deaths.

The CDC data shows that Delta variant is the pre-dominant variant in the US and it is more infectious and was leading to increased transmissibility when compared with other variants.  The Occupational Safety and Health Administration (OSHA) and Washington Labor & Industries (L&I) recognize SARS-CoV-2 (the virus that causes COVID-19) a hazardous pathogen requiring appropriate interventions and countermeasures to protect workers and others.

Vaccination is the most effective way to protect against severe illness or death from COVID-19 particularly those who have underlying medical conditions or disabilities (e.g., immunosuppressed, cancer), and/or an at-risk population (e.g., over 65, pregnant).  Other interventions and countermeasures are also required by law and/or reasonable and necessary to ensure workers and others health and safety.  Being unvaccinated increases the risk a worker



WASHINGTON STATE
UNIVERSITY
                                    Environmental Health and Safety

may contract COVID-19 and become severely ill, die and/or spread the disease to others in the workplace or those they come in contact with when performing their job. Certain vulnerable populations that contract a COVID-19 infection from a worker are at higher risk for severe illness or death. As a result of this risk for vulnerable populations, more interventions and countermeasures are reasonable and necessary to protect these populations.

### III.    EH&S Assessment

| | |
|---|---|
| Workers Name: | **Nicholas Rolovich** |
| Worker's Department or College: | **WSU Athletics** |

**A. Check all locations that apply and the time spent in each location as a percentage of their job:**

| | | |
|---|---|---|
| ☒ | Educational Setting – Higher Education | Percentage of FTE: 85% |
| ☒ | Educational Setting – K-12 | Percentage of FTE: 15% |
| ☐ | Health Care Setting | Percentage of FTE:   % |
| ☐ | Other: | Percentage of FTE:   % |

**B. Check all populations the worker will come in contact with:**

| Frequent | Regular/ Occasional | Infrequent | Population |
|---|---|---|---|
| ☒ | ☐ | ☐ | **Students – Higher Education** |
| ☐ | ☒ | ☐ | **Students – K-12** |
| ☐ | ☐ | ☐ | **Patients** |
| ☐ | ☒ | ☐ | **Vulnerable Populations** as determined by CDC<br>○ Older Adult (65+)<br>○ Disabled individuals<br>○ Individuals with the following conditions:<br>○ Cancer<br>○ Chronic kidney disease<br>○ Chronic lung disease (COPD, asthma, interstitial lung disease, cystic fibrosis, pulmonary hypertension)<br>○ Dementia or other neurological conditions<br>○ Diabetes<br>○ Down syndrome |

WSU_00016421



Environmental Health and Safety

| | | | | o Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)<br>o HIV infection<br>o Immunocompromised (certain underlying medical conditions and/or drugs and medications may suppress one's immune system, individuals already severely ill such as in critical care unit (e.g., ICU, PICU, NICU))<br>o Liver disease<br>o Overweight and obesity<br>o Pregnancy<br>o Sickle cell disease or thalassemia<br>o Smoking, current or former<br>o Solid organ or blood stem cell transplant<br>o Stroke or cerebrovascular disease which affects blood flow to the brain<br>o Substance use disorder |
|---|---|---|---|---|

**C.  Will the worker be performing services and/or engaging in activities where social distancing is not possible for more than a brief period of time:**

☒  Social distancing is generally not possible due to work duties requiring direct face-to-face services or activities for greater than 15 minutes

☐  Social distancing (6 feet or greater) is generally possible to perform most of their job duties except for brief moments of time (i.e., less than 15 minutes)

☐  The worker may work remotely to perform their job duties

**D.  Will other workers or those come into contact with the worker be able to wear the same or comparable PPE including face masks appropriate for the setting (e.g., educational setting, health care setting, etc.):**

**ER0897**

WSU_00016422



WASHINGTON STATE UNIVERSITY                                    Environmental Health and Safety

☐ Appropriate PPE for the setting will be worn at all times by other workforce members and the individuals interacting with the worker

☒ Appropriate PPE for the setting will generally be worn at all times by other workforce members, but will not be worn by all individuals interacting with them.

☐ Appropriate PPE for the setting will generally not be worn by other workforce members or individuals interacting with the worker

**E. Check applicable ventilation and fresh air controls and parameters:**

☒ The worker will be outside for the majority of their job duties, activities and services.

☒ The worker will be in WSU controlled educational facility or location where there is good fresh airflow through increased fresh air exchanges, open windows, or other approved controls for the setting.

☒ The worker is mostly in a non-WSU controlled educational facility where the ventilation and fresh air standards are unknown and/or outside of WSU's control.

☐ The worker is in a non-WSU controlled health care setting where the ventilation and fresh air standards are unknown and/or outside of WSU's control.

**Note:** The employee requesting accommodation frequently works outside, but also works in WSU controlled facilities as well as indoors in facilities outside the control.

**F. COVID-19 Infected Individuals**

☐ The worker will be around individuals known or likely infected with COVID-19 (e.g., hospital, medical clinic diagnosing or treating COVID-19 patients, emergency department)

☒ The worker will not be around individuals known or likely infected with COVID-19

**G. COVID-19 Infection Transmission Rates – Check all that apply**

☐ The worker will be in an area with low community transmission rates.



WASHINGTON STATE
UNIVERSITY

Environmental Health and Safety

☐      The worker will be in an area with moderate community transmission rates.

☐      The worker will be in an area with substantial community transmission rates.

☒      The worker will be in an area with high community transmission rates.

**H. Are there any other specific circumstances or known conditions that will increase the workers or others health and safety risks?**

The worker's duties include events where vulnerable populations may be present, with people ranging in age from k-12 to retirement. Based upon contact tracing observations, unvaccinated persons are more likely to contract SARS-CoV-2 and transmit it to others, including those in vulnerable populations. The worker's responsibilities require regular travel to locations with stringent COVID-19 protocols and safety requirements that may preclude an unvaccinated worker's attendance.

**IV. Recommendations**

Based upon the above stated facts and taking into consideration applicable federal and state public health guidance, OSHA and L&I health and safety standards and requirements, WSU EH&S professional expertise and WSU policies and health and safety standards, it is recommended that the following interventions are reasonably and necessary to protect the worker and/or others that interact with the worker:

**Personal Protective Equipment (PPE) and Source Control**

When entering WSU facilities in locations where students, faculty staff or members of the public may be present and 6 feet distancing may be maintained, the accommodated person shall wear a cloth facial covering or higher level of protective mask.

If interacting with students or staff setting with occasional interaction within 6 feet, not exceeding 10 minutes per day, wear a KN95 or a surgical/procedure mask.

If interacting with students or staff within 6 feet for durations exceeding 10 minutes, wear a NIOSH certified N95 respirator, equivalent or higher rated respirator without an exhalation valve. The accommodated employee shall receive medical approval to wear the selected respirator, receive training, successfully pass a fit test and enroll in WSU's respiratory protection program.

**Testing and Quarantine**

Do not report to a WSU work location while sick. Do not self-diagnose e.g. allergies. Employees shall leave the workplace immediately and inform their supervisor upon experiencing COVID-like symptoms.

WSU_00016424

(112 of 299), Page 112 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 112 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1784    Page 111
of 130



WASHINGTON STATE
UNIVERSITY



Environmental Health and Safety

Personnel experiencing COVID-like symptoms shall test for SARS-CoV-2 by PCR/NAAT, and/or isolate for 10 days from the date they first experienced symptoms. Employees may return to work if they receive a negative PCR/NAAT test result and no longer feel sick. Personnel testing positive shall contact EH&S at 509-335-3041 for workplace contact tracing.

After a close contact i.e. within 6 feet of a person diagnosed with COVID-15 for 15 cumulative minutes in a 24-hour period, quarantine for 14 days from the last close contact. Please understand that should a member of same household test positive, the 14-day quarantine period begins after the 10th day of a household member's infectious/isolation period.

Unvaccinated personnel shall assume responsibility for required testing based upon illness or close contacts outside the workplace.

The accommodated employee shall adhere to all PAC12 and NCAA testing requirements, acknowledging the additional testing requirements for unvaccinated participants.

Periodic screening testing may be required for workplaces employing 100 people or more per emerging requirements. Unvaccinated employees working under an accommodation shall assume responsibility for this testing and/or adhere to WSU policy at the time a testing policy for unvaccinated personnel is enacted.

Negative PCR/NAAT test required within 72 hours prior to travel.

**Travel**

When travel requires lodging, unvaccinated persons shall stay in a room by themselves or with a member of their household, if applicable. If sharing lodging, when allowed, the roommate shall not be unvaccinated or a person considered at increased risk of severe disease.

For team or organizational travel with trip durations in a single mode of transportation/vehicle lasting less than 1-hour via bus, airplane or other forms of mass transportation, unvaccinated personnel shall may wear:

- A tight fitting cloth facial covering if 6 feet of distancing is maintained;
- A KN95 if 3 feet of distancing is maintained at the breathing zone.


Ensure unvaccinated persons maintain six feet of distance from other unvaccinated individuals (including those of unknown vaccination status), and individuals considered at higher risk of severe disease.

If unable to distance 6 feet and the trip duration is 1-hour or more in a single mode of transportation/vehicle:

- Maintain 3 feet distance at the breathing zone,
- Wear a NIOSH approved N95 respirator, equivalent or higher rated respirator without an exhalation valve. The unvaccinated person shall receive medical approval to wear the selected respirator, receive training and successfully pass a fit test and enroll in WSU's respiratory protection program.

WSU_00016425



Environmental Health and Safety

- Maximize the vehicle ventilation system, not on recirculation mode and/or roll down vehicle windows.

Accommodating distancing during travel may require rental of additional buses, booking additional flights or other options where the unvaccinated individual travels in separate vehicle.

When removing a mask to eat or drink, maintain 6 feet of distancing from students or other personnel and immediately replace mask after eating or drinking. Eat outdoors or in areas with sufficient ventilation (minimum 4 air changes per hour).

**Travel Destination Locations**

Prior to travel, review destination state and local restrictions which may limit/prohibit unvaccinated persons' access to restaurants, public transportation, K-12 schools, community colleges or event venues. Some states and local jurisdictions prohibit entry into specific locations and/or events without proof of vaccination. If local restrictions prohibit access for unvaccinated persons to the event warranting travel, EH&S strongly recommends unvaccinated persons avoid travel to limit risk.

PAC12 or NCAA other organizational COVID-19 safety requirements including the destination jurisdiction's may be more stringent. Unvaccinated persons shall adhere to these requirements or WSU COVID-19 safety requirements, whichever is more stringent.

**Automobiles e.g. cars, pickup trucks, vans**

When traveling in an automobile for work with WSU students or personnel, unvaccinated persons, if able to distance 6 feet may wear a cloth facial covering and maximize use of the vehicle ventilation system, not on recirculation mode and/or roll down vehicle windows.

If unable to distance 6 feet and the trip duration is less than 1-hour:

- Maintain 3 feet distance at the breathing zone,
- Wear a surgical/procedure mask or KN95 or higher-level respiratory protection without an exhalation valve, e.g. N95.
- Maximize the vehicle ventilation system, not on recirculation mode and/or roll down vehicle windows.

If unable to distance 6 feet and the trip duration is 1-hour or more in a single mode of transportation/vehicle:

- Maintain 3 feet distance at the breathing zone,
- Wear a NIOSH approved N95 respirator, equivalent or higher rated respirator without an exhalation valve. The unvaccinated person shall receive medical approval to wear the selected respirator, receive training and successfully pass a fit test and enroll in WSU's respiratory protection program.
- Maximize the vehicle ventilation system, not on recirculation mode and/or roll down vehicle windows.

**ER0901**



Environmental Health and Safety

**Breaks**

Breaks shall be scheduled to maintain 6 feet of distancing from other personnel. Eat outdoors or in areas with sufficient ventilation (minimum 4 air changes per hour).

**<u>Additional Requirements</u>**

These requirements are not a substitute, and will be in addition, to any infection prevention or control standards imposed by a non-WSU controlled facility or location where the worker is performing services on behalf of WSU.  Similarly, all appliable professional and licensing standards and reasonable infection control requirements for that setting are to be followed by the worker at all times.  *See e.g.*, <u>CDC Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 Pandemic</u>.

# EXHIBIT U



To:      Human Resource Services
From:   Department of Athletics
Cc:      WSU Environmental Health and Safety

Re:      Nicholas Rolovich – Head Football Coach

After careful review and consideration of EH&S recommendations regarding possible accommodations related to this employee, we remain concerned that the individual cannot safely and effectively perform his assigned duties and that accommodation in these circumstances would create an undue hardship for WSU Athletics given his assigned duties and responsibilities as set forth in his contractual agreement with the University, including but not limited to the following:[1]

**Coaching: Training, evaluating and developing student-athletes.**
- Frequent close physical proximity to and contact with others is an inherent part of coaching.

**Travel: Travel is a key component of team competition and recruiting.**
- The football team does travel by 737 charter for games, they also travel by bus to airports, hotels, and stadiums. Although social distancing *may* be maintained on a chartered 737 flight, it becomes exceedingly difficult on buses, and could require that a coach travel separately in between airports, hotels, and stadiums. Organizationally this is not practical as coaches are expected to travel and be with the team on road trips. This also creates a financial burden if a coach has to travel separately. Further, team meetings and meals while traveling often take place indoors with many student-athletes and coaches in attendance; travelling separately will limit these interactions and negatively impact relationships. WSU has little to no control over access to facilities used for such meetings and cannot control circulation or sanitization of such facilities. Managing team travel is a difficult process and it only be made more difficult by having to work to safely accommodate unvaccinated staff. We are concerned that travel under these circumstances cannot be safely and effectively accommodated.

**Recruiting: Recruiting is critical to the success of the Football Program and Athletic Department.**
- Almost all recruiting travel is done via commercial flights. This means that unvaccinated coaches will be subject to seating arrangements, seat assignments etc. based on the private airlines. It is important to note that once an unvaccinated coach has taken a commercial flight they directly enter recruit homes, high schools or other training facilities. Recruiting remotely via technology or in person fully masked and socially distanced will have a negative impact on how WSU approaches recruits (and their

---

[1] In addition to concerns about the viability of accommodations, we note concerns with the employee's ability/willingness to consistently comply with masking and other requirements.

WSU_00016533

(117 of 299), Page 117 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 117 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1789    Page 116
of 130

families).  Although it is difficult to estimate how many recruits and their families will be uncomfortable with unvaccinated visits, even a small decrease in recruit access by WSU coaching staff will have significant impact on the Football Program.  Given WSU's location, relatively limited media exposure, and traditional role as the smallest program in the Pac-12, recruiting is critically important to any successful athletic program.  A coach who is met with suspicion, hesitancy, or fear creates an undue hardship for the purposes of recruiting and cannot be accommodated.

**Donors:  Donor Cultivation Is Critically Important and Requires In Person Contact.**
- If donors are hesitant, fearful, or upset about an unvaccinated coach visiting them, that creates significant hardship for Athletics.  WSU's unique location and donor base provides little margin for error; there are few mega-donors to help support the program.  Athletics fund-raising has relied on moderate donations from a larger pool of donors.  Any reduction in that group of people will have a significant impact on WSU.  If WSU does lose one "mega" donor, it can have significant and lasting consequences to the Football Program, Athletic Department, and WSU.  WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff.  Even if masked and socially distanced, the number of donors who will not engage with the program or staff regardless of accommodations is a hardship WSU cannot afford.  Note that donors are frequently older individuals who may be medically vulnerable to severe COVID-19.

**Media:  Coaches are expected to engage in all forms of local and national media.**
- All coaches, but football coaches in particular, are high profile employees.  Head coaches are generally contractually obligated to participate in media events related to the Football Program.  This includes weekly radio shows, attendance at conference-sponsored media days, regular interactions with sponsored media and regular news conferences.  These duties are part of expanding the brand of the Football Program, the Athletic Department, and the University.  However, because employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches).

**Integration into Institution**
- WSU is an R-1 research university, with a medical school, school for global health, and millions of dollars in science-based research funding.  Athletics is an important part of the WSU experience, and the Head Football Coach's contract requires him to "Integrate the Football program into the whole spectrum of academic life to complement the University and its mission in the state and community." The damage to the mission and reputation of the University posed by this situation cannot be understated, nor can it be resolved by accommodation.

**ER0905**

# EXHIBIT V

(119 of 299), Page 119 of 299    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 119 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1791    Page 118
of 130

**From:** "Chun, Patrick" <patrick.chun@wsu.edu>
**To:** "Rolovich, Nicholas R" <nick.rolovich@wsu.edu>
**Cc:** "Blair, Bryan Bernard" <bryan.b.blair@wsu.edu>
**Subject:** Follow Up/Recap
**Date:** Sun, 17 Oct 2021 18:39:44 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png

---

Nick,

As you know the deadline for compliance with the Governor's Proclamation is tomorrow, October 18, 2021. As I communicated to you earlier today in your office, the following are my expectations as we await a decision regarding your employment eligibility status:

- I will meet with the Leadership Council this evening to answer any questions and to prepare them for all scenarios as they head into game week. This is a change from what I communicated to you this morning. After our meeting, my preference is to keep you guys in the same routine/rhythm you've been in the past few weeks if at all possible. Bryan will work to get this set up.

- If you/I receive notification regarding the status of your request tomorrow (Monday, Oct. 18), we will meet immediately in Bohler Gym Conference Room 101

- If you/I have not been notified before 4 p.m. tomorrow, you will need to meet with me at 4:30 p.m. in Bohler Gym Conference Room 101

- Staff who awaiting determinations on their requests will also need to be available to meet immediately upon notification (location TBD). If they have not been notified before 4 p.m., Bryan Blair or someone from my staff will coordinate meetings for either immediately upon notification or at 4:30 p.m. in a TBD location.

Just to restate what we discussed this morning:

In our meeting on Sunday, Oct. 10, I appreciated your willingness to offer input on contingency planning relative to your pending employment eligibility status.  It is with great concern to discover you blocking the mutually agreed upon coach from arriving in Pullman last week to observe the program as a contingency. Your actions have the potential to negatively impact the football program and seriously prejudice its ability to move forward should the contingency arise. I will make note of you mentioning to me this morning you personally have been evaluating film with this coach. Also, the voicing of physical threats regarding a coach we talked about related to our contingency plan was completely unacceptable.

To be clear, the above act equates to insubordination. Insubordination is considered grounds for disciplinary action, including the termination of employment. Your conduct also was profoundly unprofessional and implicates the university's policy on workplace violence.

Until we have a decision from the University, you are obligated to act in a professional manner fitting your role and responsibilities as the head coach of our football program. You are expected to fully cooperate with administration as we work through all the possibilities of this week. The well-being of our football program remains my focal point.

-Pat

**PAT CHUN**
DIRECTOR OF ATHLETICS

**ER0907**

WSU_00002790



Washington State University Athletics
Bohler Athletic Complex, 110
Office: 509-335-0200
patrick.chun@wsu.edu
www.wsucougars.com

TOGETHER, WE WILL *ACHIEVE* WHAT WAS ONCE DEFINED AS *IMPOSSIBLE*

WSU_00002791

# EXHIBIT W

## WASHINGTON STATE
### A T H L E T I C S

Hand Delivered

October 18, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA  99163

Re:    Written Notice of Intent to Terminate for Just Cause

Coach Rolovich:

Pursuant to Paragraphs 4.1 through 4.3 of your Employment Agreement as Head Men's Football
Coach, this letter constitutes notice of the University's intent to terminate your employment for
just cause.

- You were notified on September 1, 2021, and September 23, 2021, that per Proclamation
  21-14.1, all state employees, including those in higher education, would be required to be
  fully vaccinated against COVID-19 via one of the FDA approved vaccines by October
  18, 2021.

- The notice stated that if not vaccinated, you could apply for a medical or religious
  exemption and accommodation through WSU Human Resources (HRS).  The University
  provided notice of the process on August 31, 2021, September 8, 2021, September 29,
  2021, and October 4, 2021.

- You requested an exemption from the vaccine requirement on religious grounds. Your
  request was denied on October 18, 2021.

This action is in accordance with the terms of your contract, signed in April 2020, and amended
in April 2021. The specific provisions violated include the following:

- Paragraph 1.2.1 requires you to devote your best efforts to the performance of your
  duties. In particular, you are required to "comply with and support all rules, regulations,
  policies, and decisions established or issued by the University." Further, you must "abide
  by all provisions of law." Your failure to comply with the vaccination requirement, which
  is both a University policy and requirement of law under the Governor's Proclamation,
  violates these provisions and has rendered you legally unable to perform your duties as
  Head Coach.  Your non-compliance with the vaccine requirement, and the fact that you
  are now legally unable to fulfill your obligations to the University as Head Coach, also
  violates Section 4.1.5 of your Employment Agreement, conduct of Employee seriously
  prejudicial to the best interests of the University or its athletic program, and Paragraph
  4.1.1.

- Paragraph 4.1.1 prohibits you from engaging in "deliberate and serious violations" of
  your duties, or "refusal or unwillingness to perform such duties in good faith and to the
  best of your abilities" As noted in my July 26, 2021, warning letter to you, your contract

Washington State University | Department of Intercollegiate Athletics | Office of the Director
Bohler Athletic Complex 110, PO Box 641602, Pullman, WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501 | www.wsucougars.com

ER0910                                                    WSU_00011844

Nicholas R. Rolovich
Page 2

requires you to participate in events, activities, and efforts to foster support for the Football program, and your personal decision to forego a COVID-19 vaccination has impacted your ability to do so, interfering with your ability to meet with donors and others. These activities are a critical part of being a head football coach at a Pac-12 school. See 1.2.1.2.h. Because of your decisions, WSU, the Football program, and the Athletics programs have been subject to several damaging events. These events include the following:

- Your inability to attend in-person Pac-12 Football Media Day in Los Angeles on July 27, 2021. Because of your decision to not get vaccinated, you were the only coach who did not attend in person. Your decision became the primary story concerning football and put our student athletes and other attendees in the position of having to address your absence. This was, and continues to be, a major distraction for the University, Athletics department, and the Football team.

- Your inability to attend any of the regularly scheduled Friday donor lunches. Section 1.2.1.2.h requires that you participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program. You have not actively participated in donor engagement, foster program support, or fundraising. The Friday donor lunch is a critical component of donor outreach, and your absence has been prejudicial to the Football program and the Athletics department.

- Your inability to attend the WSU Football Coaches Show in person that broadcasts live from Zeppoz. This is another critical component of donor and fan outreach. By not attending the show in person, interest from fans has been negatively impacted. Further, you are unable to attend other coaching speaking engagements in person, and you are limited in your ability to attend other campus events such as pep rallies and other fall sports. Your lack of presence as the Head Coach of WSU's most popular and well-known sport is pronounced and has been prejudicial to the Football program and the Athletics program.

- Your inability to attend live donor meetings, including several donor interactions scheduled for July. These events were subsequently canceled. Further, donors have declined to engage in personal meetings or remote meetings out of concern for their personal safety and the disappointment in the lack of leadership your handling of this matter has portrayed. Further, the University and the Athletics department has not been able to schedule future donor meetings based on your actions. Several donors have revoked gifts or put them on hold until further notice because of your decision.

- Paragraph 1.2.1.2 requires you to "Evaluate, recruit, train, and develop student-athletes." You also are responsible for establishment of a program identity and approach to competition, and the game planning for individual games and the season. You have failed to fulfill these obligations by engaging in the following behavior:

  - You are unable to attend individual position meetings or engage one-on-one with players or assistant coaches during practices, team meetings, and other preparatory functions. Interactions with assistant coaches and players has been limited and has led to poor planning, lack of communication, and a void in leadership.

**ER0911**

WSU_00011845

Nicholas R. Rolovich
Page 3

- Your ability to travel extensively and recruit has been impacted by your decision. Recruiting has been significantly impacted this year, as evidenced by a notable decline in the number of verbal commitments.

As the most high-profile employee of WSU and one of the most highly compensated state employees in Washington, your choices and behavior also reflect on the University, the Athletics Department, and the Football program at all times. In addition to the above, the voicing of physical threats regarding a coach we talked about related to our contingency plan was completely unacceptable.

Your conduct has been seriously prejudicial to the best interests of the University and the Football program, including putting the University and the Football program in a negative national spotlight, and is a violation of your contract. (See paragraph 4.1.5).

Per Section 4.2 of your Employment Agreement, you have fifteen (15) calendar days to respond to me, in writing, with reasons why you should not be terminated. I will respond accordingly consistent with the terms of your Employment Agreement.

Effective immediately you have been placed on paid administrative leave pending the outcome of this notice of intent to terminate for just cause. You are not to perform any work on behalf of the University. Your WSU email account has been disabled and systems access removed.

For information regarding your benefits, please visit http://hrs.wsu.edu/employees/benefits/separating-employee-information/. If you have specific benefits questions, such as options for continuing medical and dental coverage beyond your separation date, please contact Human Resource Services at 509.335.4521.

Sincerely,

Patrick Chun
Director of Athletics

cc:    Athletics Employment File
       HRS Personnel File
       HRS Employment Services

WSU_00011846

# EXHIBIT X

(126 of 299), Page 126 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 126 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1798    Page 125
of 130



**WASHINGTON STATE**

ATHLETICS

November 12, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA 99163

**RE:    Notice of Decision to Terminate for Just Cause**

Mr. Rolovich:

Pursuant to Paragraph 4.2 of your employment agreement, this letter constitutes notice of termination for just cause from your employment as head football coach at Washington State University, effective immediately.

This decision has been made after careful review and consideration of your lengthy and detailed response, which includes many inaccurate statements and legal claims.  I did not find your response persuasive and will not respond to each and every contention. However, please note the following:

- **Background:** Per the Governor's Proclamation 21-14.1, all state employees, including those in higher education, were required to be fully vaccinated against COVID-19 by October 18, 2021, unless they had an approved medical or religious accommodation. You requested an exemption/accommodation on religious grounds, which the University denied on October 18, 2021, thereby rendering you in violation of the Proclamation and ineligible for continuing employment at Washington State University. On October 18, 2021, the University issued you written notice of its intent to terminate your employment for just cause in accordance with the Proclamation and your contract of employment.

- **Regarding the University's decision that granting an exemption would cause undue hardship to the Athletic Department and the University:** You claim that your ability to fulfill your duties as head football coach has not been and would not be impacted by your vaccination status.  This is false.  Your performance of your duties has been significantly hindered and would continue to be as long as you are unvaccinated, notwithstanding any reasonable accommodations that might be implemented.  Your activities have had to be continually and severely limited to a much greater extent than if you had been vaccinated, in order to mitigate the risk of you becoming infected or infecting others. In addition to the information WSU provided you and your attorney in

Washington State University | Department of Intercollegiate Athletics | Office of the Director
Bohler Athletic Complex 110, PO Box 641602, Pullman, WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501 | www.wsucougars.com

**ER0914**

WSU_00011862

previous documents, including the October 18, 2021, Notice of Intent to
Terminate for Just Cause, I note the following:

- o  The Pac-12 Conference, not the University, barred you from attending
     Pac-12 Media Day in person due to the vaccination requirement for head
     coaches. You were the only Pac-12 head coach unvaccinated and unable
     to attend in-person.  Instead of showcasing our student athletes and the
     WSU football program, you became the story.  You claim this was not
     your choice and that other conferences operate differently.  This
     completely misses the point.  It was your choice not to get vaccinated,
     and your job required you to be successful and operate as a *Pac-12 head
     football coach*, which means adhering to Pac-12 rules.

- o  You have been significantly hindered in your ability to successfully contact
     and recruit prospective student-athletes, because you have been
     restricted from attending any locale that has vaccine requirements,
     including high schools, high school sporting events, junior colleges, other
     universities' sporting events, or other prospect camps.  Vitally important
     recruiting areas, especially on the west coast, including California and
     western Washington, which are historically WSU's most significant
     geographical areas for recruiting, are essentially inaccessible to you as a
     recruiter. Moreover, Hawaii, a state where you have extensive ties and
     should be able to recruit in-person with a high level of success, also has
     very stringent COVID-19 restrictions, which have limited your ability to
     successfully recruit in that state. Over 2/3 of our current football roster
     has student-athletes who reside from the states of Washington, California,
     Oregon, and Hawaii.  WSU cannot sustain a successful football program if
     coaches are limited in recruiting locations.

- o  Aside from the restrictions noted above, non-competition travel by
     unvaccinated coaches requires a quarantine upon return to campus.  This
     has limited your ability to be on the road during key recruiting periods and
     reduced the number of days you can spend traveling for recruiting
     purposes.  Also, WSU cannot risk losing recruits who refuse to visit
     campus because Athletics is accommodating unvaccinated coaches.

- o  As a result of your recruiting limitations, the football program's recruiting
     statistics and verbal commitments for the 2022 recruiting cycle have been
     directly impacted and are unacceptably low. You personally stated your
     expectation of signing a full class, which would mean a minimum of 25
     initial signees. Contrary to your claim, NCAA regulations would not have
     prevented you from signing more prospective student-athletes; it was

**ER0915**

WSU_00011863

your responsibility to manage the roster to incorporate a full class of new student-athletes. Recruiting at the level of a Pac-12 Conference institution requires a robust recruiting plan and effort.

o   Because you are unvaccinated, you were required to quarantine after travel, which limited your participation in many important activities, including donor meetings.  You appear to acknowledge this by explicitly stating you deliberately chose not to attend certain in-person donor events, which you had previously agreed to attend and were on your schedule. However, every Pac-12 head football coach must be able to regularly attend donor visits and events and actively engage in marketing efforts, in addition to other duties. Because you were unvaccinated, your ability to interact with key constituents, including students, donors, fans, and others, was severely impacted.

o   The Athletic Department has incurred significant costs associated with the need to test you and other unvaccinated football coaches for COVID-19 on a daily basis.  The Pac-12 requires a minimum of three (3) tests per week for unvaccinated staff, in addition to pre-competition testing, and the Athletic Department policy requires daily testing.  PCR testing, which must occur at least weekly for unvaccinated individuals and 72 hours prior to competition or travel, costs approximately $100 per test.  The cost for testing alone of unvaccinated staff from August 2021 through final tests on October 18, 2021, was $10,000. In addition to that cost, because of the workload of increased testing caused by you and other unvaccinated coaches, the Athletics Department was required to hire additional staff to assist in COVID-19 testing, at considerable expense.  It is important to note that these testing requirements do not apply to vaccinated players and staff, and that football was the only intercollegiate athletic program at WSU to have unvaccinated coaching staff.

o   Overwhelming scientific evidence establishes the efficacy of the vaccine in mitigating the spread of COVID-19 and preventing severe disease. By refusing to support, and by you and your staff at times actively opposing, the University's COVID-19 education and vaccination efforts, and by setting a very public example, you have undermined the University's efforts to promote student safety.  Although numbers are gradually improving, the football program has the lowest student-athlete vaccination rate of any intercollegiate athletics team at WSU and among the lowest rate in the Pac-12.  The football program experienced COVID-19 outbreaks in fall 2020 and spring 2021 that far exceeded any outbreaks among other intercollegiate athletics teams at WSU. In addition, WSU had

WSU_00011864

(129 of 299), Page 129 of 299
Case 2:22-cv-00319-TOR    ECF No. 97    filed 10/14/24    PageID.1801    Page 128
of 130

to miss or reschedule several of the seven scheduled games in the restructured fall 2020 football season, including two cancellations.

- **Regarding the University's decision that you do not have a sincerely held religious belief that conflicts with the University's vaccine requirement:**

  - ○ Prior to the Governor's proclamation, and since the beginning of the pandemic, you openly and freely expressed your opposition to the vaccine and other COVID-19 mitigation efforts on numerous occasions to numerous people, citing your own "scientific" research and making statements mirroring several specific online conspiracy theories, which included demonstrably false claims. In addition, at no point did you ever mention any religious concerns (ex: regarding fetal tissue). Therefore, your current claim that your private, unexpressed concerns were actually religious in nature is simply not credible. Your statement that you and some of your staff had unsuccessfully tried to secure documentation for a medical exemption undermines your claim. Only *after* it became clear that a religious exemption was your only other option did you claim to have religious beliefs that conflict with the vaccine requirement. It is understandable that you would want the University's review to exclude information regarding your own prior statements in its decision; however, under EEOC Guidance, these are appropriate considerations, and your assertion to the contrary is false. Further, under EEOC Guidance, personal or philosophical beliefs do not give an individual a basis to claim a religious exemption.

- **Regarding the University's exemption process:**

  - ○ Contrary to your claims, the University followed its process. You claim the University guaranteed a blind review of your request for a religious exemption and that it was improper for the Athletics Department to provide information contradicting your claim. Nothing in WSU's policy states or implies that it was improper for the Athletics Department to provide additional information bearing on this question. The committee's initial review is "blind" and based solely on information provided by the employee; however, once the committee makes its initial determination, the employee's unit is informed of the initial determination and has an opportunity to provide information specific to that employee and their job duties. The Athletics Department did not receive information about your request until it was appropriate for it to do so in accordance with the

**ER0917**

WSU_00011865

process. Further, the religious exemption request form is clear that "additional follow up information" may be sought, and there is nothing that limits WSU to information provided by the employee.

o You claim that if WSU had concerns about the sincerity of your religious beliefs, it was required to allow you to submit additional information. Again, however, the religious exemption request form uses the permissive "may," not "shall." Moreover, your November 2, 2021, response to the notice of intent to terminate provides ample additional information regarding your request for a religious exemption, and I do not find this information persuasive. As discussed above, your prior statements, as well as the timing of your request for a religious exemption, indicate that your objection to the vaccine requirement was based on factors other than religion.

o Finally, you claim that the Athletics Department and I "overturned" the accommodation recommendations of WSU's Environmental Health and Safety (EHS). This is false. As part of the normal process, EHS provided information regarding possible accommodations but, consistent with the University's process, did not make a decision on this issue or even a recommendation regarding undue hardship. The October 14, 2021, memorandum from EHS clearly states, "EHS will not determine whether these interventions and countermeasures fundamentally alter the employee's job and cannot be accommodated."

- **Regarding your insubordination and threat of violence:**

  o You claim you were merely expressing your "frustration with, and dislike of June Jones," and that you would never physically harm him. However, your exact words were, "I don't want to see that mother f*cker and will fight him if you bring him out to practice." Your tone and profanity during that interaction were deeply concerning and demonstrated a lack of self-control. The clear implication was that violence was in fact possible and actually intended against your former mentor and coach. Although you may have been frustrated, this is clearly a threat of physical violence and an attempt to obstruct the Athletics Department's contingency plans for the football program.

Finally, your claims of "bias" or "hostility" towards your religion are misguided. My primary concern, as the WSU Director of Athletics, has always been the well-being of the student-athletes under your supervision as we attempt to build a successful WSU football program. Diversity and inclusion are in our Department's core values and

adhered to on a daily basis. This includes respect for people's personal religious practices (like you, I am also a practicing Catholic), which further reinforces the baseless nature of this claim.

Based on the above, as well as the information in the October 18, 2021, Notice of Intent to Terminate for Cause and the other documents submitted in the religious exemption process and provided to your attorney, which are attached and incorporated herein, I find that you violated each of the sections of your contract outlined in the Notice of Intent to Terminate for Cause and that these violations were deliberate, serious, and seriously prejudicial to the University and the football program, thereby warranting termination for just cause.

Pursuant to Paragraph 4.3 of your employment agreement, you have fifteen (15) calendar days to appeal this decision to the University President. However, your right to receive any payment under your employment agreement shall cease November 15, 2021, the day after this letter is issued, and you are not entitled to receive any compensation pending the appeal.

Sincerely,

Patrick Chun
Director of Athletics

Enc.
1.  Notice of Intent to Terminate for Just Cause
2.  September 28, 2021, email from HRS with instructions for completing the religious exemption form
3.  October 6, 2021, notification to Athletics from HRS Exemptions
4.  October 13, 2021, memorandum from Athletics regarding undue hardship
5.  October 13, 2021, supplemental memorandum from Athletics regarding sincerely held religious belief
6.  October 14, 2021, memorandum from EHS
7.  October 18, 2021, memorandum from Athletics to HRS/EHS
8.  October 18, 2021, email from HRS exemptions with notice of denial of religious exemption

cc:    Brian Fahling, Attorney for Nicholas Rolovich
       Danielle Hess, WSU Division Chief, Office of the Attorney General
       Personnel File

**ER0919**

WSU_00011867

1  ROBERT W. FERGUSON
2  Attorney General

3  ZACHARY J. PEKELIS, WSBA #44557
   Special Assistant Attorney General
4  PACIFICA LAW GROUP LLP
   1191 2nd Avenue, Suite 2000
5  Seattle, WA  98101-3404
6  (206) 245-1700

7  SPENCER W. COATES, WSBA #49683
   Assistant Attorney General
8  800 Fifth Avenue, Suite 2000
   Seattle, WA  98104-3188
9  (206) 464-7744

10

11              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WASHINGTON
12

13

14   NICHOLAS ROLOVICH,              No. 2:22-cv-00319-TOR

15              Plaintiff,           DECLARATION OF
                                     DAVID BONES IN SUPPORT
16   v.                              OF DEFENDANT'S CROSS-
                                     MOTION FOR SUMMARY
17   WASHINGTON STATE                JUDGMENT
     UNIVERSITY,
18
19              Defendant.
                       .
20

21       I, David Bones, declare as follows:

22       1.    I am over the age of eighteen (18) years, competent to testify to the

23  matters contained in this declaration, and testify based on my personal knowledge

24  DECLARATION OF DAVID BONES – 1
25  No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0920**

and information.

2.    I am a Partner and Co-Chair of the Forensic Accounting and Commercial Damages practice area with HKA, a business and litigation consulting firm. I am experienced in economic damages, financial, and forensic accounting issues related to the scope of the analysis on this matter

3.    HKA has been retained by the defendant in the above-captioned case to render expert opinions in this case. My opinions, along with the materials I reviewed in forming those opinions, are explained in my expert report.  For my work in this case, HKA is being compensated at a rate of $550 per hour.

4.    Attached hereto as Exhibit A is a true and correct copy of the expert report and supporting exhibits. My report is based on my training, professional experience, and research. My report contains a complete statement of the opinions to which I would testify if called as a witness at trial.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this  9   day of October, 2024, at Phoenix, Arizona.

s/ _____

DAVID BONES

DECLARATION OF DAVID BONES – 2
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**ER0921**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF SERVICE**

On the 14th day of October, 2024, I caused to be served, via ECF electronic service, a true copy of the foregoing document upon all counsel registered for e-service.

DATED this 14th day of October, 2024.

_____
Erica Knerr, Legal Assistant

DECLARATION OF DAVID BONES – 3
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ER0922

# EXHIBIT A

*Nicholas Rolovich*

*v.*

*Washington State University*

*Cause No. 2:22-cv-319-TOR (E.D. Wash.)*

---

**Expert Report
of
David Bones**

**August 12, 2024**



David R. Bones, CVA

HKA GLOBAL, LLC
2355 N. Camelback Rd., Suite 415
Phoenix, AZ 85016

ER0924

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

## TABLE OF CONTENTS

1   **Introduction** ............................................................................................................... 1
   1.1   Scope of Assignment ............................................................................................ 1
2   **Background & Allegations** ......................................................................................... 2
   2.1   Relevant Parties ................................................................................................... 2
   2.2   Background .......................................................................................................... 2
3   **Summary of Opinions** ............................................................................................... 3
4   **Overview of Economics of College Athletics** ........................................................ 5
   4.1   Overview of Economics of College Football ......................................................... 8
5   **Covid-19 Impacts on College Football** ................................................................... 11
   5.1   Covid-19 Impacts on the 2020 College Football Season .................................... 11
     5.1.1   Covid-19 Impacts on WSU's 2020 College Football Season ....................... 13
   5.2   Covid-19 Impacts on 2021 College Football Season .......................................... 14
6   **Economic and Operational Impacts on College Athletics Due to Covid-19** ................ 14
7   **Economic and Operational Impacts on the WSU Athletics Department and Football** .................
     **Program Due to Covid-19** ......................................................................................... 17
   7.1   Potential Lost Revenues from Cancelled Football Games .................................. 21
     7.1.1   Lost Revenue from Ticket Sales ................................................................. 22
     7.1.2   Lost Revenue from Media Rights ................................................................ 23
     7.1.3   Lost Revenue from Bowl Games ................................................................. 25
     7.1.4   Summary of the Potential Lost Revenues to WSU Football Due to Covid-19 ......... 26
   7.2   Incremental Costs to Accommodate Unvaccinated Coaches .............................. 27
     7.2.1   Travel Costs to Accommodate Unvaccinated Coaches ............................... 27
     7.2.2   Contact Tracing Related to Covid-19 Outbreaks ......................................... 31
   7.3   Additional Impacts Due to Covid-19 ................................................................... 31
     7.3.1   Potential Loss of Donations from Donors Who Threatened to Withdraw Contributions ......... 31
     7.3.2   Covid-19 Testing Requirements for Unvaccinated Coaches and Players ............. 33
     7.3.3   Impact to WSU's Reputation ...................................................................... 34
     7.3.4   Additional Costs to Charter Flights to Recruiting Events ............................. 35
8   **HKA's Analysis of the Expert Report of David Hall** ................................................ 35
   8.1   Mr. Hall Does Not Consider the Cause of Mr. Rolovich's Inability to Mitigate His .....................
     Losses in Calculating Damages Under Opinions 3 and 4 ................................................ 36



**ER0925**

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

---

### LIST OF ATTACHMENTS

1.  Attachment A – David Bones CV and Testimony History

2.  Attachment B – List of Documents Considered

3.  Attachment C – Statement of Revenues and Expenses for WSU Athletics - FY 2018 - FY 2023

4.  Attachment D – Statement of Revenues and Expenses for WSU Football - FY 2018 - FY 2023

5.  Attachment D.1 - WSU's Football Revenue by Channel Excluding FY 2021



ER0926

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

## 1    INTRODUCTION

HKA is a business and litigation consulting firm that provides services to corporations and counsel with offices worldwide.  HKA professionals include Certified Public Accountants, Certified Fraud Examiners, Project Management Professionals, Professional Engineers, and other financial and accounting personnel skilled in forensic fact-finding and analysis.

I am a Partner and Co-Chair of the Forensic Accounting and Commercial Damages practice area with HKA, experienced in economic damages, financial, and forensic accounting issues related to the scope of the analysis on this matter.  I have prepared and analyzed claims for economic damages, valued businesses, and analyzed the business operations, solvency, and financial condition of companies in numerous industries.  I have been retained as an expert on many matters and provided testimony around the country, including being qualified as an expert in state and federal courts.  Prior to joining HKA, I was a Vice President with The Kenrich Group, and prior to that, I was an Associate Director with Navigant Consulting and a Senior Consultant with Tucker Alan, all national litigation consulting firms.  Further detail about my qualifications, including my curriculum vitae, can be found in Attachment A attached to this report.

### 1.1    SCOPE OF ASSIGNMENT

HKA was retained by Pacifica Law Group as attorneys for and on behalf of Washington State University ("WSU" or "Defendant") to render (1) affirmative opinions on the estimated economic impacts to WSU's Athletics Department of accommodating unvaccinated football coaches by allowing them to remain in their positions unvaccinated and (2) rebuttal opinions on the damages assessments of Plaintiff's expert, Mr. David Hall.  HKA bills for my time at an hourly rate of $550.  HKA's compensation in this matter is not contingent upon the outcome of this case or on the findings or opinions I make.

This report summarizes my findings to date and was prepared by me or under my direction.  The opinions presented in this report are based on facts and circumstances made available to me via documents produced in this litigation, interviews with persons with relevant knowledge, independent research, as well as from my educational and professional experience.

I understand that discovery in this matter is ongoing, and that additional deposition testimony, documents, and expert disclosures may be made available to me after the date of this report.  As new information is provided to me, including but not limited to additional documents/data produced and pleadings filed, expert reports and analyses, and/or deposition transcripts, I reserve the right to amend and/or update this report and any opinions or conclusions contained herein.  See Attachment B for a list of documents considered to form my opinions.



ER0927

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

## 2    BACKGROUND & ALLEGATIONS

### 2.1    RELEVANT PARTIES

Plaintiff Nicholas Rolovich ("Mr. Rolovich" or "Plaintiff") was the head football coach at WSU from January 14, 2020, until his employment was terminated on December 6, 2021.[1]

WSU is an agency of the State of Washington, located in Pullman, Washington, with approximately 7,000 employees and over 26,000 students enrolled.[2]

### 2.2    BACKGROUND

On January 13, 2020, Mr. Rolovich became WSU's head football coach after entering into a Memorandum of Understanding with WSU.[3]  On February 29, 2020, the governor of Washington, Jay Inslee, declared a State of Emergency in the State of Washington related to the Covid-19 pandemic ("Covid").[4]  In April 2020, Mr. Rolovich entered into an Employment Agreement with WSU, which was to expire on June 30, 2025.[5]

On August 20, 2021, Governor Inslee issued Proclamation 21-14.1, which required all state employees, healthcare workers, and educational workers (including employees in higher education) to be fully vaccinated by October 18, 2021, or receive an exemption and accommodation from their employer.[6]  On or about September 28, 2021, Mr. Rolovich submitted a request for a religious exemption from the Covid-19 vaccine requirement to WSU's Human Resource Services.[7]  Upon review, the Athletics Department at WSU determined that it would cause undue hardship to the university to accommodate Mr. Rolovich by allowing him to remain in the head coach position unvaccinated.[8]  Mr. Rolovich's exemption/ accommodation request was denied by WSU on October 18, 2021.[9]  Following an unsuccessful administrative appeal, Mr. Rolovich's employment was terminated on December 6, 2021.[10]

---

[1] Second Amended Complaint, *Nicholas Rolovich v. Washington State University, et al.*, dated September 19, 2023 ("Complaint"), ¶ 11.

[2] *Id.*, ¶¶ 12-14; WSU, *About*, https://wsu.edu/about.

[3] Complaint, ¶ 16.

[4] *Id.*, ¶ 21.

[5] *Id.*, ¶ 16.

[6] *Id.*, ¶ 48; Office of the Governor, *Proclamation 21.14.1*, https://governor.wa.gov/sites/default/files/2023-01/21-14.1%20-%20Covid-19%20Vax%20Washington%20Amendment.pdf.

[7] Complaint, ¶ 63.

[8] *Id.*, ¶¶ 66, 70.

[9] *Id.*, ¶ 90.

[10] *Id.*, ¶¶ 5, 11.



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

In addition to Mr. Rolovich, six of his assistant coaches and one non-coach football staff member also requested accommodations from the Covid-19 vaccination requirement.[11] Their accommodation requests were also denied and I understand they were ultimately separated from WSU employment.[12]

## 3    SUMMARY OF OPINIONS

The following summarizes my opinions, which are set out in more detail in the remainder of this report:

1.  The Athletics Department is a significant income source for WSU, with the football program representing almost the entire funding source for the rest of the Athletics Department.

    a.  The Covid-19 pandemic disrupted collegiate athletic departments around the country and significantly impacted WSU's financial condition, especially due to a loss in revenue from the football program.

    b.  As a result, WSU deployed substantial efforts to reduce the risks associated with Covid-19 outbreaks to mitigate negative impacts from Covid-19 and protect the university from additional financial shocks.

2.  WSU, the Athletics Department, and the football program were subject to significant economic and operational impacts due to the risks associated with Covid-19, such as lost revenue due to cancelled games and incremental costs to accommodate unvaccinated coaches.

    a.  If WSU had been forced to forfeit or cancel its football games in 2021 or 2022 due to Covid-19 outbreaks, it stood to lose millions of dollars in revenue from ticket sales, media rights, and bowl game revenue.  Under conservative economic assumptions, the potential lost revenues ranged between $3.3 million if one game was cancelled to $10.4 million if six games were cancelled.

    b.  Even absent any game cancellations, WSU would have incurred incremental costs to accommodate its unvaccinated football coaches.  For example, WSU would have incurred costs for separate travel accommodations for unvaccinated coaches, as well as additional costs for contact tracing associated with Covid-19 outbreaks.  Under conservative economic assumptions, the estimated travel costs to accommodate Mr. Rolovich and the six other unvaccinated coaches are $197,000, while the costs for contact tracing per Covid-19 outbreak are $100,000 per outbreak.

    c.  WSU also would have experienced additional adverse impacts due to Mr. Rolovich's unvaccinated status, such as potential loss of donations from donors who threatened to

---

[11] Plaintiff's First Set of Interrogatories to Defendant and Defendant's First Supplemental Answers and Objections Thereto, *Nicholas Rolovich v. Washington State University, et al.*, dated July 24, 2024, p. 11.

[12] Id., Appendix B, pp. 9-10.



Page 3

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

withdraw contributions, additional Covid-19 testing requirements, reputational impacts, and additional costs to charter flights to recruiting events.

3. The Expert Report of David Hall ("Hall Report") contains opinions that are based on speculative assumptions that are inconsistent with the terms of Mr. Rolovich's contract and do not consider mitigation factors, which render his opinions unreliable.

   a. To the extent that liability is not determined, damages are zero. To the extent liability is determined, Mr. Hall's calculations in his Opinion 2 are consistent with the terms of Mr. Rolovich's contract.

   b. Damages under Opinions 3 and 4 do not consider that Mr. Rolovich's decision to not receive the Covid-19 vaccine impacted his ability to mitigate his damages. Therefore, damages under Opinions 3 and 4 are speculative and unsupported, rendering them unreliable.



ER0930

Nicholas Rolovich v. Washington State University
Expert Report of David Bones

## 4   OVERVIEW OF ECONOMICS OF COLLEGE ATHLETICS

Athletics programs are often considered the "front porch" of many universities,[13] being the most visible program of the university and serving as an entry point for prospective students and supporters.  However, it is a common misconception that university athletic departments are profitable enterprises.[14]  University athletic departments often generate significant revenue from media rights contracts to broadcast their sports on television, particularly football and men's basketball games, ticket sales, conference distributions, and may receive financial subsidies from state government agencies and institutions.[15]  However, athletic department expenditures, which include travel, facility management, scholarships, and department salaries, often exceed the revenues generated, resulting in athletic departments that operate in annual deficits.[16]  For example, since Fiscal Year ("FY") 2018,[17] WSU's Athletics Department has operated in an annual deficit each year except for FY 2022, as shown in Figure 1 below.

**Figure 1: Annual WSU Athletics Department Surplus (Deficit)**[18]



---

<sub>[13]</sub> Harry, Molly, *Financial Ramifications of Coronavirus on Division I Athletic Departments,* p. 51.

[14] *Id.*

[15] *Id.,* pp. 51-52.

[16] *Id.,* p. 52.

[17] Washington State University's ("WSU") fiscal year is for the period from July 1 to June 30.  For example, FY 2018 covers the period from July 1, 2017 to June 30, 2018.

[18] Attachment C.



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

The teams within university athletics departments fall into two categories: (1) revenue-generating sports and (2) non-revenue-generating sports.[19]   In most Division I[20] university athletics programs, revenue-generating sports are limited to football and men's basketball, with all other sports being non-revenue-generating.[21]   Athletic departments will utilize the profits from revenue-generating sports, primarily football, to subsidize non-revenue-generating sports within the department.[22]   Despite the costly nature of non-revenue-generating sports, those teams can indirectly bring in a significant amount of tuition revenue for a university from student athletes that are not attending on athletic-based scholarships.[23]

I reviewed financial statements for WSU's Athletics Department from FY 2018 to FY 2023 that were prepared by WSU and reported to the National Collegiate Athletic Association ("NCAA").[24]   The financials reported to the NCAA included detailed revenue and expense data specific to WSU's football, men's and women's basketball, and other sports programs, as well as non-program specific data.   Based on my analysis, football was the only sports program to consistently generate a profit for WSU.   From FY 2018 to FY 2023 annual profits from WSU's football program ranged between $20 million to $25 million, excluding FY 2021, which was impacted by Covid-19.   The only other sports program at WSU to report a profit during this same period was the men's basketball program, which reported annual profits of no more than $1.2 million.   See Figure 2 below for an illustration of the annual profits / losses by athletic program at WSU from FY 2018 to FY 2023.

---

[19] Revenue-generating sports produce significant revenue and are typically income producing for the athletics department.  Non-revenue-generating sports have no immediate revenue generated from spectators of the sport, with expenses covered by sponsorships, donations and fundraising.  *See* The Johns-Hopkins Newsletter, *Nonrevenue sports should not be scapegoats for budget cuts*, https://www.jhunewsletter.com/article/2020/10/non-revenue-sports-should-not-be-scapegoats-for-budget-cuts (Oct. 22, 2020).

[20] After the NCAA created its three divisions in 1973, Division I was subdivided for football purposes in 1978 into Division I-A (the principal football schools), Division I-AA (remainder of football-playing schools) and Division I (schools not sponsoring football).  In 2006, Division I-A and I-AA were renamed Football Bowl Subdivision ("FBS") and Football Championship Subdivision ("FCS"), respectively.  To be a Division I member, FBS schools must sponsor a minimum of 16 sports, and FCS and Division I Subdivision schools must sponsor a minimum of 14 sports.  *See* The National Collegiate Athletic Association, *Our Division I Members*, https://www.ncaa.org/sports/2021/5/11/our-division-i-members.aspx.

[21] Harry, Molly, *Financial Ramifications of Coronavirus on Division I Athletic Departments¸* p. 55.

[22] *Id.*

[23] *Id.¸* p. 56.

[24] The National Collegiate Athletic Association ("NCAA") is a member-led organization dedicated to the well-being and lifelong success of college athletes.  The NCAA comprises more than 500,000 college athletes across all three divisions, who compete for about 1,100 member schools in all 50 states, the District of Columbia, Puerto Rico and Canada.  *See* NCAA, *Overview*, https://www.ncaa.org/sports/2021/2/16/overview.aspx.



Nicholas Rolovich v. Washington State University
**Expert Report of David Bones**



**Figure 2: Summary of Annual Profits / (Losses) by Athletic Program**[25]

The importance of college football on a university athletics department was confirmed in my discussion with Anne McCoy, WSU's current Athletic Director, who noted that WSU's Athletics Department lives or dies by the finances of the football program. Ms. McCoy's sentiment was reinforced by the athletic director at the University of Florida, who also noted that, as "everyone knows, footballs pays for the enterprise to go forward."[26]  Scholars have also agreed that "intercollegiate sports, particularly football, is the tail wagging the athletics dog."[27]  Based on the above illustrated financial data, it is unlikely that WSU could sustain its non-football athletics teams without the revenue generated by the football program.[28]

---

[25] WSU_00036375-452 at 450-52; WSU_00036453-531 at 529-31; WSU_00036532-610 at 608-10; WSU_00036611-91 at 689-91; WSU_00036692-772 at 770-72; and WSU_00036773-852 at 850-52.

[26] Harry, Molly, *Financial Ramifications of Coronavirus on Division I Athletic Departments*¸ p. 56.

[27] *Id.*

[28] In addition to football and basketball, the athletics teams at WSU include soccer, baseball, swimming, track and field, cross country, rowing, golf, tennis, and volleyball. *See* WSU, *Washington State University Athletics*, https://wsucougars.com.



Nicholas Rolovich v. Washington State University
Expert Report of David Bones

## 4.1    OVERVIEW OF ECONOMICS OF COLLEGE FOOTBALL

College football is a "key driver of athletic department operations."[29]   At WSU, football is by far the largest revenue-generating sport, generating a significant portion of the overall athletic department's revenues. Additionally, football has indirect impacts on a university and its community, as a college football team can serve as a unifying force on a university campus, representing a source of pride and a symbol of the community.[30]   From FY 2018 to FY 2023,[31] the WSU football program generated between 56% and 63% of the Athletics Department's total annual revenue, as shown below in Figure 3.[32]

**Figure 3: Comparison of WSU's Football to Total Athletic Revenues from FY 2018 to FY 2023**[33]



WSU's football program generates approximately 90% of its revenues from four main channels: (1) media rights deals with television networks and other media outlets, (2) conference distributions, (3) ticket sales,

---

[29] Spencer D. Wyld, David C. Wyld, *College Football's Bottom-Line Impact: Exploring the Relationship of Football Performance on Athletic Finances for Division I Institutions Today,* The Sport Journal, July 23, 2021, at 1, https://thesportjournal.org/article/college-footballs-bottom-line-impact-exploring-the-relationship-of-football-performance-on-athletic-finances-for-division-i-institutions-today.

[30] Kyle Bonagura, *Inside Nick Rolovich's downfall at Washington State over the COVID-19 vaccine,* https://www.espn.com/college-football/story/_/id/32459767/inside-nick-rolovich-downfall-washington-state-Covid-19-vaccine (Oct. 27, 2021).

[31] Financial data for FY 2024 was not available as of the date of my report.

[32] FY 2022 - $47,625,476 / $85,028,825 = 56.0%; FY 2018 - $40,783,999 / $65,117,715 = 62.6%; Attachments C & D.

[33] Attachments C & D.



ER0934

Nicholas Rolovich v. Washington State University
Expert Report of David Bones

and (4) donor contributions.  See Figure 4 below for a breakdown of WSU's football revenue by channel based on an average from FY 2018 to FY 2023.

**Figure 4: WSU's Football Revenue by Channel Excluding FY 2021**[34]



### *Media Rights*

The largest income source for WSU's football program is from media rights deals with television networks, radio stations, internet, digital, and e-commerce providers to broadcast WSU football games.[35]  I understand that the revenues from media rights include only revenues from Pac-12 conference-wide media contracts with ESPN and Fox.  From FY 2018 to FY 2023, media rights for WSU football generated between $14.5 million and $21.6 million annually for the Athletics Department, or approximately 42% of total football revenue each year.[36]

The Pac-12 conference dissolved following the conclusion of the 2023-2024 athletics season after it was unable to negotiate a media rights contract its members could agree on.[37]   The only remaining schools in the conference currently are WSU and Oregon State University.[38]  As a result, I understand that the media

---

[34] Attachment D.1.

[35] WSU_00036375-452 at 380.

[36] Attachments D & D.1.

[37] Heather Dinich, *Pac-12, commissioner George Kliavkoff agree to part ways,* https://www.espn.com/college-football/story/_/id/39540583/pac-12-commissioner-george-kliavkoff-agree-part-ways (Feb. 16, 2024).

[38] *Id.*



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

revenue landscape has changed significantly as a result of the dissolution. However, given my analysis is only through FY 2023, the conference dissolution does not affect it.

### *Conference Distributions*

The second largest source of income for WSU's football program since FY 2018 is conference distributions. I understand that conference distributions reflect distributions from the Pac-12 conference related to revenues from championship tickets sold, interest income, NCAA Units, revenue from streaming and cable services, and advertising/sponsorships. I also understand that conference distributions were pooled by the Pac-12 and distributed evenly among all 12 teams. From FY 2018 to FY 2023, annual conference distributions to the WSU football program ranged between $3.4 million to $11.2 million, or approximately 22% of total football revenue. [39]

### *Ticket Sales*

Ticket sales include revenue generated from tickets sold to the public, faculty, and students for football games.[40] Revenue captured in the ticket sales channel reflects only the face value of a game ticket, not any amount that may have been collected above the face value.[41] From FY 2018 to FY 2023, ticket sales ranged between $7.8 million to $9.4 million, or approximately 19% of total football revenue.[42] In FY 2021, WSU football recorded no revenue from ticket sales due to the impacts of the Covid-19 pandemic, which prevented fan attendance at games.[43]

### *Contributions*

Contributions to the WSU football program are predominantly generated from three sources: (1) donor contributions from individuals, corporations, foundations, clubs, or organizations designated specifically for the operations of the athletics program, (2) outside contributions for the payment of debt service, lease payments, or rental fee expenses for athletic facilities, and (3) amounts contributed above face value for tickets to football games.[44] I understand that a key responsibility of the head football coach is to generate contributions from donors through outreach and event attendance.[45] From FY 2018 to FY 2023,

---

[39] Attachments D & D.1.
[40] WSU_00036375-452 at 377.
[41] *Id.*
[42] Attachments D & D.1.
[43] Attachment D.
[44] WSU_00036375-452 at 379.
[45] WSU_00020060-62 at 61.



ER0936

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

contributions ranged between $2.3 million and $3.8 million annually, or approximately 7% of total football revenue.[46]

## 5    COVID-19 IMPACTS ON COLLEGE FOOTBALL

### 5.1    COVID-19 IMPACTS ON THE 2020 COLLEGE FOOTBALL SEASON

The Covid-19 pandemic created unprecedented operational and financial disruptions to the 2020 college football season as concerns about infection and transmission of the virus led to cancellations.  For example, in July 2020, the Ivy League announced that it would postpone all fall sports until Spring 2021 due to Covid-19-related concerns.[47]  On August 11, 2020, the Big Ten and Pac-12 conferences followed suit, opting to postpone their football seasons until Spring 2021.[48]  Shortly after, on August 13, 2020, the NCAA cancelled all fall sport championships that it controlled, which did not include football, noting that fewer than 50% of schools were willing to participate in the fall season.[49]  Power Five[50] programs operating without a football season were estimated to incur average losses of $78 million, which totaled approximately sixty percent of the schools' annual operating revenues.[51]  Some lost income may have been recouped during a spring football season, but university leaders were concerned that a spring football season would be in jeopardy if Covid-19 continued to gain momentum.[52]  As a result, several conferences that had originally postponed fall sports reversed course and chose to participate in fall sports.[53]  For example, the Big Ten and Pac-12 reversed course in September 2020, a month after originally postponing their seasons.[54]

During the 2020 season, individual universities could elect to postpone fall sports in lieu of cancelling their entire season.  Out of the 130 FBS football teams, only three football teams did not compete in some way during fall 2020, namely the University of Connecticut, Old Dominion, and New Mexico State.[55]  The

---

[46] Attachments D & D.1.  I understand that some contributions are made directly to the Athletics Department, instead of specific sports programs.

[47] Greta Anderson, *Ivy League Postpones Athletics Until 2021*, https://www.insidehighered.com/news/2020/07/09/ivy-league-will-not-play-fall-sports-2020 (Jul. 8, 2020).

[48] Christine M. Baugh, Leonard Glantz, Michelle M. Mello, *Decisions about College Football during Covid-19: An Ethical Analysis,* 2023 Spring, at 104, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10209992/#app1.

[49] *Id.*

[50] Historically, the Power Five conferences were comprised of the (ACC), Big Ten Conference (Big Ten), Big 12 Conference (Big 12), Pacific-12 Conference (Pac-12), and Southeastern Conference (SEC). *See* Signing Day Sports, *What is the Power of 5?*, https://thewire.signingdaysports.com/articles/what-is-the-power-5/ (Jul. 9, 2023).

[51] Harry, Molly, *Financial Ramifications of Coronavirus on Division I Athletic Departments*, p. 57.  See also Steve Berkowitz, *Major public college football programs could lose billions in revenue if no season is played*, https://www.usatoday.com/story/sports/ncaaf/2020/04/14/college-football-major-programs-could-see-billions-revenue-go-away/2989466001/ (Apr. 15, 2020).

[52] *Id.*

[53] Emily Giambalvo, *Which college football conferences are playing and who's still on the sidelines?*, https://www.washingtonpost.com/sports/2020/08/12/college-football-canceled-faq (Sept. 25, 2020).

[54] *Id.*

[55] Harry, Molly, *Financial Ramifications of Coronavirus on Division I Athletic Departments*, p. 57; https://athlonsports.com/college-football/college-football-teams-canceled-their-2020-season-fbs.



University of Connecticut specifically noted that it cancelled its football season due to risks associated with Covid-19.[56]  Instead of cancelling their entire seasons, several conferences, including the Big Ten and Pac-12, elected to forgo non-conference games in 2020, instead opting for a shortened schedule playing only against conference opponents.[57]

During the 2020 season, the Pac-12 allowed teams to reschedule or declare a no-contest if they were unable to play due to a Covid-19 outbreak, without the cancellation being reflected as a loss on the team's record.[58]  For example, WSU had seven games scheduled during the 2020 season.[59]  However, it ended the year with a 1-3 record, as three games were cancelled due to Covid-19 outbreaks.[60]

The Pac-12 conference also set a minimum for the number of scholarship players that needed to be available to play a game each week.  The minimum required player availability was 53 scholarship players, with at least one quarterback, seven offensive linemen, and four defensive linemen.[61]  Under the NCAA rules in effect in 2020 and 2021, FBS and FCS teams were permitted to have up to 85 scholarship players.[62] In total, about 20% of regular-season college football games nationwide were cancelled in 2020.[63]

Some conferences also implemented policies for fan attendance at games.  For example, the Pac-12 and Big Ten implemented policies that prohibited fans from attending games during the 2020 season, while the

[56] University of Connecticut, *UCONN FOOTBALL ANNOUNCES CANCELLATION OF 2020 SEASON DUE TO RISKS ASSOCIATED WITH COVID-19*, https://uconnhuskies.com/news/2020/8/5/uconn-football-announces-cancellation-of-2020-season-due-to-risks-associated-with-Covid-19.aspx (Aug. 9, 2020).

[57] Andrew Brandt, *Football's Economic Impact on College Towns, College Players and the NFL*, https://www.si.com/nfl/2020/08/18/economic-fallout-nfl-impact-of-college-football-season-cancellations; https://pac-12.com/news/2020/10/3/pac-12-announces-2020-football-schedule (Aug. 18, 2020); David Cobb, *Big Ten football schedule 2020: League to play eight games plus consolation games on championship week*, https://www.cbssports.com/college-football/news/big-ten-football-schedule-2020-league-to-play-eight-games-plus-consolation-games-on-championship-week (Sept. 16, 2020).

[58] Nick Nordi, *HCA: Pac-12 reveals plans for cancelled games and tiebreakers*, https://www.cougcenter.com/2020/10/20/21524300/pac-12-cancelled-games-tiebreakers-wsu-cougars (Oct. 20, 2020).

[59] Pac12, *Pac-12 announces 2020 football schedule*, https://pac-12.com/news/2020/10/3/pac-12-announces-2020-football-schedule (Oct. 3, 2020).

[60] WSU, *2020 Football Schedule*, https://wsucougars.com/sports/football/schedule/2020; WSU, *Washington State-Stanford Football Game Cancelled*, https://wsucougars.com/news/2020/11/20/wsu-athletics-washington-state-stanford-football-game-cancelled.aspx (Nov. 20, 2020); Jeff Nuseer, *Apple Cup canceled because of WSU COVID outbreak*, https://www.cougcenter.com/2020/11/22/21590479/apple-cup-canceled-wsu-cougars-Covid-washington-huskies (Nov. 20, 2020); Cal Athletics, *Cal At Washington State Football Game Cancelled*, https://calbears.com/news/2020/12/12/cal-at-washington-state-football-game-cancelled.aspx (Dec. 12, 2020).

[61] Brian J. Pedersen, *Pac-12 sets roster minimums, establishes game cancellation policies ahead of football restart* https://www.azdesertswarm.com/football/2020/10/19/21523836/pac12-football-coronavirus-cancellation-policy-2020-restart-outbreak-minimum-scholarship-players (Oct. 19, 2020).

[62] Michelle Brutlag Hosick, *DI Council approves one-year waiver of football scholarship limit*, https://www.ncaa.org/news/2021/10/6/general-di-council-approves-one-year-waiver-of-football-scholarship-limits.aspx (Oct. 6, 2021).

[63] Pat Forde and Ross Dellenger, *Was the 2020 College Football Season Worth It?*, https://www.si.com/college/2021/01/11/college-football-2020-season-Covid-19-daily-cover (Jan. 11, 2021)



ER0938

(151 of 299), Page 151 of 299
Case 2:22-cv-00319-TOR    ECF No. 96    filed 10/14/24    PageID.1625    Page 20
Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 151 of 299 of 68

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

ACC, Big 12 and SEC vastly limited stadium attendance.[64]  Policies prohibiting or limiting fan attendance would have meant significant lost ticket sales for football programs.

Lastly, Covid-19 also significantly impacted the 2020 football bowl season, which consists of post-season games between top teams that provide opportunities for football programs to increase revenues and exposure.  At least 21 schools publicly opted out of bowl games, with several others privately opting out.[65]  Some of the bowl games were cancelled by the organizers, while others were cancelled because the teams could not or would not play.[66]  In 2020, the Rose Bowl, one of the most historic and important bowl games, was moved from Pasadena, California to AT&T stadium in Arlington, Texas because of the growing number of Covid-19 cases in Southern California and California's restrictions prohibiting guests or fans at public recreational events (including athletic events).[67]  Of the 41 bowl games scheduled for the 2020 bowl season, 16 games were cancelled, a 39% cancellation rate.[68]

### 5.1.1   COVID-19 IMPACTS ON WSU'S 2020 COLLEGE FOOTBALL SEASON

During the 2020 season, WSU football had planned to play seven games, but was forced to cancel three games due to Covid-19 outbreaks within the teams.[69]  Two of the outbreaks leading to cancellations occurred within the WSU football team, and the third occurred within an opposing team.[70]  Most notably, during the 2020 football season, WSU was forced to cancel its annual Apple Cup game against rival University of Washington ("UW") due to a Covid-19 outbreak within the WSU football team.[71]  The Pac-12 noted that the decision to cancel the Apple Cup was made "due to Washington State not having the minimum number of scholarship players available for the game as a result of a number of positive football

---

[64] Eric Olson, *Fans head back to stadiums, some with vax cards and masks*, https://www.si.com/college/2021/01/11/college-football-2020-season-Covid-19-daily-cover (Aug. 28, 2021).

[65] *Id.*

[66] Pat Forde and Ross Dellenger, *Was the 2020 College Football Season Worth It?*, https://www.si.com/college/2021/01/11/college-football-2020-season-Covid-19-daily-cover (Jan. 11, 2021).

[67] Pasadena Tournament of Roses, *CFP Semifinal at the Rose Bowl Stadium to be relocated to AT&T Stadium in Arlington on January 1, 2021*, https://tournamentofroses.com/cfp-semifinal-at-the-rose-bowl-stadium-to-be-relocated-to-att-stadium-in-dallas-on-january-1-2021/ (Dec. 19, 2020);  Heather Dinich, *CFP semifinal moved from Rose Bowl to AT&T Stadium in Arlington, Texas*, https://www.espn.com/college-football/story/_/id/30559293/cfp-semifinal-scheduled-rose-bowl-moving-att-stadium-arlington-texas (Dec 19, 2020).

[68] Pat Forde and Ross Dellenger, Was the 2020 College Football Season Worth It?, https://www.si.com/college/2021/01/11/college-football-2020-season-Covid-19-daily-cover (Jan. 22, 2021).

[69] WSU, *2020 Football Schedule*, https://wsucougars.com/sports/football/schedule/2020; WSU, *Washington State-Stanford Football Game Cancelled*, https://wsucougars.com/news/2020/11/20/wsu-athletics-washington-state-stanford-football-game-cancelled.aspx (Nov. 20, 2020); Jeff Nuseer, *Apple Cup canceled because of WSU COVID outbreak*, https://www.cougcenter.com/2020/11/22/21590479/apple-cup-canceled-wsu-cougars-Covid-washington-huskies (Nov. 20, 2020); Cal Athletics, *Cal At Washington State Football Game Cancelled*, https://calbears.com/news/2020/12/12/cal-at-washington-state-football-game-cancelled.aspx (Dec. 12, 2020).

[70] *Id.*

[71] *Jeff Nusser, Apple Cup canceled because of WSU COVID outbreak*, https://www.cougcenter.com/2020/11/22/21590479/apple-cup-canceled-wsu-cougars-Covid-washington-huskies (Nov. 22, 2020).



**ER0939**

(152 of 299), Page 152 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 152 of 299
Case 2:22-cv-00319-TOR    ECF No. 96    filed 10/14/24    PageID.1626    Page 21
of 68

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

student-athlete Covid-19 cases and resulting isolation of additional football student-athletes under contact tracing protocols."[72]   According to Patrick Chun, WSU's Athletics Director in 2020 and UW's current Athletics Director, "The Boeing Apple Cup is one of the most sacred rivalries in all of sports and one of the most meaningful days of the year for all Washingtonians."[73]

## 5.2    COVID-19 IMPACTS ON 2021 COLLEGE FOOTBALL SEASON

Covid-19 continued to impact the 2021 football season as well.  For the 2021 college football season, conferences changed their policies surrounding cancelled games due to Covid-19 outbreaks.  In the Pac-12, teams no longer had the option to cancel or postpone games due to Covid-19 outbreaks.  Instead, if a team was unable to play a game through its own fault, it had to forfeit the game and record the forfeiture as a conference loss for the team making the forfeit.[74]  The SEC, Big Ten, and Big 12 conferences instituted the same forfeiture policy.[75]  Additionally, in the SEC and ACC conferences, if both teams were unable to play a game due to Covid-19-related issues, then both teams were required to record a loss.[76]  During the 2021 football season, no regular season games were cancelled, while five bowl games were cancelled.[77]

## 6    ECONOMIC AND OPERATIONAL IMPACTS ON COLLEGE ATHLETICS DUE TO COVID-19

The risks and challenges of Covid-19 caused significant economic and operational impacts throughout college athletics.  The decision to maintain a fall football season in 2020, albeit without fans in the Pac-12, meant institutions and conferences were able to generate revenues from media deals, but not ticket sales; however, these revenues were negatively impacted due to Covid-19 outbreaks.  The Covid-19 pandemic resulted in lost revenue due to cancelled games, additional expenses to mitigate the risks of Covid-19, and further mitigation efforts to offset significant losses incurred by university athletic departments.

### _Lost Revenue_

Cancelled games, both football and other sports, led to significant lost revenue resulting from the lack of ticket sales, decreased conference distributions, and lost revenue from media rights contracts, among other direct and indirect impacts.  For example, it was estimated that, if the 2020 college football season had

---

[72] Pacific-12 Conference, *Pac-12 statement on Washington at Washington State football game*, https://pac-12.com/news/2020/11/22/boeing-apple-cup-update (Nov. 22, 2020).

[73] *Id.*

[74] Andy Patton, *Pac-12 releases statement on 2021-2022 forfeiture*, https://duckswire.usatoday.com/2021/08/12/pac-12-releases-statement-on-2021-2022-forfeiture-policy (Aug. 12, 2021).

[75] Barrett Sallee, *SEC establishes forfeit policies for college football games canceled due to COVID-19*, https://www.cbssports.com/college-football/news/sec-establishes-forfeit-policies-for-college-football-games-canceled-due-to-Covid-19/ (Aug. 30, 2021).

[76] *Id.*

[77] ESPN, *College Football Schedule*, https://www.espn.com/college-football/schedule/_/week/11/year/2021/seasontype/2; Edward Sutelan, *College football bowl cancellations: Updated list of games canceled by COVID-19 for 2021-22*, https://www.sportingnews.com/us/ncaa-football/news/college-football-bowl-cancellations-Covid-19/1b0vt5f7z28qs1iu490s2wu9wf (Dec. 12, 2021).



ER0940

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

been cancelled, Power Five schools would have collectively lost at least $4 billion in football revenue, or an average loss of $62 million to $78 million per school.[78] Of the approximately $4 billion in lost revenue, $1.2 billion came from lost ticket sales, or an average loss of $18.6 million per school.[79] Cancelled games also impacted the media revenues received by universities for broadcasting its games. For example, during the Covid-19 pandemic, cancelled games in the Pac-12 conference cost the conference and its members $5 million in media revenue for each game.[80]

### *Additional Expenses*

Universities were also forced to incur additional expenses to manage the risks of Covid-19 and attempt to mitigate the risk of outbreaks.[81] For example, universities had to regularly test players, coaches, and staff members for Covid-19 to comply with NCAA, conference, and university Covid-19 guidelines.[82] Some athletics directors budgeted between $500,000 and $2,000,000 to account for the requirement of consistent Covid-19 testing.[83] The need for additional testing also required universities to hire additional staff to administer the necessary tests, an additional cost to the universities. For example, I understand from discussions with Dr. Guy Palmer that WSU had to hire an additional staff member to help administer Covid-19 tests for the Athletics Department.[84] Furthermore, universities incurred significant costs related to contact tracing that they would have otherwise not incurred before Covid-19.[85] In total, medical expenses, including insurance premiums, doubled in aggregate across Power Five schools from the 2019-2020

---

[78] Steve Berkowitz, *Major public college football programs could lose billions in revenue if no season is played*, https://www.usatoday.com/story/sports/ncaaf/2020/04/14/college-football-major-programs-could-see-billions-revenue-go-away/2989466001/ (Apr. 15, 2020); Mark Schlaback and Paula Lavigne, *Financial toll of coronavirus could cost college football at least $4 billion*, https://www.espn.com/college-sports/story/_/id/29198526/college-football-return-key-athletic-departments-deal-financial-wreckage-due-coronavirus-pandemic (May 21, 2020).

[79] Mark Schlaback and Paula Lavigne, *Financial toll of coronavirus could cost college football at least $4 billion*, https://www.espn.com/college-sports/story/_/id/29198526/college-football-return-key-athletic-departments-deal-financial-wreckage-due-coronavirus-pandemic (May 21, 2020).

[80] Harry, Molly, *Financial Ramifications of Coronavirus on Division I Athletic Departments*¸ p. 58. See also Eben Novy-Williams, Emily Caron, *PAC-12 LOSING NEARLY $5 MILLION FOR EACH GAME CANCELLED DUE TO COVID-19*, https://www.sportico.com/leagues/college-sports/2020/pac-12-cancelled-football-revenue-1234616953/ (Nov. 19, 2020).

[81] Emma Whitford, *Pandemic's Fall Financial Toll Adds Up*, https://www.insidehighered.com/news/2021/01/12/colleges-spent-millions-Covid-19-expenses-fall-even-sources-income-shrank-data-show (Jan. 11, 2021).

[82] For example, see 2021 testing policies at WSU_00033791-96; WSU_00033447-52; and WSU_00002865-71.

[83] Harry, Molly, *Financial Ramifications of Coronavirus on Division I Athletic Departments*¸ p. 58. See also Pete Thamel, *Will there be college football? A new flurry of pessimism has arrived*, https://sports.yahoo.com/will-there-be-college-football-a-new-flurry-of-pessimism-has-arrived-222609082.html (May 21, 2020).

[84] WSU_00034194-95 at 94.

[85] Emma Whitford, *Pandemic's Fall Financial Toll Adds Up*, https://www.insidehighered.com/news/2021/01/12/colleges-spent-millions-Covid-19-expenses-fall-even-sources-income-shrank-data-show (Jan. 11, 2021).



ER0941

(154 of 299), Page 154 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 154 of 299
Case 2:22-cv-00319-TOR    ECF No. 96    filed 10/14/24    PageID.1628    Page 23
of 68

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

season to the 2020-2021 season, primarily due to increased requirements around Covid-19 testing and prevention.[86]

### *Mitigation Efforts*

Universities nationwide were also forced to implement budget cuts and other mitigation efforts to help offset the significant losses from postponed and cancelled sports seasons, including football.  In the early stages of Covid-19, university athletics departments furloughed staff members, implemented hiring freezes, and enforced salary reductions for coaches to help reduce the departments' overall expenses.  For example, in 2020, the University of Arizona implemented a 20% base salary reduction for its football and men's basketball coaches, as well as its athletic director due to Covid-19.[87]  In fact, in 2020, WSU also implemented salary cuts and furloughs for Athletics Department staff, including two voluntary salary reductions for Mr. Rolovich, totaling 15% of his total pay, stemming from Covid-19 related issues.[88]

Athletics departments were also forced to terminate non-revenue generating sports programs as another cost cutting measure.[89]  Between March 2020 and November 2020, approximately 352 NCAA sports programs were cut primarily due to budget shortfalls due to Covid-19.[90]  Most notably, Stanford University cancelled 11 of its 36 sports programs at the conclusion of the 2020-2021 academic year due to the economic impacts of Covid-19 on its Athletics Department.[91]

Finally, some athletics departments were forced to take out external financing to cover increasing deficits due to budget shortfalls stemming from the Covid-19 pandemic.  In FY 2021, WSU took out $35.6 million in external financing in the form of general university bonds to help cover revenue losses related to the Covid-19 pandemic and balance the Athletics Department's operating budget by 2023.[92]

---

[86] Eben Novy-Williams, Lev Akabas, Emily Caron, Daniel Libit, *COVID'S IMPACT ON COLLEGE SPORTS EMERGES FROM NEW FINANCIAL DATA*, https://www.sportico.com/leagues/college-sports/2022/college-sports-data-Covids-1234658809/ (Jan. 21, 2022).

[87] Bruce Pascoe, *Amid pandemic, Arizona coaches set new national standard for sacrifice: Up to 20% in pay cuts*, https://tucson.com/sports/arizonawildcats/amid-pandemic-arizona-coaches-set-new-national-standard-for-sacrifice-up-to-20-in-pay/article_4a90f49e-2581-52e7-af1a-a83c9bb3158c.html (May 11, 2020).

[88] WSU_00002988-89 at 88; WSU_00003050.

[89] Non-revenue-generating sports have no immediate revenue generated from spectators of the sport, with expenses covered by sponsorships, donations and fundraising.  *See* The Johns Hopkins Newsletter, *Non-revenue sports should not be scapegoats for budget cuts*, https://www.jhunewsletter.com/article/2020/10/non-revenue-sports-should-not-be-scapegoats-for-budget-cuts (Oct. 22, 2020).

[90] Aishwarya Kumar, *The heartbreaking reality -- and staggering numbers -- of NCAA teams cut during the pandemic*, https://www.espn.com/olympics/story/_/id/30116720/the-heartbreaking-reality-staggering-numbers-ncaa-teams-cut-pandemic (Nov. 6, 2020).

[91] The Stanford Report, *Stanford Athletics varsity sport reductions: FAQ*, https://news.stanford.edu/stories/2020/07/athletics-faq (Jul. 8, 2020).

[92] Washington State University, *WSU to present plan for balancing athletics operating budget by 2023*, https://news.wsu.edu/press-release/2021/04/30/wsu-present-plan-balancing-athletics-operating-budget-2023 (Apr. 30, 2021).



ER0942

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

## 7    ECONOMIC AND OPERATIONAL IMPACTS ON THE WSU ATHLETICS DEPARTMENT AND FOOTBALL PROGRAM DUE TO COVID-19

Covid-19 posed significant financial and operational risks to the WSU football program, Athletics Department, and the greater university.  In 2020, there was uncertainty around how many games WSU would play given the emergence of Covid-19.  At the start of the 2020 football season, WSU was scheduled to play seven games.  However, WSU only played four games during that season due to cancellations resulting from Covid-19 outbreaks.[93]

The impact of Covid-19 related cancellations are evidenced by the year-over-year declines in profitability in the WSU Athletics Department and the football program.  Total Athletics Department revenues declined by 46% from FY 2020 to FY 2021, while its annual deficit increased 884% over FY 2020, as shown in Figure 5 below.

**Figure 5: Summary of Athletics Department Financial Declines from FY 2020 to FY 2021[94]**

|  | FY 2020 | FY 2021 | % Decline |
|---|---|---|---|
| Total Revenue | $ 74,741,186 | $ 40,089,718 | -46.4% |
| Total Deficit | $ (2,530,744) | $ (24,912,310) | -884.4% |

The primary cause of the financial decline within WSU's Athletics Department was due to declines in revenues from ticket sales, conference distributions, contributions, and media rights stemming from Covid-19-related cancellations and risks.   From FY 2020 to FY 2021, total department ticket sales decreased 100% year-over-year, revenue from conference distributions declined 68% year-over-year, revenue from contributions declined 47% year-over-year, and revenue from media rights declined 22% year-over-year, as shown in Figure 6 below.

---

[93] WSU, *2020 Football* Schedule, https://wsucougars.com/sports/football/schedule/2020.
[94] Attachment C.



ER0943

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**



Figure 6: Comparison of Athletics Department Revenue Categories from FY 2020 to FY 2021[95]

As shown in Figure 7 below, almost all the decline in revenue related to ticket sales, conference distributions, and media rights was attributable to the football program. For example, football ticket sales declined 100% year-over-year from FY 2020 to FY 2021, revenue from conference distributions attributable to football declined 67% year-over-year, and revenue from media rights attributable to football declined 22% year-over-year.

---

[95] Attachment C.



Page 18

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**



**Figure 7: Comparison of Football Revenue Categories from FY 2020 to FY 2021**[96]

As discussed in Section 6, in FY 2021, WSU took out $35.6 million in external financing in the form of general university bonds to help cover revenue losses related to the Covid-19 pandemic and balance the Athletics Department's operating budget by 2023.[97]  I understand that WSU had never taken out external financing for this purpose before.  WSU intended to repay the bonds with future Pac-12 media and bowl revenue distributions.  Such debt repayment will continue to impact the profitability of the WSU Athletics Department for many years.

To prevent future Covid-19-related impacts to WSU's Athletics Department, it had to actively manage potential risks related to Covid-19.  Given the significance of the football program on the finances of WSU's Athletics Department, the university and its Athletics Department needed to specifically manage Covid-19 risks within the football program to avoid cancelled football games, which would significantly impact the department's budget.  On April 28, 2021, WSU announced it was instituting a vaccine requirement for students and employees for the fall semester.[98]

---

[96] Attachment D.

[97] WSU, *WSU to present plan for balancing athletics operating budget by 2023,* https://news.wsu.edu/press-release/2021/04/30/wsu-present-plan-balancing-athletics-operating-budget-2023 (Apr. 30, 2021).

[98] Kyle Bonagura, *Inside Nick Rolovich's downfall at Washington State over the COVID-19 vaccine,* https://www.espn.com/college-football/story/_/id/32459767/inside-nick-rolovich-downfall-washington-state-Covid-19-vaccine (Oct. 27, 2021).



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

However, in July 2021, Mr. Rolovich, WSU's head football coach, publicly announced that he had elected not to be vaccinated against Covid-19.[99] Mr. Rolovich's message came at a time when most "powers that be" in college football, and at WSU, were doing their best to convince athletes to take the vaccine to reduce the possibility of another season that was disrupted by cancellations due to positive Covid-19 tests.[100] Additionally, Mr. Rolovich's failure to be vaccinated posed substantial additional risks to the football program and university at a time when WSU was actively attempting to limit its health and financial risks related to the Covid-19 pandemic.

One such risk was the increased rate at which unvaccinated individuals could contract and spread Covid, increasing the risk for potential Covid-19 outbreaks amongst the football team and, subsequently, the wider university and local communities.[101] NCAA rules in effect at the time of Mr. Rolovich's announcement required only unvaccinated players and coaches to undergo regular Covid-19 testing.[102] As a result, positive test results were more likely to occur in a program with greater numbers of unvaccinated players and coaches.

According to Dr. Palmer and other medical professionals worldwide, the Covid-19 vaccine was a critical part of mitigating Covid-19 outbreaks.[103] WSU encouraged its faculty and students to get the Covid-19 vaccine. In an email to employees in March 2021, WSU President Kirk Schulz noted "[g]etting vaccinated as soon as possible is more important than ever" and "if we all do our part, we can stop this latest outbreak."[104] By April 15, 2021, all Washington adults over the age of 16 were eligible for the Covid-19 vaccine.[105] Once all adults became eligible for the vaccine, WSU hosted vaccine clinics aimed at vaccinating its student population.[106]

---

[99] Nick Rolovich, @NickRolovich, X (Jul. 21, 2021, 2:19 PM), https://x.com/NickRolovich/status/1417957468366200832/photo/1. I understand that in total seven football coaches, one football recruiting assistant, and several football players also elected not to receive the Covid-19 vaccination, further increasing the risks of a Covid-19 outbreak.

[100] Eddie Timanus, *Unvaccinated Washington State football coach Nick Rolovich will not attend Pac-12 media day*, https://www.usatoday.com/story/sports/ncaaf/pac12/2021/07/21/washington-state-coach-nick-rolovich-unvaccinated-Covid-media-day/8049468002 (Jul. 21, 2021).

[101] Expert Report of Guy H. Palmer, DVM, PhD, dated August 11, 2024 ("Palmer Expert Report"), ¶¶ 57-58.

[102] The Athletic, *NCAA releases COVID-19 guidelines, suggests longer quarantines for unvaccinated*, https://www.nytimes.com/athletic/4203384/2021/08/04/ncaa-releases-Covid-19-guidelines-suggests-longer-quarantines-for-unvaccinated (Aug. 4, 2021).

[103] Palmer Expert Report, ¶¶ 26–29; Seyed M. Moghadas, et. al., *The impact of vaccination on COVID-19 outbreaks in the United States* (Nov. 30, 2020), National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7709178.

[104] WSU, *News and Notes: From the Desk of Kirk Schulz*, https://from.wsu.edu/president/2021/time-to-lean-in/email.html (Mar. 31, 2021).

[105] WSU, *All Washington adults eligible for COVID-19 vaccine beginning April 15*, https://news.wsu.edu/news/2021/03/31/washington-adults-eligible-Covid-19-vaccine-beginning-april-15 (Mar. 31, 2021).

[106] WSU, *Cougar Health Services hosting vaccine clinics this spring*, https://news.wsu.edu/news/2021/04/15/cougar-health-services-hosting-vaccine-clinics-spring (Apr. 15, 2021).



ER0946

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

Given the risks associated with Covid-19, I wanted to better understand how vaccination rates among the WSU football team compared to other teams within the Pac-12 conference. As shown in Figure 8, WSU had the lowest vaccination rate among the ten Pac-12 teams that reported their vaccination rates with only 80% vaccinated as of August 19, 2021. For comparison, Arizona had the highest vaccination rate at 100%. The stance from Arizona head coach Jedd Fisch contrasted Mr. Rolovich's approach. Mr. Fisch noted that the Arizona football program "worked very hard to accomplish" the 100% vaccination milestone, which included all players, coaches, and staffers affiliated with the program.[107] Mr. Fisch also noted that the vaccination milestone would help Arizona football avoid forfeitures during the 2021 season.[108]

**Figure 8: Pac-12 Football Team Vaccination Rates as of August 19, 2021**[109]

| School | Vaccination Rate |
| --- | --- |
| Arizona | 100% |
| UCLA | 98% |
| Washington | Above 95% |
| Colorado | 94.5% |
| Oregon | 90-95% |
| Utah | Above 90% |
| USC | Above 90% |
| Oregon State | 88% |
| Stanford | 85% |
| Washington State | 80% |

**7.1    POTENTIAL LOST REVENUES FROM CANCELLED FOOTBALL GAMES**

The potential impact of Covid-19 on WSU's football program remained significant in 2021. The existence of Covid-19 continued to increase the likelihood of cancelled football games. As noted above, WSU was required to have a minimum of 53 scholarship players available to be eligible to play a game. If WSU could not field at least 53 scholarship players, Pac-12 rules stated that WSU would forfeit that game if the Pac-12 commissioner, in his sole discretion, determined that WSU was "at fault" for the team's inability to play. It was reported that "[t]he vaccination status of players and coaches, as well as the team's ability to follow social distancing and masking protocols, will almost certainly be what drives the determination about whether a game will be forfeited by a team should they be unable to field a full team due to positive Covid

---

[107] Ryan Kelapire, *Arizona football program 100% vaccinated against COVID-19*, https://www.azdesertswarm.com/football/2021/8/19/22633460/arizona-wildcats-football-program-vaccination-rate-100-percent-Covid-19-coronavirus-pac-12-by-team (Aug. 19, 2021).

[108] *Id.*

[109] Jon Wilner, *Pac-12 Hotline: Wildcats are 100% vaccinated; ASU won't disclose numbers*, https://tucson.com/sports/pac-12-hotline/pac-12-hotline-wildcats-are-100-vaccinated-asu-wont-disclose-numbers/article_7eb1de82-0111-11ec-965d-c74107efe30e.html (Sept. 24, 2022). Vaccination data for Arizona State University and the University of California, Berkeley was not available.



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

tests or contact tracing."[110]   NCAA rules required players and coaches to quarantine for 10 days if they tested positive for Covid-19 and wait to rejoin the team until at least 24 hours had passed without having a fever.  For example, an asymptomatic player who tested positive on a Wednesday would therefore be ineligible to play not only in the Saturday game three days later but also in the *following* week's game.[111] In 2021, then, a Covid-19 outbreak posed a clear risk of having significant impacts on the WSU football program, the Athletics Department, and the university.

To estimate the impact of a cancelled game, I analyzed WSU's historical financials for the football program from FY 2018 to FY 2020.  This period reflects information that would have been known or knowable to WSU at the time it was managing the risks associated with Mr. Rolovich's vaccine decision.  I analyzed the financial impacts resulting from lost ticket sales, lost revenue from media rights, and lost revenue from bowl games, as discussed in more detail below.

### 7.1.1   LOST REVENUE FROM TICKET SALES

As discussed in Section 5.1, conferences such as the Pac-12 implemented policies that prohibited fans from attending games during the 2020 football season.  These policies directly impacted the ticket revenue WSU generated from the football ticket sales in FY 2021.  For example, in FY 2021, WSU recorded no revenue from football ticket sales.  By the 2021 football season, fans were allowed to return to stadiums and attend football games, although sometimes with Covid mitigation procedures in place.[112]

Covid-19 outbreaks also forced a significant number of cancelled games during the 2020 football season. For example, in FY 2021, WSU had three scheduled home games, two of which were cancelled due to Covid-19 outbreaks within WSU's football team.[113]   Cancelled football games resulted in lost ticket sales for the university.  Although fans were permitted back in stadiums for the 2021 season, cancelled games were still a risk WSU had to manage against.

To estimate the potential lost revenue from ticket sales due to a cancelled game, I analyzed WSU's historical ticket sales from FY 2018 to FY 2020.  During the period analyzed, WSU generated average annual ticket sales of approximately $8.3 million, or approximately $1.25 million per game, as shown in

---

[110] Andy Patton, *Pac-12 releases statement on 2021-2022 forfeiture policy*, https://duckswire.usatoday.com/2021/08/12/pac-12-releases-statement-on-2021-2022-forfeiture-policy (Aug. 12, 2021).

[111] The Athletic, *NCAA releases COVID-19 guidelines, suggests longer quarantines for unvaccinated*, https://www.nytimes.com/athletic/4203384/2021/08/04/ncaa-releases-Covid-19-guidelines-suggests-longer-quarantines-for-unvaccinated (Aug. 4, 2021).

[112] Associated Press, *College football fans head back to stadiums, some with vaccination cards and masks*, https://ktla.com/news/nationworld/college-football-fans-head-back-to-stadiums-some-with-vaccination-cards-and-masks (Aug. 28, 2021).

[113] I understand that fans were not allowed to attend the one home football game that WSU did participate in during the 2020 football season.  Therefore, given no fans, WSU recorded no ticket sales.  *See* Attachment D.



**ER0948**

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

Figure 9 below. Therefore, it is reasonable to estimate that the potential lost ticket sales to WSU resulting from a cancelled game is approximately $1.25 million per game.

**Figure 9: Average Football Ticket Sales per Home Game from FY 2018 to FY 2020**[114]

| FY | Ticket Sales | Home Games | Average Sales per Home Game |
|---|---|---|---|
| FY 2018 | $ 7,844,423 | 7 | $ 1,120,632 |
| FY 2019 | 9,022,129 | 7 | 1,288,876 |
| FY 2020 | 7,963,775 | 6 | 1,327,296 |
| Average | $ 8,276,776 | | $ 1,245,601 |

### 7.1.2  LOST REVENUE FROM MEDIA RIGHTS

Cancelled games also impacted the amount of revenue received from media rights contracts. As discussed in Section 4.1, I understand that WSU received revenue from the Pac-12 conference via separate media contracts between Fox/ESPN and the Pac-12 conference to broadcast its football games on various media outlets. From FY 2018 to FY 2020, WSU generated annual revenue from media rights between $16.8 million to $18.6 million, growing steadily at 5.1% per year, as shown in Figure 10 below.

**Figure 10: WSU's Football Media Rights Revenue from FY 2018 to FY 2020**[115]

| FY | Media Rights Revenue | % Growth |
|---|---|---|
| FY 2018 | $ 16,842,325 | *N/A* |
| FY 2019 | 17,709,396 | 5.1% |
| FY 2020 | 18,620,777 | 5.1% |

However, in FY 2021, WSU's annual revenue from media rights declined from $18.6 million to $14.5 million.[116] I understand the decline in revenue from media rights was due to fewer games played due to Covid-19 and, therefore, fewer games broadcast. For example, the Pac-12 conference played a seven-game schedule during the 2020 football season (FY 2021),[117] compared to a typical 12 game schedule.[118] To estimate the media rights for FY 2021 assuming a full 12-game season, I grew FY 2020 revenues by the historical annual growth rate of 5.1%. As shown in Figure 11 below, the estimated unimpacted revenue for FY 2021 was approximately $19.6 million.

---

[114] Attachment D; WSU, *2024 Football Schedule*, https://wsucougars.com/sports/football/schedule.

[115] Attachment D.

[116] Attachment D.

[117] Pac -12, *Pac-12 announces 2020 football schedule*, https://pac-12.com/news/2020/10/3/pac-12-announces-2020-football-schedule (Oct. 3, 2020).

[118] CFB Select, *How many games does college football play?*, https://cfbselect.com/2023/03/02/how-many-games-in-a-college-football-season (Mar. 2, 2023).



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

---

### Figure 11: Estimated FY 2021 Media Rights Revenue[119]

|  | Amount |
|---|---|
| FY 2020 Media Rights Revenue | $ 18,620,777 |
| Annual Growth Rate | 5.1% |
| Increase from FY 2020 to FY 2021 | $ 949,660 |
| **Estimated FY 2021 Media Rights Revenue** | **$ 19,570,437** |

The impact of the entire Pac-12 playing a shortened season in FY 2021 due to Covid-19 resulted in estimated lost media rights revenue to WSU of approximately $5.1 million, as shown in Figure 12 below. To estimate the lost revenue per game to WSU, I divided the total lost revenue by the five games lost which resulted in approximately $1.0 million in lost media rights revenue per game.[120]

### Figure 12: Estimate of WSU's Lost Media Rights Revenue per Game[121]

|  | Amount |
|---|---|
| Estimated FY 2021 Media Rights Revenue | $ 19,570,437 |
| Actual FY 2021 Media Rights Revenue | 14,465,867 |
| WSU's Lost Revenue | $ 5,104,570 |
| Number of Games Lost | 5 |
| **WSU's Lost Revenue per Game** | **$ 1,020,914** |

I understand that during the 2020 football season (FY 2021), the Pac-12 evenly split the lost revenue from media rights across all 12 conference teams regardless of the number of games a specific school cancelled. Therefore, WSU's lost revenue per game can be applied as a proxy for the lost revenue per game for each Pac-12 team. Each conference game involves two Pac-12 teams. Therefore, each conference game lost would result in an average of approximately $2.0 million in lost revenue as shown in Figure 13 below, $1.0 million from WSU's cancellation and another $1.0 million from its opponent's.

---

[119] Attachment D.

[120] A typical college football season is 12 games. However, in FY 2021, media rights reflect revenues based on a seven game schedule. Therefore, the difference in the number of games between a typical season and WSU's FY 2021 season was five games.

[121] Attachment D.



**ER0950**

Nicholas Rolovich v. Washington State University
**Expert Report of David Bones**

---

**Figure 13: Estimate of Total Lost Media Rights Revenue per Game**

|  | Amount |
|---|---|
| Lost Revenue per Game per Team | $ 1,020,914 |
| No. of Teams per Conference Game | 2 |
| **Total Lost Revenue per Game** | **$ 2,041,828** |

As discussed above, Covid-19 continued to pose risks that could have resulted in additional cancelled games during the 2021 football season (FY 2022) and beyond. Cancelled games meant that games scheduled to be broadcast would not have occurred. I assumed that the Pac-12 would have followed the same process it during the 2020 season and evenly split any lost revenue between all 12 conference teams. To estimate the lost revenue to WSU if one game was cancelled and the lost revenue was covered by all 12 conference teams, I divided the total lost revenue per game by the 12 conference teams which resulted in approximately $170,000 per game in lost media rights revenue, as shown in Figure 14 below.

**Figure 14: Estimate of WSU's Share of Lost Media Rights Revenue per Game**

|  | Amount |
|---|---|
| Lost Revenue per Game | $ 2,041,828 |
| No. of Teams in Pac-12 Conference | 12 |
| **WSU's Share of Lost Revenue for One Cancelled Game** | **$ 170,152** |

### 7.1.3    LOST REVENUE FROM BOWL GAMES

WSU also had to consider the possibility of lost revenue from a bowl game when assessing its Covid-19 risks.[122] For example, WSU could have had its bowl game cancelled due to a Covid-19 outbreak. As discussed in Sections 5.1 and 5.2, 16 bowl games were cancelled during the 2020 season due to Covid-19 risks, with another five cancellations in 2021.

In addition, a Covid-19 outbreak during the regular season could have resulted in WSU not being eligible for a bowl game. To qualify for a bowl game in a typical season, an eligible team must have "won a number of games against Football Bowl Subdivision (FBS) opponents that is equal to or greater than the number of its overall losses (e.g., a record of 6-6, or better)."[123] For example, a cancelled game due to a Covid-19

---

[122] WSU had participated in a bowl game every year since 2015, excluding the shortened 2020 season. *See* SRCFB, *Washington State Couger Bowls*, https://www.sports-reference.com/cfb/schools/washington-state/bowls.html.

[123] Daniel Wilco, *How college football bowl games work*, https://www.ncaa.com/news/football/article/2018-12-26/how-college-football-bowl-games-work (Dec. 26, 2018).



(164 of 299), Page 164 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 164 of 299
Case 2:22-cv-00319-TOR    ECF No. 96    filed 10/14/24    PageID.1638    Page 33
of 68

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

outbreak during the 2021 season would have resulted in a forfeit/loss per Pac-12 rules.[124] Therefore, a cancelled game would increase WSU's total losses in a season, as well as prevent WSU from potentially recognizing another win. Either way, the impact of a cancelled game could ultimately be the difference between whether a team qualifies for a bowl game or not.

I analyzed WSU's historical bowl game revenue from FY 2018 to FY 2020 to estimate the potential lost revenue due to a cancelled bowl game. During the period analyzed, WSU played in three bowl games, generating an average of approximately $1.9 million in revenues, as shown below in Figure 15. When considering its risks, WSU had to consider the possibility of losing at least $1.9 million if its bowl game was cancelled due to a Covid-19 outbreak within its coaching staff and/or team.[125] In 2021 (or FY 2022), WSU played in the Sun Bowl on December 31, 2021, which generated revenue of $1.9 million.[126]

**Figure 15: Average Football Bowl Revenues**[127]

| FY | Bowl Revenues | |
|---|---|---|
| FY 2018 | $ | 2,448,141 |
| FY 2019 | | 1,845,569 |
| FY 2020 | | 1,370,951 |
| **Average** | **$** | **1,888,220** |

### 7.1.4    SUMMARY OF THE POTENTIAL LOST REVENUES TO WSU FOOTBALL DUE TO COVID-19

In summary, Covid-19 outbreaks posed significant risks for cancelled games, which in turn could result in lost revenue from ticket sales, media rights, and bowl games. To illustrate the potential impact to WSU, I estimated the potential lost revenue if one game, two games, and six games[128] were cancelled, as shown in Figure 16 below. The total impact to WSU in terms of lost revenue ranges from $3.3 million to $10.4 million, assuming one to six games were cancelled plus one bowl game. The below amounts are conservative, as they do not include other potential lost revenue sources such as revenue from concessions, parking, and other gameday revenues. To the extent that more than six games are cancelled, the potential lost revenue to WSU would increase.

---

[124] Andy Patton, *Pac-12 releases statement on 2021-2022 forfeiture*, https://duckswire.usatoday.com/2021/08/12/pac-12-releases-statement-on-2021-2022-forfeiture-policy (Aug. 12, 2021).

[125] I understand that premiere bowl games, such as the New Years Six bowl games, can generate significant additional revenue for a university.

[126] Attachment D; WSU, *2021 Football Schedule*, https://wsucougars.com/sports/football/schedule.

[127] Attachment D; I understand that there may be expenses associated with bowl games. However, for the purposes of this illustration, I have captured the potential lost revenue to WSU.

[128] I understand that a typical season consists of six or seven home games. As a conservatism, I performed my analysis based on the assumption that typical season consisted of six home games.



(165 of 299), Page 165 of 299
Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 165 of 299
Case 2:22-cv-00319-TOR    ECF No. 96    filed 10/14/24    PageID.1639    Page 34
of 68

Nicholas Rolovich v. Washington State University
Expert Report of David Bones

**Figure 16: Summary of Potential Lost Revenue to WSU Due to Cancelled Football Games**

| Revenue Source | One Game Cancelled | Two Games Cancelled | Six Games Cancelled |
|---|---|---|---|
| Ticket Sales | $ 1,245,601 | $ 2,491,202 | $ 7,473,607 |
| Media Rights | 170,152 | 340,305 | 1,020,914 |
| Bowl Revenue | 1,888,220 | 1,888,220 | 1,888,220 |
| **Total Potential Lost Revenue to WSU** | **$ 3,303,974** | **$ 4,719,727** | **$ 10,382,741** |

## 7.2   INCREMENTAL COSTS TO ACCOMMODATE UNVACCINATED COACHES

Mr. Rolovich's and the six other coaches' decisions not to be vaccinated against Covid-19 would have forced WSU to incur incremental costs it otherwise would not have, were its coaches vaccinated.  For example, WSU would have incurred costs for separate travel and accommodations to accommodate unvaccinated coaches, as well as costs for contact tracing due to Covid-19 outbreaks.

### 7.2.1   TRAVEL COSTS TO ACCOMMODATE UNVACCINATED COACHES

On October 14, 2021, WSU's Environmental Health and Safety ("EH&S") issued an assessment related to Mr. Rolovich's vaccination exemption request.[129]  Within the assessment, WSU's EH&S provided a set of minimum recommendations that it deemed were reasonable and necessary to protect Mr. Rolovich and others he interacted with.[130]  The assessment consisted of recommendations for the necessary protective equipment, testing, quarantine, and travel accommodations, among other items.[131]  The travel recommendations for unvaccinated individuals consisted of separate hotel rooms and separate modes of transportation to accommodate distancing, such as separate flights and buses.[132]  In his report, Dr. Palmer also stated that he would have recommended that separate travel arrangements—e.g., separate chartered flights, separate buses, and individual hotel accommodations—be implemented for the unvaccinated coaches in order to reduce the risks of transmission of Covid-19.[133]

To estimate the incremental travel costs per game, I estimated the cost for WSU to charter another plane for away games to accommodate Mr. Rolovich and the six other unvaccinated coaches, as well as the cost for an additional bus for home and away games.[134]  Based on discussions with WSU Athletics Department

---

[129] WSU_00016420-27.

[130] *Id.* at 24-27; Rough Draft of Jason Sampson Deposition, *Rolovich v. Washington State University, et al.*, dated August 2, 2024, pp. 25:16-26:6 and 27:2-14.

[131] WSU_00016420-27 at 24-27.

[132] *Id.* at 25-26.

[133] Palmer Expert Report, ¶ 60.

[134] I understand that WSU football coaches typically received individual hotel accommodations.  Therefore, it is unlikely WSU would have incurred incremental costs for additional hotel rooms to accommodate its unvaccinated coaches.



Page 27

ER0953

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

staff, I understand that the average plane that WSU chartered for away games could accommodate between 160-178 passengers and it was unlikely that WSU would have chartered a similar plane to accommodate the seven unvaccinated coaches.

Given Dr. Palmer's recommendations for separate chartered air travel, I estimated the cost to charter a smaller plane to accommodate just the seven unvaccinated coaches.  My analysis assumes that WSU would have chartered a Bombardier Learjet 45, which accommodates 7 people.[135]  The cost to charter a flight includes several types of fees, such as an hourly rental fee, landing fees, ramp and handling fees, and crew fees, as well as taxes and fees.  See below for an explanation and estimate of the fee.

- The hourly rental fee is a fee for billable flight time, calculated on an hourly basis.  The hourly fee for a Bombardier Learjet 45 is $4,450 per hour, inclusive of a fuel surcharge.[136]  I assumed that the average roundtrip flight from WSU to its opponent's location was a total of 5.5 hours, including 30 minutes before takeoff and after landing each flight, plus an average of 1.75 hours each way.[137]

- The landing fee is charged by the airport authority to maintain the facility and varies by airport, with fees typically ranging from $150 to $500 per way.[138]  For the purposes of my analysis, I assumed the midpoint of the landing fee, or $325 per way.

- The ramp and handling fee is charged to handle and park an aircraft, which varies between $100 and $500 per visit.[139]  For the purposes of my analysis, I assumed the midpoint of the ramp and handling fee, or $300 per visit.

- Crew fees include overnight and per diem fees to cover food, lodging, and other expenses for the flight crew related to being away from home.  The crew fee ranges between $200 and $400 per crew member per night.[140]  For the purposes of my analysis, I assumed the midpoint of the crew fee, or $300 per crew member per night.  I also assumed the crew were only away from home for one night per crew member.

---

[135] Paramount Business Jets, *Learjet 45 Charter- Rental Cost and Hourly Rate*, https://www.paramountbusinessjets.com/private-jet-charter/aircraft/learjet-45.

[136] *Id.*; Paramount Business Jets, *Private Jet Rental Costs*, https://www.paramountbusinessjets.com/private-jet-rental-cost.

[137] To determine the average travel time of 1.75 hours per leg, I averaged the flight time between WSU's closest and furthest conference opponents.  WSU's closest conference opponent is the University of Washington in Seattle, WA, which is approximately a one hour flight from Pullman, WA.  WSU's furthest conference opponent is the University of Arizona in Tucson, AZ, which is approximately a 2.5 hour flight from Pullman, WA.  *See* https://www.travelmath.com/flying-time/from/Pullman,+WA/to/Seattle,+WA and https://www.travelmath.com/flying-time/from/Pullman,+WA/to/Tucson,+AZ.

[138] Paramount Business Jets, *Private Jet Rental Costs*, https://www.paramountbusinessjets.com/private-jet-rental-cost.

[139] *Id.*

[140] *Id.*



Page 28

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

- The federal excise tax is a tax charged for all US domestic flight legs at a rate of 7.5%. The federal excise tax is charged on any amount paid for air transportation.[141]

- The US Segment fee is a government tax calculated per passenger.[142] In 2021, the segment fee was $4.30 per passenger per leg, and increased to $4.50 per passenger per leg in 2022.[143] For the purposes of my analysis, I assumed an average US segment fee of $4.40 per passenger per leg, for a total of seven passengers, or 14 legs.

Based on the estimates for each fee discussed above, the estimated cost to charter a smaller plane to accommodate WSU's unvaccinated coaches would have been approximately $28,000 per game, as shown in Figure 17 below.

**Figure 17: Estimated Cost to Charter a Private Plane per Game**[144]

| Types of Fees | Unit Cost | Quantity | Total Cost |
|---|---|---|---|
| Hourly Rental Fee | $ 4,450 | 5.5 | $ 24,475 |
| Landing Fee | $ 325 | 2.0 | 650 |
| Ramp and Handling Fee | $ 300 | 2.0 | 600 |
| Crew Fees | $ 300 | 2.0 | 600 |
| Subtotal | | | $ 26,325 |
| Federal Excise Tax *(7.5% of subtotal)* | | | 1,974 |
| US Segment Fees | $ 4.40 | 14 | 62 |
| Total | | | $ 28,361 |
| **Total (Rounded)** | | | **$ 28,000** |

Next, I estimated the cost for WSU to charter an additional bus for away and home games to accommodate Mr. Rolovich and the six other unvaccinated coaches. An estimate for the average cost to charter an additional charter bus is between $1,100 and $1,900 per day, depending on location.[145] For the purposes of my analysis, I assumed the midpoint of the average cost range or $1,500 per day. I also assumed that WSU would have to rent a bus for one day for a home game and two days for an away game.[146] See Figure 18 below for the cost of an additional bus per home and away game.

---

[141] *Id.*

[142] *Id.*

[143] Federal Aviation Administration, *Current Aviation Excise Tax Structure*, https://www.faa.gov/sites/faa.gov/files/2022-07/ATTF_Excise_Tax_Rate_Structure_CY_2022.pdf.

[144] I understand that WSU may incur additional fees associated with chartering a private plane, such as in-flight catering, aircraft positioning fees, and Wi-Fi charges, which I did not include in my analysis. Therefore, the estimated cost to charter a private plane is conservative. *See* https://www.paramountbusinessjets.com/private-jet-rental-cost.

[145] National Charter Bus, *How Much Does a Charter Bus Rental Cost?*, https://www.nationalbuscharter.com/charter-bus-rental-prices.

[146] I understand that WSU football would arrive at its opponent's location the day prior to a game and leave immediately following a game.



ER0955

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

### Figure 18: Average Cost to Charter an Additional Bus for Home and Away Games

|  | Unit Cost | No. of Days | Cost per Game |
|---|---|---|---|
| Home Games | $ 1,500 | 1 | $ 1,500 |
| Away Games | $ 1,500 | 2 | $ 3,000 |

I understand that WSU had five games left in the 2021 season, two home games and three away games, following Mr. Rolovich's termination and the imposition of Governor Inslee's proclamation requiring state employees to be fully vaccinated on October 18, 2021.[147]   Governor Inslee's proclamation remained in effect until October 31, 2022, when the Governor terminated the state of emergency, including all underlying proclamations.[148]  By that time, WSU had played eight games in the 2022 season, five homes games and three away games.[149]   Therefore, WSU would have incurred incremental costs to charter a plane to six away games, plus an additional bus for seven home games and six away games. As shown in Figure 19, the incremental cost to WSU to accommodate Mr. Rolovich and the six other unvaccinated coaches that I understand travelled with the team, was approximately $197,000.

### Figure 19: Incremental Travel Costs to Accommodate Unvaccinated Coaches

| Travel Cost | Per Game Cost | No. of Games | Total Cost |
|---|---|---|---|
| Chartered Flight | $ 28,000 | 6 | $ 168,000 |
| Buses *(Home)* | $ 1,500 | 7 | 10,500 |
| Buses *(Away)* | $ 3,000 | 6 | 18,000 |
| Buses Subtotal |  |  | $ 28,500 |
| Total |  |  | $ 196,500 |
| **Total (Rounded)** |  |  | **$ 197,000** |

---

[147] WSU, *2021 Football Schedule*, https://wsucougars.com/sports/football/schedule/2021.

[148] Washington Governor Jay Inslee, *Inslee announces end to remaining COVID-19 emergency orders and state of emergency by October 31*, https://governor.wa.gov/news/2022/inslee-announces-end-remaining-Covid-19-emergency-orders-and-state-emergency-october-31 (Sept. 8, 2022); Office of Governor Jay Inslee, Proclamation 21-14.6, https://governor.wa.gov/sites/default/files/proclamations/21-14.6%20-%20COVID%20Vaccination%20Requirement_Recission_%28tmp%29.pdf.

[149] WSU, *2022 Football Schedule*, https://wsucougars.com/sports/football/schedule/2022.



**ER0956**

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

### 7.2.2    CONTACT TRACING RELATED TO COVID-19 OUTBREAKS

WSU also had to incur significant costs to conduct contact tracing related to Covid-19 outbreaks.  Per the Centers for Disease Control and Prevention, "contact tracing is the process of quickly identifying, assessing, and managing people who have been exposed to a disease to prevent additional transmission."[150]  Contact tracing is also a fundamental tool for stopping Covid-19 outbreaks.[151]

WSU experienced two Covid-19 outbreaks in February and March 2021.  As part of WSU's response to each outbreak, it undertook significant contact tracing efforts to identify close contacts who may have contracted Covid-19.  I understand that the March 2021 outbreak involved members of WSU's football team who hosted a birthday party for a teammate without approved Covid-19 mitigation practices.[152]  By March 9, 2021, 28 positive cases were identified from the football program.[153]  By March 17, 2021, another 29 positive Covid-19 cases were identified via contact tracing and subsequent testing.[154]

The cost of contact tracing and targeted testing resulting from the two Covid-19 outbreaks cost WSU approximately $200,000.[155]  To estimate the incremental cost of future contact tracing, I assumed the contact tracing costs were the same for two early 2021 outbreaks, or $100,000 per outbreak.  Therefore, an estimate of the incremental cost WSU would be subject to in the event of future Covid-19 outbreaks would be $100,000 per outbreak.  This cost does not include additional staffing and supply costs that WSU incurred.[156]  Therefore, the above estimate of WSU's incremental cost for contact tracing is conservative.

### 7.3    ADDITIONAL IMPACTS DUE TO COVID-19

WSU also experienced additional impacts resulting from Mr. Rolovich's decision not to receive the Covid-19 vaccination.  Such impacts included (1) threats from donors to withdraw contributions, (2) costs for more frequent Covid-19 testing for unvaccinated coaches, (3) reputational impacts to WSU, and (4) additional costs to charter flights to recruiting events.

### 7.3.1    POTENTIAL LOSS OF DONATIONS FROM DONORS WHO THREATENED TO WITHDRAW CONTRIBUTIONS

I understand that Mr. Rolovich's decision not to receive the Covid-19 vaccination was not well-received by some donors at WSU, endangering ongoing and future donor relationships.  For example, in August 2021, WSU donor, Mr. Gordon MacArthur, informed WSU personnel that he had cancelled his bequest to WSU

---

[150] Centers for Disease Control, *Contract Tracing*, https://www.cdc.gov/museum/pdf/cdcm-pha-stem-lesson-contact-tracing-lesson.pdf.

[151] *Id.*

[152] WSU_00034458-60 at 58.

[153] *Id.* at 59.

[154] *Id.*; 3 + 20 + 2 + 4 = 29 cases.

[155] WSU_00034458-60 at 59.

[156] *Id.*



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

for scholarships, noting the reason was "[b]ecause of Rolovich's refusal to get vaccinated and the negative message it sends to so many who look up to the coaches."[157]  At the time Mr. MacArthur informed WSU that he had cancelled his bequest, the value was approximately $1,000,000.[158]

Given the significant contribution cancelled by one donor, WSU had to manage further losses from donors and preserve its donor relationships.  See below for a list of selected examples of various donors threatening to withdraw donation pledges or contributions.  In addition to the below examples, I understand that there were several additional donors that did not explicitly threaten to withdraw their contributions but were still unhappy with Mr. Rolovich's decision not to receive the Covid-19 vaccination, endangering future donor relationships.

- A donor attended the Pebble Beach – Coaches Classic, which Mr. Rolovich also attended without telling the donors he was unvaccinated.[159]  As a result of Mr. Rolovich's participation while unvaccinated, the donor threatened to pull a $250,000 donation because of Rolovich's unvaccinated status.[160]

- On July 21, 2021, a WSU alumnus and donor communicated that, because of Coach Rolovich's decision to not get vaccinated against Covid he will "no longer send monetary support to WSU programs and unfortunately will not be rooting for the WSU Football team as long as Rolovich represents Washington State University."[161]

- On July 24, 2021, a WSU alumnus communicated that "[i]f [Mr. Rolovich] is not fired WSU will get no more donations from me and I will not be rooting for the football team."[162]

- On July 25, 2021, a WSU alumnus expressed that, because of Mr. Rolovich's actions, "I will not attend a football game or contribute payments to the [Cougar Athletic Fund] for as long as he remains our head coach."[163]

- Around September 16, 2021, another WSU donor announced in a Seattle Times article that she was "closing her checkbook" to WSU over Mr. Rolovich's vaccine decision.  The donor had previously donated around $26,000 to WSU.[164]

---

[157] WSU_00019338-39 at 39.

[158] *Id.*

[159] WSU_00019337.

[160] *Id.*

[161] WSU_00018117-228 at 133.

[162] *Id,* at 160.

[163] *Id.* at 140.

[164] WSU_00033744.



ER0958

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

I also understand that as part of Mr. Rolovich's head coaching responsibilities, he was required to attend certain functions on behalf of WSU and its football program, such as donor and fan outreach events. However, as noted below, Mr. Rolovich's vaccination status precluded him from attending several in-person events, and limited WSU from planning future events.  For example,

- Mr. Rolovich was unable to attend the WSU Football Coaches Show in person, which is a "critical component of donor and fan outreach."[165]

- Mr. Rolovich was unable to attend weekly Friday donor lunches, which the university considered a "critical" part of donor outreach."[166]

- Mr. Rolovich cancelled an event on July 22, 2021 with a $7 million donor couple.[167]

- Mr. Rolovich cancelled a dinner on July 23, 2021 that was auctioned off as a private experience. WSU received multiple requests for refunds following the cancellation.[168]

- WSU had to remove Mr. Rolovich from the Kickoff with the Cougs event on August 26, 2021 and the CAF Coaches Luncheon event, scheduled for October 9, 2021.[169]

### 7.3.2    COVID-19 TESTING REQUIREMENTS FOR UNVACCINATED COACHES AND PLAYERS

Unvaccinated coaches and players were also subject to continued Covid-19 testing requirements in 2021. I reviewed the Covid-19 guidelines issued by the NCAA, Pac-12 conference, and WSU to better understand the Covid-19 testing requirements for vaccinated and unvaccinated coaches and players.  According to WSU's Fall 2021 guidelines updated in August 2021, vaccinated coaches and players were only required to test for Covid-19 if 5% or more of the football team tested positive within a two-week period.[170]  Contact tracing and social distancing were also not required for vaccinated coaches and players.[171]

However, unvaccinated coaches were subject to much more frequent testing for team travel and activities. For example, per WSU guidelines from August 2021, unvaccinated coaches had to take one PCR test per week, plus daily antigen tests for team travel and activities.[172]  I understand that seven WSU football coaches, plus one football recruiting assistant, were unvaccinated.  Given the more frequent testing

---

[165] WSU_00020060-62 at 62.
[166] *Id.* at 61.
[167] WSU_00019337.
[168] *Id.*
[169] *Id.*
[170] WSU_00002865-71 at 68.
[171] *Id.*
[172] *Id.* at 69.



**ER0959**

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

requirements for unvaccinated coaches, WSU needed to consider the additional testing costs to accommodate unvaccinated coaches.

### 7.3.3    IMPACT TO WSU'S REPUTATION

On July 21, 2021, Mr. Rolovich publicly announced that he had elected not to receive the Covid-19 vaccine, stating:

> *"As the Pac-12 Conference has required that all in-person participants at next week's Pac-12 Football Media Day be fully vaccinated, I will participate remotely and look forward to talking about our football team and the incredible young men in our program.  **I have elected not to receive a Covid-19 vaccine for reasons which will remain private [emphasis added]**.  While I have made my own decision, I respect that every individual — including our coaches, staff and student-athletes — can make his or her own decision regarding the Covid-19 vaccine.  I will not comment further on my decision."[173]*

Following Mr. Rolovich's statement, news of his decision began to circulate across the internet and social media platforms.  For example, various large national media outlets posted articles about Mr. Rolovich's decision, such as ESPN.com, Yahoo News, The Washington Post, USA Today, Fox News, and The Wall Street Journal.[174]  Within 24 hours of Mr. Rolovich's statement, the potential audience reach[175] according to a Meltwater[176] survey was nearly 1.1 billion views.[177]  As of August 23, 2021, approximately one month after Mr. Rolovich's statement, the potential audience reach had increased to 6.5 billion views, nearly six times the levels from one month prior.[178]  A potential audience reach of 6.5 billion views made the Rolovich vaccine issue "the single-largest driver of WSU coverage in years" and could be the highest total reach of any WSU issue in the past four years.[179]

Another metric measured in the Meltwater survey was public sentiment on social media related to the Rolovich vaccine coverage.  As of July 23, 2021, negative sentiment reached 13% compared to positive sentiment of 6%.[180]  For comparison, WSU's historical negative sentiment rarely exceeded single digits.[181]

---

[173] Nick Rolovich, @NickRolovich, X (Jul. 21, 2021, 2:19 PM),
https://x.com/NickRolovich/status/1417957468366200832/photo/1.

[174] WSU_00016653.

[175] Potential audience reach measures the number of times news coverage could have been read or seen related to a specific topic, in this case the topic was coverage on Mr. Rolovich's vaccination status.  *See* WSU_00016653.

[176] Meltwater empowers companies with a suite of solutions that spans media, social, consumer, and sales intelligence. By analyzing ~1 billion pieces of content each day and transforming them into vital insights, Meltwater unlocks the competitive edge to drive results.  *See* LinkedIn, *Meltwater*, https://www.linkedin.com/company/meltwater.

[177] WSU_00003824-25 at 24.

[178] WSU_00016653; WSU_00034704-13 at 06.

[179] WSU_00016653; WSU_00034704-13 at 12.

[180] WSU_00008849-58 at 56.

[181] WSU_00003824-25 at 24.



Page 34

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

This type of negative publicity surrounding Mr. Rolovich's vaccination decision had the potential to cause significant reputational damage to WSU.

### 7.3.4    ADDITIONAL COSTS TO CHARTER FLIGHTS TO RECRUITING EVENTS

As discussed in Section 7.2.1, WSU would have incurred incremental costs to charter a separate aircraft for travel to home and away games to accommodate Mr. Rolovich and the six other unvaccinated coaches. According to a memo from the Athletics Department, nearly all recruiting travel is done by commercial flight.[182]  However, I understand it is Dr. Palmer's opinion that he would have recommended that the football team, including staff, no longer travel on commercial flights.[183]  Therefore, WSU would have incurred further incremental costs to charter aircraft for coaches to attend recruiting events.

## 8    HKA'S ANALYSIS OF THE EXPERT REPORT OF DAVID HALL

On July 1, 2024, David A. Hall issued an expert report ("Hall Report") on behalf of Mr. Rolovich to provide opinions on economic damages against WSU, assuming Mr. Rolovich prevails on liability.[184]  Mr. Hall quantified alleged lost compensation damages to Mr. Rolovich stemming from his termination as head football coach at WSU.[185]  Opinion 1 to the Hall Report notes that damages can be reasonably measured as the difference between Mr. Rolovich's but-for compensation, prior to his termination, and his actual compensation.[186]  He applied this damages framework to calculate damages under two scenarios.

### *Scenario One*

Mr. Hall assumed that Mr. Rolovich was terminated without cause and entitled to liquidated damages pursuant to his employment agreement with WSU ("Hall Opinion 2").[187]  Pursuant to Mr. Rolovich's employment agreement ("Rolovich Contract"), he was entitled to 60% of his remaining base salary if he was terminated without cause.[188]  Mr. Hall calculated damages to Mr. Rolovich from contract termination on December 6, 2021, through contract expiration on June 30, 2025.[189]  Damages totaled $4,251,135.[190]

---

[182] WSU_00016082-83 at 82.
[183] Palmer Expert Report, ¶ 60.
[184] Expert Report of David A. Hall, dated July 1, 2024 ("Hall Report"), p. 1.
[185] Hall Report, p. 3.
[186] Hall Report, p. 4.
[187] Hall Report, p. 3.
[188] ROLOVICH00000053-62 at 60.
[189] Hall Report, Attachment 1.
[190] Hall Report, p. 5 and Attachment 1.



ER0961

**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

---

### *Scenario Two*

Mr. Hall assumed that WSU violated Title VII[191] and Mr. Rolovich is entitled to the full remaining value of his contract through contract expiration on June 30, 2025 ("Hall Opinion 3").[192] Mr. Hall assumed two different alternatives under Scenario Two, one which includes Mr. Rolovich's actual compensation throughout the damage period as mitigation and one which does not include any mitigation. In total, Mr. Hall's estimated damages ranged from $10,394,849 to $10,638,521.[193]

Mr. Hall also assumed that Mr. Rolovich would have received a future contract extension with WSU prior to his termination ("Hall Opinion 4").[194] He assumed the duration of Mr. Rolovich's hypothetical extension would have been between one and three years, assuming the same total contract value of $3,005,400 per year pursuant to the Rolovich Contract.[195] Damages related to Mr. Rolovich's possible extensions ranged from $2,650,097 to $7,613,557.[196] Mr. Hall noted that Hall Opinions 3 and 4 are additive, noting total damages under a three-year contract extension scenario are $18,008,406.[197]

### 8.1    MR. HALL DOES NOT CONSIDER THE CAUSE OF MR. ROLOVICH'S INABILITY TO MITIGATE HIS LOSSES IN CALCULATING DAMAGES UNDER OPINIONS 3 AND 4

Mr. Hall's Opinions 3 and 4 are predicated on the assumption that Mr. Rolovich was entitled to the full remaining value of the Rolovich Contract.[198] As noted in Opinion 1 to the Hall Report, damages are the difference between Mr. Rolovich's but-for and actual compensation. According to Mr. Hall, Mr. Rolovich's but-for annual compensation was $3,005,400, which is comprised of base salary, compensation for collateral opportunities, and a vehicle stipend.[199] To determine actual compensation, Mr. Hall assumed two different scenarios. The first scenario incorporated Mr. Rolovich's actual compensation, as well as a projection of his future compensation.[200] In the second scenario, Mr. Hall assumed that Mr. Rolovich had no requirement to mitigate his damages and, therefore, actual compensation was zero.[201] Damages under Hall Opinion 3 are calculated from December 6, 2021 to June 30, 2025.[202] Damages under Hall Opinion 4

---

[191] Title VII prohibits employment discrimination based on race, color, religion, sex and national origin. *See* Equal Employment Opportunity Commission, *Title VII of the Civil Rights Act of 1964*, https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964.

[192] Hall Report, p. 6.

[193] Hall Report, p. 7 and Attachments 2 and 2a.

[194] Hall Report, pp. 7-8.

[195] Hall Report, pp. 7-8.

[196] Hall Report, p. 8.

[197] Hall Report, p. 8.

[198] Hall Report, pp. 6-8. Mr. Hall noted that the full remaining value of the Rolovich Contract is equal to Mr. Rolovich's full base salary plus compensation for collateral opportunities.

[199] Hall Report, p. 6.

[200] Hall Report, p. 6.

[201] Hall Report, p. 7.

[202] Hall Report, Attachment 2.



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

are calculated in one-year increments from June 30, 2025 to June 30, 2028.[203]  Damages under Hall Opinions 3 and 4 are additive.[204]  However, Hall Opinions 3 and 4 are based on his flawed interpretation of the Rolovich Contract and do not consider the cause of Mr. Rolovich's inability to mitigate his damages.

First, the inputs used to arrive at damages under Hall Opinions 3 and 4 are based on his flawed interpretation of the Rolovich Contract.  For example, based on my layperson's review of the Rolovich Contract, Mr. Hall assumes without basis that Mr. Rolovich's but-for compensation is equal to the full remaining value of the Rolovich Contract.  However, based on my review of the Rolovich Contract, I did not identify any provision whereby Mr. Rolovich was entitled to the full remaining value of his contract regardless of whether he was terminated with or without cause.  In contrast, Mr. Hall relied on the terms of the Rolovich Contract when it worked in his favor, such as in his calculation of Mr. Rolovich's actual compensation whereby he assumed mitigation was not required.  Mr. Hall's basis to assume mitigation is not required comes from Section 4.4.1 of the Rolovich Contract which stated, "Employee shall have no mitigation obligation and WSU shall have no offset rights against any compensation earner or received by Employee subsequent to such termination."[205]  As such, Hall Opinions 3 and 4 attempt to move outside the contract for the purpose of compensation amounts but still rely on the contract for the lack of mitigation consideration.  This results in an unreliable calculation of damages as the result is not tied to contractual terms or economic damages principles.

Additionally, Mr. Hall's Opinions 3 and 4 do not consider that Mr. Rolovich's inability to mitigate his damages was caused by Mr. Rolovich's own decision not to get vaccinated.  In fact, Mr. Hall noted in his Opinion 1 that "[d]ue to the public and contentious nature of Mr. Rolovich's termination, Mr. Rolovich contends that his reputation has been damaged, impairing him from finding comparable employment."[206]  Mr. Hall's analysis inherently assumes that WSU was the sole cause of Mr. Rolovich's impaired reputation and that WSU's actions impacted Mr. Rolovich's ability to find comparable employment.

However, Mr. Hall ignores the fact that Mr. Rolovich himself was the primary cause of his damaged reputation.  For example, on July 21, 2021, Mr. Rolovich publicly announced his vaccination decision, noting that, "I have elected not to receive a Covid-19 vaccine."[207]  Mr. Rolovich's announcement received more negative than positive sentiment.  As discussed in Section 7.3.3, the public sentiment about Mr. Rolovich's vaccine decision in the month following his announcement was significantly more negative than positive, 13% compared to 6%, respectively.  In addition, Mr. Rolovich acknowledged in text exchanges that he understood that the sentiment around his vaccine decision was not well received by the public.  For example,

---

[203] Hall Report, p. 8 and Attachment 4.
[204] Hall Report, p. 8.
[205] ROLOVICH00000053-62 at 60.
[206] Hall Report, p. 4.
[207] https://x.com/NickRolovich/status/1417957468366200832/photo/1.



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

- On July 25, 2021, Mr. Rolovich sent a masked picture of himself with the caption "pariah."[208]

- On July 29, 2021, Mr. Rolovich acknowledged that he was "pissing off the whole country."[209]

Following his termination from WSU, multiple coaching opportunities were recommended to Mr. Rolovich, including several head coaching roles. However, based on my review of multiple text message exchanges involving Mr. Rolovich, the overwhelming response from Mr. Rolovich was that he was not eligible for the openings given that he was unvaccinated. I understand that the responses received by Mr. Rolovich are consistent with WSU's stance on the Covid-19 vaccine. See below for examples of Mr. Rolovich's exchanges related to his job search following his termination from WSU.[210]

### *General Comments about Job Search*

- On December 6, 2021, Mr. Rolovich noted that "Incarnate Word said no, vaxxed only. Nevada wants to hire me but they said vaxxed only. Abilene Christian the same."[211]

- On January 7, 2022, Mr. Rolovich asked for recommendations on where to coach in Texas. When asked if he wanted college opportunities, Mr. Rolovich noted "[n]o, I probably need to take a year off. I'm like a leper these days."[212]

- On March 19, 2022, Mr. Rolovich was asked how everything was to which he responded "[c]ant get a job…fucking vax."[213]

### *University of Nevada*

- On December 6, 2021, Mr. Rolovich was asked if he was pursuing the Nevada job, to which he replied "[n]o, must be vaxx."[214] The question about the Nevada job was regarding its open head coaching role.[215]

- In another exchange on December 6, 2021, Mr. Rolovich noted that "Nevada [would] hire me if I was vaxxed they said."[216]

---

[208] ROLOVICH00060096-106 at 98.

[209] ROLOVICH00033079-87 at 79.

[210] My review of Mr. Rolovich's text messages was impacted as many of the text messages were incomplete, with certain messages and information not included, making it difficult to ascertain the full context of the conversation.

[211] ROLOVICH00061687.

[212] ROLOVICH00013623-25 at 23.

[213] ROLOVICH00061483.

[214] ROLOVICH00061300.

[215] Chris Murray, *Here are 25 candidates who could be Nevada football's next head coach*, https://nevadasportsnet.com/news/reporters/here-are-25-candidates-who-could-be-nevada-footballs-next-head-coach (Dec. 6, 2021).

[216] ROLOVICH00060929.



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

---

### *University of Hawaii*

- On December 8, 2021, Mr. Rolovich was asked if there were "any doors left open at [University of Hawaii]" or if "that closed and bridges burnt." Mr. Rolovich responded stating "[n]ot burnt, just vax requirements."[217]

- On January 15, 2022, Mr. Rolovich received a text message stating "[g]o fix Hawaii."[218] The message was in regard to the recent head coaching opening at the University of Hawaii following the resignation of its head coach.[219] Mr. Rolovich responded "[t]hey wont [sic] hire me" and later added it was because of the "[v]ax [sic]."[220]

### *Arizona State University*

- On November 7, 2022, Mr. Rolovich noted that "[i]f the AD stays at ASU, we aint [sic] going there. He is making them wear masks on the bus and plane."[221]

As a Division I FBS head football coach, Mr. Rolovich should have known that finding comparable employment might be difficult. Regardless of WSU's decision, Mr. Rolovich knew, or should have known, that Division I FBS football head coaching jobs were extremely limited. There are only approximately 130 Division I FBS head coaching positions across college football, the same division as WSU.[222] The above messages relate to five of the approximately 130 opportunities[223] that Mr. Rolovich could have pursued but was not eligible for because he was unvaccinated. Following the 2021 college football season, 29 head coaching jobs were available, 22% of all Division I head coaching jobs.[224] Another 24 head coaching jobs were available following the 2022 college football season.[225] In the two years immediately following Mr. Rolovich's termination, more than 40% of all head coaching jobs in Division I football were available.[226] It is unclear how many of the remaining opportunities Mr. Rolovich pursued and/or was turned down from given his vaccination status. In any event, the above examples indicate that Mr. Rolovich's ability to find

---

[217] ROLOVICH00061222-24 at 24.

[218] ROLOVICH00061776-77 at 76.

[219] Christian Shimabuku, *Potential candidates to fill UH football head coaching vacancy following Todd Graham's sudden resignation*, https://www.khon2.com/sports/uh-immediately-begins-search-for-next-head-football-coach-following-todd-grahams-resignation (Jan. 14, 2022).

[220] ROLOVICH00061776-77 at 76.

[221] ROLOVICH00061701.

[222] NCAA, *Our Division I Members*, https://www.ncaa.org/sports/2021/5/11/our-division-i-members.aspx.

[223] As of the 2022 football season, there were 131 FBS Division I football teams. *See* Mike Huguenin, *Current FBS coaches have been in their jobs for an average of just 3.7 years*, https://www.on3.com/news/current-fbs-coaches-have-been-in-their-jobs-for-an-average-of-just-3-7-years (May 16, 2022).

[224] Mike Huguenin, *Current FBS coaches have been in their jobs for an average of just 3.7 years*, https://www.on3.com/news/current-fbs-coaches-have-been-in-their-jobs-for-an-average-of-just-3-7-years (May 16, 2022).

[225] Brandon Marcello, *Coaching Carousel Audit: Examining data of CFB coaching changes*, https://247sports.com/longformarticle/2022-2023-college-football-coaching-carousel-data-208652178 (Apr. 20, 2023).

[226] (29 + 24) / 131 = 40.5%.

---



**Nicholas Rolovich v. Washington State University**
**Expert Report of David Bones**

comparable employment and mitigate his losses was greatly impacted by his decision not to receive the Covid-19 vaccine rather than any actions of WSU.

Additionally, I spoke with WSU's current Athletic Director, Anne McCoy, to understand the status of the alleged extension discussions Mr. Hall referenced. Ms. McCoy had no recollection of any extension discussions with Mr. Rolovich or his agent. Ms. McCoy informed me that contract extensions at WSU were not automatic and that it was just as likely that a head coach would be fired as it was that they would receive an extension. As such, it is speculative, unsupported, and without merit for Mr. Hall to calculate damages based on the assumption that WSU harmed Mr. Rolovich's reputation and impacted his ability to find comparable employment, which renders Mr. Hall's Opinions 3 and 4 unreliable.



**ER0966**

Attachment A



CURRICULUM VITAE

# DAVID R. BONES, CVA

## PARTNER, CO-LEAD OF COMMERCIAL DAMAGES PRACTICE

## QUALIFICATIONS

BS, Finance, Magna Cum Laude, Arizona State University, US
UCLA Extension, Accounting Certificate
Certified Valuation Analyst

## MEMBERSHIPS

National Association of Certified Valuators and Analysts (NACVA)
Association of Certified Fraud Examiners (ACFE)
Maricopa County Bar Association, Finance Committee

## PROFILE

**David Bones** has been helping clients investigate, analyze, and resolve their complex litigation disputes for more than 20 years. David's work has focused primarily on commercial litigation, valuation, intellectual property, forensic accounting, construction, government contracts, and bankruptcy matters.

David has been retained as an expert on over 100 matters, including disputes with damages in excess of $1 billion.  He has provided expert testimony on more than 40 occasions in various settings, including federal and state bench and jury trials around the United States, depositions, arbitrations (including FINRA), and has also presented at mediations. He has issued provided opinions in matters involving lost profits, lost wages, business valuations, construction disputes, funds/asset tracing, financial condition, and solvency analyses.  In 2008, David had the opportunity to lead the solvency team on one of the largest fraudulent conveyance cases in US history.  He has also authored treatises on working with experts and presented to attorney and client groups on many occasions.

Before joining HKA, David provided litigation consulting services at Navigant Consulting, Inc., an international consulting firm, and Tucker Alan Inc.  He also worked for US Airways as a senior analyst in its corporate finance group, and a manager in the Alliance Operations Group.

David has consulted on behalf of Fortune 500 companies and others in various industries, including mining, gaming, energy, real estate development, homebuilding, shipbuilding, manufacturing, software, healthcare (hospital and insurance), grocery, automotive, transportation, specialty finance (subprime mortgage and auto), non-profit, financial institutions, and agriculture.



CURRICULUM VITAE
DAVID R. BONES, CVA

PAGE 1 OF 10

Attachment A

## SELECTED EXPERIENCE

### COMMERCIAL LITIGATION

**Damage Calculation, Defective Heavy Helicopters**
Calculated damages of over $200M related to a fleet of alleged defective heavy helicopters from one of the largest aircraft manufacturers in the world in the context of fraud, breach of warranty, negligent misrepresentation, and unjust enrichment claims. Analyses included development of a dynamic damages model to determine the but-for value of a non-defective helicopter based on industry research and  publicly available "blue book" data, and then compare it to the actual value of a given helicopter at any point in time. Efforts also included significant research of the oil and gas industry.

**Damage Analysis, Failed Acquisition of Cotton Farming Operation**
Analyzed damages related to a large cotton farming operation resulting from alleged misrepresentations made by an acquirer. Analyses included an assessment of lost profits resulting from grower's inability to sell its cotton in futures market price pools provided by a cotton cooperative, and lost subsidies as a result of buyer's negligence in timely applying for the relevant programs.

**Business Interruption Lost Profits, Brewery Production Facility**
Calculated damages related to a business interruption claim at a brewery production facility. Analyses included assessing lost profits related to production losses, as well as costs to repair or rebuild the facility.

**Damage Calculation, Renewable Energy Project, Philippines**
Calculated damages related to a renewable energy project in the Philippines, which involved advanced gasification for converting waste to energy. Analyses included an assessment of contemporaneous projections and development of a discounted cash flow model to determine losses as a result of economic interference claims.

**Lost Profits, Large Homebuilder**
Performed a lost profits analysis for a large homebuilder in the context of a breach of contract matter. Analysis included a review of the home sales cycle from raw land to final closing. Efforts also included detailed analysis of the units in question, a review of industry trends, and the creation of a damages model.

**Damage Calculation, Single Engine Plane Accident**
Calculated damages related to a single engine plane accident at a flight training school. Analyses included lost profits related to loss of instructor revenue and rental use of aircraft.  Damages also considered cost to repair the aircraft.

**Bus Shelter Maintenance, Economic Damages Determination**
Determined economic damages to a municipal agency related to a breach of a bus shelter maintenance services agreement by the services provider. Efforts also included an analysis of the economic impact to the agency including increased costs, loss of revenue share and other guaranteed payments, in addition to the impact of substitute servicers on the agency. Also calculated the value of bus shelter assets, pursuant to the terms of the services agreement.



**CURRICULUM VITAE**
**DAVID R. BONES, CVA**

PAGE 2 OF 10

ER0968

## Lost Profits Analysis

Analyzed lost profits resulting from a breach of contract claim between an insurance consulting company and a dental insurance third party administrator. The analysis included a review of historical financial performance, insurance certificate growth rates, and projected future profits.

## Lost Wages Calculation

Calculated lost wages resulting from a wrongful termination claim involving a large financial institution in a FINRA arbitration. The analysis included a review of historical earnings, commission structures and payments, development of projected future earnings, and industry research regarding compensation structures of securities professionals.

## Defamation Lost Profits Analysis

Analyzed lost profits in the context of a business defamation claim involving a restaurant chain and a homeowners' association. The analyses included a review of historical financial performance trends, geographic locations of the various restaurants compared to the home development, and other potential causes of performance changes.

## Hospital Lost Profits Calculation

Calculated lost profits for a large hospital in the context of a breach of contract matter with one of its hospitalist groups. Analysis included a review of historical financial performance, physician compensation structures, and owner compensation levels. Also reviewed trends within the hospital/hospitalist industry, specifically about compensation increases and the resulting pressure on profitability.

## Potential Damages Liability Consulting Services

Provided consulting services to assess potential damages liability resulting from a breach of contract claim between a major hospital provider network and a major health insurance company. Performed analyses to determine significant factors in patient hospital selection, including in-network vs. out-of-network providers, preferred steerage patterns, geographic influence and PCP privileges at various hospitals. Developed several potential damage models to assist in settlement negotiations.

## Subprime Auto Loan Portfolio Analysis

Analyzed the value of a subprime auto loan portfolio for a credit union in the context of a breach of contract matter. Work included analyses of the significant value drivers including prepayment rates, delinquency rates, default rates and discount rate.

## Failed Utility Merger Damages Assessment

Calculated damages in the context of a failed utility merger. This work included an analysis of the damages claim, research related to synergies realized in other transactions, and the preparation of a valuation model. Performed a detailed comparison of expected synergies vs. actual synergies realized.

## Oil Spill Damages Calculation

Calculated damages in the context of an oil spill matter. This included an analysis of reimbursement requests and amounts previously paid. This also included a review of employee timesheets to determine the amount of time attributable to the spill.



**CURRICULUM VITAE**
DAVID R. BONES, CVA

Attachment A

## VALUATION

**Confidential Ongoing Large Takings Matter**

Retained by Plaintiffs to calculate just compensation related to large-scale government takings property in the U.S.  The total amount potentially in dispute is likely in the billions.

**Valuation Analysis, Partnership Dispute in Aviation Company**

Analyzed the value of a prospective ownership interest in a company operating in the private jet membership market.  The company sought financing as part of its growth-by-acquisition strategy, impacting the capital structure of the company on a post-transaction basis.  Our investigation included the analysis of the various capital financing and acquisition scenarios on a pre- and post-closing basis to determine the impact on the disputed membership interest.  Efforts also included a review of contemporaneous indications of equity value contemplated throughout the due diligence process.

**Valuation Analysis, Auto Glass JV Put/Call Option Material Adverse Change Dispute**

Calculated the buyout price of a minority member of a joint venture pursuant to terms in a put/call agreement. The minority member alleged that adjustments to the option price were necessary based on material adverse changes to the business, based on material change provisions expressed in the put/call agreement. Analyzed operational data to rebut claims of a "material change," offering opinions that explained the underlying causes of business impacts not covered by the put/call agreement.

**Sand and Gravel Mine Valuation**

Performed a valuation of an operating sand and gravel mine as part of a municipal dispute. Work included reviews of historical financial and operational data including financial statements, production reports, contract documents, and mining plans. Developed revenue, operating expense, capital expenditure and depreciation projections through mine end of life including an analysis of estimated royalty payments to the mineral's leaseholders.

**Distressed Debt Value Calculation**

Calculated the value of a Department of Energy (DOE) backed, defaulted debt security due to allegations by the Department of Justice of bid rigging during a live auction process. Work included analysis of historical prices related to distressed secured debt instruments to develop estimates of reasonable recovery rates. Also analyzed prices paid for distressed loans related to other companies that received DOE guarantees.

**Post M&A Representations and Warranties Claim for Healthcare Company**

Calculated damages in a breach of representations and warranties claim regarding an acquisition of a healthcare company by a private equity firm. Claims were related to over-stated accounts receivable and the impact of a government investigation regarding undisclosed fraudulent billing. The analyses included a detailed review of accounts receivable collections performance, a detailed review of the company's financial condition before and after the government investigation, and a valuation of the company considering both the income and market approaches.

**Fraudulent Conveyance Valuation, Mining Company**

Valued a multi-billion-dollar mining company in the context of a fraudulent conveyance matter. The analysis involved the review of financial projections, historical performance, industry conditions, as well as analyst reports. Valuation efforts included both the income and market approaches with assessment of appropriate discount rates and control premiums to determine reasonably equivalent value.



CURRICULUM VITAE
DAVID R. BONES, CVA

PAGE 4 OF 10

### Auto Dealership Valuation

Valued several auto dealerships in the context of a probate dispute regarding an unfair share issuance. The analysis included detailed review of financial statements, industry research, and review of other contemporaneous valuations. Prepared valuation analyses using the income and market approaches for operating companies and asset approach for holding companies.

### Damages Calculation, Real Estate Development

Calculated damages related to a partnership dispute in a large global convergence development project. Work included an analysis of several related entities' financial statements, industry research, project status assessment, and a valuation of the partner's interest utilizing the market approach.

### Value Determination, Medical Park

Determined the value of a medical park lease, but-for allegations of an improper asset sale, to calculate damages for minority shareholders in the real estate development project. Work included calculating the value of the lease investors would have received under three valuation scenarios: the Capitalized Earnings method, the Lease Renewal method, and the Sale After Initial Lease method. Efforts also included industry research on the medical office market including comparable lease rates, capitalization rates, and discount rates.

### Valuation of Undeveloped Mining Entity

Prepared a valuation of an undeveloped mining entity in the context of a fraudulent conveyance matter. Analysis included a review of technical reports, cash flow forecasts, and publicly available transaction data. Efforts included both the income and market approaches with assessment of comparability of properties and appropriate discounts to determine reasonably equivalent value.

### Hotel and Casino, Shareholder Dispute Valuation

Valued a major hotel and casino in the context of a shareholder dispute. The analysis involved a review of historical operating results, financial projections, industry conditions, and analyst reports. Efforts included both the income and market approaches with emphasis related to appropriate minority and marketability discounts.

### Fraudulent Conveyance Valuation, Construction Company

Valued a privately held construction company in the context of a fraudulent conveyance matter. Analyzed the value of several related companies at different points in time. Efforts included an analysis of historical financial performance, financial projections, and margin impacts. Provided indications of reasonably equivalent value based on income and market valuation approaches.

### Cable Service Provider Valuation

Performed a valuation of a cable service provider to determine if the transaction price paid was appropriate. This involved the analysis of several valuation multiples derived from cable provider mergers. Reviewed industry transactions and other indicia of value over the relevant time period.

## INTELLECTUAL PROPERTY

### Diminution in Value Due to Trade Secret Disclosure, Chemical Manufacturer

Performed a valuation of a chemical manufacturer as part of a post-transaction dispute involving a private equity buyer based on allegations of an improper trade secret disclosure. Efforts included a calculation of the fair value of the chemical manufacturer if buyers had known that certain trade secrets had been previously disclosed to a



ER0971

competitor. The research also included the effects of competition on previously protected markets in the pharmaceutical manufacturing industry to determine the impact of a new entrant on a previously protected market.

### Unjust Enrichment and Lost Profits Due to Misappropriation of Trade Secrets, Defense Contractor

Evaluation of damages for a large, publicly traded, multi-national defense contractor in the context of business interference and unjust enrichment claims related to alleged misappropriation of trade secrets. Efforts also included the rebuttal of claims related to alleged lost profits and certain wages paid.

### Unjust Enrichment and Lost Profits Due to Misappropriation of Trade Secrets, Medical Services

Evaluation of damages related to allegations of misappropriation of trade secrets for a privately held medical services company. Analysis included a review of historical financial performance and industry and economic research. Specifically, damages involved the assessment of lost profits and unjust enrichment.

### Lost Profits Calculation, Breach of Non-Solicit

Calculated lost profits resulting from a breach of contract claim between a prime contractor and its subcontractor in the context of a software contract within the intelligence community. The breach related to allegations of soliciting employees in violation of a non-solicit clause. Analysis included a review of historical employee tenure, average billing rates and variable costs to determine lost profits.

### Lost Royalty Payments Analysis, Software Company

Analyzed lost royalty payments and lost business value of a privately held software company in the context of a breach of contract matter. Performed significant research of trends in the industry, market and macro-economic environment. Efforts included calculating royalty payments and analyzing the value of the company at several points in time.

### Damages Calculation, Trademark

Calculated damages of a commercial washroom equipment manufacturer related to a trademark infringement and unfair competition matter. Analysis included the calculation of plaintiff's lost profits in addition to infringer's actual profits, pursuant to the Lanham Act. Work included detailed review of financial statements as well as invoices from the infringing party.

## FORENSIC ACCOUNTING AND AUDITING MALPRACTICE

### Fraud Investigation, Utility

Submitted an expert report analyzing the financial and accounting records related to an IRS qualified like-kind exchange program amidst allegations of embezzlement by a large public utility against its intermediary. The analysis included a detailed tracing of funds in the program accounts, a comparison of the bank records to the intermediary's accounting of the program, and identification of transfers to related entities of the intermediary.

### Fraud Investigation, Large Non-Profit Bankruptcy

Analyzed the financial and accounting records of a large non-profit entity and various subsidiaries to identify fraudulent activities by senior management in the context of a bankruptcy/auditing malpractice matter. This involved the detailed tracing of assets and funds between the related entities to establish ultimate sources of monies used for real estate transactions. Identified information available to outside parties at the time of certain transactions.



### Causes of Failure Analysis, Finance Company

Analyzed the causes of failure for a specialty finance company in the business of originating and securitizing non-conforming mortgage loans in the context of an auditing malpractice matter. Performed an analysis of the financial history of the company, as well as industry and economic factors that contributed to the bankruptcy. Also calculated damages based on avoidable transactions. This included an analysis of the company's various loan covenants, and the impact to the company of write-downs to certain residual assets.

### Causation of Failure Analysis, Non-Conforming Mortgage Financial Company

Analyzed causation of failure for a financial institution in the business of originating and securitizing non-conforming mortgage loans in the context of an auditing malpractice matter. This analysis included a review of the financial history of the bank, including compliance with regulatory capital requirements at different points in time. The analysis also included the identification of avoidable damages based on the insured depositor activity.

### Causes of Failure Analysis, Agricultural Company

Analyzed the causes of failure for an agricultural company in the context of an auditing malpractice matter. This analysis included a review of the financial history of the company as well as industry and economic factors that contributed to the bankruptcy. The damage analysis also performed based on avoidable transactions that were identified.

## BANKRUPTCY AND SOLVENCY

### Fraudulent Conveyance Solvency, Mining Company

Led the solvency team on one of the largest fraudulent conveyance matter in US history, which included a multi-billion-dollar mining company and an international subsidiary. Prepared analyses related to the company's financial condition including an assessment of solvency at various points in time. The solvency determination included ability to pay debts, capitalization levels, and comparisons of fair market value of assets to the liabilities. Efforts included a detailed review of financial and accounting records, detailed audit workpapers, business plans, industry outlook, management discussions, and various company projections. Also conducted analyses related to the parent-subsidiary relationship in the context of alter-ego and piercing the corporate veil claims. This work included analyses of board of directors matrices over several entities and the respective management control over the same entities in question.

### Solvency Analysis, Grocery Chain

Performed a solvency analysis of a billion-dollar grocery chain in the context of a preference claim by analyzing the fair market value of the company's assets compared to the liabilities. Efforts included a line item review of all assets and available appraisals, as well as all liabilities including pension accounting issues. Reviewed historical operating results, financial projections, industry research, and competitor information. Prepared indications of enterprise value based on income and market approaches.

### Solvency Analysis, Casino Chain

Performed a solvency analysis of a major casino chain in the context of a fraudulent transfer claim resulting from a leveraged management buyout of a publicly traded company. Efforts included an analysis of market indications of solvency and transaction sentiment. Reviewed publicly available information including SEC filings, analyst reports, bond pricing and rating data, as well as stock price activity of target company and peer competitors. Analyzed macro-economic trends affecting the gaming industry including new casino construction



**CURRICULUM VITAE**
DAVID R. BONES, CVA

PAGE 7 OF 10

activity and regional unemployment data. Also used valuation models for the market and income approaches to "stress test" margins of solvency under various scenarios.

## GOVERNMENT CONTRACTS

### Lost Profits Calculation

Calculated lost profits resulting from breach of contract and fraud claims relating to contracts between a large city and local taxi companies, as well as contracts between the taxi companies and taxi drivers, to provide taxi service at a major US airport. The analysis included a review of defendants' responses to the city's request for proposal, industry analysis, and historical operating capacity.

### Fraudulent Time Charging Evaluation, Shipyard

Investigated allegations of a fraudulent time charging scheme within a shipyard of one of the largest shipbuilders in the US. Analyzed hundreds of millions of records of data and developed specific models to identify likely mischarges. Work included the quantification of likely mischarging as well as analyses related to the reallocation of mischarged costs.

### Lost Profits Analysis, Water Filtration Manufacturer

Performed a lost profits analysis for a water filtration manufacturer in the context of termination of a municipal water treatment facility in Fridley, MN. The analysis included a review of: costs incurred related to water filtration modules, historical margins, and other possible mitigating sales.

### Lost Profits Analysis, Concession Vendors, Airport

Performed a lost profits analysis related to concession vendors at the airport in Albuquerque, NM. Claims included delays in the opening of the concession area in addition to reduced operating area inside the terminal.

## CONSTRUCTION

### Casino/Hotel Real Estate Development

Calculated damages resulting from a construction dispute on one of the largest casino/hotel real estate development projects in US history. Work included assisting the owner with settlement of subcontractors, evaluating the general contractor's performance regarding cost overruns on guaranteed maximum price contracts, analyzing back charge claims and preparing damages calculations for an expert report and trial.

### Hotel Renovation

Analyzed damages resulting from a fire at a hotel renovation project in San Francisco. Work included a detailed review of costs incurred, additional financing costs, and incremental costs related to the delays caused by the fire and anticipated repair.

### Casino/Hotel Development

Led project close-out and claims preparation for a $1.5B hotel/casino development in the Washington, DC area. Efforts included analyses of contractor invoices, cost reports, change orders, owner accounting data, and other data sources. Assisted owner and counsel with negotiation and final close-out of over 100 subcontractors in less than six months.



CURRICULUM VITAE
DAVID R. BONES, CVA

PAGE 8 OF 10

**Lost Profits Calculation**

Calculated lost profits for a construction company in the context of a breach of contract matter. Efforts included a review of historical financial performance, analysis of labor and materials costs required to complete the project, and an analysis of appropriate rental rates for equipment.

**Casino/Hotel Development**

Assisted a large gaming client with the close-out of a billion-dollar hotel/casino project. Efforts included analyses of subcontractor and general contractor claims, and related negotiations.

**Airport Cost Analysis**

Performed a cost analysis to determine appropriate increased costs to a construction company resulting from changed site conditions at an airport. Reviewed other technical reports, bid documents, job cost records, and various projections.

## US AIRWAYS

Senior Analyst in the Corporate Finance Group at US Airways. Worked in operations analysis, which served as an internal consulting group for the airline. Collaborated with senior management to provide ad hoc analyses and implement changes as needed.

Reviewed contractual rights related to entire aircraft fleet, including financing provisions and return conditions under various time or operational triggers.  Developed complex models to analyze operating performance and project customer volume based on flight schedules, airport arrival curves and process time. Model results were used to develop performance programs, determine capital expenditure requirements, and recommend optimum staffing levels to maximize profitability.  He also collaborated with the TSA to ensure sufficient baggage screening capacity at the Phoenix Sky Harbor airport based on expected volume growth and modeling results.

Worked as a Manager in the Alliance Operations group. Served as liaison between US Airways and its regional airline providers, including Mesa Airlines. Analyzed operational data to prioritize airport audits. Also served as a member of the emergency response team.



ER0975

## PUBLICATIONS / PRESENTATIONS

Overview of Financial Statement Analysis and Commercial Damages - CLE Presentation to Sanders & Parks, P.C.; *October 2014*.

Post Hoc Ergo Propter Hoc; Causation Issues to Consider in Damages Analyses – CLE Presentation to Tiffany & Bosco, P.A.; *November 2014*.

Working with Expert Witnesses and Consultants: Ten Steps to Success – CLE Presentation to Bryan Cave LLP; *March 2015*.

The CityCenter Litigation: Strategies for Dealing with Mega-Project Litigation and Adapting Those Strategies for Smaller Cases – CLE Presentation to the Construction SuperConference; *December 2015*.

Mega-Project Dispute and Lessons Learned – CLE Presentation to AACE; *February 2016*.

The CityCenter Litigation: The Use of Technology in Construction Litigation – CLE Presentation to the Nevada State Bar Construction Section; *October 2016*.

Working with Experts: Ten Steps to Success – CLE Presentation to AZ Association of Defense Counsel; *November 2016*.

Working With Experts In Construction Litigation And Daubert/Frye Motions – CLE Lorman Presentation, February 2019.

Experts, Assisting the Trier of Fact Under the New Rules - Nevada State Bar Litigation Section CLE, October 2019.

For Commercial Damage Matters, Numbers Are Not Enough - Law & Risk Mitigation Today, November 2019

COVID-19 Roundtable on Project Financing and Cash Flow - ABA Forum on Construction Law Webinar, April 2020.

COVID-19 Impact on Damages – Looking for Reasonable Certainty in Uncertain Times – GAR/Lexology Webinar, May 2020.

Served as a Guest Lecturer for Accounting and Finance Classes at Stanford University, June 2023.

Energy Industry Headwinds Leading to Insolvency and What's Next – IEL 75th Annual Energy Law Conference Presentation, February 2024.

"Energy Industry Headwinds Leading to Insolvency and What's Next." *Proceedings of the Institute on Oil and Gas Law*, 75th Edition, Published by LexisNexis/Matthew Bender, 2024.

Nevada Civil Practice Manual Co-Author of Chapter Regarding Expert Witnesses, 2016-present.



## David R. Bones
## Testimony Experience In Last Four Years

| Case Name | Venue |
|---|---|
| BML Properties LTD. v. China Construction America, Inc., et al. No. 657550 – 2024 | New York County Supreme Court |
| Sutter's Place, Inc. dba Bay 101 v. S.J. Bayshore Development, LLC No. 22CV397119 – 2024 | Superior Court of the State of California County of Santa Clara |
| Catclar Manager LLC v. Soho Scottsdale Manager LTD. – 2024 | Private Arbitration |
| London Luxury, LLC v. Walmart Inc. No. 5:22-cv-05059-TLB – 2023 & 2024 | United States District Court Western District of Arkansas Fayetteville Division |
| World Mechanical, Inc. v. Bernards Builders, Inc., et al. No.  SC126014 – 2021 & 2023 | Superior Court of the State of California County of Los Angeles |
| PCL Construction Services, Inc. v. Monarch Growth Inc., et al. No. Case 2019cv33368 – 2023 | District Court, City and County of Denver, State of Colorado |
| Terrell Materials Corporation v. Ozinga Ready Mix Concrete, Inc. No. Case 2019L009669 – 2023 | Circuit Court of Cook County, Illinois |
| The State of Mississippi, et al. v. The United States of America No. 1:19-cv-00231-EDK – 2023 | United States Court of Federal Claims |
| USI Insurance Services, LLC v. Alliant Insurance Services, Inc., et al. No. 2:23-cv-00192-SMB – 2023 | United States District Court District of Arizona |
| 3500 Sepulveda, LLC and 13th & Crest Associates, LLC v. RREEF America REIT II Corporation BBB, et al. No. Case 2:17-cv-08537 – 2018, 2021, & 2023 | United States District Court Central District of California |
| Bristow Group, Inc. and Bristow U.S. LLC v. Sikorsky Aircraft Corporation, et al. No. Case 19-03691 – 2023 | United States Bankruptcy Court Southern District of Texas Houston Division |
| UPA 1, LLC v. The Korte Company No. A-17-763262-B – 2022 | Clark County District Court of Nevada |

ER0977

# David R. Bones
## Testimony Experience In Last Four Years

| Case Name | Venue |
| --- | --- |
| Susan Kamuda and Brian Kamuda v. Sterigenics, U.S., LLC, et al. No. 2018-L-010475 – 2022 | Circuit Court of Cook County, Illinois County Department, Law Division |
| Asset Lifecycle Management, LLC v. Willow Glen Ventures, LLC No. 2020-41394 – 2022 | In the District Court of Harris County, Texas |
| Gilbert MH, LLC v. Gilbert Family Hospital, LLC, et al. No. 2:18-CV-04046-SPL – 2021 | United States District Court District of Arizona |
| Liebert Corporation v. SVO Building One, LLC No. 01-18-0003-1318 – 2021 | American Arbitration Association |
| Richard K. Nichols, et al. v. The Northern Trust Company, et al. No. 2016 CH 07239 – 2021 | Circuit Court of Cook County, Illinois County Department, Chancery Division |
| Servitas, LLC, et al. v. Eric A. Traub, et al. No. A-18-786422-B – 2020 | Clark County District Court of Nevada |
| UMB Bank, N.A. v. Kobi Electric, LLC, et al. No. 017-299994-18 – 2020 | In the District Court of Tarrant County, Texas |
| Generations at Pinnacle Peak, LLC v. Whitestone Pinnacle of Scottsdale – Phase II, LLC No. 2:17-cv-04597-DLR – 2019 & 2020 | United States District Court District of Arizona |
| S&M Brands, Inc. v. Josh Stein and the State of North Carolina No. 17 CVS 6894 – 2019 & 2020 | In the General Court of Justice Superior Court Division |

ER0978

**Nicholas Rolovich v. Washington State University**
**List of Documents Considered**

Attachment B

| No. | Description |
| --- | --- |

**Bates Stamped Documents**

| No. | Description |
| --- | --- |
| 1 | ROLOVICH00000053-62 |
| 2 | ROLOVICH00013623-25 |
| 3 | ROLOVICH00033079-87 |
| 4 | ROLOVICH00060096-106 |
| 5 | ROLOVICH00060929-30 |
| 6 | ROLOVICH00061222-24 |
| 7 | ROLOVICH00061300 |
| 8 | ROLOVICH00061483 |
| 9 | ROLOVICH00061687-88 |
| 10 | ROLOVICH00061701 |
| 11 | ROLOVICH00061776-77 |
| 12 | WSU_00002865-71 |
| 13 | WSU_00002988-89 |
| 14 | WSU_00003050 |
| 15 | WSU_00003824-25 |
| 16 | WSU_00008849-58 |
| 17 | WSU_00016082-83 |
| 18 | WSU_00016420-27 |
| 19 | WSU_00016653 |
| 20 | WSU_00018117-228 |
| 21 | WSU_00019337 |
| 22 | WSU_00019338-39 |
| 23 | WSU_00020060-62 |
| 24 | WSU_00033447-52 |
| 25 | WSU_00033744 |
| 26 | WSU_00033791-96 |
| 27 | WSU_00034194-95 |
| 28 | WSU_00034458-60 |
| 29 | WSU_00034704-13 |
| 30 | WSU_00036375-452 |
| 31 | WSU_00036453-531 |
| 32 | WSU_00036532-610 |
| 33 | WSU_00036611-691 |
| 34 | WSU_00036692-772 |
| 35 | WSU_00036773-852 |

(192 of 299), Page 192 of 299    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 192 of 299
Case 2:22-cv-00319-TOR    ECF No. 96    filed 10/14/24    PageID.1666    Page 61
of 68

**Nicholas Rolovich v. Washington State University**
**List of Documents Considered**

Attachment B

| No. | Description |
|-----|-------------|

**Non-Bates Stamped Documents**

36   Second Amended Complaint, *Nicholas Rolovich v. Washington State University, et al.*, dated September 19, 2023
37   Plaintiff's First Set of Interrogatories to Defendant and Defendant's First Supplemental Answers and Objections Thereto, *Nicholas Rolovich v. Washington State University, et al.,* dated July 24, 2024
38   Expert Report of David A. Hall, dated July 1, 2024
39   Expert Report of Guy H. Palmer, DVM, PhD, dated August 11, 2024
40   Rough Draft of Jason Sampson Deposition, *Rolovich v. Washington State University, et al.*, dated August 2, 2024

**Research**

41   Harry, Molly, Financial Ramifications of Coronavirus on Division I Athletic Department at https://www.ojed.org/index.php/gsm/article/view/2813/1590
42   https://247sports.com/longformarticle/2022-2023-college-football-coaching-carousel-data-208652178
43   https://apnews.com/article/sports-college-football-college-sports-football-health-e7dfc686595462e1a588e4751dbd163b
44   https://athlonsports.com/college-football/college-football-teams-canceled-their-2020-season-fbs
45   https://calbears.com/news/2020/12/12/cal-at-washington-state-football-game-cancelled.aspx
46   https://cfbselect.com/2023/03/02/how-many-games-in-a-college-football-season
47   https://duckswire.usatoday.com/2021/08/12/pac-12-releases-statement-on-2021-2022-forfeiture-policy
48   https://from.wsu.edu/president/2021/time-to-lean-in/email.html
49   https://governor.wa.gov/news/2022/inslee-announces-end-remaining-covid-19-emergency-orders-and-state-emergency-october-31
50   https://governor.wa.gov/sites/default/files/2023-01/21-14.1%20-%20COVID-19%20Vax%20Washington%20Amendment.pdf
51   https://governor.wa.gov/sites/default/files/proclamations/21-14.6%20-%20COVID%20Vaccination%20Requirement_Recission_%28tmp%29.pdf
52   https://ktla.com/news/nationworld/college-football-fans-head-back-to-stadiums-some-with-vaccination-cards-and-masks
53   https://nevadasportsnet.com/news/reporters/here-are-25-candidates-who-could-be-nevada-footballs-next-head-coach
54   https://news.stanford.edu/stories/2020/07/athletics-faq
55   https://news.wsu.edu/news/2021/03/31/washington-adults-eligible-covid-19-vaccine-beginning-april-15
56   https://news.wsu.edu/news/2021/04/15/cougar-health-services-hosting-vaccine-clinics-spring
57   https://news.wsu.edu/press-release/2021/04/30/wsu-present-plan-balancing-athletics-operating-budget-2023
58   https://pac-12.com/news/2020/10/3/pac-12-announces-2020-football-schedule
59   https://pac-12.com/news/2020/11/22/boeing-apple-cup-update
60   https://sports.yahoo.com/will-there-be-college-football-a-new-flurry-of-pessimism-has-arrived-222609082.html
61   https://thesportjournal.org/article/college-footballs-bottom-line-impact-exploring-the-relationship-of-football-performance-on-athletic-finances-for-division-i-institutions-today
62   https://thewire.signingdaysports.com/articles/what-is-the-power-5/
63   https://tournamentofroses.com/cfp-semifinal-at-the-rose-bowl-stadium-to-be-relocated-to-att-stadium-in-dallas-on-january-1-2021/
64   https://tucson.com/sports/arizonawildcats/amid-pandemic-arizona-coaches-set-new-national-standard-for-sacrifice-up-to-20-in-pay/article_4a90f49e-2581-52e7-af1a-a83c9bb3158c.html

(193 of 299), Page 193 of 299    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 193 of 299
Case 2:22-cv-00319-TOR    ECF No. 96    filed 10/14/24    PageID.1667    Page 62
of 68

**Nicholas Rolovich v. Washington State University**
**List of Documents Considered**

Attachment B

| No. | Description |
| --- | --- |
| 65 | https://tucson.com/sports/pac-12-hotline/pac-12-hotline-wildcats-are-100-vaccinated-asu-wont-disclose-numbers/article_7eb1de82-0111-11ec-965d-c74107efe30e.html |
| 66 | https://uconnhuskies.com/news/2020/8/5/uconn-football-announces-cancellation-of-2020-season-due-to-risks-associated-with-covid-19.aspx |
| 67 | https://wsu.edu/about |
| 68 | https://wsucougars.com |
| 69 | https://wsucougars.com/news/2020/11/20/wsu-athletics-washington-state-stanford-football-game-cancelled.aspx |
| 70 | https://wsucougars.com/news/2020/12/12/wsu-athletics-washington-state-california-football-game-canceled.aspx |
| 71 | https://wsucougars.com/sports/football/schedule |
| 72 | https://wsucougars.com/sports/football/schedule/2020 |
| 73 | https://wsucougars.com/sports/football/schedule/2021 |
| 74 | https://wsucougars.com/sports/football/schedule/2022 |
| 75 | https://www.azdesertswarm.com/football/2020/10/19/21523836/pac12-football-coronavirus-cancellation-policy-2020-restart-outbreak-minimum-scholarship-players |
| 76 | https://www.azdesertswarm.com/football/2021/8/19/22633460/arizona-wildcats-football-program-vaccination-rate-100-percent-covid-19-coronavirus-pac-12-by-team |
| 77 | https://www.cbssports.com/college-football/news/big-ten-football-schedule-2020-league-to-play-eight-games-plus-consolation-games-on-championship-week |
| 78 | https://www.cbssports.com/college-football/news/sec-establishes-forfeit-policies-for-college-football-games-canceled-due-to-covid-19/ |
| 79 | https://www.cdc.gov/museum/pdf/cdcm-pha-stem-lesson-contact-tracing-lesson.pdf |
| 80 | https://www.cougcenter.com/2020/10/20/21524300/pac-12-cancelled-games-tiebreakers-wsu-cougars |
| 81 | https://www.cougcenter.com/2020/11/22/21590479/apple-cup-canceled-wsu-cougars-covid-washington-huskies |
| 82 | https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964 |
| 83 | https://www.espn.com/college-football/schedule/_/week/11/year/2021/seasontype/2 |
| 84 | https://www.espn.com/college-football/story/_/id/30559293/cfp-semifinal-scheduled-rose-bowl-moving-att-stadium-arlington-texas |
| 85 | https://www.espn.com/college-football/story/_/id/32459767/inside-nick-rolovich-downfall-washington-state-covid-19-vaccine |
| 86 | https://www.espn.com/college-football/story/_/id/39540583/pac-12-commissioner-george-kliavkoff-agree-part-ways |
| 87 | https://www.espn.com/college-sports/story/_/id/29198526/college-football-return-key-athletic-departments-deal-financial-wreckage-due-coronavirus-pandemic |
| 88 | https://www.espn.com/olympics/story/_/id/30116720/the-heartbreaking-reality-staggering-numbers-ncaa-teams-cut-pandemic |
| 89 | https://www.faa.gov/sites/faa.gov/files/2022-07/ATTF_Excise_Tax_Rate_Structure_CY_2022.pdf |
| 90 | https://www.insidehighered.com/news/2020/07/09/ivy-league-will-not-play-fall-sports-2020 |
| 91 | https://www.insidehighered.com/news/2021/01/12/colleges-spent-millions-covid-19-expenses-fall-even-sources-income-shrank-data-show |
| 92 | https://www.jhunewsletter.com/article/2020/10/non-revenue-sports-should-not-be-scapegoats-for-budget-cuts |
| 93 | https://www.khon2.com/sports/uh-immediately-begins-search-for-next-head-football-coach-following-todd-grahams-resignation |
| 94 | https://www.linkedin.com/company/meltwater |

**Nicholas Rolovich v. Washington State University**
**List of Documents Considered**

Attachment B

| No. | Description |
|-----|-------------|
| 95 | https://www.nationalbuscharter.com/charter-bus-rental-prices |
| 96 | https://www.ncaa.com/news/football/article/2018-12-26/how-college-football-bowl-games-work |
| 97 | https://www.ncaa.org/news/2021/10/6/general-di-council-approves-one-year-waiver-of-football-scholarship-limits.aspx |
| 98 | https://www.ncaa.org/sports/2021/2/16/overview.aspx |
| 99 | https://www.ncaa.org/sports/2021/5/11/our-division-i-members.aspx |
| 100 | https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10209992/#app1 |
| 101 | https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7709178 |
| 102 | https://www.nytimes.com/athletic/4203384/2021/08/04/ncaa-releases-covid-19-guidelines-suggests-longer-quarantines-for-unvaccinated/ |
| 103 | https://www.on3.com/news/current-fbs-coaches-have-been-in-their-jobs-for-an-average-of-just-3-7-years |
| 104 | https://www.paramountbusinessjets.com/private-jet-charter/aircraft/learjet-45 |
| 105 | https://www.paramountbusinessjets.com/private-jet-rental-cost |
| 106 | https://www.si.com/college/2021/01/11/college-football-2020-season-covid-19-daily-cover |
| 107 | https://www.si.com/nfl/2020/08/18/economic-fallout-nfl-impact-of-college-football-season-cancellations |
| 108 | https://www.sportico.com/leagues/college-sports/2020/pac-12-cancelled-football-revenue-1234616953/ |
| 109 | https://www.sportico.com/leagues/college-sports/2022/college-sports-data-covids-1234658809/ |
| 110 | https://www.sportingnews.com/us/ncaa-football/news/college-football-bowl-cancellations-covid-19/1b0vt5f7z28qs1iu490s2wu9wf |
| 111 | https://www.sports-reference.com/cfb/schools/washington-state/bowls.html |
| 112 | https://www.travelmath.com/flying-time/from/Pullman,+WA/to/Seattle,+WA |
| 113 | https://www.travelmath.com/flying-time/from/Pullman,+WA/to/Tucson,+AZ |
| 114 | https://www.usatoday.com/story/sports/ncaaf/2020/04/14/college-football-major-programs-could-see-billions-revenue-go-away/2989466001/ |
| 115 | https://www.usatoday.com/story/sports/ncaaf/pac12/2021/07/21/washington-state-coach-nick-rolovich-unvaccinated-covid-media-day/8049468002 |
| 116 | https://www.washingtonpost.com/sports/2020/08/12/college-football-canceled-faq |
| 117 | https://x.com/NickRolovich/status/1417957468366200832/photo/1 |

**Nicholas Rolovich v. Washington State University**
**Statement of Revenues and Expenses for WSU Athletics**
**FY 2018 - FY 2023**

Attachment C

| Item | FY 2018 (1) | FY 2019 (2) | FY 2020 (3) | FY 2021 (4) | FY 2022 (5) | FY 2023 (6) |
|---|---|---|---|---|---|---|
| *Revenues* | | | | | | |
| Ticket Sales | $ 8,406,070 | $ 9,508,360 | $ 8,620,981 | $ 7,365 | $ 9,299,636 | $ 10,198,582 |
| Student Fees | 1,574,788 | 1,502,845 | 1,440,904 | 1,053,997 | 1,275,107 | 900,535 |
| Direct Institutional Support | 3,453,878 | 3,658,000 | 3,767,000 | 3,758,000 | 13,653,596 | 5,882,999 |
| Indirect Institutional Support | 308,852 | 301,170 | 298,489 | 307,091 | 435,000 | 400,000 |
| Guarantees | - | 316,200 | 100,000 | - | - | 315,000 |
| Contributions | 9,143,479 | 11,662,904 | 14,563,852 | 7,746,721 | 9,945,450 | 11,774,366 |
| In-Kind | 162,345 | 41,933 | 38,762 | 38,762 | 328,752 | 1,366,250 |
| Media Rights | 19,814,500 | 20,834,583 | 21,906,797 | 17,018,667 | 24,221,502 | 25,468,828 |
| NCAA Distributions | 1,388,924 | 1,415,461 | 434,302 | 1,452,296 | 1,288,143 | 1,556,009 |
| Conference Distributions (Non Media and Non Bowl) | 10,709,299 | 11,984,865 | 12,357,527 | 4,015,983 | 13,181,438 | 8,834,084 |
| Program, Novelty, Parking and Concession Sales | 1,014,976 | 966,992 | 865,849 | 20,235 | 1,363,338 | 1,697,331 |
| Royalties, Licensing, Advertisement and Sponsorships | 4,440,208 | 4,576,936 | 4,341,126 | 3,412,926 | 4,949,281 | 4,584,354 |
| Sports Camp Revenues | 326,716 | 480,539 | 272,843 | 9,417 | 256,196 | 550,481 |
| Athletics Restricted Endowment and Investments Income | 676,067 | 701,698 | 711,669 | 768,792 | 828,311 | 887,797 |
| Other Operating Revenue | 1,249,472 | 1,893,284 | 3,650,134 | 479,466 | 2,086,750 | 2,555,407 |
| Bowl Revenues | 2,448,141 | 1,845,569 | 1,370,951 | - | 1,916,325 | 2,009,201 |
| **Total Operating Revenues** | **$ 65,117,715** | **$ 71,691,339** | **$ 74,741,186** | **$ 40,089,718** | **$ 85,028,825** | **$ 78,981,224** |
| | | | | | | |
| *Expenses* | | | | | | |
| Athletic Student Aid | $ 10,779,818 | $ 11,024,162 | $ 10,461,688 | $ 11,424,943 | $ 12,225,098 | $ 12,342,793 |
| Guarantees | 1,687,947 | 1,724,640 | 1,939,725 | 374,613 | 1,911,192 | 1,328,250 |
| Coaching Salaries, Benefits and Bonuses Paid by the University and Related Entities | 12,788,800 | 13,884,074 | 13,993,061 | 13,195,423 | 12,204,570 | 14,187,865 |
| Support Staff/ Administrative Compensation, Benefits and Bonuses paid by the University and Related Entities | 13,261,269 | 13,833,295 | 14,472,497 | 12,367,812 | 16,938,846 | 15,605,518 |
| Severance Payments | 1,099,264 | 673,588 | 3,106,974 | 1,440,695 | 1,074,339 | - |
| Recruiting | 1,269,495 | 1,362,747 | 1,179,747 | 230,390 | 1,423,288 | 1,847,093 |
| Team Travel | 4,127,165 | 4,124,912 | 4,007,492 | 2,703,706 | 4,918,158 | 6,130,740 |
| Sports Equipment, Uniforms and Supplies | 2,160,593 | 1,753,539 | 1,814,142 | 1,802,288 | 1,899,000 | 2,108,671 |
| Game Expenses | 2,022,397 | 2,273,069 | 1,899,196 | 739,896 | 2,793,628 | 2,861,718 |
| Fund Raising, Marketing and Promotion | 2,021,348 | 1,848,017 | 1,261,660 | 1,214,236 | 1,502,202 | 2,646,999 |
| Sports Camp Expenses | 279,414 | 319,796 | 276,717 | 18,197 | 68,724 | 269,267 |
| Spirit Groups | 209,277 | 162,655 | 210,299 | 80,606 | 97,717 | 383,362 |
| Athletic Facilities Debt Service, Leases and Rental Fee | 9,214,963 | 9,221,913 | 9,215,738 | 9,965,854 | 10,802,306 | 11,036,457 |
| Direct Overhead and Administrative Expenses | 1,996,167 | 2,437,547 | 2,301,916 | 1,870,427 | 1,977,375 | 1,753,674 |
| Indirect Institutional Support | 308,852 | 301,170 | 298,489 | 307,091 | 435,000 | 400,000 |
| Medical Expenses and Insurance | 837,520 | 713,497 | 543,689 | 1,055,790 | 1,029,551 | 1,868,708 |
| Memberships and Dues | 2,139,759 | 2,281,898 | 2,346,636 | 2,684,084 | 2,255,108 | 2,842,357 |
| Student-Athlete Meals (non-travel) | 1,112,910 | 1,057,741 | 932,824 | 831,060 | 1,459,192 | 1,578,286 |
| Other Operating Expenses | 4,628,114 | 5,213,745 | 5,018,297 | 2,694,917 | 6,705,328 | 9,440,311 |
| Bowl Expenses | 1,465,763 | 1,634,111 | 1,616,793 | - | 1,575,635 | 1,913,802 |
| Bowl Expenses - Coaching Compensation/ Bonuses | 364,200 | 412,850 | 374,350 | - | 395,734 | 363,366 |
| **Total Operating Expenses** | **$ 73,775,035** | **$ 76,258,966** | **$ 77,271,930** | **$ 65,002,028** | **$ 83,691,991** | **$ 90,909,237** |
| **Excess (Deficiencies) of Revenues Over (Under) Expenses** | **$ (8,657,320)** | **$ (4,567,627)** | **$ (2,530,744)** | **$ (24,912,310)** | **$ 1,336,834** | **$ (11,928,013)** |

**Nicholas Rolovich v. Washington State University**
**Statement of Revenues and Expenses for WSU Athletics**
**FY 2018 - FY 2023**

Attachment C

<u>**Sources and Note:**</u>
(1) WSU_00036375-452 at 450-52.
(2) WSU_00036453-531 at 529-31.
(3) WSU_00036532-610 at 608-10.
(4) WSU_00036611-691 at 689-91.
(5) WSU_00036692-772 at 770-72.
(6) WSU_00036773-852 at 850-52.
(7) I understand WSU's fiscal year is July 1 to June 30. For example, Fiscal Year 2018 is the period from July 1, 2017 to June 30, 2018.

**Nicholas Rolovich v. Washington State University**
**Statement of Revenues and Expenses for WSU Football**
**FY 2018 - FY 2023**

Attachment D

| Item | FY 2018 [1] | FY 2019 [2] | FY 2020 [3] | FY 2021 [4] | FY 2022 [5] | FY 2023 [6] |
|---|---|---|---|---|---|---|
| *Revenues* | | | | | | |
| Ticket Sales | $ 7,844,423 | $ 9,022,129 | $ 7,963,775 | $ - | $ 8,718,722 | $ 9,361,787 |
| Student Fees | - | - | - | - | - | 695,535 |
| Direct Institutional Support | 1,130,833 | 1,320,528 | 1,203,925 | 1,194,893 | 871,442 | 937,256 |
| Guarantees | - | 300,000 | 100,000 | - | - | 300,000 |
| Contributions | 2,444,071 | 3,120,369 | 2,821,702 | 2,306,105 | 2,910,027 | 3,751,898 |
| In-Kind | 43,000 | 22,333 | 16,248 | 16,248 | 116,248 | 400,000 |
| Media Rights | 16,842,325 | 17,709,396 | 18,620,777 | 14,465,867 | 20,588,277 | 21,648,504 |
| NCAA Distributions | 300,077 | 316,240 | 104,159 | 482,818 | 434,704 | 641,090 |
| Conference Distributions (Non Media and Non Bowl) | 9,102,904 | 10,187,135 | 10,493,698 | 3,413,586 | 11,204,222 | 7,508,971 |
| Program, Novelty, Parking and Concession Sales | - | - | - | - | 474,137 | 908,083 |
| Royalties, Licensing, Advertisement and Sponsorships | 376,250 | 376,250 | 365,000 | 400,000 | 300,000 | - |
| Sports Camp Revenues | 16,300 | 28,594 | 2,267 | 160 | 16,810 | 58,049 |
| Athletics Restricted Endowment and Investments Income | 230,251 | 213,361 | 193,321 | 222,221 | 74,562 | 81,214 |
| Other Operating Revenue | 5,424 | 804 | - | - | - | 457,051 |
| Bowl Revenues | 2,448,141 | 1,845,569 | 1,370,951 | - | 1,916,325 | 2,009,201 |
| **Total Operating Revenues** | $ 40,783,999 | $ 44,462,708 | $ 43,255,823 | $ 22,501,898 | $ 47,625,476 | $ 48,758,639 |
| | | | | | | |
| *Expenses* | | | | | | |
| Athletic Student Aid | $ 3,666,058 | $ 3,906,024 | $ 3,609,492 | $ 4,155,297 | $ 4,440,000 | $ 4,623,449 |
| Guarantees | 1,025,000 | 950,000 | 1,136,250 | - | 1,075,000 | 875,000 |
| Coaching Salaries, Benefits and Bonuses Paid by the University and Related Entities | 6,905,217 | 7,781,677 | 7,816,259 | 7,315,361 | 5,844,558 | 7,117,932 |
| Support Staff/ Administrative Compensation, Benefits and Bonuses Paid by the University and Related Entities | 1,628,422 | 1,753,388 | 1,984,027 | 2,158,915 | 5,199,324 | 2,686,345 |
| Severance Payments | - | - | 992,990 | - | - | - |
| Recruiting | 523,791 | 503,936 | 402,492 | 114,969 | 641,614 | 887,559 |
| Team Travel | 1,066,412 | 1,058,373 | 1,377,260 | 695,993 | 1,235,880 | 1,460,828 |
| Sports Equipment, Uniforms and Supplies | 968,684 | 737,180 | 755,851 | 760,427 | 394,650 | 837,292 |
| Game Expenses | 1,188,519 | 1,324,507 | 1,033,218 | 143,770 | 1,179,266 | 1,218,488 |
| Fund Raising, Marketing and Promotion | - | - | - | - | 700 | 28,860 |
| Sports Camp Expenses | 13,171 | 16,594 | 3,780 | 8,046 | 11,791 | 29,812 |
| Direct Overhead and Administrative Expenses | 202,897 | 692,228 | 642,091 | 231,654 | - | 180,901 |
| Medical Expenses and Insurance | - | - | - | - | 109 | - |
| Memberships and Dues | 1,977 | 2,009 | 1,284 | 2,684 | 4,875 | 6,652 |
| Student-Athlete Meals (Non-Travel) | 373,404 | 398,710 | 359,959 | 350,345 | 74,729 | 90,148 |
| Other Operating Expenses | 629,860 | 880,581 | 943,805 | 596,078 | 748,480 | 3,015,338 |
| Bowl Expenses | 1,465,763 | 1,634,111 | 1,616,793 | - | 1,575,635 | 1,913,802 |
| Bowl Expenses - Coaching Compensation/ Bonuses | 364,200 | 412,850 | 374,350 | - | 395,734 | 363,366 |
| **Total Operating Expenses** | $ 20,023,375 | $ 22,052,168 | $ 23,049,901 | $ 16,533,539 | $ 22,822,345 | $ 25,335,772 |
| **Excess (Deficiencies) of Revenues Over (Under) Expenses** | $ 20,760,624 | $ 22,410,540 | $ 20,205,922 | $ 5,968,359 | $ 24,803,131 | $ 23,422,867 |

**Nicholas Rolovich v. Washington State University**
**Statement of Revenues and Expenses for WSU Football**
**FY 2018 - FY 2023**

Attachment D

**<u>Sources and Note:</u>**
(1) WSU_00036375-452 at 450-52.
(2) WSU_00036453-531 at 529-31.
(3) WSU_00036532-610 at 608-10.
(4) WSU_00036611-691 at 689-91.
(5) WSU_00036692-772 at 770-72.
(6) WSU_00036773-852 at 850-52.
(7) I understand WSU's fiscal year is July 1 to June 30. For example, Fiscal Year 2018 is the period from July 1, 2017 to June 30, 2018.

**Nicholas Rolovich v. Washington State University**
**WSU's Football Revenue by Channel Excluding FY 2021**

**Attachment D.1**

| Item | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | Average Excluding FY 2021 |
|---|---|---|---|---|---|---|---|
| Ticket Sales | 19.2% | 20.3% | 18.4% | 0.0% | 18.3% | 19.2% | 19.1% |
| Contributions | 6.0% | 7.0% | 6.5% | 10.2% | 6.1% | 7.7% | 6.7% |
| Media Rights | 41.3% | 39.8% | 43.0% | 64.3% | 43.2% | 44.4% | 42.4% |
| Conference Distributions | 22.3% | 22.9% | 24.3% | 15.2% | 23.5% | 15.4% | 21.7% |
| Other Revenue | 11.2% | 9.9% | 7.8% | 10.3% | 8.8% | 13.3% | 10.2% |
| **Total Operating Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

<u>**Source and Note:**</u>
(1) Attachment D.
(2) I understand WSU's fiscal year is July 1 to June 30. For example, Fiscal Year 2018 is the period from July 1, 2017 to June 30, 2018.

(200 of 299), Page 200 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 200 of 299
Case 2:22-cv-00319-TOR ECF No. 89-17 filed 09/23/24 PageID.1388 Page 2
of 14





# WASHINGTON STATE
## ATHLETICS



November 12, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA 99163

**RE:    Notice of Decision to Terminate for Just Cause**

Mr. Rolovich:

Pursuant to Paragraph 4.2 of your employment agreement, this letter constitutes notice of termination for just cause from your employment as head football coach at Washington State University, effective immediately.

This decision has been made after careful review and consideration of your lengthy and detailed response, which includes many inaccurate statements and legal claims. I did not find your response persuasive and will not respond to each and every contention. However, please note the following:

- **Background:** Per the Governor's Proclamation 21-14.1, all state employees, including those in higher education, were required to be fully vaccinated against COVID-19 by October 18, 2021, unless they had an approved medical or religious accommodation. You requested an exemption/accommodation on religious grounds, which the University denied on October 18, 2021, thereby rendering you in violation of the Proclamation and ineligible for continuing employment at Washington State University. On October 18, 2021, the University issued you written notice of its intent to terminate your employment for just cause in accordance with the Proclamation and your contract of employment.

- **Regarding the University's decision that granting an exemption would cause undue hardship to the Athletic Department and the University:** You claim that your ability to fulfill your duties as head football coach has not been and would not be impacted by your vaccination status. This is false. Your performance of your duties has been significantly hindered and would continue to be as long as you are unvaccinated, notwithstanding any reasonable accommodations that might be implemented. Your activities have had to be continually and severely limited to a much greater extent than if you had been vaccinated, in order to mitigate the risk of you becoming infected or infecting others. In addition to the information WSU provided you and your attorney in

Exhibit P Page 2

**ER0988**

WSU_00000001

previous documents, including the October 18, 2021, Notice of Intent to Terminate for Just Cause, I note the following:

○ The Pac-12 Conference, not the University, barred you from attending Pac-12 Media Day in person due to the vaccination requirement for head coaches. You were the only Pac-12 head coach unvaccinated and unable to attend in-person. Instead of showcasing our student athletes and the WSU football program, you became the story. You claim this was not your choice and that other conferences operate differently. This completely misses the point. It was your choice not to get vaccinated, and your job required you to be successful and operate as a *Pac-12 head football coach*, which means adhering to Pac-12 rules.

○ You have been significantly hindered in your ability to successfully contact and recruit prospective student-athletes, because you have been restricted from attending any locale that has vaccine requirements, including high schools, high school sporting events, junior colleges, other universities' sporting events, or other prospect camps. Vitally important recruiting areas, especially on the west coast, including California and western Washington, which are historically WSU's most significant geographical areas for recruiting, are essentially inaccessible to you as a recruiter. Moreover, Hawaii, a state where you have extensive ties and should be able to recruit in-person with a high level of success, also has very stringent COVID-19 restrictions, which have limited your ability to successfully recruit in that state. Over 2/3 of our current football roster has student-athletes who reside from the states of Washington, California, Oregon, and Hawaii. WSU cannot sustain a successful football program if coaches are limited in recruiting locations.

○ Aside from the restrictions noted above, non-competition travel by unvaccinated coaches requires a quarantine upon return to campus. This has limited your ability to be on the road during key recruiting periods and reduced the number of days you can spend traveling for recruiting purposes. Also, WSU cannot risk losing recruits who refuse to visit campus because Athletics is accommodating unvaccinated coaches.

○ As a result of your recruiting limitations, the football program's recruiting statistics and verbal commitments for the 2022 recruiting cycle have been directly impacted and are unacceptably low. You personally stated your expectation of signing a full class, which would mean a minimum of 25 initial signees. Contrary to your claim, NCAA regulations would not have prevented you from signing more prospective student-athletes; it was

your responsibility to manage the roster to incorporate a full class of new student-athletes. Recruiting at the level of a Pac-12 Conference institution requires a robust recruiting plan and effort.

o Because you are unvaccinated, you were required to quarantine after travel, which limited your participation in many important activities, including donor meetings. You appear to acknowledge this by explicitly stating you deliberately chose not to attend certain in-person donor events, which you had previously agreed to attend and were on your schedule. However, every Pac-12 head football coach must be able to regularly attend donor visits and events and actively engage in marketing efforts, in addition to other duties. Because you were unvaccinated, your ability to interact with key constituents, including students, donors, fans, and others, was severely impacted.

o The Athletic Department has incurred significant costs associated with the need to test you and other unvaccinated football coaches for COVID-19 on a daily basis. The Pac-12 requires a minimum of three (3) tests per week for unvaccinated staff, in addition to pre-competition testing, and the Athletic Department policy requires daily testing. PCR testing, which must occur at least weekly for unvaccinated individuals and 72 hours prior to competition or travel, costs approximately $100 per test. The cost for testing alone of unvaccinated staff from August 2021 through final tests on October 18, 2021, was $10,000. In addition to that cost, because of the workload of increased testing caused by you and other unvaccinated coaches, the Athletics Department was required to hire additional staff to assist in COVID-19 testing, at considerable expense. It is important to note that these testing requirements do not apply to vaccinated players and staff, and that football was the only intercollegiate athletic program at WSU to have unvaccinated coaching staff.

o Overwhelming scientific evidence establishes the efficacy of the vaccine in mitigating the spread of COVID-19 and preventing severe disease. By refusing to support, and by you and your staff at times actively opposing, the University's COVID-19 education and vaccination efforts, and by setting a very public example, you have undermined the University's efforts to promote student safety. Although numbers are gradually improving, the football program has the lowest student-athlete vaccination rate of any intercollegiate athletics team at WSU and among the lowest rate in the Pac-12. The football program experienced COVID-19 outbreaks in fall 2020 and spring 2021 that far exceeded any outbreaks among other intercollegiate athletics teams at WSU. In addition, WSU had

(203 of 299), Page 203 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 203 of 299
Case 2:22-cv-00319-TOR    ECF No. 69-17    filed 09/23/24    PageID.1391    Page 5
of 14

to miss or reschedule several of the seven scheduled games in the
restructured fall 2020 football season, including two cancellations.

- **Regarding the University's decision that you do not have a sincerely
held religious belief that conflicts with the University's vaccine
requirement:**
    - Prior to the Governor's proclamation, and since the beginning of the
    pandemic, you openly and freely expressed your opposition to the vaccine
    and other COVID-19 mitigation efforts on numerous occasions to
    numerous people, citing your own "scientific" research and making
    statements mirroring several specific online conspiracy theories, which
    included demonstrably false claims. In addition, at no point did you ever
    mention any religious concerns (ex: regarding fetal tissue). Therefore,
    your current claim that your private, unexpressed concerns were actually
    religious in nature is simply not credible. Your statement that you and
    some of your staff had unsuccessfully tried to secure documentation for a
    medical exemption undermines your claim. Only *after* it became clear that
    a religious exemption was your only other option did you claim to have
    religious beliefs that conflict with the vaccine requirement. It is
    understandable that you would want the University's review to exclude
    information regarding your own prior statements in its decision; however,
    under EEOC Guidance, these are appropriate considerations, and your
    assertion to the contrary is false.  Further, under EEOC Guidance, personal
    or philosophical beliefs do not give an individual a basis to claim a
    religious exemption.

- **Regarding the University's exemption process:**
    - Contrary to your claims, the University followed its process. You claim the
    University guaranteed a blind review of your request for a religious
    exemption and that it was improper for the Athletics Department to
    provide information contradicting your claim.  Nothing in WSU's policy
    states or implies that it was improper for the Athletics Department to
    provide additional information bearing on this question.  The committee's
    initial review is "blind" and based solely on information provided by the
    employee; however, once the committee makes its initial determination,
    the employee's unit is informed of the initial determination and has an
    opportunity to provide information specific to that employee and their job
    duties. The Athletics Department did not receive information about your
    request until it was appropriate for it to do so in accordance with the

process. Further, the religious exemption request form is clear that "additional follow up information" may be sought, and there is nothing that limits WSU to information provided by the employee.

o You claim that if WSU had concerns about the sincerity of your religious beliefs, it was required to allow you to submit additional information. Again, however, the religious exemption request form uses the permissive "may," not "shall." Moreover, your November 2, 2021, response to the notice of intent to terminate provides ample additional information regarding your request for a religious exemption, and I do not find this information persuasive. As discussed above, your prior statements, as well as the timing of your request for a religious exemption, indicate that your objection to the vaccine requirement was based on factors other than religion.

o Finally, you claim that the Athletics Department and I "overturned" the accommodation recommendations of WSU's Environmental Health and Safety (EHS). This is false. As part of the normal process, EHS provided information regarding possible accommodations but, consistent with the University's process, did not make a decision on this issue or even a recommendation regarding undue hardship. The October 14, 2021, memorandum from EHS clearly states, "EHS will not determine whether these interventions and countermeasures fundamentally alter the employee's job and cannot be accommodated."

- **Regarding your insubordination and threat of violence:**

  o You claim you were merely expressing your "frustration with, and dislike of June Jones," and that you would never physically harm him. However, your exact words were, "I don't want to see that mother f*cker and will fight him if you bring him out to practice." Your tone and profanity during that interaction were deeply concerning and demonstrated a lack of self-control. The clear implication was that violence was in fact possible and actually intended against your former mentor and coach. Although you may have been frustrated, this is clearly a threat of physical violence and an attempt to obstruct the Athletics Department's contingency plans for the football program.

Finally, your claims of "bias" or "hostility" towards your religion are misguided. My primary concern, as the WSU Director of Athletics, has always been the well-being of the student-athletes under your supervision as we attempt to build a successful WSU football program. Diversity and inclusion are in our Department's core values and

adhered to on a daily basis. This includes respect for people's personal religious practices (like you, I am also a practicing Catholic), which further reinforces the baseless nature of this claim.

Based on the above, as well as the information in the October 18, 2021, Notice of Intent to Terminate for Cause and the other documents submitted in the religious exemption process and provided to your attorney, which are attached and incorporated herein, I find that you violated each of the sections of your contract outlined in the Notice of Intent to Terminate for Cause and that these violations were deliberate, serious, and seriously prejudicial to the University and the football program, thereby warranting termination for just cause.

Pursuant to Paragraph 4.3 of your employment agreement, you have fifteen (15) calendar days to appeal this decision to the University President. However, your right to receive any payment under your employment agreement shall cease November 15, 2021, the day after this letter is issued, and you are not entitled to receive any compensation pending the appeal.

Sincerely,

Patrick Chun
Director of Athletics

Enc.
1. Notice of Intent to Terminate for Just Cause
2. September 28, 2021, email from HRS with instructions for completing the religious exemption form
3. October 6, 2021, notification to Athletics from HRS Exemptions
4. October 13, 2021, memorandum from Athletics regarding undue hardship
5. October 13, 2021, supplemental memorandum from Athletics regarding sincerely held religious belief
6. October 14, 2021, memorandum from EHS
7. October 18, 2021, memorandum from Athletics to HRS/EHS
8. October 18, 2021, email from HRS exemptions with notice of denial of religious exemption

cc:   Brian Fahling, Attorney for Nicholas Rolovich
      Danielle Hess, WSU Division Chief, Office of the Attorney General
      Personnel File

**ER0993**

WSU_00000006



# WASHINGTON STATE
### ATHLETICS

$D117322\overline{56}$

Hand Delivered

October 18, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA 99163

Re:     Written Notice of Intent to Terminate for Just Cause

Coach Rolovich:

Pursuant to Paragraphs 4.1 through 4.3 of your Employment Agreement as Head Men's Football Coach, this letter constitutes notice of the University's intent to terminate your employment for just cause.

- You were notified on September 1, 2021, and September 23, 2021, that per Proclamation 21-14.1, all state employees, including those in higher education, would be required to be fully vaccinated against COVID-19 via one of the FDA approved vaccines by October 18, 2021.

- The notice stated that if not vaccinated, you could apply for a medical or religious exemption and accommodation through WSU Human Resources (HRS). The University provided notice of the process on August 31, 2021, September 8, 2021, September 29, 2021, and October 4, 2021.

- You requested an exemption from the vaccine requirement on religious grounds. Your request was denied on October 18, 2021.

This action is in accordance with the terms of your contract, signed in April 2020, and amended in April 2021. The specific provisions violated include the following:

- Paragraph 1.2.1 requires you to devote your best efforts to the performance of your duties. In particular, you are required to "comply with and support all rules, regulations, policies, and decisions established or issued by the University." Further, you must "abide by all provisions of law." Your failure to comply with the vaccination requirement, which is both a University policy and requirement of law under the Governor's Proclamation, violates these provisions and has rendered you legally unable to perform your duties as Head Coach. Your non-compliance with the vaccine requirement, and the fact that you are now legally unable to fulfill your obligations to the University as Head Coach, also violates Section 4.1.5 of your Employment Agreement, conduct of Employee seriously prejudicial to the best interests of the University or its athletic program, and Paragraph 4.1.1.

- Paragraph 4.1.1 prohibits you from engaging in "deliberate and serious violations" of your duties, or "refusal or unwillingness to perform such duties in good faith and to the best of your abilities" As noted in my July 26, 2021, warning letter to you, your contract

Washington State University | Department of Intercollegiate Athletics | Office of the Director
Bohler Athletic Complex 110, PO Box 641602, Pullman, WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501 | www.wsucougars.com

**ER0994**

WSU_00000007

(207 of 299), Page 207 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 207 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-17    filed 09/23/24    PageID.1395    Page 9
of 14



Nicholas R. Rolovich
Page 2

requires you to participate in events, activities, and efforts to foster support for the Football program, and your personal decision to forego a COVID-19 vaccination has impacted your ability to do so, interfering with your ability to meet with donors and others. These activities are a critical part of being a head football coach at a Pac-12 school. See 1.2.1.2.h. Because of your decisions, WSU, the Football program, and the Athletics programs have been subject to several damaging events. These events include the following:

- Your inability to attend in-person Pac-12 Football Media Day in Los Angeles on July 27, 2021. Because of your decision to not get vaccinated, you were the only coach who did not attend in person. Your decision became the primary story concerning football and put our student athletes and other attendees in the position of having to address your absence. This was, and continues to be, a major distraction for the University, Athletics department, and the Football team.

- Your inability to attend any of the regularly scheduled Friday donor lunches. Section 1.2.1.2.h requires that you participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program. You have not actively participated in donor engagement, foster program support, or fundraising. The Friday donor lunch is a critical component of donor outreach, and your absence has been prejudicial to the Football program and the Athletics department.

- Your inability to attend the WSU Football Coaches Show in person that broadcasts live from Zeppoz. This is another critical component of donor and fan outreach. By not attending the show in person, interest from fans has been negatively impacted. Further, you are unable to attend other coaching speaking engagements in person, and you are limited in your ability to attend other campus events such as pep rallies and other fall sports. Your lack of presence as the Head Coach of WSU's most popular and well-known sport is pronounced and has been prejudicial to the Football program and the Athletics program.

- Your inability to attend live donor meetings, including several donor interactions scheduled for July. These events were subsequently canceled. Further, donors have declined to engage in personal meetings or remote meetings out of concern for their personal safety and the disappointment in the lack of leadership your handling of this matter has portrayed. Further, the University and the Athletics department has not been able to schedule future donor meetings based on your actions. Several donors have revoked gifts or put them on hold until further notice because of your decision.

- Paragraph 1.2.1.2 requires you to "Evaluate, recruit, train, and develop student-athletes." You also are responsible for establishment of a program identity and approach to competition, and the game planning for individual games and the season. You have failed to fulfill these obligations by engaging in the following behavior:

- You are unable to attend individual position meetings or engage one-on-one with players or assistant coaches during practices, team meetings, and other preparatory functions. Interactions with assistant coaches and players has been limited and has led to poor planning, lack of communication, and a void in leadership.

(208 of 299), Page 208 of 299
Case 2:22-cv-00319-TOR   ECF No. 89-17   filed 09/23/24   PageID.1396   Page
10 of 14



Nicholas R. Rolovich
Page 3

- Your ability to travel extensively and recruit has been impacted by your decision. Recruiting has been significantly impacted this year, as evidenced by a notable decline in the number of verbal commitments.

As the most high-profile employee of WSU and one of the most highly compensated state employees in Washington, your choices and behavior also reflect on the University, the Athletics Department, and the Football program at all times. In addition to the above, the voicing of physical threats regarding a coach we talked about related to our contingency plan was completely unacceptable.

Your conduct has been seriously prejudicial to the best interests of the University and the Football program, including putting the University and the Football program in a negative national spotlight, and is a violation of your contract. (See paragraph 4.1.5).

Per Section 4.2 of your Employment Agreement, you have fifteen (15) calendar days to respond to me, in writing, with reasons why you should not be terminated. I will respond accordingly consistent with the terms of your Employment Agreement.

Effective immediately you have been placed on paid administrative leave pending the outcome of this notice of intent to terminate for just cause. You are not to perform any work on behalf of the University. Your WSU email account has been disabled and systems access removed.

For information regarding your benefits, please visit http://hrs.wsu.edu/employees/benefits/separating-employee-information/. If you have specific benefits questions, such as options for continuing medical and dental coverage beyond your separation date, please contact Human Resource Services at 509.335.4521.

Sincerely,

Patrick Chun
Director of Athletics


cc:    Athletics Employment File
       HRS Personnel File
       HRS Employment Services



HUMAN RESOURCE SERVICES

OCT 13 2021

RECEIVED

October 13, 2021
Re: Religious Accommodation Request | Nicholas Rolovich

This response is a supplement to the earlier response to the request received from HRS on October 6, 2021, regarding a religious accommodation request for Nick Rolovich (Employee). The initial response focused on the essential functions of Rolovich's job and the inability to perform those functions with the requested accommodations.

Underlying the request for an accommodation is the initial conclusion that Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being vaccinated for COVID-19. Rolovich has made several statements that cast doubt on his claimed sincerely held religious belief. The statements and the timing of Rolovich's statements with respect to religious beliefs as they relate to COVID-19 vaccinations are summarized below.

- In numerous formal and informal meetings between March and August, Rolovich made it clear to Pat Chun, his supervisor, and many within the Athletics Department, that he was unwilling to take the vaccine based on his independent research. He stated on multiple times he had done his own research, made an independent decision and came to a conclusion that he would not take the vaccine. It was clear from these statements that his decision not to be vaccinated was based on the conclusions he reached following his own research. On May 24, 2021, Rolovich firmly restated to Pat Chun his stance on not taking the vaccine based on his research in a meeting in Pat Chun's office.

- On August 19, 2021, Rolovich personally reiterated and reaffirmed directly to Pat Chun his ongoing stance of not receiving a COVID-19 vaccination. He disclosed he attempted to seek a medical exemption but was unable to secure the necessary documentation. He then disclosed he would elect to pursue a religious based exemption to meet the employment requirements stated in the Governor's Proclamation 21-14-1.
  - o In that meeting, Pat Chun stated directly to Rolovich that since the start of this pandemic, Rolovich had been vocal and consistent in his opinions and skepticisms about the COVID-19 virus and the full nature of the public health emergency. He has continuously been critical of the role the government and communicated a multitude of baseless theories with respect to vaccination.

- The following are examples of his reasoning:
  - o COVID-19 Vaccine was not fully FDA approved, and therefore not safe
  - o The vaccine could and would negatively impact women and fertility rates
  - o The vaccine would negatively impact his mortality

The government and therefore the vaccine could not be trusted. Rolovich participated in Pac-12 Conference sponsored and WSU Athletics mandated education sessions relative to the merits of

the COVID-19 vaccine. In addition, WSU Athletics arranged a one-on-one meeting with Dr. Guy Palmer, a world-renowned infectious disease expert. Notwithstanding information shared by the experts in these sessions, Rolovich continued to rely on the results of his own research.

In sum, throughout the multiple individual and group meetings, Rolovich made it clear that he refused to be vaccinated based on the conclusions he reached through his own research, he only mentioned religion after the Governor issued the Proclamation requiring vaccination, and then only mentioned religion in reference to seeking an exemption from the vaccination requirement. We believe these facts support re-evaluation of the claimed sincerely held religious belief.

| From: | HRS Exemptions |
| To: | Rolovich, Nicholas R |
| Cc: | Chun, Patrick; McCoy, Anne R; Blair, Bryan Bernard |
| Subject: | OFFICIAL NOTICE: Religious Exemption Denied |
| Date: | Monday, October 18, 2021 4:29:57 PM |

Dear Nicholas Rolovich:

You submitted a request for an exemption to the COVID-19 vaccination requirement as mandated by Governor Inslee's proclamation 21-14.2. This notification confirms that we are **unable to approve your request** for an exemption and accommodation based on a sincerely held religious belief, practice, or observance. We would like to provide additional information on the review process in an effort to clarify your exemption denial and the University's approach to each individual request.

Under the proclamation, the University is legally prohibited from allowing workers to engage in work after October 18, 2021, if they are not fully vaccinated against COVID-19, with limited exceptions. One exception is if a worker has an approved religious accommodation and is thereby exempt from the vaccine requirement. To qualify for an approved religious exemption from the vaccine requirement:

- A worker must explain how the vaccine requirement conflicts with their sincerely held religious belief, practice or observance; *and*
- Must be able to accommodate the unvaccinated worker without undue hardship.

In considering your request for accommodation, the University considered both the information you submitted as well as your own prior statements to WSU staff and others regarding vaccination. Based on your comments, in conjunction with the timing of your request for a religious accommodation, the University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement.

Furthermore, it would pose an undue hardship to the University and/or a threat to yourself and others to allow you to remain in your position while unvaccinated. The University evaluated the essential functions of your position to determine whether these possible accommodations would mitigate the threat posed by allowing you to remain unvaccinated while performing your job duties and also whether there were possible accommodations that would allow you to effectively perform all of your duties while remaining unvaccinated.

Based upon the nature of your head coaching responsibilities and core job functions and activities, the University has determined you cannot safely and effectively do your job without undue hardship to the University.

We hope this information helps you understand how the University individually evaluated your request.

Thank you,

**ER0999**

WSU_00000029

*Washington State University, Human Resource Services*
*French Administration 139 | Pullman, WA 99164-1014*
*Phone: 509-335-4521 | Fax: 509-335-1259 | HRS Website: http://www.hrs.wsu.edu*

IMPORTANT NOTICE: This communication, including any attachment, contains information that may be confidential or privileged, and is intended solely for the entity or individual to whom it is addressed. If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message is strictly prohibited. Nothing in this email, including any attachment, is intended to be a legally binding signature.

**ER1000**

WSU_00000030

## WASHINGTON STATE
### ATHLETICS

Hand Delivered

October 18, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA 99163

Re:     Written Notice of Intent to Terminate for Just Cause

Coach Rolovich:

Pursuant to Paragraphs 4.1 through 4.3 of your Employment Agreement as Head Men's Football Coach, this letter constitutes notice of the University's intent to terminate your employment for just cause.

- You were notified on September 1, 2021, and September 23, 2021, that per Proclamation 21-14.1, all state employees, including those in higher education, would be required to be fully vaccinated against COVID-19 via one of the FDA approved vaccines by October 18, 2021.

- The notice stated that if not vaccinated, you could apply for a medical or religious exemption and accommodation through WSU Human Resources (HRS). The University provided notice of the process on August 31, 2021, September 8, 2021, September 29, 2021, and October 4, 2021.

- You requested an exemption from the vaccine requirement on religious grounds. Your request was denied on October 18, 2021.

This action is in accordance with the terms of your contract, signed in April 2020, and amended in April 2021. The specific provisions violated include the following:

- Paragraph 1.2.1 requires you to devote your best efforts to the performance of your duties. In particular, you are required to "comply with and support all rules, regulations, policies, and decisions established or issued by the University." Further, you must "abide by all provisions of law." Your failure to comply with the vaccination requirement, which is both a University policy and requirement of law under the Governor's Proclamation, violates these provisions and has rendered you legally unable to perform your duties as Head Coach. Your non-compliance with the vaccine requirement, and the fact that you are now legally unable to fulfill your obligations to the University as Head Coach, also violates Section 4.1.5 of your Employment Agreement, conduct of Employee seriously prejudicial to the best interests of the University or its athletic program, and Paragraph 4.1.1.

- Paragraph 4.1.1 prohibits you from engaging in "deliberate and serious violations" of your duties, or "refusal or unwillingness to perform such duties in good faith and to the best of your abilities" As noted in my July 26, 2021, warning letter to you, your contract

Washington State University | Department of Intercollegiate Athletics | Office of the Director
Bohler Athletic Complex 110, PO Box 641602, Pullman, WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501 | www.wsucougars.com

Exhibit O Page 3

ER1001

WSU_00033988

(214 of 299), Page 214 of 299
Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 214 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-16    filed 09/23/24    PageID.1385    Page 4
of 5

Nicholas R. Rolovich
Page 2

requires you to participate in events, activities, and efforts to foster support for the Football program, and your personal decision to forego a COVID-19 vaccination has impacted your ability to do so, interfering with your ability to meet with donors and others. These activities are a critical part of being a head football coach at a Pac-12 school. See 1.2.1.2.h. Because of your decisions, WSU, the Football program, and the Athletics programs have been subject to several damaging events. These events include the following:

- Your inability to attend in-person Pac-12 Football Media Day in Los Angeles on July 27, 2021. Because of your decision to not get vaccinated, you were the only coach who did not attend in person. Your decision became the primary story concerning football and put our student athletes and other attendees in the position of having to address your absence. This was, and continues to be, a major distraction for the University, Athletics department, and the Football team.

- Your inability to attend any of the regularly scheduled Friday donor lunches. Section 1.2.1.2.h requires that you participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program. You have not actively participated in donor engagement, foster program support, or fundraising. The Friday donor lunch is a critical component of donor outreach, and your absence has been prejudicial to the Football program and the Athletics department.

- Your inability to attend the WSU Football Coaches Show in person that broadcasts live from Zeppoz. This is another critical component of donor and fan outreach. By not attending the show in person, interest from fans has been negatively impacted. Further, you are unable to attend other coaching speaking engagements in person, and you are limited in your ability to attend other campus events such as pep rallies and other fall sports. Your lack of presence as the Head Coach of WSU's most popular and well-known sport is pronounced and has been prejudicial to the Football program and the Athletics program.

- Your inability to attend live donor meetings, including several donor interactions scheduled for July. These events were subsequently canceled. Further, donors have declined to engage in personal meetings or remote meetings out of concern for their personal safety and the disappointment in the lack of leadership your handling of this matter has portrayed. Further, the University and the Athletics department has not been able to schedule future donor meetings based on your actions. Several donors have revoked gifts or put them on hold until further notice because of your decision.

- Paragraph 1.2.1.2 requires you to "Evaluate, recruit, train, and develop student-athletes." You also are responsible for establishment of a program identity and approach to competition, and the game planning for individual games and the season. You have failed to fulfill these obligations by engaging in the following behavior:

  - You are unable to attend individual position meetings or engage one-on-one with players or assistant coaches during practices, team meetings, and other preparatory functions. Interactions with assistant coaches and players has been limited and has led to poor planning, lack of communication, and a void in leadership.

(215 of 299), Page 215 of 299    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 215 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-16    filed 09/23/24    PageID.1386    Page 5
of 5

Nicholas R. Rolovich
Page 3

- Your ability to travel extensively and recruit has been impacted by your decision. Recruiting has been significantly impacted this year, as evidenced by a notable decline in the number of verbal commitments.

As the most high-profile employee of WSU and one of the most highly compensated state employees in Washington, your choices and behavior also reflect on the University, the Athletics Department, and the Football program at all times. In addition to the above, the voicing of physical threats regarding a coach we talked about related to our contingency plan was completely unacceptable.

Your conduct has been seriously prejudicial to the best interests of the University and the Football program, including putting the University and the Football program in a negative national spotlight, and is a violation of your contract. (See paragraph 4.1.5).

Per Section 4.2 of your Employment Agreement, you have fifteen (15) calendar days to respond to me, in writing, with reasons why you should not be terminated. I will respond accordingly consistent with the terms of your Employment Agreement.

Effective immediately you have been placed on paid administrative leave pending the outcome of this notice of intent to terminate for just cause. You are not to perform any work on behalf of the University. Your WSU email account has been disabled and systems access removed.

For information regarding your benefits, please visit http://hrs.wsu.edu/employees/benefits/separating-employee-information/. If you have specific benefits questions, such as options for continuing medical and dental coverage beyond your separation date, please contact Human Resource Services at 509.335.4521.

Sincerely,

Patrick Chun
Director of Athletics

cc:    Athletics Employment File
       HRS Personnel File
       HRS Employment Services

ER1003

WSU_00033990

|        |                                                                                                       |
| ------ | ----------------------------------------------------------------------------------------------------- |
| **From:** | "HRS Exemptions" </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f3e0c5dc45b4489180399229277dc7f3-hrs.exempti> |
| **Cc:** | "Chun, Patrick" <patrick.chun@wsu.edu>, "McCoy, Anne R" <amccoy@wsu.edu>, "Blair, Bryan Bernard" <bryan.b.blair@wsu.edu> |
| **Subject:** | OFFICIAL NOTICE: Religious Exemption Denied |
| **Date:** | Mon, 18 Oct 2021 23:09:29 -0000 |
| **Importance:** | Normal |

---

Dear Nicholas Rolovich:

You submitted a request for an exemption to the COVID-19 vaccination requirement as mandated by Governor Inslee's proclamation 21-14.2. This notification confirms that we are **unable to approve your request** for an exemption and accommodation based on a sincerely held religious belief, practice, or observance. We would like to provide additional information on the review process in an effort to clarify your exemption denial and the University's approach to each individual request.

Under the proclamation, the University is legally prohibited from allowing workers to engage in work after October 18, 2021, if they are not fully vaccinated against COVID-19, with limited exceptions. One exception is if a worker has an approved religious accommodation and is thereby exempt from the vaccine requirement. To qualify for an approved religious exemption from the vaccine requirement:

- A worker must explain how the vaccine requirement conflicts with their sincerely held religious belief, practice or observance; *and*
- Must be able to accommodate the unvaccinated worker without undue hardship.

In considering your request for accommodation, the University considered both the information you submitted as well as your own prior statements to WSU staff and others regarding vaccination. Based on your comments, in conjunction with the timing of your request for a religious accommodation, the University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement.

Furthermore, it would pose an undue hardship to the University and/or a threat to yourself and others to allow you to remain in your position while unvaccinated. The University evaluated the essential functions of your position to determine whether these possible accommodations would mitigate the threat posed by allowing you to remain unvaccinated while performing your job duties and also whether there were possible accommodations that would allow you to effectively perform all of your duties while remaining unvaccinated.

Based upon the nature of your head coaching responsibilities and core job functions and activities, the University has determined you cannot safely and effectively do your job without undue hardship to the University.

We hope this information helps you understand how the University individually evaluated your request.

Thank you,

*Washington State University, Human Resources Services*
*French Administration 139 | Pullman, WA  99164-1014*
*Phone*: 509-335-4521  |  *Fax*: 509-335-1259  |  *HRS Website*:  http://www.hrs.wsu.edu

WSU_00022513

IMPORTANT NOTICE: This communication, including any attachment, contains information that may be confidential or privileged, and is intended solely for the entity or individual to whom it is addressed.  If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message is strictly prohibited.  Nothing in this email, including any attachment, is intended to be a legally binding signature.

Exhibit N Page 4

**ER1005**

WSU_00022514

1   ROBERT W. FERGUSON
    Attorney General
2
    SPENCER W. COATES, WSBA #49683
3   Assistant Attorney General
    Complex Litigation Division
4   800 Fifth Avenue, Suite 2000
    Seattle, WA  98104-3188
5   (206) 464-7744

6   ZACHARY J. PEKELIS, WSBA #44557
    W. SCOTT FERRON, WSBA #61154
7   ERICA P. CORAY, WSBA #61987
    AI-LI CHIONG-MARTINSON, WSBA #53359
8   Special Assistant Attorneys General
    PACIFICA LAW GROUP LLP
9   1191 2nd Avenue, Suite 2000
    Seattle, WA  98101-3404
10  (206) 245-1700

11              **UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF WASHINGTON**
12

13  NICHOLAS ROLOVICH,              |  NO. 2:22-cv-00319-TOR

                         Plaintiff, |  PLAINTIFF'S FIRST SET OF
14                                  |  REQUESTS FOR ADMISSION TO
         v.                         |  DEFENDANT **AND**
15                                  |  **DEFENDANT'S ANSWERS AND**
    WASHINGTON STATE                |  **OBJECTIONS THERETO**
16  UNIVERSITY,                     |

17                       Defendant. |

18          In  accordance  with  Federal  Rule  of  Civil  Procedure  36,  Defendant

19  Washington  State  University  ("WSU")  hereby  submits  these  Answers  and

20  Objections ("Answers") to Plaintiff's First Set of Requests for Admission to

21  Defendant ("Requests") as follows:

22

---

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND**
**DEF.'S ANSWERS AND**
**OBJECTIONS THERETO**

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Exhibit M Page 2

**ER1006**

## GENERAL OBJECTIONS APPLICABLE TO ALL ANSWERS

1.     WSU objects to Plaintiff's characterization of the Requests as "continuing." WSU will respond to the specific Requests set forth herein and will supplement its Answers as necessary to comply with the Federal Rules of Civil Procedure. WSU reserves the right to modify or supplement these Answers as necessary.

2.     WSU objects to the Requests as vague, ambiguous, overbroad, unduly burdensome, duplicative, not relevant to any party's claims or defenses, and not proportional to the needs of the litigation. WSU specifically objects to the Requests' specified time period as overbroad in that it extends well after Plaintiff filed this lawsuit. Unless otherwise stated, these Answers pertain to the time period of January 1, 2020, to November 14, 2022.

3.     WSU objects to the Requests' definition of "You/Your" as vague, ambiguous, overbroad, not relevant to any party's claims or defenses, and not proportional to the needs of the litigation, including to the extent it purports to require WSU to obtain information from persons who either are not WSU employees or were not involved in WSU's actions challenged by Plaintiff. WSU understands these Requests to seek—and its Answers reflect—only information currently known by WSU.

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Exhibit M Page 3

**ER1007**

1    4.    WSU objects to the Requests to the extent they impose burdens or

2    seek discovery beyond what is permitted or required under the Federal Rules of

3    Civil Procedure, including Rules 26 and 36.

4    5.    WSU objects to the Requests to the extent they call for information

5    protected from disclosure by attorney-client privilege, the work product doctrine,

6    or any other applicable privilege, protection, or immunity.

7    6.    WSU objects to the Requests to the extent they seek information

8    protected from disclosure by the Family Education Rights and Privacy Act

9    (FERPA), 20 U.S.C. § 1232g, the Health Insurance Portability and

10   Accountability Act (HIPAA), 42 U.S.C. § 1320d-6, or any other applicable

11   privacy protection. WSU will only disclose such protected information consistent

12   with the Stipulated Protective Order entered in this case. *See* ECF No. 61.

13   7.    WSU objects to the Requests' use of the undefined phrase "the

14   review committee" as vague and ambiguous. In these Answers, WSU uses the

15   phrase "review committee" to refer to the following current or former WSU

16   employees, two or more of whom conducted an initial, "blind" review of any

17   employee request for a religious exemption with respect to Proclamation 21.14.1

18   (including Plaintiff's request): Lisa Gehring, Bonnie Dennler, Teddi Phares, and

19   Daniel Records. *See* WSU Ans. to Plf.'s Interrogatory No. 13.

20   8.    The foregoing General Objections are incorporated by reference into

21   the Answer to each Request. WSU not having listed specifically any one of its

22

PLF.'S FIRST SET OF REQUESTS          3          ATTORNEY GENERAL OF WASHINGTON
FOR ADMISSION TO DEF. **AND**                          Complex Litigation Division
                                                          800 Fifth Avenue, Suite 2000
**DEF.'S ANSWERS AND**                                      Seattle, WA 98104-3188
**OBJECTIONS THERETO**                                         (206) 464-7744
                                                        Exhibit M Page 4

**ER1008**

1    General Objections in response to a particular Interrogatory does not constitute a

2    waiver of any objection, even if it could have been specifically stated.

3

4                    **REQUESTS FOR ADMISSION**

5    **REQUEST FOR ADMISSION NO. 1:** Admit that the review committee

6    found that Plaintiff described a sincerely held religious belief in his Request for

7    Religious Exemption.

8    **ANSWER:** WSU objects to this Request as vague and ambiguous and on

9    the other grounds set forth in its General Objections, especially as to the

10    undefined phrases "review committee" and "described a sincerely held religious

11    belief." WSU further objects to this Request as irrelevant to any party's claims

12    or defenses.

13    Subject to and without waiving the foregoing objections, the Request is

14    admitted in part, and denied in part. WSU admits that, after reviewing only the

15    information Plaintiff submitted in writing on October 3, 2021, the review

16    committee found the information contained therein sufficient at that stage of the

17    accommodation process to "support the accommodation request based on a

18    sincerely held religious belief." Except as otherwise admitted, denied.

19

20

21

22

PLF.'S FIRST SET OF REQUESTS        4
FOR ADMISSION TO DEF. **AND**
**DEF.'S ANSWERS AND**
**OBJECTIONS THERETO**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 5

**ER1009**

1    **REQUEST FOR ADMISSION NO. 2:** Admit that the review committee

2    did not reach out to Plaintiff for follow-up information regarding the sincerity of

3    his religious belief described in his Request for Religious Exemption.

4    **ANSWER:** WSU objects to this Request as vague and ambiguous and on

5    the other grounds set forth in its General Objections, especially as to the lack of

6    a specified time period and the vague use of the phrase "religious belief," and the

7    undefined and vague phrases "review committee," "reach out," and "follow-up

8    information." WSU further objects to this Request as irrelevant to any party's

9    claims or defenses.

10    Subject to and without waiving the foregoing objections, the Request is

11    admitted in part, and denied in part. WSU admits that the review committee did

12    not request additional information from Plaintiff regarding his asserted religious

13    objection to the COVID-19 vaccines between the time he submitted materials in

14    support of his religious accommodation request on October 3, 2021, and when

15    WSU denied his request on October 18, 2021. Except as otherwise admitted,

16    denied.

17

18    **REQUEST FOR ADMISSION NO. 3:** Admit that the review committee,

19    after a review of Plaintiff's written and/or oral communications in his Request

20    for Religious Exemption, determined that such communications supported

21    Plaintiff's accommodation request based on a sincerely held religious belief.

22

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 6

**ER1010**

1    **ANSWER:** WSU objects to this Request as vague and ambiguous and on

2    the other grounds set forth in its General Objections, especially as to the

3    undefined and vague phrases "review committee" and "written and/or oral

4    communications." WSU further objects to this Request as irrelevant to any

5    party's claims or defenses.

6    Subject to and without waiving the foregoing objections, the Request is

7    admitted in part, and denied in part. WSU admits that, after reviewing only the

8    information Plaintiff submitted in writing on October 3, 2021, the review

9    committee found the information contained therein sufficient at that stage of the

10   accommodation process to "support the accommodation request based on a

11   sincerely held religious belief." Except as otherwise admitted, denied.

12

13   **REQUEST FOR ADMISSION NO. 4:** Admit that the review committee

14   did not contact Plaintiff for follow-up information related to his Request for

15   Religious Exemption.

16   **ANSWER:** WSU objects to this Request as vague and ambiguous and on

17   the other grounds set forth in its General Objections, especially as to the lack of

18   a specified time period and the vague phrases "review committee" and "follow-

19   up information related to his Request for Religious Exemption." WSU further

20   objects to this Request as irrelevant to any party's claims or defenses.

21

22

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 7

ER1011

1       Subject to and without waiving the foregoing objections, the Request is

2    admitted in part, and denied in part. WSU admits that the review committee did

3    not request additional information from Plaintiff regarding his asserted religious

4    objection to the COVID-19 vaccines between the time he submitted materials in

5    support of his religious accommodation request on October 3, 2021, and when

6    WSU denied his request on October 18, 2021. Except as otherwise admitted,

7    denied.

8

9       **REQUEST FOR ADMISSION NO. 5:** Admit that the review committee

10    contacted individuals other than Plaintiff for follow-up information to assess the

11    sincerity of Plaintiff's religious belief described in his Request for Religious

12    Exemption.

13       **ANSWER:** WSU objects to this Request as vague and ambiguous and on

14    the other grounds set forth in its General Objections, especially as to the vague

15    phrases "review committee," "follow-up information," and Plaintiff's

16    unidentified "religious belief." WSU further objects to this Request as irrelevant

17    to any party's claims or defenses. WSU further objects to this Request to the

18    extent it calls for information protected from disclosure by attorney-client

19    privilege, the work product doctrine, or any other applicable privilege protection,

20    or immunity.

21

22

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Exhibit M Page 8

**ER1012**

1      Subject to and without waiving the foregoing objections, the Request is

2    admitted in part, and denied in part. WSU admits that HRS invited and received

3    information from the WSU Athletics Department concerning Plaintiff's religious

4    accommodation request, including but not limited to information relevant to

5    whether Plaintiff held sincere religious beliefs in conflict with vaccination against

6    COVID-19. Except as otherwise expressly admitted, denied.

7

8      **REQUEST FOR ADMISSION NO. 6:** Admit that the review committee

9    did not contact anyone in the WSU Athletic Department for follow-up

10   information to assess the sincerity of Plaintiff's religious belief described in his

11   Request for Religious Exemption.

12     **ANSWER:** WSU objects to this Request as vague and ambiguous and on

13   the other grounds set forth in its General Objections, especially as to the vague

14   phrases "review committee," "follow-up information," and Plaintiff's

15   unidentified "religious belief." WSU further objects to this Request as irrelevant

16   to any party's claims or defenses. WSU further objects to this Request to the

17   extent it calls for information protected from disclosure by attorney-client

18   privilege, the work product doctrine, or any other applicable privilege protection,

19   or immunity.

20     Subject to and without waiving the foregoing objections, denied.

21

22

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 9

**ER1013**

1   **REQUEST FOR ADMISSION NO. 7:** Admit that the reversal of the

2   review committee's determination that Plaintiff's Request for Religious

3   Exemption described a sincerely held religious belief was the only instance in

4   which the review committee's finding of sincerity was subsequently reversed.

5   **ANSWER:** WSU objects to this Request as vague and ambiguous and on

6   the other grounds set forth in its General Objections, especially as to the vague

7   and undefined phrases "review committee" and "reversal." WSU further objects

8   to this Request as irrelevant to any party's claims or defenses.

9   Subject to and without waiving the foregoing objections, denied.

10

11   **REQUEST FOR ADMISSION NO. 8:** Admit that WSU never prepared

12   any documented analysis of the financial impact that would have resulted from

13   granting an accommodation to Plaintiff's Request for Religious Exemption.

14   **ANSWER:** WSU objects to this Request as vague and ambiguous and on

15   the other grounds set forth in its General Objections, especially as to the vague

16   and undefined phrases "documented analysis" and "financial impact." WSU

17   further objects to this Request as irrelevant to the claims or defenses in this case.

18   Subject to and without waiving the foregoing objections, denied.

19

20

21

22

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 10

**ER1014**

1    **REQUEST FOR ADMISSION NO. 9:** Admit that WSU did nothing to

2    verify the authenticity of vaccination cards that WSU Employees and students

3    provided in response to the Vaccine Mandate.

4    **ANSWER:** WSU objects to this Request as vague and ambiguous and on

5    the other grounds set forth in its General Objections, especially in its use of the

6    phrase "WSU did nothing" and its suggestion that WSU students provided

7    vaccination cards in response to the "Vaccine Mandate," which the Requests

8    define as "the COVID-19 vaccination that was mandate pursuant to the

9    Governor's Proclamation 21-14.1." WSU further objects to this Request as

10    irrelevant to any party's claims or defenses.

11    Subject to and without waiving the foregoing objections, denied.

12

13    **REQUEST FOR ADMISSION NO. 10:** Admit that WSU had no

14    procedure for determining whether Employees or students provided fake

15    vaccination cards in response to the Vaccine Mandate.

16    **ANSWER:** WSU objects to this Request as vague and ambiguous and on

17    the other grounds set forth in its General Objections, especially in its use of the

18    phrase "WSU had no procedure" and its suggestion that WSU students provided

19    vaccination cards in response to the "Vaccine Mandate," which the Requests

20    define as "the COVID-19 vaccination that was mandate pursuant to the

21

22

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 11

**ER1015**

(228 of 299), Page 228 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 228 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-14    filed 09/23/24    PageID.1373    Page
12 of 16

1    Governor's Proclamation 21-14.1." WSU further objects to this Request as

2    irrelevant to the claims or defenses in this case.

3         Subject to and without waiving the foregoing objections, denied.

4

5    **REQUEST FOR ADMISSION NO. 11**: Admit that WSU granted every

6    Request for Religious Exception sought by any student-athlete participating in

7    the football program.

8         **ANSWER**: WSU objects to this Request as vague, ambiguous and on the

9    other grounds set forth in its General Objections, especially in its use of the

10   undefined phrase "Request for Religious Exception," without any reference to

11   whatever requirement from which an "[e]xception" was sought. WSU further

12   objects to the Request as overbroad, unduly burdensome, and not proportional to

13   the needs of the case, including because it is not limited by any relevant

14   timeframe. WSU further objects to this Request as calling for information

15   protected from disclosure by FERPA. WSU further objects to this Request as

16   irrelevant to any party's claims or defenses.

17        Subject to and without waiving the foregoing objections, denied.

18

19   **REQUEST FOR ADMISSION NO. 12**: Admit that WSU granted every

20   Request for Religious Exception by any student who sought an exception.

21

22

PLF.'S FIRST SET OF REQUESTS          11
FOR ADMISSION TO DEF. **AND**
**DEF.'S ANSWERS AND**
**OBJECTIONS THERETO**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 12

**ER1016**

1      **ANSWER:** WSU objects to this Request as vague, ambiguous and on the

2   other grounds set forth in its General Objections, especially in its use of the

3   undefined phrase "Request for Religious Exception," without any reference to

4   whatever requirement from which an "[e]xception" was sought. WSU further

5   objects to the Request as overbroad, unduly burdensome, and not proportional to

6   the needs of the case, including because it is not limited by any relevant

7   timeframe. WSU further objects to this Request as calling for information

8   protected from disclosure by FERPA. WSU further objects to this Request as

9   irrelevant to any party's claims or defenses.

10      Subject to and without waiving the foregoing objections, denied.

11

12      **REQUEST FOR ADMISSION NO. 13:** Admit that WSU's Athletics

13   Department utilized Cortext for communicating about medical and health-related

14   issues, including Plaintiff's vaccination status.

15      **ANSWER:** WSU objects to this Request as vague and ambiguous and on

16   the other grounds set forth in its General Objections, especially as to the vague

17   and undefined phrase "medical and health-related issues." WSU further objects

18   to this Request as overbroad and unduly burdensome, including due to the lack

19   of a specified timeframe, and to the extent it seeks information based on

20   documents not within WSU's possession, custody, or control. WSU further

21   objects to the Request as seeking information protected from disclosure by

22

PLF.'S FIRST SET OF REQUESTS             12
FOR ADMISSION TO DEF. **AND**
**DEF.'S ANSWERS AND**
**OBJECTIONS THERETO**

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Exhibit M Page 13

**ER1017**

1    FERPA or HIPAA. Finally, WSU objects to the Request as seeking information

2    irrelevant to any party's claims or defenses.

3        Subject to and without waiving the foregoing objections, the Request is

4    admitted in part, denied in part. WSU admits that some WSU Athletics

5    Department employees utilized, at times, Imprivata Cortext as a HIPAA-

6    compliant text application for some student athlete-related "medical and health-

7    related issues" in 2020, 2021, and 2022. Following a reasonable investigation,

8    WSU denies that Cortext was used by WSU Athletics employees specifically to

9    communicate about Plaintiff's vaccination status. Except as otherwise admitted,

10   denied.

11

12       DATED this 3rd day of September 2024.

13                                  ROBERT W. FERGUSON
                                    Attorney General
14
                                    *s/Zachary P. Pekelis*
15                                  ZACHARY J. PEKELIS, WSBA #44557
                                    W. SCOTT FERRON, WSBA #61154
16                                  ERICA P. CORAY, WSBA #61987
                                    AI-LI CHIONG-MARTINSON, WSBA #53359
17                                  Special Assistant Attorneys General
                                    PACIFICA LAW GROUP LLP
18                                  1191 2nd Avenue, Suite 2000
                                    Seattle, WA 98101-3404
19                                  (206) 245-1700
                                    Zach.Pekelis@pacificalawgroup.com
20
                                    SPENCER W. COATES, WSBA #49683
21                                  Assistant Attorney General
                                    Complex Litigation Division
22

PLF.'S FIRST SET OF REQUESTS              13        ATTORNEY GENERAL OF WASHINGTON
FOR ADMISSION TO DEF. **AND**                         Complex Litigation Division
                                                      800 Fifth Avenue, Suite 2000
**DEF.'S ANSWERS AND**                                     Seattle, WA 98104-3188
**OBJECTIONS THERETO**                                       (206) 464-7744

(231 of 299), Page 231 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 231 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-14    filed 09/23/24    PageID.1376    Page
15 of 16

1

800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Spencer.Coates@atg.wa.gov

2

3

Attorneys for Defendant Washington State
University

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

PLF.'S FIRST SET OF REQUESTS
FOR ADMISSION TO DEF. **AND
DEF.'S ANSWERS AND
OBJECTIONS THERETO**

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Exhibit M Page 15

**ER1019**

1          **<u>CERTIFICATE OF SERVICE</u>**

2          I hereby declare that on this day I caused the foregoing document to be

3    served upon all counsel of record.

4          I declare under penalty of perjury under the laws of the State of

5    Washington and the United States that the foregoing is true and correct.

6          DATED this 3rd day of September 2024, at Seattle, Washington.

7                              *s/Zachary J. Pekelis*
                              ZACHARY J. PEKELIS, WSBA #44557
8                              Special Assistant Attorney General

9

10

11

12

13

14

15

16

17

18

19

20

21

22

PLF.'S FIRST SET OF REQUESTS          15          ATTORNEY GENERAL OF WASHINGTON
FOR ADMISSION TO DEF. **AND**                        Complex Litigation Division
**DEF.'S ANSWERS AND**                                800 Fifth Avenue, Suite 2000
**OBJECTIONS THERETO**                                Seattle, WA  98104-3188
                                                        (206) 464-7744
                                          Exhibit M Page 16

**ER1020**

Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 233 of 299

**From:** "hrs@wsu.edu" <hrs@wsu.edu>
**To:** "Dennler, Bonnie "<b.carothers@wsu.edu>
**Subject:** Scanned from HRS Xerox Multifunction Printer
**Date:** Fri, 15 Oct 2021 11:47:25 -0700
**Importance:** Normal
**Attachments:** Scanned_from_a_Xerox_Multifunction_Printer.pdf

Please open the attached document. It was scanned and sent to you using a Xerox Multifunction Printer.

Attachment File Type: pdf, Multi-Page

Multifunction Printer Location:
Device Name: HRSXEROX

HRS Xerox Copier

Exhibit K Page 3

**ER1021**



HUMAN RESOURCE SERVICES

OCT 13 2021

RECEIVED

October 13, 2021
Re: Religious Accommodation Request | Nicholas Rolovich

This response is a supplement to the earlier response to the request received from HRS on October 6, 2021, regarding a religious accommodation request for Nick Rolovich (Employee). The initial response focused on the essential functions of Rolovich's job and the inability to perform those functions with the requested accommodations.

Underlying the request for an accommodation is the initial conclusion that Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being vaccinated for COVID-19. Rolovich has made several statements that cast doubt on his claimed sincerely held religious belief. The statements and the timing of Rolovich's statements with respect to religious beliefs as they relate to COVID-19 vaccinations are summarized below.

- In numerous formal and informal meetings between March and August, Rolovich made it clear to Pat Chun, his supervisor, and many within the Athletics Department, that he was unwilling to take the vaccine based on his independent research. He stated on multiple times he had done his own research, made an independent decision and came to a conclusion that he would not take the vaccine. It was clear from these statements that his decision not to be vaccinated was based on the conclusions he reached following his own research. On May 24, 2021, Rolovich firmly restated to Pat Chun his stance on not taking the vaccine based on his research in a meeting in Pat Chun's office.

- On August 19, 2021, Rolovich personally reiterated and reaffirmed directly to Pat Chun his ongoing stance of not receiving a COVID-19 vaccination. He disclosed he attempted to seek a medical exemption but was unable to secure the necessary documentation. He then disclosed he would elect to pursue a religious based exemption to meet the employment requirements stated in the Governor's Proclamation 21-14-1.
  - In that meeting, Pat Chun stated directly to Rolovich that since the start of this pandemic, Rolovich had been vocal and consistent in his opinions and skepticisms about the COVID-19 virus and the full nature of the public health emergency. He has continuously been critical of the role the government and communicated a multitude of baseless theories with respect to vaccination.

- The following are examples of his reasoning:
  - COVID-19 Vaccine was not fully FDA approved, and therefore not safe
  - The vaccine could and would negatively impact women and fertility rates
  - The vaccine would negatively impact his mortality

The government and therefore the vaccine could not be trusted. Rolovich participated in Pac-12 Conference sponsored and WSU Athletics mandated education sessions relative to the merits of

Exhibit K Page 5

**ER1022**

the COVID-19 vaccine. In addition, WSU Athletics arranged a one-on-one meeting with Dr. Guy Palmer, a world-renowned infectious disease expert. Notwithstanding information shared by the experts in these sessions, Rolovich continued to rely on the results of his own research.

In sum, throughout the multiple individual and group meetings, Rolovich made it clear that he refused to be vaccinated based on the conclusions he reached through his own research, he only mentioned religion after the Governor issued the Proclamation requiring vaccination, and then only mentioned religion in reference to seeking an exemption from the vaccination requirement. We believe these facts support re-evaluation of the claimed sincerely held religious belief.

**From:** HRS Exemptions <hrs.exemptions@wsu.edu>

**To:** "Chun, Patrick" <patrick.chun@wsu.edu>, "McCoy, Anne R" <amccoy@wsu.edu>

**Cc:** "Wilmoth, Bonnie" <bonnie.wilmoth@wsu.edu>, "Warren, Stephanie C" <stephanie.warren@wsu.edu>, HRS Exemptions <hrs.exemptions@wsu.edu>

**Subject:** RESPONSE NEEDED | Religious Accommodation Request | Nick Rolovich

**Date:** Wed, 6 Oct 2021 21:04:42 +0000

**Importance:** Normal

**Inline-Images:** image001.png; image002.png; image003.png; image004.jpg

---

Human Resource Services received a Religious Accommodation request regarding one of your employees:

| | |
|---|---|
| **Employee:** | Nick Rolovich |
| **TITLE:** | Head Football Coach |
| **WSU ID:** | 011732256 |
| **Effective Date:** | Upon Approval |

Nick Rolovich has requested an accommodation from Washington State University's (WSU) COVID-19 vaccine requirement based upon a religious belief, practice, and/or observance. WSU has engaged in a good faith review of the information submitted through written and/or oral communications, which support the accommodation request based on a sincerely held religious belief.

After review, we are considering approving the employee's request subject to the following terms and conditions:

- Employee must wear a face covering that covers the employee's nose and mouth, and fits snugly a at all times unless 1) the employee is outside and can maintain 6 feet of social distance from all other individuals; 2) while working alone indoors. (note - a person is working alone if they are isolated from interactions with others and have little or no expectation of in-person interruptions (e.g. in a closed office).

- Employee must social distance from others on WSU property when possible.

- If WSU adopts a COVID-19 testing requirement for unvaccinated workforce members, employee will be required to submit to such testing as required by WSU.

- The terms and conditions are subject to change and are amended to conform to any federal, state and local public health orders or other lawful government orders, and/or WSU adoption of additional occupational health and safety interventions or countermeasures to prevent the spread of COVID-19 in the workplace.

**Next Steps -** Review Job Duties
The department is to review the employee's position description or essential job functions, to determine if the employee is able to perform essential functions of the position and meet the COVID-19 safety measures consistent with the recommendations of the state and protect the health and safety of the WSU community as part of this accommodation request.

**RESPONSE NEEDED:**
Please contact the HRS Exemptions team at hrs.exemptions@wsu.edu by the end of the day **Friday, October 8, 2021** to let us know:
1. You have no concern with this request
2. If you are **NOT** able to accommodate this request with the above recommendations
3. If you are able to accommodation the request but believe additional measures may be necessary to meet health and safety standards (e.g. relocation of office space to a non-open/shared or less central/populated work area,

**ER1024**

Exhibit J Page 3

WSU_00011806

safety barriers such as plexi-glass or heightened cubical walls; telework agreement. etc)

4. If you have any questions or would like to meet to discuss further.

Once a decision on the Religious Accommodation is finalized, HRS will send out the final accommodation notification to the employee and the department.

Thank you,

*Teddi*

Teddi Phares, PHR
HR Consultant | Washington State University Human Resource Services
Pronouns: She/Her/Hers
PO Box 641014 | French Administration Building, Room 139| Pullman, WA 99164-1014
e: teddi.phares@wsu.edu |  t: (509) 335-8331 or  (509) 335-4521| f: (509) 335-1259
*Connect with Human Resource Services!*
Main Website: hrs.wsu.edu |Jobs: wsu.edu/jobs



IMPORTANT NOTICE: This communication, including any attachment, contains information that may be confidential or privileged, and is intended solely for the entity or individual to whom it is addressed.  If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message is strictly prohibited.  Nothing in this email, including any attachment, is intended to be a legally binding signature.

**WSU_00021020**

## Metadata

| All Custodians | Dennler, Bonnie; Elliot, Theresa; Gehring, Lisa | SEMANTIC |
|---|---|---|
| All Paths | b.carothers@wsu.edu-3.pst//Top of Personal Folders/b.carothers@wsu.edu (Primary)/Top of Information Store/Inbox/HRS/Labor/KendraWF/1683b.eml//OFM_SHR_Vaccine_Mandate_Guidance_Version3.docx//Microsoft_Word_Document1.docx; gehring@wsu.edu-2.pst//Top of Personal Folders/gehring@wsu.edu (MainArchive)/Recoverable Items/DiscoveryHolds/1def5.eml//OFM_SHR_Vaccine_Mandate_Guidance_Version3.docx//Microsoft_Word_Document1.docx; gehring@wsu.edu.pst//Top of Personal Folders/gehring@wsu.edu (Primary)/Top of Information Store/Inbox/Litigation Hold Documents/Barnes/17b0d.eml//OFM_SHR_Vaccine_Mandate_Guidance_Version3.docx//Microsoft_Word_Document1.docx; telliot@wsu.edu.pst//Top of Personal Folders/telliot@wsu.edu (Primary)/Top of Information Store/Inbox/Pandemic/vaccine mask WD/1a96b.eml//OFM_SHR_Vaccine_Mandate_Guidance_Version3.docx//Microsoft_Word_Document1.docx | SEMANTIC |
| Author | Petrie, Valerie B (ATG) | SEMANTIC |
| Begin Family | WSU_00020972 | SEMANTIC |
| Custodian | Dennler, Bonnie | SEMANTIC |
| End Family | WSU_00021031 | SEMANTIC |
| Extension | docx | SEMANTIC |
| Family Date | 10/11/2021 2:40 pm UTC | VIRTUAL |
| File Path | b.carothers@wsu.edu-3.pst//Top of Personal Folders/b.carothers@wsu.edu (Primary)/Top of Information Store/Inbox/HRS/Labor/KendraWF/1683b.eml//OFM_SHR_Vaccine_Mandate_Guidance_Version3.docx//Microsoft_Word_Document1.docx | SEMANTIC |
| Filename | Microsoft_Word_Document1.docx | SEMANTIC |
| MD5 Hash | 1f5ed2bd8b6125b9ea411b55aab5f2ff | SEMANTIC |
| Placeholder | N | SEMANTIC |
| Primary Date | 09/13/2021 5:39 pm UTC | DOC_TYPE_ALIAS |
| Redacted | N | SEMANTIC |
| SHA1 Hash | d939983694a0412c67c0ad1c75a1237599c5481e | SEMANTIC |

Exhibit I Page 3

**ER1026**

# GUIDANCE ON EVALUATING RELIGIOUS ACCOMMODATION REQUESTS

*Please note that this guidance is intended for WA state agencies. It is not intended for broader use.*

The process for reviewing a request for an exemption to the COVID-19 vaccination requirement due to a sincerely held religious belief is a confidential interactive process between the employee and the agency/organization human resources department. As with the ADA accommodation process, the results of this process will be considered, analyzed, and determined on a case-by-case basis.  The employee must actively participate in the interactive accommodation process and provide all information reasonably needed to evaluate the request.

1. ***What is the definition of religion when assessing a request for religious accommodation?***
Under federal and state law, "religion" is broadly defined. It includes traditional, organized religions such as Christianity, Judaism, Islam, Hinduism, and Buddhism.  A religious belief may be individualistic, and it also includes religious beliefs that are new, uncommon, not part of a formal church or sect, or only held by a small number of people.  Non-theistic, moral or ethical beliefs about what is right and wrong, which are sincerely held with the strength of traditional religious views, may meet the definition of a sincerely held religious belief.  However, social, political, or economic philosophies, or personal preferences, are not "religious" beliefs under the law.

2. ***How should an agency/organization evaluate a request for religious accommodation?***
When reviewing the request, the agency should follow these abiding principles:
- • Presume a religious belief to be sincerely held.
- • Be cognizant that religious beliefs are not static and are susceptible to change over the course of a person's life.
- • Remember the fact that an individual is not a frequent observer of their faith or had not previously made their faith public does not necessarily limit its sincerity.
- • An accommodation does not have to be limited to what is requested by the employee.

3. ***Once it is determined an individual qualifies for an exemption to the vaccination requirement based on a sincerely held belief, what happens next?***
- Once a request has been made, the process is like the ADA accommodation process
- The employee's essential functions of the position should be considered and the agency/organization should engage in an interactive process to identify options to limit transmission of COVID-19 in the workplace without creating an undue hardship for the employer (see below). Agencies/organizations may consult the accommodation matrix for more information.

4. ***What can an employer do if they have questions about an employee's request for religious accommodation from the vaccine mandate?***
Federal guidance on religious accommodation encourages employers to presume that an employee's request for religious accommodation is based on a sincere belief in a religion, unless the employer has a valid, objective reason to question the employee.  The employer

Exhibit I Page 4

**ER1027**

WSU_00021020

(240 of 299), Page 240 of 299  Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 240 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-10    filed 09/23/24    PageID.1343    Page 5
of 8

## GUIDANCE ON EVALUATING RELIGIOUS ACCOMMODATION REQUESTS

should review the request on its own merits, initiate discussion with the employee about whether an employee's religious belief is sincerely held (see questions below), possible accommodation, and assess whether accommodation is possible.  Employees have an obligation to actively participate in the accommodation process and must cooperate with an employer's attempt to accommodate their needs. In addition, the employee must show that the proposed accommodation would enable the employee to perform the essential functions of his/her position and is practical for the employer.

In determining whether an employee's religious belief is sincerely held, a limited initial inquiry could include objective, general questions, without delving too far into an employee's reasons for a particular belief and without requiring input from an outside source, such as a formal religious leader.  Such inquiries might include asking how long the employee has followed the professed belief or what constitutes the basic tenets of the religion.  The employer does not have to accept a high-level statement of religious observance that provides no details; an employer can ask about the specific belief, tenet, or observance that conflicts with the vaccination requirement.

However, if the employer determines it needs additional supporting information, and/or has doubts as to the sincerity or religious nature of the employee's professed belief, the employer has the option to request supporting documents or other types of verification from the employee.  Such written materials may include requesting the employee's own first-hand explanation.  Employers should proceed with caution and obtain legal advice before seeking third-party verification, e.g., requesting verification from the employee's pastor, rabbi, church elder, etc.  Employers should keep questions and information requests focused on the particular religious belief system, and not inquire into intensely personal details about the employee's level of observance or faith in their stated religion.

In evaluating a request for accommodation, employers are not required to consider only the accommodation that the employee believes is the best one but must offer an alternative accommodation that is reasonable.  A reasonable accommodation can be determined only by analyzing the specific facts surrounding a particular request and core job duties. Generally, an accommodation is unreasonable if it (1) does not remove the conflict between the workplace and the employee's need for accommodation; (2) discriminates against the employee; or (3) compromises the employee's access to the terms, conditions and privileges of employment. Federal guidance recommends that if more than one accommodation is possible, the employer should offer the accommodation that will least disadvantage the employee's opportunities in the workplace.

*Seek legal advice from your assigned labor and personnel assistant attorney general if you need assistance.*

**5.  What if an employee refuses to answer questions and/or complete the form?**

(241 of 299), Page 241 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 241 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-10    filed 09/23/24    PageID.1344    Page 6
of 8

## GUIDANCE ON EVALUATING RELIGIOUS ACCOMMODATION REQUESTS

An employee is required to participate in the interactive process. However, they are not required to submit information in writing. Where an employee refuses to answer in writing, an effort should be made to discuss the questions with the employee and the employer should document their responses to comply with the proclamation.

6.  ***What if an employee fails to complete just one part of the form (or even just one question, such as the one about prior vaccine/medicine) but completes the rest?***
If the employee does not answer all the questions, the employer should consider the information that was provided and assess if it has sufficient information to the employee has a sincerely held religious belief which prevents vaccination.

7.  ***What if an employee submits a different form entirely?***
If the employee submits a different form, the employer should determine if the information provided permits them to determine if the employee has a sincerely held religious belief which prevents vaccination. If a large number of employees submit the same form, please reach out to your AAG to discuss.

8.  ***What if the reason cited is general, such as "My body is my temple?***
Where an employee provides a general statement rather than answering the questions asked, the employer may seek additional information reasonably necessary to determine if the employee has a sincerely held religious belief which prevents vaccination.

9.  ***What if the reasons cited by the employee are believed by the employer to be factually inaccurate?***
Where the information provided by the employee appears to in inaccurate, such as the employee stating the vaccines contain an ingredient which they do not, the employer could provide the employee with educational resources, (i.e. DOH information on common misconceptions about the COVID-19 vaccines: https://www.doh.wa.gov/Emergencies/COVID19/VaccineInformation/VaccineFacts) and ask them to confirm their continued request for accommodation after consulting the information.

10. ***How does an employer determine if a religious accommodation imposes more than a minimal burden on operation of the business (or an "undue hardship")?***

An accommodation based on religion utilizes a different standard than am accommodation based on a disability.  With respect to religious accommodation, an accommodation is an "undue hardship" if it imposes more than a *de minimis* cost on the employer.  It is incumbent upon the employer to establish that an accommodation is an undue hardship. An employer cannot rely on hypothetical hardship when faced with an employee's religious obligation that conflicts with scheduled work but should rely on objective data. Considerations of an undue hardship may include:

* Type of workplace

# GUIDANCE ON EVALUATING RELIGIOUS ACCOMMODATION REQUESTS

- Nature of employee's duties

- Actual work disruption

- A request that is unduly difficult, substantial, or disruptive to implement

- Causes a lack of staffing

- Cost of the accommodation and number of employees needing the accommodation

- Number of Employees Impacted by permitting the requested accommodation including seniority systems and collectively bargained rights – for example, other employees had CBA seniority right to choose their preferred jobs and shifts, and accommodation in this case would interfere with those rights.
- Size and operating costs of the business impact of the accommodation on the agency as a whole not just the impact on a satellite office.
- Safety Concerns and Security Considerations.

*Seek legal advice from your assigned labor and personnel assistant attorney general to assess options.*

**Resources:**

EEOC Section 12 (Updated January 15, 2021):
https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination

EEOC Technical Guidance, "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (updated May 28, 2021):
https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K.6

Washington Human Rights Commission (Updated July 2015):
https://www.hum.wa.gov/sites/default/files/public/99_Religion%20and%20non-discrimination.pdf

Title VII of the Civil Rights Act of 1964:
https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964

Revised Code of Washington 49.60, Washington Law Against Discrimination:
https://app.leg.wa.gov/rcw/default.aspx?cite=49.60

Washington DOH, Building Confidence and Busting Myths:
https://www.doh.wa.gov/Emergencies/COVID19/VaccineInformation/VaccineFacts

# GUIDANCE ON EVALUATING RELIGIOUS ACCOMMODATION REQUESTS

Exhibit I Page 8

**ER1031**

WSU_00021024

(244 of 299), Page 244 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 244 of 299

7/31/24, 6:35 PM    Case 2:22-cv-00319-TOR    For Nick Rolovich and WSU, COVID vaccine mandate deadline approaches    Page 2
                                                            of 3

SPORTS > COLLEGE SPORTS • News

# Would WSU actually fire Nick Rolovich? Examining the exemption review process with the vaccine mandate deadline approaching

Rolovich has until Oct. 18 to comply with Gov. Jay Inslee's order

 By JON WILNER | jwilner@bayareanewsgroup.com | Bay Area News Group
UPDATED: October 7, 2021 at 6:29 p.m.

Washington State has entered the decision phase with football coach Nick Rolovich. At any point in the next 11 days, the university will determine his fate.

A mid-season dismissal is within the realm of possibility.

Rolovich announced in July that he would not receive the COVID vaccine but has offered no update on his situation, except to say that he would comply with Washington Gov. Jay Inslee's vaccine mandate.

According to that mandate, state employees in higher education must be fully vaccinated or receive a medical or religious exemption by Oct. 18. Failure to comply will result in termination.

Presuming Rolovich didn't change his stance on the vaccine but desired to remain employed, he would have submitted an exemption request by the start of this week.

At some point prior to Oct. 18, a team of at least two people trained in the exemption review process will determine if Rolovich's requests meets the standard for approval established by WSU (in conjunction with the state attorney general's office).

As with all other exemption requests — the university has received hundreds of them — Rolovich's name and department are not visible to those reviewing the application. The blind review was designed to create fairness for employees across all WSU campuses, regardless of position or salary.

There are two possible outcomes.

**— If Rolovich's request for an exemption is denied:**

He would have the option to get vaccinated by Oct. 18. If he follows that course, Rolovich would be placed on unpaid leave (or could take vacation time) until the day he becomes fully vaccinated.

(With the one-shot Johnson & Johnson vaccine, he would be eligible to return to work after two weeks.)

If Rolovich's request is denied and he refuses to get vaccinated by Oct. 18, the university would begin the separation process.

The timeline for termination differs by employment status — one process for tenured professors, another for administrative personnel, etc. Rolovich has a contract (until June 30, 2025) that includes provisions for termination with and without cause.

**— If Rolovich's exemption request is approved:**

If the blind review results in the approval of Rolovich's exemption request, the process would enter a second phase.

Washington State vice president for communications Phil Weiler could not discuss Rolovich's case specifically — the university is prohibited by law from commenting — but Weiler outlined the exemption process in general terms.

An approved request would be sent to the human resources department, which would identify the employee in question and send an email to his/her supervisor indicating the exemption had been approved.

Exhibit H Page 2

ER1032

(245 of 299), Page 245 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 245 of 299

7/31/24, 6:35 PM    Case 2:22-cv-00319-TOR    For Nick Rolovich and WSU, COVID vaccine mandate deadline approaches    Page 3 of 3

    ECF No. 38    filed 09/23/24    PageID.1338    Page 3 of 3

At that point, according to Weiler, the supervisor would determine if the unvaccinated employee would be capable of "keeping the public safe" and performing his/her job effectively.

The employee would be required to follow WSU's policy for unvaccinated individuals, which includes limiting in-person contact as much as possible and, when interaction is required, wearing a mask and following social distancing guidelines.

(An unvaccinated graphic designer who works alone in an office could function effectively and keep the public safe. But that might not be the case with an unvaccinated food service employee who works close to hundreds of students.)

If the supervisor determined the unvaccinated employee could continue functioning effectively and keeping the public safe, the supervisor would notify human resources that the exemption had been granted. The employee would then be informed.

If the supervisor determined the unvaccinated employee could not function effectively and keep the public safe, then human resources would be notified the request had been denied and the employee would be informed — and he/she would have until Oct. 18 to get vaccinated.

Would Rolovich, if unvaccinated, be capable of functioning effectively and keeping the public safe?

His contract, which was obtained by the Hotline, outlines a list of 13 "specific duties and responsibilities."

They include all the standard stuff, from making staff decisions to meeting competitive goals and following sound fiscal policy with the program's budget.

— But subsection 'h' states: *"Under the direction of the Athletic Director, participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program;"*

— And subsection 'i' states: *"Serve as director of instructional youth Football programs to be held in athletic facilities at the University's Pullman campus if deemed applicable;"*

— And subsection 'j' states: *"The Athletic Director or his designee may reasonably assign other duties from time to time that are consistent with customary duties of a Head Football Coach at a Division I Football program;"*

There is more to Rolovich's job than running practice, watching film and coaching during games. If unvaccinated, would he be capable of executing the external duties (recruiting, fundraising, directing the youth programs, representing the university in public events) at the expected level?

If the exemption request were approved via the blind process, then his supervisor, athletic director Pat Chun, would determine if Rolovich could carry out his duties effectively and keep the public safe.

That's where the formal nature of WSU's process diverges from reality:

Chun won't make the determination alone.

A decision of that magnitude — Rolovich is the highest-paid state employee and the public face of WSU athletics — will be made by president Kirk Schulz, presumably with significant input from Chun and perhaps others, including provost Elizabeth Chilton, chief human resources officer Theresa Elliot-Cheslek and possibly even Marty Dickinson, chair of the WSU Board of Regents.

This is the antithesis of a typical coaching evaluation. It's an unprecedented situation — all of Rolovich's peers in the Pac-12 are vaccinated — cast against the state of Washington's attempts to contain the pandemic.

Would the university actually fire Rolovich over this?

Weiler declined to address the specific situation but said of an unvaccinated employee who doesn't meet the standards for an exemption:

"Washington State has no latitude. The Governor's mandate was clear."

---

**Support the Hotline:** *Receive three months of unlimited access for just 99 cents. Yep, that's 99 cents for 90 days, with the option to cancel anytime. Details are here, and thanks for your support.*

---

*** *Send suggestions, comments and tips (confidentiality guaranteed) to pac12hotline@bayareanewsgroup.com or call 408-920-5716*

*** *Follow me on Twitter: @WilnerHotline*

*** *Pac-12 Hotline is not endorsed or sponsored by the Pac-12 Conference, and the views expressed herein do not necessarily reflect the views of the Conference.*

*Originally Published: October 7, 2021 at 9:01 a.m.*

T The Trust Project ⌄

⏰ October 8, 2021

# Nearly 90% of WSU employees are vaccinated

👤 By Communications staff, Washington State University


All WSU employees must be fully vaccinated or have obtained a medical or religious exemption by Oct. 18.

PULLMAN, Wash. – Nearly 90% of Washington State University employees are vaccinated against COVID-19 and student levels are even higher, with infection rates involving the Pullman campus, in particular, declining dramatically compared to a year ago.

"Our vaccination rates are high, and we know it's the path that gets us through this pandemic," said WSU President Kirk Schulz. "With a critical state deadline approaching for our employees, we've sought to work through pockets of hesitancy and uncertainty with compassion and understanding but with a firm commitment to making sure we're doing everything possible to deliver a robust in-person educational experience."

Under Gov. Jay Inslee's vaccine mandate, all state employees must be fully vaccinated by Oct. 18 or have an approved exemption for documented medical reasons or sincerely held religious beliefs. Those who don't meet the requirements will be prohibited from engaging in work for the State of Washington, including public universities.

Exhibit G Page 2

ER1034

Although the final state deadline is still more than a week away, preliminary compliance figures are available because WSU employees were required to verify their vaccine status by Oct. 4 to be considered fully vaccinated by Oct. 18. Those who sought exemptions were to submit their completed requests by Oct. 4 to provide the university time to evaluate the requests ahead of the state deadline.

Students faced a Sept. 10 deadline for verifying their vaccination status or applying for a medical or religious exemption. Those who fail to comply will be prohibited from enrolling for the upcoming spring semester.

## Vaccination rates

Of the approximately 10,000 full- and part-time WSU employees systemwide, 88% were fully or partially vaccinated as of Oct. 5. Verification efforts are continuing.

For students who have submitted documentation, reported vaccination rates at each of WSU's five physical campuses are more than 95%. The Pullman and Spokane campuses top the list at 98% each. Most students have either reported their vaccination status or requested an exemption, though percentages vary by campus and are still growing as compliance efforts continue.

Detailed figures for each campus can be found online.

## Steep decline in COVID-19 cases involving WSU Pullman

For the Pullman campus, the number of COVID-19 cases involving the WSU community have declined dramatically compared to last fall.

Last year, according to Whitman County Public Health, there were 526 confirmed COVID-19 cases involving members of the WSU Pullman community from Aug. 30 to Sept. 12. During the same period this year, that number dropped to 121 cases.

For the week ending Oct. 6, WSU Pullman had just eight active cases among students, faculty and staff.

## Medical and religious exemptions

More than 1,250 requests for medical and religious exemptions have been made by WSU students, faculty and staff. So far, nearly 800 have been approved and the review process is continuing. Final numbers will be available after Oct. 18.

(248 of 299)  Page 248 of 299
8/17/24, 7:47 AM    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 248 of 299
Nearly 90% of WSU employees are vaccinated | WSU Insider | Washington State University

The requests for religious exemptions are evaluated in a "blind" review process, meaning the identities of the individuals requesting exemptions are unknown to the members of the review committee except in instances when additional information is needed through follow-up contact. Separate review committees were created for students and employees.

A panel of faculty and staff from all WSU campuses with expertise in religions, diverse backgrounds, and legal accommodations makes up the committee reviewing student requests.

Employee religious requests are reviewed by a committee consisting of a team from WSU's Human Resource Services as well as the university's Office of Civil Rights and Compliance. Employee medical exemption requests are considered by the university's Disability Services team, which normally handles medical-related leave and accommodation requests.

The Washington Attorney General's Office is being consulted on criteria WSU is using to decide the exemption requests and providing legal advice to both committees as needed.

Those who requested exemptions were asked to provide supporting information.

For employees, the exemption requests go through a two-step process. The first is the blind review. Then, if an exemption is approved, the request moves to a separate accommodation review step where a determination is made whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community.

An appeals process is in place for students. Employees are provided the opportunity to supply additional information before final decisions are made.

## Media Contacts

► Phil Weiler, vice president, University Marketing and Communications, 509-595-1708, phil.weiler@wsu.edu

Categories: Campus & Community, Health & Medicine, Press Releases, University Affairs

**NEXT** Story

Exhibit G Page 4

ER1036

(249 of 299) Page 249 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 249 of 299

8/17/24, 7:47 AM Case 2:22-cv-00319-TOR Nearly 90% of WSU employees are vaccinated/WSU Insider | Washington State University Page 5 of 6



## WSU employees again urged to check direct deposit information

🕐 August 16, 2024

More victims discovered and students, faculty and staff are now strongly advised to begin switching to the Okta Verify mobile application as their primary MFA tool.

👤 By Communications staff, Washington State University

# Recent News

8/17/24, 7:47 AM                    Nearly 90% of WSU employees are vaccinated | WSU Insider | Washington State University



### Robot planning tool accounts for human carelessness

A new algorithm may make robots safer by making them more aware of human inattentiveness.

👤 By Tina Hilding, Voiland College of Engineering and Architecture

🕐 August 15, 2024



### Endangered frogs set to hop into the wild

Nearly 400 mature frogs will soon be released into the wild of the Columbia National Wildlife Refuge thanks to a team of WSU scientists and their collaborators.

👤 By College of Arts and Sciences staff, Washington State University

🕐 August 14, 2024



### Fear of appearing prejudiced can inhibit accurate performance feedback to women

Evaluators who want to avoid appearing prejudiced may overcorrect and give women inflated performance feedback, new research indicates — a practice that could ultimately hinder their ability to improve and advance.

👤 By Communications staff, Washington State University

🕐 August 14, 2024

### Saipan students join WSU to promote



https://news.wsu.edu/press-release/2021/10/08/nearly-90-of-wsu-employees-are-vaccinated/

ER1038

# Expert Report of M. Therese Lysaught, PhD.

**Prepared for Defendant Washington State University in**

**Eastern District of Washington Case No. 2:22-cv-00319-TOR**

***Nicholas Rolovich*, plaintiff**

***v.***

***Washington State University*, defendant.**

Dated: August 9, 2024         Signed: M. Therese Lysaught

                              M. Therese Lysaught

                              Digitally signed by M. Therese
                              Lysaught
                              Date: 2024.08.09 14:11:04 -05'00'

Expert Report of M. Therese Lysaught – Page 1

I.    **CREDENTIALS**

A.    **Expertise and Employment History**

1.  I am a Roman Catholic moral theologian with a Mandatum from the Roman Catholic Church to teach in the theological disciplines, pursuant to the encyclical of Pope John Paul II *Ex Corde Ecclesia*. My areas of expertise include Roman Catholic moral theology, Catholic social teaching, the theology and ethics of Catholic health care, health care ethics, and global health.

2.  I am a tenured Professor in the Neiswanger Institute of Bioethics and Health Policy at Loyola University Chicago, Stritch School of Medicine. I have worked at Loyola University Chicago since July 1, 2013, with a joint appointment in the Institute of Pastoral Studies from 2013-2020. In 2020, I was appointed to the Pontifical Academy for Life at the Vatican as a Corresponding Member. From 2012-2013, I served as a Visiting Scholar with the Catholic Health Association. From August 2007-May 2013, I held the position of tenured Associate Professor in the Department of Theology at Marquette University, Milwaukee, Wisconsin. In August 1995, I joined the faculty of the Department of Religious Studies at the University of Dayton as an Assistant Professor, where I received tenure and promotion to the rank of Associate Professor effective 2001. At all three universities, I have held academic administrative positions. From 1995-1998, I served on the Recombinant DNA Advisory Committee at the National Institutes of Health. In 1994-1995, I served as an NIH Fellow in the Program in Molecular and Clinical Genetics/ Biomedical Ethics at the University of Iowa, via the Ethical, Legal, and Social Implications Program (ELSI) of the National Center for Human Genome Research (NCHGR).

3.  I earned a BS in Chemistry from Hope College in Holland, Michigan (1985), an MA in Theology from the University of Notre Dame (1986), and a PhD in Religion (Theological Ethics) from Duke University (1992).

4.  Since 2022, I have served as the Editor of the *Journal of Moral Theology*, a scholarly peer-reviewed journal focused on Catholic moral theology. Since 1992, I have also served in a variety of advisory capacities, including with: the Pontifical Academy for Life, the Catholic Medical Mission Board; the Global Faith-Based Health Care initiative sponsored by Georgetown University and the Fondazione Bruno Kessler in Trento, Italy; the Program on Medicine and Religion at the University of Chicago; the Board of Directors of the Society of Christian Ethics; the Anglican-Roman Catholic Theological Consultation U.S.A. under the auspices of the United States Conference of Catholic Bishops; the American Association for the Advancement of Science; the Catholic Health Association; and the Recombinant DNA Advisory Committee of the National Institutes of Health. I also regularly consult with Catholic health systems and universities on matters of theology, mission, and ethics.

Expert Report of M. Therese Lysaught – Page 2

### B.    Publications

5.  Since 2007, I have published six books in English—one on Catholic moral theology (*Gathered for the Journey: Moral Theology in Catholic Perspective*, 2007), two on theology and health care ethics (*On Moral Medicine: Theological Perspectives in Medical Ethics*, 2012; and *Catholic Bioethics and Social Justice*, 2019); one on the theological foundations of Catholic health care (*Caritas in Communion: Theological Foundations of Catholic Health Care*, 2014); one on the ethics of neuroscience (*Biopolitics After Neuroscience: Morality and the Economy of Virtue*, 2020); and one on the celebrated global health pioneer, Dr. Paul Farmer (*A Prophet to the Peoples: Paul Farmer's Witness and Theological Ethics*, 2023). Two of these books have been translated into Spanish. Three of these books have received awards—the 2021 Expanded Reason Institute Award from the Universidad Francisco de Vitoria (Madrid) and the Fondazione Vaticana Joseph Ratzinger Benedetto XVI for *Biopolitics After Neuroscience*; in 2019, *Catholic Bioethics and Social Justice* received an honorable mention for Best New Books on Catholic Social Teaching from the Catholic Press Association; and in 2008, *Gathered for the Journey* won third place honors for the annual award for Best New Book in Theology, also from the Catholic Press Association. Within the last ten years, I have also published: 22 peer-reviewed journal articles; 11 chapters in books; many briefer publications; and I have given 11 refereed conference papers and 39 invited lectures on the theology and ethics of Catholic health care and additional topics. These items are also listed in Appendix 1.

### C.    Service as an Expert Witness

6.  In the past ten years, I have served as an expert witness in the following cases: *Chavies v. Catholic Health East*, No. 13-1645 (E.D. Pa.); *Medina v. Catholic Health Initiatives*, No. 13-cv-01249-REB-KLM (D. Colo.); *Smith v. OSF Healthcare System*, Case No. 16-CV-467-SMY-RJD (S.D. Ill.)*; Lilian Romero v. Ana Romero*, Los Angeles Superior Court Case No. 16STPB06815, *In re Juan Fernando Romero*, Los Angeles Superior Court Case No. 16STPB07123; and *Capello v. Franciscan Alliance*, No. 3:16-cv-290-TLS-MGG (N.D. Ind.).

### D.    Scope of Work

7.  I was asked to evaluate the opinions offered by John Di Camillo regarding Nicholas Rolovich's refusal to receive the COVID-19 vaccination for the stated reason that it conflicted with his sincere religious beliefs as a Roman Catholic.

### E.    Documents Considered

8.  The documents I have considered in forming my opinions in this matter include those documents cited in this Report and those listed below. These documents, especially those that represent the teachings of the Roman Catholic Church, are the type of documents that are regularly relied upon by experts in my field.

Expert Report of M. Therese Lysaught – Page 3

- The Second Amended Complaint
- Nicholas Rolovich's Exemption Request Form Submitted on September 28, 2021
- The WSU Athletic Department's Memos Submitted to Human Resources Services on October 13, 2021
- The October 18, 2021 email from Human Resources Services with the official notice that his exemption was denied
- The October 18, 2021 letter from Pat Chun to Nicholas Rolovich re: Written Notice of Intent to Terminate for Just Cause
- The November 12, 2021 letter from Pat Chun to Nicholas Rolovich re: Notice of Decision to Terminate for Just Cause

### F.    Compensation

9.  I am being compensated for the work on this case at a rate of $300/hour for research, writing, consulting, and testifying at trial or in deposition.

## II.    EXPERT REPORT

10. In his opinion, John Di Camillo addresses the question of whether Mr. Rolovich "may have been <u>required</u> to refuse a COVID-19 vaccination" based on "the teachings of the Roman Catholic Church."[1] In his analysis, he purports to offer a summary of the Roman Catholic teaching on conscience; he applies what he refers to as "the principle of therapeutic proportionality"; and makes statements about Roman Catholic teaching about vaccinations in general. Based on these premises he concludes that "that if, after due diligence in seeking out and critically assessing medical and moral information pertaining to COVID-19 and the vaccines, Nicholas Rolovich came to a sure judgment in conscience that he should not receive a COVID-19 vaccine, then the teachings of the Catholic Church <u>required</u> that he refuse the vaccine."[2]

11. In my opinion, Mr. Di Camillo's presentation of each of his premises is deeply flawed. While he correctly cites one part of the Roman Catholic teaching on conscience, he fails to present the Church's teaching in its entirety. His "principle of therapeutic proportionality" is idiosyncratic. He omits one of the most central principles of Catholic bioethics that helps patients to make morally-informed decisions about medical interventions—namely, the principle of ordinary and extraordinary means. And most importantly, his analysis <u>entirely ignores</u> the robust body of authoritative teaching promulgated by the Roman Catholic magisterium[3] in 2020 and 2021 regarding the moral

---

[1] John Di Camillo, "Expert Declaration of John A. Camillo," July 1, 2024, no. 4, emphasis added.

[2] Di Camillo, no. 47, emphasis added.

[3] Within the Roman Catholic Church, the term "magisterium" (based on the Latin word for "teacher" (magister)) refers to the official teaching authority of the Church, constituted by the Pope and Bishops in union with him.

Expert Report of M. Therese Lysaught – Page 4

acceptability—and, in fact, morally obligatory status—of the COVID-19 vaccines. Roman Catholic teaching <u>requires</u> faithful Catholics to use such teaching to properly form their consciences and to give witness to that teaching in their actions.

12. In addition, in his report, Di Camillo does not even attempt to analyze or evaluate the actual process by which Mr. Rolovich formed his conscience and came to his judgement. The Catholic Church enjoins a clear and robust process for conscience formation. Yet Di Camillo does not appear to have spoken with Mr. Rolovich or reviewed any documents relevant to Mr. Rolovich's process for "seeking out and critically assessing medical and moral information pertaining to COVID-19 and vaccines."

13. My analysis will proceed in four sections:

First, I will review the long list of statements regarding the moral acceptability of the COVID-19 vaccines promulgated by the spectrum of Roman Catholic magisterial authorities in 2020-2021. These authorities include:

   a. Pope Francis (multiple from 2020-2022)
   b. The Congregation for the Doctrine of the Faith (Dec. 2020)
   c. The Vatican COVID-19 Commission/Pontifical Academy for Life (Dec. 2020)
   d. The US Conference of Catholic Bishops (Dec. 2020)

Next, I will review the position of Di Camillo's employer, the National Catholic Bioethics Center, on the COVID-19 vaccines. This position was used to create a vaccine exemption template which was used, in slightly modified fashion, by Mr. Rolovich in his application to Washington State University for a religious exemption. Di Camillo's opinion is largely a restatement of that template. The template also contradicts the consensus of the Roman Catholic magisterium.

Third, I will explain the major flaws in the opinions offered in Di Camillo's report. Specifically, I will address his incomplete presentation of Roman Catholic teaching on conscience, his principle of "therapeutic proportionality," and I will outline the more important and relevant principle by which Catholics are to evaluate whether particular medical interventions are morally obligatory, the principle of ordinary and extraordinary means.

Finally, I will discuss the Church's position on the consequences that conscientious action may entail, namely, that while individuals have rights to follow their consciences, such actions may entail ecclesiastical, civil, and/or employment penalties.

14. Based on all of these factors, I conclude that Mr. Di Camillo is incorrect that Mr. Rolovich was required to refuse the COVID-19 vaccine based on his Roman Catholic faith.

1. **Statements Regarding the COVID-19 Vaccines by Roman Catholic Magisterial Authorities Consistently Support Vaccination**

15. Mr. Rolovich requested an exemption from Washington State University's COVID-19 vaccine mandate for employees based on his claim that to receive the COVID-19 vaccine would violate his conscience <u>as a member of the Roman Catholic Church</u>. To assess the validity of that claim, the necessary first step is to ascertain the teaching of the Roman Catholic Church on this particular question—specifically, on the moral status of the COVID-19 vaccines. This is necessary for two reasons. First, it establishes whether Mr. Rolovich's claim that his religious objection stems from his Catholic faith is factually true. Second, as we will see in II.3 below, in order to form one's conscience well, Catholics are required to consult and follow the authoritative teaching of the Roman Catholic magisterium.

16. There is a hierarchy of teaching authority in the Roman Catholic Church. Globally, the authority structure proceeds as follows (from highest to lowest):[4]

    a. An Ecumenical Council, such as the Second Vatican Council (1962-1965)
    b. An *ex cathedra* statement by the Pope (rare event)[5]
    c. Official statements by the Pope
    d. Statements of Vatican Curial offices. In this case, the relevant offices would be:[6]
        i. The Dicastery for the Doctrine of the Faith
        ii. The Dicastery for the Promotion of Integral Human Development
            1. Vatican COVID-19 Commission
        iii. The Pontifical Academy for Life

---

[4] Russell Smith, "A Resource for Evaluating Levels of Authority in Church Teaching," *Health Care Ethics* USA (Catholic Health Association, 2007): https://www.chausa.org/docs/defaultsource/hceusa/112fcbb5b75d4c0bbbeba53044bc03461-pdf.

[5] The Pope's authority to issue infallible teachings, or to teach *ex cathedra* ("from the chair" of Peter) is defined in Can. 749, §1 of the *Code of Canon Law* (1983): https://www.vatican.va/archive/cod-iuris-canonici/cic_index_en.html. As it states: "By virtue of his office, the Supreme Pontiff possesses infallibility in teaching when as the supreme pastor and teacher of all the Christian faithful, who strengthens his brothers and sisters in the faith, he proclaims by definitive act that a doctrine of faith or morals is to be held." Such teachings have only been promulgated twice, in 1854 regarding the doctrine of the Immaculate Conception of Mary and in 1950 regarding the doctrine of the Assumption of the Blessed Virgin Mary. Therefore, *ex cathedra* teachings are not relevant in this case.

[6] The Vatican curial offices are analogous to the 15 executive departments that are part of the Cabinet of the US government. E.g., the Vatican Dicastery for Culture and Education would be analogous to the US Department of Education. Altogether, there are 55 dicasteries and other executive bodies, headquartered in Vatican City, that referred to as the Roman Curia. For a complete list of the Vatican curial offices, see: https://www.vatican.va/content/romancuria/en.html.

Expert Report of M. Therese Lysaught – Page 6

17. Within specific countries, additional authorities would include the local bishops' conferences—in this case, the US Conference of Catholic Bishops (USCCB).

18. In order to form one's conscience well as a Catholic on a particular topic, one must first carefully read and follow the teachings of these various entities, ordinarily in this order. Analogously to civil case law, newer teachings by these various authorities build on, sometimes correct, and supersede previous teachings.

19. With regard to the COVID-19 vaccines, in 2021 there was a resounding consensus among these Roman Catholic magisterial statements that the currently available COVID-19 vaccines were all morally acceptable. This was also true of the Pfizer and Moderna vaccines that were available in the summer of 2021. As I detail below, Pope Francis, the Dicastery for the Doctrine of the Faith, the Vatican COVID-19 Commission sponsored by the Dicastery for Promoting Integral Human Development, the Pontifical Academy for Life, and the USCCB concur on this point. These bodies also concur that Catholics have a "moral responsibility" to be vaccinated in order to protect their own lives and health, to protect the lives and health of others, and to promote the common good.

20. These authoritative, magisterial bodies reached these conclusions via thorough, careful, balanced, faithful reasoning processes using the multiple sources of the Catholic tradition: the best scientific evidence about the SARS-COV-2 virus and anti-COVID-19 vaccines as it became available as the pandemic unfolded; the basic tenets of epidemiology and public health; the principles of Catholic bioethics; the principles of Catholic social teaching; and the cardinal and theological virtues. An adequate and credible Catholic moral analysis brings together all of these sources when considering a particular practical question. One can see this process in these documents.

A.  Pope Francis

21. In this case, there is neither an ecumenical council nor an *ex cathedra* papal statement that directly addressed COVID-19 vaccines. Therefore, we begin with the statements of Pope Francis. The Second Vatican Council, held from 1962-1965, is the most recent Ecumenical Council. It states clearly that the Pope exercises an:

> ...authentic magisterium...even when he is not speaking *ex cathedra*; that is, [regard] must be shown in such a way that his supreme magisterium is acknowledged with reverence, the judgments made by him are sincerely adhered to, according to his manifest mind and will. His mind and will in the matter may be known either from the character of the documents, from his frequent repetition of the same doctrine, or from his manner of speaking.[7]

---

[7] Second Vatican Council, *Lumen Gentium* (Dogmatic Constitution on the Church), §25, emphasis added.

Expert Report of M. Therese Lysaught – Page 7

ER1045

22. Therefore, the necessary starting point for any analysis regarding the Roman Catholic position on the moral validity of the COVID-19 vaccines—whether conducted by a Catholic organization or an individual Catholic—are statements by the Pope.

23. Pope Francis addressed the COVID-19 vaccines at least six times between 2020-2021. In these statements, he made clear that the all of the COVID-19 vaccines were morally acceptable, that to be vaccinated against COVID-19 was (for Catholics) a moral obligation, and that the Roman Catholic Church should work with local governments and other organizations to ensure universal access to these vaccines.

**(1) September 2020:** In September 2020, Pope Francis addressed members of the Italian Pharmaceutical Bank.[8] Faced with a global pandemic, the Pope repeatedly decried global disparities in vaccine distribution and called for redoubled, coordinated efforts for <u>universal</u> vaccine access. As he noted, "I repeat that it would be sad if, in providing the vaccine, priority were given to the wealthiest, or if this vaccine became the property of this or that country, and was no longer for everyone. It must be universal, for all." Instead, he "propose[d] to globalise treatment, that is, the possibility of access to those drugs that could save so many lives for all populations." He called on pharmacists, pharmaceutical companies, and governments to work toward the goal of a "more equitable distribution of medicines." Pope Francis would not call for universal access to a medical intervention that the Church deemed morally problematic in any way.

**(2) January 2021:** On January 1, 2021, Pope Francis issued his annual World Day of Peace message. These statements are generally considered to carry significant weight. Entitled "A Culture of Care as a Path to Peace," Pope Francis emphasized the centrality of care for others at the center of the gospel.[9] At this point, the Pfizer, Moderna, and Johnson & Johnson vaccines had been released and, as we will see below, the Vatican had issued statements confirming their moral acceptability. Here, he renewed his "appeal to political leaders and the private sector to spare no effort to ensure access to Covid-19 vaccines and to the essential technologies needed to care for the sick, the poor and those who are most vulnerable." He grounds this appeal on in Catholic theology and Catholic social doctrine, which "can serve as a 'grammar' of care: commitment to promoting the dignity of each human person, solidarity with the poor and vulnerable,

---

[8] Address of His Holiness Pope Francis to the Members of the 'Banco Farmaceutico' Foundation,' (September 19, 2020), https://www.vatican.va/content/francesco/en/speeches/2020/september/documents/papa-francesco_20200919_banco-farmaceutico.html.

[9] Pope Francis, "A Culture of Care as a Path to Peace. Message of His Holiness Pope Francis for the Celebration of the 54th World Day of Peace," (January 1, 2021), https://www.vatican.va/content/francesco/en/messages/peace/documents/papa-francesco_20201208_messaggio-54giornatamondiale-pace2021.html.

Expert Report of M. Therese Lysaught – Page 8

the pursuit of the common good and concern for protection of creation."[10]

(3) **January 2021:** In January 2021, Vatican City became the first country to offer COVID-19 vaccines to all of its citizens and employees.[11] Shortly thereafter, in an intentionally publicized event, Pope Francis and then-Pope-Emeritus Benedict XVI publicly received the vaccines.[12] In doing so, Pope Francis "referred to the vaccination as 'an ethical action, because [if you don't get vaccinated] you are gambling with your health, you are gambling with your life, but you are also gambling with the lives of others.'" He also rejected vaccine refusal. "There is a suicidal denialism that I would not know how to explain," he stated, "but today people must take the vaccine."[13]

(4) **May 2021:** In a May 2021 video message, Pope Francis continued to call for universal access to the COVID-19 vaccines and for the temporary suspension of patent restrictions that were making such universal access difficult.[14]

(5) **August 2021:** On August 17, 2021, Pope Francis released a video message created in conjunction with a number of Spanish-speaking bishops from North and South America designed to combat vaccine refusal. He attributed the existence of the COVID-19 vaccines "to God's grace." He further made clear: "Getting the vaccines that are authorized by the respective authorities is <u>an act of love</u>. And helping the majority of people to do so is an act of love. Love for oneself, love for our families and friends, and love for all peoples. Love is also social and political. There is social love and political love, it is universal....Getting vaccinated is a simple yet profound way to care for one another, especially the most vulnerable."[15] This position echoes the Catholic teaching that charity—self-gift or self-emptying love for the good of others—is, following the example of Jesus and the teaching of Thomas Aquinas, the center of Catholic moral reasoning.

---

[10] Ibid., §6.

[11] Elise Ann Allen, "Vatican Issues Vaccine Mandate for All Employees," *Crux* (December 24, 2021), https://cruxnow.com/vatican/2021/12/vatican-issues-vaccine-mandate-for-all-employees.

[12] "Pope Francis and the Pope Emeritus Receive COVID-19 Vaccine," *Vatican News* (January 14, 2021), https://www.vaticannews.va/en/pope/news/2021-01/pope-francis-benedict-xvi-covid-19-vaccine.html.

[13] Joshua J. McElwee, "Pope Francis Suggests People Have Moral Obligation to Take Coronavirus Vaccine," *NCR* (January 11, 2021), https://www.ncronline.org/vatican/pope-francis-suggests-people-have-moral-obligation-take-coronavirus-vaccine.

[14] Joe McCarthy, "Pope Francis Calls for Universal Access to COVID-10 Vaccines and Lifting of Patent Restrictions," *Global Citizen* (May 8, 2021): https://www.globalcitizen.org/en/content/pope-francis-covid-19-vaccines-vax-live/.

[15] Pope Francis, "Unity Across the Americas," https://www.youtube.com/watch?v=zY5rwTnJF0U, emphasis added.

Expert Report of M. Therese Lysaught – Page 9

(6) **December 2021:** In December 2021, in the face of the Omicron-variant surge, the Vatican issued a vaccine mandate for all employees.[16] Employees who were not vaccinated faced possible demotion salary loss, suspension, and more. The mandate allowed for health exemptions but not religious conscientious exemptions.[17]

(7) **January 2022:** In January 2022, Pope Francis stated that getting vaccinated against the coronavirus was "a moral obligation."[18] He also decried "ideological divides [that] were discouraging people from getting vaccinated [and the]…baseless information" that encouraged such positions. "Vaccines," he noted "represent, in addition to other treatments that need to be developed, the most reasonable solution for the prevention of the disease."

24. Thus, the constant teaching and messaging from Pope Francis over 2020-2022 was that the COVID-19 vaccines were not only morally acceptable, but they were in fact morally obligatory and, even further, a generous act of Christian charity directed toward the promotion of the common good both in our own communities and across the globe. He mandated that all Vatican City employees be vaccinated and championed universal access to the vaccines, especially for the poor.

   B.   The Congregation for the Doctrine of the Faith

25. The Congregation for the Doctrine of the Faith (CDF) concurred with Pope Francis. The oldest of the Roman Curia's dicasteries, the CDF is responsible for the oversight of all matters related to doctrine, faith, and morals throughout the Catholic Church.[19] In December 20, 2020, the CDF issued a statement addressing the moral acceptability of the COVID-19 vaccines, entitled "Note on the Morality of Using Some Anti-COVID-19 Vaccines."[20] They analyzed the full slate of vaccines that had been in production since

---

[16] Allen, "Vatican Issues Vaccine Mandate for All Employees."

[17] Claire Giangravé, "Vatican Tightens COVID-19 Restrictions, Applies Mandatory Vaccination," *Religious News Service* (January 12, 2022), https://religionnews.com/2022/01/12/vatican-tightens-covid-19-restrictions-applies-mandatory-vaccination/.

[18] Associated Press, "On COVID Vaccinations, Pope Says Health Care is a 'Moral Obligation,'" *NPR* (January 10, 2022), https://www.npr.org/2022/01/10/1071785531/on-covid-vaccinations-pope-says-health-care-is-a-moral-obligation.

[19] See "Dicastery for the Doctrine of the Faith," http://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_pro_14071997_en.html. The organization's name was changed from the "Congregation for the Doctrine of the Faith" to the "Dicastery for the Doctrine of the Faith" in 2022. Per footnote 5 above, dicasteries could be considered analogous to US government executive departments, with authority over aspects of the church that fall under their area of expertise. Insofar as the CDF adjudicates the Church's doctrine and moral law, it could be considered analogous to the US Supreme Court.

[20] Congregation for the Doctrine of the Faith, "Note on the Morality of Using Some Anti-Covid-19 Vaccines,"

Expert Report of M. Therese Lysaught – Page 10

the beginning of the pandemic, including Pfizer, Moderna, AstraZeneca, Johnson and Johnson. Knowing that some of the vaccines had been produced using two cell lines from fetuses aborted in 1964 and 1970, they concluded that <u>all the vaccines were morally acceptable</u>.

26. Specifically, they stated: "*it is morally acceptable to receive Covid-19 vaccines that have used cell lines from aborted fetuses in their research and production process*" (§2, italics in original). They continued that due to the "grave danger" presented by the "uncontainable spread of a serious pathological agent—in this case, the pandemic spread of the SARS-CoV2 virus that causes Covid-19," "all vaccinations recognized as clinically safe and effective can be used <u>in good conscience</u> with *the certain knowledge that the use of such vaccines does not constitute formal cooperation with the abortion* from which the cells used in production of the vaccines derive" (§3, italics in original, emphasis added). And they emphasized that while vaccination—like all medical interventions and, in fact, all moral actions—is voluntary, "from the ethical point of view, *the morality of vaccination depends not only on the duty to protect one's own health, but also on the duty to pursue the common good*" (§5, italics in the original). It is important to note here that the CDF refers to reasons for being vaccinated as "duties." A duty is an obligation.

27. As is clear from the above, the CDF stated clearly that the COVID-19 vaccines could be used in good conscience. In the penultimate paragraph of the document, the CDF recognizes that some people may refuse vaccination for reasons of conscience, but they do not endorse, encourage, or affirm this position. Instead, they state that these persons "must do their utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles for the transmission of the infectious agent. In particular, they must avoid any risk to the health of those who cannot be vaccinated for medical or other reasons, and who are the most vulnerable."[21] In other words, the onus is on those who refuse.

28. Echoing Pope Francis, the CDF also states that there is "a moral imperative for the pharmaceutical industry, governments and international organizations *to ensure that vaccines, which are effective and safe from a medical point of view, as well as ethically acceptable, are also accessible to the poorest countries in a manner that is not costly for them*" (§6, italics in the original). Again, the CDF would not recommend universal access as "a moral imperative" if it held that the vaccines were in any way morally problematic.

---

(December 12, 2020), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_nota-vaccini-anticovid_en.html.

[21] Ibid., §5.

Expert Report of M. Therese Lysaught – Page 11

29. Thus, the Church's highest doctrinal office made clear that the COVID-19 vaccines were morally acceptable; that they could be used in good conscience; that there was a duty to use them to protect the fundamental goods of health (one's own and others); and that it was morally imperative that they be made universally available.

C. The Dicastery for the Promotion of Integral Human Development/Vatican COVID-19 Commission and the Pontifical Academy for Life

30. As the scope of the pandemic emerged in March 2020, Pope Francis established the Vatican COVID-19 Commission within the Dicastery for the Promotion of Integral Human Development as a novel, rapid response to the pandemic.[22] The establishment of this Commission denotes the seriousness with which the Holy Father took the pandemic. That he established it indicates that the work of this Commission had his authorization and blessing. The Commission reports directly to the Holy Father.

31. On December 29, 2020, the Vatican COVID-19 Commission, in conjunction with the Pontifical Academy for Life, issued a 20-point action plan on vaccine equity entitled "Vaccine for All. 20 Points for a Fairer and Healthier World."[23] (The Pontifical Academy for Life is the Vatican's academic body with expertise in questions of bioethics). Per the Commission's website, the document examined equity across the full spectrum of vaccine development and deployment, with a particular focus on awareness-building to foster trust in vaccines against the COVID-19 virus.[24]

32. The Vatican COVID-19 Commission confirmed and discussed in greater detail the position of the CDF. As the Commission noted, Pope Francis "has affirmed the need to make the now imminent Covid-19 vaccines available and accessible to all."[25] In analyzing the moral aspects of the "entire 'life cycle'" of vaccine production, the commission concluded that "all clinically recommended vaccinations can be <u>used with a clear conscience</u> and that the use of such vaccines does not signify some sort of cooperation with voluntary abortion" and that vaccination is "a moral responsibility."[26] They reiterate

---

[22] See the Vatican COVID-19 Commission, https://www.humandevelopment.va/en/vatican-covid-19.html; and Vatican COVID-19 Commission, "2020 Year in Review: Preparing the Future," https://www.humandevelopment.va/content/dam/sviluppoumano/general/vatican-covid19-response/reports/2020-EN-AnnualReport-VaticanCovid19Commission.pdf. Again, a dicastery is one of the executive departments of the Vatican administrative state.

[23] Vatican COVID-19 Commission and Pontifical Academy for Life, "Vaccine for All. 20 Points for a Fairer and Healthier World," (December 29, 2020), https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2020/12/29/201229c.html

[24] Ibid., §14.

[25] Ibid., §1.

[26] Ibid., §5, emphasis in the original.

Expert Report of M. Therese Lysaught – Page 12

the claim that vaccination is a "moral responsibility."[27] They make no mention of exemptions for reasons of conscience.

    D.  <u>US Conference of Catholic Bishops</u>

33. Although the US Conference of Catholic Bishops (USCCB) does not have any authoritative standing in and of itself, at times it issues statements that—like all magisterial statements—require respectful consideration by Catholic individuals and organizations in the US.

34. On November 20, 2020, prior to the approval of the Pfizer and Moderna vaccines and prior to the statements by the CDF and the Vatican COVID-19 Commission, the USCCB's "Committee on Doctrine" in conjunction with their "Committee on Pro-Life Activities" issued a memorandum entitled "Vaccines for COVID-10." In that memorandum, they state clearly: "Some are asserting that if a vaccine is connected in any way with tainted cell lines, then it is immoral to be vaccinated with them. <u>This is an inaccurate portrayal of Catholic moral teaching</u>."[28] They cite as evidence for their position three documents issued by Vatican offices prior to the COVID-19 pandemic.

35. On December 11, 2020, the Chairmen of the USCCB Committee on Doctrine and Committee on Pro-Life Activities issued a further statement entitled "Moral Considerations Regarding the New COVID-19 Vaccines." There they reiterate and expand the above position:

> In view of the gravity of the current pandemic and the lack of availability of alternative vaccines, the reasons to accept the new COVID-19 vaccines from Pfizer and Moderna are sufficiently serious to justify their use, despite their remote connection to morally compromised cell lines. In addition, receiving the COVID-19 vaccine ought to be understood as an act of charity toward the other members of our community. In this way, being vaccinated safely against COVID-19 should be considered an act of love of our neighbor and part of our moral responsibility for the common good.[29]

---

[27] Ibid., §13.

[28] Chairmen of the USCCB Committee on Doctrine and Committee on Pro-Life Activities, "Memorandum on Vaccines for COVID-19," (November 20, 2020), https://www.usccb.org/resources/memo-to-bishops-on-vaccines-for-covid-19_0.pdf. Emphasis added.

[29] Chairmen of the USCCB Committee on Doctrine and the Committee on Pro-Life Activities, "Moral Considerations Regarding the New COVID-19 Vaccines," (December 11, 2020), https://www.usccb.org/resources/moral-considerations-covid-vaccines.pdf. They do conclude that the AstraZeneca COVID-19 vaccine is "more morally compromised" and "should be avoided," but that if it is the only one available to a person, "it would be permissible

Expert Report of M. Therese Lysaught – Page 13

36. The US bishops concur with the Pope and the CDF—that all the COVID-19 vaccines are morally acceptable, that getting vaccinated is an act of love (charity), and that being vaccinated is a morally responsibility. They make no mention of exemptions for reasons of conscience.

37. In summary, the top-level Roman Catholic magisterial authorities spoke with one voice regarding the COVID-19 vaccines. Pope Francis, the Dicastery for the Doctrine of the Faith, the Vatican COVID-19 Commission sponsored by the Dicastery for Promoting Integral Human Development, the Pontifical Academy for Life, and the USCCB all concurred: (1) that all available COVID-19 vaccines were morally acceptable to use; (2) that Catholics have a moral responsibility, duty, or obligation to be vaccinated against COVID-19 in order to protect their own lives and health and the lives and health of others from a serious pathogen with no effective treatments; (3) that being vaccinated against COVID-19 was an act of love; and (4) that the Church should work with public bodies to ensure universal access to vaccines. At no time did any of these Roman Catholic authorities in 2020-2022 advocate, recommend, counsel, or approve Catholics seeking exemptions from vaccine mandates. In fact, Pope Francis himself criticized those who did and sought to persuade them otherwise.

38. To, therefore, to conclude that a baptized Catholic would be "required" as a Catholic "to refuse a COVID-19 vaccination" requires a significant distortion, misunderstanding, or misrepresentation of Catholic teaching.

**2.** **The Position of the National Catholic Bioethics Center**

39. Despite this clear magisterial guidance on the moral acceptability of the COVID-19 vaccines and the moral obligation for Catholics to be vaccinated, the National Catholic Bioethics Center (NCBC)—John Di Camillo's employer— took a position radically at odds with the Roman Catholic Church. The NCBC is a very small, private organization that has no authoritative standing in the Church; they have no authorization to articulate positions that contravene the teachings of the Roman Catholic magisterium.

40. The NCBC's first statement on the COVID-19 vaccines was issued on December 7, 2020— prior to the statements by the CDF, the Vatican COVID-19 Commission, and the USCCB. This position paper was entitled "Points to Consider on the Use of COVID-19 Vaccines."[30]

---

to accept the AstraZeneca vaccine." This, however, was prior to the determinations by the CDF and the Vatican COVID-19 Commission.

[30] NCBC, "Points to Consider on the Use of the COVID-19 Vaccines," (December 8, 2020), https://static1.squarespace.com/static/5e3ada1a6a2e8d6a131d1dcd/t/5fd3ce39e679895094dd1e49/1607716409 962/NCBCVaccineStatementFINAL.pdf.

Expert Report of M. Therese Lysaught – Page 14

Rather than being in conversation with the current Roman Catholic magisterium, it drew on older magisterial documents.[31]

41. Their statement opens with the sentence: "<u>The NCBC</u> recognizes an ethical hierarchy among COVID-19 vaccines."[32] In other words, they state clearly that this is their own position and not Roman Catholic teaching.

42. This posited "ethical hierarchy" among the COVID-19 vaccines is based on a pseudo-'quantitative' relationship between the vaccines and cell-lines used in vaccine research, testing, and manufacturing that were derived from two aborted fetuses in the late 1960s and early 1970s.[33] Per their calculus, vaccines can be more or less "morally compromised" based on: (1) whether these cell lines were used in the manufacturing process (most "morally compromised," e.g., AstraZeneca, Johnson & Johnson); (2) whether said-cell lines were not used in the manufacturing process but in, perhaps, the testing phase (medially "morally compromised," e.g., Pfizer, Moderna, Novavax, Sinofi); or (3) whether said-cell lines were not used at all ('morally pure').[34]

43. In their conclusion, they do state that "the NCBC concludes that <u>none of the vaccines currently in development is excluded or forbidden in principle.</u>"[35] But they then go on to categorize the vaccines in groups (1) and (2) above as "lesser" and "graver" evils. They give the impression that these vaccines are somehow morally problematic. They further state that anyone who decides to receive such vaccines "should do so only 'under protest' and should make known their opposition to abortion and to the use of abortion-derived cell lines."[36] They continue that <u>the better moral course</u> is "to provide witness by <u>declining any vaccine that uses abortion-derived cell lines</u> in one or more phases of development or production. Such a decision can be made in good conscience…"[37]

44. Although conscience is only mentioned once in their document, it is mentioned four times in their executive summary:

---

[31] The NCBC statement cites magisterial documents from 2005 and 2008.

[32] NCBC, "Points to Consider on the Use of the COVID-19 Vaccines," p. 1, emphasis added.

[33] See, for example, a chart compiled by the Charlotte Lozier Institute that similarly focuses on this issue: "COVID-19 Vaccine Candidates and Abortion-Derived Cell Lines," https://lozierinstitute.org/wp-content/uploads/2023/01/CHART-Analysis-of-COVID-19-Vaccines-02June21.pdf.

[34] NCBC, "Points to Consider on the Use of the COVID-19 Vaccines," p. 5.

[35] Ibid., p. 5, emphasis added.

[36] Ibid., p. 6.

[37] Ibid., p. 8, emphasis added.

Expert Report of M. Therese Lysaught – Page 15

Nonetheless, for grave reasons, people could decide in good <u>conscience</u> to accept vaccines that use abortion-derived cell lines in their development and production to protect their own lives and health and that of others in the absence of any satisfactory alternative. The use of an ethically problematic vaccine, however, may be done only 'under protest.' A person who discerns in <u>conscience</u> that he or she can take such a vaccine has an obligation to make known his or her opposition to abortion and the use of abortion-derived cell lines. People may legitimately discern in <u>conscience</u> that they cannot use a vaccine with some connection to abortion and such a refusal can be a courageous witness to help build a culture of life. The Catholic Church neither requires nor forbids the use of ethically problematic vaccines, but instead urges people to discern what decision to make after having carefully formed their <u>consciences</u> about the moral and prudential issues surrounding the vaccines that become available. [Emphases added]

45. In sum, in early December 2020, the NCBC took the position that all of the available COVID-19 vaccines were "morally compromised," that Catholics could receive them but only "under protest," and that the more morally preferable or pure position was to refuse them. They simply assert that this is a matter of conscience.

46. They arrived at this position prior to the issuing of the series of authoritative magisterial statements detailed in Section II.1 above. However, after these statements were issued (December 11-29, 2020), the NCBC <u>did not revise</u> their position.

47. Instead, explicitly contravening Roman Catholic magisterial authority, they doubled-down on it. They spearheaded efforts to advance their alternate position and to convince Catholics to request religious exemptions from COVID-19 vaccine requirements. In July 2021, they created and actively disseminated a "Vaccine Exemption Template Letter" that they sent to bishops, advertised in parish bulletins, and distributed through social media networks.[38]

48. That template includes numerous misleading or erroneous statements. For example, it references the CDF's 2008 Instruction entitled *Dignitatis Personae* (On Certain Bioethical Questions) to support the statement:

There is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions. It is permissible to use such vaccines

---

[38] NCBC, "Vaccine Exemption Template Letter," (July 7, 2021), https://www.ncbcenter.org/ncbc-news/vaccineletter.

Expert Report of M. Therese Lysaught – Page 16

only under certain case-specific conditions, based on a judgment of conscience.

*Dignitatis Personae* says nothing of the sort. In fact, it says the opposite. While analyzing at length the responsibilities of <u>research professionals</u> vis a vis such cell lines, with regard to patients it merely states: "Grave reasons may be morally proportionate to justify the use of such 'biological material.' Thus, for example, danger to the health of children could permit parents to use a vaccine which was developed using cell lines of illicit origin...."[39] In other words, the CDF describes <u>no</u> "general moral duty to refuse the use of [such] medical products"; it instead explicitly gave patients permission to use them. I know of nowhere in the authoritative Catholic moral tradition where any such "general moral duty" is articulated.

49. This is just one example of the way that the NCBC's vaccine exemption template distorts or misrepresents Catholic teaching. It is important to note that the NCBC was still presenting such faulty guidance <u>seven months after</u> the CDF, the Vatican COVID-19 Commission, and the USCCB had issued their statements and in spite of the constant messaging of Pope Francis which, as outlined earlier, took a radically different position. Crucially, their vaccine exemption template—which is explicitly identified as being <u>for baptized Catholics</u>—makes no mention of Pope Francis and no mention of any of the other documents, except for one line taken out of context from the CDF statement (see Section II.3 below).

**3.  <u>Rebutting Di Camillo's Specific Claims</u>**

50. As mentioned earlier, Di Camillo is an employee of the NCBC and assisted in developing their vaccine exemption template.[40] He concludes his opinion that "that if, after due diligence in seeking out and critically assessing medical and moral information pertaining to COVID-19 and the vaccines, Nicholas Rolovich came to a sure judgment in conscience that he should not receive a COVID-19 vaccine, then the teachings of the Catholic Church <u>required</u> that he refuse the vaccine."[41] His conclusion is based on three premises: Roman Catholic teaching on conscience; what he refers to as the "principle of therapeutic proportionality"; and his assessment of Roman Catholic teaching on vaccinations.

51. In my opinion, his presentation of each of these premises is either incomplete or deeply flawed. He omits multiple central aspects of the Roman Catholic teaching on

---

[39] Congregation for the Doctrine of the Faith, *Dignitatis Personae*, §35.

[40]  Di Camillo, no. 14.

[41] Di Camillo, no. 47, emphasis added.

Expert Report of M. Therese Lysaught – Page 17

conscience.[42] His "principle of therapeutic proportionality" is idiosyncratic. He omits one of the most central principles of Catholic bioethics for helping patients to make morally-informed decisions about medical interventions—namely, the principle of ordinary and extraordinary means. And his analysis completely ignores the teaching of the Roman Catholic magisterium regarding the moral acceptability of the COVID-19 vaccines and the moral obligation for Catholics to be vaccinated.

(A) Di Camillo Ignores the Relevant Teachings of the Roman Catholic Magisterium Regarding the Moral Acceptability of the COVID-19 Vaccines

52. Di Camillo's opinion fails to mention any of the teaching of the Roman Catholic magisterium regarding the moral acceptability of the COVID-19 vaccines and the moral obligation of Catholics to be vaccinated detailed in Section II.1 above. He does cite one cherry-picked sentence from the CDF's "Note on the Morality of Using Some COVID Vaccines," but he uses in a misleading way (see Section II.3(D) below).[43] The use of this footnote indicates that Di Camillo is familiar with the CDF document but chose to ignore its content. His opinion therefore gives the impression that there was no authoritative magisterial teaching on the moral acceptability/obligatoriness of the COVID-19 vaccines that would have established for a baptized Roman Catholic what the Roman Catholic position on this question was in August 2021.

(B) Di Camillo Misrepresents Roman Catholic Teaching on Conscience

53. Di Camillo's argument centers on Roman Catholic teaching on conscience. The Roman Catholic tradition provides a rich, complex, and nuanced understanding of conscience. In my opinion, Di Camillo's opinion distorts this tradition by presenting only a partial account. His opinion relies almost entirely on the short entry on "moral conscience" in *The Catechism of the Catholic Church*.[44] He omits a key section of that entry; takes that

---

[42] Other reputable and credentialed Catholic bioethicists have also critiqued the NCBC/Di Camillo position and concur with the reasoning presented in this rebuttal. See e.g., Jason T. Eberl and Tobias Winright, "Catholics Have No Grounds to Claim Exemption from COVID Vaccine Mandates," *NCR* (August 17, 2021), https://www.ncronline.org/news/coronavirus/catholics-have-no-grounds-claim-exemption-covid-vaccine-mandates. Peter J. Cataldo provides a particularly thorough critique of the NCBC's misinterpretation of Catholic teaching in "Why the CDF 'Note on the Morality of Using Some Anti-COVID-19 Vaccines' Suggests a Moral Obligation to Receive SARS-COV-2-Vaccines," *HCEUSA* 31, no. 2 (Fall 2023), https://www.chausa.org/publications/health-care-ethics-usa/archive/issue/fall-2021/why-the-cdf-note-on-the-morality-of-using-some-anti-covid-19-vaccines-suggests-a-moral-obligation-to-receive-sars-cov-2-vaccines.

[43] Di Camillo, fn. 22, p. 35.

[44] The *Catechism of the Catholic Church* is a "catechism"—an introductory summary of the teachings of the Catholic Church. Insofar as it only presents a basic account of church teaching, it is generally not used in professional theological analysis. The *Catechism* was fully revised in 1992 and is periodically updated as Church teaching evolves. The *Catechism* is available online via the Vatican website: https://www.vatican.va/archive/ENG0015/_INDEX.HTM.

Expert Report of M. Therese Lysaught – Page 18

entry out of context of relevant teachings in the *Catechism* itself; and similarly omits to mention aspects of Roman Catholic teaching on conscience detailed in other authoritative church documents that he cites. In the following, l detail what he has omitted.

(1) Di Camillo Omits a Key Section of the *Catechism's* Entry on "Moral Conscience"

54. The *Catechism of the Catholic Church* summarizes the Church's teaching on conscience in §§1776-1802.[45] These paragraphs outline four aspects of the Church's teaching: what conscience is; that and how conscience is to be formed; how to choose in accord with conscience; and erroneous judgement.

55. Di Camillo's opinion repeats claims from §§1776-1789 in a superficial and selective manner. He correctly states that conscience is held to be an important human faculty,[46] but he does not emphasize that conscience is crucially "a judgement of reason."[47] He selectively highlights sentences about a person's "duty" to obey one's conscience (the *Catechism* does not use the word "duty").[48]

56. He reprises parts of the *Catechism's* emphasis on the formation of conscience.[49] He cites one of the key emphases of this section—namely, that to form one's conscience well requires respectful dialogue with "the authoritative teaching of the Church"[50]; and further that "The education of conscience is indispensable for human beings who are subjected to negative influences and tempted by sin <u>to prefer their own judgement</u> and <u>to reject authoritative teachings.</u>"[51] But, although he quotes these passages, they play no role in his analysis.

57. His summary of the Church's position on conscience ends with the first sentence from §1790: "A human being must always obey the certain judgement of his conscience." That is the first line of an section on "Erroneous Judgement," a section that <u>he omits in</u>

---

[45] *Catechism of the Catholic Church*, "Moral Conscience," §§1776-1802, http://www.scborromeo.org/ccc/p3s1c1a6.htm.

[46] Di Camillo, nos. 21-24.

[47] *Catechism of the Catholic Church*, §1776.

[48] Di Camillo, nos. 25-27.

[49] Di Camillo, nos. 28-29.

[50] *Catechism of the Catholic Church*, §1785, §1788.

[51] *Catechism of the Catholic Church*, §1783, emphasis added.

Expert Report of M. Therese Lysaught – Page 19

its entirety.[52] Catholic teaching holds that simply because one chooses in accord with one's conscience, that does not mean that one has chosen correctly or morally.[53] As the *Catechism* notes, conscience can be wrong due to ignorance[54] or personal responsibility.[55] It states specifically: "In such cases, the person is culpable for the evil he commits."[56] Among "the sources of errors of judgement in moral conduct," the *Catechism* includes: "ignorance [due to]…when a man 'takes little trouble to find out what is true and good'" as well as "bad example given by others, enslavement to one's passions, assertion of a mistaken notion of autonomy of conscience, rejection of the Church's authority and her teaching, lack of conversion and charity."[57] If the person is not responsible for their errors, they are less culpable, but their action "remains no less an evil, a privation, a disorder."[58] It remains the responsibility of all to "correct the errors of moral conscience" in themselves and others.[59]

58. Therefore, just because one follows one's conscience does not mean that one's conscience was correct or that one's action was morally good. In addition, as Peter Cataldo, a conservative and respected Catholic bioethicist, notes, the obligation to follow one's conscience "does not include a certain conscience that is based on negligent ignorance of the facts. The only erring judgement of conscience to which one is still morally bound to follow is that judgement in which one is excusably ignorant of the facts."[60] More specifically:

> Catholic teaching recognizes that the proper formation of conscience in part relies on human reason; in the context of vaccines for SARS-CoV-2, the resources of reason on which the formation of conscience depends include peer-reviewed scientific evidence presented by legitimate scientific sources and authorities. The moral obligation to obey one's certain conscience is applicable if, and only if, one

---

[52] *Catechism of the Catholic Church,* §§1790-1794.

[53] "Faced with a moral choice, conscience can make either a right judgement in accordance with reason and the divine law, or, on the contrary, an erroneous judgement that departs from them" (§1786).

[54] *Catechism of the Catholic Church*, §1790.

[55] *Catechism of the Catholic Church*, §1791.

[56] *Catechism of the Catholic Church*, §1791.

[57] *Catechism of the Catholic Church*, §1791-2, emphasis added.

[58] *Catechism of the Catholic Church*, §1793.

[59] *Catechism of the Catholic Church*, §1793.

[60] Cataldo, 2023, citing Thomas Aquinas, *Summa Theologica,* I-II, q. 19, a. 5, a. 6.

Expert Report of M. Therese Lysaught – Page 20

has a certain conscience that is not negligently ignorant of the facts.[61]

59. Thus, Di Camillo entirely omits the *Catechism's* teaching that conscience can be wrong as well as Catholic teaching on negligent (or "vincible") ignorance. Nor does he discuss a person's responsibility to accept the consequences of following their conscience, whether their conscience was correct or not (I will address this further in Section II.4 below).

(2) Di Camillo Omits the *Catechism's* Statements that Conscience Formation Requires Adherence to Authoritative Church Teaching

60. As mentioned above, Di Camillo cites the *Catechism's* counsel that proper formation of conscience requires adhering to the authoritative teachings of the Church and that for Catholics to reject said-teachings is a sin. But he then proceeds to ignore this component. This omission becomes even more glaring when one reads the entry on moral conscience in context of the *Catechism* as a whole, as of course, one must. For the *Catechism* repeatedly emphasizes that individual Catholics are required to follow the guidance of authoritative Catholic teaching, particularly to the guidance of the Pope. To give just a few examples, as the *Catechism* notes elsewhere:

When "the Bishop of Rome...proposes in the exercise of the ordinary Magisterium a teaching that leads to better understanding of faith and morals...the faithful 'are to <u>adhere to it with religious assent</u>.'"[62]

The faithful "<u>have the duty of observing the constitutions and decrees conveyed by the legitimate authority of the Church</u>. Even if they concern disciplinary matters, these determinations call for docility in charity."[63]

"At the same time the conscience of each person should avoid confining itself to individualistic considerations in its moral judgments of the person's own acts. As far as possible conscience should take account of the good of all, as expressed in the moral law, natural and revealed, and consequently in the law of the Church and in the authoritative teaching of the Magisterium on moral questions. <u>Personal conscience and reason should not be set in opposition to the moral law or the Magisterium of the Church</u>."[64]

---

[61] Ibid. The *Catechism* says nothing about 'critically assessing information from various sources' or "judgements about the credibility of sources"; that is Di Camillo's particular gloss and the main criterion he uses to evaluate Mr. Rolovich's decision, even though he does not review any component of Mr. Rolovich's decision-making process (Di Camillo, no. 30).

[62] *Catechism of the Catholic Church*, §892, emphasis added.

[63] *Catechism of the Catholic Church*, §2037, emphasis added.

Expert Report of M. Therese Lysaught – Page 21

(3) Di Camillo Omits the Second Vatican Council's Teaching that Individual Conscience Formation Requires Adherence to Authoritative Church Teaching

61. The *Catechism* draws these statements from the Catholic tradition more broadly, including two authoritative documents that Di Camillo cites in his report. First, Di Camillo cites two lines from the Second Vatican Council's Declaration *Dignitatis Humanae* to suggest that a person ought not be prevented from following her or his conscience.[65] But he omits the Council's clear and specific directive that:

> In the formation of their consciences, the Christian faithful ought carefully to attend to the sacred and certain doctrine of the Church….It is her duty to give utterance to, and authoritatively to teach, that truth which is Christ Himself, and also to declare and confirm by her authority those principles of the moral order which have their origins in human nature itself.[66]

62. This same position is also articulated in another document that Di Camillo cites, the Second Vatican Council's Pastoral Constitution on the Church in the Modern World (*Gaudium et Spes*).[67] Again he omits the Constitution's injunctions about the authority of Church teaching vis a vis the consciences of lay Catholics:

> Let the layman not imagine that his pastors are always such experts, that to every problem which arises, however complicated, they can readily give him a concrete solution, or even that such is their mission. Rather [they should be] enlightened by Christian wisdom and giving close attention to the teaching authority of the Church….[68]

> …[with regard to reproductive questions] spouses should be aware that they cannot proceed arbitrarily, but must always be governed according to a conscience dutifully conformed to the divine law itself, and should be submissive toward the Church's teaching office, which authentically interprets that law in the light of the Gospel.[69]

---

[64] *Catechism of the Catholic Church*, §2039, emphasis added. See also §937, §2032, et passim.

[65] Di Camillo, no. 27.

[66] Second Vatican Council, *Dignitatis Humanae*, §14.

[67] Di Camillo, no. 22, no. 26.

[68] Second Vatican Council, *Gaudium et Spes,* §44.

[69] Ibid., §50.

Expert Report of M. Therese Lysaught – Page 22

(273 of 299), Page 273 of 299    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 273 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-7    filed 09/23/24    PageID.1303    Page 24
of 50

63. More examples could be adduced,[70] but in sum, Di Camillo presents only a partial and therefore misleading account of the Roman Catholic teaching on conscience. Multiple authoritative sources of church teaching explicitly state that adequate conscience formation requires adherence to the authoritative teaching of the Church and that "rejection of the Church's authority" results in <u>culpable</u> error. Di Camillo's opinion makes no mention of the authoritative teaching of the Roman Catholic Church regarding the COVID-19 vaccines.

Conscience, as presented by Di Camillo, has become exactly what the *Catechism* and the Catholic Church rejects—"a mistaken notion of autonomy of conscience" that "'takes little trouble to find out what is true or good'" "set in opposition to the Magisterium of the Church"—an authority unto itself that can override the Pope and authoritative teaching.

64. It is also worth noting that, even when it comes to applying his own (mistaken) view of the Church's teaching on conscience, Di Camillo does not attempt to analyze Rolovich's actual process for informing his conscience. Instead, he merely opines (incorrectly) that Rolovich would be required to refuse the vaccine *"if,* after due diligence in seeking out and critically assessing medical and moral information pertaining to COVID-19 and vaccines" he determined he should not receive the vaccine.[71] But Di Camillo does not appear to have spoken with Rolovich or reviewed any documents relevant to Rolovich's process for due diligence for assessing the relevant medical and moral information regarding the COVID-19 vaccines.

<u>(C) Di Camillo's Principle of "Therapeutic Proportionality" Is Idiosyncratic</u>

65. The putative principle of "therapeutic proportionality" plays a significant role in Di Camillo's opinion. I have worked in Catholic bioethics for three decades, and I had never heard of this principle until I saw it referenced in the NCBC vaccine exemption template in 2021. As far as I can tell, this is an idiosyncratic principle advanced by the NCBC. Per my research, although the NCBC uses it frequently, references to a principle of "therapeutic proportionality" appear only six times in the literature since 2004.[72]

---

[70] See, e.g., Catholic Church, *Code of Canon Law*, c. 752: "Not indeed an assent of faith, but yet a religious submission of mind and will must be given to the teaching which either the Supreme Pontiff or the College of Bishops pronounce on faith or on morals when they exercise the authentic Magisterium even if they do not intend to proclaim it by a definitive act." See also Fr. William Most, "Four Levels of the Church's Teaching," *ETWN* (n.d.), https://www.ewtn.com/catholicism/library/four-levels-of-the-churchs-teaching-12242.

[71] Di Camillo, no. 47.

[72] A search on "therapeutic proportionality" in the ATLA database (the main database of literature on religion and theology, including Catholic theology) produced no citations. A search on PubMed (the main database of medical and bioethics literature) produced only 6 citations. A Google search produced one additional citation.

Expert Report of M. Therese Lysaught – Page 23

66. This 'principle' appears to me to be an idiosyncratic rephrasing of a concept that is fundamental to both secular and Catholic clinical ethics, namely, cost/benefit or, in Catholic terminology, proportionate/disproportionate analysis.[73] Central to clinical decision-making is that the benefits of a particular medical intervention should outweigh the burdens (costs). The person to weigh the relationship between benefits and burdens is the patient. The patient is to receive, "all <u>reasonable</u> information" regarding possible as to the burdens and benefits so that they are properly 'informed,' and morally, they must do their best to make an objective, reasonable decision.[74]

67. The criterion of proportionality is affirmed in the *Ethical and Religious Directives for Catholic Health Care Services*[75] as is the centrality of informed consent.[76] The *Ethical and Religious Directives for Catholic Health Care Services* (ERDs) is an authoritative document containing doctrinal, moral, and sacramental guidelines for Catholic health care institutions issued by the US Conference of Catholic Bishops. Any health care organization that wishes to identify itself as a Catholic entity must adhere to the ERDs.

68. While Di Camillo correctly notes that, per the ERDs, a patient's informed consent requires "access to moral information,"[77] he again omits that, <u>per the ERDs</u>, a key source of such "moral information" is (for Catholics) the Church. As the ERDs note:

> In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In

---

[73] While the NCBC employs this concept of "therapeutic proportionality" in their July 2021 vaccine exemption template, at that time they made no mention of considering the COVID-19 vaccines to be "experimental." It does appear that subsequently (in 2022), this became one of their talking points and they began to analyze the vaccines not using the standards for clinical medicine but for medical research. We see this in their April 28, 2022 "Updated Statement on COVID-19 Vaccine Mandates" (https://www.ncbcenter.org/ncbc-news/updatedvaccinestaement ) and the corresponding press release, "The NCBC Updates Its Statement on COVID-19 Vaccine Mandates to Include Children and Vulnerable Persons," (https://static1.squarespace.com/static/5e3ada1a6a2e8d6a131d1dcd/t/626aec4023d5e80ec1de04a3/1651174464308/Press+Release+Vulnerable+Persons.pdf ) which refers to the "exploitation" of children (apparently via vaccination) and notes that "The updated NCBC statement also recalls the higher ethical standards required in medical research." This shift also appears in Di Camillo's opinion, no. 34.

[74] US Conference of Catholic Bishops, *The Ethical and Religious Directives for Catholic Health Care Services* (2018), Directive no. 27, https://www.usccb.org/resources/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06_0.pdf. This document is referred to as the ERDs, and this abbreviation will be used going forward.

[75] See Directives 30, 33, 47, 49, 50, 51, 56, 57 and the Introduction to Part V of the 6th edition of the ERDs.

[76] ERDs, Directives 26, 27, et passim.

[77] Di Camillo, no. 35.

Expert Report of M. Therese Lysaught – Page 24

consultation with medical professionals, <u>church leaders</u> review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and <u>offer authoritative teaching and guidance about the moral</u> and pastoral <u>responsibilities entailed by the Christian faith</u>. While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction.

69. The COVID-19 vaccines are an excellent example of one of these questions. Throughout his opinion,[78] Di Camillo simply omits this requirement that Mr. Rolovich's moral assessment must respect the magisterium's normative guidance and direction regarding the morally obligatory nature of the COVID-19 vaccines.

70. But while proportionality is an important criterion for Catholic clinical assessment, it never stands alone. It is a subcomponent of a more important principle that helps determine whether a medical intervention is morally obligatory or not.

(D) <u>Di Camillo Entirely Omits the Principle of Ordinary and Extraordinary Means</u>

71. Di Camillo's third section—"Teachings of the Roman Catholic Church on Vaccination in General"—is just bafflingly incorrect. His opinion, again, misleads by presenting only part of the teaching on this question. And it requires <u>entirely ignoring</u> the Church's well-established principle of ordinary and extraordinary means. This principle is found in the ERDs, in nearly every textbook of Catholic bioethics and in the majority of clinical case analyses conducted by professional Catholic bioethicists.

72. First, Di Camillo states that vaccinations "must be voluntary"—full stop.[79] This is a deceptive claim insofar as per both Catholic and secular bioethics, all medical interventions must always be voluntary. One cannot force a patient to accept a medical intervention involuntarily. That does *not*, however, mean that for the Church, some medical interventions are not at the same time voluntary <u>and</u> morally obligatory.

73. To make these determinations, the Church provides individual Catholics (patients, providers, ethicists, etc.) with the principle of ordinary and extraordinary means. Interventions that can be considered "ordinary" means are held to be "morally obligatory." Interventions that are considered "extraordinary" are not. This is clearly stated in the ERDs, and <u>Di Camillo simply omits it</u>.

---

[78] Di Camillo, nos. 31-41.

[79] Di Camillo, no. 42.

Expert Report of M. Therese Lysaught – Page 25

74. As the ERDs note, the Catholic tradition has long taught that "every person is <u>obliged</u> to use ordinary means to preserve his or her health."[80] Because of the sacredness of human life, voluntarily protecting our own life and health is an overriding theological and moral commitment.[81] Thus, in the Catholic tradition, a medical intervention can be both voluntary and 'morally obligatory'—and many are.

75. The ERDs define ordinary means:

> A person has a <u>moral obligation</u> to use ordinary or proportionate means of preserving his or her life. Proportionate [ordinary] means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[82]

They continue:

> A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate [extraordinary] means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

76. The key terms here are: reasonable and excessive. The COVID-19 vaccines very quickly proved to be highly effective at preventing serious illness, hospitalization, and death from a highly infectious disease that can have serious, long-term or even fatal outcomes and for which there is still no effective treatment. Clearly, they met the bar for reasonable hope of benefit. They do not impose any significant burdens or risks for recipients without medical contraindications, and they were free of charge in the US. Authoritative magisterial guidance concluded that there are no overweening moral obstacles that would change this calculus.

77. Unlike any other medical treatment, vaccines also have the additional benefit that they protect not only the patient but also other people—our immediate families and those we encounter in our communities, particularly those who more vulnerable, preserving their health and life as well. Thus, for vaccines, the benefit/cost ratio is even greater. Consequently, for those without medical contraindications, vaccines are not merely ordinary treatment—the moral obligation to be vaccinated is even greater.

---

[80] ERDs, Directive 32, emphasis added.

[81] ERDs, General Introduction.

[82] Directive 56, emphasis added.

Expert Report of M. Therese Lysaught – Page 26

(277 of 299), Page 277 of 299    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 277 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-7    filed 09/23/24    PageID.1307    Page 28
of 50

It was via the principle of ordinary and extraordinary means that the authoritative bodies in the Roman Catholic magisterium deemed the COVID-19 vaccines morally obligatory (Pope Francis), a duty (the CDF), or a moral responsibility (the Vatican COVID-19 Commission and the USCCB).

78. Finally, it is again misleading to suggest that the Church has not taken a position on vaccination. It offered a clear and consistent position on the COVID-19 vaccines, as detailed in Section II.1 above. In addition, neither vaccines nor vaccine mandates are new.[83] The Catholic Church has never opposed state vaccination mandates. Catholic colleges and universities have been mandating a variety of vaccines for decades, even vaccines developed and manufactured in the same way as the COVID-19 vaccines.[84]

Therefore, vaccination overwhelmingly meets the criteria to be considered ordinary treatment and thus, as the consensus of magisterial commentary has noted, any reasonable Catholic who has formed their conscience well should consider it morally obligatory.

### 4. The Costs of Conscience in the Roman Catholic Tradition

79. One final aspect of the Roman Catholic teaching on conscience must be mentioned briefly. Catholic teaching on conscience is both old and new. The theoretical frame for the concept was developed most clearly in the work of the 13th century theologian, Thomas Aquinas. After that, the concept had a mixed history in the Catholic tradition. Over the centuries, the Roman Catholic Church punished many martyrs and people of other faiths who sought to conscientiously exercise their religious freedom. The concept had a mixed history even in the 19th and early 20th centuries, until it was revivified by the Second Vatican Council in the 1960s.[85]

80. Behind this history is an aspect of conscience omitted from Di Camillio's account: that while individuals have a right to conscience, that right entails responsibilities and,

---

[83] Kevin Malone and Alan R. Hinman, "Vaccination Mandates: The Public Health Imperative and Individual Rights," in *Law in Public Health Practice*, 2nd ed., ed. Richard A. Goodman, et al. (Oxford University Press, 2007), 338-360, https://www.cdc.gov/vaccines/imz-managers/guides-pubs/downloads/vacc_mandates_chptr13.pdf.

[84] See, e.g., the University of Notre Dame, "Immunization FAQs," (accessed July 19, 2024), https://uhs.nd.edu/for-incoming-students/immunization-faqs/. In 2021, per state mandates, this list also included the COVID-19 vaccines. Similar requirements can be found on the websites of most Catholic educational and health care institutions including all three Catholic universities in Washington state, Seattle University (https://www.seattleu.edu/life-at-seattle-u/health-wellness/student-health-center/immunizations/), St. Martin's University (https://www.stmartin.edu/student-life/student-wellbeing/health-services), and Gonzaga University (https://www.gonzaga.edu/student-life/health-well-being/health-counseling-services/resources/vaccinations).

[85] See, e.g., David DeCosse and Kristin Heyer, eds., *Conscience and Catholicism: Rights, Responsibilities, and Institutional Responses* (Orbis Books, 2015).

Expert Report of M. Therese Lysaught – Page 27

correlatively, consequences. For example, prior to the Second Vatican Council, the Church largely opposed the practice of Catholic conscientious objection to war.[86] The Church raised no objections to governments that jailed Catholics who conscientiously objected to participating in war for pacifist reasons. During the Vietnam War era, the Church began to recognize the moral rights of Catholics who conscientiously objected to war and refused conscription, burned draft cards,[87] or threw blood on nuclear war heads.[88] But they equally acknowledged that such conscientious objectors must face the consequences of their actions—e.g., to serve time in prison. While the Church now has given qualified support to military conscientious objection, it recognizes that such a stance may incur "consequences to person and career," and it agrees that those who object for reasons of conscience must be willing to participate in some sort of alternative service, even if it is still part of the 'war machine' to which they object.[89] The US Government requires military conscientious objectors to go through a rigorous process in which they first detail in writing and/or via a personal presentation how they arrived at their beliefs, the influence those beliefs have had on how they live their lives.[90] The Catholic Church supports such a process.[91] Signing a pre-fabricated template form is not sufficient.

81. This position is rooted in an affirmation of political governance as necessary for human flourishing. Within Catholic theology, there is at least a *prima facie* assumption that polities act for the common good and that citizens have a responsibility to cooperate with such authorities. The Second Vatican Council affirms this in, again, their remarks on conscience:

---

[86] See, e.g., Jeremy Kessler, "The Legal Origins of Catholic Conscientious Objection," *William and Mary Bill of Rights Journal*, 31, no. 2 (2022-2023), 380, https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=2031&context=wmborj; and Rachel M. Johnston-White, "A New Primacy of Conscience? Conscientious Objection, French Catholicism, and the State During the Algerian War," *Journal of Contemporary History* 54, no. 1 (2019): 112-138.

[87] "The Catonsville Nine," https://en.wikipedia.org/wiki/Catonsville_Nine

[88] Mary Ann Mueller and Ann Brown, "The Plowshares Eight: Thirty Years On," *Waging Nonviolence* (September 9, 2010), https://wagingnonviolence.org/2010/09/the-plowshares-8-thirty-years-on/

[89] See, e.g., the very different tenor in the USCCB statements from 1969 (https://www.usccb.org/resources/statement-catholic-conscientious-objector-division-world-justice-and-peace-october-15) and 2014 (https://www.usccb.org/resources/conscientious-objection).

[90] US Selective Service System, "Conscientious Objectors," https://www.sss.gov/conscientious-objectors/.

[91] Catholic Peace Fellowship, "The Church and Conscientious Objection," http://www.catholicpeacefellowship.org/downloads/conscientious_objection_sheet.pdf. Notably, Mr. Rolovich did not provide answers to any of the legitimate questions WSU asked him on their religious exemption application form, questions that were similar to the US Selective Service conscientious objector process. Insofar as he could not or would not provide justification for his position, it raises a question of whether his conscience was sufficiently well-formed, per Catholic teaching.

Expert Report of M. Therese Lysaught – Page 28

(279 of 299), Page 279 of 299    Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 279 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-7    filed 09/23/24    PageID.1309    Page 30
of 50

The political community exists, consequently, for the sake of the common good, in which it finds its full justification and significance, and the source of its inherent legitimacy....Yet the people who come together in the political community are many and diverse, and they have every right to prefer divergent solutions. If the political community is not to be torn apart while everyone follows his own opinion, there must be an authority to direct the energies of all citizens toward the common good, not in a mechanical or despotic fashion, but by acting above all as a moral force which appeals to each one's freedom and sense of responsibility.

It is clear, therefore, that the political community and public authority are founded on human nature and hence belong to the order designed by God, even though the choice of a political regime and the appointment of rulers are left to the free will of citizens. It follows also that political authority, both in the community as such and in the representative bodies of the state, must always be exercised within the limits of the moral order and directed toward the common good—with a dynamic concept of that good—according to the juridical order legitimately established or due to be established. <u>When authority is so exercised, citizens are bound in conscience to obey</u>.[92]

This position is also included in the *Catechism*, but again, Di Camillo does not cite it.[93]

82. The Church also reserves the right to impose consequences on those who conscientiously object to its teachings or authority structure. Especially over the last decade, Catholic politicians in the US who—in conscience—vote for legislation supporting abortion rights because such legislation represents the wishes of their constituencies have been denied communion and/or threatened with excommunication by a handful of bishops.[94]

83. The Church also inflicts employment consequences on those who follow their consciences within Catholic institutions. For example, in October 2021, the Vatican inflicted employment consequences on those employees who refused to receive the COVID vaccines when the Vatican instituted its vaccine mandate—either suspending them until they were vaccinated or allowing them to leave their positions.[95] In the US,

---

[92] Second Vatican Council, *Gaudium et Spes*, §74, emphasis added.

[93] *Catechism*, §§1897-1927, http://www.scborromeo.org/ccc/p3s1c2a2.htm#1906.

[94] "Eucharist Denial to Catholic Politicians Over Abortion," *Wikipedia*:
https://en.wikipedia.org/wiki/Eucharist_denial_to_Catholic_politicians_over_abortion

[95] Ivana Saric, "Swiss Guards Leave Corps in Order to Avoid Vatican Vaccine Mandate," *Axios* (October 3, 2021),
https://www.axios.com/2021/10/03/swiss-guards-covid-vaccine-switzerland

Expert Report of M. Therese Lysaught – Page 29

employees (whether Catholic or not) who follow their consciences are regularly terminated by Catholic employers, and the US courts have regularly supported these consequences.[96] In July 2024, Cardinal Carlo Maria Vigano, the former Papal Nuncio to the US (a very prominent church position) was excommunicated for his consistent vocal conscientious objection to Pope Francis' legitimacy.[97] In November 2023, the bishop of Tyler, Texas, was removed from his position for similar reasons.[98]

5. **Conclusion**

84. Based on the foregoing, it is my opinion that Di Camillo is incorrect that Mr. Rolovich was required to refuse the COVID-19 vaccine based on his Roman Catholic faith. To reach his conclusion, he misrepresents Roman Catholic teaching on conscience, taking sentences and passages out of context and omitting key aspects of the teaching that is included in the very documents he cites. He makes no mention of the fact that Catholic teaching acknowledges that the practice of following one's conscience—whether well-formed or erroneous—may have serious civil, ecclesiastical, or employment consequences.

85. He entirely ignores the teaching promulgated by Pope Francis, the Dicastery for the Doctrine of the Faith, the Vatican COVID-19 Commission sponsored by the Dicastery for Promoting Integral Human Development, the Pontifical Academy for Life, and the USCCB which all concurred: (1) that all available COVID-19 vaccines were morally acceptable to use; (2) that Catholics have a moral responsibility, duty, or obligation to be vaccinated against COVID-19 in order to protect their own lives and health and the lives and health of others from a serious pathogen with no effective treatments; (3) that being vaccinated against COVID-19 was an act of love; and (4) that the Church should work with public bodies to ensure universal access to vaccines. He fails to mention that at no time did any of these Roman Catholic authorities in 2020-2022 advocate, recommend, counsel, or approve Catholics to seek exemptions from vaccine mandates. In fact, Pope

---

[96] For just two of many examples, see "North Carolina Catholic School Had Right to Fire Gay Teacher Who Announced Wedding Online, Court Rules," *CBS News* (May 10, 2024), https://www.cbsnews.com/news/north-carolina-catholic-school-fired-gay-teacher-lonnie-billard-wedding-court-ruling/; and David K. Li and Yasmeen Persaud, "Catholic School Had Legal Right to Fire Unmarried, Pregnant Teacher, New Jersey Court Rules," *NBC News* (August 16, 2023), https://www.nbcnews.com/crime-courts/new-jersey-high-court-catholic-school-teacher-fired-premarital-s-rcna100232. See also New Ways Ministries, "Employees of Catholic Institutions Who Have Been Fired, Forced to Resign, Had Offers Rescinded, or Had Their Jobs Threatened Because of LGBT Issues," (updated September 21, 2021): https://www.newwaysministry.org/issues/employment/employment-disputes/.

[97] Christopher White, "Archbishop Vigano Found Guilty of Schism, Excommunicated by Vatican," *NCR* July 5, 2024: https://www.ncronline.org/vatican/vatican-news/archbishop-vigan-found-guilty-schism-excommunicated-vatican.

[98] Nicole Winfield, "Pope Francis Removes a Leading US Conservative Critic as Bishop of Tyler, Texas," *AP* (November 11, 2023), https://apnews.com/article/pope-tyler-bishop-strickland-removed-0f9f0be7d5938b36d6e7ead8c33e5150.

Expert Report of M. Therese Lysaught – Page 30

Francis himself criticized those who did and sought to persuade them otherwise.

86. He utilizes an idiosyncratic concept while omitting one of the most central principles of Catholic bioethics—the principle of ordinary and extraordinary means—which is used to determine which medical inventions are morally obligatory.

87. Finally, Di Camillo does not even attempt to analyze or evaluate the actual process by which Mr. Rolovich formed his conscience and came to his judgement to determine whether or not it met the criteria for a well-formed conscience in the Catholic tradition.

88. Thus, in my opinion, to conclude that a baptized Catholic could be "required" as a Catholic to refuse COVID-19 vaccination requires a significant distortion, misunderstanding, or misrepresentation of Catholic teaching.

APPENDIX 1

# M. THERESE LYSAUGHT, PhD

Neiswanger Institute for Bioethics
Stritch School of Medicine, Loyola University Chicago
Pontifical Academy for Life
mlysaught@luc.edu

---

## EDUCATION

| | | | |
|---|---|---|---|
| PhD | Religion/Theological Ethics | Duke University | 1992 |
| MA | Theology | University of Notre Dame | 1986 |
| BS | Chemistry | Hope College | 1985 |

---

## TENURED TEACHING & RESEARCH APPOINTMENTS

| | |
|---|---|
| 2013- | Professor, Neiswanger Institute for Bioethics and Health Policy, Stritch School of Medicine; Institute of Pastoral Studies, Loyola University Chicago (joint appointment) |
| 2012-2013 | Visiting Scholar, Catholic Health Association |
| 2007-2013 | Associate Professor, Marquette University, Department of Theology |
| 1995-2007 | Assistant/Associate Professor, University of Dayton, Dept. of Religious Studies |
| 1995 | Postdoctoral Research Fellow, Department of Pediatrics & Genetics, College of Medicine, University of Iowa |
| 1994 | NIH Fellow, Program in Molecular and Clinical Genetics, Program in Biomedical Ethics University of Iowa, funded by the National Institutes of Health (NIH), National Center for Human Genome Research (NCHGR), Ethical, Legal, and Social Implications Program (ELSI) |
| 1992-1994 | Associate, The Park Ridge Center for Health, Faith, and Ethics |

Expert Report of M. Therese Lysaught – Page 32

**ACADEMIC ADMINISTRATION**

| | |
|---|---|
| 2014-2018 | Associate Dean, Institute of Pastoral Studies, Loyola University Chicago |
| 2011-2012 | Director of Graduate Studies, Department of Theology, Marquette University |
| 2008-2010 | Assistant Chair, Department of Theology, Marquette University |
| 1999-2000 | Interim Director of Graduate Studies, Dept. of Religious Studies, Univ. of Dayton |

**CONSULTING & FACILITATION**

2024      St. Norbert College, Moral Analysis of Health Plan Coverage

2023      Peace Health, Moral Analysis

2023-      External Member, Dissertation Committee, Sarah Kothe, Candler School of Theology, Emory University: "Catholic Bioethics and Aging: An Ethnographic Study of the Moral Projects of Seniors in Assisted Living"

2022      St. Xavier University, Moral Analysis of Health Plan Coverage

2022-2023      External Member, Dissertation Committee, AM Sutherland, University of Kwazulu-Natal, South Africa: "Intertwined Lives: Reconstructing Life After the Death of a Son: An Autoethnography of a Pastoral Counselor and Mother"

2020-      CMMB, Project Lead and Facilitator for "Building Resiliency," Initiative for Zambia, South Sudan, Haiti, Kenya, and Peru.

2020      Expert Witness, *Capello v. Franciscan Alliance, Inc.*

2019-      CHA Ministry Assessment External Evaluator

2018-2019      American Association for the Advancement of Science, Science for Seminaries Grant, Content Advisor for Sacred Heart Seminary, Milwaukee, WI

2018-2019      Department of Religious Studies, Cardinal Stritch University, Milwaukee, WI: Revisioning and restructuring of newly launched graduate program in pastoral ministry.

2018      Expert Witness, *Romero v. Romero,* LA Superior Court

Expert Report of M. Therese Lysaught – Page 33

ER1071

| 2017- | Global Faith-Based Health Systems: Integrating Technology and Empowering Communities: Georgetown University and the Fondazione Bruno Kessler (Trento, Italy) |
| 2017 | Expert Witness, *Smith v. OSF HealthCare System* |
| 2016 | Trinity Health, Ethics Function Design |
| 2014-2015 | Co-chair, Loyola University Chicago Strategic Plan Steering Committee, [Plan 2020](#) |
| 2015 | Expert Witness, *Medina v. CHI* |
| 2014 | Expert Witness, *Chavies v. Catholic Health East* |
| 2014 | Presence Health, Ministry Leadership Formation Design Team |
| 2013-2014 | Catholic Health East/Trinity Health Ministry Leadership Formation Design Team |
| 2013 | Catholic Health East, Catholic Social Practices Webinar Series Design and Implementation |
| 2013 | Trinity Health, Moral Analyses of Outsourcing and Clinically Integrated Networks |
| 2010 | Catholic Healthcare West, Moral Analysis of a Case at St. Joseph's Hospital, Phoenix |
| 2000-2007 | Ethics Committee, Good Samaritan Hospital, Dayton, Ohio |
| 2000-2007 | Executive Committee, Greater Dayton Healthcare Ethics Consortium |

---

**EDITORIAL & ADVISORY POSITIONS**

| 2023- | International Bioethics Group |
| 2023- | PACTPAN (Pan-African Catholic Theology and Pastoral Network), Health and Healing Unit |
| 2022 | Catholic Health Association Working Group on the Principle of Double Effect |
| 2020- | Pontifical Academy for Life, Corresponding Member |
| 2020- | The Hank Center for the Catholic Intellectual Heritage, Board |

Expert Report of M. Therese Lysaught – Page 34

| | |
|---|---|
| 2022- | Editor, *Journal of Moral Theology*<br>Associate Editor, 2019-2021<br>Editorial Advisory Board, 2009-2018 |
| 2022- | Editorial Board, *Journal of Catholic Social Thought* |
| 2019- | Editorial Board, *Studies in Christian Ethics* |
| 2018-2020 | Northwestern Medical Center CPE Advisory Board |
| 2017-2021 | Editorial Board, *Journal of the Society of Christian Ethics* |
| 2013-2014 | CPE Advisory Board, Presence Health, Chicago |
| 2012-2015 | Program on Medicine and Religion, University of Chicago, Annual Conference Planning Committee |
| 2010-2014 | Society of Christian Ethics, Board of Directors<br>    Executive Committee/Program Committee, 2012-2014<br>    Chair, Nominating Committee, 2011-2012<br>    Program Committee Review Committee, 2011-2014 |
| 2008-2011 | Anglican-Roman Catholic Theological Consultation-USA, USCCB, Member |
| 2008-2012 | Christian Theological Research Fellowship, Vice-President |
| 2005-2006 | Louisville Institute, Christian Faith and Life Sabbatical Grant Program, Reviewer |
| 2003-2006 | Joseph Cardinal Bernardin Center, Catholic Theological Union, Chicago, Working Group on the Consistent Ethic of Life |
| 2002-2009 | Catholic Health Association, Theologian/Ethicist Committee (TEC) of the Board of Directors |
| 2001-2003 | Catholic Health Association Theologians and Ethicists Working Group "Harnessing the Promise of Genetics" |
| 2001-2006 | Catholic Health Association Theologians & Ethicists Working Group, The Principle of Cooperation |
| 1999, 2000 | Catholic Health Association Theologians and Ethicists Colloquium Planning Committee |

Expert Report of M. Therese Lysaught – Page 35

| 1998-2001 | American Association for the Advancement of Science (AAAS), Program of Dialogue Between Science, Religion, and Ethics, Advisory Board Member |
| 1995-1998 | Recombinant DNA Advisory Committee (RAC), National Institutes of Health |
| 1994-1998 | Society of Christian Ethics (SCE) Women's Caucus, co-chair |

---

**PUBLICATIONS (Abridged 2014-2024)**

**Books**

*Biopolítica después de la Neurociencia: Moralidad y la Economía de la Virtud.* Co-escrito con Jeffrey P. Bishop and Andrew A. Michel (Madrid, Espana: Universidad Francisco de Vitoria, in press 2024).

*A Prophet to the Peoples: Paul Farmer's Witness and Theological Ethics*. Co-edited with Jennie Weiss Block and Alexandre A. Martins (Pickwick Publications, February 2023).

*Biopolitics After Neuroscience: Morality and the Economy of Virtue.* Co-authored with Jeffrey P. Bishop and Andrew A. Michel (Bloomsbury Academic, 2022). Winner of a €25,000

*Catholic Bioethics and Social Justice: The Praxis of US Health Care in a Globalized World.* Co-edited with Michael P. McCarthy (Liturgical Press, 2019). 2019 Catholic Press Association Book Award, Catholic Social Teaching, Honorable Mention.

*Reunidos para El Camino: Teología en una Perspectiva Católica*. Co-editado con David Matzko McCarthy. Traducción por Helena Faccia Serrano (Granada, Espana: Editorial Nuevo Inicio, 2019).

*Caritas in Communion: Theological Foundations of Catholic Health Care* (Catholic Health Association, 2014).

*On Moral Medicine: Theological Explorations in Medical Ethics*, 3rd ed. Co-edited with Joseph Kotva (Eerdmans, 2012).

*Gathered for the Journey: Moral Theology in Catholic Perspective.* Co-edited with David M. McCarthy (Eerdmans/SCM, 2007). 2008 Catholic Press Association Book Award, Theology, Third Place Honors.

Expert Report of M. Therese Lysaught – Page 36

### Journal Articles

"Resocializing Catholic Healthcare Leadership: Lessons from Paul Farmer and Pope Francis," *Concilium* 2024, no. 3, Special issue on "Health and Healing: Ethical, Theological, and Pastoral Perspectives," 58-70.

"Risocializzare la leadership cattolica nell'assistenza sanitaria: lezioni da Paul Farmer e papa Francesco," *Concilium*, Anno LX, fascicolo 3 (2024): 82-96

"Resocializar el liderazgo sanitario católico: lecciones de Paul Farmer y el papa Francisco," *Concilium*, 406 (Junio 2024): 71-84.

"*Ad (Synodalem) Theologiam (Moralem) Promovendam*," *Journal of Moral Theology* 13, no. 1 (2024): 1-14.

"The Power of Proximity: Toward an Ethic of Accompaniment in Surgery," with Charles Nicholson, Monica Bodd, Ellery Sarosi, Martha Carlough, and Farr Curlin, *Hastings Center Report* 54, no. 2 (2024): 12-21.

"Vicious Trauma: Poverty, Race, Bodies and the Confounding of Virtue Ethics," with Cory D. Mitchell, *Journal of the Society of Christian Ethics* 42, no. 1 (Fall 2022): 75-100.

"Theological Ethics of Life: A New Volume by the Pontifical Academy for Life," with Roberto Dell'Oro, *Journal of Moral Theology*, 11, no. 2 (July 2022): 65-77.

"Building Caregiver Resiliency in Global Health: Embodying the Catholic Social Tradition in the Face of COVID-19," with Beth Reece, Marcia Grand Ortega, Ana Victoria Guizado, and Cecilia Bustamente-Pixa, *Linacre Quarterly* 89, no. 2 (May 2022): 184-205.

"Looking Backward to Move Forward: Writing Your System's Racial Autobiography," with Sheri Bartlett Browne *Health Progress* (Spring 2022): 43-50.

"Whose Revolution? Which Future? The Legacy of Alasdair MacIntyre for a Radical Pedagogy in Virtue," with Daniel P. Rhodes, *Expositions: Interdisciplinary Studies in the Humanities* 14, no. 1 (2020): 97-125.

"Beyond Stewardship: Reordering the Economic Imagination of Catholic Health Care," *Christian Bioethics* 26, no. 1 (April 2020): 31-55.

"*Las Periferías y el Pan*: Pope Francis, *La Teología del Pueblo*, and the Conversion of Catholic Bioethics," *Perspectiva Teológia* 51, no. 3 (2019): 421-442.

"Equally Strange Fruit: Catholic Health Care and the Appropriation of Residential Segregation," with Cory D. Mitchell, *Journal of Moral Theology* 8, no. 1 (2019): 36-62.

Expert Report of M. Therese Lysaught – Page 37

"A Social Praxis for US Health Care: Revisioning Catholic Bioethics Via Catholic Social Doctrine," *Journal of the Society of Christian Ethics* 38, no. 2 (2018): 111-130, with Michael McCarthy.

"That Jagged Little Pill and the Counter-Politics of the Community of the Expelled: A Sacramental Assessment of Psychiatric Medication," *Christian Bioethics* 24, no. 3 (26 October 2018): 246–264.

Issue editor, *Journal of Medicine and Philosophy* 41, no. 6 (December 2016).  Special issue on *The Anticipatory Corpse*, by Jeffrey P. Bishop.

"From *The Anticipatory Corpse to the Participatory Body*," *Journal of Medicine and Philosophy* 41, no. 6 (December 2016).

"Geographies and Accompaniment: An Ecclesial Re-Ordering of the Art of Dying," *Studies in Christian Ethics* 29, no. 3 (August 2016): 286–293.

"Clinically Integrated Networks: A Cooperation Analysis," *Health Care Ethics: USA* 23, no. 4 (Fall 2015): 6-10.

"Roman Catholic Teaching on International Debt: Toward a New Methodology for Catholic Social Ethics and Moral Theology," *Journal of Moral Theology* 4, no. 2 (June 2015): 1-17.

"Characterization of a Human Powered Nebulizer Compressor for Resource Poor Settings." With Christopher J. Hallberg, Christopher E. Zmudka, William K. Kopesky, Lars E. Olson. *BME Online* (16 June 2014) 13:77.

"Treatment of Asthma Exacerbations with the Human-Powered Nebuliser: A Randomised Clinical Trial." With Christopher J Hallberg, René Antonio Najarro, Fausto Cea Gil, Clara Villatoro, Ana Celia Diaz de Uriarte, and Lars E Olson. *npj Primary Care Respiratory Medicine* 24, Article number: 14016 (26 June 2014).

"Reverse Innovation from the Least of Our Neighbors: Community Health Workers and U.S. Health Care," *Health Progress* 94, no. 1 (Jan/Feb 2013): 45-52.

"Moral Analysis of a Procedure at Phoenix Hospital," *Origins* 40, no. 33 (Jan. 27, 2011): 537-547.

"Docile Bodies: Transnational Research Ethics as Biopolitics," *Journal of Medicine and Philosophy* 34, 2009, pp. 384-408.

"Respect: Or, How Respect for Persons Became Respect for Autonomy," *Journal of Medicine and Philosophy* 29, no. 6 (December 2004): 665-680.

"Reconstruing Genetic Research as Research," *J Law, Medicine, & Ethics* 26 (1998): 48-54.

Expert Report of M. Therese Lysaught – Page 38

**Chapters in Books**

"Religion and Theology: Western/Abrahamic" in Methods in Medical Ethics, 3rd edition, eds. Jeremy Sugarman and Daniel Sulmasy. Georgetown University Press (in press 2024), with Jonathan Crane and Aasim Padela.

"A Field Hospital for Catholic Bioethics: The Postconciliar Method of Pope Francis in *Laudato Si'* and *Fratelli Tutti*," in *The Gift of Creation*, ed. Mátyás Szalay. Cascade Press (in press 2024).

"Bringing Christ to Christ: The Sacramental and Trinitarian Heart of the Church's Healing Ministry," in *SVD Health Professionals: Participating in God's Mission to Heal*, ed. by Alexandre Rödlach, 131-147. Rome: SVD Publications, 2023.

"Liberating Theological Ethics from the Invisible Hand: Paul Farmer, the World's Poor, and the Quandaries of the Fortunate," in *A Prophet to the Peoples: Paul Farmer's Witness and Theological Ethics*. Co-edited with Jennie Weiss Block and Alexandre A. Martins. 152-180. Pickwick Press, 2023.

"Jesus is My *Coyote*: Rev. Ramon Dagoberto Quinones and the Sanctuary Movement," in *People of God Get Ready! Twelve Misfits, Malcontents and Dreamers for Troubled Times,* edited by Peter Slade, Shea Tuttle, and Jacqueline A. Bussie. 259-282. Wm B. Eerdmans, 2023.

"After COVID-19: Toward a Sacramental Biopolitics," in *Routledge Companion to Christian Ethics*, eds. Rebecca Miles and D. Stephen Long. 372-388. Routledge Press, 2022.

"Catholicism in the Neonatal Context: Belief, Practice, Challenge, Hope." In *Religion and the Ethics in the Neonatal Intensive Care Unit*, edited by Ron Green and George Little. 37-64. Oxford University Press, 2019.

"A Midwife in Egypt: Sr. Mary Stella Simpson." In *Can I Get a Witness? Can I Get a Witness? Thirteen Peacemakers, Community-Builders, and Agitators for Faith and Justice*, ed. Charles Marsh, Daniel Rhodes, and Shea Tuttle. 296-323. Wm B. Eerdmans, 2019.

"Catholic Bioethics Meets Catholic Social Thought: A Problem, a Primer, and a Plan." In *Catholic Bioethics and Social Justice*, co-edited with Michael P. McCarthy. 1-23. Liturgical Press, 2019.

"Outsourcing." In *Catholic Bioethics and Social Justice*, co-edited with Michael P. McCarthy. 267-281. Liturgical Press, 2019. Co-authored with Robert DeVita.

"Incarnating Caritas." In *Incarnate Grace: Perspectives on the Ministry of Catholic Health Care*, edited by Charles Bouchard. 11-26. Catholic Health Association, November 2017. [This book is a sequel to my *Caritas in Communion*].

Expert Report of M. Therese Lysaught – Page 39

"Ritual – A Framework for Ritual at the Deathbed." In *Dying in the Twenty-First Century*, edited by Lydia Dugdale. 67-86. MIT Press, 2015.

**Encyclopedia and Dictionary Articles**

"Human Gene Transfer Research," *Encyclopedia of Bioethics*, 4th Edition. Edited by Bruce Jennings.  Macmillan Reference USA, 2014.

"Human Gene Transfer Research." In *Encyclopedia of Bioethics*, 3rd ed., edited by Stephen G. Post.  NY: Macmillan Reference USA, 2003.

"Body: II. Social Theories." In *Encyclopedia of Bioethics*, 2nd ed., edited by Warren T. Reich, 300-305. New York, NY: Simon and Schuster Macmillan, 1995.

**Lay Publications**

"Commentary on USCCB "'Doctrinal Note on the Moral Limits to the Technological Manipulation of the Human Body,'" *NCR* May 1, 2023.

"Reclaiming the Catholic Moral and Intellectual Tradition from the Culture Wars," *NCR* (April 7, 2022).

"Catholics Seeking 'Religious' Exemptions to Vaccines Must Follow Authentic Church Teaching on Conscience," *NCR* (September 21, 2021).

"All Vaccines are Morally Acceptable, Says Member of Pontifical Academy for Life," *NCR* (March 5, 2021).

"Vatican: It's Unjust (and Dangerous) for Wealthy Nations to Hoard the Covid Vaccine," *America* (January 27, 2021).

"Jesus is With Us in the Boat — A Perspective [on COVID] from Mumbai," in *Renewing Relationship: Essays as We Evolve and Emerge From Pandemic*, ed. by Bruce Compton. Catholic Health Association (November 2020): 29-37. With Sr. Dr. Beena Madhavath.

"Unmasking Neoliberalism's Invisible Grip: Homo Economicus and the Person in Bioethics," *Contending Modernities*, University of Notre Dame, Science and the Human Person Essay Series. July 18, 2019.

**PAPERS & PRESENTATIONS (selected)**

**Peer-Reviewed Conference Papers**

"Building Caregivers' Resiliency in the Global South through a Virtual Program," APHA Annual Meeting, Atlanta, November 14, 2023

"Addressing the Hidden Crisis: Building Women Caregivers' Resiliency and Well-being," Women Deliver 2023 Conference, July 2023, with Carol Tosone, Claudia Llanten, Henry Msoka, Isamar Guion, and Alex Garcia.

"Vicious Trauma: Poverty, Race, Bodies and the Confounding of Virtue Ethics," Annual Meeting of the Society of Christian Ethics, January 2021, with Cory D. Mitchell.

"Economizing Ethics: The Emergence of "Value" in the History of Ethical Theory" on a panel entitled "Deconstructing Value: A Multilayered Theological Analysis of Human Meaning-Making," with Jean-Pierre Fortin, Dan Rhodes, and David Byrne at the conference entitled "What Matters: On Value and Valuing," Toronto School of Theology, May 7-8, 2020, Toronto, Canada (cancelled due to COVID-19).

"Tools for Transformation: Chaplains as Facilitators of Post-Traumatic Growth," with Beth Reece, M.Div., BCCC, Program on Medicine and Religion, Columbus, OH, March 2020 (postponed due to COVID-19).

"Trauma-Informed Bioethics," panel discussion with Julie Gunby and Jacqueline Wolf, ASBH, Oct. 24, 2019.

"Tools for Transformation: Chaplains as Facilitators of Post-Traumatic Growth," with Beth Reece, M.Div., BCCC, National Association of Catholic Chaplains Annual Meeting, May 2019.

"Pope Francis: The Lived Integration of Catholic Social Thought and Catholic Bioethics" at "Pope Francis, A Voice Crying Out in the World: Mercy, Justice, Love and Care for the Earth," Villanova University, April 15-18, 2018.

"A Catholic Social Praxis for US Health Care: Revisioning Catholic Bioethics Via Catholic Social Doctrine," Society of Christian Ethics, January 2018, Portland, Oregon.

"Is the Latest the Greatest?  Ethical Perspectives on Novel Interventions," The Annual Conference of the National Association of Catholic Chaplains, Chicago, IL, April 23, 2016.

"Catholic Perspectives on Embodiment," Three plenaries.  The Third Annual Conference for the Program on Medicine and Religion, Chicago, IL, March 7-9, 2014.

Expert Report of M. Therese Lysaught – Page 41

"Stewardship vs. Caritas: A Challenge to the Principle of Stewardship in Catholic Health Care Ethics," Second Annual Conference of the Program on Medicine and Religion, University of Chicago.  Chicago, IL, May 28, 2013

**<u>Invited Lectures & Presentations</u>**

"Catholic Bioethics and Social Justice," The Marianist Lecture, Chaminade University, Honolulu, October 13, 2024.

"The Human Genome and Anthropological Singularity: The Case of Enhancement," International Bioethics Group, Brussels, Belgium, May 24-26, 2024.

Chair, "From Domination to Responsibility: Rethinking Humancentrism," Pontifical Academy for Life Annual Meeting, "Human. Meaning and Challenges," The Vatican, Rome, February 12-13, 2024.

"Commentary on the USCCB *Doctrinal Note on Technological Manipulation of the Body*," Illinois Catholic Health Association, April 17, 2023.

"Pastoral Accompaniment for the Sick Today," Symposium on *The Leadership of Pope Francis in the Global Health* Emergency, the Health and Healing Unit of PACTPAN (Pan-African Catholic Theology and Pastoral Network), March 25, 2023.

Keynote, "Neither Marketplace nor Battleground: Catholic Universities as Field Hospital for a Better Kind of Politics," Association of Catholic Colleges and Universities Annual Meeting, February 2023.

"Toward a Sacramental Biopolitic," Postgraduate Course in "Theopolitics. New Trends in Political Theology" IFES and certificated by the Pontifical University of Salamanca (UPSA), January 12 and 19, 2023.

"Biopolitics After Neuroscience," the Neuroscience Interest Group, Annual Meeting of the Society of Christian Ethics, Chicago, IL, January 6, 2023.

"Toward a Womanist Bioethics: A Response to Wylin Wilson," John Hope Franklin Humanities Institute, Duke University, December 1, 2022.

"Beyond Catholic Discordance: Pope Francis and the Sacramental Vision of the Second Vatican Council," Spanish Bishops' Conference, Avila Spain, November 2022.

"Sr. Mary Stella Simpson and Health Equity," Valparaiso University, October 25, 2022.

Expert Report of M. Therese Lysaught – Page 42

(293 of 299), Page 293 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 293 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-7    filed 09/23/24    PageID.1323    Page 44
of 50

"Biopolitics After Neuroscience," Pontificia Universidad Católica de Puerto Rico, Ponce, Puerto Rico, October 21, 2022.

"Confronting the Invisible Hand: Neoliberalism and the Future of (Bio)Ethics," Magisterial Lecture, Inter-American University of Puerto Rico, San Juan, Puerto Rico, October 20, 2022.

"Norm Wirzba and the Delight of Dirt," panel respondent, Valparaiso University, October 6, 2022.

Symposium on "Life, Solidarity, Fraternity: The Consistent Ethic in Light of *Fratelli Tutti*", The Bernardin Center, Catholic Theological Union, September 17-18, 2022

Expanded Reason Congress, Universidad Francisco Vittoria, Madrid, Spain, May 22-24, 2022.

"War or Peace?: Toward a Better Kind of Biopolitics," at "Pope Francis, Vatican II, and the Way Forward," March 25-26, 2022, Loyola University Chicago, sponsored by the Hank Center for the Catholic Intellectual Heritage (Loyola University Chicago), the Boisi Center (Boston College), and the Center for Religion and Public Life (Fordham University).

"God v. Mammon: Biopolitics After Neuroscience," Theology, Medicine, and Culture Program, Duke University, April 1, 2022.

"Reimagining Theological Bioethics," Contributions to a Postliberal Theology: A New Beginning, Instituto de Filosofía Edith Stein, Archdiocese of Granada, Spain, and the Pontifical University of Salamanca, March 22, 2022.

"Theological Ethics and Neuroscience," the Neuroscience Interest Group, Annual Meeting of the Society of Christian Ethics, Costa Mesa, CA, January 10, 2022.

"Catholic Bioethics and Social Justice," Opening Keynote, Catholic Health Association of Ontario, Toronto, Canada, October 22, 2021.

"Presentación del Volumen: Covid-9 y ética teológica en America Latina"—Catholic Theological Ethics in a World Church, Latin American Section, July 10, 2021

"(How) Are We (Not) Talking About Race?" Catholic Health Association Assembly Table Talk, June 14 and June 15, 2021, with Michael McCarthy.

"COVID, Community Health, and Catholic Social Teaching," OSF Health, April 14, 2021.

"COVID and Catholic Bioethics: Time to Rethink Our Priorities," St. Mary's College, IN, February 17, 2021.

Expert Report of M. Therese Lysaught – Page 43

"'A Heart Open to the Whole World': The Trinitarian Dynamism of an Integral Human Ecology of Social Friendship in *Laudato Si'* and *Fratelli Tutti,*" Seminar, Pontifical Academy for Life, February 16, 2021.

"'The Spirit of Revolutionary Change': Catholic Social Thought and the Transformation of Catholic Bioethics in a Time of COVID," 2021 Bessette Lecture on Medical Ethics, Kings College, Wilkes-Barre, PA, February 4, 2021.

"Leaving God for God: Reframing Medical Pastoral Care as a Theological Practice," Opening Keynote, Conference on "Dying a Christian Death," Kennedy Institute of Ethics, Georgetown University, Washington, DC, November 6, 2020.

"Healthcare is a Racial Justice Issue," session 4, with Cory Mitchell and Malik Henfield, sponsored by #whitecoatsforblacklives and the Chicago Coalition of Churches, October 28, 2020.

"Tools for Transformation: Chaplains as Facilitators of Post-Traumatic Growth," with Beth Reece, M.Div., B.C.C.C., National Association of Catholic Chaplains, Webinar, June 2020.

"*Las Periferias y El Pan*: The Latin American Influence on Pope Francis' Sacramental Logic and the Conversion of Catholic Bioethics," Summer Institute, Instituto de la Filosofia Edith Stein, Granada, Spain, June 27, 2019.

"Living Instruments of the Church's Mission: Cultivating the Gift of Lay Ministry," Cardinal Stritch University, Celebration of Lay Ministry Symposium, Milwaukee, WI, January 2019.

"Living Instruments of the Church's Mission: The Theology of the Laity and Catholic Health Care," Illinois Catholic Health Association Annual Meeting, Chicago, IL, November 2018.

"What is Theology and Why Does It Matter to Health Care Boards? Conversation with Authors of *Incarnate Grace*," CHA Assembly, San Diego, CA, June 2018.

"That Jagged Little Pill and the Counter-Politics of the Community of the Expelled: A Sacramental Assessment of Psychiatric Medication," Conference on Taking Our Meds Faithfully: Symposium on Christianity & Psychopharmacology. Duke University, Durham, NC, March 2017.

"Which Faith? Which Reason? Which Justice: A Theological Commentary on *Laudato Si'*," Loyola University Chicago Symposium on *Laudato Si'* & the Environment, Chicago, IL, September 2016.

"Pastoral and Palliative Care Resources for Dying Well," Towards a Contemporary Art of Dying--The 5th Annual McDonald Symposium in Theological Ethics at the University of Cambridge, Cambridge, England, May 18-20, 2015.

Expert Report of M. Therese Lysaught – Page 44

"Theological Foundations of Catholic Health Care," CHE Health Leadership Academy, Philadelphia, PA, June 9, 2014.

"Adam Smith or Mother McCauley? Can Catholic Health Care Be For-Profit?" The 11th Annual Conference on Contemporary Catholic Health Care Ethics, The Neiswanger Institute for Bioethics, Loyola University Chicago, Chicago, IL, March 14, 2014.

"Catholicism in the Neonatal Context: Belief, Practice, Challenge, Hope," The Annual Gravens Conference on the Physical and Developmental Environment of the High-Risk Infant in collaboration with the March of Dimes, Clearwater Beach, FL, February 7, 2014.

"Theological Foundations of Catholic Health Care," Catholic Health Association Minnesota, Minneapolis, MN, November 8, 2013.

"Solidarity," Catholic Health East/Trinity Health Catholic Social Practices Webinar Series, October 23, 2013.

"Gratuitousness," Catholic Health East/Trinity Health Catholic Social Practices Webinar series, September 23, 2013.

---

**COURSES TAUGHT**

**Loyola University Chicago**

**Masters**

| | |
|---|---|
| IPS 465 | Theology and Ethics at the End of Life |
| IPS 545 | Foundations of Christian Spirituality |
| IPS 553 | Moral Theology and Christian Ethics |
| IPS 570 | Introduction to Theology and Ministry for Catholic Health Care |
| IPS 599 | Praying for Miracles? |
| BEHL 416 | Catholic Bioethics and Social Justice |
| IPS 596 | Dying Well |
| BEHL 491 | Global Bioethics |
| BEHL 500 | Introduction to Healthcare Mission Leadership |

**Doctoral**

| | |
|---|---|
| BEHL 510 | Theological Bioethics |
| BEHL 510 | Theology, Race, and Catholic Health Care |
| BEHL 510 | Paul Farmer: Medicine and Theology from the Margins |
| BEHL 512 | Canon Law for Catholic Healthcare |

Expert Report of M. Therese Lysaught – Page 45

**Marquette University**

**Graduate**

| | |
|---|---|
| THEO 205 | Introduction to Theological Ethics |
| THEO 6410 | Introduction to Theological Ethics |
| THEO 347 | Christian Social Ethics |
| THEO 385 | Social Justice and Health Care (developed for College of Nursing) |
| THEO 8610 | Catholic Moral Theology |
| THEO 8650 | Catholic Healthcare Ethics |

**Undergraduate**

| | |
|---|---|
| THEO 175 | Medical Ethics |
| THEO 179 | Justice and Morality (majors capstone course) |
| THEO 195 | Independent Study in Medical Ethics |
| THEO 195 | Independent Study on Suffering and Embodiment |
| ARSC 3986 | MU-MCW Bioethics Internship |

**University of Dayton**

**Graduate**

| | |
|---|---|
| REL 500A | Research Methods |
| REL 500D | Foundations of Systematic and Moral Theology (also online) |
| REL 547 | Christian Discipleship |
| REL 561 | Approaches to Morality |
| REL 562 | Contemporary Moral Problems |
| REL 660 | Catholicism, Bioethics, and the U.S. Context |
| REL 660 | Catholic Moral Theology |

**Undergraduate**

| | |
|---|---|
| REL 103 | Introduction to Religion |
| ASI 101-102 | CORE: Interdisciplinary Introduction to Religion and Philosophy |
| ASI 150 | Introduction to the University Experience |
| ASI 375 | CORE Capstone: Professional Ethics in a Global Society |
| REL 363 | Faith and Justice ("The Body Politic in Florence: Saints and the Poor," Florence, Italy, Summer 2005) |
| REL 367 | Christian Ethics and Health Care |
| REL 367 | Christian Ethics and Health Care (The Body Politic in Florence: Theology and Medicine from the Early Church to the Renaissance," Florence, Italy, Summer 2005) |

Expert Report of M. Therese Lysaught – Page 46

**FUNDED GRANTS AND RESEARCH SUPPORT**

In addition to the ~$440,000 in grants I have been awarded for my own research, I have also assisted organizations in securing $1.25M and in managing an additional ~$1M in grants.

LILLY ENDOWMENT: Thriving Congregations Grant, 2021-2025, with the Montreat Conference Center and the Black Mountain School of Theology and Community (October 2020: $1,000,000).

LILLY ENDOWMENT: Called to Lives of Meaning and Purpose Planning Grant, Summer 2017 (May 2017: $50,000; Co-PI).

ASSOCIATION OF THEOLOGICAL SCHOOLS: Innovation Grant Program: "Reimagining Theological Contextual Education: Theological Action Research Teams," 2017-2018 (August 2017: $50,000; Co-PI).

ASSOCIATION OF THEOLOGICAL SCHOOLS: Faculty Development Grant, "Forming Faculty for Integrated Ministerial Formation," 2017-2018 (August 2017: $15,000, PI).

CATHOLIC HEALTH ASSOCIATION: Visiting Scholar, 2012-2013 (June 2012. $40,000).

WABASH CENTER FOR TEACHING AND LEARNING IN THEOLOGY AND RELIGION: "Graduate Teaching Program Initiative," 2010-2012 (June 2010. $15,000).

THE ARETE FOUNDATION, Science of Virtue Program: "The Economy of Virtue: Virtue Theory in Light of Poverty and Neuroscience," with Jeffrey P. Bishop, Amy Laura Hall, and Andrew Michel. 2010-2012 (March 2010.  $225,000)

NATIONAL COLLEGIATE INVENTORS AND INNOVATORS ALLIANCE: "The Human-Powered Nebulizer in Central America," with Lars E. Olson, Ph.D., 2010-2011 (January 2010 $42,000).

CELEBRATING THE CENTENNIAL OF WOMEN: "Women in Theology at Marquette University," 2009-2010 (August 2009, $2,000).

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: "Revision of On Moral Medicine, for the Third Edition," 2006 ($5,500)

LOUISVILLE INSTITUTE: Christian Faith and Life Sabbatical Grant, "Anointing the Sick: Christian Practices, Bodies, and Medical Ethics," 2003-4 ($45,000)

LILLY PROGRAM IN CHRISTIAN LEADERSHIP, UNIVERSITY OF DAYTON: Teaching Grant for "The Vocations of Medicine," 2003 ($3,500)

Expert Report of M. Therese Lysaught – Page 47

(298 of 299), Page 298 of 299 Case: 25-761, 06/12/2025, DktEntry: 26.6, Page 298 of 299
Case 2:22-cv-00319-TOR    ECF No. 89-7    filed 09/23/24    PageID.1328    Page 49
of 50

INTERDISCIPLINARY FACULTY SEMINAR ON RELIGION AND SCIENCE, UNIVERSITY OF DAYTON: Research Grant, 2000 ($3,500)

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: "Gene Therapy and Children: A Test-Case for Human Subjects Research," 1999 ($3,000)

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: Forum on the Catholic Intellectual Tradition Today, "Virgil Michel and the Liturgical Movement: An Undiscovered Source for Liturgy and Ethics," 1998 ($3,000)

DEPARTMENT OF RELIGIOUS STUDIES, UNIVERSITY OF DAYTON: Research Grant, "Liturgy and Ethics in Feminist Theology," 1998 ($3,000)

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: Forum on the Catholic Intellectual Tradition Today, University of Dayton, "In-Ritualed Bodies: Liturgy as the Foundation for Christian Ethics," 1997 ($3,000)

SUMMER RESEARCH GRANT, DEPARTMENT OF RELIGIOUS STUDIES, UNIVERSITY OF DAYTON: 1996 ($3,000)

NATIONAL INSTITUTES OF HEALTH: ELSI Fellowship in Molecular and Clinical Genetics, University of Iowa, 1994 ($40,000)

---

**HONORS & AWARDS**

Expanded Reason Institute, Expanded Reason Award, for *Biopolitics After Neuroscience: Morality and the Economy of Virtue*, 2021.

Catholic Press Association Book Award, Catholic Social Thought, Honorable Mention, for *Catholic Bioethics and Social Justice: The Praxis of US Healthcare in a Globalized World*, 2019.

Catholic Press Association Book Award, Theology, Third Place Honors, for *Gathered for the Journey: Moral Theology in Catholic Perspective*, 2008

University Teaching Fellow, University of Dayton, 1996-97
Graduate Assistantship, Duke University, 1987-1990
Leroy E. Dettman Scholarship, 1987-1988
Graduate Assistantship, University of Notre Dame, 1985-1986
Phi Beta Kappa, Hope College, 1985
Magna Cum Laude, Hope College, 1985
Almon T. Godfrey Senior Prize in Chemistry for Excellence in Scholarship & Research, Hope College, 1985
Sigma Xi Award for Research, Hope College, 1985

Expert Report of M. Therese Lysaught – Page 48

Cupery Research Fellowship, Hope College, 1984
Mortar Board, Hope College, 1984
Jaecker Chemistry Scholarship, Hope College, 1983-1985

---

**PROFESSIONAL MEMBERSHIPS**

Society of Christian Ethics; Catholic Theological Ethics in a World Church

---

Expert Report of M. Therese Lysaught – Page 49