No. 25-761

## In the United States Court of Appeals for the Ninth Circuit

NICHOLAS ROLOVICH,
Plaintiff-Appellant,

v.

WASHINGTON STATE UNIVERSITY, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Washington
Honorable Thomas O. Rice
(2:22-cv-319-TOR)

## EXCERPTS OF RECORD
## VOLUME 6 OF 8

ERIC N. KNIFFIN
KNIFFIN LAW, PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903

ERIC J. SEESE
FROST BROWN TODD LLP
1801 California St., Ste. 2700
Denver, CO 80202

JOSEPH C. DAVIS
 *Counsel of Record*
LUKE W. GOODRICH
ANGELA WU HOWARD
REED M. BARTLEY
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*jdavis@becketfund.org*

*Counsel for Plaintiff-Appellant*

(2 of 289), Page 2 of 289    Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 2 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-6    filed 09/23/24    PageID.1273    Page 3
of 9

**From:** "Rolovich, Nicholas R" <nick.rolovich@wsu.edu>
**To:** HRS Exemptions <hrs.exemptions@wsu.edu>
**Subject:** Religious exemption
**Date:** Mon, 4 Oct 2021 03:49:02 +0000
**Importance:** Normal
**Attachments:** 20211003190246720.pdf

---

Please see the attached exemption form and additional letter.

Nick Rolovich

Exhibit E Page 3

**ER1089**

(3 of 289), Page 3 of 289    Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 3 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-6    filed 09/23/24    PageID.1275    Page 5
of 9

WASHINGTON STATE UNIVERISTY
RELIGIOUS EXEMPTION REQUEST FORM
PROCLAMATION 21-14.1 (COVID-19 VACCINE REQUIREMENT)

Washington State University will provide reasonable accommodations to qualified applicants and employees with sincerely held religious beliefs, practice, or observance that conflict with job requirements, unless providing such accommodations would pose an undue hardship.

**Instructions for employees:**

Initiate request for religious accommodation in Workday. For instructions on completing the COVID-19 Vaccination Verification in Workday refer to COVID-19 Vaccination Verification for Workers.

Below are initial intake questions for you to respond to in requesting a sincerely held religious beliefs, practice, or observance exemption pursuant to Proclamation 21-14.1.

Claiming an exemption/accommodation based on false, misleading, or dishonest information is grounds for disciplinary action up to and including termination from employment.

Complete and return to Human Resource Services, Pullman, WA, no later than October 4, 2021.  To avoid delay, you may submit the form by fax to: 509-335-1259 or email to hrs.exemptions@wsu.edu.   If you have any questions or need more information, please do not hesitate to contact your HRS Service Team.

**Questionnaire:**

1.  Employee Name (Print):  _Nicholas Rolovich_
    WSU ID#        :  _11732256_

2.  Describe the sincerely held religious belief, practice, or observance that is the basis for your request for a religious exemption/accommodation to WSU's COVID-19 vaccination requirement.

    _See attached_

3.  Briefly explain how your sincerely held religious belief, practice, or observance conflicts with WSU's COVID-19 vaccination requirement.

    _See attached_

4.  How long have you held the above religious belief, practice, or observance?

    _See attached_

Religious Exemption Request Form 9/1/2021

1

(4 of 289), Page 4 of 289    Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 4 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-6    filed 09/23/24    PageID.1276    Page 6
of 9

WASHINGTON STATE UNIVERISTY
RELIGIOUS EXEMPTION REQUEST FORM
PROCLAMATION 21-14.1 (COVID-19 VACCINE REQUIREMENT)

5.  If you have ever received a FDA authorized or approved vaccine at any time in your life, please explain how your sincerely held religious belief, practice, or observance causes you to object to the COVID-19 vaccine compared to other vaccines you received.

*See attached*

6.  If the request for accommodation is temporary, please identify the anticipated date the accommodation is no longer needed:  *life*

Washington State University may need to obtain additional follow up information about your strongly held religious belief(s) and/or discuss reasonable accommodations to WSU's COVID-19 vaccination requirement.  Human Resource Services will reach out to you if additional information is needed to process this request.

I certify that I have read and understand the information provided in this request, and that I have truthfully completed it based on my knowledge, information, and belief.  I understand that it is illegal to claim an exemption/ or accommodation on false, misleading, or dishonest grounds, including by providing false, misleading, or dishonest information when seeking an exemption/accommodation, and that any violations will be subject to appropriate legal enforcement and/or discipline.

_____
Employee Signature

_9/28/21_____
Date

**ER1091**

WSU_00000089

(5 of 289), Page 5 of 289    Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 5 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-6    filed 09/23/24    PageID.1277    Page 7
of 9

[Date]

To Whom It May Concern,

I am a baptized Catholic seeking an exemption from WSU's vaccine mandate. This letter explains why my sincerely held religious beliefs prohibit me from accepting the vaccine, and why I am compelled to do so by the teachings of the Roman Catholic Church.

I believe that abortion is the taking of innocent human life. The Roman Catholic Church teaches that I am required to refuse a medical intervention, including a vaccination, when my conscience has come to sure judgment that, as in this case, accepting the vaccine will make me complicit in the abortions that produced the human cell lines from which currently available vaccines are ultimately derived. While the Catholic Church, in principle, does not prohibit the use of vaccines, the following authoritative Church teachings provide the basis on which I have determined that I cannot accept the vaccination:

- Vaccination is not morally obligatory in principle and so must be voluntary. [1]
- There is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions.
- A person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Catholic moral teachings. [2]
- A person is morally required to obey his or her sure conscience. [3]

There is no authoritative Church teaching universally obliging Catholics to receive any vaccine. An individual Catholic may invoke Church teaching to refuse a vaccine developed or produced using abortion- derived cell lines. More generally, a Catholic might refuse a vaccine based on the Church's teachings concerning therapeutic proportionality. Therapeutic proportionality is an assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of

the person, including spiritual, psychological, and bodily goods. [4] It can also extend to the good of others and the common good, which likewise entail spiritual and moral dimensions and are not reducible to public health. The judgment of therapeutic proportionality must be made by the person who is the potential recipient of the intervention in the concrete circumstances, [5] not by public health authorities or by other individuals who might judge differently in their own situations.

While my Bishop encourages vaccines, he also confirms that at the core of the Church's teaching are the first and last points listed above: vaccination is not a universal obligation, and a person must obey the judgment of his or her own informed and certain conscience. In fact, the *Catechism of the Catholic Church* instructs that following one's conscience is following Christ Himself:

> In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law: "Conscience is a law of the mind; yet [Christians] would not grant that it is nothing more; . . . [Conscience] is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ." [6]

WSU_00000090

Because I have come to an informed and sure judgment in conscience that I must not receive the vaccine, the Catholic Church requires that I follow this certain judgment of my conscience. The *Catechism* is clear: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.'" 7

It is important to note that the law provides protection for sincerely held religious beliefs, even when some members of the same Church or denomination disagree with the beliefs held by the individual. Under Title VII, the test is not, in my case, what Pope Francis may believe about vaccinations, but rather, what I believe the Catholic Faith requires of me,

> [i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences . . . and the guarantee of free exercise is not limited to beliefs which are shared by all of the of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the command of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of Ind. Emp't. Sec. Div.*, 450 U.S. 707, 715-716 (1981).

Finally, in response to your questions about any past medicine and vaccinations that I might have received, I can say that I have never knowingly accepted or received medication or vaccine(s) that were derived from the cell lines of aborted fetuses.

I am merely requesting a reasonable accommodation to my sincerely held religious objection to these vaccines. It is difficult to comprehend any undue hardship that would be placed upon WSU by this accommodation since it has been established that those who have been vaccinated are seeing their immunity wane significantly (*see*, Waning immunity of the BNT162b2 vaccine: A nationwide study from Israel, https://www.medrxiv.org/content/10.1101/2021.08.24.21262423v1) (booster shots are required to get the short-lived immunity back), it has been demonstrated that the vaccinated have "breakthrough" infections at an alarming rate, and they also shed the virus just as the unvaccinated (*see, e.g., CDC mask decision followed stunning findings from Cape Cod beach outbreak* https://abcnews.go.com/Politics/cdc-mask-decision-stunning-findings-cape-cod-beach/story?id=79148102).

The same accommodations given to the vaccinated staff to protect themselves and others will be equally efficacious for the unvaccinated.

NOTES

_____

Nick Rolovich

10/3/21

WSU_00000091

1 Congregation for the Doctrine of the Faith (CDF), "Note on the Morality of Using Some Anti-COVID-19 Vaccines," December 17, 2020, n. 5: "At the same time, practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary."

2 See United States Conference of Catholic Bishops (USCCB), *Ethical and Religious Directives for Catholic Health Care Services*, 6th ed. (Washington, DC: USCCB Publishing, 2018), n. 28. Hereafter "*ERDs*."

3 "A human being must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself. Yet it can happen that moral conscience remains in ignorance and makes erroneous judgments about acts to be performed or already committed." *Catechism of the Catholic Church* (Vatican City: Libreria Editrice Vaticana, 1993), www.vatican.va, n. 1790. Hereafter "*CCC*."

4 See *ERDs*, nn. 32-33; nn. 56-57; Part Three, Introduction, para. 2; Part Five, Introduction, para. 3.

5 See *ERDs*, nn. 56-57. Both of these directives state that the proportionality of medical interventions is established "in the patient's judgment."

6 *CCC*, n. 1777, citing John Henry Cardinal Newman, "Letter to the Duke of Norfolk," V, in *Certain Difficulties felt by Anglicans in Catholic Teaching II* (London: Longmans Green, 1885), 248.

7 *CCC*, n. 1782, citing Second Vatican Council, *Dignitatis humanae*, December 7, 1965, n. 3.

Exhibit E Page 9

**ER1094**

WSU_00000092



## CATHOLIC DIOCESE OF SPOKANE

### Office of the Bishop

August 20, 2021

To Whom it may concern:

I have known Nick Rolovich since the summer of 1987. As a newly ordained priest for the Archdiocese of San Francisco, I was assigned to Our Lady of Loretto parish in Novato, CA. At the same time, Nick's parents, Mike and Lori, and their three children moved from San Francisco to the northern most town in Marin County. Prior to his enrollment at Our Lady of Loretto, Nick was a student at Holy Name Catholic school in San Francisco.

The Rolovich family was involved in the parish and regularly attended weekend Mass. In the summer prior to Nick going to the eighth grade, I was assigned to teach at Marin Catholic High School. A year later, Nick entered Marin Catholic. Nick's athletic skills in both football and baseball were often covered in the local press. However, less known was his work as a retreat leader in the Campus Ministry program.

Nick left the area for college, but I would see him and several of his classmates from both Our Lady of Loretto and Marin Catholic whenever he returned to Marin. As with most young people raised in Catholic homes and educated in Catholic schools, young adulthood is a period of questioning, searching, and infrequent involvement in the practice of one's faith. I would say this defined Nick and most of his classmates during their twenties.

Ten years ago, I was ordained a bishop and left Marin to serve in the Diocese of San Jose. When Nick and his wife began their family, Nick contacted me to baptize his children. The birth of children is often the time when a young person reconnects with the religion of their youth.

For the last six years, I have been the Catholic Bishop of Spokane. Our diocese includes the town of Pullman and the Catholic Newman center of St. Thomas More. Once Nick was settled in his new coaching position and relocated his family to Pullman, he contacted me. I am also aware that Nick has introduced himself to Fr. Paul Heric, the Catholic chaplain to WSU. I see this as an expression of a renewed commitment to his relationship to God and the Church.

Finally, I write this letter to shed light on one man's life of faith. I realize this is not easily explained nor often appreciated in the secular society and time in which we live. However, I believe Nick Rolovich is a man of faith who sincerely tries to live his life in a manner that seeks God's will. In time, I hope others will also see this important aspect of Nick's life.

Most Reverend Thomas A. Daly
Catholic Diocese of Spokane

(9 of 289), Page 9 of 289    Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 9 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1201    Page 2
of 64

# Fr Paul Texts

Table of Contents

1  ROLOVICH00030919

2  ROLOVICH00030923

3  ROLOVICH00012142

4  ROLOVICH00034053

5  ROLOVICH00012144

6  ROLOVICH00012146

7  ROLOVICH00001293

8  ROLOVICH00001297

9  ROLOVICH00012150

10  ROLOVICH00034057

11  ROLOVICH00001415

12  ROLOVICH00012152

13  ROLOVICH00012154

14  ROLOVICH00001417

15  ROLOVICH00034059

16  ROLOVICH00034061

17  ROLOVICH00012156

18  ROLOVICH00001300

19  ROLOVICH00001419

20  ROLOVICH00001421

21  ROLOVICH00026028

22  ROLOVICH00035188

23  ROLOVICH00035199

24  ROLOVICH00035200

25  ROLOVICH00026914

26  ROLOVICH00035327

**Chat with "Father Paul" <+15095998437> on July 26, 2021**

All Parties: Father Paul <+15095998437>; +15095955272

Earliest item: 2021-07-26 08:35:43
Latest item: 2021-07-26 11:08:39

**Monday 26 July 2021**

Instant Message : Native Messages                    Time: 08:35:43
From: Father Paul <+15095998437>

How you holding up?

Instant Message : Native Messages                    Time: 08:36:28
From: +15095955272

Without the strength He has given me, I would be a broken man.

Instant Message : Native Messages                    Time: 09:41:13
From: Father Paul <+15095998437>

Here for you.

Exhibit B Page 4

**ER1098**

ROLOVICH00030919

(12 of 289), Page 12 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 12 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1204    Page 5
of 64

Instant Message : Native Messages                          Time: 10:55:58
From: Father Paul <+15095998437>

64901494387__86F5C4CF-204C-432B-8ED3-433249938F42.HEIC



https://p13-
content.icloud.com/M3E49350BA395947F1B60F5BA6C345E8E03765F71
D508FCEC05FB9F0385E3BDFD.C01USN00

---

Instant Message : Native Messages                          Time: 11:02:57
From: Father Paul <+15095998437>

Nick

I found this helpful.

What happens in the end I you got the shot an it was all good. It's a
very good chance it will be. As you said most are getting the variant
who have not gotten the shot. I believe because of the kind of man you
are an your charter getting the vaccine would not impede you. As one
who has worked with college for 20 years I desire to have you so much
at WSU. Your a game changer! Peace.

(13 of 289), Page 13 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 13 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1205    Page 6
of 64

Instant Message : Native Messages                 Time: 11:08:39
From: +15095955272

Thank you for your counsel and info the past few days. It has been
pretty amazing for me with my reconnection with God over the past
year or so. I am awaiting some medical results currently that will help
me with my decision.

**End Thread**

Thread Statistics
**Instant Message Count:** 6

(14 of 289), Page 14 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 14 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1206    Page 7
of 64

**Chat with "Father Paul" <+15095998437> on August 1, 2021**

All Parties: Father Paul <+15095998437>; +15095955272

Earliest item: 2021-08-01 10:28:45
Latest item: 2021-08-01 10:38:39

**Sunday 01 August 2021**

Instant Message : Native Messages                    Time: 10:28:45
From: Father Paul <+15095998437>

Happy Sunday to you Nick in your family.

Instant Message : Native Messages                    Time: 10:29:05
From: +15095955272

Thank you father.

Instant Message : Native Messages                    Time: 10:29:39
From: +15095955272

I realized He carried me through this last week, much like footprints.

Instant Message : Native Messages                    Time: 10:31:38
From: Father Paul <+15095998437>

Yes he has.

Instant Message : Native Messages                    Time: 10:33:02
From: Father Paul <+15095998437>

How is your wife an And children been doing?

Instant Message : Native Messages                    Time: 10:34:21
From: +15095955272

Struggling with schooling decision for this fall. I still love her and honor
her as my wife and mother of our children.

(15 of 289), Page 15 of 289   Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 15 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1207    Page 8
of 64

Instant Message : Native Messages                           Time: 10:34:47
From: +15095955272

I am very proud of the children and the kind young people they have
become.

Instant Message : Native Messages                    Time: 10:38:39
From: Father Paul <+15095998437>

Have you come to a decision about getting the vaccine or not?

**End Thread**

Thread Statistics
**Instant Message Count:** 8

Exhibit B Page 8

**ER1102**

ROLOVICH00030924

**Chat with "Father Paul" <+15095998437> on August 9, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-08-09 12:22:17
Latest item: 2021-08-09 19:35:14

**Monday 09 August 2021**

Instant Message : Native Messages                    Time: 12:22:17
From: Unknown

I read this this morning regarding temptation..."Keep in mind, temptation itself is not a sin. Being tempted is not the same as sinning. Sinning is when you yield to the temptation. Satan uses temptation to move us away from the will of God. He offers the down payment of pleasure, numbing pain, or distraction so that he can come back later for full payment with interest.

Instant Message : Native Messages                    Time: 12:37:27
From: Father Paul <+15095998437>

Fantastic insight.

Instant Message : Native Messages                    Time: 12:44:16
From: Father Paul <+15095998437>

I know your slammed but would love to show the Catholic student center. It's behind the Couge

Instant Message : Native Messages                    Time: 13:04:42
From: Father Paul <+15095998437>

Y the way I met one one with Dean you field goal kicker. What an amazing Man. So impressed. He really loves you as a coach. You need to know your players care about you.

Instant Message : Native Messages                    Time: 15:08:33
From: Unknown

He is amazing, organized a snow removal for some needy people in the community last winter

Instant Message : Native Messages                Time: 19:35:14
From: Father Paul <+15095998437>

All your players I work with are Quality men of God.

**End Thread**

Thread Statistics
**Instant Message Count:** 6

**Chat with "Father Paul" <+15095998437> on August 16, 2021**

All Parties: +15095955272; Father Paul <+15095998437>; Unknown

**Earliest item: 2021-08-16 05:05:00**
**Latest item: 2021-08-16 22:08:41**

**Monday 16 August 2021**

Instant Message : Native Messages                    Time: 05:05:00
From: Unknown

"Providence is the hand of God moving in the glove of history"

Instant Message : Native Messages                    Time: 07:21:15
From: Father Paul <+15095998437>

Again would really like to chat.

Instant Message : Native Messages                    Time: 16:52:54
From: Father Paul <+15095998437>

How was your day?

Instant Message : Native Messages                    Time: 19:46:35
From: Father Paul <+15095998437>

Pure love is capable of great deeds, and it is not broken by difficulty or adversity. As it remains strong in the midst of great difficulties, so too it perseveres in the toilsome and drab life of each day. - Saint Faustina

Instant Message : Native Messages                    Time: 19:47:39
From: Unknown

Thank you

Instant Message : Native Messages                    Time: 19:48:29
From: Father Paul <+15095998437>

This is the root of marriage

**Instant Message : Native Messages**
From: Father Paul <+15095998437>
Time: 22:00:47



**Instant Message : Native Messages**
From: Unknown
Time: 22:01:40

They are gonna fire me Father

**Instant Message : Native Messages**
From: Father Paul <+15095998437>
Time: 22:02:30

Do you know that for sure.

Instant Message : Native Messages          Time: 22:02:42
From: Unknown

Yes

Instant Message : Native Messages          Time: 22:04:44
From: Unknown

Not at all

Instant Message : Native Messages          Time: 22:07:42
From: Father Paul <+15095998437>

Ok. Then know you have my support. Your a man of great courage an conviction.

Instant Message : Native Messages          Time: 22:08:28
From: Father Paul <+15095998437>

I will pray for your heart because I am sure it is breaking.

Instant Message : Native Messages          Time: 22:08:29
From: Unknown

It is only possible now that God has entered my heart

Instant Message : Native Messages          Time: 22:08:41
From: Father Paul <+15095998437>

Amen.

**End Thread**

Thread Statistics
**Instant Message Count:** 15

Exhibit B Page 13

**ER1107**

ROLOVICH00034055

(21 of 289), Page 21 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 21 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1213    Page 14
of 64

**Chat with "Father Paul" <+15095998437> on August 18, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-08-18 10:09:24
Latest item: 2021-08-18 20:31:10

**Wednesday 18 August 2021**

Instant Message : Native Messages            Time: 10:09:24
From: Father Paul <+15095998437>

Know, and fix in your heart, that the Lord is God in the heavens above
and on earth below, and that there is no other. You must keep his
statutes and commandments which I enjoin on you today.

Instant Message : Native Messages            Time: 11:25:35
From: Unknown

Did a proclamation this morning, and enjoyed it.

Instant Message : Native Messages            Time: 11:25:59
From: Father Paul <+15095998437>

Sweet

Instant Message : Native Messages            Time: 13:51:53
From: Father Paul <+15095998437>

Could you send my your talk an power point on the gospel you gave at
Camp.

Instant Message : Native Messages            Time: 13:53:38
From: Father Paul <+15095998437>

Sorry wrong person.

Exhibit B Page 14

ER1108

ROLOVICH00012144

(22 of 289), Page 22 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 22 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1214    Page 15
of 64

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 13:54:44

Peace

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 20:25:11

How was your day

Instant Message : Native Messages
From: Unknown
Time: 20:25:32

Tough

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 20:26:06

Ok. What was going on? What you feeling

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 20:29:50

How was it tough

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 20:31:10

5 Trust in the LORD with all your heart and lean not on your own understanding; 6 in all your ways submit to him, and he will make your paths straight.

**End Thread**

Thread Statistics
**Instant Message Count:** 11

**Chat with "Father Paul" <+15095998437> on August 19, 2021**

All Parties: Father Paul <+15095998437>; Unknown

**Earliest item: 2021-08-19 05:48:01**
**Latest item: 2021-08-19 23:24:30**

**Thursday 19 August 2021**

Instant Message : Native Messages                    Time: 05:48:01
From: Unknown

Father, why would it be that the devil is coming after me so strongly? And so consistently since I arrived in Pullman.

Instant Message : Native Messages                    Time: 06:31:03
From: Father Paul <+15095998437>

Nick Gods grace is enough for you. He has no power over you. You are enough an a beloved son of the Father. You are protected in Jesus name.

Instant Message : Native Messages                    Time: 06:52:06
From: Father Paul <+15095998437>

https://ac.wordonfire.org/Prod/link-tracker?
redirectUrl=aHR0cHMlM0ElMkYlMkZ3d3cud29yZG9uZmlyZS5vcmclMkZw
ZXRlcnNvbi1ib29r&a=999795128&account=wordonfire%2Eactivehosted
%2Ecom&email=yR7bRLKkIBb%2FKS4efJ1KjWydMBTpgs8%2By%2Bzg
O7vf48c%3D&s=790d4a66642529888ed3cfbdb80027b7&i=6524A1308
9A94A1444765

Instant Message : Native Messages                    Time: 07:15:34
From: Father Paul <+15095998437>

https://youtu.be/wlQ2PgQeWmQ

Instant Message : Native Messages                    Time: 07:15:45
From: Father Paul <+15095998437>

Listen to this song

Exhibit B Page 16

ROLOVICH00012146

(24 of 289), Page 24 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 24 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1216    Page 17
of 64

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 07:15:56

I am around all day

---

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 07:42:57

From the book of the prophet Isaiah

11:1-16

---

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 07:43:28

Look this up an read. The Father is raising you up.

---

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 15:23:53

How you holding up right now

---

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 15:25:10

Victor is one happy Man today.

---

Instant Message : Native Messages
From: Unknown

Time: 15:26:25

He makes me happy everyday

---

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 15:26:51

?

Has Pat considered if they let you go how many player may not play?

Exhibit B Page 17

ROLOVICH00012147

**ER1111**

Instant Message : Native Messages    Time: 15:27:32
From: Unknown

I am not sure. He hasn't talked about that

Instant Message : Native Messages    Time: 15:27:53
From: Father Paul <+15095998437>

He really should.

Instant Message : Native Messages    Time: 15:28:18
From: Unknown

I try hard to avoid threats

Instant Message : Native Messages    Time: 15:29:14
From: Unknown

Talked with Bishop Daly today. He agreed to help. How God brought
him back in my life is truly amazing. And you Father

Instant Message : Native Messages    Time: 15:33:02
From: Father Paul <+15095998437>

I know you would never ever

Say that. But I am more interested if they thought of that.

And thank you! You really have inspired me

To think through issues like this at a deeper level.

Instant Message : Native Messages    Time: 16:05:46
From: Unknown

Can I call you later

Instant Message : Native Messages    Time: 16:19:52
From: Father Paul <+15095998437>

Yes

Exhibit B Page 18

**ER1112**

ROLOVICH00012148

Instant Message : Native Messages                    Time: 22:55:21
From: Father Paul <+15095998437>

What is your email

Instant Message : Native Messages                    Time: 22:56:45
From: Unknown

Nrolo21@hotmail.com

Instant Message : Native Messages                    Time: 23:21:47
From: Father Paul <+15095998437>

good conscience is another fundamental element of Christian moral
teaching. "Conscience is a judgment of reason by which the human
person recognizes the moral quality of a concrete act" (CCC, no. 1796).
"Man has in his heart a law inscribed by God. . . . His conscience is
man's most secret core, and his sanctuary" (GS, no. 16).

Instant Message : Native Messages                    Time: 23:24:30
From: Father Paul <+15095998437>

Based on are conversations Nick this is what I have heard you saying.

**End Thread**

Thread Statistics
**Instant Message Count:** 23

**ER1113**

ROLOVICH00012149

**Chat with "Father Paul" <+15095998437> on August 20, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-08-20 05:26:56
Latest item: 2021-08-20 23:50:40

**Friday 20 August 2021**

Instant Message : Native Messages                      Time: 05:26:56
From: Unknown

I like the first definition or quote.

Instant Message : Native Messages                      Time: 05:27:40
From: Unknown

Have you read the poem "If"?

Instant Message : Native Messages                      Time: 05:39:26
From: Unknown

"God has a way of blessing you exactly where you experienced the pain the most."

Ephraim, meaning " God has made me fruitful in the land of my affliction."

This made sense to me, this team is like something I've never been around. The % of love and commitment in a very troubling time is unmatched. I am grateful for them.

Instant Message : Native Messages                      Time: 06:54:23
From: Father Paul <+15095998437>

I believe I have.

Instant Message : Native Messages                      Time: 07:18:19
From: Father Paul <+15095998437>

The definition I send you on conscience is the classic one from the catholic catechism. I recommend you spend allot of thought with it.

(28 of 289), Page 28 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 28 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1220    Page 21
of 64

Instant Message : Native Messages          Time: 07:19:44
From: Father Paul <+15095998437>

I am coming to practice today. Over looking the practice field on top.

Instant Message : Native Messages          Time: 07:21:00
From: Unknown

I've noticed you before. You attack the stairs with a vigor of a college
hill resident. Its keeping you young father.

Instant Message : Native Messages          Time: 07:22:01
From: Father Paul <+15095998437>

My calves are huge.

Instant Message : Native Messages          Time: 08:28:05
From: Father Paul <+15095998437>

Your proclamation today

Lord, + open my lips.

– And my mouth will proclaim your praise.

Instant Message : Native Messages          Time: 11:16:12
From: Father Paul <+15095998437>

Entrust your cares to the Lord *

and he will support you.

He will never allow *

the just man to stumble.

Instant Message : Native Messages          Time: 11:17:19
From: Unknown

Do you think he allows for stumbles?

Exhibit B Page 21

ER1115

ROLOVICH00001294

**Instant Message : Native Messages**     Time: 11:18:06
From: Unknown

I feel like a just man can stumble but may never fall in the Lords eyes?

**Instant Message : Native Messages**     Time: 11:21:59
From: Father Paul <+15095998437>

We all stumble yet our focus cannot not be on that. Our interior gaze on the Lord is what keep fixed on him. It's that interior Sanctuary of the Heart that keeps us focused.

**Instant Message : Native Messages**     Time: 11:22:33
From: Unknown

I'm on that train. Makes sense

**Instant Message : Native Messages**     Time: 11:23:27
From: Father Paul <+15095998437>

Yes you are. One day at a time.

**Instant Message : Native Messages**     Time: 11:24:52
From: Father Paul <+15095998437>

I have something for you. You free at 1 for me to drop it off?

**Instant Message : Native Messages**     Time: 11:40:20
From: Unknown

I should be, unless they call me to another meeting

**Instant Message : Native Messages**     Time: 13:14:55
From: Father Paul <+15095998437>

I am outside your complex

Exhibit B Page 22

ROLOVICH00001295

**ER1116**

Instant Message : Native Messages                    Time: 13:15:14
From: Unknown

I'll be right down

Instant Message : Native Messages                    Time: 13:15:14
From: Father Paul <+15095998437>

First foor

Instant Message : Native Messages                    Time: 22:28:29
From: Father Paul <+15095998437>

How you doing?

Instant Message : Native Messages                    Time: 23:50:40
From: Father Paul <+15095998437>

What time is practice

**End Thread**

Thread Statistics
**Instant Message Count:** 22

Exhibit B Page 23

ER1117

ROLOVICH00001296

**Chat with "Father Paul" <+15095998437> on August 24, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-08-24 08:22:23
Latest item: 2021-08-24 19:32:18

**Tuesday 24 August 2021**

Instant Message : Native Messages                    Time: 08:22:23
From: Father Paul <+15095998437>

4. "Talent wins games, but teamwork and intelligence win championships."

Instant Message : Native Messages                    Time: 08:25:55
From: Father Paul <+15095998437>

"You never know how strong you are, until being strong is your only choice." "Calm mind brings inner strength and self-confidence, so that's very important for good health." "Life doesn't get easier or more forgiving, we get stronger and more resilient." "Courage is grace under pressure."

Instant Message : Native Messages                    Time: 09:44:49
From: Father Paul <+15095998437>

Are you around I want to bring something to you

Instant Message : Native Messages                    Time: 10:59:02
From: Unknown

In a meeting. Are you here?

Instant Message : Native Messages                    Time: 10:59:46
From: Father Paul <+15095998437>

In five. I want to drop off the religious exemption form from the diocese for you to sign

Exhibit B Page 24

ER1118

ROLOVICH00001297

Instant Message : Native Messages
From: Unknown
Time: 11:00:25

Ok, I can come down when you get here

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 11:03:59

Here

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 13:16:02

https://youtu.be/wlQ2PgQeWmQ

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 13:16:25

This is how much you ate love.

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 18:42:54

How things going.

Instant Message : Native Messages
From: Unknown
Time: 19:23:01

Great, excited to see Uniontown

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 19:23:54

Nice. Any word from Pat?

Instant Message : Native Messages
From: Unknown
Time: 19:24:32

No, I haven't turned anything in yet

ROLOVICH00001298

(33 of 289), Page 33 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 33 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1225    Page 26
of 64

Instant Message : Native Messages                    Time: 19:32:18
From: Father Paul <+15095998437>

Ok

**End Thread**

Thread Statistics
**Instant Message Count:** 14

(34 of 289), Page 34 of 289   Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 34 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1226    Page 27
of 64

**Chat with "Father Paul" <+15095998437> on August 28, 2021**

All Parties: Father Paul <+15095998437>; Unknown

**Earliest item: 2021-08-28 08:28:40**
**Latest item: 2021-08-28 09:31:07**

**Saturday 28 August 2021**

Instant Message : Native Messages
From: Unknown
Time: 08:28:40

Next time we get a few minutes, I would love to discuss Babylon.

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 08:29:58

Ok. Don't know allot allot. But sure

Instant Message : Native Messages
From: Unknown
Time: 08:30:50

I will do some research. Is it mentioned in the Old Testament?

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 08:31:26

That would be great.

Instant Message : Native Messages
From: Father Paul <+15095998437>
Time: 09:27:41

You an your wife have plans tonight

Instant Message : Native Messages
From: Unknown
Time: 09:28:38

Watching football games on TV. What do you have in mind?

Instant Message : Native Messages                    Time: 09:29:54
From: Father Paul <+15095998437>

Well! We're you watching football

Instant Message : Native Messages            Time: 09:30:36
From: Unknown

At my home, I am not going out. If I get covid I'm done here. Staying in my bubble

Instant Message : Native Messages                    Time: 09:31:07
From: Father Paul <+15095998437>

I know that.

**End Thread**

Thread Statistics
**Instant Message Count:** 9

**ER1122**

ROLOVICH00012151

**Chat with "Father Paul" <+15095998437> on September 3, 2021**

All Parties: Father Paul <+15095998437>; Unknown

**Earliest item: 2021-09-03 08:07:06**
**Latest item: 2021-09-03 15:09:00**

**Friday 03 September 2021**

Instant Message : Native Messages                    Time: 08:07:06
From: Father Paul <+15095998437>

"When you pass through the waters, I will be with you; and through the rivers, they shall not overwhelm you; when you walk through fire you shall not be burned, and the flame shall not consume you."

Isaiah 43:2

Instant Message : Native Messages                    Time: 08:08:28
From: Unknown

Thats a good one, good timing

Instant Message : Native Messages                    Time: 08:10:04
From: Father Paul <+15095998437>

Know that you will be taken care of. You have a great support system. Lots of love for you Nick.

Instant Message : Native Messages                    Time: 13:34:26
From: Father Paul <+15095998437>

How you doing

Instant Message : Native Messages                    Time: 14:55:27
From: Unknown

Great

Instant Message : Native Messages                    Time: 14:55:38
From: Unknown

These boys get to play tomorrow

Instant Message : Native Messages                    Time: 15:06:37
From: Father Paul <+15095998437>

Yes sir they do. And you are there leader.

Instant Message : Native Messages                    Time: 15:07:38
From: Unknown

"Their". Men of the clothe must still have proper grammar Father. Thank you for your presence

Instant Message : Native Messages                    Time: 15:08:15
From: Father Paul <+15095998437>

Shit. I flunk grammar.

Instant Message : Native Messages                    Time: 15:08:39
From: Unknown

But you aced goodness

Instant Message : Native Messages                    Time: 15:09:00
From: Father Paul <+15095998437>

Sometimes. Thank u

**End Thread**

Thread Statistics
**Instant Message Count: 11**

ER1124

ROLOVICH00034058

(38 of 289), Page 38 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 38 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1230    Page 31
of 64

**Chat with "Father Paul" <+15095998437> on September 8, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-09-08 06:04:25
Latest item: 2021-09-08 13:57:05

**Wednesday 08 September 2021**

Instant Message : Native Messages                  Time: 06:04:25
From: Unknown

Today is a new day and I'm excited about it.

Instant Message : Native Messages                  Time: 07:32:15
From: Father Paul <+15095998437>

Praise God

Instant Message : Native Messages                  Time: 13:02:02
From: Father Paul <+15095998437>

Hey are you free to chat in person

Instant Message : Native Messages                  Time: 13:05:04
From: Unknown

Sure

Instant Message : Native Messages                  Time: 13:07:48
From: Unknown

I have a meeting with Pat shortly but should be available sometime
after that

Instant Message : Native Messages                  Time: 13:19:17
From: Father Paul <+15095998437>

Ok. Praying for you. I think it's time if he does not know about your
taking the religious exemption.

Exhibit B Page 31

**ER1125**

ROLOVICH00001415

Instant Message : Native Messages                    Time: 13:49:44
From: Unknown

I am done with Pat, if you want to get together

Instant Message : Native Messages                    Time: 13:50:09
From: Father Paul <+15095998437>

Yes. On my way Dow.

Instant Message : Native Messages                    Time: 13:57:05
From: Father Paul <+15095998437>

Outside

**End Thread**

Thread Statistics
**Instant Message Count:** 9

Exhibit B Page 32

ROLOVICH00001416

**ER1126**

**Chat with "Father Paul" <+15095998437> on September 14, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-09-14 08:46:25
Latest item: 2021-09-14 18:56:36

**Tuesday 14 September 2021**

Instant Message : Native Messages                    Time: 08:46:25
From: Father Paul <+15095998437>

B

rothers and sisters:

Christ Jesus, though he was in the form of God,

did not regard equality with God something to be grasped.

Rather, he emptied himself,

taking the form of a slave,

coming in human likeness;

and found human in appearance,

he humbled himself,

becoming obedient to death,

even death on a cross.

Because of this, God greatly exalted him

and bestowed on him the name

that is above every name,

that at the name of Jesus

every knee should bend,

of those in heaven and on earth and under the earth,

and every tongue confess that

Jesus Christ is Lord,

to the glory of God the Father.

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 18:10:01

Hello Coach how have you been doing?

Instant Message : Native Messages
From: Unknown

Time: 18:11:24

I've been ok, deadline is approaching

Instant Message : Native Messages
From: Father Paul <+15095998437>

Time: 18:11:55

Did you fill out your paperwork

Instant Message : Native Messages
From: Unknown

Time: 18:56:36

Not yet

**End Thread**

Thread Statistics
**Instant Message Count:** 5

ROLOVICH00012153

(42 of 289), Page 42 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 42 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1234    Page 35
of 64

**Chat with "Father Paul" <+15095998437> on September 27, 2021**

All Parties: Father Paul <+15095998437>; Unknown

**Earliest item: 2021-09-27 09:33:52**
**Latest item: 2021-09-27 10:56:11**

**Monday 27 September 2021**

Instant Message : Native Messages                    Time: 09:33:52
From: Father Paul <+15095998437>

I am in Spokane till Wednesday. If you need anything please let me know.

---

Instant Message : Native Messages                    Time: 09:43:39
From: Father Paul <+15095998437>

Philippians 1:20, 21

I know that I shall never be put to shame,

because my hopes and expectations have never been disappointed.

I fully trust that now as always

– Christ will be glorified in me,

whether I live or die.

For to me life is Christ, and death is gain.

– Christ will be glorified in me,

whether I live or die.

---

Instant Message : Native Messages                    Time: 10:37:37
From: Father Paul <+15095998437>

Do you have 10 minutes to talk

---

Instant Message : Native Messages                    Time: 10:40:47
From: Father Paul <+15095998437>

It's regarding Abe

---

**ER1129**

ROLOVICH00012154

Instant Message : Native Messages          Time: 10:55:44
From: Unknown

Can you give me 20 minutes

Instant Message : Native Messages          Time: 10:56:11
From: Father Paul <+15095998437>

Yes

**End Thread**

Thread Statistics
**Instant Message Count:** 6

Exhibit B Page 36

ER1130

ROLOVICH00012155

**Chat with "Father Paul" <+15095998437> on October 5, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-10-05 12:53:36
Latest item: 2021-10-05 21:25:01

**Tuesday 05 October 2021**

Instant Message : Native Messages                    Time: 12:53:36
From: Father Paul <+15095998437>

Nick I'm walking by your place in the next five minutes are you in your office to chat or free to?

Instant Message : Native Messages                    Time: 12:54:23
From: Unknown

Ok

Instant Message : Native Messages                    Time: 13:00:40
From: Father Paul <+15095998437>

Outside

Instant Message : Native Messages                    Time: 20:29:31
From: Father Paul <+15095998437>

What will you do if you get the religious Exemption, and others don't? Plus already some have not

Instant Message : Native Messages                    Time: 21:22:41
From: Unknown

Who has not?

Instant Message : Native Messages                    Time: 21:25:01
From: Father Paul <+15095998437>

Gotten the Exemption

**ER1131**

ROLOVICH00001417

**End Thread**

Thread Statistics

**Instant Message Count:** 6

**Chat with "Father Paul" <+15095998437> on October 12, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-10-12 10:32:39
Latest item: 2021-10-12 17:50:24

**Tuesday 12 October 2021**

Instant Message : Native Messages                    Time: 10:32:39
From: Father Paul <+15095998437>

Is it possible for you to send out a notice to players that if they are interested in attending a Varsity Bible study tonight an every Tuesday at 7pm. My place. Abe an Liam will be leading it. Thanks.

Instant Message : Native Messages                    Time: 10:33:37
From: Unknown

I probably have to let Liam or Abe send it out

Instant Message : Native Messages                    Time: 10:33:58
From: Father Paul <+15095998437>

Ok.

Instant Message : Native Messages                    Time: 17:05:39
From: Father Paul <+15095998437>

How is you day

Instant Message : Native Messages                    Time: 17:05:59
From: Unknown

Up and down

Instant Message : Native Messages                    Time: 17:06:34
From: Father Paul <+15095998437>

Ready to head into mass in 5 min. This mass is for you.

(47 of 289), Page 47 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 47 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1239    Page 40
of 64

Instant Message : Native Messages                    Time: 17:06:54
From: Unknown

Thank you

Instant Message : Native Messages          Time: 17:07:20
From: Father Paul <+15095998437>

Gods got this

Instant Message : Native Messages          Time: 17:50:24
From: Father Paul <+15095998437>

I need fire wood for the winter. You mentioned you went to get some,

Were?

**End Thread**

Thread Statistics
**Instant Message Count:** 9

(48 of 289), Page 48 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 48 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1240    Page 41
of 64

**Chat with "Father Paul" <+15095998437> on October 13, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-10-13 08:22:03
Latest item: 2021-10-13 23:07:33

**Wednesday 13 October 2021**

Instant Message : Native Messages                    Time: 08:22:03
From: Father Paul <+15095998437>

Hey Chris Parks wife Anna is in surgery till 4pm today.

Instant Message : Native Messages                    Time: 09:48:48
From: Unknown

Yes, I texted him

Instant Message : Native Messages                    Time: 19:44:46
From: Unknown

I got some firewood from a guy named Len in Endicott. Not sure if he
has more ready but I can ask if you want?

Instant Message : Native Messages                    Time: 20:55:15
From: Unknown

He has more if you would like me to schedule a delivery forbyou

Instant Message : Native Messages                    Time: 20:55:49
From: Father Paul <+15095998437>

That would be great.

Exhibit B Page 41

ROLOVICH00034061

Instant Message : Native Messages                    Time: 23:07:33
From: Father Paul <+15095998437>

Courage doesn't mean you don't get afraid. Courage means you don't let fear stop you.

Bethany Hamilton

**End Thread**

Thread Statistics
**Instant Message Count:** 6

**ER1136**

ROLOVICH00034062

### Chat with "Father Paul" <+15095998437> on October 18, 2021

All Parties: Father Paul <+15095998437>; Unknown

**Earliest item: 2021-10-18 09:57:08**
**Latest item: 2021-10-18 19:25:27**

---

**Monday 18 October 2021**

---

Instant Message : Native Messages                    Time: 09:57:08
From: Father Paul <+15095998437>

And I am certain that God, who began the good work within you, will continue His work until it is finally finished on the day when Christ Jesus returns. ~ Philippians 1:6. So we say with confidence, "The Lord is my helper; I will not be afraid. What can mere mortals do to me?

---

Instant Message : Native Messages                    Time: 12:49:03
From: Father Paul <+15095998437>

I am free all day if you need anything

---

Instant Message : Native Messages                    Time: 16:20:57
From: Father Paul <+15095998437>

The LORD is my shepherd, I shall not be in want. he restores my soul. He guides me in paths of righteousness for his name's sake. Even though I walk through the valley of the shadow of death, I will fear no evil, for you are with me; your rod and your staff, they comfort me.

---

Instant Message : Native Messages                    Time: 17:10:11
From: Father Paul <+15095998437>

I love you an believe in you soooo much.

---

Instant Message : Native Messages                    Time: 17:13:13
From: Father Paul <+15095998437>

I am outside

---

**Instant Message : Native Messages**  Time: 17:42:03
From: Unknown

I wasn't allowed back in the building

**Instant Message : Native Messages**  Time: 17:42:45
From: Father Paul <+15095998437>

That sucks. I am sooo sorry.

**Instant Message : Native Messages**  Time: 17:42:56
From: Father Paul <+15095998437>

We're you at

**Instant Message : Native Messages**  Time: 17:47:17
From: Father Paul <+15095998437>

What about your Religious exemption

**Instant Message : Native Messages**  Time: 17:47:47
From: Father Paul <+15095998437>

Do you want to come to the Newman Center? And abe would to get the team to come to the church

**Instant Message : Native Messages**  Time: 18:03:31
From: Father Paul <+15095998437>

So you know St Gall is always unlocked.

**Instant Message : Native Messages**  Time: 19:25:27
From: Father Paul <+15095998437>

Hey please give my number to the other coaches. I am here for you all.

**End Thread**

Thread Statistics
**Instant Message Count: 12**

### Chat with "Father Paul" <+15095998437> on October 21, 2021

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-10-21 07:35:44
Latest item: 2021-10-21 10:38:54

**Thursday 21 October 2021**

Instant Message : Native Messages                     Time: 07:35:44
From: Unknown

Is there any mass during the week in the area?

Instant Message : Native Messages          Time: 08:02:04
From: Father Paul <+15095998437>

9 am today at st Boniface

Instant Message : Native Messages          Time: 08:02:39
From: Father Paul <+15095998437>

5:10 at Newman center

Instant Message : Native Messages          Time: 08:26:28
From: Father Paul <+15095998437>

Pm

Instant Message : Native Messages          Time: 09:42:17
From: Father Paul <+15095998437>

Nick do you have time tomorrow to meet up?

Instant Message : Native Messages          Time: 09:45:33
From: Father Paul <+15095998437>

We need to talk about the law suit

ROLOVICH00001300

(53 of 289), Page 53 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 53 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1245    Page 46
of 64

Instant Message : Native Messages          Time: 09:46:09
From: Father Paul <+15095998437>

Also, please call Bishop Daily

Instant Message : Native Messages          Time: 10:38:51
From: Father Paul <+15095998437>

Church is concerned with dignity of each human being.

Each person has inherent freedom…the gift of free will from God.
That's the heart of all morality.

Vatican note here on vaccines need to be voluntary….paragraph 5.  But
there comes with that freedom obligations…to take steps to protect
others and the common good.  With every right comes a responsibility .

Example of abortion.  Mother has freedom…but when she bears a child,
The baby has a right to life…mother has obligations to preserve that
life.  Freedom is not exclusive.

Back to vaccines…coach has freedom to say no vaccine…that's ok.  But
he then should be required to take all measures to reduce risk of
spreading virus…mask, testing etc.

That's the perfect world…but we don't live in a perfect world.  The state
upholds abortion, violating the freedom of the baby.  The state also has
many laws that violate one's freedom to some degree.  Some are moral
(traffic laws) some are not ….abortion….death penalty…other
examples.  And vaccine mandate could be said to fall in that category.

Church complies with laws…just and unjust,  but one's freedom of
conscience also comes into play….

Bottom line:  call them to think deeply about the issues…learn the
teaching….know that Christ is present….avoid the spin, bitterness etc of
the debate.

--

Exhibit B Page 46

ER1140

ROLOVICH00001301

Instant Message : Native Messages                    Time: 10:38:54
From: Father Paul <+15095998437>

This is what I am preaching on.

**End Thread**

Thread Statistics

**Instant Message Count:** 9

**Chat with "Father Paul" <+15095998437> on November 4, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-11-04 11:18:12
Latest item: 2021-11-04 13:21:33

**Thursday 04 November 2021**

Instant Message : Native Messages          Time: 11:18:12
From: Father Paul <+15095998437>

Hello. How have you been doing.

Instant Message : Native Messages          Time: 11:21:01
From: Unknown

I think they will win the Pac 12

Instant Message : Native Messages          Time: 11:25:29
From: Father Paul <+15095998437>

So do I.

Instant Message : Native Messages          Time: 12:39:29
From: Father Paul <+15095998437>

So how are you doing personally and how was your trip

Instant Message : Native Messages          Time: 12:40:30
From: Unknown

I'm ok, confused, scared, why me stuff. Trip was wonderful

Instant Message : Native Messages          Time: 13:20:11
From: Father Paul <+15095998437>

I know. An get it.

Exhibit B Page 48

ROLOVICH00001419

Instant Message : Native Messages          Time: 13:20:21
From: Father Paul <+15095998437>

"Consider it pure joy, my brothers, and sisters, whenever you face trials of many kinds because you know that the testing of your faith produces perseverance. Let perseverance finish its work so that you may be mature and complete, not lacking anything. If any of you lacks wisdom, you should ask God, who gives generously to all without finding fault, and it will be given to you."

Instant Message : Native Messages          Time: 13:21:26
From: Father Paul <+15095998437>

In my experience this kind of suffering it's a preparation for things to come. Know I'm here for you I love you can't believe in you

Instant Message : Native Messages          Time: 13:21:33
From: Father Paul <+15095998437>

And

**End Thread**

Thread Statistics
**Instant Message Count:** 9

(57 of 289), Page 57 of 289   Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 57 of 289
Case 2:22-cv-00319-TOR   ECF No. 89-3   filed 09/23/24   PageID.1249   Page 50
of 64

**Chat with "Father Paul" <+15095998437> on November 5, 2021**

All Parties: Father Paul <+15095998437>; Unknown

Earliest item: 2021-11-05 10:47:24
Latest item: 2021-11-05 12:52:00

**Friday 05 November 2021**

Instant Message : Native Messages                    Time: 10:47:24
From: Unknown

1 Corinthians 12, is a wonderful lesson I will use with the next team I coach.

Instant Message : Native Messages                    Time: 10:48:36
From: Unknown

1 Corinthians 13, 1-2 really spoke to me todday

Instant Message : Native Messages                    Time: 10:50:06
From: Father Paul <+15095998437>

That is simply awesome. I can't wait till the day comes. One of my favorites

Instant Message : Native Messages                    Time: 10:51:46
From: Father Paul <+15095998437>

It what way is it speaking.

Instant Message : Native Messages                    Time: 10:52:35
From: Unknown

Truth. In the purpose of living

Instant Message : Native Messages                    Time: 10:53:09
From: Father Paul <+15095998437>

Amen.

Instant Message : Native Messages                    Time: 10:53:40
From: Father Paul <+15095998437>

I am glad your thinking about coaching.

Instant Message : Native Messages                    Time: 10:54:08
From: Unknown

Yeah, me too

Instant Message : Native Messages                    Time: 10:56:05
From: Father Paul <+15095998437>

Young people need your heart an courage. This is just the beginning of
how God is preparing you. Suffering is the greatest resume out there.

Instant Message : Native Messages                    Time: 10:57:30
From: Unknown

James 1:3-4

Instant Message : Native Messages                    Time: 10:58:25
From: Father Paul <+15095998437>

Yesssss. Love this.

Instant Message : Native Messages                    Time: 12:52:00
From: Father Paul <+15095998437>

Hi Nick would your son like to make some money raking leaves I've got
a backyard in a front yard full of them I'll pay them $75

**End Thread**

Thread Statistics
**Instant Message Count: 12**

**ER1145**

ROLOVICH00001422

(59 of 289), Page 59 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 59 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1251    Page 52
of 64

# Instant Message

| | |
|---|---|
| Source: | Native Messages |
| Service Identifier: | +19039321449 |
| From:Identifier: | +15095998437 |
| From:Role: | From |
| From:Name: | Father Paul |
| From:Identifier Type: | PhoneNumber |
| From:Normalized Identifier: | +15095998437 |
| Body: | Romans 8:38-39<br>For I am convinced that neither death nor life, neither angels nor demons, neither the present nor the future, nor any powers, neither height nor depth, nor anything else in all creation, will be able to separate us from the love of God that is in Christ Jesus our Lord. |
| Identifier: | *Empty Value* |
| Time Stamp: | 2021-11-27 16:54:46 |
| Attachment: | *Empty Object* |
| Status: | Read |
| Type: | Sms |
| Folder: | Inbox |
| Source Application: | Native Messages |
| Parent Source: | Native Messages |

ROLOVICH00026028

(60 of 289), Page 60 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 60 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1252    Page 53
of 64

# Instant Message

| | |
|---|---|
| Source: | Native Messages |
| Service Identifier: | +19039321436 |
| From:Identifier: | +15095998437 |
| From:Role: | From |
| From:Name: | Father Paul |
| From:Identifier Type: | PhoneNumber |
| From:Normalized Identifier: | +15095998437 |
| Body: | Love some. I think Ian have the new virus though |
| Identifier: | *Empty Value* |
| Time Stamp: | 2022-01-07 02:15:23 |
| Attachment: | *Empty Object* |
| Status: | Read |
| Type: | Sms |
| Folder: | Inbox |
| Source Application: | Native Messages |
| Parent Source: | Native Messages |

ROLOVICH00035188

(61 of 289), Page 61 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 61 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1253    Page 54
of 64

# Instant Message

| | |
|---|---|
| Source: | Native Messages |
| Service Identifier: | *Empty Value* |
| From:Identifier: | *Empty Value* |
| From:Role: | From |
| From:Is Phone Owner: | Yes |
| To:Identifier: | +15095998437 |
| To:Role: | To |
| To:Name: | Father Paul |
| To:Identifier Type: | PhoneNumber |
| To:Normalized Identifier: | +15095998437 |
| Body: | Or we can meet at Roost but im not wearing a mask |
| Identifier: | *Empty Value* |
| Time Stamp: | 2022-01-14 15:39:37 |
| Attachment: | *Empty Object* |
| Status: | Sent |
| Type: | AppMessage |
| Folder: | Sent |
| Source Application: | Native Messages |
| Parent Source: | Native Messages |

Exhibit B Page 54

ROLOVICH00035199

(62 of 289), Page 62 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 62 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1254    Page 55
of 64

# Instant Message

| | |
|---|---|
| Source: | IMS Service |
| From:Identifier: | 14153286745 |
| From:Role: | From |
| From:Name: | *Empty Value* |
| From:Is Phone Owner: | Yes |
| From:Identifier Type: | PhoneNumber |
| From:Normalized Identifier: | +14153286745 |
| To:Identifier: | +15095998437 |
| To:Role: | To |
| To:Name: | Father Paul |
| To:Identifier Type: | PhoneNumber |
| To:Normalized Identifier: | +15095998437 |
| Body: | Or we can meet at Roost but im not wearing a mask |
| Time Stamp: | 2022-01-14 15:39:37 |
| Date Delivered: | *Empty Value* |
| Attachment: | *Empty Object* |
| Status: | *Empty Value* |
| Type: | Sms |
| Folder: | Sent |
| SMSC: | *Empty Value* |
| Source Application: | IMS Service |

Exhibit B Page 55

ROLOVICH00035200

ER1149

(63 of 289), Page 63 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 63 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1255    Page 56
of 64

# Instant Message

| | |
|---|---|
| Source: | Native Messages |
| Service Identifier: | *Empty Value* |
| From:Identifier: | 5095998437 |
| From:Role: | From |
| From:Name: | Father Paul |
| From:Identifier Type: | PhoneNumber |
| From:Normalized Identifier: | +15095998437 |
| To:Identifier: | 4153286745 |
| To:Role: | To |
| To:Name: | *Empty Value* |
| To:Is Phone Owner: | Yes |
| To:Identifier Type: | PhoneNumber |
| To:Normalized Identifier: | +14153286745 |
| Subject: | *Empty Value* |
| Body: | |

The Lord's descent into hell
"What is happening? Today there is a great silence over the earth, a great silence, and stillness, a great silence because the King sleeps; the earth was in terror and was still, because God slept in the flesh and raised up those who were sleeping from the ages. God has died in the flesh, and the underworld has trembled.
Truly he goes to seek out our first parent like a lost sheep; he wishes to visit those who sit in darkness and in the shadow of death. He goes to free the prisoner Adam and his fellow-prisoner Eve from their pains, he who is God, and Adam's son.
The Lord goes in to them holding his victorious weapon, his cross. When Adam, the first created man, sees him, he strikes his breast in terror and calls out to all: 'My Lord be with you all.' And Christ in reply says to Adam: Â'And with your spirit.Â' And grasping his hand he raises him up, saying: Â'Awake, O sleeper, and arise from the dead, and Christ shall give you light. Â'I am your God, who for your sake became your son, who for you and your

Exhibit B Page 56

ROLOVICH00026914

(64 of 289), Page 64 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 64 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1256    Page 57
of 64

descendants now speak and command with authority those in prison: Come forth, and those in darkness: Have light, and those who sleep

Identifier: *Empty Value*

Time Stamp: 2022-04-16 21:11:23

Attachment: *Empty Object*

Attachments:Filename: pkeys.jpg

Attachments:Content Type: image/jpeg

Attachments:Data: 3290

Attachments:URL: *Empty Value*

Attachments:Attachment Extracted Path: files\Image\PART_1650143485499_pkeys.jpg

Attachments:Filename: vuoto.gif

Attachments:Content Type: image/gif

Attachments:Data: 49

Attachments:URL: *Empty Value*

Attachments:Attachment Extracted Path: files\Image\PART_1650143485507_vuoto.gif

Attachments:Filename: back.jpg

Attachments:Content Type: image/jpeg

Attachments:Data: 2659

Attachments:URL: *Empty Value*

Attachments:Attachment Extracted Path: files\Image\PART_1650143485512_back.jpg

ROLOVICH00026915

(65 of 289), Page 65 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 65 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1257    Page 58
of 64

| | |
|---|---|
| Attachments:Filename: | up.jpg |
| Attachments:Content Type: | image/jpeg |
| Attachments:Data: | 2715 |
| Attachments:URL: | *Empty Value* |
| Attachments:Attachment Extracted Path: | files\Image\PART_1650143485518_up.jpg |
| Attachments:Filename: | psearch_f.jpg |
| Attachments:Content Type: | image/jpeg |
| Attachments:Data: | 2103 |
| Attachments:URL: | *Empty Value* |
| Attachments:Attachment Extracted Path: | files\Image\PART_1650143485523_psearch_f.jpg |
| Attachments:Filename: | riga_int.jpg |
| Attachments:Content Type: | image/jpeg |
| Attachments:Data: | 6744 |
| Attachments:URL: | *Empty Value* |
| Attachments:Attachment Extracted Path: | files\Image\PART_1650143485529_riga_int.jpg |
| Status: | Read |
| Type: | Mms |
| Folder: | Inbox |
| Source Application: | Native Messages |
| Parent Source: | Native Messages |

ER1152

ROLOVICH00026916

(66 of 289), Page 66 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 66 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1258    Page 59
of 64



ER1153

ROLOVICH00026917

Exhibit B Page 60

ROLOVICH00026918







Exhibit B Page 62

ROLOVICH00026920

**ER1156**

Exhibit B Page 63

**ER1157**

ROLOVICH00026921

(71 of 289), Page 71 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 71 of 289
Case 2:22-cv-00319-TOR    ECF No. 89-3    filed 09/23/24    PageID.1263    Page 64
of 64

# Instant Message

| | |
|---|---|
| Source: | Native Messages |
| Service Identifier: | *Empty Value* |
| From:Identifier: | *Empty Value* |
| From:Role: | From |
| From:Is Phone Owner: | Yes |
| To:Identifier: | +15095998437 |
| To:Role: | To |
| To:Name: | Father Paul |
| To:Identifier Type: | PhoneNumber |
| To:Normalized Identifier: | +15095998437 |
| Body: | Not yet, and my phone died and i missed church. I mowed the lawn and did pushups. Talked to God a bit about forgiveness. Do you think the lawsuit is considered revenge? |
| Identifier: | *Empty Value* |
| Time Stamp: | 2022-05-15 21:36:58 |
| Attachment: | *Empty Object* |
| Status: | Sent |
| Type: | Sms |
| Folder: | Sent |
| Source Application: | Native Messages |
| Parent Source: | Native Messages |

Exhibit B Page 64

ROLOVICH00035327

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

NICOLAS ROLOVICH,

              Plaintiff,

    v.

WASHINGTON STATE
UNIVERSITY,

              Defendant.

CASE NO:  2:22-CV-00319-TOR

**DECLARATION OF NICHOLAS ROLOVICH**

1.    My name is Nicholas Rolovich. I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

2.    I first met Fr. Paul Heric in July 2021.

3.    Fr. Paul is a Catholic priest and was at the time the Chaplain of the St. Thomas More Catholic Cougs Student Center at WSU.

4.    I was introduced to Fr. Paul through one of my football players, Liam Ryan, who encouraged me to talk to Fr. Paul and gave me his cell phone number.

5.    After I first reached out to Fr. Paul, our relationship developed through text messages, phone calls, and time spent together in person.

6.    Our conversations covered a wide range of topics including my Catholic faith; how to understand my obligations as father, husband, and coach; how to be a spiritual leader for others; and how to help our athletes deal with adversity and loss.

7.    Father Paul quickly became a friend and someone I looked to for advice and encouragement.

8.    I credit Father Paul with helping me reconnect with the Catholic faith of my youth and grow closer to God.

9.    As part of our conversations, I asked for Fr. Paul's spiritual direction and advice as I struggled with what to do in response to the pressure I was under to get a COVID-19 vaccine.

10.    At first, Fr. Paul encouraged me to comply with WSU's wishes and get vaccinated.

11.    However, as I continued to share my thoughts and concerns with Father Paul, he told me I needed to understand my decision about the vaccine in light of the Catholic Church's teaching on my religious obligation to form and then follow my conscience.

DECLARATION OF NICHOLAS ROLOVICH - 2

ER1160

12.    Fr. Paul shared with me selections from the Catholic Catechism on the conscience and encouraged me to spend time with them.

13.    Fr. Paul also shared with me moral guidance related to COVID-19 vaccines developed by the Diocese of Spokane.

14.    Fr. Paul encouraged me to talk to my bishop, Bishop Daly, about how my Catholic faith related to my decision on the COVID vaccination.

15.    At Fr. Paul's prompting, I reached out to and spoke with my bishop.

16.    It was through Fr. Paul's counsel and my study of the materials he sent me that I came to understand that I had a religious obligation as a Catholic to follow my conscience and decline to take a COVID vaccination.

17.    On several occasions, Fr. Paul encouraged me and prompted me to submit a request for religious exemption to WSU.

18.    Fr. Paul continues to be a friend and mentor I rely on for spiritual direction and encouragement.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 23rd day of September 2024, at Novato, California.


*Nick Rolovich*
_____
Nicholas Rolovich

DECLARATION OF NICHOLAS ROLOVICH - 3

1  BRIAN FAHLING, WSBA #18894
2  Law Office of Brian Fahling
   559 Old Mill Rd
3  Sandpoint, ID 83864
   (425) 802-7326
4
5  ERIC KNIFFIN
   Kniffin Law PLLC
6  102 S. Tejon St., Suite 1100
   Colorado Springs, CO 80903
7  (719) 212-4391
8  ERIC JOB SEESE
   Frost Brown Todd LLP
9  1801 California Street, Suite 2700
   Denver, CO 80202
10 (303) 406-4990
11
12              **UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF WASHINGTON**
13
14  NICHOLAS ROLOVICH,
                                        NO. 2:22-cv-00319
15            Plaintiff,
16      v.                              **PLAINTIFF'S**
                                        **STATEMENT OF**
17  WASHINGTON STATE                    **MATERIAL FACTS**
    UNIVERSITY,                         **NOT IN DISPUTE**
18
            Defendant.
19
20
21
22
23
24  PLAINTIFF'S STATEMENT OF              **LAW OFFICE OF BRIAN FAHLING**
    MATERIAL FACTS NOT IN DISPUTE                    559 Old Mill Rd
    NO. 2:22-cv-00319-TOR                            Sandpoint, ID 83864
                                                       (425) 802-7326
                                                E: bfahling@fahlinglaw.com

                        **ER1162**

### A. Rolovich Consults with Religious Authorities and Reaches a Firm Conclusion about his Religious Duty

1. Plaintiff Nick Rolovich met Fr. Paul Heric, a Catholic priest and the Chaplain at the St. Thomas More Catholic Cougs Student Center at WSU, in July 2021. Kniffin Decl. Ex. A ¶¶ 2-3.

2. Over the summer of 2021, Rolovich came to count Fr. Paul as a friend and someone he looked to for advice and encouragement. Kniffin Decl. Ex. A. ¶¶ 5–7.

3. Rolovich credits Fr. Paul with helping him reconnect with the Catholic faith of his youth and grow closer to God. Kniffin Decl. Ex. A ¶ 8; Kniffin Decl. Ex. B at 6.

4. As part of their conversations, Rolovich asked Fr. Paul for spiritual direction and advice as to what to do with the conflict and confusion he was feeling in response to pressure to receive a COVID-19 vaccine. Kniffin Decl. Ex. A ¶ 9.

5. At first, Fr. Paul encouraged Rolovich to comply with WSU's wishes and get vaccinated. Kniffin Decl. Ex. A ¶ 10, Ex. B. at 5.

6. However, as Rolovich continued to share his thoughts and concerns with Fr. Paul, Fr. Paul told him that he needed to understand his decision about the vaccine in light of the Catholic Church's teaching on the conscience. Kniffin Decl. Ex. A ¶ 11.

7. When Rolovich told Fr. Paul he believed WSU would fire him unless he got a COVID vaccine, and that he was determined to follow what he understood as his religious obligation to decline, Fr. Paul responded,

> Ok. Then know you have my support. Your a man of great courage and conviction.

Kniffin Decl. Ex. B at 12-13.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 1

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

ER1163

8.  Fr. Paul shared with Rolovich selections from the Catholic Catechism on the
conscience and encouraged Rolovich to spend time with them. Kniffin Decl. Ex. A ¶
12; Kniffin Decl. Ex. B at 19-20.

9.  Fr. Paul also shared with Rolovich moral guidance related to COVID-19
vaccines developed by the Diocese of Spokane. Kniffin Decl. Ex. A ¶ 13, Ex. B at 5.

10. Fr. Paul encouraged Rolovich to talk to his bishop, Bishop Daly, about how
his Catholic faith related to my decision on the COVID vaccination. Kniffin Decl.
Ex. A ¶ 14.

11. At Fr. Paul's prompting, Rolovich reached out to and spoke with Bishop
Daly. Rolovich wrote to Fr. Paul,

> Talked with Bishop Daly today. He agreed to help. How God brought
> him back in my life is truly amazing. And you Father.

Kniffin Decl. Ex. B. at 18.

12. Bishop Daly later released a public letter testifying that he had known
Rolovich in various capacities and that he saw Rolovich's growing relationship with
Fr. Paul "as an expression of a renewed commitment to his relationship to God and
the Church." Kniffin Decl. Ex. C.

13. Bishop Daly concluded his letter,

> Finally, I write this letter to shed light on one man's life of faith. I realize
> this is not easily explained nor often appreciated in the secular society
> and time in which we live. However, I believe Nick Rolovich is a man
> of faith who sincerely tries to live his life in a manner that seeks God's
> will. In time, I hope others will also see this important aspect of Nick's
> life.

Kniffin Decl. Ex. C.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 2

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

ER1164

14.It was through Fr. Paul's counsel and through Rolovich's study of the Catholic materials that Fr. Paul provided him that Rolovich came to understand that he had a religious obligation as a Catholic to follow his conscience and decline to take a COVID vaccination. Kniffin Decl. Ex. A ¶ 16.

15.On several occasions, Fr. Paul encouraged and prompted Rolovich to submit a request for religious exemption to WSU. Kniffin Decl. Ex. A ¶ 17; Kniffin Decl. Ex. B at 24, 31, 34.

16.Fr. Paul continues to be a friend and mentor that Rolovich relies on for spiritual direction and encouragement. Kniffin Decl. Ex. A ¶ 18.

**B. Rolovich Informs Chun of Intent to File for Religious Exemption**

17.On August 19, 2021, the day after Governor Inslee announced a new COVID-19 vaccine mandate that covered WSU employees, Rolovich told WSU Athletics Director Pat Chun ("Chun") that he intended to seek a religious exemption from the new mandate. Kniffin Decl. Ex. D at 4.

18.In an email to the Board of Regents, WSU President Kirk Schulz acknowledged that the Rolovich "situation has made many of our alumni, fans, supporters, and employees angry, embarrassed, and eager for the administration (and me personally) to show some leadership." Kniffin Decl. Ex. D at 3.

**C. Rolovich Applies for Religions Exemption**

19.On October 4, 2024, Rolovich submitted his request for a religious exemption to WSU's Human Resource Services (HRS) office. Kniffin Decl. Ex. E at 3 *et seq*.

20.Rolovich's request for a religious exemption was based on a form letter prepared by the National Catholic Bioethics Center (NCBC), which he modified. Kniffin Decl. Ex. F ¶ 13.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 3

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

21. The stated purpose of Rolovich's request was to "explain[] why [his] sincerely held religious beliefs prohibit [him] from accepting the vaccine, and why [he was] compelled to do so by the teachings of the Roman Catholic Church." Kniffin Decl. Ex. E at 7.

22. Rolovich's request articulated two separate religious grounds for his exemption request. First, Rolovich's request states, "An individual Catholic may invoke Church teaching to refuse a vaccine developed or produced using abortion-derived cell lines." "The Roman Catholic Church teaches that I am required to refuse a medical intervention, including a vaccination, when my conscience has come to sure judgment that, as in this case, accepting the vaccine will make me complicit in the abortions that produced the human cell lines from which currently available vaccines are ultimately derived." Kniffin Decl. Ex. E at 7.

23. Second, Rolovich's request states that "a Catholic might refuse a vaccine based on the Church's teaching concerning therapeutic proportionality. Therapeutic proportionality is an assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods. It can also extend to the good of others and the common good, which likewise entail spiritual and moral dimensions and are not reducible to public health." Kniffin Decl. Ex. E at 7.

24. Rolovich's request also states, "While my Bishop encourages vaccines, he also confirms that at the core of the Church's teaching are the first and last points listed above: vaccination is not a universal obligation, and a person must obey the judgment of his or her own informed and certain conscience." Kniffin Decl. Ex. E at 7.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 4

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

25. Rolovich's request also states, "Because I have come to an informed and sure judgment in conscience that I must not receive the vaccine, the Catholic Church requires that I follow this certain judgment of my conscience." Kniffin Decl. Ex. E at 8.

26. Rolovich supplemented his request with detailed references to the Catechism of the Catholic Church, the Second Vatican Council, a document from the Vatican's Congregation for the Doctrine of the Faith entitled "Note on the Morality of Using some Anti-COVID-19 Vaccines," and a document from United States Conference of Catholic Bishops Conference entitled "Ethical and Religious Directives for Catholic Health Services, 6th ed." Kniffin Decl. Ex. E at 9.

**D. Details regarding WSU's Review Process**

27. An article published in the WSU Insider on October 8, 2021, describes the process that WSU had established to review employees' requests for religious exemptions from the Governor's vaccine mandate. Kniffin Decl. Ex. G.

28. The WSU Insider article states, "For employees, the exemption requests go through a two-step process. The first is the blind review," "meaning the identities of the individuals of the individuals requesting exemptions are unknown to the members of the review committee except in instances when additional information is needed through follow-up contact." Kniffin Decl. Ex. G at 4.

29. The WSU Insider article states, "Employee religious requests are reviewed by a committee consisting of a team from WSU's Human Resource Services as well as the university's Office of Civil Rights and Compliance." Kniffin Decl. Ex. G at 4.

30. The WSU Insider article states, "The Washington Attorney General's Office is being consulted on criteria WSU is using to decide the exemption requests and

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 5

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

providing legal advice to both [the religious exemption request review committee and the medical exemption request review committee] as needed." Kniffin Decl. Ex. G at 4.

31. The WSU Insider article states, "Then, if an exemption is approved, the request moves to a separate accommodation review step where a determination is made whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community." Kniffin Decl. Ex. G at 4.

32. The WSU Insider Article states, "Employees are provided the opportunity to supply additional information before final decisions are made." Kniffin Decl. Ex. G at 4.

33. This same review process was also explained in an article written by sportswriter Jon Wilner, for which WSU President for Communications Phil Weiler was interviewed. Kniffin Decl. Ex. H.

34. According to the Wilner article, "The blind review was designed to create fairness for employees across all WSU campuses, regardless of position or salary." Kniffin Decl. Ex. H at 2.

35. According to the Wilner article, "If the exemption request were approved via the blind process, then his supervisor, athletic director Pat Chun, would determine if Rolovich could carry out his duties effectively and keep the public safe." Kniffin Decl. Ex. H at 3.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 6

ER1168

### E.  Washington State Human Resources' Guidance on Evaluating Religious Accommodation Requests

36. WSU's religious exemption review committee also relied on a document

provided through the State Human Resources (SHR) division, entitled "Guidance on

Evaluating Religious Accommodation Requests. Kniffin Decl. Ex. I.

37. This Guidance advises that "[w]hen reviewing [a] request [for religious

exemption,] agency should follow these abiding principles:

- Presume a religious belief to be sincerely held.

- Be cognizant that religious beliefs are not static and are susceptible to change over the course of a person's life.

- Remember the fact that an individual is not a frequent observer of their faith or had not previously made their faith public does not necessarily limit its sincerity."

Kniffin Decl. Ex. I at 4, ¶ 2.

38. This Guidance also notes that under "[f]ederal guidance on religious

accommodation," an employer "should review the request on its own merits" and

"initiate discussion with the employee about whether an employee's religious belief

is sincerely held." Kniffin Decl. Ex. I at 4–5, ¶ 4.

39. The end of the Guidance includes, under "Resources," a link to Section 12 of

the U.S. Equal Employment Opportunity Commission's (EEOC) Compliance

Manual, Religious Discrimination, available at

https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination. Kniffin

Decl. Ex. I at 7.

40. The Guidance's "Resources" section also links to the EEOC's Technical

Guidance, "What You Should Know About COVID-19 and the ADA, the

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 7

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

**ER1169**

Rehabilitation Act, and Other EEO Laws," available at
https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws. Kniffin Decl. Ex. I at 7.

**F. WSU Review Committee Approves Rolovich Exemption Request**

41. On October 6, HRS notified the Athletics Department that WSU's review committee had "engaged in a good faith review" of Rolovich's application and had concluded that his exemption request was "based on a sincerely held religious belief." Kniffin Decl. Ex. J at 3.

**G. WSU Athletics Department Challenges Review Committee's Determination**

42. On October 13, the Athletics Department submitted a letter to HRS challenging the review committee's conclusion that Rolovich's exemption request was based on a sincere religious belief. Kniffin Decl. Ex. K.

43. That letter claimed that "Rolovich has made several statements that cast doubt on his claimed sincerely held religious belief." Kniffin Decl. Ex. K at 5.

44. That letter concludes, "In sum, throughout the multiple individual and group meetings, Rolovich made it clear that he refused to be vaccinated based on the conclusions he reached through his own research, he only mentioned religion after the Governor issued the Proclamation requiring vaccination, and then only mentioned religion in reference to seeking an exemption from the vaccination requirement. We believe these facts support re-evaluation of the claimed sincerely held religious belief." Kniffin Decl. Ex. K at 6.

45. When HRS employee Bonnie Dennler received this memorandum, she promptly notified legal counsel. Kniffin Decl. Ex. L at 95:15-19.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 8

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

46. Any conversations that HRS had regarding Rolovich's request for a religious exemption request between the time HRS received this October 13 memorandum from the Athletics Department and when WSU gave Rolovich "Written Notice of Intent to Terminate for Just Cause" were conducted in the presence of legal counsel. Kniffin Decl. Ex. L at 108:22-111:24.

47. WSU's "review committee did not request additional information from Plaintiff regarding his asserted religious objection to the COVID-19 vaccines between the time he submitted materials in support of his religious accommodation request on October 3, 2021, and when WSU denied his request on October 18, 2021." Kniffin Decl. Ex. M at 6.

## H. WSU Gives Rolovich "Written Notice of Intent to Terminate for Just Cause"

48. On October 18, Rolovich received an email from HRS stating that his request for a religious exemption had been denied. That email states in part, "Based on your comments, in conjunction with the timing of your request for a religious accommodation, the University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement." Kniffin Decl. Ex. N at 3.

49. Moments later, Chun hand delivered to Rolovich a letter giving him "Written Notice of Intent to Terminate for Just Cause," which said that his "failure to comply with the vaccination requirement . . . rendered [him] legally unable to perform [his] duties as Head Coach," said his "personal decision to forego a COVID-19 vaccination" amounted to a "deliberate and serious violation[]" of his contractual duties. Kniffin Decl. Ex. O at 3-4.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 9

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

(85 of 289), Page 85 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 85 of 289
Case 2:22-cv-00319-TOR    ECF No. 89    filed 09/23/24    PageID.1188    Page 11
of 14

1

## I. WSU Denies Rolovich's Administrative Appeals

2   50. On November 2, pursuant to Paragraph 4.3 of his employment agreement,

3   Rolovich appealed WSU's "Written Notice of Intent to Terminate for Just Cause" to

4   Chun. ECF 29 at 27 *et seq.*

5   51. On November 12, Chun rejected Rolovich's appeal. Part of Chun's letter

6   provides detail regarding "the University's decision that you do not have a sincerely

7   held religious belief that conflicts with the University's vaccine requirement":

8
> Prior to the Governor's proclamation, and since the beginning of the
9   pandemic, you openly and freely expressed your opposition to the
    vaccine and other COVID-19 mitigation efforts on numerous occasions
10  to numerous people, citing your own "scientific" research and making
    statements mirroring several specific online conspiracy theories, which
11  included demonstrably false claims. In addition, at no point did you ever
    mention any religious concerns (ex: regarding fetal tissue). Therefore,
12  your current claim that your private, unexpressed concerns were actually
    religious in nature is simply not credible. Your statement that you and
13  some of your staff had unsuccessfully tried to secure documentation for
    a medical exemption undermines your claim. Only *after* it became clear
14  that a religious exemption was your only other option did you claim to
    have religious beliefs that conflict with the vaccine requirement. It is
15  understandable that you would want the University's review to exclude
    information regarding your own prior statements in Its decision;
16  however, under EEOC Guidance, these are appropriate considerations,
    and your assertion to the contrary is false. Further, under EEOC
17  Guidance, personal or philosophical beliefs do not give an individual a
    basis to claim a religious exemption.
18

19
20  Kniffin Decl. Ex. P at 5.

21  52. On November 26, Rolovich filed a second administrative appeal to President

22  Kirk Schulz. ECF 29 at 11 *et seq.*

23  53. On December 6, President Schulz responded to Rolovich's appeal by letter.

24  That letter said in part, "The record in the written materials establishes that the

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 10

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

ER1172

(86 of 289), Page 86 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 86 of 289
Case 2:22-cv-00319-TOR    ECF No. 89    filed 09/23/24    PageID.1189    Page 12
of 14

University had a legitimate basis to question whether you have a sincerely held religious belief, practice, or observance that conflicts with the vaccination requirement." Kniffin Decl. Ex. Q at 4.

54. President Schulz's letter ends, "In conclusion, your appeal is denied. Under Paragraph 4.3 of the Agreement, this is the final decision of the University." Kniffin Decl. Ex. Q at 5.

**J. WSU Expert Reports**

55. The Expert Report of Renee DiResta, prepared for Defendant WSU in this matter, concludes:

> Based on the above, it is my opinion that Mr. Rolovich indeed harbored significant reservations about being vaccinated for COVID-19, but the concerns he expressed in the private messages that I observed between him and his close associates throughout this period fall into the realm of safety concerns and conspiracy theories, rather than religious objections to vaccination.

Kniffin Decl. Ex. R ¶ 53.

56. The Expert Report of M. Theresa Lysaught, prepared for Defendant WSU in this matter, concludes:

> Thus, in my opinion, to conclude that a baptized Catholic could be "required" as a Catholic to refuse COVID-19 vaccination requires a significant distortion, misunderstanding, or misrepresentation of Catholic teaching.

Kniffin Decl. Ex. F ¶ 88.

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 11

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

**ER1173**

(87 of 289), Page 87 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 87 of 289
Case 2:22-cv-00319-TOR    ECF No. 89    filed 09/23/24    PageID.1190    Page 13
of 14

1   DATED this 23rd day of September 2024.

2                                              **LAW OFFICE OF BRIAN FAHLING**

3                                              /s/ Brian Fahling

4                                              Brian Fahling WSBA #18894
                                               559 Old Mill Rd
5                                              Sandpoint, ID 83864
                                               Tele: 425.802.7326
6                                              Email: bfahling@fahlinglaw.com

7                                              **KNIFFIN LAW PLLC**

8
                                               /s/ Eric Kniffin
9                                              Eric Kniffin CO Bar # 48016
                                               102 S. Tejon Street, Suite 1100
10                                             Colorado Springs, CO 80903
                                               Tele: 719-212-4391
11                                             Email: eric@kniffin.law
                                               *Admitted pro hac vice*
12

13                                             **FROST BROWN TODD LLP**

14                                             /s/ E. Job Seese
                                               E. Job Seese, CO Bar # 48379
15                                             Michael A. Freimann, CO Bar #35430
                                               Mamie Ling, CO Bar #49483
16                                             Meredith Grant, CO Bar #59667
                                               1801 California Street, Suite 2700
17                                             Denver, CO 80202
                                               Tele: 303.623.9000
18                                             jseese@fbtlaw.com
                                               mfreimann@fbtlaw.com
19                                             mling@fbtlaw.com
                                               mgrant@fbtlaw.com
20                                             Tele: (303) 406-4990
                                               *Admitted pro hac vice*
21

22                                             *Attorneys for Plaintiff*

23

24

PLAINTIFF'S STATEMENT OF                                          **LAW OFFICE OF BRIAN FAHLING**
MATERIAL FACTS NOT IN DISPUTE                                              559 Old Mill Rd
NO. 2:22-cv-00319-TOR - 12                                                Sandpoint, ID 83864
                                                                          (425) 802-7326
                                                                   E: bfahling@fahlinglaw.com

# ER1174

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of September 2024, I electronically filed the

forgoing MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of

Court using the CM/ECF System, which in turn automatically generated a Notice of

Electronic Filing (NEF) to all parties in the case who are registered users of the

CM/ECF system. The NEF for the foregoing specifically identifies recipients of

electronic notice. I hereby certify that none of the represented parties are non-

CM/ECF participants.

By: /s/ E. Job Seese
E. Job Seese

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
NO. 2:22-cv-00319-TOR - 13

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

ER1175

1   ROBERT W. FERGUSON
    Attorney General
2   SPENCER W. COATES, WSBA #49683
    Assistant Attorney General
3   800 Fifth Avenue, Suite 2000
    Seattle, WA  98104-3188
4   (206) 464-7744
    ZACHARY J. PEKELIS, WSBA #44557
5   W. SCOTT FERRON, WSBA #61154
    Special Assistant Attorneys General
6   PACIFICA LAW GROUP LLP
    1191 2nd Avenue, Suite 2000
7   Seattle, WA  98101-3404
    (206) 245-1700

8
                    **UNITED STATES DISTRICT COURT**
9                   **EASTERN DISTRICT OF WASHINGTON**

10  NICHOLAS ROLOVICH,                    NO. 2:22-cv-00319-TOR

11                  Plaintiff,            DEFENDANT WSU'S ANSWER
                                          TO PLAINTIFF'S SECOND
12      v.                                AMENDED COMPLAINT

13  WASHINGTON STATE
    UNIVERSITY, an agency of the
14  State of Washington,

15                  Defendant.[1]

16  _____

17      [1]Previous Defendants Patrick Chun and Governor Jay Inslee have been

18  removed from the case caption, consistent with the Court's order granting in part

19  Defendants' Motions to Dismiss. ECF Nos. 33, 57. The Second Amended

20  Complaint disregards those orders by continuing to refer to Mr. Chun and

21  Governor Inslee as "Defendants" and specifically pleading claims against them

22  that the Court previously dismissed with prejudice. WSU denies that any claims

DEFENDANT WSU'S ANSWER TO            1        ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                        Complex Litigation Division
COMPLAINT                                          800 Fifth Avenue, Suite 2000
                                                     Seattle, WA  98104-3188
                                                         (206) 464-7744

**GENERAL DENIAL**

Defendant Washington State University (WSU), by and through its attorneys, Robert W. Ferguson, Attorney General of Washington, Spencer W. Coates, Assistant Attorney General, and Zachary J. Pekelis and W. Scott Ferron, Special Assistant Attorneys General, hereby answer Plaintiff's Second Amended Complaint (SAC). Except as expressly admitted or qualified, WSU denies each and every allegation, statement, or charge in the SAC (whether contained in numbered paragraphs, unnumbered paragraphs, headings, or elsewhere), and denies that Plaintiff is entitled to any of the relief requested. To the extent that section and subsection headings used in the SAC constitute allegations to which a response is required, those allegations are denied.

## I.    INTRODUCTION

1.    Paragraph 1 asserts allegations regarding Plaintiff's purported motivations or legal conclusions or argument, none of which requires a response by way of factual pleading. To the extent a response is required, Paragraph 1 is denied.

2.    Paragraph 2 asserts legal conclusions to which no response is required, and contains characterizations of the SAC which speaks for itself. To the extent a response is required, Paragraph 2 is denied.

---

against Mr. Chun or Governor Inslee remain in or could be asserted in this action. *See* ECF No. 57.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**ER1177**

## II.    JURISDICTION AND VENUE

3.    Paragraph 3 asserts a legal conclusion to which no response is required. To the extent a response is required, Paragraph 3 is denied.

4.    Paragraph 4 asserts legal conclusions to which no response is required, and contains characterizations of an Employment Agreement that speaks for itself. To the extent a response is required, Paragraph 4 is denied.

## III.    EXHUASTION OF ADMINISTRATIVE PROCEDURES/REMEDIES

### A.    WSU Administrative Process

5.    The first sentence of Paragraph 5 contains characterizations of an Employment Agreement that speaks for itself. To the extent a response is required, WSU admits that the Employment Agreement allowed Plaintiff to appeal to the University President or designee a decision of the Athletic Director regarding termination for just cause. WSU admits that Plaintiff timely responded to the Athletic Director's notice of the provisions of the Agreement alleged to have been violated and that Plaintiff timely appealed the Athletic Director's decision to terminate for just cause. WSU admits that President Schultz denied Mr. Rolovich's appeal of the Athletic Director's decision on or about December 6, 2021. Paragraph 5 is otherwise denied.

### B.    Equal Employment Opportunity Commission/Washington State Human Rights Commission

6.    WSU admits that Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), and that EEOC notified

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

3

## ER1178

1  WSU of this charge on February 17, 2022. The remainder of Paragraph 6 contains

2  legal conclusions or argument to which no response is required. To the extent a

3  further response is required, the allegations are denied.

4       7.    WSU admits that the U.S. Department of Justice's Civil Rights

5  Division (DOJ) issued a Notice of Right to Sue to Plaintiff on August 16, 2022.

6  WSU is without information sufficient to form a belief as to the truth of the

7  remaining allegations in Paragraph 7 and therefore denies them.

8  **C.**    **Department of Enterprise Services—Office of Risk Management (Tort Claim)**

9       8.    Admit.

10       9.    Admit.

11       10.    Paragraph 10 contains legal conclusions or argument to which no

12  response is required. To the extent a further response is required, the allegations

13  are denied.

14  **IV.   PARTIES**

15       11.    WSU admits that Plaintiff was the Head Football Coach for WSU

16  from January 14, 2020, until his employment was terminated on December 6,

17  2021. WSU is without information sufficient to form a belief as to the truth of

18  the remaining allegations in Paragraph 11 and therefore denies them.

19       12.    Admit.

20       13.    WSU admits that Patrick Chun is the Athletics Director for WSU

21  and that he was sued in his individual capacity before being dismissed by this

22

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Court as a Defendant on May 30, 2023, and again on October 24, 2023. WSU

2    denies that Plaintiff may assert any claims against Mr. Chun. The remainder of

3    Paragraph 13 contains legal conclusions or argument to which no response is

4    required. To the extent a further response is required, the allegations are denied.

5            14.    WSU admits that Jay Inslee is the Governor of Washington and that

6    he was sued in his official capacity before being dismissed by this Court as a

7    Defendant on May 30, 2023, and again on October 24, 2023. ECF Nos. 33, 57.

8    To the extent a further response is required, the allegations are denied.

9    **V.    STATEMENT OF FACTS**

10            15.    WSU admits that it terminated Plaintiff's employment for just cause.

11    The remainder of Paragraph 15 contains legal conclusions or argument to which

12    no response is required. To the extent a further response is required, the

13    allegations are denied.

14    **A.**

15            16.    WSU denies that the SAC attached a true and correct copy of the

16    employment agreement between Plaintiff and WSU as an exhibit. WSU admits

17    that it entered into a memorandum of understanding (MOU) with Plaintiff, which

18    was dated January 13, 2020. WSU further admits that it executed an employment

19    agreement (the Agreement) with Plaintiff in April 2020. Both the MOU and the

20    Agreement speak for themselves. The remaining allegations in Paragraph 16

21    consist of legal conclusions or argument to which no response is required. To the

22    extent a further response is required, the allegations are denied.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

17.    WSU admits that Paragraph 17 quotes some portions of the Agreement, which speaks for itself. The remainder of Paragraph 17 contains legal conclusions and argument to which no response is required. To the extent a further response is required, the allegations are denied.

18.    WSU admits that Paragraph 18 quotes some portions of the Agreement, which speaks for itself. The remainder of Paragraph 18 contains legal conclusions and argument to which no response is required. To the extent a further response is required, the allegations are denied.

19.    WSU admits that Paragraph 19 quotes Paragraph 4.1 of the Agreement, which speaks for itself. The remainder of Paragraph 19 contains legal conclusions and argument to which no response is required. To the extent a further response is required, the allegations are denied.

20.    Paragraph 20 contains legal conclusions and argument to which no response is required. To the extent a further response is required, the allegations are denied.

**B.**

21.    WSU admits that Governor Inslee issued Proclamation 20-05, which speaks for itself, on February 29, 2020. WSU further admits that Proclamation 20-05 was Governor Inslee's first proclamation related to COVID-19. WSU is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21 and therefore denies the same.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1     22.    WSU admits that some employees—including assistant football

2 coaches—signed updated employment agreements in 2021, all of which speak

3 for themselves. The remainder of Paragraph 22 contains legal conclusions and

4 argument to which no response is required. To the extent a further response is

5 required, the allegations are denied.

6     23.    WSU admits that the Agreement was never amended from its

7 original form. The remainder of Paragraph 23 contains legal conclusions and

8 argument to which no response is required. To the extent a further response is

9 required, the allegations are denied.

10 **C.**

11     24.    WSU is without information sufficient to form a belief as to the truth

12 of the allegations in Paragraph 24 and therefore denies them.

13     25.    WSU is without information sufficient to form a belief as to the truth

14 of the allegations in Paragraph 25 and therefore denies them.

15     26.    WSU is without information sufficient to form a belief as to the truth

16 of the allegations in Paragraph 26 and therefore denies them.

17     27.    WSU is without information sufficient to form a belief as to the truth

18 of the allegations in Paragraph 27 and therefore denies them.

19     28.    WSU is without information sufficient to form a belief as to the truth

20 of the allegations in Paragraph 28 and therefore denies them.

21     29.    WSU is without information sufficient to form a belief as to the truth

22 of the allegations in Paragraph 29 and therefore denies them.

DEFENDANT WSU'S ANSWER TO     7     ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED          Complex Litigation Division
COMPLAINT                 800 Fifth Avenue, Suite 2000
                        Seattle, WA 98104-3188
                        (206) 464-7744

**D.**

30.     WSU denies that statements attributed to Mr. Chun in the SAC, even if true, would "demonstrate[] his hostility toward Mr. Rolovich's expressed religious" beliefs. WSU is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30 and therefore denies them.

31.     WSU is without information sufficient to form a belief as to the truth of the allegations in Paragraph 31 and therefore denies them.

32.     WSU is without information sufficient to form a belief as to the truth of the allegations in Paragraph 32 and therefore denies them.

33.     WSU admits that at some points prior to August 20, 2021, it had permitted exemptions from the University's COVID-19 vaccination requirement for employees based on either medical reasons or "personal/religious" objections. Consistent with Governor Inslee's Proclamation 21-14, WSU modified its policy to limit exemptions and reasonable accommodations to those employees who were unable to receive the COVID-19 vaccines due to medical reasons or sincerely held religious beliefs. To the extent a further response is required, Paragraph 33 is denied.

34.     WSU is without information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore denies them.

35.     WSU is without information sufficient to form a belief as to the truth of the allegations in Paragraph 35 and therefore denies them.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

8

**ER1183**

1    36.    WSU admits that Paragraph 36 accurately quotes a portion of an

2    August 24, 2021, Q13 Fox article that purports to quote an email from Kathryn

3    Leathers. WSU is without information sufficient to form a belief as to the truth

4    of the remaining allegations in Paragraph 36 and therefore denies them.

5    37.    WSU admits that Paragraph 37 accurately quotes a portion of an

6    October 13, 2021, KXLY article, which speaks for itself. WSU denies the

7    remainder of Paragraph 37.

8    38.    WSU is without information sufficient to form a belief as to the truth

9    of the allegations in Paragraph 38 and therefore denies them.

10    39.    WSU is without information sufficient to form a belief as to the truth

11    of the allegations in Paragraph 39 and therefore denies them.

12    40.    WSU is without information sufficient to form a belief as to the truth

13    of the allegations in Paragraph 40 and therefore denies them.

14    41.    WSU is without information sufficient to form a belief as to the truth

15    of the allegations in Paragraph 41 and therefore denies them.

16    42.    WSU admits that Plaintiff emailed WSU's Human Resource

17    Services (HRS) regarding exemptions from the COVID-19 vaccination

18    requirement. Those emails speak for themselves. To the extent a further response

19    is required, WSU is without information sufficient to form a belief as to the truth

20    of the remaining allegations in Paragraph 42 and therefore denies them.

21    43.    WSU is without information sufficient to form a belief as to the truth

22    of the allegations in Paragraph 43 and therefore denies them.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1       44.    WSU is without information sufficient to form a belief as to the truth

2    of the allegations in Paragraph 44 and therefore denies them.

3       45.    WSU is without information sufficient to form a belief as to the truth

4    of the allegations in Paragraph 45 and therefore denies them.

5       46.    WSU is without information sufficient to form a belief as to the truth

6    of the allegations in Paragraph 46 and therefore denies them.

7       47.    WSU is without information sufficient to form a belief as to the truth

8    of the allegations in Paragraph 47 and therefore denies them.

9       48.    WSU admits that on or about August 20, 2021, Governor Inslee

10    issued Proclamation 21-14.1, which speaks for itself.

11       49.    WSU denies that Paragraph 49 accurately quotes a portion of

12    Proclamation 21-14.1, which speaks for itself. To the extent a further response is

13    required, Paragraph 49 contains legal conclusions to which no response is

14    required. To the extent a further response is required, the allegations are denied.

15    **E.**

16       50.    WSU admits that Paragraph 50 accurately quotes a portion of a

17    September 13, 2021, DailyMed announcement, which speaks for itself. WSU

18    admits that footnote 3 of Paragraph 50 accurately quotes a portion of the

19    document hyperlinked therein, which speaks for itself. Except as expressly

20    admitted above, WSU denies all remaining allegations in Paragraph 50.

21

22

DEFENDANT WSU'S ANSWER TO        10
PLAINTIFF'S SECOND AMENDED
COMPLAINT

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

(99 of 289), Page 99 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 99 of 289
Case 2:22-cv-00319-TOR    ECF No. 59    filed 11/07/23    PageID.1012    Page 11
of 31

1    51.    WSU denies that any letter was attached as an exhibit to the SAC.

2    WSU is without information sufficient to form a belief as to the truth of the

3    remaining allegations in Paragraph 51 and therefore denies them.

4    52.    WSU is without information sufficient to form a belief as to the truth

5    of the allegations in Paragraph 52 and therefore denies them.

6    53.    WSU is without information sufficient to form a belief as to the truth

7    of the allegations in Paragraph 53 and therefore denies them.

8    54.    Paragraph 54 contains legal conclusions and argument to which no

9    response is required. To the extent a further response is required, the allegations

10    are denied.

11    55.    Paragraph 55 cites a federal statute, 21 U.S.C. § 360bbb-3, which

12    speaks for itself. Paragraph 55 contains legal conclusions and argument to which

13    no response is required. To the extent a further response is required, the

14    allegations are denied.

15    56.    WSU admits that Paragraph 56 contains a link to the FDA's website

16    but denies that the link directs the reader to the Fact Sheet referenced in that

17    paragraph. Regardless, the Fact Sheet speaks for itself. To the extent a further

18    response is required, the allegations are denied.

19    57.    Denied.

20    58.    Denied.

21

22

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ER1186

**F.**

59.    WSU admits that it timely established procedures for its employees to request, and for the University to consider and approve or deny requests for, religious and/or medical exemptions in accordance with Proclamation 21-14, as amended. WSU denies the remaining allegations in Paragraph 59.

60.    WSU admits that WSU published its procedures for evaluating requests for religious exemptions pursuant to Proclamation 21-14, as amended, on the University's website and that it shared "Frequently Asked Questions (FAQs)" with answers. WSU further admits that Paragraph 60 accurately quotes a portion of the FAQs, which speaks for itself, but denies that the link in footnote 4 of Paragraph 60 directs the reader to the FAQs. The remainder of Paragraph 60 contains legal conclusions and argument to which no response is required. To the extent a further response is required, the allegations are denied.

61.    WSU admits that Paragraph 61 accurately quotes portions of the WSU-Everett webpage cited in footnote 5, which webpage speaks for itself. The remainder of Paragraph 61 contains legal conclusions and argument to which no response is required. To the extent any further response is required, WSU denies the remaining allegations contained in Paragraph 61.

62.    WSU admits that Paragraph 62 accurately quotes portions of the October 7, 2021, Mercury News article cited in footnote 6, which article speaks for itself. The remainder of Paragraph 62 contains legal conclusions and

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

12

ER1187

1    argument to which no response is required. To the extent any further response is

2    required, WSU denies the remaining allegations contained in Paragraph 62.

3    **G.**

4        63.    Denied.

5        64.    WSU admits that HRS sent Mr. Chun an email on October 6, 2021,

6    which speaks for itself. The remaining allegations in Paragraph 64 are denied.

7        65.    WSU admits that Paragraph 65 accurately quotes portions of an

8    October 6, 2021, email from HRS, which speaks for itself. To the extent a further

9    response is required, any remaining allegations are denied.

10    **H.**

11        66.    WSU admits that the Athletics Department sent HRS two

12    memoranda dated October 13, 2021, which speak for themselves. To the extent

13    a further response is required, any remaining allegations in Paragraph 66 are

14    denied.

15        67.    WSU admits that Paragraph 67 accurately quotes portions of one of

16    the October 13, 2021, Athletics Department memoranda and HRS's October 6,

17    2021 email, which speak for themselves. To the extent a further response is

18    required, any remaining allegations in Paragraph 67 are denied.

19        68.    WSU admits that on October 14, 2021, the Department of

20    Environmental Health and Safety (EH&S) sent a memorandum to Mr. Chun and

21    the Athletics Department, and that Paragraph 68 accurately quotes a portion of

22

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

this memorandum, which speaks for itself. To the extent a further response is required, any remaining allegations in Paragraph 68 are denied.

69.    WSU admits that the Athletics Department sent HRS a memorandum in response to the October 14, 2021, EH&S memorandum, and that Paragraph 69 accurately quotes a portion of this memorandum, which speaks for itself. To the extent a further response is required, any remaining allegations are denied.

70.    WSU admits that the Athletics Department issued a memorandum in response to the October 14, 2021, EH&S memorandum, and that Paragraph 70 accurately quotes some portions of this memorandum, which speaks for itself. To the extent a further response is required, any remaining allegations are denied.

**I.**

71.    WSU admits that it developed protocols for employees during the COVID-19 pandemic and that Plaintiff, as a former WSU employee, was required to follow them while employed by WSU. WSU is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71 and therefore denies them.

72.    WSU admits that Paragraph 72 accurately quotes portions of the Spokesman Review article cited in footnote 7, and that the article appears to have originally run in the Seattle Times. The article speaks for itself. To the extent any further response is required, WSU denies the remaining allegations contained in Paragraph 72.

DEFENDANT WSU'S ANSWER TO          14          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                      Complex Litigation Division
COMPLAINT                                       800 Fifth Avenue, Suite 2000
                                                Seattle, WA  98104-3188
                                                (206) 464-7744

1    73.    WSU is without information sufficient to form a belief as to the truth

2    of the allegations in Paragraph 73 and therefore denies them.

3    74.    WSU is without information sufficient to form a belief as to the truth

4    of the allegations in Paragraph 74 and therefore denies them.

5    75.    WSU admits that Paragraph 75 links to a Post Millennial article

6    dated November 19, 2021, which speaks for itself. WSU is without information

7    sufficient to form a belief as to the truth of the remaining allegations in

8    Paragraph 75 and therefore denies them.

9    **J.**

10    76.    WSU admits that counsel for Plaintiff provided WSU with a

11    document, purportedly a declaration from Dr. Bhattacharya, on November 2,

12    2021, which speaks for itself. WSU denies the remainder of the allegations of

13    Paragraph 76.

14    77.    WSU is without information sufficient to form a belief as to the truth

15    of the allegations in Paragraph 77 and therefore denies them.

16    78.    WSU is without information sufficient to form a belief as to the truth

17    of the allegations in Paragraph 78 and therefore denies them.

18    79.    WSU is without information sufficient to form a belief as to the truth

19    of the allegations in Paragraph 79 and therefore denies them.

20    80.    Denied.

21    81.    WSU admits that Paragraph 81 accurately reproduces a portion of

22    the declaration provided to WSU on November 2, 2021, purportedly by

DEFENDANT WSU'S ANSWER TO                    15          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                                   Complex Litigation Division
COMPLAINT                                                      800 Fifth Avenue, Suite 2000
                                                                Seattle, WA 98104-3188
                                                                    (206) 464-7744

1    Dr. Bhattacharya, which speaks for itself. WSU is without information sufficient

2    to form a belief as to the truth of the remaining allegations in Paragraph 81 and

3    therefore denies them.

4        82.    WSU admits that Paragraph 82 accurately quotes a portion of the

5    declaration provided to WSU on November 2, 2021, purportedly by

6    Dr. Bhattacharya, which speaks for itself. WSU is without information sufficient

7    to form a belief as to the truth of the remaining allegations in Paragraph 82 and

8    therefore denies them.

9        83.    WSU is without information sufficient to form a belief as to the truth

10   of the allegations in Paragraph 83 and therefore denies them.

11       84.    WSU admits that Paragraph 84 accurately quotes a portion of the

12   Declaration provided to WSU on November 2, 2021, purportedly by

13   Dr. Bhattacharya, which speaks for itself. WSU is without information sufficient

14   to form a belief as to the truth of the remaining allegations in Paragraph 84 and

15   therefore denies them.

16       85.    WSU admits that Paragraph 85 accurately quotes three words of a

17   July 28, 2021, Washington Post article, which speaks for itself. WSU is without

18   information sufficient to form a belief as to the truth of the remaining allegations

19   in Paragraph 85 and therefore denies them.

20       86.    WSU admits that Paragraph 86 accurately quotes a portion of the

21   Declaration provided to WSU on November 2, 2021, purportedly by

22   Dr. Bhattacharya, which speaks for itself. WSU is without information sufficient

DEFENDANT WSU'S ANSWER TO          16          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                              Complex Litigation Division
COMPLAINT                                              800 Fifth Avenue, Suite 2000
                                                         Seattle, WA 98104-3188
                                                            (206) 464-7744

ER1191

1 to form a belief as to the truth of the remaining allegations in Paragraph 86 and

2 therefore denies them.

3    87.    Paragraph 87 characterizes the conclusions of the declaration

4 provided on November 2, 2021, purportedly by Dr. Bhattacharya, which speaks

5 for itself. Footnote 13 to Paragraph 87 cites two news articles, both of which

6 speak for themselves. WSU is without information sufficient to form a belief as

7 to the truth of the remaining allegations in Paragraph 87 and therefore denies

8 them.

9    88.    Denied.

10    89.    Paragraph 89 contains legal conclusions and argument to which no

11 response is required. Paragraph 89 characterizes the opinion of a purported expert

12 that speaks for itself. To the extent a further response is required, the allegations

13 are denied.

14 **K.**

15    90.    WSU admits that Paragraph 90 contains an accurately quoted

16 portion from the October 18, 2021, email from HRS Exemptions to Plaintiff. The

17 email speaks for itself. WSU is without information sufficient to form a belief as

18 to the truth of the remaining allegations in Paragraph 90 and therefore denies

19 them.

20    91.    WSU denies the first sentence of Paragraph 91. WSU admits that

21 the second sentence of Paragraph 91 contains an accurately quoted portion from

22

DEFENDANT WSU'S ANSWER TO          17          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                          Complex Litigation Division
COMPLAINT                                           800 Fifth Avenue, Suite 2000
                                                    Seattle, WA  98104-3188
                                                    (206) 464-7744

1    the October 18, 2021, email from HRS Exemptions to Plaintiff, which speaks for

2    itself, and otherwise denies the second sentence of Paragraph 91.

3        92.    WSU denies that HRS ever took the position "that Mr. Rolovich's

4    sincere religious beliefs could be accommodated by WSU," or that its October

5    18, 2021, email to Plaintiff represented a "revers[al]" of any such position. WSU

6    admits that the October 18, 2021, email from HRS to Plaintiff stated that "it

7    would pose an undue hardship to the University and/or a threat to yourself and

8    others to allow you to remain in your position while unvaccinated." The email

9    speaks for itself. To the extent a further response is required, any remaining

10   allegations in Paragraph 92 are denied.

11       93.    WSU admits that it provided Mr. Rolovich with a Notice of Intent

12   to Terminate With Just Cause on October 18, 2021, which speaks for itself.

13   Paragraph 93 also contains legal conclusions and arguments to which no response

14   is required. To the extent any further response is required, WSU is without

15   information sufficient to form a belief as to the truth of the remaining allegations

16   in Paragraph 93 and therefore denies them.

17       94.    WSU is without information sufficient to form a belief as to the truth

18   of the allegations in Paragraph 94 and therefore denies them.

19       95.    WSU is without information sufficient to form a belief as to the truth

20   of the allegations in Paragraph 95 and therefore denies them.

21       96.    WSU is without information sufficient to form a belief as to the truth

22   of the allegations in Paragraph 96 and therefore denies them.

DEFENDANT WSU'S ANSWER TO              18          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                              Complex Litigation Division
COMPLAINT                                             800 Fifth Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                            (206) 464-7744

1    97.    Paragraph 97 contains legal conclusions and argument to which no

2    response is required. To the extent a further response is required, the allegations

3    are denied.

4                          **COUNT I**
                    **BREACH OF CONTRACT**
5    **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR**
                            **DEALING**
6
7    98.    WSU incorporates by reference its answers to the preceding

     paragraphs.
8
9    99.    Paragraph 99 contains legal conclusions and argument to which no

10   response is required. To the extent a further response is required, the allegations

11   are denied.

12   100.    WSU admits that it terminated Plaintiff's employment in

13   December 2021 for just cause. The remainder of Paragraph 100 contains legal

14   conclusions and argument to which no response is required. To the extent a

     further response is required, the allegations are denied.
15
16   101.    Denied.

17   102.    Denied.

18   103.    Paragraph 103 contains legal conclusions and argument to which no

19   response is required. To the extent a further response is required, the allegations

20   are denied.

21

22

DEFENDANT WSU'S ANSWER TO         19         ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                        Complex Litigation Division
COMPLAINT                                          800 Fifth Avenue, Suite 2000
                                                    Seattle, WA  98104-3188
                                                        (206) 464-7744

1    104.  Paragraph 104 contains legal conclusions and argument to which no

2    response is required. To the extent a further response is required, the allegations

3    are denied.

4    105.  Denied.

5    106.  Denied.

6    107.  Denied.

7    108.  Denied.

8    109.  Paragraph 109 contains legal conclusions and argument to which no

9    response is required. To the extent a further response is required, the allegations

10   are denied.

11   110.  Denied.

12   111.  Denied.

13   **COUNT II**
**WRONGFUL WITHHOLDINGS OF WAGES**
14   **RCW 49.52, et. seq., and RCW 49.48.010, et seq.**

15   112.  WSU incorporates by reference its answers to the preceding

16   paragraphs.

17   113.  Paragraph 113 contains legal conclusions and argument to which no

18   response is required. To the extent a further response is required, the allegations

19   are denied.

20   114.  WSU admits that Plaintiff's employment was terminated for just

21   cause in December 2021. The remainder of Paragraph 114 contains legal

22   conclusions and argument to which no response is required. To the extent a

DEFENDANT WSU'S ANSWER TO          20          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                              Complex Litigation Division
COMPLAINT                                                  800 Fifth Avenue, Suite 2000
                                                           Seattle, WA  98104-3188
                                                              (206) 464-7744

**ER1195**

1  further response is required, the remaining allegations of Paragraph 114 are

2  denied.

3      115.  Paragraph 115 contains legal conclusions and argument to which no

4  response is required. To the extent a further response is required, the allegations

5  are denied.

6      116.  Paragraph 116 contains legal conclusions and argument to which no

7  response is required. To the extent a further response is required, the allegations

8  are denied.

9      117.  Paragraph 117 contains legal conclusions and argument to which no

10  response is required. To the extent a further response is required, the allegations

11  are denied.

### COUNT III
### WASHINGTON LAW AGAINST DISCRIMINATION
### RCW 49.60 *et seq.*

14      118.  WSU incorporates by reference its answers to the preceding

15  paragraphs.

16      119.  Denied.

17      120.  Paragraph 120 contains legal conclusions and argument to which no

18  response is required. To the extent a further response is required, the allegations

19  are denied.

20

21

22

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ER1196

(110 of 289), Page 110 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 110 of 289
Case 2:22-cv-00319-TOR    ECF No. 59    filed 11/07/23    PageID.1023    Page 22
of 31

**COUNT IV**
**WASHINGTON CONSTITUTION, ARTICLE 1, SECTION 11**
**DISCRIMINATION AGAINST RELIGION/CONSCIENCE**

121. WSU incorporates by reference its answers to the preceding paragraphs.

122. Count IV was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 122 is denied.

123. Count IV was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 123 is denied.

124. Count IV was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 124 is denied.

**COUNT V**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.***

125. WSU incorporates by reference its answers to the preceding paragraphs.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

22

**ER1197**

1     126.    Paragraph 126 contains legal conclusions and argument to which no

2     response is required. To the extent a further response is required, the allegations

3     are denied.

4     127.    Denied.

5     128.    WSU admits that Plaintiff requested a religious exemption and

6     accommodation from Proclamation 21-14's vaccination requirement. To the

7     extent a further response is required, any remaining allegations in Paragraph 128

8     are denied.

9     129.    Paragraph 129 contains legal conclusions and argument to which no

10    response is required. To the extent a further response is required, the allegations

11    are denied.

12    130.    Denied.

13    131.    Denied.

14    132.    Paragraph 132 contains legal conclusions and argument to which no

15    response is required. To the extent a further response is required, the allegations

16    are denied.

17    133.    Denied.

18    134.    Denied.

19    135.    Denied.

20

21

22

DEFENDANT WSU'S ANSWER TO           23          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                        Complex Litigation Division
COMPLAINT                                          800 Fifth Avenue, Suite 2000
                                                   Seattle, WA  98104-3188
                                                       (206) 464-7744

ER1198

(112 of 289), Page 112 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 112 of 289
Case 2:22-cv-00319-TOR    ECF No. 59    filed 11/07/23    PageID.1025    Page 24
of 31

**COUNT VI**
**42 U.S.C., SECTION 1983**
**First Amendment-Free Exercise of Religion and Fourteenth**
**Amendment-Due Process**
**(Defendant Chun only, in his Individual Capacity)**

136. WSU incorporates by reference its answers to the preceding paragraphs.

137. Count VI was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 137 is denied.

138. Count VI was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 138 is denied.

139. Count VI was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 139 is denied.

140. Count VI was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 140 is denied.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

24

**ER1199**

1    141.   Count VI was dismissed with prejudice per this Court's May 30,

2    2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

3    Accordingly, no response is required. To the extent any response is required,

4    Paragraph 141 is denied.

5    142.   Count VI was dismissed with prejudice per this Court's May 30,

6    2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

7    Accordingly, no response is required. To the extent any response is required,

8    Paragraph 142 is denied.

9    143.   Count VI was dismissed with prejudice per this Court's May 30,

10   2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

11   Accordingly, no response is required. To the extent any response is required,

12   Paragraph 143 is denied.

13   144.   Count VI was dismissed with prejudice per this Court's May 30,

14   2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

15   Accordingly, no response is required. To the extent any response is required,

16   Paragraph 144 is denied.

17   145.   Count VI was dismissed with prejudice per this Court's May 30,

18   2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

19   Accordingly, no response is required. To the extent any response is required,

20   Paragraph 145 is denied.

21

22

DEFENDANT WSU'S ANSWER TO          25          ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                          Complex Litigation Division
COMPLAINT                                           800 Fifth Avenue, Suite 2000
                                                    Seattle, WA 98104-3188
                                                    (206) 464-7744

**ER1200**

**COUNT VII**
**42 U.S.C., SECTION 1983**
**(First Amendment-Free Exercise of Religion)**

146.    WSU incorporates by reference its answers to the preceding paragraphs.

147.    Count VII was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 147 is denied.

148.    Count VII was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 148 is denied.

149.    Count VII was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 149 is denied.

150.    Count VII was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57). Accordingly, no response is required. To the extent any response is required, Paragraph 150 is denied.

151.    Count VII was dismissed with prejudice per this Court's May 30, 2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**ER1201**

1    Accordingly, no response is required. To the extent any response is required,

2    Paragraph 151 is denied.

3    152.   Count VII was dismissed with prejudice per this Court's May 30,

4    2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

5    Accordingly, no response is required. To the extent any response is required,

6    Paragraph 152 is denied.

7    **COUNT VIII**
     **FOURTEENTH AMENDMENT-DUE PROCESS (As Applied)**

8

9    153.   Count VIII was dismissed with prejudice per this Court's May 30,

10   2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

11   Accordingly, no response is required. To the extent any response is required,

12   Paragraph 153 is denied.

13   154.   Count VIII was dismissed with prejudice per this Court's May 30,

14   2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

15   Accordingly, no response is required. To the extent any response is required,

16   Paragraph 154 is denied.

17   155.   Count VIII was dismissed with prejudice per this Court's May 30,

18   2023, Order (ECF No. 33), and again on October 24, 2023 (ECF No. 57).

19   Accordingly, no response is required. To the extent any response is required,

20   Paragraph 155 is denied.

21

22

DEFENDANT WSU'S ANSWER TO              27      ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                        Complex Litigation Division
COMPLAINT                                          800 Fifth Avenue, Suite 2000
                                                     Seattle, WA  98104-3188
                                                        (206) 464-7744

**ER1202**

**PRAYER FOR RELIEF**

Paragraphs a through i of the Prayer for Relief section of the SAC constitute Plaintiff's requests for relief, to which no response is required. To the extent a response is required, WSU denies Plaintiff is entitled to the relief requested or to any relief whatsoever.

**AFFIRMATIVE DEFENSES**

WSU's affirmative defenses to the SAC are set forth below. By setting forth the following defenses, WSU does not assume burden of proof on the matter and issue other than those on which it has the burden of proof as a matter of law. WSU reserves the right to supplement these defenses.

1.    Plaintiff's SAC improperly asserts claims already dismissed with prejudice by this Court against Defendant WSU, and against Former Defendants Patrick Chun and Jay Inslee, who have already been terminated as Defendants by Order of this Court. *See* ECF Nos. 33, 57.

2.    Plaintiff has failed to state a claim, in whole or in part, upon which relief may be granted.

3.    Plaintiff's damages, if any, were caused by Plaintiff's own acts or omissions or by the acts or omissions of third parties.

4.    The SAC fails, in whole or in part, because some or all of the relief sought may be barred by Plaintiff's failure to mitigate damages.

5.    WSU's actions with respect to Plaintiff and concerning Plaintiff's employment were based solely on legitimate, non-discriminatory, and

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

ER1203

1    non-retaliatory business reasons, and were the result of a good faith effort to

2    comply with the law.

3         6.     Plaintiff's claims are barred in whole or in part by the doctrines of

4    laches, waiver, unclean hands, estoppel, and/or fraud on the court.

5         7.     Accommodating Plaintiff would have imposed an undue hardship

6    on WSU.

7         8.     Plaintiff's claim under RCW 49.52, et seq., and RCW 49.48.010,

8    et seq. fail as a matter of law because, *inter alia*, Washington's Wage Rebate Act

9    does not apply to damages awards, and WSU did not willfully withhold

10   Plaintiff's wages because a bona fide dispute existed as to Plaintiff's right to

11   liquidated damages.

12        9.     WSU has not yet had a full opportunity to conduct discovery and,

13   accordingly, reserves the right to assert additional affirmative defenses that may

14   be disclosed in the course of discovery.

15                    **WSU'S REQUEST FOR RELIEF**

16   Wherefore, WSU prays that the Court:

17        1.     Dismiss Plaintiff's Second Amended Complaint with prejudice;

18        2.     Deny all relief that Plaintiff requests;

19        3.     Grant WSU its costs and reasonable attorneys' fees; and

20        4.     Grant WSU such other and further relief as the Court may deem just

21   and proper.

22

DEFENDANT WSU'S ANSWER TO              29
PLAINTIFF'S SECOND AMENDED
COMPLAINT

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    DATED this 7th day of November 2023.

2                                    ROBERT W. FERGUSON
                                     Attorney General
3
                                     /s/ Spencer W. Coates
4                                    SPENCER W. COATES, WSBA #49683
                                     Assistant Attorney General
5                                    800 Fifth Avenue, Suite 2000
                                     Seattle, WA  98104-3188
6                                    (206) 464-7744
                                     Spencer.Coates@atg.wa.gov
7
                                     ZACHARY J. PEKELIS, WSBA #44557
8                                    W. SCOTT FERRON, WSBA #61154
                                     Special Assistant Attorneys General
9                                    PACIFICA LAW GROUP LLP
                                     1191 2nd Avenue, Suite 2000
10                                   Seattle, WA  98101-3404
                                     (206) 245-1700
11                                   Zach.Pekelis@PacificaLawGroup.com
                                     Scott.Ferron@PacificaLawGroup.com
12
                                     *Attorneys for Defendant Washington
13                                   State University*

14

15

16

17

18

19

20

21

22

DEFENDANT WSU'S ANSWER TO            30        ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF'S SECOND AMENDED                          Complex Litigation Division
COMPLAINT                                          800 Fifth Avenue, Suite 2000
                                                      Seattle, WA  98104-3188
                                                          (206) 464-7744

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 7th, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 7th day of November 2023, at Seattle, Washington.

*/s/ Spencer W. Coates*
SPENCER W. COATES, WSBA #49683
Assistant Attorney General

DEFENDANT WSU'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

(120 of 289), Page 120 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 120 of 289
Case 2:22-cv-00319-TOR    ECF No. 53    filed 09/19/23    PageID.885    Page 1 of 33

1    BRIAN FAHLING, WSBA #18894
     Law Office of Brian Fahling
2    559 Old Mill Rd.
3    Sandpoint, ID 83864
     (425) 802-7326
4
5    ERIC KNIFFIN, CO Bar # 48016
     Kniffin Law
6    102 S. Tejon St., Suite 1100
     Colorado Springs, CO 80903
7    (719) 212-4391
     *Admitted pro hac vice*
8
9    E. JOB SEESE, CO Bar # 48379
     Lewis Roca Rothgerber Christie
10   1601 19th Street, Suite 1000
     Tele: 303.623.9000
11   Denver, CO 80202
     (303) 623-9000
12   *Admitted pro hac vice*

13                                                      Honorable Thomas O. Rice

14                    **UNITED STATES DISTRICT COURT**
15                   **EASTERN DISTRICT OF WASHINGTON**

16   NICHOLAS ROLOVICH,                 | No.  2:22-cv-00319-TOR

17        Plaintiff,

18   v.                                 | **SECOND AMENDED COMPLAINT**

19
     WASHINGTON STATE UNIVERSITY,
20   an agency of the State of Washington;
     PATRICK CHUN, Director of Athletics for
21   Washington State University, in his
     individual capacity; and JAY INSLEE,
22   Governor, in his official capacity,

23        Defendants.

24

25

26

                                        **LAW OFFICE OF BRIAN FAHLING**
                                                559 Old Mill Rd.
                                               Sandpoint, ID 83864
                                              T: (425) 802-7326
SECOND AMENDED COMPLAINT - 1             E: bfahling@fahlinglaw.com

                        **ER1207**

(121 of 289), Page 121 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 121 of 289
Case 2:22-cv-00319-TOR    ECF No. 53    filed 09/19/23    PageID.886    Page 2 of
33

# I. INTRODUCTION

1.      Plaintiff Nicholas Rolovich brings this action to vindicate his federal and state constitutional, statutory, and contractual rights, which rights were violated by Defendants, causing Mr. Rolovich significant and ongoing damages.

2.      This action arises under the laws of the United States, specifically, 42 U.S.C. § 1983, 42 U.S.C. § 1988, 42 U.S.C. § 2000e, *et seq.*, and the First and Fourteenth Amendments to the United States Constitution. This action also arises under the laws of the State of Washington, including RCW 49.60 *et seq.* (Washington Law Against Discrimination ("WLAD")), RCW 49.48, *et seq.,* RCW 49.52, *et seq.*, Article I, section 9 of the Washington Constitution, and state contract law.

## II. JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to RCW 2.08.010.

4.      Venue is proper in this district pursuant to RCW 4.12.025(1) because Washington State University's ("WSU") principal business is located in Whitman County and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and constitutional violations alleged herein, occurred in Whitman County. Additionally, the Employment Agreement between Mr. Rolovich and WSU requires that any litigation regarding enforcement or construction of the terms of the Agreement be filed in Whitman County Superior Court.

## III. EXHAUSTION OF ADMINISTRATIVE PROCEDURES/REMEDIES

**A.      WSU Administrative Process**

5.      Pursuant to Mr. Rolovich's employment agreement with WSU, he was required to appeal his termination, first, to Mr. Chun, and upon Mr. Chun's denial of the appeal, to WSU President, Kirk Schulz. Mr. Rolovich timely appealed to Mr. Chun, and then President Schulz. President Schulz denied Mr. Rolovich's appeal on December 6, 2021.

SECOND AMENDED COMPLAINT - 2

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**B.     Equal Employment Opportunity Commission/Washington State Human Rights Commission**

6.      On or about February 14, 2022, Mr. Rolovich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act 1964, 42 U.S.C. §§ 2000 *et seq*. Because the Washington State Human Rights Commission ("WHRC") is a designated Fair Employment Practices Agency ("FEPA") in partnership with the EEOC, Mr. Rolovich's EEOC filing (dual filing) fulfills the State's requirement that a 49.60.030, *et seq.,* claim be filed with the State prior to any court filing. The State and federal claims arise out of the same facts alleged herein.

7.      On or about August 16, 2022, Mr. Rolovich received, from the Department of Justice, Civil Rights Division ("DOJ"), a Notice of Right to Sue Within 90 Days in response to his previously filed charge of discrimination with the EEOC. This complaint has been filed within 90 days of Mr. Rolovich's receipt of the DOJ Notice of Right to Sue.

**C.     Department of Enterprise Services—Office of Risk Management (Tort Claim)**

8.      On or about April 27, 2022, Mr. Rolovich filed a tort claim with the State of Washington Department of Enterprise Services, Office of Risk Management.

9.      More than 60 days has elapsed from the date of filing Mr. Rolovich's tort claim. RCW 4.92.110.

10.     Any and all prerequisites to the filing of this lawsuit have been met.

### IV. PARTIES

11.     Plaintiff Nicholas Rolovich was Head Football Coach for WSU from January 14, 2020, until he was terminated on December 6, 2021. He currently resides in Northern California.

12.     Washington State University is an agency of the State of Washington, with a principal place of business located at Pullman, Washington. WSU has approximately 7,000 employees.

SECOND AMENDED COMPLAINT - 3

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

13. Defendant Patrick Chun is Athletics Director for WSU. He is sued in his individual capacity only. At all times relevant to this complaint, Patrick Chun was acting as an agent of WSU.

14. Defendant Jay Inslee is the governor of the State of Washington. He is sued in his official capacity.

## V. STATEMENT OF FACTS

15. Washington State University ("WSU) terminated head football coach Nicholas Rolovich after he had refused to be vaccinated because of his religious and personal beliefs. WSU claimed that Mr. Rolovich's refusal to be vaccinated gave the University "just cause" to terminate him. By claiming that it had just cause to terminate Mr. Rolovich, WSU did not have to pay him liquidated damages as provided for in the employment agreement. The liquidation clause required WSU to pay Mr. Rolovich sixty percent of his $2,000,000+ base salary for the approximately three and one-half years remaining on his approximately five-year contract.

**A. The Employment Agreement Between WSU and Mr. Rolovich**

16. Mr. Rolovich's employment as head coach of the WSU football commenced with a Memorandum of Understanding ("MOU"), dated January 13, 2020. The financial terms of the MOU were the same as found in the employment agreement entered into between Mr. Rolovich and WSU in April 2020. (A true and correct copy of the employment agreement is attached hereto as EXHIBIT A, and incorporated herein.) The Agreement was to expire on June 30, 2025. WSU's termination of Mr. Rolovich became final on December 6, 2021, when President Schulz denied Mr. Rolovich's final appeal.

17. The agreement provides that WSU could terminate Mr. Rolovich "without cause" at any time, but if WSU terminated him without cause, it would be required to pay "liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary

SECOND AMENDED COMPLAINT - 4

ER1210

1    due under the terms of [the] Agreement." At the time of his termination, Mr. Rolovich had

2    approximately three and one-half more years to serve as WSU's head football coach.

3         18.    The agreement also provides that WSU could terminate Mr. Rolovich for "just

4    cause" if he was found to be in violation of the just cause provisions set forth in the contract.

5    If WSU terminated Mr. Rolovich for just cause, "all obligations of the University to make

6    further payments under th[e] Agreement and/or to provide any other consideration . . .

7    [would] cease."

8         19.    The employment agreement sets forth the following grounds for "just cause"

9    termination of Mr. Rolovich:

**4.1 Termination by University for just cause**. The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as examples of its normally understood meaning in employment contracts, any of the following:

**4.1.1** Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

**4.1.2** Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

**4.1.3** Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

**4.1.4** An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 5

1    knowledge of the intended violation and failed to intervene, of any law, rule,
2    regulation, constitutional provision, bylaw or interpretation of the University,
3    the NCAA, or the Pac-12 which may in the reasonable judgment of the
     University reflect adversely upon the University or its athletic program
4    including, but not limited to, any such violation which may result in the
     University being placed on probation by the Pac-12 or the NCAA and
5    including any such violation which may have occurred during prior
     employment of Employee at another NCAA member institution;

6    **4.1.5** Conduct of Employee seriously prejudicial to the best interests of the
7    University or its athletic program; or

8    **4.1.6** Prolonged absence from duty without the consent of Employee's
     supervisor.
9

10        20.    Nothing in Mr. Rolovich's employment agreement with WSU contemplates a

11   scenario where WSU could claim "just cause" to terminate him because he refused to violate

12   his religious faith, conscience, or bodily integrity.

13   **B.    Unlike Other WSU Football Coaches, Mr. Rolovich's Agreement Did Not
            Include Provisions Requiring Him to Follow State and Federal Health and
14          Safety Guidelines**

15        21.    Less than two months after Mr. Rolovich entered into his employment

16   contract with WSU, on February 29, 2020, Governor Inslee issued the first of nearly 500

17   proclamations related to COVID-19, declaring a State of Emergency in the State of

18   Washington.

19        22.    On or about July 2021, WSU induced some of its football coaches to sign new

20   employment agreements with provisions requiring them to "follow all federal, state, and local

21   health directives, as well as university policies related to health and safety."

22        23.    Mr. Rolovich never signed an amendment to his employment agreement

23   requiring him to follow health directives or university policies related to health and safety.

24   His contract with WSU contains no such provisions.

25

26

SECOND AMENDED COMPLAINT - 6

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**ER1212**

**C.    Mr. Rolovich Discerns that His Religiously-Informed Conscience Precludes him from Receiving Available COVID-19 Vaccines**

24.    By the summer of 2021, Mr. Rolovich discerned that it would violate his conscience to receive any available COVID-19 vaccine.

25.    Mr. Rolovich is a practicing Catholic.

26.    The Catechism of the Catholic Church teaches that each person has a duty to develop a well-formed conscience, which "formulates its judgments according to reason."

27.    The Catechism teaches that, in developing their conscience, Catholics must draw upon the Word of God, prayer, personal experience, the advice of others, and the teaching of the Church.

28.    The Catechism teaches that one "must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself." In other words, a Catholic is morally obliged to obey his conscience.

29.    As a Catholic, Mr. Rolovich drew upon his study of the Bible, personal prayer, personal experience, personal study, advice from others, advice from a Catholic priest, and the teachings of the Church in concluding that his conscience precluded him from receiving any available COVID-19 vaccine.

**D.    Mr. Chun's/WSU's Hostility Toward Mr. Rolovich**

30.    As set forth below, Mr. Chun made a number of statements to Mr. Rolovich that demonstrated his hostility toward Mr. Rolovich's expressed religious, personal, and scientific reasons for refusing to receive a COVID vaccine. Even before Governor Inslee issued his vaccine Mandate, Mr. Chun told Mr. Rolovich that his request for a religious exemption would be denied and he would be fired with cause unless he agreed to comply with the vaccine mandate.

SECOND AMENDED COMPLAINT - 7

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1213

31.     On or around May 24, 2021, Mr. Chun, after Mr. Rolovich said that he was not planning on getting a COVID-19 vaccine, claimed that he was worried about Mr. Rolovich's mental health and accused him of having extreme views regarding many issues.

32.     On or about May 27, 2021, Mr. Rolovich was called to a 3 p.m. meeting at Mr. Chun's office. Mr. Chun told Mr. Rolovich that his beliefs were making him incapable of leading his players. Mr. Chun also tried to get Mr. Rolovich into counseling because he believed that the Mr. Rolovich had mental health issues. Mr. Chun suggested that Mr. Rolovich should talk to Mr. Chun's wife because she had been in a couple different religions he referred to as "cults".

33.     In August 2021, before Governor Inslee issued a vaccine mandate for state employees, WSU had its employees check boxes on a computer form to designate their reason for not wanting to be vaccinated. The form provided for a medical exemption and a personal/religious exemption. Mr. Rolovich checked the personal/religious box.

34.     On August 16, 2021, Mr. Rolovich was called to an urgent meeting with Mr. Chun and Deputy Director of Athletics, Bryan Blair. At this meeting, Mr. Chun told Mr. Rolovich that Governor Inslee was intending to issue a vaccine mandate that would eliminate the "personal exemption" from the coaching staff's declaration of vaccination status. Mr. Chun warned Mr. Rolovich that any religious exemption request he submitted would be scrutinized to no end, and that Inslee's mandate would have a "high threshold" for religious exemptions moving forward.

35.     At that same meeting, Mr. Chun confidently told Mr. Rolovich that if he did not get the vaccine, he could be expected to be fired with cause on October 19, 2021.

36.     Mr. Chun's predictions about how WSU would treat requests for religious exemptions are consistent with the State's vaccine mandate policy as set forth in an August 3, 2021 email from Kathryn Leathers, Governor's Office General Counsel, to staff with the

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1214

(128 of 289), Page 128 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 128 of 289
Case 2:22-cv-00319-TOR    ECF No. 53    filed 09/19/23    PageID.893    Page 9 of 33

1  Attorney General's Office.[1] In that email she explained: "Of possible exemptions [to the

2  vaccine mandate]: medical for sure; and religious (if we have to; if yes, as narrow as

3  possible)."

4       37.  WSU's statistics on vaccination exemptions reflect the Governor's policy, as

5  well as WSU's bias against religious exemptions: By early October 2021, WSU had

6  approved requests for medical exemptions at almost twice the rate of religious exemption

7  requests ("437 employees have requested religious exemptions. Only 98 have been granted

8  so far. Just over 100 employees have requested medical exemptions of which 41 have been

9  granted so far.")[2]

10       38.  On August 19, 2021, Mr. Rolovich was summoned to a meeting with

11  Mr. Chun. Assistant Athletics Director Bryan Blair also was present at the meeting.

12  Mr. Chun told Mr. Rolovich that he had four choices: 1. Get the vaccine; 2. Don't get the

13  vaccine and get fired; 3. Claim an exemption; or 4. Resign right now. Mr. Rolovich told

14  Mr. Chun that he was not resigning and that he wanted to coach the team. Mr. Chun said,

15  "but you say you don't care about the money" and "why don't you just resign?" Mr. Chun

16  then accused Mr. Rolovich of having situational integrity. Mr. Chun also called Mr. Rolovich

17  a "con-man" and accused him of being selfish. Mr. Chun then stated that Mr. Rolovich's

18  objections to receiving the vaccine were causing Mr. Chun and President Schulz reputational

19  damage. Mr. Chun then stated that all Mr. Rolovich had to do is get vaccinated.

20       39.  At the same meeting, Mr. Chun admitted his efforts to get Mr. Rolovich to

21  take the vaccination in the past had been coercive, and Mr. Rolovich responded that the

22  present meeting was much more coercive than earlier meetings. Mr. Chun pressed

23  

24  [1] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

25  [2] Erin Robinson, WSU granting fewer religious exemptions than the state as a whole, KXLY Spokane (Oct. 13, 2021), https://www.kxly.com/wsu-granting-fewer-religious-exemptions-than-the-state-as-a-whole/.

26  

SECOND AMENDED COMPLAINT - 9

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1    Mr. Rolovich again about the vaccine, and Mr. Rolovich said that he believed he had privacy

2    rights and did not feel comfortable telling Mr. Chun about his reasons for declining to receive

3    a COVID-19 vaccine. Mr. Chun then demanded that Mr. Rolovich tell him what his answer

4    would be.

5          40.    Mr. Chun then stated that Governor Inslee "did this" just to come after

6    Mr. Rolovich and WSU. Based on the context of Mr. Chun's statement, Mr. Rolovich

7    understood "did this" to mean that Governor Inslee was trying to force Mr. Rolovich's hand

8    with his new mandate because he was angry that the highest paid and one of the highest

9    profile State employees had asserted personal or religious objections to his vaccine mandate.

10   Mr. Chun also admitted to Mr. Rolovich that the Board of Regents wanted him fired. At this

11   point in their heated exchange, Mr. Chun modified his earlier statement: he now said that

12   Mr. Rolovich only had two options: get vaccinated or resign.

13         41.    Up to this point, Mr. Rolovich had refrained from bringing his religious

14   beliefs into his conversations with Mr. Chun about COVID vaccines. Mr. Rolovich did not

15   feel comfortable talking about his faith because it is a very personal matter to him and he was

16   uncomfortable talking about his religious beliefs with his supervisor.

17         42.    Mr. Rolovich also was uncomfortable because he did not know how WSU

18   would react to him sharing his religious opposition to medical research based on aborted fetal

19   tissue, given that WSU professors have in the past publicly defended such research.

20   However, after Mr. Chun made it clear that WSU intended to terminate him, Mr. Rolovich

21   asked Mr. Chun and Mr. Blair about the University's process for requesting a religious

22   exemption from a vaccine mandate. Mr. Chun and Mr. Blair said they did not know details

23   about the University's process. They said they had been on the phone with WSU's Human

24   Resource Services ("HRS") about that topic earlier in the day. Mr. Rolovich also had emailed

25   HRS about the process by this time, but no one had any answers because the Governor had

26   not yet made his proclamation.

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 10

43.     Mr. Chun then told Mr. Rolovich that he needed to have his religious exemption approved by August 29, the Sunday before the Utah State game. Mr. Rolovich asked who at WSU would review and approve religious exemption requests. Mr. Chun and Mr. Blair said they did not know. Mr. Rolovich asked them when the religious exemption application would be available. They said they did not know. Mr. Rolovich then responded that he feared the University would not be able to approve his exemption by Mr. Chun's August 29 deadline, given that the University's policy had not even been made public, let alone made available to him.

44.     Mr. Chun and Mr. Blair told Mr. Rolovich that they were in a time crunch and had to make a decision if he was going to coach that season. They said they did not want to start a season with Mr. Rolovich if they thought they may have to fire him on Oct 18th, pursuant to the Governor's mandate.

45.     Mr. Rolovich responded that he would seek a religious exemption right then if one was available. Mr. Chun and Mr. Blair then got even more heated and started to question Mr. Rolovich's character. Mr. Chun said if Mr. Rolovich got the religious exemption, he would forever question his character. Mr. Chun and Mr. Blair both talked about the early days of the pandemic, and that Mr. Rolovich had not mentioned his faith. Mr. Rolovich said that he did not see the point, as he does not see faith and science as exclusive.

46.     Mr. Chun and Mr. Blair then stressed that the University's religious exemption would be hard to get and that there was no guarantee that Mr. Rolovich's request would be approved. Mr. Rolovich again asked what the criteria was going to be. They said they did not know.

47.     Mr. Rolovich did not feel comfortable talking about his faith because his faith is a very personal matter to him and because he was uncomfortable talking about his religious beliefs with his supervisor.

SECOND AMENDED COMPLAINT - 11

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1217

48.     On August 20, 2021, Governor Inslee issued Proclamation 21-14.1, which required all state employees to be fully vaccinated by October 18, 2021.

49.     Governor Inslee's Proclamation mandated vaccination for state employees "even when the only vaccines available are those authorized under U.S. Food and Drug Administration Emergency Use Authorizations."

**E.     Governor Inslee and WSU Mandated That Coach Rolovich and All State Employees Accept an Experimental Vaccine**

50.     At all times relevant to this Complaint, the only vaccines available to Washington State employees were vaccines authorized under U.S. Food and Drug Administration Emergency Use Authorizations. According to DailyMed, a publication of the National Institute of Medicine, the only FDA-approved vaccine—Comirnaty—was not available to the American public:

> SEPTEMBER 13, 2021
> Pfizer received FDA BLA license for its COVID-19 vaccine
>
> Pfizer received FDA BLA license on 8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY). At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed 2 new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename.
>
> At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution. As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels.[3]

51.     On August 23, 2021, the United States Food and Drug Administration ("FDA") issued two separate letters pertaining to two separate COVID-19 vaccines. One

---

[3] *Pfizer received FDA BLA license for its COVID-19 vaccine*, DailyMed (Sept. 13, 2021), https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (Last visited Nov. 8, 2022); *see also,* Summary Basis of Regulatory Action – Comirnaty, FDA (Nov. 8, 2021) ("November 8 Comirnaty SBRA") at 5, available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022 ("In the U.S., there are no licensed vaccines or anti-viral drugs for the prevention of COVID-19."), available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022).

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 12

1    letter, addressed to Pfizer Inc., concerned the Pfizer-BioNTech COVID-19 Vaccine. Letter,

2    United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021), ("Pfizer Letter")

3    (A true and correct copy of the Pfizer Letter is attached hereto as EXHIBIT B and

4    incorporated herein). The other letter, addressed to BioNTech Manufacturing GmbH,

5    concerned the COMIRNATY vaccine. Letter, United States Food and Drug Administration

6    to BioNTech Manufacturing GmbH (Aug. 23, 2021), ("BioNTech Letter") (A true and

7    correct copy of the BioNTech Letter is attached hereto as EXHIBIT C and incorporated

8    herein).

9        52.    In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted

10    Emergency Use Authorization (EUA) for the Pfizer-BioNTech COVID-19 Vaccine. (Pfizer

11    Letter at 1.) It also notes that the EUA was continued on December 23, 2020, February 25,

12    2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2).

13        53.    The FDA stated in the Pfizer Letter that, although it had granted the

14    COMIRNATY vaccine full approval "for certain uses," the Pfizer-BioNTech COVID-19

15    Vaccine was still only authorized under an EUA. (Pfizer Letter at 2).

16        54.    At all times relevant to this Complaint, the Pfizer-BioNTech COVID-19

17    Vaccine remained available only under the authorization of an EUA. (Pfizer Letter).

18        55.    The Federal Food, Drug, And Cosmetic Act provides that subject to the

19    limitations referenced and described in U.S.C. § 360bbb-3, the Secretary of Health and

20    Human Services "may authorize the introduction into interstate commerce, during the

21    effective period of a declaration [of emergency or threat justifying emergency authorized

22    use] under subsection (b), of a drug, device, or biological product intended for use in an

23    actual or potential emergency (referred to in this section as an 'emergency use.'" 21 U.S.C.

24    § 360bbb-3(a)(1). As an essential part of the explicit statutory conditions for EUA, the EUA

25    Statute mandates that all individuals to whom the EUA product may be administered be

26    given the option to accept or refuse administration of the product:

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**ER1219**

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

(ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A).

56.    The statutorily required Fact Sheets for each of the EUA COVID-19 vaccines acknowledge that individuals cannot be compelled to accept or receive the vaccine. *See, e.g.*, Pfizer-BioNTech, Fact Sheet for Recipients and Caregivers (June 25, 2021), https://www.fda.gov/media/144414/download ("It is your choice to receive or not to receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.").

57.    WSU never explained to Mr. Rolovich the potential risks of taking the experimental vaccine.

58.    WSU never gave Mr. Rolovich the option to accept or decline the experimental vaccine, telling him only that he would be fired for just cause if he refused.

**F.    WSU Established a Blind Review Process for Exemption Requests**

59.    In the weeks that followed Governor Inslee's August 20, 2021, proclamation creating a COVID-19 vaccine mandate for State employees, WSU established procedures as

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

to how employees could request, and how the University would consider and approve or

deny requests for religious and/or medical exemptions from the vaccine mandate.

60.    WSU published its procedures for evaluating requests for religious

exemptions from the vaccine mandate on the University's website.[4] Part of this policy is

expressed in the form of FAQs. In that context, the University represented that HRS would

not share the details of an employee's request for an exemption with the employee's

supervisor or manager:

> **I am requesting a medical or religious exemption, what will my supervisor/manager see as my exemption reason?**
>
> The Workday process will show as 'in-process' when an exemption is requested and will be updated to 'complete' once reviewed and accepted. HRS will work directly with employees regarding their requested exemption as needed.

61.    The University described its process in more detail in an October 8, 2021, statement posted on its website:

> The requests for religious exemptions are evaluated in a 'blind' review process, meaning the identities of the individuals requesting exemptions are unknown to the members of the review committee except in instances when additional information is needed through follow-up contact. Separate review committees were created for students and employees. . . .
>
> For employees, the exemption requests go through a two-step process. The first is the blind review. Then, if an exemption is approved, the request moves to a separate accommodation review step where a determination is made whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community.[5]

62.    Phil Weiler, WSU vice president for communications, reiterated the process

WSU would use to handle exemption requests:

---

[4] WSU, Human Resource Services, COVID-19 Vaccination Verification (Oct. 12, 2021), available at https://web.archive.org/web/20211103092159/https://hrs.wsu.edu/covid-19/vax-verification (last visited Nov. 10, 2022).

[5] Nearly 90% of WSU Employees are Vaccinated, WSU, Oct. 8, 2021, https://everett.wsu.edu/nearly-90-of-wsu-employees-are-vaccinated/ (last visited Nov. 10, 2022).

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 15

1
2
3

> If the blind review results in the approval of Rolovich's exemption request, the process would enter a second phase. . . . An approved request would be sent to the human resources department, which would identify the employee in question and send an email to his/her supervisor indicating the exemption had been approved.[6]

4
5

At that point, according to Weiler, the supervisor would determine if the unvaccinated

6

employee would be capable of "keeping the public safe" and perform his/her job effectively.

*Id.*

7
8

### G.    WSU's Blind Review Process Determined that Mr. Rolovich's Religious Beliefs Were Sincere and Granted his Request for a Religious Exemption

9

63.    On September 28, 2021, Mr. Rolovich completed his application for a

10

religious exemption and submitted it to HRS.

11

64.    On October 6, 2021, HRS notified Mr. Chun that the University had

12

completed its "good faith review" process and had determined that Mr. Rolovich was entitled

13

to a religious exemption from the COVID-19 vaccine requirement because it found that he

14

had articulated a "sincerely held religious belief" that prevented him from complying with

15

the Governor's mandate.

16

65.    HRS then informed Mr. Chun that it was "considering approving the

17

employee's request (for accommodation) subject to the following terms and conditions,"

18

summarizing a proposed list of accommodations, including mask wearing, social distancing,

19

and testing requirements. HRS said the next step would be for the Athletics Department to

20

decide whether it was "able to accommodate this request with the above recommendations."

21

HRS stated in that email that it would not reach out to Mr. Rolovich until the University's

22

"decision on the Religious Accommodation is finalized." HRS requested that the Athletics

23

Department respond to its proposed accommodations by October 8.

24
25
26

---

[6] Jon Wilner, Would WSU actually fire Nick Rolovich? Examining the exemption review process with the vaccine mandate deadline approaching, Mercury News, Oct. 7, 2021, https://www.mercurynews.com/2021/10/07/would-wsu-actually-fire-nick-rolovich-examining-the-exemption-review-process-as-vaccine-mandate-deadline-approaches/ (last visited Nov. 10, 2022).

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**H.      Chun Improperly Inserted Himself Into the Process and Compelled WSU to
Overturn Its Determination that Mr. Rolovich's Religious Beliefs Were Sincere**

66.      Mr. Chun, writing on behalf of the WSU Athletics Department, responded to

HRS on October 13 with two memoranda. The first memorandum told HRS that it had

rejected HRS' proposed accommodations and had determined that "the department is not

able to accommodate this request."

67.      Mr. Chun's and the Athletics Department's second memorandum challenged

HRS' conclusion that "Rolovich met the requirements for a religious exemption to the

vaccination requirement by demonstrating a sincerely held religious belief against being

vaccinated for COVID-19." That challenge was based on the Athletics Department's

assertion that "Rolovich had made several statements that cast doubt on his claimed sincerely

held religious belief." The memorandum stated that the fact that Rolovich had articulated

other reasons for refusing a COVID vaccination before he had told Mr. Chun about his

religious objections to the available COVID vaccines "support[ed] re-evaluation of the

claimed sincerely-held religious belief."

68.      On October 14, 2021, Department of Environmental Health and Safety

("EH&S") issued a memorandum to Mr. Chun with extensive detail about how it had used its

"expertise in environmental and occupational health and safety" to make an "individualized

assessment" of Mr. Rolovich's working environment and formulate a list of "reasonable and

necessary interventions and countermeasures to ensure the safety of the employee and others

the employee may be in contact with."

69.      Mr. Chun, writing on behalf of the Athletics Department, subsequently wrote

HRS a memorandum, copying EH&S, that rejected EH&S' recommendations.

Mr. Chun/Athletics Department rejected EH&S' assessment that its recommendations would

"ensure the safety of the employee and others the employee may be in contact with."

70.      The Mr. Chun and the Athletics Department also rejected EHS's proposed

accommodations on the basis that having an unvaccinated head coach "would create an

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1223

undue hardship for WSU Athletics given his assigned duties and responsibilities." The

memorandum states, in part:

- "WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff."

- "[B]ecause employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches)."

- "The damage to the mission and reputation of the University posed by this situation cannot be understated [*sic*], nor can it be resolved by accommodation."

## I.    Mr. Rolovich's Compliance with WSU Protocols, and Mr. Chun's Violation of WSU Protocols, Undermine Mr. Chun's Given Reasons for Not Accommodating Mr. Rolovich's Religious Convictions

71.    During the pandemic, WSU imposed protocols it hoped would mitigate the

transmission of Covid among its employees and students. Mr. Rolovich was required to

follow specific protocols developed for him because he was unvaccinated. Days before

Mr. Rolovich informed Mr. Chun that he intended to seek a religious exemption from the

vaccine Mandate, Mr. Chun said that he was confident that Mr. Rolovich could safely coach

WSU's football team.

72.    The Seattle Times reported that Mr. Rolovich was "undergoing daily COVID-

19 testing and wears a mask. Chun said the coach is adhering to all protocols."[7] "WSU

athletic director Pat Chun, who is vaccinated, made it clear Wednesday that he backs his

coach, saying Rolovich is the right person for the job despite the two being diverged on the

vaccine decision." *Id.*

---

[7] Scott Hanson, WSU in 'strict COVID management' after football coach Nick Rolovich's decision to not get vaccinated, Spokesman Review, Aug. 13, 2021, https://www.spokesman.com/stories/2021/aug/13/wsu-in-strict-covid-management-after-football-coac/ (last visited Nov. 10, 2022).

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 18

73.     Mr. Chun, however, did not follow WSU's Covid protocols. Four days after he fired Mr. Rolovich for allegedly "undermin[ing] the University's efforts to promote student safety," Mr. Chun was caught violating masking regulations at a donor event;[8] days later Mr. Chun was caught violating masking regulations while in the locker room with WSU football players.[9]

74.     When a local politician pointed out Mr. Chun's double-standard, Mr. Chun went to the City Councilor's place of business, launched a vulgar tirade, and threatened violence in front of the City Councilor's teenage daughter. Mr. Chun became so angry that the police got involved and decided that Mr. Chun would be "permanently trespassed" from the City Councilor's businesses.[10]

75.     On November 19, 2021, a local reporter noted that Mr. Chun was disregarding masking rules at a WSU basketball game in Idaho.[11]

---

[8] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/ (last visited Nov. 10, 2022).

[9] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664 (last visited Nov. 10, 2022). Mr. Chun's conduct violated both the University's and host Arizona State University's masking policies. *See* Arizona State University, Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

[10] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-trespassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html (last visited Nov. 10, 2022); Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/ (last visited Nov. 10, 2022).

[11] Katie Daviscourt, WSU athletic director caught violating COVID protocols after firing head football coach for refusing vaccine, Post Millennial, Nov. 19, 2021, https://thepostmillennial.com/wsu-athletic-director-violating-covid-firing-coach (last visited Nov. 10, 2022).

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 19

**J.    Stanford Public Health and Infectious Disease Expert States that WSU Could Have Safely Accommodated Mr. Rolovich**

76.    Dr. Bhattacharya, a former Professor of Medicine (20+ years) and current Professor of Health Policy at Stanford University School of Medicine submitted a 29 page declaration to Mr. Chun and President Schulz on behalf of Mr. Rolovich. The Declaration provided scientific evidence in support of his conclusion that WSU could keep its employees safe while granting exemptions for those whose medical conditions and religious convictions prevent them from receiving a COVID vaccine.

77.    Dr. Bhattacharya also is a research associate at the National Bureau of Economic Research, and Director of Stanford's Center for Demography and Economics of Health and Aging. Dr. Bhattacharya holds an M.D. and Ph.D. from Stanford University. He has published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. Dr. Bhattacharya's research has been cited in the peer-reviewed scientific literature more than 11,600 times.

78.    Dr. Bhattacharya has dedicated his professional career to the analysis of health policy, including infectious disease epidemiology and policy, and the safety and efficacy of medical interventions. He has both studied extensively and commented publicly on the necessity and safety of vaccine requirements for those who have contracted and recovered from COVID-19 (individuals who have "natural immunity"). Dr. Bhattacharya is intimately familiar with the emergent scientific and medical literature on this topic and pertinent government policy responses to the issue both in the United States and abroad.

79.    Dr. Bhattacharya also is the primary co-author of the Great Barrington Declaration, which describes an alternate policy of focused protection. His co-authors of the Declaration include Prof. Martin Kulldorff of Harvard University and Prof. Sunetra Gupta of Oxford University. Over 12,000 epidemiologists and public health professionals and 35,000

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1226

1  medical professionals had co-signed the Declaration by the time Mr. Rolovich was

2  terminated.

3        80.    WSU produced no evidence, let alone scientific evidence, that the

4  accommodation plans developed by EH&S would not be effective for Mr. Rolovich.

5        81.    In his declaration, Dr. Bhattacharya noted, "According to a meta-analysis by

6  Dr. John Ioannidis of every seroprevalence study conducted to date of publication with a

7  supporting scientific paper (74 estimates from 61 studies and 51 different localities

8  worldwide), the median infection survival rate—the inverse of the infection fatality rate—

9  from COVID-19 infection is 99.77%. For COVID-19 patients under 70, the meta-analysis

10  finds an infection survival rate of 99.95%. A separate meta-analysis by other scientists

11  independent of Dr. Ioannidis' group reaches qualitatively similar conclusions.

12        82.    Dr. Bhattacharya continued, "A study of the seroprevalence of COVID-19 in

13  Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the

14  infection survival rate in a preprint companion paper: 99.9984% for patients 5 to 9 years old;

15  99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86%

16  for patients 50 to 64 years old; and 94.6% for patients above 65."

17        83.    Those numbers are consistent with what the US CDC has reported. A US

18  CDC report found between 6 and 24 times more SARS-CoV-2 infections than cases reported

19  between March and May 2020. Correspondingly, the CDC's estimate of the infection fatality

20  rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997%

21  survivability rate. For people ages 20-49 years, it was 0.02%, meaning that young adults have

22  a 99.98% survivability rate. For people age 50-69 years, it was 0.5%, meaning this age group

23  has a 99.5% survivability rate. Finally, for people ages 70+ years, it was 5.4%, meaning

24  seniors have a 94.6% survivability rate.

25        84.    Dr. Bhattacharya stated, "It has been found that vaccinated individuals are at

26  least as likely as unvaccinated individuals to be shedding live virus. Data from studies

SECOND AMENDED COMPLAINT - 21

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1227

1    indicate that vaccinated and unvaccinated individuals infected with the Delta variant might

2    transmit infection. Importantly, it has been shown that infectious SARS-CoV-2 is frequently

3    found even in vaccinated persons.”

4        85.    Also, the CDC reported in July 2021 that “new scientific data” indicated that

5    vaccinated people who experienced breakthrough infections carried similar viral loads to the

6    unvaccinated, leading the CDC to infer that vaccinated people transmit the virus at

7    concerning levels.[12]

8        86.    Dr. Bhattacharya noted that “[a]symptomatic individuals are an order of

9    magnitude less likely to infect others than symptomatic individuals, even in intimate settings

10    such as people living in the same household where people are much less likely to follow

11    social distancing and masking practices that they follow outside the household. Spread of the

12    disease in less intimate settings by asymptomatic individuals—including in the context of the

13    WSU work environment—is likely to be even less likely than in the household.”

14        87.    Dr. Bhattacharya concluded that the best empirical evidence shows that the

15    probability that an asymptomatic individual will spread the disease is very low. And because

16    the overwhelming majority of WSU employees were vaccinated in the fall of 2021, they

17    faced even less risk from any of their asymptomatic, unvaccinated coworkers who receive an

18    accommodation from WSU for religious or medical reasons.[13]

19        88.    When Mr. Rolovich was asymptomatic, he—like all other asymptomatic

20    individuals—presented an almost 0% chance of infecting others with COVID-19.

21
22    [12] *See* Joel Achenbach, CDC Reversal on Indoor Masking Prompts Experts to Ask, “Where’s the Data?” Wash. Post, July 28, 2021, wapo.st/2THpmIQ (last visited Nov. 10, 2022).

23
24    [13] President Schulz had said that nearly 90 percent of WSU employees and 97 percent of students were vaccinated. Chuck Culpepper, Washington State Football Coach Nick Rolovich Fired after Failing to Comply with Vaccine Mandate, Washington Post, Oct. 18, 2021, https://www.washingtonpost.com/sports/2021/10/18/nick-rolovich-washington-state-fired-covid-mandate/. *See also* Donald G. McNeil, Jr., How Much Herd Immunity Is Enough?, NY Times, Dec. 24, 2020 (updated Sept.

25    22, 2021), https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html (“Dr. Fauci noted, a herd-immunity figure at 90 percent or above is in the range of the infectiousness of measles. ‘I’d bet

26    my house that Covid isn’t as contagious as measles,’ he said.”).

SECOND AMENDED COMPLAINT - 22

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

89.      In Dr. Bhattacharya's expert opinion, derived from his personal scientific investigations, and his examination and analysis of a multitude of scientific studies, WSU could have safely accommodated Mr. Rolovich and other unvaccinated employees.

**K.**     **WSU's Termination of Mr. Rolovich as Head Coach**

90.      Mr. Rolovich arrived at a meeting on October 18, 2021, and one minute before that meeting, at 4:29, while waiting for Mr. Chun, Mr. Rolovich received an email from HRS Exemptions notifying him that the University was "unable to approve your request for an exemption and accommodation based on a sincerely held religious belief, practice, or observance."

91.      Though the HRS panel had already determined that Mr. Rolovich's religious beliefs were sincere and granted him a religious exemption on that basis, HRS allowed Mr. Chun to improperly influence and interfere with the final decision made in its blind review process. Mr. Chun notified HRS that he disagreed with HRS's determination regarding Mr. Rolovich's sincerity, and, as a result, HRS reversed its determination, stating, "[b]ased on your comments, in conjunction with the timing of your request for a religious accommodation, the University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement."

92.      HRS also reversed its position that Mr. Rolovich's sincere religious beliefs could be accommodated by WSU, adopting Mr. Chun and the Athletics Department's position that Mr. Rolovich could not "safely and effectively do [his] job without undue hardship to the University."

93.      At the October 18 meeting, Mr. Chun served Mr. Rolovich with Written Notice of Intent to Terminate with Just Cause.

94.      Mr. Chun had a security officer, who was present during the meeting, escort Mr. Rolovich from the building and to Mr. Rolovich's truck.

SECOND AMENDED COMPLAINT - 23

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1229

95.     Mr. Chun did not permit Mr. Rolovich to return to his office to retrieve his private property.

96.     Mr. Chun did not permit Mr. Rolovich to speak with his WSU football players after the meeting.

97.     As a direct and proximate result of WSU's, Governor Inslee's, and Mr. Chun's actions, Mr. Rolovich has suffered, and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, and compensation and benefits for which he is entitled to an award of monetary damages.

**COUNT I**
**BREACH OF CONTRACT**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

98.     Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

99.     Pursuant to the terms of WSU's employment contract with Mr. Rolovich, WSU could terminate him with just cause (as defined in the contract), or without cause, but if it terminated Mr. Rolovich without cause, WSU was required to pay liquidated damages in an amount equal to sixty percent of his remaining base salary. When he was terminated, Mr. Rolovich had approximately three and one-half years remaining on his contract.

100.     WSU terminated Mr. Rolovich in December 2021, claiming that it had just cause to do so, and on that basis denied that it owed Mr. Rolovich any further compensation under Mr. Rolovich's employment agreement.

101.     WSU breached its contract with Mr. Rolovich because it did not have just cause to terminate Mr. Rolovich.

102.     WSU violated its own policies by allowing HRS to be improperly and unlawfully influenced by Mr. Chun, who persuaded HRS to reverse its determination that Mr. Rolovich's religious beliefs regarding Covid vaccines were sincere.

SECOND AMENDED COMPLAINT - 24

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**ER1230**

1    103.    Mr. Rolovich reasonably relied upon WSU's representation that it would

2  follow a blind review process in determining whether a request for a religious exemption

3  from the vaccine mandate was grounded in a sincere religious belief.

4    104.    Mr. Rolovich's determination that he could not receive a COVID-19 vaccine

5  without violating his religious convictions was not a deliberate and serious violation of his

6  contractual duties, it was not an act of misconduct, or an intentional or major violation or

7  repeated instance of secondary violations, nor was it prejudicial to the best interests of the

8  University or its athletic program. It was an act of faith, of conscience.

9    105.    By taking punitive action against Mr. Rolovich for raising a religious

10  objection that the University's own process deemed sincere, WSU breached its employment

11  agreement with Mr. Rolovich.

12    106.    After HRS determined that Mr. Rolovich's religious beliefs were sincere, both

13  HRS and EH&S determined that Mr. Rolovich's sincere religious beliefs could be

14  accommodated by requiring countermeasures to ensure his safety and others he may be in

15  contact with.

16    107.    For approximately a year prior to his termination, Mr. Rolovich had

17  successfully performed his job as head coach while following countermeasures required of

18  him by WSU because of his vaccination status.

19    108.    Mr. Chun rejected the HRS and EH&S accommodation protocols developed

20  for Mr. Rolovich, without ever seeking input from Mr. Rolovich.

21    109.    Mr. Rolovich's sincere religious beliefs could have been accommodated as

22  was clearly demonstrated by HRS, and especially EH&S, whose expertise in environmental

23  and occupational health and safety" made an "individualized assessment" of Mr. Rolovich's

24  working environment and formulated a list of "reasonable and necessary interventions and

25  countermeasures to ensure the safety of the employee and others the employee may be in

26  contact with."

SECOND AMENDED COMPLAINT - 25

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1231

110. WSU's refusal to seek input from Mr. Rolovich on his religious accommodation, a duty imposed by law, was a breach of its employment agreement with Mr. Rolovich, as was Mr. Chun's predetermination before Governor Inslee's vaccine mandate that Mr. Rolovich would be fired with cause if he did not get vaccinated.

111. WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT II**
**WRONGFUL WITHHOLDING OF WAGES**
**RCW 49.52, et. seq., and RCW 49.48.010, et seq.**

112. Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

113. Pursuant to the terms of WSU's employment contract with Mr. Rolovich, WSU could terminate him with just cause (as defined in the contract), or without cause, but if it terminated him without cause, WSU was required to pay liquidated damages in an amount equal to sixty percent of his remaining base salary. When he was terminated, Mr. Rolovich had approximately three and one-half years remaining on his contract.

114. WSU terminated Mr. Rolovich in December 2021, claiming that it had just cause to do so, and on that basis denied that it owed Mr. Rolovich any further compensation under Mr. Rolovich's employment agreement.

115. WSU's improper "just cause" termination of Mr. Rolovich was done to avoid paying him liquidated damages, as required by his contract with WSU if he had been properly terminated under the 'without cause' provision.

116. The actions of WSU and its agents in failing to pay Plaintiff all wages due at the end of his employment violated RCW 49.48 et seq.

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 26

117.    The actions of WSU and its agents also constitute willful withholding of agreed upon wages in violation of RCW 49.52.050 and .070.

WHEREFORE, Plaintiff prays for damages as provided for law, including exemplary damages in amounts equal to double the amounts due to Plaintiff, pursuant to RCW 49.52.070, and attorneys fees and costs pursuant to RCW 49.48.030 and RCW 49.52.070..

## COUNT III
## WASHINGTON LAW AGAINST DISCRIMINATION
### RCW 49.60 *et seq.*

118.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

119.    A substantial factor in WSU's decision to terminate Mr. Rolovich "for just cause" was his religious beliefs (creed) as expressed by him in seeking a religious exemption from Governor Inslee's vaccine mandate.

120.    An individual's exercise of religious beliefs in a decision not to be vaccinated, or take medicine, cannot lawfully serve as the basis for a just cause termination.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

## COUNT IV
## WASHINGTON CONSTITUTION, ARTICLE 1, SECTION 11
## DISCRIMINATION AGAINST RELIGION/CONSCIENCE

121.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

122.    The Washington State Constitution guarantees Mr. Rolovich "[a]bsolute freedom of conscience in all matters of religious sentiment, belief, and worship." The same constitutional provision states that "no one shall be molested or disturbed in person or property on account of religion."

SECOND AMENDED COMPLAINT - 27

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

## ER1233

123.    Defendants, by their conduct and words, discriminated against Mr. Rolovich because he acted according to his conscience, guided by his religion, in refusing to be vaccinated.

124.    Defendants' threat to fire Mr. Rolovich with "just cause" if he did not take an experimental vaccine was a disturbing and unlawful assault upon Mr. Rolovich's conscience, bodily integrity, and religious faith.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

## COUNT V
## VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*

125.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

126.    Title VII of the Civil Rights Act of 1964 prohibits WSU from discriminating against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C. §2000e-2(a).

127.    Mr. Rolovich holds sincere religious beliefs that precluded him from receiving any of the COVID-19 vaccines available during the times relevant to this complaint.

128.    Mr. Rolovich notified WSU of those beliefs by requesting a religious exemption and reasonable accommodations from the vaccine mandate.

129.    WSU's HRS panel, pursuant to the University's established policies and protocol, determined that Mr. Rolovich had sincere religious beliefs that precluded him from taking the vaccine, thereafter notifying the Athletics Department (Mr. Chun) of its determination.

130.    The HRS panel, having concluded that Mr. Rolovich's religious beliefs were sincere, asked only for Mr. Chun's input on whether Mr. Rolovich's sincere religious beliefs could be accommodated.

SECOND AMENDED COMPLAINT - 28

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

131.    Both HRS and EHS determined that WSU could accommodate Mr. Rolovich's sincere religious beliefs.

132.    WSU failed to engage with Mr. Rolovich in the interactive process set forth in the EEOC's Compliance Manual on Religious Discrimination before concluding that it would not accommodate his request for a religious exemption.

133.    WSU's disapproval of Mr. Rolovich's sincerely-held religious reasons for refusing to receive a COVID-19 vaccine was one of the University's motives for its discriminatory treatment of Mr. Rolovich.

134.    Accommodating Mr. Rolovich's religious beliefs would not have resulted in an undue hardship on WSU's operations.

135.    WSU's discriminatory actions were intentional and/or reckless and in violation of Title VII.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT VI**
**42 U.S.C., SECTION 1983**
**First Amendment-Free Exercise of Religion and Fourteenth Amendment-Due Process**
**(Defendant Chun only, in his Individual Capacity)**

136.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

137.    All of the acts of Defendant Chun were conducted by him under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

138.    The law regarding the free exercise of religion in employment is well established.

139.    The law regarding due process in employment is well established.

140.    Defendant Chun knew the First Amendment prohibits government officials from discriminating against an employee because of his religious beliefs.

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 29

141. Defendant Chun knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

142. Defendant Chun knew the Fourteenth Amendment prohibits government from denying an employee due process.

143. Defendant Chun knew the Fourteenth Amendment prohibits government officials from denying an employee his right to due process.

144. Defendant Chun acted with willful malice, and/or intentionally and in gross disregard of Mr. Rolovich's constitutional rights, and/or in reckless disregard of Mr. Rolovich's constitutional rights.

145. As a direct and proximate result of Defendant Chun's actions, Mr. Rolovich has been deprived of his constitutional right to the free exercise of religion, to be free from governmental hostility directed at his religion, and his right to due process and equal protection under the law.

WHEREFORE, Plaintiff prays for damages against Defendant Chun as provided for by law.

### COUNT VII
### 42 U.S.C., SECTION 1983
### (First Amendment-Free Exercise of Religion)

146. Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

147. All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

148. Defendants granted twice as many medical exemptions as religious exemptions to WSU employees, reflecting Defendants' discriminatory policy to grant religious exemptions as narrowly as possible.

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SECOND AMENDED COMPLAINT - 30

ER1236

149.    The creation of a formal mechanism for granting exemptions renders WSU's vaccine mandate not generally applicable because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude.

150.    Defendants ultimately denied Mr. Rolovich's religious exemption request, terminated him, and improperly claimed it had just cause to do so, because Mr. Rolovich had informed Defendants that religious convictions precluded him from receiving a COVID-19 vaccine.

151.    Mr. Rolovich's religious conviction to not be vaccinated cannot be punished by WSU by terminating him with just cause.

152.    The actions of Defendants, as alleged herein, are unconstitutional abridgements of Mr. Rolovich's rights to the free exercise of religion secured by the First and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

### COUNT VIII
### FOURTEENTH AMENDMENT-DUE PROCESS (As Applied)

153.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

154.    All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

155.    Defendants' policies, as administratively construed and applied against Mr. Rolovich, granted WSU officials unfettered discretion to disregard the process they created for determining whether a religious exemption would be granted and, therefore, abridged Mr. Rolovich's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

      a.      Assume jurisdiction over this action;

      b.      Award damages in an amount to be determined at trial plus pre and post-judgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

      c.      Award liquidated damages, as provided for in the employment contract;

      d.      Award punitive damages, as provided for under 42 U.S.C. § 1983, Title VII, RCW 49.60 *et seq.* and as otherwise provide for under federal and state law;

      e.      Award double damages as provided for in RCW 49.52, *et seq.*;

      f.      Award damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus pre and post-judgment interest;

      g.      Award an offset for the adverse federal income tax consequences resulting from damages and award of attorneys' fees;

      h.      Award costs that Plaintiff has incurred in this action, including but not limited to expert witness fees, as well as reasonable attorneys' fees and costs to the fullest extent permitted by federal and state law; and

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**ER1238**

1     i.  Award such other and further relief as the Court may deem just and

2 proper.

3    DATED this 19th day of September, 2023.

4

5           By  s/ Brian Fahling

6             Brian Fahling
              WSBA #18894

7             LAW OFFICE OF BRIAN FAHLING
              559 Old Mill Rd.

8             Sandpoint, ID 83864
              T: 425.802.7326

9             E-mail: bfahling@fahlinglaw.com

10           By  s/ Eric Kniffin

11             Eric Kniffin
              CO Bar #48016

12             (Admitted *Pro Hac Vice*)

13             KNIFFIN LAW
              102 S. Tejon St., Suite 1100

14             Colorado Springs, CO 80903
              T: 719-212-4391

15             E-mail: eric@kniffin.law

16           By  s/ Job Seese

17             E. Job Seese
              CO Bar #48379

18             (Admitted *Pro Hac Vice*)
              LEWIS ROCA ROTHGERBER CHRISTIE

19             101 19th Street, Suite 1000

20             Denver, CO 80202
              T: 303-623-90007

21             E-mail: jseese@lewisroca.com

22           Attorneys for Plaintiff

23

24

25

26

SECOND AMENDED COMPLAINT - 33

LAW OFFICE OF BRIAN FAHLING
559 Old Mill Rd.
Sandpoint, ID 83864
T: (425) 802-7326
E: bfahling@fahlinglaw.com

ER1239

(153 of 289), Page 153 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 153 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.440    Page 1 of
137

1  BRIAN FAHLING, WSBA #18894
2  Law Office of Brian Fahling
   8124 NE 166th St
3  Kenmore, WA 98028
   (425) 802-7326
4

5  ERIC KNIFFIN
   Kniffin Law PLLC
6  102 S. Tejon Street, Suite 1100
7  Colorado Springs, CO 80903
   (719) 246-8889
8

9  ERIC JOB SEESE
   Lewis Roca Rothgerber Christie LLP
10 1601 19th Street, Suite 1000
   Denver, CO 80202
11 (303) 623-9000

12                                              Honorable Thomas O. Rice

13            UNITED STATES DISTRICT COURT
14           EASTERN DISTRICT OF WASHINGTON

15 NICHOLAS ROLOVICH,
16                                    NO.  2:22-cv-00319-TOR
        Plaintiff,
17
18 v.                                 DECLARATION OF BRIAN
                                       FAHLING IN SUPPORT OF
19 WASHINGTON STATE                    NICHOLAS ROLOVICH'S
   UNIVERSITY, an agency of the        OPPOSITION TO WSU
20 State of Washington; PATRICK        DEFENDANTS' MOTION TO
                                       DISMISS
21 CHUN, Director of Athletics for
   Washington State University, in his
22 individual capacity; and JAY        May 11, 2023
   INSLEE, Governor, in his official   With Oral Argument: 11:00 a.m.
23 capacity,                           Spokane Courtroom 902
24
        Defendants.
25

26

DECLARATION OF BRIAN FAHLING IN SUPPORT OF NICHOLAS ROLOVICH'S
OPPOSITION TO WSU DEFENDANTS' MOTION TO DISMISS - 1

1    1.    I, Brian Fahling, represent Nicholas Rolovich in this matter. I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

2.    The exhibits attached hereto is incorporated by reference into Mr. Rolovich's First Amended Complaint, ECF No. 1-1 ¶¶ 5, 63-65 (FAC or the Complaint).

3.    Attached as **Exhibit 1** is a true and correct copy of Mr. Rolovich's application for a religious exemption from Governor Inslee's vaccine mandate (Proclamation 21.14.1), submitted to WSU's Human Resources Services. *See* FAC ¶¶ 63-65 (redactions in application made by WSU's Human Resources Services).

4.    Attached as **Exhibit 2** is a true and correct of Mr. Rolovich's November 26, 2021, appeal to President Schulz, which includes with it a true and correct copy of Mr. Rolovich's November 2, 2021, appeal to Mr. Chun. *See* FAC ¶ 5.

I declare under penalty of perjury that the foregoing is true and correct. EXECUTED this 12th day of April, 2023, at Kenmore, Washington.

/s/  Brian Fahling
Brian Fahling, WSBA #18894

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

DECLARATION OF BRIAN FAHLING IN SUPPORT OF NICHOLAS ROLOVICH'S
OPPOSITION TO WSU DEFENDANTS' MOTION TO DISMISS - 2

**ER1241**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of April, 2023, I electronically filed the forgoing DECLARATION OF BRIAN FAHLING IN SUPPORT OF NICHOLAS ROLOVICH'S OPPOSITION TO WSU DEFENDANTS' MOTION TO DISMISS, with the Clerk of Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that none of the represented parties are non-CM/ECF participants.

**LAW OFFICE OF BRIAN FAHLING**

By: __/s/ Brian Fahling_____
        Brian Fahling

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

DECLARATION OF BRIAN FAHLING IN SUPPORT OF NICHOLAS ROLOVICH'S
OPPOSITION TO WSU DEFENDANTS' MOTION TO DISMISS - 3

ER1242

# EXHIBIT 1

WASHINGTON STATE UNIVERISTY
RELIGIOUS EXEMPTION REQUEST FORM
PROCLAMATION 21-14.1 (COVID-19 VACCINE REQUIREMENT)

Washington State University will provide reasonable accommodations to qualified applicants and employees with sincerely held religious beliefs, practice, or observance that conflict with job requirements, unless providing such accommodations would pose an undue hardship.

**Instructions for employees:**

Initiate request for religious accommodation in Workday. For instructions on completing the COVID-19 Vaccination Verification in Workday refer to COVID-19 Vaccination Verification for Workers.

Below are initial intake questions for you to respond to in requesting a sincerely held religious beliefs, practice, or observance exemption pursuant to Proclamation 21-14.1.

Claiming an exemption/accommodation based on false, misleading, or dishonest information is grounds for disciplinary action up to and including termination from employment.

Complete and return to Human Resource Services, Pullman, WA, no later than October 4, 2021. To avoid delay, you may submit the form by fax to: 509-335-1259 or email to hrs.exemptions@wsu.edu. If you have any questions or need more information, please do not hesitate to contact your HRS Service Team.

**Questionnaire:**

1. Employee Name (Print): ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   WSU ID#           : 1173226

2. Describe the sincerely held religious belief, practice, or observance that is the basis for your request for a religious exemption/accommodation to WSU's COVID-19 vaccination requirement.

   *See attached*

3. Briefly explain how your sincerely held religious belief, practice, or observance conflicts with WSU's COVID-19 vaccination requirement.

   *See attached*

4. How long have you held the above religious belief, practice, or observance?

   *See attached*

**ER1244**

WASHINGTON STATE UNIVERISTY
RELIGIOUS EXEMPTION REQUEST FORM
PROCLAMATION 21-14.1 (COVID-19 VACCINE REQUIREMENT)

5.  If you have ever received a FDA authorized or approved vaccine at any time in your life, please explain how your sincerely held religious belief, practice, or observance causes you to object to the COVID-19 vaccine compared to other vaccines you received.

*See attached*

6.  If the request for accommodation is temporary, please identify the anticipated date the accommodation is no longer needed: __life__ .

Washington State University may need to obtain additional follow up information about your strongly held religious belief(s) and/or discuss reasonable accommodations to WSU's COVID-19 vaccination requirement. Human Resource Services will reach out to you if additional information is needed to process this request.

I certify that I have read and understand the information provided in this request, and that I have truthfully completed it based on my knowledge, information, and belief. I understand that it is illegal to claim an exemption/ or accommodation on false, misleading, or dishonest grounds, including by providing false, misleading, or dishonest information when seeking an exemption/accommodation, and that any violations will be subject to appro▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

__9/28/21__

Date

[Date]

To Whom It May Concern,

I am a baptized Catholic seeking an exemption from WSU's vaccine mandate. This letter
explains why my sincerely held religious beliefs prohibit me from accepting the vaccine, and
why I am compelled to do so by the teachings of the Roman Catholic Church.

I believe that abortion is the taking of innocent human life. The Roman Catholic Church teaches
that I am required to refuse a medical intervention, including a vaccination, when my conscience
has come to sure judgment that, as in this case, accepting the vaccine will make me complicit in
the abortions that produced the human cell lines from which currently available vaccines are
ultimately derived. While the Catholic Church, in principle, does not prohibit the use of
vaccines, the following authoritative Church teachings provide the basis on which I have
determined that I cannot accept the vaccination:

- Vaccination is not morally obligatory in principle and so must be voluntary. [1]
- There is a general moral duty to refuse the use of medical products, including certain
  vaccines, that are produced using human cells lines derived from direct abortions.
- A person's informed judgments about the proportionality of medical
  interventions are to be respected unless they contradict authoritative Catholic
  moral teachings. [2]
- A person is morally required to obey his or her sure conscience. [3]

There is no authoritative Church teaching universally obliging Catholics to receive any vaccine.
An individual Catholic may invoke Church teaching to refuse a vaccine developed or produced
using abortion- derived cell lines. More generally, a Catholic might refuse a vaccine based on the
Church's teachings concerning therapeutic proportionality. Therapeutic proportionality is an
assessment of whether the benefits of a medical intervention outweigh the undesirable side-
effects and burdens in light of the integral good of
the person, including spiritual, psychological, and bodily goods. [4] It can also extend to the
good of others and the common good, which likewise entail spiritual and moral dimensions
and are not reducible to public health. The judgment of therapeutic proportionality must be
made by the person who is the potential recipient of the intervention in the concrete
circumstances, [5] not by public health authorities or by other individuals who might judge
differently in their own situations.

While my Bishop encourages vaccines, he also confirms that at the core of the Church's
teaching are the first and last points listed above: vaccination is not a universal obligation, and
a person must obey the judgment of his or her own informed and certain conscience. In fact,
the *Catechism of the Catholic Church* instructs that following one's conscience is following
Christ Himself:

> In all he says and does, man is obliged to follow faithfully what he knows to be
> just and right. It is by the judgment of his conscience that man perceives and
> recognizes the prescriptions of the divine law: "Conscience is a law of the mind;
> yet [Christians] would not grant that it is nothing more; . . . [Conscience] is a
> messenger of him, who, both in nature and in grace, speaks to us behind a veil,
> and teaches and rules us by his representatives. Conscience is the aboriginal
> Vicar of Christ."[6]

Because I have come to an informed and sure judgment in conscience that I must not receive the vaccine, the Catholic Church requires that I follow this certain judgment of my conscience. The *Catechism* is clear: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.'" [7]

It is important to note that the law provides protection for sincerely held religious beliefs, even when some members of the same Church or denomination disagree with the beliefs held by the individual. Under Title VII, the test is not, in my case, what Pope Francis may believe about vaccinations, but rather, what I believe the Catholic Faith requires of me,

> [i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences . . . and the guarantee of free exercise is not limited to beliefs which are shared by all of the of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the command of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of Ind. Emp't. Sec. Div.*, 450 U.S. 707, 715-716 (1981).

Finally, in response to your questions about any past medicine and vaccinations that I might have received, I can say that I have never knowingly accepted or received medication or vaccine(s) that were derived from the cell lines of aborted fetuses.

I am merely requesting a reasonable accommodation to my sincerely held religious objection to these vaccines. It is difficult to comprehend any undue hardship that would be placed upon WSU by this accommodation since it has been established that those who have been vaccinated are seeing their immunity wane significantly (*see*, Waning immunity of the BNT162b2 vaccine: A nationwide study from Israel, https://www.medrxiv.org/content/10.1101/2021.08.24.21262423v1) (booster shots are required to get the short-lived immunity back), it has been demonstrated that the vaccinated have "breakthrough" infections at an alarming rate, and they also shed the virus just as the unvaccinated (*see, e.g., CDC mask decision followed stunning findings from Cape Cod beach outbreak* https://abcnews.go.com/Politics/cdc-mask-decision-stunning-findings-cape-cod-beach/story?id=79148102).

The same accommodations given to the vaccinated staff to protect themselves and others will be equally efficacious for the unvaccinated.

NOTES

3/21

E

1 Congregation for the Doctrine of the Faith (CDF), "Note on the Morality of Using Some Anti-COVID-19 Vaccines," December 17, 2020, n. 5: "At the same time, practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary."

2 See United States Conference of Catholic Bishops (USCCB), *Ethical and Religious Directives for Catholic Health Care Services*, 6th ed. (Washington, DC: USCCB Publishing, 2018), n. 28. Hereafter "*ERDs*."

3 "A human being must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself. Yet it can happen that moral conscience remains in ignorance and makes erroneous judgments about acts to be performed or already committed." *Catechism of the Catholic Church* (Vatican City: Libreria Editrice Vaticana, 1993), www.vatican.va, n. 1790. Hereafter "*CCC*."

4 See *ERDs*, nn. 32-33; nn. 56-57; Part Three, Introduction, para. 2; Part Five, Introduction, para. 3.

5 See *ERDs*, nn. 56-57. Both of these directives state that the proportionality of medical interventions is established "in the patient's judgment."

6 *CCC*, n. 1777, citing John Henry Cardinal Newman, "Letter to the Duke of Norfolk," V, in *Certain Difficulties felt by Anglicans in Catholic Teaching II* (London: Longmans Green, 1885), 248.

7 *CCC*, n. 1782, citing Second Vatican Council, *Dignitatis humanae*, December 7, 1965, n. 3.

# EXHIBIT 2



November 26, 2021

Kirk H. Schulz
President
Washington State University
E: PresidentsOffice@wsu.edu
T: 509-335-0200

Re: Appeal of Chun's Termination of Nicholas Rolovich

Dear President Schulz:

As counsel for Nicholas Rolovich, Brian Fahling of the Law Office of Brian Fahling and Eric Kniffin of Lewis Roca submit this letter under Paragraph 4.3 of Coach Rolovich's Employment Contract with the University to offer you the opportunity to reevaluate Patrick Chun's November 12, 2021, decision to terminate Coach Rolovich, and his contemporaneous claim that the University has the legal right to avoid paying Coach Rolovich liquidated damages as required under Paragraph 4.4.1 of his Contract.

Along with this appeal we attach the following:

Ex. A:  Mr. Chun's Oct. 18 letter to Coach Rolovich, Notice of Intent to Terminate for Just Cause
Ex. B:  Coach Rolovich's Nov. 2 letter to Mr. Chun appealing Oct. 18 Notice, with attachments;
Ex. C:  Mr. Chun's November 12 letter to Coach Rolovich, Notice of Decision to Terminate for Just Cause, with attachments; and
Ex. D:  Coach Rolovich's Employment Contract with WSU.

As specified in Paragraph 4.3 of Coach Rolovich's Contract, the primary purpose of this letter is to explain why Mr. Chun was wrong to claim that he had "just cause" to terminate Coach Rolovich. To that end, it is important that we highlight for you the myriad ways in which Mr. Chun has violated University policy and Coach Rolovich's legal and constitutional rights.

We presume you are aware that Mr. Chun has been exhibiting extremely poor judgment and self-control as of late. Since deciding to terminate Coach Rolovich, he has been caught violating masking regulations at a donor event[1] and with WSU football players in the locker room.[2] When a local politician pointed out Mr. Chun's rank hypocrisy, Mr. Chun

---

[1] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/.

[2] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664. Mr. Chun's conduct violated both the University's and host Arizona State University's masking policies. See Arizona State University,

President Kirk H. Schulz
November 26, 2021
Page 2

went to the City Councilor's place of business and launched a vulgar tirade and threatened violence in front of the City Councilor's teenage daughter. Mr. Chun was so unhinged that the police got involved and decided that Chun would be "permanently trespassed" from the City Councilor's businesses.[3] But not even police action has been enough to quell Mr. Chun's misconduct: on November 19 a local reporter noted that Mr. Chun was openly flaunting masking rules at a WSU basketball game in Idaho.[4]

We presume that you condemn Mr. Chun's misconduct and his public violations of State, WSU, and host school COVID-19 safety policies. In that same spirit, we want to bring to your attention the manner in which Mr. Chun mishandled Coach Rolovich's request for a religious exemption from the Governor's vaccine mandate. That conduct and its illegality is detailed in our appeal, attached as Exhibit B, and we will reference it only in passing here.

We are confident that a neutral decisionmaker, familiar with the facts and caselaw relevant to Mr. Chun's decision to deny Coach Rolovich's request for a religious exemption, will come to see that there are two basic options in this matter. Option one is to embrace the University's processes, affirm Coach Rolovich's rights, and reject Mr. Chun's conduct in this affair. Option two is to defend Mr. Chun's conduct and turn a blind eye to University policy and Coach Rolovich's rights. These choices are clear because the relevant facts and legal principles are clear and unassailable.

Below we set out five points that succinctly state the strength of Coach Rolovich's position. While we understand the decision to uphold or reverse Mr. Chun's termination decision resides solely with you at this final stage of WSU's administrative process, we would not object to your seeking legal counsel on the legal issues presented in Coach Rolovich's November 2 appeal to Mr. Chun and Mr. Chun's November 12 decision to deny the appeal and reassert his stance that the University had grounds to terminate Coach Rolovich with just cause.

**First, Mr. Chun's claimed "just cause" to terminate Coach Rolovich rests entirely on his conclusion that Coach Rolovich was insincere.**

Mr. Chun claimed in his October 18 letter that the University had just cause to terminate Coach Rolovich because he had violated paragraphs 4.1.1 and 4.1.5 of his employment contract. Ex. A at 1, 2. Paragraph 4.1.1 applies when an employee is guilty of "[d]eliberate and serious violations" of his contractual duties or demonstrates a "refusal or unwillingness

---

Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

[3] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-trespassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html; Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/.

[4] Katie Daviscourt, WSU athletic director caught violating COVID protocols after firing head football coach for refusing vaccine, Post Millennial, Nov. 19, 2021, https://thepostmillennial.com/wsu-athletic-director-violating-covid-firing-coach/?utm_source=pocket_mylist.

116098490.9

President Kirk H. Schulz
November 26, 2021
Page 3

to perform such duties in good faith and to the best of Employee's abilities." Ex. D.
Paragraph 4.1.5 applies when an employee is guilty of conduct "seriously prejudicial to the
best interests of the University or its athletics program." *Id*. Even after our appeal showed
Mr. Chun the errors in his analysis, he doubled down: his November 15 letter referred to
the paragraphs cited in his October 18 letter and did not cite any additional grounds for
finding just cause. Ex. C. at 6.

Each of Mr. Chun's arguments implicitly relies on Mr. Chun's assertion that Coach
Rolovich filed a request for a religious exemption in bad faith. Put another way, if Mr.
Chun's claim that the University found Coach Rolovich insincere fails, so does his claim
that the University had just cause to terminate Rolovich.

Washington caselaw, more than half a century of civil rights law, and common sense all
confirm that an employee who raises a sincere religious objection is not *deliberately*
violating his contract. An employee who believes his obligations to his Creator preclude
him from complying with a company policy is not *refusing* or *unwilling* to perform his
duties "in good faith and to the best of his abilities" any more than an employee who
cannot comply with a company mandate for medical reasons.[5] It is impossible to imagine
that a court would agree with Mr. Chun that an employee who sincerely seeks a religious
exemption and accommodation is *guilty* of conduct "seriously prejudicial to the best
interests of the University or its athletics program." An employer cannot have just cause
"where the termination resulted because the employee exercised a legal right or privilege,"
such as the fundamental right to religious exercise.[6] To the contrary, terminating an
employee over a bona fide religious objection is a textbook prima facie case of religious
discrimination.[7]

In short, if the University found that Coach Rolovich had a sincere religious objection to
the Governor's vaccine mandate, the University cannot plausibly claim that it had grounds
to terminate him for just cause.

**Second, the University established a "blind review process" to determine sincerity,
and that process unquestionably found Coach Rolovich sincere.**

There is no doubt that the University established a "blind review process" to determine the
sincerity of employees that applied for a religious exemption. The University's stated
policy, media reports on the University's policy, and Washington State's VP for
Communications Phil Weiler all confirm this. Ex. B. at 6-8.

---

[5] *See* Ex. B at 11-12. Government actions "are not neutral and generally applicable, and therefore trigger
strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more
favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).,

[6] *Farnam v. CRISTA Ministries*, 807 P.2d 830, 834 (Wash. 1991).; *see also* Ex. B. at 18, 33.

[7] *Kennedy v. Bremerton Sch. Dist.*, 991 F.3d 1004, 1022 (9th Cir. 2021) (A prima facie case of religious
discrimination requires the plaintiff to show "that (1) he had a bona fide religious belief, the practice of which
conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the
employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his
inability to fulfill the job requirement.").

116098490.9

(166 of 289), Page 166 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 166 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.453    Page 14 of
137

President Kirk H. Schulz
November 26, 2021
Page 4

The University followed the process described by each of these sources, and its review committee concluded that Coach Rolovich had demonstrated a "sincerely held religious belief." Ex. B. at 4, 8, 17-18 (citing HRS' Oct. 6 email to Chun, Ex. C-3 at 1). HRS' October 6 email to the Athletics Department did not invite Mr. Chun to comment on, let alone attempt to overturn the review committee's determination that Coach Rolovich was entitled to an exemption. This is further evidence that Coach Rolovich's reading of the University's policy is correct.

HRS' October 6 email only sought input from Mr. Chun and the Athletics Department on the accommodation question, not the sincerity question. Mr. Chun was simply asked whether he believed Coach Rolovich could perform the essential functions of his position under its proposed accommodations:

> Next Steps - Review Job Duties. The department is to review the employee's position description or essential job functions, to determine if the employee is able to perform essential functions of the position and meet the COVID-19 safety measures consistent with the recommendations of the state and protect the health and safety of the WSU community as part of this accommodation request.[8]

The University's own policy, testimony from media reports and State officials, and HRS' own conduct all confirm that the University had established a blind review process to determine whether an employee had shown a sincere religious objection to the Governor's vaccine requirement. There is no doubt that the University's established process ran its course and that it found Coach Rolovich sincere. This definitive determination means that the University has no plausible grounds on which to argue that it had just cause to terminate Coach Rolovich's employment contract.

**Third, Mr. Chun's interference with the University's "blind review process," and the subsequent actions of other University officials who bowed under pressure from Chun, violated University policy and Coach Rolovich's rights.**

Had the University followed its policies, Mr. Chun would not have been told that Coach Rolovich had applied for a religious exemption. Ex. B. at 6-8. However, that error pales in comparison to those that followed. First, Mr. Chun saw that the University's sincerity determination frustrated his goal of firing Coach Rolovich without having to pay liquidated damages. So he inserted himself into the already-completed process in order to interfere with and overturn the University's conclusion. Ex. B. at 5, 8-9. Second, HRS bowed to this pressure from Mr. Chun and allowed his bias to infect and override its "blind review process": HRS' October 18 email to Coach Rolovich cites Mr. Chun's input in support of its new conclusion that it "questions" Coach Rolovich's sincerity. *Id*. at 6.

As explained in Coach Rolovich's appeal to Mr. Chun, by allowing Mr. Chun to interfere with the University's "blind review process" and overturn that process' conclusion that Coach Rolovich was sincere, the University violated its own policies and Coach Rolovich's statutory and constitutional rights. A partial and preliminary list of those rights

---

[8] Ex. C-3 at 1.

116098490.9

President Kirk H. Schulz
November 26, 2021
Page 5

include Coach Rolovich's Fourteenth Amendment to procedural due process, his First
Amendment right to free exercise, his Title VII right to freedom from religious
discrimination, and his rights under the unconstitutional conditions doctrine. *Id.* at 6-15,
18.[9]

**Fourth, the University's decision on the accommodation question is legally irrelevant
to whether the University had "just cause" to terminate Coach Rolovich.**

As stated above, the University's decision on the accommodation issue is not relevant to
the central question of whether the University had just cause to terminate Coach Rolovich.
Even if the University's process, reasoning, and conclusion on the accommodation
question were legally defensible, an employer does not have just cause to terminate an
employee with sincere religious objections to a new employer requirement that was not
foreseen when his contract was entered into.[10]

It is also important to note that Mr. Chun's November 12 letter to Coach Rolovich
misrepresents the Governor's Proclamation 21-14.1. Mr. Chun claims:

> Per the Governor's Proclamation 21-14.1, all state employees, including
> those in higher education, were required to be fully vaccinated against
> COVID-19 by October 18, 2021, ***unless they had an approved medical or
> religious accommodation***.[11]

This statement fundamentally misrepresents the Governor's Proclamation, which instead
states:

> Workers for State Agencies, Workers for operators of Educational Settings,
> and Health Care Providers ***are not required to get vaccinated*** against
> COVID-19 under this Order if they are unable to do so because of a
> disability or ***if the requirement to do so conflicts with their sincerely held
> religious beliefs, practice, or observance***.[12]

The Proclamation is clear: "if the requirement . . . conflicts with" a football coach's
"sincerely held religious beliefs, practice, or observance," the coach is "not required to get

---

[9] Even if the University could show that Mr. Chun's animus did not infect its decisions regarding Coach
Rolovich's religious exemption and termination, Coach Rolovich's Free Exercise claims would still survive.
*See, e.g., Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1144–45 (10th Cir. 2006) ("[T]he Free Exercise
Clause has been applied numerous times when government officials interfered with religious exercise not out
of hostility or prejudice, but for secular reasons, such as saving money, promoting education, obtaining
jurors, facilitating traffic law enforcement, maintaining morale on the police force, or protecting job
opportunities. Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged
governmental action is not neutral, but the Free Exercise Clause is not confined to actions based on
animus.").

[10] *Supra* at 3; *see also* Ex. B. at 15, 17-18.

[11] Ex. C at 1 (emphasis added).

[12] Gov. Inslee Proclamation 21-14.1 at ¶2.a., Aug. 20, 2021 (emphases added), available at
https://www.governor.wa.gov/sites/default/files/proclamations/21-14.1%20-%20COVID-
19%20Vax%20Washington%20Amendment.pdf.

President Kirk H. Schulz
November 26, 2021
Page 6

vaccinated against COVID-19 under this Order." As applied here, because the University concluded that Coach Rolovich had demonstrated a "sincerely held religious belief," he is "not required to get vaccinated" under Proclamation 21-14.1.

You may decide for yourself whether Mr. Chun's misrepresentation of the Governor's Proclamation was intentional or just sloppy. Either way, Mr. Chun's assertion that he would not accommodate Coach Rolovich's sincere religious beliefs does not magically, or legally, transform Coach Rolovich's sincere religious beliefs into insincere religious beliefs. Mr. Chun's analysis muddles the important procedural and legal differences between the University's sincerity analysis and its accommodation analysis. If Mr. Chun's error was unintentional, it is easily corrected. If it was intentional, it is a  bad faith effort to escape buying out Coach Rolovich's contract.

To be sure, WSU may terminate Coach Rolovich for no reason, or for any reason, but what it cannot do is terminate Coach Rolovich for just cause because, as the University determined, he acted upon his sincerely held religious beliefs. To the extent Mr. Chun claims otherwise, his position is indefensible. Like so many choices Mr. Chun has made in recent months, the University would do well to distance itself from it.

**Fifth, if the University finds it necessary to defend Mr. Chun's decision to deny Coach Rolovich's request for an accommodation, it will be required to defend even more unreasonable, biased, and illegal conduct.**

If the University does nonetheless seek to defend Mr. Chun's conduct and ultimate decision on the accommodation question, it will have to deal with another slate of procedural, statutory, and constitutional problems. *Id*. at 17-34. Apart from these legal problems, many of Mr. Chun's assertions in denying Coach Rolovich's request for an accommodation are demonstrably false and scientifically indefensible. *Id*. at 20-30.

The same applies to the additional reasons Mr. Chun introduced in his November 15 letter denying Coach Rolovich's appeal. Ex. C at 1-6. We will not take time to refute each of Mr. Chun's assertions here because they are irrelevant to the central issues before you in this appeal. We will, however, respond briefly to three of them.[13]

### 1. Mr. Chun's Unsupported and Inaccurate Claims of "Overwhelming Scientific Evidence"

The scientific claims that Mr. Chun has made to support his decision to terminate Coach Rolovich were wrong when they were made and are even more unsupportable now. Mr. Chun's undocumented claim that "[o]verwhelming scientific evidence establishes the efficacy of the vaccine in mitigating the spread of COVID-19," Ex. C. at 3, flies in the face of actual scientific studies on the subject, as Dr. Bhattacharya explains in his attached

---

[13] It is noteworthy, too, that Mr. Chun, in his termination of Coach Rolovich, does not deny any of Coach Rolovich's accounts of Mr. Chun's statements in section IA of his Letter Appeal. Ex. B at 2-4. These statements are strong evidence that Mr. Chun demonstrated animus towards Coach Rolovich's religious beliefs.

116098490.9

President Kirk H. Schulz
November 26, 2021
Page 7

declaration.[14] And whether or not the vaccine(s) prevent severe disease for the vaccinated is irrelevant to the Governor's and the University's stated purpose of mitigating the spread of COVID-19.[15]

Coach Rolovich has always been willing to undergo COVID testing. Ex. B at 24 n.16. Governor Inslee considered a "testing strategy option" in August, but rejected it because he was aware it would make it easier for State employees with religious objections, like Rolovich, to secure a religious accommodation. *Id.* at 24 n.17. Three days after Mr. Chun terminated Coach Rolovich, Governor Inslee announced he would allow employees to undergo testing in lieu of vaccinations.[16] As Dr. Bhattacharya demonstrates, it would be better for employers to require daily symptom checking paired with periodic PCR or antigen testing for *all* employees, not just the unvaccinated, given how easily vaccinated persons can contract and spread COVID. Ex. B-1 ¶9. However, the Governor's announcement is a good step in the right direction, and enough to undermine Mr. Chun's rationale.

### 2.   Mr. Chun Cites Coach Rolovich's June Jones Comment

Mr. Chun suggests that a comment Coach Rolovich made about June Jones is itself grounds for termination with just cause. Ex. C. at 5. First, these comments were not made to Mr. Chun or in his presence, so Mr. Chun is not in a position to judge their context or Coach Rolovich's tone. Second, Mr. Chun had previously evaluated Coach Rolovich's conduct in this instance and found them to be grounds for a reprimand, not termination— let alone termination for just cause. Third, Coach Rolovich's conduct in this instance pales in comparison to the tirade that Mr. Chun visited upon Pullman City Councilor Al Sorensen on September 29.[17] If Mr. Chun sincerely believed that Coach Rolovich's conduct was "deeply concerning and demonstrated a lack of self-control," and therefore

---

[14] Ex. B-1 ¶¶ 21-28. *See also* Press Release: Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html ("the Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people"); Sanjay Mishra, Evidence mounts that people with breakthrough infections can spread Delta easily, National Geographic, Aug. 20, 2021, https://www.nationalgeographic.com/science/article/evidence-mounts-that-people-with-breakthrough-infections-can-spread-delta-easily ("A preliminary study has shown that in the case of a breakthrough infection, the Delta variant is able to grow in the noses of vaccinated people to the same degree as if they were not vaccinated at all. The virus that grows is just as infectious as that in unvaccinated people, meaning vaccinated people can transmit the virus and infect others.").

[15] Gov. Proc. 21-14.1 at 3 ("to further our individual and collective duty to reduce the spread of COVID-19 in our communities, I issued Proclamation 21-14 requiring all employees . . . to be fully vaccinated against COVID-19 on or before October 18, 2021"); Ex. C at 1, 3 ("Your activities had had to be continually and severely limited to a much greater extent than if you had been vaccinated, in order to mitigate the risk of you becoming infected or infecting others." "Overwhelming scientific evidence establishes the efficacy of the vaccine in mitigating the spread of COVID-19[.]"). Pullman Police enforcing Gov. Inslee proclamations to combat spread of COVID-19, WSU Insider, Aug. 19, 2020, https://news.wsu.edu/news/2020/08/19/pullman-police-enforcing-gov-inslee-proclamations-combat-spread-covid-19/ (Governor's Proclamations are "aimed at mitigating the spread of COVID-19").

[16] Liz Brazile, WA to allow employers to test for Covid in place of mandatory vaccinations, KUAW, Nov. 18, 2021, https://www.kuow.org/stories/wa-employers-may-be-able-to-test-for-covid-in-place-of-mandatory-vaccination.

[17] *See* supra, n.3.

116098490.9

President Kirk H. Schulz
November 26, 2021
Page 8

grounds for termination with just cause, then he would have resigned immediately after his conduct on September 29. If the University sincerely held Mr. Chun's alleged standards about vulgarity and "threat[s] of violence," it would have required Mr. Chun to resign or be fired for just cause soon thereafter. That Mr. Chun still holds his job speaks for itself.

### 3. Mr. Chun Cites Coach Rolovich's Masking Practices

Finally, Mr. Chun rejected HRS' proposed accommodations and also EHS' individualized assessment and proposed accommodations in part based upon his alleged concerns about Coach Rolovich's inability to follow WSU's masking and social distancing rules. Ex. C-4 at 2, Ex. C-7 at 1 n.1. Coach Rolovich disputes Mr. Chun's accusations. But more importantly, Mr. Chun's conduct, both before and after he submitted these memoranda, violates his own standards. As documented above, Mr. Chun has violated the State's, WSU's, and other universities' public safety policies on numerous occasions. He has done so at home, at WSU, and at other schools. He has done so indoors and outdoors. He had done so with WSU athletes and with WSU donors. WSU will be in a terribly compromised position if it has to defend Mr. Chun's reasoning, while tolerating Mr. Chun's own conduct.

*    *    *

ER1257

President Kirk H. Schulz
November 26, 2021
Page 9

As described above, we suggest that you have two basic options on how to handle this appeal. Option one is to embrace the University's religious exemption policy, affirm Coach Rolovich's rights, and reject Mr. Chun's conduct in this affair. If you choose this option, we are open to discussing with you and your counsel how the University can quickly and efficiently resolve this matter by discussing the liquidated damages Coach Rolovich is entitled to under his employment contract with the University. Option two is to defend Mr. Chun's conduct and turn a blind eye to University policy and Coach Rolovich's rights. If you choose this option, we will look forward to arguing the merits of Coach Rolovich's case before a truly neutral decisionmaker.

We look forward to your response.


Law Office of Brian Fahling                    Lewis Roca

By: _____                           By: _____
    Brian Fahling                                 Eric N. Kniffin, Special Counsel
    Attorney for Nicholas Rolovich                Attorney for Nicholas Rolovich

cc:     Danielle Hess
        Chief Counsel
        Washington State University
        E: danielleh@wsu.edu

        Patrick Chun
        Director of Athletics
        Washington State University
        Athletics.Director@wsu.edu


ATTACHMENTS

116098490.9

**ER1258**

# EXHIBIT A

# WASHINGTON STATE
## A T H L E T I C S

Hand Delivered

October 18, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA 99163

Re:    Written Notice of Intent to Terminate for Just Cause

Coach Rolovich:

Pursuant to Paragraphs 4.1 through 4.3 of your Employment Agreement as Head Men's Football Coach, this letter constitutes notice of the University's intent to terminate your employment for just cause.

- You were notified on September 1, 2021, and September 23, 2021, that per Proclamation 21-14.1, all state employees, including those in higher education, would be required to be fully vaccinated against COVID-19 via one of the FDA approved vaccines by October 18, 2021.

- The notice stated that if not vaccinated, you could apply for a medical or religious exemption and accommodation through WSU Human Resources (HRS). The University provided notice of the process on August 31, 2021, September 8, 2021, September 29, 2021, and October 4, 2021.

- You requested an exemption from the vaccine requirement on religious grounds. Your request was denied on October 18, 2021.

This action is in accordance with the terms of your contract, signed in April 2020, and amended in April 2021. The specific provisions violated include the following:

- Paragraph 1.2.1 requires you to devote your best efforts to the performance of your duties. In particular, you are required to "comply with and support all rules, regulations, policies, and decisions established or issued by the University." Further, you must "abide by all provisions of law." Your failure to comply with the vaccination requirement, which is both a University policy and requirement of law under the Governor's Proclamation, violates these provisions and has rendered you legally unable to perform your duties as Head Coach. Your non-compliance with the vaccine requirement, and the fact that you are now legally unable to fulfill your obligations to the University as Head Coach, also violates Section 4.1.5 of your Employment Agreement, conduct of Employee seriously prejudicial to the best interests of the University or its athletic program, and Paragraph 4.1.1.

- Paragraph 4.1.1 prohibits you from engaging in "deliberate and serious violations" of your duties, or "refusal or unwillingness to perform such duties in good faith and to the best of your abilities" As noted in my July 26, 2021, warning letter to you, your contract

Washington State University | Department of Intercollegiate Athletics | Office of the Director
Bohler Athletic Complex 110, PO Box 641602, Pullman, WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501 | www.wsucougars.com

ER1260

Nicholas R. Rolovich
Page 2

requires you to participate in events, activities, and efforts to foster support for the Football program, and your personal decision to forego a COVID-19 vaccination has impacted your ability to do so, interfering with your ability to meet with donors and others. These activities are a critical part of being a head football coach at a Pac-12 school. See 1.2.1.2.h. Because of your decisions, WSU, the Football program, and the Athletics programs have been subject to several damaging events. These events include the following:

- Your inability to attend in-person Pac-12 Football Media Day in Los Angeles on July 27, 2021. Because of your decision to not get vaccinated, you were the only coach who did not attend in person. Your decision became the primary story concerning football and put our student athletes and other attendees in the position of having to address your absence. This was, and continues to be, a major distraction for the University, Athletics department, and the Football team.

- Your inability to attend any of the regularly scheduled Friday donor lunches. Section 1.2.1.2.h requires that you participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program. You have not actively participated in donor engagement, foster program support, or fundraising. The Friday donor lunch is a critical component of donor outreach, and your absence has been prejudicial to the Football program and the Athletics department.

- Your inability to attend the WSU Football Coaches Show in person that broadcasts live from Zeppoz. This is another critical component of donor and fan outreach. By not attending the show in person, interest from fans has been negatively impacted. Further, you are unable to attend other coaching speaking engagements in person, and you are limited in your ability to attend other campus events such as pep rallies and other fall sports. Your lack of presence as the Head Coach of WSU's most popular and well-known sport is pronounced and has been prejudicial to the Football program and the Athletics program.

- Your inability to attend live donor meetings, including several donor interactions scheduled for July. These events were subsequently canceled. Further, donors have declined to engage in personal meetings or remote meetings out of concern for their personal safety and the disappointment in the lack of leadership your handling of this matter has portrayed. Further, the University and the Athletics department has not been able to schedule future donor meetings based on your actions. Several donors have revoked gifts or put them on hold until further notice because of your decision.

- Paragraph 1.2.1.2 requires you to "Evaluate, recruit, train, and develop student-athletes." You also are responsible for establishment of a program identity and approach to competition, and the game planning for individual games and the season. You have failed to fulfill these obligations by engaging in the following behavior:

  - You are unable to attend individual position meetings or engage one-on-one with players or assistant coaches during practices, team meetings, and other preparatory functions. Interactions with assistant coaches and players has been limited and has led to poor planning, lack of communication, and a void in leadership.

Nicholas R. Rolovich
Page 3

- Your ability to travel extensively and recruit has been impacted by your decision. Recruiting has been significantly impacted this year, as evidenced by a notable decline in the number of verbal commitments.

As the most high-profile employee of WSU and one of the most highly compensated state employees in Washington, your choices and behavior also reflect on the University, the Athletics Department, and the Football program at all times. In addition to the above, the voicing of physical threats regarding a coach we talked about related to our contingency plan was completely unacceptable.

Your conduct has been seriously prejudicial to the best interests of the University and the Football program, including putting the University and the Football program in a negative national spotlight, and is a violation of your contract. (See paragraph 4.1.5).

Per Section 4.2 of your Employment Agreement, you have fifteen (15) calendar days to respond to me, in writing, with reasons why you should not be terminated. I will respond accordingly consistent with the terms of your Employment Agreement.

Effective immediately you have been placed on paid administrative leave pending the outcome of this notice of intent to terminate for just cause. You are not to perform any work on behalf of the University. Your WSU email account has been disabled and systems access removed.

For information regarding your benefits, please visit http://hrs.wsu.edu/employees/benefits/separating-employee-information/. If you have specific benefits questions, such as options for continuing medical and dental coverage beyond your separation date, please contact Human Resource Services at 509.335.4521.

Sincerely,

Patrick Chun
Director of Athletics

cc:    Athletics Employment File
       HRS Personnel File
       HRS Employment Services

ER1262

**WASHINGTON STATE UNIVERSITY**
**Human Resource Services**

**Important Benefits Information**
**Separation of Employment**

As you leave employment with Washington State University, the following are some topics we encourage you to review to ensure you are aware of how your outplacement from the University impacts your benefits and retirement program(s).

For additional and detailed information, including links to various forms and paperwork referenced in this handout, please visit: hrs.wsu.edu/employees/benefits/separating-employee-information/. If you have questions, contact HRS Pullman at (509) 335-4521 or by email at hrs@wsu.edu.

## Contact and Address Information

- **WSU:** It is important to update your personal address online through Workday. This will ensure WSU is able to mail important information you may need after you separate, such as your W2 form.

- **Retirement Program(s):** Contact TIAA and/or the DRS directly (at the phone numbers listed below) to report the updated address for retirement accounts, and to receive future mailings from them.

## Medical and Dental Coverage

- Medical and dental coverage ends on the last day of the month in which you are paid for at least 8 hours or more in your benefit-eligible appointment with WSU. You may be eligible for continuation of your medical coverage under COBRA for at least 18 months. The Health Care Authority in Olympia will mail a COBRA packet to your home address.  Employees can also access COBRA information by calling (800) 200-1004 or online at hrs.wsu.edu/employees/benefits/separating-employee-information/. *You have 60 days from the date your coverage ends to pursue this benefit.*

- In the event your spouse or registered domestic partner (RDP) works for WSU, they have the option of adding you onto their insurance as a dependent for a lower premium rate than the COBRA rates. *You have 60 days from the end of your coverage to pursue this option, and should contact HRS-Pullman within that 60-day period.  Postponing making this request could result in a gap in or loss of coverage.*

- Upon separation, you can also review coverage options through the Marketplace as an alternative to pursuing COBRA.  Please visit www.healthcare.gov for additional information.

    Refer to *WAC 182 Chapter 12 Section 131* for information regarding benefit eligibility or contact HRS.  If you do not agree with the benefit eligibility decision WSU has made, you have the right to request HRS to re-evaluate your benefit eligibility at any time. Should you disagree with the eligibility decision made by HRS, you also have the right to appeal through PEBB Appeals Process at www.pebb.hca.wa.gov.

## Retirement Plans (including Voluntary Investments Plans)

- Employees have several options regarding their retirement account(s), including:  leaving funds in the account; rolling-over funds into another investment vehicle; or withdrawing some or all retirement funds. Employees should contact their retirement plan directly and speak with a tax advisor to understand the implications of their choice, such as taxes, possible penalties, etc.

    Contact information for the various retirement vendors follows:
    - **TIAA (for the WSURP and VIP Accounts):** Contact TIAA at (800) 842-2252 or visit their website at www.tiaa.org/wsu for additional information.

PO Box 641014, Pullman, WA 99164-1014
509-335-4521 | Fax: 509-335-1259 | hrs@wsu.edu | www.hrs.wsu.edu

**ER1263**

- o **PERS/TRS/LEOFF:** Contact the Department of Retirement Systems (DRS) at (800) 547-6657 or visit their website at www.drs.wa.gov.   Before deciding to withdraw/rollover your contributions, consider the information provided at www.drs.wa.gov/publications, "Withdrawals".
  - **PERS 3 & TRS 3:** In addition to DRS, contact VOYA at (888) 327-5596 or visit their website at www.drs.wa.gov/plan3 for additional information.

- o **Deferred Compensation, State of Washington:** Contact Deferred Compensation at (888) 327-5596 or visit www.drs.wa.gov/dcp for additional information.

NOTE: *In the event you are eligible to retire, contact HRS-Benefits and your retirement plan to review your options, including pursuing retirement.*

## Life Insurance

Life insurance coverage ceases after your employment ends.  You have the option to convert the insurance into an individual policy or transfer coverage to a spouse or registered domestic partner (RDP).  Contact MetLife at 1-866-548-7139 or log onto your account at mybenefits.metlife.com/wapebb.  ***You have 31 days from the end of your appointment to pursue these options.***

## Long Term Disability Insurance

Both the optional and basic long term disability (LTD) coverage cease after your employment ends.

## Flexible Spending Account(FSA)/DCAP

If you participate(d) in a Flexible Spending Account (FSA) and/or Dependent Care Assistant Program (DCAP) through your employment with WSU, you are encouraged to contact Navia Benefit Solutions directly to review your options regarding these accounts.  They may be reached at (800) 669-3539 or pebbapp.naviabenefits.com. If your appointment is not yet over, you have the option to accelerate or pre-pay your contributions into the FSA account prior to separation so you can continue to use the benefit for the remainder of the calendar year. Contact HRS to pursue this option.

## Health Savings Account (HSA)

If you participated in a Consumer Directed Health Plan with the attached Health Savings Account through your employment with WSU, you are encouraged to contact Health Equity directly to see what your options are regarding your Health Savings Account, and any questions you have regarding this benefit at 877-873-8823 or www.healthequity.com/pebb.

## Leave Payout

**(For employees who accrue annual and/or sick leave)**
If the appointment is eligible for annual leave payout, WSU will process the leave payout after the employee's leave/time reports are received from your department and audited. Normally individuals on temporary appointments are not eligible for annual leave cash out. Sick leave is not eligible for payout, unless a qualified employee is retiring from the university. Contact HRS at (509) 335-4521 or hrs@wsu.edu if you have questions.

## Unemployment Benefits

You may be eligible for unemployment benefits. Visit www.esd.wa.gov for more information and to apply.

ER1264

# EXHIBIT B

LAW OFFICE OF
*brian fahling*

November 2, 2021

Patrick Chun
Director of Athletics
Washington State University
E: Athletics.Director@wsu.edu
T: 509-335-0200

Re: Appeal of Written Notice of Intent to Terminate Nicholas Rolovich

Dear Mr. Chun:

As counsel for Nicholas Rolovich, Brian Fahling of the Law Office of Brian Fahling and Eric Kniffin of Lewis Roca submit this letter appeal of your Written Notice of Intent to Terminate him as Head Football Coach of the Washington State University Cougars.

While we are unclear on the standard WSU will use to review this appeal, we are using this opportunity to bring to your attention a myriad of procedural, legal, and constitutional infirmities in the manner which WSU handled Coach Rolovich's request for a religious exemption and its related intention to terminate his employment with the University, for "just cause."

This appeal is organized in three sections:

Section I provides relevant background information, including: Mr. Chun's reaction to Coach Rolovich telling him about his intention to request to a religious exemption from Governor Inslee's COVID-19 vaccine mandate as soon as one became available; Mr. Chun's actions to overturn Human Resource Services' ("HRS") decision that found Coach Rolovich had demonstrated a "sincerely held religious belief"; and his actions to overturn Environmental Health & Safety's (ER&S) recommendations for "interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

Section II summarizes some of the most obvious legal infirmities of the University's decision to deny Coach Rolovich a religious exemption because the University "questions the assertion that [his] sincerely held religious views conflict with the University's vaccine requirement."

Section III summarizes some of the most obvious legal infirmities of the University's decision that it would not accommodate Coach Rolovich's religious convictions, despite HRS' and EH&S' findings that the University could do safely.

An appeal of this sort is usually the employee's opportunity to restate his case and plead with his employer. But we see this appeal differently. This is your opportunity to take a step back, reexamine your illegal and unconstitutional conduct, and adopt a different posture toward Coach Rolovich before you and the University are forced to defend your conduct in the context of a federal court civil rights action.

We look forward to your response.

115884715.10

Mr. Pat Chun
November 2, 2021
Page 2

## I.  BACKGROUND FACTS

This section provides factual background relevant to the University's October 18 decision to reject and in the alternative refuse to accommodate Coach Rolovich's request for a religious exemption from Washington's COVID-19 vaccine requirement, and its subsequent and related decision to terminate Coach Rolovich for "just cause."

The University's decision to deny Coach Rolovich's request for a religious exemption from Governor Inslee's vaccine mandate and its decision to fire him is related to its decision to take the same actions towards some of Coach Rolovich's assistant coaches, John Richardson, Ricky Loco, and Craig Stutzman, who are represented by undersigned counsel. As such, the legal arguments and background facts in those coaches' appeals are incorporated into Coach Rolovich's appeal by reference.

### A.  Mr. Chun Was Openly Hostile Toward Coach Rolovich's Religious and Scientific Objections to COVID-19 Vaccines.

Over the past year, Mr. Chun made a number of statements to Coach Rolovich that demonstrated his hostility toward Coach Rolovich's expressed religious and scientific reasons for refusing to receive a COVID vaccine. Mr. Chun even told Coach Rolovich that his request for a religious exemption would be denied and he would be fired unless he agreed to be vaccinated. The following summary is based on contemporaneous notes that Coach Rolovich made regarding these conversations.

On May 24, 2021, at approximately 3 p.m., at the request of Mr. Chun, a meeting was held regarding Coach Rolovich's previous statement to Mr. Chun that he was not planning to get the vaccine. Mr. Chun stated he was worried about Coach Rolovich's mental health and then accused Coach Rolovich of having extreme views regarding many issues. Coach Rolovich told Mr. Chun that the only thing he puts above the team is his faith and his family.

On May 27, 2021, Coach Rolovich was called to a 3 p.m. meeting at Mr. Chun's office. Mr. Chun told Coach Rolovich that the Coach's beliefs were making him incapable of leading his players. Mr. Chun also tried to get Coach Rolovich into counseling because he believed that the Coach had mental health issues. Mr. Chun offered his wife as someone the Coach could talk to because she had been in a couple different religions he referred to as "cults".

On August 16, 2021, Coach Rolovich was called to an urgent meeting at 5 p.m. with Mr. Chun and Deputy Director of Athletics, Bryan Blair. At this meeting, Coach Rolovich was told that Governor Inslee was intending to issue a new mandate that would eliminate the "personal exemption" from the coaching staff's declaration of vaccination status. Mr. Chun warned the Coach that any religious exemption request he submitted would be scrutinized to no end, and that Inslee's mandate would have a "high threshold" for religious exemptions moving forward.

115884715.9

Mr. Pat Chun
November 2, 2021
Page 3

Mr. Chun's predictions line up perfectly with an Aug. 3 email from Kathryn Leathers, Governor's Office General Counsel, to staff with the Attorney General's Office.[1] In that email she explained: "Of possible exemptions: medical for sure; and religious (if we have to; if yes, as narrow as possible)." Mr. Chun, likely aware of Ms. Leathers' email, confidently told Coach Rolovich that if he didn't get the vaccine, he could be expected to be fired with cause on Oct 19, 2021.

On August 19, 2021, Coach Rolovich was again summoned to Mr. Chun's office for a meeting at 4:30 p.m. Bryan Blair was also present at the meeting. Mr. Chun told Coach Rolovich that he had 4 choices: 1. Get the vaccine; 2. Don't get the vaccine and get fired. 3. Claim an exemption; or 4. Resign right now. Coach Rolovich told Mr. Chun that he wasn't resigning and that he wanted to coach the team. Mr. Chun said, "but you say you don't care about the money" and "why don't you just resign?" Mr. Chun then accused Coach Rolovich of having situational integrity. Mr. Chun also called the Coach a "Con-man" and accused him of being selfish. Mr. Chun then stated that Coach Rolovich's objections to receiving the vaccine were causing Mr. Chun and President Schulz reputational damage. Mr. Chun then stated that all Coach Rolovich had to do is get vaccinated.

Mr. Chun admitted his efforts to get Coach Rolovich to take the vaccination in the past had been coercive, and Coach Rolovich responded that the present meeting was much more coercive than earlier meetings. Mr. Chun pressed Rolovich again about the vaccine, and Coach Rolovich said that he believed he had privacy rights and didn't feel comfortable telling Mr. Chun about his position on the vaccine. Mr. Chun then demanded that Coach Rolovich tell him what his answer would be.

Mr. Chun then stated that Governor Inslee "did this" just to come after Coach Rolovich and WSU. Based on the context of Mr. Chun's statement, Coach Rolovich understood "did this" to mean that Governor Inslee was trying to force Coach Rolovich's hand with his new mandate because he was angry that the highest paid and one of the highest profile State employees had asserted personal or religious objections to his vaccine mandate. Mr. Chun also admitted to Coach Rolovich that the Board of Regents wanted him fired.

At this point in their heated exchange, Mr. Chun modified his earlier statement: he now said that Coach Rolovich only had two options: get vaccinated or resign.

Up to this point, Coach Rolovich had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines. Coach Rolovich didn't feel comfortable talking about his faith. His faith is a very personal matter to him and he was uncomfortable talking about his religious beliefs with his supervisor. Coach Rolovich was also uncomfortable because he did not know how Washington State University would react to him sharing his religious opposition to medical research based on aborted fetal tissue, given that WSU professors have in the past publicly defended such research. However, after Mr. Chun made it clear that WSU intended to terminate him, Coach Rolovich asked Mr. Chun and Mr. Blair about the

---

[1] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

Mr. Pat Chun
November 2, 2021
Page 4

University's process for requesting a religious exemption from a vaccine mandate. Mr. Chun and Mr. Blair said they did not know details about the University's process. They said they had been on the phone with HRS about that very topic earlier in the day. Coach Rolovich had also emailed HRS about the process by this time, but no one had any answers because the Governor hadn't yet made his proclamation.

Mr. Chun then told the Coach that he needed to have his religious exemption approved by the Sunday of game week vs. Utah State. Coach Rolovich asked who approves it. They didn't know. He asked them when it would be available. They didn't know. Coach Rolovich then responded that he feared the University would not be able to approve his exemption by Mr. Chun's deadline, August 29, given that the University's policy had not even been public, let alone made available to him. Mr. Chun and Mr. Blair told Coach Rolovich that they were in a time crunch and had to make a decision if he was going to coach this season. They made it sound like he wouldn't be able to coach until his exemption was approved. They said they did not want to start a season with the Coach if they thought they may have to fire him on Oct 18th, according to the Governor's mandate.

Coach Rolovich responded that he would seek a religious exemption right then if one was available. Chun and Blair then got even more heated and started to question Coach Rolovich's character. Mr. Chun said if Coach Rolovich got the religious exemption, he would forever question his character. Mr. Chun and Mr. Blair both talked about the early days of the pandemic, and that Coach Rolovich hadn't mentioned his faith. Coach Rolovich said that he did not see the point, as he does not see faith and science as exclusive (neither does the law). Coach Rolovich also recalls that Chun and Blair had questioned Coach Rolovich's faith early in the COVID pandemic. Chun and Blair then began to go on about how hard the religious exemption would be and that there is no guarantee that he would get his approved. Coach Rolovich again asked what the criteria was going to be. They said they did not know.

### B. WSU Rejected Coach Rolovich's Application for a Religious Exemption from the Governor's Vaccine Mandate.

In the weeks that followed Governor Inslee's decision to create a vaccine mandate for State employees, WSU developed its own procedures as to how employees could request, and how the University would consider, requests for religious exemptions from the COVID-19 vaccine requirement found in Proclamation 21-14.1.

On September 28, 2021, Coach Rolovich completed his application for a religious exemption and submitted it to HRS.

On October 6, 2021, HRS notified Mr. Chun that the University had completed its "good faith review" process and had determined that Coach Rolovich was entitled to a religious exemption from the COVID-19 vaccine requirement because it found that he had articulated a "sincerely held religious belief" that prevented him from complying with the Governor's mandate.

HRS then informed Mr. Chun that it was "considering approving the employee's request subject to the following terms and conditions," summarizing a proposed list of accommodations,

115884715.9

ER1269

Mr. Pat Chun
November 2, 2021
Page 5

including mask wearing, social distancing, and testing requirements. HRS said the next step would be for the Athletics Department to decide whether it was "able to accommodate this request with the above recommendations." HRS stated in that email that it would not reach out to Coach Rolovich until the University's "decision on the Religious Accommodation is finalized." HRS requested that the Athletics Department respond to its proposed accommodations by October 8.

The Athletics Department responded to HRS on October 13 with two memoranda. The first memorandum told HRS that it had rejected HRS' proposed accommodations and had determined that "the department is not able to accommodate this request."

The Athletics Department's second memorandum challenged HRS' conclusion that "Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being vaccinated for COVID-19." That challenge was based on the Athletics Department's assertion that "Rolovich had made several statements that cast doubt on his claimed sincerely held religious belief." In short, the memorandum states that the fact that Rolovich had articulated other reasons for refusing a COVID vaccination before he had told Mr. Chun about his religious objections to the available COVID vaccines "support[ed] re-evaluation of the claimed sincerely-held religious belief."

On October 14, 2021, EH&S issued a memorandum to Mr. Chun detailing how it had used its "expertise in environmental and occupational health and safety" to make an "individualized assessment" of Coach Rolovich's working environment and formulate a list of "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

The Athletics Department subsequently wrote HRS a memorandum, copying EH&S, that rejected EH&S' recommendations. The Athletics Department rejected EH&S' assessment that its recommendations would "ensure the safety of the employee and others the employee may be in contact with."

The Athletics Department also rejected EH&S proposed accommodations on the basis that having an unvaccinated head coach "would create an undue hardship for WSU Athletics given his assigned duties and responsibilities." For example, the memorandum states:

) "WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff."

) "[B]ecause employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches)."

) "The damage to the mission and reputation of the University posed by this situation cannot be understated, nor can it be resolved by accommodation."

115884715.9

Mr. Pat Chun
November 2, 2021
Page 6

On the afternoon of October 18, Mr. Chun called Coach Rolovich in for a meeting at 4:30. One minute before that meeting, at 4:29, Coach Rolovich received an email from HRS Exemptions, copying Mr. Chun, Mr. Blair, and Ms. Anne McCoy, notifying him that the University was "unable to approve your request for an exemption and accommodation based on a sincerely held religious belief, practice, or observance." HRS' email adopted the Athletics Department's position regarding Rolovich's sincerity, stating, "Based on your comments, in conjunction with the timing of your request for a religious accommodation, the University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement." HRS' email also adopted the Athletics Department's position that Rolovich could not "safely and effectively do your job without undue hardship to the University."

During that meeting, Mr. Chun handed Coach Rolovich a letter written under his own name with the subject line, "Written Notice of Intent to Terminate for Just Cause."

## II.    THE UNIVERSITY'S "BLIND REVIEW PROCESS" FOUND COACH ROLOVICH SINCERE; ALLOWING MR. CHUN TO INTERFERE AND LETTING HIS BIAS OVERRULE THIS DETERMINATION VIOLATED UNIVERSITY POLICY AND COACH'S LEGAL RIGHTS.

WSU's handling of Coach Rolovich's religious exemption request is rife with procedural problems and constitutional errors, each of which provides Coach Rolovich with independent legal grounds to challenge WSU's decision to terminate his contract and its assertion that it had grounds to do so "for just cause."

The University's short appeal deadline has prevented us from fully exploring the facts and Coach Rolovich's causes of action against the University. The following list is, however, a good start.

### A.    The University Violated its COVID Vaccine Religious Exemption Policy by Sharing Details with Mr. Chun and Allowing Him to Participate in its Sincerity Determination.

According to University counsel Danielle Hess, the University's published policies setting forth its policy for evaluating requests for religious exemptions from the vaccine mandate are posted online at https://hrs.wsu.edu/covid-19/vax-verification/. Part of this policy is expressed in the form of FAQs. In that context, the University states that HRS will not share the details of an employee's request for an exemption with the employee's supervisor or manager:

> **I am requesting a medical or religious exemption, what will my supervisor/manager see as my exemption reason?**
>
> The Workday process will show as "in-process" when an exemption is requested and will be updated to "complete" once reviewed and accepted. HRS will work directly with employees regarding their requested exemption as needed.

ER1271

(185 of 289), Page 185 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 185 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.472    Page 33 of 137

Mr. Pat Chun
November 2, 2021
Page 7

The University described its process in more detail in an October 8, 2021, statement posted on its website:[2]

> The requests for religious exemptions are evaluated in a ***"blind" review process***, meaning the identities of the individuals requesting exemptions are unknown to the members of the review committee except in instances when additional information is needed through follow-up contact. Separate review committees were created for students and employees. . . .

> For employees, the exemption requests go through a two-step process. The first is the ***blind review***. Then, if an exemption is approved, the request moves to a separate accommodation review step where a determination is made whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community. (emphases added)

The media took great interest in the University's statement and published articles detailing the University's process in more detail. For example, one such article said:

> WSU has implemented a ***blind review process***, so identifying marks for all employees will be removed when the panel evaluates the requests. . . .

> Approval of Rolovich's request during the ***blind review process*** does not guarantee his continued employment.

> An approved request would be sent to the human-resources department, which would identify the employee in question and send an email to his/her supervisor ***indicating the exemption had been approved***.

> ***At that point, the supervisor would determine if reasonable accommodations could be made*** for the unvaccinated employee to perform his/her job effectively and keep the public safe.[3] (emphases added)

Another article drew from the author's interview with Washington State vice president for communications Phil Weiler:

> If the ***blind review*** results in the approval of Rolovich's exemption request, the process would enter a second phase.

> Washington State vice president for communications Phil Weiler could not discuss Rolovich's case specifically—the university is prohibited by law from commenting—but Weiler outlined the exemption process in general terms.

---

[2] Nearly 90% of WSU Employees are Vaccinated, WSU, Oct. 8, 2021, https://everett.wsu.edu/nearly-90-of-wsu-employees-are-vaccinated/.

[3] Jon Wilner, Here's the vaccine exemption questionnaire that may determine WSU coach Nick Rolovich's job status, Seattle Times, Oct. 12, 2021, https://www.seattletimes.com/sports/wsu-cougar-football/heres-the-vaccine-exemption-questionnaire-that-may-determine-wsu-coach-nick-rolovichs-job-status/.

115884715.9

(186 of 289), Page 186 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 186 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.473    Page 34 of 137

Mr. Pat Chun
November 2, 2021
Page 8

> *An approved request* would be sent to the human resources department, which would identify the employee in question *and send an email to his/her supervisor indicating the exemption had been approved*.
>
> At that point, according to Weiler, the supervisor would determine if the unvaccinated employee would be capable of "keeping the public safe" and performing his/her job effectively.[4] (emphases added)

The University's policy and its public representations unmistakably and repeatedly stated that an employee's identity would be kept private and the employee's supervisor would not be notified, let alone involved, until after the University's "blind review process" was complete and the University had determined whether "the exemption had been approved."

The promise of a blind and confidential process was an important representation, and not at all a surprising one. HR departments typically make such review processes confidential because these sorts of exemption requests contain highly sensitive personal information. HR frequently has to collect personal information that must be handled confidentially for privacy reasons. Requests for medical exemptions and accommodations require the employee to disclose protected health information. Disclosing this information to a supervisor could also reveal that the employee has a disability, such as HIV status, that could lead to the employee suffering disability discrimination. Employees requesting religious exemptions likewise have important privacy interests that are violated when employers share details with an employee's supervisor or manager.

We do not know whether the University has kept its promises and followed its policy in other instances. But we know for certain that here it did not.

The University concluded that Coach Rolovich was entitled to the exemption because his religious beliefs are sincere. But then, a week later, the University abandoned its process requiring "blind" determination and instead allowed Mr. Chun to intervene, improperly permitting him to provide input that questioned Coach Rolovich's sincerity, thereby poisoning its original determination that the exemption had been approved.

The University's procedural detours are as disturbing as they are unlawful. Mr. Chun should never have been told what sort of exemption Coach Rolovich had sought, nor should Mr. Chun have been allowed to interfere with the exemption decision that had already been made. HRS was clearly satisfied that it did not need additional information to assess the sincerity of Coach Rolovich's religious beliefs because HRS' October 6 email to Chun states that "WSU has engaged in a good faith review of the information submitted through written and/or oral communications, which support the accommodation request based on a sincerely held religious belief."

---

[4] Jon Wilner, Would WSU actually fire Nick Rolovich? Examining the exemption review process with the vaccine mandate deadline approaching, Mercury News, Oct. 7, 2021, https://www.mercurynews.com/2021/10/07/would-wsu-actually-fire-nick-rolovich-examining-the-exemption-review-process-as-vaccine-mandate-deadline-approaches/.

115884715.9

(187 of 289), Page 187 of 289    Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 187 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.474    Page 35 of
137

Mr. Pat Chun
November 2, 2021
Page 9

Nevertheless, Mr. Chun somehow managed to get HRS to reconsider the exemption it had granted Coach Rolovich, manipulating the process by unlawfully supplying HRS with self-serving statements aimed at undermining Coach Rolovich's exemption. There is no provision, however, in the exemption process that allowed Mr. Chun to reopen and reverse the exemption determination by HRS ("The requests for religious exemptions are evaluated in a *"blind" review process*, meaning the identities of the individuals requesting exemptions are unknown to the members of the review committee except in instances when additional information is needed through follow-up contact [with the person claiming the exemption]".)

As shown below, these procedural violations also support other causes of action against the University. But here, it is enough to note that the University violated its own established procedures in its thinly-veiled effort to reverse HRS' decision to grant Coach Rolovich's request for a religious exemption.

**B.     The University's Decision to let Mr. Chun Intervene and Direct its Exemption Process Violated Coach Rolovich's Right to Procedural Due Process.**

The Fourteenth Amendment to the U.S. Constitution prohibits government from depriving people of liberty or property without procedural due process. One aspect of this constitutional right is that government cannot terminate employees who have a "for cause" provision in their employment contracts except through the reasoned application of a rule of law, something that requires that the decision be made by a neutral decisionmaker. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion).

As noted above, if the University had followed its own procedures, Coach Rolovich's right to procedural due process and a neutral decisionmaker would have been satisfied. But then again, if the University had followed its procedures, HRS' decision to grant Coach Rolovich's religious exemption would not have not have been subject to Mr. Chun's bad faith and illegal efforts to reverse the decision.

The University did not leave the question of whether Coach Rolovich would receive an exemption in the hands of its "blind review process," but instead handed the reins over to Mr. Chun. And Mr. Chun was anything but a neutral decision maker.

As detailed in Section I.B., before Mr. Chun interfered with the University's "blind review process," he had on multiple occasions expressed anger and outrage at Coach Rolovich for declining to take a COVID vaccine. Mr. Chun's comments to Coach Rolovich indicated that he cared more about Governor Inslee's ire, President Schulz's wishes, and his own reputation than about Coach Rolovich's religious faith and his legal rights.

When Coach Rolovich first told Mr. Chun that he intended to make use of the State's religious exemption, Mr. Chun called him a con-man and questioned his character. Mr. Chun told Coach Rolovich that the Governor was targeting him and that the regents wanted him fired. It was clear to Coach Rolovich that Mr. Chun was feeling substantial pressure from his higher ups over Coach Rolovich's vaccination status. Newspaper articles confirm that Governor Inslee and

115884715.9

**ER1274**

(188 of 289), Page 188 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 188 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.475    Page 36 of
137

Mr. Pat Chun
November 2, 2021
Page 10

President Schultz were angry at Coach Rolovich and hint at the pressure Mr. Chun was under to ensure that Coach Rolovich would not be allowed to continue as WSU's head football coach unless he submitted to the Governor's vaccine mandate.[5]

Even back in August, Mr. Chun made it clear that he would do everything in his power to make sure that Coach Rolovich was denied an exemption from the vaccine mandate, telling Coach Rolovich that he really had only two options: get vaccinated or resign.

We now know that Mr. Chun made good on his threat. He intervened and forced the University to reopen its sincerity determination to make sure that the process reached his predetermined, preannounced conclusion. Given Mr. Chun's hostility toward Coach Rolovich and his convictions, and the substantial pressure Mr. Chun was under from University leadership and Olympia, it is hard to imagine a less neutral decisionmaker.

As shown in Section III below, Mr. Chun's assertion that the University could not safely accommodate Coach Rolovich's religious exercise is unreasonable. Mr. Chun had no basis on which to disregard EH&S' "expertise" in this area. Given there is no science to support Mr. Chun's alleged "safety" concern, the best way to understand Mr. Chun's conclusion is that it proceeded from his own personal bias and the pressure he was under from the Governor, President Schulz, and the University's rectors to fire the Coaches.

Mr. Chun's bias also infected the *manner* in which he and the University have tried to frame their decision to terminate Coach Rolovich. Universities fire football coaches pretty frequently. No one knows that better than football coaches and their families. That is why Coach Rolovich's contract with the University has a "without cause" provision, so that Coach Rolovich could continue providing for his family and would have time to land on his feet if his relationship with the University went sour. But here, the University has tried to describe this as a "just cause" terminations, even though the present circumstances are the result of Coach Rolovich's sincere religious beliefs, an unexpected COVID pandemic, and the University's own restrictive policies. No neutral decisionmaker would see these as "just cause" determinations.

Mr. Chun and the University have undoubtedly strained to frame Coach Rolovich's termination as a "just cause" dismissal in hopes that the University could avoid having to buy out Coach Rolovich's contract, which it must if it terminates him "without cause." They know that without-cause terminations would cost the University, for Rolovich and his assistant coaches, about five million dollars in aggregate. The Fourteenth Amendment precludes the University from allowing a deeply prejudiced decisionmaker to deprive them of their property interests in their contracts in this manner.

By allowing someone with a clear personal bias, and under such intense pressure to deliver a preordained outcome, to have veto power over his request for a religious exemption, the University violated Coach Rolovich's Fourteenth Amendment right to procedural due process.

This appeal process, now explicitly controlled by Mr. Chun, only compounds the procedural due process violation. Given Mr. Chun's history with Coach Rolovich, his biased intervention in the

---

[5] Several examples may be found in articles cited in Section III.E. below.

115884715.9

(189 of 289), Page 189 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 189 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.476    Page 37 of 137

Mr. Pat Chun
November 2, 2021
Page 11

University's sincerity determination, and his biased refusal to accommodate Coach Rolovich's religious exercise, it is impossible to imagine that Mr. Chun could preside as a neutral decisionmaker over Coach Rolovich's appeal.

### C. The Governor's and the University's Demonstrated Hostility Toward Religious Exemptions, Including Coach Rolovich's Exemption, Violates His First Amendment Free Exercise Rights.

"[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020).

The Constitution "commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018). In *Masterpiece Cakeshop*, the Supreme Court found that the Colorado Civil Rights Commission's "inappropriate and dismissive comments" about Jack Phillips' religious beliefs and their doubts about his sincerity showed a "lack of due consideration for Phillips' free exercise rights and the dilemma he faced." *Id.* at 1729. The Court found that these "official expressions of hostility to religion . . . were inconsistent with what the Free Exercise Clause requires." *Id.* at 1732.

Here, Governor Inslee and Mr. Chun have both demonstrated hostility toward religious objections to the vaccine mandate. Even before Governor Inslee issued his sweeping vaccine mandate, his hostility toward those who would seek religious exemptions was on full display. As noted above, the Governor's General Counsel sent an email on August 3 stating that the Governor's mandate would include "medical" exemptions "for sure," but would only offer "religious" exemptions "if we have to," and then "as narrow as possible."

Mr. Chun eagerly followed the Governor's effort to "narrow" the conditions under which a religious exemption could be obtained. Even before the vaccine mandate had been issued, Mr. Chun told Coach Rolovich that his exemption would be scrutinized to no end, and that Inslee's mandate would have a "high threshold" for religious exemptions moving forward.

These facts raise much more than a "slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices." Under *Masterpiece Cakeshop*, Governor Inslee's and Mr. Chun's hostility toward religious objections to the vaccine mandate violated Coach Rolovich's First Amendment rights.

### D. Washington's and the University's Preference for Medical over Religious Exemptions Also Violates Coach Rolovich's Free Exercise Rights.

The Free Exercise Clause does not only prohibit government hostility toward Coach Rolovich's religious beliefs: it also prohibits Washington's and WSU's preferential treatment of medical exemptions over religious exemptions. The Supreme Court has been unmistakably clear in the context of the COVID pandemic: government actions "are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any

ER1276

Mr. Pat Chun
November 2, 2021
Page 12

comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Government demonstrates this unconstitutional favoritism when it is more generous with medical exemptions than with religious exemptions. *Holt v. Hobbs*, 574 U.S. 352, 368 (2015) (government interest in prison safety cannot excuse policy that allowed beards for medical but not religious reasons).

The August 3 email from Governor Inslee's General Counsel bluntly stated the State's favoritism for medical exemptions over religious exemptions:

> Of possible exemptions: medical for sure; and religious (if we have to; if yes, as narrow as possible).[6]

Around two weeks later, Mr. Chun—no doubt aware of the State's bias and likely familiar with Ms. Leathers' email, and knowing that Coach Rolovich was seeking a religious and not a medical exemption from the mandate—confidently told Coach Rolovich that if he didn't get the vaccine, he could be expected to be fired with cause on October 19, 2021.

The University's statistics on vaccination exemptions reflects the Governor's attorney's policy and Mr. Chun's bias: WSU has approved requests for medical exemptions at almost twice the rate of religious exemption requests.[7]

The State's and the University's manifest preference for medical over religious exemptions means that Washington's mandate is not neutral or generally applicable and that the University's actions towards Coach Rolovich will fail strict scrutiny.

### E.     The University's Failure to Ever Ask Coach Rolovich any Follow-Up Questions Demonstrates that HRS Did Not Have Honest Doubts About His Sincerity.

The Governor's mandate and the University's religious exemption process require the University to determine whether Coach Rolovich's requested exemption was based on a "sincerely held religious belief." As explained above, University policy precluded the review committee or HRS from letting Mr. Chun know that Coach Rolovich was seeking a religious exemption, let alone allowing him to infect its "blind review process" and overrule its determination.

Courts have "few occasions to [address sincerity], as the sincerity of a religious belief is not often challenged." *McAlister v. Livingston*, 348 F. App'x 923, 935 (5th Cir. 2009). "Like the religious nature of a belief, observance, or practice, the sincerity of an employee's stated religious belief is usually not in dispute and is 'generally presumed or easily established.'" *Moussazadeh v. Tx. Dep't of Crim. Just.*, 703 F.3d 781, 790 (5th Cir. 2012).

---

[6] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

[7] Preliminary Vaccination & Exemption Data, WSU Insider (last updated Oct. 6, 2021), https://news.wsu.edu/wsu-vaccination-and-exemption-data/.

115884715.9

Mr. Pat Chun
November 2, 2021
Page 13

The sincerity inquiry is even more dangerous when the employer in question is a governmental entity. That is because the Establishment Clause precludes government from deciding what counts as a legitimate theological belief. *See, e.g., Roby v. U.S. Dept. of Navy*, 76 F.3d 1052, 1056 (9th Cir. 1996) ("when the military undertakes to measure the depth with which the applicant holds [his] belief, we think the inquiry becomes an impermissible subjective look into his heart and soul. The question is, does he believe, not, how deeply does he believe."); *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 725 (2014) ("it is not for us to say that their religious beliefs are mistaken or insubstantial . . . our narrow function . . . in this context is to determine whether the line drawn reflects an honest conviction.").

Even if the government believes that an employee has been inconsistent in following his convictions, this is not itself grounds for ruling him insincere. "[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance" *Grayson v. Schuler*, 666 F.3d 450, 454-55 (7th Cir. 2012); *see also Adeyeye v. Heartland Sweeteners, LLC,* 721 F.3d 444 (7th Cir. 2013) ("Has the plaintiff had a true conversion experience? Is he following religious practices that are embedded in his culture and family upbringing? Is he making Pascal's coldly rational wager to believe in God based on his self-interest? These questions are simply not an appropriate or necessary line of inquiry for courts. We are not and should not be in the business of deciding whether a person holds religious beliefs for the 'proper' reasons. We thus restrict our inquiry to whether or not the religious belief system is sincerely held; we do not review the motives or reasons for holding the belief in the first place."); *EEOC v. Ilona of Hungary, Inc*., 108 F.3d 1569, 1575 (7th Cir. 1997) (en banc) (finding that a Jewish employee proved her request for leave to observe Yom Kippur was based on a sincerely held religious belief, even though she had never in her prior eight-year tenure sought leave from work for a religious observance, and conceded that she generally was not a very religious person, but evidence showed that the recent birth of her son and the death of her father strengthened her religious beliefs).

These important constitutional principles are reflected in the Equal Employment Opportunity Commission's ("EEOC") guidance for employers facing requests for religious accommodation. The EEOC cautions employers they should generally assume that an employee's request for a religious accommodation is based on a sincerely held religious belief. Its guidance states that an "employer would be justified in seeking additional supporting information" about the employer's asserted religious belief *only* if the employer has determined that it has "an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice."[8] EEOC Compliance Manual on Religious Discrimination, Jan. 15, 2021, available at https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (emphasis supplied); *see also, Chenzira v. Cincinnati Child.'s Hosp. Med. Ctr*., No. 1:11–CV–00917, 2012 WL 6721098, at *4 (S.D. Ohio Dec. 27, 2012) (holding that Title VII could cover a request to be excused from hospital mandatory vaccination policy due to vegan opposition to a vaccine that was animal-tested or contains animal byproducts if plaintiff "subscribe[d] to veganism with a

---

[8] The EEOC recently confirmed that its general guidance applies in full to requests for exemptions from COVID-19 vaccine mandates. *See* EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, at L.2 (last updated Oct. 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L.

115884715.9

Mr. Pat Chun
November 2, 2021
Page 14

sincerity equating that of traditional religious views," noting her citation to essays about veganism and to Biblical excerpts).

Washington State and the University knew all this. Press Secretary Mike Faulk with Governor Inslee's office explained to reporters that if a State employer had reason to believe an applicant had in the past been inconsistent regarding his stated religious objection, "the HR professionals would engage in follow up questions to better understand the person's history, such as demonstrating changes they have made as an adult based on those beliefs. We understand people's religious views may change over time."[9]

The University's failure to follow-up with Coach Rolovich means that it never really doubted Coach's sincerity. Mr. Chun's expressed doubts about Coach Rolovich's sincerity were unjustified and improper. His uninvited and unlawful "follow up" with HRS violated (obliterated) the University's own policy, the Governor's office's representations, EEOC guidance, and Coach Rolovich's rights.

### F.    Mr. Chun Created Unconstitutional Conditions Burdening Coach Rolovich's First Amendment Rights.

Statements made by Mr. Chun to Coach Rolovich regarding his decision not to be vaccinated created unconstitutional conditions burdening his First Amendment rights. On multiple occasions Mr. Chun questioned Coach Rolovich's character, the sincerity of his faith, and his mental health, among other threatening remarks, Mr. Chun told him that he is selfish, his views are extreme, that he could expect to be fired on October 19, 2021, that if he didn't tell Mr. Chun he would get vaccinated, he would be put on administrative leave until the October 19 deadline, and Mr. Chun offered his wife as someone the Coach could talk to because she had been in a couple different religions he referred to as "cults". In short, Mr. Chun created a hostile work environment and unconstitutional conditions burdening Coach Rolovich's First Amendment rights. *See, e.g., Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up"). Moreover, there is a constitutionally protected liberty interest in refusing unwanted medical treatment. *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990); *see also, Washington v. Harper,* 494 U.S. 210, 229 (1990) (A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]").

---

[9] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

Mr. Pat Chun
November 2, 2021
Page 15

Mr. Chun's relentless and coercive efforts to force Coach Rolovich to get vaccinated were an unmistakable trespass upon the Coach's First Amendment rights.

### G. WSU Breached its Contract with Coach Rolovich Because it Did Not Have "Just Cause" to Terminate Him.

As discussed above, because Coach Rolovich's religious exemption was granted by HRS, WSU did not have grounds to terminate him with just cause. Furthermore, a denial of an accommodation by Mr. Chun does not constitute "just cause" under the terms of his contract. There is no *force majeure* clause in Coach Rolovich's contract with WSU, nor is there any provision that contemplates a scenario where he could be terminated because he refused to violate his conscience, bodily integrity, or religious faith by refusing to take a vaccine. Coach Rolovich's response to a global pandemic, and the actions and mandates of government officials in response to the pandemic, could not have been contemplated by either party when the contract was executed. Requiring an employee to respond to a pandemic by taking new vaccines developed through the use of abortion-derived cell lines was never part of Coach Rolovich's employment contract with the University.

Mr. Chun's assertions in his October 18 Notice of Intent to Terminate letter, that Coach Rolovich's decision to decline to receive a COVID vaccine on religious grounds gives it "just cause" to terminate him, is without basis in fact or law:

- **Paragraph 1.2.1**: Coach Rolovich complied with the vaccine requirement: he sought a religious exemption and it was granted. WSU's refusal to provide an accommodation does not change the fact that Coach Rolovich complied as required.

- **"Inability to attend Pac 12 media day in LA"** *See above.* Also, this was a decision made by the Pac 12 and not Coach Rolovich's choice. It appears that media members were allowed at media day with proof of a negative test before arriving. Coach Rolovich would have taken a test to attend. Other conferences allowed their unvaccinated coaches to attend their media day with a negative test.

- **"Inability to attend Friday donor lunches"** *See above.* Coach Rolovich was never asked to go to those lunches. It was only vaccinated coaches that were asked. Coach Rolovich would have attended and worn a mask. Nothing in the mandate required Chun or anyone else not to invite Coach Rolovich to the luncheons.

- **"Inability to attend the WSU Football Coaches Show at Zeppoz..."** – *See above.* Also, Coach Rolovich did attend the show in person during the 2020 season at the same establishment.[10]

- **"Inability to attend live donor meetings, including some events in July..."** - *See above.* Also, the reason the July donor meetings were cancelled was due to Athletics

---

[10] *See also* Section III.D.7, showing that the University has permitted coaches and players to appear on the WSU Football Coaches Show at Zeppoz in violation of applicable mask mandates.

115884715.9

(194 of 289), Page 194 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 194 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.481    Page 42 of 137

Mr. Pat Chun
November 2, 2021
Page 16

Department quarantine rules that were very unclear. The Athletics Department said unvaccinated people would have to quarantine for 10 days if they left "the area" during the summer. The term "area" was unclear and if Coach Rolovich left the "area" to attend these donor events, he would have missed the beginning of training camp. Coach Rolovich viewed training camp as the most important part of his job.

**"You are unable to attend individual position meetings or engage in one-on-one meetings..."** - *See above.* Also, Coach Rolovich attended any meeting he wanted with a mask and distancing. He engaged with players all the time at practice, being careful as possible to socially distance. He also talked to assistant coaches at practice. He attended team meetings. The claim that interactions with assistant coaches and players has been limited and has led to "poor planning, lack of communication and a void in leadership" rings hollow in view of the three game Pac 12 winning streak the Cougars had before Coach Rolovich was informed he was being terminated.

**"Your ability to travel extensively and recruit has been impacted..."** *See above.* Also, recruiting has not been significantly impacted. WSU has had great in-state commitments. Significantly, there is an inflated roster due to the covid extra year, so Coach Rolovich's plan was to be a little slower with commits so they didn't over sign and not have room, which would have led to NCAA violations. Coach Rolovich also recruited when the team had road games in Utah and Cal Berkely. This can be confirmed through compliance. Mr. Chun should also look at the "visit to commit" ratio.

Mr. Chun also suggests in his Written Notice of Intent to Terminate that Coach Rolovich "voic[ed] physical threats regarding a coach we talked about . . . ." That is a baseless and reckless allegation. Coach Rolovich promptly responded in an email to Mr. Chun after he first made the allegation:

In your email today [Oct. 18], you made a couple of assertions that simply aren't accurate. First, you stated that I had voiced physical threats against a certain coach, and that based on that interpretation of my words, I could be disciplined or terminated.

My words were clearly not meant as a threat, but they were intended to express to Bryan my frustration with, and dislike of June Jones. I found it entirely inappropriate and in bad faith that you and June were having discussions about him replacing me.

It was even more egregious that June had subsequently disclosed my religious exemption request to a USA Today reporter, who wrote an article about it.

Therefore, when Bryan talked about bringing June Jones to a practice, I was merely letting Bryan know just what a bad idea, and how improper that would be.

My words were never meant as a threat (I would never physically harm him), and you and Bryan absolutely know that. Frustration is not an act of insubordination and I have done nothing wrong.

115884715.9

**ER1281**

Mr. Pat Chun
November 2, 2021
Page 17

Second, I never "blocked" Dan Morrison from coming to Pullman. I actually recommended him, so why would I block him? I did speak with Dan on the phone and he asked me my honest opinion about certain things. Therefore, I was candid with him as I should have.

As discussed herein, it is clear that Mr. Chun decided to terminate Coach Rolovich as far back as August, even before Inslee's vaccine mandate was issued. The hostility displayed by Mr. Chun toward Coach Rolovich because of his decision not to get vaccinated, frankly, is very disturbing.

WSU has acted in bad faith in breaching its contract with Coach Rolovich.

## III.  THE UNIVERSITY'S REFUSAL TO ACCOMMODATE COACH ROLOVICH'S RELIGIOUS EXERCISE VIOLATED ITS OWN POLICIES AND ROLOVICH'S LEGAL RIGHTS

Although HRS proposed what it thought was an acceptable reasonable accommodation, and although EH&S applied its "expertise" to perform a detailed, individualized assessment of Coach Rolovich's workplace and conclude that the University could safely accommodate Coach Rolovich's religious exercise without sacrificing his own safety or that of others, Mr. Chun intervened again. He rejected the proposed accommodations and the University adopted Mr. Chun's conclusion in its October 18 email to Coach Rolovich.

By finding accommodations unworkable without ever consulting with Coach Rolovich, the University again violated its own policy and Coach Rolovich's legal rights. Mr. Chun's claim that the University could not "safely" accommodate Coach Rolovich is irrational. It contradicts EH&S' expert opinion and is also unsupportable in light of the testimony from Coach Rolovich's expert witness, Dr. Jayanta Bhattacharya, Professor of Medicine, Economics, and Health Research and Policy at Stanford University. The past year shows that Coach Rolovich could indeed work safely and effectively under the University's safety protocols.

In the light of all this evidence and experience, the only thing that remains of the University's "undue burden" argument are speculative claims that accommodating religious exercise here will hurt the University's reputation and its bottom-line. But our civil rights laws would mean nothing if employers, landlords, and places of accommodation could escape the duty to accommodate on these bases.

### A.  The University's Conclusion that it Could Not Accommodate Coach Rolovich's Religious Beliefs is Legally Irrelevant to the Question of Whether the University Can Fire Him for "Just Cause."

The first thing to note about the University's accommodation inquiry is that it is legally irrelevant to one of the most important questions at issue here: whether the University can legally terminate Coach Rolovich for "just cause."

The University's October 18 email to Coach Rolovich tries to hedge its bets by claiming two alternative grounds for denying his exemption. First, the University claims it found Coach Rolovich ineligible for an exemption because it "questions" his sincerity. As we have shown, the

115884715.9

ER1282

Mr. Pat Chun
November 2, 2021
Page 18

University's blind review process ran its course and concluded that Coach Rolovich was sincere. That was the end of the story. The fact that HRS and EH&S developed and EH&S approved accommodations for Coach Rolovich demonstrates that the University had reached a final conclusion on the sincerity question.

To be sure, the University has tried to claim that it actually found Coach Rolovich insincere—or, more accurately, that it "questions" his sincerity. To the extent the University claims that the University's October 18 email represents its conclusion on this matter, Section II demonstrates that this result was reached in violation of its policies, civil rights laws, and the United States Constitution. The University will lose badly if it tries to defend Coach Rolovich's termination on this basis.

Second, the University claims it denied Coach Rolovich's request for religious accommodation because the accommodations recommended by HRS and EH&S would place an "undue burden" on the University. As shown below, this result too was reached in violation of University policy and Coach Rolovich's rights.

But before getting to those deficiencies, it is important to note that the University's accommodation defense cannot save its claim that the University has grounds to terminate Coach Rolovich for "just cause." The accommodation argument presumes HRS' conclusion: Rolovich had presented a "sincerely held religious belief." And Washington caselaw is clear that an employer cannot have just cause to terminate an employee "where the termination resulted because the employee exercised a legal right or privilege," such as the fundamental right to religious exercise. *Farnam v. CRISTA Ministries*, 807 P.2d 830, 834 (Wash. 1991).[11]

### B. The University Violated Its Own Policy and Coach Rolovich's Rights by Denying Him an Accommodation Without Seeking His Input.

The University violated the law when, without seeking Coach Rolovich's input, it concluded that it could not reasonably accommodate him.

An employer's duty to negotiate possible accommodations ordinarily requires it to take "some initial step to reasonably accommodate the religious belief of that employee." *Peterson v. Hewlett-Packard Co*., 358 F.3d 599, 606 (9th Cir. 2004). It is clear "that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440–41 (9th Cir. 1993) (internal citations omitted).

An employee's "concomitant duty" to cooperate, however, arises only *after* the employer has suggested a possible accommodation: "[T]he statutory burden to accommodate rests with the employer[;] the employee has a correlative duty to make a good faith attempt to satisfy his

---

[11] Article I, Section 11 of the Washington Constitution "absolutely protects the free exercise of religion, and extends broader protection than the first amendment to the federal constitution." *City of Woodinville v. Northshore United Church of Christ*, 211 P.3d 406, 410 (Wash. 2009).

Mr. Pat Chun
November 2, 2021
Page 19

needs *through means offered by the employer.*" *Id.* (internal citation omitted) (emphasis supplied).

Moreover, an employee's "correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer*"* arises after the employer takes the "initial step' towards accommodating [the employee's] conflicting religious practice" by suggesting a possible accommodation. *E.E.O.C. v. AutoNation USA Corp.*, 52 F. App'x 327, 329 (9th Cir. 2002).

In this case, the University's HRS showed that it understood this requirement. Its religious exemption form notifies employees:

> Washington State University may need . . . [to] discuss reasonable accommodations to WSU's COVID-19 vaccination requirement. **Human Resource Services will reach out to you** if additional information is needed to process this request. (emphasis added)

But that did not happen. Neither before nor after Mr. Chun unlawfully intervened to override HRS and EH&S did the University reach out to Coach Rolovich to express its concerns, give him an opportunity, and to engage in the "bilateral cooperation" that the Ninth Circuit and EEOC expect.

### C.    The University Had No Reasonable Basis for Preferring Mr. Chun's Assertions Over EH&S' "Expertise" on the Safety Issue.

A "conclusion" that is formed without proof or sufficient evidence is a conjecture. And that is the best way to describe the University's decision to adopt Mr. Chun's claim that it could not "safely" accommodate Coach Rolovich's religious beliefs. First, it was irrational for the University to give its Director of Athletics more weight than its Environmental Health and Safety Department on this key question. Second, as shown in the section to follow, the University's alleged safety concerns are at odds with the best science on COVID-19 and the available vaccines.

On October 14, the Director of Environmental Health and Safety Department issued an eight-page memorandum that applied its "expertise in environmental and occupational health and safety" to the question of whether the University could both accommodate Coach Rolovich's religious beliefs and "ensure the safety of the employee and others the employees may be in contact with." After performing a detailed "individualized assessment" of Coach Rolovich's workplace and responsibilities, EH&S answered that question in the affirmative.

Sometime in the next few days, Mr. Chun wrote his own memorandum that refuted EH&S' expert opinion. Why? Mr. Chun said that "[f]requent close physical proximity to and contact with others is an inherent part of coaching." But EH&S knew that "[s]ocial distancing is generally not possible" for Coach Rolovich because his job "require[s] direct face-to-face services or activities for greater than 15 minutes."

Mr. Chun also said Coach Rolovich had to do a lot of travel. But EH&S knew that too: it acknowledged that Coach's "duties include events where vulnerable populations may be present,

ER1284

(198 of 289), Page 198 of 289Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 198 of 289
Case 2:22-cv-00319-TOR     ECF No. 29     filed 04/12/23     PageID.485     Page 46 of
137

Mr. Pat Chun
November 2, 2021
Page 20

with people ranging in age from k-12 to retirement;" it recognized that his "responsibilities require regular travel."

EH&S has "expertise in environmental and occupational health and safety." Pat Chun has a bachelor's degree in journalism and a master's degree in sports leadership.

In litigation over Coach Rolovich's termination, EH&S' memorandum qualifies as a declaration against interest. That Mr. Chun refuted EH&S expert opinion is further evidence that he cared more about firing Coach Rolovich than about public health. That the University gave Mr. Chun's conjecture more weight than EH&S reasoned judgement is further evidence that the University cared more about carrying out Mr. Chun's, President Schulz's, and its regents' wishes than following the law and respecting Coach Rolovich's rights.

### D. The University's Conclusion That It Could Not Safely Accommodate Coach Rolovich's Religious Beliefs was Based on Assumptions Not Supported by Science and Contradicted by Prior Experience.

To further demonstrate the unreasonableness of the University's conclusions, Coach Rolovich submits a declaration from Dr. Bhattacharya, a former Professor of Medicine (20+ years) and current Professor of Health Policy at Stanford University School of Medicine. *See* Exhibit A, attached hereto; Dr. Bhattacharya's CV is attached hereto as Exhibit B. Dr. Bhattacharya's declaration provides evidence in support of his conclusion that WSU can keep its employees safe while granting exemptions for those whose medical conditions and religious convictions prevent them from receiving a COVID vaccine.

Dr. Bhattacharya is also a research associate at the National Bureau of Economic Research, and Director of Stanford's Center for Demography and Economics of Health and Aging. Dr. Bhattacharya holds an M.D. and Ph.D. from Stanford University. He has published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. Dr. Bhattacharya's research has been cited in the peer-reviewed scientific literature more than 11,600 times. *See*, Declaration of Dr. Jayanta Bhattacharya, p. 1-2, ¶ 3.

Dr. Bhattacharya has dedicated his professional career to the analysis of health policy, including infectious disease epidemiology and policy, and the safety and efficacy of medical interventions. He has both studied extensively and commented publicly on the necessity and safety of vaccine requirements for those who have contracted and recovered from COVID-19 (individuals who have "natural immunity"). Dr. Bhattacharya is intimately familiar with the emergent scientific and medical literature on this topic and pertinent government policy responses to the issue both in the United States and abroad. *Id.* at p. 3, ¶ 4.

Dr. Bhattacharya is also the primary co-author of the Great Barrington Declaration, which describes an alternate policy of focused protection. His co-authors of the Declaration include Prof. Martin Kulldorff of Harvard University and Prof. Sunetra Gupta of Oxford University. Over 12,000 epidemiologists and public health professionals and 35,000 medical professionals have co-signed the Declaration. *Id.,* p. 8, ¶ 19.

115884715.9

**ER1285**

Mr. Pat Chun
November 2, 2021
Page 21

In stark contrast to the scientific evidence relied upon by Dr. Bhattacharya in his declaration, WSU has produced no evidence, let alone scientific evidence, that the accommodation plans developed by EH&S would not be effective for Coach Rolovich.

### 1.    The median infection survival rate for COVID-19 is 99.7 %.

"According to a meta-analysis by Dr. John Ioannidis of every seroprevalence study conducted to date of publication with a supporting scientific paper (74 estimates from 61 studies and 51 different localities worldwide), the median infection survival rate—the inverse of the infection fatality rate—from COVID-19 infection is 99.77%. For COVID-19 patients under 70, the meta-analysis finds an infection survival rate of 99.95%. A separate meta-analysis by other scientists independent of Dr. Ioannidis' group reaches qualitatively similar conclusions. *Id.* at p. 5, ¶ 14.

"A study of the seroprevalence of COVID-19 in Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the infection survival rate in a preprint companion paper: 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65. *Id.* at ¶ 15.

"Those numbers are consistent with what the US CDC has reported. A US CDC report found between 6 and 24 times more SARS-CoV-2 infections than cases reported between March and May 2020. Correspondingly, the CDC's estimate of the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate. For people ages 20-49 years, it was 0.02%, meaning that young adults have a 99.98% survivability rate. For people age 50-69 years, it was 0.5%, meaning this age group has a 99.5% survivability rate. Finally, for people ages 70+ years, it was 5.4%, meaning seniors have a 94.6% survivability rate. *Id.*, p. 6, ¶ 17.

"One segment – the elderly and others with severe chronic disease – faces a higher risk of mortality if infected (especially if unvaccinated). A second segment – typically non-elderly people – face a very low risk of mortality if infected and instead face much greater harm from lockdowns, school closures, and other non-pharmaceutical interventions than from COVID infection itself. The right strategy, then, is focused protection of the vulnerable population by prioritizing them for vaccination while lifting lockdowns and other restrictions on activities for the rest since they cause harm without corresponding benefit for the non-vulnerable." *Id.*, p. 7, ¶ 19.

### 2.    Vaccinated individuals are at least as likely as unvaccinated individuals to be shedding live virus.

"It has been found that vaccinated individuals are at least as likely as unvaccinated individuals to be shedding live virus. Data from studies indicate that

Mr. Pat Chun
November 2, 2021
Page 22

vaccinated and unvaccinated individuals infected with the Delta variant might transmit infection. Importantly, it has been shown that infectious SARS-CoV-2 is frequently found even in vaccinated persons." *Id.*, p. 13, ¶ 27.

Also, the CDC recently reported in July that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated, leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[12]

For example, 74% of cases in a Cape Cod outbreak in July occurred in vaccinated individuals, again demonstrating that the vaccines are not terribly effective when it comes to preventing infection.[13] This forced the Director of the CDC, Rochelle Walensky, to admit that individuals vaccinated for COVID-19, while having less symptoms, can still become infected with and transmit the virus. Dr. Walensky admitted that "what [the COVID19 vaccines] can't do anymore is prevent transmission." After this admission, Wolf Blitzer asked Dr. Walensky if "you get covid, you're fully vaccinated, but you are totally asymptomatic, you can still pass on the virus to someone else, is that right?" Dr. Walensky responded, "that is exactly right."[14]

Differential treatment of the vaccinated and unvaccinated by WSU, then, is clearly not based on data or science.

### 3. Asymptomatic spread of COVID-19 is rare.

According to Dr. Bhattacharya, "the best evidence on how frequently asymptomatic disease spread occurs comes from a large meta-analysis of 54 studies from around the world of within-household spread of the virus—that is, from an infected person to someone else living in the same home (Madewell et al. 2020). This study represents the most comprehensive survey of the vast empirical literature on asymptomatic spread. At home, *of course*, none of the safeguards often recommended in public spaces outside of home (such as masking and social distancing) are typically applied. Because the study focuses on a single setting (household transmission), it is not subject to the same problems that other studies on this topic might have. In particular, by focusing on a homogenous setting where few safeguards exist, the estimate represents an upper bound on the frequency that someone positive for the virus but with no symptoms (and hence either pre-symptomatic or asymptomatic) may spread the virus to close contacts. The primary result is that symptomatic patients passed on the disease to household members in 18% of instances. In comparison, those infected but without symptoms (asymptomatic and pre-symptomatic patients) passed on the infection to household members in only 0.7% of instances. *Id.*, p. 19-20, ¶ 37.

"Asymptomatic individuals are an order of magnitude less likely to infect others than symptomatic individuals, even in intimate settings such as people living in

---

[12] *See* Joel Achenbach, CDC Reversal on Indoor Masking Prompts Experts to Ask, "Where's the Data?" Wash. Post, July 28, 2021, wapo.st/2THpmIQ (last visited Oct. 26, 2021).

[13] *See* Molly Walker, CDC Alarmed: 74% of Cases in Cape Cod Cluster Were Among the Vaxxed, MedPage Today, July 30, 2021, bit.ly/2V6X3UP (last visited Oct. 26, 2021).

[14] The Situation Room (@CNNSitRoom), Twitter (Aug. 5, 2021, 5:14 p.m.), https://twitter.com/CNNSitRoom/status/1423422301882748929.

115884715.9

Mr. Pat Chun
November 2, 2021
Page 23

the same household where people are much less likely to follow social distancing and masking practices that they follow outside the household. Spread of the disease in less intimate settings by asymptomatic individuals—including in the context of the WSU work environment—is likely to be even less likely than in the household." *Id.*, p. 22, ¶ 43.

In other words, if Coach Rolovich isn't symptomatic, he, like all other asymptomatic individuals, presents almost a 0% chance of infecting others. Mr. Chun clearly did not consider this fact in his decision to overrule the accommodation plans.

**4.    WSU can keep its employees and others safe if it does not mandate that all its employees be vaccinated.**

"Can WSU keep its employees safe if it does not mandate that all its employees be vaccinated? *The answer is a definitive yes*." *Id.*, p. 22, ¶ 44 (emphasis supplied). That is Dr. Bhattacharya's expert opinion, derived from his personal scientific investigations, and his examination and analysis of a multitude of scientific studies.

"First and most obviously, WSU could adopt a robust sick policy, requiring that employees who have not been vaccinated and who show symptoms consistent with COVID-19 infection stay at home from work, returning to work only once they have had a negative COVID-19 PCR or antigen test result. This could be implemented, for instance, by requiring employees to complete a symptom self-check each day before coming to work. WSU would provide employees with a supply of inexpensive rapid antigen tests, which are easy to self-administer at home, provide results within 30 minutes, and are highly accurate for detecting whether a patient is infectious. A large number of lateral flow antigen tests have received Emergency Use Authorization (EUA) by the US Food and Drug Administration. Alternatively, WSU could require that any unvaccinated employees obtain those tests themselves to keep its own costs down. Employees who report COVID-19 like symptoms would be asked to send a picture of their positive test result to their manager or a WSU health official by phone or email to verify their result. A system that required the few employees who seek the vaccine exemption to provide this information to their manager each day before coming to work would be inexpensive—no online reporting system would be necessary. *Id.*, p. 22-23, ¶ 45.

"For this symptom checking policy to be effective in reducing the risk of disease spread, it must be the case that symptomatic employees are substantially more likely to infect others than employees who are infected (that is, have evidence of the virus in the nasopharynx), but who have no symptoms. Fortunately, the best empirical evidence shows that the probability that an asymptomatic individual will spread the disease is very low. And because the overwhelming majority of WSU employees will themselves be vaccinated, they face even less risk from any

115884715.9

ER1288

(202 of 289), Page 202 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 202 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.489    Page 50 of 137

Mr. Pat Chun
November 2, 2021
Page 24

of their asymptomatic, unvaccinated coworkers who receive an accommodation from WSU for religious or medical reasons of developing severe COVID symptoms.[15] *Id.*, p. 23-24, ¶ 46.

"In addition, WSU could implement a program of weekly PCR or antigen testing as a condition of an employee's receiving an exemption. Many other organizations have implemented a testing regimen like this for all employees, including my home institution, Stanford University. Employees receiving an exemption could take the test in the workplace—there are versions of the test available that can be self-administered. Or employees could be required to purchase and take the test at home.[16,17] *Id.*, p. 23-24, ¶ 46.

"Since its spread through the human population, the SARS-CoV-2 virus—an RNA virus—has been mutating, including some forms that are likely more transmissible than the original wild-type virus that emerged from Wuhan, China, in 2019. As of the date of this declaration, the Delta variant is the dominant form of the SARS-CoV-2 virus worldwide. The virus will continue to mutate as it continues to spread. However, the possibility of such a mutation does not alter the conclusion that accommodations can be allowed without risk to public safety. *Id.*, p. 24, ¶ 48.

"The first two accommodations discussed above would be equally effective against variants as they are against the original Wuhan version. That is because all variants to arise thus far produce symptoms that can be checked for, and can be identified through standard COVID testing. So regular symptom-checking and/or testing for those receiving medical or religious accommodations will detect the variant if it is present." *Id.* at ¶ 49.

---

[15] President Schulz has said that nearly 90 percent of WSU employees and 97 percent of students are vaccinated. Chuck Culpepper, Washington State Football Coach Nick Rolovich Fired after Failing fo Comply with Vaccine Mandate, Washington Post, Oct. 18, 2021, https://www.washingtonpost.com/sports/2021/10/18/nick-rolovich-washington-state-fired-covid-mandate/. *See also* Donald G. McNeil, Jr., How Much Herd Immunity Is Enough?, NY Times, Dec. 24, 2020 (updated Sept. 22, 2021), https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html ("Dr. Fauci noted, a herd-immunity figure at 90 percent or above is in the range of the infectiousness of measles. 'I'd bet my house that Covid isn't as contagious as measles,' he said.").

[16] Coach Rolovich has been willing to abide by a daily testing protocol: he was doing so in August. *See* Scott Hanson, WSU in 'strict COVID management' after football coach Nick Rolovich's decision to not get vaccinated, Spokesman Review, Aug. 13, 2021, https://www.spokesman.com/stories/2021/aug/13/wsu-in-strict-covid-management-after-football-coac/ ("Rolovich, meanwhile, is undergoing daily COVID-19 testing and wears a mask. Chun said the coach is adhering to all protocols.").

[17] On August 4, the Governor's office was considering a "testing strategy option" of "allowing workers to opt-out of the vaccine in favor of weekly COVID-19 testing." But two days later this option was rejected. https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible. Upon information and belief, the Governor's office rejected this option because it understood that allowing a "testing strategy option" would make it easier for Coach Rolovich and other State employees with religious objections to demonstrate that they could work safely without receiving a COVID vaccine.

115884715.9

**ER1289**

Mr. Pat Chun
November 2, 2021
Page 25

    **5.**    **Variants do not affect the reasonableness of the COVID-recovery alternative discussed above.**

"Variants likewise do not affect the reasonableness of the COVID-recovery alternative discussed above. The key point is that the mutant variants do not escape the immunity provided by prior infection with the wild-type virus or vaccination. This is true of the delta variant as well. In a study of a large population of patients in Israel, *vaccinated* people who had not been previously infected were 13 times more likely to experience a breakthrough infection with the Delta variant than patients who had recovered from COVID. Although reinfection can occur, people who have been previously infected by the virus are unlikely to have a severe outcome (hospitalization or death) after exposure to a variant virus. A variant circulating in the population thus poses little additional risk of excess mortality due to viral infection." *Id.*, p. 25, ¶ 50.

    **6.**    **Chun and WSU have provided no evidence that the safety measures already imposed on Coach Rolovich for over a year would not be adequate to protect himself and others if an accommodation was granted.**

Coach Rolovich received an email from HRS at 4:29 p.m. on October 18, only a minute before the meeting with Chun, where Chun handed him a three-page letter of intent to terminate; the email stated that "the University has determined you cannot safely and effectively do your job without undue hardship to the University." There was no disclosure of evidence relied upon by Chun and WSU in determining that Coach Rolovich could not safely and effectively do his job. Chun's memorandums overruling the HRS Exemptions and EH&S proposed accommodations was equally bereft of any supporting scientific data.

In fact, Coach Rolovich had been safely and effectively doing his job since he arrived on the WSU campus. For the past year he has been following the safety protocols required of him by the University and Chun. During that time there has been no evidence to suggest that Coach Rolovich wasn't safely and effectively doing his job. The same, of course, cannot be said of Mr. Chun who became infected with COVID at a donor event last summer. The University did not explain how the safety protocols Coach Rolovich followed for more than a year without incident would suddenly be ineffective, especially when almost every student and staff member at WSU has now been vaccinated.

Dr. Bhattacharya summarized the implications of the studies he has reviewed and cited: "Now that every American adult and teenager has free access to the vaccines, the case for a vaccine mandate is weaker than it once was. There is no good public health case for WSU to terminate employees who have a sincere medical or religious objection to vaccination. Since the successful vaccination campaign already protects the vulnerable population, the unvaccinated—especially recovered COVID patients—pose a vanishingly small threat to the vaccinated. They are

Mr. Pat Chun
November 2, 2021
Page 26

protected by an effective vaccine that dramatically reduces the likelihood of hospitalization or death after infections." *Id.*, p. 29, ¶ 57.

Coach Rolovich, through Dr. Bhattacharya's declaration, has produced compelling scientific evidence that the University should have granted him an accommodation. There is an accommodation for Coach Rolovich that WSU could have provided if it had simply taken the time to consider the facts and the science. Instead, WSU and Chun chose to ruin the lives of those who would not reject their faith by submitting to the governor's mandate.

> **7.** **Chun was wrong to conclude that Coach Rolovich could not perform the essential functions of his job under the accommodations presented by HRS and EH&S: Coach Rolovich had been effectively doing so under the similar protocols for over a year.**

In the undated correspondence responding to the EH&S accommodation plan, the reasons for denying the accommodation plan are essentially the same as those set forth in Chun's October 13 memorandum denying the accommodation plan provided by HRS Exemptions. The bullet points in the undated correspondence are addressed below.

The following indicates a brief summary of some of Coach Rolovich's response to Mr. Chun's purported reasons for declining EH&S' recommendations:

> **Coaching**: **Training, evaluating and developing student-athletes.**
> Frequent close physical proximity to and contact with others is an inherent part of coaching.
>
> > **Response:** Coach Rolovich has been doing all of this safely throughout the pandemic. Also, vaccinated coaches are required to wear masks and socially distance, though they often disregard both requirements.
>
> **Travel**: **Travel is a key component of team competition and recruiting.**
> The football team does travel by 737 charter for games; it also travels by bus to airports, hotels, and stadiums. Although social distancing may be maintained on a chartered 737 flight, it becomes exceedingly difficult on buses, and could require that a coach travel separately in between airports, hotels, and stadiums. Organizationally this is not practical as coaches are expected to travel and be with the team on road trips. This also creates a financial burden if a coach has to travel separately. Further, team meetings and meals while traveling often take place indoors with many student-athletes and coaches in attendance; travelling separately will limit these interactions and negatively impact relationships. WSU has little to no control over access to facilities used for such meetings and cannot control circulation or sanitization of such facilities. Managing team travel is a difficult process and it only be made more difficult by having to work to safely accommodate unvaccinated staff. We are concerned that travel under these circumstances cannot be safely and effectively accommodated.

115884715.9

Mr. Pat Chun
November 2, 2021
Page 27

**Response:** Coach Rolovich has been traveling without incident and without infecting anyone. The NCAA has recommended more buses for all teams to increase distancing. Meals during travel were all done according to the local health rules. The team has been accommodated the entire year. There have been no cases of COVID-19 this year due to travel. There has been only one positive case (which was discovered before training camp).

**Recruiting: Recruiting is critical to the success of the Football Program and Athletics Department.** Almost all recruiting travel is done via commercial flights. This means that unvaccinated coaches will be subject to seating arrangements, seat assignments etc. based on the private airlines. It is important to note that once an unvaccinated coach has taken a commercial flight they directly enter recruit homes, high schools or other training facilities. Recruiting remotely via technology or in person fully masked and socially distanced will have a negative impact on how WSU approaches recruits (and their families). Although it is difficult to estimate how many recruits and their families will be uncomfortable with unvaccinated visits, even a small decrease in recruit access by WSU coaching staff will have significant impact on the Football Program. Given WSU's location, relatively limited media exposure, and traditional role as the smallest program in the Pac-12, recruiting is critically important to any successful athletics program. A coach who is met with suspicion, hesitancy, or fear creates an undue hardship for the purposes of recruiting and cannot be accommodated.

**Response:** Coaches have not been on the road recruiting since the pandemic began (recruitment was permitted by the NCAA at summer camps, off-campus visits will be permitted November 28, 2021–January 13, 2022). As a result, there have been no opportunities to do home visits, and that is an NCAA rule. There have been multiple official visitors to the campus, with no concerns arising about Coach Rolovich's vaccination status. The only concern was with one family and that was about what WSU would do about my employment because Coach Rolovich had not taken the vaccine. The majority of comments from recruits and their families have been positive and respectful about what I had described at the time as my personal decision.

**Donors: Donor Cultivation Is Critically Important and Requires in Person Contact.** If donors are hesitant, fearful, or upset about an unvaccinated coach visiting them, that creates significant hardship for Athletics. WSU's unique location and donor base provides little margin for error; there are few mega-donors  to help support the program. Athletics fund-raising has relied on moderate donations from a larger pool of donors. Any reduction in that group of people will have a significant impact on WSU. If WSU does lose one "mega" donor, it can have significant and lasting consequences to the Football Program, Athletics Department, and WSU. WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff. Even if masked and socially distanced, the number of donors who will not engage with the program or staff regardless of accommodations is a

115884715.9

Mr. Pat Chun
November 2, 2021
Page 28

hardship WSU cannot afford. Note that donors are frequently older individuals who may be medically vulnerable to severe COVID-19.

> **Response:** The majority of donor events that have taken place since the pandemic began have been done via Zoom. Rather than talk with donors about the importance of protecting and respecting the beliefs of its coaches, Mr. Chun and WSU continue to demonize the unvaccinated coaches, though science has confirmed that the vaccinated are as or nearly as risky to others as the unvaccinated.

**Media: Coaches are expected to engage in all forms of local and national media.** All coaches, but football coaches in particular, are high profile employees. Head coaches are generally contractually obligated to participate in media events related to the Football Program. This includes weekly radio shows, attendance at conference sponsored media days, regular interactions with sponsored media and regular news conferences. These duties are part of expanding the brand of the Football Program, the Athletics Department, and the University. However, because employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches).

> **Response:** The majority of Coach Rolovich's interactions have been done via Zoom, but vaccinated coaches are also required to mask and socially distance indoors, which means in most cases Coach Rolovich had been interacting with media on the same terms as vaccinated coaches.
>
> It is also important to note that there is abundant evidence that Mr. Chun's alleged concern about mask wearing and social distancing has been selectively focused on Coach Rolovich and his unvaccinated assistant coaches. A few examples are sufficient to make this point for the present:
>
> On October 25, four days after firing Coach Rolovich, Mr. Chun was photographed indoors, unmasked, at a donor event. One reporter noted, "This is in violation of Inslee's reinstituted indoor mask mandate. This isn't good optics for WSU. . . . [I]t's objectively poor optics for the director who announced Rolovich's termination to be seen violating a different Inslee COVID mandate."[18]
>
> Mr. Chun likely did not think that a picture of him unmasked at a donor event would become public and make news. But WSU football knows it is on camera, it still flaunts the Governor's mandate. On the October 28 edition of the U.S. Bank

---

[18] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/.

Mr. Pat Chun
November 2, 2021
Page 29

Washington State Coaches Show, coach Jake Dickert and players Chau Smith-Wade and Kaleb Ford-Dement appear on camera unmasked.[19]

The Governor's mandate and the WSU Athletics Department require all coaches and players to be masked when indoors, vaccinated and unvaccinated alike, when social distancing is not feasible. Yet on October 30, after the Arizona State game, Mr. Chun was filmed in the locker room in close contact with coaches and players, all of whom were unmasked.[20] This violated both the University's and host Arizona State University's masking policies.[21]

Every day provides new evidence of Mr. Chun's hypocrisy. Earlier today it was reported that Mr. Chun and his wife have been "permanently trespassed" from two Pullman businesses following allegations of threatening behavior toward Pullman City Councilor Pat Sorensen.[22] According to the police report, Mr. Chun and his wife showed up at Sorensen's place of business. Mr. Chun was upset with Sorensen because his daughter had posted a video online of a party at the Chun residence where the hosts and their guests were not wearing masks. Mr. Chun got aggressive with Sorensen in front of his daughter, yelling, "you are a f—" and "do you know how many people f— hate you."[23] Mr. Chun threatened to "destroy" Sorensen. Sorensen told police he felt threatened and that he was afraid Mr. Chun would "become physical" if Sorensen got up from his desk.

Like political leaders hosting large gatherings at the French Laundry in violation of safety guidelines, or who take off their masks as soon as the group photo opportunity is over, Mr. Chun has shown that he cares more about appearances and his reputation than public health. These incidents provide even further evidence that Mr. Chun was not a neutral decisionmaker and that the University's alleged health concerns are a pretext for its illegal discrimination against Coach Rolovich and his assistant coaches.

**Integration into Institution.** WSU is an R-1 research university, with a medical school, school for global health, and millions of dollars in science-based research funding.

---

[19] WSUCourgarAthletics, *WSU Football: U.S. Bank Coaches Show with Jake Dickert 10/28/21*, YouTube (Oct. 28, 2021), https://www.youtube.com/watch?v=D-PbZgTiAmI.

[20] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664.

[21] Arizona State University, Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

[22] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-trespassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html.

[23] Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/.

115884715.9

ER1294

Mr. Pat Chun
November 2, 2021
Page 30

Athletics is an important part of the WSU experience, and the Head Football Coach's contract requires him to "Integrate the Football program into the whole spectrum of academic life to complement the University and its mission in the state and community." The damage to the mission and reputation of the University posed by this situation cannot be understated, nor can it be resolved by accommodation.[24]

> **Response:** It is decidedly unclear how the exercise of a First Amendment right by an employee can be seen as inflicting damage to the mission and reputation of the University. Termination on those grounds is retaliatory and illegal. Surely, the better argument is that at a university where the unfettered exchange of ideas should be paramount, coaches and others who act according to their faith on such an important question are truly integrating into the whole spectrum of academic life to complement the University and its mission in the state and the community. That is, unless the "whole spectrum of academic life" at WSU means thinking only approved thoughts, and acting only according to WSU's approved thought mandate.

### E.    Employers Cannot Use Alleged Reputational Damages and Others' Biases to Excuse their Duty to Accommodate Religious Exercise.

What remains of the University's "undue burden" argument is its claim that its faculty and donors would be upset, and its reputation harmed, if it accommodated religious exercise in this instance. Courts give employers considerable latitude in making "undue burden" determinations." But that latitude has limits and the University has exceeded them.

The EEOC's recent guidance on COVID vaccine mandates provides examples of what employers may consider in judging whether accommodating religious objections to a vaccine mandate would impose an "undue burden."[25]

First, employers may consider "direct monetary costs." The employer may consider "administrative costs necessary for an accommodation, such as costs associated with rearranging schedules and recording substitutions for payroll purposes, or infrequent or temporary payment of premium wages (e.g., overtime rates)." It cannot just tally costs in the abstract but must look at "the identifiable cost in relation to the size and operating costs of the employer, and the

---

[24] Mr. Chun's posture in October contradicts statements he made in August. *See, e.g.*, Scott Hanson, WSU in 'strict COVID management' after football coach Nick Rolovich's decision to not get vaccinated, Spokesman Review, Aug. 13, 2021, https://www.spokesman.com/stories/2021/aug/13/wsu-in-strict-covid-management-after-football-coac/ ("WSU athletic director Pat Chun, who is vaccinated, made it clear Wednesday that he backs his coach, saying Rolovich is the right person for the job despite the two being diverged on the vaccine decision." "Chun said the coach is adhering to all protocols.").

[25] EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, at L (last updated Oct. 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L. This COVID-19 specific guidance incorporates by reference the more general EEOC Compliance Manual on Religious Discrimination, Jan. 15 2021, available at https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.

115884715.9

Mr. Pat Chun
November 2, 2021
Page 31

number of individuals who will in fact need a particular accommodation." Here and throughout, the EEOC supports its guidance with extensive footnotes to caselaw that work out these strictures in more detail.

Second, employers may consider an accommodation's "burden on the conduct of the employer's business." But again, employers cannot just consider any inconvenience. The EEOC limits this consideration by providing specific examples, such as: "the risk of the spread of COVID-19 to other employees or to the public" [addressed above]; and "diminished efficiency," from redistributing "the accommodated employee's share of . . . work."

Finally, the EEOC cautions that employers may not consider "speculative hardships when faced with an employee's religious objection but, rather, should rely on objective information":

> An employer cannot rely on hypothetical hardship when faced with an employee's religious obligation that conflicts with scheduled work, but rather should rely on objective information. A mere assumption that many more people with the same religious practices as the individual being accommodated may also seek accommodation is not evidence of undue hardship.

In this case, the University has repeatedly relied on alleged burdens that EEOC guidance and caselaw preclude employers from bringing into the "undue burden" analysis. For example, Mr. Chun's memorandum rejecting EH&S' recommendations relies on the following:

> "WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff."

> "[B]ecause employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches)."

> "The damage to the mission and reputation of the University posed by this situation cannot be understated, nor can it be resolved by accommodation."

State officials have also made similar complaints in the media over the past few months. For example:

> "My understanding of requiring health care and long-term care provider employees to get vaccinated is to protect patients/residents . . . ," [Senior Assistant Attorney General Eric] Sonju wrote. "However, for executive cabinet agency employees, the purpose really is to get vaccine numbers up and having the state lead by example."[26]

---

[26] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

ER1296

Mr. Pat Chun
November 2, 2021
Page 32

Another article quotes President Schulz:

> Rolovich's resistance frustrated campus leaders, including Schulz. . . . "Certainly we've been in the national media again and again and again over Coach Rolovich's particular stance on vaccines and his personal decision whether or not to be vaccinated," Schulz said. "It would be naïve of me to say this wasn't affecting the perception of Washington State University with prospective students, with donors, with lots of people around." [27]

An October 11 piece in the Seattle Times states that Coach Rolovich's religious stance had "created an awkward situation for Washington State, an R1-level research institution (highest classification) with a medical school," not because Coach Rolovich posed an actual health risk but because he was "the face of the university's highest-profile entity." In President Schulz's words,

> At most universities, people pay attention to what the university president, the football coach, the (men's) basketball coach and the athletic director have to say — that's just the reality. . . .
>
> People look at them for leadership, because they're highly visible and highly compensated. It doesn't help when you have people who are contrary to the direction we're going. [28]

Finally, last week ESPN published a long-form piece that promised to tell "the story of those few months and especially the chaotic final days, including never-before-told details of the battle between Rolovich and Washington State over his vaccination status." [29] The article interviewed several University leaders, but none describe the problem created by Coach Rolovich's religious exemption request as a public health issue—it was a "public relations issue."[30]

The reporter interviewed Dr. Guy Palmer, "a world-renowned WSU regents professor of pathology and infectious diseases" and asked him why Coach Rolovich's religious stance "didn't sit nearly as well among the faculty":

> "I think what would have been the broadest response of the faculty is embarrassed for the university," Palmer said. "Especially because they've launched a new medical school in the last several years. We've gotten medicine, nursing,

---

[27] Billy Witz, Washington State Fires Football Coach Over Vaccine Refusal, NY Times, Oct. 18, 2021, https://www.nytimes.com/2021/10/18/sports/ncaafootball/nick-rolovich-fired-covid-vaccine-mandate.html.

[28] Jon Wilner, Here's the vaccine exemption questionnaire that may determine WSU coach Nick Rolovich's job status, Seattle Times, Oct. 12, 2021, https://www.seattletimes.com/sports/wsu-cougar-football/heres-the-vaccine-exemption-questionnaire-that-may-determine-wsu-coach-nick-rolovichs-job-status/.

[29] Kyle Bonagura, Inside Nick Rolovich's downfall at Washington State over the COVID-19 vaccine, ESPN, Oct. 27, 2021, https://www.espn.com/college-football/story/_/id/32459767/inside-nick-rolovich-downfall-washington-state-covid-19-vaccine.

[30] Id.

115884715.9

Mr. Pat Chun
November 2, 2021
Page 33

pharmacy—you're building out as a health sciences university, and then you have a high-profile individual sending a different message."[31]

To prove the point, a WSU athletics spokesperson told ESPN about the difference that the University's refusal to accommodate Rolovich had made. He was not relieved that the University was now a safer place for players, coaches, and donors. Rather, he bragged that denying Rolovich's religious exemption has "proved successful on the fundraising front. The athletic department received $3.5 million in donation pledges."[32]

In sum, the University is claiming the legal right to refuse to accommodate religious exercise because it has concluded that doing so would hurt "donor commitments," would cause "embarrassment," would "damage" its "reputation," would set the wrong kind of "example," it would send the wrong "message," and would "create[] an awkward situation."

As President Schulz put it, the University cannot let the "the face of the university's highest-profile entity" be someone with unpopular religious convictions. That would be "contrary to the direction we're going."

These public statements highlight two serious problems with the University's denial of Rolovich's religious exemption. First, they show that in making its decision, the University impermissibly relied on perceived public hostility toward religious objectors. Civil rights laws and constitutional protections would be worthless if employers were allowed to use concerns and predictions of this nature to excuse them from accommodating sincere religious beliefs.[33] To allow the University to do so here would set a terrible precedent that would have repercussions throughout the law.

Second, these public statements show that in denying Rolovich an exemption, the University's main goal was not to ensure health and safety, but to compel what it (and much of the public) viewed as fundamentally expressive conduct: "lead[ing] by example" and "send[ing] a message," as "a high-profile individual," consistent with the preferred messaging of the University and the State. But "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014). While public employers have an interest "in controlling speech made by an employee in his or her professional capacity,"

---

[31] *Id.*

[32] *Id.*

[33] *See, e.g., Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971) ("[I]t would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome."); *E.E.O.C. v. St. Anne's Hosp. of Chi., Inc.*, 664 F.2d 128, 133 (7th Cir. 1981) ("[T]he animus against which the Act was directed should not be permitted to undermine and deter compliance with the Act."); *Olsen v. Marriott Int'l, Inc.*, 75 F. Supp. 2d 1052, 1066-67 (D. Ariz. 1999) (concluding that "potential lost revenue does not justify [an employer's] sex-based hiring practice" despite customer preferences and noting that "economic considerations are virtually never a factor" in determining whether sex-based hiring is permitted based on Title VII's bona fide occupational qualification exception).

115884715.9

ER1298

(212 of 289), Page 212 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 212 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.499    Page 60 of
137

Mr. Pat Chun
November 2, 2021
Page 34

*Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006), no reasonable interpretation of Rolovich's job description would include the duty to lead a public health campaign by personal example. By publicly and unequivocally framing Rolovich's vaccination status as a matter of expressive conduct, the University unconstitutionally sought to compel him to speak on a matter outside his professional capacity. *See id.*

\*       \*       \*

WSU and Mr. Chun had a choice when Coach Rolovich raised a religious objection to the Governor's vaccine mandate. They could have given him a fair hearing, and then initiated a dialogue to discuss with Coach Rolovich, in light of the best science, how to accommodate his religious exercise. But instead, they ran roughshod over their policies and Coach Rolovich's rights because they saw his religious beliefs as an embarrassment, and Mr. Chun made sure he inserted himself to make sure the process reached its preordained conclusion. The "reputational" damage that WSU has allegedly suffered was self-inflicted, but the reputational damage suffered by Coach Rolovich was caused by the University's and Mr. Chun's bad faith actions throughout the entire process.

Dated this 2nd day of November, 2021.

Law Office of Brian Fahling          Lewis Roca

By: _____          By: _____
Brian Fahling                            Eric N. Kniffin, Special Counsel
Attorney for Nicholas Rolovich           Attorney for Nicholas Rolovich

cc:    President Kirk Schulz
       Office of the President
       Washington State University
       PresidentsOffice@wsu.edu

       Danielle Hess
       Chief Counsel
       Washington State University
       danielleh@wsu.edu


ATTACHMENTS

ER1299

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

|  |  |
|---|---|
| *Plaintiffs,* | |
| v. | Civil Action No.: |
| *Defendant.* | |

## DECLARATION OF DR. JAYANTA BHATTACHARYA SUPPORTING PLAINTIFFS

I, Dr. Jayanta Bhattacharya, declare as follows:

1. I am an adult of sound mind and make this statement voluntarily, based upon my own personal knowledge, education, and experience.

2. Based on my training and experience, I have formed an opinion on the reasonableness of the requested accommodations and on the possibility of other accommodations not listed to a reasonable degree of scientific certainty.

### EXPERIENCE & CREDENTIALS

3. I am a former Professor of Medicine (20+ years) and current Professor of Health Policy at Stanford University School of Medicine and a research associate at the National Bureau of Economic Research. I am also Director of Stanford's Center for Demography and Economics of Health and Aging. I hold an M.D. and Ph.D. from Stanford University. I have published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others.

My research has been cited in the peer-reviewed scientific literature more than 11,600 times. My curriculum vitae is attached to this declaration as Exhibit A.

4.    I have dedicated my professional career to the analysis of health policy, including infectious disease epidemiology and policy, and the safety and efficacy of medical interventions. I have both studied extensively and commented publicly on the necessity and safety of vaccine requirements for those who have contracted and recovered from COVID-19 (individuals who have "natural immunity"). I am intimately familiar with the emergent scientific and medical literature on this topic and pertinent government policy responses to the issue both in the United States and abroad.

5.    My assessment of vaccine immunity is based on studies related to the efficacy and safety of the one vaccine to receive full approval from the Food and Drug Administration (FDA) and the two vaccines that the FDA has granted Emergency Use Authorization (EUA) for use in the United States. These include two mRNA-technology vaccines (manufactured by Pfizer-BioNTech and Moderna) and an adenovirus-vector vaccine technology (manufactured by Johnson & Johnson). Of those, the Pfizer vaccine, also known as Comirnaty, has full FDA approval.

6.    I have not and will not receive any financial or other compensation to prepare this Declaration or to testify in this case. Nor have I received compensation for preparing declarations or reports or for testifying in *any* other case related to the COVID-19 pandemic, or any personal or research funding from any pharmaceutical company. My participation here has been motivated solely by my commitment to public health, just as my participation in other cases has been.

7.   I have no prior relationship with any of the plaintiffs.

8.   I have been asked to provide my opinion on several matters related to Washington State University's (WSU) vaccine policy for its employees, including the following:

**ER1301**

⟩ Whether, for most of the population, including the vast majority of children and young adults, COVID-19 infection poses less of a mortality risk than seasonal influenza.

⟩ Whether infectious SARS-CoV-2 is frequently found even in vaccinated persons;

⟩ Whether, based on the current medical and scientific knowledge, immunity after COVID recovery (sometimes referred to as natural immunity) is categorically inferior to vaccine immunity to prevent reinfection and transmission of the SARS-CoV-2 virus;

⟩ Whether asymptomatic disease spread is rare;

⟩ The safety of providing accommodations to those who have religious or medical reasons for declining to be vaccinated; and

⟩ What those accommodations could look like in practice.

9.  My main conclusion is that WSU can safely accommodate employees who have not previously been infected with COVID-19 but have religious or medical reasons for not wanting the vaccine by requiring daily symptom checking paired with rapid antigen tests to confirm if a worker is infectious. To reduce the risk from asymptomatically infected employees, WSU can require employees to conduct weekly PCR or antigen tests, though if it adopts this accommodation, it would be best practice to require it of both vaccinated and unvaccinated employees since both groups can spread the virus asymptomatically. If implemented, these accommodations would keep WSU's workforce, students and campus visitors as safe as possible from the risk of COVID infection, without terminating employees.

## OPINIONS

### I.    COVID-19 Infection Fatality Risk

10. SARS-CoV-2, the virus that causes COVID-19 infection, entered human circulation some time in 2019 in China. The virus itself is a member of the coronavirus family of viruses,

(216 of 289), Page 216 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 216 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.503    Page 64 of 137

several of which cause typically mild respiratory symptoms upon infection. The SARS-CoV-2 virus, by contrast, induces a wide range of clinical responses upon infection. These presentations range from entirely asymptomatic infection to mild upper respiratory disease with unusual symptoms like loss of sense of taste and smell, hypoxia, or a deadly viral pneumonia that is the primary cause of death due to SARS-CoV-2 infection.

11. The mortality danger from COVID-19 infection varies substantially by age and a few chronic disease indicators.[1] For most of the population, including the vast majority of children and young adults, COVID-19 infection poses less of a mortality risk than seasonal influenza. By contrast, for older people – especially those with severe comorbid chronic conditions – COVID-19 infection poses a high risk of mortality, on the order of a 5% infection fatality rate.

12. The best evidence on the infection fatality rate from SARS-CoV-12 infection (that is, the fraction of infected people who die due to the infection) comes from seroprevalence studies. The definition of seroprevalence of COVID-19 is the fraction of people in a population who have specific antibodies against SARS-CoV-2 in their bloodstream. A seroprevalence study measures the fraction of a population who have antibodies that are produced specifically by people infected by the SARS-CoV-2 virus. The presence of specific antibodies in blood provides excellent evidence that an individual was previously infected.

13. Seroprevalence studies provide better evidence on the total number of people who have been infected than do case reports or positive reverse transcriptase-polymerase chain reaction (RT-PCR) test counts. PCR tests are the most common type of test used to check whether a person currently has the virus or viral fragments in their body (typically in the nasopharynx). The PCR

---

[1] Public Health England (2020) Disparities in the Risk and Outcomes of COVID-19. August 2020. https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/908434/Disparities_in_the_risk_and_outcomes_of_COVID_August_2020_update.pdf

test should not be used to count the total number of people who have been infected to date in a population. Case reports and PCR test counts both miss infected people who are not identified by the public health authorities or who do not volunteer for RT-PCR testing. That is, they miss people who were infected but recovered from the condition without coming to the attention of public health authorities. Because they ignore unreported infections, fatality rate estimates based on case reports or positive test counts are substantially biased toward reporting a higher fatality rate.

14. According to a meta-analysis[2] by Dr. John Ioannidis of every seroprevalence study conducted to date of publication with a supporting scientific paper (74 estimates from 61 studies and 51 different localities worldwide), the median infection survival rate—the inverse of the infection fatality rate—from COVID-19 infection is 99.77%. For COVID-19 patients under 70, the meta-analysis finds an infection survival rate of 99.95%. A separate meta-analysis[3] by other scientists independent of Dr. Ioannidis' group reaches qualitatively similar conclusions.

15. A study of the seroprevalence of COVID-19 in Geneva, Switzerland (published in *The Lancet*)[4] provides a detailed age breakdown of the infection survival rate in a preprint companion paper[5] 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65.

---

[2] John P.A. Ioannidis , *The Infection Fatality Rate of COVID- 19 Inferred from Seroprevalence Data*, Bulletin of the World Health Organization BLT 20.265892.

[3] Andrew T. Levin, et al., *Assessing the Age Specificity of Infection Fatality Rate for COVID- 19: Meta-Analysis & Public Policy Implications* (Aug. 14,2020) MEDRXIV, http://bit.ly/3gploIV.

[4] Silvia Stringhini, et al., *Seroprevalence of Anti-SARS-CoV-2 IgG Antibodies in Geneva, Switzerland (SEROCoV-POP): A Population Based Study* (June 11, 2020) THE LANCET, https://bit.ly/3187S13.

[5] Francisco Perez-Saez, et al. *Serology- Informed Estimates of SARS-COV-2 Infection Fatality Risk in Geneva, Switzerland* (June 15,2020) OSF PREPRINTS, http://osf.io/wdbpe/.

ER1304

(218 of 289), Page 218 of 289Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 218 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.505    Page 66 of
137

16. I estimated the age-specific infection fatality rates from the Santa Clara County seroprevalence study[6] data (for which I am the senior investigator). The infection survival rate is 100% among people between 0 and 19 years (there were no deaths in Santa Clara in that age range up to that date); 99.987% for people between 20 and 39 years; 99.84% for people between 40 and 69 years; and 98.7% for people above 70 years.

17. Those numbers are consistent with what the US CDC has reported. A US CDC report[7] found between 6 and 24 times more SARS-CoV-2 infections than cases reported between March and May 2020. Correspondingly, the CDC's estimate of the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate. For people ages 20-49 years, it was 0.02%, meaning that young adults have a 99.98% survivability rate. For people age 50-69 years, it was 0.5%, meaning this age group has a 99.5% survivability rate. Finally, for people ages 70+ years, it was 5.4%, meaning seniors have a 94.6% survivability rate. [8] There is thus no substantial qualitative disagreement about the infection fatality rate reported by the CDC and other sources in the scientific literature. This should come as no surprise since they all rely on seroprevalence studies to estimate infection fatality rates.

18. It is helpful to provide some context for how large the mortality risk is posed by COVID infection relative to the risk posed by other infectious diseases. Since seroprevalence-based mortality estimates are not readily available for every disease, in the figure immediately below, I plot case fatality rates, defined as the number of deaths due to the disease divided by the number of identified or diagnosed cases of that disease. The case fatality rate for SARS-CoV-2 is ~2%

---

[6] Eran Bendavid, et al., *COVID- 19 Antibody Seroprevalence in Santa Clara County, California* (April 30,2020) MEDRXIV, https://bit.ly/2EuLIFK.
[7] Fiona P. Havers, et al., *Seroprevalence of Antibodies to SARS-CoV-2 in 10 Sites in the United States, March 23-May 12, 2020* (Jul. 21, 2020) JAMA INTERN MED., https://bit.ly/3goZUgy.
[8] COVID- 19 Pandemic Planning Scenarios, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

(though that number has decreased with the availability of vaccines and effective treatments). By contrast, the case fatality rate for SARS is over five times higher than that, and for MERS, it is 16 times higher than that.



19. Perhaps the most important implication of these estimates is that they identify two distinct populations of people who face a very different risk from COVID infection. One segment – the elderly and others with severe chronic disease – faces a higher risk of mortality if infected (especially if unvaccinated). A second segment – typically non-elderly people – face a very low risk of mortality if infected and instead face much greater harm from lockdowns, school closures, and other non-pharmaceutical interventions than from COVID infection itself. The right strategy, then, is focused protection of the vulnerable population by prioritizing them for vaccination while

7

lifting lockdowns and other restrictions on activities for the rest since they cause harm without corresponding benefit for the non-vulnerable. The Great Barrington Declaration, of which I am a primary co-author, describes an alternate policy of focused protection. This policy would lead to fewer COVID-related deaths and fewer non-COVID-related deaths than universal lockdowns or a strategy that lets the virus rip through the population. My co-authors of this Declaration include Prof. Martin Kulldorff of Harvard University and Prof. Sunetra Gupta of Oxford University. Over 12,000 epidemiologists and public health professionals and 35,000 medical professionals have co-signed the Declaration.[9]

20. The infection fatality rate estimates presented in this section are drawn from data before widespread vaccination in the U.S. and elsewhere. The COVID-19 vaccines approved for use in the U.S. are very effective in substantially reducing the infection fatality rate. According to the US Centers for Disease Control, the mRNA vaccines were 94% effective against COVID-19 hospitalization for patients 65 and older.[10] So, the infection fatality rates that I provide above are overestimated by at least one order of magnitude. Fully vaccinated, non-elderly professors in classrooms face a vanishingly small risk of mortality even if the SARS-CoV-2 virus infects them.

## II. COVID-19 Vaccines Provide Limited Protection Against Infection, and Vaccinated Individuals Are at Least as Likely as Unvaccinated Individuals To Shed Live Virus.

21. In contrast to the concrete findings regarding the robust durability of natural immunity, it is yet unclear in the scientific literature how long-lasting vaccine-induced immunity will be.

---

[9] Bhattacharya J, Gupta S, Kulldorff M (2020) Great Barrington Declaration. https://gbdeclaration.org
[10] Tenforde MW, Olson SM, Self WH, et al. Effectiveness of Pfizer-BioNTech and Moderna Vaccines Against COVID-19 Among Hospitalized Adults Aged  65 Years — United States, January–March 2021. MMWR Morb Mortal Wkly Rep 2021;70:674–679. DOI: http://dx.doi.org/10.15585/mmwr.mm7018e1external icon

ER1307

Notably, the researchers argue that they can best surmise the predicted durability of vaccine immunity by looking at the expected durability of natural immunity.[11]

22. A recent study from Qatar by Chemaitelly and colleagues, which tracked 927,321 individuals for six months after vaccination concluded that the Pfizer vaccine's "induced protection against infection appears to wane rapidly after its peak right after the second dose, but it persists at a robust level against hospitalization and death for at least six months following the second dose."[12]

23. The key figures from the Qatari study are reproduced immediately below. Panel A shows that vaccine mediated protection against infection peaks at 72.1% zero to four weeks after the second dose, and then declines to 0%, 20 weeks after the second dose. According to this result, vaccines only protect against infection (and therefore disease spread) for a short period of time after the second dose of the mRNA vaccines.

---

[11] Ledford, H. (2021). Six months of COVID vaccines: What 1.7 billion doses have taught scientists. *Nature*, *594*(7862), 164-167. doi: 10.1038/d41586-021-01505-x (study notes that "Six months is not much time to collect data on how durable vaccine responses will be. . . . In the meantime, some researchers are looking to natural immunity as a guide.").

[12] Chemaitelly, H., Tang, P., Hasan, M. R., Al Mukdad, S., Yassine, H. M., Benslimane, F. M., Khatib, H. A. A., Coyle, P., Ayoub, H. H., Kanaani, Z. A., Kuwari, E. A., Jeremijenko, A., Kaleeckal, A. H., Latif, A. N., Shaik, R. M., Rahim, H. F. A., Nasrallah, G. K., Kuwari, M. G. A., Romaihi, H. E. A., Abu-Raddad, L. J. (2021). Waning of BNT162b2 vaccine protection against SARS-CoV-2 infection in Qatar. *medRxiv*, Preprint. doi: 10.1101/2021.08.25.21262584



24. On the other hand, Panel B shows that protection versus severe disease is long lasting after vaccination—even though the person will no longer be fully protected against infection and, presumably, disease spread. At 20-24 weeks after the second dose, the vaccine remains 95.3% efficacious versus severe disease. While it appears to dip after 25 weeks to 71.5% efficacy, the confidence interval is so wide that it is consistent with no decrease whatsoever even after 25 weeks.



10

**ER1309**

25. The Qatari study is no outlier. A large study in California tracked the infection rates for nearly 5 million patients vaccinated with two doses of the Pfizer mRNA vaccine. The study tracked both SARS-CoV-2 infections as well as COVID-19 related hospitalizations. The figure immediately below plots the trend in vaccine efficacy over time for different age groups in the population cohort. **Panel A** on the right plots effectiveness versus SARS-CoV-2 *infections*.[13] Though the drop in effectiveness is not as



steep as in the Qatari study, there is nevertheless a sharp drop. While in the first month, vaccine effectiveness is near 90% for all age-groups, by month 5, it drops to nearly 50% for all the groups. By contrast, **Panel B** plots vaccine efficacy versus *hospitalizations*. It remains high with no decline over time –near 90% throughout the period. The vaccine provides durable private protection versus severe disease, but declining protection versus infection (and hence transmission).

---

[13] Tartof SY, Slezak JM, Fischer H, Hong V, Ackerson BK, Ranasinghe ON, Frankland TB, Ogun OA, Zamparo JM, Gray S, Valluri SR, Pan K, Angulo FJ, Jodar L, McLaughlin JM. Effectiveness of mRNA BNT162b2 COVID-19 vaccine up to 6 months in a large integrated health system in the USA: a retrospective cohort study. *Lancet*. 2021 Oct 16;398(10309):1407-1416. doi: 10.1016/S0140-6736(21)02183-8. Epub 2021 Oct 4. PMID: 34619098; PMCID: PMC8489881.

11

26. Another recent study tracked 620,000 vaccinated US veterans to measure breakthrough infections for the three vaccines in common use in the US.[14] Like the other studies, the authors of the study found a sharp decline in vaccine effectiveness versus infection. Five months after vaccination, the effectiveness of the J&J vaccine dropped from ~90% to less than 10%; the Pfizer vaccine dropped from ~90% to ~50%; and the Moderna dropped from ~90% to ~65%. The figure on this page tracks the decline in effectiveness of the vaccines against infection over time documented in this study. This study corroborates yet another study that documented declining vaccine efficacy in the first three months after vaccination against disease transmission in the era of the Delta variant.[15]



---

[14] Cohn BA, Cirillo PM, Murphy CC, et al. Breakthrough SARS-CoV-2 Infections in 620,000 U.S. Veterans, February 1, 2021 to August 13, 2021. medRxiv. October 14, 2021. https://doi.org/10.1101/2021.10.13.21264966;
[15] Eyre, D. W., Taylor, D., Purver, M., Chapman, D., Fowler, T., Pouwels, K. B., Walker, A. S. & Peto, T. E. A. (2021). The impact of SARS-CoV-2 vaccination on Alpha & Delta variant transmission. *medRxiv*, Preprint. doi: 10.1101/2021.09.28.21264260

**ER1311**

27. Yet another study, conducted in Wisconsin, confirmed that vaccinated individuals can shed infectious SARS-CoV-2 viral particles.[16] The authors analyzed nasopharyngeal samples to check whether patients showed evidence of infectious viral particles. They found that vaccinated individuals were at least as likely as unvaccinated individuals to be shedding live virus. They concluded:

> Combined with other studies these data indicate that vaccinated and unvaccinated individuals infected with the Delta variant might transmit infection. Importantly, we show that infectious SARS-CoV-2 is frequently found even in vaccinated persons.

28. In summary, the evidence to date strongly suggests that while vaccines—like natural immunity—provide protection against severe disease, they, unlike natural immunity, provide only short-lasting protection against subsequent infection and disease spread. In short, there is no medical or scientific reason to believe that vaccine immunity will prove longer lasting than natural immunity, much less that all currently approved vaccines will be expected to prove more durable than natural immunity despite their different technological foundations and dosing protocols.

### III.    Vaccine Side Effects, Though Rare, Do Occur and Can Be Deadly.

29. Though the COVID vaccines are safe by the standards of many other vaccines approved for use in the population, like all medical interventions, they have side effects. In summarizing the evidence on vaccine side effects, the CDC lists both common side effects, at least one of which occurs in over half of all people who receive the vaccines, as well as deadly side effects that occur rarely in demographic subsets of the vaccinated population.

---

[16] Riemersma, K. K., Grogan, B. E., Kita-Yarbro, A., Halfmann, P. J., Segaloff, H. E., Kocharian, A., Florek, K. R., Westergaard, R., Bateman, A., Jeppson, G. E., Kawaoka, Y., O'Connor, D. H., Friedrich, T. C., & Grande, K. M. (2021). Shedding of infectious SARS-CoV-2 despite vaccination. *medRxiv*, Preprint. doi: 10.1101/2021.07.31.21261387

30. The common side effects include pain and swelling at the vaccination site and fatigue, headache, muscle pain, fever, and nausea for a limited time after vaccination.[17] Less common but severe side effects also include severe and non-severe allergic (anaphylactic) reactions that can occur immediately after vaccination, which can typically be treated with an epinephrine injection.[18] Finally, the CDC's vaccine safety committee has identified rare but deadly side effects, including a heightened risk of clotting abnormalities[19] in young women after the Johnson & Johnson (J&J) vaccination, elevated risks of myocarditis and pericarditis[20] in young people—but especially young men—after mRNA vaccination, and higher risk of Guillane-Barre Syndrome[21] after the J&J vaccine. There is still the possibility of severe side effects that have yet to be identified as the vaccines have been in use in human populations for less than a year. Active investigation to check for safety problems is still ongoing.

31. Though the CDC[22] still recommends the vaccines for children 12 years old and up despite the evidence of elevated risk of myocarditis, other analysts[23] have objected to overly rosy

---

[17] Centers for Disease Control and Prevention. (2021, September 30). *Possible side effects after getting a COVID-19 vaccine*. Retrieved October 1, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect/after.html

[18] Centers for Disease Control and Prevention. (2021, August 30). *What to do if you have an allergic reaction after getting a COVID-19 vaccine*. Retrieved October 1, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/allergic-reaction.html

[19] Kulldorff, M. (2021, April 17). The dangers of pausing the J&J vaccine. *The Hill*. https://thehill.com/opinion/healthcare/548817-the-dangers-of-pausing-the-jj-vaccine

[20] National Center for Immunization & Respiratory Diseases, Centers for Disease Control and Prevention. (2021, August 23). *Clinical considerations: Myocarditis and pericarditis after receipt of mRNA COVID-19 vaccines among adolescents and young adults*. Retrieved October 1, 2021 from https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html

[21] LaFraniere, S. & Weiland, N. (2021, July 12). FDA attaches warning of rare nerve syndrome to Johnson & Johnson vaccine. *The New York Times*. https://www.nytimes.com/2021/07/12/us/politics/fda-warning-johnson-johnson-vaccine-nerve-syndrome.html

[22] Walensky, R. (2021, May 12). CDC director statement on Pfizer's use of COVID-19 vaccine in adolescents age 12 and older. *Center for Disease Control and Prevention*. Retrieved October 1, 2021 from https://www.cdc.gov/media/releases/2021/s0512-advisory-committee-signing.html

[23] Pegden, W. (2021, June 24). Weighing myocarditis cases, ACIP failed to balance the harms vs benefits of 2nd doses. *Medium*. https://medium.com/@wpegden?p=d7d6b3df7cfb

14

ER1313

assumptions made in the CDC analysis about vaccine side effects. Those analysts suggest that the CDC's recommendation is fragile to minor perturbation in their assumptions. The critical point for my analysis—undisputed in the scientific literature—is that the vaccines do have side effects, some of which are severe and not all of which are necessarily known now.

## IV. The Risk of Those Side Effects is Heightened in Certain Groups & Clinical Data on Vaccine Safety and Efficacy are Not Available for Patients with Certain Chronic Diseases.

32. The CDC lists two primary contraindications to COVID vaccination: (1) "severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine"; and (2) "immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine."[24] Among the inactive ingredients of the COVID vaccines, polyethylene glycol (PEG)—which is used in other drugs and vaccines— is most likely to induce an allergic reaction. In addition to contraindications, the CDC lists several precautions to vaccination, including known allergic reactions to polysorbate or PEG or to other non-COVID vaccines and injectable therapies. Patients with precautions are encouraged to consult with an allergist or immunologist and to conduct an individualized risk assessment by the vaccination provider before getting the vaccine[25] Some clinical evidence indicates that those who have recovered from COVID-19 could have a *heightened* risk of adverse effects compared with

---

[24] National Center for Immunization & Respiratory Diseases, Centers for Disease Control and Prevention. (2021, September 27). *Interim clinical considerations for use of COVID-19 vaccines currently approved or authorized in the United States.* Retrieved October 1, 2021 from https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html

[25] Centers for Disease Control and Prevention. (2021, September 27). *Interim clinical considerations for use of COVID-19 vaccines currently approved or authorized in the United States: Contraindications and precautions.* Retrieved Oct. 1, 2021 from https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fvaccines%2Fcovid-19%2Finfo-by-product%2Fclinical-considerations.html#Contraindications

hose who have never had the virus.[26, 27] This may be because vaccine reactogenicity after the first dose is higher among those with prior immunity.[28] Despite this evidence, the CDC does not list prior immunity as a contraindication to vaccination, though it does recommend waiting 90 days after recovering before vaccination.

33. Though the CDC recommends the COVID vaccines for all adults, because they are novel—available for use in the population for only 9-10 months—there remain open questions about their use in special populations because they have not been tested in subgroups of patients with particular clinical conditions. For instance, in a comprehensive discussion of the biology of immune responses to vaccination (including COVID-19 vaccination) for patients with Multiple Sclerosis published in June 2021, Coyle et al. emphasize the lack of high-quality evidence available to guide recommendations for MS patients. They point out that three of six medical societies that focus on MS patients have failed to make a recommendation on whether MS patients

---

[26] Mathioudakis, A. G., Ghrew, M., Ustianowski, A., Ahmad, S., Borrow, R., Papavasileiou, L. P., Petrakis, D., & Bakerly, N. D. (2021). Self-reported real-world safety and reactogenicity of COVID-19 vaccines: A vaccine recipient survey. *Life*, *11*(3), 249. doi: 10.3390/life11030249

[27] Menni, C., Klaser, K., May, A., Polidori, L., Capdevila, J., Louca, P., Sudre, C. H., Nguyen, L. H., Drew, D. A., Merino, J., Hu, C., Selvachandran, S., Antonelli, M., Murray, B., Canas, L. S., Molteni, E., Graham, M. S., Modat, M., Joshi, A. D., Spector, T. D. (2021). Vaccine side-effects and SARS-CoV-2 infection after vaccination in users of the COVID Symptom Study app in the UK: A prospective observational study. *The Lancet Infectious Diseases*, *21*(7), 939-949. doi: 10.1016/S1473-3099(21)00224-3 (finding that "Systemic side-effects were more common (1.6 times after the first dose of ChAdOx1 nCoV-19 [i.e., AstraZeneca vaccine] and 2.9 times after the first dose of BNT162b2 [i.e., Pfizer/BioNTech vaccine] among individuals with previous SARS-CoV-2 infection than among those without known past infection. Local effects were similarly higher in individuals previously infected than in those without known past infection (1.4 times after the first dose of ChAdOx1 nCoV-19 and 1.2 times after the first dose of BNT162b2).").

[28] Krammer, F., Srivastava, K., the PARIS team & Simon, V. (2021). Robust spike antibody responses and increased reactogenitiy in seropositive individuals after a single dose of SARS-CoV-2 mRNA vaccine. *medRxiv*, Preprint. https://www.medrxiv.org/content/10.1101/2021.01.29.21250653v1 (concluding that "vaccine reactogenicity after the first dose is substantially more pronounced in individuals with pre-existing immunity." The authors note that "quantitative serological assays that measure antibodies to the spike protein could be used to screen individuals prior to vaccination," which would "limit the reactogenicity experienced by COVID-19 survivors.").

should receive the COVID-19 vaccines. They and other authorities[29] emphasize the need for personalized decision making based on the clinical condition of the MS patient:[30]

> Currently, three COVID-19 vaccines have been granted emergency use authorization in the USA on the basis of promising interim findings of ongoing trials. Because analyses of these vaccines in people with MS are not available, decisions regarding COVID-19 vaccination and DMT choice should be informed by data and expert consensus, and personalized with considerations for disease burden, risk of infection, and other factors.

34. The paucity of data on the COVID-19 vaccine on patients with particular conditions is not limited to Multiple Sclerosis. Pregnant women were excluded from participating in the COVID-19 vaccination trials, consequently only limited randomized trial data are available about COVID-19 vaccine safety for that group.[31] Though the CDC and obstetrics focused specialty organizations nevertheless recommend COVID vaccination for pregnant women, many authors in peer reviewed journal articles have pointed to the lack of scientific data regarding vaccine safety in this group a problem for clinicians providing accurate advice to pregnant women.[32] Given this uncertainty, Nicola Volpe and her colleagues[33] writing in the *Journal of Perinatal Medicine* explicitly recommend that "Women should discuss with healthcare professionals about the benefits and risks of having the vaccine, allowing an informed decision." In recent months some observational studies have shown reassuring results, including that pregnant woman face no

---

[29] Ciotti, J. R., Valtcheva, M. V. & Cross, A. H. (2020). Effects of MS disease-modifying therapies on responses to vaccinations: A review. *Multiple Sclerosis Related Disorders*, 45, 1-11. doi: 10.1016/j.msard.2020.102439

[30] Coyle, P. K., Gocke, A., Vignos, M. & Newsome, S. D. (2021). Vaccine considerations for multiple sclerosis in the COVID-19 era. *Advances in Therapy*, 38(7), 3550-3588. doi:10.1007/s12325-021-01761-3

[31] Rasmussen, S. A., Kelley, C. F., Horton, J. P., & Jamieson, D. J. (2021). Coronavirus disease 2019 (COVID-19) vaccines and pregnancy: What obstetricians need to know. *Obstetrics & Gynecology*, 137(3), 408-414. doi: 10.1097/AOG.0000000000004290 Erratum in: *Obstetrics & Gynecology, 137*(5), 962. doi: 10.1097/AOG.0000000000004379

[32] Holness, N. A., Powell-Young, Y. M., Torres, E., DuBois, S., & Giger, J. N. (2021) Covid-19, pregnancy, and vaccinations. *Journal of National Black Nurses Association*, 32(1), 1-9..

[33] Volpe, N., Luca Schera, G. B., Dall'Asta, A., Di Pasquo, E., & Ghi, T. (2021) COVID-19 in pregnancy: Where are we now? *Journal of Perinatal Medicine*, 49(6), 637-642. doi: 10.1515/jpm-2021-0309.

17

greater risk of complications during pregnancy or delivery,[34] or of spontaneous abortion or miscarriage after vaccination.[35] Nevertheless, there is still an area of active research where safety signals may still emerge. A large French study of vaccine safety in pregnancy expects to report complete results in late 2022.[36] After a thorough review of mostly reassuring data on the safety of the vaccine for pregnant women, Lydia Shook and some of her colleagues at Massachusetts General Hospital write that – given the recent introduction of the vaccine into use by pregnant women – it may be some time before full safety data become available:[37]

> Complete pregnancy outcomes data from people vaccinated in the first and early second trimesters are not yet available as most of these pregnancies are ongoing. Durability of IgG in the blood of neonates born to vaccinated mothers has not yet been defined, nor has whether the anti-SARS-CoV-2 IgG generated influences the response to other childhood vaccines. Information on postnatal outcomes and offspring development will require long term follow-up of children born to individuals who received the vaccine during pregnancy.

35. There are also patients with particular genetic conditions where vaccine safety data are not adequate. For instance, for patients with alpha-1 antitrypsin deficiency (AATD), an inherited disorder that predisposes a patient to enzymatic tissue injuries and inflammation—especially in the lungs— there are no clinical data whatsoever regarding the safety and efficacy of the COVID-19 vaccines. Writing in *Lancet Respiratory Medicine*, Yang and Zhao hypothesize "individuals with AATD might derive limited benefit from the current COVID-19 vaccines." They note that

---

[34] Theiler, R. N., Wick, M., Mehta, R., Weaver, A. L., Virk, A., & Swift, M. (2021). Pregnancy and birth outcomes after SARS-CoV-2 vaccination in pregnancy. *American Journal of Obstetrics & Gynecology MFM, 3*(6), 100467. doi: 10.1016/j.ajogmf.2021.100467 Online ahead of print.

[35] Kharbanda, E. O., Haapala, J., DeSilva, M., Vazquez-Benitez, Vesco, K. K., Naleway, A. L., & Lipkind, H. S. (2021). Spontaneous abortion following COVID-19 vaccination during pregnancy. *JAMA*, e2115494. Online ahead of print. doi:10.1001/jama.2021.15494

[36] Cottin, J., Benevent, J., Khettar, S., & Lacroix, I. (2021). COVID-19 vaccines and pregnancy: What do we know? *Therapie, 76*(4), 373-374. doi: 10.1016/j.therap.2021.05.011

[37] Shook, L. L., Fallah, P. N., Silberman, J. N., & Edlow, A. G. (2021) COVID-19 vaccination in pregnancy and lactation: Current research and gaps in understanding. *Frontiers in Cellular and Infection Microbiology, 11*, 735394. doi: 10.3389/fcimb.2021.735394

ER1317

"even though vaccination has been prioritised to more vulnerable populations (such as people with AATD), individuals with AATD are usually not included in clinical trials (as reported in ClinicalTrials.gov), and thus the effectiveness and adverse event profile of vaccination in this population are unknown."[38] The same can be said for other patients with many other chronic diseases, for whom the decision whether to vaccinate should be an individual decision made in consultation with their physicians, rather than coerced by a firm or the government.

## V.    Asymptomatic Disease Spread is Rare.

36. In this section, I discuss the evidence regarding the asymptomatic transmission of disease. This is important because if asymptomatic disease spread is rare, WSU can keep its employees and students safe from COVID disease spread by the simple expedient of requiring employees who have not been vaccinated (and even those who have been) to report daily through an online app whether they are experiencing symptoms consistent with COVID-19. Those who are experiencing symptoms would be asked to stay at home from work and get tested; returning to work only if the test is negative.

37. The best evidence on how frequently asymptomatic disease spread occurs comes from a large meta-analysis of 54 studies from around the world of within-household spread of the virus—that is, from an infected person to someone else living in the same home (Madewell et al. 2020). This study represents the most comprehensive survey of the vast empirical literature on asymptomatic spread. At home, *of course*, none of the safeguards often recommended in public spaces outside of home (such as masking and social distancing) are typically applied. Because the study focuses on a single setting (household transmission), it is not subject to the same problems

---

[38] Yang, C. & Zhao, H. (2021) COVID-19 vaccination in patients with 1-antitrypsin deficiency. *The Lancet, Respiratory Medicine*, *9*(8), 818-820. doi:10.1016/S2213-2600(21)00271-X

(232 of 289), Page 232 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.519
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 232 of 289
Page 80 of 137

that other studies on this topic might have. In particular, by focusing on a homogenous setting where few safeguards exist, the estimate represents an upper bound on the frequency that someone positive for the virus but with no symptoms (and hence either pre-symptomatic or asymptomatic) may spread the virus to close contacts. The primary result is that symptomatic patients passed on the disease to household members in 18% of instances. In comparison, those infected but without symptoms (asymptomatic and pre-symptomatic patients) passed on the infection to household members in only 0.7% of instances.[39]

38. There is some additional evidence on how frequently asymptomatic disease spread occurs. A large study of 10 million residents of Wuhan, China, all tested for the presence of the virus, found a total of 300 cases, all asymptomatic. A comprehensive contact tracing effort identified 1,174 close contacts of these patients, none of whom tested positive for the virus.[40] This is consistent with a vanishingly low level of asymptomatic spread of the disease. Given the late date of the study relative to the date of the large first wave of infections in Wuhan, it is likely that none of the 300 asymptomatic cases were likely ever to develop symptoms. A separate, smaller meta-analysis similarly found that asymptomatic patients are much less likely to infect others than symptomatic patients.[41]

39. By contrast with asymptomatic patients, symptomatic patients are very likely to infect others with the virus during extended interactions, especially in the initial period after they develop

---

[39] Madewell, Z. J., Yang, Y., Longini, I. M., Halloran, M. E. & Dean, N. E. (2020). Household transmission of SARS-CoV-2: A systematic review and meta-analysis. *JAMA Network Open*, *3*(12), 1-17. doi:10.1001/jamanetworkopen.2020.31756

[40] Cao, S., Gan, Y., Wang, C., Bachmann, M., Wei, S., Gong, J., Huang, Y., Wang, T., Li, L., Lu, K., Jiang, H., Gong, Y., Xu, H., Shen, X., Tian, Q., Lv, C., Song, F., Yin, X. & Lu, Z. (2020). Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China. *Nature Communications*, *11*(1), 5917. doi: 10.1038/s41467-020-19802-w

[41] Buitrago-Garcia, D., Egli-Gany, D., Counotte, M. J., Hossmann, S., Imeri, H., Ipekci, A. M., Salanti, G. & Low, N. (2020). Occurrence and transmission potential of asymptomatic and presymptomatic SARS-CoV-2 infections: A living systematic review and meta-analysis. *PLOS Medicine*, *17*(9), e1003346. doi: 10.1371/journal.pmed.1003346

20

ER1319

symptoms. A careful review of 79 studies on the infectivity of COVID-19 patients found that even symptomatic patients are infectious for only the first eight days after symptom onset, with no evidence of live virus detected beyond day nine of illness.[42]

40. Much of the support for the idea that asymptomatic disease spread is common comes from theoretical modeling work from earlier in the epidemic (including some of my own published research[43]), predicting some level of asymptomatic disease spread. However, this sort of modeling work does not represent actual evidence that asymptomatic spread is common in the real world, since they rely on many modeling assumptions that are impossible to check.

41. There is at least one prominent real-world study that some have used to argue that asymptomatic disease spread is common. A meta-analytic study by Qiu et al. (2021) distinguishes the likelihood of disease spread by a pre-symptomatic individual from the likelihood of spread by an asymptomatic individual who never develops symptoms.[44]  A primary finding of this study is that, while an asymptomatic individual who never develops symptoms is exceedingly unlikely to spread the disease, individuals who are not symptomatic now but will eventually develop symptoms are efficient at infecting others during their pre-symptomatic state.

42. Distinguishing between an infected individual who will eventually develop symptoms and an infected individual who will never develop symptoms is difficult without the passage of time. Infected individuals who will develop symptoms tend to do so within a very short interval

---

[42] Cevik, M., Tate, M., Lloyd, O., Maraolo, A. E., Schafers, J. & Ho, A. (2021). SARS-CoV-2, SARS-CoV, and MERS-CoV viral load dynamics, duration of viral shedding, and infectiousness: A systematic review and meta-analysis. *The Lancet, Microbe*, *2*(1), e13-e22. doi: 10.1016/S2666-5247(20)30172-5

[43] Peirlinck, M., Linka, K., Costabal, F. S., Bhattacharya, J., Bendavid, E., Ioannidis, J. P. A. & Kuhl, E. (2020). Visualizing the invisible: The effect of asymptotic transmission on the outbreak dynamics of COVID-19. *Computer Methods in Applied Mechanics and Engineering*, *372*(1), 113140. doi:  10.1016/j.cma.2020.113410

[44] Qiu, X., Nergiz, A. I., Maraolo, A. E., Bogoch, I. I., Low, N. & Cevik, M. (2021). The role of asymptomatic and pre-symptomatic infection in SARS-CoV-2 transmission-A living systematic review. *Clinical Microbiology and Infection*, *27*(4), 511-519. doi: 10.1016/j.cmi.2021.01.011

**ER1320**

(234 of 289), Page 234 of 289  Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 234 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.521    Page 82 of
137

(two to three days) after first becoming infected. Meanwhile, infected individuals who never develop symptoms may test positive with the PCR test for the virus for an extended period. These two groups of observationally identical individuals are mixed in the population in some unknown frequency that may change over time. Given this information constraint, from a policy point of view, the relevant question is how likely it is that an infected individual without symptoms (whether pre-symptomatic or purely asymptomatic) will spread the disease to close contacts. The Madewell et al. (2020) study provides an answer (less than 0.7% secondary attack rate in household settings), while the Qiu et al. (2021) study does not. Additionally, unlike the Madewell et al. (2020) study, the Qiu et al. (2021) study does not concentrate its focus on a homogenous environment (households), which makes the results it reports harder to interpret.

43. In summary, asymptomatic individuals are an order of magnitude less likely to infect others than symptomatic individuals, even in intimate settings such as people living in the same household where people are much less likely to follow social distancing and masking practices that they follow outside the household. Spread of the disease in less intimate settings by asymptomatic individuals—including in the context of the WSU work environment—is likely to be even less likely than in the household.

**VI.    There is a Safe Alternative to Termination that Can Be Offered to WSU Employees.**

44. Can WSU keep its employees safe if it does not mandate that all its employees be vaccinated? The answer is a definitive yes.

45. First and most obviously, WSU could adopt a robust sick policy, requiring that employees who have not been vaccinated and who show symptoms consistent with COVID-19 infection stay at home from work, returning to work only once they have had a negative COVID-19 PCR or antigen test result. This could be implemented, for instance, by requiring employees to complete a symptom self-check each day before coming to work. WSU would provide employees

with a supply of inexpensive rapid antigen tests, which are easy to self-administer at home, provide results within 30 minutes, and are highly accurate for detecting whether a patient is infectious.[45,] [46] A large number of lateral flow antigen tests have received Emergency Use Authorization (EUA) by the US Food and Drug Administration.[47] Alternatively, WSU could require that any unvaccinated employees obtain those tests themselves to keep its own costs down. employees who report COVID-19 like symptoms would be asked to send a picture of their positive test result to their manager or a WSU health official by phone or email to verify their result.[48] A system that required the few employees who seek the vaccine exemption to provide this information to their manager each day before coming to work would be inexpensive – no online reporting system would be necessary.

46. For this symptom checking policy to be effective in reducing the risk of disease spread, it must be the case that symptomatic employees are substantially more likely to infect others than employees who are infected (that is, have evidence of the virus in the nasopharynx), but who have no symptoms. Fortunately, as we have seen in the previous section, the best empirical evidence shows that the probability that an asymptomatic individual will spread the disease is very low. And because the overwhelming majority of WSU employees will themselves be vaccinated, they face

---

[45] Surasi, K., Cummings, K. J., Hanson, C., Morris, M. K., Salas, M., Seftel, D., Ortiz, L., Thilakaratne, R., Stainken, C. & Wadford, D. A. (2021). Effectiveness of Abbott BinaxNOW rapid antigen test for detection of SARS-CoV-2 infections in outbreak among horse racetrack workers, California, USA. *Emerging Infectious Diseases*, *27*(11).

[46] Homza, M., Zelena, H., Janosek, J., Tomaskova, H., Jezo, E., Kloudova, A., Mrazek, J., Svagera, Z. & Pymula, R. (2021). Covid-19 antigen testing: Better than we know? A test accuracy study. *Infectious Diseases*, *53*(9), 661-668. doi: 10.1080/23744235.2021.1914857

[47] US FDA. (2021) In-Vitro Diagnostics EUA – Antigen Diagnostic Tests for SARS-CoV-2. Oct. 4, 2021. https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/in-vitro-diagnostics-euas-antigen-diagnostic-tests-sars-cov-2  Accessed Oct. 10, 2021

[48] Indeed, if WSU's goal is really to prevent the spread of COVID-19 as much as reasonably possible, symptom checking should be required of all workers, whether vaccinated or not, since the evidence shows that vaccination does not eliminate the possibility of infection and may provide less protection versus infection than immunity induced by prior COVID infection.

ER1322

even less risk from any of their asymptomatic, unvaccinated coworkers who receive an accommodation from WSU for religious or medical reasons of developing severe COVID symptoms.

47. In addition, WSU could implement a program of weekly PCR or antigen testing as a condition of an employee's receiving an exemption.   Many other organizations have implemented a testing regimen like this for all employees, including my home institution, Stanford University. Employees receiving an exemption could take the test in the workplace—there are versions of the test available that can be self-administered. Or employees could be required to purchase and take the test at home.[49]

## VII.   Variants Do Not Alter the Conclusion that Accommodations Can Be Allowed Without Risk to Public Safety.

48. Since its spread through the human population, the SARS-CoV-2 virus—an RNA virus—has been mutating, including some forms that are likely more transmissible than the original wild-type virus that emerged from Wuhan, China, in 2019. As of the date of this declaration, the Delta variant is the dominant form of the SARS-CoV-2 virus worldwide. The virus will continue to mutate as it continues to spread. However, the possibility of such a mutation does not alter the conclusion that accommodations can be allowed without risk to public safety.

49. For one thing, the first two accommodations discussed above would be equally effective against variants as they are against the original Wuhan version.   That is because all variants to arise thus far produce symptoms that can be checked for, and can be identified through standard COVID testing.  So regular symptom-checking and/or testing for those receiving medical or religious accommodations will detect the variant if it is present.

---

[49] Indeed, the safest option would be for both vaccinated and unvaccinated workers to be required to provide a weekly test, since both can have asymptomatic SARS-CoV-2 infections.

ER1323

50. Variants likewise do not affect the reasonableness of the COVID-recovery alternative discussed above. The key point is that the mutant variants do not escape the immunity provided by prior infection with the wild-type virus or vaccination.[50, 51, 52] This is true of the delta variant as well. In a study of a large population of patients in Israel, *vaccinated* people who had not been previously infected were 13 times more likely to experience a breakthrough infection with the Delta variant than patients who had recovered from COVID.[53] Although reinfection can occur, people who have been previously infected by the virus are unlikely to have a severe outcome (hospitalization or death) after exposure to a variant virus (see section I above for citations). A variant circulating in the population thus poses little additional risk of excess mortality due to viral infection.

51. The dissemination of vaccines that protect against hospitalizations and deaths upon COVID-19 infection throughout the older population in the United States has partially decoupled the growth in COVID-19 cases from COVID-19 mortality. Vaccinated people can still be infected but much less commonly have severe symptoms in response to infection. Throughout last year, a rise in cases was inevitably accompanied by an increase in deaths with a two-to-three-week lag. However, during this most recent wave, in Sweden and the U.K., where vaccines have been

---

[50] Tarke, A., Sidney, J., Methot, N., Yu, E. D., Zhang, Y., Dan, J. M., Goodwin, B., Rubiro, P., Sutherland, A., Wang, E., Frazier, A., Ramirez, S. I., Rawlings, S. A., Smith, D. M., da Silva Antunes, R., Peters, B., Scheuermann, R. H., Weiskopf, D., Crotty, S., Grifoni, A. & Sette, A. (2021). Impact of SARS-CoV-2 variants on the total CD4+ and CD8+ T cell reactivity in infected or vaccinated individuals, *Cell Reports Medicine 2*, 100355.

[51] Wu, K., Werner, A. P., Moliva, J. I., Koch, M., Choi, A., Stewart-Jones, G. B. E., Bennett, H., Boyoglu-Barnum, S., Shi, W., Graham, B. S., Carfi, A., Corbett, K. S., Seder, R. A. & Edwards, D. K. (2021). mRNA-1273 vaccine induces neutralizing antibodies against spike mutants from global SARS-CoV-2 variants. *bioRxiv*, Preprint. doi: 10.1101/2021.01.25.427948

[52] Redd, A. D., Nardin, A., Kared, H., Bloch, E. M., Pekosz, A., Laeyendecker, O., Abel, B., Fehlings, M., Quinn, T. C. & Tobian, A. A. (2021). CD8+ T-cell responses in COVID-19 convalescent individuals target conserved epitopes from multiple prominent SARS-CoV-2 circulating variants. *Open Forum Infectious Diseases 8*(7), ofab143.

[53] Gazit, S., Shlezinger, R., Perez, G., Lotan, R., Peretz, A., Ben-Tov, A., Cohen, D., Muhsen, K., Chodick, G. & Patalon, T. (2021). Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: Reinfections versus breakthrough infections. *medRxiv*, Preprint. doi: 10.1101/2021.08.24.21262415

**ER1324**

provided to a large portion of the vulnerable elderly population and more, there have been "relatively few hospitalizations and deaths" in those countries.[54] Because of the success of the American vaccination effort among the vulnerable elderly, COVID-19 cases and COVID-19 deaths are at least partially decoupled, so the public danger from the continuing spread of COVID-19 disease is less than it was last year when the vaccine was not available.

**VIII.** **The Presence of Lingering Post-Viral Infection Symptoms in a Subset of Recovered COVID Patients ("Long COVID") Does Not Alter the Conclusion that Accommodations Pose No Threat to Public Safety.**

52. Some analysts and politicians have used the possibility that a fraction of patients who recover from COVID infection will experience lingering symptoms to justify unyielding vaccine mandates. Long COVID, as this phenomenon is called, includes a complex set of clinical outcomes with a poorly understood link to acute COVID infection.[55] One cross-sectional study found that about 30% of recovered COVID patients reported at least one symptom months after recovery, with fatigue and anosmia (loss of sense of smell) by far the most common.[56] A separate study with a more convincing longitudinal methodology, by contrast, concluded that only 2.3% of patients experienced such symptoms three months after recovery.[57] Patients who suffered a more severe acute course of COVID, including hospitalization, were more likely to report lingering symptoms

---

[54] Bhattacharya, J., Kulldorff, M. & Gupta, S. (2021, July 12). Sweden's lessons for the UK's third wave. *The Spectator*. https://www.spectator.co.uk/article/sweden-shows-that-the-uk-s-third-wave-won-t-sting

[55] Nalbandian, A., Sehgal, K., Gupta, A., Madhavan, M. V., McGroder, C., Stevens, J. S., Cook, J. R., Nordvig, A. S., Shalev, D., Sehrawat, T. S., Ahluwalia, N., Bikdeli, B., Dietz, D., Der-Nigoghossian, C., Liyanage-Don, N., Rosner, G. F., Bernstein, E. J., Mohan, S., Beckley, A. A. & Wan, E. Y. (2021). Post-acute COVID-19 syndrome. *Nature Medicine*, *27*(4), 601-615. doi: 10.1038/s41591-021-01283-z

[56] Logue, J. K., Franko, N. M., McCulloch, D. J., McDonald, D., Magedson, A., Wolf, C. R., & Chu, H. Y. (2021). Sequelae in adults at 6 months after COVID-19 infection. *JAMA Network Open, 4*(2), e210830. doi: 10.1001/jamanetworkopen.2021.0830

[57] Sudre, C. H., Murray, B., Varsavsky, T., Graham, M. S., Penfold, R. S., Bowyer, R. C., Pujol, J. C., Klaser, K., Antonelli, M., Canas, L. S., Molteni, E., Modat, M., Cardoso, M. J., May, A., Ganesh, S., Davies, R., Nguyen, L. H., Drew, D. A., Astley, C. M., Steves, C. J. (2021). Attributes and predictors of long COVID. *Nature Medicine*, *27*(4), 626-631. doi: 10.1038/s41591-021-01292-y

**ER1325**

after recovery.[58] A study of children who recovered from COVID found the same rate of long COVID symptoms as a control group of children who had no serological evidence of prior COVID infection.[59] Some analysts have noted the similarity between "long COVID" symptoms and other functional somatic syndromes that sometimes occur after other viral infections and other triggers (and sometimes with no identifiable etiology).[60]

53. To summarize, as with other viruses, long COVID symptoms occur in a minority of patients who recover from COVID and pose a real burden on patients who suffer from it. However, this fact does not alter the logic of my point about accommodations. On the contrary. After suffering through a COVID infection, with or without long COVID, such individuals should not be forced to also endure common, but mild, vaccine adverse reactions or risk rare—but serious— adverse reactions. Moreover, the successful vaccine rollout in the United States—where every teenager and adult now have free access to the vaccines—addresses the problem of long COVID, just as it addresses COVID-associated mortality.

## IX. Fetal Cell Lines Were Used to Develop the Johnson & Johnson Vaccine and Were Used to Test the Two mRNA Vaccines.

54. Many people of religious faith have a deeply held objection to benefitting from abortion of a human fetus. At the same time, much modern biological research, development, and production employs fetal cell lines that are derived from an abortion that occurred decades ago. The fetal tissue used in biological work is not the actual tissue from the aborted baby—it is a clone

---

[58] Arnold, D. T., Hamilton, F. W., Milne, A., Morley, A. J., Viner, J., Attwood, M., Noel, A., Gunning, S., Hatrick, J., Hamilton, S., Elvers, K. T., Hyams, C., Bibby, A., Moran, E., Adamali, H. I., Dodd, J. W., Maskell, N. A., Barratt, S. L. (2021). Patient outcomes after hospitalisation with COVID-19 and implications for follow-up: Results from a prospective UK cohort. *Thorax*, *76*, 399-401. doi: 10.1136/thoraxjnl-2020-216086

[59] Radtke, T., Ulyte, A.,  Puhan, M. A. & Kriemler, S. (2021). Long-term symptoms after SARS-CoV-2 infection in school children: Population-based cohort with 6-months follow-up. *JAMA*, *326*(9), 869-871. doi: 10.1001/jama.2021.11880

[60] Ballering, A., Olde Hartman, T. & Rosmalen, J. (2021). Long COVID-19, persistent somatic symptoms and social stigmatization. *Journal of Epidemiology and Community Health*, *75*, 603-604.  doi: 10.1136/jech-2021-216643

of cells sampled from that tissue. Nevertheless, many religious people object to the personal use of any product that involved the use of these fetal tissue cell lines. In the context of the COVID-19 vaccines, fetal tissue lines were used in the research and testing of both the mRNA vaccines (Pfizer and Moderna) and the adenovector vaccine (Johnson & Johnson).

55. While aborted fetal tissue is not used in the production of the mRNA vaccines, they are used in the production of the Johnson & Johnson vaccine.[61] While some religious authorities have stated that the cell lines used in the development, production, and testing of these vaccines are remote enough from the act of abortion that it is permissible for faithful people to be vaccinated with these vaccines,[62] other religious authorities disagree[63] reflecting longstanding objections to vaccines derived using aborted tissue lines.[64] Ultimately, it is a matter of individual conscience for each person to decide whether the benefits derived from the vaccines in terms of protection against severe COVID disease should be eschewed in light of sincere moral/religious qualms about deriving that benefit as the ultimate fruit of an action that the faithful person deems sinful.

## Conclusion

56. A fundamental ethical principle guiding the practice of medicine is that any medical intervention, whether surgical, pharmacological, or a vaccine, should be recommended and undertaken only if it is deemed medically necessary. Any medical procedure, including

---

[61] Zimmerman, R. K. (2021). Helping patients with ethical concerns about COVID-19 vaccines in light of fetal cell lines used in some COVID-19 vaccines. *Vaccine, 39*(31), 4242-4244. doi: 10.1016/j.vaccine.2021.06.027

[62] Giangrave, C. & Jenkins J. (2021, August 18). *As US bishops reject exemptions, Pope Francis dubs COVID-19 vaccine 'act of love'*. Religious News Service. https://religionnews.com/2021/08/18/pope-francis-declares-getting-a-covid-19-vaccine-an-act-of-love/

[63] Piper, J. (2021, January 4). *Can I take a vaccine made from aborted babies?* Desiring God. https://www.desiringgod.org/interviews/can-i-take-a-vaccine-made-from-aborted-babies

[64] Peli̇ , G., Kara i̇ , S., Mikirtichan, G. L., Kubar, O. I., Leavitt, F. J., Tai, M. C., Morishita, N., Vuleti̇ , S. & Tomaševi̇ , L. (2016). Religious exception for vaccination or religious excuses for avoiding vaccination. *Croatian Medical Journal, 57*(5), 516-521. doi: 10.3325/cmj.2016.57.516

vaccination, involves risk. No medical procedure is 100% safe, especially those involving a new vaccine, which by definition has not been studied for long-term adverse side effects. For this reason, it is a fundamental principle of medical ethics that the risks of the procedure be balanced against the potential benefits.

57. Now that every American adult and teenager has free access to the vaccines, the case for a vaccine mandate is weaker than it once was. There is no good public health case for WSU to terminate employees who have a sincere medical or religious objection to vaccination. Since the successful vaccination campaign already protects the vulnerable population, the unvaccinated—especially recovered COVID patients—pose a vanishingly small threat to the vaccinated. They are protected by an effective vaccine that dramatically reduces the likelihood of hospitalization or death after infections.

58. In conclusion, the emerging evidence from the medical literature finds that the vaccines—though safe for most people—do sometimes cause known severe side effects; that the development of the mRNA vaccines and the production of the adenovirus vector vaccines both involved the use of fetal tissue cell lines, to which some people have sincere religious objections; and finally, that there exist inexpensive safe accommodations that WSU can adopt which would protect both employees, students, and visitors against SARS-CoV-2 infection without terminating unvaccinated employees.

59. I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct this 21st day of October, 2021, at Stanford, California.

ER1328

Respectfully submitted,

_____
Dr. Jay Bhattacharya, MD, Ph.D.
Professor of Health Policy
Stanford University

30

**ER1329**

# EXHIBIT B

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

**Address**

Department of Health Policy                          **Phone:** (650) 736-0404
Stanford University School of Medicine
615 Crothers Way                                     **Email:** jay@stanford.edu
Stanford, CA 94305-6006                              http://web.stanford.edu/~jay

---

**RESEARCH INTERESTS**

Health economics, health policy, and outcomes research

**A.  ACADEMIC HISTORY:**

| | | |
|---|---|---|
| Stanford University | A.M., A.B. | 1990 |
| Stanford University School of Medicine | M.D. | 1997 |
| Stanford University Department of Economics | Ph.D. | 2000 |

**B.  EMPLOYMENT HISTORY:**

| | |
|---|---|
| 2001 – present | Professor (Assistant to Full), Stanford University School of Medicine, Department of Economics (by courtesy) |
| 2013 – present | Senior Fellow, Stanford Institute for Economic Policy Research |
| 2007 – present | Research Associate, Sphere Institute / Acumen LLC |
| 2002 – present | FRF to Research Associate, National Bureau of Economic Research |
| 2014 – 2021 | Senior Fellow Stanford Freeman Spogli Institute |
| 2001 – 2020 | Professor (Assistant to Full) Department of Health Research and Policy (by courtesy) |
| 2006 – 2008 | Research Fellow, Hoover Institution |
| 1998 – 2001 | Economist (Associate to Full), RAND Corporation |
| 1998 – 2001 | Visiting Assistant Professor, UCLA Department of Economics |

**C.  SCHOLARLY PUBLICATIONS:**

PEER-REVIEWED ARTICLES (154 total)

1. Yoshikawa A, Vogt W.B., Hahn J., **Bhattacharya J.**, "Toward the Establishment and Promotion of Health Economics Research in Japan," *Japanese Journal of Health Economics and Policy* 1(1):29-45, (1994).

2. Vogt WB, **Bhattacharya J**, Kupor S, Yoshikawa A, Nakahara T, "The Role of Diagnostic Technology in Competition among Japanese Hospitals," *International Journal of Technology Management, Series on Management of Technology in Health Care*, 11(1):93-105 (1995).

3. **Bhattacharya J**, Vogt WB, Yoshikawa A, Nakahara T, "The Utilization of Outpatient Medical Services in Japan," *Journal of Human Resources*, 31(2): 450-76, (1996).

4. Vogt WB, Kupor S, **Bhattacharya J**, Yoshikwawa A, Nakahara T, "Technology and Staffing in Japanese University Hospitals: Government vs. Private," *International Journal of Technology Assessment in Health Care*, 12(1): 93-103, (1996).

**JAY BHATTACHARYA, M.D., Ph.D.**                                      September 2021

5. Sturm R, Gresenz C, Sherbourne C, **Bhattacharya J**, Farley D, Young AS, Klap R, Minnium K, Burnham MA, and Wells KB. "The Design of Healthcare for Communities: A Study of Health Care Delivery for Alcohol, Drug Abuse, and Mental Health Conditions." *Inquiry* 36(2):221-33 (1999).

6. Goldman D, **Bhattacharya J**, Joyce G, D'Amato R, Bozette S, Shapiro M, Liebowitz A. "The Impact of State Policy on the Costs of HIV Infection", *Medical Care Research and Review* 58(1):31-53 (2001). See comments *Medical Care Research and Review* 58(4):497-498 (2001).

7. Schoenbaum M, Spranca M, Elliot M, **Bhattacharya J**, Short PF. "Health Plan Choice and Information about Out-of-Pocket Costs: An Experimental Analysis" *Inquiry* 38(1):35-48 (2001).

8. Reville R, **Bhattacharya J**, and Sager L. "New Methods and Data Sources for Measuring the Economic Consequences of Workplace Injuries," *American Journal of Industrial Medicine* 40(4):452-63 (2001).

9. Goldman D, **Bhattacharya J**, McCaffrey D, Duan N, Leibowitz A, Morton S. "The Effect of Insurance on Mortality in an HIV+ Population in Care," *JASA* 96(455):883-894, (2001). See comments "The Effect of Insurance on Mortality in an HIV+ Population in Care," *JASA* 97(460):1218 (2002).

10. Su C, **Bhattacharya J**, and Wang CC, "Role of Neck Surgery in Conjunction with Radiation in Regional Control of Node-Positive Cancer of the Oropharynx" *American Journal of Clinical Oncology* 25(2):109-16. (2002).

11. DeLeire T, **Bhattacharya J**, and MaCurdy T. "Comparing Measures of Overtime Across BLS Surveys." *Industrial Relations* 41(2):362-369 (2002).

12. Studdert D, **Bhattacharya J**, Warren B, Schoenbaum M, Escarce JJ. "Personal Choices of Health Plans by Managed Care Experts." *Medical Care* 40(5):375-86 (2002).

13. **Bhattacharya J**, Schoenbaum M, and Sood N. "Optimal Contributions to Flexible Spending Accounts for Medical Care." *Economics Letters* 76(1):129-135 (2002).

14. Reville R, Neuhauser F, **Bhattacharya J**, and Martin C, "Comparing Severity of Impairment for Different Permanent Upper Extremity Musculo-Skeletal Injuries" *Journal of Occupational Rehabilitation* 12(3):205-21 (2002).

15. Lakdawalla D., Goldman D, **Bhattacharya J**, Hurd M, Joyce G, and Panis C., "Forecasting the Nursing Home Population", *Medical Care* 41(1):8-20 (2003) See comments "Forecasting the Nursing Home Population," *Medical Care* 41(1):28-31 (2003).

16. **Bhattacharya J**, Deleire T, Haider S, Currie J. "Heat or Eat? Cold-Weather Shocks and Nutrition in Poor American Families," *American Journal of Public Health* 93(7):1149-1154 (2003).

17. **Bhattacharya J** and Vogt W. "A Simple Model of Pharmaceutical Price Dynamics." *Journal of Law and Economics* 46:599-626 (2003).

18. **Bhattacharya J**, Goldman D, Sood N. "The Link Between Public and Private

**JAY BHATTACHARYA, M.D., Ph.D.**                        September 2021

Insurance and HIV-Related Mortality," *Journal of Health Economics* 22:1105-1122 (2003).

19. Lakdawalla D, **Bhattacharya J**, and Goldman D. "Are the Young Becoming More Disabled?" *Health Affairs* 23(1):168-176 (2004).

20. **Bhattacharya J**, Currie J, and Haider S. "Poverty, Food Insecurity, and Nutritional Outcomes in Children and Adults," *Journal of Health Economics* 23(4):839-862 (2004).

21. Yoo BK, **Bhattacharya J**, McDonald K and Garber A. "Impacts of Informal Caregiver Availability on Long-term Care Expenditures in OECD Countries," *Health Services Research* 39(6 Pt 2):1971-92 (2004).

22. **Bhattacharya J**, Goldman D, and Sood N. "Price Regulation in Secondary Insurance Markets" *Journal of Risk and Insurance* 72(4):61-75 (2005).

23. **Bhattacharya J**. "Specialty Selection and Lifetime Returns to Specialization Within Medicine" *Journal of Human Resources* 40(1):115-143 (2005).

24. Lakdawalla D, Philipson T, **Bhattacharya J**, "Welfare-Enhancing Technological Change and the Growth of Obesity," *American Economics Review* (Papers and Proceedings) 95(2): 253-257 (2005).

25. **Bhattacharya J,** Shang B, Su CK, Goldman D "Technological Advance in Cancer and the Future of Medical Care Expenditures by the Elderly," *Health Affairs.* [Web Exclusive 10.1377/hlthaff.w5.r5-r17] 26 September (2005).

26. Goldman DP, Shang B, **Bhattacharya J**, Garber AM, Hurd M, Joyce GF, Lakdawalla D, Panis C, Shekelle P, "Consequences Of Health Trends And Medical Innovation For The Future Elderly," *Health Affairs.* [Web Exclusive 10.1377/hlthaff.w5.r53-r66] 26 September (2005).

27. **Bhattacharya J** and Lakdawalla D, "The Labor Market Value of Health Improvements" *The Forum for Health Economics and Health Policy.* Forum: Biomedical Research and the Economy: Article 2 http://www..bepress.fhep/biomedical_research/2 (2005).

28. **Bhattacharya J** and Lakdawalla D, "Does Medicare Benefit the Poor?" *Journal of Public Economics* 90(1-2):277-92 (2006).

29. **Bhattacharya J**, Goldman D, McCaffrey D, "Estimating Probit Models with Endogenous Covariates," *Statistics in Medicine* 25(3):389-413 (2006).

30. **Bhattacharya J**, Currie J, and Haider S, "Breakfast of Champions? The Nutritional Effects of the School Breakfast Program," *Journal of Human Resources* (2006) 41(3):445-466.

31. **Bhattacharya J** and Sood N, "Health Insurance and the Obesity Externality" *Advances In Health Economics And Health Services Research* 17:279-318 (2007).

32. Shetty K and **Bhattacharya J,** "The Impact of the 2003 ACGME Work Hours Regulations" *Annals of Internal Medicine* 147: 73-80 (2007). See comment "A Response to Dr. Puhan" *Annals of Internal Medicine* 148(6): 482 (2008).

33. **Bhattacharya J** and Shang B, "Model Based Survey Design Using Logits:

JAY BHATTACHARYA, M.D., Ph.D.                                    September 2021

Estimating Lost Statistical Power from Random Alternative Sampling" *Survey Research Methods* 1(3):145-154 (2007).ea

34. **Bhattacharya J**, Choudhry K, and Lakdawalla D, "Chronic Disease and Trends in Severe Disability in Working Age Populations" *Medical Care* 46(1):92-100 (2008).

35. **Bhattacharya J**, Shaikh A, Vytlacil E, "Treatment Effect Bounds under Monotonicity Assumptions: An Application to Swan-Ganz Catheterization" *American Economic Review (Papers and Proceedings)* 98(2): 351–56 (2008).

36. Shetty K, Vogt WB, and **Bhattacharya J,** "Hormone Replacement Therapy and Cardiovascular Health in the US." *Medical Care* 47(5):600-606 (2009).

37. **Bhattacharya J** and Bundorf K, "The Incidence of the Healthcare Costs of Obesity" *Journal of Health Economics* 28(3):649-658 (2009)

38. Bendavid E and **Bhattacharya J,** "PEPFAR in Africa: An Evaluation of Outcomes" *Annals of Internal Medicine* 150(10):688-695 (2009)

39. Nukols T, **Bhattacharya J**, Wolman DM, Ulmer C, Escarce JJ, "Cost Implications of Reductions to Resident Physician Work Hours and Workloads for Resident Physicians," *New England Journal of Medicine* 360(21):2202-15 (2009).

40. **Bhattacharya J** and Isen A, "On Inferring Demand for Health Care in the Presence of Anchoring and Selection Biases," *Forum for Health Economics & Policy*: 12(2) (Health Economics), Article 6. http://www.bepress.com/fhep/12/2/6 (2009)

41. **Bhattacharya J**, Goldman D, and Sood N, "Market Evidence of Misperceived Prices and Mistaken Mortality Risks," *Journal of Economic Behavior and Organization* 72(1):451-462 (2009)

42. Seabury S, **Bhattacharya J**, Neuhauser F, Reville R, "Using Empirical Data on Earnings Losses to Improve Permanent Disability Ratings in Workers' Compensation," *Journal of Risk and Insurance* 77(1):231-260 (2010).

43. Kautz T, Bendavid E, **Bhattacharya J**, Miller NG, "AIDS and Declining Support for Dependent Elderly People in Africa: Retrospective Analysis Using Demographic and Health Surveys" *British Medical Journal* 340:c2841 doi:10.1136 (2010)

44. Patel CJ, **Bhattacharya J**, Butte AJ, "An Environment-Wide Association Study (EWAS) on Type 2 Diabetes Mellitus," *PLoS ONE* 5(5): e10746. doi:10.1371/journal.pone.0010746 (2010)

45. Yoo BK, **Bhattacharya J**, Fiscella K, Bennett NM, Szilagyi P, "Effects of Mass Media Coverage on Timing and Annual Receipt of Influenza Vaccination among Medicare Elderly" *Health Services Research* 45(5 Pt 1):1287-309.  (2010)

46. Bendavid E, Leroux E, **Bhattacharya J**, Smith N, and Miller G, "The Role of Drug Prices and Foreign Assistance in Expanding HIV Treatment in Africa" *British Medical Journal* 341:c6218 (2010)

47. Shetty K, Deleire T, White C, and **Bhattacharya J,** ``Changes in Hospitalization Rates Following Smoking Bans,'' *Journal of Policy Analysis and Management* 30(1):6-28 (2011)

JAY BHATTACHARYA, M.D., Ph.D.                                    September 2021

48. **Bhattacharya J** and Sood N, "Who Pays for Obesity*?" Journal of Economic Perspectives* 25(1):139-58 (2011)

49. Liu V, Weill D, **Bhattacharya J,** "Racial Differences in Survival Following Lung Transplantation" *Archives of Surgery* 146(3):286-293 (2011)

50. Liu V, **Bhattacharya J**, Weill D, Hlatky M, "Persistent Racial Disparities in Survival Following Heart Transplantation" *Circulation* 123:1642-1649 (2011)

51. **Bhattacharya J** and Packalen M "Opportunities And Benefits As Determinants Of The Direction Of Scientific Research"' *Journal of Health Economics* (2011) 30(4):603-15

52. Atella V, **Bhattacharya J**, Carbonari L, "Pharmaceutical Price Controls and Minimum Efficacy Regulation: Evidence from the US and Italy," *Health Services Research* (2012) 47(1 Pt 1):293-308.

53. **Bhattacharya J**, Shaikh AM, and Vytlacil E, "Treatment Effect Bounds: An Application to Swan-Ganz Catheterization," *Journal of Econometrics* (2012) 168(2): 223-243.

54. **Bhattacharya J** and Packalen M, "The *Other* Ex-Ante Moral Hazard in Health"' *Journal of Health Economics* (2012) 31(1):135-46

55. Smith-Spangler C, **Bhattacharya J**, and Goldhaber-Fiebert JD, "Diabetes, Its Treatment, and Catastrophic Medical Spending in 35 Developing Countries" *Diabetes Care* (2012) 35(2):319-26

56. Arroyo A, Wang E, Saynina O, **Bhattacharya J**, Wise P, "The Association Between Insurance Status and Emergency Department Disposition of Injured California Children" *Academic Emergency Medicine* (2012) 19: 541–551.

57. **Bhattacharya J** and Vogt WB, "Do Instrumental Variables Belong in Propensity Scores?" *International Journal of Statistics & Economics* 9(A12) (2012)

58. Goldhaber-Fiebert JD, Rubinfeld RE, **Bhattacharya J**, Robinson TN, Wise PH, "The Utility of Childhood and Adolescent Obesity Assessment in Relation to Adult Health" *Medical Decision Making* (2012) 33(2):163-75.

59. Bendavid E, Holmes CB, **Bhattacharya J**, Miller G, "HIV Development Assistance and Adult Mortality in Africa" *JAMA* 2012;307(19):2060-2067.

60. Perlroth DJ, **Bhattacharya J**, Goldman DP, Garber AM," An economic analysis of conservative management versus active treatment for men with localized prostate cancer," *J Natl Cancer Inst Monogr.* 2012(45):250-7.

61. **Bhattacharya J**, Gathmann C, Miller NG, "The Gorbachev Anti-Alcohol Campaign and Russia's Mortality Crisis," *American Economic Journals: Applied Economics* (2013) 5(2):232-60.

62. Erickson K, Tan K, Winkelmayer W, Chertow G, **Bhattacharya J**, "Variation in Nephrologist Visits to Patients on Hemodialysis across Dialysis Facilities and Geographic Locations." *Clinical Journal of the American Society of Nephrology* (2013): 987-994 doi:10.2215/CJN.10171012

63. Bundorf K, Mata R, Schoenbaum M, **Bhattacharya J**, "Are Prescription Drug Insurance Choices Consistent with Expected Utility Theory?" *Health Psychology* (2013) *32*(9), 986.

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

64. Basu S, Seligman H, **Bhattacharya J**, "Nutritional policy changes in the Supplemental Nutrition Assistance Program: A microsimulation and cost-effectiveness analysis" *Medical Decision Making* (2013) *33*(7), 937-948.

65. Wang NE, Saynina O, Vogel LD, Newgard CD, **Bhattacharya J**, Phibbs CS. The effect of trauma center care on pediatric injury mortality in California, 1999 to 2011. *J Trauma Acute Care Surg*. 2013 Oct;75(4):704-16. doi: 10.1097/TA.0b013e31829a0a65. PMID: 24064887; PMCID: PMC4306425.

66. Nguyen C, Hernandez-Boussard T., Davies SM, **Bhattacharya J**, Khosla RM, Curtin CM, "Cleft Palate Surgery: An Evaluation of Length of Stay, Complications, and Costs by Hospital Type," *The Cleft Palate-Craniofacial Journal*. (2013)

67. Austin D, Luan A, Wang L, **Bhattacharya J,** "Small Increases to Employer Premiums Could Shift Millions of People to the Exchanges and Add Billions of Dollars to Federal Outlays" *Health Affairs* 32.9 (2013): 1531-1537.

68. Bendavid E and **Bhattacharya J**, "The Relationship of Health Aid to Population Health Improvements" *JAMA Internal Medicine* Jun;174(6):881-7. doi: 10.1001/jamainternmed.2014.292. (2014) PMID: 24756557

69. Erickson K, Winkelmayer W, Chertow G, **Bhattacharya J** "Physician Visits and 30-day Hospital Readmissions in Patients Receiving Hemodialysis." *Journal of the American Society of Nephrology* Sep;25(9):2079-87. doi: 10.1681/ASN.2013080879  (2014) PMID: 2481216.

70. Patel RB, Mathur MB, Gould M, Uyeki TM, **Bhattacharya J**, Xiao Y, Khazeni N "Demographic and Clinical Predictors of Mortality from Highly Pathogenic Avian Influenza A (H5N1) Virus Infection: CART Analysis of International Cases." PLoS One Mar 25;9(3):e91630. doi: 10.1371/journal.pone.0091630. eCollection 2014. PMID: 24667532 (2014).

71. Basu S, Seligman H, Gardner C, and **Bhattacharya J**, "Ending SNAP subsidies for sugar-sweetened beverages could reduce obesity and type 2 diabetes" *Health Affairs* Jun;33(6):1032-9. doi: 10.1377/hlthaff.2013.1246 (2014) PMID: 24889953

72. Jena AB, Schoemaker L, and **Bhattacharya J**, "Exposing Physicians to Reduced Residency Work Hours Did Not Adversely Affect Patient Outcomes After Residency" *Health Affairs* 33:1832-1840 (2014)

73. Mathur MB, Patel RB, Gould M, Uyeki TM, **Bhattacharya J**, Xiao Y, Gillaspie Y, Khazeni N, "Global Seasonal Patterns in Human HPAI H5N1 Infection: Analysis of International Cases" *PLoS ONE* Sep 12;9(9):e106171. doi: 10.1371/journal.pone.0106171. eCollection 2014. PMID: 25215608 (2014)

74. **Bhattacharya J**, Vogt WB. "Employment and Adverse Selection in Health Insurance." *Forum for Health Economics and Policy* 17(1):79-104. DOI: 10.1515/fhep-2013-0017 (2014)

75. Erickson KF, Winkelmayer WC, Chertow GM, and **Bhattacharya J**. "Medicare Reimbursement Reform for Provider Visits and Health Outcomes in Patients on Hemodialysis." *Forum for Health Economics and Policy* 17(1):53-77 (2014)

76. Park MD, **Bhattacharya J**, Park KT. "Differences in healthcare expenditures for inflammatory bowel disease by insurance status, income, and clinical care setting." PeerJ. Sep 23;2:e587. doi: 10.7717/peerj.587 PMID: 25279267 (2014)

**JAY BHATTACHARYA, M.D., Ph.D.**                    September 2021

77. Erickson KF, Mell MW, Winkelmayer WC, Chertow GM, and **Bhattacharya J** "Provider Visit Frequency and Vascular Access Interventions in Hemodialysis" *Clinical Journal of the American Society of Nephrology* (2015) 10(2):269-77. doi: 10.2215/CJN.05540614. PMID: 25587105

78. Chicklis C, MaCurdy T, **Bhattacharya J**, Shafrin J, Zaidi S, and Rogers D "Regional Growth in Medicare Spending, 1992-2010." *Health Services Research* (2015) 50(5):1574-88. doi: 10.1111/1475-6773.12287 PMID: 25676603

79. Romley JA, Axeen S, Lakdawalla DN, Chernew ME, **Bhattacharya J**, and Goldman DP. "The Relationship between Commercial Health Care Prices and Medicare Spending and Utilization." Health Services Research (2015) 50(3):883-96. doi: 10.1111/1475-6773.12262. PMID: 25429755

80. Gidwani R and **Bhattacharya J** "CMS Reimbursement Reform and the Incidence of Hospital-Acquired Pulmonary Embolism or Deep Vein Thrombosis." *Journal of General Internal Medicine* 30(5):588-596 (2015)

81. Erickson KF, Mell MW, Winkelmayer WC, Chertow GM, and **Bhattacharya J** "Provider Visits and Early Vascular Access Placement in Maintenance Hemodialysis." *Journal of the American Society of Nephrology* 26(8):1990-7 doi:10.1681/ASN.2014050464 (2015)  PMID: 25452668

82. Goldhaber-Fiebert JD, Studdert DM, Farid MS, **Bhattacharya J** "Will Divestment from Employment-Based Health Insurance Save Employers Money? The Case of State and Local Governments." *Journal of Empirical Legal Studies* 12(3): 343-394 (2015) DOI: 10.1111/jels.12076

83. Alsan M, Schoemaker L, Eggleston K, Kammili N, Kolli P, **Bhattacharya J**. "Out-of-pocket health expenditures and antimicrobial resistance in low- and middle-income countries" *Lancet Infectious Disease* (2015) 15(10):1203-1210

84. Wang L, Haberland C, Thurm C, **Bhattacharya J**, Park KT. "Health Outcomes in US Children with Abdominal Pain at Major Emergency Departments Associated with Race and Socioeconomic Status" *PLoS One* 10(8): e0132758 DOI: 10.1371/journal.pone.0132758 (2015)

85. Patel MI, **Bhattacharya J**, Asch SM, Kahn J "Acceptance of Advance Directives and Palliative Care Referral for Veterans with Advanced Cancer: A Retrospective Analysis." *The American Journal of Hospice & Palliative Care* DOI:10.1177/1049909115595216 (2015).

86. Jena AB, Schoemaker L, **Bhattacharya J**, Seabury SA  (2015) Physician spending and subsequent risk of malpractice claims: observational study. *BMJ* 2015;351:h5516 doi: 10.1136/bmj.h5516.  PMID: 26538498  See also: Jena AB, Schoemaker L, Bhattacharya J, Seabury SA. "Authors' reply to Barbieri and Kovarik, Mariani, and Waxman and Kanzaria." *BMJ*. 2015 351:h6774. doi: 10.1136/bmj.h6774 (2015). PMID: 26668033

87. Richman I, Asch SM, **Bhattacharya J**, Owens DK. "Colorectal Cancer Screening in the Era of the Affordable Care Act" *Journal of General Internal Medicine* (2016) 31(3):315-20. doi: 10.1007/s11606-015-3504-2.  PMID: 26349953

88. Mooney JJ, **Bhattacharya J**, and Dhillon GS Effect of Transplant Center Volume on Cost and Readmissions in Medicare Lung Transplant Recipients, *Annals of the*

*American Thoracic Society* 13(7):1034-41. doi: 10.1513/AnnalsATS.201601-017OC (2016). PMID: 27064753

89. Hurley MP, Schoemaker L, Morton JM, Wren SM, Vogt WB, Watanabe S, Yoshikawa A, **Bhattacharya J**. "Geographic variation in surgical outcomes and cost between the United States and Japan." *Am J Manag Care*. 22(9):600-7 (2016) PMID: 27662222

90. Erickson KF, Winkelmayer WC, Chertow GM, **Bhattacharya J**. "Hemodialysis Hospitalizations and Readmissions: The Effects of Payment Reform." *Am J Kidney Dis.* 2016 Nov 14. pii: S0272-6386(16)30524-8. doi: 10.1053/j.ajkd.2016.08.033. (2016) PMID: 27856087

91. Richman I, Asch SM, Bendavid E, **Bhattacharya J**, Owens DK. "Breast Density Notification Legislation and Breast Cancer Stage at Diagnosis: Early Evidence from the SEER Registry." *J Gen Intern Med*. 32(6):603-609 (2017) doi: 10.1007/s11606-016-3904-y. PMID: 27844260

92. Erickson KF, Zheng Y, Winkelmayer WC, Ho V, **Bhattacharya J**, Chertow GM. "Consolidation in the Dialysis Industry, Patient Choice, and Local Market Competition."*Clin J Am Soc Nephrol.* 12(3):536-545 (2017) doi: 10.2215/CJN.06340616 PMID: 27831510

93. Erickson KF, Winkelmayer WC, Chertow GM, **Bhattacharya J**. "Effects of physician payment reform on provision of home dialysis." *Am J Manag Care* 22(6):e215-23. (2016) PMID: 27355909

94. Eneriz-Wiemer M, Saynina O, Sundaram V, Lee HC, **Bhattacharya J**, Sanders LM. "Parent Language: A Predictor for Neurodevelopmental Follow-up Care Among Infants With Very Low Birth Weight." *Acad Pediatr*. 16(7):645-52. doi: 10.1016/j.acap.2016.04.004. (2016) PMID: 27130810

95. Chen B, Jalal H, Hashimoto H, Suen SC**,** Eggleston K, Hurley M, Schoemaker L, and **Bhattacharya J**. "Forecasting Trends in Disability in a Super-Aging Society: Adapting the Future Elderly Model to Japan," *Journal of the Economics of Ageing* 8 (2016): 42-51.

96. Liu VX, Fielding-Singh V, Greene JD, Baker JM, Iwashyna TJ, **Bhattacharya J**, Escobar GJ. "The Timing of Early Antibiotics and Hospital Mortality in Sepsis" *Am J Respir Crit Care Med*. (2017) 196(7):856-863. doi: 10.1164/rccm.201609-1848OC PMID: 28345952

97. Shaw JG, Farid M, Noel-Miller C, Joseph N, Houser A, Asch SA, **Bhattacharya J**, Flowers L. "Social Isolation and Medicare Spending: Among Older Adults, Objective Social Isolation Increases Expenditures while Loneliness Does Not" *J of Aging and Health* 29(7):1119-1143 (2017)

98. Tran EMT, **Bhattacharya J**, Pershing S. "Self-Reported Receipt of Dilated Fundus Examinations Among Patients with Diabetes: Medical Expenditure Panel Survey, 2002-2013" *American Journal of Ophthalmology* 179:18-24 (2017) doi: 10.1016/j.ajo.2017.04.009 PMID: 28455116

99. Lin E, Cheng XS, Chin KK, Zubair T, Chertow GM, Bendavid E, Bhattacharya J. "Home Dialysis in the Prospective Payment System Era" J Am Soc Nephrol 28(10):2993-3004. doi: 10.1681/ASN.2017010041. Epub 2017 May 10. (2017) PMID: 28490435

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

100.    Hakim I, Hathi S, Nair A, Narula T, **Bhattacharya J**. "Electronic health records and the frequency of diagnostic test orders" *Am J Manag Care*. 23(1):e16-e23. (2017) PMID: 28141935

101.    Pollom EL, Wang G, Harris JP, Koong AC, Bendavid E, **Bhattacharya J**, Chang DT. "The Impact of Intensity Modulated Radiation Therapy on Hospitalization Outcomes in the SEER-Medicare Population With Anal Squamous Cell Carcinoma" *Int J Radiat Oncol Biol Phys.* 98(1):177-185. doi: 10.1016/j.ijrobp.2017.01.006. PMID: 28258896 (2017)

102.    Kwong JZ, Weng Y, Finnegan M, Schaffer R, Remington A, Curtin C, McDonald KM, **Bhattacharya J**, Hernandez-Boussard T. "Effect of Medicare's Nonpayment Policy on Surgical Site Infections Following Orthopedic Procedures" *Infect Control Hosp Epidemiol.* 38(7):817-822 doi: 10.1017/ice.2017.86.  (2017) PMID: 28487001

103.    Chen SP, **Bhattacharya J**, Pershing S. "Vision Loss and Cognition in the US Population of Older Adults, *JAMA Ophthalmology* 135(9):963-970 (2017) DOI: 10.1001/jamaophthalmol.2017.2838 PMID: 28817745 PMCID: PMC5710542

104.    Lin E, MaCurdy M, **Bhattacharya J** "MACRA and its Implications for Nephrology" *Journal of American Society of Nephrology* (2017) 28(9):2590-2596. doi: 10.1681/ASN.2017040407

105.    Sandhu AT, Heidenreich PA, **Bhattacharya J**, and Bundorf MK "Cardiovascular Testing and Clinical Outcomes in Emergency Department Patients with Chest Pain" *JAMA Internal Medicine* (2017) 177(8):1175-1182 PMID: 28654959 PMCID: PMC5710427 doi:10.1001/jamainternmed.2017.2432

106.    Mooney JJ, Hedlin H, Mohabir P, **Bhattacharya J**, & Dhillon GS. "Racial and ethnic disparities in lung transplant listing and waitlist outcomes." *The Journal of Heart and Lung Transplantation*, *37*(3), 394–400. doi:10.1016/j.healun.2017.09.017 (2017)

107.    Packalen M and **Bhattacharya J** (2017) "Neophilia Ranking of Scientific Journals" *Scientometrics* 110(1):43-64 PMID: 28713181 PMCID: PMC5506293 doi: 10.1007/s11192-016-2157-1

108.    Garber AM, Azad TD, Dixit A, Farid M, Sung E, Vail D, **Bhattacharya J** "Medicare savings from conservative management of low back pain" *American Journal of Managed Care* 24(10):e332-e337. (2018)

109.    Patel MI, Sundaram V, Desai M, Periyakoil VS, Kahn JS, **Bhattacharya J**, Asch SM, Milstein A, and Bundorf MK. "Effect of a Lay Health Worker Intervention on Goals-of-Care Documentation and on Health Care Use, Costs, and Satisfaction Among Patients with Cancer: A Randomized Clinical Trial." *JAMA Oncol.* 4(10):1359-1366. doi: 10.1001/jamaoncol.2018.2446. (2018)

110.    Erickson KF, Winkelmayer WC, Ho V, **Bhattacharya J**, Chertow GM "Market Competition and Health Outcomes in Hemodialysis" *Health Services Research* 53(5):3680-3703. doi: 10.1111/1475-6773.12835. Epub 2018 Feb 22. (2018)

111.    Yu JX, Oliver M, Lin J, Chang M, Limketkai BN, Soetikno R, **Bhattacharya J**, Kaltenbach T. Patients Prescribed Direct-Acting Oral Anticoagulants Have Low Risk of Postpolypectomy Complications. *Clinical Gastroenterology and*

**JAY BHATTACHARYA, M.D., Ph.D.**                               September 2021

*Hepatology*. https://doi.org/10.1016/J.CGH.2018.11.051 17(10 2000-2007.e3 (2018) PMID: 30503964.  PMCID: PMC6541555

112. Patel CJ, **Bhattacharya J**, Ioannidis J, & Bendavid E. "Systematic identification of correlates of HIV infection." *AIDS*, *32*(7):933-943. (2018)

113. McKenzie RB, Sanders L, Bhattacharya J, Bundorf MK  "Health Care System Factors Associated with Transition Preparation in Youth with Special Health Care Needs" Population Health Management 22(1):63-73. doi: 10.1089/pop.2018.0027. Epub 2018 Jun 29  (2019)

114. Erickson KF, Winkelmayer WC, Ho V, Bhattacharya J, Chertow GM "Market Consolidation and Mortality in Patients Initiating Hemodialysis" *Value in Health.* 22(1):69-76. doi: 10.1016/j.jval.2018.06.008. Epub 2018 Jul 27. (2019)

115. Curto V, Einav L, Finkelstein A, Levin J, & **Bhattacharya J**. "Health Care Spending and Utilization in Public and Private Medicare." *American Economic Journal: Applied Economics*, 11(2), 302–332. https://doi.org/10.1257/app.20170295 (2019)

116. Mooney JJ, **Bhattacharya J**, and Dhillon GS "Effect of Broader Geographic Sharing of Donor Lungs on Lung Transplant Waitlist Outcomes" *Journal of Heart and Lung Transplantation* 38(2):136-144. doi: 10.1016/j.healun.2018.09.007. Epub 2018 Sep 14.  (2019)

117. Azad, T., Vail, D., Bentley, J., Han, S., Suarez, P., Varshneya, K., Mittal V, Desai M, **Bhattacharya J**, and Ratliff, J. "Initial Provider Specialty is Associated with Long-term Opiate Use in Patients with Newly Diagnosed Low Back and Lower Extremity Pain." Spine 44(3):211-218. doi: 10.1097/BRS.0000000000002840. (2019)

118. Patel MI, Moore D, **Bhattacharya J**, Milstein A, & Coker TR "Perspectives of Health Care Payer Organizations on Cancer Care Delivery Redesign: A National Study" *Journal of Oncology Practice* 15:1, e46-e55 (2019)

119. Lin E, **Bhattacharya J**, & Chertow GM "Prior Hospitalization Burden and the Relatedness of 30-Day Readmissions in Patients Receiving Hemodialysis." *Journal of the American Society of Nephrology*, *30*(2), 323–335. https://doi.org/10.1681/asn.2018080858 (2019)

120. Packalen M, & **Bhattacharya J**. "Age and the Trying Out of New Ideas." *Journal of Human Capital*, 13(2), 341–373. https://doi.org/10.1086/703160 (2019)

121. Patel MI, Ramirez D, Agajanian R, Agajanian H, **Bhattacharya J**, & Bundorf KM "Lay Health Worker-Led Cancer Symptom Screening Intervention and the Effect on Patient-Reported Satisfaction, Health Status, Health Care Use, and Total Costs: Results From a Tri-Part Collaboration." *Journal of Oncology Practice*, https://doi.org/10.1200/JOP.19.00152 (2019)

122. Sandhu AT, Kohsaka S, **Bhattacharya J**, Fearon WF, Harrington RA, & Heidenreich PA. "Association Between Current and Future Annual Hospital Percutaneous Coronary Intervention Mortality Rates." *JAMA Cardiology*, 1–8. https://doi.org/10.1001/jamacardio.2019.3221 (2019)

123. Patel M, Andrea N, **Bhattacharya J**, & Coker TR. "A Community-Partnered, Evidence-Based Approach to Improving Cancer Care Delivery for Low-Income

and Minority Patients with Cancer." *Journal of Community Health*, 44(5), 912–920. https://doi.org/10.1007/s10900-019-00632-x (2019)

124. Hamad R, Templeton ZS, Schoemaker L, Zhao M, & **Bhattacharya J**. "Comparing Demographic and Health Characteristics of New and Existing SNAP Recipients: Application of A Machine Learning Algorithm." *The American Journal of Clinical Nutrition*, 109(4), 1164–1172. https://doi.org/10.1093/ajcn/nqy355 (2019)

125. Erickson KF, Zhao B, Niu J, Winkelmayer WC, **Bhattacharya J**, Chertow GM, & Ho V. "Association of Hospitalization and Mortality Among Patients Initiating Dialysis with Hemodialysis Facility Ownership and Acquisitions." *JAMA Network Open*, 2(5), e193987. https://doi.org/10.1001/jamanetworkopen.2019.3987 (2019)

126. Jena AB, Farid M, Blumenthal D, & **Bhattacharya J**. "Association of Residency Work Hour Reform with Long Term Quality and Costs of Care of US Physicians: Observational Study." *BMJ*, 366, l4134. https://doi.org/10.1136/bmj.l4134 (2019).

127. Hamad R, Nguyen TT, **Bhattacharya J**, Glymour MM, & Rehkopf DH. "Educational Attainment and Cardiovascular Disease in The United States: A Quasi-Experimental Instrumental Variables Analysis." *PLoS Medicine*, 16(6), e1002834. https://doi.org/10.1371/journal.pmed.1002834 (2019)

128. Yu JX, Lin JL, Oliver M, Soetikno R, Chang MS, Kwong AJ, Limketkai BN, **Bhattacharya J**, Kaltenbach T. Trends in EMR for Nonmalignant Colorectal Polyps in The United States. *Gastrointestinal Endoscopy*. https://doi.org/10.1016/j.gie.2019.08.004 (2019)

129. Kim D, Chen C, Tysinger B, Park S, Chong MZ, Wang L, Zhao M, Yean JM, Koh WP, Yoong J, **Bhattacharya J**, & Eggleston K. Smoking, life expectancy, and chronic disease in South Korea, Singapore, and the United States: A microsimulation model [published online ahead of print, 2019 Dec 4]. Health Econ. 2019;10.1002/hec.3978. doi:10.1002/hec.3978

130. Ryckman T, Robinson M, Pedersen C, **Bhattacharya J**, Bendavid E. Impact of Feed the Future initiative on nutrition in children aged less than 5 years in sub-Saharan Africa: difference-in-differences analysis. *BMJ*.;367:l6540. Published 2019 Dec 11. doi:10.1136/bmj.l6540 (2019) PMID: 31802569 PMCID: PMC7269831

131. Pan CK, Vail D, **Bhattacharya J**, Cao M, Mruthyunjaya P. (2020) The Effect of Obstructive Sleep Apnea on Absolute Risk of Central Serous Chorioretinopathy. Am J Ophthalmol. 2020 Oct;218:148-155 PMID 32574769

132. Erickson KF, Shen JI, Zhao B, Winkelmayer WC, Chertow GM, Ho V, & **Bhattacharya J**. Safety-Net Care for Maintenance Dialysis in the United States. *J Am Soc Nephrol*. 31(2):424-433. doi:10.1681/ASN.2019040417 (2020) PMID: 31857351 PMCID: PMC7003304

133. Bonde AN, Martinussen T, Lee CJ, Lip GYH, Staerk L, Bang CN, **Bhattacharya J**, Gislason G, Torp-Pedersen C, Olesen JB, Hlatky MA. Rivaroxaban Versus Apixaban for Stroke Prevention in Atrial Fibrillation: An Instrumental Variable Analysis of a Nationwide Cohort. Circ Cardiovasc Qual

**JAY BHATTACHARYA, M.D., Ph.D.**                    September 2021

Outcomes.13(4):e006058. doi:10.1161/CIRCOUTCOMES.119.006058 (2020)
PMID: 32283966

134. Sood N, Simon P, Ebner P, Eichner D, Reynolds J, Bendavid E, & **Bhattacharya J**
Seroprevalence of SARS-CoV-2-Specific Antibodies Among Adults in Los
Angeles County, California, on April 10-11, 2020 [published online ahead of
print, 2020 May 18]. *JAMA*.;e208279. doi:10.1001/jama.2020.8279 (2020)
PMID: 32421144 PMCID: PMC7235907

135. Packalen M, **Bhattacharya J**. NIH funding and the pursuit of edge science. Proc
Natl Acad Sci U S A. 117(22):12011-12016. doi:10.1073/pnas.1910160117
(2020)

136. Alobuia WM, Dalva-Baird NP, Forrester JD, Bendavid E, **Bhattacharya J**,
Kebebew E. Racial disparities in knowledge, attitudes and practices related to
COVID-19 in the USA [published online ahead of print, 2020 Jun 3]. J Public
Health (Oxf). 2020;fdaa069. doi:10.1093/pubmed/fdaa069

137. Shin SH, Lillard DR, **Bhattacharya J**. Understanding the correlation between
Alzheimer's Disease polygenic risk, wealth, and the composition of wealth
holdings. *Biodemography and Social Biology* (2020) Oct 28;268:113473. doi:
10.1016/j.socscimed.2020.113473

138. Curto V, Einav L, Levin J, and **Bhattacharya J**. Can Health Insurance
Competition Work? Evidence from Medicare Advantage. *Journal of Political
Economy* (2021) 129(2): 570-606.

139. Sandhu AT, **Bhattacharya J**, Lam J, Bounds S, Luo B, Moran D, Uwilingiyimana
AS, Fenson D, Choradia N, Do R, Feinberg L, MaCurdy T, Nagavarapu S.
Adjustment for Social Risk Factors Does Not Meaningfully Affect Performance
On Medicare's MIPS Clinician Cost Measures. *Health Aff* (Millwood). 2020
Sep;39(9):1495-1503. doi: 10.1377/hlthaff.2020.00440. PMID: 32897780.

140. Kasajima M, Hashimoto H, Suen SC, Chen B, Jalal H, Eggleston K, **Bhattacharya
J**. Future projection of the health and functional status of older people in
Japan: A multistate transition microsimulation model with repeated cross-
sectional data. *Health Econ*. 2020 Jul 14. doi: 10.1002/hec.3986. Epub ahead of
print. PMID: 32662080.

141. Lin E, Chertow GM, **Bhattacharya J**, Lakdawalla D. Early Delays in Insurance
Coverage and Long-term Use of Home-based Peritoneal Dialysis. Med Care.
2020 Jul;58(7):632-642. doi: 10.1097/MLR.0000000000001350. PMID:
32520837; PMCID: PMC7295012.

142. Peirlinck M, Linka K, Costabal FS, **Bhattacharya J**, Bendavid E, Ioannidis J, Kuhl
E (2020), "Visualizing the Invisible: The Effect of Asymptotic Transmission on
the Outbreak Dynamics of COVID-19" *Computer Methods in Applied Mechanics
and Engineering.* 372: 1 Dec. 2020, 113410.
https://doi.org/10.1016/j.cma.2020.113410.

143. Azad, T. D., Zhang, Y., Stienen, M. N., Vail, D., Bentley, J. P., Ho, A. L., Fatemi,
P., Herrick, D., Kim, L. H., Feng, A., Varshneya, K., Jin, M., Veeravagu, A.,
**Bhattacharya, J.,** Desai, M., Lembke, A., & Ratliff, J. K. (2020). Patterns of
Opioid and Benzodiazepine Use in Opioid-Naïve Patients with Newly

(256 of 289), Page 256 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 256 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.543    Page 104
of 137

Diagnosed Low Back and Lower Extremity Pain. *Journal of General Internal Medicine*, 35(1), 291–297. https://doi.org/10.1007/s11606-019-05549-8

144. Bendavid E, Oh C, **Bhattacharya J**, Ioannidis J (2020) "Assessing Mandatory Stay-at-Home and Business Closure Effects on the Spread of COVID-19" *European Journal of Clinical Investigation*. 5 January 2021. doi:10.1111/eci.13484

145. Zhang J, Chen Y, Einav L, Levin J, **Bhattacharya J.** Consolidation of primary care physicians and its impact on healthcare utilization. *Health Econ*. 2021 Mar 25. doi: 10.1002/hec.4257. Epub ahead of print. PMID: 33764640.

146. Lin JL, Rigdon J, Van Haren K, Buu M, Saynina O, **Bhattacharya J,** Owens DK, Sanders LM. Gastrostomy Tubes Placed in Children With Neurologic Impairment: Associated Morbidity and Mortality. J Child Neurol. 2021 Mar 22:8830738211000179. doi: 10.1177/08830738211000179. Epub ahead of print. PMID: 33750232.

147. Lin E, Chertow GM, **Bhattacharya J,** Lakdawalla D. Early Delays in Insurance Coverage and Long-term Use of Home-based Peritoneal Dialysis. *Med Care.* 2020 Jul;58(7):632-642. doi: 10.1097/MLR.0000000000001350. PMID: 32520837; PMCID: PMC7295012.

148. Alsan M, Atella V, **Bhattacharya J,** Conti V, Mejia I, Miller G. (2021) Technological Progress and Health Convergence: The Case of Penicillin in Postwar Italy. *Demography* 58 (4): 1473–1498. https://doi.org/10.1215/00703370-9368970

149. Bendavid E, Mulaney B, Sood N, Shah S, Bromley-Dulfano R, Lai C, Weissberg Z, Saavedra-Walker R, Tedrow J, Bogan A, Kupiec T, Eichner D, Gupta R, Ioannidis JPA, **Bhattacharya J.** COVID-19 antibody seroprevalence in Santa Clara County, California. *Int J Epidemiol.* 2021 Feb 22:dyab010. doi: 10.1093/ije/dyab010. Epub ahead of print. PMID: 33615345; PMCID: PMC7928865.

150. Park, W. G., Sandhu, A., MaCurdy, T., Choradia, N., Schmitt, C., Koscheski, C., Lam, J., Bounds, S., Do, R., Feinberg, L., Vail, D., Nagavarapu, S., & **Bhattacharya, J.** (2021). Development of a Cost Measure for Screening/Surveillance Colonoscopy for the Merit-Based Incentive Payment System. *Gastroenterology*. https://doi.org/10.1053/j.gastro.2021.03.040

151. Sandhu, A. T., Do, R., Lam, J., Blankenship, J., Van Decker, W., Rich, J., Gonzalez, O., Wu, X., Pershing, S., Lin, E., MaCurdy, T. E., **Bhattacharya, J**., & Nagavarapu, S. (2021). Development of the Elective Outpatient Percutaneous Coronary Intervention Episode–Based Cost Measure. *Circulation: Cardiovascular Quality and Outcomes*, 14(3), 6461. https://doi.org/10.1161/circoutcomes.119.006461

152. Duseja R, Andress J, Sandhu AT, **Bhattacharya J**, Lam J, Nagavarapu S, Nilasena D, Choradia N, Do R, Feinberg L, Bounds S, Leoung J, Luo B, Swygard A, Uwilingiyimana A, MaCurdy T. (2021) Development of Episode-Based Cost Measures for the US Medicare Merit-based Incentive Payment System. *JAMA Health Forum.* 2021;2(5):e210451. doi:10.1001/jamahealthforum.2021.0451

153. Tisdale RL, Ma I, Vail D, **Bhattacharya J**, Goldhaber-Fiebert J, Heidenreich PA, Sandhu A. (2021) Availability of Cost-effectiveness Studies for Drugs With High

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

Medicare Part D Expenditures. *JAMA Netw Open*. 2021;4(6):e2113969. doi:10.1001/jamanetworkopen.2021.13969

154. Dalva-Baird NP, Alobuia WM, Bendavid E, **Bhattacharya J**. Racial and ethnic inequities in the early distribution of U.S. COVID-19 testing sites and mortality. *Eur J Clin Invest*. 2021 Aug 14:e13669. doi: 10.1111/eci.13669. Epub ahead of print. PMID: 34390487.

NON-PEER-REVIEWED WORK (63 total)

1. **Bhattacharya J**, Garber AM, MaCurdy T. Cause-Specific Mortality among Medicare Enrollees. *National Bureau of Economic Research Working Paper Series*. 1996;No. 5409.

2. **Bhattacharya J,** Currie J. "Youths at Nutritional Risk : Malnourished or Misnourished?" *National Bureau of Economic Research Working Paper Series*. 2000;No. 7686(7686):483–522.

3. **Bhattacharya J,** Lakdawalla D. Does Medicare Benefit the Poor? New Answers to an Old Question. *National Bureau of Economic Research Working Paper Series*. 2002;No. 9280.

4. **Bhattacharya J.** "Coinsurance, Cost Sharing, and the Demand Managed Behavioral Health Services" *Frontlines: Linking Alcohol Services Research & Practice*, June (2003).

5. **Bhattacharya J**, Lakdawalla D. Time-Inconsistency and Welfare. *National Bureau of Economic Research Working Paper Series*. 2004;No. 10345.

6. Sood N, Alpert A, **Bhattacharya J**. Technology, Monopoly and the Decline of the Viatical Settlements Industry. *National Bureau of Economic Research Working Paper Series*. 2005;No. 11164(March).

7. **Bhattacharya J**, Vogt WB. Employment and Adverse Selection in Health Insurance. *National Bureau of Economic Research Working Paper Series*. 2006;No. 12430(August).

8. **Bhattacharya J.** "Dollars to Doughnuts" *Hoover Digest* 3 (2007).

9. **Bhattacharya J**, Vogt WB. Do Instrumental Variables Belong in Propensity Scores? National Bureau of Economic Research, Inc, NBER Technical Working Papers: 0343; 2007;No. 343.

10. **Bhattacharya J**, Packalen M. Is Medicine an Ivory Tower? Induced Innovation, Technological Opportunity, and For-Profit vs. Non-Profit Innovation. *National Bureau of Economic Research Working Paper Series*. 2008;No. 13862.

11. Atella V, **Bhattacharya J**, Carbonari L. Pharmaceutical Industry, Drug Quality and Regulation: Evidence from US and Italy.  *National Bureau of Economic Research Working Paper Series.* 2008.

12. **Bhattacharya J**. Insuring the near-elderly: how much would Medicare save? *Ann Intern Med*. 2009 Dec 1;151(11):816-7. doi: 10.7326/0003-4819-151-11-200912010-00158. PMID: 19949148.

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

13. Yoo B-K, Kasajima M, **Bhattacharya J**. Public Avoidance and the Epidemiology of novel H1N1 Influenza A. *National Bureau of Economic Research Working Paper Series*. 2010;15752:1–39.

14. Aranovich G, **Bhattacharya J**, Garber A, MaCurdy T, "Coping with Chronic Disease? Chronic Disease and Disability in Elderly American Population 1982-1999," NBER Working Paper *#14811* (2009)

15. Jena AB, Schoemaker L, **Bhattacharya J**, Seabury SA. "Authors' reply to Barbieri and Kovarik, Mariani, and Waxman and Kanzaria." BMJ. 351:h6774. doi: 10.1136/bmj.h6774.  (2015) PMID: 26668033

16. Gidwani R, **Bhattacharya J**. "CMS Reimbursement Reform: Authors' Reply." *J Gen Intern Med.* 2015 30(11):1588. doi: 10.1007/s11606-015-3465-5. PMID: 26179821

17. **Bhattacharya J**. "A way out of the dismal arithmetic of hepatitis C treatment." *Am J Manag Care*. (6 Spec No.):SP183-4. (2016) PMID: 27266945

18. Liu V, Fielding-Singh V, Iwashyna TJ, **Bhattacharya J**, Escobar G. "Reply to the Timing of Early Antibiotics and Hospital Mortality in Sepsis - Playing Devil's Advocate. *Am J Respir Crit Care Med*. doi: 10.1164/rccm.201704-0774LE. (2017) PMID: 28485627

19. L Flowers, A Houser, C Noel-Miller, J Shaw, **J Bhattacharya** (2017) "Medicare spends more on socially isolated older adults." *AARP Insight on the Issues* 125, 1119-1143.

20. **Bhattacharya J** and Packalen M (2020) Stagnation and Scientific Incentives. *National Bureau of Economic Research Working Paper* #26752. https://www.nber.org/papers/w26752

21. Bendavid E and **Bhattacharya J** "Is the Coronavirus as Deadly as They Say?" Wall Street Journal, March 24, 2020.

22. Bendavid, E., Mulaney, B., Sood, N., Shah, S., Ling, E., Bromley-Dulfano, R., Lai, C., Weissberg, Z., Saavedra, R., Tedrow, J., Tversky, D., Bogan, A., Kupiec, T., Eichner, D., Gupta, R., Ioannidis, J., & **Bhattacharya, J**. (2020). COVID-19 Antibody Seroprevalence in Santa Clara County, California. medRxiv, 2020.04.14.20062463. https://doi.org/10.1101/2020.04.14.20062463

23. **Bhattacharya J** and Packalen M "Lives vs. Lives: The Global Cost of Lockdown" Spectator, May 13, 2020

24. **Bhattacharya J** and Packalen M "Focused COVID-19 Restrictions Will Save Lives in Poor Countries", Financial Post, July 3, 2020.

25. **Bhattacharya J** and Agarwal S. "Lift lockdowns, protect the vulnerable, treat Covid like a health issue and not a disaster" The Print. July 24, 2020

26. Fronsdal TL, **Bhattacharya J**, Tamang S. (2020) Variation in Health Care Prices Across Public and Private Payers. *National Bureau of Economic Research Working Paper* #27490. https://www.nber.org/papers/w27490

27. **Bhattacharya J** and Kulldorff M. "The Case Against Covid Tests for the Young and Healthy" Wall Street Journal, Sept. 3, 2020

(259 of 289), Page 259 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 259 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.546    Page 107
of 137

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

28. **Bhattacharya J**, Packalen M. On the Futility of Contact Tracing. *Inference* 5(3) September (2020) https://inference-review.com/article/on-the-futility-of-contact-tracing

29. **Bhattacharya J** and Packalen M. Contact Tracing is Far from Futile: A Reply. Inference 6(1) May (2021) https://inference-review.com/letter/contact-tracing-is-far-from-futile

30. **Bhattacharya J.** A Sensible and Compassionate Anti-COVID Strategy. *Imprimis* 49(10). October 2020. https://imprimis.hillsdale.edu/sensible-compassionate-anti-covid-strategy/

31. Kulldorff M, Gupta S, and **Bhattacharya J.** Great Barrington Declaration. Oct. 4, 2020.

32. Kulldorff M, Gupta S, and **Bhattacharya J.** "Lockdowns do More Harm than Good" New York Post. October 6, 2020.

33. **Bhattacharya J.** "Ask Me Anything – Dr. Jay Bhattacharya." r/LockdownSkepticism. *Reddit*. October 17, 2020

34. **Bhattacharya J.** "It is genuinely possible to shield the vulnerable from Covid, while the rest of us go back to normal" The Telegraph. October 20, 2020

35. Kulldorff M, Gupta S, and **Bhattacharya J** "Our COVID-19 plan would minimize mortality and lockdown-induced collateral damage" USA Today, Oct. 22, 2020.

36. **Bhattacharya J** "It's Time for an Alternative to Lockdown" Spectator, Oct. 29, 2020.

37. Kulldorff M, Gupta S, and **Bhattacharya J** "We Should Focus on Protecting the Vulnerable from COVID Infection" Newsweek, Oct. 30, 2020.

38. Kulldorff M and **Bhattacharya J.** "Lockdown Isn't Working" Spectator, Nov. 2, 2020.

39. Kulldorff M, Gupta S, and **Bhattacharya J.** Focused Protection: The Middle Ground between Lockdowns and "Let it Rip". Great Barrington Declaration, Nov. 25, 2020.

40. **Bhattacharya J** and Makridis C "Facts – not fear – will stop the pandemic" The Hill, Dec. 3, 2020.

41. **Bhattacharya J** and Gupta S. "How to End the Lockdowns Next Month" Wall Street Journal, Dec. 17, 2020.

42. Agarwal S and **Bhattacharya J**. "Majority Indians have natural immunity. Vaccinating entire population can cause great harm" The Print. January 11, 2021

43. Nicholson T and **Bhattacharya J**. "Appropriate Use of PCR Needed for a Focused Response to the Pandemic" The Hill. January 29, 2021.

44. **Bhattacharya J** and Kulldorff M. "Facebook is Silencing Debate on Lockdown." Spiked Online. February 15, 2021.

45. **Bhattacharya J** and Kulldorff M. "California's Failed Response to Covid" Eureka. March 12, 2021

46. Kulldorff M and **Bhattacharya J.** "One of the Lockdowns' Greatest Casualties Could be Science." The Federalist. March 18, 2021

47. **Bhattacharya J** and Kulldorff M. "Vaccine Passports Prolong Lockdowns" Wall Street Journal. April 6, 2021.

(260 of 289), Page 260 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 260 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.547    Page 108
of 137

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

48. **Bhattacharya J.** "Masks for Children, Muzzles for Covid-19 News." Wall Street Journal. April 13, 2021.

49. **Bhattacharya J** and Kulldorff M. "Lockdown proponents can't escape the blame for the biggest public health fiasco in history" The Telegraph. April 24, 2021

50. **Bhattacharya J** and Licon JA. "The High Costs of Lockdowns: An Interview with Dr. Bhattacharya" Eudaimonia Junction. April 26, 2021.

51. **Bhattacharya J.** "Editor's Note: Public Health Loses its Innocence." Collateral Global. May 4, 2021.

52. **Bhattacharya J.** "How the West Can Help India" Spectator. May 6, 2021

53. **Bhattacharya J** and Giubilini A. "Immunity Passports: A Debate Between Jay Bhattacharya and Alberto Giubilini" Lockdown Sceptics. May 7, 2021

54. **Bhattacharya J.** "Editor's Note: Children Are A Casualty of Lockdown." *Collateral Global*. May 11, 2021.

55. Kopinska JA, Atella V, **Bhattacharya J**, Miller G (2021) The Changing Relationship between Bodyweight and Longevity in High- and Low- Income Countries. National Bureau of Economic Research Working Paper #28813. https://www.nber.org/papers/w28813

56. Toubat O, Berg AH, Sobhani K, Mulligan K, Hori AM, **Bhattacharya J**, Sood N (2021) Manufacturer Signal-to-Cutoff Threshold Underestimates Cumulative Incidence of SARS-CoV-2 Infection: Evidence from the Los Angeles Firefighters Study. *medRxiv*. **doi:** https://doi.org/10.1101/2021.04.20.21255829.

57. Bendavid E, Oh C, **Bhattacharya J**, Ioannidis JPA. Response to Letters Re: 'Assessing mandatory stay- At- Home and business closure effects on the spread of COVID- 19'. *European Journal of Clinical Investigation*. 2021 Mar:e13553. DOI: 10.1111/eci.13553.

58. **Bhattacharya J.** "What Does Lockdown and Focused Protection Mean in Nursing Homes?" Collateral Global. May 18, 2021.

59. **Bhattacharya J.** "Cancer and Lockdown" Collateral Global. May 25, 2021.

60. Kulldorff M and **Bhattacharya J** "It's mad that 'herd immunity' was ever a taboo phrase" The Telegraph, May 27, 2021

61. **Bhattacharya J**, Gupta S, Kulldorff M, "The Beauty of Vaccines and Natural Immunity" Smerconish. June 4, 2021

62. **Bhattacharya J** "Stanford professor challenges SJ Merc's "Coronavirus Lessons Learned" assertions" Opportunity Now.  June 4, 2021

63. **Bhattacharya J** "On the Catastrophic Misapplication of the Precautionary Principle" Collateral Global. June 14, 2021

64. Kulldorff M and **Bhattacharya J** "The Ill-Advised Push to Vaccinate the Young" The Hill, June 17, 2021

65. Sood N and **Bhattacharya J** "Mandatory Masking of School Children is a Bad Idea" Orange County Register, July 13, 2021.

66. Green T and Bhattacharya J "Lockdowns are Killers in the Global South" UnHerd. July 22, 2021.

67. Kulldorff M and **Bhattacharya J** "The Smear Campaign Against the Great Barrington Declaration" Spiked. Aug. 2, 2021

**JAY BHATTACHARYA, M.D., Ph.D.**                              September 2021

68. **Bhattacharya J** and Boudreaux D "Eradication of COVID is a Dangerous and Expensive Fantasy" <u>Wall Street Journal</u>. Aug. 4, 2021

<u>BOOKS AND REPORTS (8 total)</u>

1. Yoshikawa A, **Bhattacharya J**, Vogt WB eds. <u>Health Economics of Japan: Patients, Doctors, and Hospitals Under a Universal Health Insurance System</u>, Tokyo: University of Tokyo Press, (1996).

2. Goldman DP, Hurd M, Shekelle PG, Newberry SJ, Panis CWA, Shang B, **Bhattacharya J**, Joyce GF, Lakdawalla D. <u>Health Status and Medical Treatment of the Future Elderly: Final Report</u>, TR-169-CMS, Santa Monica, CA: RAND (2004).

3. **Bhattacharya J**, Currie J, Haider SJ, Variyam J. Evaluating the Impact of School Nutrition Programs: Final Report. E-FAN-04-008, Washington D.C.: Economic Research Service, USDA (2004).

4. **Bhattacharya J**, Hyde T, Tu P. <u>Health Economics</u>, London: Palgrave-MacMillan, (2013).

5. MaCurdy T, **Bhattacharya J**, Perlroth D, Shafrin J, Au-Yeung A, Bashour H, Chicklis C, Cronen K, Lipton B, Saneinejad S, Shrestha E, Zaidi S. <u>Geographic Variation in Spending, Utilization, and Quality: Medicare and Medicaid Beneficiaries</u>. Acumen Report to the Institute of Medicine Committee Study of Geographic Variation in Health Care Spending and Promotion of High-Value Health Care, Washington, DC: Institute of Medicine (2013)

6. MaCurdy T, **Bhattacharya J**, Shafrin J, Chicklis C, Cronen K, Friley J, Lipton B, Rogers D, Zaidi S. <u>IOM Study of Geographic Variation: Growth Analysis</u>. Acumen Report to the Institute of Medicine Committee Study of Geographic Variation in Health Care Spending and Promotion of High-Value Health Care, Washington, DC: Institute of Medicine (2013)

7. **Bhattacharya J**, Chandra A, Chernew M, Goldman D, Jena A, Lakdawalla D, Malani A, Philipson T. <u>Best of Both Worlds: Uniting Universal Coverage and Personal Choice in Health Care</u>, American Enterprise Institute (AEI) White Paper, Washington DC: AEI Press (2013)

8. **Bhattacharya J**, Vail D, Moore D, Vogt W, Choradia N, Do R, Erickson K, Feinberg L, Isara F, Lin E, Narayanan V, Vaikath M, MaCurdy T. <u>Medicare Current State and Future Trends Environment Scan</u>. Center for Medicare and Medicaid Services (CMS) White Paper (2019)

<u>BOOK CHAPTERS (15 total)</u>

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

1. **Bhattacharya J**, Garber AM, MaCurdy T. "Cause-Specific Mortality Among Medicare Enrollees," in <u>Inquires in the Economics of Aging</u>, D Wise (ed.), Chicago, IL: University of Chicago Press. (1997).

2. MaCurdy T, Nechyba T, **Bhattacharya J**. "Ch. 2: An Economic Model of the Fiscal Impacts of Immigration," <u>The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration</u>, J Smith (ed.), National Academy of Sciences Commission on Behavioral and Social Sciences and Education: Washington D.C., (1998).

3. **Bhattacharya J**, Currie J. "Youths and Nutritional Risk: Malnourished or Misnourished?" in <u>Risky Behavior Among Youths</u>, J Gruber (ed.), (2001).

4. Yoshikawa A. and **Bhattacharya J**. "Japanese Health Care" in <u>World Health Systems: Challenges and Perspectives</u>, Bruce Fried and Laura M. Gaydos (eds.), Chicago, IL: Health Administration Press (2002).

5. **Bhattacharya J**, Cutler D, Goldman DP, Hurd MD, Joyce GF, Lakdawalla DN, Panis CWA, and Shang B, "Disability Forecasts and Future Medicare Costs" <u>Frontiers in Health Policy Research, Vol. 6</u>, Alan Garber and David Cutler (eds.) Boston, MA: MIT Press (2003).

6. **Bhattacharya J**, Choudhry K, and Lakdawalla D. (2007) "Chronic Disease and Trends in Severe Disability in Working Age Populations" Proceedings from the Institute of Medicine workshop, 'Disability in America: An Update,' Institute of Medicine: Washington, D.C.

7. **Bhattacharya J**, Garber AM, MaCurdy T. "Trends in Prescription Drug Use by the Disabled Elderly" in <u>Developments in the Economics of Aging</u>, D. Wise (ed), Chicago, IL, University of Chicago Press (2009).

8. **Bhattacharya J** and Richmond P "On Work and Health Among the American Poor" in <u>Pathways to Self-Sufficiency: Getting Ahead in an Era Beyond Welfare Reform</u> John Karl Scholz and Carolyn Heinrich (eds), New York, NY, Russell Sage Foundation (2009).

9. **Bhattacharya J**, Garber A, MaCurdy T "The Narrowing Dispersion of Medicare Expenditures 1997-2005" in Research Findings in the Economics of Aging, D. Wise (ed.), Chicago, IL, University of Chicago Press (2010)

10. **Bhattacharya J**, Bundorf MK, Pace N, and Sood N "Does Health Insurance Make You Fat?" in <u>Economic Aspects of Obesity</u> Michael Grossman and Naci Mocan (eds.), Chicago, IL, University of Chicago Press (2010)

11. **Bhattacharya J**, Garber A, Miller M, and Perlroth D "The Value of Progress against Cancer in the Elderly" <u>Investigations in the Economics of Aging</u>, David Wise (ed), Chicago, IL, University of Chicago Press (2012)

12. Yoshikawa A. and **Bhattacharya J**. "Japanese Health Care" in <u>World Health Systems: Challenges and Perspectives, 2nd edition</u>, Bruce Fried and Laura M. Gaydos (eds.), Chicago, IL: Health Administration Press (2012).

13. Hanson, J., Chandra, A., Moss, E., **Bhattacharya, J.** Wolfe, B., Pollak, S.D.. Brain Development and Poverty: Preliminary Findings. In <u>Biological Consequences of</u>

**JAY BHATTACHARYA, M.D., Ph.D.**                                      September 2021

Socioeconomic Inequalities. B. Wolfe, T. Seeman, and W. Evans (Eds). NY: Sage. (2012)

14. **Bhattacharya J** "The Diffusion of New Medical Technologies: The Case of Drug-Eluting Stents (A Discussion of Chandra, Malenka, and Skinner)" In Explorations in the Economics of Aging, David Wise (ed.), Chicago, IL, University of Chicago Press (2014).

15. MaCurdy T and **Bhattacharya J** "Challenges in Controlling Medicare Spending: Treating Highly Complex Patients" in Insights in the Economics of Aging, David Wise (ed.) Chicago, IL, University of Chicago Press (2015).

ABSTRACTS (3)

1. Su CK and **Bhattacharya J**. Longitudinal Hospitalization Costs and Outcomes in the Treatment of the Medicare Breast Cancer Patient. *International Journal of Radiation Oncology Biology Physics* (1996); 36(S1): 282. [abstract]

2. Nguyen C, Hernandez-Boussard T., Davies S, **Bhattacharya J**, Khosla R, Curtin C. *Cleft Palate Surgery: Variables of Quality and Patient Safety*. Presented at the 69th Annual American Cleft-Palate Craniofacial Association (2012). [abstract]

3. Patel MI, Ramirez D, Agajanian R, Bhattacharya J, Milstein A, Bundorf MK. "The effect of a lay health worker-led symptom assessment intervention for patients on patient-reported outcomes, healthcare use, and total costs." Journal of Clinical Oncology 36(15 Suppl):6502 [abstract]

**D. PUBLIC AND PROFESSIONAL SERVICE:**

JOURNAL EDITING
*Journal of Human Capital,* Associate Editor (2015-present)
*American Journal of Managed Care,* Guest Editor (2016)
*Journal of Human Resources,* Associate Editor (2011-13)
*Forum for Health Economics & Policy*, Editorial Board Member (2001-2012)
*Economics Bulletin*, Associate Editor (2004-2009)

SERVICE ON SCIENTIFIC REVIEW AND ADVISORY COMMITTEES (Selected)
⌡ Standing member of the Health Services Organization and Delivery (HSOD) NIH review panel, 2012-2016
⌡ NIH reviewer (various panels, too numerous to list) 2003-present
⌡ NIH Review Panel Chair:  2018 (P01 review), 2020 (DP1 review).
⌡ Invited Reviewer for the European Research Council, ERC Advanced Grant 2015 RFP
⌡ NIH Stage 2 Challenge Grant Review Panel, July 2009
⌡ Appointed a member of an Institute of Medicine (IOM) panel on the regulation of work hours by resident physicians, 2007-8.
⌡ Standing member of the NIH Social Science and Population Studies Review Panel, Fall 2004-Fall 2008

(264 of 289), Page 264 of 289    Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 264 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.551    Page 112
of 137

**JAY BHATTACHARYA, M.D., Ph.D.**                                    **September 2021**

⟩ Invited Reviewer for National Academy of Sciences report on Food Insecurity and Hunger, November 2005.

⟩ Invited Reviewer for the National Academy of Sciences report on the Nutrition Data Infrastructure, December 2004

⟩ Invited Reviewer for the National Institute on Health (NIH) Health Services Organization and Delivery Review Panel, June 2004, Alexandria, VA.

⟩ Invited Reviewer for the Food Assistance and Nutrition Research Program US Department of Agriculture Economic Research Service Research Proposal Review Panel, June 2004, Stanford, CA.

⟩ Invited Reviewer for the National Institute on Health (NIH) Social Science and Population Studies Review Panel, February 2004, Alexandria, VA.

⟩ Invited Reviewer for the National Institute on Health (NIH) Social Sciences and Population Studies Review Panel, November 2003, Bethesda, MD.

⟩ Invited Reviewer for the National Institute on Health (NIH) Social Science, Nursing, Epidemiology, and Methods (3) Review Panel, June 2003, Bethesda, MD.

⟩ Invited Reviewer for the Food Assistance and Nutrition Research Program US Department of Agriculture Economic Research Service Research Proposal Review Panel, August 2002.

⟩ Research Advisory Panel on Canadian Disability Measurement, Canadian Human Resources Development Applied Research Branch, June 2001 in Ottawa, Canada.

⟩ Invited Reviewer for the National Institute of Occupational Safety and Health R18 Demonstration Project Grants Review panel in July 2000, Washington D.C.

⟩ Research Advisory Panel on Japanese Health Policy Research.  May 1997 at the Center for Global Partnership, New York, NY.

<u>TESTIMONY TO GOVERNMENTAL PANELS</u> AND AGENCIES (9)

⟩ US Senate Dec. 2020 hearing of the Subcommittee on Homeland Security and Governmental Affairs.  Testimony provided on COVID-19 mortality risk, collateral harms from lockdown policies, and the incentives of private corporations and the government to invest in research on low-cost treatments for COVID-19 disease

⟩ "Roundtable on Safe Reopening of Florida" led by Florida Gov. Ron DeSantis. September 2020.

⟩ "Evaluation of the Safety and Efficacy of COVID-19 Vaccine Candidates" July 2020 hearing of the House Oversight Briefing to the Economic and Consumer Policy Subcommittee.

⟩ US Senate May 2020 virtual roundtable. Safely Restarting Youth Baseball and Softball Leagues, invited testimony

⟩ "Population Aging and Financing Long Term Care in Japan" March 2013 seminar at the Japanese Ministry of Health.

⟩ "Implementing the ACA in California" March 2011 testimony to California Legislature Select Committee on Health Care Costs.

⟩ "Designing an Optimal Data Infrastructure for Nutrition Research" June 2004 testimony to the National Academy of Sciences commission on "Enhancing the Data Infrastructure

JAY BHATTACHARYA, M.D., Ph.D.                                    September 2021

in Support of Food and Nutrition Programs, Research, and Decision Making,"
Washington D.C.

) "Measuring the Effect of Overtime Reform" October 1998 testimony to the California
Assembly Select Committee on the Middle Class, Los Angeles, CA.

) "Switching to Weekly Overtime in California."  April 1997 testimony to the California
Industrial Welfare Commission, Los Angeles, CA.

<u>REFEREE FOR RESEARCH JOURNALS</u>

American Economic Review; American Journal of Health Promotion; American Journal of
Managed Care; Education Next; Health Economics Letters; Health Services Research; Health
Services and Outcomes Research Methodology; Industrial and Labor Relations Review;
Journal of Agricultural Economics; Journal of the American Medical Association; Journal of
Health Economics; Journal of Health Policy, Politics, and Law; Journal of Human Resources;
Journal of Political Economy; Labour Economics; Medical Care; Medical Decision Making;
Review of Economics and Statistics; Scandinavian Journal of Economics; Social Science and
Medicine; Forum for Health Economics and Policy; Pediatrics; British Medical Journal

| Trainee | Current Position |
| --- | --- |
| Peter Groeneveld, MD, MS | Associate Professor of Medicine, University of Pennsylvania |
| Jessica Haberer, MD, MS | Assistant Professor of Medicine, Harvard Medical School |
| Melinda Henne, MD, MS | Director of Health Services Research, Bethesda Naval Hospital |
| Byung-Kwang Yoo, MD, PhD | Associate Professor, Public Health, UC Davis |
| Hau Liu, MD, MS, MBA | Chief Medical Officer at Shanghai United Family Hospital |
| Eran Bendavid, MD, MS | Assistant Professor, General Medicine Disciplines, Stanford University |
| Kaleb Michaud, MS, PhD | Associate Professor of Medicine, Rheumatology and Immunology, University of Nebraska Medical Center |
| Kanaka Shetty, MD | Natural Scientist, RAND Corporation |
| Christine Pal Chee, PhD | Associate Director of the Health Economics Resource Center, Palo Alto VA |
| Matthew Miller, MD | VP Clinical Strategy and Head of Innovation, Landmark Health |
| Vincent Liu, MD | Research Scientist, Kaiser Permanente Northern California Division of Research |
| Daniella Perlroth, MD | Chief Data Scientist, Lyra Health |
| Crystal Smith-Spangler, MD | Internist, Palo Alto Medical Foundation |
| Barrett Levesque, MD MS | Assistant Professor of Clinical Medicine, UC San Diego Health System |
| Torrey Simons, MD | Clinical Instructor, Department of Medicine, Stanford University |
| Nayer Khazeni, MD | Assistant Professor of Medicine (Pulmonary and Critical Care Medicine), Stanford University |
| Monica Bhargava, MD MS | Assistant Clinical Professor, UCSF School of Medicineilan |
| Dhruv Kazi, MD | Assistant Professor, UCSF School of Medicine |
| Zach Kastenberg, MD | Resident, Department of Surgery, Stanford University |
| Kit Delgado, MD | Assistant Professor, Department of Emergency Medicine and Faculty Fellow, University of Pennsylvania |
| Suzann Pershing, MD | Chief of Ophtalmology for the VA Palo Alto Health Care System |
| KT Park, MD | Assistant Professor, Department of Medicine, Stanford University |
| Jeremy Goldhaber-Fiebert, PhD | Associate Professor, Department of Medicine, Stanford University |
| Sanjay Basu, MD | Assistant Professor, Department of Medicine, Stanford University |
| Marcella Alsan, MD, PhD | Assistant Professor, Department of Medicine (CHP/PCOR), Stanford Univ. |
| David Chan, MD, PhD | Assistant Professor, Department of Medicine (CHP/PCOR), Stanford Univ. |
| Karen Eggleston, PhD | Senior Fellow, Freeman Spogli Institute, Stanford University |
| Kevin Erickson, MD | Assistant Professor, Department of Nephrology, Baylor College of Medicine |
| Ilana Richman, MD | VA Fellow at CHP/PCOR, Stanford University |

**JAY BHATTACHARYA, M.D., Ph.D.**                                                     September 2021

| | |
|---|---|
| Alexander Sandhu, MD | VA Fellow at CHP/PCOR, Stanford University |
| Michael Hurley | Medical Student, Stanford University |
| Manali Patel, MD | Instructor, Department of Medicine (Oncology), Stanford University |
| Dan Austin, MD | Resident Physician, Department of Anesthesia, UCSF School of Medicine |
| Anna Luan, MD | Resident Physician, Department of Medicine, Stanford University |
| Louse Wang | Medical Student, Stanford University |
| Christine Nguyen, MD | Resident Physician, Department of Medicine, Harvard Medical School |
| Josh Mooney, MD | Instructor, Department of Medicine (Pulmonary and Critical Care Medicine), Stanford University |
| Eugene Lin, MD | Fellow, Department of Medicine (Nephrology), Stanford University |
| Eric Sun, MD | Assistant Professor, Department of Anesthesia, Stanford University |
| Sejal Hathi | Medical Student, Stanford University |
| Ibrahim Hakim | Medical Student, Stanford University |
| Archana Nair | Medical Student, Stanford University |
| Trishna Narula | Medical Student, Stanford University |
| Daniel Vail | Medical Student, Stanford University |
| Tej Azad | Medical Student, Stanford University |
| Jessica Yu, MD | Fellow, Department of Medicine (Gastroenterology), Stanford University |
| Daniel Vail | Medical Student, Stanford University |
| Alex Sandhu, MD | Fellow, Department of Medicine (Cardiology), Stanford University |
| Matthew Muffly, MD | Clinical Assistant Professor, Dept. of Anesthesia, Stanford University |

**Dissertation Committee Memberships**

| | | | |
|---|---|---|---|
| Ron Borzekowski | Ph.D. in Economics | Stanford University | 2002 |
| Jason Brown | Ph.D. in Economics | Stanford University | 2002 |
| Dana Rapaport | Ph.D. in Economics | Stanford University | 2003 |
| Ed Johnson | Ph.D. in Economics | Stanford University | 2003 |
| Joanna Campbell | Ph.D. in Economics | Stanford University | 2003 |
| Neeraj Sood[*] | Ph.D. in Public Policy | RAND Graduate School | 2003 |
| James Pearce | Ph.D. in Economics | Stanford University | 2004 |
| Mikko Packalen | Ph.D. in Economics | Stanford University | 2005 |
| Kaleb Michaud[*] | Ph.D. in Physics | Stanford University | 2006 |
| Kyna Fong | Ph.D. in Economics | Stanford University | 2007 |
| Natalie Chun | Ph.D. in Economics | Stanford University | 2008 |
| Sriniketh Nagavarapu | Ph.D in Economics | Stanford University | 2008 |
| Sean Young | Ph.D. in Psychology | Stanford University | 2008 |
| Andrew Jaciw | Ph.D. in Education | Stanford University | 2010 |
| Chirag Patel | Ph.D. in Bioinformatics | Stanford University | 2010 |
| Raphael Godefroy | Ph.D. in Economics | Stanford University | 2010 |
| Neal Mahoney | Ph.D. in Economics | Stanford University | 2011 |
| Alex Wong | Ph.D. in Economics | Stanford University | 2012 |
| Kelvin Tan | Ph.D. in Management Science | Stanford University | 2012 |
| Animesh Mukherjee | Masters in Liberal Arts Program | Stanford University | 2012 |
| Jeanne Hurley | Masters in Liberal Arts Program | Stanford University | 2012 |
| Patricia Foo | Ph.D. in Economics | Stanford University | 2013 |
| Michael Dworsky | Ph.D. in Economics | Stanford University | 2013 |
| Allison Holliday King | Masters in Liberal Arts Program | Stanford University | 2013 |
| Vilsa Curto | Ph.D. in Economics | Stanford University | 2015 |
| Rita Hamad | Ph.D. in Epidemiology | Stanford University | 2016 |
| Atul Gupta | Ph.D. in Economics | Stanford University | 2017 |
| Yiwei Chen | Ph.D. in Economics | Stanford University | 2019 |
| Yiqun Chen | Ph.D. in Health Policy | Stanford University | 2020 |
| Min Kim | Ph.D. in Economics | Iowa State Univ. | 2021 |
| Bryan Tysinger | Ph.D. in Public Policy | RAND Graduate School | 2021 |

(267 of 289), Page 267 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 267 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.554    Page 115
of 137

**JAY BHATTACHARYA, M.D., Ph.D.**                    **September 2021**

## E.  GRANTS AND PATENTS

<u>PATENT</u> (2)

1. "Environmental Biomarkers for the Diagnosis and Prognosis for Type 2 Diabetes Mellitus" with Atul Butte and Chirag Patel (2011), US Patent (pending).
2. "Health Cost and Flexible Spending Account Calculator" with Schoenbaum M, Spranca M, and Sood N (2008), U.S. Patent No. 7,426,474.

<u>GRANTS AND SUBCONTRACTS</u> (42)

CURRENT (6)

| | |
|---|---|
| 2019-2020 | Funder: Acumen, LLC. |
| | Title: Quality Reporting Program Support for the Long-Term Care Hospital, Inpatient Rehabilitation Facility, Skilled Nursing Facility QRPs and Nursing Home Compare |
| | Role: PI |
| 2018-2020 | Funder: Acumen, LLC. |
| | Title: Surveillance Activities of Biologics |
| | Role: PI |
| 2018-2020 | Funder: France-Stanford Center for Interdisciplinary Studies |
| | Title: A Nutritional Account of Global Trade: Determinants and Health Implications |
| | Role: PI |
| 2017-2023 | Funder: National Institutes of Health |
| | Title: The Epidemiology and Economics of Chronic Back Pain |
| | Role: Investigator (PI: Sun) |
| 2017-2021 | Funder: National Institutes of Health |
| | Title: Big Data Analysis of HIV Risk and Epidemiology in Sub-Saharan Africa |
| | Role: Investigator (PI: Bendavid) |
| 2016-2020 | Funder: Acumen, LLC. |
| | Title: MACRA Episode Groups and Resource Use Measures II |
| | Role: PI |

PREVIOUS (36)

| | |
|---|---|
| 2016-2018 | Funder: University of Kentucky |
| | Title: Food acquisition and health outcomes among new SNAP recipients since the Great Recession |
| | Role: PI |
| 2015-2019 | Funder: Alfred P. Sloan Foundation |

**JAY BHATTACHARYA, M.D., Ph.D.**                                    **September 2021**

|  |  |
|---|---|
|  | Title: Public versus Private Provision of Health Insurance |
|  | Role: PI |
| 2015-2019 | Funder: Natural Science Foundation |
|  | Title: Health Insurance Competition and Healthcare Costs |
|  | Role: Investigator (PI: Levin) |
| 2014-2015 | Funder: The Centers for Medicare and Medicaid Services |
|  | Title: Effect of Social Isolation and Loneliness on Healthcare Utilization |
|  | Role: PI |
| 2014-2015 | Funder: AARP |
|  | Title: The Effect of Social Isolation and Loneliness on Healthcare Utilization and Spending among Medicare Beneficiaries |
|  | Role: PI |
| 2013-2019 | Funder: National Bureau of Economic Research |
|  | Title: Innovations in an Aging Society |
|  | Role: PI |
| 2013-2014 | Funder: Robert Wood Johnson Foundation |
|  | Title: Improving Health eating among Children through Changes in Supplemental Nutrition Assistance Program (SNAP) |
|  | Role: Investigator (PI: Basu) |
| 2011-2016 | Funder: National Institutes of Health (R37) |
|  | Title: Estimating the Potential Medicare Savings from Comparative Effectiveness Research |
|  | Role: PI Subaward (PI: Garber) |
| 2011-2016 | Funder: National Institute of Aging (P01) |
|  | Title: Improving Health and Health Care for Minority and Aging Populations |
|  | Role: PI Subcontract (PI: Wise) |

(269 of 289), Page 269 of 289
Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 269 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.556    Page 117
of 137

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

| | |
|---|---|
| 2010-2018 | Funder: National Institutes of Health |
| | Title: Clinic, Family & Community Collaboration to Treat Overweight and Obese Children |
| | Role: Investigator (PI: Robinson) |
| 2010-2014 | Funder: Agency for Health, Research and Quality (R01) |
| | Title: The Effects of Private Health Insurance in Publicly Funded Programs |
| | Role: Investigator (PI: Bundorf) |
| 2010-2013 | Funder: Agency for Healthcare Research and Quality |
| | Title: G-code" Reimbursement and Outcomes in Hemodialysis |
| | Role: Investigator (PI: Erickson) |
| 2010-2013 | Funder: University of Southern California |
| | Title: The California Medicare Research and Policy Center |
| | Role: PI |
| 2010-2012 | Funder: University of Georgia |
| | Title: Natural Experiments and RCT Generalizability: The Woman's Health Initiative |
| | Role: PI |
| 2010-2011 | Funder: National Bureau of Economic Research |
| | Title: Racial Disparities in Health Care and Health Among the Elderly |
| | Role: PI |
| 2009-2020 | Funder: National Institute of Aging (P30) |
| | Title: Center on the Demography and Economics of Health and Aging |
| | Role: PI (2011-2020) |
| 2009-2011 | Funder: Rand Corporation |
| | Title: Natural Experiments and RCT Generalizability: The Woman's Health Initiative |
| | Role: PI |
| 2008-2013 | Funder: American Heart Association |
| | Title: AHA-PRT Outcomes Research Center |
| | Role: Investigator (PI: Hlatky) |
| 2007-2009 | Funder: National Institute of Aging (R01) |
| | Title: The Economics of Obesity |
| | Role:  PI |
| 2007-2009 | Funder:  Veterans Administration, Health Services Research and Development Service |
| | Title: Quality of Practices for Lung Cancer Diagnosis and Staging |
| | Role: Investigator |
| 2007-2008 | Funder: Stanford Center for Demography and Economics of Health and Aging |
| | Title: The HIV Epidemic in Africa and the Orphaned Elderly |

(270 of 289), Page 270 of 289   Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 270 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.557    Page 118
of 137

**JAY BHATTACHARYA, M.D., Ph.D.**                                   September 2021

|  |  |
|---|---|
|  | Role: PI |
| 2007 | Funder: University of Southern California |
|  | Title: The Changes in Health Care Financing and Organization Initiative |
|  | Role: PI |
| 2006-2010 | Funder: National Institute of Aging (K02) |
|  | Title: Health Insurance Provision for Vulnerable Populations |
|  | Role: PI |
| 2006-2010 | Funder: Columbia University/Yale University |
|  | Title: Dummy Endogenous Variables in Threshold Crossing Models, with Applications to Health Economics |
|  | Role: PI |
| 2006-2007 | Funder: Stanford Center for Demography and Economics of Health and Aging |
|  | Title: Obesity, Wages, and Health Insurance |
|  | Role: PI |
| 2005-2009 | Funder: National Institute of Aging (P01 Subproject) |
|  | Title: Medical Care for the Disabled Elderly |
|  | Role: Investigator (PI: Garber) |
| 2005-2008 | Funder: National Institute of Aging (R01) |
|  | Title: Whom Does Medicare Benefit? |
|  | Role: PI Subcontract (PI: Lakdawalla) |
| 2002 | Funder: Stanford Center for Demography and Economics of Health and Aging |
|  | Title: Explaining Changes in Disability Prevalence Among Younger and Older American Populations |
|  | Role: PI |
| 2001-2003 | Funder: Agency for Healthcare Research and Quality (R01) |
|  | Title: State and Federal Policy and Outcomes for HIV+ Adults |
|  | Role: PI Subcontract (PI: Goldman) |
| 2001-2002 | Funder: National Institute of Aging (R03) |
|  | Title: The Economics of Viatical Settlements |
|  | Role: PI |
| 2001-2002 | Funder: Robert Woods Johnson Foundation |
|  | Title: The Effects of Medicare Eligibility on Participation in Social Security Disability Insurance |
|  | Role: PI Subcontract (PI: Schoenbaum) |
| 2001-2002 | Funder: USDA |
|  | Title: Evaluating the Impact of School Breakfast and Lunch |
|  | Role: Investigator |
| 2001-2002 | Funder: Northwestern/Univ. of Chicago Joint Center on Poverty |
|  | Title: The Allocation of Nutrition with Poor American Families |
|  | Role: PI Subcontract          (PI: Haider) |
| 2000-2002 | Funder: National Institute on Alcohol Abuse & Alcoholism (R03) |
|  | Title: The Demand for Alcohol Treatment Services |
|  | Role: PI |
| 2000-2001 | Funder: USDA |
|  | Title: How Should We Measure Hunger? |

(271 of 289), Page 271 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 271 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.558    Page 119
of 137

**JAY BHATTACHARYA, M.D., Ph.D.**                                    September 2021

Role: PI Subcontract (PI: Haider)

## F.  SCHOLARSHIPS AND HONORS

- Phi Beta Kappa Honor Society, 1988
- Distinction and Departmental Honors in Economics, Stanford University, 1990
- Michael Forman Fellowship in Economics, Stanford University, 1991-1992
- Agency for Health Care Policy and Research Fellowship 1993-1995
- Outstanding Teaching Assistant Award, Stanford University, Economics, 1994
- Center for Economic Policy Research, Olin Dissertation Fellowship, 1997-1998
- Distinguished Award for Exceptional Contributions to Education in Medicine, Stanford University, 2005, 2007, and 2013.
- Dennis Aigner Award for the best applied paper published in the *Journal of Econometrics*, 2013

# EXHIBIT C



# WASHINGTON STATE
## ATHLETICS

November 12, 2021

Nicholas R. Rolovich
1815 SW Casey Court
Pullman, WA  99163

**RE:    Notice of Decision to Terminate for Just Cause**

Mr. Rolovich:

Pursuant to Paragraph 4.2 of your employment agreement, this letter constitutes notice of termination for just cause from your employment as head football coach at Washington State University, effective immediately.

This decision has been made after careful review and consideration of your lengthy and detailed response, which includes many inaccurate statements and legal claims.  I did not find your response persuasive and will not respond to each and every contention. However, please note the following:

- **Background:** Per the Governor's Proclamation 21-14.1, all state employees, including those in higher education, were required to be fully vaccinated against COVID-19 by October 18, 2021, unless they had an approved medical or religious accommodation. You requested an exemption/accommodation on religious grounds, which the University denied on October 18, 2021, thereby rendering you in violation of the Proclamation and ineligible for continuing employment at Washington State University. On October 18, 2021, the University issued you written notice of its intent to terminate your employment for just cause in accordance with the Proclamation and your contract of employment.

- **Regarding the University's decision that granting an exemption would cause undue hardship to the Athletic Department and the University:** You claim that your ability to fulfill your duties as head football coach has not been and would not be impacted by your vaccination status.  This is false.  Your performance of your duties has been significantly hindered and would continue to be as long as you are unvaccinated, notwithstanding any reasonable accommodations that might be implemented.  Your activities have had to be continually and severely limited to a much greater extent than if you had been vaccinated, in order to mitigate the risk of you becoming infected or infecting others. In addition to the information WSU provided you and your attorney in

Washington State University | Department of Intercollegiate Athletics | Office of the Director
Bohler Athletic Complex 110, PO Box 641602, Pullman, WA 99164-1602 | 509-335-0200 | Fax: 509-335-4501 | www.wsucougars.com

ER1360

previous documents, including the October 18, 2021, Notice of Intent to Terminate for Just Cause, I note the following:

- ○ The Pac-12 Conference, not the University, barred you from attending Pac-12 Media Day in person due to the vaccination requirement for head coaches. You were the only Pac-12 head coach unvaccinated and unable to attend in-person. Instead of showcasing our student athletes and the WSU football program, you became the story. You claim this was not your choice and that other conferences operate differently. This completely misses the point. It was your choice not to get vaccinated, and your job required you to be successful and operate as a *Pac-12 head football coach*, which means adhering to Pac-12 rules.

- ○ You have been significantly hindered in your ability to successfully contact and recruit prospective student-athletes, because you have been restricted from attending any locale that has vaccine requirements, including high schools, high school sporting events, junior colleges, other universities' sporting events, or other prospect camps. Vitally important recruiting areas, especially on the west coast, including California and western Washington, which are historically WSU's most significant geographical areas for recruiting, are essentially inaccessible to you as a recruiter. Moreover, Hawaii, a state where you have extensive ties and should be able to recruit in-person with a high level of success, also has very stringent COVID-19 restrictions, which have limited your ability to successfully recruit in that state. Over 2/3 of our current football roster has student-athletes who reside from the states of Washington, California, Oregon, and Hawaii. WSU cannot sustain a successful football program if coaches are limited in recruiting locations.

- ○ Aside from the restrictions noted above, non-competition travel by unvaccinated coaches requires a quarantine upon return to campus. This has limited your ability to be on the road during key recruiting periods and reduced the number of days you can spend traveling for recruiting purposes. Also, WSU cannot risk losing recruits who refuse to visit campus because Athletics is accommodating unvaccinated coaches.

- ○ As a result of your recruiting limitations, the football program's recruiting statistics and verbal commitments for the 2022 recruiting cycle have been directly impacted and are unacceptably low. You personally stated your expectation of signing a full class, which would mean a minimum of 25 initial signees. Contrary to your claim, NCAA regulations would not have prevented you from signing more prospective student-athletes; it was

(275 of 289), Page 275 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 275 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.562    Page 123
of 137

your responsibility to manage the roster to incorporate a full class of new student-athletes. Recruiting at the level of a Pac-12 Conference institution requires a robust recruiting plan and effort.

o Because you are unvaccinated, you were required to quarantine after travel, which limited your participation in many important activities, including donor meetings. You appear to acknowledge this by explicitly stating you deliberately chose not to attend certain in-person donor events, which you had previously agreed to attend and were on your schedule. However, every Pac-12 head football coach must be able to regularly attend donor visits and events and actively engage in marketing efforts, in addition to other duties. Because you were unvaccinated, your ability to interact with key constituents, including students, donors, fans, and others, was severely impacted.

o The Athletic Department has incurred significant costs associated with the need to test you and other unvaccinated football coaches for COVID-19 on a daily basis. The Pac-12 requires a minimum of three (3) tests per week for unvaccinated staff, in addition to pre-competition testing, and the Athletic Department policy requires daily testing. PCR testing, which must occur at least weekly for unvaccinated individuals and 72 hours prior to competition or travel, costs approximately $100 per test. The cost for testing alone of unvaccinated staff from August 2021 through final tests on October 18, 2021, was $10,000. In addition to that cost, because of the workload of increased testing caused by you and other unvaccinated coaches, the Athletics Department was required to hire additional staff to assist in COVID-19 testing, at considerable expense. It is important to note that these testing requirements do not apply to vaccinated players and staff, and that football was the only intercollegiate athletic program at WSU to have unvaccinated coaching staff.

o Overwhelming scientific evidence establishes the efficacy of the vaccine in mitigating the spread of COVID-19 and preventing severe disease. By refusing to support, and by you and your staff at times actively opposing, the University's COVID-19 education and vaccination efforts, and by setting a very public example, you have undermined the University's efforts to promote student safety. Although numbers are gradually improving, the football program has the lowest student-athlete vaccination rate of any intercollegiate athletics team at WSU and among the lowest rate in the Pac-12. The football program experienced COVID-19 outbreaks in fall 2020 and spring 2021 that far exceeded any outbreaks among other intercollegiate athletics teams at WSU. In addition, WSU had

(276 of 289), Page 276 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 276 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.563    Page 124
of 137

to miss or reschedule several of the seven scheduled games in the restructured fall 2020 football season, including two cancellations.

- **Regarding the University's decision that you do not have a sincerely held religious belief that conflicts with the University's vaccine requirement:**
  - Prior to the Governor's proclamation, and since the beginning of the pandemic, you openly and freely expressed your opposition to the vaccine and other COVID-19 mitigation efforts on numerous occasions to numerous people, citing your own "scientific" research and making statements mirroring several specific online conspiracy theories, which included demonstrably false claims. In addition, at no point did you ever mention any religious concerns (ex: regarding fetal tissue). Therefore, your current claim that your private, unexpressed concerns were actually religious in nature is simply not credible. Your statement that you and some of your staff had unsuccessfully tried to secure documentation for a medical exemption undermines your claim. Only *after* it became clear that a religious exemption was your only other option did you claim to have religious beliefs that conflict with the vaccine requirement. It is understandable that you would want the University's review to exclude information regarding your own prior statements in its decision; however, under EEOC Guidance, these are appropriate considerations, and your assertion to the contrary is false. Further, under EEOC Guidance, personal or philosophical beliefs do not give an individual a basis to claim a religious exemption.

- **Regarding the University's exemption process**:
  - Contrary to your claims, the University followed its process. You claim the University guaranteed a blind review of your request for a religious exemption and that it was improper for the Athletics Department to provide information contradicting your claim. Nothing in WSU's policy states or implies that it was improper for the Athletics Department to provide additional information bearing on this question. The committee's initial review is "blind" and based solely on information provided by the employee; however, once the committee makes its initial determination, the employee's unit is informed of the initial determination and has an opportunity to provide information specific to that employee and their job duties. The Athletics Department did not receive information about your request until it was appropriate for it to do so in accordance with the

(277 of 289), Page 277 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 277 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.564    Page 125
of 137

process. Further, the religious exemption request form is clear that "additional follow up information" may be sought, and there is nothing that limits WSU to information provided by the employee.

- ○ You claim that if WSU had concerns about the sincerity of your religious beliefs, it was required to allow you to submit additional information. Again, however, the religious exemption request form uses the permissive "may," not "shall." Moreover, your November 2, 2021, response to the notice of intent to terminate provides ample additional information regarding your request for a religious exemption, and I do not find this information persuasive. As discussed above, your prior statements, as well as the timing of your request for a religious exemption, indicate that your objection to the vaccine requirement was based on factors other than religion.

- ○ Finally, you claim that the Athletics Department and I "overturned" the accommodation recommendations of WSU's Environmental Health and Safety (EHS). This is false. As part of the normal process, EHS provided information regarding possible accommodations but, consistent with the University's process, did not make a decision on this issue or even a recommendation regarding undue hardship. The October 14, 2021, memorandum from EHS clearly states, "EHS will not determine whether these interventions and countermeasures fundamentally alter the employee's job and cannot be accommodated."

- **Regarding your insubordination and threat of violence:**
  - ○ You claim you were merely expressing your "frustration with, and dislike of June Jones," and that you would never physically harm him. However, your exact words were, "I don't want to see that mother f*cker and will fight him if you bring him out to practice." Your tone and profanity during that interaction were deeply concerning and demonstrated a lack of self-control. The clear implication was that violence was in fact possible and actually intended against your former mentor and coach. Although you may have been frustrated, this is clearly a threat of physical violence and an attempt to obstruct the Athletics Department's contingency plans for the football program.

Finally, your claims of "bias" or "hostility" towards your religion are misguided. My primary concern, as the WSU Director of Athletics, has always been the well-being of the student-athletes under your supervision as we attempt to build a successful WSU football program. Diversity and inclusion are in our Department's core values and

adhered to on a daily basis. This includes respect for people's personal religious practices (like you, I am also a practicing Catholic), which further reinforces the baseless nature of this claim.

Based on the above, as well as the information in the October 18, 2021, Notice of Intent to Terminate for Cause and the other documents submitted in the religious exemption process and provided to your attorney, which are attached and incorporated herein, I find that you violated each of the sections of your contract outlined in the Notice of Intent to Terminate for Cause and that these violations were deliberate, serious, and seriously prejudicial to the University and the football program, thereby warranting termination for just cause.

Pursuant to Paragraph 4.3 of your employment agreement, you have fifteen (15) calendar days to appeal this decision to the University President.  However, your right to receive any payment under your employment agreement shall cease November 15, 2021, the day after this letter is issued, and you are not entitled to receive any compensation pending the appeal.

Sincerely,

Patrick Chun
Director of Athletics

Enc.
1.  Notice of Intent to Terminate for Just Cause
2.  September 28, 2021, email from HRS with instructions for completing the religious exemption form
3.  October 6, 2021, notification to Athletics from HRS Exemptions
4.  October 13, 2021, memorandum from Athletics regarding undue hardship
5.  October 13, 2021, supplemental memorandum from Athletics regarding sincerely held religious belief
6.  October 14, 2021, memorandum from EHS
7.  October 18, 2021, memorandum from Athletics to HRS/EHS
8.  October 18, 2021, email from HRS exemptions with notice of denial of religious exemption

cc:    Brian Fahling, Attorney for Nicholas Rolovich
       Danielle Hess, WSU Division Chief, Office of the Attorney General
       Personnel File

ER1365

# EXHIBIT D

# EMPLOYMENT AGREEMENT

This Employment Agreement (Agreement) is made between Washington State University (University) and Nicholas R. Rolovich (Employee), and it cancels and replaces any and all prior employment agreements or understandings, whether in writing or otherwise, between these two parties.

1. **Employment Position**

   1.1. **Employment as Employee of University**. Employee shall serve as the Head Coach of the University's Intercollegiate Football Program (Football) and shall perform the duties outlined in Section 1.2 herein during the term of this Agreement. Employee is subject to and governed by the terms and conditions of the Agreement.

   1.2 **Description of Employee's responsibilities**

   1.2.1 **Recognition of duties**. Employee agrees to devote Employee's best efforts to the performance of their duties for the University, and to comply with and support all rules, regulations, policies, and decisions established or issued by the University. Employee agrees to abide by all provisions of law, including the Washington State Ethics in Public Service Law, RCW 42.52. Employee also agrees during the term of this Agreement that Employee will not engage, directly or indirectly, in any business that would detract from Employee's ability to apply their best efforts to the performance of their duties hereunder. Employee also agrees not to usurp any economic opportunities of the University.

      1.2.1.1 **General duties and responsibilities**. Employee agrees to undertake and perform properly, efficiently, to the best of Employee's ability, and consistent with the standards of the University all duties and responsibilities (as defined in Section **1.2.1.2** and/or Athletic Director) attendant to the position of Head Coach of the University's Football Program. Employee further agrees to abide by and comply with the constitution, bylaws, and interpretations of the National Collegiate Athletic Association (NCAA) and Pac-12 Conference (Pac-12), Title IX of the Education Amendments Act of 1972 (Title IX) including, but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA, Pac-12 and University policy, and all NCAA, Pac-12, and University rules and regulations relating to the conduct and administration of the Football Program as now constituted or as may be amended during the term hereof. In the event Employee becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, Employee shall promptly report the same to the Athletic Director, Director of Compliance, or Faculty Athletic Representative of the University, and cooperate and comply with any related inquiries or investigations. Employee agrees to adhere to, respect, and to follow the academic standards and requirements of the University in regard to the recruitment and eligibility of prospective and current student-athletes for the Football Program. All academic standards, requirements, and policies of the University shall also be observed by Employee at all times.

      1.2.1.2 **Specific duties and responsibilities.** Employee is accountable for the following list of specific duties and responsibilities. This list supplements Employee's other general duties and responsibilities provided elsewhere in this Agreement.

         a. Integrate the Football program into the whole spectrum of academic life to complement the University and its mission in the state and community;

         b. Evaluate, recruit, train, and develop student-athletes to compete successfully against major college competition in a quality Division I Football program;

1

**ER1367**

c. Maintain a competitive Football program consistent with the Athletic Director's goals, which will reasonably be established upon consultation with Employee;

d. Cooperate with and support the University's faculty and administrative officials to ensure that student-athletes participating in the Football program meet all academic requirements;

e. Conduct the Football program with integrity and maintain financial responsibility consistent with the Football program budget, standards, and reasonable expectations of the Athletic Department and the University;

f. Recommend to the Athletic Director the appointment and discharge of assistant Football coaches and all other contracted staff specific to Football. Employee and the Athletic Director shall consult regarding those issues and make reasonable efforts to reach agreement. The Athletic Director shall then make the final decision;

g. Manage the Football program, including, but not limited to, assisting the Athletic Director, or his designee, with Football budget preparation and administration, and the supervision and evaluation of the Football program's staff;

h. Under the direction of the Athletic Director, participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program;

i. Serve as director of instructional youth Football programs to be held in athletic facilities at the University's Pullman campus if deemed applicable;

j. The Athletic Director or his designee may reasonably assign other duties from time to time that are consistent with customary duties of a Head Football Coach at a Division I Football program;

k. Cooperate with any investigation relating to the University's athletic programs, including the Football Program;

l. Ensure full compliance with Title IX of the Education Amendments Act of 1972 (Title IX), including but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA and Pac-12 policy and univeristy policies and regulations; and

m. Any other reasonable duties as assigned by the Athletic Director.

1.3 **Employee subject to discipline for violations of NCAA rules and regulations.** If Employee is found to be in violation of NCAA rules and regulations, including, but not limited to, the ethical conduct expectations as stated in NCAA Bylaws 10.1, 11.1.1, 11.1.2, 11.1.2.1, and 19.01.2, whether while employed by the University or during prior employment at another NCAA member institution, Employee shall be subject to disciplinary or corrective action as set forth through the NCAA enforcement procedures. Further, the University may suspend Employee for a period of time, without pay, or may terminate employment as provided in Section 4.1 hereof if Employee is found to have been involved in or condoned a major violation or a pattern of uncorrected secondary violations of NCAA, Pac-12, or University rules and regulations.

1.4    **Reporting relationship.** Employee shall report to the Athletic Director, or to such other person as the Athletic Director may designate.

1.5    **Staffing.** The University will provide Employee with a full-time staff as allowed by NCAA and Pac-12 rules.

## 2.    Term of Employment

The University hereby employs and Employee accepts employment for the period beginning on January 14, 2020 and ending on June 30, 2025, subject, however, to prior termination in accordance with the provisions set forth in Section 4. Employee is solely responsible for obtaining legal employment status in the United States and is required to report legal status to University. Employee must immediately inform University if legal employment status is denied or revoked. The University may terminate this agreement if Employee is unable to maintain legal employment status in the U.S. On or before May 31, 2025, Employee will receive written notification from the University of its intent to renew or not renew the Agreement. If Employee obtains new employment commencing prior to June 30, 2025, Employee shall notify University immediately, and all payments and fringe benefits under this Agreement shall cease on the date Employee's new employment commences.

## 3.    Compensation

In consideration for the promises he has made in entering into this Agreement, Employee shall be entitled to the compensation set forth herein. All payments from the University are subject to normal deductions and withholding for state, local, and federal taxes and for any retirement or other benefits to which Employee is entitled or in which Employee participates, and are subject to the terms and conditions of Section 4 concerning termination of this Agreement.

3.1    **Base salary.** The base salary paid by the University to Employee for services and satisfactory performance of the terms and conditions of this Agreement shall be at the annual salary rate of $2,000,000 payable by the University in accord with payroll dates and procedures applicable to University employees generally. Employee shall be eligible for consideration for salary increases to the base salary that are authorized and funded by the state of Washington, subject to a determination by the Athletic Director.

3.2    **Compensation for all collateral opportunities.** University shall pay Employee supplemental compensation in the amount of $1,000,000 each employment year for the term of this contract in consideration of any collateral opportunity available to Employee as a Head Coach of the Football team. This supplemental compensation is intended to reflect income paid by third parties to the University for the types of collateral opportunities described herein.  Employee is entitled to receive additional compensation directly from third parties for collateral opportunities not arranged by or in conflict with arrangements made previously by the University with the understanding that Employee must receive prior written approval from the University, which approval shall not be unreasonably withheld. University agrees to pay Employee said compensation in accordance with payroll dates and procedures applicable to general University employees.

3.3    **Fringe benefits.** During the term of this Agreement, the University will provide Employee with the fringe benefits described in this Section 3.2 and no others.

3.3.1    **Standard University fringe benefits.** Employee shall be entitled to the standard University fringe benefits, including group life insurance, family medical coverage, and retirement plan contributions. Retirement contributions shall be made in accordance with the retirement plan selected by Employee and offered through the University. If any benefit/consideration is based in whole or in part upon the salary paid to Employee, such benefit/consideration shall be made without including any collateral compensation or

3

**ER1369**

incentive or supplemental compensation. Notwithstanding the above, Employee shall not accrue nor be entitled to use annual leave.

3.3.2  **Expenses**. The University will reimburse Employee at the rate authorized by state law and University regulations for all travel and out-of-pocket expenses reasonably incurred by Employee for the purpose of and in connection with the performance of Employee's duties under this Agreement.

3.3.3  **Vehicle**. During the term of this Agreement, the University may provide Employee with either: (a) a donated vehicle on a loan basis; or (b) a stipend in the amount of $450 per month in lieu of a donated vehicle. The University has the sole discretion to determine whether to provide the use of the loaned vehicle or the stipend. Employee shall use, maintain, and service any vehicle provided in compliance with the University's written policies and procedures regarding courtesy cars, as those policies now exist or may be amended. The University's courtesy car program is structured as an "accountable plan" for tax purposes, and Employee understands and agrees that Employee shall be taxed on the annual percentage of personal use of the vehicle, which will be calculated from the mileage records submitted by Employee. Employee shall not remove any dealer identification markings placed on the vehicle for promotional purposes.

3.3.4  **Tickets**. University will provide Employee with use of a 12-seat family suite in Martin Stadium for each WSU home Football contest, and up to twenty (20) tickets for each home, away and post-season Football contest in which the University's Football team competes during the term of this Agreement. Tickets to each home game of each of the University's other varsity intercollegiate athletic teams will be provided in non-priority seating sections according to the provisions of the athletic department's ticket policy for staff members. Employee understands and acknowledges that the value of tickets and passes may be considered income to Employee and will be so reported by the University. Employee also understands that the use of tickets and passes will be subject to normal compliance review for complimentary tickets.

3.3.5  **Guest Travel**. Employee may bring spouse and two guests with the Football team on all away team travel trips; or, Employee may bring spouse and dependent children on all away team travel trips on a space available basis. Employee cannot bring two guests and dependent children on the same away team travel trip, however, dependent children can be considered as part of the permissible two guests. Employee, spouse and any guests or children must be traveling with team on the same trip. The University will pay as compensation to Employee all travel and lodging costs associated with bringing spouse and guests or children on the road trips and related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 Conference regulations. Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and guests or children to the contest, including airfare, ground transportation, lodging, and cost of admission to the games and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University. Travel expenses shall be paid in accordance with applicable IRS regulations.

3.3.6  **Guest travel for post-season competition**. Whenever Employee attends post-season athletic competition because the Football team is participating in the event, Employee may elect to bring their spouse and dependent children, regardless of age, to the event and related activities. The University will pay as compensation to Employee all costs associated with bringing Employee's spouse or partner and dependent children to the event and its related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 regulations. Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and dependent children to the event, including, but not limited to, airfare, other travel costs such as rental car or bus fare,

lodging, subsistence, and cost of admission to the game and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University.

3.3.7 **Alaska Lounge**. The University will pay Employee's membership dues to the Alaska Airlines Lounge. Employee understands and acknowledges that the value of this membership may be considered income to the Employee and will be so reported by the University.

3.3.8 **Parking**. The University will provide Employee with two (2) permits for parking purposes for each of the University's home Football contests in Pullman, Washington. Employee understands and acknowledges that the value of tickets and passes may be considered income to the Employee and will be so reported by the University.

3.3.9 **One-time payment.** The University will pay Employee a one-time payment of $561,803 (five hundred sixty-one thousand, eight hundred and three dollars) in order to reimburse Employee for payment of contractual buy-out obligation to former employer. Employee is solely responsible for satisfying any contractual obligations to the former employer. Employee understands and acknowledges that this payment shall be subject to standard withholding applicable to salary payments for Employee's position at the University.

3.3.10 **Golf club membership.** The University, as additional compensation, will pay Employee's membership dues at the Palouse Ridge Country Club. The University will also pay the Employee's fee for joining the club, if any. Employee understands and acknowledges that the value of such membership may be considered income to the Employee and will be so reported by the University.

3.3.11 **On-campus summer camp**. The University has the exclusive right to operate summer youth Football camps on its campus using University facilities. Pursuant to Section 1.2.1.2(i) hereof and subject to Section 3.3.11 hereof, Employee shall direct and participate in the University's summer Football camps. Notwithstanding the provisions of Section 4.3.2 hereof, the coaches of the University's Football program will be compensated for their performance of duties in said on-campus summer camps consistent with athletic department policies.

3.3.12 **Outside income**. Employee may be compensated for outside activities appropriate to the promotion of athletic programs, provided such activities do not conflict or interfere with the discharge of duties under this Agreement. Employee must receive prior approval from the Athletic Director, or from such other person as the Athletic Director may designate, for all such outside compensation. Such activities must comply with the state ethics law and University policy.

3.4 **Incentive Compensation.** Each employment year during the term of this Agreement, in addition to the base salary and supplemental compensation, the University shall pay Employee any applicable incentive compensation as provided in Section 3.4. The University shall pay Employee incentive compensation for an employment year within a reasonable time (generally, 30 days) after the University has determined the amount of the payment and whether the conditions of payment have been met. The University shall annually pay Employee the incentive compensation for the following achievement(s):

| Achievement | Amount of Incentive Payment |
|---|---|
| • Pac-12 North Champion * | $50,000 |
| • Pac-12 Conference Champion * | $100,000 (non-inclusive) |
| | |
| • Final National Ranking Top 25 (CFP, AP, USA Today) * | $50,000 |
| • Final National Ranking Top 10 (CFP, AP, USA Today,) * | $100,000 (non-inclusive) |

5

(285 of 289), Page 285 of 289 Case: 25-761, 06/12/2025, DktEntry: 26.7, Page 285 of 289
Case 2:22-cv-00319-TOR    ECF No. 29    filed 04/12/23    PageID.572    Page 133
of 137

| | |
|---|---|
| • Pac-12 Public School Graduation Rate #1 * *(based on the WSU Football NCAA GSR)* | $25,000 |
| • Pac-12 Public School Graduation Rate Top 4 * *(based on the WSU Football NCAA GSR)* | $15,000 (non-inclusive) |
| • 7+ Regular Season wins <u>and</u> participation in Bowl Game <u>not</u> Sugar, Rose, Orange, Cotton, Peach, Fiesta * | $25,000 |
| • Sugar, Rose, Orange, Cotton, Peach or Fiesta Bowl Game * | $100,000 (non-inclusive) |
| • College Football Playoff appearance * | $200,000 (non-inclusive) |
| • National Championship Game appearance* | $300,000 (non-inclusive) |
| • National Championship Game victory* | $400,000 (non-inclusive) |
| • Pac-12 Coach of the Year | $25,000 |
| • National Coach of Year (AP, AFCA)** | $50,000 |

*One Payment only in each incentive category for highest level reached
**One Payment only, even if multiple awards

4.   **Termination**

4.1   **Termination by University for just cause**. The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as examples of its normally understood meaning in employment contracts, any of the following:

4.1.1   Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

4.1.2   Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

4.1.3   Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

4.1.4   An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation

6

**ER1372**

by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

**4.1.5**  Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

**4.1.6**  Prolonged absence from duty without the consent of Employee's supervisor.

**4.2**  **Determination of Just Cause and hearing provision**. Just Cause sufficient to satisfy the provisions of Section 4.1 shall initially be determined in good faith by the Athletic Director of the University. The Athletic Director shall give Employee written notice of the provisions of the Agreement alleged to have been violated, together with a statement of the factual basis for those allegations. Employee will have fifteen (15) calendar days within which to respond to the Athletic Director, in writing, with reasons Employee should not be terminated. The Athletic Director, after considering any response provided by Employee, will issue a decision regarding termination for Just Cause. If a summary suspension has been issued in accordance with paragraph 4.3.1, the Athletic Director must issue a decision regarding termination within five (5) calendar days of receipt of Employee's response. If a summary suspension has not been ordered, the Athletic Director shall issue a decision regarding termination within ten (10) calendar days of receipt of Employee's response.

Employee's right to receive any payment under this Agreement, including all portions of Section 3, shall cease the day following the issuance of the decision to terminate for Just Cause.

**4.3**  **Appeal of termination for Just Cause**. Employee may appeal the Athletic Director's decision to terminate for Just Cause to the University President or designee. Such appeal must be made in writing within fifteen (15) calendar days' notice of the Athletic Director's determination and must contain a statement of the reasons Employee requests the President to set aside the decision to terminate for Just Cause. Employee must provide a copy of the appeal to the Athletic Director at the time it is delivered to the Office of the President. The Athletic Director may, within seven (7) calendar days of receipt of the notice of appeal, provide to the President an additional written statement supporting the Athletic Director's decision and shall provide the President with: 1) the written notice of termination sent to Employee; 2) Employee's written response, if any; and 3) the written decision of termination. The President may allow oral statements in the President's discretion. The President shall render a final decision within thirty (30) calendar days of receiving the materials provided by the Athletic Director, which shall be the final decision of the University.

Employee shall not be entitled to receive any compensation under this Agreement pending the appeal.  Should Employee be reinstated by the President, Employee shall be entitled to back pay for compensation not paid during the pendency of the appeal.

**4.3.1**  **Summary suspension**. Once the preliminary determination of intent to terminate for Just Cause is made, the Athletic Director shall have the administrative authority to order suspension of Employee from Employee's duties and salary pending termination of this Agreement, provided that notice of any such suspension shall be delivered to Employee in writing, detailing the reasons for such suspension. This notice may be contained in the same document as the written notice of termination. Summary suspension may also be imposed if the Athletic Director finds that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. The Athletic Director has the authority to issue immediate summary suspension if facts show that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. Employee may respond to the notice of summary suspension together with Employee's response, if any, to the notice of termination.

Employee shall not be entitled to receive any compensation under this Agreement during the summary suspension period.

7

**ER1373**

**4.3.2    University's obligations upon termination for Just Cause**. In the event this Agreement is terminated for Just Cause in accordance with the provisions of Sections 4.1 and 4.2, all obligations of the University to make further payments under this Agreement and/or to provide any other consideration shall cease. In no case shall the University be liable to Employee for the loss of any collateral business opportunities or any other benefits, perquisites, or athletically-related income from any other source, nor shall Employee be liable to the University for the loss of any such collateral business opportunities. Employee will be paid all compensation earned up to the date of termination for Just Cause.

**4.4    Termination by University without Just Cause**. The University reserves the right to terminate this Agreement prior to its normal expiration without cause. Termination by the University without cause shall be effectuated by delivering to Employee written notice, signed by the President of the University or by the Athletic Director or such other person as the University may designate, of the University's intent to terminate this Agreement without cause. In such event, University will pay Coach liquidated damages, in lieu of any and all other legal remedies or equitable relief.

**4.4.1    Liquidated damages upon termination by University without Just Cause**. The parties agree that actual damages resulting from termination without just cause would be difficult to calculate and that the payment of liquidated damages by University to Employee shall constitute sufficient and reasonable compensation to Employee for any loss, damages, or injury suffered by Employee because of termination without just cause by University. The parties further agree that the payment of liquidated damages shall not be construed as a penalty.

If the University terminates this Agreement without just cause at any time prior to June 30, 2025, the University shall pay Employee liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of this Agreement specifically in Section 3.1. This payment shall be paid in full, either in one lump sum or a series of payments at the discretion of the University, by no later than March 15 of the calendar year following the effective date of termination, In no case shall the University be liable for the loss of any business opportunities or any other benefits, perquisites, supplemental income or athletically related income from any other source. The parties intend that the provisions of this Agreement comply with, or meet an exemption from, Section 409A of the Code, and the regulations thereunder and all provisions of this Agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties thereunder, and neither party shall have the right to accelerate, defer or otherwise modify the manner of payment of any amount set forth in this Section 5.01(e), except for the University's right to determine the payment schedule. Employee shall have no mitigation obligation and WSU shall have no offset rights against any compensation earner or received by Employee subsequent to such termination.

**4.5    Termination by Employee**

**4.5.1    Written notice by Employee**. Employee may terminate this Agreement during its term by giving the University fourteen (14) calendar days' advance written notice of the termination, or affirmatively communicates to the Director of Athletics or their delegate of an intention to leave or accept a coaching position elsewhere. Payment of remaining salary will cease on the date Employee submits a resignation, fails to report to work, or otherwise engages in actions that clearly establish employment with another party.

**4.5.2    Liquidated damages upon termination by employee.** Employee recognizes that University is making a highly valuable investment in their continued employment by entering into this Agreement and that investment would be lost if they were to resign prior to the expiration of this Agreement. The parties agree actual damage to University in such case would be extremely difficult to calculate. The parties further agree that the payment

8

**ER1374**

of liquidated damages by Employee and acceptance by University shall constitute sufficient and reasonable compensation to University for injury and that it shall be enforceable as liquidated damages and not as a penalty.

If Employee terminates this Agreement during the initial term of this Agreement, Employee shall pay liquidated damages to the University as follows:

- On or before June 30, 2021: $8,000,000
- July 1, 2021, through June 30, 2022 (inclusive): $6,000,000
- July 1, 2022, through June 30, 2023 (inclusive): $5,000,000
- July 1, 2023, through June 30, 2024 (inclusive): $2,000,000
- July 1, 2024, through June 30, 2025 (inclusive): $1,000,000

**5.      Restriction on Competition**

Employee agrees and specifically promises that Employee will neither directly nor indirectly through an agent actively seek, negotiate for, or accept employment, under any circumstances, as a coach or in any other capacity related to intercollegiate athletics with any member institution of the NCAA or with any football team participating in any professional league or conference in the United States or elsewhere requiring performance of duties prior to the expiration date of the term of this Agreement or any extension without first notifying the Athletic Director and obtaining permission from the Athletic Director to seek such described employment opportunities, such permission to not be unreasonably withheld.

**6.      Choice of Law**

This Agreement has been entered into under, and shall be governed by, the laws of the State of Washington. In the event that either party for the enforcement or construction of any of the provisions of this Agreement commences litigation, the actions shall be brought in the Superior Court of the State of Washington and the venue shall be in Whitman County, Washington.

**7.      Alternate Dispute Resolution**

Except as otherwise provided in this Agreement, when a dispute arises between the parties and it cannot be resolved by direct negotiation, the parties agree to participate in good faith mediation. The mediator shall be chosen by agreement of the parties. If the parties cannot agree on a mediator, the parties shall use a mediation service that selects the mediator for the parties. The cost of the mediation, if any, shall be shared equally by the parties, unless otherwise agreed. The parties agree that mediation shall precede any action in a judicial tribunal.

Nothing in this Agreement shall be construed to limit the parties' choice of a mutually acceptable alternative resolution method such as a disputes hearing, a Disputes Resolution Panel, or arbitration.

**8.      Merger Clause**

This Agreement supersedes all prior understandings and agreements, oral or written, regarding Employee's employment by the University, including University handbooks or manuals.

**9.      Amendments to Agreement**

This Agreement may be amended at any time only by a written instrument duly approved by the University through its designated representative and accepted by Employee, such approval and acceptance to be acknowledged in writing.

9

**ER1375**

10.      **Acknowledgment**

Employee acknowledges that Employee has read and understands the foregoing provisions of this Agreement and that such provisions are reasonable and enforceable and that Employee agrees to abide by this Agreement and the terms and conditions set forth herein. Employee further acknowledges that Employee has been provided an opportunity to seek the advice of legal counsel before entering into this Agreement.

11.      **Severability**

If any provision of this Agreement is found to be unenforceable, either in whole or in part, then such provision shall be deemed amended to delete or modify, as necessary, the offending provision or provisions or to alter the bound thereof in order to render said provision valid and enforceable. The remainder of this Agreement will not be affected, and will remain in full force and effect to the extent provided by law.

**IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT.**

WASHINGTON STATE UNIVERSITY                    EMPLOYEE

_____                    _____
Patrick Chun                                   Nicholas R. Rolovich
Director of Athletics
Date:      April 7, 2020                        Date:      Apr 6, 2020

_____
Kirk H. Schulz
Office of the President
Date:

Approved as to form:

_____
Office of the Attorney General
Date:      9/10/20

10

**ER1376**