No. 25-761

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Nicholas Rolovich,
*Plaintiff-Appellant,*

v.

Washington State University et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Washington
Honorable Thomas O. Rice
No. 2:22-cv-319-TOR

Brief of *Amicus Curiae* Christ Medicus Foundation
in Support of Appellant

Justin E. Butterfield
   *Counsel of Record*
Lea E. Patterson
Butterfield & Patterson, PLLC
P.O. Box 941681
Plano, Texas 75094
Telephone: (945) 284–0700
justin@butterfieldpatterson.com
lea@butterfieldpatterson.com

*Counsel for* Amicus Curiae

June 20, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29(4)(A), *Amicus Curiae* Christ Medicus Foundation is a non-profit 501(c)(3) organization, has no corporate parent, and is not owned in whole or in part by any publicly held corporation.

## TABLE OF CONTENTS

Corporate Disclosure Statement..................................................................................ii

Table of Authorities....................................................................................................iv

Statement of Interest of *Amicus Curiae* ..................................................................1

Argument ......................................................................................................................2

    I.    The Constitution prohibits courts from adjudicating theological questions..............................................................................2

    II.    Determining that the Plaintiff's objection to the COVID-19 vaccine was not religious implicates impermissible theological questions..............................................................................5

Conclusion ..................................................................................................................11

Certificate of Compliance .........................................................................................12

Certificate of Service .................................................................................................12

## TABLE OF AUTHORITIES

**Cases**

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ........................................... 4

*Callahan v. Woods*, 658 F.2d 679 (9th Cir. 1981) ....................................................... 6

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) ...................... 3, 8, 10

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter Day Saints v. Amos*, 483 U.S. 327 (1987) .................................................................................. 4

*Holt v. Hobbs*, 574 U.S. 352 (2015) ............................................................................ 9

*Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784 (9th Cir. 2025) (Bress, J., concurring) ............... 3, 5, 8, 9

*Lee v. Weisman*, 505 U.S. 577 (1992) ....................................................................... 10

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .................................................................. 4

*New York v. Cathedral Acad.*, 434 U.S. 125 (1977) ................................................. 2, 3

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) ......................................................... 2, 5

*Spencer v. World Vision, Inc.*, 633 F.3d 723 (9th Cir. 2011) .................................... 3, 4

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981) ............................. 5, 10

*Trs. of New Life in Christ Church v. City of Fredericksburg*, 142 S. Ct. 678 (2022) ........................................................................................................................ 5

*United States v. Ballard*, 322 U.S. 78 (1944) ............................................................. 2

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................................... 10

**Other Authorities**

Catholic Medical Association, "Catholic Medical Association Opposes Vaccine Mandates without Conscience and Religious Exemptions," July 28, 2021, https://www.cathmed.org/catholic-medical-association-opposes-vaccine-mandates-without-conscience-and-religious-exemptions/. ..................................................................................................8

Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U.L. Rev. 1701, 1708–10, 1727 (2020) ............................................................................................4

The Christ Medicus Foundation, "Statement of The Christ Medicus Foundation addressing the problematic rise of vaccine mandates," July 1, 2021, https://christmedicus.org/consent-and-vaccine-mandates/. ...............1, 8

The National Catholic Bioethics Center, "Updated Statement on Covid-19 Vaccination Mandates," April 28, 2022, https://www.ncbcenter.org/ncbc-news/updatedvaccinestaement .........................8

U.S. Equal Employment Opportunity Commission Compliance Manual on Religious Discrimination, Section 12: Religious Discrimination, IV Reasonable Accommodation, (January 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religiousdiscrimination. ........................................................................................9

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae,* the Christ Medicus Foundation ("CMF"), is a Catholic ministry that, in part, defends and advances religious freedom by educating religious leaders, lay leaders, and the general public on the intersection of healthcare, the exercise of faith and religious freedom, and the right to life and human dignity. As COVID-19 vaccination mandates proliferated, CMF advocated for religious and conscientious exemptions. The Catholic Church teaches that medical interventions, including vaccinations, should generally be voluntary. The Church further teaches that a person may refuse medical interventions if the person's conscience leads him or her to that conclusion. CMF calls for a respect and protection of the conscience of the individual to make his or her own decisions about what medical interventions to receive or not receive.[2]

---

[1] All parties consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than *Amicus* or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] The Christ Medicus Foundation, "Statement of The Christ Medicus Foundation addressing the problematic rise of vaccine mandates," July 1, 2021, https://christmedicus.org/consent-and-vaccine-mandates/.

## ARGUMENT

**I. The Constitution prohibits courts from adjudicating theological questions.**

The First Amendment's Establishment and Free Exercise "Clauses work in tandem" to deny government the authority to create an established church and to protect the religious free exercise of all people. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022); *United States v. Ballard*, 322 U.S. 78, 86 (1944); . The Ecclesiastical Abstention Doctrine applies this principle to prohibit courts from interpreting or determining the importance of churches' doctrines. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969) (The First Amendment "forbids civil courts" from determining "the interpretation of particular church doctrines and the importance of those doctrines to the religion."); *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment."). The judiciary cannot wield religious authority to resolve civil disputes, because "the Religion Clauses create a structural restraint on the government's power to decide religious questions." *Huntsman v. Corp. of the*

*President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 800 (9th Cir. 2025) (Bress, J., concurring).

Therefore, any court must exercise caution when attempting to discern between the religious and the secular so that it does not become a doctrinal arbiter. *See Cathedral Acad.*, 434 U.S. at 133 ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment."); *Spencer v. World Vision, Inc.*, 633 F.3d 723, 731 (9th Cir. 2011) (O'Scannlain, J., concurring); *see also id.* at 732, 734 (describing judicial efforts to "distinguish[] between the sacred and the secular" as a "constitutional briar patch" and an "unseemly judicial inquiry"). As the Tenth Circuit explained in *Colorado Christian University v. Weaver*, "It is not for the state to decide what Catholic—or evangelical, or Jewish—'polic[y]' is . . . . That is a question of religious doctrine on which the State may take no position without entangling itself in an intrafaith dispute." 534 F.3d 1245, 1263–64 (10th Cir. 2008) (citation omitted).[3]

---

[3] Many Ecclesiastical Abstention cases invoke the concept of religious "entanglement," which refers to situations where the government sifts through an

Any judicial determination that entails resolving questions of theological import, even implicitly, is Constitutionally prohibited. *See, e.g., World Vision*, 633 F.3d at 731 (O'Scannlain, J., concurring); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter Day Saints v. Amos*, 483 U.S. 327, 343–44 (1987) (Brennan, J., concurring) ("What makes the application of a religious–secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs."). *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 724 (2014) ("HHS and the principal dissent in effect tell the plaintiffs that their beliefs are flawed. For good reason, we have repeatedly refused to take such a step."). "This

---

organization's religious beliefs and subjects them to granular scrutiny. *See* Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U.L. Rev. 1701 (2020). The language of entanglement became part of the ill-fated *Lemon* test, *see Lemon v. Kurtzman*, 403 U.S. 602 (1971), which revolved around ambiguous notions of the appearance of government "endorsement" of religion and has since been overturned. *Kennedy*, 597 U.S. at 534 (describing and overturning *Lemon*). Given the shared terminology, it is important to note that Ecclesiastical Abstention's "entanglement" is distinct from *Lemon* and does *not* look for the appearance of "endorsement"; it looks for the risk that government scrutiny of church operations will result in government control of religious doctrine and exercise.

4

doctrine is longstanding, a logically necessary feature of the Constitution's protections for religious freedom." *Huntsman*, 127 F.4th at 796 (Bress, J., concurring).

Ultimately, the First Amendment recognizes that "the judicial process is singularly ill equipped to resolve" religious disputes, *see Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981), and accomplishes the First Amendment's guarantee that "religious persons would enjoy the right 'to decide for themselves, free from state interference, matters of . . . faith and doctrine.'" *Trs. of New Life in Christ Church v. City of Fredericksburg,* 142 S. Ct. 678, 679 (2022) (Gorsuch, J., dissenting from denial of cert.) (quoting *Kedroff,* 344 U.S. at 116). "First Amendment values are plainly jeopardized when . . . litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church in U.S.*, 393 U.S. at 449.

## II. Determining that the Plaintiff's objection to the COVID-19 vaccine was not religious implicates impermissible theological questions.

On the record below, the District Court's conclusion that the Plaintiff's objections to the COVID-19 vaccine were not sincerely religious implicates doctrinal questions. The Plaintiff consulted with his priest, applied for a religious

5

exemption, and explained in his application that his Catholic faith compelled him to refuse the vaccination because, among other reasons, it would make him complicit in abortions. 6-ER-1113–14; 6-ER-1118; 6-ER-1156; 6-ER-1160-61; 6-ER-1089–95. However, the District Court held that his objections were not religious, because he "frequently expressed secular concerns about the COVID-19 vaccine." 1-ER-9. Essentially, this is a theological determination: a mandate for the form that religious beliefs must take. Under the District Court's reasoning, the only religious beliefs that receive legal protection are those that are completely divorced from "secular" reasoning. But religious people often believe things for both religious and "secular" reasons. As this Court explained in *Callahan v. Woods*:

> In *Yoder* the Supreme Court warned that a belief that is based on 'purely secular considerations' merits no protection under the free exercise clause. 406 U.S. at 215, 92 S.Ct. at 1532. It did not limit the scope of the First Amendment to "purely religious" claims; the area of overlap is presumably protected. The devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork. Such personal considerations are irrelevant to an analysis of the claimants' free exercise rights, so long as their religious motivation requires them to keep the Sabbath and avoid pork products. Religious duties need not contradict personal values or preferences in order to be protected.

658 F.2d 679, 684–85 (9th Cir. 1981). The court cannot deem Plaintiff's

6

religious beliefs unworthy of protection.

Furthermore, to argue that his objection was not sincerely religious, the State of Washington retained an "expert" in "Roman Catholic moral theology" for the explicit purpose of rendering an opinion about the "correct" interpretation of the Church's magisterial teachings and purporting to debunk the truth (rather than the sincerity) of Plaintiff's religious beliefs. 5-ER-1039–69. Canvassing a variety of sources, including papal statements, canon law, and Vatican documents, the report presented a religious doctrinal opinion that Catholic doctrine does not prohibit Catholics from receiving the COVID-19 vaccine and, therefore, that the Plaintiff's religious belief that his faith prohibited him from taking the COVID-19 vaccine was theologically incorrect. *See* 5-ER-1042–43. The issue is a matter of ongoing religious debate within the Catholic church, with major Catholic organizations (including *Amicus*) advocating for conscientious exemptions to COVID-19 vaccine mandates.[4] To the extent the District Court relied on this report in determining

---

[4] *See* The Christ Medicus Foundation, "Statement of The Christ Medicus Foundation addressing the problematic rise of vaccine mandates," July 1, 2021, https://christmedicus.org/consent-and-vaccine-mandates/; The National Catholic Bioethics Center, "Updated Statement on Covid-19 Vaccination Mandates," April

that the Plaintiff's objection was not religious, it erred for many reasons.

Adjudicating between the Plaintiff's articulation of his own religious beliefs and the Defendants' expert's claims that his religious beliefs are not mandated by his church is necessarily a theological determination: deciding that the Plaintiff's religious beliefs are not doctrinally correct. But neither the Court nor the State can tell the Plaintiff what his faith requires. *See, e.g.*, *Huntsman*, 127 F.4th at 796 (Bress, J., concurring) ("It is understandable that even members of the same religion may have different views on religious practices and requirements. But it is up to members of the Church to work through these issues among themselves and through their own processes. Religious disagreements are to be worked out within the faith."). Government cannot require an individual, even a member of a hierarchical church, to follow a particular interpretation of that church's doctrine. *See, e.g., Colo. Christian Univ.*, 534 F.3d at 1263–64 ("It is not for the state to decide what Catholic—or evangelical, or Jewish—'polic[y]' is . . . .") (citation omitted);

---

28, 2022, https://www.ncbcenter.org/ncbc-news/updatedvaccinestaement; Catholic Medical Association, "Catholic Medical Association Opposes Vaccine Mandates without Conscience and Religious Exemptions," July 28, 2021, https://www.cathmed.org/catholic-medical-association-opposes-vaccine-mandates-without-conscience-and-religious-exemptions/.

U.S. Equal Employment Opportunity Commission Compliance Manual on Religious Discrimination, Section 12: Religious Discrimination, IV Reasonable Accommodation, (January 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religiousdiscrimination. Determining that the Plaintiff's beliefs are not sincerely religious because they are not, in one expert's opinion, required by the Catholic church is a quintessentially doctrinal adjudication that the First Amendment prohibits. *Huntsman*, 127 F.4th at 798 (noting that "the prospect of Church leaders being cross-examined on matters of religious understanding is deeply unsettling.")

    Such a determination also misses the point. Sincerity asks whether the Plaintiff actually believes what he claims, not whether what he believes is true or consistent with other members of the same faith. *See Holt v. Hobbs,* 574 U.S. 352, 362 (2015) ("[T]he District Court went astray when it relied on petitioner's testimony that not all Muslims believe that men must grow beards. . . . [E]ven if [Petitioner's belief] were [idiosyncratic], the protections of RLUIPA, no less than the guarantee of the Free Exercise Clause, is 'not limited to beliefs which are shared by all of the members of a religious sect.'" (quoting *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,

9

450 U.S. 707, 715–16 (1981))). The question of sincerity does not and cannot ask whether the Plaintiff's beliefs are factually true or consistent with Catholic doctrine. See Colo. Christian Univ., 534 F.3d at 1263–64; W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). As the Supreme Court explained in Lee v. Weisman, 505 U.S. 577, 592 (1992), "A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed."

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand for trial.

June 20, 2025　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　*/s/ Justin E. Butterfield*
　　　　　　　　　　　　　　　　Justin E. Butterfield
　　　　　　　　　　　　　　　　　*Counsel of Record*
　　　　　　　　　　　　　　　　Lea E. Patterson
　　　　　　　　　　　　　　　　Butterfield & Patterson, PLLC
　　　　　　　　　　　　　　　　PO Box 941681
　　　　　　　　　　　　　　　　Plano, Texas 75094
　　　　　　　　　　　　　　　　Telephone: (945) 284-0700
　　　　　　　　　　　　　　　　justin@butterfieldpatterson.com
　　　　　　　　　　　　　　　　lea@butterfieldpatterson.com

　　　　　　　　　　　　　　　　*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

In compliance with Circuit Rules 29-2(c)(3) and 32-1, I certify that according to the word count feature of the word processing program used to prepare this brief, this brief contains 2,006 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure Rule 32(f) and Circuit Rule 32-1, and complies with the typeface requirements and length limits of Federal Rule of Appellate Procedure Rule 32(a) and Circuit Rule 29-2(c)(3).

Dated: June 20, 2025                                          */s/ Justin E. Butterfield*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing brief on June 20, 2025, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

Dated: June 20, 2025.                                         */s/ Justin E. Butterfield*