No. 25-761

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

NICHOLAS ROLOVICH, *Plaintiff-*

*Appellant,*

v.

WASHINGTON STATE UNIVERSITY;
PATRICK CHUN,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
For the Eastern District of Washington
Case No. 2:22-cv-319-TOR
The Honorable Thomas O. Rice, United States District Judge

---

## APPELLEES' ANSWERING BRIEF

---

NICHOLAS W. BROWN
  *Attorney General*
SPENCER W. COATES
  *Assistant Attorney General*
WASHINGTON ATTORNEY
GENERAL'S OFFICE
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404
*spencer.coates@atg.wa.gov*

ZACHARY J. PEKELIS
ERICA CORAY
W. SCOTT FERRON
  *Special Assistant Attorneys General*
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 245-1700
*zach.pekelis@pacificalawgroup.com*

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................1

JURISDICTIONAL STATEMENT ...................................5

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................6

STATEMENT OF THE CASE .......................................7

    A.  The COVID-19 Pandemic..................................7

    B.  Rolovich's Hiring and COVID-19's Impact on WSU .......7

    C.  Rolovich's Conspiratorial COVID-19 Views...................8

    D.  Rolovich and the Vaccines ...............................10

    E.  Rolovich's Announcement of His Vaccine Opposition ..11

    F.  The Delta Surge and Proclamation 21-14 ....................12

    G.  Rolovich's Accommodation Request.............................12

    H.  WSU's Denial of Rolovich's Accommodation Request ..14

    I.  Procedural History ........................................16

        1.  The Pleadings Phase .............................................16

        2.  The Summary Judgment Phase ...........................17

STANDARD OF REVIEW.....................................................19

SUMMARY OF ARGUMENT ...............................................19

ARGUMENT .........................................................................21

I.   The District Court Correctly Granted WSU Summary
Judgment on Rolovich's Title VII and WLAD Claims .............21

    A.  Accommodating Rolovich Would Have Caused WSU
Undue Hardship........................................................22

i

1. Under *Petersen*, Rolovich's increased risk of spreading COVID-19 constitutes an undue hardship ........................................................24

2. The economic costs of accommodating Rolovich constitute an undue hardship................................40

3. Restrictions on Rolovich's ability to perform his job duties while unvaccinated constitute undue hardship ........................................................45

B. The District Court Correctly Held that Rolovich Failed to Establish a Prima Facie Failure-to-Accommodate-Religion Case ...........................................46

C. Rolovich Did Not Plead a Disparate Treatment Claim, Which Would Fail as a Matter of Law .............50

1. Rolovich did not plead a disparate treatment claim ........................................................51

2. Any disparate treatment claim fails as a matter of law ........................................................53

II. The District Court Correctly Granted WSU Summary Judgment on Rolovich's Breach-of-Contract Claim....................................57

III. The District Court Correctly Granted WSU Summary Judgment on Rolovich's Wage-Withholding Claim ....................................59

IV. The District Court Correctly Dismissed Rolovich's Free Exercise Claim Against Chun....................................................60

CONCLUSION ........................................................................64

# TABLE OF AUTHORITIES

## Federal Cases

*Akers v. Brookdale Univ. Hosp. & Med. Ctr.*,
    No. CV06- 00350(3MC)(VVP), 2006 WL 2355842
    (E.D.N.Y. Aug. 15, 2006) ....................................................... 57

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ............................................................... 63

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................... 19, 61

*Balint v. Carson City*,
    180 F.3d 1047 (9th Cir. 1999) (en banc) .............................. 18

*Baugh v. Austal USA, LLC*,
    No. 1:22-cv-329, 2025 WL 28453
    (S.D. Ala. Jan. 3, 2025) ........................................................ 44

*Beickert v. N.Y.C. Dep't of Educ.*,
    No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236
    (E.D.N.Y. Sept. 25, 2023) ..................................................... 36

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................... 19

*Bolden-Hardge v. Office of Cal. Controller*,
    63 F.4th 1215 (9th Cir. 2023) .............................................. 49

*Bordeaux v. Lions Gate Entm't, Inc.*,
    No. 23-4340, 2025 WL 655065
    (9th Cir. Feb. 28, 2025) .................................................. 40, 43

*Brandon v. Bd. of Educ.*,
    No. 4:22-cv-00635-SRC, 2025 WL 1360684
    (E.D. Mo. May 8, 2025) ......................................................... 37

*Brosseau v. Haugen*,
    543 U.S. 194 (2004) ............................................................... 63

*Bushra v. Main Line Health, Inc.*,
  No. 24-1117, 2025 WL 1078135
  (3d Cir. Apr. 10, 2025) .................................................. 22, 39

*Callahan v. Woods*,
  658 F.2d 679 (9th Cir. 1981) ...................................... 48, 50

*Cassell v. Snyders*,
  990 F.3d 539 (7th Cir. 2021) .............................................. 37

*Chavez v. S.F. Bay Area Rapid Transit Dist.*,
  No. C 22-06119 WHA, 2024 WL 4371002
  (N.D. Cal. Oct. 1, 2024) .................................................... 39

*Coghlan v. Am. Seafoods Co.*,
  413 F.3d 1090 (9th Cir. 2005) ........................................... 53

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ........................................... 51

*Crawford–El v. Britton*,
  523 U.S. 574 (1998) ........................................................... 61

*Dahl v. Bd. of Trustees of W. Mich. Univ.*,
  15 F.4th 728 (6th Cir. 2021) (per curiam) ........................ 35

*Dixon v. Bessent*,
  No. 24-5110, 2025 WL 1720742
  (D.C. Cir. June 20, 2025) .................................................. 39

*Doe v. San Diego Unified Sch. Dist.*,
  (*SDUSD*), 19 F.4th 1173 (9th Cir. 2021) ...................... 34, 60

*Does 1-11 v. Board of Regents of University of Colorado*,
  100 F.4th 1251 (10th Cir. 2024) ....................................... 63

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
  575 U.S. 768 (2015) ........................................................... 52

*EEOC v. TriCore Reference Labs.*,
  849 F.3d 929 (10th Cir. 2017) ........................................... 38

iv

*Efimoff v. Port of Seattle*,
No. 2:23-CV-01307-BAT, 2024 WL 4765161
(W.D. Wash. Nov. 13, 2024) ................................................. 33

*Fallon v. Mercy Catholic Medical Center
of Southeastern Pennsylvania*,
877 F.3d 487 (3d Cir. 2017) ................................................. 49

*Fellowship of Christian Athletes v.
San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) (en banc) ................................. 60

*Fisher v. Dep't of Fin. Insts.*,
No. C22-5991 TSZ, 2025 WL 1434366
(W.D. Wash. May 19, 2025) .................................................. 50

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ............................................................. 62

*Gardner-Alfred v. Fed. Reserve Bank of N.Y.*,
143 F.4th 51 (2d Cir. 2025) ................................................. 48

*Garrison v. Merch. & Gould, P.C.*,
No. 09-CV-1728-JPD, 2011 WL 887749
(W.D. Wash. Mar. 10, 2011) ................................................. 60

*Gordon v. Virtumundo, Inc.*,
575 F.3d 1040 (9th Cir. 2009) ............................................. 19

*Green v. United Parcel Serv., Inc.*,
No. CV 18-8744, 2019 WL 1430244
(E.D. La. Mar. 29, 2019) ...................................................... 38

*Groff v. DeJoy*,
600 U.S. 447 (2023) ............................................. 18, 22, 45, 46

*Henry v. S. Ohio Med. Ctr.*,
--- F.4th ----, No. 24-3863, 2025 WL 2621727
(6th Cir. Sept. 11, 2025) ...................................................... 22

*Herrera v. Cathay Pac. Airways Ltd.*,
  104 F.4th 702 (9th Cir. 2024) ............................................. 36

*Hittle v. City of Stockton*,
  101 F.4th 1000 (9th Cir. 2024) ............................................ 55

*Holly v. Clairson Indus., LLC*,
  492 F.3d 1247 (11th Cir. 2007) ........................................... 39

*Hunter v. United Parcel Serv., Inc.*,
  697 F.3d 697 (8th Cir. 2012) ............................................. 55

*In re Finjan Holdings, Inc.*,
  58 F.4th 1048 (9th Cir. 2023) ............................................ 19

*Jackson v. King Cnty.*,
  No. 2:23-CV-00774-RSL, 2025 WL 2022075
  (W.D. Wash. July 18, 2025) .............................................. 37

*Kennedy v. Pei-Genesis*,
  No. 24-1563, 2025 WL 602159 (3d Cir. Feb. 25, 2025) ........................ 48

*Kidd v. Univ. Med. Ctr. of S. Nev.*,
  No. 2:22-CV-01990-ART-NJK, 2024 WL 4046249
  (D. Nev. July 2, 2024) ................................................... 39

*Kizer v. St. Jude Child.'s Res. Hosp.*,
  No. 24-5207, 2024 WL 4816856 (6th Cir. Nov. 18, 2024) ..................... 22

*Leake v. Raytheon Techs. Corp.*,
  No. 23-15320, 2024 WL 1854287 (9th Cir. Apr. 29, 2024) ................... 38

*Lisoski v. King Cnty.*,
  No. 2:23-CV-00536-RSL, 2025 WL 2511243
  (W.D. Wash. Sept. 2, 2025) .............................................. 37

*Lubetsky v. Applied Card Sys., Inc.*,
  296 F.3d 1301 (11th Cir. 2002) ........................................... 54

*Matejka v. Blue Origin Enters. LP,*
  No. 2:25-CV-00199-BAT, 2025 WL 1635228
  (W.D. Wash. June 9, 2025) .................................................................. 49

*McCray v. Wilkie,*
  966 F.3d 616 (7th Cir. 2020) .............................................................. 51

*McDonnell Douglas v. Green,*
  411 U.S. 792 (1973) ............................................................................ 53

*McDowell v. Bayhealth Med. Ctr., Inc.,*
  No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024) ..................... 49

*McMinimee v. Yakima Sch. Dist. No. 7,*
  No. 1:18-CV-3073-TOR, 2019 WL 11680199
  (E.D. Wash. Aug. 7, 2019) ................................................................. 59

*Melino v. Boston Med. Ctr.,*
  127 F.4th 391 (1st Cir. 2025) ................................................. 22, 33, 37

*Moran v. Selig,*
  447 F.3d 748 (9th Cir. 2006) ............................................................. 39

*New Yorkers for Religious Liberty, Inc. v. City of N.Y.,*
  125 F.4th 319 (2d Cir. 2025) ............................................................. 61

*O'Hailpin v. Hawaiian Airlines, Inc.,*
  No. CV 22-00532 HG-WRP, 2025 WL 1543951
  (D. Haw. May 30, 2025) ..................................................................... 39

*Olmstead v. L.C. ex rel. Zimring,*
  527 U.S. 581 (1999) ........................................................................... 44

*Opara v. Yellen,*
  57 F.4th 709 (9th Cir. 2023) ............................................................. 53

*Passarella v. Aspirus, Inc.,*
  108 F.4th 1005 (7th Cir. 2024) ......................................................... 50

vii

*Petersen v. Snohomish Reg'l Fire & Rescue,*
  --- F.4th ----, No. 24-1044, 2025 WL 2503128
  (9th Cir. Sept. 2, 2025) ............................................................... passim

*Peterson v. Hewlett-Packard Co.,*
  358 F.3d 599 (9th Cir. 2004) ........................................................ 51

*Pilz v. Inslee,*
  No. 22-35508, 2023 WL 8866565
  (9th Cir. Dec. 22, 2023) ................................................................ 62

*Raytheon Co. v. Hernandez,*
  540 U.S. 44 (2003) ........................................................................ 55

*Reed v. Great Lakes Cos.,*
  330 F.3d 931 (7th Cir. 2003) ........................................................ 55

*Richardson v. Nat'l Basketball Ass'n,*
  No. 23CV6926 (DLC), 2025 WL 2402614
  (S.D.N.Y. Aug. 18, 2025) .......................................................... 34, 35

*Robinson v. Adams,*
  847 F.2d 1315 (9th Cir. 1987) ...................................................... 55

*Rodrique v. Hearst Commc'ns, Inc.,*
  126 F.4th 85 (1st Cir. 2025) ...................................................... 22, 23

*Saloojas, Inc. v. Aetna Health of Cal., Inc.,*
  80 F.4th 1011 (9th Cir. 2023) ...................................................... 19

*Savel v. MetroHealth Sys.,*
  No. 24-4025, 2025 WL 1826674
  (6th Cir. July 2, 2025) .............................................................. 22, 39

*Snow v. Women's Healthcare Assocs., LLC,*
  No. 3:23-CV-01393-IM, 2024 WL 3640111
  (D. Or. Aug. 2, 2024) .................................................................... 33

*Spivack v. City of Phila.,*
  109 F.4th 158 (3d Cir. 2024) ...................................................... 60, 62

*St. Christopher Assocs., L.P. v. United States,*
511 F.3d 1376 (Fed. Cir. 2008) ............................................................58

*Together Emps. v. Mass Gen. Brigham Inc.,*
573 F. Supp. 3d 412 (D. Mass. 2021)...................................................34

*Varkonyi v. United Launch All., LLC,*
No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523
(C.D. Cal. Feb. 21, 2024) ......................................................................42

*We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.,*
76 F.4th 130 (2d Cir. 2023)...................................................................60

*Welsh v. United States,*
398 U.S. 333 (1970) ................................................................................49

*Wise v. Child.'s Hosp. Med. Ctr. of Akron,*
No. 24-3674, 2025 WL 1392209
(6th Cir. May 14, 2025) ...............................................22, 23, 25, 40

**State Cases**

*Baldwin v. Sisters of Providence in Wash., Inc.,*
769 P.2d 298 (Wash. 1989) ...........................................................57, 58

*Lund v. Grant Cnty. Pub. Hosp. Dist. No. 2,*
932 P.2d 183 (Wash. Ct. App. 1997).....................................................58

**Federal Statutes**

28 U.S.C. § 1291.............................................................................................5

28 U.S.C. § 1331.............................................................................................5

28 U.S.C. § 1367(a) ......................................................................................5

**Federal Constitutional Provisions**

U.S. Const. am. I............................................................................................16

U.S. Const. am. XIV .....................................................................................16

**State Constitutional Provisions**

Wash. Const. art. I, § 11 ............................................................. 16

**State Statutes**

Wash. Rev. Code 49.52.050(2) ................................................... 59

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ................................................ 5, 19, 50, 60

Fed. R. Civ. P. 56(a) ................................................................. 19

Fed. R. Civ. P. 56(c)(4) .............................................................. 36

## INTRODUCTION

This is one of many Title VII cases challenging the application of COVID-19 vaccine mandates adopted during an especially dangerous phase of the pandemic in summer 2021. In these cases, courts routinely grant summary judgment on undue hardship grounds because, the evidence showed, allowing the plaintiffs to remain in their positions unvaccinated would endanger others. This has held true in a wide array of employment contexts—from firefighters to bus drivers to TV actors to NBA referees. The common thread has been the significant in-person contacts (with coworkers, members of the public, or others) the plaintiffs' jobs entailed. And *every* federal appellate court to review those decisions has affirmed summary judgment for the employer, including this Court. *See Petersen v. Snohomish Reg'l Fire & Rescue*, --- F.4th ----, No. 24-1044, 2025 WL 2503128 (9th Cir. Sept. 2, 2025); *infra* at 22.

This commonsense rationale was the primary basis for the District Court's entry of summary judgment for Appellee Washington State University (WSU or the University) on Appellant Nicholas Rolovich's failure-to-accommodate claim. And three key, undisputed facts show that the District Court's undue hardship ruling was correct.

***First***, the position of head football coach at WSU demanded close, near-constant contacts with countless other people—including student-athletes, other WSU employees, recruits, donors, reporters, and others.

1

***Second***, when Appellee Patrick Chun (then WSU's Athletics Director) evaluated Rolovich's accommodation request, Chun consulted the available public health guidance, which advised that the COVID-19 vaccines reduced a person's risk of spreading the virus. Precisely because of the head football coach's highly interpersonal job, Rolovich was just the type of person most likely to contract and transmit COVID-19. This fact is detailed in the findings of WSU's two unrebutted scientific experts.

***Third***, Rolovich's risk factors were even greater due to his well-documented refusal to follow the masking and distancing requirements to which he was already subject during the 2021 football season. Indeed, during games, cameras captured Rolovich repeatedly removing his mask in close proximity to others (players, coaches, and game officials) to talk with (or yell at) them. These were not sporadic slip-ups: Rolovich testified that he *had* to remove his mask, both to coach effectively and to get oxygen. This rendered him incapable of following even the "minimum" requirements of masking and distancing that any accommodation would have involved.

Together, those undisputed facts show that allowing Rolovich to continue as WSU's head coach unvaccinated would have significantly increased his risk of spreading the virus. And that represents an undue hardship as a matter of law.

To create the illusion of a material fact dispute on appeal, Rolovich's Opening Brief distracts from that central holding, distorts the evidentiary record, and deploys new arguments not raised below.

First, Rolovich tries to change the subject from undue hardship, focusing instead on the District Court's alternative holding that the record showed that his vaccine opposition was not based on any bona fide religious belief. But that conclusion, too, was correct: In thousands of Telegram messages, texts, and other communications, Rolovich and his friends obsessively voiced a hodgepodge of *secular* concerns with the vaccines—from fears of adverse health effects to QAnon conspiracy theories—without ever mentioning a religious objection. It was not until vaccination became a condition of Rolovich's employment—and his agent sent him a religious exemption request template—that Rolovich first "realized" a religious basis for his vaccine opposition. The District Court correctly concluded that, under these suspicious circumstances, no reasonable jury would find Rolovich's eleventh-hour epiphany sincere.

That holding was right, but this Court need not even reach it, given that the District Court's undue hardship conclusion provides an independent basis to affirm. And on that conclusion, Rolovich has no evidence establishing a genuine dispute of material fact. He tries to obfuscate the record with a curated set of excerpts, from which he offers misleading snippets and outright misrepresentations. But a review of the *complete* record shows that no competent evidence contradicts the three

3

key undisputed facts above, which establish WSU's undue hardship as a matter of law.

With new appellate counsel, Rolovich unveils a number of new arguments not raised below. But none of these forfeited arguments supports his Title VII claim. For example, Rolovich argues that WSU's accommodation of other employees working completely different jobs in separate departments somehow shows that allowing him to continue coaching unvaccinated would not have endangered others. Not only did he fail to argue that in the District Court, but he identifies no similarly situated employee and cites no authority suggesting such comparator evidence is even relevant to a failure-to-accommodate-religion claim.

Most egregiously, Rolovich spends much of his brief on a Title VII disparate treatment theory he neither pleaded nor otherwise presented below. His new disparate treatment theory fixates on a single text message referencing a "Rolo strategy," from which Rolovich imagines a conspiracy between Chun, WSU's President, and its Regents Chair to fire him based on his religion. Even if it weren't forfeited, that theory finds no support in the actual evidence, which shows unequivocally that none of these alleged co-conspirators even knew what Rolovich's religion was and that Chun made his accommodation decision based on available public health guidance—and without input from University leadership.

As for the remaining claims Rolovich actually pleaded, the District Court correctly held that they necessarily failed alongside his failure-to-

4

accommodate claim. The District Court correctly entered summary judgment on the breach-of-contract and wage-withholding claims because, once WSU appropriately denied Rolovich's accommodation request, he was legally ineligible to work for the University unvaccinated. That provided "just cause" to terminate his employment and disentitled Rolovich to liquidated damages under his employment contract.

Finally, the District Court correctly dismissed Rolovich's free exercise claim against Chun under Rule 12(b)(6). This Court and many other circuits have squarely rejected Rolovich's theory that the Free Exercise Clause entitled him to an exemption from a neutral, generally applicable vaccine mandate. Because the governing law is directly contrary to this theory, Rolovich cites no case supporting it, let alone one representing the "clearly established" authority necessary to overcome Chun's qualified immunity.

## JURISDICTIONAL STATEMENT

Appellees agree this Court has appellate jurisdiction over the District Court's final judgment under 28 U.S.C. § 1291, and that Rolovich's federal claims vested the District Court with original jurisdiction pursuant to 28 U.S.C. § 1331. This allowed exercise of supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Should the Court affirm summary judgment for WSU on Rolovich's Title VII and Washington Law Against Discrimination (WLAD) claims based on undue hardship where unrebutted evidence established that his unvaccinated status (1) significantly increased his risk of spreading COVID-19; (2) would have exposed WSU to costly logistical challenges and risked millions in losses; and (3) prevented him from performing essential job duties?

2. Alternatively, should entry of summary judgment be affirmed because no reasonable jury could conclude on this record that Rolovich had a sincerely held religious belief conflicting with COVID-19 vaccination?

3. Should the Court decline to address Rolovich's Title VII disparate treatment theory because he did not raise it in the District Court? Alternatively, is WSU entitled to summary judgment because no evidence suggests his termination was likely motivated by his religion?

4. Should summary judgment on Rolovich's breach-of-contract and wage-withholding claims be affirmed because WSU had just cause to terminate his employment?

5. Should the District Court's dismissal of Rolovich's free exercise claim be affirmed because no case clearly establishes that the denial of a religious exemption from a neutral, generally applicable vaccination mandate could support a free exercise violation?

## STATEMENT OF THE CASE

### A. The COVID-19 Pandemic

COVID-19 is a respiratory disease caused by an airborne, highly contagious virus that can cause serious illness or death. 2-ER-57–58. On February 29, 2020, then-Washington Governor Jay Inslee proclaimed an emergency and, the next month, issued a "Stay Home" order. 2-ER-59.

Accordingly, WSU transformed its operations during the spring 2020 semester so almost all work and instruction were done remotely. 2-ER-59–60. Although remote instruction continued into the fall semester, many students chose to live on campus. 2-ER-67. COVID-19 cases remained persistent, and several outbreaks infected WSU students, including two football team outbreaks. 2-ER-67–68.

### B. Rolovich's Hiring and COVID-19's Impact on WSU

In January 2020, Chun announced Rolovich's hiring as WSU's new head football coach. 2-ER-55; 5-ER-792. The head coach leads a team of approximately 120 players and 30 coaches and staff in coaching practices, twelve regular-season games, and (usually) one bowl game. 2-ER-50. Head coaching duties also include recruitment, media appearances, and donor cultivation. 2-ER-52–55.

Three weeks after Rolovich's hiring, COVID-19 had become a public health emergency. 2-ER-59. The pandemic's impact on WSU's Athletics Department (Athletics) was immediate and significant. Many competitions were canceled due to state restrictions on in-person

7

gatherings, and those that continued did so without spectators, depriving Athletics of significant revenue. 2-ER-63.

The fall 2020 football season was shortened to seven games for all Pac-12 teams, including WSU. 2-ER-64. But COVID-19 outbreaks among football players caused three WSU games to be cancelled. 2-ER-64–65.

In March 2021, WSU's football team was connected to another major outbreak that contributed to sharp increases in COVID-19 cases county-wide. 2-ER-68. A few weeks later, the county was one of only three in Washington that had to revert back one phase in the State's "reopening plan" due to elevated disease activity. 2-ER-69.

## C. Rolovich's Conspiratorial COVID-19 Views

Since the early days of the pandemic, Rolovich freely expressed his conspiratorial beliefs in the virus's nefarious origins, its overblown danger, the folly of public health interventions to stem its spread and, eventually, the COVID-19 vaccines' dangers and inefficacy. 2-ER-76–77. In emails, texts, and Telegram messages, Rolovich shared numerous claims—many by QAnon[1] groups, influencers, and channels—asserting

---

[1] The "central idea" of the QAnon "conspiracy theory alleges that 'a group of Satan-worshipping elites who run a child sex ring are trying to control our politics and media' – and that . . . President Donald Trump was fighting back." 1-SER-267 (quoting Kevin Roose, *What is QAnon, the Viral Pro-Trump Conspiracy Theory?* N.Y. Times, Sept. 3, 2021, https://www.nytimes.com/article/what-is-qanon.html). Members of the cabal purportedly drank the children's blood "to extract a life-extending chemical called adrenochrome." Roose, *supra*.

8

that COVID-19 was not a serious public health threat but instead part of a vast government plot. 2-ER-76; 1-SER-275–77.

In one message, Rolovich wrote: "[t]he real virus was intercepted at a [Deep Underground Military Bunker] in . . . [New Mexico] and replaced with a weak virus that died two months later." 4-SER-659. According to this theory, President "Trump and the White Hats used the fake COVID PLANDEMIC to discreetly hunt down and arrest[ ] over 300,000 criminals," "sav[e] children from child sex trafficking," and shut down "adrenochrome production facilities." 4-SER-659. Rolovich expressed similar views in conversations with his fellow coaches and other WSU Athletics personnel. 2-ER-76; 5-ER-796–97; 2-SER-302.

Soon after the COVID-19 vaccines became available in early 2021, they became a major focus of Rolovich's discussions with friends, coworkers, and others.[2] 1-SER-273–79. Throughout late 2020 and 2021, Rolovich frequently expressed concerns regarding the vaccines' safety, efficacy, and regulatory approval processes. 2-ER-76–77. For example, on July 23, 2021, Rolovich shared a post with friends via Telegram, stating: "Under vakseen [sic] fascism, the state owns your body. Pharma is the state, Pharma uses human bodies as toxic profit factories, life itself is ultimately discarded as waste, and a bunch of bougie grifters help

---

[2] Starting in December 2020, the U.S. Food and Drug Administration issued Emergency Use Authorizations for three COVID-19 vaccines developed by Pfizer, Moderna, and Johnson & Johnson. 2-ER-70.

9

manage and cover up the genocide in return for a share of the loot." 2-ER-118; 4-SER-750; *see also* 4-SER-729, 4-SER-735, 4-SER-744, 4-SER-747.

These are not isolated examples. In discovery, Rolovich produced thousands of messages expressing conspiracy theories, health-based fears, or other *secular* concerns about the COVID-19 vaccines. *See, e.g.*, 1-SER-273–77; 3-SER-393–514.[3] Yet conspicuously absent from Rolovich's massive repository of vaccine-related correspondence was any "specifically religious arguments in his objections to vaccination." 1-SER-277. And it is undisputed that "[n]one of Rolovich's written communications before August 17, 2021"—when Rolovich learned of the Governor's vaccine mandate—"stated that he had a religiously based objection to the COVID-19 vaccines." 2-ER-78.

## D.    Rolovich and the Vaccines

In April 2021, WSU announced it would require proof of vaccination for employees and on-campus students in the fall semester, when it expected to return to fully in-person instruction. 2-ER-71–72. Because Rolovich had been outspoken about his fear of the vaccines, Chun

---

[3] This massive volume is especially remarkable given that a forensic examination of Rolovich's personal iPhone revealed that over 222,000 text messages had been deleted. 1-SER-30. An automatic deletion function discarding text messages after 30 days caused the loss of all text messages before July 30, 2021—two weeks after Rolovich publicly announced his decision not to be vaccinated. 2-ER-88; 1-SER-30.

10

arranged for him to meet with Dr. Guy Palmer, an infectious disease professor and the Chief Science Advisor for WSU's COVID-19 response. 2-ER-79. Rolovich expressed various health-based and regulatory concerns about the vaccines with Dr. Palmer, but no religious objection. 2-ER-80–81.

In May 2021, Chun and Rolovich met several times to discuss Rolovich's vaccine stance. 2-ER-82–86. Rolovich continued to express alarm about the vaccines' purported adverse health effects. 2-ER-82. Undisputedly, Rolovich again did not mention religion or any religious objection to vaccination. 2-ER-86.

### E.    Rolovich's Announcement of His Vaccine Opposition

On June 10, 2021, the Pac-12 announced it would require all attendees of football media day in Los Angeles to be vaccinated. 2-ER-87. Chun informed Rolovich of the Pac-12's policy, and Rolovich reaffirmed his anti-vaccination stance. 2-ER-87.

On July 21, 2021, the week before media day, Rolovich released a statement via his personal Twitter account. 2-ER-88. The tweet stated: "I have elected not to receive a COVID-19 vaccine for reasons which will remain private. While I have made my own decision, I respect that every individual . . . can make his or her own decision regarding the COVID-19 vaccine." 2-ER-88.

Rolovich's announcement generated significant negative media coverage. 2-ER-89. Hundreds of WSU alumni, donors, and others wrote

11

to WSU leadership to express disapproval of Rolovich's anti-vaccine position, threatening to withhold millions in donations. 2-ER-89–90.

### F. The Delta Surge and Proclamation 21-14

Rolovich's July 2021 announcement coincided with the highly infectious "Delta variant" becoming the dominant COVID-19 strain. 2-ER-92. COVID-19 case counts reached unprecedented levels, and hospitalizations and deaths also soared. 2-ER-92–93. According to the unrebutted testimony of WSU's scientific experts, the data available in summer and fall of 2021 showed the vaccines remained highly effective at both protecting against the virus's transmission and preventing severe disease. 2-ER-93–94.

On August 9, 2021, Governor Inslee issued Proclamation 21-14 (the Proclamation). 2-ER-95. The Proclamation initially prohibited healthcare workers and most state employees from working after October 18 without being fully vaccinated against COVID-19, unless they had an approved accommodation for religious or medical reasons. 2-ER-95. On August 18, the Governor announced the Proclamation's extension to educational employers (including WSU). 2-ER-96. The Proclamation superseded WSU's earlier policy, which had allowed exemptions for non-religious "philosophical/personal" reasons. 2-ER-97.

### G. Rolovich's Accommodation Request

On August 16, 2021, Chun informed Rolovich the Proclamation would soon cover WSU, and accommodations would be afforded only for

medical or religious reasons. 2-ER-123. The next day, Rolovich's agent, Thayer Evans, sent him a vaccine mandate religious exemption request template from the National Catholic Bioethics Center (NCBC). 2-ER-124; 3-SER-562. The NCBC template invoked the "Church's teaching" that a Catholic "must obey the judgment of his or her own informed and certain conscience." 2-ER-124; 3-SER-562.

Later that day, Rolovich spoke with Father Paul Heric, a Catholic priest he'd met a few weeks earlier who had initially *encouraged* him to get vaccinated. 2-ER-121, 2-ER-142. Rolovich testified that it was only at that point—on August 17, 2021, a few hours after Evans sent him the NCBC template—that Rolovich first "came to understand that [he] had a religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination." 2-ER-125; 3-SER-389–90. A few days later, Evans wrote in a text message to Rolovich and his attorney: "Since Nick's not going to get the shot and we can't find a doctor to write him a note, I think [a religious accommodation] is the best alternative strategy we have." 2-ER-128; 3-SER-549.[4]

On August 19, 2021, Rolovich informed Chun and then-Deputy Athletics Director Bryan Blair that he intended to pursue a religious accommodation. 2-ER-125–26. It is undisputed that Rolovich had never

---

[4] In July or August 2021, Rolovich and Evans discussed finding a doctor to write him a note to pursue a medical accommodation. 2-ER-116–17; 3-SER-381. Rolovich undisputedly has no condition that would have supported a medical accommodation. 2-ER-117.

13

before mentioned a religious basis for his vaccine opposition to Chun or Blair. 2-ER-126. Also undisputedly, Rolovich did not share the nature of his religious objection with Chun and Blair at that meeting, or at any point thereafter. 2-ER-127.

On October 4, 2021, Rolovich emailed his religious exemption request to WSU's Human Resource Services (HRS). The request was based on the NCBC template Evans had found, which Rolovich's attorney then edited. 2-ER-124; 2-ER-128. Rolovich himself neither drafted nor edited his exemption request. 2-ER-129; 3-SER-237.

## H.    WSU's Denial of Rolovich's Accommodation Request

On October 6, 2021, without providing Rolovich's exemption request itself, HRS notified Athletics that his request "support[ed] the accommodation request based on a sincerely held religious belief." 2-ER-131. HRS advised that it was Athletics' responsibility "to determine if the employee is able to perform essential functions of the position," "meet the [State's] COVID-19 safety measures," "and protect the health and safety of the WSU community as part of this accommodation request." 2-ER-131–32. In total, eight football coaches and staff sought religious accommodations, including Rolovich. 2-ER-132.

Chun, Blair, and then-Deputy Athletics Director Anne McCoy evaluated Rolovich's job duties to determine if he could safely be accommodated. 2-ER-132–36. In doing so, they undisputedly relied on the public health information available at that time. 2-ER-136; 4-ER-598; 5-

14

ER-809. They also considered a memo prepared by WSU Environmental Health & Safety (EH&S) assessing Rolovich's position and identifying the minimum public health requirements he would have had to follow to continue working unvaccinated if he received an accommodation. 2-ER-139–46; 5-ER-813; 5-ER-895.

It is undisputed that the head football coach job requires frequent, in-person contacts with a wide range of individuals. 2-ER-54–55. It is also undisputed that, in fall 2021, unvaccinated persons posed a materially higher risk of contracting and transmitting COVID-19. 2-ER-154–55. Accordingly, Chun decided—with McCoy and Blair's agreement—to deny Rolovich's accommodation request. 2-ER-132–33; 2-ER-146.

Chun set forth his reasoning in three memos to HRS. The first focused on the increased risk of an unvaccinated coach spreading COVID-19. 5-ER-888. The second memo "cast doubt" on whether Rolovich had a sincere religious belief against vaccination given his longtime expression of "vocal and consistent" secular objections without ever mentioning a religious one. 5-ER-892. The third memo responded to EH&S's assessment, concluding Rolovich could not "safely and effectively perform his assigned duties." 5-ER-904.

On October 18, 2021, HRS emailed Rolovich informing him of the denial of his accommodation request because WSU could not accommodate him without undue hardship. 2-ER-148. HRS also stated that WSU "question[ed] [Rolovich's] assertion that [his] sincerely held

15

religious views conflict with the University's vaccine requirement." 2-ER-149. Chun then delivered Rolovich a letter stating WSU was terminating his employment for "just cause" pursuant to his employment contract. 2-ER-151–52. Through counsel, Rolovich appealed the termination—first to Chun, then to WSU President Kirk Schulz. 2-ER-151–53. Both appeals were denied. 2-ER-151–53.

## I. Procedural History

### 1. The Pleadings Phase

Rolovich filed suit in state court against WSU, Chun, and Governor Inslee, and quickly amended. The First Amended Complaint asserted claims under (1) Title VII, (2) the WLAD, (3) the Free Exercise Clause, U.S. Const. am. I; (4) the Due Process Clause, *id.* am. XIV; (5) Article I, section 11 of the Washington Constitution; and (6) a breach-of-contract theory. 5-SER-1115–22.

Defendants removed and then moved to dismiss. 5-SER-1014. The District Court dismissed with prejudice all claims against Governor Inslee and the constitutional claims against WSU and Chun. 1-ER-40.

Rolovich's remaining claims moved forward. On Rolovich's Title VII and WLAD claims, the District Court held Rolovich had "adequately stated a claim for failure to accommodate." 1-ER-23–24. The District Court did not address a traditional disparate treatment claim under Title VII or the WLAD, as Rolovich had not asserted one; in opposing WSU's

16

motion to dismiss, Rolovich only argued that he "adequately pled a failure-to-accommodate claim." 5-SER-957–58; 4-SER-880–82.

With the District Court's leave, Rolovich filed a Second Amended Complaint adding a claim for "wrongful withholding of wages." 6-ER-1232. He did not amend the complaint in any other respects. 4-SER-858. *Compare* 6-ER-1233–35, *with* 5-SER-1117–20.

### 2. The Summary Judgment Phase

Rolovich moved for partial summary judgment on his prima facie case of failure to accommodate religion under Title VII. 4-SER-835. WSU cross-moved for summary judgment on all claims. 4-SER-787. The District Court denied Rolovich's motion and granted WSU's. 1-ER-12.

On Rolovich's Title VII claim, the District Court held that he failed to establish a prima facie case because the "record does not support [his] claim of religious objection to the vaccination." 1-ER-9. The District Court accurately noted that, "[i]n the thousands of pages of discovery" Rolovich produced, he "[did] not invoke a religious objection to the vaccine." 1-ER-9.

"[M]ore importantly," the District Court held, WSU's undue hardship defense prevailed. 1-ER-9–10. WSU's "unrebutted expert testimony" established that Rolovich's "unvaccinated status materially increased the risk of spreading COVID-19 to others"—a risk compounded by his "repeatedly refus[ing] to wear a mask during games and meetings." 1-ER-11. Because Rolovich's "job as head football coach undisputedly

17

required frequent interactions with students, coworkers, donors, the media and others (hundreds of people)," this "increased risk of exposure of COVID-19" to others "created an undue hardship for [WSU] and no other possible accommodation would have negated that risk." 1-ER-10–11. The District Court also found undue hardship in the "unrebutted evidence" that accommodating Rolovich "would have resulted in increased travel costs, harm to recruitment and fundraising efforts, and damage to WSU's reputation and donor commitments." 1-ER-10.[5]

On Rolovich's WLAD claim, WSU was entitled to summary judgment for the same reasons. 1-ER-9. As both parties agreed, "[t]he requirements to state a claim for a failure to accommodate under the WLAD are substantially similar to those under Title VII." 1-ER-9; 1-SER-178; 4-SER-803.

On Rolovich's breach-of-contract and wage-withholding claims, the District Court granted WSU summary judgment because it "had just cause to terminate [his] employment," so WSU neither breached Rolovich's employment agreement nor owed him liquidated damages under it. 1-ER-11.

---

[5] In reciting the legal standards, the District Court quoted *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc), which contained "de minimis" language later overruled by *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). 1-ER-10. (The summary judgment order also cited *Groff*. 1-ER-10.) The District Court later struck the *Balint* citation as a clerical error that did "not change the conclusion of the Court." 1-ER-2.

18

## STANDARD OF REVIEW

This Court reviews de novo the District Court's grant of summary judgment and Rule 12(b)(6) dismissal, and may affirm on any basis supported by the record. *Saloojas, Inc. v. Aetna Health of Cal., Inc.*, 80 F.4th 1011, 1014 (9th Cir. 2023); *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009). Summary judgment is appropriate when no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A Rule 12(b)(6) motion "is analyzed using the plausibility pleading standards of Rule 8(a), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 [] (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 [] (2009)." *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1056–57 (9th Cir. 2023). Under those standards, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## SUMMARY OF ARGUMENT

**I.** **Title VII/WLAD.** The District Court correctly granted WSU summary judgment on Rolovich's failure-to-accommodate-religion claims because accommodating him would have caused WSU undue hardship. This Court's recent decision in *Petersen* confirms WSU's undue hardship, which was supported by undisputed evidence of: the highly interpersonal nature of the head coach position; expert testimony regarding the health and safety risks posed by an unvaccinated coach; Rolovich's chronic

19

noncompliance with masking and distancing rules; and the substantial economic harms WSU risked had it allowed him to continue coaching unvaccinated. Alternatively, summary judgment should be affirmed because no reasonable jury could find Rolovich had a bona fide religious belief conflicting with COVID-19 vaccination.

Rolovich did not plead a traditional disparate treatment claim in any of his three complaints or otherwise give notice of that claim below. That forfeited theory also fails because no evidence shows WSU's decisionmakers knew what Rolovich's religious beliefs even were, let alone that their hostility to such beliefs likely motivated the termination of his employment.

**II.** **Breach of Contract.** The District Court correctly granted summary judgment on Rolovich's breach-of-contract claim because his termination was for just cause: having neither received an accommodation nor been vaccinated by the deadline, he was legally prohibited from working for WSU.

**III.** **Washington Wage Rebate Act.** The District Court correctly granted summary judgment on Rolovich's wage-withholding claim. Because Rolovich was terminated for just cause, WSU was not obligated under his employment agreement to pay liquidated damages, so no wages were unlawfully and willfully withheld.

**IV.** **Free Exercise.** The District Court correctly dismissed Rolovich's free exercise claim against Chun. This claim is foreclosed by

20

binding precedent holding that the Free Exercise Clause confers no right to an exemption from neutral and generally applicable vaccination requirements, and Chun is protected by qualified immunity.

## ARGUMENT

I.  **The District Court Correctly Granted WSU Summary Judgment on Rolovich's Title VII and WLAD Claims**

To establish a prima facie case of failure to accommodate religion under Title VII, a plaintiff has the burden to show:

> (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and the conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement.

*Petersen*, 2025 WL 2503128, at *4 (cleaned up). If the plaintiff establishes a prima facie case, "the burden then shifts to the employer to show that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* (cleaned up). Because the failure-to-accommodate-religion standards under the WLAD "mirror[] the federal" Title VII standard, WSU addresses those claims together, using "Title VII" to refer to both statutes. *Id.* n.3.

## A. Accommodating Rolovich Would Have Caused WSU Undue Hardship

The District Court's grant of summary judgment should be affirmed based on undue hardship. *See, e.g.*, *id.* at *4 ("assum[ing] [plaintiffs] have set forth a prima facie case" and proceeding directly to undue hardship on appeal). An "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Groff*, 600 U.S. at 468. Three basic undue hardship principles are particularly relevant here:

*First*, legitimate safety concerns, including the spread of infectious diseases, constitute undue hardship. *See Petersen*, 2025 WL 2503128, at *7. Consistent with that principle, every circuit to consider the issue in the COVID-19 vaccine context—including this Court—has affirmed summary judgment on undue hardship based on the unvaccinated employee's risk of spreading the virus. *See, e.g.*, *id.*; *Henry v. S. Ohio Med. Ctr.*, --- F.4th ----, No. 24-3863, 2025 WL 2621727, at *8 (6th Cir. Sept. 11, 2025); *Savel v. MetroHealth Sys.*, No. 24-4025, 2025 WL 1826674, at *2 (6th Cir. July 2, 2025); *Wise v. Child.'s Hosp. Med. Ctr. of Akron*, No. 24-3674, 2025 WL 1392209, at *5 (6th Cir. May 14, 2025); *Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135, at *2 (3d Cir. Apr. 10, 2025); *Melino v. Boston Med. Ctr.*, 127 F.4th 391, 397–98 (1st Cir. 2025); *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 92–93 (1st Cir. 2025); *Kizer v. St. Jude Child.'s Res. Hosp.*, No. 24-5207, 2024 WL 4816856, at *5 (6th Cir. Nov. 18, 2024).

22

***Second***, the undue hardship analysis must account for the "cumulative cost or burden of granting accommodations to other employees" who requested them. EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* § L.4 (updated May 15, 2023), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws; *see, e.g.*, *Petersen*, 2025 WL 2503128, at *7–8; *Wise*, 2025 WL 1392209, at *5.

***Third***, the "relevant [undue hardship] inquiry" must be "cabined" to "the medical and scientific evidence available at the time [the employer] made [its] decision." *Rodrique*, 126 F.4th at 92; *see also Peterson*, 2025 WL 2503128, at *9 ("We must consider the costs faced by [the employer] in October 2021, not today," including "the scientific evidence and COVID data then available . . . .").[6]

These three principles undergird the District Court's correct conclusion that "[t]he overwhelming evidence shows that Plaintiff's refusal to vaccinate would cause undue hardship to Defendant." 1-ER-11. WSU presented unrebutted expert testimony on the safety risks posed by

---

[6] Although Rolovich conceded this point below, 1-SER-186, his amicus Dr. Ram Duriseti overlooks it. Not only are all Dr. Duriseti's sources outside the record, but most were published after October 2021. The Court should disregard them. *See Rodrique*, 126 F.4th at 93 n.4 (declining to consider "sources outside the record" plaintiff cited "to establish that the COVID-19 vaccine does not reduce the risk of transmission" because "none . . . were before the district court").

Rolovich to players, staff, and the broader university community. 2-ER-153–57. WSU showed that accommodating not only Rolovich, but seven other football coaches and staff, would have compounded those risks. 2-ER-132; 3-ER-456; 4-ER-689. And WSU undisputedly relied on the authoritative scientific guidance available in fall 2021 when making its decision. 2-ER-136; 4-ER-598; 5-ER-809.

## 1. Under *Petersen*, Rolovich's increased risk of spreading COVID-19 constitutes an undue hardship

As the District Court noted, WSU "put forward unrebutted expert testimony that Plaintiff's unvaccinated status materially increased the risk of spreading COVID-19 to others." 1-ER-11. No competent evidence contradicts this fact, which establishes undue hardship as a matter of law, as confirmed by this Court's recent decision in *Petersen*.

In *Petersen*, unvaccinated firefighters with Snohomish Regional Fire and Rescue (SRFR) sued after SRFR denied their requests for religious accommodations from the Proclamation. 2025 WL 2503128 at *1. The district court granted summary judgment on undue hardship because "the undisputed evidence showed that 'allowing unvaccinated firefighters to work would increase the risk of spreading COVID-19.'" *Id.* at *3. This Court affirmed in a published opinion that strongly supports WSU's undue hardship defense, for multiple reasons:

***First***, the *Petersen* record showed that "firefighters work in group settings, interfacing constantly with coworkers and the public, both

24

inside and outdoors." *Id.* at *7 ("[W]hen considering undue hardship in the context of COVID, employers should consider if the employee 'works in a solitary or group work setting,' 'has close contact with other employees or members of the public,' and 'works outdoors or indoors.'") (quoting *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (Mar. 1, 2022), https://perma.cc/CQ9C-JPNY). The same is all true of a football coach.

Indeed, a football coach's job involves far more close contacts: the undisputed record establishes that an unvaccinated head football coach and seven assistant coaches and staff would, together, have had hundreds (if not thousands) of potential weekly COVID-19 exposures. *See* 2-ER-50–55; 2-SER-293–97. Rolovich's successor as head coach testified that his typical week involved interactions with "perhaps 1,000 or more" people across diverse settings, predominantly face-to-face encounters in close quarters. 2-SER-297–301. And Rolovich's own testimony confirmed the intensely interpersonal nature of his job, particularly given his leadership philosophy of never "pass[ing] [players or staff] in person without engaging them." 2-ER-56–57; 3-SER-365. His duties encompassed not only coaching but also traveling and sharing meals with the team, media obligations, donor events, and other activities involving sustained, close interactions with countless other people. 2-ER-50–55; 5-ER-793–96; 2-SER-293–97. In other words, a football coach "is precisely the kind of person who could easily spread the virus." *Wise*, 2025 WL

25

1392209, at *3 (affirming summary judgment based on undue hardship where plaintiff "was exposed to up to 27 pharmacy employees each ten-hour shift").

**Second**, the *Petersen* Court relied on the "extensive declaration of Dr. John Lynch," a "board-certified physician in infectious disease who led "the University [of Washington]'s COVID response." 2025 WL 2503128 at *6. Dr. Lynch's "unrebutted" findings established that "SRFR would have faced significant health and safety costs by allowing unvaccinated firefighters to continue working, even with accommodations." *Id.* at *7. His many findings cited in *Petersen* include:

- "Dr. Lynch opined that COVID vaccination is the best way to slow the spread of COVID and prevent serious illness or death." *Id.* at *6.

- He explained that "being fully vaccinated provides better protection [from reinfection] as compared to having recovered from COVID." *Id.*

- "During th[e] time [of the vaccination mandate], 'cases were spiking due to the Delta variant despite other strategies in place. This was followed by the Omicron waves, which continued . . . into 2022.'" *Id.*

- "Dr. Lynch explained in some detail why Plaintiffs' proposed accommodation—testing, masking, and social distancing in lieu of vaccination—was inadequate. Regular COVID-19 testing was

26

'not sufficient' because tests are not always accurate and unvaccinated people subject to testing were 'among positive cases that . . . caused outbreaks in' Washington." *Id.* at *7.

- "Dr. Lynch described . . . masks, as 'complements, not substitutes, for getting vaccinated,' since '[m]asks shore up protection on the outside,' and vaccines do so on the 'inside.' . . . [V]accines are 'effective around the clock,' and masks are not because 'a work-based masking requirement applies only while employees are at work.'" *Id.*

- "For Dr. Lynch, 'vaccination was and is the single best tool available for stemming the spread of COVID-19 . . . , especially when used in combination with other mitigations.'" *Id.*

Those findings apply equally here because Dr. Lynch offered nearly *identical* opinions in his expert report for WSU. 4-ER-671; 4-ER-673; 4-ER-678; 4-ER-689. And similar to Dr. Lynch's "review[ of] 'the risks of COVID-19 spreading throughout fire stations'" in *Petersen*, 2025 WL 2503128, at *6, here he analyzed the football coaches' job duties and concluded that their "risk of being exposed to individuals . . . with COVID-19 and transmitting COVID-19 (if infected) was significantly greater" than the general population, 4-ER-689.[7]

---

[7] Dr. Lynch was uniquely qualified to assess COVID-19 spread in the football context, having served "as a consultant for the National Football League (NFL) in 2020 and 2021 to" make "recommendations for mitigations to prevent COVID-19 . . . transmission." 4-ER-687.

WSU's other medical expert, Dr. Guy Palmer, likewise concluded that "accommodating Mr. Rolovich and the other football staff in October of 2021 by allowing [them] to continue doing their jobs unvaccinated would have posed a serious risk of them contracting COVID-19 and transmitting it to others," as well as "increased the risk of another outbreak similar to the one that occurred in March of 2021, with the football team again at the epicenter." 3-ER-455–56. Dr. Palmer also "agree[d] with [Dr. Lynch's] other conclusions generally and in their particulars." 3-ER-425; 3-ER-440. And, as in *Petersen*, Dr. Lynch's and Dr. Palmer's opinions were "unrebutted." 2025 WL 2503128 at *6; 2-ER-153–57.

**Third**, the record in *Petersen* "showed that Plaintiffs did not always wear masks or social distance." *Id.* at *7. And "[b]ecause firefighters did not (and likely could not) always mask and social distance, SRFR needed a way to ensure employee and public safety. Dr. Lynch's opinion explains that the vaccine offered the safest, easiest, and most effective way of doing so." *Id.*

So, too, here. As the District Court noted, Rolovich "repeatedly refused to wear a mask during games and meetings," 1-ER-11, despite the fact that Pac-12 rules, WSU requirements, and state law all required unvaccinated persons to mask and distance in summer and fall of 2021, 2-ER-103–16. Rolovich testified that unmasking during games was *necessary* to "un-muffle [his] voice" and "make sure [players] heard [him]"

28

or could "read[ his] lips" when he was "sending in plays and/or information" in a noisy "football stadium with 30,000 people." 3-SER-372–73. Rolovich further rationalized that masks constrained his oxygen flow and exacerbated "party headaches" he experienced from yelling. 3-SER-374. But even if Rolovich had been willing and able to follow masking requirements, Dr. Lynch concluded (as he did in *Petersen*) that the "use of [PPE] is a complement—not a substitute for getting vaccinated," which was "the most important and effective public health tool at our disposal to combat COVID-19." 4-ER-671, 4-ER-678; *see Petersen*, 2025 WL 2503128, at *7.

Confronted with this lopsided and undisputed record of undue hardship, Rolovich meekly musters only four retorts: (1) he purportedly removed his mask only "occasionally"; (2) WSU did not expel from the team "14 unvaccinated football players" who received religious exemptions; (3) WSU had achieved "herd immunity" with its "95% vaccination rate"; and (4) WSU granted accommodations to other unvaccinated employees doing different jobs in other departments. Op. Br. at 32, 34, 38. Even if these arguments had all been raised below (and the latter two were not), they are unsupported by competent evidence or legal authority.

### a. *Rolovich frequently violated masking requirements*

Rolovich mischaracterizes the record in claiming he only "occasionally remov[ed] his mask to communicate in noisy environments

29

and to drink." Op. Br. at 38. In reality, WSU built a robust photographic record of Rolovich flagrantly and frequently violating masking and distancing rules in fall 2021, including during games—which violated WSU and NCAA rules. 4-SER-763–74; 4-ER-601; 5-ER-799, 5-ER-808–09. A few (of many) examples appear below.



4-SER-763–74 (circles added); *see also* 3-ER-486–507.

Rolovich also often mocked masking requirements and spent time unmasked in close proximity to fans and donors after failing to disclose— or outright lying about—his unvaccinated status:



1-SER-229 (Rolovich with wine bar employee in May 2021 where he misled staff to gain entry when asked if he was vaccinated).

 

5-ER-867 (Rolovich at indoor football game on July 17, 2021); 5-ER-864 (same, blowing through vuvuzela) (circle added); *see also* 1-SER-224–29.

31

Rolovich's noncompliance with masking and distancing policies is undisputed, as is Dr. Lynch's conclusion that "[t]hese compliance issues made vaccination all the more important in ensuring the safety of the community." 3-ER-449. As the EH&S memorandum noted, masking and social distancing were "*minimum*" requirements of *any* reasonable accommodation for an unvaccinated person. 2-ER-141–43; 5-ER-899. Under these requirements, Rolovich would have had to wear a "NIOSH certified N95 respirator" when within six feet of others for longer than ten minutes. 2-ER-143. Adhering to that "minimum" requirement would have been impossible for Rolovich, given he could not consistently wear even a *cloth* mask while coaching. 4-ER-602.[8]

Rolovich's apparent argument that a "reasonable jury could . . . infer" that masking was a reasonable alternative to vaccination *for him* is wholly unsupported in the record. Op. Br. at 38. Rolovich suggests a jury might reject the conclusions of scientific experts based on the arguments of counsel. But to defeat a motion for summary judgment Rolovich must point to contradictory *evidence in the record. See, e.g.*, *Petersen*, 2025 WL 2503128, at *9 (employer's "unrebutted medical evidence . . . showed the inadequacy of Plaintiffs' proposed

---

[8] Rolovich misrepresents the EH&S memo as making "proposed accommodations." Op. Br. at 17. In fact, the memo described "just the requirements that at a minimum would be required" if Rolovich were ultimately accommodated, "but not . . . a recommendation" about *whether* he could safely be accommodated. 3-SER-524.

accommodation" of masking, testing, and distancing); *Melino*, 127 F.4th at 398 (similar). No such evidence exists.

Finally, Rolovich's claim that WSU had "permissive masking regulations for the unvaccinated" likewise finds no support in the record. Op. Br. at 34. His sole evidence is an interrogatory answer summarizing Governor Inslee's separate vaccine mandate for university *students*. *Id.* at 38 (citing 2-ER-309–10). Under that proclamation, students with exemptions were required to wear a mask "at all times while on WSU property," except in limited, enumerated circumstances like "showering" or "sleeping." 2-ER-309; 1-SER-12–13. Nothing about this masking requirement is "permissive." And when similar masking rules applied to Rolovich, he violated them.

### b. *Exemptions for student-athletes are irrelevant*

Rolovich's argument regarding student-athlete exemptions is misplaced for several reasons, most fundamentally because the undue hardship analysis's "focus . . . is on the *employee* seeking an accommodation," not "the vaccination status of persons who are not employed" by WSU. *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *13 (W.D. Wash. Nov. 13, 2024). If accepted, Rolovich's position would compel the accommodation of unvaccinated physicians (or firefighters) unless their employers refused to care for unvaccinated patients. Title VII requires nothing of the sort. *See, e.g.*, *Snow v. Women's Healthcare Assocs., LLC*, No. 3:23-CV-01393-IM,

33

2024 WL 3640111, at *8 n.4 (D. Or. Aug. 2, 2024) (unvaccinated patients irrelevant to undue hardship); *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) (same).

Rolovich also ignores fundamental differences between the *employee* and *student* vaccination mandates, which derived from different gubernatorial proclamations. 1-SER-10; 1-SER-18; 3-ER-553; 3-ER-417. Specifically, the student mandate required WSU to provide *exemptions* for qualified students, but did not provide for any *accommodation* process (including an undue hardship analysis, which is a feature of employment discrimination law). 1-SER-13, 1-SER-20. WSU therefore did not—and legally could not—deny students *exemptions* on the basis of undue hardship. *Id.*; *see, e.g., Doe v. San Diego Unified Sch. Dist.* (*SDUSD*), 19 F.4th 1173, 1180 (9th Cir. 2021) (rejecting analogy between exemption policy for student vaccination mandate and "accommodation procedure in [school district's] *employee* vaccination mandate"); *Richardson v. Nat'l Basketball Ass'n*, No. 23CV6926 (DLC), 2025 WL 2402614, at *15 (S.D.N.Y. Aug. 18, 2025) (rejecting former basketball referee's argument "that the NBA did not impose a vaccination requirement on the NBA players" as "inapposite" because "the plaintiff does not contend that the NBA had the ability to unilaterally impose a vaccine requirement on the players").

34

Relatedly, Rolovich wrongly assumes Athletics could have removed unvaccinated players with valid exemptions from the team. Yet Athletics undisputedly had "no involvement or authority over the student vaccination requirement or the process by which [student-athletes] applied for and received religious exemptions." 5-ER-814. Chun's task was "to determine whether unvaccinated Athletics *employees* could safely perform their job duties without endangering the health and safety of others." 5-ER-814. He did not have authority to oust unvaccinated players with approved exemptions, and would have risked litigation had he tried to do so. *See Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 732 (6th Cir. 2021) (per curiam).

Even if unvaccinated players were relevant to WSU's ability to accommodate Rolovich (and they aren't), no evidence suggests they were comparable in their risk profile to a head coach who interacts in close contact with hundreds of people weekly—both on and off the field. *See supra* at 25–28. Nor does the record show that any unvaccinated football players failed to comply with masking rules, let alone that any were as brazenly cavalier about the rules as their coach. *See supra* at 28–32.

Finally, the fact that some student-athletes were unvaccinated only *increased* the health risk posed by unvaccinated coaches. The danger to unvaccinated students would undisputedly have been "dramatically" higher had eight unvaccinated football staff continued in their jobs. 3-ER-456. As a matter of law, the health risk to non-employees—especially

35

unvaccinated non-employees like students or patients—constitutes undue hardship. *See Petersen*, 2025 WL 2503128, at *6 (recognizing SRFR's "concern[ ] with the health of . . . the public, including vulnerable patients, that it serves"); *see, e.g.*, *Beickert v. N.Y.C. Dep't of Educ.*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *5 (E.D.N.Y. Sept. 25, 2023). In other words, that some football players were unvaccinated gave WSU *more* reason to deny Rolovich's accommodation request, not less. 3-ER-457; 5-ER-814; 5-ER-901.

### c. Rolovich's new "herd immunity" theory lacks support

For the first time on appeal, Rolovich argues that WSU had a 95% vaccination rate at the end of October 2021, which gave it "herd immunity." Op. Br. at 35. Rolovich did not make this argument below, so it is forfeited. 1-SER-135–42; *see Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 706 n.3 (9th Cir. 2024).

This argument also fails because it is unsupported by competent evidence. The "data" supporting the 95% figure is cobbled together from disparate parts of the record, none of which actually says WSU had a "systemwide vaccination rate of 95%." Op. Br. at 18 (citing 2-ER-248; 2-ER-216; 5-ER-1035).

More importantly, even assuming the figure's accuracy, no evidence supports its *scientific* significance. Op. Br. at 35. Because Rolovich's herd immunity argument is fundamentally a scientific one, it must be supported by scientific evidence. Yet none exists in this record. *See* Fed.

R. Civ. P. 56(c)(4); *see, e.g.*, *Melino*, 127 F.4th at 398 ("Melino's 'undue hardship argument' also fails because no medical evidence in the summary judgment record contradicts BMC's position."); *Cassell v. Snyders*, 990 F.3d 539, 549 (7th Cir. 2021) ("It has been difficult . . . to estimate when 'herd immunity' might be achieved through vaccination . . . . [A]s judges without scientific expertise, we must appreciate these uncertainties . . . .").

The three district court decisions (and one dissent from a cert denial) cited by Rolovich do not support his "herd immunity" theory. Op. Br. at 35–36. Each involved large groups of employees challenging *blanket* denials of religious exemptions, not individual determinations of undue hardship. *Id.* Unlike WSU, none of the employers provided "concrete evidence of the harms that would have accrued to them . . . if they would have allowed religious exemptions." *Brandon v. Bd. of Educ.*, No. 4:22-cv-00635-SRC, 2025 WL 1360684, at *34 (E.D. Mo. May 8, 2025). In contrast, courts have routinely granted summary judgment based on the undue hardship of accommodating *individual* employees. *See Jackson v. King Cnty.*, No. 2:23-CV-00774-RSL, 2025 WL 2022075, at *6 (W.D. Wash. July 18, 2025) ("Almost every court to consider an accommodation that would create a significant health or safety risk has concluded that the risk constitutes an undue hardship for purposes of a failure-to-accommodate claim.") (collecting cases); *see also Lisoski v. King*

37

*Cnty.*, No. 2:23-CV-00536-RSL, 2025 WL 2511243, at *1 (W.D. Wash. Sept. 2, 2025) (lifeguard/swim instructor).

### d. Rolovich's new "comparator" argument is misplaced

Rolovich's final argument—regarding WSU's accommodation of employees in other departments—was also not raised below and is forfeited. 1-SER-180–87.

Even if the Court considers it, Rolovich does not explain how those other employees' accommodations are even theoretically relevant to whether WSU could safely accommodate *him*. Such comparator evidence is part of "traditional" disparate treatment claims, not failure-to-accommodate claims. *See, e.g.*, *Leake v. Raytheon Techs. Corp.*, No. 23-15320, 2024 WL 1854287, at *1 (9th Cir. Apr. 29, 2024) (affirming dismissal of disparate treatment claim because no "non-religious employees . . . declined to comply with the vaccination requirement" but "were not subject to the adverse consequences that Plaintiffs allege"). Rolovich provides no principled basis for grafting the comparator prong of the disparate treatment prima facie case onto the undue hardship defense to failure-to-accommodate claims. *Cf. EEOC v. TriCore Reference Labs.*, 849 F.3d 929, 941 (10th Cir. 2017) (explaining role of comparator evidence in disparate treatment cases).[9]

---

[9] Other courts have recognized that "[c]omparator evidence has no role whatsoever in a failure to accommodate claim." *Green v. United Parcel Serv., Inc.*, No. CV 18-8744, 2019 WL 1430244, at *1, n.2 (E.D. La. Mar. 29, 2019); *see, e.g.*, *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1263

38

Even if comparator evidence were relevant to undue hardship, Rolovich identifies no "similarly situated" employee whom WSU accommodated—because he cannot. Instead, he points to employees in *different* departments with *different* jobs whose accommodations were approved by *different* supervisors. Op. Br. at 38. As a matter of law, then, those employees are not "similarly situated" to Rolovich "in all material respects." *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). Because Rolovich has failed to identify any employee similarly situated to *him* who received an accommodation, his argument that "unnamed employees received unidentified accommodations" does not rebut WSU's undue hardship defense. *Bushra*, 2025 WL 1078135, at *2 ("without any information on other employees granted accommodations, we cannot reasonably infer that [the employer] accommodated *similarly situated* staff") (cleaned up); *see also Savel*, 2025 WL 1826674, at *3; *Dixon v. Bessent*, No. 24-5110, 2025 WL 1720742, at *3 (D.C. Cir. June 20, 2025).[10]

_____

(11th Cir. 2007); *O'Hailpin v. Hawaiian Airlines, Inc.*, No. CV 22-00532 HG-WRP, 2025 WL 1543951, at *2 (D. Haw. May 30, 2025); *Chavez v. S.F. Bay Area Rapid Transit Dist.*, No. C 22-06119 WHA, 2024 WL 4371002, at *5 (N.D. Cal. Oct. 1, 2024).

[10] That undisputed fact distinguishes the single case Rolovich cites, where *other nurses* in similar care units had received accommodations. *Kidd v. Univ. Med. Ctr. of S. Nev.*, No. 2:22-CV-01990-ART-NJK, 2024 WL 4046249, at *6 (D. Nev. July 2, 2024). No evidence shows any accommodated employees had jobs similar to Rolovich's, let alone any who also flagrantly violated masking requirements. The only employees with similar jobs who requested accommodations were his assistant coaches, and their requests were all denied. 4-ER-603.

39

\*    \*    \*

As explained above, WSU provided extensive, unrebutted evidence of the specific safety threat Rolovich posed. He cannot now overcome his failure to adduce contrary evidence through unsupported, speculative, and forfeited arguments. This Court should decline Rolovich's invitation to "substitute the health and safety judgment of a [university] facing a rapidly evolving, highly uncertain novel pandemic for that of . . . hindsight judgment." *Wise*, 2025 WL 1392209, at \*5. No "case law . . . permits . . . such Monday morning quarterbacking." *Id.*

## 2. The economic costs of accommodating Rolovich constitute an undue hardship

Unrebutted evidence establishes that accommodating Rolovich would have forced WSU to incur substantial expenses and risk the loss of millions of dollars at a time it faced dire financial challenges. *See* 5-ER-929. To calculate these economic impacts, WSU offered the expert testimony of David Bones, which Rolovich did not rebut. 5-ER-924–87.

### a.   *WSU would have incurred nearly $200,000 in travel costs to accommodate unvaccinated football coaches*

Bones concluded that the additional costs WSU would have incurred to provide separate travel arrangements for Rolovich and the other unvaccinated coaches would have been at least $197,000. 5-ER-956. These costs alone support a finding of undue hardship. *See Bordeaux v. Lions Gate Entm't, Inc.*, No. 23-4340, 2025 WL 655065, at \*1 (9th Cir.

40

Feb. 28, 2025) (undue hardship where production company would have to spend $300,000 to accommodate unvaccinated actor).

Rolovich calls these costs "chimerical" because WSU did not require separate travel for unvaccinated football *players*. *See* Op. Br. at 39. Again, Athletics had no authority to impose accommodations (including separate travel) on unpaid student-athletes who received *exemptions*. *See supra* at 34–35 .

### b. *Unvaccinated coaches would have risked millions in losses from cancelled games*

Unrebutted evidence also shows that allowing football coaches to remain unvaccinated significantly increased the likelihood of an outbreak on the team necessitating game cancellations. 4-ER-689; 5-ER-953. Bones calculated WSU would have lost at least $1.24 million for each cancelled game, and up to $1.88 million for a cancelled bowl game. 5-ER-952.

Rolovich argues these unrebutted calculations should be disregarded as "speculat[ive]" because WSU's 95% vaccination rate made another football team outbreak "low"-risk. Op. Br. at 40. Once again, however, his forfeited "herd immunity" theory finds zero support in the record. *See supra* at 36–37. Rolovich also overlooks that, in August 2021, WSU's *football team* had the *lowest* known vaccination rate of any Pac-12 team (80%), and a coach/staff vaccination rate of 75% (24 of 32). 5-ER-947; 2-SER-293; *see, e.g.*, *Petersen*, 2025 WL 2503128, at *8 (noting that

41

the "cost of accommodating nearly twenty-five percent of [SRFR]'s firefighters is substantial" because "allowing unvaccinated firefighters to work . . . put other firefighters at risk"). The football program's vaccination rate was thus markedly lower than the full University's, increasing the risk of a team outbreak, forfeited games, and millions in losses. *See* 5-ER-947–53.[11]

Equally irrelevant is Rolovich's hindsight argument that no 2021 games were ultimately cancelled due to outbreaks. Op. Br. at 40. The undue hardship inquiry must be conducted not "with the benefit of hindsight" but instead "based on the costs faced by [WSU] in October 2021." *Petersen*, 2025 WL 2503128, at *9 ("An undue hardship may include an evaluation of the risk of hardship, not just an accounting of damages actually suffered."). In October 2021, all WSU knew was that outbreaks had canceled three of its own football games the prior season, that 16 of 41 bowl games that season had been canceled, that WSU's football team had experienced another COVID-19 outbreak in spring of 2021, and that the Pac-12 had changed its rules in 2021 to treat games

---

[11] Rolovich cites *Varkonyi v. United Launch Alliance, LLC*, No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523, at *5 (C.D. Cal. Feb. 21, 2024), in which the court denied summary judgment where the employer "provided nothing from which the Court can determine the negative health ramifications of 3.8 percent of employees remaining unvaccinated." Here, WSU has adduced unrebutted evidence showing the health and safety risks of allowing eight football coaches and staff to remain unvaccinated. *See supra* at 27–28.

cancelled due to outbreaks as forfeits. 5-ER-939, 5-ER-948. This significant risk of millions in lost revenue is sufficiently "realistic" to support a finding of undue hardship. *Petersen*, 2025 WL 2503128, at *9; *see, e.g.*, *Bordeaux*, 2025 WL 655065, at *2 (affirming summary judgment on undue hardship where estimated costs of shutting down production of television show were at least $1.5 million).

### c.   WSU would have lost millions in donations

Accommodating Rolovich would also have risked the loss of significant revenue from WSU donors. After Rolovich publicly announced his vaccine opposition, one donor informed WSU he had canceled a planned $1 million bequest, another threatened to rescind a $250,000 donation, many other donors made similar threats, and multiple donor events were canceled. *See* 2-ER-165–69; 5-ER-957–59. The historical contributions from major donors who threatened to stop giving because of Rolovich totaled several million dollars. 2-ER-167; 1-SER-246–47.

Again without rebutting that evidence, Rolovich argues lost donations cannot support undue hardship because they reflect hostility to a "religious practice." *See* Op. Br. at 40–41. But these donors could not have been hostile to a "religious practice" of which they were never aware. And they expressed their concerns long before it was publicly revealed (in October 2021) Rolovich was pursuing a religious accommodation. *See, e.g.*, 2-ER-88–89; 1-SER-231. The donors knew only what Rolovich had

43

publicly announced: he was declining vaccination for "reasons that will remain private." 2-ER-88.

Rolovich also argues that other donors supported his vaccine refusal, citing one such supporting email. Op. Br. at 41–42 (citing 2-ER-294–5). But unlike the donors who opposed Rolovich's stance, there is no evidence of whether this lone email author had previously donated, how much, or what amount he was planning to withhold. And even this email shows (and the record reflects) that "the majority" of donors, including "many . . . major donors," did not want Rolovich to continue coaching unvaccinated. 2-ER-294.

Finally, Rolovich notes that any lost donations would be minimal relative to WSU's overall budget. Op. Br. at 42. He cites no case suggesting Athletics was required to consider the entire University budget in assessing the undue hardship of accommodating one employee. *Cf. Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 606 n.16 (1999) (under Rehabilitation Act Section 504, "the 'undue hardship' inquiry requires not simply an assessment of the cost of the accommodation in relation to the [employer's] overall budget, but a case-by-case analysis") (cleaned up).[12] It also ignores WSU's then-fraught economic condition: from 2020

---

[12] Rolovich cites *Baugh v. Austal USA, LLC*, No. 1:22-cv-329, 2025 WL 28453, at *7 (S.D. Ala. Jan. 3, 2025), where an expenditure of $1 million to accommodate 160 employees of an over-$1 billion corporation did not alone establish undue hardship. Op. Br. at 42. Here, Athletics anticipated the loss of millions of dollars to accommodate just *one employee*.

to 2021, Athletics' revenue declined by 46% and its deficit increased by 884%, prompting WSU to secure $35.6 million in external financing. 2-ER-942. Against this backdrop, the loss of millions was "substantial" in the context of WSU's business. *Groff*, 600 U.S. at 468.

### 3. Restrictions on Rolovich's ability to perform his job duties while unvaccinated constitute undue hardship

Rolovich's unvaccinated status would also have made it difficult or impossible for him to perform critical job functions due to various safety protocols. Unvaccinated individuals undisputedly faced greater probability of testing positive for COVID-19, both from increased susceptibility to infection and from mandatory testing requirements for unvaccinated personnel. 3-ER-457–58. Under WSU's health and safety policies, even Rolovich's close contact with an infected person would trigger a 14- or 24-day quarantine. 2-ER-145–46; 5-ER-810.

Rolovich's unvaccinated status also undermined his ability to do the most important part of his job after coaching: recruitment. *See* 2-ER-52; 2-ER-961; 2-SER-303. In fall 2021, many jurisdictions where WSU typically recruited players barred unvaccinated individuals from school facilities, severely limiting Rolovich's ability to recruit in person. 4-ER-600; 2-ER-83–84.

Without disputing those facts, Rolovich argues that NCAA rules prohibited *all* in-person, off-campus recruiting "between the time the vaccine became available and the date of his firing on October 18, 2021."

Op. Br. at 44. Rolovich misses the point. His recruiting limitations due to his unvaccinated status would undisputedly have continued into November 2021, when the "contact period" began. 2-ER-296. Rolovich was the *only* unvaccinated Pac-12 head coach, which would have put WSU at a significant recruiting disadvantage going forward. 2-ER-92; 5-ER-807–08; 4-ER-601.

## B. The District Court Correctly Held that Rolovich Failed to Establish a Prima Facie Failure-to-Accommodate-Religion Case

Summary judgment on Rolovich's Title VII claim is also appropriate because, as the District Court held, "the record does not support Plaintiff's claim of religious objection to the vaccination." 1-ER-9. This is true for two reasons.

***First***, though Rolovich "frequently expressed secular concerns about the COVID-19 vaccine to friends, family members and coworkers," in "thousands of pages of discovery" containing his vaccine-related communications, he "does not invoke a religious objection to the vaccine." 1-ER-9. Rolovich bristles at that observation, but it tracks the *undisputed* fact that "[n]one of Rolovich's written communications before August 17, 2021, stated that he had a religiously based objection to the COVID-19 vaccines." 2-ER-78.

In discovery, Rolovich produced thousands of Telegram and text messages espousing conspiracy theories and other secular arguments

against vaccination. 2-ER-76–77; 3-SER-393–514; 1-SER-273–78.[13] From late 2020 through 2021, Rolovich shared numerous secular claims against the vaccines—e.g., they were "experimental," a "hoax," a "bio-weapon," and part of "naked authoritarianism." 3-SER-457; 3-SER-511; 3-SER-482. Rolovich also shared these same views in conversations with WSU colleagues. 2-ER-77. At no point before August 17, 2021, however, did Rolovich mention religion or any religious objection. 2-ER-78; 2-ER-81; 2-ER-86.

It was only *after* learning (1) the vaccine would be mandated, (2) philosophical exemptions were eliminated, and (3) no doctor would provide a medical exemption, that Rolovich's agent recommended pursuing a religious accommodation as the "best alternative strategy," since Rolovich was "not going to get the shot and we can't find a doctor to write him a note." 2-ER-127–28. Rolovich then submitted the NCBC template his agent found online, which his lawyer edited. 2-ER-128–29.

The District Court rightly held that, on this record, no reasonable jury would find sincere Rolovich's all-too-convenient religious rationale. As this Court has explained, a "reasonable suspicion of dissimulation"

---

[13] Rolovich's vaccine-related communications were analyzed by WSU's vaccine hesitancy and misinformation expert, Renée DiResta, who found that "many if not most of Mr. Rolovich's communications appear to take issue with the vaccine based on deep-seated and sustained concerns about vaccine safety and efficacy," including "many . . . within the framework of longstanding conspiratorial vaccine tropes or QAnon"-specific themes. 1-SER-274–76.

47

arises when "a longstanding philosophical belief . . . only recently, and to the claimant's advantage, [has] taken on theological overtones." *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981); *see also Gardner-Alfred v. Fed. Reserve Bank of N.Y.*, 143 F.4th 51, 67 (2d Cir. 2025) (affirming summary judgment where "evidence of [plaintiff's] religious beliefs is so wholly contradictory, incomplete, and incredible that no reasonable jury could accept her professed beliefs as sincerely held."); *Kennedy v. Pei-Genesis*, No. 24-1563, 2025 WL 602159, at *1 (3d Cir. Feb. 25, 2025) (similar).

Amici the United States and the Christ Medicus Foundation largely ignore the evidence of Rolovich's dissimulation, apparently taking the position that sincerity can never be resolved against a plaintiff at summary judgment, which is incorrect. *See, e.g.*, *Gardner-Alfred*, 143 F.4th at 67. The Government is right that, "while a plaintiff's prior statements can be probative on the issue of sincerity, they do not automatically outweigh concurrent statements of religious belief." U.S. Br. at 13. But the District Court did not hold that Rolovich's long-held and vocal secular objections to vaccination *automatically* discredit his asserted religious objection. Rather, on this record, no reasonable jury could believe Rolovich's testimony that—at the very moment a religious objection to vaccination became necessary for him to keep his job while remaining unvaccinated—he belatedly "came to understand" his

48

"religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination." 6-ER-1161.

**Second**, even if a jury could find that belief *sincere*, such an amorphous and fungible objection does not establish an "actual conflict" with COVID-19 vaccination under the governing law. *See Bolden-Hardge v. Office of Cal. Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023).[14] In *Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania*, 877 F.3d 487, 492 (3d Cir. 2017), the court affirmed dismissal of a failure-to-accommodate-religion claim where the plaintiff believed consenting to his employer's vaccination mandate "would violate his conscience as to what is right and what is wrong." The Third Circuit held that Fallon "simply worrie[d] about the health effects of the flu vaccine" and his objection did not "'occupy . . . a place parallel to that filled by God in traditionally religious persons.'" *Id*. at 491–92 (quoting *Welsh v. United States*, 398 U.S. 333, 340 (1970)).

The Third Circuit has continued to apply *Fallon* in the COVID-19 vaccine mandate context. *See, e.g.*, *McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870, at *2 & n.5 (3d Cir. Nov. 15, 2024). And the vast majority of district courts within this Circuit have adopted the *Fallon* approach. *See, e.g.*, *Matejka v. Blue Origin Enters. LP*, No. 2:25-

---

[14] Although Rolovich's exemption request—which he neither wrote nor edited—also invoked "therapeutic proportionality" and abortion-related concerns, neither of his summary judgment declarations mentioned those beliefs as a basis for his vaccine opposition. 6-ER-1159–61; 2-ER-203–11.

CV-00199-BAT, 2025 WL 1635228, at *10 (W.D. Wash. June 9, 2025); *Fisher v. Dep't of Fin. Insts.*, No. C22-5991 TSZ, 2025 WL 1434366, at *7 (W.D. Wash. May 19, 2025). *But compare Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009 (7th Cir. 2024) (reversing Rule 12(b)(6) dismissal where plaintiff objected to vaccination based on belief her body is "a temple of the Holy Spirit"), *with id.* at 1016 (Rovner, J., dissenting) ("It cannot be enough . . . to assert that because one's conscience is G-d given, any decision one reaches in their good conscience is . . . religious in nature.").

Rolovich's "follow-my-conscience" objection is indistinguishable from Fallon's. To be sure, "a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one." *Callahan*, 658 F.2d at 684. But Rolovich's "follow-my-conscience" objection does not merely *coincide* with his secular objections to vaccination; it is entirely *derivative* of them. Thus, even if a reasonable jury could find Rolovich's "conscience" objection sincere (and it couldn't), it would not create an actual *religious* conflict with vaccination as a matter of law.

## C. Rolovich Did Not Plead a Disparate Treatment Claim, Which Would Fail as a Matter of Law

Rolovich chastises the District Court for "simply ignor[ing]" his Title VII "claim for intentional religious discrimination," i.e., traditional disparate treatment. Op. Br. at 4. But Rolovich forfeited any such claim

by not raising it below. Even if he had, WSU would be entitled to summary judgment because no evidence supports Rolovich's conclusory allegations of anti-religious bias.

### 1. Rolovich did not plead a disparate treatment claim

"A claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment and failure to accommodate." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). These theories are distinct and have separate elements. *Id.* at 603, 606. A plaintiff must accordingly give fair "notice" of which theory he relies on sufficiently in advance of summary judgment to enable the employer to "defend against" it. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *McCray v. Wilkie*, 966 F.3d 616, 623 (7th Cir. 2020).

Rolovich did not give notice of a traditional disparate treatment claim in the District Court. In his first amended complaint, Rolovich's Title VII claim asserted a failure-to-accommodate theory only. 5-SER-1119–20. In moving to dismiss that claim, WSU addressed only a failure-to-accommodate theory; Rolovich's opposition brief addressed only failure-to-accommodate; at oral argument, both parties discussed only failure-to-accommodate; and the District Court's order addressed only failure-to-accommodate. 1-ER 19–23; 5-SER-986–93; 5-SER-957–58; 5-SER-916–18; 4-SER-879–81. WSU's reply specifically noted: "Rolovich's Title VII claim is based on an alleged failure to accommodate, *not*

51

*disparate treatment.*" 5-SER-916 (emphasis added). Rolovich never disputed WSU's representation. And when he amended his complaint again, his Title VII allegations remained exactly the same. *Compare* 5-SER-1119–20, *with* 6-ER-1236–37.

Even after discovery and Rolovich moved for partial summary judgment on his Title VII claim, he gave no hint of a traditional disparate treatment theory. Instead, his motion asked the District Court to rule in his favor "as to his *prima facie* case for the Title VII failure to accommodate claim." 4-SER-842.

After WSU cross-moved for summary judgment on all claims, Rolovich's response brief noted that "Title VII's 'disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice.'" 1-SER-158 (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015)). But *Abercrombie* was a failure-to-accommodate case, and even Rolovich's response brief did not assert that he was relying on a traditional disparate treatment theory, too.

In an abundance of caution, WSU argued in its reply brief that, to the extent Rolovich was trying to "retroactively add an unpled liability theory," the District Court should disallow it. 1-SER-125. The District Court evidently agreed, analyzing Rolovich's Title VII claim under a failure-to-accommodate framework only. 1-ER-8–11. This was no oversight: it tracked how Rolovich had presented his claim from the start.

52

## 2. Any disparate treatment claim fails as a matter of law

Even if Rolovich had given WSU and the District Court timely notice of a traditional disparate treatment claim, it would fail. Rolovich's contrary arguments ignore governing law and distort the record.

A Title VII disparate treatment plaintiff must first establish a prima facie case of discrimination in one of two ways: "either by using the *McDonnell Douglas* [*v. Green,* 411 U.S. 792, 802 (1973)] framework," or by "produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer." *Opara v. Yellen*, 57 F.4th 709, 721–22 (9th Cir. 2023) (cleaned up). Rolovich relies on the latter method only. *See* Op. Br. at 45–48.

"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption," and "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (cleaned up). And "[w]hen the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion for summary judgment." *Id.* (cleaned up).

No evidence supports Rolovich's allegations of anti-religious animus. His brief misleadingly cherry-picks words and phrases to falsely claim Chun "denigrated Rolovich's religion" and Schulz "mocked Rolovich's religious beliefs." Op. Br. at 2. An examination of the few pieces of admissible evidence Rolovich cites—rather than the misleading

53

snippets in his brief—shows there is no substance to his breathless allegations of anti-religious "fury." *Id.* at 14; *see* 2-ER-250; 2-ER-254; 2-ER-257; 2-ER-269–72; 2-ER-289; 4-ER-784.[15]

More fundamentally, Rolovich's "discriminatory motive" theory collapses under one undisputed fact: none of WSU's decisionmakers knew what Rolovich's religious beliefs even were. 2-ER-126–27; 5-ER-797. In fact, each of the comments Rolovich identifies occurred *before* he requested a religious accommodation on October 4, 2021. *See* Op. Br. at 46 (citing 2-ER-269 (texts between President Schulz and Chair Dickinson on August 19, 2021)); 4-ER-781–82 (Rolovich's notes to himself in May 2021)); 6-ER-1089. Rolovich cites no evidence *anyone* at WSU outside HRS even saw Rolovich's exemption request. *See* 3-ER-415–17.

As common sense suggests, "an employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion." *Lubetsky v. Applied Card Sys.,*

---

[15] For example, Chair Dickinson did not write that *she* "want[ed] the coach gone," as her message plainly referred to the media. Op. Br. at 15 (quoting 2-ER-271). And Chun's "appeal denial" did not "invoke[] his own Catholicism" to "illicitly decide[] what Catholic policy on COVID vaccination is." *Id.* at 47 (cleaned up) (citing 5-ER-993). Chun mentioned his own Catholicism only to rebut the appeal's "claims of 'bias' or hostility towards [Rolovich's] religion." 4-ER-992. Finally, the claim that Chun said Rolovich's "beliefs were making him incapable of leading his players" relies on inadmissible hearsay statements that, in any event, could not possibly refer to Rolovich's religious beliefs—as he admittedly had not disclosed them to Chun at that point (or ever). *See* Op. Br. at 14, 46 (cleaned up) (quoting 4-ER-781–84).

54

*Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002); *see also Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 703 (8th Cir. 2012) (similar); *Reed v. Great Lakes Cos.*, 330 F.3d 931, 934 (7th Cir. 2003) (similar); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 (2003) (same in disability discrimination context); *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (same in race discrimination context). This poses an insuperable bar to Rolovich's disparate treatment theory.

Moreover, WSU has plainly "articulate[d] [a] legitimate nondiscriminatory reason" for Rolovich's termination: he was unvaccinated and his accommodation request was denied, so he was legally ineligible to work at WSU after October 18, 2021. *Hittle v. City of Stockton*, 101 F.4th 1000, 1012 (9th Cir. 2024); *see id.* at 1014 ("Where there are obvious alternative explanations for the . . . purposeful invidious discrimination plaintiff asks us to infer, discrimination is not a plausible conclusion.") (cleaned up). Rolovich argues this reason is pretextual because WSU supposedly had already "decided to reject that [accommodation] request and fire Rolovich before it had even received it." Op. Br. at 47. As evidence, he seizes on President Schulz's reference to a "Rolo strategy" in a single text message to Chair Dickinson, leaping to the conclusion that this must have been a scheme to deny his accommodation request and fire him. Op. Br. at 48; *see* 2-ER-266.

No evidence supports the existence of any such scheme. The "Rolo strategy" text came two days *before* Schulz learned that Rolovich planned

to request a religious accommodation. 2-ER-266; 2-ER-269. In context, the "Rolo strategy" refers either to the Proclamation itself or to a "communication strategy." *See* 2-ER-266 (Schulz stating in same text message that "Gov will do indoor mask mandate and vaccine requirement for higher ed tomorrow"); 2-ER-289 (Schulz stating contemporaneous message that "it would be wise to get a Seattle firm to assist with our communication strategy"). But there is not one shred of evidence the "Rolo strategy" was a secret plot to *fire* him—not in the 40,000 pages of discovery produced by WSU, nor in Chun's, Schulz's, and Dickinson's personal text messages that Rolovich subpoenaed, nor in the eleven depositions he took. 1-SER-3–4.

In fact, the evidence directly contradicts Rolovich's conspiracy theory. Chun testified that he based his accommodation decision on available public health guidance, input from his Deputy Athletics Directors, and advice from HRS and legal counsel—not at the direction of (or in cahoots with) Schulz or Dickinson. 5-ER-812; *see also* 4-ER-596. And Schulz testified that, because he knew any appeal would go to him, he "was careful . . . to avoid providing [his] recommendations to Mr. Chun regarding the accommodation decision." 3-ER-345. All this testimony stands unrebutted. Rolovich's belief that his firing was a "foreordained" conspiracy finds no support in any evidence. Op. Br. at 48. The Court should reject Rolovich's unpled, forfeited, and unsupported disparate treatment theory.

56

## II. The District Court Correctly Granted WSU Summary Judgment on Rolovich's Breach-of-Contract Claim

Having correctly granted summary judgment on Rolovich's Title VII claim, the District Court's disposition of his other claims in WSU's favor logically followed. Beginning with the breach-of-contract claim, the claim hinges on whether WSU had "just cause" to terminate Rolovich's employment. *See* Op. Br. at 50. His employment agreement gives the term "Just Cause" its "normally understood meaning in employment contracts." 4-ER-612. In Washington, a termination for "just cause" is "one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d 298, 304 (Wash. 1989).

The District Court correctly held WSU "had just cause to terminate [Rolovich's] employment" because he undisputedly was legally prohibited from working for WSU after October 18, 2021. 1-ER-12; 2-ER-95–96. As the District Court previously recognized, Rolovich's breach-of-contract claim "rests on the determination of whether Plaintiff's exemption and accommodation would have imposed an undue hardship." 1-ER-39–40. And because Rolovich was *not* entitled to an accommodation under Title VII and remained unvaccinated, he could not legally continue working for WSU. That represents "just cause" as a matter of law. *See, e.g., Akers v. Brookdale Univ. Hosp. & Med. Ctr.*, No. CV06-00350(3MC)(VVP),

2006 WL 2355842, at *3 (E.D.N.Y. Aug. 15, 2006) ("It seems axiomatic if an employee fails to fulfill an express, material condition of her employment . . . that must constitute 'cause' for termination.").

Rolovich argues that, "under Washington law, 'whether an employer properly determined it had just cause for termination is a question for the trier of fact.'" Op. Br. at 50 (quoting *Lund v. Grant Cnty. Pub. Hosp. Dist. No. 2*, 932 P.2d 183, 185 (Wash. Ct. App. 1997)). But he omits *Lund*'s key caveat: just cause "is a question for the trier of fact *unless there is no genuine dispute under [Rule] 56(c)*." 932 P.2d at 186 (emphasis added, citation omitted). Here, since Rolovich's Title VII claim fails, there is no genuine dispute that (1) Rolovich was legally prohibited from working for WSU after October 18, 2021; (2) this reason was not "arbitrary, capricious, or illegal"; and (3) it was "reasonably believed by [WSU] to be true." *Baldwin*, 769 P.2d at 303.

Rolovich's other arguments fare no better. He fails to explain how nonbinding "FAQs" referencing "non-disciplinary" separations alter or supplant his contract's "just cause" provisions. Op. Br. at 50–51. This guidance did not apply to Rolovich (it applied only to select employees and was issued on August 9, 2021—*before* the Proclamation covered WSU), and did not alter any of his contract's terms. *See, e.g.*, *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (finding no precedent for "read[ing] into a contract . . . agency guidance . . . not incorporated by reference into the contract").

58

Rolovich also fails to explain how terms added to the contracts of *other* Athletics employees hired or renewed during the pandemic could change the provisions of his own contract. *See* Op. Br. at 51–52. The District Court correctly rejected that argument at the motion to dismiss stage. 1-ER-39. Rolovich claims he "couldn't possibly have been 'on notice'" when signing his contract that noncompliance with a vaccine mandate could result in termination. Op. Br. at 51. But this ignores the contract's requirement that he "abide by all provisions of law," from which he should have understood that termination would result if he became legally ineligible to work for WSU. 4-ER-607.

## III. The District Court Correctly Granted WSU Summary Judgment on Rolovich's Wage-Withholding Claim

Rolovich's claim under the Washington Wage Rebate Act, Wash. Rev. Code 49.52.050(2), fails alongside his other claims. Rolovich argues WSU is liable for not paying him liquidated damages following his termination, which would make sense only if WSU had fired him *without* "just cause." Op. Br. at 53. But because Rolovich was ineligible for WSU employment, his termination *was* for just cause. *See supra* at 57–59. Thus, WSU was not obligated to pay liquidated damages.

Moreover, even without "just cause," an employer's "genuine belief that he is not obligated to pay certain wages precludes the withholding of wages from falling within the operation of [Wash. Rev. Code] 49.52.050(2)." *McMinimee v. Yakima Sch. Dist. No. 7*, No. 1:18- CV-3073-

TOR, 2019 WL 11680199, at *10 (E.D. Wash. Aug. 7, 2019) (cleaned up). Here, WSU indisputably had a genuine (and accurate) belief it did not owe Rolovich liquidated damages, which defeats his wage withholding claim. *See, e.g.*, *Garrison v. Merch. & Gould, P.C.*, No. 09-CV-1728-JPD, 2011 WL 887749, at *10 (W.D. Wash. Mar. 10, 2011).

## IV.    The District Court Correctly Dismissed Rolovich's Free Exercise Claim Against Chun

Finally, the District Court properly dismissed under Rule 12(b)(6) Rolovich's free exercise claim against Chun. Under the Free Exercise Clause, "laws that burden religious exercise must be both neutral and generally applicable," or else they are subject to "strict scrutiny." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc) (citation omitted).

Rolovich sees a free exercise violation in Chun's denial of his accommodation request. *See* Op. Br. at 55–62. But this Court and others have long rejected the notion of a free exercise right to religious exemptions from neutral and generally applicable vaccine mandates. Even a mandate that allows medical exemptions but *no religious exemptions* does not trigger strict scrutiny or violate the Free Exercise Clause. *See, e.g.*, *SDUSD*, 19 F.4th at 1178; *Spivack v. City of Phila.*, 109 F.4th 158, 176 (3d Cir. 2024); *We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 155 (2d Cir. 2023). Thus, Chun's decision to deny Rolovich's accommodation request—whether on undue

60

hardship or sincerity grounds—did not violate the Constitution. *See, e.g.*, *New Yorkers for Religious Liberty, Inc. v. City of N.Y.*, 125 F.4th 319, 332–33 (2d Cir. 2025) (affirming dismissal of free exercise claim because government may "deny accommodations if it concluded a claimant was not personally devout in the belief underlying the objection").

Rolovich tries to avoid this line of authority by accusing Chun of "hostility towards Rolovich's religious beliefs and practice." Op. Br. at 57. But Rolovich needs more than bare accusations of animus: "Where the claim is invidious discrimination in contravention of the First . . . Amendment[]," Supreme Court "decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676); *see also Crawford–El v. Britton*, 523 U.S. 574, 598 (1998) (requiring "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury" to survive motion to dismiss) (cleaned up).

Rolovich's complaint does not allege facts plausibly establishing any discriminatory purpose. He alleges Chun "made a number of statements" that supposedly "demonstrated his hostility toward Mr. Rolovich's expressed religious, *personal, and scientific* reasons for refusing to receive a COVID vaccine." 5-ER-1213 (emphasis added). But those statements came *before* Chun learned Rolovich was applying for a religious accommodation. *See* Op. Br. at 59. Thus, the District Court correctly ruled that "any allegations of coercion prior to that date cannot

61

support a free exercise claim because it was not evident [to Chun] that Plaintiff possessed religious beliefs" against vaccination. 1-ER-29.

For the first time on appeal, Rolovich baselessly contends "a jury could reasonably infer that Chun *did* already know of the religious nature of Rolovich's vaccine objection." Op. Br. at 60; *see* 5-SER-953–54. That forfeited argument is irreconcilable with the complaint, which admits that, before August 19, 2021, Rolovich "had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines." 6-ER-1216. This new, contradictory argument does not salvage his free exercise claim.

Nor is the claim saved by Rolovich's argument (also new on appeal) that "Chun's actions weren't 'generally applicable' because he burdened Rolovich using individualized 'discretion.'" Op. Br. at 73 (citing *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021); *see* 5-SER-953–54. This forfeited argument ignores the many cases holding that a vaccine mandate's allowance for medical or religious exemptions is not equivalent to the "open-ended exemptions that courts have held trigger strict scrutiny." *Spivack*, 109 F.4th at 171 (citing *Fulton*, 593 U.S. at 535); *see, e.g.*, *Pilz v. Inslee*, No. 22-35508, 2023 WL 8866565, at *2 (9th Cir. Dec. 22, 2023). Unlike *Fulton*, the Proclamation did not afford Chun open-ended "discretion to grant individualized exemptions." 593 U.S. at 544 (Barrett, J., concurring).

Finally, even if Rolovich had pled facts supporting a colorable free exercise claim (he did not), the District Court correctly determined qualified immunity bars it. To overcome Chun's qualified immunity, Rolovich must plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

Rolovich fails both prongs. He has identified no case putting Chun on notice that denying Rolovich's accommodation request could violate the Free Exercise Clause. *See* Op. Br. at 55–62; *al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). The only case Rolovich cites finding a free exercise violation in the vaccine context is *Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251 (10th Cir. 2024), which found that a university's religious exemption policy likely violated the Free Exercise Clause. That case is readily distinguishable since the policy expressly favored certain religious adherents over others. *Id.* at 1258, 1257. And it was decided almost three years *after* Chun's accommodation decision, so is "of no use in the clearly established inquiry." *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004).

Thus, Rolovich has identified no authority "clearly establishing" that Chun's denial of Rolovich's accommodation request constitutes a free exercise violation—because none exists.

63

## CONCLUSION

The Court should affirm.

RESPECTFULLY SUBMITTED this 15th day of September, 2025.

_s/Zachary J. Pekelis_

NICHOLAS W. BROWN
  *Attorney General*
SPENCER W. COATES
  *Assistant Attorney General*
WASHINGTON ATTORNEY
GENERAL'S OFFICE
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404
*spencer.coates@atg.wa.gov*

ZACHARY J. PEKELIS
ERICA CORAY
W. SCOTT FERRON
  *Special Assistant Attorneys General*
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 245-1700
*zach.pekelis@pacificalawgroup.com*

*Counsel for Defendants-Appellees*
*Washington State University and Patrick Chun*

64

## CERTIFICATE OF SERVICE

I, Zach Pekelis, hereby certify that I electronically filed the foregoing  ANSWERING BRIEF OF DEFENDANTS-APPELLEES WASHINGTON STATE UNIVERSITY AND PATRICK CHUN with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system on September 15, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

PACIFICA LAW GROUP LLP

   *s/ Zachary J. Pekelis*
Zachary J. Pekelis, WSBA #44557
401 Union Street, Suite 1600
Seattle, WA 98101-2668
T: 206-245-1700
F: 206-245-1750
zach.pekelis@pacificalawgroup.com

Special Assistant Attorneys General
Attorneys for Appellees Washington State
University and Patrick Chun

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*


**9th Cir. Case Number(s)** 25-3387

The undersigned attorney or self-represented party states the following:

[X ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:




**Signature** *s/Zachary J. Pekelis*      **Date** 9/15/2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

2

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____25-761_____

I am the attorney or self-represented party.

**This brief contains 13,996 words,** including _0_ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.

3

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/Zachary J. Pekelis_ **Date** _9/15/2025_____

(use "s/[typed name]" to sign electronically-filed documents)