**No. 25-761**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

NICHOLAS ROLOVICH,
*Plaintiff-Appellant,*

v.

WASHINGTON STATE UNIVERSITY;
PATRICK CHUN,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
For the Eastern District of Washington
Case No. 2:22-cv-319-TOR
The Honorable Thomas O. Rice, United States District Judge

---

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 5

---

NICHOLAS W. BROWN
  *Attorney General*
SPENCER W. COATES
  *Assistant Attorney General*
WASHINGTON ATTORNEY
GENERAL'S OFFICE
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404
*spencer.coates@atg.wa.gov*

ZACHARY J. PEKELIS
ERICA CORAY
W. SCOTT FERRON
  *Special Assistant Attorneys General*
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 245-1700
*zach.pekelis@pacificalawgroup.com*

*Counsel for Defendants-Appellees*

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY, et al.,<br><br>Defendants. | NO. 2:22-cv-00319-TOR<br><br>DECLARATION OF ZACHARY J. PEKELIS IN SUPPORT OF DEFENDANT'S MOTION TO STAY DISCOVERY<br><br>January 21, 2024<br>Without Oral Argument |

PEKELIS DECL. ISO DEFENDANT'S        1
MOTION TO STAY DISCOVERY

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

I, ZACHARY J. PEKELIS, declare as follows:

1.    I am a partner at Pacifica Law Group LLP and serve as a Special Assistant Attorney General in this matter representing Defendant Washington State University (WSU). I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

2.    The original Jury Trial Scheduling Order set the discovery deadline as September 3 (ECF. No 44). Prior to this date, Rolovich had propounded, and WSU responded to, 30 interrogatories, 29 requests for production, and 13 requests for admission. In responding to the requests for production, WSU has produced 7,550 documents, totaling over 40,292 pages.

3.    Prior to the original discovery cutoff, Rolovich's counsel also took the depositions of ten witnesses—WSU's former Athletics Director Pat Chun, its current Athletics Director Anne McCoy, WSU's President Kirk Schulz, two former managers in WSU Human Resources Services (HRS) (Lisa Gehring and Bonnie Dennler), two members of WSU's Board of Regents (Marty Dickinson and Enrique Cerna), WSU's Director of Environmental Health and Safety Jason Sampson, and WSU's Vice President for Marketing and Communications Phil Weiler. Additionally, Rolovich issued Rule 45 subpoenas duces tecum to multiple witnesses for their personal communications and other documents, including President Schulz, Regent Dickinson, Regent Cerna, former WSU Regent Heather Redman, Gehring, Dennler, WSU's former HRS Vice President Theresa Elliot-Cheslek, and WSU's former Deputy Athletics Director Bryan Blair.

PEKELIS DECL. ISO DEFENDANT'S
MOTION TO STAY DISCOVERY

2

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

4.    WSU's counsel has taken two depositions: the depositions of Rolovich and one of his experts, John Di Camillo.

5.    After the original discovery deadline passed, WSU agreed to allow Rolovich to depose one of its expert witnesses and a Rule 30(b)(6) witness because Rolovich's counsel represented that these depositions were necessary for his response to WSU's Cross-Motion for Summary Judgment and because Rolovich's counsel had requested to take these depositions before the original cutoff (and WSU agreed). On October 22, 2024, Rolovich's counsel took the deposition of WSU's economic expert, David Bones. On October 24, Rolovich's counsel took WSU's deposition through a designated Rule 30(b)(6) witness.

6.    The summary judgment motions were fully briefed on November 18, 2024. After this date, Rolovich has engaged in the following discovery efforts: (i) propounded a thirtieth request for production of documents to WSU; (ii) sent Rule 45 document subpoenas to WSU's former media strategy consultant (Brian Curtis) and his company (Paradigm Four), seeking nearly every communication related to Rolovich; (iii) served a Rule 45 document subpoena on WSU's then-current head football coach, Jake Dickert, seeking nearly every communication mentioning Rolovich, his agent, and Coach Dickert's hiring; (iv) sought to schedule an early January deposition of Mr. Blair, in email communications with Mr. Blair's attorney; (v) sent WSU's counsel a request take the deposition of WSU's expert on vaccine refusal and conspiracies, Renee DiResta, who was disclosed to Rolovich on August 12; and (vi) sent WSU's counsel a request to take the deposition of Ms. Elliot-Cheslek, who has been on

PEKELIS DECL. ISO DEFENDANT'S
MOTION TO STAY DISCOVERY

3

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

a medical leave of absence since July. Attached as **Exhibit A** is a true and correct copy of the Rule 45 subpoena to Brian Curtis. Attached as **Exhibit B** is a true and correct copy of the of the Rule 45 subpoena to Paradigm Four. Attached as **Exhibit C** is a true and correct copy of the of the Rule 45 subpoena to Coach Dickert. Attached as **Exhibit D** is a true and correct copy of my email correspondence with Rolovich's counsel and Mr. Blair's counsel, Joseph Dickey. Attached as **Exhibit E** is a true and correct copy of email correspondence between the parties' counsel regarding Rolovich's request to take the depositions of Ms. DiResta and Ms. Elliot-Cheslek.

7.    On December 13, 2024, I spoke with Rolovich's attorney, Job Seese, by phone, proposing a temporary stay of discovery until the summary judgment motions are decided.

8.    On December 17, 2024, Mr. Seese sent an email re-raising a prior challenge to WSU's assertion of attorney-client privilege or work product protection in various documents WSU withheld or redacted in productions from June and July. Counsel for both parties previously discussed these privilege challenges on October 2, after which Rolovich's counsel waited a month to respond to WSU's justifications for withholding the documents as privileged.

9.    Mr. Seese later followed up by email stating that Rolovich opposes a temporary stay of discovery. Attached as **Exhibit F** is my email correspondence with Mr. Seese on December 17, 2024.

PEKELIS DECL. ISO DEFENDANT'S
MOTION TO STAY DISCOVERY

4

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 20th day of December, 2024, at Seattle, Washington.


*s/     Zachary J. Pekelis*
ZACHARY J. PEKELIS, WSBA #44557

PEKELIS DECL. ISO DEFENDANT'S
MOTION TO STAY DISCOVERY

5

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**CERTIFICATE OF SERVICE**

On the 20th day of December, 2024, I caused to be served, via ECF electronic service, a true copy of the foregoing document upon all counsel registered for e-service.

DATED this 20th day of December, 2024.

_____
Erica Knerr
Legal Assistant

PEKELIS DECL. ISO DEFENDANT'S
MOTION TO STAY DISCOVERY

6

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>            Plaintiff,<br><br>   v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>            Defendant. | NO. 2:22-cv-00319-TOR<br><br>DECLARATION OF HAILEY JAMES IN SUPPORT OF WASHINGTON STATE UNIVERSITY'S CROSS-MOTION FOR SUMMARY JUDGMENT |

I, Hailey James, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.     I am the Chief of Staff in the Office of the Chancellor at Washington State University (WSU or the University). I have served in this position since

DECLARATION OF HAILEY JAMES          1
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

January 2023. Previously, I was the Deputy Chief of Staff from February until December 2022. From July 2021 until January 2022, I was the Deputy Chief of Staff and Director of Strategic Communications and Initiatives in the Office of the President. And from October 2020 until July 2021, I was the Emergency Operations Manager for COVID-19 at WSU.

3.     In my role as Emergency Operations Manager for COVID-19 at WSU, I oversaw the COVID-19 Operations Team, led the student testing, screening, and vaccination efforts for the Pullman and Spokane campuses, coordinated timelines and deadlines for compliance with policies and procedures, and managed COVID-19 communications across the institution.

4.     On April 28, 2021, WSU first announced that it would require proof of COVID-19 vaccination for all students engaging in activities at WSU campuses for the 2021–22 school year. At that time, WSU permitted students to seek exemptions for medical, religious, or philosophical/personal reasons. Students living in university housing were required to show proof of vaccination or an approved exemption by August 6, 2021. Students not living in university housing or otherwise subject to program-specific requirements were originally required to show proof of vaccination or an approved exemption by November 1, 2021. Students who did not meet the COVID-19 vaccination or exemption requirement were prohibited from registering for spring 2022 classes and could face other penalties.

DECLARATION OF HAILEY JAMES     2
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

5. On June 30, 2021, Governor Inslee issued Proclamation 20-12.3, which prohibited "institutions of higher education" (IHEs)—including WSU—from holding in-person instruction unless the IHE implemented, among other things, (i) a policy requiring all students, staff, and faculty to be fully vaccinated against COVID-19, "subject to any medical exemptions required by law and any religious or philosophical exemptions the IHE provides," and (ii) a policy and procedure to verify the vaccination status of students, staff, and faculty. On July 12, 2021, Governor Inslee issued Proclamation 20-12.4, which contained the same requirements. Attached as **Exhibit A** is a true and correct copy of Proclamation 20-12.4.

6. Under Proclamations 20-12.3 and 20-12.4, IHEs had to require all students, staff, and faculty claiming an exemption to the vaccination requirement to comply with the Washington Secretary of Health's face covering order (Order 20-03) and applicable workplace safety requirements from the Washington Department of Labor and Industries (L&I).

7. WSU crafted its student vaccination requirement to comply with Proclamations 20-12.3 and 20-12.4.

8. On August 12, 2021, due to the prevalence of the Delta variant of COVID-19, WSU changed the deadline for students to show proof of vaccination or approved exemption from November 1, 2021 to September 10, 2021. WSU also removed the "personal/philosophical" exemption option, allowing only

DECLARATION OF HAILEY JAMES
NO. 2:22-cv-00319-TOR

3

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

religious or medical exemptions to the COVID-19 vaccination requirement to ensure consistency with the accommodations then available to WSU employees. Under Proclamation 21-14.1, which applied to WSU employees, only religious and medical accommodations were permitted.

9.    It was important for WSU to communicate the vaccination policies to students prior to the September 21, 2021 deadline for tuition payments, so that students could make informed decisions about their enrollment.

10.    Students were required to submit proof of COVID-19 vaccination or a request for a religious or medical exemption by the applicable deadline.

11.    For religious exemption requests, students filled out a form online that detailed their request. Identifying information was then removed from the documents submitted by the student and the requests were sent to a committee of approximately ten faculty and staff members from around the University to conduct a blind review. The Attorney General's Office (AGO) provided training to the committee members on assessing whether a request appeared to state a religiously based objection to COVID-19 vaccination. Two members of the committee, with guidance from the AGO, would review each request to determine whether the student provided sufficient information to support a religious exemption. The committee members would then decide if the request was approved, denied, or whether there was insufficient information to make a

DECLARATION OF HAILEY JAMES            4
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

determination. If the committee members disagreed or determined the request was not supported by sufficient information, they would consult with the AGO.

12.    If a student's religious exemption request was denied, the student could appeal the decision either to the Dean of Students or the Vice Chancellor for Student Affairs, depending on which campus they attended. Appeals were also reviewed with identifying information redacted.

13.    To request a medical exemption from the COVID-19 vaccination requirement, students were required to upload documents from a licensed healthcare provider describing the student's need for a medical exemption to the student's patient portal on the Cougar Health Services (CHS) website. CHS staff would then review the documentation to determine whether it supported the request for a medical exemption.

14.    If a student's exemption request was denied and the student remained unvaccinated, in the spring 2022 semester the student would be prohibited from registering for classes or participating in any in-person activities.

15.    Pursuant to Proclamation 20-12.4 and Secretary of Health Order 20-03, students whose exemption requests were granted were required to wear a face covering that covered both their noses and mouths at all times while on WSU property unless: (1) they were outside and could maintain six feet of social distance from others; (2) they were alone indoors; (3) they were swimming or engaged in other water sports; (4) they were actively engaged in eating or

DECLARATION OF HAILEY JAMES
NO. 2:22-cv-00319-TOR

5

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

drinking; (5) they were showering, bathing, or engaging in other personal hygiene activities that required removal of their face covering; (6) they were communicating with a deaf or hard of hearing person and removal of the mask was essential to that communication; (7) they were obtaining a service or engaged in a transient activity that required temporary and brief removal of the face covering; (8) removal was necessary to confirm identity; (9) they were sleeping; (10) they were inside their bedroom alone or only with their assigned roommate; (11) federal law prohibited wearing a face covering or required its removal; (12) in cases of emergency in which they are unable to put on a face covering. Students were also required to remain socially distanced from others while on WSU property.

16. Proclamations 20-12.3 and 20-12.4 contained no provision for an IHE to deny a student's exemption request on the basis of "undue hardship" to the IHE—unlike Proclamation 21-14.1, which applied to WSU *employees* only. Accordingly, WSU did not deny any student's request for an exemption from the University's COVID-19 vaccination requirement on the ground that allowing the student to remain unvaccinated would impose an undue hardship on the University.

17. However, students who worked as part-time employees of the University were also subject to Proclamation 21-14.1, and thus were also required to receive an approved *accommodation* from the University. For such student-

DECLARATION OF HAILEY JAMES
NO. 2:22-cv-00319-TOR

6

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

employees seeking religious accommodations, the *student* review committee would assess whether the student-employee's exemption request appeared to state a religiously based objection to COVID-19 vaccination. If it did, HRS would then transmit the accommodation request to the University department employing the student-employee, which was charged with evaluating whether it could reasonably accommodate the student-employee without undue hardship to the University.

18.     In total, seventeen student-athletes on the 2021 WSU football team requested exemptions from the COVID-19 vaccine requirement in the fall of 2021. (This was the most student-athletes seeking exemptions of any WSU sports team, both as an absolute number and as a percentage of the team's roster.) Of those seventeen, fifteen requested religious exemptions and two requested medical exemptions. Ultimately, WSU approved requests for religious exemptions for twelve football players and approved requests for medical exemptions for two football players. None of the football players who requested exemptions were employed by the University, so the University had no occasion to—and did not—assess whether exempting those players from the vaccination requirement would have imposed an undue hardship on the University.

DECLARATION OF HAILEY JAMES
NO. 2:22-cv-00319-TOR

7

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED and SIGNED this 18 day of November 2024, at Pullman, Washington.

HAILEY JAMES

DECLARATION OF HAILEY JAMES    8
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**CERTIFICATE OF SERVICE**

On the 18th day of November, 2024, I caused to be served, via ECF electronic service, a true copy of the foregoing document upon all counsel registered for e-service.

    DATED this 18th day of November, 2024.

_____
Erica Knerr, Legal Assistant

DECLARATION OF HAILEY JAMES         9
NO. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# EXHIBIT A



**STATE OF WASHINGTON**
**— OFFICE OF GOVERNOR JAY INSLEE —**

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATIONS 20-05, 20-12, et seq., AND 20-25, et seq.**

**20-12.4**
**Higher Education**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout Washington State as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its persistence in Washington State, and the high risk it continues to pose to our most vulnerable populations, I have subsequently issued several amendatory proclamations, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person, which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, continues to persist in the state of Washington; and

**WHEREAS**, despite an increase in infections, hospitalizations, and deaths in the latter half of 2020, Washington State has avoided overwhelming the state's health care systems throughout this pandemic by implementing rigorous safety and prevention measures, such as physical distancing, masking, social and economic prohibitions and, since December 2020, the administration of vaccinations to prevent infection with the coronavirus that causes COVID-19 symptoms; and

**WHEREAS**, the U.S. Centers for Disease Control and Prevention (CDC) and the Washington State Department of Health (DOH) have determined that the COVID-19 vaccines that have received emergency approval by the U.S. Food & Drug Administration are safe and effective against infection with the coronavirus that causes COVID-19; and

**WHEREAS**, everyone age 12 and older is currently eligible to receive a vaccination against the coronavirus causing COVID-19 symptoms, and Washington health care providers, in collaboration with public health and other community partners, have successfully administered millions of vaccine doses, but have millions more doses to administer, and it is necessary to achieve the highest rate of vaccination of the United States population as possible; and

**WHEREAS,** on March 13, 2020, in recognition of experts' warnings that continued normal operation of public and private universities, colleges, community colleges, and technical colleges could increase the spread of COVID-19 throughout Washington State, I issued Emergency Proclamation 20-12

prohibiting public and private universities, colleges, community colleges, and technical colleges from conducting in-person classroom instruction and lectures related to all educational programs; and

**WHEREAS,** the prohibitions in Proclamation 20-12 expired on April 24, 2020, but public and private universities, colleges, community colleges, and technical colleges remained in modified operation, including remote learning and certain programs for essential workers; and

**WHEREAS,** Washington's public and private universities, colleges, community colleges, and technical colleges are an important part of our economy and are vital to the educational, social, and economic needs of Washingtonians; and

**WHEREAS,** using remote learning to replace most classroom instruction creates challenges to access for many Washingtonians; and

**WHEREAS,** the progression of COVID-19 in Washington State shows ethnic disparities in health impacts which are likely to increase ethnic disparities in access and success in post-secondary education, requiring the State and all of our campuses and programs to understand how these challenges affect our students and to work to minimize these impacts; and

**WHEREAS,** although public and private universities, colleges, community colleges, and technical colleges made tremendous efforts to continue to function through remote learning, in-person learning benefits Washington; and

**WHEREAS,** the nature of COVID-19 viral transmission, including both asymptomatic and symptomatic spread as well as the relatively high infectious nature, suggests it is appropriate to provide in-person learning at public and private universities, colleges, and technical schools only through a science-based approach that incorporates safety, sanitation, and physical distancing guidelines; and

**WHEREAS,** during the initial return to campus in the fall of 2020, there were more than 35 COVID-19 outbreaks linked to public and private institutions of higher education, and some higher education institutions have seen a substantial increase in COVID-19 positive cases that are tied to both congregate living arrangements, including fraternities and sororities, and also large social gatherings of students, thereby triggering the need to increase safety measures to address these outbreaks; and

**WHEREAS,** I issued Proclamations 20-12.1 and 20-12.2 to permit Washington's public and private universities, colleges, community colleges, and technical colleges to resume in-person instruction, lectures and similar educational gatherings, provided that extensive safety requirements were implemented, and to impose certain safety requirements on shared housing; and

**WHEREAS,** the widespread availability of safe and effective COVID-19 vaccinations makes it appropriate to lift legally-mandated safety requirements for public and private universities, colleges, community colleges, and technical colleges that have committed to implementing vaccination requirements on their campuses; and

2

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace, and

**WHEREAS**, students attending public and private universities, colleges, community colleges, and technical colleges are largely in the age demographic with the highest rate of COVID-19 cases and the lowest rate of vaccinations of those over the age of 18, which, taken with the foregoing, justifies continuing to mandate certain safety measures for public and private universities, colleges, community colleges, and technical colleges that choose not to implement vaccination requirements on their campuses; and

**WHEREAS**, DOH continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support DOH and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with DOH in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-05 and 20-12, et seq., and 20-25, et seq., continue in effect except as amended herein, to allow for in-person classroom instruction, lectures and similar educational gatherings at public and private universities, colleges, community colleges, and technical colleges (referred to hereafter collectively as institutions of higher education, or IHEs), provided certain requirements are and continue to be satisfied.

**FURTHERMORE**, IHEs that do not have fully vaccinated campuses are prohibited from providing in-person classroom instruction, lectures and similar educational gatherings, except when they implement, follow, and enforce the requirements specified below. IHEs with fully vaccinated campuses are wholly exempt from this proclamation and encouraged, but not required, to follow DOH's COVID-19 recommendations for higher education.

IHEs WITH FULLY VACCINATED CAMPUSES
An IHE has a fully vaccinated campus and is exempt from this proclamation when it meets all of the following requirements:

- The IHE implements a policy requiring all of its students, staff, and faculty who participate in or attend IHE courses, operations, or other activities in person at IHE locations to be fully vaccinated against COVID-19, subject to any medical exemptions required by law and any religious or philosophical exemptions the IHE provides.

3

- o For purposes of this proclamation, a person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use by the FDA (e.g., Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose COVID-19 vaccine authorized for emergency use by the FDA (e.g., Johnson & Johnson (J&J)/Janssen). For purposes of this proclamation, an IHE may consider a person fully vaccinated against COVID-19 two weeks after they have received all recommended doses of a COVID-19 vaccine that is listed for emergency use by the World Health Organization (WHO).
- The IHE implements a policy and procedure to verify the vaccination status of students, staff, and faculty who are not exempt from the vaccination requirement:
  - o The IHE must verify the vaccination status of all staff and faculty who do not wear face coverings in the workplace, as required by the Department of Labor & Industries (L&I).
  - o The IHE must verify the vaccination status of all students by obtaining or observing documentary proof of full vaccination, such as a CDC vaccination card, documentation of vaccination from a health care provider, or a state immunization information system record, or obtaining a hard copy or electronically signed self-attestation from the student. Any student self-attestation must include the following information:
    - § The dates when each dose of the COVID-19 vaccine was administered to the student;
    - § Language stating that the student is attesting to the truthfulness of their self-attestation and will be subject to disciplinary action if their self-attestation is determined to be untruthful in violation of the IHE's code of conduct or equivalent; and
    - § Language stating that the IHE and state and local public health officials may require further verification of the student's vaccination status, including observing the student's CDC vaccination card, state immunization information system record, or other documentation.
- The IHE implements a policy requiring every student, staff member, and faculty member who claims an exemption to the vaccination requirement and every volunteer, contractor, and visitor to wear a face covering at IHE locations in accordance with the Secretary of Health's face covering order and to comply with any applicable L&I workplace safety requirements. For people claiming exemptions to the Secretary of Health's face covering order, the IHE's policy must include putting in place other safety measures to protect the safety of the exempt people and others.

REQUIREMENTS FOR IHEs WITHOUT FULLY VACCINATED CAMPUSES

**Campus Safety**

- Adhere to all federal, state and local public health and workplace safety requirements;
- Develop a comprehensive COVID-19 infection control plan incorporating the requirements below, applicable workplace safety requirements, and best practices in CDC and DOH guidance for IHEs, and make available a copy of the plan at each location on campus;
- Implement a policy and procedure requiring students, staff, and faculty to provide information about their vaccination status, as follows:
  - o The IHE must verify the vaccination status of all staff and faculty who do not wear face coverings in the workplace, as required by L&I.

4

1-SER-21

- o The IHE must require all fully vaccinated students who participate in or attend IHE courses, operations, or other activities in person at IHE locations to provide documentary proof of full vaccination, and the IHE must obtain or observe documentary proof of full vaccination, such as a CDC vaccination card, documentation of vaccination from a health care provider, or a state immunization information system record, or obtain a hard copy or electronically signed self-attestation from the student. Any student self-attestation must include the following information:
  - The dates when each dose of the COVID-19 vaccine was administered to the student;
  - Language stating that the student is attesting to the truthfulness of their self-attestation and will be subject to disciplinary action if their self-attestation is determined to be untruthful in violation of the IHE's code of conduct or equivalent; and
  - Language stating that the IHE and state and local public health officials may require further verification of the student's vaccination status, including viewing the student's CDC vaccination card, state immunization information system record, or other documentation;
  - o The IHE must presume all persons on campus are unvaccinated until proof of vaccination is provided.
- Enforce compliance with the Secretary of Health's face covering order and L&I's requirements inside IHE facilities;
- To the extent permitted by law, require all students, regardless of vaccination status, to wear face coverings when meeting with a faculty member for office hours or similar purposes, if requested by the faculty member;
- Maintain minimum physical distancing, whenever possible, of three feet between all non-household members indoors on campus, including students, faculty, staff, volunteers, contractors, and visitors, and where physical distancing cannot be maintained, implement administrative or engineering controls to minimize exposure;
- Implement and maintain hand washing policies to ensure frequent and adequate hand washing and maintain adequate supplies;
- Implement and maintain adequate sanitization protocols consistent with CDC's *Cleaning and Disinfecting Your Facility* guidance and *Guidance for Institutions of Higher Education (IHEs)* and the U.S. Environmental Protection Agency's list of disinfectants for COVID-19;
- Implement and maintain a self-certification COVID-19 screening program for students and personnel consistent with DOH's *Guidance for Daily COVID-19 Symptom Screening of Staff and Guests*;
- Develop response protocols for students, personnel, and visitors reporting symptoms and/or confirmed to have COVID-19;
- If students or personnel are experiencing any known COVID-19 symptoms, are confirmed to have COVID-19, or have been exposed to a confirmed case of COVID-19, require them to follow the direction of the local health jurisdiction and, to the extent not inconsistent with that direction, DOH's *Evaluation and Management of Persons with New Unexplained Symptoms of COVID-19*, *What to do if you were potentially exposed to someone with COVID-19*, and *What to do if you have confirmed or suspected COVID-19* and CDC's *What to Do If You Are Sick* guidance;

5

- Make diligent efforts to monitor and enforce compliance with the requirements of this proclamation by students and personnel within the institution's disciplinary authority and procedures and any other applicable authority;
- Develop a plan with the relevant local health jurisdiction to address the isolation and quarantine needs of any personnel and students who have confirmed or suspected COVID-19 or exposure to an individual confirmed to have COVID-19 and are unable to isolate or quarantine in their usual place of residence; and
- Assess recognized hazards, including COVID-19, as part of the ongoing requirement to provide a safe and healthy workplace and, where appropriate, take additional steps to protect unvaccinated employees. Appropriate steps could include but are not limited to maximizing fresh air and providing a mask that is more protective than a cloth face covering. These should be considered as part of the IHE's comprehensive infection control plan.

**Student Worker and Personnel Support**
- Provide student workers and personnel with PPE such as gloves, goggles, face shields, and/or masks as appropriate or required for student workers/personnel not working alone (e.g. any public-facing job and/or those whose responsibility includes operating within physical distancing limits), and shut down or suspend any activity if PPE cannot be provided;
- Comply and require compliance with L&I requirements for face coverings and the Secretary of Health's face covering order as applicable to the workplace except where this order is more stringent;
- Comply with all applicable laws providing protections for high risk workers, including, but not limited to, the Health Emergency Labor Standards Act; and
- Educate students and personnel on symptom detection, sources of high risk to COVID-19, prevention measures, and leave benefits/policies.

**Visitor Expectations**
- Post visible entry point signage for students, personnel, and visitors describing shared on-campus responsibilities and requirements, including those regarding proper hygiene and sanitization, physical distancing and face coverings, staying home if feeling sick, information on how and when to report concerns, and other information as appropriate or required.

**Food Services**
- Implement floor markings to promote physical distancing;
- Post signs to remind patrons of physical distancing and face covering requirements and to use hand sanitizer;
- Complete routine sanitization of high-touch surfaces and shared resources (e.g., door handles, points of sales); and
- Enforce compliance with the Secretary of Health's face covering order and L&I's requirements inside IHE food service facilities

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support

6

implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

This Proclamation, and the prohibitions and orders contained herein are effective immediately and will remain in effect until rescinded or otherwise amended. Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

Signed and sealed with the official seal of the state of Washington on this 12th day of July, A.D., Two Thousand and Twenty-One at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

'

BY THE GOVERNOR:

_____/s/_____
Secretary of State

7

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorneys General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH, <br><br> Plaintiff, <br><br> v. <br><br> WASHINGTON STATE UNIVERSITY, et al., <br><br> Defendant. | No. 2:22-cv-00319-TOR <br><br> DECLARATION OF ZACHARY J. PEKELIS IN SUPPORT OF DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT <br><br> December 3, 2024 <br> Without Oral Argument |

ZACHARY J. PEKELIS DECL. ISO DEF'S
REPLY ISO CROSS-MOTION FOR SUMMARY JUDGMENT – 1
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

I, Zachary J. Pekelis, declare as follows:

1.    I am a partner at Pacifica Law Group LLP and serve as a Special Assistant Attorney General in this matter representing Defendant Washington State University (WSU).

2.    I am over the age of 18, am competent to testify on the matters contained in this declaration, and make this declaration based on my personal knowledge.

3.    Attached as **Exhibit A** is a true and correct copy of an email to counsel of record in this matter from Kevin Faulkner, the expert who performed the forensic examination of Plaintiff's devices, dated October 18, 2024.

4.    Attached as **Exhibit B** is a true and correct copy of a news article containing a transcript of Plaintiff's remarks at Pac-12 media day on July 27, 2021, which he attended remotely: Theo Lawson, *Transcript: Everything Washington State coach Nick Rolovich said at Pac-12 Media Day*, Spokesman Review, July 27, 2021, https://www.spokesman.com/stories/2021/jul/27/transcript-everything-washington-state-coach-nick-/. A video recording of Plaintiff's remarks is available at https://www.youtube.com/watch?v=Y4zTEFjyoQI.

5.    Attached as **Exhibit C** is a true and correct copy of a news article: Colton Clark, *Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State*, Spokesman Review, Oct. 9, 2021, https://www.spokesman.com/stories/2021/oct/09/report-washington-state-coach-nick-rolovich-applie/.

ZACHARY J. PEKELIS DECL. ISO DEF'S
REPLY ISO CROSS-MOTION FOR SUMMARY JUDGMENT – 2
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

6.    Attached as **Exhibit D** is a true and correct copy of Defendant's answer to Plaintiff's Interrogatory No. 27.

7.    Attached as **Exhibit E** is a true and correct copy of excerpts of the transcript of the deposition of Lisa Gehring taken in this matter.

8.    Attached as **Exhibit F** is a true and correct copy of excerpts of the transcript of the deposition of Bonnie Dennler taken in this matter.

9.    Attached as **Exhibit G** is a true and correct copy of a text message exchange between Plaintiff and then-WSU assistant coach Craig Stutzmann, dated September 28, 2021 and bearing bates numbers ROLOVICH00110525–28.

10.    Attached as **Exhibit H** is a true and correct copy of excerpts of the transcript of the deposition of Anne McCoy taken in this matter.

11.    Attached as **Exhibit I** is a true and correct copy of excerpts of the transcript of the deposition of David Bones taken in this matter.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the forgoing is true and correct and of my own knowledge.

DATED and SIGNED this 18th day of November, 2024, at Seattle, Washington.

s/ *Zachary J. Pekelis*
ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General

ZACHARY J. PEKELIS DECL. ISO DEF'S
REPLY ISO CROSS-MOTION FOR SUMMARY JUDGMENT – 3
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 18th day of November 2024, at Seattle, Washington.

_____
Erica Knerr, Legal Assistant

ZACHARY J. PEKELIS DECL. ISO DEF'S
REPLY ISO CROSS-MOTION FOR SUMMARY JUDGMENT – 4
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# EXHIBIT A

| | |
|---|---|
| **From:** | Kevin Faulkner |
| **To:** | Spencer Coates; Jessica Buswell; Jennah Williams; Zach Pekelis; Rebecca Garland; Ai-Li Chiong-Martinson; Scott Ferron; Erica Coray; Erica Knerr; jseese@fbtlaw.com; eric@kniffin.law; mfreimann@fbtlaw.com; mgrant@fbtlaw.com; ABatts@fbtlaw.com; ADrake@dunnandblack.com; mobrien@dunnandblack.com; bfahling@fahlinglaw.com; |
| **Cc:** | Jessica Smith; Shayla Milliner; |
| **Subject:** | NICHOLAS ROLOVICH v. WASHINGTON STATE UNIVERSITY - Forensic Examination Findings |
| **Sent:** | 10/18/2024 4:50:41 PM |

Counselors,

Defendant in this matter has engaged Aletheian Labs, LLC ("Aletheian") to provide forensic consulting services and to carry out the tasks set forth in the Stipulated Forensic Examination Protocol dated September 17, 2024 (the "Protocol").

Under the Protocol, Aletheian created forensic extractions of the devices provided by Plaintiff (the "Devices") and examined those extractions to determine whether any text messages, chat messages, or other similar communications (together, "Text Messages") responsive to WSU's discovery requests were deleted, corrupted, altered, lost, or otherwise made inaccessible, including by analyzing "empty messages" and/or "unknown address" appearing in the Text Message productions and report the results of our examination and analysis to Plaintiff's and Defendant's counsel simultaneously.

Aletheian is hereby reporting the results of our forensic examination and analysis. No substance of any specific communications or documents that Aletheian reviewed during our examination will be included herein.

1. Aletheian compared the number of total Text Messages to the number of deleted messages on each Device and compared the result with statements made in the Declaration.
    1. The iPhone 8 Plus had a total of 1,660 text messages still present on the device and indicated that 222,824 text messages had been deleted. This device also had 675 "Facebook Messenger" messages still present on the device and indicated that 120 messages may have been deleted. Furthermore, this device had "Telegram" messages in two different states of deletion. Our analysis found 84,736 deleted messages identified in the "Trash" which were still recoverable, and 3 messages that were marked as deleted with some data still recoverable. This device also had 368 "Signal" messages still present on the device and indicated that 371 messages may have been deleted. By default, iPhones keep text messages forever until a user chooses to delete them. This iPhone 8 Plus however, was configured to only keep 30 days of text messages. This means that because of a setting change that happened on this iPhone, each night this device would delete any text messages older than 30 days. The most recent text message present on this device was dated August 8, 2021 and the earliest text message was dated July 30, 2021, meaning that this device has only 10 total days of text messages still present on the device; all other text messages were deleted. This 30 day deletion setting did not affect other

chat applications such as Facebook Messenger, Telegram, or Signal; only SMS, MMS, and iMessage text messages.

2. The iPhone SE had a total of 17,545 text messages still present on the device and indicated that 388 text messages had been deleted. This device also had 1,000 "GroupMe" messages still present on the device and indicated that 2,847 messages may have been deleted. The iPhone SE was configured to retain its text messages forever; the 30-day delete setting for text messages was not enabled on this device.

3. The Samsung Galaxy A02s had a total of 4,865 text messages still present on the device and it was not readily discernible how many text messages may have been deleted. This device also had 472 "GroupMe" messages still present on the device and indicated that 1,368 messages may have been deleted.

4. The Samsung S21 Ultra 5G had a total of 116,209 text messages still present on the device and it was not readily discernible how many text messages may have been deleted. There were multiple other messaging applications present on this device broken down below.

   1. This device also had 481 "Facebook" messages still present on the device and it was not readily discernible how many messages may have been deleted.

   2. This device also had 1,565 "Facebook Messenger" messages still present on the device and it was not readily discernible how many messages may have been deleted.

   3. This device also had 190 "GroupMe" messages still present on the device and no indication that any messages were deleted.

   4. This device also had 112 "Instagram" messages still present on the device and it was not readily discernible how many messages may have been deleted.

   5. This device also had 33 "Snapchat" messages still present on the device and it was not readily discernible how many messages may have been deleted.

   6. This device also had 44,942 active "Telegram" messages and 9,514 deleted messages identified in the "Trash" which were still recoverable.

   7. This device also had 253 "Twitter" messages still present on the device and it was not readily discernible how many messages may have been deleted.

2. Aletheian then analyzed the production data to identify "empty messages" and/or "unknown address" and identified 421 produced documents, each containing one or more empty messages in the produced data Aletheian reviewed. We also looked for other issues in the productions such as labeling information as coming from one source when it actually came from another. The following summarizes the number of instances of the empty messages broken down by device as well as other issues noted:

   1. The iPhone 8 Plus had 12 produced documents containing 12 empty messages. It also had "Facebook Messenger" messages listed as "SMS-MMS-CHAT" in the production data.

   2. The iPhone SE had 8 produced documents containing 9 empty messages.

   3. The Samsung Galaxy A02s had no produced documents containing empty messages. It also had "GroupMe" messages listed as "SMS-MMS-CHAT" in the production data.

4. The Samsung S21 Ultra 5G had 401 produced documents containing 4,002 empty messages. It also had "Facebook Messenger" messages listed as "SMS-MMS-CHAT" in the production data.

3. Finally, Aletheian analyzed reasons for the empty messages. We found the following broken down by device:

1. The iPhone 8 Plus

1. Some empty messages were caused when data was produced from a data source called "Recents" which tracks recent interactions with participants including those in text messages, but does not capture content of those text messages; just the recipients and most recent date and time. We found that a number of produced items were from "Recents" entries that are associated with text messages that had been deleted and were no longer available.

2. Some additional empty messages were caused when data was produced from "Recents" while the related text message thread was also separately produced from the text messaging database or from another database named "KnowledgeC.db."

3. We did find one message where the produced data lists an empty message but our review of the data found no such empty message.

4. Finally, we did identify a message that appeared as an empty message but actually contained just a new-line character.

2. The iPhone SE

1. Some empty messages were caused when data was produced from "Recents" while the related text message thread was also separately produced from the text messaging database or from another database named "KnowledgeC.db."

2. We found one message that was an unsent, blank message that appeared to have some sort of error.

3. Finally, we did identify a few messages that appeared as an empty message but they actually contained new-line characters.

3. The Samsung Galaxy A02s

1. The Samsung Galaxy A02s had no produced documents containing empty messages.

4. The Samsung S21 Ultra 5G

1. The Samsung S21 Ultra 5G had the vast majority of the empty messages produced in this case. For the sake of time, we sampled 95 of the 401 produced documents containing empty messages in order to identify causes that should extend beyond just the sampled items.

2. The majority of the empty messages were caused by the inclusion of some behind-the-scenes system messages that would not be seen by a user looking at their phone. Specifically, messages with an m_type of "134" were included, but these messages communicate delivery status of sent group messages and would not contain any text actually typed by a user.

3. We found messages on this device that were imported from the iPhone 8, that appeared as an empty message on this phone but may have contained a new-line character on the iPhone 8.

4. We also found a message on this device that was imported from the iPhone 8 that appeared as an empty message because the record of a text message existing is in the database on this phone, but the records relating to contents of the message do not exist.

5. There are some Telegram messages being displayed as empty where the original text does appear to be present in the Telegram database, but the forensic tool used to report upon the Telegram data is not extracting that text.

6. We located a Telegram message marked as deleted where the original message was not recoverable.

7. We also identified messages received on this phone that appear to be empty messages but actually contain just a new-line character.

8. Finally, ROLOVICH00098379 contains an "empty message" but we could not evaluate the reason as the empty messages in this production was not found in the data we extracted from the Samsung S21 Ultra 5G. We also searched for numerous intact messages from this produced document but could not locate them on the data we extracted from this device either.

4. In conclusion, while there are a number of different technical issues causing empty messages to appear in the produced data, the majority of those empty messages come from a limited number of technical issues that could easily be resolved by filtering out certain information if text messaging data were to be reproduced.

If counsel for Plaintiff would provide the appropriate contact and shipping address, we would be happy to return the mobile phones as also required by the Protocol.

Thanks,

-Kevin

**Kevin T. Faulkner**

Cofounder & CTO - Aletheian Labs, LLC
kevin@althlabs.com

# EXHIBIT B

Case 2:22-cv-00319-TOR    ECF No. 128-1    filed 11/18/24    PageID.4925    Page 7 of 73

☰ Menu         Q Search         **News**         **Sports**         **Business**         **A&E**         **Weather**

# THE SPOKESMAN-REVIEW





News   Schedule   Multimedia   Stats

SPORTS   >   WSU FOOTBALL

# Transcript: Everything Washington State coach Nick Rolovich said at Pac-12 Media Day

July 27, 2021 │ Updated Tue., July 27, 2021 at 10:55 a.m.

›



Case: 25-761, 09/15/2025, DktEntry: 54.2, Page 36 of 289

Case 2:22-cv-00319-TOR    ECF No. 128-1    filed 11/18/24    PageID.4926    Page 8 of 73

11/18/24, 10:01 AM                Transcript: Everything Washington State coach Nick Rolovich said at Pac-12 Media Day | The Spokesman-Review

Washington head coach Nick Rolovich answers question via video conference during the Pac-12 Conference NCAA college football Media Day Tuesday, July 27, 2021, in Los Angeles. (Associated Press)

| 𝕏 | ✉ | ☻ |
|---|---|---|

**By Theo Lawson** 🔗
theol@spokesman.com
(509) 459-5584

Nick Rolovich's much-anticipated virtual media availability took place on Tuesday morning at the W Hollywood Hotel. Below is a transcript of everything the second-year Washington State coach said during his 20-minute availability.

*Opening Statement...*

**Rolovich:** Good morning, everybody. Appreciate the opportunity to speak to you all. Like to begin by addressing where I believe our program is headed into the season. High level of pride for the effort these players have put in, especially the last year. I think they deserve to be the focus today. A couple MVPs I want to talk about. Coach Dwain Bradshaw, our strength coach, and what he's done to foster a competitive environment, a place where these young men feel like they are improving physically, mentally. Very responsible for the element of togetherness that is pretty evident when you're around this football team right now. His staff, they've really done a nice job preparing these young guys to get to training camp and for the season. I've done a leadership committee for a lot of places, a lot of years. Probably wasn't as necessary as it was this last year. The guys on that, the communication, they're taking the reins when there's not a whole lot of time for us to be together during the summer. They've really got some high goals. I think them kind of taking ownership of this team is also very evident. Thirdly, I know the news came out with Renard Bell, his injury. We're going to miss him. He's still a valuable part of this program. He's got an incredible mentality as far as attacking the rehab process already. I already know that he's dialing in for a comeback when he gets healthy. Hopefully your biggest takeaway from today will be the unwavering commitment from the players in our program. I'm glad you guys get to talk to a couple of them down there. Like a lot of our peers across the country, our kids have been through so much this year, the last 18 months. But I am impressed with their mental strength, with their focus, on health and safety, online school, and doing everything they can to get better physically and as a team. All coaches always say they're proud of their guys. But I don't know that I've been around a team that has had to endure so much but

11/18/24, 10:01 AM          Transcript: Everything Washington State coach Nick Rolovich said at Pac-12 Media Day | The Spokesman-Review

also yet remained focused on the goal at hand in an unselfish manner. They really understand leaning on each other and that they need each other to do what they want to do. That's a tribute to the quality of people we have in this program, including our student-athletes, coaches, staff, alumni that's helped build this thing to where it's at. And, again, the leadership council for what they've done to keep us on the rails. And the support we've received from our department, our medical experts, the fan base in Cougar Nation is as passionate and as genuine as I could have ever imagined being around. So I appreciate that. Ton of excitement for training camp, ton of excitement for Utah State, our first game. We got some good battles going on. We got guys who want to show what they're about, guys have been waiting a long time. We've got a bunch of starters, about 18 starters returning this season. What I learned this year was how important spring ball was. To my detriment, I thought we could get through last year. It is what it was, right? But the value of spring ball was incredible when you look at the differences of last year at this time and then where we're at now. That set us in with Coach Bradshaw into the off-season program in the summer, the player-run practices these guys took hold of. There's a want to in this room. But spring ball is important to the development of individual skill sets, goal setting, and it was great to have with the newer coaching staff. I think it's going to have a big impact on how we attack and how well we do this season. I love this group. There's high character. They work hard on and off the field. They are always committed to improving in various ways, whether it's within football or some of the other elements our athletic department has allowed them to develop as young people. We got our two guys down there, Max and Jahad, guys that know what it means to be a Coug, guys that have had production here for many years. Very familiar to Coug fans. They deserve all the praise that they will be given. But I know that they also know that humility, they couldn't do what they're doing without their teammates. I'm sure you'll hear that from them as they get a chance to speak. We're fortunate to have many others who have garnered pre-season award watches, position groups with high-level talent, a lot of returners. There's NFL Draft picks in our locker room. It's a nice combination, and we're excited to watch as they develop in training camp and go into the season. I'm very confident in this team, these players will elevate not only Washington State football but also the Pac-12. This isn't a secret. A lot of people are in their super senior year. It's going to be a hell of a conference. There's going to be a lot of high-level players, high-level challenges, coaches with all types of different schemes. I think it's set up to be a real, real special year for the Pac-12. Now I have prepared a few written remarks to briefly address my statement regarding my decision not to receive a vaccination up to this point. The reasons for my individual choice will remain private. However, I want to make it clear I respect, I support all the work being done by the State of Washington, who as a state has one of the highest percentages of vaccinations in the country. Whitman

11/18/24, 10:01 AM Transcript: Everything Washington State coach Nick Rolovich said at Pac-12 Media Day | The Spokesman-Review

County, which has — I mean, what a job they had to do with college, a university in a small college town. I think that brought some unique challenges for them. And Washington State University in navigating us all through this unprecedented pandemic. As I go forward, I plan on adhering to all policies that are implemented for the unvaccinated at the state, local, campus, conference level. I'm not against vaccinations. I wholeheartedly support those who choose to be vaccinated, including our players, staff, coaches. In fact, I appreciate our athletic department. They had a challenge in front of them. Going to such great lengths to educate, keep the mental health of these guys in consideration all regarding the vaccine. Washington State athletics hosted multiple educational sessions for our student-athletes, coaches, staff regarding the vaccinations, including a session solely for members of our football team and their parents. I think that's a big part of this. As to our current football student-athlete vaccination rate, our A.D. Pat Chun may have more specifics. Like some of you know, I've stayed off of some of these topics. As of today our team is roughly at 75% fully vaccinated or in the process of getting fully vaccinated. We will continue to educate the remaining players on the benefits of it. I think we all know this virus is deadly, and these vaccines are free. I urge everyone to consider being vaccinated. I do. I appreciate all the members of the media who show an interest in Cougar football, Pac-12 football. I look forward to answering your questions as they come up today, so I think I will leave it there for questions.

**Q:** You said your reasons for not getting the vaccination is going to be remain private, I respect that. However, how do you feel that message is received by your players who kind of look at you as a pillar, somebody to follow, but then you choose not to get vaccinated? How do you feel that is received by the players?

**Rolovich:** Well, I think they respect my statement. I'm going to kind of stay with what I've said at this point. Again, going back to the leadership committee, what this locker room is about, was there a fear of distraction? Yeah. But I think this team has really stayed focused on the goal at hand.

**Q:** About your communication to the players about the NIL, this new ruling. What is your communication to the players? How do you feel this is going to impact your team?

**Rolovich**: I have no problem with them making money. I told them that. I told them that the only thing I want them all to be careful of is if what they do or what they say, there has to be some respect for the locker room. There's medical stuff I think that they want to be

11/18/24, 10:01 AM    Transcript: Everything Washington State coach Nick Rolovich said at Pac-12 Media Day | The Spokesman-Review

careful about. I don't have a problem with the rule. College athletics has always been evolving. This is probably a faster pace than most thought, but we've overcome things in the past. I just want them to keep the team the main thing. We go by a code of faith, family, academics, and football. I want them to always keep that kind of priority list as they move on. I know there was a lot of excitement about it. I mean, don't test young people with creativity. These guys and the women on some of the other sports, combined with some of the technology today, I think there's a lot of opportunity for them. That's our job as a staff, to keep the main thing the main thing. What they do on the side is what they do. I think it will be something we will continually have to monitor with our staff, our SID department. If things arise that cause us any issues within the team, we'll address it. I think we have very good lines of communication. I just want to get to training camp and see what these guys can do on the field.

**Q:** The new commissioner has said before that he favors a policy in which if a team can't play due to COVID, they would then forfeit that game. As it pertains to your decision not to get the vaccine, how do you square that decision with the possibility you might be putting your team more at risk of having to forfeit a game?

**Rolovich:** Like I said, I'm going to follow all policies that are laid out, kind of stand on the statement we have. This is an ongoing decision for me. I'm going to kind of stand by the stuff I've already said. I appreciate the question, though.

**Q:** What has the message been from the Washington State administration as it pertains to your decision to not get the vaccine?

**Rolovich**: I think communication was good. They respect my decision. I don't mean to cause any heartache to this university or this athletic department or this state. I appreciate the support that we've gotten since I've gotten here. But we do have an open line of communication.

**Q:** Can you tell us about your quarterback Jayden de Laura. He was suspended for the DUI but reinstated back in May. He missed spring practice. Can you tell us how his maturation process has come along since last year as a true freshman?

**Rolovich**: Sure. Got thrown into a crazy season. Did win the job last fall. I think Jayden will I think definitely say he knows he made a mistake. But when that happened, I said, Jayden, this mistake will not decide your career. How you approach after this mistake will probably determine a good portion of your career. He got his head down, worked on his academics. I know it hurt him not to be in spring ball. It hurt us, right, not having a guy

who has taken some game reps in the system being out there. I just felt for the betterment of that young man and his future and his ability to help us in the future, you know, it was the right punishment to make sure he understood the severity of his decisions. A little bit of it is the town we live in. It has a little bit, to me, when we were at Hawaii, living on an island, you really realize that you rely on each other in so many different ways. I think that's very similar to a small college town. I'm excited to see what he can do in this competition as we enter fall camp. But I'm proud of him for fighting through. That's not easy with media scrutiny or social media or those things. He seems to be on the right track, not that he was off the tracks, he just made a bad decision. I'm sure it matured him. I'm sure of that. And listen, we all make mistakes. I'm probably a prime example of that. As young people, as a college staff I think it's our job to help them with these lessons and make sure that they improve from it. When they become members of the community, we're big on them understanding or at least hearing that someday they most likely will be a father, a husband. They don't have a choice. They're going to have an impact on their community wherever they choose to live. To reinforce that that should be a positive influence on your community or as a dad or as a husband, we try to hit on that a bunch. I mean, some of the things we've done in our program I think are very unique. Coach John Richardson's financial program that we've kind of ramped up for spring ball I think taught a lot of life lessons, whether it be buying a house, whether it be choosing a car; preowned, new, lease, credit scores. I mean, I thought we as a staff equipped them with some knowledge that will help them outside of football.

**Q:** As you mentioned earlier, the State of Washington is urging residents to get vaccinated. As the coach of Washington State, there's a lot of Washington State fans around the state, how concerned are you that your decision might discourage some of those fans since they look up to you from following the State's advice?

**Rolovich**: No, I hope everyone makes their own decision and listens to everybody they need to listen to. That was not my intention at all.

**Q:** Obviously you didn't have the luxury last year to do on-campus recruiting in your first year. You did get creative on social media and things like that. How would you describe the state of Washington State recruiting right now in year two?

**Rolovich**: It was a very unique year. I think what you need to appreciate, and I'm sure you do, and everyone, the young men of this class, whether it's here or at any school, really had

to have some blind trust without being able to see it and feel the energy of places they were choosing to go to school. For us, the Zooms, we were trying to do a 10-series first down to Pullman, not trying to keep them on a 2 1/2-hour Zoom, hit them with 30 minutes, allows us to keep continuous communication. If you did it every week, you're looking at two and a half months. I will always be honest to recruits, to their families. This is their process. We want them to want to be here. Probably hurt us a lot because I think when you get to Pullman, when you get on campus and you feel that spirit, alumni of not just football, all alumnis know how special this place is to them, it either connects to you or it might not be what you're looking for, and that's okay. We're know we're a small college town, we're not a big city. We understand that. That is very attractive to people also. I think it will be increasingly more attractive when we get a chance to get on the field and show how we play football. I think the way this team will play, I'm not saying wins or losses, I'm saying the togetherness, the unity, will be attractive to even more recruits.

**Q:** You talked about the injury to Renard Bell. It means you return one starting receiver in Travell Harris. How do you feel about the overall depth of that group now and who do you see stepping into some of those roles?

**Rolovich**: Calvin (Jackson). I see Calvin, the healthiest he's been since we've been here. Also had a tough year in multiple ways, but is focused and I think dialed in for a real successful senior campaign. We got to get something out of CJ Moore. Brandon Gray. I think De'Zhaun Stribling did a nice job in spring as an early enrollee. Lincoln Victor brought incredible leadership. Joey Hobert has done some good things since we've been here. It's definitely not something we wanted to see happen, but I think we'll have some guys step up. And combine that with the running game and the offensive line, I think there's a lot of weapons still. We'll try to get as many people ready as we can, but I'm excited to see what they can do when we get out there.

**Q:** I know that Jarrett Guarantano had a chance to work in Southern Cal with Jordan Palmer this summer. Talk about his development, continual learning of the playbook.

**Rolovich**: He's definitely a want-to guy. He's been through a lot. Been through a lot of offenses. I think was able to kind of translate some of it with what we do. I still think we're fairly unique and it needs reps. But his effort level is high. I think he'll get better and better as we get going and he gets the reps. We got Cam coming in in his second year. I think he's much more comfortable than he was last year. I think you need three quarterbacks in a season like this. In a conference that's this challenging, I think you need to have at least three guys ready. Think we'll have more than that, so.

# THE SPOKESMAN-REVIEW

## Local journalism is essential.

Give directly to The Spokesman-Review's Northwest Passages community forums series -- which helps to offset the costs of several reporter and editor positions at the newspaper -- by using the easy options below. Gifts processed in this system are not tax deductible, but are predominately used to help meet the local financial requirements needed to receive national matching-grant funds.



## Jim Meehan

Jim Meehan is no stranger to Zag Nation. As the lead writer covering the Gonzaga men's basketball team, he tells the stories behind the game and gets fans a bit closer to their favorite players.



## Choose amount

✓ Secure

| One-time | Monthly |

| $1,000 | $500 | $250 |
| $100 | $55 | $25 |

$ Other                                              USD

☐ Add note/comment
☐ Give in honor/memory

Continue

---

✉

## Subscribe to the Cougs newsletter

Get the latest Cougs headlines delivered to your inbox as they happen.

**Sign up**

---

## WSU FOOTBALL

11/18/24, 10:01 AM    Transcript: Everything Washington State coach Nick Rolovich said at Pac-12 Media Day | The Spokesman-Review



## As No. 19 WSU prepares for New Mexico, Cougs paying extra attention to the Lobos' dual-threat QB

---

WSU's class of 2025 grows to 22 members with commitment from CB Gaylon McNeal Jr.

---

WSU jumps three spots to No. 18 in second round of CFP rankings

---

A closer look at WSU DT David Gusta's monster impact, freeing up the Cougs' defense to make key plays

SPONSORED

Case 2:22-cv-00319-TOR    ECF No. 128-1    filed 11/18/24    PageID.4935    Page 17 of 73



## Local stroke survivor urges others to learn signs of stroke

At the height of the COVID-19 pandemic in March 2020, 65-year-old Spokane resident Gary Mortlock woke up in the middle of the night,

© Copyright 2016,The Spokesman-Review

# EXHIBIT C

Case: 25-761, 09/15/2025, DktEntry: 54.2, Page 47 of 289

Case 2:22-cv-00319-TOR ECF No. 128-1 filed 11/18/24 PageID.4937 Page 19 of 73

11/18/24, 10:26 AM Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State | The Spokesman…

☰ Menu　　🔍 Search　　**News**　　**Sports**　　**Business**　　**A&E**　　**Weather**

## THE SPOKESMAN-REVIEW





**News**　**Schedule**　**Multimedia**　**Stats**

SPORTS > WSU FOOTBALL

# Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State

Oct. 9, 2021 │ Updated Sat., Oct. 9, 2021 at 8:41 p.m.　　　　　　　　　　❯

1-SER-47

Case 2:22-cv-00319-TOR    ECF No. 128-1    filed 11/18/24    PageID.4938    Page 20 of 73

11/18/24, 10:26 AM          Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State | The Spokesman…



Washington State head coach Nick Rolovich watches the first half of a Pac- 12 Conference game against Oregon State Saturday in Pullman. (Tyler Tjomsland/The Spokesman-Review)  [Buy this photo](#)

| ✗ | ✉ | ⊙ |
|---|---|---|

**By Colton Clark**
The Spokesman-Review

<mark>Washington State football coach Nick Rolovich is seeking a religious exemption after refusing to receive a COVID-19 vaccination, according to a report published Saturday morning.</mark>

June Jones – Rolovich's coach at Hawaii in the early 2000s – told USA TODAY's Brent Schrotenboer that he has advised the second-year Cougars coach to receive a vaccine, but Rolovich instead has elected to file for an exemption and is awaiting word on whether he will be granted approval.

Washington Gov. Jay Inslee announced in August the state's educational employees must be either fully vaccinated, or be approved for a religious or medical exemption by Oct. 18. If

11/18/24, 10:26 AM          Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State | The Spokesman…

Rolovich fails to meet one of the requirements, his job will be on the line.

Rolovich, who announced in July he would not be receiving a coronavirus vaccine for "private" reasons, has declined to speak on his status regarding the state mandate. Jones said Rolovich did not elaborate on why he is refusing to receive a vaccine.

"I don't know exactly, but I know he filed a religious exemption, and they haven't decided on that yet," Jones told USA TODAY on Thursday. Jones mentored Rolovich for several years in the early 2000s. Rolovich was Hawaii's quarterback from 2000-01, and served as a student assistant under Jones from 2003-04.

"He believes the way he believes, and he doesn't think he needs it. It's like I told him: It's not about him anymore. It's about the people around you and the credibility of the university, and he's got to take one for the team."

Jones has been pleading with Rolovich to consider the consequences of his decision. He's had "six or seven conversations over the last 60 days" with Rolovich.

"My advice is for him to take the shot," Jones said. "There's too much at stake to risk losing his job, and it's an unfortunate situation. It may be against what he believes obviously, but there are more people at stake – the university's credibility, the lives of the assistant coaches and their families. There's a whole bunch more at stake than just him, and that's exactly what I told him."

WSU declined to comment on the report.

Rolovich's application for a religious exemption will be reviewed by a "blind" committee, per a report from Jon Wilner of the Mercury News (San Jose). Committee members are not told who each applicant is.

Employees applying for exemptions must detail what beliefs prevent them from being vaccinated and explain why those are "sincerely held."

Rolovich's religious ideologies have not been shared publicly, but he comes from a Catholic family background, and attended a Catholic high school in Northern California.

Last month, Billy Ray Stutzmann – a friend and former player of Rolovich's – announced over Twitter that he had lost his job at Navy because his request for a religious exemption had been denied. Stutzmann's brother, Craig, is WSU's co-offensive coordinator and quarterbacks coach. Both brothers attended a Catholic high school in Hawaii. USA TODAY

https://www.spokesman.com/stories/2021/oct/09/report-washington-state-coach-nick-rolovich-applie/          3/8

11/18/24, 10:26 AM    Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State | The Spokesman…

reported that Billy Ray Stutzmann retweeted conservative comments last week that linked COVID-19 vaccines to abortion.

Pope Francis and many Catholic groups have endorsed the vaccines, but some conservative Catholics oppose them on religious grounds, "believing it is tied to abortion, which they oppose," USA TODAY reported.

Aborted fetal cells aren't present in these vaccines. A fetal cell line was used to produce the Johnson & Johnson vaccine, and the Pfizer and Moderna vaccines used a fetal cell line only early in testing, according to the article. That's not unusual in modern medicine. Several common drugs – including Tylenol, Tums, Maalox and Pepto Bismol – are developed using fetal cell lines.

"A concern about the possible use of fetal cells to develop vaccines is not, by itself, sufficient grounds to grant an exemption," WSU spokesman Phil Weiler said in the article.

Weiler told Schrotenboer that an approved exemption can be overridden in some cases if the person's job puts them in close contact with the public – in other words, if the unvaccinated individual cannot perform his or her duties effectively while keeping the public safe.

According to Wilner, Rolovich would still have the option to get vaccinated by Oct. 18 if his exemption request is denied. If he does decide to follow that course, he will have to either take unpaid leave or vacation time until he is fully vaccinated – meaning, two weeks removed from his final shot.

Rolovich said in July that he is not opposed to vaccinations, but he's kept mum on why he has decided not to receive this vaccine, and has not been transparent about the route he'll take concerning the mandate.

He's the only coach in major college football to announce that he will not get vaccinated. He is the only unvaccinated Pac-12 coach.

"Rolo is Rolo, and he is who he is because of the person he was," Jones said. "He was a quarterback, kind of his own guy, a leader. He's been that way as a coach. He believes that he doesn't need to take it and doesn't want to take it, and he doesn't want somebody telling him what to do. But like I said, to me, there's just too much at stake."

11/18/24, 10:26 AM    Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State | The Spokesman…

The Cougar fan base has been divided for the past couple of months, and debate online is frequent. WSU's program has received only one commitment from a prep player since Rolovich's announcement July 21.

## THE SPOKESMAN-REVIEW

### Local journalism is essential.

Give directly to The Spokesman-Review's Northwest Passages community forums series -- which helps to offset the costs of several reporter and editor positions at the newspaper -- by using the easy options below. Gifts processed in this system are not tax deductible, but are predominately used to help meet the local financial requirements needed to receive national matching-grant funds.

Active Person

https://www.spokesman.com/stories/2021/oct/09/report-washington-state-coach-nick-rolovich-applie/    5/8



### Subscribe to the Cougs newsletter

Get the latest Cougs headlines delivered to your inbox as they happen.

**Sign up**

11/18/24, 10:26 AM       Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State | The Spokesman...

## WSU FOOTBALL



# First look: No. 19 Washington State visits New Mexico for teams' third meeting of all-time

WSU notebook: Jake Dickert hoping for more rules clarity after Utah State game, injury updates and more

WSU rewind: Cougs may have torched a subpar Utah State defense, but their rushing attack indicated an encouraging trend

WSU moves up one spot to No. 19 in new AP Top 25

SPONSORED

11/18/24, 10:26 AM          Washington State coach Nick Rolovich confirms he applied for religious exemption after win over Oregon State | The Spokesman…



## Specialized procedure: Seattle patient travels to Spokane for robotic heart surgery at Sacred Heart

When a lifelong heart condition became worse, Donny Jones, who lives near Seattle, knew by last June that he'd be heading to Spokane.

© Copyright 2016,The Spokesman-Review

# EXHIBIT D

ROBERT W. FERGUSON
Attorney General

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

NICHOLAS ROLOVICH,

Plaintiff,

v.

WASHINGTON STATE
UNIVERSITY

Defendant.

CASE NO: 2:22-CV-00319-TOR

PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANT **AND DEFENDANT'S ANSWERS AND OBJECTIONS THERETO**

In accordance with Federal Rules of Civil Procedure 26 and 33, Defendant Washington State University (WSU or the University) hereby submits these answers and objections (Answers) to Plaintiff's Second Set of Interrogatories to Defendant (Interrogatories) as follows:

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 1

### GENERAL OBJECTIONS APPLICABLE TO ALL RESPONSES

1. WSU objects to Plaintiff's characterization of the Interrogatories as "continuing." WSU will respond to the specific Interrogatories set forth herein and will supplement its Answers as necessary to comply with applicable rules, including Federal Rule of Civil Procedure 33. WSU reserves the right to modify or supplement these Answers as necessary or appropriate.

2. WSU objects to the Interrogatories as overbroad, unduly burdensome, duplicative of or cumulative with other discovery requests, not relevant to any party's claims or defenses, and not proportional to the needs of the litigation.

3. WSU objects to the Interrogatories' definition of "You/Your" as vague, ambiguous, overbroad, not relevant to any party's claims or defenses, and not proportional to the needs of the litigation, including to the extent it purports to require WSU to obtain information from persons who either are not WSU employees or were not involved in WSU's actions challenged by Plaintiff. WSU understands these Interrogatories to seek—and its Answers reflect—only information currently known by WSU.

4. WSU objects to the Interrogatories to the extent they impose burdens or seek discovery beyond what is permitted or required under the Federal Rules of Civil Procedure, including Rules 26 and 33.

5. WSU objects to the Interrogatories to the extent they call for documents or information protected from disclosure by attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 2

6.      WSU objects to the Interrogatories to the extent they seek documents or information protected from disclosure by the Family Education Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d-6, or any other applicable privacy protection. WSU only will produce or disclose such protected documents or information consistent with the Stipulated Protective Order entered in this case. *See* ECF No. 61.

7.      WSU objects to the Interrogatories to the extent they seek documents or information already possessed by or equally available to Plaintiff, including documents or information in the public domain or which WSU has previously produced or disclosed to Plaintiff.

8.      WSU objects to the Interrogatories to the extent they seek documents, electronically stored information ("ESI"), or tangible things, and are therefore more properly framed as Requests for Production pursuant to Federal Rule of Civil Procedure 34. Pursuant to Rule 33(d), for such Interrogatories WSU will describe and produce business records, consistent with the Parties' ESI Protocol Agreement.

9.      WSU objects that these Interrogatories on the grounds that they are extraordinarily broad, encompass topics and materials that Plaintiff can or should have been aware of long ago, and yet were propounded at 10:46 p.m. PDT on the last day to serve written discovery before the discovery cutoff then in place, and appear calculated to consume time and resources during a period when Plaintiff has also noted the depositions of a significant number of witnesses.

10.     The foregoing General Objections are incorporated by reference into the Answer to each Interrogatory. WSU not having listed specifically any one of its

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 3

General Objections in response to a particular Interrogatory does not constitute a waiver of any objection, even if it could have been specifically stated.

## INTERROGATORIES

**INTERROGATORY NO. 20:** Identify all WSU Employees who signed employment contracts, either new or amended, or contract addenda with WSU between March 1, 2020 and November 12, 2021, where such employment contracts or addenda contained language requiring the Employee to "follow all federal, state, and local health directives, as well as university policies related to health and safety," or similar language, including the name of each Employee, whether the employment contract was new or amended, and the date of execution of each contract or addendum.

**ANSWER:** WSU objects to Interrogatory No. (Rog) 20 as vague, ambiguous, overbroad, unduly burdensome, not relevant to any claim or defense, and not proportional to the needs of this litigation, including in its vague use of the phrase "any similar language." WSU also objects that, in response to Plaintiff's Request for Production No. (RFP) 7, WSU has already produced all contracts of football coaches that contained the relevant language with terms beginning between August 1 and December 31, 2020, even though RFP 7 requested only documents and communications regarding contracts "around April 2020." *See, e.g.,* WSU_00011774, WSU_00003054 (executed in June of 2021).

Subject to and without waiving the foregoing objections, WSU answers that, pursuant to Federal Rule of Civil Procedure 33(d), WSU will produce all executed

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 4

the Interrogatories define as "the COVID-19 vaccination that was mandated pursuant to the Governor's Proclamation 21-14.1."

Subject to and without waiving the above objections, WSU answers that each employee's supervisor was responsible for verifying the COVID-19 vaccination card of an employee who declared that he or she was vaccinated pursuant to WSU's vaccination requirement. Pursuant to Federal Rule of Civil Procedure 33(d), WSU refers Plaintiff to the documents to be produced in response to RFP 23.

**INTERROGATORY NO. 26:** Describe with specificity every instance in which WSU determined that an Employee or student provided WSU a fake vaccination card or other falsified vaccination information and all actions that WSU undertook in response.

**ANSWER:** WSU objects to Rog 26 as vague, ambiguous, overbroad, unduly burdensome, not relevant to any claim or defense, and not proportional to the needs of this litigation, including in the vague use of the undefined terms "provided," "fake vaccination card," and "other falsified vaccination information."

**INTERROGATORY NO. 27:** Identify every WSU Employee who was separated from employment as a result of not complying with the Vaccine Mandate, including without limitation whether such Employee was terminated with "just cause" and/or was given a non-disciplinary dismissal.

**ANSWER:** WSU objects to Rog 27 as vague, overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 9

the case, including in its request for all documents regarding each employee that was separated.

Subject to and without waiving the foregoing objections, WSU answers that the following classifications applied in WSU's Workday system to all employees separated from WSU employment for noncompliance with the Vaccine Mandate: civil service employees' terminations were classified as separations for "non-disciplinary reasons" while, for all other types of employees (including administrative professionals, faculty, and coaches), their terminations were classified as separations "for cause." WSU further answers by referring Plaintiff to its answer to Rog 11.

**INTERROGATORY NO. 28:** Describe with specificity the loss in donations WSU claims it would have experienced as a result of WSU granting Plaintiff a religious exemption to the Vaccine Mandate, including (a) the identity of each donor whom WSU claims would have withheld donations, (b) the value of donations that WSU claims it would have lost from each respective donor; (c) the amount and date of any donations that donor made in the six (6) months following Plaintiff's termination, and (d) all prior donations made by such respective donors.

**ANSWER:** WSU objects to Rog 28 as vague, overbroad, unduly burdensome, and not proportional to the needs of the case. WSU further objects to Rog 28 as cumulative of Plaintiff's other discovery requests, including Rogs 8 and 9, as well as RFP 10.

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 10

students or WSU employees not employed within the Athletics Department. WSU further objects to Rog 30 to the extent it seeks information protected by FERPA, 20 U.S.C. § 1232g, HIPAA, 42 U.S.C. § 1320d-6, or any other applicable privacy protection. WSU also objects to Rog 30 as duplicative of Plaintiff's other discovery requests, including Rogs 11 and 14. Finally, WSU objects to this request as contravening the agreement reached by the parties—after extensive negotiations—as to the documents and information WSU would produce or disclose regarding the accommodation process and other employees' accommodation requests.

DATED this 3rd day of September, 2024.

ROBERT W. FERGUSON
Attorney General

*/s/ Zachary J. Pekelis*
ZACHARY J. PEKELIS, WSBA #44557
AI-LI CHIONG-MARTINSON, WSBA #53359
ERICA P. CORAY, WSBA #61987
W. SCOTT FERRON, WSBA #61154
Special Assistant Attorneys General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700
Zach.Pekelis@PacificaLawGroup.com

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Spencer.Coates@atg.wa.gov

*Attorneys for Defendant Washington State University*

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 14

## **VERIFICATION**

I, Sharyl Kammerzell, being first duly sworn, upon oath, state as follows:

I have read the foregoing responses to Plaintiff's Second Set of Interrogatories to Defendant, know the contents thereof, and swear under penalty of perjury that the foregoing answers are true and correct.

DATED at Pullman, Washington, this __24__ day of ___September___, 2024.

Signed: _Sharyl Kammerzell_____

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 15

## CERTIFICATE OF SERVICE

I hereby declare that on this day I caused the foregoing document to be served upon all counsel of record.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 3rd day of September, 2024 at Seattle, Washington.

/s/ Zachary J. Pekelis
ZACHARY J. PEKELIS

PLF.'S SECOND SET OF INTERROGATORIES TO DEF.
**AND DEF.'S ANSWERS AND OBJECTIONS THERETO** – 16

# EXHIBIT E

# Lisa Gehring

# Rolovich v. Washington State University, et al.

# August 20, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: transcripts@buellrealtime.com

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


NICHOLAS ROLOVICH,                    )  CIVIL ACTION NO.
                                      )  2:22-CV-00319-TOR
          Plaintiff,                  )
                                      )
vs.                                   )
                                      )
WASHINGTON STATE UNIVERSITY,          )
                                      )
                                      )
          Defendant.                  )
_____



        VIDEORECORDED DEPOSITION OF LISA GEHRING


Deposition upon oral examination of Lisa Gehring taken at

the request of the Plaintiff, before Danelle Bungen, CSR,

by the law offices of Frost Brown Todd, 1801 California

Street, Suite 2700, Denver, Colorado, commencing at

10:30 A.M. on August 20, 2024, pursuant to the Federal

Rules of Civil Procedure.

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 39

Q.    Okay.  So turn to the next page, if you would, 51; so there's like a cover page.  See at the top there, "This information is intended to help Human Resource leaders within covered state agencies/organizations navigate questions related to Governor Inslee's August 20th, 2021 proclamation."

What -- what does this guidance document mean to you as an HR professional at WSU?  What sort of marching orders do you get from a document like this?

MR. COATES:  Object to form.

THE WITNESS:  When the state comes out with guidance, that's what it is, it's -- it's guidance. It's not saying we have to follow these very specific things from the Office of Financial Management, but they're just providing us general guidance.

Q.    (BY MR. KNIFFIN)  Would FAQs fall in the same category?  Are these rules that you may follow but you don't have to?

A.    It depends.  Sometimes if an FAQ is very specific reiterating what the mandate says, then that would be different; as opposed to guidance, in terms -- guidelines in terms of how you may want to develop a process.

I don't recall all the specifics of this particular communication, but it would be potentially

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 53

employment."  Do you see that?

MR. COATES:  Object to form.

THE WITNESS:  Yes.

Q.    (BY MR. KNIFFIN)  That seems to me to say that if WSU found it couldn't accommodate someone, then any separation that followed would be nondisciplinary.  Am I missing something?

MR. COATES:  Object to form.

THE WITNESS:  It would depend on the employment type, and if it was -- if there was a contract and perhaps if a contract had some different language in it.

But in terms of our Civil Service Administrative Professional, they weren't treated as disciplinary.

(Exhibit No. 73 - E-mailed dated 9-13-21 Gehring to Getchell and others, Bates WSU_24590 through WSU_24501 - marked for identification.)

Q.    (BY MR. KNIFFIN)  I'm marking Exhibit 73, beginning with WSU_24590.  So this is an e-mail you sent, Lisa, on September 13th, 2021, and then here, at the very top of the e-mail you're answering a question from Julia and you've got three categories here; "CS," "AP" and "Faculty."  Do you see that?

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 59

precludes WSU from firing someone for cause for not complying with the vaccine mandate?

MR. COATES:  Object to the form.  Misstates prior testimony.

THE WITNESS:  Correct, that's what that's stating.

Q.  (BY MR. KNIFFIN)  So if you turn a few pages to page 21, at the top it says "Sample nondiscrim-" -- excuse me -- "Sample nondisciplinary separation letters are provided here."  Do you see that?

MR. COATES:  What are you --

THE WITNESS:  What exhibit are you looking at?

Q.  (BY MR. KNIFFIN)  I am looking at still this guidance document.

A.  70.

Q.  Sorry.

MR. COATES:  72?

Q.  (BY MR. KNIFFIN)  I'm going backwards, I apologize.

So looking back at 72, I want you to look at page 21 of that document.

MR. KNIFFIN:  Is this 72?  I didn't write down the numbers myself.  72.  Thank you.  (Speaking to court reporter.)

Q.  (BY MR. KNIFFIN)  Do you see that, "Sample

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 60

nondiscrim-" -- "nondisciplinary separation letters are provided here"?

A.    Yes.

Q.    Okay.  I'm going to provide you now with one of those.

A.    And this may help clarify.

Q.    Um-hmm.

A.    The Office of Financial Management; so this document really addresses Civil Service and bargaining unit employees.  And when I -- when we were talking about "exempt" earlier and I mentioned exempt from Civil Service, so these processes, they're really addressing Civil Service employees --

Q.    Okay.

A.    -- and bargaining unit employees.  Those employees who are exempt from Civil Service, those Administrative Professionals, WSU, the institution, and -- would develop the Administrative Professional policy.  The Faculty manual dictates policy for Faculty.  And if there are employment contracts, their contracts would dictate their policy.

        So OFM provided guidance pertaining to Civil Service employees.

Q.    Okay.

            (Exhibit No. 75 - Metadata, re Notice of

            Nondisciplinary Separation, Bates WSU_21193

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 61

through WSU_21194 - marked for

identification.)

Q.   (BY MR. KNIFFIN)  Let look at this document.  This is

Document 75, Exhibit 75.  This begins with -- I want

to make sure they're the same one -- page 21193.  Is

that the one you have?

A.   Yeah.

Q.   If you look on page at the bottom it says 21193, you

see that the "Regarding" line, sort of in the header

of this form letter, says "Notice of nondisciplinary

Separation."  Do you see that?

A.   Yes.

Q.   Do you recall whether WSU employed this or similar

form letters to process separations related to the

vaccine mandate?

A.   I don't recall if this was the specific letter, but,

yes, there were letters issued for our Civil Service

employees, I believe the Administrative Professional,

and I don't recall the Faculty process off the top of

my head.

Q.   Lisa, you had said that this guidance is specific to

certain types of employees.  Where is the part of this

document, or on what do you base your understanding,

that this applies to some types of state employees but

not others?

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 62

A.   OFM would provide guidance as it pertains typically to Civil Service employees; again, without reading the whole document.

Q.   I'm looking on the first page above the Table of Contents.  The second sentence of that -- excuse me -- the second paragraph begins, "The proclamation covers most state employees and volunteers and some contractors."  And then it says, "Resources and information surrounding the requirements for contractors may be found at the following link..."

A.   Um-hmm.

Q.   Okay.  Do you see that?

        Are there other parts of this document or is there some other -- is there something else in -- in state law, in the Administrative Code, that gives you clarity, as someone working in HRS.  As to which employees are and aren't covered by this guidance?

        MR. COATES:  Object to form.

        THE WITNESS:  The proclamation covered all state employees.

Q.   (BY MR. KNIFFIN)  Oh.  I --  Fair enough.  I think I misread that, misread that myself.

        If I am a WSU employee, how do I know whether this guidance applies to me in my employment situation?

Rolovich v. Washington State University, et al.                                    Lisa Gehring

Page 226

REPORTER'S CERTIFICATE


STATE OF WASHINGTON
                              ss.
COUNTY OF SPOKANE
              I, Danelle Bungen, Certified Shorthand

Reporter, Spokane County, State of Washington, License

No. 2760, do certify that I reported the taking of the

videorecorded deposition of the witness, LISA GEHRING,

commencing on August 20, 2024, at the hour of 10:30 A.M.;

that prior to being examined, the witness was by me duly

sworn to testify to the truth and nothing but the truth.

        I further certify that the foregoing transcript

is a true and correct transcription of my original

stenographic notes; that the reading and signing of the

deposition by the witness was expressly requested.

        I further certify that I am not a relative or

employee of any attorney or counsel of any of the parties,

nor a relative or employee of any attorney or counsel

involved in this action, nor a person financially

interested in the action.

        IN WITNESS WHEREOF, I have hereunto set my hand

this 4th day of September 2024.


_____

Danelle Bungen, CSR

# EXHIBIT F

# Bonnie Dennler

# Rolovich v. Washington State University, et al.

# August 21, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Rolovich v. Washington State University, et al.                    Bonnie Dennler

Page 1

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF WASHINGTON

_____

NICHOLAS ROLOVICH,              )
                                )
            Plaintiff,          )
                                )
        v.                      ) No. 2:22-cv-00319-TOR
                                )
WASHINGTON STATE UNIVERSITY,    )
                                )
            Defendant.          )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

BONNIE DENNLER

_____

Spokane, Washington

DATE TAKEN:   AUGUST 21, 2024

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

5ec578f3-49ad-45b1-9bc7-b7b73b1ce37f

Rolovich v. Washington State University, et al.                    Bonnie Dennler

Page 150

would take on our employees.  They would be subject to the employment processes laid out for WSU.  That's how I would interpret this.

Q.  So this sentence -- well, let's just start at the beginning of the paragraph.  "After conducting this analysis it is possible that agencies will not be able to accommodate an employee's request."  And then down to the end, "Failure to comply with the governor's mandate will result in a nondisciplinary separation from employment."

Now, as a lawyer, and I would think as someone in HR, too, I look at the word "will," and that's like the word "shall."  That's saying this is something you have to do.

Is there something else in this document that would tell you that this "will" or "shall" doesn't apply to WSU?

MR. COATES:  Object to form.  Foundation.

A.  There are -- my understanding, there are agencies that are required to follow personnel stuff under OFM, and there are agencies that are exempt -- are exempted.  This is guidance, and WSU has its own employment and personnel processes that they would follow.

So, I mean, in my mind, when I look at this, it

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

5ec578f3-49ad-45b1-9bc7-b7b73b1ce37f

1-SER-78

Rolovich v. Washington State University, et al.                          Bonnie Dennler

Page 151

has the list of -- I look at this as guidance.  We developed the WSU processes in accordance with our personnel pro- -- our personnel policies for our civil service, our AP, and our faculty.

BY MR. KNIFFIN:

Q.  Are you unclear as to whether this guidance applies to WSU?

MR. COATES:  Object to form.

A.  There are certain employee types, specific agencies, that follow under OFM's requirements.  So -- and other employee employee types that are exempted, and they fall under the set of agency requirements that they're exempted through.

My understanding, in my role in working with OFM and working with WSU, are -- we have three employee categories:  Civil service, AP, faculty.  AP, faculty, are exempted from the -- like the Washington Administrative Codes, the personnel policies associated with that, and they would fall under the policies of WSU.

So my understanding is this document is a guidance for agencies --

Q.  Is --

A.  -- but there are agencies that are exempted from -- they're not governed by OFM's guidance.  That's

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

5ec578f3-49ad-45b1-9bc7-b7b73b1ce37f

Rolovich v. Washington State University, et al.                    Bonnie Dennler

Page 152

my understanding.

BY MR. KNIFFIN:

Q.  So at the very top it says, "This information is intended to help human resource leaders within covered State agencies."

Do you know whether WSU is a covered State agency?

Would you like me to clarify that for you?

A.  I don't know if I need you to clarify.  I think we would have to look at the agency specific list --

Q.  Okay.

A.  -- and --

Q.  I have the list.

A.  And -- okay.

MR. KNIFFIN:  So I think we're on 108; is that right?

THE COURT REPORTER:  Correct.

(Exhibit No. 108 marked.)

BY MR. KNIFFIN:

Q.  Okay.  This is Exhibit 108.  This is the 2022 Washington State Government Organization Chart.  It is the document that is linked.

The third bullet point on the first page here says, "Every agency under the authority of a board, council, or commission listed at," and then it has a

Rolovich v. Washington State University, et al.                    Bonnie Dennler

Page 170

C E R T I F I C A T E

STATE OF WASHINGTON

COUNTY OF PIERCE


        I, Cindy M. Koch, a Certified Court Reporter in
and for the State of Washington, do hereby certify that
the foregoing transcript of the deposition of Bonnie
Dennler, having been duly sworn, on August 21, 2024, is
true and accurate to the best of my knowledge, skill and
ability.  Reading and signing was requested pursuant to
FRCP Rule 30(e).
        IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 18th day of October, 2024.




        _____
        CINDY M. KOCH, CCR, RPR, CRR #2357


My commission expires:
JUNE 9, 2025

5ec578f3-49ad-45b1-9bc7-b7b73b1ce37f

# EXHIBIT G

**Platform:** SMS-MMS-CHAT    **Name:** CHAT - NR0000001 - 00033 - 2021/09/28    **Timezone:** UTC+0000



|  Craig Stutzmann Work <5093394205> | Nick Rolovich <(415) 328-6745> |
|---|---|

Craig Stutzmann Work <+15093394205>

---

2021/09/28

Craig Stutzmann Work <+15093394205>

I'm supposedly out cause of contact tracing dues to being on the bus within 6 ft of Kolney for 15 mins. I'd challenge the total time on the bus, with police escort you can cut that time in half. Plus idk why I'm within 6 ft of anyone who is unvaccinated, isn't that why we have a seating chart. To prevent that

12:33:51 pm

Craig Stutzmann Work <5093394205>

With police escort cutting in half makes it 13 mins.

ROLOVICH00110525



ROLOVICH00110526



12:34:34 pm

Nick Rolovich <(415) 328-6745>

Supposed to be
12:34:51 pm

Craig Stutzmann Work <+15093394205>

+1 (208) 305-2067
Jason Sampson cell.
12:42:18 pm

Spooner just sent me
12:42:26 pm

Lmk when I should call him, cause I'm would call him now but I'll wait on your direction
12:42:57 pm

ROLOVICH00110527

Nick Rolovich <(415) 328-6745>

Call whenever, they just told me the only way out is Kolney with 2 negative tests

12:48:11 pm

Craig Stutzmann Work <+15093394205>

I called Jason Sampson and left a message and a text. I also asked spooner if I should come in to test in case Sampson clears me from contact tracing. Spooner hasn't responded.

12:52:57 pm

ROLOVICH00110528

Case 2:22-cv-00319-TOR   ECF No. 128-1   filed 11/18/24   PageID.4977   Page 59 of 73

# EXHIBIT H

# Anne McCoy

# Rolovich v. Washington State University, et al.

# August 21, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Rolovich v. Washington State University, et al.                    Anne McCoy

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON
_____

NICHOLAS ROLOVICH,                    )
                                      )
                Plaintiff(s),         )
                                      )
       vs.                            )   2:22-cv-00319-TOR
                                      )
WASHINGTON STATE UNIVERSITY,          )
                                      )
                Defendant(s).         )
_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

ANNE McCOY

_____




Taken at 1191 Second Avenue, Suite 2000

Seattle, Washington












DATE TAKEN:   AUGUST 21, 2024

REPORTED BY:  PATSY D. JACOY, CCR 2348

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

1ab6e24f-4cdd-42e3-9215-0564a35e0565

Rolovich v. Washington State University, et al.                                    Anne McCoy

Page 47

(Exhibit No. 151 was marked.)

Q.  (BY MR. SEESE)  All right.  You have in front of you what we've marked as Exhibit 151, and this is an email from you to Bryan Blair dated January 14 of 2021, and I want to call your attention to the third paragraph of the cover email where it says -- where you write:  It includes the template COVID language.

Did I read that correctly?

A.  Yes, I'm reading, it says:  It includes the template COVID language.

Q.  Okay.  And in this case you're referring to the attachment which is the employment agreement of Scott Salwasser, correct?

A.  Yes.

Q.  And who was Mr. Salwasser?

A.  I believe he was an assistant strength coach with us with football.

Q.  All right.  Now, call your attention to the first full page of the attachment, WSU 26707.  And in Section 1.2.1.1, you see bolded language in the middle of the paragraph.  Do you see that?

A.  I do.

Q.  All right.  Would you read that for the record.

A.  Employee also specifically agrees to follow

1ab6e24f-4cdd-42e3-9215-0564a35e0565

Rolovich v. Washington State University, et al.                           Anne McCoy

Page 48

all federal, state and local health directives as well as university policies related to health and safety.

Q.  All right.  And is that what you're referring to when you say that the contract includes the template COVID language?

A.  I would need to confirm this was an email actually sent versus a draft since I don't see myself in the from line, but we were updating templates with COVID-specific language.

Q.  Okay.  And, in fact, if we look back at Exhibit 150, which is Mr. Rolovich's contract which has a date of January 14, 2020, we see that that same Section 1.2.1.1 does not have that language, correct?

MR. PEKELIS:  Object to form.

A.  None of our coaching contracts prior to the COVID time period would have any of the COVID-specific language that has since been added to all.

Q.  (BY MR. SEESE)  Okay.  So -- so in that case, specifically in the case of Mr. Rolovich's contract, his contract did not have the COVID-specific language that we see in the contract that was prepared for Scott Salwasser exactly a year later, right?

MR. PEKELIS:  Object to form.

A.  None of the employment agreements would have had any of the COVID-specific language prior to the

1ab6e24f-4cdd-42e3-9215-0564a35e0565

# EXHIBIT I

# David R. Bones

# Rolovich v. Washington State University, et al.

# October 22, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Rolovich v. Washington State University, et al.                    David R. Bones

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON

_____

NICOLAS ROLOVICH,

Plaintiff,

vs.                        No.  2:22-CV-00319-TOR

WASHINGTON STATE UNIVERSITY,

Defendant.

_____

VIDEO-RECORDED VIDEOCONFERENCE
DEPOSITION UPON ORAL EXAMINATION

OF

DAVID R. BONES

_____

Taken at:  Phoenix, Arizona

(All participants appeared via videoconference.)

DATE TAKEN:   October 22, 2024, 9:00 a.m.

REPORTED BY:  Caryn E. Winters, CRR, RPR, CCR, CSR

WA 2496 CA 14512 ID SRL-718

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

44c01d98-7b05-40af-8fa7-920b040c8812

Rolovich v. Washington State University, et al.                    David R. Bones

Page 45

each specific -- sometimes, yes.  I don't know if it's always that way.

Q   What typically makes you decide between using the average versus the median?

A   It would depend on a number of things.  The number of data points, what I -- what the purpose of the analysis is, those types of things.

Q   In what situations would you seek to use the median instead of the average?

A   I mean, if I had a case -- like, if I was looking at market multiples, for example, if I'm valuating a company as part of a damages analysis, and I've got a number of multiples, and I've got a few, you know, big outliers, I might consider looking at a median instead of an average, depending on how sensitive that change was.  Or I might look at both and present both.  It just kind of depends on the facts and circumstances of each case.

Q   In the work that you performed on this case, did you ever seek out actual numbers from the 2021 football season?

A   When you say "actual numbers," I mean, we have -- I have an entire -- I have attachments that have all kinds of actual numbers for 2021 football season.  So I'm not exactly sure what you're referring to.

Q   Did you get more specific and ask for the specific and the actual costs of any accommodations or testing,

Rolovich v. Washington State University, et al.                    David R. Bones

Page 46

contact tracing?

A    I kid.  As we talked about a minute ago, part of -- there were a couple of issues with that.  One, the numbers that were actually spent on contact tracing and testing and all that are way more than anything that I included in my report.

The reason I didn't include all of those actual numbers is because I wanted to make sure I was focused on incremental costs, not just the total cost that was actually incurred, right?  COVID is happening with or without people getting vaccinations.  So what's the incremental cost if you have in this case coaches that are not vaccinated?  What would be the incremental-type costs?

If I had brought in all the actual costs the numbers would have been a lot -- a lot higher than what I considered in my report.

Q    So you didn't get any of the actual costs for the 2021 football season related to things like the COVID testing, the contact tracing?

A    Like I said, when I was asking questions about those costs the numbers were way higher.  I don't remember what they were.  But I just -- I elected at that point in time and said that's not going to be relevant for the financial and economic analysis that I'm doing because I'm focused on the incremental costs.

44c01d98-7b05-40af-8fa7-920b040c8812

Rolovich v. Washington State University, et al.                          David R. Bones

Page 109

STATE OF WASHINGTON )
                    :   ss:   REPORTER'S CERTIFICATE
COUNTY OF SPOKANE   )

           I, Caryn E. Winters Keller, a certified court reporter in and for the states of Washington, California, and Idaho, do hereby certify:

           That the foregoing video deposition of DAVID A. BONES, via videoconference, was taken on the date and at the time and place as shown on Page 1 hereto;

           That the witness was sworn upon their oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein.

           That the foregoing is a true and correct transcription of my shorthand notes of the requested deposition transcribed by me or under my direction;

           Reading and signing was requested pursuant to FRCP Rule 30(e).

           WITNESS my hand this 28th day of October, 202

_____
CARYN E. WINTERS KELLER, CRR, RPR
WA CCR 2496 CA CSR 14512 ID CSR SRL-718

(This transcript and billing have been prepared/submitted for final preparation and delivery in accordance with all Washington state laws, rules and regulations, including WAC 308-14-130, WAC 308-14-135, RCW 18-35, and applicable court rules regulating formatting and equal-terms requirements. Alterations, changes, fees or charges that violate any of these provisions are not authorized by me and are not at my direction or with my knowledge.)

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

44c01d98-7b05-40af-8fa7-920b040c8812



# DEPOSITION TRANSCRIPT NOTICE

**DATE:**  10/29/2024

**TO:**    Erica P. Coray

**CASE NAME:**   Rolovich v. Washington State University, et al.

**WITNESS:**  David R. Bones

**DATE TAKEN:**  10/22/2024

Reading and signing was requested pursuant to FRCP Rule 30(e).  The above transcript must be read, and the Errata and/or Declaration signed within 30 days of this notice or before the trial date, whichever timeframe is shorter. Otherwise, signature will be deemed waived for all purposes.  Please contact the witness and arrange a convenient time and place for reading and signing.  Please submit the signed original Errata and/or Declaration to this office. The form(s) may be emailed to reception@buellrealtime.com, mailed to Buell's address in the footer of this letter or faxed to 206.287.9832.

<u>Buell Realtime Reporting, LLC</u>

CC:
Spencer W. Coates
Mamie Ling

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066   Tacoma 253.235.0111  Eastern Washington 509.624.3261
reception@buellrealtime.com
www.buellrealtime.com



# E R R A T A

**CASE NAME:**   Rolovich v. Washington State University, et al.

**DATE TAKEN:** 10/22/2024

**WITNESS:**   David R. Bones

## CORRECTIONS

| Page | Line | Now Reads | Should Read | Reason(s) for Change(s) |
|---|---|---|---|---|
| 10 | 21 | "agent for college" | "agent for college athletics" | add missing word |
| 11 | 5 | "took trade secretly and thins" | "took trade secrets and things" | correct typo |
| 15 | 5-6 | "I wouldn't care right as law" | "I wouldn't characterize as a law" | correct typo |
| 19 | 19 | "later set a whole knew" | "later set a whole new" | correct typo |
| 45 | 11 | "if I'm valuating a company" | "if I'm valuing a company" | correct typo |
| 46 | 2 | "I kid." | "I did." | correct typo |
| 63 | 20-21 | "36 million dollars this debt to" | "36 million dollars in debt to" | correct typo |
| 66 | 8-9 | "this was kind a very unusual" | "this was a very unusual" | remove extra word |
| 66 | 19-20 | "what we're talking about mere" | "what we're talking about here" | correct typo |
| 67 | 21-22 | "That's really controversial" | "That's not really controversial" | add missing word |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066  Tacoma 253.235.0111  Eastern Washington 509.624.3261
reception@buellrealtime.com
www.buellrealtime.com



# E R R A T A

**CASE NAME:**   Rolovich v. Washington State University, et al.

**DATE TAKEN:** 10/22/2024

**WITNESS:**   David R. Bones

## CORRECTIONS

| Page | Line | Now Reads | Should Read | Reason(s) for Change(s) |
|---|---|---|---|---|
| 77 | 2 | "I didn't pick a this is the only date" | "I didn't pick this as the only date" | correct typo |
| 82 | 13 | "they typically threw on" | "they typically flew on" | correct typo |
| 87 | 12 | "when the mandate's got to be" | "when the mandate's going to be" | correct typo |
| 99-100 | 23-13 | Includes answer as part of question | Answer should begin at 99:23 with "well I mean" | |
| 105 | 1 | "--based on what understands from" | "--based on what he understands from" | add missing word |
| 107 | 10 | "different times of aircraft" | "different types of aircraft" | correct typo |
| 91 | 8 | Mr: Pekelis: Objection | Ms. Coray: Objection | correct attorney name |
| 96 | 23 | Mr. Pekelis: Objection | Ms. Coray: Objection | correct attorney name |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066  Tacoma 253.235.0111  Eastern Washington 509.624.3261
reception@buellrealtime.com
www.buellrealtime.com

1-SER-100



# D E C L A R A T I O N

**CASE NAME:**  Rolovich v. Washington State University, et al.

**DATE TAKEN:** 10/22/2024

**WITNESS:**   David R. Bones


I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.


_____
David R. Bones


Signed on the ___14___ day of _November_____, 202_4_ .


1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066  Tacoma 253.235.0111  Eastern Washington 509.624.3261
reception@buellrealtime.com
www.buellrealtime.com

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA 44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1700

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>                Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>                Defendant. | No. 2:22-cv-00319-TOR<br><br>DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT |

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................... 1

II.   ARGUMENT IN REPLY.................................................................. 2

   A.    WSU Prevails on the Title VII Claims ............................................. 2

     1.    Rolovich cannot prove a sincere religious conflict with vaccination................................................................ 2

     2.    Accommodating Rolovich would have imposed an undue hardship.................................................................... 4

       a.    Rolovich's increased risk of spreading COVID-19 is undisputed................................................... 4

          i.    The risk of coaches spreading the virus was real....... 5

          ii.    Alternative mitigation measures were insufficient .... 7

          iii.    Student-athletes are irrelevant to undue hardship ...... 9

          iv.    Rolovich's cases are easily distinguished ................ 11

       b.    The economic costs of accommodating Rolovich are unrebutted......................................................... 13

          i.    Transportation costs ................................................. 14

          ii.    Canceled games......................................................... 15

          iii.    Lost donations .......................................................... 16

       c.    Rolovich admits he could not do off-campus recruiting .... 17

     3.    Rolovich has no disparate treatment claim............................... 17

   B.    WSU Prevails on the Contract Claim.............................................. 19

     1.    WSU had just cause to terminate Rolovich's employment..... 19

     2.    Rolovich's process arguments are irrelevant to his contract claim ........................................................................ 20

   C.    WSU Prevails on the Wage Withholding Claim.............................. 21

III.  CONCLUSION .............................................................................. 22

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - ii
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

Case 2:22-cv-00319-TOR   ECF No. 126   filed 11/18/24   PageID.4733   Page 3 of 29

# TABLE OF AUTHORITIES

**Federal Cases**

*Antredu v. Mass. Dep't of Youth Servs.*,
No. CV 22-12016-WGY, 2024 WL 1539725 (D. Mass. Apr. 9, 2024) ......... 12

*Bartholomew v. Washington*,
693 F. Supp. 3d 1107 (W.D. Wash. 2023) ..................................................... 18

*Bass v. T-Mobile USA, Inc.*,
No. 22-11975, 2024 WL 1315843 (E.D. Mich. Mar. 27, 2024) .................... 13

*Beickert v. N.Y.C. Dep't of Educ.*,
No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236
(E.D.N.Y. Sept. 25, 2023) ............................................................................ 11

*Bhatia v. Chevron U.S.A., Inc.*,
734 F.2d 1382 (9th Cir. 1984) (per curiam) ................................................... 8

*Bordeaux v. Lions Gate Ent., Inc.*,
703 F. Supp. 3d 1117 (C.D. Cal. 2023) ................................................. 14, 15

*Carroll v. Tobii Dynavox LLC*,
No. 5:23-CV-00124-HDV-SPx, 2024 WL 1600632
(C.D. Cal. Apr. 3, 2024) ............................................................................... 12

*Chavez v. S.F. Bay Area Rapid Transit Dist.*,
No. C 22-06119 WHA, 2024 WL 4371002 (N.D. Cal. Oct. 1, 2024) ............ 13

*Chavez v. San Francisco Bay Area Rapid Transit District*,
No. C 22-06119-WHA, 723 F. Supp. 3d 805, (N.D. Cal. 2024) .................... 12

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000) ...................................................................... 18

*Dahl v. Bd. of Trustees of W. Mich. Univ.*,
15 F.4th 728 (6th Cir. 2021) (per curiam) ..................................................... 10

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021) ..................................................................... 5, 9

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - iii
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

1-SER-104

*EEOC v. JBS USA, LLC*,
  115 F. Supp. 3d 1203 (D. Colo. 2015) .............................................................. 7

*EEOC v. Rent-A-Ctr., Inc.*,
  917 F. Supp. 2d 112 (D.D.C. 2013) ................................................................ 15

*Efimoff v. Port of Seattle*,
  No. 2:23-CV-01307-BAT, 2024 WL 4765161
  (W.D. Wash. Nov. 13, 2024) .......................................................... 2, 3, 10, 11

*Gantt v. City of N. Charleston*,
  No. 2:22-CV-04224-DCN-MHC,
  2024 WL 4486184 (D.S.C. July 25, 2024) ...................................................... 11

*Green v. United Parcel Serv., Inc.*,
  No. CV 18-8744, 2019 WL 1430244 (E.D. La. Mar. 29, 2019) .................... 13

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ......................................................................................... 13

*Haczynska v. Mount Sinai Health Sys., Inc.*,
  No. 23-CV-3091 (MKB), 2024 WL 3178639
  (E.D.N.Y. June 26, 2024) .......................................................................... 18, 19

*Hailey v. Legacy Health*,
  No. 3:23-CV-00149-IM, 2024 WL 4253238 (D. Or. Sept. 20, 2024) .... 5, 6, 18

*Haley v. Exec. Off. of Health & Hum. Servs.*,
  No. CV 23-11691-RGS, 2024 WL 1836480 (D. Mass. Apr. 26, 2024) ......... 11

*Hittle v. City of Stockton*,
  101 F.4th 1000 (9th Cir. 2024) ....................................................................... 18

*Isaac v. Exec. Office of Health & Hum. Servs.*,
  No. CV 22-11745-RGS, 2023 WL 8544987 (D. Mass. Dec. 11, 2023) ......... 11

*Kidd v. University Medical Center of Southern Nevada*,
  No. 2:22-CV-01990-ART-NJK, 2024 WL 4046249
  (D. Nev. July 2, 2024) ..................................................................................... 12

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - iv
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

Case 2:22-cv-00319-TOR    ECF No. 126    filed 11/18/24    PageID.4735    Page 5 of 29

*Lavelle-Hayden v. Legacy Health*,
  No. 3:22-CV-01752-IM,
  2024 WL 3822712 (D. Or. Aug. 14, 2024) .............................................. 11, 16

*McDowell v. Bayhealth Med. Ctr., Inc.*,
  No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024) ............................... 3

*McKnight v. Torres*,
  563 F.3d 890 (9th Cir. 2009) ....................................................................... 20

*Miller v. Charleston Area Med. Ctr.*,
  No. 2:23-CV-00340, 2024 WL 4518293 (S.D. W. Va. Oct. 17, 2024).......... 11

*Petersen v. Snohomish Reg'l Fire & Rescue*,
  No. C22-1674 TSZ, 2024 WL 278973 (W.D. Wash. Jan. 25, 2024) ............... 9

*Savel v. Metrohealth Sys.*,
  No. 1:22-CV-02154, 2024 WL 4581542 (N.D. Ohio Oct. 25, 2024) ............ 11

*Slater v. Behav. Health Res.*,
  No. 23-5270-RJB, 2024 WL 4290289 (W.D. Wash. Sept. 25, 2024)............. 4

*Snow v. Women's Healthcare Assocs., LLC*,
  No. 3:23-CV-01393-IM, 2024 WL 3640111 (D. Or. Aug. 2, 2024).............. 10

*Speer v. UCOR LLC*,
  No. 3:22-CV-426, 2024 WL 4370773 (E.D. Tenn. Oct. 1, 2024).................... 5

*St. Christopher Assocs., L.P. v. United States*,
  511 F.3d 1376 (Fed. Cir. 2008) .................................................................... 19

*Together Emps. v. Mass Gen. Brigham Inc.*,
  573 F. Supp. 3d 412 (D. Mass. 2021)............................................................ 10

*Urbina v. Comcast Cable Commc'ns Mgmt.*, LLC,
  No. 16-CV-03948-LB,
  2017 WL 6550506 (N.D. Cal. Oct. 6, 2017) ................................................. 17

*Van Asdale v. Int'l Game Tech.*,
  577 F.3d 989 (9th Cir. 2009) ......................................................................... 7

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - v

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

*Varkonyi v. United Launch Alliance, LLC,*
    No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523
    (C.D. Cal. Feb. 21, 2024)......................................................................... 12

*White v. Univ. of Wash.,*
    No. 2:22-cv-01798-TL, 2024 WL 1241063 (W.D. Wash. Mar. 22, 2024) .... 17

*Wood v. Green,*
    323 F.3d 1309 (11th Cir. 2003) ........................................................... 7

**State Cases**

*134th St. Lofts, LLC v. iCap Nw. Opportunity Fund, LLC,*
    479 P.3d 367 (Wash. Ct. App. 2020)................................................... 20

**State Statutes**

RCW 49.48............................................................................................ 22

RCW 49.52............................................................................................ 22

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - vi

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

## I.    INTRODUCTION

The Court need answer a single question to grant WSU's Cross-MSJ: would allowing an unvaccinated college football coach to continue in his job have posed an undue hardship in October 2021—during the pandemic's Delta surge? The answer is yes. Undue hardship exists where an unvaccinated employee would increase the risk of spreading COVID-19 to others. Cross-MSJ at 17–18. The uncontroverted evidence shows an unvaccinated head football coach *did* increase that risk due to (1) unvaccinated persons' greater propensity to transmit the deadly virus; and (2) the highly interpersonal nature of the head coaching position, which would expose many people to infection. Moreover, the uncontroverted evidence shows that the significant cost of accommodating Rolovich would on its own constitute undue hardship.

Unable to refute this evidence, Rolovich tries to manufacture a dispute by floating an array of novel arguments—all unsupported by precedent or evidence. For example, downplaying the public health danger as "mostly hypothetical" is neither factually accurate nor legally relevant, as risk assessment inherently involves uncertainty. WSU was not required to gamble with the health of its community in order to accommodate Rolovich. Moreover, Rolovich completely ignores both his record of flagrant noncompliance with then-existing masking requirements and his admission that he considered unmasking *necessary* to coach. Even if masking were a viable alternative to vaccination (and it undisputedly was not), Rolovich concededly could not have followed it.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - 1
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

Rolovich's remaining arguments also fail. His fixation on unvaccinated football players is a red herring because the undue hardship analysis's "focus . . . is on the *employee* seeking an accommodation," not "the vaccination status of persons who are not employed" by WSU. *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *13 (W.D. Wash. Nov. 13, 2024). Under the separate proclamation mandating *student* vaccination, WSU had no authority to expel unvaccinated student-athletes with valid exemptions from their teams, as Rolovich suggests WSU should have done. And the presence of some unvaccinated football players only *increased* the health risk of having unvaccinated coaches.

Rolovich's other claims fall with his Title VII claim. This Court already held that Rolovich's contract claim hinges on WSU's undue hardship defense. And WSU did not withhold any wages because it lawfully terminated Rolovich's employment with just cause, paying him all accrued wages. Accordingly, WSU is entitled to summary judgment on all claims.

## II.     ARGUMENT IN REPLY

### A.     WSU Prevails on the Title VII Claims

#### 1.  Rolovich cannot prove a sincere religious conflict with vaccination

Initially, Rolovich's Partial MSJ must be denied because he concedes "that his sincerity is an issue of fact not properly resolved on summary judgment." Resp. at 2. And he does not dispute that, given his voluminous communications expressing secular objections to COVID-19 vaccination, a jury could reasonably

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - 2
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

disbelieve the sincerity of his eleventh-hour religious epiphany. *See* Cross-MSJ at 11–14; Resp. at 2.[1]

Rolovich claims "convictions about aborted fetal issue" [sic] motivated his vaccine refusal. Resp. at 2–3. But no reasonable jury would credit this objection as sincere. Rolovich offers *no* evidence he ever mentioned this objection to anyone, other than on his exemption request form (which he neither wrote nor edited). *Id.*; Cross-MSJ at 14 n.2. Rolovich even omits this objection in both his declarations. ECF Nos. 89-2 ¶ 16, 121 ¶¶ 27–31.

Finally, Rolovich does not dispute his conscience-based objection is "entirely derivative of" his *secular* objections, not based on "religious authorities." Cross-MSJ at 16. Nor does he address the cases holding that such objections do not establish a *religious* conflict with vaccination. *Id.* at 15–16; *see also McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870, at *2–3 & n.5 (3d Cir. Nov. 15, 2024) (unpublished).

---

[1] A forensic examination revealed Rolovich deleted over 200,000 messages from phones he used through August 2021. Declaration of Zachary J. Pekelis (Pekelis Decl.), Ex. A. WSU is seeking discovery regarding potential spoliation.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - 3
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

**2. Accommodating Rolovich would have imposed an undue hardship**

**a. Rolovich's increased risk of spreading COVID-19 is undisputed**

Rolovich's failure to rebut WSU's scientific evidence is fatal to his claim. *See, e.g.*, *Slater v. Behav. Health Res.*, No. 23-5270-RJB, 2024 WL 4290289, at *5 (W.D. Wash. Sept. 25, 2024). The following facts are now undisputed:

- COVID-19, a deadly virus, surged in summer and fall 2021. Def.'s Reply Statement of Material Facts Not in Dispute (Reply Facts) ¶¶ 12–20, 83–90, 194.

- COVID-19 vaccination is the most effective means of preventing transmission, serious illness, and death. The unvaccinated have a greater risk of contracting, spreading, and becoming seriously ill from the virus. *Id.* ¶¶ 39–42, 194.

- Rolovich's well-documented noncompliance with masking and distancing rules substantially exacerbated his risk of transmission. *Id.* ¶¶ 107–33, 195.

- Even if Rolovich and other unvaccinated coaches followed mitigation measures such as masking, they would still have had a significantly higher risk of transmitting COVID-19. *Id.* ¶¶ 194, 195.

These facts prove accommodating Rolovich would have endangered the WSU community. His contrary arguments do nothing to rebut that or otherwise undermine WSU's undue hardship defense.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 4
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

### i.    The risk of coaches spreading the virus was real

Rolovich downplays the undisputed public health risk he posed as "mostly hypothetical." Resp. at 7. But an undue hardship need not be "certain to occur," for whenever "an employer considers whether an accommodation will constitute an undue hardship, it is necessarily making a projection." *Speer v. UCOR LLC*, No. 3:22-CV-426, 2024 WL 4370773, at *10 (E.D. Tenn. Oct. 1, 2024). Tellingly, Rolovich cites no case rejecting an employer's undue hardship defense just because it, like WSU's, involved an evidence-based risk assessment of foreseeable consequences.

To the contrary, the Ninth Circuit has recognized an accommodation may pose an undue hardship "by increasing the risk of the spread of COVID-19 to other employees or to the public." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021). Because Rolovich has not rebutted WSU's scientific experts, the transmission risk posed by eight unvaccinated football staff[2] is a verity.

The undisputed evidence also shows the risk of outbreaks was *not* hypothetical. WSU's football team experienced outbreaks in late 2020 and early

---

[2] Rolovich does not disagree the Court should consider his accommodation's "aggregate or cumulative effects" because other football employees "request[ed] the same accommodation." *Hailey v. Legacy Health*, No. 3:23-CV-00149-IM, 2024 WL 4253238, at *9 (D. Or. Sept. 20, 2024); Cross-MSJ at 17.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 5
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

2021. *See* Reply Facts ¶¶ 35–38. A November 2020 outbreak resulted in two canceled football games. *Id.* ¶ 31. And a March 2021 outbreak sickened football players and staff, spread to other teams (whose games were canceled), and led to more stringent public health measures for Whitman County. *Id.*; ECF No. 106 at 11. WSU could ill afford another outbreak in fall 2021—just when it was returning to an in-person campus.

Rolovich suggests WSU had to experience another outbreak *during* the 2021 football season before the risk was sufficiently serious. Resp. at 10. But "Title VII case law is clear that an employer is not required" to "take[] a 'wait and see' approach to the consequences of permitting unvaccinated employees to continue to have direct, in-person contact . . . during the largest surge of COVID-19 cases up to that point." *Hailey*, 2024 WL 4253238, at *15.

Finally, Rolovich's contention that his job did not entail significant in-person interactions finds no record support. Resp. at 8–9. Rolovich testified that coaching requires frequent in-person contacts to be successful, such as communicating during games, traveling with the team, leading practices, and meeting with players, staff, and recruits. ECF No. 98 at 15–16. Three knowledgeable, unrebutted witnesses—Coach Dickert, Athletics Director McCoy, and former Athletics Director Chun—say the same. *See* Reply Facts ¶ 4;

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 6
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

ECF Nos. 100 ¶¶ 8–40, 105 ¶¶ 11–21, 97 ¶¶ 12–24. It is undisputed Rolovich could not coach football by Zoom.[3]

### ii.   Alternative mitigation measures were insufficient

Rolovich claims WSU had "already willingly undertaken" the risk of coaches working unvaccinated "halfway into the 2021 season," when they were subject to masking and testing requirements. Resp. at 7. Not so.

***First***, vaccination did not become a condition of employment until October 18, 2021. Even if pre-Proclamation mitigation measures could possibly be described as temporary *accommodations* (and they cannot), "prior accommodations do not make an accommodation reasonable." *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003); *see also EEOC v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1236 (D. Colo. 2015). Thus, WSU had no obligation to maintain the pre-Proclamation status quo once vaccination became a job requirement and accommodating Rolovich presented an unacceptable health risk. As President Schulz explained in denying Rolovich's appeal, "[a]n

---

[3] Rolovich's declaration bizarrely contends his "official duties as WSU's head football coach did not require frequent in-person contacts and interactions with a wide range of individuals." ECF No. 121 ¶ 11. This conclusory assertion is inconsistent with his deposition testimony. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("sham affidavit" rule). Other than recruiting, Rolovich does not identify a job duty that he could have done remotely in 2021.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 7
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

accommodation that simply continues the measures that were in place during the past year, including the time the university was largely shut down to in-person operation and prior to the widespread availability of COVID-19 vaccines, is not reasonable." ECF No. 108 at 75.

***Second***, WSU recognized that Rolovich's chronic noncompliance with pre-Proclamation masking requirements made the status quo untenable. In summer 2021, Rolovich publicly committed to following all applicable health protocols. Pekelis Decl., Ex. B. WSU reminded him of these requirements. ECF No. 97 at 82–83. But then Rolovich repeatedly and flagrantly removed his mask during the season's first seven games, and continued violating basic local health directives. Cross-MSJ at 30–38; Reply Facts ¶¶ 126–33. By October 18, it was clear Rolovich could not perform his coaching duties without violating "minimum" masking and distancing requirements. Reply Facts ¶ 173.

Rolovich ignores this key point. He thereby concedes he (1) did not, and could not, coach while masking and distancing; and (2) was ideologically hostile to masking. Cross-MSJ at 30–38. Accommodating Rolovich would have likely put WSU in violation of state law, its own guidelines, and Pac-12 protocols, constituting an undue hardship as a matter of law. *Id*. at 34; *see Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1384 (9th Cir. 1984) (per curiam).

***Finally***, even if Rolovich could have followed mitigation protocols without compromising his coaching, WSU's unrebutted experts conclude that, given his constant interpersonal duties, only vaccination could sufficiently mitigate the risk

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 8
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

of COVID-19 outbreaks. *See* Reply Facts ¶¶ 194, 195; *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674 TSZ, 2024 WL 278973, at *6–7 (W.D. Wash. Jan. 25, 2024) ("[A]llowing unvaccinated firefighters to work would increase the risk of spreading COVID-19 even with the use of masks," testing, and distancing because those "are less effective than vaccines" and "firefighters could not always wear masks" or "distance while at work.").

### iii.   Student-athletes are irrelevant to undue hardship

Rolovich's arguments regarding unvaccinated student-athletes fail to advance his cause. Resp. at 7–8.

***First***, Rolovich wrongly assumes WSU could prevent unvaccinated student-athletes with valid exemptions from playing on the team. WSU's student vaccination requirement arose from a gubernatorial proclamation (Proclamation 20-12.4) specific to college campuses and *separate* from Proclamation 21-14, which applied to *employees* only. Declaration of Hailey James (James Decl.) ¶¶ 6–7, Ex. A; ECF No. 106 at 130; ECF No. 107 ¶ 27. Proclamation 20-12.4 required WSU to provide *exemptions* for qualified students but, unlike the employee mandate, it did not provide for any student *accommodation* process (including an undue hardship analysis), which is a feature of *employment* discrimination law. James Decl. ¶ 16, Ex. A at 3. WSU therefore did not—and could not—deny students *exemptions* on the basis of undue hardship. James Decl. ¶ 16; *see also Doe*, 19 F.4th at 1180 (rejecting analogy between exemption policy

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 9

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

for student vaccination mandate and "accommodation procedure in [school district's] *employee* vaccination mandate").

***Second***, the Athletics Department (Athletics) undisputedly had "no involvement or authority over the student vaccination requirement or the process by which [student-athletes] applied for and received religious exemptions." ECF No. 97 ¶ 81. Chun's task was "to determine whether unvaccinated Athletics *employees* could safely perform their job duties without endangering the health and safety of others." *Id.* ¶ 81. He could not remove unvaccinated players with approved exemptions from the team, *id.*, and would have risked litigation had he tried to do so, *see Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 732 (6th Cir. 2021) (per curiam).

***Third***, even if WSU had the authority to eject exempt, unvaccinated student-athletes from the team (and it didn't), Rolovich is wrong that not doing so somehow obligated it to accommodate *him*. If right, Rolovich's position would require unvaccinated physicians to be accommodated if their hospitals treated unvaccinated patients. Title VII requires nothing of the sort. *See, e.g.*, *Snow v. Women's Healthcare Assocs., LLC*, No. 3:23-CV-01393-IM, 2024 WL 3640111, at *8 n.4 (D. Or. Aug. 2, 2024) (unvaccinated patients irrelevant to undue hardship); *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) (same); *Efimoff*, 2024 WL 4765161, at *13 (same for unvaccinated airport visitors).

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 10

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

*Finally*, the fact that some student-athletes were unvaccinated only *increased* the hardship posed to WSU by unvaccinated coaches. The danger to unvaccinated students would undisputedly have been "dramatically" higher had eight unvaccinated football staff continued in their jobs. ECF No. 106 at 33. As a matter of law, the risk to non-employees—especially *unvaccinated* non-employees like students or patients—constitutes undue hardship. *See, e.g.*, *Beickert v. N.Y.C. Dep't of Educ.*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at \*5 (E.D.N.Y. Sept. 25, 2023); *Lavelle-Hayden v. Legacy Health*, 3:22-CV-01752-IM, 2024 WL 3822712, at \*13 n.12 (D. Or. Aug. 14, 2024). That some football players were unvaccinated thus gave WSU *more* reason to deny Rolovich's accommodation request.

### iv.    *Rolovich's cases are easily distinguished*

At least 20 recent cases have recognized the undue hardship in unvaccinated employees' increased risk of transmitting COVID-19 as a matter of law. *See* Cross-MSJ at 21–22 (cases cited); *see also Efimoff*, 2024 WL 4765161, at \*13 (collecting in-circuit cases); *Savel v. Metrohealth Sys.*, No. 1:22-CV-02154, 2024 WL 4581542, at \*12 (N.D. Ohio Oct. 25, 2024); *Miller v. Charleston Area Med. Ctr.*, No. 2:23-CV-00340, 2024 WL 4518293, at \*4–5 (S.D. W. Va. Oct. 17, 2024); *Gantt v. City of N. Charleston*, No. 2:22-CV-04224-DCN-MHC, 2024 WL 4486184, at \*12 (D.S.C. July 25, 2024), *R&R adopted*, 2024 WL 4343708 (Sept. 30, 2024); *Haley v. Exec. Off. of Health & Hum. Servs.*, CV 23-11691-RGS, 2024 WL 1836480, at \*1 (D. Mass. Apr. 26, 2024); *Isaac v. Exec.*

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 11
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

*Office of Health & Hum. Servs.*, No. CV 22-11745-RGS, 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023). Against this consensus, Rolovich marshals just four cases—each readily distinguishable. Resp. at 5–7.

In *Chavez v. San Francisco Bay Area Rapid Transit District*, No. C 22-06119-WHA, 723 F. Supp. 3d 805, (N.D. Cal. 2024), the *employer* did not seek summary judgment on the Title VII claim; summary judgment was denied to the *plaintiffs*. *Id.* at 809. Unlike Rolovich, the plaintiffs also offered expert testimony disputing the employer's medical expert. *Id.* at 819.

In *Carroll v. Tobii Dynavox LLC*, No. 5:23-CV-00124-HDV-SPx, 2024 WL 1600632 (C.D. Cal. Apr. 3, 2024), the court denied summary judgment because there was *no* medical evidence establishing undue hardship. *Id.* at *6. Not so here.

Similarly, in *Varkonyi v. United Launch Alliance, LLC*, No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523 (C.D. Cal. Feb. 21, 2024), the employer "provided nothing from which the Court can determine the negative health ramifications of" allowing plaintiffs to remain unvaccinated. *Id.* at *5.

Likewise, in *Kidd v. University Medical Center of Southern Nevada*, No. 2:22-CV-01990-ART-NJK, 2024 WL 4046249 (D. Nev. July 2, 2024), the employer offered no medical expert testimony. MSJ, *Kidd*, 2024 WL 404249 (ECF. No. 24). Moreover, employees in the same nursing unit as the plaintiff received accommodations. *Id.* at *6. Here, Rolovich does not identify any similarly situated employee who was accommodated. *See, e.g., Antredu v. Mass.*

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 12

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

*Dep't of Youth Servs.*, No. CV 22-12016-WGY, 2024 WL 1539725, at *5 n.4 (D. Mass. Apr. 9, 2024).[4]

**b.  The economic costs of accommodating Rolovich are unrebutted**

The record demonstrates accommodating Rolovich would have caused WSU significant economic hardship, including (1) $196,500 in travel costs; (2) $1.4 million in lost ticket sales for each regular-season game canceled and $1.8 million for a canceled bowl game; and (3) at least $1.25 million in lost donations.

Notably, Rolovich offers no expert testimony to rebut WSU's economic expert David Bones, making his calculations undisputed. Instead, Rolovich argues these losses are not significant enough to constitute an undue hardship under *Groff v. DeJoy*, 600 U.S. 447 (2023). But *Groff* rejected only the "more than *de-minimis*" formulation of undue hardship; it did not require break-the-bank hardship. *Id.* at 469. And here each category of economic costs is independently sufficient to establish WSU's undue hardship.

---

[4] In any event, comparator evidence is irrelevant in failure-to-accommodate cases (unlike disparate-treatment cases). *See, e.g.*, *Chavez v. S.F. Bay Area Rapid Transit Dist.*, No. C 22-06119 WHA, 2024 WL 4371002, at *5 (N.D. Cal. Oct. 1, 2024); *Bass v. T-Mobile USA, Inc.*, No. 22-11975, 2024 WL 1315843, at *9 (E.D. Mich. Mar. 27, 2024); *Green v. United Parcel Serv., Inc.*, No. CV 18-8744, 2019 WL 1430244, at *1 n.2 (E.D. La. Mar. 29, 2019).

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 13
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

### i.   *Transportation costs*

Rolovich argues that $196,500 to provide unvaccinated coaches separate transportation for 13 games is insignificant compared to WSU Athletics' total operating expenses for two full years. Resp. at 13. But he ignores the undisputed fact that, in the months before the Proclamation went into effect, WSU took out a $35.6 million loan to help cover pandemic-related losses. Reply Facts ¶ 33. In this context, almost $200,000 in additional transportation costs represents a substantial burden.

Rolovich illogically argues that "WSU already chartered flights for its football team." Resp. at 14. But *additional* transportation costs for unvaccinated coaches constitutes an undue hardship specifically because it "would have been duplicative of services" WSU "was already paying for." *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1137 (C.D. Cal. 2023).

Finally, Rolovich dismisses WSU's transportation-cost hardship as "litigation-manufactured." Resp. at 12–13. Not so. EH&S specifically advised Athletics that "travel may require rental of additional buses, booking additional flights or other options where the unvaccinated individual travels in [a] separate vehicle." ECF No. 97 at 112. Athletics responded that "[t]he football team does travel by 737 charter for games [and] by bus to airports, hotels, and stadiums" and that it would "create[] a financial burden if a coach has to travel separately." *Id.* at 115. WSU thus contemporaneously reasoned that costly separate travel arrangements would be necessary to meet the safety standards outlined by EH&S.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 14

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

### ii.   Canceled games

Rolovich does not dispute that losses from canceled football games in 2021 and 2022 would have totaled $1.25 to 1.8 million per game. Reply Facts ¶¶ 198–202. Rather, he argues these losses cannot be considered because they were not calculated at the time of the accommodation decision. Resp. at 20.

Rolovich cites no authority holding employers must perform an accounting of undue hardship costs contemporaneously with the accommodation decision. To the contrary, "the precise costs" of an accommodation" need *not* be "calculated at the time of Plaintiff's request," particularly where "the substantial sums involved would have been obvious." *Bordeaux*, 703 F. Supp. 3d at 1128; *see also EEOC v. Rent-A-Ctr., Inc.*, 917 F. Supp. 2d 112, 118 (D.D.C. 2013) (employer not "obligated to demonstrate [undue hardship] with empirical data"). Here, Athletics leadership undisputedly knew of both the potential for game cancellations due to outbreaks and the significant financial losses that would result. WSU was not required to precisely quantify those losses in the 14 days it had to evaluate Rolovich's accommodation request.

Finally, Rolovich argues it is *now* "known that in the 2021 season, Pac-12 did not cancel the one game that was impacted by COVID-19, but instead rescheduled it," citing no evidence. Resp. at 21. Even if true, this overlooks that five *bowl* games were canceled due to COVID-19 outbreaks in 2021. ECF No. 96 at 21. Rolovich also ignores the rule that the undue hardship analysis is confined to "'the information available to the employer when it made its undue hardship

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 15
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

decision.'" Resp. at 11 (quoting *Lavelle-Hayden*, 2024 WL 3822712, at *10).[5] When it made its decision, WSU knew three games had been canceled in 2020 due to COVID-19 outbreaks and, in 2021, the Pac-12 had changed its rules to provide that games cancelled due to outbreaks would be treated as forfeits by the responsible team. ECF No. 97 ¶ 82. Thus, WSU specifically considered the serious risk of additional outbreak-related cancellations. *Id.* ¶¶ 81–82, at 127–28.

### iii. Lost donations

Rolovich concedes that accommodating him would have entailed significant lost donations, admitting one donor canceled a planned $1 million bequest and another withheld a $250,000 pledge—both because of Rolovich's anti-vaccine stance. Resp. at 18; ECF No. 109 ¶¶ 12, 15. These undisputed lost donations *alone* establish undue hardship. And the undisputed record shows many more donors were similarly upset and would likely have cut their giving by millions more had Rolovich remained as head coach. Reply Facts ¶¶ 205–07.

---

[5] *Lavelle-Hayden* does not support Rolovich's argument that WSU was required to contemporaneously calculate costs. *Lavelle-Hayden* holds that undue hardship may not be *rebutted* with evidence an employer could not have known at the time because "Title VII does not require employers to predict the future." 2024 WL 3822712, at *10. Thus, March 2022 data could not be used *against* the employer for its 2021 decision. *Id.* at *17.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - 16
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

Rolovich offers the strawman that "donors' bias against Rolovich's request for a religious accommodation cannot be considered." Resp. at 20. But donors' threats to withhold giving undisputedly arose from Rolovich's *vaccine refusal*, not his accommodation request—which was not publicized until after his termination. *See* Cross-MSJ at 25–26. Rolovich did not *inform* WSU he would request an accommodation until August 19, 2021, and that was not publicly reported until October. Reply Facts ¶ 153; Pekelis Decl., Ex. C. Donor outrage at Rolovich had nothing to do with religious animus.

### c. Rolovich admits he could not do off-campus recruiting

WSU does not fault Rolovich for not recruiting in person when the NCAA calendar forbade it. Rather, WSU's position is Rolovich admittedly could not recruit in person *going forward* because (1) many school districts restricted visits from unvaccinated persons; (2) a five-day quarantine was required of unvaccinated persons upon each return to campus, limiting his ability to coach and do successive recruiting trips; and (3) his hostility to masks exacerbated the health and reputational risks of in-person recruiting. Cross-MSJ at 26–27. WSU's determination that *in-person* recruiting was an essential function of Rolovich's job deserves deference. *See Urbina v. Comcast Cable Commc'ns Mgmt., LLC*, No. 16-CV-03948-LB, 2017 WL 6550506, at *8 (N.D. Cal. Oct. 6, 2017).

### 3. Rolovich has no disparate treatment claim

Because "undue hardship is a complete defense to WLAD and Title VII failure-to-accommodate claims," WSU's defense defeats those claims. *White v.*

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 17
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

*Univ. of Wash.*, No. 2:22-cv-01798-TL, 2024 WL 1241063, at *6 (W.D. Wash. Mar. 22, 2024) (cleaned up). Rolovich briefly argues that undue hardship is not a complete defense to a *disparate treatment* claim. Resp. at 28–29. But "failure to accommodate" and "disparate treatment" are different theories with "different elements." *Bartholomew v. Washington*, 693 F. Supp. 3d 1107, 1116 n.8 (W.D. Wash. 2023). Rolovich's prior complaint pleaded only a failure-to-accommodate theory under Title VII and WLAD, as the Motion to Dismiss briefing and Order confirm. ECF Nos. 22 at 27, 28 at 27, 31 at 14, 33 at 7–11. Rolovich did not amend those claims in the operative complaint. *Compare* ECF No. 1-1 at 97–98, 99–100, *with* ECF No. 53 at 27, 28–29.

Rolovich's attempt to retroactively add an unpled liability theory is improper. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). In similar vaccine cases, courts routinely prohibit failure-to-accommodate plaintiffs from asserting a disparate treatment theory for the first time at summary judgment. *Hailey*, 2024 WL 4253238, at *7; *Haczynska v. Mount Sinai Health Sys., Inc.*, 23-CV-3091 (MKB), 2024 WL 3178639, at *11 n.15 (E.D.N.Y. June 26, 2024). So should this Court.[6]

---

[6] The theory fail anyway because he (1) was unqualified for his job when he became ineligible to work for WSU; and (2) has not identified comparators or other evidence of discrimination. *See Hittle v. City of Stockton*, 101 F.4th 1000, 1011–12 (9th Cir. 2024); *Haczynska*, 2024 WL 3178639, at *11 n.15.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 18

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

**B.     WSU Prevails on the Contract Claim**

**1.  WSU had just cause to terminate Rolovich's employment**

This Court already ruled that "just cause" could be decided at summary judgment based on whether accommodating Rolovich "would have imposed an undue hardship," and Rolovich offers no reason to revisit that ruling. ECF No. 33 at 27–28. Rolovich continues to ignore that WSU appropriately terminated him for just cause because he was legally prohibited from working at WSU—a contractual requirement. *Id*. His contrary arguments (such as invoking the "health directive" provisions in other coaches' contracts) are mostly derivative of arguments this Court has already rejected. *Id.* at 27; ECF No. 28 at 18–20, 23–25.

Rolovich's new arguments also miss the mark. For instance, he fails to show how nonbinding "FAQs" referencing "non-disciplinary" separations alter or supplant his contract's "just cause" provisions. Resp. at 33–34. When the FAQs were issued, the Proclamation did not even "cover . . . higher education institutions" like WSU. Reply Facts at 142–43. And unlike the Proclamation itself, this guidance did not apply to Rolovich or alter existing employment contracts. *Id*.; *see, e.g.*, *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (finding no precedent for "read[ing] into a contract . . . agency guidance . . . not incorporated by reference into the contract"). Rolovich identifies no evidence or authority suggesting WSU was prohibited from

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - 19
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

terminating contract employees like him for "just cause" for noncompliance with the Proclamation.[7] Rolovich's contract itself controls.

### 2. Rolovich's process arguments are irrelevant to his contract claim

Rolovich's accusations of an improper accommodation process rest on conclusory allegations of nefarious motive and unsupported conspiracy theories, Resp. at 34–41, echoing his unsuccessful due process arguments at the Motion to Dismiss stage. ECF Nos. 28, 33. Those arguments are equally defective now when recast under a "good faith and fair dealing" theory.

Initially, Rolovich cannot ground a "good faith and fair dealing" claim in an accommodation process that is not prescribed by the contract itself. *See McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009) ("[T]he implied duty of good faith and fair dealing" is "limited to assuring compliance with the express terms of the contract[.]"); *134th St. Lofts, LLC v. iCap Nw. Opportunity Fund, LLC*, 479 P.3d 367, 374 (Wash. Ct. App. 2020) (similar). Rolovich's contract does not mention accommodations nor entitle him to any particular accommodation process. While Section 4.3 prescribes termination appeal procedures, WSU undisputedly followed them. *See* Reply Facts ¶¶ 188–92.

---

[7] In processing terminations for noncompliance with the Proclamation, WSU undisputedly utilized non-disciplinary separations for *civil service* employees only and "for cause" terminations for all other employees. Reply Facts at 143.

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 20

No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

Moreover, WSU did not act improperly in processing Rolovich's accommodation request. *See* ECF No. 22 at 40–42, 46–51; No. 31 at 21–23. Rolovich's stale arguments that an initial "blind review" determination somehow precluded WSU from "questioning" his professed religious objections strain credulity, and this Court has already rejected them. ECF No. 33 at 20–26. The Proclamation prohibits employers from affording accommodations "they know are based on false, misleading, or dishonest grounds or information" or "the personal preference of the individual." Procl. 21-14.2 at 6. WSU could not follow that directive if, after reviewing Rolovich's anonymized exemption request form, it was barred from considering evidence unavailable to the blind review committee showing his asserted religious objections were insincere. ECF No. 107 ¶ 33.

Rolovich's claim that WSU "prejudged" his accommodation request is unsupported by evidence and legally irrelevant. Resp. at 37–40; Reply Facts at 130–33. Rolovich identifies no evidence to dispel this Court's previous conclusion that "Chun's actions during the review process, even his questions regarding the sincerity of Plaintiff's religious beliefs, were permissible under the process." ECF No. 33 at 20.

**C.    WSU Prevails on the Wage Withholding Claim**

WSU did not wrongfully withhold liquidated damages from Rolovich because he was appropriately terminated for just cause. While Rolovich may disagree with WSU's accommodation decision, it is undisputed WSU had a "bona

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - 21
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

fide" *belief* Rolovich could not reasonably be accommodated. ECF Nos. 105 ¶¶ 40–55, 108 ¶¶ 38–41, 97 ¶¶ 63–85. These uncontested facts defeat Rolovich's RCW 49.52 claim. Likewise, Rolovich concedes WSU paid him his accrued wages through his termination, defeating any RCW 49.48 claim. ECF No. 107 ¶ 37.

### III.    CONCLUSION

The Court should enter judgment for WSU on all claims.

I certify that this memorandum contains 4,836 words, in compliance with the Court's Order of September 18, 2024, ECF No. 86.

DATED this 18th day of November, 2024.

PACIFICA LAW GROUP LLP

By: *s/Zachary J. Pekelis*
Zachary J. Pekelis, WSBA #44557
Ai-Li Chiong-Martinson, WSBA #53359
Erica P. Coray, WSBA #61987
W. Scott Ferron, WSBA #61154
Special Assistant Attorneys General
1191 Second Ave., Suite 2000
Seattle, WA 98101

ROBERT W. FERGUSON
Attorney General

Spencer W. Coates, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404

*Counsel for Defendant*
*Washington State University*

DEF.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT - 22
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2024, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to all parties who are registered with the CM/ECF system.

Dated this 18th day of November, 2024.

_____
Erica Knerr, Legal Assistant

DEF.'S REPLY IN SUPPORT OF ITS CROSS-
MOTION FOR SUMMARY JUDGMENT - 23
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.17500

ALEXANDRIA T. DRAKE, WSBA #45188
Dunn & Black, P.S.
111 North Post, Ste. 300
Spokane, WA 99201-0907
(509) 455-8711

ERIC JOB SEESE
Frost Brown Todd LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990

ERIC KNIFFIN
Kniffin Law PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903
(719) 212-4391

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON**

NICHOLAS ROLOVICH,

    Plaintiff,

    v.

WASHINGTON STATE
UNIVERSITY,

    Defendant.

NO. 2:22-cv-00319

**PLAINTIFF'S *AMENDED* COMBINED RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

December 3, 2024
Without Oral Argument

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

## INTRODUCTION

WSU's *Combined Response to Plaintiff's Partial Motion for Summary Judgment and Cross-Motion for Summary Judgment* is a tour de force of post-hoc rationales for why WSU would have suffered undue hardship had it accommodated Plaintiff ("Rolovich"). At most, however, WSU's "undisputed" evidence is highly disputed, speculative and often inconsistent with WSU's actual practice at the time. Much of WSU's evidence is also inappropriate under current Title VII jurisprudence, either because it was not within WSU's knowledge at the time of the termination decision or because it relies on impermissible considerations under Title VII. The sheer scope of the factual record that WSU cites—and the ambiguity of that record—underscores the fact-intensive nature of Rolovich's claims and WSU's defenses. Additionally, WSU omits the growing number of COVID-19 vaccine cases in the Ninth Circuit and elsewhere that are headed to juries or have already gone to juries. Rolovich's case should as well.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

**A. Triable Issues of Fact Preclude WSU's Request for Summary Judgment on Rolovich's Title VII Claim**

   **1.    Rolovich has satisfied the elements of his prima facie case. Alternatively, as WSU admits, sincerity is a question of fact for the jury which necessarily precludes granting summary judgment.**

Rolovich has asked the Court to find that he has established a *prima facie* case under Title VII.[1] ECF No. 88 at 14. WSU argues the Court should deny Rolovich's motion because it claims Rolovich did not sincerely hold the religious beliefs described in his exemption letter. ECF No. 93 at 18-21. If the Court concludes that a reasonable jury could doubt Rolovich's sincerity, despite the evidence in his motion, then Rolovich agrees that his sincerity is an issue of fact not properly resolved on summary judgment. *See Id.* at 18, ll. 6-14.

To the extent WSU is asking the Court to rule that Rolovich's convictions are not religious, *id.* at 21, the Court should decline. Both reasons described in his exemption letter are grounded in Catholic teaching.  ECF No. 88 at 12-14. As to Rolovich's convictions about aborted fetal issue, the Ninth Circuit has affirmed that such concerns count as "religious beliefs" that "conflict with receiving the COVID-19 vaccine." *Keene v. City & Cnty. of San Francisco*, No. 22-16567,

---

[1] Rolovich follows WSU's practice and uses "Title VII" to refer to both Title VII and WLAD. *See* ECF No. 93 at 10, n.1.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

2023 WL 3451687, at *2 (9th Cir. May 15, 2023). As to Rolovich's convictions about therapeutic proportionality, the cases WSU relies on[2] are all ones where "plaintiffs failed to adequately articulate their religious exemptions." ECF No. 88 at 11 (collecting cases). WSU provides no example of a court that has rejected as non-religious a conviction "rooted in identified teachings" and "developed through study and consultation with religious authorities." *Id.* at 12 (collecting cases).

---

[2] *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 489 (3d Cir. 2017) ("While Fallon does not belong to any religious organization, he holds strong personal beliefs"); *Finn v. Humane Soc'y of United States*, No. CV GLR-23-2107, 2024 WL 1765702, at *4–5 (D. Md. Apr. 24, 2024) ("Finn [] does not identify if she subscribes to any particular religion or the specific nature of any religious beliefs"); *Bartholomew v. Washington*, No. 3:23-CV-05209-DGE, 2024 WL 1426308, at *5 (W.D. Wash. Mar. 26, 2024) (Bartholomew "focused on his belief in his own 'natural immunity'"); *McCarthy v. Bos. Med. Ctr.*, No. CV 22-11886-RGS, 2024 WL 185392, at *1 n.2 (D. Mass. Jan. 17, 2024) (plaintiff failed to "plead some modicum of plausible facts sufficient to create an inference that the conflict arises from some specific religious tenet or principle"); *Caruano v. Bayhealth Med. Ctr., Inc.*, 714 F. Supp. 3d 461, 468 n.3 (D. Del. 2024) (court found plaintiff had not "sufficiently connected her objection to the vaccine to a religious belief tied to her Christian faith").

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

In any event, WSU itself contends that the sincerity of a Title VII plaintiff's religious belief is an issue of fact not properly resolved on a motion for summary judgment. *Id.* at 18, ll. 6-14. At best, Rolovich has satisfied the "sincerely held religious belief" element of his *prima facie* case (which is a "not onerous" burden), and if the Court finds that he has not, WSU has conceded that it is a question of fact for the jury to decide.

### 2. WSU has not established "undue hardship" as a matter of law

### a. Title VII's Undue Hardship Standard

Just last year, the Supreme Court clarified an employer-defendant's burden on the defense of undue hardship: "showing 'more than a *de minimis* cost' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). Instead, an "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *id.* at 468, and "is more severe than a mere burden," *id.* at 469. Post-*Groff*, WSU "must show that the burden of granting an accommodation would result in **substantial** increased costs **in relation** to the conduct of its particular business." *Id.* at 470 (emphasis added).

WSU cannot "escape liability simply by showing that an accommodation would impose some sort of additional costs. Those costs would have to rise to the level of hardship, and adding the modifier 'undue' means that the requisite

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." *Id.* Additionally, WSU's "[u]ndue hardship cannot be supported by merely conceivable or hypothetical hardships." *WSU Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir.1981) (affirming lower court's finding that defendant's proffered hypothetical costs did not constitute cognizable undue hardship). Further, "[w]here an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1111 (W.D. Wash. 2023) (quoting *Groff*, 600 U.S. at 473).

Lastly, while WSU focuses on COVID-19 cases in which courts have granted summary judgment due to the "undue burden" caused to the employer, other recent COVID vaccination decisions in both the Ninth Circuit and elsewhere have allowed these claims to go forward to trial. For example, in *Chavez v. San Francisco Bay Area Rapid Transit Dist.* ("*BART*"), in a case involving six plaintiffs with Title VII claims very similar to Rolovich's claim, the court denied cross-motions for summary judgment on the view that "whether a given accommodation would cause undue hardship is, in any case, a fact-intensive inquiry." No. C 22-06119 WHA, 2024 WL 3334741, at *10 (N.D. Cal. Mar. 18, 2024). Relevant to this case, the *Chavez* trial court found that resolving plaintiffs' Title VII claims on summary judgment "would run afoul of the

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Supreme Court's discretion to engage in 'context-specific application.'" *Id.* at *12 (*quoting Groff v. DeJoy*, 600 U.S. 447, 473 (2023). The court ultimately denied the cross-motions for summary judgment and sent the issues to the jury, which resulted in a $7.4 million verdict for plaintiffs.

*Chavez* is one of at least four Title VII vaccine mandate cases where courts in the Ninth Circuit have this year rejected employers' motions for summary judgment. In *Kidd v. Univ. Med. Ctr. of S. Nevada*, No. 2:22-CV-01990-ART-NJK, 2024 WL 4046249 (D. Nev. July 2, 2024), the court held there were material issues of fact on undue hardship given that defendant had "granted religious exemptions to 85% of employees who requested them." *Id*. at *5–6 In *Carroll v. Tobii Dynavox LLC*, No. 523CV00124HDVSPX, 2024 WL 1600632 (C.D. Cal. Apr. 3, 2024), the court held there were issues of material fact on "whether [the defendant] engaged in a good-faith effort to explore various possible accommodations." *Id*. at *6. Though the defendant produced evidence that it had reviewed the possibility of accommodating the plaintiff, it was unclear whether the employer had even "sat down with [p]laintiff to review and discuss other options.") *Id*. Finally, in *Varkonyi v. United Launch All., LLC*, No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523 (C.D. Cal. Feb. 21, 2024), the court denied summary judgment because employer's undue hardship arguments did not take into account that its workforce was over 90% vaccinated. *Id*. at *5. The court

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

1-SER-137

also found that while the employer had offered many undue hardship arguments, "the problem with this evidence is that none of it demonstrates how much it would have cost [defendant] to accommodate [plaintiff]." *Id*.

### b. Rolovich's "increased risk of contracting and transmitting COVID-19" is largely hypothetical and whether it constituted an undue hardship is a question of fact

WSU's "public safety risk" argument is mostly hypothetical. WSU argues that Rolovich's unvaccinated status caused such a heightened public health risk that it imposed an undue burden. However, this argument ignores the risk that WSU had already willingly undertaken, and is now applied to Rolovich differently. At the time Rolovich was terminated, WSU was already halfway into the 2021 season, had been testing all unvaccinated coaches (and presumably players under the Pac-12 guidelines at the time), and had provided exemptions to fourteen unvaccinated players while providing no accommodations to them nor making any changes to their interactions with the football team and/or travel and lodging accommodations for away games. SADMF ¶¶ 4, 24, and 199.

WSU had already evaluated the risk of public safety and determined it could move forward with unvaccinated individuals on the football team. While Proclamation 21-14 did not apply to students, WSU itself had a vaccine requirement for students, as well as exemption process. *See* WSU Statement of Undisputed Facts, ¶ 43. Tellingly—and in the face of the same public health

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

considerations that allegedly informed WSU's consideration of Rolovich's exemption request—WSU granted exemptions to 14 unvaccinated players (12 religious and two medical exemptions).  SADMF ¶ 4. A reasonable jury could deduce from such evidence that accommodating Rolovich would not have posed an incremental public safety risk that would rise to the level of an undue hardship. While WSU argues that the head coach position carried unique duties, the jury may take note of the fact that players would not only have had considerable and prolonged physical contact with another on the field, in lockers, and in practice, they also interacted with the general student population and mixed in dormitories and housing.

WSU's reliance on the typical interactions of the current football coach, Jake Dickert, is misleading at best.  The interactions which Jake Dickert claims to have in a typical day are what is experienced *now*, not what was experienced in 2021 or even 2022. The interactions in 2021 and 2022 were limited, due to guidelines and policies in place by Washington and by WSU itself. Recruiting itself had been adjusted by Pac-12, as further discussed below, which had moved a significant portion of recruiting through Zoom. At a time when most people had limited interactions, WSU now argues that, at a time Americans were practicing social distancing, Rolovich's recruiting activities would have involved extensive travel to, and into, recruits' home. In fact, Pac-12 had instituted recruitment dead

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

periods up through May 31, 2021. Remote recruiting was the norm for the months leading up to June 1, 2021.  SADMF ¶ 68.

The evidence in the record shows that the refusal to accommodate Rolovich was WSU succumbing to pressure from external forces instead of complying with Title VII. The status of players was not public, and so there were no negative reactions or pressure from fans, alumni, donors, or the public. The argument of the safety risk that one unvaccinated coach would have had is hypothetical at this point and undermined by the numerous exemptions and accommodations that WSU already provided to members of the football team. That WSU granted these exemptions, and accommodated (or decided no special accommodations were necessary even given their unvaccinated status) these players throughout the 2021 and 2022 football seasons, is direct evidence that contradicts WSU's assertion of any alleged undue hardship. That WSU chose not to isolate or distance the unvaccinated players during travel for games is further evidence from which a jury could conclude that the alleged public safety risk of allowing the head coach, like his players, to remain unvaccinated would not have posed an undue hardship. SADMF ¶ 205.

The hypothetical and conjectural nature of WSU's "public safety risk" argument is underscored by the four weeks of pre-season camp coupled with the seven games of the 2021 season that WSU's football team had already completed.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Over ten weeks in which numerous players and coaches – unvaccinated – interacted with other members of the football program, participated in practices, training, travel, and games. And during these ten plus weeks, there were no outbreaks. SADMF ¶¶ 205 & 210.  The scenarios that WSU now offers are merely hypotheticals.

Further, the analysis of whether Rolovich's unvaccinated status had such an incremental impact on public safety as to cause an undue hardship must be viewed at the time, based upon what was known at the time. "It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision." *Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *10 (D. Or. Aug. 14, 2024) (quoting Kluge *v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023)). As the *Lavelle-Hayden* court explained:

> Along with considering both economic and non-economic costs when assessing undue hardship, this Court further holds that it is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision. This approach comports with how courts analyze whether a plaintiff has alleged a prima facie case against an employer—by assessing the information the plaintiff provided to the employer and, thus, the information of which the employer had notice.

*Id.*

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

As of October 18, 2021, WSU knew the risks of unvaccinated individuals and the impact of those unvaccinated individuals on the football team. It had guidelines in place for the team, and weekly testing. SADMF ¶ 140. Based upon what was known at the time, there was no incremental impact on public safety caused by Rolovich that rises to the level of establishing an undue hardship upon WSU's football program as a matter of law.

      **c.**      **A reasonable jury, viewing the evidence in the light most favorable to Rolovich, could find that the fiscal costs of providing accommodation did not constitute an undue hardship**

WSU cites a parade of horribles regarding the *theoretical* fiscal costs of accommodating Rolovich. WSU asserts that the cost of accommodating Rolovich's exemption request would have approximated $196,500 in additional travel costs and that it would constitute an undue economic hardship. ECF No. 93 at 30-31. But courts must "apply the [undue hardship] test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Groff*, 600 U.S. at 470-71 (internal quotations omitted). Tellingly, this $196,500—even if the jury credits it—is the cost of travel accommodations across two football seasons. SADMF ¶ 225.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

More relevant here are the total operating expenses and revenues of the WSU football program over the years. For the 2018 through 2022 football seasons, WSU's total operating expenses ranged from $16,533,539 to $25,335,772. SADMF ¶ 221. When deposed, WSU's expert admitted that he failed to determine the actual costs for each season and performed no calculation to determine the costs against the overall operating expenses. SADMF ¶ 224. Rather, he only looked at the incremental cost across two seasons. *Id.*

WSU's estimated cost of $28,500 for hiring separate buses, which WSU incorrectly stated was for the 2021 season, ECF No. 93 at 31; ECF No. 94 at ¶ 197, is for a total of 13 games across two football seasons. SADMF, ¶ 200. If $196,500 is compared against total expenses for the 2021 and 2022 seasons (a total of $48,158,117), it amounts to 0.4 percent of WSU's total expenses. Compared against the team travel expenses alone (a total of $2,696,708), it amounts to 7.295 of the travel expenses across two seasons. SADMF, ¶ 202. These costs are minimal and do not rise to the level of undue hardship to bar accommodation requirements under Title VII.

This economic analysis not only is a litigation-inflated number, but is also hypothetical and speculative. *Lavelle-Hayden,* 2024 WL 3822712, at *10 ("It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision.") For example, WSU's non-retained

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

expert Dr. Guy Palmer—whom another WSU expert, David Bones, relied upon exclusively to calculate the costs of accommodation—"would have also recommended that" all unvaccinated coaches would have had to travel separately – by chartered plane, separate buses, and separate accommodations. ECF No. 106 at 34, ¶ 60; ECF No. 96 at 27-28. These are litigation-manufactured recommendations that go beyond what the Athletics Department and Pac-12's required, or what WSU actually did with respect to exempted unvaccinated players.

In reality, Dr. Palmer's primary recommendations were for WSU to "follow all requirements from the Athletics Department and the Pac-12."  ECF No. 106 at 34, ¶ 59. The Athletics Department's accommodations would have been wearing masks and maintaining social distancing. *Id.* The Pac-12 would have required surveillance testing of a PCR test or three antigen tests per week, negative PCR test prior to any games, refraining from returning to campus from *non-team* related travel without a negative PCR test, and quarantining upon return to campus from any *non-team* related travel until a negative PCR test was obtained. *Id.* The cost of quarantine and testing would have been minimal—so minimal that WSU's expert did not find them worthy of analysis. SADMF ¶ 226. Further, these testing costs had already been undertaken by WSU throughout the 2021 football season.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

At trial, the jury may reasonably find that Rolovich's separate travel would not have posed an undue hardship, whether evaluated in context of WSU's overall operations or evaluated just in the context of the football program. WSU generated total operating revenue of $47,625,476 in the 2021 football season and $48,758,639 in the 2022 football season. ECF No. 96 at 66-67. A jury could reasonably find that these added costs did not "rise to the level of hardship" of being "excessive" or "unjustifiable." Given the small percentages and that WSU already chartered flights for its football team, these accommodation expenses would not be "unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business" of the football team and WSU. *Poole v. Centennial Imports, Inc.*, No. 2:12-cv-00647-APG-VCF, at *10 (D. Nev. May 19, 2014).

Additionally, the largely hypothetical nature of the cost of accommodating Rolovich is further evidenced by the football players were unvaccinated and traveling *with* the rest of the team (players and coaches that were vaccinated), SADMF, ¶ 4. There is even less basis for WSU to take on additional costs to provide different and exclusive accommodations to Rolovich by the fictitious assumption that he would have needed to travel separately from both vaccinated and unvaccinated members of the football team.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

It is entirely unclear why WSU would have needed to charter a separate plane and a separate bus for Rolovich. This is especially true given that the record shows WSU did not take that measure (separate charter transportation) for the 14 unvaccinated players whom WSU granted exemptions. *Id.* A reasonable jury could conclude that there was no need for separate accommodation, and therefore WSU created its own illusion of hardship. Simply put, there was no undue hardship to accommodate Rolovich.

Even assuming that the accommodations provided to unvaccinated players included separate travel from the rest of the team, it is inconceivable that the incremental cost of including Rolovich to those travel costs would have created an undue fiscal burden. There is also no evidence that WSU considered alternative options at the time. *United States v. Cal. Dep't of Corr. & Rehab.*, 2:24-cv-00925-DJC-DB, at *30 (E.D. Cal. June 20, 2024) ("The Supreme Court's ruling in *Groff* is clear that before declaring that providing an accommodation for an employee's religious beliefs creates an undue hardship, an employer must consider other options, not simply assess 'the reasonableness of a particular possible accommodation or accommodations.'"). For example, WSU already had the costs of weekly testing and seven games that were played under this model, yet this alternative was not considered. Dr. Palmer had recommended that the Pac-12 guidelines and Athletics Department policies were followed. While Mr.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Bones admitted that these costs were minimal, there is no evidence that WSU considered these alternative *and reasonable* accommodations, which certainly would not have posed an undue hardship due to their minimal costs.

WSU has not established that, as a matter of law, its litigation-generated calculation of speculative fiscal costs would pose an undue hardship.

### d. Donor Opposition to Accommodating Rolovich Is Not Cognizable to Factor into Undue Hardship

WSU contends that the *potential* lost donations would have caused an undue hardship for the University. EFC No. 93 at 25-26 ("Accommodating Rolovich also *risked* the loss of significant revenue" (emphasis added)). Specifically, WSU argues that many high-level donors had expressed "anger and disappointment that Rolovich was endangering the WSU committee." *Id*. at 25. WSU contends that after the termination of Rolovich, $3.5 million was donated. ECF No. 94 ¶ 208. However, WSU has withheld whether the impetus for the $3.5 million in donations was specifically because of Rolovich's termination, or that it had been withheld because WSU had continued to employ Rolovich.

First, as noted above, under *Groff* any alleged undue hardship must be measured against the overall context of the employer's business. "[T]he decision of whether a particular accommodation works an undue hardship on … an employer … must be made by considering 'the particular factual context of each

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

case.'" *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (quoting *Anderson v. General Dynamics Convair Aerospace Div.*, 489 F.2d 397, 400 (9th Cir. 1978)).

Here, WSU represents that in a typical year its football program typically received between $2.3 and 3.8 million in donor contributions. ECF No. 94 ¶ 204. The money that had allegedly been threatened to be withheld were donations overall to WSU, not those specifically earmarked for the athletics department as a whole. From fiscal year 2018 through 2023, the WSU Athletics Department received donations that ranged from $7.7 to 14.5 million. SADMF ¶ 210.

In fiscal year 2022, WSU received $120.9 million in philanthropic support, "the highest activity since FY2015." SADMF ¶ 213. In fiscal year 2023, WSU received $167.9 million in annual fundraising. *Id.* The threatened withholding of donations, and the economic impact of such withheld donations, must also be analyzed in the context of the business – WSU as a whole. The range of $2.3 to 3.8 million which WSU's football program receives is nominal from the overall donations WSU receives each year.

WSU claims that multiple donors explicitly threatened to withhold further donations, but only provides that one donor canceled a $1 million bequest to the university and that another reinstated a $1.5 million bequest after Rolovich's termination. The others shown in the table provide that most have given, over their

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

lifetime, less than $500,000. ECF No. 102, pp. 17-18. More importantly, is what level their giving was over the years. Only two gave $25,001 and above each year, from fiscal years 2021 through 2023. *Id.*

When compared against the annual giving WSU received each year, the economic impact of the threatened withholding of donations (which is something every university must contend with, as it is the nature of their business) amounts to approximately one percent of the giving it received. This does not count as "significant" under *Groff*.

Second, and more fundamentally, the Supreme Court made clear in *Groff* that Title VII forbids failure-to-accommodate by proxy. The *Groff* Court noted that, to the extent it "was not previously clear," "a coworker's dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'" 600 U.S. at 472. The Court elaborated that, "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to ***the very notion of accommodating religious practice*** cannot be considered 'undue.'" *Id.* (emphasis added).

The Supreme Court's caution about taking co-worker hostility into account applies with full force to WSU's reliance on its donors' sentiments: "If bias or hostility to a religious practice or a religious accommodation provided a defense

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

to a reasonable accommodation claim, Title VII would be at war with itself." *Id*. Here, permitting donors to influence the decision of whether an accommodation is appropriate, is contrary to Title VII caselaw and its purpose. "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *Anderson v. v. General Dynamics Convair Aerospace Div*., 489 F.2d 397, 402 (9th Cir. 1978) (quoting *U.S. v. Bethlehem Steel Corp*., 446 F.2d 652, 663 (2d Cir. 1971)).

Given the financial model of universities, donors are comparable to a business' customers. In *Diaz v. Pan Am World Airways, Inc*., the court held that customer preference may be taken into account only when it is based on the company's inability to perform the primary function or service it offers. 442 F.2d 385 (5th Cir. 1971). Here, WSU's core function is to educate its students.

For all these reasons, WSU's donors' "expressed anger and disappointment" at Rolovich's decision to exercise his rights under Title VII, the WLAD, and the Governor's Proclamation are not relevant to the undue hardship analysis. Even if the donations that were withheld were substantial in the context of WSU's operations—which they were not—the donors' bias against Rolovich's request for a religious accommodation cannot be considered under the Title VII

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

undue hardship analysis.

### e. Hypothetical game cancellations and lost ticket revenue do not constitute cognizable "undue hardship," must less establish undue hardship as a matter of law

The potential of cancelled games and lost ticket revenue is a claim of undue hardship that WSU offers now—during litigation. At the time Rolovich was terminated, no games had been cancelled. No outbreaks had occurred. And this was under the existing weekly testing that WSU had undertaken, which it then cancelled once it terminated all of the football coaches. At the time Rolovich was provided the Notice of Intent to Terminate, the alleged undue hardship from cancelled games and lost ticket revenue was not a factor in consideration. This is because at that time, WSU was aware that there would be no cancelled games as a result of Rolovich's unvaccinated status. Therefore, it was not a factor or point of consideration in WSU's undue hardship analysis.

Now, during litigation, WSU has developed an analysis of cancelled games and potential lost ticket revenue as a result, in order to increase their numbers for the undue hardship analysis. At this time, it is known that in the 2021 season, Pac-12 did not cancel the one game that was impacted by COVID-19, but instead rescheduled it. Therefore, the potential lost ticket revenue, media rights, and conference distributions are all hypothetical and created for litigation. "The Ninth Circuit has echoed the Sixth Circuit's 'skepticism' about ''hypothetical

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

hardships' based on assumptions about accommodations which have never been put into practice.'" *E.E.O.C. v. Alamo Rent-A-Car LLC*, 432 F.Supp.2d 1006, 1016 (D. Ariz. May 26, 2006) (quoting *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 402 (9th Cir. 1978)).

Under this faulty series of hypotheticals, "virtually no accommodation could overcome the undue hardship test." *Id.* WSU has asserted facts that are grounded only in assumptions in what could have happened, and opinion based on hypothetical scenarios, developed long after the 2021 and 2022 football seasons to support litigation. "Because 'undue hardship canoe be proved by assumptions nor by opinions based on hypothetical facts …. [WSU] has not raised a material factual issue concerning undue burden." *Id.* at 1017.

Furthermore, the canceled games and resulting lost ticket revenue, media rights, and conference distributions is admitted by WSU to not be an undue hardship based upon their actions. This was a risk that WSU had already accepted when it granted exemptions to 14 football players, and did not require any accommodations or changes to the team despite the 14 unvaccinated football players. Despite the 14 unvaccinated football players, WSU did not cancel any games in the 2021 or 2022 football seasons before the vaccine mandate was lifted. WSU had already determined that the potential losses from a COVID-19 outbreak on the football team, due to unvaccinated individuals, was not an undue

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

hardship to prevent providing exemptions or to even require accommodations. WSU had determined these potential losses were not "substantial" in the context of WSU's business.

> **f.     The arguments offered by WSU related to alleged reputational and institutional damage are based on faulty assumptions of fact and do not amount to "undue hardship" as a matter of law**

WSU's position regarding the impact on reputation is related to Rolovich's ability to meet with donors, fans, alumni, the public-at-large, fans, the media, and that the football team itself was significantly limited in 2021. ECF No. 93 at 34-35. However, each of these limitations existed because WSU refused to contemplate any alternative options or accommodations. *See generally,* ECF Nos. 93 and 94. Rather, WSU determined that in-person interactions were required, and therefore it could not accommodate Rolovich.

However, there is nothing that made in-person interactions a requirement to achieve the job duties of cultivating relationships. During a period where the pandemic was still in place, and society had largely learned to interact and build relationships virtually, it is strange that WSU contends its reputation could only be cultivated through in-person interactions. WSU admits that it canceled a number of previously scheduled in-person donor events, yet WSU provided no alternatives, made no other plans to conduct other forms of interaction –

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

something that nearly every charitable organization had to shift to in order to continue operating during the pandemic shut-down.

"Although Title VII 'directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation,' the availability of options that would allow the employee to keep working may affect the reasonableness of an option that would not." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1110 (W.D. Wash. 2023) (quoting *Ansonia Bd. Of Educ. V Philbrook*, 479 U.S. 60, 68 (1986)). "Where an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1111 (W.D. Wash. 2023) (quoting *Groff*, 600 U.S. at 473).

There is no evidence WSU considered any alternatives to accommodate Rolovich as it related to interactions with fans, alumni, donors, and the public-at-large to determine whether they were reasonable and could be implemented. At the time of Rolovich's termination, weekly testing was already in place as required by Pac-12 (and should have continued even after Rolovich's termination due to Pac-12 rules). Therefore, WSU had sufficient information as to whether Rolovich could attend these events, if it had continued the weekly COVID-19 tests.

WSU relies upon the objections and negative reaction to Rolovich's

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

unvaccinated status. However, WSU admittedly was receiving a mixture of responses to Rolovich's unvaccinated status. Instead of providing reasonable accommodation, and providing the necessary public relations support for it, WSU opted to simply walk away and refuse to accommodate, claiming an "undue hardship" that it cannot prove.

> **g.    WSU's recruitment analysis is factually incorrect and, at a minimum, raises a factual issue for the jury**

It is important to note that the NCAA did not permit in-person recruiting from March 2020 to June 1, 2021. Vaccine status was not relevant, it was simply not permitted. Rolovich was not permitted to recruit from August 1, 2021 through August 31, 2021 per the NCAA rules. SADMF ¶ 70. The permitted evaluation period ran from September 1, 2021 through November 27, 2021. *Id.* at ¶ 71. However, during this period, no in-person, off-campus recruiting contacts with the prospective student-athlete was permitted. *Id.* It was not until the contact period of November 28, 2021 through December 11, 2021 that Rolovich could have engaged in in-person, off-campus recruiting. *Id.* Rolovich was terminated on October 18, 2021, long before he could have engaged in any in-person recruiting.

Further, WSU contends that Rolovich did not leave campus for the purpose of recruiting between January 1 and September 30, 2021, because of his unvaccinated status, which caused him to lag behind in recruiting. ECF No. 93 at

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

33-34; ECF No. 94 at ¶ 94. And that further, as training began in June 2021, "it would not have been practical for Rolovich to quarantine for five-day periods" if he left for in-person recruiting. *Id.* However, this position fails to take into account the NCAA recruiting calendar. The NCAA had put in place an immediate ban on in-person recruiting for Division I coaches and put in place a recruiting dead period at the onset of COVID-19 on March 18, 2020. SADMF ¶ 70. This dead period was continuously extended throughout 2020. *Id.* On November 18, 2020, the NCAA extended the recruiting dead period for all Division I sports through April 15, 2021. *Id.* This dead period did not allow in-person recruiting. *Id.* Instead, the NCAA permitted additional flexibility in virtual recruiting in football by allowing all coaches, full-time school staff members and current students to conduct recruiting calls (telephone and video) without a countable coach being present. *Id.* On February 17, 2021, the NCAA extended the dead period through May 31, 2021. *Id.* Therefore, Rolovich could not perform any in-person recruiting from January 1, 2021 through May 31, 2021.

In June 2021, there was no vaccine mandate nor any restrictions on the participation of coaches that were unvaccinated. The NCAA permitted on-campus evaluations during unofficial visits during the days football camps and clinics were allowed in June and July 2021 only, but otherwise the recruiting calendar was followed with a waiver of the telephone call legislation. SADMF ¶ 71. The

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

quiet period (which does not permit in-person recruiting contacts or evaluations on or off WSU's campus) ran from June 1 through June 27, 2021. *Id.* The dead period ran from June 28, 2021 through July 24, 2021, followed by a quiet period from July 25, 2021 through July 31, 2021. *Id.* For the 2021-2022 recruiting period, the dead period was in place from August 1, 2021 through August 31, 2021. *Id.*

Simply, Rolovich was severely restricted, by the NCAA, from in-person recruiting. Once the football season began, Rolovich's focus was on the team and its performance for that season. Even then, no in-person, off-campus recruiting contacts were permitted during the evaluation period of September 1, 2021 through November 27, 2021. *Id.* Further, other coaches could have contributed to the recruitment, as was part of their job. Due to the significant dead periods that were instituted by the NCAA, it is only logical that his recruitment numbers are different from Jake Dickert, who had no such restrictions in place during his recruitment period.

For the 2022 season, which is a mixture of recruits from Rolovich and Dickert, there were 27 enrollees, 19 of which were scholarship enrollees. Of those 19, 7 had committed to WSU under Rolovich in 2021. SADMF ¶ 5. This was all obtained after offers were made under significant dead periods imposed by the NCAA. In short, the impact on recruiting as a result of Rolovich's unvaccinated

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

status was minimal. WSU has not shown that Rolovich's unvaccinated status damaged WSU's football program and its ability to recruit and fill its roster.

WSU has failed to establish undue hardship as a matter of law. Based on the record, WSU's cited hardships are either litigated-created statistics that WSU did not calculate or know at the time it terminated Rolovich or are sufficiently minimal in the overall context of WSU's business that a reasonable jury could find them not to be "undue."

**3.    In the alternative, disputed facts regarding WSU's motives preclude summary judgment on Rolovich's Title VII claim**

According to WSU, an "undue hardship" is a "complete defense" to Rolovich's Title VII (and WLAD) claim. ECF No. 93 at 16. Fortunately for Rolovich and civil rights plaintiffs everywhere, WSU is mistaken. Federal civil rights law does not let bad actors off the hook so easily. The 1991 Amendments to Title VII "expressly overruled the basic premise that an employer could avoid all liability under Title VII by establishing the absence of 'but for' causation." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 850–51 (9th Cir. 2002).

As amended, Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). *See also* 42 U.S.C. § 2000e-2(m). "[M]otive is especially easy to infer

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

where an employee has submitted a request for an accommodation or where the employer knows of the employee's religious practice." *Hebrew v. Texas Dep't of Crim. Just.*, 80 F.4th 717, 724 (5th Cir. 2023).

The Ninth Circuit has held that a plaintiff may establish her Title VII case by "simply produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir.2004). Even "a single discriminatory comment by a plaintiff's supervisor is decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez–Curry v. Nev. Transp. Dep't*, 1039 (9th Cir. 2005).

In Section B.3 below, Rolovich details a litany of text messages and statements that create issues of fact as to whether WSU followed its own procedures and acted in good faith in the course of denying Rolovich's request for a religious exemption. Under the same evidence, a reasonable jury could easily find that WSU was motivated to deny Rolovich's request for a religious accommodation or that it made disparaging remarks about his religious beliefs. These facts preclude summary judgment for WSU on Rolovich's Title VII/WLAD claim.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

**B. WSU Is Not Entitled to Summary Judgement Rolovich's Claim for Breach of Contract**

WSU summarily addresses Rolovich's breach of contract claim in one short paragraph, ECF No. 93 at 38, and incorrectly concludes that this cause of action is irrevocably tethered to Rolovich's Title VII claim. WSU's perfunctory treatment of this claim is premised on its assumption that disposing of Rolovich Title VII claim automatically disposes of his breach of contract claim. That is not the case.

Admittedly, the Court's May 30, 2023 Order regarding Defendants' Motions to Dismiss noted that "Plaintiff's breach of contract claim rests on the determination of whether Plaintiff's exemption and accommodation would have imposed an undue hardship." ECF No. 33 at 27. Both this dicta and WSU's assumption that Rolovich's breach of contract claim must necessarily fail if his Title VII fails appear premised on a misunderstanding of the nature of the breaches that Rolovich has alleged. They also overlook what discovery has revealed over the intervening 17 months since the May 30, 2023 Order.

At its core, Rolovich's breach of contract argument is that – even if the finder of fact concludes that accommodating Rolovich would have imposed an undue hardship (thus relieving WSU from Title VII liability) – WSU breached his contract by characterizing his resulting termination as a "just cause" termination.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Rolovich contends that this was done in order to avoid owing liquidated damages to Rolovich.[3] Although WSU elides it, Rolovich has also pled that WSU's actions in his termination also breached the duty of good faith and fair dealing. SAC at 24, ll. 9-10 ("COUNT I - BREACH OF CONTRACT – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING"). *See also id.* ¶ 111 ("WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.").

Whether an employer properly determined that it had just cause for a termination is a factual question for the jury. *Lund v. Grant Cnty. Pub. Hosp. Dist. No. 2*, 85 Wash. App. 223, 228, 932 P.2d 183, 185 (1997); *see also Trainer v. Kitsap Cnty.*, 107 Wash. App. 1035 (2001) ("[I]t was and is the proper role of the jury to determine just cause."). Given that WSU has not presented *any* evidence on the topic, the Court should allow this cause of action to proceed to the jury. Additionally, Rolovich highlights below multiple examples of why the

---

[3] It is not disputed that WSU could have terminated Rolovich's employment at any time. But his employment agreement required that WSU pay Rolovich liquidated damages in the amount of 60% of his salary for the remainder of his five-year term unless the termination was for "just cause."

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

issue of whether WSU properly terminated Rolovich's employment agreement for "just cause" is a question of fact for a jury.

### 1. Official FAQs accompanying Proclamation 21-14 imposing the mandate provided that terminations for refusal to get vaccinated were to be "non-disciplinary"

On August 9, 2021, Governor Jay Inslee issued a binding directive which mandated that Washington State employees who refused to receive the COVID-19 vaccine should *not* receive any type of disciplinary termination characterization. SADMF ¶ 167. Specifically, accompanying Proclamation 21-14 were "FAQs for vaccine mandate for some state employees and certain private employers" ("FAQS"). *Id*. One FAQ specifically reads: "What if someone refuses to get vaccinated?" Answer: "[E]mployees who refuse will be subject to *non-disciplinary dismissal* from employment for failing to meet the qualifications of the job." *Id*. (emphasis added). Whatever persuasive authority the FAQs may have, a jury could well conclude this guidance should have guided WSU's "just cause" determination. *Id*. at ¶ 209.

Lisa Gehring, a member of WSU's HRS department, acknowledged in her deposition that this language from the FAQs meant WSU was precluded from firing someone "for cause" based on an employee's failure to comply with the vaccine mandate. *Id*. A reasonable jury could find that, in light of the

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

unambiguous language in the Governor's FAQs, WSU erred when it elected to terminate Rolovich for "just cause."

**2. WSU negotiated and included language in other football coaches' agreements concerning the consequences of electing not to get vaccinated. No such provision was included in Rolovich's employment agreement.**

Other WSU football coaches were similarly terminated based on their failure to receive the COVID-19 vaccine. SADMF ¶ 217. These coaches had contracts that were largely identical to Rolovich's except for this material difference: the assistant coaches' agreement expressly included an obligation missing from Rolovich's agreement: "**Employee agrees to follow all federal, state, and local health directives as well as university policies related to health and safety**." *Id*. (emphasis in original). This inclusion and omission raise a question for trial – namely, whether the omission in Rolovich's agreement of a requirement to "follow all federal, state, and local health directives" should have factored into WSU's "just cause" termination decision. Even more specifically, it raises an issue of fact as to whether WSU's "just cause" determination should be viewed by the jury with added skepticism since WSU was capable to negotiating the "shall follow all health directives" provision when in fact it wished to make it clear that failure to follow such directives was a term of employment. In a related vein, a reasonable jury could conclude that WSU's diligence in amending other

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

coaches' contracts indicates that WSU believed it gained something that it did not believe it had under Rolovich's agreement. There is an issue of fact (a) as to whether WSU failed to follow its own stated procedures for evaluating Rolovich's exemption request and (b) if so, whether such failure breached the implied covenant of good faith and fair dealing.

There are significant issues of material fact as to whether WSU resolved Rolovich's request for a religious exemption according to its established procedures. Most significantly, WSU documents and testimony offer conflicting accounts of how its review process determined whether an employee's request for a religious exemption was based on a sincerely held religious belief.

First, WSU internal documents and talking points consistently state that this determination was made by its blind review committee before the employee's department was contacted regarding possible accommodations:

- Internal procedures drafted by HRS state that the review committee "*determines* if the employee holds sincerely held religious beliefs, practice, or observance" and the employee's department is contacted only after a "sincerely held religious belief is *confirmed.*" SADMF ¶ 110.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

- On October 8, Ms. Gehring affirms as "correct" a draft statement to the Governor's office stating that the review committee makes the "***final decision*** as to whether to grant a religious exemption." (emphasis added). *Id*. at ¶ 107.

- A WSU Insider article published the same day, which HHS reviewed before publication, says that the employee's department is notified by email only "if an exemption is ***approved***." (emphasis added). *Id*. at ¶ 108.

- October 15 WSU talking points state, "If an employee exemption is ***approved***, the application goes through a second process…" *Id*. at ¶ 103.  (emphasis added).

- On October 19, WSU's current Chief Human Resource Officer, Theresa Elliot-Cheslek, wrote, "Once a determination was made, the process moved to HRS for notification. If the [Religious Exemption] was ***approved***, the next step was the accommodation process." *Id*. at ¶ 104.  (emphasis added).

These documents describe the way that WSU actually evaluated employee requests for religious exemptions: in 473 of 475 applications (99.6%), the review committee made the final determination as to whether an employee had a

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

sincerely held religious objection to the vaccine mandate. *Id*. at ¶ 112. [1] When WSU review committee member Bonnie Dennler was asked if there was "any other employee at WSU whose application for religious exemption was treated the way Nick Rolovich's was treated," she answered: "I do not believe so." *Id*. at ¶ 113.

Very recently, WSU has claimed that its blind review committee—which its talking points said made its review process "**fair and equitable** for all requestors," *id*. at ¶ 104, —*never* made the final call on whether an exemption request was based on a sincerely held religious belief. "Ultimately, department as the appointing authority had the authority and responsibility to decide whether the employee had a sincerely held belief in conflict with COVID-19 vaccination…." *Id*.

WSU claims that the Governor's Proclamation and EEOC guidance *precluded* the University from entrusting the sincerity determination to a blind review process. *Id*. It has made no effort to reconcile this claim with its statements elsewhere lauding the significance of its blind review process.

These differing accounts create issues of material fact as to what WSU's process for evaluating requests for religious exemptions actually was and whether WSU knowingly departed from those procedures in denying that Rolovich's request was based on a sincerely held religious belief. It will be up to a jury to

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

decide whether WSU rejected Rolovich's exemption request through the process it described as "fair and equitable" and whether WSU made good on President Schulz's promise: "Regardless of (how much money) the person makes, what position they have, we have to treat people the same." SADMF ¶ 125.  These issues of material fact preclude summary judgment for WSU.

Just as there are issues of material fact as to whether WSU processed Rolovich's religious exemption request the same way it treated hundreds of others, there are issues of fact as to whether WSU prejudged Rolovich's exemption request, denying him his right to a full and fair consideration of his religious objection.

- Discovery has uncovered behind-the-scenes communications among WSU's top officials that provide ample evidence from which the jury could find that WSU decided in August 2021—long before it decided on criteria for reviewing religious exemption requests, and long before it saw Rolovich's application stating his religious objections—that it was going to deny his request. A reasonable jury could find that WSU developed this "Rolo strategy" so it could create a case for a "just cause" termination and avoid paying Rolovich liquidated damages. Such an inference would also support

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

a jury finding that, in exercising its discretion in terminating Rolovich's employment, WSU breached its implied duty of good faith and fair dealing. *Silvey v. Numerica Credit Union*, 519 P.3d 920, 931 (2022). On August 17, 2021, three days before the Governor's Proclamation was made applicable to state employees in higher education (but after WSU officials were aware that such a change was coming), a WSU Board of Regents member texted President Kirk Schulz asking, "What is our game plan in dealing with Rolovich?" SADMF ¶ 95.

- Within an hour and a half, President Schulz texted Athletics Director Patrick Chun, "We have a plan - so let me get some details and I will give you a call." *Id*. at ¶ 96.

- An hour later, President Schulz texted the Chair of the Board of Regents, Marty Dickinson, "Let me know how schedule looks for next few days - we have a Rolo strategy." *Id*.

- Two days later, immediately upon learning that Rolovich intended to seek a religious exemption, President Schulz texted the Chair again:

    Not to be too depressing this evening – but it appears that Nick is going to claim a religious exemption to the

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

vaccine mandate. I asked Phils to engage a Seattle firm to assist us – and I intend to be pretty public expressing my disappointment with his decision. Right now we are so angry (Pat and myself) that we cannot see straight.

*Id*. at ¶ 97.

- Chair Dickinson responded to President Schulz: "So disappointed and pissed!! Right there with you Kirk! And can you pls tell me his devoted religion?" President Schulz responded, "I have no $&$@@ idea. Probably searching on the internet as we speak." *Id*.

- The next morning, Chair Dickinson texted President Schulz that they needed to "recognized all the nuances" of the situation, including "From firing and paying $$$ while Seattle beats us up on deficit yet want the coach gone!!!! . . . time to take the reigns and in my opinion no longer protect Nick who has tarnished WSU Brand." *Id*. at ¶ 98.

- Later that day, President Schulz sent the Board of Regents an update expressing his "disappointment" in Rolovich's decision to file for a religious exemption. Schulz stated that while he has "the greatest respect" for other WSU employees "whose religious convictions prevent them from taking the vaccine," he was

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

"deeply disappointed that WSU's football coach has opted to use the exemption process." *Id*. at ¶ 99.

- Eleven days before Rolovich had even submitted his exemption request, Chun texted a friend, "Our head coach has put himself in a bad situation by not getting Vax. It's going to be a great lesson for current or future coaches about decisions you can or cannot make as a head coach." *Id*. at ¶ 100.

Viewed in the light most favorable to Rolovich, this evidence could lead a reasonable jury to conclude that WSU was never going to follow its own process or the process mandated by Title VII. Even viewed in the most innocent light for WSU, it indicates that before WSU officials knew anything about the bases of Rolovich's religious objection (and, thus, of its viability or authenticity), they were "angry" and "pissed." WSU leadership set in motion a "Rolo strategy" and "plan" to that would be "a great lesson for current or future coaches about decisions you can or cannot make as a head coach." A reasonable jury could conclude that this "Rolo strategy" involved denying Rolovich's request for a religious exemption and thus avoid his liquidated damages. These issues of material fact preclude summary judgment on Rolovich's breach of contract claim.

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

**C. Disputed issues of material fact preclude summary judgment on Rolovich's claim that WSU willfully withheld wages.**

Similarly, factual disputes preclude summary judgment for WSU on Rolovich's withholding of wages claim. *See* ECF No. 93 at 38-40. It is the employer's burden to show that it had a "bona fide" belief that the employee was not due the wages in question. *Hvidtfeldt v. Sitrion Sys. Americas, Inc.*, 190 Wash. App. 1031 (2015) (citing *Wash. State Nurses Ass'n v. Sacred Heart Med. Ctr.*, 175 Wn.2d 822, 834, 287 P.3d 516 (2012)). "The issue of whether an employer acts willfully is generally a question of fact. But the issue may be resolved on summary judgment when no material facts are in dispute." *Ruhl v. ProjectCorps, LLC*, 192 Wash. App. 1041 (2016) (citing *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 161, 961 P.2d 371 (1998)). If "reasonable minds could reach different conclusions from the evidence presented," summary judgment on Rolovich's wrongful withholding of wages claim is "improper." *Zimmerman v. W8LESS Prod., LLC,* 160 Wash. App. 678, 695, 248 P.3d 601, 609 (2011), *disapproved of on other grounds by Crossroads Mgmt., LLC v. Ridgway*, 540 P.3d 82 (Wash. 2023).

Here, summary judgment for WSU is improper because there are disputed material facts as to whether WSU's decision to terminate Rolovich was made in good faith. First, as noted above in Section B.3, WSU President Schulz understood that he had to treat people the same and his public statements was careful to pledge that he would do so: "Regardless of [how much money] the

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

person makes, what position they have, we have to treat people the same." SADMF ¶ 125. He noted that the relevant question was whether he was "willing to terminate a faculty member [or] a staff member for the same decision[.]" *Id*. Yet behind closed doors, he expressed an intent to treat Rolovich's application different from everyone else's. SADMF ¶¶ 104 &176. Schulz knew this was a risky strategy, privately texting, "While I know I have to be careful—I would like to include a quote expressing my disappointment in this decision." SADMF ¶ 176. Yet he did so regardless.

Second, although WSU's above-described internal policies entrusted HRS's review committee with making judgments on sincerity, and though Chun's October 13 memo to HRS requested "re-evaluation of the claimed sincerely held religious belief," WSU now claims that "ultimately," the "appointing authority"—here, the Athletics Department—had the authority and responsibility to decide whether the employee had a sincerely held belief in conflict with COVID-19 vaccination." *Id*. at ¶ 115.

Third, the blind review committee made the final sincerity determination in 99.6% of requests for religious exemptions, but WSU recently confirmed that it was Athletics itself that made the final sincerity determination on Rolovich's application. *Id*. at 123.

In short, there is palpable dissonance between WSU's public commitment to fairness and impartiality and its internal talk about a "Rolo strategy," between

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

its public statements and its 30(b)(6) testimony on its review procedures, and between the way it decided over 450 exemption requests and the way it handled Rolovich's. These tensions create material issues of fact as to whether WSU really believed that it was acting in good faith when it allowed Chun to overturn the review committee's sincerity determination, when WSU decided not to accommodate Rolovich's religious convictions, and when it then concluded that it had "just cause" to terminate him and avoid paying out his liquidated damages provision.

For all these reasons, Rolovich's wrongful withholding claim should proceed to the jury.

## CONCLUSION

For the reasons provided above, Rolovich respectfully requests that the Court

a) deny WSU's request for summary judgment on the Title VII, WLAD, breach of contract, and wage-withholding claims;

b) grant summary judgment on the first element of Rolovich's *prima facie* case for the Title VII failure to accommodate claim, that Rolovich has a religious belief which conflicted with WSU's vaccine mandate;

c) grant summary judgment on the second element of Rolovich's *prima facie* case for his Title VII failure to accommodate claim, that Rolovich informed WSU of his religious belief and conflict; and

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

d) grant summary judgment on the third element of Rolovich's *prima facie* case for his Title VII failure to accommodate claim, that Rolovich was terminated by WSU for Rolovich's inability to comply with the vaccine mandate, a job requirement.

I certify that this memorandum contains 9,398 words, in compliance with the Court's Order of September 18, 2024, ECF No. 86.

DATED this 4th day of November, 2024.

/s/ Alexandria T. Drake
Alexandria T. Drake, WSBA #45188
DUNN & BLACK, P.S.
111 North Post, Ste. 300
Spokane, WA 99201-0907
(509) 455-8711
adrake@dunnandblack.com

/s/ E. Job Seese
E. Job Seese
*Admitted pro hac vice*
FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4901
jseese@fbtlaw.com

Eric Kniffin
*Admitted pro hac vice*
KNIFFIN LAW PLLC
102 S. Tejon Street, Suite 1100
Colorado Springs, CO 80903
(719) 212-4391
eric@kniffin.law

*Attorneys for Plaintiff*

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2024, I electronically filed the forgoing PLAINTIFF'S COMBINED RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that none of the represented parties are non-CM/ECF participants.

By:   /s/ E. Job Seese
          E. Job Seese

PLAINTIFF'S AMENDED COMBINED
RESP. TO DEF.'S CROSS-MSJ AND REPLY
I/S/O PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

ALEXANDRIA T. DRAKE, WSBA #45188
Dunn & Black, P.S.
111 North Post, Ste. 300
Spokane, WA 99201-0907
(509) 455-8711

ERIC JOB SEESE
Frost Brown Todd LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990

ERIC KNIFFIN
Kniffin Law PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903
(719) 212-4391

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>Defendant. | NO. 2:22-cv-00319<br><br>**PLAINTIFF'S COMBINED RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>December 3, 2024<br>Without Oral Argument |

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY IN
SUPPORT OF PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

## INTRODUCTION

WSU's *Combined Response to Plaintiff's Partial Motion for Summary Judgment and Cross-Motion for Summary Judgment* (WSU's "Brief") is a tour de force of post-hoc rationales for why WSU would have suffered undue hardship had it accommodated Plaintiff ("Rolovich"). At most, however, WSU's "undisputed" evidence is highly disputed, speculative and often inconsistent with WSU's actual practice at the time. Much of WSU's evidence is also inappropriate under current Title VII jurisprudence, either because it was not within WSU's knowledge at the time of the termination decision or because it relies on impermissible considerations under Title VII. The sheer scope of the factual record that WSU cites—and the ambiguity of that record—underscores the fact-intensive nature of Rolovich's claims and WSU's defenses. Additionally, WSU omits the growing number of COVID-19 vaccine cases in the Ninth Circuit and elsewhere that are headed to juries or have already gone to juries. Rolovich's case should as well.

**A. Triable Issues of Fact Preclude WSU's Request for Summary Judgment on Rolovich's Title VII Claim**

    **1.    Rolovich has satisfied the elements of his prima facie case. Alternatively, as WSU admits, sincerity is a question of fact for the jury which necessarily precludes granting summary judgment.**

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 1

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Rolovich has asked the Court to find that he has established a prima facie case under Title VII.[1] ECF No. 88 at 14. WSU argues the Court should deny Rolovich's motion because it claims Rolovich did not sincerely hold the religious beliefs described in his exemption letter.  ECF No. 93 at 18-21. If the Court concludes that a reasonable jury could doubt Rolovich's sincerity, despite the evidence in his motion, then Rolovich concedes that his sincerity is an issue of fact not properly resolved on summary judgment. *See Id.* at 18, ll. 6-14.

To the extent WSU is asking the Court to rule that Rolovich's convictions are not religious, *id.* at 21, the Court should decline. Both reasons described in his exemption letter are grounded in Catholic teaching.  ECF No. 88 at 12-14. As to Rolovich's convictions about aborted fetal issue, the Ninth Circuit has affirmed that such concerns count as "religious beliefs" that "conflict with receiving the COVID-19 vaccine." *Keene v. City & Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at *2 (9th Cir. May 15, 2023). As to Rolovich's convictions

---

[1] Rolovich follows WSU's practice and uses "Title VII" to refer to both Title VII and WLAD. *See* ECF No. 93 at 10, n.1.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 2

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

about therapeutic proportionality, the cases WSU relies on[2] are all ones where "plaintiffs failed to adequately articulate their religious exemptions." ECF No. 88 at 11 (collecting cases). WSU provides no example of a court that has rejected as non-religious a conviction "rooted in identified teachings" and "developed through study and consultation with religious authorities." *Id.* at 12 (collecting cases).

---

[2] *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 489 (3d Cir. 2017) ("While Fallon does not belong to any religious organization, he holds strong personal beliefs"); *Finn v. Humane Soc'y of United States*, No. CV GLR-23-2107, 2024 WL 1765702, at *4–5 (D. Md. Apr. 24, 2024) ("Finn [] does not identify if she subscribes to any particular religion or the specific nature of any religious beliefs"); *Bartholomew v. Washington*, No. 3:23-CV-05209-DGE, 2024 WL 1426308, at *5 (W.D. Wash. Mar. 26, 2024) (Bartholomew "focused on his belief in his own 'natural immunity'"); *McCarthy v. Bos. Med. Ctr.*, No. CV 22-11886-RGS, 2024 WL 185392, at *1 n.2 (D. Mass. Jan. 17, 2024) (plaintiff failed to "plead some modicum of plausible facts sufficient to create an inference that the conflict arises from some specific religious tenet or principle"); *Caruano v. Bayhealth Med. Ctr., Inc.*, 714 F. Supp. 3d 461, 468 n.3 (D. Del. 2024) (court found plaintiff had not "sufficiently connected her objection to the vaccine to a religious belief tied to her Christian faith").

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 3

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

In any event, WSU itself contends that the sincerity of a Title VII plaintiff's religious belief is an issue of fact not properly resolved on a motion for summary judgment. *Id.* at 18, ll. 6-14. At best, Rolovich has satisfied the "sincerely held religious belief" element of his *prima facie* case (which is a "not onerous" burden), and if the Court finds that he has not, WSU has conceded that it is a question of fact for the jury to decide.

### 2. WSU has not established "undue hardship" as a matter of law

#### a. Title VII's Undue Hardship Standard

Just last year, the Supreme Court clarified an employer-defendant's burden on the defense of undue hardship: "showing 'more than a *de minimis* cost' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). Instead, an "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *id.* at 468, and "is more severe than a mere burden," *id.* at 469. Post-*Groff*, WSU "must show that the burden of granting an accommodation would result in **substantial** increased costs **in relation** to the conduct of its particular business." *Id.* at 470 (emphasis added).

WSU cannot "escape liability simply by showing that an accommodation would impose some sort of additional costs. Those costs would have to rise to the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 4

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

level of hardship, and adding the modifier 'undue' means that the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." *Id.* Additionally, WSU's "[u]ndue hardship cannot be supported by merely conceivable or hypothetical hardships." *WSU Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir.1981) (affirming lower court's finding that defendant's proffered hypothetical costs did not constitute cognizable undue hardship).  Further, "[w]here an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1111 (W.D. Wash. 2023) (quoting *Groff*, 600 U.S. at 473).

Lastly, while WSU focuses on COVID-19 cases in which courts have granted summary judgment due to the "undue burden" caused to the employer, other recent COVID vaccination decisions in both the Ninth Circuit and elsewhere have allowed these claims to go forward to trial. For example, in *Chavez v. San Francisco Bay Area Rapid Transit Dist.* ("*BART*"), in a case involving six plaintiffs with Title VII claims very similar to Rolovich's claim, the court denied cross-motions for summary judgment on the view that "whether a given accommodation would cause undue hardship is, in any case, a fact-intensive inquiry." No. C 22-06119 WHA, 2024 WL 3334741, at *10 (N.D. Cal.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 5

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Mar. 18, 2024). Relevant to this case, the *Chavez* trial court found that resolving plaintiffs' Title VII claims on summary judgment "would run afoul of the Supreme Court's discretion to engage in 'context-specific application.'" *Id.* at *12 (*quoting Groff v. DeJoy*, 600 U.S. 447, 473 (2023). The court ultimately denied the cross-motions for summary judgment and sent the issues to the jury, which resulted in a $7.4 million verdict for plaintiffs.

*Chavez* is one of at least four Title VII vaccine mandate cases where courts in the Ninth Circuit have this year rejected employers' motions for summary judgment. In *Kidd v. Univ. Med. Ctr. of S. Nevada*, No. 2:22-CV-01990-ART-NJK, 2024 WL 4046249 (D. Nev. July 2, 2024), the court held there were material issues of fact on undue hardship given that defendant had "granted religious exemptions to 85% of employees who requested them." *Id*. at *5–6 In *Carroll v. Tobii Dynavox LLC*, No. 523CV00124HDVSPX, 2024 WL 1600632 (C.D. Cal. Apr. 3, 2024), the court held there were issues of material fact on "whether [the defendant] engaged in a good-faith effort to explore various possible accommodations." *Id*. at *6. Though the defendant produced evidence that it had reviewed the possibility of accommodating the plaintiff, it was unclear whether the employer had even "sat down with [p]laintiff to review and discuss other options.") *Id*. Finally, in *Varkonyi v. United Launch All., LLC*, No. 2:23-CV-

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 6

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

00359-SB-MRW, 2024 WL 1677523 (C.D. Cal. Feb. 21, 2024), the court denied summary judgment because employer's undue hardship arguments did not take into account that its workforce was over 90% vaccinated.   *Id*. at *5. The court also found that while the employer had offered many undue hardship arguments, "the problem with this evidence is that none of it demonstrates how much it would have cost [defendant] to accommodate [plaintiff]." *Id*.

> **b.      Rolovich's "increased risk of contracting and transmitting COVID-19" is largely hypothetical and whether it constituted an undue hardship is a question of fact**

WSU's "public safety risk" argument is mostly hypothetical. WSU argues that Rolovich's unvaccinated status caused such a heightened public health risk that it imposed an undue burden. However, this argument ignores the risk that WSU had already willingly undertaken, and is now applied to Rolovich differently. At the time Rolovich was terminated, WSU was already halfway into the 2021 season, had been testing all unvaccinated coaches (and presumably players under the Pac-12 guidelines at the time), and had provided exemptions to fourteen unvaccinated players while providing no accommodations to them nor making any changes to their interactions with the football team and/or travel and lodging accommodations for away games. SADMF ¶¶ 4, 24, and 199.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 7

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

WSU had already evaluated the risk of public safety and determined it could move forward with unvaccinated individuals on the football team. While Proclamation 21-14 did not apply to students, WSU itself had a vaccine requirement for students, as well as exemption process. *See* WSU Statement of Undisputed Facts, ¶ 43. Tellingly—and in the face of the same public health considerations that allegedly informed WSU's consideration of Rolovich's exemption request—WSU granted exemptions to 14 unvaccinated players (12 religious and two medical exemptions).  SADMF ¶ 4. A reasonable jury could deduce from such evidence that accommodating Rolovich would not have posed an incremental public safety risk that would rise to the level of an undue hardship. While WSU argues that the head coach position carried unique duties, the jury may take note of the fact that players would not only have had considerable and prolonged physical contact with another on the field, in lockers, and in practice, they also interacted with the general student population and mixed in dormitories and housing.

WSU's reliance on the typical interactions of the current football coach, Jake Dickert, is misleading at best.  The interactions which Jake Dickert claims to have in a typical day are what is experienced *now*, not what was experienced in 2021 or even 2022. The interactions in 2021 and 2022 were limited, due to

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 8

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

guidelines and policies in place by Washington and by WSU itself. Recruiting itself had been adjusted by Pac-12, as further discussed below, which had moved a significant portion of recruiting through Zoom. At a time when most people had limited interactions, WSU now argues that, at a time Americans were practicing social distancing, Rolovich's recruiting activities would have involved extensive travel to, and into, recruits' home. In fact, Pac-12 had instituted recruitment dead periods up through May 31, 2021. Remote recruiting was the norm for the months leading up to June 1, 2021.  SADMF ¶ 68.

The evidence in the record shows that the refusal to accommodate Rolovich was WSU succumbing to pressure from external forces instead of complying with Title VII. The status of players was not public, and so there were no negative reactions or pressure from fans, alumni, donors, or the public. The argument of the safety risk that one unvaccinated coach would have had is hypothetical at this point and undermined by the numerous exemptions and accommodations that WSU already provided to members of the football team. That WSU granted these exemptions, and accommodated (or decided no special accommodations were necessary even given their unvaccinated status) these players throughout the 2021 and 2022 football seasons, is direct evidence that contradicts WSU's assertion of any alleged undue hardship. That WSU chose not

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 9

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

to isolate or distance the unvaccinated players during travel for games is further evidence from which a jury could conclude that the alleged public safety risk of allowing the head coach, like his players, to remain unvaccinated would not have posed an undue hardship. SADMF ¶ 205.

The hypothetical and conjectural nature of WSU's "public safety risk" argument is underscored by the four weeks of pre-season camp coupled with the seven games of the 2021 season that WSU's football team had already completed. Over ten weeks in which numerous players and coaches – unvaccinated – interacted with other members of the football program, participated in practices, training, travel, and games. And during these ten plus weeks, there were no outbreaks. SADMF ¶¶ 205 & 210.  The scenarios that WSU now offers are merely hypotheticals.

Further, the analysis of whether Rolovich's unvaccinated status had such an incremental impact on public safety as to cause an undue hardship must be viewed at the time, based upon what was known at the time. "It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision." *Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *10 (D. Or. Aug. 14, 2024) (quoting Kluge *v. Brownsburg*

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 10

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

*Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023)). As the *Lavelle-Hayden* court explained:

> Along with considering both economic and non-economic costs when assessing undue hardship, this Court further holds that it is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision. This approach comports with how courts analyze whether a plaintiff has alleged a prima facie case against an employer—by assessing the information the plaintiff provided to the employer and, thus, the information of which the employer had notice.

*Id.*

As of October 18, 2021, WSU knew the risks of unvaccinated individuals and the impact of those unvaccinated individuals on the football team. It had guidelines in place for the team, and weekly testing. SADMF ¶ 140. Based upon what was known at the time, there was no incremental impact on public safety caused by Rolovich that rises to the level of establishing an undue hardship upon WSU's football program as a matter of law.

**c.    A reasonable jury, viewing the evidence in the light most favorable to Rolovich, could find that the fiscal costs of providing accommodation did not constitute an undue hardship**

WSU cites a parade of horribles regarding the *theoretical* fiscal costs of accommodating Rolovich. WSU asserts that the cost of accommodating Rolovich's exemption request would have approximated $196,500 in additional

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 11

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

travel costs and that it would constitute an undue economic hardship. ECF No. 93 at 30-31. But courts must "apply the [undue hardship] test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Groff*, 600 U.S. at 470-71 (internal quotations omitted). Thus, this $196,500—even if the jury credits it—is the cost of travel accommodations across two football seasons. SADMF ¶ 225.

Relevant here are the total operating expenses and revenues of the WSU football program over the years. For the 2018 through 2022 football seasons, WSU's total operating expenses ranged from $16,533,539 to $25,335,772. SADMF ¶ 221. When deposed, WSU's expert admitted that he failed to determine the actual costs for each season and performed no calculation to determine the costs against the overall operating expenses. SADMF ¶ 224. Rather, he only looked at the incremental cost across two seasons. *Id.*

WSU's estimated cost of $28,500 for hiring separate buses, which WSU incorrectly stated was for the 2021 season, ECF No. 93 at 31; ECF No. 94 at ¶ 197, is for a total of 13 games across two football seasons.  SADMF, ¶ 200. If $196,500 is compared against total expenses for the 2021 and 2022 seasons (a total of $48,158,117), it amounts to 0.4 percent of WSU's total expenses.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 12

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Compared against the team travel expenses alone (a total of $2,696,708), it amounts to 7.295 of the travel expenses across two seasons. SADMF, ¶ 202. These costs are minimal and do not rise to the level of undue hardship to bar accommodation requirements under Title VII.

This economic analysis not only is a litigation-inflated number, but is also hypothetical and speculative. *Lavelle-Hayden,* 2024 WL 3822712, at *10 ("It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision.") For example, WSU's non-retained expert Dr. Guy Palmer—whom another WSU expert, David Bones, relied upon exclusively to calculate the costs of accommodation—"would have also recommended that" all unvaccinated coaches would have had to travel separately – by chartered plane, separate buses, and separate accommodations. ECF No. 106 at 34, ¶ 60; ECF No. 96 at 27-28. These are litigation-manufactured recommendations that go beyond what the Athletics Department and Pac-12's required, or what WSU actually did with respect to exempted unvaccinated players.

In reality, Dr. Palmer's primary recommendations were for WSU to "follow all requirements from the Athletics Department and the Pac-12." ECF No. 106 at 34, ¶ 59. The Athletics Department's accommodations would have

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 13

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

been wearing masks and maintaining social distancing. *Id.* The Pac-12 would have required surveillance testing of a PCR test or three antigen tests per week, negative PCR test prior to any games, refraining from returning to campus from *non-team* related travel without a negative PCR test, and quarantining upon return to campus from any *non-team* related travel until a negative PCR test was obtained. *Id.* The cost of quarantine and testing would have been minimal—so minimal that WSU's expert did not find them worthy of analysis. SADMF ¶ 226. Further, these testing costs had already been undertaken by WSU throughout the 2021 football season.

At trial, the jury may reasonably find that Rolovich's separate travel would not have posed an undue hardship, whether evaluated in context of WSU's overall operations or evaluated just in the context of the football program. WSU generated total operating revenue of $47,625,476 in the 2021 football season and $48,758,639 in the 2022 football season. ECF No. 96 at 66-67. A jury could reasonably find that these added costs did not "rise to the level of hardship" of being "excessive" or "unjustifiable." Given the small percentages and that WSU already chartered flights for its football team, these accommodation expenses would not be "unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business" of the football team

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 14

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

and WSU. *Poole v. Centennial Imports, Inc.*, No. 2:12-cv-00647-APG-VCF, at *10 (D. Nev. May 19, 2014).

Additionally, the largely hypothetical nature of the cost of accommodating Rolovich is further evidenced by the football players were unvaccinated and traveling *with* the rest of the team (players and coaches that were vaccinated), SADMF, ¶ 4. There is even less basis for WSU to take on additional costs to provide different and exclusive accommodations to Rolovich by the fictitious assumption that he would have needed to travel separately from both vaccinated and unvaccinated members of the football team.

It is entirely unclear why WSU would have needed to charter a separate plane and a separate bus for Rolovich. This is especially true given that the record shows WSU did not take that measure (separate charter transportation) for the 14 unvaccinated players whom WSU granted exemptions. *Id.* A reasonable jury could conclude that there was no need for separate accommodation, and therefore WSU created its own illusion of hardship. Simply put, there was no undue hardship to accommodate Rolovich.

Even assuming that the accommodations provided to unvaccinated players included separate travel from the rest of the team, it is inconceivable that the incremental cost of including Rolovich to those travel costs would cause an undue

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 15

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

hardship. There is also no evidence that WSU considered alternative options at the time. *United States v. Cal. Dep't of Corr. & Rehab.*, 2:24-cv-00925-DJC-DB, at *30 (E.D. Cal. June 20, 2024) (" The Supreme Court's ruling in *Groff* is clear that before declaring that providing an accommodation for an employee's religious beliefs creates an undue hardship, an employer must consider other options, not simply assess 'the reasonableness of a particular possible accommodation or accommodations.'"). For example, WSU already had the costs of weekly testing and seven games that were played under this model, yet this alternative was not considered. Dr. Palmer had recommended that the Pac-12 guidelines and Athletics Department policies were followed. While Mr. Bones admitted that these costs were minimal, there is no evidence that WSU considered these alternative *and reasonable* accommodations, which certainly would not have posed an undue hardship due to their minimal costs.

WSU has not established that, as a matter of law, its litigation-generated calculation of speculative fiscal costs would pose an undue hardship.

### d. Donor Opposition to Accommodating Rolovich Is Not Cognizable to Factor into Undue Hardship

WSU contends that the *potential* lost donations would have caused an undue hardship for the University. EFC No. 93 at 25-26 ("Accommodating Rolovich also *risked* the loss of significant revenue" (emphasis added)).

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 16

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Specifically, WSU argues that many high-level donors had expressed "anger and disappointment that Rolovich was endangering the WSU committee." *Id*. at 25. WSU contends that after the termination of Rolovich, $3.5 million was donated. ECF No. 94 ¶ 208. However, WSU has withheld whether the impetus for the $3.5 million in donations was specifically because of Rolovich's termination, or that it had been withheld because WSU had continued to employ Rolovich.

First, as noted above, under *Groff* any alleged undue hardship must be measured against the overall context of the employer's business. "[T]he decision of whether a particular accommodation works an undue hardship on … an employer … must be made by considering 'the particular factual context of each case.'" *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (quoting *Anderson v. General Dynamics Convair Aerospace Div.*, 489 F.2d 397, 400 (9th Cir. 1978)).

Here, WSU represents that in a typical year its football program typically received between $2.3 and 3.8 million in donor contributions. ECF No. 94 ¶ 204. The money that had allegedly been threatened to be withheld were donations overall to WSU, not those specifically earmarked for the athletics department as a whole. From fiscal year 2018 through 2023, the WSU Athletics Department received donations that ranged from $7.7 to 14.5 million. SADMF ¶ 210.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 17

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

In fiscal year 2022, WSU received $120.9 million in philanthropic support, "the highest activity since FY2015." SADMF ¶ 213. In fiscal year 2023, WSU received $167.9 million in annual fundraising. *Id.* The threatened withholding of donations, and the economic impact of such withheld donations, must also be analyzed in the context of the business – WSU as a whole. The range of $2.3 to 3.8 million which WSU's football program receives is nominal from the overall donations WSU receives each year.

WSU claims that multiple donors explicitly threatened to withhold further donations, but only provides that one donor canceled a $1 million bequest to the university and that another reinstated a $1.5 million bequest after Rolovich's termination. The others shown in the table provide that most have given, over their lifetime, less than $500,000. ECF No. 102, pp. 17-18. More importantly, is what level their giving was over the years. Only two gave $25,001 and above each year, from fiscal years 2021 through 2023. *Id.*

When compared against the annual giving WSU received each year, the economic impact of the threatened withholding of donations (which is something every university must contend with, as it is the nature of their business) amounts to approximately one percent of the giving it received. This does not count as "significant" under *Groff*.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 18

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Second, and more fundamentally, the Supreme Court made clear in *Groff* that Title VII forbids This takes into consideration the sentiments and opinions of donors to WSU. However, current Title VII jurisprudence forbids failure-to-accommodate by proxy. The *Groff* Court noted that, to the extent it "was not previously clear," "a coworker's dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'" 600 U.S. at 472. The Court elaborated that, "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to ***the very notion of accommodating religious practice*** cannot be considered 'undue.'" *Id.* (emphasis added).

The Supreme Court's caution about taking co-worker hostility into account applies with full force to WSU's reliance on its donors' sentiments: "If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself." *Id*. Here, permitting donors to influence the decision of whether an accommodation is appropriate, is contrary to Title VII caselaw and its purpose. "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed."

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 19

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

*Anderson v. v. General Dynamics Convair Aerospace Div.*, 489 F.2d 397, 402 (9th Cir. 1978) (quoting *U.S. v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir. 1971)).

Given the financial model of universities, donors are comparable to a business' customers. In *Diaz v. Pan Am World Airways, Inc.*, the court held that customer preference may be taken into account only when it is based on the company's inability to perform the primary function or service it offers. 442 F.2d 385 (5th Cir. 1971). Here, WSU's core function is to educate its students.

For all these reasons, WSU's donors' "expressed anger and disappointment" at Rolovich's decision to exercise his rights under Title VII, the WLAD, and the Governor's Proclamation are not relevant to the undue hardship analysis. Even if the donations that were withheld were substantial in the context of WSU's operations—which they were not—the donors' bias against Rolovich's request for a religious accommodation cannot be considered under the Title VII undue hardship analysis.

### e. Hypothetical game cancellations and lost ticket revenue do not constitute cognizable "undue hardship," must less establish undue hardship as a matter of law

The argument now of potential cancelled games and lost ticket revenue is a claim of undue hardship that WSU offers now, during litigation. At the time

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 20

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Rolovich was terminated, no games had been cancelled. No outbreaks had occurred. And this was under the existing weekly testing that WSU had undertaken, which it then cancelled once it terminated all of the football coaches. At the time Rolovich was provided the Notice of Intent to Terminate, the alleged undue hardship from cancelled games and lost ticket revenue was not a factor in consideration. This is because at that time, WSU was aware that there would be no cancelled games as a result of Rolovich's unvaccinated status. Therefore, it was not a factor or point of consideration in WSU's undue hardship analysis.

Now, during litigation, WSU has developed an analysis of cancelled games and potential lost ticket revenue as a result, in order to increase their numbers for the undue hardship analysis. At this time, it is known that in the 2021 season, Pac-12 did not cancel the one game that was impacted by COVID-19, but instead rescheduled it. Therefore, the potential lost ticket revenue, media rights, and conference distributions are all hypothetical and created for litigation. "The Ninth Circuit has echoed the Sixth Circuit's 'skepticism' about ''hypothetical hardships' based on assumptions about accommodations which have never been put into practice.'" *E.E.O.C. v. Alamo Rent-A-Car LLC*, 432 F.Supp.2d 1006, 1016 (D. Ariz. May 26, 2006) (quoting *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 402 (9th Cir. 1978)).

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 21

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Under this faulty series of hypotheticals, "virtually no accommodation could overcome the undue hardship test." *Id.* WSU has asserted facts that are grounded only in assumptions in what could have happened, and opinion based on hypothetical scenarios, developed long after the 2021 and 2022 football seasons to support litigation. "Because 'undue hardship canoe be proved by assumptions nor by opinions based on hypothetical facts …. [WSU] has not raised a material factual issue concerning undue burden." *Id.* at 1017.

Furthermore, the canceled games and resulting lost ticket revenue, media rights, and conference distributions is admitted by WSU to not be an undue hardship based upon their actions. This was a risk that WSU had already accepted when it granted exemptions to 14 football players, and did not require any accommodations or changes to the team despite the 14 unvaccinated football players. Despite the 14 unvaccinated football players, WSU did not cancel any games in the 2021 or 2022 football seasons before the vaccine mandate was lifted. WSU had already determined that the potential losses from a COVID-19 outbreak on the football team, due to unvaccinated individuals, was not an undue hardship to prevent providing exemptions or to even require accommodations. WSU had determined these potential losses were not "substantial" in the context of WSU's business.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 22

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

**f.      The arguments offered by WSU related to alleged reputational and institutional damage are based on faulty assumptions of fact and do not amount to "undue hardship" as a matter of law**

WSU's position regarding the impact on reputation is related to Rolovich's ability to meet with donors, fans, alumni, the public-at-large, fans, the media, and that the football team itself was significantly limited in 2021. ECF No. 93 at 34-35. However, each of these limitations existed because WSU refused to contemplate any alternative options or accommodations. *See generally,* ECF Nos. 93 and 94. Rather, WSU determined that in-person interactions were required, and therefore it could not accommodate Rolovich.

However, there is nothing that made in-person interactions a requirement to achieve the job duties of cultivating relationships. During a period where the pandemic was still in place, and society had largely learned to interact and build relationships virtually, it is strange that WSU contends its reputation could only be cultivated through in-person interactions. WSU admits that it canceled a number of previously scheduled in-person donor events, yet WSU provided no alternatives, made no other plans to conduct other forms of interaction – something that nearly every charitable organization had to shift to in order to continue operating during the pandemic shut-down.

"Although Title VII 'directs that any reasonable accommodation by the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 23

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

employer is sufficient to meet its accommodation obligation,' the availability of options that would allow the employee to keep working may affect the reasonableness of an option that would not." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1110 (W.D. Wash. 2023) (quoting *Ansonia Bd. Of Educ. V Philbrook*, 479 U.S. 60, 68 (1986)). "Where an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1111 (W.D. Wash. 2023) (quoting *Groff*, 600 U.S. at 473).

There is no evidence WSU considered any alternatives to accommodate Rolovich as it related to interactions with fans, alumni, donors, and the public-at-large to determine whether they were reasonable and could be implemented. At the time of Rolovich's termination, weekly testing was already in place as required by Pac-12 (and should have continued even after Rolovich's termination due to Pac-12 rules). Therefore, WSU had sufficient information as to whether Rolovich could attend these events, if it had continued the weekly COVID-19 tests.

WSU relies upon the objections and negative reaction to Rolovich's unvaccinated status. However, WSU admittedly was receiving a mixture of responses to Rolovich's unvaccinated status. Instead of providing reasonable

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 24

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

accommodation, and providing the necessary public relations support for it, WSU opted to simply walk away and refuse to accommodate, claiming an "undue hardship" that it cannot prove.

### g.    WSU's recruitment analysis is factually incorrect and, at a minimum, raises a factual issue for the jury

It is important to note that the NCAA did not permit in-person recruiting from March 2020 to June 1, 2021. Vaccine status was not relevant, it was simply not permitted. Rolovich was not permitted to recruit from August 1, 2021 through August 31, 2021 per the NCAA rules. SADMF ¶ 70. The permitted evaluation period ran from September 1, 2021 through November 27, 2021. *Id.* at ¶ 71. However, during this period, no in-person, off-campus recruiting contacts with the prospective student-athlete was permitted. *Id.* It was not until the contact period of November 28, 2021 through December 11, 2021 that Rolovich could have engaged in in-person, off-campus recruiting. *Id.* Rolovich was terminated on October 18, 2021, long before he could have engaged in any in-person recruiting.

Further, WSU contends that Rolovich did not leave campus for the purpose of recruiting between January 1 and September 30, 2021, because of his unvaccinated status, which caused him to lag behind in recruiting. ECF No. 93 at 33-34; ECF No. 94 at ¶ 94. And that further, as training began in June 2021, "it would not have been practical for Rolovich to quarantine for five-day periods" if

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 25

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

he left for in-person recruiting. *Id.* However, this position fails to take into account the NCAA recruiting calendar. The NCAA had put in place an immediate ban on in-person recruiting for Division I coaches and put in place a recruiting dead period at the onset of COVID-19 on March 18, 2020. SADMF ¶ 70. This dead period was continuously extended throughout 2020. *Id.* On November 18, 2020, the NCAA extended the recruiting dead period for all Division I sports through April 15, 2021. *Id.* This dead period did not allow in-person recruiting. *Id.* Instead, the NCAA permitted additional flexibility in virtual recruiting in football by allowing all coaches, full-time school staff members and current students to conduct recruiting calls (telephone and video) without a countable coach being present. *Id.* On February 17, 2021, the NCAA extended the dead period through May 31, 2021. *Id.* Therefore, Rolovich could not perform any in-person recruiting from January 1, 2021 through May 31, 2021.

In June 2021, there was no vaccine mandate nor any restrictions on the participation of coaches that were unvaccinated. The NCAA permitted on-campus evaluations during unofficial visits during the days football camps and clinics were allowed in June and July 2021 only, but otherwise the recruiting calendar was followed with a waiver of the telephone call legislation. SADMF ¶ 71. The quiet period (which does not permit in-person recruiting contacts or evaluations

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 26

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

on or off WSU's campus) ran from June 1 through June 27, 2021. *Id.* The dead period ran from June 28, 2021 through July 24, 2021, followed by a quiet period from July 25, 2021 through July 31, 2021. *Id.* For the 2021-2022 recruiting period, the dead period was in place from August 1, 2021 through August 31, 2021. *Id.*

Simply, Rolovich was severely restricted, by the NCAA, from in-person recruiting. Once the football season began, Rolovich's focus was on the team and its performance for that season. Even then, no in-person, off-campus recruiting contacts were permitted during the evaluation period of September 1, 2021 through November 27, 2021. *Id.* Further, other coaches could have contributed to the recruitment, as was part of their job. Due to the significant dead periods that were instituted by the NCAA, it is only logical that his recruitment numbers are different from Jake Dickert, who had no such restrictions in place during his recruitment period.

For the 2022 season, which is a mixture of recruits from Rolovich and Dickert, there were 27 enrollees, 19 of which were scholarship enrollees. Of those 19, 7 had committed to WSU under Rolovich in 2021. SADMF ¶ 5. This was all obtained after offers were made under significant dead periods imposed by the NCAA. In short, the impact on recruiting as a result of Rolovich's unvaccinated

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 27

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

status was minimal. WSU has not shown that Rolovich's unvaccinated status damaged WSU's football program and its ability to recruit and fill its roster.

WSU has failed to establish undue hardship as a matter of law. Based on the record, WSU's cited hardships are either litigated-created statistics that WSU did not calculate or know at the time it terminated Rolovich or are sufficiently minimal in the overall context of WSU's business that a reasonable jury could find them not to be "undue."

**3.      In the alternative, disputed facts regarding WSU's motives preclude summary judgment on Rolovich's Title VII claim**

According to WSU, an "undue hardship" is a "complete defense" to Rolovich's Title VII (and WLAD) claim. ECF No. 93 at 16. Fortunately for Rolovich and civil rights plaintiffs everywhere, WSU is mistaken. Federal civil rights law does not let bad actors off the hook so easily. The 1991 Amendments to Title VII "expressly overruled the basic premise that an employer could avoid all liability under Title VII by establishing the absence of 'but for' causation." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 850–51 (9th Cir. 2002).

As amended, Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). *See also* 42 U.S.C. § 2000e-2(m). "[M]otive is especially easy to infer

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 28

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

where an employee has submitted a request for an accommodation or where the employer knows of the employee's religious practice." *Hebrew v. Texas Dep't of Crim. Just*., 80 F.4th 717, 724 (5th Cir. 2023).

The Ninth Circuit has held that a plaintiff may establish her Title VII case by "simply produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *McGinest v. GTE Service Corp*., 360 F.3d 1103, 1122 (9th Cir.2004). Even "a single discriminatory comment by a plaintiff's supervisor is decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez–Curry v. Nev. Transp. Dep't*, 1039 (9th Cir. 2005).

In Section B.3 below, Rolovich details a litany of text messages and statements that create issues of fact as to whether WSU followed its own procedures and acted in good faith in the course of denying Rolovich's request for a religious exemption. Under the same evidence, a reasonable jury could easily find that WSU was motivated to deny Rolovich's request for a religious accommodation or that it made disparaging remarks about his religious beliefs. These facts preclude summary judgment for WSU on Rolovich's Title VII/WLAD claim.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 29

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

**B. WSU Is Not Entitled to Summary Judgement Rolovich's Claim for Breach of Contract**

In its Brief, WSU summarily addresses Rolovich's breach of contract claim in one short paragraph, Brief at 38, and incorrectly concludes that this cause of action is irrevocably tethered to Rolovich's Title VII claim. WSU's perfunctory treatment of this claim is premised on its assumption that disposing of Rolovich Title VII claim automatically disposes of his breach of contract claim. That is not the case.

Admittedly, the Court's May 30, 2023 Order regarding Defendants' Motions to Dismiss noted that "Plaintiff's breach of contract claim rests on the determination of whether Plaintiff's exemption and accommodation would have imposed an undue hardship." ECF No. 33 at 27. Both this dicta and WSU's assumption that Rolovich's breach of contract claim must necessarily fail if his Title VII fails appear premised on a misunderstanding of the nature of the breaches that Rolovich has alleged. They also overlook what discovery has revealed over the intervening 17 months since the May 30, 2023 Order.

At its core, Rolovich's breach of contract argument is that – even if the finder of fact concludes that accommodating Rolovich would have imposed an undue hardship (thus relieving WSU from Title VII liability) – WSU breached his contract by characterizing his resulting termination as a "just cause" termination.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 30

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Rolovich contends that this was done in order to avoid owing liquidated damages to Rolovich.[3] Although WSU's Brief elides it, Rolovich has also pled that WSU's actions in his termination also breached the duty of good faith and fair dealing. SAC at 24, ll. 9-10 ("COUNT I - BREACH OF CONTRACT – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING"). *See also id.* ¶ 111 ("WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.").

Whether an employer properly determined that it had just cause for a termination is a factual question for the jury. *Lund v. Grant Cnty. Pub. Hosp. Dist. No. 2*, 85 Wash. App. 223, 228, 932 P.2d 183, 185 (1997); *see also Trainer v. Kitsap Cnty.*, 107 Wash. App. 1035 (2001) ("[I]t was and is the proper role of the jury to determine just cause."). Given that WSU has not presented *any* evidence on the topic, the Court should allow this cause of action to proceed to the jury. Additionally, Rolovich highlights below multiple examples of why the

---

[3] It is not disputed that WSU could have terminated Rolovich's employment at any time. But his Employment Agreement required that WSU pay Rolovich liquidated damages in the amount of 60% of his salary for the remainder of his five-year term unless the termination was for "just cause."

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 31

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

issue of whether WSU properly terminated Rolovich's employment agreement for "just cause" is a question of fact for a jury.

### 1. Official FAQs accompanying Proclamation 21-14 imposing the mandate provided that terminations for refusal to get vaccinated were to be "non-disciplinary"

On August 9, 2021, Governor Jay Inslee issued a binding directive which mandated that Washington State employees who refused to receive the COVID-19 vaccine should *not* receive any type of disciplinary termination characterization. SADMF ¶ 167.  Specifically, accompanying Proclamation 21-14 were "FAQs for vaccine mandate for some state employees and certain private employers" ("FAQS").  *Id*. One FAQ specifically reads: "What if someone refuses to get vaccinated?" Answer: "[E]mployees who refuse will be subject to *non-disciplinary dismissal* from employment for failing to meet the qualifications of the job." *Id*.  (emphasis added). Whatever persuasive authority the FAQs may have, a jury could well conclude this guidance should have guided WSU's "just cause" determination. *Id*. at ¶ 209.

Lisa Gehring, a member of WSU's HRS department, acknowledged in her deposition that this language from the FAQs meant WSU was precluded from firing someone "for cause" based on an employee's failure to comply with the vaccine mandate. *Id*. A reasonable jury could find that, in light of the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 32

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

unambiguous language in the Governor's FAQs, WSU erred when it elected to terminate Rolovich for "just cause."

### 2. WSU negotiated and included language in other football coaches' agreements concerning the consequences of electing not to get vaccinated. No such provision was included in Rolovich's employment agreement.

Other WSU football coaches were similarly terminated based on their failure to receive the COVID-19 vaccine. SADMF ¶ 217. These coaches had contracts that were largely identical to Rolovich's except for this material difference: the assistant coaches' agreement expressly included an obligation missing from Rolovich's agreement: "**Employee agrees to follow all federal, state, and local health directives as well as university policies related to health and safety**." *Id*. (emphasis in original). This inclusion and omission raise a question for trial – namely, whether the omission in Rolovich's agreement of a requirement to "follow all federal, state, and local health directives" should have factored into WSU's "just cause" termination decision. Even more specifically, it raises an issue of fact as to whether WSU's "just cause" determination should be viewed by the jury with added skepticism since WSU was capable to negotiating the "shall follow all health directives" provision when in fact it wished to make it clear that failure to follow such directives was a term of employment. In a related vein, a reasonable jury could conclude that WSU's diligence in amending other

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 33

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

coaches' contracts indicates that WSU believed it gained something that it did not believe it had under Rolovich's agreement. There is an issue of fact (a) as to whether WSU failed to follow its own stated procedures for evaluating Rolovich's exemption request and (b) if so, whether such failure breached the implied covenant of good faith and fair dealing.

There are significant issues of material fact as to whether WSU resolved Rolovich's request for a religious exemption according to its established procedures. Most significantly, WSU documents and testimony offer conflicting accounts of how its review process determined whether an employee's request for a religious exemption was based on a sincerely held religious belief.

First, WSU internal documents and talking points consistently state that this determination was made by its blind review committee before the employee's department was contacted regarding possible accommodations:

- Internal procedures drafted by HRS state that the review committee "***determines*** if the employee holds sincerely held religious beliefs, practice, or observance" and the employee's department is contacted only after a "sincerely held religious belief is ***confirmed.***" SADMF ¶ 110.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 34

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

- On October 8, Ms. Gehring affirms as "correct" a draft statement to the Governor's office stating that the review committee makes the "***final decision*** as to whether to grant a religious exemption." (emphasis added). *Id*. at ¶ 107.

- A WSU Insider article published the same day, which HHS reviewed before publication, says that the employee's department is notified by email only "if an exemption is ***approved***." (emphasis added). *Id*. at ¶ 108.

- October 15 WSU talking points state, "If an employee exemption is ***approved***, the application goes through a second process…" *Id*. at ¶ 103.  (emphasis added).

- On October 19, WSU's current Chief Human Resource Officer, Theresa Elliot-Cheslek, wrote, "Once a determination was made, the process moved to HRS for notification. If the [Religious Exemption] was ***approved***, the next step was the accommodation process." *Id*. at ¶ 104.  (emphasis added).

These documents describe the way that WSU actually evaluated employee requests for religious exemptions: in 473 of 475 applications (99.6%), the review committee made the final determination as to whether an employee had a

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 35

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

sincerely held religious objection to the vaccine mandate. *Id*. at ¶ 112. [1] When WSU review committee member Bonnie Dennler was asked if there was "any other employee at WSU whose application for religious exemption was treated the way Nick Rolovich's was treated," she answered: "I do not believe so." *Id*. at ¶ 113.

Very recently, WSU has claimed that its blind review committee—which its talking points said made its review process "**fair and equitable** for all requestors," *id*. at ¶ 104, —*never* made the final call on whether an exemption request was based on a sincerely held religious belief. "Ultimately, department as the appointing authority had the authority and responsibility to decide whether the employee had a sincerely held belief in conflict with COVID-19 vaccination…." *Id*.

WSU claims that the Governor's Proclamation and EEOC guidance *precluded* the University from entrusting the sincerity determination to a blind review process. *Id*. It has made no effort to reconcile this claim with its statements elsewhere lauding the significance of its blind review process.

These differing accounts create issues of material fact as to what WSU's process for evaluating requests for religious exemptions actually was and whether WSU knowingly departed from those procedures in denying that Rolovich's

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 36

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

request was based on a sincerely held religious belief. It will be up to a jury to decide whether WSU rejected Rolovich's exemption request through the process it described as "fair and equitable" and whether WSU made good on President Schulz's promise: "Regardless of (how much money) the person makes, what position they have, we have to treat people the same." SADMF ¶ 125. These issues of material fact preclude summary judgment for WSU.

Just as there are issues of material fact as to whether WSU processed Rolovich's religious exemption request the same way it treated hundreds of others, there are issues of fact as to whether WSU prejudged Rolovich's exemption request, denying him his right to a full and fair consideration of his religious objection.

- Discovery has uncovered behind-the-scenes communications among WSU's top officials that provide ample evidence from which the jury could find that WSU decided in August 2021—long before it decided on criteria for reviewing religious exemption requests, and long before it saw Rolovich's application stating his religious objections—that it was going to deny his request. A reasonable jury could find that WSU developed this "Rolo strategy" so it could create a case for a "just cause" termination and avoid paying

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 37

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Rolovich liquidated damages. Such an inference would also support a jury finding that, in exercising its discretion in terminating Rolovich's employment, WSU breached its implied duty of good faith and fair dealing. *Silvey v. Numerica Credit Union*, 519 P.3d 920, 931 (2022). On August 17, 2021, three days before the Governor's Proclamation was made applicable to state employees in higher education (but after WSU officials were aware that such a change was coming), a WSU Board of Regents member texted President Kirk Schulz asking, "What is our game plan in dealing with Rolovich?" SADMF ¶ 95.

- Within an hour and a half, President Schulz texted Athletics Director Patrick Chun, "We have a plan - so let me get some details and I will give you a call." *Id*. at ¶ 96.

- An hour later, President Schulz texted the Chair of the Board of Regents, Marty Dickinson, "Let me know how schedule looks for next few days - we have a Rolo strategy." *Id*.

- Two days later, immediately upon learning that Rolovich intended to seek a religious exemption, President Schulz texted the Chair again:

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 38

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Not to be too depressing this evening – but it appears that Nick is going to claim a religious exemption to the vaccine mandate. I asked Phils to engage a Seattle firm to assist us – and I intend to be pretty public expressing my disappointment with his decision. Right now we are so angry (Pat and myself) that we cannot see straight.

*Id*. at ¶ 97.

- Chair Dickinson responded to President Schulz: "So disappointed and pissed!!  Right there with you Kirk!  And can you pls tell me his devoted religion?" President Schulz responded, "I have no $&$@@ idea.  Probably searching on the internet as we speak." *Id*.

- The next morning, Chair Dickinson texted President Schulz that they needed to "recognized all the nuances" of the situation, including "From firing and paying $$$ while Seattle beats us up on deficit yet want the coach gone!!!! . . . time to take the reigns and in my opinion no longer protect Nick who has tarnished WSU Brand." *Id*. at ¶ 98.

- Later that day, President Schulz sent the Board of Regents an update expressing his "disappointment" in Rolovich's decision to file for a religious exemption. Schulz stated that while he has "the greatest respect" for other WSU employees "whose religious

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 39

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

convictions prevent them from taking the vaccine," he was "deeply disappointed that WSU's football coach has opted to use the exemption process." *Id.* at ¶ 99.

- Eleven days before Rolovich had even submitted his exemption request, Chun texted a friend, "Our head coach has put himself in a bad situation by not getting Vax. It's going to be a great lesson for current or future coaches about decisions you can or cannot make as a head coach." *Id.* at ¶ 100.

Viewed in the light most favorable to Rolovich, this evidence could lead a reasonable jury to conclude that WSU was never going to follow its own process or the process mandated by Title VII. Even viewed in the most innocent light for WSU, it indicates that before WSU officials knew anything about the bases of Rolovich's religious objection (and, thus, of its viability or authenticity), they were "angry" and "pissed." WSU leadership set in motion a "Rolo strategy" and "plan" to that would be "a great lesson for current or future coaches about decisions you can or cannot make as a head coach." A reasonable jury could conclude that this "Rolo strategy" involved denying Rolovich's request for a religious exemption and thus avoid his liquidated damages. These issues of material fact preclude summary judgment on Rolovich's breach of contract claim.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 40

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

**C. Disputed issues of material fact preclude summary judgment on Rolovich's claim that WSU willfully withheld wages.**

Similarly, factual disputes preclude summary judgment for WSU on Rolovich's withholding of wages claim. *See* ECF No. 93 at 38-40.  It is the employer's burden to show that it had a "bona fide" belief that the employee was not due the wages in question. *Hvidtfeldt v. Sitrion Sys. Americas, Inc.*, 190 Wash. App. 1031 (2015) (citing *Wash. State Nurses Ass'n v. Sacred Heart Med. Ctr.*, 175 Wn.2d 822, 834, 287 P.3d 516 (2012)).  "The issue of whether an employer acts willfully is generally a question of fact. But the issue may be resolved on summary judgment when no material facts are in dispute." *Ruhl v. ProjectCorps, LLC*, 192 Wash. App. 1041 (2016) (citing *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 161, 961 P.2d 371 (1998)). If "reasonable minds could reach different conclusions from the evidence presented," summary judgment on Rolovich's wrongful withholding of wages claim is "improper." *Zimmerman v. W8LESS Prod., LLC,* 160 Wash. App. 678, 695, 248 P.3d 601, 609 (2011), *disapproved of on other grounds by Crossroads Mgmt., LLC v. Ridgway*, 540 P.3d 82 (Wash. 2023).

Here, summary judgment for WSU is improper because there are disputed material facts as to whether WSU's decision to terminate Rolovich was made in good faith. First, as noted above in Section B.3, WSU President Schulz understood that he had to treat people the same and his public statements was careful to pledge that he would do so: "Regardless of [how much money] the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 41

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

person makes, what position they have, we have to treat people the same." SADMF ¶ 125. He noted that the relevant question was whether he was "willing to terminate a faculty member [or] a staff member for the same decision[.]" *Id*. Yet behind closed doors, he expressed an intent to treat Rolovich's application different from everyone else's. SADMF ¶¶ 104 &176. Schulz knew this was a risky strategy, privately texting, "While I know I have to be careful—I would like to include a quote expressing my disappointment in this decision." SADMF ¶ 176. Yet he did so regardless.

Second, although WSU's above-described internal policies entrusted HRS's review committee with making judgments on sincerity, and though Chun's October 13 memo to HRS requested "re-evaluation of the claimed sincerely held religious belief," WSU now claims that "ultimately," the "appointing authority"—here, the Athletics Department—had the authority and responsibility to decide whether the employee had a sincerely held belief in conflict with COVID-19 vaccination." *Id*. at ¶ 115.

Third, the blind review committee made the final sincerity determination in 99.6% of requests for religious exemptions, but WSU recently confirmed that it was Athletics itself that made the final sincerity determination on Rolovich's application. *Id*. at 123.

In short, there is palpable dissonance between WSU's public commitment to fairness and impartiality and its internal talk about a "Rolo strategy," between

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 42

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

its public statements and its 30(b)(6) testimony on its review procedures, and between the way it decided over 450 exemption requests and the way it handled Rolovich's. These tensions create material issues of fact as to whether WSU really believed that it was acting in good faith when it allowed Chun to overturn the review committee's sincerity determination, when WSU decided not to accommodate Rolovich's religious convictions, and when it then concluded that it had "just cause" to terminate him and avoid paying out his liquidated damages provision.

For all these reasons, Rolovich's wrongful withholding claim should proceed to the jury.

## CONCLUSION

For the reasons provided above, Plaintiff Nicholas Rolovich respectfully requests that the Court

a) deny WSU's request for summary judgment on the Title VII, WLAD, breach of contract, and wage-withholding claims;

b) grant summary judgment on the first element of Rolovich's *prima facie* case for the Title VII failure to accommodate claim, that Rolovich has a religious belief which conflicted with WSU's vaccine mandate;

c) grant summary judgment on the second element of Rolovich's *prima facie* case for his Title VII failure to accommodate claim, that Rolovich informed WSU of his religious belief and conflict; and

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 43

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

d) grant summary judgment on the third element of Rolovich's *prima facie* case for his Title VII failure to accommodate claim, that Rolovich was terminated by WSU for Rolovich's inability to comply with the vaccine mandate, a job requirement.

I certify that this memorandum contains 9401 words, in compliance with the Court's Order of September 18, 2024, ECF No. 86.

DATED this 4th day of November, 2024.

/s/ Alexandria T. Drake

Alexandria T. Drake, WSBA #45188
DUNN & BLACK, P.S.
111 North Post, Ste. 300
Spokane, WA 99201-0907
(509) 455-8711
adrake@funnandblack.com

/s/ E. Job Seese
E. Job Seese
*Admitted pro hac vice*
FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4901
jseese@fbtlaw.com

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 44

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Eric Kniffin
*Admitted pro hac vice*
KNIFFIN LAW PLLC
102 S. Tejon Street, Suite 1100
Colorado Springs, CO 80903
(719) 212-4391
eric@kniffin.law

*Attorneys for Plaintiff*

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 45

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of November, 2024, I electronically filed the forgoing PLAINTIFF'S COMBINED RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that none of the represented parties are non-CM/ECF participants.

By:    /s/ E. Job Seese
E. Job Seese

0157347.0787550   4892-5978-6997v7

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 46

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

ROBERT W. FERGUSON
Attorney General

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>Defendant. | NO. 2:22-cv-00319-TOR<br><br>DECLARATION OF JOSEPH KENNEDY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

I, JOSEPH KENNEDY, declare as follows:

1. I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

DECL. OF JOSEPH KENNEDY IN SUPPORT OF
DEF'S MOTION FOR SUMMARY JUDGMENT – 1
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2.    In the summer of 2021, I was the co-owner and operator of Barrels Wine Bar on Mercer Island, WA.

3.    I sent an email to Washington State University President Kirk Schulz and Athletics Director Patrick Chun on July 23, 2021. When I did not receive a response, I followed up with another email on July 31, 2021. A true and accurate copy of that email, along with the photo I attached, is attached as Exhibit A.

4.    The contents of the two emails that I sent to President Schulz and Athletics Director Chun are truthful and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 1st (First) day of October, 2024, at Mercer Island , Washington.

s/ _____

JOSEPH KENNEDY

DECL. OF JOSEPH KENNEDY IN SUPPORT OF
DEF'S MOTION FOR SUMMARY JUDGMENT – 2
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## CERTIFICATE OF SERVICE

On the 14th day of October, 2024, I caused to be served, via ECF electronic service, a true copy of the foregoing document upon all counsel registered for e-service.

DATED this 14th day of October, 2024.

_____
Erica Knerr, Legal Assistant

DECL. OF JOSEPH KENNEDY IN SUPPORT OF
DEF'S MOTION FOR SUMMARY JUDGMENT – 3
No.2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# EXHIBIT A

**From:** Joe Kennedy <jkennedy59@me.com>
**To:** Athletics.Director@wsu.edu, PresidentsOffice@wsu.edu
**Subject:** Disappointed Once Again
**Date:** Sat, 31 Jul 2021 12:30:51 -0700
**Importance:** Normal
**Inline-Images:** Screen_Shot_2021-07-31_at_11.46.12_AM.png; IMG_2799.jpg

---

Dear President Schulz and Athletic Director Chun:

I am disappointed once again, but this time it is because of a lack of communication from both of you regarding the email I sent on July 23 (See Below). It is now July 31, and I haven't heard even an acknowledgement that you received my email. Maybe that's the way you choose to respond, by not responding, but that's not how I remember the leadership of WSU Under Glenn Terrell, Sam Smith, Lane Rawlins, or Elson Floyd choosing to respond to an alumni's concern about how their staff members represent themselves to the public.

Here are the facts: Rolovich entered our wine bar and lied to us by responding to the question "Are you vaccinated?" The response was, "We're all good here." That last quote implies that all in their party had been vaccinated. We now know that is not the truth.

We were excited to have him in our bar and talk Cougar football for a short time. Of course we thought, he was vaccinated as implied by his response to our question. Now we are not sure we can trust him on anything he says.

I wanted to copy Rolovich on this and the previous email but his email is the only one on the website that is not listed. See screenshot below.

| FOOTBALL | | | |
|---|---|---|---|
| Nick Rolovich | Head Coach | 509-335-0250 | |
| Jason Cvercko | Chief of Staff | 509-335-0206 | jason.cvercko@wsu.edu |
| Jake Dickert | Defensive Coordinator/Linebackers | 509-335-0256 | jacob.dickert@wsu.edu |
| Brian Smith | Associate Head Coach / Offensive Coordinator / Running Backs | 509-335-0261 | brian.m.smith@wsu.edu |
| Craig Stutzmann | Co-Offensive Coordinator / Quarterbacks | 509-335-0257 | craig.stutzmann@wsu.edu |
| Kyle Krantz | Special Teams Coordinator | 509-335-0254 | kyle.krantz@wsu.edu |
| Andre Allen | Wide Receivers | 509-335-0885 | andre.allen@wsu.edu |
| Mark Banker | Safeties | 509-335-0263 | mark.banker@wsu.edu |

I've been told by many of my Cougar friends that I should bring this to the print media and social media for a number of reasons. So far, I have chosen not to do that. I would like to hear from you by the end of the work day (5:00 PM) Monday, August 2, 2021 with a response to this email. I will consider how I go forward after that.

I realize that this is a personnel matter and that you will probably not comment because of that, but Rolovich is a public employee and his behavior as a public employee is a reflection on both of you and the institution as well. And you have a obligation to respond to this email.

I look forward to your response.

Joe Kennedy

Joe and Tina Kennedy
Barrels Wine Bar… Experience Wine!

WSU_00035342

7605 27th Street #107
Mercer Island, WA 98040
206-268-0588
206-979-6524 (personal after-hours)
www.barrelswinebar.com
https://www.facebook.com/barrelswinebar/
https://www.instagram.com/barrelswinebar/

PREVIOUS EMAIL SENT JULY 23, 2021.

Dear President Schulz and Athletic Director Chun:

We are extremely disappointed with Coach Nick Rolovich for a number of reasons. The most recent news that he was unvaccinated and is choosing not to get vaccinated came as a huge surprise to us.

Why as a surprise?  Coach Rolovich entered our wine bar (Barrels Wine Bar) in Mercer island on May 13, 2021.  There was a mask mandate in Washington State at the time.  He and a staff member  from the Athletic Department (entered with alligator masks on) and were asked if they were vaccinated.  The reply we got was something like: We're all good here.  The coach removed his mask as he made his way to the back room of our wine bar.  He sat with his mask off for over an hour and met with one of our employees, Stephanie Lawrenson (pictured below), a die-hard Cougar, whose family is extremely supportive of the Cougar Football program.

He left our bar without his mask on close to 6:00 PM to meet with supporters on the island.  We know some of those supporters he visited that evening and would wonder if Coach Rolovich was honest with them about his unvaccinated status.

Both my wife and I are WSU Alumni; me 1982 and 1986 and my wife 1982.  My Father, Dr. Thomas L. Kennedy, was a History professor, held a number of Dean positions, and was Vice Provost of the University.  We have deep love for the institution.  Further, we are proud to call ourselves "Cougs"

How you choose to respond to Coach Rolovich's behavior as a leader of young men and women will reflect not only on you but the integrity of the university as well.

Please, don't "Coug it!"

Respectfully,

Joe Kennedy

WSU_00035343



Joe and Tina Kennedy
Barrels Wine Bar… Experience Wine!
7605 27th Street #107
Mercer Island, WA 98040
206-268-0588
206-979-6524 (personal after-hours)
www.barrelswinebar.com
https://www.facebook.com/barrelswinebar/
https://www.instagram.com/barrelswinebar/

WSU_00035344

ROBERT W. FERGUSON
Attorney General
SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
ZACHARY J. PEKELIS, WSBA #44557
W. SCOTT FERRON, WSBA #61154
Special Assistant Attorneys General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1700

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH, <br><br> Plaintiff, <br><br> v. <br><br> WASHINGTON STATE UNIVERSITY, an agency of the State of Washington, <br><br> Defendant. | NO. 2:22-cv-00319-TOR <br><br> DECLARATION OF ADAM GANDERS |

I, Adam Ganders, declare as follows:

1.     I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

2.     I am the Senior Associate Director of Athletics and Assistant Vice President for Advancement at Washington State University (WSU), roles I have served in since 2022. Prior to that, I served as the Associate Athletic Director of the Cougar Athletic Fund (CAF) since 2020. Between 2020 and 2024, I oversaw

DECLARATION OF ADAM
GANDERS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

all facets of the CAF's annual giving program, including day-to-day operations. Today, I oversee all facets of Cougar Athletics fundraising and development, including major gifts, annual giving, planned giving, and stewardship. Additionally, I am the main Athletics liaison to the WSU Foundation.

3.    Maintaining positive donor relations with high-value donors is critical to the survival of WSU Athletics, because without the financial support of donors, WSU Athletics would have significant budget challenges.

4.    I did not interact regularly with former WSU head football coach Nick Rolovich when he was employed by WSU in 2020 and 2021. However, because of my previous and current roles at WSU in managing donor relations, I am familiar with some aspects of the donor response to the public revelation of Mr. Rolovich's unvaccinated status and the ensuing public controversy.

5.    Once it became publicly known in July 2021 that Mr. Rolovich was unvaccinated, I, along with others working alongside me at WSU, received numerous communications from donors upset with Mr. Rolovich. Several explicitly threatened to withhold further financial contributions to WSU, with more expressing general displeasure if Rolovich continued on as head football coach while unvaccinated. A collection of true and correct copies of some of these communications where I was personally involved is attached hereto as Exhibit A.

DECLARATION OF ADAM GANDERS

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

6.    On request from WSU's counsel to provide more detailed information about these donors who, as evidenced by records produced in this litigation, had expressed displeasure with Mr. Rolovich's vaccination stance to WSU, I asked my colleagues at the WSU Foundation to compile and provide the requested data. That information was compiled by my WSU Foundation colleagues into a single spreadsheet and provided back to me and counsel, which I understand has been provided in this litigation in response to Mr. Rolovich's discovery requests. A true and correct copy of this document is attached as Exhibit B to this Declaration.

7.    The information contained in Exhibit B is true and accurate as of this date to the best of my knowledge, and is the type of information WSU regularly relies on to be accurate in coordinating its donation and giving efforts. The information in Exhibit B includes general approximations from the WSU Foundation of each donor's lifetime giving amount and associated giving level, their previous giving in FY 2021-23, and their largest giving amount.

DECLARATION OF ADAM GANDERS

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this _9th_ day of _OCTOBER_, at _PULLMAN_, Washington.

_____
ADAM GANDERS

DECLARATION OF ADAM GANDERS                  4                  ATTORNEY GENERAL OF WASHINGTON
                                                                Complex Litigation Division
                                                                800 Fifth Avenue, Suite 2000
                                                                Seattle, WA  98104-3188
                                                                (206) 464-7744

## CERTIFICATE OF SERVICE

On the 14th day of October, 2024, 1 caused to be served, via ECF electronic service, a true copy of the foregoing document upon all counsel registered for e-service.

DATED this 14th day of October, 2024.

_____
Erica Knerr, Legal Assistant

DECLARATION OF ADAM
GANDERS

5

**PACIFICA LAW GROUP LLP**
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Case 2:22-cv-00319-TOR   ECF No. 102   filed 10/14/24   PageID.3809   Page 6 of 18

# EXHIBIT A

**From:** "Ganders, Adam Lawrence" <aganders@wsu.edu>
**To:** "Chun, Patrick" <patrick.chun@wsu.edu>
**Cc:** "Straub, Mitchell H" <mitch.straub@wsu.edu>
**Subject:** RE: rolovich
**Date:** Tue, 27 Jul 2021 17:48:38 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png

---

FYI. I left Woody a voicemail.

 **Adam Ganders '07**
Associate Athletic Director
Cougar Athletic Fund
Department of Intercollegiate Athletics
Washington State University
Office: 509-335-0218

*TOGETHER, WE WILL ACHIEVE WHAT WAS ONCE DEFINED AS IMPOSSIBLE*

**From:** Scott Woodward <woodfish24@gmail.com>
**Sent:** Tuesday, July 27, 2021 8:36 AM
**To:** Chun, Patrick <patrick.chun@wsu.edu>
**Cc:** Straub, Mitchell H <mitch.straub@wsu.edu>; Ganders, Adam Lawrence <aganders@wsu.edu>
**Subject:** rolovich

7/27/2021

My record speaks for itself when it comes to the support of WSU.

- Gray W

- WSU Heritage Society

- WSU President's Associate

- WSU Advocate/Trustee

- VP of the WSU Tri-Cities Alumni Assoc.

- Member of the Bobo Brayton Endowment Fund Board of Trustees

- Alumni Coordinator for Cougar Baseball

I think that level of support grants me some space to comment on recent events involving Coach Rolovich. I will preface my comments with a huge thanks to you and your staff for the tremendous job you all have done to get WSU Athletics back on track financially and laying the foundation for the national respect of Cougar athletics. I would venture to say that in the 50+ years I have been part of the Cougar family your leadership is the best that our university has experienced.

That being said I feel Coach Rolovich's recent decision to not follow national, state, and university guidelines concerning Covid vaccination is an embarrassment to the institution breaking down the hard-earned respect we have all worked to establish at WSU. I have endured a self-inflicted cooling-off period since he first tweeted his decision. My cooling off period did not work as a matter of fact over the 7 days my temperature has increased. Daily discussions with my wife produced talking points I would like to share with you.

- Coach Rolovich has slapped our new medical school and research on diseases in the face.

- Coach Rolovich has divided the Cougar nation just when we were getting excited about returning to campus.

WSU_00004125

- No proof on this but if I was a parent of a recruit, I would be moving WSU down the list of considered schools.

- The daily regional and national media images of Coach Rolovich alongside images of our campus accompanying the ugly story of his non-vaccination stand makes me sick.

- Rolovich has created a huge distraction for the team

- The silence is deafening from the administration.

So, what about solutions? I am confident that you have been in contact with President Schulz trying to find a solution. Perhaps that accounts for the administrative radio silence since your initial responses.  I keep going back to the WSU Covid vaccination policy, all students and staff must be vaccinated with exceptions for personal, religious, or health reasons. If one is to apply any of the exceptions then they must be masked and maintain social distancing. So, if Coach Rolovich has a personal reason that stands up to that protocol then he must be masked at all times and must maintain his social distance, no exceptions. If he is not willing to abide by the rules that the students and staff are required to follow then he should catch the next wave to Hawaii. If that is the case your administrative wisdom will dictate the direction of his contract. If he does abide then our university saves its $3 million investment and Rolovich continues to coach.

I have been waiting for the needle to move one way or the other on this matter. I just can't wait any longer to share my thoughts. I have confidence you and President Schulz will find a solution. No response needed just action.

Scott Woodward class of 1972

509 627 3621

WSU_00004126

**From:** Scott Woodward <woodfish24@gmail.com>
**To:** Pat Chun <patrick.chun@wsu.edu>, "Straub, Mitchell H" <mitch.straub@wsu.edu>, "Ganders, Adam Lawrence" <aganders@wsu.edu>
**Subject:** rules on Rolo
**Date:** Thu, 5 Aug 2021 17:19:14 -0700
**Importance:** Normal

---

Pat, as the official fall semester blossoms and fall sports get underway I feel there is a need to go public with exactly what the specifics are in "managing" staff who are not vaccinated.
In particular Coach Rolovich, does he fall into the old adage of special rules for special fools, or do you and President Schulz hold him accountable to national, state, and University standards?
I think it would behoove us all to have those exact standards that Coach Rolovich is being held to made public.
Scott Woodward (class of 1972)
509-627-3621

WSU_00016346

**From:** "Ryan, Elizabeth" <lizryan@wsu.edu>
**To:** "Connell, Michael C" <connell@wsu.edu>, "Miles, Victoria Mari" <vmmiles@wsu.edu>
**Cc:** "Winfree, Nickole M" <nikki.winfree@wsu.edu>, "Boyer, Theresa Marlene" <theresa.boyer@wsu.edu>, "Straub, Mitchell H" <mitch.straub@wsu.edu>, "Neighbors, Emily Eileen" <emily.neighbors@wsu.edu>, "Ganders, Adam Lawrence" <aganders@wsu.edu>
**Subject:** Good News FW: Bequest reinstated.
**Date:** Tue, 19 Oct 2021 01:40:38 +0000
**Importance:** Normal
**Inline-Images:** image001.png

---

Mike and Victoria –

Note the below email went to presidentsoffice@wsu.edu.  But please share to Kirk's personal email if you feel appropriate.

Good news includes reinstatement of a $1.5 Million bequest and a $100,000 cash gift within the next week. Both will be for unrestricted scholarship for students with financial need.

Go Cougs!
Liz



**LIZ RYAN, JD**
DIRECTOR, GIFT PLANNING
Washington State University Foundation
901 5th Avenue, Suite 2900
Seattle, WA 98164
Office: 206-770-6062
Cell: 206-491-1444
Email: lizryan@wsu.edu
foundation.wsu.edu/giftplanning

NOTICE:  This email is intended solely for the use of the individual(s) to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify me by telephone and return the original message to me at the listed email address.  Thank You.

This information is not intended to be a source of legal, tax, or financial advice, and should not be considered or relied upon as such.  The WSU Foundation does not engage in the marketing of services pertaining to individualized advice about estate distribution documents.  You should not act or rely on information in or referenced by this email without seeking the advice of a qualified legal, tax, and/or financial advisor.  Furthermore, this information cannot be relied upon as professional advice adequate in scope and content to avoid the imposition of penalties under the Internal Revenue Code.  General information about the WSU Foundation and its management policies for all types of gifts can be found here.

**From:** Gordon MacArthur <macgl777@yahoo.com>
**Sent:** Monday, October 18, 2021 6:28 PM
**To:** Ryan, Elizabeth <lizryan@wsu.edu>; WSU President's Office <presidentsoffice@wsu.edu>; Winfree, Nickole M <nikki.winfree@wsu.edu>
**Subject:** Bequest reinstated.

Thank you all for your efforts.  I would have preferred to see Rolovich just get vaccinated and encourage others to do so as well, but since that didn't happen, termination was appropriate for such a high profile state employee.

WSU_00034837

I reinstated the bequest.  I spoke with Liz a few minutes ago and will be meeting with her in the coming weeks.  Also will be doing a $100,000 donation to WSU for scholarships within the next week.

Gordon MacArthur

WSU_00034838

**From:** "Ganders, Adam Lawrence" <aganders@wsu.edu>
**To:** "Straub, Mitchell H" <mitch.straub@wsu.edu>
**Subject:** Fwd: WSU FB @ ASU
**Date:** Thu, 7 Oct 2021 02:04:51 +0000
**Importance:** Normal

---

FYI

AG

Begin forwarded message:

**From:** Steve Hamilton <stevehamiltonevents@gmail.com>
**Date:** October 6, 2021 at 3:16:45 PM PDT
**To:** "Ganders, Adam Lawrence" <aganders@wsu.edu>
**Subject: Re: WSU FB @ ASU**

Hi Adam:

Thanks for reaching out.  Unfortunately, Desiree and I will be in New York that weekend visiting our daughter who recently moved there.  Sorry that we have to miss the game.

In the interest of full disclosure, however, please count me as a Cougar who will not provide any additional financial support for WSU Athletics until Coach Rolovich is vaccinated.  If he has not complied with Governor Inslee's mandate by the deadline, then I fully support Rolovich's dismissal from WSU.

Go Cougs!

Steve

On Oct 4, 2021, at 10:47 AM, Ganders, Adam Lawrence <aganders@wsu.edu> wrote:

Steve,

Greetings from Pullman! I hope you and Desiree are doing well.

I am reaching out because I am heading down to Arizona the week of Oct. 25 ahead of our football game against ASU.  Are you and Desiree in Arizona that week? If so, I would welcome a visit to thank you in-person for the unwavering support of our student-athletes and give you an update from WSU Athletics. We can grab lunch or dinner that week if it works with your schedule.

I look forward to connecting. Go Cougs!

WSU_00034982

**Adam Ganders '07**
Associate Athletic Director
Cougar Athletic Fund
Department of Intercollegiate Athletics
Washington State University
Office: 509-335-0218

WSU_00034983

**From:** Athletics Director <athletics.director@wsu.edu>
**To:** "Adams, Bridget Lee" <bridget.adams@wsu.edu>, "Ganders, Adam Lawrence" <aganders@wsu.edu>
**Subject:** FW: Thank You
**Date:** Fri, 22 Oct 2021 18:55:43 +0000
**Importance:** Normal

---

FYI ...

---

**From:** Joe Vithayathil <joevitha@hotmail.com>
**Sent:** Thursday, October 21, 2021 8:59 AM
**To:** Athletics Director <athletics.director@wsu.edu>
**Cc:** Schulz, Kirk <kirk.schulz@wsu.edu>
**Subject:** Thank You

Hello, Director Chun and President Schulz,
I wanted to thank you both for your handling of the very difficult situation created by Mike Rolovich. I emailed you back in July to express my disappointment in Rolovich's refusal to be vaccinated. I understand this was a very difficult issue for you to handle- and that it was just one small part of a much larger issue facing WSU (and all universities). Everything I have read about this situation shows that you handled this in a very fair and equitable fashion. I didn't want Coach Rolovich to be treated any differently than any other WSU employee, even if he was in a high-profile position of leadership. It seems to me that he was afforded the same due process that was available to every university employee. As a Coug (and incidentally a Catholic) I am very comfortable with the way his exemption request was handled. I know this was a very difficult and unfortunately divisive situation that was not of your making.  Also, I have no doubt you will face a barrage of criticism and vitriol from some vocal members of the WSU community (and from people outside that community as well). But I just want to let you know that there are countless Cougs that are very proud of how you have handled this. Today I am making a donation to the Cougar Athletic Fund. Thank you once again for showing exceptional leadership during a very difficult time.

Go Cougs!
Joe Vithayathil
WSU Class of 1999

---

**From:** Joe Vithayathil <joevitha@hotmail.com>
**Sent:** Wednesday, July 21, 2021 5:57 PM
**To:** Athletics.Director@wsu.edu <Athletics.Director@wsu.edu>
**Cc:** kirk.schulz@wsu.edu <kirk.schulz@wsu.edu>
**Subject:** Coach Rolo vaccination

Hello Mr. Chun and President Schulz,
I want to thank you both for always representing my beloved WSU in a very professional and respectful manner. However I am extremely disappointed and embarrassed by Coach Rolovich's anti-vaccination stance. The coach seems like a great person and I respect anyone's personal health choices. But when you have a leadership position at a highly regarded university, I feel that you have a responsibility to conduct yourself in a way that is consistent with that university's values. President Schulz has rightly declared that all students and faculty should be vaccinated for the coming school year for obvious reasons related to public health. The fact that WSU's most high profile employee would ignore this and (seemingly) be swayed by baseless fear-mongering is something I can not stomach. I am by no means a big-time donor, I

WSU_00035092

am lucky if I can get to one or two games a year. But unless this matter is addressed I will not make any future contributions to the Cougar Athletic Fund or attend any Cougar football games. I will encourage my fellow Cougs to do the same. It breaks my heart to write that.

Sincerely,

Joe Vithayathil

WSU class of 1999

WSU_00035093

1-SER-245

Case 2:22-cv-00319-TOR    ECF No. 102    filed 10/14/24    PageID.3819    Page 16 of 18

# EXHIBIT B

| Primary Full Name | Spouse Name | Giving Clubs | Lifetime Giving Amount | Donor giving amounts by FY21 | Donor giving amounts by FY22 | Donor giving amounts by FY23 | Donor largest gift |
|---|---|---|---|---|---|---|---|
| Ken E. Goetsch | Mavis Goetsch | Below Heritage | 2 | 0 | 0 | 0 | 1 |
| Bill Boaz | Linnea Boaz | Below Heritage | 4 | 1 | 1 | 2 | 2 |
| Jenna Newcomb Barkime | Kirk Barkhimer | Below Heritage | 5 | 2 | 3 | 2 | 2 |
| Joe Vithayathil | | Below Heritage | 1 | 0 | 1 | 0 | 1 |
| Manpreet Chahal* | Lindsay Fisher | Heritage Society | 6 | 5 | 5 | 5 | 4 |
| KC Graham | | Below Heritage | 3 | 0 | 1 | 2 | 2 |
| Cale E. Ramaker | | Below Heritage | 6 | 0 | 0 | 0 | 3 |
| Patrick Barko | | Below Heritage | 1 | 0 | 1 | 0 | 1 |
| Brad Wall | Maddie Wall | Below Heritage | 2 | 1 | 0 | 0 | 1 |
| Brian Walsh | | Below Heritage | 4 | 1 | 2 | 1 | 1 |
| Roger McClellan | Kathleen McClellan | Benefactor | 6 | 4 | 1 | 1 | 6 |
| Sam Reed | Margery Reed | Below Heritage | 5 | 1 | 1 | 1 | 1 |
| Terry Sullivan | | Below Heritage | 6 | 3 | 3 | 3 | 3 |
| Cindy Brunson | | Below Heritage | 6 | 1 | 2 | 2 | 4 |
| Ty Bennett | Kathy Bennett | Silver Benefactor | 6 | 5 | 1 | 6 | 6 |
| Steven E. Hamilton | Desiree Hamilton | Below Heritage | 6 | 0 | 0 | 0 | 3 |
| Lloyd Stroup | Renee Stroup | Below Heritage | 4 | 0 | 1 | 0 | 1 |
| Kurt Dammeier | Leslie Dammeier | Laureate | 6 | 6 | 6 | 5 | 6 |
| Gordon MacArthur * | | Benefactor | 6 | 0 | 6 | 0 | 6 |
| David Mudd | Maitri Sojourner | Below Heritage | 3 | 1 | 1 | 1 | 1 |
| Mike Price | Joyce Price | Below Heritage | 4 | 0 | 0 | 0 | 1 |
| Craig Schafer | Lisa Schafer | Heritage Society | 6 | 0 | 0 | 0 | 5 |
| Mikal Thomsen | Lynn Thomsen | Laureate | 6 | 5 | 4 | 5 | 6 |
| Charles "Chuck" Gregg | Erica Schutte | Below Heritage | 3 | 0 | 1 | 1 | 1 |
| Scott Woodward | Pamela Woodward | Heritage Society | 6 | 3 | 4 | 4 | 4 |
| Diane C. Hamilton | Daniel Hamilton | Below Heritage | 5 | 1 | 1 | 1 | 1 |
| Jeff Lanctot | Lisa Lanctot | Benefactor | 6 | 1 | 0 | 0 | 5 |
| Doug Burr | Susan Burr | Below Heritage | 1 | 0 | 0 | 0 | 1 |
| Cisco Masias | | Below Heritage | 2 | 0 | 0 | 0 | 1 |

| Primary Full Name | Spouse Name | Giving Clubs | Lifetime Giving Amount | Donor giving amounts by FY21 | Donor giving amounts by FY22 | Donor giving amounts by FY23 | Donor largest gift |
|---|---|---|---|---|---|---|---|
| David Brandt | Mindy Brandt | Below Heritage | 1 | 0 | 0 | 0 | 1 |
| Bruce E. Jackson | | Below Heritage | 2 | 1 | 0 | 1 | 1 |
| Jennifer Skoglund | | Below Heritage | 2 | 0 | 0 | 0 | 1 |
| Stephen O'Shea | Janette O'Shea | Below Heritage | 1 | 0 | 0 | 0 | 1 |
| Patrick LaFramboise | Ann LaFramboise | Below Heritage | 5 | 2 | 0 | 0 | 2 |
| Robert Tate | Tracy Tate | Below Heritage | 1 | 1 | 0 | 1 | 1 |
| Duane Bloedow | Gladys Bloedow | Below Heritage | 4 | 1 | 1 | 1 | 1 |
| Betsy Lane | | Below Heritage | 0 | 0 | 0 | 0 | 0 |
| Ben Kuttner | | Below Heritage | 0 | 0 | 0 | 0 | 0 |
| Rick Burnstead | Janet Burnstead | Benefactor | 6 | 4 | 3 | 0 | 4 |

*Manpreet Chahal was approached for a $25,000 commitment in the Fall of 2020. He agreed, and signed the pledge.

*Gordon MacArthur was approached for a $1 million revocable testamentary commitment in FY21. He agreed and signed documentation. He rescinded this agreement as a result of the Rolovich situation.

| Key: | | | |
|---|---|---|---|
| **Giving Clubs:** | | **Amount Coding:** | |
| Below Heritage | under $50,000 | 0 | $0.00 |
| Heritage Society | $50,000-$99,999 | 1 | $1.00 - $1,000 |
| Benefactor | $100,000-$249,999 | 2 | $1,001 - $2,500 |
| Silver Benefactor | $250,000-$499,999 | 3 | $2,501 - $5,000 |
| Crimson Benefactor | $500,000-$999,999 | 4 | $5,001 - $10,000 |
| Laureate | $1,000,000-$4,999,999 | 5 | $10,001 - $25,000 |
| Crimson Laureate | $5,000,000-$9,999,999 | 6 | $25,001 and above |

ROBERT W. FERGUSON
Attorney General

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>Defendant.<br>. | No. 2:22-cv-00319-TOR<br><br>DECLARATION OF RENEE DIRESTA IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |

I, Renee DiResta, declare as follows:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge

and information.

2.      I am a researcher and author, and from June 2019 until June 2024 I was the Technical Research Manager of the Stanford Internet Observatory, a research center within Stanford University with a track that focused on understanding how narratives spread and go viral on social media. I have a decade of experience studying the narratives and online dynamics of the anti-vaccine movement specifically, including its intersection with other conspiratorial communities.

3.      I have been retained by defendant in the above-captioned case to render expert opinions in this case. My opinions, along with the materials I reviewed in forming those opinions, are explained in my expert report. For my work in this case, I am being compensated at a rate of $250 per hour.

4.      Attached hereto as Exhibit A is a true and correct copy of the expert report and supporting exhibits. My report is based on my training, professional experience, and research. My report contains a complete statement of the opinions to which I would testify if called as a witness at trial.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this __8__ day of October, 2024, in New York.

s/ _____

RENEE DIRESTA

## CERTIFICATE OF SERVICE

On the 14th day of October, 2024, I caused to be served, via ECF electronic service, a true copy of the foregoing document upon all counsel registered for e-service.

DATED this 14th day of October, 2024.

_____
Erica Knerr, Legal Assistant

# EXHIBIT A

# Expert Report of Renée DiResta,

**Prepared for Defendant Washington State University in**

**Eastern District of Washington Case No. 2:22-cv-00319-TOR**

***Nicholas Rolovich*, plaintiff**

*v.*

***Washington State University*, defendant.**

Dated: August __9__, 2024        Signed:_____
                                             Renée DiResta

**BACKGROUND AND QUALIFICATIONS**

1.      From June 2019 until June 2024 I was the Technical Research Manager of the Stanford Internet Observatory, a research center within Stanford University with a track that focused on understanding how narratives spread and go viral on social media. I have a decade of experience studying the narratives and online dynamics of the anti-vaccine movement specifically, including its intersection with other conspiratorial communities.

2.      From 2020-2023, I served on the Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA, which was formed to address the persistent and important threat to public health in the USA posed by suboptimal uptake of some vaccines. I have prepared background reports and research primers on vaccination narratives and social media that were used to inform the Sabin Institute Vaccine Science and Policy Group, the Lancet and Financial Times joint commission on global health futures, Science for Global Policy, and many other think tanks and policy projects. I have published multiple academic papers on the dynamics of vaccine hesitancy and anti-vaccine narratives on social media in journals including *The Lancet* and *Annals of Internal Medicine*. I have a forthcoming contributed book chapter on vaccine narratives in an American Public Health Association (APHA) volume on COVID-19.

3.      During the COVID-19 vaccine rollout, I was one of the leaders of an inter-institutional partnership called the Virality Project that published weekly briefings to enable public health officials and frontline physicians to understand and respond to rumors, misinformation, and emergent vaccine hesitancy narratives related to the COVID-19 vaccines. In this capacity I participated in briefings for the Office of the Surgeon General on the dynamics of viral COVID-19 vaccine rumors and misinformation.

4.      A copy of my CV, which contains additional information regarding my qualifications and a list of publications authored or co-authored, is attached as **Attachment A**.

5.      I am being compensated $250 per hour for my expert work on this matter. I have not testified as an expert at trial or by deposition in any case in the past four years.

## FACTS OR DATA CONSIDERED

6.      In addition to the research, studies, and news reports cited in this report and knowledge I have gained through my extensive work researching and writing about vaccine hesitancy, anti-vaccine conspiracy theories, and the QAnon movement, I considered the following materials in forming the opinions set forth in this report:

- Approximately 460 documents that I understand were produced by Mr. Rolovich in this litigation and reference the term "vaccine", "vacc*", and/or "vax*", in addition to documents referencing the term "abort*", or "fetal", or "cells".

- The following timeline of relevant dates, which was prepared by counsel:

| | |
|---|---|
| 1/14/2020: | Rolovich hired as head coach of WSU's football team. |
| 4/21/2021: | Rolovich meets with WSU professor, Dr. Guy Palmer, regarding COVID-19 vaccines and side effects. |
| 4/28/2021: | WSU announces vaccine requirement. |
| 5/24/2021: | Rolovich meets with WSU's Athletic Director, Pat Chun, to discuss vaccine. According to Rolovich, Mr. Chun "claimed that he was worried about Mr. Rolovich's mental health and accused him of having extreme views regarding many issues." |
| 7/21/2021: | Rolovich tweets that he will not receive COVID-19 vaccine for "reasons which will remain private." |
| 7/27/2021: | Rolovich virtually attends Pac-12 media day, as participants were required to be vaccinated in order to attend in-person. |
| 8/9/2021: | Washington Governor Jay Inslee issues Proclamation 12-14, requiring state workers to be vaccinated against COVID-19. |
| 8/19/2021: | Rolovich first informs Athletics Department that he intends to seek religious exemption. |
| 10/04/2021: | Rolovich submits application for religious exemption. |
| 10/18/2021: | Rolovich notified that his request for exemption and accommodation was not approved. |

| 11/12/2021: | Notice of termination issued to Rolovich. |
| 11/26/2021: | Rolovich appeals the termination decision. |
| 12/6/2021: | Rolovich's appeal is denied. |
| 11/14/2022: | Rolovich files original complaint in this litigation. |

- Second Amended Complaint of Nicholas Rolovich

**EARLY EXAMPLES OF ANTI-VACCINE CONSPIRACY THEORIES**

7.     For as long as there have been vaccines, there have been anti-vaccine narratives. Some of the earliest anti-vaccine narratives were religious. For example, in the early 1800s, Dr. Edward Jenner created a mechanism for inoculating against smallpox using cowpox.[1] At the time, as disease was often believed to be a punishment from God, some religious leaders assailed smallpox variolation as an effort to avoid a deserved fate.[2] Others later expressed concern that variolation introduced material from a cow into a human body – a violation of bodily purity or sanctity.[3]

8.     In 1853, the United Kingdom passed the Vaccination Act of 1853, making smallpox vaccination compulsory for children; by the 1860s, two-thirds of babies were vaccinated and smallpox death rates declined significantly.[4] Nonetheless, religious adherents argued that it was "unChristian," while more secular complaints framed it as political tyranny against the working class.[5] Anti-vaccine arguments based on concerns about safety additionally became prominent, and formal "anti-vaccination leagues" were established by those who wished to resist vaccines, and to evangelize against

[1] Stefan Riedel, "Edward Jenner and the History of Smallpox and Vaccination," *Baylor University Medical Center Proceedings*, *18*(1), 21–25 (2005), https://doi.org/10.1080/08998280.2005.11928028.

[2] Per-Olof Hasselgren, "The Smallpox Epidemics in America in the 1700s and the Role of Surgeons: Lessons to Be Learned During the Global Outbreak of COVID-19," *World Journal of Surgery* 44, no. 9 (2020): 2838-2839, https://link.springer.com/article/10.1007%2Fs00268-020-05670-4.

[3] College of Physicians of Philadelphia, History of Vaccines, "History of Anti-Vaccination Movements," https://www.historyofvaccines.org/content/articles/history-anti-vaccination-movements.

[4] The Health Foundation, "United Kingdom Vaccination Act 1853", https://navigator.health.org.uk/theme/united-kingdom-vaccination-act-1853.

[5] Nadja Durbach, "'They Might as Well Brand Us': Working-Class Resistance to Compulsory Vaccination in Victorian England," *Social History of Medicine* 13, no. 1 (2000): 45–63, https://doi.org/10.1093/shm/13.1.45.

them. According to letters that were sent to the editors of medical journals around the time the Compulsory Vaccination Act was passed, the anti-vaccination leagues disputed the safety and efficacy of vaccines; created conspiratorial allegations about the mechanisms as well as developers of vaccines; alleged that other diseases, including sexually transmitted diseases, were side effects of being vaccinated; and challenged the validity of mandates requiring immunization during epidemics.[6]

### ANTI-VACCINE CONSPIRACY THEORIES IN THE 21st CENTURY

9. The prevalence of themes and narratives skeptical of, or outright hostile to, vaccines waxes and wanes. However, highly similar narratives and themes persist over time, often regardless of the specific diseases they mitigate, because these narratives voice real concern and fears.

10. Epidemiologists and public health experts who study vaccine hesitancy have extensively categorized the prevalent vaccine rejection and hesitancy themes of the last 20 years, and how they manifest on social media, drawing on data from anti-vaccine websites and online communities.[7] I have studied that literature closely, including the quantitative assessments of prevalent vaccine rejection and hesitancy themes, and have built upon it through my own work researching and writing about vaccine hesitancy and anti-vaccine conspiracy theories. Summarizing across that

---

[6] Stanley Williamson, "Anti-vaccination Leagues," *Archives of Disease in Childhood* 59, no. 12 (1984): 1195–96, https://doi.org/10.1136/adc.59.12.1195.

[7] Laeth Nasir, "Reconnoitering the antivaccination web sites: news from the front," *J Fam Pract* 49(8):731-3 (August 2000), https://pubmed.ncbi.nlm.nih.gov/10947140/; Robert M. Wolfe, Lisa K. Sharp, and Martin S. Lipsky, "Content and Design Attributes of Antivaccination Web Sites," *JAMA* 287, no. 24 (June 26, 2002): 3245, https://doi.org/10.1001/jama.287.24.3245; P. Davies, S. Chapman, and J. Leask, "Antivaccination Activists on the World Wide Web," *Archives of Disease in Childhood* 87, no. 1 (2002): 22–25, https://doi.org/10.1136/adc.87.1.22; Anna Kata, "A Postmodern Pandora's Box: Anti-vaccination Misinformation on the Internet," *Vaccine* 28, no. 7 (February 17, 2010): 1709-16, https://doi.org/10.1016/j.vaccine.2009.12.022; Tara C. Smith, "Vaccine Rejection and Hesitancy: A Review and Call to Action," *Open Forum Infectious Diseases* 4, no. 3 (2017), https://doi.org/10.1093/ofid/ofx146; Amelia Jamison, David A. Broniatowski, Michael C. Smith, Kajal S. Parikh, Adeena Malik, Mark Dredze, and Sandra C. Quinn, "Adapting and Extending a Typology to Identify Vaccine Misinformation on Twitter," *American Journal of Public Health* 110, no. S3 (2020): S331–39, https://doi.org/10.2105/ajph.2020.305940; The Virality Project, "Memes, Magnets, and Microchips: Narrative dynamics around COVID-19 vaccines," Feb. 2022, Stanford Digital Repository, https://doi.org/10.25740/mx395xj8490; Angelo Fasce, Philipp Schmid, Dawn L. Holford, Luke Bates, Iryna Gurevch, and Stephan Lewandowsky, "A Taxonomy of Anti-vaccination Arguments From a Systematic Literature Review and Text Modelling," *Nature Human Behaviour* 7, no. 9 (July 17, 2023): 1462–80, https://doi.org/10.1038/s41562-023-01644-3.

research, the most common, longstanding, and prevalent themes in vaccine rejection and hesitancy include:

- **Safety:** narratives alleging that vaccines are unsafe (e.g., that they cause sudden infant death syndrome, autism, or seizures); are under-tested or untested, either individually or in aggregate; contain toxic ingredients; cause other ailments (such as cancer); cause harm; weaken the immune system.

- **Efficacy:** narratives related to the idea that vaccines do not work, that they are less effective than treatments or alternative medicines (including homeopathy), or that they offer no more protection than doing nothing at all.

- **Religiosity:** narratives argue that vaccines contain materials or are party to moral acts that are objectionable on religious grounds (such as cell culture systems originally obtained via abortion, or porcine ingredients); that the human body is perfect as God made it (rendering vaccines unnecessary or against God's laws); that preventing illness or death interferes with God's will.

- **Liberty:** narratives argue that no one, including the government or an employer, should be able to tell people what to put in their bodies, that parents should be the sole decision maker for children (vis a vis school requirements), and that individuals have the right to unqualified "health freedom" or "medical choice."

- **Distrust of industry or scientific processes:** narratives allege that vaccines are produced by profit-motivated pharmaceutical companies, often leveraging authentic instances of past abuses in which companies *have* concealed harm in pursuit of profit; that medical journals are "bought"; that scientists or experts conceal harms.

- **Conspiracy:** narratives claim to reveal malicious intent underlying vaccine policies or products, reflecting broad distrust in authority and expertise; narratives impute malign motives or nefarious actions to individuals, companies, or governments associated with vaccination.

11.     Regarding the safety and efficacy themes, those themes were particularly prevalent during the COVID-19 pandemic, as the public followed the story of COVID-19 vaccine development in real time. Many other vaccines, particularly those for childhood illnesses, have decades of safety and efficacy data available. Therefore, hesitancy due to safety and efficacy reasons in the COVID-19 context was at least partially a function of recency; fear of adverse events featured prominently in

surveys, and participants expressed a desire to "wait and see".[8]  However, safety themes have long been prevalent on most anti-vaccine websites, even in discussions of well-established and safe vaccines.

Some argue the existence of "hot lots" (specific dangerous batches), express concern about purportedly dangerous ingredients, or extrapolate from stories of individual reported bad experiences to reach sweeping conclusions; these arguments often do not dissipate even after thorough scientific investigations and research has been conducted.[9]

12.    Regarding the conspiracy theme of vaccine rejection and hesitancy, conspiracy theories related to vaccines often draw on material found in other themes, but then layer on an element of deliberate malice or concealed action on the part of leaders or experts.[10] For example, safety concerns about vaccine risks are made conspiratorial through allegations that the government is *actively hiding evidence* of vaccine dangers.[11] Toxicity claims, which often focus on vaccine ingredients, may allege that vaccines contain secret microchips, or are designed to purposefully execute a "depopulation agenda".[12] Other longstanding vaccine conspiracy theories allege that vaccine advocates are paid off by "big pharma," or that doctors who criticize vaccines are silenced or murdered.[13] High-profile figures like George Soros and Bill Gates frequently appear in these narratives; the specifics of their purported

[8] Ashley Kirzinger, Audrey Kearney, Liz Hamel, and Mollyann Brodie, "KFF/The Washington Post Frontline Health Care Workers Survey - Vaccine Intentions," Apr. 6, 2021, https://www.kff.org/report-section/kff-washington-post-frontline-health-care-workers-survey-vaccine-intentions/.

[9] Eve Dubé, Caroline Laberge, Maryse Guay, Paul Bramadat, Réal Roy, and Julie A. Bettinger, "Vaccine Hesitancy," *Human Vaccines & Immunotherapeutics* 9, no. 8 (Aug. 8, 2013): 1763–73, https://doi.org/10.4161/hv.24657.

[10] This is common to conspiracy theorizing in general. Conspiracy theories take real events, or claims with a grain of truth, and attempt to explain them by asserting a connection to powerful or sinister figures who are secretly colluding in service to a malevolent goal. See, for example, Roland Imhoff et al., "Conspiracy Mentality and Political Orientation Across 26 Countries," *Nature Human Behaviour* 6, no. 3 (Jan. 17, 2022): 392–403, https://doi.org/10.1038/s41562-021-01258-7.

[11] Anna Kata, "A Postmodern Pandora's Box: Anti-vaccination Misinformation on the Internet," *Vaccine* 28, no. 7 (Feb. 17, 2010): 1709-16, https://doi.org/10.1016/j.vaccine.2009.12.022.

[12] Jack Goodman and Flora Carmichael, "Coronavirus: Bill Gates 'Microchip' Conspiracy Theory and Other Vaccine Claims Fact-checked," *BBC,* May 29, 2020, https://www.bbc.com/news/52847648.

[13] Flora Teoh, "Conspiracy Theory About the Deaths of Alternative Medicine Practitioners Ignores Evidence, Misrepresents Certain Doctors - Health Feedback," *Health Feedback*, Aug. 23, 2023, https://healthfeedback.org/claimreview/conspiracy-theory-deaths-alternative-medicine-practitioners-ignores-evidence-misrepresents-certain-doctors/.

malign activity shifts to account for the specific details of a given outbreak.[14] Conspiratorial predispositions and belief in COVID-19 conspiracy theories were found to be predictors of vaccine hesitancy during the COVID-19 pandemic.[15] Conspiracy content remains one of the most prevalent vaccine conversation themes on social media.[16]

13.    Regarding the religiosity theme, although religious concerns about vaccination do exist, none of the world's major religions are opposed to vaccines.[17] The Catholic Church, for example, has extensively debated the ethics of using vaccines derived from human cell lines or fetal material obtained from an abortion, suggesting that vaccines without them be used where possible, but it remains pro-vaccine and Catholic religious leaders have consistently encouraged vaccination, including during the COVID-19 pandemic.[18] Other concerns related to vaccines interrupting "divine will" (fatalism) or impurity (concerns that being vaccinated will render the recipient impure) appear in some Christian Science, Jehovah's Witnesses, anthroposophy, and faith-healing practices but are not widely

---

[14] Alex Mahadevan, "Bill Gates and George Soros Are Targets of Another COVID-19 Conspiracy Theory," *Poynter*, June 1, 2020, https://www.poynter.org/fact-checking/2020/bill-gates-and-george-soros-the-target-of-another-covid-19-conspiracy-theory/.

[15] Christina E. Farhart, Ella Douglas-Durham, Krissy Lunz Trujillo, and Joseph A. Vitriol, "Vax Attacks: How Conspiracy Theory Belief Undermines Vaccine Support," *Progress in Molecular Biology and Translational Science*, Volume 188,Issue 1, (2022): 135–69, https://doi.org/10.1016/bs.pmbts.2021.11.001; Joseph A. Vitriol and Jessecae K. Marsh, "A Pandemic of Misbelief: How Beliefs Promote or Undermine COVID-19 Mitigation," *Frontiers in Political Science* 3 (June 17, 2021), https://doi.org/10.3389/fpos.2021.648082; Daniel Allington, Siobhan McAndrew, Vivienne Moxham-Hall, and Bobby Duffy, "Coronavirus Conspiracy Suspicions, General Vaccine Attitudes, Trust and Coronavirus Information Source as Predictors of Vaccine Hesitancy among UK Residents during the COVID-19 Pandemic," *Psychological Medicine* 53, no. 1 (2023): 236–47. https://doi.org/10.1017/S0033291721001434.

[16] Amelia Jamison, David A. Broniatowski, Michael C. Smith, Kajal S. Parikh, Adeena Malik, Mark Dredze, and Sandra C. Quinn, "Adapting and Extending a Typology to Identify Vaccine Misinformation on Twitter," *American Journal of Public Health* 110, no. S3 (Oct. 2020): S331–39, https://doi.org/10.2105/ajph.2020.305940.

[17] John D. Grabenstein, "What the World's Religions Teach, Applied to Vaccines and Immune Globulins," *Vaccine* 31, no. 16 (April 12, 2013): 2011–23, https://doi.org/10.1016/j.vaccine.2013.02.026.

[18] "Pontifical Academy for Life Statement: Moral Reflections on Vaccines Prepared From Cells Derived From Aborted Human Foetuses," *The Linacre Quarterly* 86, no. 2–3 (May 2019): 182–87, https://doi.org/10.1177/0024363919855896; United States Conference of Catholic Bishops, "Pope Francis and Bishops From the Americas Promote COVID-19 Vaccine," 2021, https://www.usccb.org/resources/pope-francis-and-bishops-americas-promote-covid-19-vaccine.

popular.[19] In the case of COVID-19 vaccines, neither Christian Scientists nor Jehovah's Witnesses organizationally opposed COVID-19 vaccination.[20]

14.    Notably, within the United States, religion intersects with vaccination policy through exemption options to vaccination requirements in some states. Generally speaking, there are three potential types of exemptions from compulsory vaccination, including for schoolchildren: (1) medical, which are given by physicians in cases in which there is a contraindication that makes being vaccinated dangerous or risky; (2) personal belief, or "philosophical objections"; and (3) religious exemptions, which may require that the individual seeking the exemption provide evidence of a sincerely-held religious belief contrary to vaccination.[21] In an effort to demonstrate sincere beliefs, petitioners sometimes submit a supportive letter from clergy.[22]

15.    Numerous peer-reviewed academic studies and papers document and discuss dynamics by which religious objections to vaccines may be leveraged to mask underlying concerns about vaccine safety, trust, and personal choice in an effort to avoid vaccine mandates.[23] For example, in one study of "frameworks through which vaccine decisions were made," authors reported that Orthodox Jewish parents indicated that they were more worried about vaccine safety and other secular

[19] Hanne Amanda Trangerud, "'What Is the Problem With Vaccines?' a Typology of Religious Vaccine Skepticism," *Vaccine X* 14 (Aug. 2023): 100349, https://doi.org/10.1016/j.jvacx.2023.100349; Eric Wombwell,Mary T. Fangman, Alannah K. Koder, and David L. Spero, "Religious Barriers to Measles Vaccination," *Journal of Community Health* 40, no. 3 (Oct. 16, 2014): 597–604, https://doi.org/10.1007/s10900-014-9956-1.

[20] Jehovah's Witnesses, "Are Jehovah's Witnesses Opposed to Vaccination? Or Do They Get Vaccines?," https://www.jw.org/en/jehovahs-witnesses/faq/jw-vaccines-immunization/; Maggie Phillips, "Christian Scientists Consider the COVID-19 Vaccine," *Tablet*, Nov. 19, 2021,https://www.tabletmag.com/sections/community/articles/christian-scientists-consider-covid-19-vaccinations.

[21] National Conference of State Legislatures, "States with Religious and Philosophical Exemptions from School Immunization Requirements," Aug. 5, 2024, https://www.ncsl.org/health/states-with-religious-and-philosophical-exemptions-from-school-immunization-requirements.

[22] Requirements for proving sincerity vary by locale; for examples of such letters in New York City submitted in relation to the COVID-19 vaccination requirements, see Reuven Blau, "COVID Vaccine Religious Exemption Letters Show Battle of Faith Vs. Science," *THE CITY - NYC News*, Dec. 1, 2021, https://www.thecity.nyc/2021/12/01/covid-vaccine-religious-exemption-letters-faith-vs-science/.

[23] Gordana Pelčić, Silvana Karačić, Galina L. Mikirtichan, Olga I. Kubar, Frank J. Leavitt, Michael Cheng-tek Tai, Naoki Morishita, Suzana Vuletić, and Luka Tomašević, "Religious Exception for Vaccination or Religious Excuses for Avoiding Vaccination," *Croatian Medical Journal* 57, no. 5 (Oct. 2016): 516–21, https://doi.org/10.3325/cmj.2016.57.516.

vaccine hesitancy concerns, though "religious frameworks were mobilized" to justify exemption seeking; concerns about safety were at the root of purportedly religious requests. Indeed, some participants noted that if a Rabbi were to tell them "you have to vaccinate," they would not follow the religious guidance – and so, to avoid being put in this position, they might seek out a rabbi who was likely to be open-minded about their existing views.[24] Broader studies into other aspects of healthcare additionally note that although religious authorities are perceived as influential partners in public health strategies (as they can be a source of information and ethical guidance for devotees) their followers also frequently choose to act independently of religious guidance and in accordance with the outcome they are looking for.[25]

16.    Other research, including into religious exemptions for school vaccination requirements and professional influenza vaccine requirements for healthcare providers, discusses indications that "'religion' often serves as [a] cover for anti-vaccine sentiments that have little to do with any organized faith's official teachings"[26] and that some individuals deceitfully exploit religious exemptions and may even encourage others to pursue them simply because the law allows it, independent of sincere religious conviction.[27] Safety-based concerns and fears underpinning claims of religious exemption blur the distinction between religious and secular opposition to vaccines. Media coverage of school vaccine exemption disputes has additionally highlighted individuals who start

---

[24] Ben Kasstan, "'If a Rabbi Did Say "You Have to Vaccinate," We Wouldn't': Unveiling the Secular Logics of Religious Exemption and Opposition to Vaccination," *Social Science & Medicine* 280 (July 2021): 114052, https://doi.org/10.1016/j.socscimed.2021.114052.

[25]    Lea Taragin-Zeller, "A Rabbi of One's Own? Navigating Religious Authority and Ethical Freedom in Everyday Judaism," *American Anthropologist* 123 (June 2021) Wiley: 833-45, https://doi:10.1111/aman.13603.

[26] Quote is from Kasstan (citation 24), extended source is to E.J. Sobo, "Vaccination: against my religion?" In Bloomsbury Religion in North America, edited by Bielo, J., Green, W.S., Pinn, A. London: Bloomsbury.

[27] Dorit Reiss, "Thou Shalt Not Take the Name of the Lord Thy God in Vain: Use and Abuse of Religious Exemptions from School Immunization Requirements," 65 *Hastings L.J.* 1551 (2013-2014), https://repository.uclawsf.edu/hastings_law_journal/vol65/iss6/5/; see also Jennifer A. Reich, "'I Have to Write a Statement of Moral Conviction. Can Anyone Help?': Parents' Strategies for Managing Compulsory Vaccination Laws," *Sociological Perspectives* 61, no. 2 (Jan. 30, 2018): 222–39, https://doi.org/10.1177/0731121418755113.

online advocacy organizations teaching people how to get religious exemptions, providing downloadable letter templates and detailed instructions for what to say in letters or interviews.[28]

17.      Prior to 2021, much of the research into exemptions and religious objections to vaccination and exemptions focused on childhood vaccines and influenza vaccines. As governments implemented COVID-19 vaccine requirements, and as some afforded religious exemptions, recent studies and commentary have sought to understand the dynamics of COVID-19 religious objections specifically.[29] Established religious concerns related to aborted fetal cells may apply in the case of the Johnson & Johnson vaccine, which used historic fetal cell lines when developing and producing their vaccine, though such concerns are a degree removed where the mRNA vaccines are concerned; although Pfizer and Moderna do not use fetal cells for production or manufacturing, they were used early in development to test effectiveness.[30] In light of this, one scholar points out, "Many Christians objecting to COVID vaccines do so on scientific grounds, such as the experimental nature of the vaccines, and their alleged deleterious side-effects, or on cultural grounds such as the increasing power of governments or the duplicity of government officials and scientists. The theological grounds tend to be far less prominent, except for their postulated link to past abortions. Other issues can only be described as ephemeral, such as the claim that God will protect us from viruses, and that our bodies should not be modified by vaccines."[31]

[28] Dan Goldberg, "Push to broaden religious exemption gains momentum," *Politico*, May 30, 2018, https://www.politico.com/states/new-york/albany/story/2018/05/30/push-to-broaden-religious-exemption-gains-momentum-438629; Mark Weiner, "NY Vaccine Debate: Protect Religious Beliefs of Students or Health of Classmates?," *Syracuse*, June 13, 2018, https://www.syracuse.com/politics/2018/06/ny_vaccine_debate_protect_religious_beliefs_of_students_or_health_of_classmates.html.

[29] Andrew Flescher, "How Well Do Religious Exemptions Apply to Mandates for COVID-19 Vaccines?," *Religions* 14, no. 5 (Apr. 24, 2023): 569, https://doi.org/10.3390/rel14050569.

[30] UCLA Health, "COVID-19 Vaccine: Addressing Concerns," https://www.uclahealth.org/treatment-options/covid-19-info/covid-19-vaccine-addressing-concerns; Michigan Department of Health & Human Service, "COVID-19 Vaccines & Fetal Cells," updated May 1, 2023, https://www.michigan.gov/-/media/Project/Websites/coronavirus/Folder17/COVID-19_Vaccines_and_Fetal_Cells_031921.pdf.

[31] D. Gareth Jones, "Religious Concerns About COVID-19 Vaccines: From Abortion to Religious Freedom," *Journal of Religion and Health* 61, no. 3 (Apr. 11, 2022): 2233–52, https://doi.org/10.1007/s10943-022-01557-x.

18.    As with school vaccines, however, an online ecosystem offering guidance, templates, and arguments for the concerned or fearful to use to frame their requests for a religious exemption emerged specific to COVID-19 vaccination. Facebook groups formed to connect around how best to secure one.[32] Telegram, a low-moderation social media platform popular with anti-vaccine activists, became a go-to source to find communities offering guidance, templates, and tricks. Media coverage has documented the world of for-profit and on-demand religious vaccine exemptions.[33] Social media had long been a source of information and community for the vaccine hesitant, and a gathering place for anti-vaccine activists to connect with those seeking information, and it – not churches, synagogues, mosques, or other religious institutions – became the central location for information exchange on this topic as well.[34]

## ANTI-VACCINE CONSPIRACY THEORIES IN THE INFORMATION AGE

19.    The prevalence and spread of vaccine resistance and hesitancy narratives is shaped by the information and communication environment. In the early 2000s, for example, much of the public conversation about vaccines focused on one key paper, published in The Lancet in 1998 by gastroenterologist Andrew Wakefield, which suggested that the MMR (measles mumps rubella) vaccine caused childhood autism.[35] The paper received significant broadcast media coverage and generated significant concern about the measles vaccine. By 2004, however, the editor of the Lancet

[32] Kiera Butler, "Inside the Private Facebook Groups Where Anti-vaxxers Plot to Get Religious Exemptions," *Mother Jones*, September 24, 2021, https://www.motherjones.com/politics/2021/09/inside-the-private-facebook-groups-where-anti-vaxxers-plot-to-get-religious-exemptions/.

[33] Mary Harris, "The For-Profit World of Religious Vaccine Exemptions," *Slate Magazine*, September 20, 2021, https://slate.com/human-interest/2021/09/religious-covid-vaccine-exemption-letters-for-sale-profit.html; Tess Owen, "Proud Boy Rabbi Promises Religious Exemptions for COVID Vaccine," *Vice*, October 8,2021, https://www.vice.com/en/article/z3xje9/proud-boy-rabbi-promises-religious-exemptions-for-covid-vaccine.

[34] Dorit Rubinstein Reiss, "Religious Exemptions to Vaccines and the Anti-Vax Movement," *Bill of Health - Petrie-Flom Center at Harvard Law School* (blog), July 16, 2021, https://blog.petrieflom.law.harvard.edu/2021/07/16/religious-exemptions-to-vaccines-and-the-anti-vax-movement.

[35] Children's Hospital of Philadelphia, "Vaccines and Autism," last reviewed by Lori Handy, MD, MSCE, on February 5, 2024, https://www.chop.edu/centers-programs/vaccine-education-center/vaccines-and-other-conditions/vaccines-autism.

suggested it should not have been published.[36] In 2010 the paper was formally retracted by the journal and, following an investigation by the U.K. General Medicine Council, Wakefield's medical license was revoked.[37] Coverage of the anti-vaccine movement's claims about a purported link between vaccines and autism subsequently declined significantly on mainstream broadcast and print media.[38]

20.      Around this time, social media companies were becoming increasingly popular. As coverage of misleading claims about vaccines declined in broadcast media and journalism coverage, some of the most prominent anti-vaccine activist organizations joined Facebook, which enabled users to post publicly and grow audiences directly. The National Vaccine Information Center, for example, an early anti-vaccine activist organization dedicated to, among other things, advocacy opposing school vaccination requirements, created a Facebook page in 2009.[39]

21.      Although the narrative themes themselves are largely unchanged since the late-1800s, the mechanics of social media provided unique opportunities for the anti-vaccine movement to recruit new adherents and reach new audiences, including by running ads, forming groups, and establishing dedicated channels, accounts, and pages. The expansion of the digital information ecosystem, which includes self-published blogs and websites, as well as the rise of large social media platforms, transformed the conversation around vaccines.[40]

---

[36] Richard Horton, "A statement by the editors of The Lancet," *The Lancet*, Mar. 6, 2004, https://www.thelancet.com/journals/lancet/article/PIIS0140673604156997/fulltext.

[37] General Medical Council, Preliminary Proceedings Committee and Professional Conduct Committee (Procedure), "Dr. Andrew Jeremy Wakefield: Determination of Serious Professional Misconduct (SPM) and Sanction" (May 24, 2010), http://www.circare.org/autism/Wakefield_SPM_and_SANCTION_32595267.pdf.

[38] Graham Dixon and Cristopher Clarke, "The Effect of Falsely Balanced Reporting of the Autism-vaccine Controversy on Vaccine Safety Perceptions and Behavioral Intentions," *Health Education Research* 28, no. 2 (Nov.27, 2012): 352–59, https://doi.org/10.1093/her/cys110.

[39] Renée DiResta, "On Virality: How the anti-vaccine movement influences public discourse through online activism," *Governing Health Futures,* July 15, 2020, https://www.governinghealthfutures2030.org/wp-content/uploads/2021/10/072020_Renee-DiResta_On-virality-How-the-antivaccine-movement-influences-public-discourse-through-online-activism.pdf.

[40] Anna Kata, "A Postmodern Pandora's Box: Anti-vaccination Misinformation on the Internet," *Vaccine* 28, no. 7 (Feb. 17, 2010): 1709-16, https://doi.org/10.1016/j.vaccine.2009.12.022.

22.        Changes in how people receive science and health information have inadvertently bolstered vaccination hesitancy. With local and regional newspapers disappearing, more people rely on internet sites of varying quality and intent. While media coverage once offered a largely unified view of health facts, the internet fragments information.[41] It also enables borderless and persistent communities of people who share information amongst themselves, often oriented around a common topic of interest, leading to the formation of strong trusted bonds.[42] Beyond being personalized and algorithmically mediated, social media is also highly participatory; users can post, share, and amplify individual pieces of content.

23.        The fragmentation in the information environment is compounded by shifts in who, or what, people trust.[43] A widely-cited 2012 paper by Dr. Anna Kata described, "[A] new postmodern paradigm of healthcare has emerged, where power has shifted from doctors to patients, the legitimacy of science is questioned, and expertise is redefined. Together this has created an environment where anti-vaccine activists are able to effectively spread their messages. Evidence shows that individuals turn to the Internet for vaccination advice and suggests such sources can impact vaccination decisions — therefore it is likely that anti-vaccine websites and content can influence whether people vaccinate themselves or their children."[44]

24.        People form opinions through repeated contacts and engagement with trusted sources. Simply encountering a piece of anti-vaccine propaganda doesn't change a person's beliefs. Instead,

---

[41] Renée DiResta and Claire Wardle, "Online Misinformation About Vaccines," background paper within The Sabin-Aspen Vaccine Science & Policy Group, "Meeting The Challenge of Vaccination Hesitancy" (Apr. 2022), 137-170, https://www.sabin.org/app/uploads/2022/04/Sabin-Aspen-report-2020_Meeting-the-Challenge-of-Vaccine-Hesitancy.pdf.

[42] Anna Kata, "A Postmodern Pandora's Box: Anti-vaccination Misinformation on the Internet," *Vaccine* 28, no. 7 (Feb. 17, 2010): 1709-16, https://doi.org/10.1016/j.vaccine.2009.12.022.

[43] Ed Pertwee, Clarissa Simas, and Heidi J. Larson, "An Epidemic of Uncertainty: Rumors, Conspiracy Theories and Vaccine Hesitancy," *Nature Medicine* 28, no. 3 (Mar. 2022): 456–59, https://doi.org/10.1038/s41591-022-01728-z.

[44] Anna Kata, "Anti-vaccine Activists, Web 2.0, and the Postmodern Paradigm – an Overview of Tactics and Tropes Used Online by the Anti-vaccination Movement," *Vaccine* 30, no. 25 (May 28, 2012): 3778–89, https://doi.org/10.1016/j.vaccine.2011.11.112.

people are persuaded over time through interactions with peers – on social media, as well as in private group chats – who reinforce the legitimacy of a viewpoint. This social reinforcement lends credibility to the notion that vaccines may be harmful.[45] Online anti-vaccine and vaccine hesitant communities additionally often share highly personal "lived experience" stories, which may be far more persuasive than a message from an authority figure, or a collection of official statistics.[46]

25.	The anti-vaccine movement is effective in promoting its online content. Although many mainstream social media platforms now attempt to minimize it by instead surfacing reputable sources in response to vaccine queries, for many years individuals seeking information about vaccines online were likely to encounter misleading information about vaccine safety before finding reliable sources.[47] Anti-vaccine activists and influencers prioritize cross-promoting their peers to ensure that individuals who follow one influencer or join one group are made aware of others. They leverage blogs and micro-media properties, produce documentaries, websites, and write books, and promote these outputs on social media as well through email lists and encouragements to their followers to forward and share.[48]

## THE QANON MOVEMENT

26.	In the course of my research into online narratives and vaccine-related conspiracy theories, I have also studied the QAnon conspiracy theory. QAnon is "a cult, a popular movement, a puzzle, a community, a way to fight back against evil, a new religion, a wedge between countless loved

---

[45] Damon Centola, "The Complex Contagion of Doubt in the Anti-Vaccine Movement," background paper within The Sabin-Aspen Vaccine Science & Policy Group, "Meeting The Challenge of Vaccination Hesitancy" (Apr. 2022), 126-136, https://www.sabin.org/app/uploads/2022/04/Sabin-Aspen-report-2020_Meeting-the-Challenge-of-Vaccine-Hesitancy.pdf.

[46] Emily K. Brunson, "The Impact of Social Networks on Parents' Vaccination Decisions," *PEDIATRICS* 131, no. 5 (May 2013): e1397–1404, https://doi.org/10.1542/peds.2012-2452.

[47] Damon Centola, "Influential Networks," *Nature Human Behaviour* 3, no. 7 (May 20, 2019): 664–65, https://doi.org/10.1038/s41562-019-0607-5; Sabin-Aspen Vaccine Science & Policy Group Report, "Meeting The Challenge of Vaccination Hesitancy" (Apr. 2022), 22, https://www.sabin.org/app/uploads/2022/04/Sabin-Aspen-report-2020_Meeting-the-Challenge-of-Vaccine-Hesitancy.pdf.

[48] Rebekah Getman, Mohammad Helmi, Hal Roberts, Alfa Yansane, David Cutler, and Brittany Seymour, "Vaccine Hesitancy and Online Information: The Influence of Digital Networks," *Health Education & Behavior* 45, no. 4 (Dec. 21, 2017): 599–606, https://doi.org/10.1177/1090198117739673.

ones, a domestic terrorism threat, and more than anything, a conspiracy theory of everything."[49] The seed content for QAnon, cryptic posts known as "Q drops" purportedly written by a government insider with Q-level clearance, began to appear on the internet message board 4chan beginning in 2017. The narrative contours are variable and constantly evolving, but the central idea of the conspiracy theory alleges that "a group of Satan-worshiping elites who run a child sex ring are trying to control our politics and media" – and that, while he was in office, former President Donald Trump was fighting back.[50]

27.      QAnon is a highly participatory way of making sense of the world. The central figure in the name, an anonymous individual or group that signed messages as Q, was purportedly a high-ranking government insider who released cryptic messages for followers to decode. This decoding process was highly collaborative; online groups formed to solve the riddles and derive truths from the texts. They became highly involved in working to connect the dots and 'awaken' their friends, families, and colleagues to the revealed truth of the world.[51] This collective knowledge-making activity, described by some analysts as being similar to participating in an alternate-reality game, is one reason why QAnon has remained so cohesive over time.[52]

28.      Similarly to the anti-vaccine movement, the QAnon movement on social media initially grew in large part through algorithmic recommendations. My own initial exposure to the QAnon community on Facebook was in early 2018, when Facebook began to recommend Groups focused on the then-nascent theory to a research account that I maintained specifically to study anti-vaccine Facebook Groups and Pages. The research account had never proactively indicated interest in QAnon, nor searched for terms related to it; the content was simply promoted to it.

29.      For some time after it emerged, QAnon groups and content on Facebook were recommended to followers of other conspiracy theories, including chemtrails, flat Earth, Pizzagate,

---

[49] Mike Rothschild, "The Storm is Upon Us: How QAnon Became a Movement, Cult, and Conspiracy Theory of Everything," (Melville House, 2021), p xiii.

[50] Kevin Roose, "What Is QAnon, the Viral Pro-Trump Conspiracy Theory?" *The New York Times*, Sept. 3, 2021, https://www.nytimes.com/article/what-is-qanon.html.

[51] Alice E. Marwick and William Clyde Partin, "Constructing Alternative Facts: Populist Expertise and the QAnon Conspiracy," *New Media & Society*, May 1, 2022, 2535-2555, https://doi.org/10.1177/14614448221090201.

[52] Clive Thompson, "QAnon Is Like a Game—a Most Dangerous Game," *WIRED*, Sept. 22, 2020, https://www.wired.com/story/qanon-most-dangerous-multiplatform-game/.

9/11 "truth", and others.[53] Many of these conspiracy theories are oriented around a high degree of distrust in government or a belief that the government is actively lying to the public. The result of this algorithmic promotion was an omniconspiracy theory that incorporated villains, tropes, and worldviews from the others, leading to a highly activist community dynamic akin to a "big tent welcoming to all those who question authority, distrust the media, and do their own research."[54] QAnon has attracted adherents from many other conspiratorial communities, absorbing their concerns and theories into its lore. It is often described as cult-like, because many of its members come to actively reject "outside" information as untrustworthy, and may cease to engage with family members and friends who are not believers.[55]

30.    On October 6, 2020, out of increased concern about violence tied to militarized social movements, Facebook banned QAnon content on the platform under its Dangerous Individuals and Organizations policy.[56] It was not the first to do so; Reddit, an early central gathering place where adherents discussed Q-drops, had banned QAnon in September of 2018.[57] Twitter acted against the conspiracy community presence on its platform in January 2021, banning 70,000 QAnon accounts and limiting the recommendation of 150,000 more following the January 6 attack on the United States Capitol.[58] However, many of these accounts would be restored beginning in December 2022 after the platform changed hands following its purchase by Elon Musk.[59]

---

[53] Brandy Zadrozny, "'Carol's Journey': What Facebook knew about how it radicalized users," *NBC News*, Oct. 22, 2021, https://www.nbcnews.com/tech/tech-news/facebook-knew-radicalized-users-rcna3581.

[54] Mike Rothschild, "The Storm is Upon Us: How QAnon Became a Movement, Cult, and Conspiracy Theory of Everything," (Melville House, 2021), p xvi.

[55] Renée DiResta, "From QAnon to Pizzagate, When Online Conspiracies Form Cults," *WIRED*, Nov. 13, 2018, https://www.wired.com/story/online-conspiracy-groups-qanon-cults/.

[56] Meta, "An Update to How We Address Movements and Organizations Tied to Violence," Aug. 19, 2020, updated on Oct. 17, 2022, https://about.fb.com/news/2020/08/addressing-movements-and-organizations-tied-to-violence/.

[57] Brandy Zadrozny and Ben Collins, "Reddit Bans Qanon subreddits after months of violent threats," *NBC News,* Sept. 12, 2018, https://www.nbcnews.com/tech/tech-news/reddit-bans-qanon-subreddits-after-months-violent-threats-n909061.

[58] Ben Collins and Brandy Zadrozny, "Twitter Bans 7000 QAnon accounts, limits 150,000 others as part of broad crackdown," *NBC News,* July 21, 2020, https://www.nbcnews.com/tech/tech-news/twitter-bans-7-000-qanon-accounts-limits-150-000-others-n1234541.

[59] Stuart A. Thompson, "Musk Lifted Bans for Thousands on Twitter. Here's What They're Tweeting.", *The New York Times,* Dec. 22, 2022, https://www.nytimes.com/2022/12/22/technology/musk-twitter-bans.html.

31.     Although QAnon communities were de-platformed from major social media companies, they established themselves and thrived on message boards and chat services, as well as on low-moderation platforms such as Telegram, Truth Social, Parler, and Gab. Telegram in particular became a central hub.[60]

32.     Telegram is a social media platform that offers broadcast channels, comment capability on broadcast posts, and also encrypted chat. Telegram emerged as a prime broadcast tool for QAnon influencers who'd had large followings on other social media platforms. A July 2021 analysis noted the presence of "more than 3,500 Telegram groups and channels that refer directly to QAnon and a further 10,000+ groups and channels linked to these."[61] Some of these channels have hundreds of thousands of followers; while influencers themselves may primarily broadcast, participation takes place in the comments and in amplification and shares by rank-and-file followers.

### ANTI-VACCINE MOVEMENT AND THE COVID-19 VACCINES

33.     The anti-vaccine movement was quick to react to news of the burgeoning outbreak of COVID-19 in China. As early as January 2020, anti-vaccine activists perceived the growing crisis as an opportunity to undermine confidence in vaccination writ large.[62] A vaccine would emerge, they assumed, and they could take advantage of its "rushed" nature to frame vaccines as dangerous.[63]

34.     Pre-vaccine pandemic mitigation efforts included lockdowns, masks, and school and business closures. This led to significant anger from some communities, inspiring early anti-mask and anti-lockdown protests. While anger was also prevalent outside conspiratorial communities, QAnon adherents were often highly visible participants in these early efforts; many did not believe that the pandemic or the disease was real, some acknowledged that it was real but insisted that it was planned by government authorities or other powerful institutions (a "plandemic"), and some processed the lockdown measures as the arrival of coordinated global tyranny. Early conspiracy theories about

---

[60] Jordan Wildon and Marc-André Argentino, "QAnon is not Dead: New Research into Telegram Shows the Movement is Alive and Well," *Global Network on Extremism & Technology* (blog), July 28, 2021, https://gnet-research.org/2021/07/28/qanon-is-not-dead-new-research-into-telegram-shows-the-movement-is-alive-and-well/.

[61] *Ibid.*

[62] Renée DiResta, "Anti-vaxxers Think This Is Their Moment," *The Atlantic*, Dec. 20, 2020, https://www.theatlantic.com/ideas/archive/2020/12/campaign-against-vaccines-already-under-way/617443/.

[63] Tara Haelle, "This Is the Moment the Anti-Vaccine Movement Has Been Waiting For," *The New York Times,* Aug. 31, 2021, https://www.nytimes.com/2021/08/31/opinion/anti-vaccine-movement.html.

COVID-19 within QAnon communities "connected the dots" to other QAnon lore; masks on children, for example, might be something that the purported pedophilic-elite network was using to conceal trafficking.[64]

35.    As vaccinations rolled out in the U.S. in late 2020, longstanding anti-vaccine activists became increasingly focused on undermining their uptake. Once again, the narratives largely fit within the same well-established themes, with slight inflections for the specifics of the pandemic.[65] For example, safety concerns about the COVID-19 vaccine took the form of misuse and misreading of statistics. Efficacy debates roiled with each emerging variant and booster. Liberty narratives focused not only on vaccine passports and mandates, but on masking and lockdown measures. "'They' are lying to you", or "'They' are out to harm you" became all-encompassing conspiracy theories applied to nearly every facet of the vaccine rollout.[66] And, because the pandemic was a novel pathogen, and experts did get things wrong, there was a systematic effort to undermine even the idea of expertise.[67]

36.    QAnon groups were also concerned about the vaccine, particularly following the departure of President Trump from office in January 2021. Narratives included that the vaccines were bioweapons, pushed by a cabal of corrupt government officials and pharmaceutical companies; the vaccines were "gene therapy" and would alter DNA; people who received them would die or be seriously injured; the vaccine was the "Mark of the Beast" in the Book of Revelation.[68] And all of this, narratives repeatedly emphasized, was not accidental – the purported goal was depopulation, and social control.[69]

---

[64] Marianna Spring and Mike Wendling, "How Covid-19 Myths Are Merging With the QAnon Conspiracy Theory," *BBC,* Sept. 2, 2020, https://www.bbc.com/news/blogs-trending-53997203.

[65] Tara C. Smith and Dorit Rubinstein Reiss, "Digging the Rabbit Hole, COVID-19 Edition: Anti-vaccine Themes and the Discourse Around COVID-19," *Microbes and Infection* 22, no. 10 (Nov. 2020): 608–10, https://doi.org/10.1016/j.micinf.2020.11.001.

[66] The Virality Project, "Memes, Magnets, and Microchips: Narrative dynamics around COVID_19 vaccines," Feb. 2022, Section 3, https://doi.org/10.25740/mx395xj8490.

[67] Renée DiResta, "Invisible Rulers: The People Who Turn Lies Into Reality," (Public Affairs, 2024), Chapter 7.

[68] The Virality Project, "Memes, Magnets, and Microchips: Narrative dynamics around COVID_19 vaccines," Feb. 2022, 58-59, https://doi.org/10.25740/mx395xj8490.

[69] Craig Timberg and Elizabeth Dwoskin, "With Trump gone, QAnon groups focus fury on attacking coronavirus vaccines," *Washington Post,* Mar. 11, 2021, https://www.washingtonpost.com/technology/2021/03/11/with-trump-gone-qanon-groups-focus-fury-attacking-covid-vaccines/.

37.    The World Health Organization used the term "infodemic" to refer to the chaotic information environment during COVID-19.[70] It was very difficult to know what was true about the novel disease and the new vaccines, and people turned to social media to try to make sense of the world. Unverified stories of side effects were perhaps the most prominent theme; they went viral frequently as the combination of uncertainty and impact made the topic highly engaging.[71] In many cases, stories about distribution protocols, policies, and side effects related to the vaccine were spun into conspiracy theories attributing specific malintent to shadowy figures in government or within pharmaceutical companies; these proliferated on social media during the pandemic and generated significant engagement.[72]

38.    Much of the unreliable information and rumors about COVID-19 vaccines on social media were significantly boosted via amplification from influencers. Some of these were the long-time anti-vaccine activists such as Robert F. Kennedy Jr. and his Children's Health Defense organization.[73] Others were primarily known from their content in the wellness, politics, and parenting spheres, though they became significant spreaders of vaccine claims as the vaccine rollout occurred.[74] While some influencers were ideologically motivated, many profited by selling anti-vaccine books and products, monetizing websites with ads, and creating affiliate links to anti-vaccine groups; some even founded a medical freedom-focused super PAC.[75] On social media, fear, uncertainty, sensationalism,

---

[70] World Health Organization, "Let's Flatten The Infodemic Curve," https://www.who.int/news-room/spotlight/let-s-flatten-the-infodemic-curve.

[71] Cindy Sing Bik Ngai, Rita Gill Singh, and Le Yao, "Impact of COVID-19 Vaccine Misinformation on Social Media Virality: Content Analysis of Message Themes and Writing Strategies," *Journal of Medical Internet Research* 24, no. 7 (July 6, 2022): e37806, https://doi.org/10.2196/37806.

[72] The Virality Project, "Memes, Magnets, and Microchips: Narrative dynamics around COVID_19 vaccines," Feb. 2022, 31-40, https://doi.org/10.25740/mx395xj8490.

[73] Michelle R. Smith, "How a Kennedy Built an Anti-vaccine Juggernaut Amid COVID-19," *AP News*, Dec. 15, 2021, https://apnews.com/article/how-rfk-jr-built-anti-vaccine-juggernaut-amid-covid-4997be1bcf591fe8b7f1f90d16c9321e.

[74] Ashley Fetters Maloy and Gerrit De Vynck, "How wellness influencers are fueling the anti-vaccine movement," *Washington Post,* Sept. 12, 2021, https://www.washingtonpost.com/technology/2021/09/12/wellness-influencers-vaccine-misinformation/.

[75] Richard M. Carpiano, Timothy Callaghan, Renée DiResta, Noel T. Brewer, Chelsea Clinton, Alison P. Galvani, et al., "Confronting the Evolution and Expansion of Anti-vaccine Activism in the USA in the COVID-19 Era," *The Lancet* 401, no. 10380 (Mar. 1, 2023): 967–70, https://doi.org/10.1016/s0140-6736(23)00136-8.

and outrage are often used to attract attention and monetize followings, and the topic of COVID-19 and vaccines afforded significant opportunity to capture attention.[76]

39.     Vaccine-skeptical and anti-vaccine physicians have long been part of the anti-vaccine thought influencer sphere, as described by epidemiologist Tara Smith in 2017.[77] These figures became quite prominent in the COVID-19 vaccine discourse, because their medical credentials make them appear to be reliable figures.[78] Some have medical credentials in disciplines unrelated to the areas that they expressed strong opinions about, though the reader may be unaware or not look more deeply after seeing the word "Dr." in the byline or comment. As with other influencers, many grew large followings; Dr. Robert Malone and Dr. Peter McCullough became frequent guests on vaccine-skeptical, anti-vaccine, and highly conspiratorial podcasts.[79] Some of these doctor-influencers also similarly monetized those followings on social media and e-mail newsletter platforms such as Substack.[80] The content of these perceived experts was widely shared and received significant engagement on platforms such as Twitter/X.[81]

40.     The Terms of Service on social media platforms govern what is acceptable to post, and therefore what is available for sharing. Since 2019, social media platforms have implemented policies to combat misinformation about vaccines on the grounds that false claims about vaccines can cause harm.[82] During COVID-19, platforms including Facebook, Twitter, and YouTube rapidly

---

[76] Rachel E. Moran, Anna L. Swan, and Taylor Agajanian, "Vaccine Misinformation for Profit: Conspiratorial Wellness Influencers and the Monetization of Alternative Health.," *International Journal of Communication* 18 (2024), https://ijoc.org/index.php/ijoc/article/view/21128/4494.

[77] Tara C. Smith, "Vaccine Rejection and Hesitancy: A Review and Call to Action," *Open Forum Infectious Diseases* 4, no. 3 (Jan. 2017), https://doi.org/10.1093/ofid/ofx146.

[78] Sahana Sule, Marisa C. DaCosta, Erin DeCou, Charlotte Gilson, Kate Wallace, and Sarah L. Goff, "Communication of COVID-19 Misinformation on Social Media by Physicians in the US," *JAMA Network Open* 6, no. 8 (Aug. 15, 2023): e2328928, https://doi.org/10.1001/jamanetworkopen.2023.28928.

[79] The Virality Project, "Memes, Magnets, and Microchips: Narrative dynamics around COVID_19 vaccines," Feb. 2022, 79-82, https://doi.org/10.25740/mx395xj8490.

[80] Kristina Fiore, "Anti-Vax Newsletters Pull in $2.5M on Substack," *MedPage Today*, Feb. 1, 2022, https://www.medpagetoday.com/special-reports/exclusives/96955.

[81] Mallory J. Harris, Ryan Murtfeldt, Shufan Wang, Erin A. Mordecai, and Jevin D. West, "The Role and Influence of Perceived Experts in an Anti-vaccine Misinformation Community," *medRxiv*, July 13, 2023, https://doi.org/10.1101/2023.07.12.23292568.

[82] Renée DiResta, "On Virality: How the anti-vaccine movement influences public discourse through online activism," *Governing Health Futures*, July 15, 2020, https://www.governinghealthfutures2030.org/wp-content/uploads/2021/10/072020_Renee-DiResta_On-virality-How-the-antivaccine-movement-influences-public-discourse-through-online-activism.pdf.

adapted existing health misinformation policies in an attempt to ensure that the information environment they were responsible for did not amplify false and misleading information.[83] Platforms like Facebook, Twitter, and YouTube introduced measures to reduce the spread of COVID-19 vaccine misinformation that included taking down misinformation content, labeling misleading posts, reducing misleading post prevalence in user feeds, and providing users with authoritative information from health organizations like the World Health Organization (WHO) and the Centers for Disease Control and Prevention (CDC).[84]

41.     Mainstream social media platforms aggressively moderated false and misleading COVID-19 vaccine-related content as well as rumors throughout 2020-2022. However, many smaller alt-platforms deliberately did not, out of a mix of free expression concerns, sympathy for the claims, and a generally hands-off moderation approach writ large. These included Telegram and Gab, YouTube competitor Rumble (a video channel platform), and the chan message boards. Influencers and others who wanted to create, post, and discuss vaccine-related claims or conspiracy theories banned on mainstream platforms largely established themselves there, particularly if they themselves were banned on mainstream social media platforms as well.[85]

**ROLOVICH'S COMMUNICATIONS ARE CONSISTENT WITH MANY COMMON ANTI-VACCINE CONSPIRACY THEORIES AND QANON**

42.     As noted, I was provided hundreds of documents—primarily text messages, group chats, and Telegram posts dated from July 2020 to August 2023—which I understand were produced by Plaintiff Nicholas Rolovich in this litigation and reference the term "vaccine", "vacc*", "vax*",

---

[83] The Virality Project, "Memes, Magnets, and Microchips: Narrative dynamics around COVID_19 vaccines," Feb. 2022, Section 5, https://doi.org/10.25740/mx395xj8490.

[84] David A. Broniatowski, Joseph R. Simons, Jiayan Gu, Amelia M. Jamison, and Lorien C. Abroms, "The Efficacy of Facebook's Vaccine Misinformation Policies and Architecture During the COVID-19 Pandemic," *Science Advances* 9, no. 37 (Sept. 15, 2023), https://doi.org/10.1126/sciadv.adh2132.

[85] Mark Scott, "Fringe Social Media Networks Sidestep Online Content Rules," *POLITICO*, Jan. 25, 2022, https://www.politico.eu/article/fringe-social-media-telegram-extremism-far-right/.

"abort*", "fetal", and/or cells.[86] Based on my knowledge, research, experience studying the narratives and online dynamics of the anti-vaccine movement, I reviewed and analyzed the content of those documents to determine whether they could be viewed as falling within the following vaccine rejection and hesitancy themes, as discussed above: safety, efficacy, religiosity, liberty, distrust of industry, and conspiracy. As I evaluated the documents, I coded them according to which vaccine hesitancy themes were present and made notes about commentary originating from Mr. Rolovich.

43.    In the large number of documents that I was given to analyze, there were many dozens of communications that fall under the previously-described well-established vaccine hesitancy themes.

44.    Based on my review of the documents, many if not most of Mr. Rolovich's communications appear to take issue with the vaccine based on deep-seated and sustained concerns about vaccine safety and efficacy. These concerns are regularly expressed, and frequently within a conspiratorial frame: for example, the vaccines are not just unsafe and going to lead to mass deaths of the vaccinated, they are *intentionally* unsafe and "they" (the government, Anthony Fauci, pharmaceutical companies) are covering it up.

45.    Mr. Rolovich's messages include multiple shares of video and blog content related to adverse reactions, including statistics related to vaccine injuries and concerns about blot clots or the rigor of vaccine trials. *See* **Attachment B** at ROLOVICH00005879, ROLOVICH00026901, ROLOVICH00027002-03, ROLOVICH00076421-22, ROLOVICH00027163, ROLOVICH00077005, ROLOVICH00011619, ROLOVICH00029874-77, ROLOVICH00000302. He shares media indicating a belief that taking the vaccine is not worth the risk, *id.* at ROLOVICH00005880 and ROLOVICH00031209-12, and that it will permanently alter DNA, *id.* at ROLOVICH00013341-42. He additionally frequently shares material by, or featuring, credentialed doctors who are COVID-19 vaccine skeptics. *See id.* at ROLOVICH00035487-89, ROLOVICH00029961-63, ROLOVICH00011621, ROLOVICH00011592, ROLOVICH00011624,

---

[86] Some of the documents that I received from counsel, which I understand were produced by Mr. Rolovich, appear to be missing messages, images, or other content. I also understand that the completeness of Mr. Rolovich's text message production is an issue that is currently being discussed by WSU's counsel and Mr. Rolovich's counsel. In the event that any additional documents are produced by Mr. Rolovich in connection with that discussion, I reserve the right to incorporate those materials into my analysis and amend this report.

ROLOVICH00032978-80, ROLOVICH00057294-96. He sends himself, and additionally forwards to friends, articles from blogs such as Children's Health Defense, or newsletters from vaccine skeptics.

46.    In other communications, Mr. Rolovich and his associates make arguments about liberty or expresses concerns about mandates, including segregation of or discrimination against the unvaccinated, and discuss exemption concerns with others pursing them. *See* **Attachment C** at ROLOVICH00024507, ROLOVICH00025013-14, ROLOVICH00013444-45, ROLOVICH00025776-77, ROLOVICH00075215, ROLOVICH00016334, ROLOVICH00004963, ROLOVICH00027278, ROLOVICH00033991-92, ROLOVICH00035888, ROLOVICH00013377-78, ROLOVICH00005833, ROLOVICH00000806. In an early exchange 28 April 2021, Mr. Rolovich seeks advice for what to do if the vaccine becomes mandatory at WSU. *Id.* at ROLOVICH00031053-54.

47.    Additionally, many of the text message chains, group chats, and Telegram channels in the document set frequently incorporate both longstanding and QAnon-specific conspiracy theories as well as theories about vaccines. Mr. Rolovich and his associates in a persistent group chat repeatedly share material from Telegram channels and chan board posts produced by QAnon influencers or expressing QAnon themes. *See* **Attachment D** at ROLOVICH00059276-07, ROLOVICH00031063-133, ROLOVICH00059631-59, ROLOVICH00081201-46, ROLOVICH00031313-52, ROLOVICH00036247-73, ROLOVICH00036292-314, ROLOVICH00031396-471, ROLOVICH00036332-79, ROLOVICH00031594-646, ROLOVICH00036482-526, ROLOVICH00036568-92, ROLOVICH00031697-761, ROLOVICH00031827-76, ROLOVICH00012716-31, ROLOVICH00031924-71, ROLOVICH00012798-830, ROLOVICH00012860-88, ROLOVICH00032190-230, ROLOVICH00026016-18. One persistent group chat includes a significant number of posts about both supposed election fraud in 2020, some of which cite QAnon influencer (indeed, theorized to *be* Q himself) Ron Watkins, as well as vaccine safety concerns.[87] *Id.* at ROLOVICH00036247-73, ROLOVICH00051440, ROLOVICH00059276-97, ROLOVICH00031063-133, ROLOVICH00059631-59, ROLOVICH00059686-702,

---

[87] David D. Kirkpatrick, "Who Is Behind QAnon? Linguistic Detectives Find Fingerprints," *The New York Times,* Feb. 29, 2022, https://www.nytimes.com/2022/02/19/technology/qanon-messages-authors.html.

ROLOVICH00031396-471, ROLOVICH00036332-79, ROLOVICH00031827-76, ROLOVICH00031924-71, ROLOVICH00032190-230, ROLOVICH00012956-75. Based on my knowledge and experience researching online narratives and vaccine-related conspiracy theories, including the QAnon conspiracy theory, references to QAnon rhetoric (such as "WWG1WGA" and "The Great Awakening") within the chats, and the list of Telegram channels Mr. Rolovich followed (several of which have QAnon in the name), indicates deep familiarity with QAnon. While the specifics of Mr. Rolovich's opinions about electoral legitimacy, pedophilic cabals, one-world government, and other topics that appear within the messages are out of scope for this analysis, these recurring themes suggest sustained engagement with QAnon groups, influencers, and channels, including Qtah, We the Media, Kanekoa the Great, Praying Medic, Q Qanon, Gen Flynn, Code Monkey, Sidney Powell, Lin Wood. *See also id.* at ROLOVICH00031313-52.

48.    Given this alignment, it is unsurprising to see that many of Mr. Rolovich's conversations about vaccine safety, efficacy, or the intent of the manufacturers are expressed within the framework of longstanding conspiratorial vaccine tropes or QAnon concerns. In December 2020, long prior to the release of any vaccine, Mr. Rolovich forwarded emails speculating about whether George Soros and Bill Gates had patents on COVID-19 cures to receptive family and friends. *See* **Attachment E** at ROLOVICH00011866-67, ROLOVICH00034020. Allegations of deliberate malice can be found throughout the vaccine-related messages between Rolovich and contacts, illustrating the way in which hesitancy concerns can mutate into conspiracy theories. *See id.* at ROLOVICH00051440, ROLOVICH00005884-05, ROLOVICH00011617, ROLOVICH00036247-73, ROLOVICH00012860-88, ROLOVICH00012920-37, ROLOVICH00026372-73, ROLOVICH00016399-400. For example, there is talk of a "criminal conspiracy of coronavirus" (*id.* at ROLOVICH00010639), and a need to hang those responsible (*id.* at ROLOVICH00012924-25); COVID itself is "fake" or a "plandemic" (*id.* at ROLOVICH00013135-36), but is also part of a nefarious plot to ensure "depopulation by any means" (*id.* at ROLOVICH00012925), and a "trojan horse for a global takeover" (*id.* at ROLOVICH00012703). The articles shared and liked in these group chats attribute circumstances to shadowy nefarious actors repeatedly: "They" are deliberately hiding cures like ivermectin (*id.* at ROLOVICH00012921), or "destroying women, poisoning breast

milk, murdering babies, and hiding the truth" (*id.* at ROLOVICH00013236). Content indicating a concern that pharmaceutical companies are profit-driven also goes one step further, implying that the companies are part of a deliberate, malevolent effort to harm and that "they killed people for vaccine profits" (*see id.* at ROLOVICH00005878), or that former Pfizer employees have confirmed there is "poison in [the] vaccine" (*see id.* at ROLOVICH00012860-62) and the company is hiding the numbers of those who died during vaccine trials (*id.* at ROLOVICH00013526).

49.     Liberty concerns, too, extend beyond philosophical opposition to mandates and veer into the conspiratorial. For example, on July 20, 2021, Rolovich shares a post noting that "In the US, the Supreme Court has ruled that vaccinated people worldwide are products, patented goods, according to U.S. law, no longer human….The quality of a natural person and all related rights are lost." *Id.* at ROLOVICH00031267.

50.     In the documents that I reviewed, Mr. Rolovich does not appear to clearly articulate any specifically religious arguments in his objections to vaccination. Based on the documents that I reviewed, this remains true even as Mr. Rolovich begins to communicate to his associates his concerns that he will be fired for refusing vaccination and after he applied for a religious exemption. *See* **Attachment F** at ROLOVICH00031594-646.

51.     Several text messages from group chats involving Mr. Rolovich and former WSU football colleagues David Fox and Brian Stutzmann, as well as text messages with Safiya Richardson, involved references to religion, God, prayer, and faith, suggesting that communicating about faith or faith-based concerns would not have been anomalous or uncomfortable in those environments. *See id.* at ROLOVICH00034916, ROLOVICH00035844-46, ROLOVICH00034967-68, ROLOVICH00034994, ROLOVICH0002559-93. Nonetheless, in the conversations in which religious discourse appears, Mr. Rolovich does not mention religious exemptions or express religiously-rooted vaccine hesitancy beliefs. Rather, he reverts to expressing secular concerns about *vaccine safety.* I*d.* at ROLOVICH00031594-646, ROLOVICH00031697-761, ROLOVICH00031063-133, ROLOVICH00033117-23. For example, in a message from July 29, 2021, Mr. Fox is disparaging an article entitled, "Stop using religion to fight COVID-19 vaccine. Taking it is the Christian thing to do", saying, "you knew they'd eventually come for the religious exemptions", and posting a chan board

screenshot warning that "the Chinese doctor wants all of the White Christians to take the vax of death". *Id.* at ROLOVICH0031698-700. Rolovich does not comment on the religious exemption; rather, he later shares some memes and an interview from Steve Bannon's War Room interview featuring Dr. Robert Malone in which they are alleging that the virus has caused the vaccine to be more dangerous. *Id.* at ROLOVICH00031730. On July 15, 2021, Mr. Fox shares content with Mr. Rolovich and Mr. Stutzman related to vaccine ingredients, including one slide (among a half-dozen or so) which mentions human fetal cells. *Id.* at ROLOVICH00031066-68. Rolovich does not reference it. Instead, a bit further down the thread, he responds with a URL for "centerformedicalfreedom.com". *Id.* at ROLOVICH00031113. Based on my review of the documents, it does not appear that Mr. Rolovich ever directly identified concerns about fetal cells as the basis of his objection to the vaccine, which was the most common religious concern for Catholics and one of the objections that Mr. Rolovich referenced in his Second Amended Complaint.

52.     There are additionally several text messages between Mr. Rolovich and Father Paul, a Catholic priest at the St. Thomas More Student Center in Pullman, Washington, who served as chaplain to the WSU football team, as well as Bishop Tom Daly. These messages do not contain any articulation by Mr. Rolovich of religious beliefs specific to vaccination. On July 25, 2021, Mr. Rolovich briefly asks Bishop Daly if he supports the vaccine; the Bishop affirms that he does "with reservations". *See id.* at ROLOVICH00033208.  In another message, from earlier that day, Mr. Rolovich texts Safiya Richardson to note that he "spoke with a priest" who "encouraged [him] to get it". *See id.* at ROLOVICH000033117. (Here, again, Ms. Richardson expresses sentiments about religion and vaccines, and Mr. Rolovich turns the conversation to secular content about vaccine safety.)  Father Paul connects with Mr. Rolovich several times to inquire about his decision and to offer him support. By August, Mr. Rolovich appears to pursue a religious exemption, sending himself an email containing vaccine religious exemption documents from Gab News (a reference to the alt-right social media platform). *See id.* at ROLOVICH00000544. However, based on the documents that I reviewed, discussions of specific spiritual concerns about aborted fetal cells or vaccination appear to be absent from chats with friends or religious leaders in the messages. On August 20, 2021 he receives a religious exemption letter from Bishop Daly.  *See id.* at ROLOVICH00001398-99.

1-SER-279

53.     Based on the above, it is my opinion that Mr. Rolovich indeed harbored significant reservations about being vaccinated for COVID-19, but the concerns he expressed in the private messages that I observed between him and his close associates throughout this period fall into the realm of safety concerns and conspiracy theories, rather than religious objections to vaccination.

# ATTACHMENT A

# Curriculum Vitae

## Renée DiResta
### renee.diresta@protonmail.com

## Personal Statement

I'm a researcher who studies computational propaganda, influence operations, and adversarial dynamics online. My work has spanned the full spectrum of the problem, from identifying specific operational tactics and networks across multiple adversary types, to understanding what these operations reveal at a systems level, to working with policymakers to develop meaningful mitigation responses. I've worked alongside engineering and machine learning teams to develop technical capabilities for anomaly detection and developed scenario exercises to proactively identify threats and potential vulnerabilities.

I have been doing empirical research into influence operations since 2015. That year, I participated in whole-of-government efforts to counter computational propaganda put out by ISIS. From 2018-2020 I was a technical adviser (TAG) to the Senate Select Committee on Intelligence with joint appointment from Sens. Warner and Burr. In August 2018 I testified as an expert witness in a public SSCI hearing, and in December 2018 released a 260 page report commissioned by SSCI on the Russian Internet Research Agency's interference in US society from 2014-2017 that was widely cited in the Committee's subsequent official report. In 2019, still as a TAG, I led a team at Stanford investigating the actions of Russian military intelligence (the GU) during that same time period. I've worked with and briefed Senate and House members and committees, as well as the White House, the US Digital Service, the State Department, the Department of Homeland Security, the Office of the Surgeon General, senior U.S. military and national security leaders, and other industry and government leaders in Europe and Canada. I've testified before Congress numerous times.

In January 2017, I was named a Presidential Leadership Scholar, and had the opportunity to advance my work with the support of the Presidents Bush, President Clinton, and the LBJ Foundations. In August 2020, I was named an Emerson Fellow, and began a book project focused on the evolution of propaganda and its impacts. I have developed strong bipartisan stakeholder networks within the tech industry, in government, and among funders, civil society, press, activists, and academics. I am a contributor to *The Atlantic* and have written extensively on 'tech & society' and technology policy issues in many other publications. I speak regularly, and in 2020, I keynoted prominent cybersecurity conference Black Hat.

My book on modern propaganda and influence, *Invisible Rulers*, was released by Hatchette/ Public Affairs in June 2024.

## Education, Training, and Fellowships

| | |
|---|---|
| BS, Computer Science, Political Science, Honors College, SUNY Stony Brook | 1999-2004 |
| Presidential Leadership Scholar | 2017 |
| Mozilla Fellow | 2018-2020 |
| Truman National Security Project Security Fellow | 2019 |
| Emerson Fellow | 2020 |

## Professional Experience

**Stanford Internet Observatory, Technical Research Manager**                    June 2019–June 2024

During my time there, Stanford Internet Observatory was an interdisciplinary center for researching the abuse of online communication technologies. We studied harm ranging from Trust & Safety challenges for children on large social media platforms, to state actor influence operations, to emerging tactical challenges facilitated by the adoption of new technologies (for example, generative AI). My responsibilities involved studying online harms using both quantitative and qualitative methods, and devising or evaluating technical or policy solutions to mitigate the issues. Additional responsibilities included guiding research assistants and students on projects, communicating research findings to media and the public, and leading inter-institutional collaborative efforts. These included research projects with other Stanford Cyber Policy Center organizations as well as outside collaborations with universities and civil society organizations, such as the Election Integrity Project and the Virality Project.

**Mozilla, Fellow, Media, Misinformation & Trust**                    February 2018–February 2020

The Mozilla Foundation's mission during the period of my fellowship was 'helping machines make better decisions'; My two-year project was committed to helping the public better understand the algorithms and affordances that shape digital environments as well as society writ large. I produced outputs including writing, speaking, collaborative presentations, and games toward that end.  I worked alongside  other Fellows to develop constructive policies related to tech and society. Much of my work focused on health misinformation and algorithmic manipulation.

**Yonder, Director of Research**                    March 2018–April 2019

Yonder is a cybersecurity company focused on detecting and mitigating malign narratives that increasingly impact corporations and political entities. I led a research team that investigated strategies and tactics used by state actors to spread disinformation. My team produced one of the two Senate Select Committee on Intelligence reports on Russian interference in the United States' social and political ecosystem from 2014-2017. We analyzed the data sets provided to the committee by Facebook, Twitter, and Alphabet using both quantitative and qualitative methods. Additionally, my team conducted research on tactics and strategies used by Iran, Saudi Arabia, and non-state actors in other incidents. Additional responsibilities included cross-functional team participation on product development, business development, strategy, and product marketing.

**Haven, Co-Founder/Director of Marketing**                    November 2014–January 2018

I co-founded Haven, a SaaS company which built technology to streamline global logistics for large commodity traders, enabling end-to-end shipment management to connect shippers with global carriers. 90% of all physical goods in the world are shipped in a container, and nearly all of those shipments have traditionally been arranged via email, phone, and spreadsheet; our tech eliminated time-consuming, error-prone workflows by prioritizing automation, visibility, and collaboration. At various times I grew business development, marketing, sales, and data teams. Acquired by FourKites.

**O'Reilly AlphaTech Ventures, Principal**                    June 2011–November 2014

As a seed-stage venture capitalist, I developed relationships with founders, evaluated investments, analyzed industries, and supported portfolio companies. My work for portfolio companies included developing financial, growth, and pricing models, giving product and strategy feedback, and developing strategic partnerships. The areas that I focused on included robotics; connected devices, IoT, and Industrial Internet; logistics and supply chain; and future of manufacturing. I regularly mentored at startup accelerators. I wrote an O'Reilly book, *The Hardware Startup: Building Your Product, Business, and Brand.*

**Jane Street, Equity Derivatives Trader**                    September  2004–June  2011

Jane Street is a quantitative proprietary trading firm headquartered in New York City. I started as a

clerk, writing algorithms to automate trader workflows. I transitioned into trading and worked on both the International ETF and ADR desks as an arbitrage trader and a market maker.

## Professional Activities

Harvard Berkman-Klein affiliate, co-founder Vaccinate California (parent-led immunization advocacy nonprofit), Advisory Board member of The Resolution Project (nonprofit focused on supporting youth-initiated social-good ventures), 2018 Council on Foreign Relations Term Member.

## Publications

### *Journal Articles*

1. R. DiResta and J. A. Goldstein, How Spammers and Scammers Leverage AI-Generated Images on Facebook for Audience Growth, arXiv preprint arXiv:2403.12838 (2024). (*Forthcoming in Harvard Misinformation Review)*

2. S. Feuerriegel, R. DiResta, J. A. Goldstein, S. Kumar, P. Lorenz-Spreen, M. Tomz, and N. Pröllochs, Research can help to tackle AI-generated disinformation, *Nature and Human Behavior* 7, 1818-1821 (2023), https://doi.org/10.1038/s41562-023-01726-2.

3. R. E. Robertson, A. Dunphy, S. Grossman, R. DiResta, and D. Thiel, Identifying Search Directives on Social Media, *Journal of Online Trust and Safety*, *2*(1) (2023), https://doi.org/10.54501/jots.v2i1.133.

4. H. S. Lalani, R. DiResta, R. J. Baron, D. Scales, Addressing Viral Medical Rumors and False or Misleading Information, *Annals of Internal Medicine* 176 (8), 1113-1120 (July 18, 2023), https://doi.org/10.7326/M23-121.

5. Isabelle Augenstein, Timothy Baldwin, Meeyoung Cha, Tanmoy Chakraborty, Giovanni Luca Ciampaglia, David Corney, Renée DiResta, Emilio Ferrara, Scott Hale, Alon Halevy, Eduard Hovy, Heng Ji, Filippo Menczer, Ruben Miguez, Preslav Nakov, Dietram Scheufele, Shivam Sharma, Giovanni Zagni, Factuality challenges in the era of large language models, arXiv preprint arXiv:2310.05189 (2023). (Forthcoming in *Nature Machine Learning*)

6. S. Lewandowsky, R. E. Robertson, R. DiResta, Challenges in Understanding Human-Algorithm Entanglement During Online Information Consumption, *Perspectives on Psychological Science*, *0*(0) (July 10, 2023), https://doi.org/10.1177/17456916231180.

7. K. Starbird, R. DiResta, and M DeButts, Influence and Improvisation: Participatory Disinformation during the 2020 US Election, *Social Media+ Society*, 9(2) (June 7, 2023), https://doi.org/10.1177/20563051231177943.

8. R. M. Carpiano, T. Callaghan, R. DiResta, et al., Confronting the evolution and expansion of anti-vaccine activism in the USA in the COVID-19 era, *The Lancet* 401 (10380), 967-970 (Mar. 2, 2023), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(23)00136-8/fulltext.

9. D. J. Opel, N. T. Brewer, A. M. Buttenheim, T. Callaghan, R. M. Carpiano, C. Clinton, DPhil,J. A. Elharake, L. C. Flowers, A. P. Galvani, P. J. Hotez, J. L. Schwartz, R. M. Benjamin, A. Caplan, R. DiResta, R. Lakshmanan, Y. A. Maldonado, M. M. Mello, W. E. Parmet, D. A. Salmon, J. M. Sharfstein, and S. B. Omer, The Legacy of the COVID-19 Pandemic for Childhood Vaccination in the USA, *The Lancet* 401 (10370), 75-78 (2023), https://doi.org/10.1016/S0140-6736(22)01693-2.

10. J. A. Goldstein and R. DiResta, Research note: This salesperson does not exist: How tactics from

political influence operations on social media are deployed for commercial lead generation, Harvard Kennedy School Misinformation Review (Sept. 15, 2022), https://misinforeview.hks.harvard.edu/article/research-note-this-salesperson-does-not-exist-how-tactics-from-political-influence-operations-on-social-media-are-deployed-for-commercial-lead-generation/.

11.  B. Nyhan, E. Zuckerman, R. DiResta, and L. Edelson, The Black Box of Social Media: Social media companies need to give their data to independent researchers to better understand how to keep users safe, *Scientific American* 327 (6), 80 (2022), https://doi.org/10.1038/scientificamericanTruthvsLies0922-80.

12.  N. T. Brewer, A. M. Buttenheim, C. V. Clinton, M. M. Mello, R. M. Benjamin, T. Callaghan, A. Caplan, R. M. Carpiano, R. DiResta, J. A. Elharake, L. C. Flowers, A. P. Galvani, P. J. Hotez, R. Lakshmanan, Y. A. Maldonado, S. B. Omer, D. A. Salmon, J. L. Schwartz, J. M. Sharfstein, and D. J. Opel, Incentives for COVID-19 Vaccination, *The Lancet Regional Health–Americas* 8 (2022), https://doi.org/10.1016/j.lana.2022.100205.

13.  S. Bradshaw, R. DiResta, and C. Miller, Playing Both Sides: Russian State-Backed Media Coverage of the# BlackLivesMatter Movement, *The International Journal of Press/Politics*, 28(4), 791-817 (2023), https://doi.org/10.1177/19401612221082052.

14.  D. A. Salmon, J. A. Elharake, N. T. Brewer, R. M. Carpiano, R. DiResta, Y. A. Maldonado, S. K. Sgaier, and S. B. Omer, Verification in the COVID-19 World, *The Lancet Regional Health–Americas* 6 (2022), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8696017/.

15.  S. B. Omer, R. M. Benjamin, N. T. Brewer, A. M. Buttenheim, T. Callaghan, A. Caplan, R. M. Carpiano, C. Clinton, R. DiResta, J. A. Elharake, L. C. Flowers, A. P. Galvani, R. Lakshmanan, Y. A. Maldonado, S. M. McFadden, M. M. Mello, D. J. Opel, D. R. Reiss, D. A. Salmon, J. L. Schwartz, J. M. Sharfstein, and P. J. Hotez, Promoting COVID-19 vaccine acceptance: recommendations from the Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA, *The Lancet* 398 (10317), 2186-2192 (2021), https://doi.org/10.1016/S0140-6736(21)02507-1.

16.  R. DiResta, S. Grossman, and A. Siegel, In-House Vs. Outsourced Trolls: How Digital Mercenaries Shape State Influence Strategies, *Political Communication*, *39*(2), 222–253 (2021), https://doi.org/10.1080/10584609.2021.1994065.

17.  P. J. Hotez, R. E. Cooney, R. M. Benjamin, N. T. Brewer, A. M. Buttenheim, T. Callaghan, A. Caplan, R. M. Carpiano, C. Clinton, R. DiResta, J. A. Elharake, L. C. Flowers, A. P. Galvani, R. Lakshmanan, Y. A. Maldonado, S. M. McFadden, M. M. Mello, D. J. Opel, D. R. Reiss, D. A. Salmon, J. L. Schwartz, J. M. Sharfstein, and S. B. Omer, Announcing the *Lancet* Commission on Vaccine Refusal, Acceptance, and Demand in the USA, *The Lancet* 397 (10280), 1165-1167 (2021), https://doi.org/10.1016/S0140-6736(21)00372-X.

18.  V. Molter and R. DiResta, Pandemics & Propaganda: How Chinese State Media Creates and Propagates CCP Coronavirus Narratives, *Harvard Kennedy School Misinformation Review* 1(3) (2020), https://misinforeview.hks.harvard.edu/article/pandemics-propaganda-how-chinese-state-media-creates-and-propagates-ccp-coronavirus-narratives/.


*Books*

R. DiResta, *Invisible Rulers: The People Who Turn Lies Into Reality* (Hatchette/ Public Affairs 2024).

R. DiResta, B. Forrest, and R. Vinyard, *The Hardware Startup: Building Your Product, Business, and Brand.* (O'Reilly, 2014)

*Articles & Essays*

1. R. DiResta, What Happened to Stanford Spells Trouble for the Election, *The New York Times* (Jun. 24, 2024), https://www.nytimes.com/2024/06/25/opinion/stanford-disinformation-election-jordan-twitter.html.

2. R. DiResta, My Encounter with the Fantasy-Industrial Complex, *The Atlantic* (Jun. 15, 2024), https://www.theatlantic.com/ideas/archive/2024/06/cia-renee-censorship-conspiracy-twitter/678688/.

3. R. DiResta and D. Willner, White House AI Executive Order takes On Complexity of Content Integrity Issues, *Tech Policy Press* (Nov. 1, 2023), https://www.techpolicy.press/white-house-ai-executive-order-takes-on-complexity-of-content-integrity-issues/.

4. R. DiResta, J. Perrino, Oversight Board: Meta Should Review the COVID-19 Claims it Removes and Improve Transparency, *Tech Policy Press* (Apr. 27, 2023), https://www.techpolicy.press/oversight-board-meta-should-review-the-covid-19-claims-it-removes-and-improve-transparency/.

5. J. Askonas and R. DiResta, How Gamers Eclipsed Spies as an Intelligence Threat, *Foreign Policy* (Apr. 15, 2023), https://foreignpolicy.com/2023/04/15/ukraine-leak-intelligence-discord-espionage-gamers-internet-online/.

6. R. DiResta, The New Media Goliaths, *Noéma* (June 1, 2023), https://www.noemamag.com/the-new-media-goliaths/.

7. R. DiResta, How Online Mobs Act Like Flocks of Birds, *Noéma* (Nov. 3, 2022), https://www.noemamag.com/how-online-mobs-act-like-flocks-of-birds/ .

8. R. DiResta, The Twitter Files Are a Missed Opportunity, *The Atlantic* (Dec. 15, 2022), https://www.theatlantic.com/ideas/archive/2022/12/twitter-files-content-moderation-transparency/672468/.

9. R. DiResta, Arizona's 'Tricky Voting Machines' Sounds Suspiciously Familiar, *The Atlantic* (Nov. 12, 2022), https://www.theatlantic.com/ideas/archive/2022/11/arizona-election-voting-machines-fraud-conspiracy-tv-tropes/672100/.

10. R. DiResta, Elon Musk Is Fighting for Attention, Not Free Speech, *The Atlantic* (Apr. 14, 2022), https://www.theatlantic.com/ideas/archive/2022/04/elon-musk-buy-twitter-free-speech/629571/.

11. R. DiResta, The Ukraine Crisis Briefly Put America's Culture War in Perspective, *The Atlantic* (Mar. 22, 2022), https://www.theatlantic.com/ideas/archive/2022/03/russia-ukraine-war-stopped-internet-culture-war/627122/.

12. J. Goldstein and R. DiResta, China's Fake Twitter Accounts Are Tweeting Into the Void, *Foreign Policy* (Dec. 15, 2021), https://foreignpolicy.com/2021/12/15/china-twitter-trolls-ccp-influence-operations-astroturfing/.

13. R. DiResta and B. Goldberg, 'Prebunking' Health Misinformation Tropes Can Stop Their Spread, *Wired* (Aug. 28, 2021), https://www.wired.com/story/prebunking-health-misinformation-tropes-can-stop-their-spread/.

14. R. DiResta and T. Rose-Stockwell, How to Stop Misinformation Before It Gets Shared, *Wired* (Mar. 26, 2021), https://www.wired.com/story/how-to-stop-misinformation-before-it-gets-shared/.

15. R. DiResta, It's Not Misinformation. It's Amplified Propaganda, *The Atlantic* (Oct. 9, 2021), https://www.theatlantic.com/ideas/archive/2021/10/disinformation-propaganda-amplification-ampliganda/620334/.

16. R. DiResta, Institutional Authority Has Vanished. Wikipedia Points to the Answer, *The Atlantic* (July 21, 2021), https://www.theatlantic.com/ideas/archive/2021/07/cdc-should-be-more-like-wikipedia/619469/.

17. R. DiResta, The Anti-Vaccine Influencers Who Are merely Asking Questions, *The Atlantic* (Apr. 24, 2021), https://www.theatlantic.com/ideas/archive/2021/04/influencers-who-keep-stoking-fears-about-vaccines/618687/.

18. R. DiResta, Vaccines and the Mediation of Consent, *Tech Policy Press* (Jul. 19 2021),

https://www.techpolicy.press/vaccines-and-the-mediation-of-consent/.

19. R. DiResta and K. Kornbluh, The Federal Government Can Act Now on the Facebook Whistleblower's Revelations, *Tech Policy Press* (Oct. 29, 2021), https://www.techpolicy.press/the-federal-government-can-act-now-on-the-facebook-whistleblowers-revelations/.

20. R. DiResta, Dancing in the Dark Disinformation Researchers Need More Robust Data and Partnerships, COVID-19 and the Information Space Boosting the Democratic Response, *National Endowment for Democracy*, 39-43 (Jan. 2021), https://www.ned.org/wp-content/uploads/2021/01/Global-Insights-COVID-19-Information-Space-Boosting-Democratic-Response-1.pdf.

21. V. Molter, R. DiResta, and A. Stamos, Opinion: As Chinese propaganda on covid-19 grows, U.S. social media must act, *The Washington Post* (Apr. 27, 2020), https://www.washingtonpost.com/opinions/2020/04/27/chinese-propaganda-covid-19-grows-us-social-media-must-act/.

22. R. DiResta, Social Media Fact-Checking Is Not Censorship, *Slate* (June 4, 2020), https://slate.com/technology/2020/06/twitter-fact-checking-trump-misinformation-censorship.html.

23. R. DiResta, Why People Are Especially Tempted to Share Misinformation in a Global Health Crisis, *Slate* (Mar. 20, 2020), https://slate.com/technology/2020/03/misinformation-coronavirus-social-media-moderation.html.

24. R. DiResta, Anti-vaxxers Think This Is Their Moment, *The Atlantic* (Dec. 20, 2020), https://www.theatlantic.com/ideas/archive/2020/12/campaign-against-vaccines-already-under-way/617443/.

25. R. DiResta, Right-Wing Social Media Finalizes Its Divorce From Reality, *The Atlantic* (Nov. 23, 2020), https://www.theatlantic.com/ideas/archive/2020/11/right-wing-social-media-finalizes-its-divorce-reality/617177/.

26. R. DiResta, The Supply of Disinformation Will Soon Be Infinite, *The Atlantic* (Sept. 20, 2020), https://www.theatlantic.com/ideas/archive/2020/09/future-propaganda-will-be-computer-generated/616400/.

27. R. DiResta, AI-Generated Text Is The Scariest Deepfake of All, *Wired* (July 31, 2020), https://www.wired.com/story/ai-generated-text-is-the-scariest-deepfake-of-all/.

28. R. DiResta, Virus Experts Aren't Getting the Message Out, *The Atlantic* (May 6, 2020), https://www.theatlantic.com/ideas/archive/2020/05/health-experts-dont-understand-how-information-moves/611218/.

29. R. DiResta and I. García-Camargo, Virality Project (US): Marketing Meets Misinformation, *Stanford University Freeman Spogli Insitute for International Studies Blog* (May 26, 2020), https://fsi.stanford.edu/news/manufacturing-influence-0.

30. R. DiResta, For China, the "USA Virus" Is a Geopolitical Ploy, *The Atlantic* (Apr. 11, 2020), https://www.theatlantic.com/ideas/archive/2020/04/chinas-covid-19-conspiracy-theories/609772/.

31. S. Grossman, R. DiResta, and T. Kheradpir, Blurring the Lines of Media Authenticity: Prigozhin-Linked Group Funding Libyan Broadcast Media, *Stanford Internet Observatory Blog* (Mar. 20, 2020), https://cyber.fsi.stanford.edu/io/news/libya-prigozhin.

32. R. DiResta, The Conspiracies Are Coming From Inside the House, *The Atlantic* (Mar. 10, 2020), https://www.theatlantic.com/ideas/archive/2020/03/internet-conspiracies-are-coming-inside-country/607645/.

33. R. DiResta, How Amazon's Algorithms Curated a Dystopian Bookstore, *Wired* (Mar. 5, 2019), https://www.wired.com/story/amazon-and-the-spread-of-health-misinformation/.

34. R. DiResta, Facebook's Anti-Conservative Bias Audit Is Here, *Slate* (Aug. 21, 2019), https://slate.com/technology/2019/08/facebook-anti-conservative-bias-audit-results-kyl.html.

35. R. DiResta and B. Jones, Russia Embraces Disinformation About Disinformation, *Slate* (Feb. 5, 2019), https://slate.com/technology/2019/02/russia-disinformation-mueller-

hackingredstone.html.

36.  R. DiResta, A New Law Makes Bots Identify Themselves—That's the Problem, *Wired* (Jul. 24, 2019), https://www. wired. com/story/law-makes-bots-identify-themselves.

37.  R. DiResta, What We Now Know About Russian Disinformation, *The New York Times* (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/opinion/russia-report-disinformation.html.

38.  R. DiResta, Free speech is not the same as free reach, *Wired* (Aug. 30, 2018), https://www.wired.com/story/free-speech-is-not-the-same-as-free-reach/.

39.  R. DiResta, The Information War Is On. Are We Ready For It?, *Wired* (Aug. 3, 2018), https://www.wired.com/story/misinformation-disinformation-propaganda-war/.

40.  R. DiResta, The Complexity of Simply Searching for Medical Advice, *Wired* (Jul. 3, 2018), https://www.wired.com/story/the-complexity-of-simply-searching-for-medical-advice/.

41.  R. DiResta, Free Speech in the Age of Algorithmic Megaphones, *Wired* (Oct. 12, 2018), https://www.wired.com/story/facebook-domestic-disinformation-algorithmic-megaphones/.

42.  R. DiResta, The Digital Maginot Line, *Ribbonfarm* (Nov. 28, 2018), https://www.ribbonfarm.com/2018/11/28/the-digital-maginot-line/.

43.  R. DiResta, Online Conspiracy Groups Are a Lot Like Cults, *Wired* (Nov. 13, 2018), https://www.wired.com/story/online-conspiracy-groups-qanon-cults/.

44.  R. DiResta, How ISIS and Russia Won Friends and Manufactured Crowds, *Wired* (Mar. 8, 2018), https://www.wired.com/story/isis-russia-manufacture-crowds/.

45.  R. DiResta, This Dramatic Graph Shows How the Pro-Vaccine Movement Can Win, *Slate* (Apr. 14, 2017), https://slate.com/technology/2017/04/this-dramatic-graph-shows-how-the-pro-vaccine-movement-can-win.html.

46.  R. DiResta, There Are Bots. Look Around, *Ribbonfarm* (May 23, 2017), https://www.ribbonfarm.com/2017/05/23/there-are-bots-look-around/.

47.  R. DiResta and T. Harris, Why Facebook and Twitter Can't Be Trusted to Police Themselves, *POLITICO Magazine* (Nov. 1, 2017), https://www.politico.com/magazine/story/2017/11/01/why-facebook-and-twitter-cant-be-trusted-to-police-themselves-215775/.

48.  R. DiResta, J. Little, J. Morgan, L. M. Neudert, B. Nimmo, The Bots That Are Changing Politics, *Vice* (Nov. 2, 2017), https://www.vice.com/en/article/twitter-facebook-google-bots-misinformation-changing-politics/.

49.  R. DiResta, Social Network Algorithms Are Distorting Reality By Boosting Conspiracy Theories, *Fast Company* (May 11, 2016), https://www.fastcompany.com/3059742/social-network-algorithms-are-distorting-reality-by-boosting-conspiracy-theories.

50.  R. DiResta, California's Anti-Vaccine Movement: Politics, Wealth, and Paranoia, *Slate* (Apr. 8, 2015), https://www.slate.com/articles/health_and_science/medical_examiner/2015/04/california_a nti_vaccine_movement_politics_wealth_bob_sears_and_robert_f.html.

51.  R. DiResta, Anti-Vaxxers Are Using Twitter to Manipulate a Vaccine Bill, *Wired* (Jun. 8, 2015), https://www.wired.com/2015/06/antivaxxers-influencing-legislation/.

*Reports and Other Publications*

1.  S. Grossman, R. Pfefferkorn, D. Thiel, S. Shah, R. DiResta, J. Perrino, E. Cryst, A. Stamos, and J. Hancock, The Strengths and Weaknesses of the Online Child Safety Ecosystem, *Stanford Digital Repository* (Apr. 22, 2024), https://purl.stanford.edu/pr592kc5483.

2.  R. DiResta and J. A. Goldstein, How Spammers and Scammers Leverage AI-Generated Images on Facebook for Audience Growth, preprint paper (2024), https://fsi9-prod.s3.us-west-1.amazonaws.com/s3fs-public/2024-03/DiRestaGoldstein_AIGeneratedImages_Preprint.pdf.

3.  D. Thiel, R. DiResta, A. Stamos, Cross-Platform Dynamics of Self-Generated CSAM, *Stanford*

*Internet Observatory* (June 7, 2023), https://purl.stanford.edu/jd797tp7663.

4.  D. Thiel and R. DiResta, Child Safety on Federated Social Media, *Stanford Internet Observatory* (July 24, 2023), https://purl.stanford.edu/vb515nd6874.

5.  J. Goldstein, G. Sastry, M. Musser, R. DiResta, M. Gentzel, and K. Sedova, Generative Language Models and Automated Influence Operations: Emerging Threats and Potential Mitigations, January 2023, https://cdn.openai.com/papers/forecasting-misuse.pdf.

6.  J. A. Goldstein, G. Sastry, M. Musser, R. DiResta, M. Gentzel, and K. Sedova, Forecasting Potential Misuses of Language Models for Disinformation Campaigns and How to Reduce Risk, Center for Security and Emerging Technology, January 2023, https://cset.georgetown.edu/publication/forecasting-potential-misuses-of-language-models-for-disinformation-campaigns-and-how-to-reduce-risk/.

7.  N. Michael, S. Solomon, M. Kurilla, S. Thomas, G. Benjamin, C. Baur, and R. DiResta, Foresight from the Covid-19 Pandemic: Science, Policy, Communication (COVID-SPC), Institute on Science for Global Policy (2023), https://scienceforglobalpolicy.org/publication/foresight-from-the-covid-19-pandemic-science-policy-communication-covid-spc/.

8.  S. Grossman, R. DiResta, K. Ramali, R. Sharma, S. Bradshaw, and K. Nershi, In Bed with Embeds: How a Network Tied to IRA Operations Created Fake "Man on the Street" Content Embedded in News Articles, *Stanford Digital Repository* (2021), https://doi.org/10.25740/xw115vb5420.

9.  S. Grossman, Nadine J., D. Thiel, C. Giles, and R. DiResta, Mind Farce: An Investigation into an Inauthentic Facebook and Instagram Network Linked to an Israeli Public Relations Firm, *Stanford Digital Repository* (Aug. 4, 2022), https://stacks.stanford.edu/file/druid:vh191ny7721/20220804%20Mind%20Force.pdf.

10. S. Grossman, E. Tianshi, D. Thiel, and R. DiResta, My Heart Belongs to Kashmir: An Analysis of a Pro-Indian Army Covert Influence Operation on Twitter, *Stanford Digital Repository* (Sept. 21, 2022), https://stacks.stanford.edu/file/druid:zs105tw7107/20220921%20India%20takedown.pdf.

11. R. DiResta (editor) et al., Memes, Magnets and Microchips: Narrative dynamics around COVID-19 vaccines, The Virality Project (Feb. 24, 2022), https://fsi.stanford.edu/publication/memes-magnets-and-microchips-narrative-dynamics-around-covid-19-vaccines.

12. R. DiResta, J. A. Goldstein, C. Miller, and H. Wang, One Topic, Two Networks: Evaluating Two Chinese Influence Operations on Twitter Related to Xinjiang, *Stanford Digital Repository* (Dec. 2, 2021), https://stacks.stanford.edu/file/druid:sn407zm8237/20211202-china-twitter-takedown.pdf.

13. S. Grossman, R. DiResta, K. Ramali, R. Sharma, S. Bradshaw, and K. Nershi, In Bed with Embeds: How a Network Tied to IRA Operations Created Fake "Man on the Street" Content Embedded in News Articles, *Stanford Internet Observatory* (Dec. 2, 2021), https://stacks.stanford.edu/file/druid:xw115vb5420/20211202-mena-twitter-takedown.pdf.

14. R. DiResta (editor) et al., The Long Fuse: Misinformation and the 2020 Election, final report of the Election Integrity Partnership (Jul. 1, 2021), https://purl.stanford.edu/tr171zs0069

15. R. DiResta, D. Thiel, S. Grossman, E. Cryst, Contours and Controversies of Parler, Stanford Internet Observatory (Jan. 28, 2021), https://cyber.fsi.stanford.edu/io/publication/contours-and-controversies-parler.

16. A. Morabia, C. Sellers, and R. DiResta, AJPH: What are the implications for public health of the anti-democratic movements and the war on truth?, APHA 2021 Annual Meeting and Expo (2021).

17.   R. DiResta, J. A. Goldstein, and S. Grossman, Middle East Influence Pperations: Observations Across Social Media Takedowns, Digital Activism and Authoritarian Adaptation in the Middle East (2021), https://pomeps.org/middle-east-influence-operations-observations-across-social-media-takedowns.

18.   R. DiResta, C. Miller, V. Molter, J. Pomfret, and G. Tiffert, Telling China's Story: The Chinese Communist Party's Campaign to Shape Global Narratives, *Stanford Digital Repository* (2020), https://purl.stanford.edu/pf306sw8941.

19.   S. Grossman, K. Ramali, R. DiResta, L. Beissner, S. Bradshaw, W. Healzer, I. Hubert, Stoking Conflict by Keystroke: An Operation Run by IRA-Linked Individuals Targeting Libya, Sudan, and Syria, *Stanford Internet Observatory* (Dec. 15, 2020), https://cyber.fsi.stanford.edu/io/content/ira-takedown-20201215.

20.   C. Miller, V. Molter, I. Garcia-Camargo, and R. DiResta, Sockpuppets Spin COVID Yarns: An Analysis of PRC-Attributed June 2020 Twitter Takedown, *Stanford Internet Observatory* (June 17, 2020), https://fsi.stanford.edu/publication/june-2020-prc-takedown.

21.   S. Grossman, H. Khadija, R. DiResta, T. Kheradpir, C. Miller, Blame it on Iran, Qatar, and Turkey: An analysis of a Twitter and Facebook operation linked to Egypt, the UAE, and Saudi Arabia, *Stanford Internet Observatory* (Apr. 2, 2020), https://fsi.stanford.edu/publication/twitter-facebook-egypt-uae-saudi.

22.   R. DiResta and C. Wardle, Online Misinformation About Vaccines, *The Sabin-Aspen Vaccine Science & Policy Group* (2020), https://www.atrainceu.com/sites/default/files/299_Part%202-Article%205-Online%20Misinformation.pdf.

23.   R. DiResta, T. Kheradpir, and C. Miller, The World is Swimming in a Sea of Rumors": Influence Operations Associated with El FAGR Newspaper (Egypt), *Stanford Internet Observatory* (Apr. 2, 2020), https://fsi.stanford.edu/publication/april-2020-egypt-takedown.

24.   R. DiResta, S. Grossman, K H, and C. Miller, Analysis of Twitter Takedown of State-Backed Operation Attributed to Saudi Arabian Digital Marketing Firm Smaat, *Stanford Digital Repository* (Dec. 22, 2019), https://fsi.stanford.edu/publication/twitter-takedown-saudi-smaat.

25.   S. Grossman, D. Bush, R. DiResta, Evidence of Russia-linked influence operations in Africa, *Stanford Internet Observatory* (Oct. 29, 2019), https://fsi.stanford.edu/publication/evidence-russia-linked-influence-operations-africa.

26.   C. Corcoran, R. DiResta, D. Morar, N. Dhamani, D. Sullivan, J. L Gleason, P. Azunre, S. Kramer, B. Ruppel, Disinformation: Detect to Disrupt, *Truth and Trust Online* (2019), https://truthandtrustonline.com/wp-content/uploads/2019/10/paper_28.pdf.

27.   R. DiResta, K. Shaffer, B. Ruppel, D. Sullivan, R. Matney, R. Fox, J. Albright, B. Johnson, The Tactics and Tropes of the Internet Research Agency, Congress of the United States, U.S. Senate Documents (2019), https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1003&context=senatedocs.

28.   R. DiResta and S. Grossman, Potemkin Pages & Personas: Assessing GRU Online Operations, 2014-2019, *Stanford Internet Observatory* (2019), https://purl.stanford.edu/cv483mb5313.

29.   R. DiResta, OF VIRALITY AND VIRUSES:  THE ANTI-VACCINE MOVEMENT AND SOCIAL MEDIA, NAPSNet Special Reports (Nov. 08, 2018), https://nautilus.org/napsnet/napsnet-special-reports/of-virality-and-viruses-the-anti-vaccine-movement-and-social-media/.