**No. 25-761**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NICHOLAS ROLOVICH,
*Plaintiff-Appellant,*

v.

WASHINGTON STATE UNIVERSITY;
PATRICK CHUN,
*Defendants-Appellees.*

On Appeal from the United States District Court
For the Eastern District of Washington
Case No. 2:22-cv-319-TOR
The Honorable Thomas O. Rice, United States District Judge

## SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 4 OF 5

NICHOLAS W. BROWN
  *Attorney General*
SPENCER W. COATES
  *Assistant Attorney General*
WASHINGTON ATTORNEY
GENERAL'S OFFICE
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404
*spencer.coates@atg.wa.gov*

ZACHARY J. PEKELIS
ERICA CORAY
W. SCOTT FERRON
  *Special Assistant Attorneys General*
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 245-1700
*zach.pekelis@pacificalawgroup.com*

*Counsel for Defendants-Appellees*

# EXHIBIT II

**Platform:** SMS-MMS-IMS    **Name:** CHAT - NR0000001 - 00742 - 2022/03/18    **Timezone:** UTC+0000

David Fox <+15053011787>          Bill SR Stutzmann <8082182313>

Nick Rolovich <(415) 328-6745>          David Fox <5053011787>

8082182313,5053011787          Unknown address

2022/03/18

David Fox <5053011787>


**Donald J Trump** ✓ @realdonaldtrump
2h · 🌐

Speaker Robin Vos, of the Great State of Wisconsin, just said there was "widespread fraud" in the 2020 Presidential Election, but that the State Legislature cannot do anything about it. Wrong! If you rob the diamonds from a jewelry store, if you get caught, you have to give the diamonds back, votes should be no different. There is already a very powerful resolution in the Wisconsin State Assembly that calls for the decertification of the 2020 Election and reclaiming of Wisconsin's 10 electoral votes. There is so much fraud, as Vos knows, that this should be done quickly and easily. The highly respected Special Counsel, Michael Gableman, has exposed so much already, including election bribery with Mark Zuckerberg's $8.8 million, horrific fraud stealing votes from the elderly in nursing homes, and rampant ballot harvesting and phantom votes. Far more votes than is needed for the Republican candidate, me, to win. Our Country would not be in the mess it's in if Republicans had the courage to act. We would be energy independent, no inflation, the Ukraine desecration would not be happening, our economy would be strong, there would have been no surrender in Afghanistan, and so much else. Speaker Vos should do the right thing and correct the Crime of the Century— immediately! It is my opinion that other states will be doing this, Wisconsin should lead the way!

1,712 likes   189 comments   543 reposts   14 quotes

12:09:47 am

Nick Rolovich <(415) 328-6745>

I saw that.  All coming together.  Precipice
12:10:35 am

**EXHIBIT 179**
ROLOVICH
10/4/2024
Buell Realtime Reporting
206-287-9066

ROLOVICH00088069

Unknown address

(Empty message)

12:10:37 am

UA    (Empty message)

12:10:45 am

David Fox <5053011787>

https://technofog.substack.com/p/us-intelligence-operations-against

12:14:55 am

Boom



12:16:31 am

ROLOVICH00088070



12:17:19 am

Nick Rolovich <(415) 328-6745>

The best
12:18:14 am

Unknown address

(Empty message)
12:18:16 am

(Empty message)
12:18:29 am

ROLOVICH00088071

David Fox <5053011787>

You might drop some knowledge and it may seem like only 10 people saw it but in those 10 people one of them took it and dropped it else where and it caused a ripple effect now 20 million people saw it. You are more powerful than you think.

12:50:14 am



12:52:37 am

ROLOVICH00088072



12:52:42 am

Nick Rolovich <(415) 328-6745>

Whoa
12:53:17 am

Unknown address

(Empty message)
12:53:18 am

(Empty message)
12:53:26 am

ROLOVICH00088073

David Fox <5053011787>



**U.S. Army** ✓
@USArmy

💥 💥 💥

Watch as #USArmy #Paratroopers with @173rdAbnBde conduct a live-fire exercise with 60mm and 120mm Mortars at Grafenwoehr Training Area, Germany.

1:45   405 views

6:03 PM · Mar 17, 2022 · Sprinklr

12:54:16 am

4 year



954
Q !UW.yye1fxo 03/17/18 19:44:01   ID: b02328
Archive Bread/Post Links: 701163 / 701978
Direct Link: 701978

Next week.
BOOM.
BOOM.
BOOM.
Q

12:54:28 am

Pretty bad ass pin

ROLOVICH00088074



12:55:41 am



12:57:11 am

ROLOVICH00088075

# UN warns of massive refugee movement from Africa: "500 million people on their way to Europe"

By Kenneth Garger

March 15, 2022 | 1:11am | Updated



12:59:48 am

ROLOVICH00088076



**886472** >>15886550
(hide): 76d662848e91
5, ClipboardImage.png) (h

**▶Anonymous** 03/17/22 (Thu)
16:35:04 ID: 3ce635 (3)
No.15886550
File (hide):
c2fe38f7d0812f7⋯.png (1.5 MB,
1200x800, 3:2, ClipboardImage.png) (h)
(u)

**⌐I warns of**
**fugee mov**
**rica: "500**
**their way**

enneth Garger

h 15, 2022 | 1:11am

>>15886472
Goodbye Europe.
Used to be a
beautiful place with
beautiful customs.
Now it's become a
shithole.   And
heading towards
complete and total
shitholery.

01:01:38 am

🤔

ROLOVICH00088077



01:05:44 am

Nick Rolovich <(415) 328-6745>

https://en.wikipedia.org/wiki/Dan_White
01:23:07 am

Unknown address

(Empty message)
01:23:12 am

(Empty message)
01:23:16 am

Nick Rolovich <(415) 328-6745>

Thats my uncle
01:23:41 am

ROLOVICH00088078

Unknown address

(Empty message)
01:23:44 am

(Empty message)
01:23:51 am

Bill SR Stutzmann <8082182313>

What's RRN?
01:30:43 am

David Fox <5053011787>

Real Raw News
01:30:58 am

Bill SR Stutzmann <8082182313>

Liked "Real Raw News"
01:31:49 am

Telegram?
01:31:58 am

David Fox <5053011787>

It's posted on the board a lot but believed to be satire. It reports a lot of stuff we like
01:32:00 am

I don't think so.
01:32:17 am

Bill SR Stutzmann <8082182313>

Thanks....
Big week coming
X22report is real good today
01:32:56 am

4-SER-644

ROLOVICH00088079

David Fox <5053011787>

Should read RRN with the idea that it may be total bs
01:33:31 am

Bill SR Stutzmann <8082182313>

👍
01:34:15 am

David Fox <5053011787>

Dan White is your uncle?
01:34:49 am

Nick Rolovich <(415) 328-6745>

Yes.
01:35:08 am

Unknown address

(Empty message)
01:35:09 am

(Empty message)
01:35:18 am

Nick Rolovich <(415) 328-6745>

My mom is a white
01:35:23 am

Unknown address

(Empty message)
01:35:25 am

(Empty message)
01:35:32 am

4-SER-645

ROLOVICH00088080

David Fox <5053011787>

**That's crazy**
01:36:02 am

Nick Rolovich <(415) 328-6745>

His son and I went to school together.  Crazy times when we were young
01:36:54 am

Unknown address

**(Empty message)**
01:36:56 am

David Fox <5053011787>

**I bet**
01:37:06 am

Unknown address

**(Empty message)**
01:37:08 am

David Fox <5053011787>

https://www.reuters.com/world/middle-east/brother-lebanese-central-bank-governor-arrested-2022-03-17/
01:40:42 am

Dasting

> ▶**Anonymous** 03/17/22 (Thu) 14:28:20 ID: b1897b **(4)**
> No.15885751  >>15885918
>
> >>15885733
> **Diamonds are so plentiful that if the Dutch
> Cartel didn't control them so heavily they would
> literally be worthless.**
> *Disclaimer: this post and the subject matter and contents thereof -
> text, media, or otherwise - do not necessarily reflect the views of the
> 8kun administration.*

01:41:48 am

4-SER-646

ROLOVICH00088081

Nick Rolovich <(415) 328-6745>

Showing that to my wife, she wants a new one.  Fuck that.  Tits or GTFO
01:47:42 am

Unknown address

(Empty message)
01:47:44 am

(Empty message)
01:47:55 am

David Fox <5053011787>

Hahaha
01:48:11 am

Bill SR Stutzmann <8082182313>

Laughed at "Showing that to my wife, she wants a new one.  Fuck that.  Tits or GTFO"
01:49:12 am

David Fox <5053011787>



01:54:56 am

4-SER-647

ROLOVICH00088082

https://thenationalpulse.com/2022/03/17/bidens-new-covid-coordinator-urges-vaccine-passports-mandates/

01:56:17 am

> ▶**Anonymous**  03/17/22 (Thu) 19:21:49 ID: 0a91b2 (
> No.15887503
>
> >>15887097 p NATO begins major war games
> near Russia
>
> muh escalations
>
> trump came down one
> nato's going up one
>
> *Disclaimer: this post and the subject matter and contents there*
> *text, media, or otherwise - do not necessarily reflect the views of*
> *8kun administration.*

01:59:05 am

Every anon trying to decode this truth post, it's a pic of Scavino

4-SER-648

ROLOVICH00088083



02:00:03 am

ROLOVICH00088084



02:00:18 am

Time stamp goes with this

ROLOVICH00088085



02:01:30 am

F'ing habbening boys

ROLOVICH00088086



02:09:59 am


Article removed 🤔

ROLOVICH00088087



**Not Found**

The requested URL was not found on this server.

02:11:02 am

https://web.archive.org/web/20220317230758/https://vancouvertimes.org/ceo-of-disney-arrested-for-human-trafficking/

02:12:14 am

https://t.me/realKarliBonne/80191

02:17:18 am

Nick Rolovich <(415) 328-6745>

Thats a boom

02:18:08 am

Unknown address

(Empty message)

02:18:10 am

ROLOVICH00088088



ROLOVICH00088089



(Empty message)

09:04:40 am

Nick Rolovich <(415) 328-6745>

I'm going to get her an NIL deal from Club Rolo.  $1k to be a woman.

09:05:18 am

Unknown address

(Empty message)

09:05:21 am

(Empty message)

09:05:27 am

David Fox <5053011787>

Emphasized "https://twitter.com/LakovosJustice/status/1504691768889163781?t=Do7Iuq0xNeOX9TWjL3vXiw&s=19"

02:17:38 pm

ROLOVICH00088090



**Ian Miles Cheong** ✔
@stillgray

Luzhniki Stadium in Moscow. An estimated 130,000 people turned up for the concert to show their support for the Russian army and President Putin.



0:06

1,519 views

7:00 AM · 18 Mar 22 · Twitter Web App

02:22:22 pm

Ian Miles Cheong (@stillgray) Tweeted:
Luzhniki Stadium in Moscow. An estimated 130,000 people turned up for the concert to show their support for the Russian army and President Putin.
https://t.co/XqMZqgRYW2 https://twitter.com/stillgray/status/1504804882423095297?s=20&t=WZH9HXZFPU9S0DLfN0_Jmw

02:23:29 pm

▶Anonymous  03/18/22 (Fri) 08:28:50 ID: dc0c50 **(13)**
No.15890513  >>15890577

Russian Federation Representative at UN:
There is also the P781 Project to study transmission to humans of diseases through bats. Work from this was done through the infamous Lugar Center in Tbilisi [Georgia].

*Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

02:41:54 pm

4-SER-656

ROLOVICH00088091

Nick Rolovich <(415) 328-6745>

**Falling apart**
02:43:44 pm

Unknown address

(Empty message)
02:43:46 pm

(Empty message)
02:43:54 pm

David Fox <5053011787>

Good convo this morning with couple anons that also lost job over jab. All feel it's turning in our favor but we're not quite there yet
02:44:52 pm

Nick Rolovich <(415) 328-6745>

https://twitter.com/TARich83379280/status/1504858907470036997?t=0zpJJwVfOP65VrYnxT1-wQ&s=19
05:03:56 pm

Unknown address

(Empty message)
05:04:03 pm

(Empty message)
05:04:10 pm

Nick Rolovich <(415) 328-6745>

https://twitter.com/GovInslee/status/1504642360583413760?t=VWLZaQl__gPxwnl4ZuClaA&s=19
05:08:39 pm

4-SER-657

ROLOVICH00088092

Unknown address

(Empty message)

05:08:44 pm

**UA**

(Empty message)

05:08:54 pm

David Fox <5053011787>

Emphasized "https://twitter.com/TARich83379280/status/1504858907470036997?t=0zpJJwVfOP65VrYnxT1-wQ&s=19"

05:58:15 pm

^^^literal faggot

05:58:45 pm

Nick Rolovich <(415) 328-6745>

https://t.me/c/1585594122/3767

05:58:50 pm

Unknown address

(Empty message)

05:58:52 pm

**UA**

(Empty message)

05:58:58 pm

Bill SR Stutzmann <8082182313>

Laughed at "https://twitter.com/GovInslee/status/1504642360583413760?t=VWLZaQI__gPxwnI4ZuCIaA&s=19"

06:20:48 pm

David Fox <5053011787>

https://www.thegatewaypundit.com/2022/03/warning-170000-illegals-amass-us-southern-border-ready-storm-across-biden-ends-trumps-covid-rules-video/

07:41:27 pm

ROLOVICH00088093

Nick Rolovich <(415) 328-6745>

The real virus was intercepted at a DUMB in Dulce NM and replaced with a weak virus that died two months later. Trump and the White Hats used the fake COVID PLANDEMIC to discreetly hunt down and arrested over 300,000 criminals guilty of TREASON and crimes against humanity across the country with the assistance of the USMC, Putin, Xi, Modi, and Interpol.

2 million+ children have been saved from thousands of DUMBs and Immense tunnel systems across the planet.

This operation was about saving children from child sex trafficking and adrenochrome production facilities.

08:32:02 pm

Unknown address

(Empty message)
08:32:08 pm

(Empty message)
08:32:15 pm

Nick Rolovich <(415) 328-6745>

https://t.me/c/1715743874/78956
08:35:42 pm

David Fox <5053011787>

Wow. I really hope that's true
08:35:42 pm

Unknown address

(Empty message)
08:35:45 pm

(Empty message)
08:35:53 pm

ROLOVICH00088094

Nick Rolovich <(415) 328-6745>



08:36:26 pm

Unknown address

(Empty message)
08:36:31 pm

(Empty message)
08:36:37 pm

ROLOVICH00088095

# EXHIBIT JJ

**Platform:** SMS-MMS-IMS    **Name:** CHAT - NR0000001 - 01417 - 2021/12/06    **Timezone:** UTC+0000



| | |
|---|---|
| John Richardson <3073994451> | stutz <8089271678> |
| Rick Logo <9704131032> | Mark Weber <8013762308> |
| Nick Rolovich <(415) 328-6745> | stutz <+18089271678> |
| Rick Logo <+19704131032> | John Richardson <+13073994451> |
| +18089271678,+19704131032,8013762308,+13073994451 | UA Unknown address |

---

2021/12/06

Nick Rolovich <(415) 328-6745>

> Incarnate word said no, vaxxed only.  Nevada wants to hire me but they said vaxxed only.  Abilene Christian the same.  Space force at 5 pm if anyone wants to join.
> 04:11:48 pm

Unknown address

(Empty message)

04:11:49 pm

(Empty message)

04:11:52 pm

(Empty message)

04:11:53 pm

(Empty message)

04:11:55 pm

4-SER-662

ROLOVICH00110720

stutz <8089271678>

Brutal. Baylor will be there at 5pm

04:21:23 pm

Rick Logo <9704131032>

Eliah has a basketball 🏀 game tonight , but maybe Enoka I will check with Folole

04:23:07 pm

John Richardson <3073994451>

Jobs keep opening up just waiting for the correct one. Must keep the faith.

We will be at Space Force

04:39:53 pm

Mark Weber <8013762308>

Loved "Jobs keep opening up just waiting for the correct one. Must keep the faith. We will be at Space Force"

04:49:58 pm

stutz <8089271678>

Just shoveled the front, back is killing me. Baylor will be up there. I'll swing by

11:47:58 pm

4-SER-663

ROLOVICH00110721

# EXHIBIT KK

**Platform:** SMS-MMS-IMS    **Name:** CHAT - NR0000001 - 01582 - 2022/01/15    **Timezone:** UTC+0000

| Coach Aaron Ingram <+15103044533> | Nick Rolovich <(415) 328-6745> |

---

2022/01/15

Coach Aaron Ingram <+15103044533>

> Go fix Hawaii
> 02:46:38 pm

Nick Rolovich <(415) 328-6745>

> They wont hire me
> 05:31:32 pm

Coach Aaron Ingram <+15103044533>

> You never know, a lot has changed since you left.  That place needs some love and it's the kind only certain people can provide, and your one of the top ones to do it.
> 05:38:54 pm

Nick Rolovich <(415) 328-6745>

> Vax
> 05:39:49 pm

Coach Aaron Ingram <+15103044533>

> Geez is every university requiring it?
> 05:40:15 pm

Nick Rolovich <(415) 328-6745>

> Blue ones for sure
> 05:40:42 pm

Coach Aaron Ingram <+15103044533>

> Man.  Crazy
> 05:40:58 pm

4-SER-665

ROLOVICH00110736

# EXHIBIT LL

**Platform:** SMS-MMS-IMS    **Name:** CHAT - NR0000001 - 01417 - 2022/11/07    **Timezone:** UTC+0000



John Richardson <3073994451>

stutz <8089271678>

Rick Logo <9704131032>

Mark Weber <8013762308>

Nick Rolovich <(415) 328-6745>

stutz <+18089271678>

Mark Weber <+18013762308>

3073994451,+18089271678,+18013762308,9704131032

---

2022/11/07

Nick Rolovich <(415) 328-6745>

If the AD stays at ASU, we aint going there.  He is making them wear masks on the bus and plane

05:46:24 pm

4-SER-667

ROLOVICH00110034

# EXHIBIT MM

**From:** "Nick Rolovich" <nrolo21@hotmail.com>
**To:** "Thayer Evans" <thayerevans@gmail.com>
**Subject:** Fwd: Letter from Bishop Daly
**Date:** Sat, 21 Aug 2021 01:56:26 -0000
**Importance:** Normal
**Attachments:** Rolovich,_Nick_from_Bishop_Daly.pdf

---

Let me know what you think

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Janet Voye <jvoye@dioceseofspokane.org>
**Sent:** Friday, August 20, 2021 3:17:10 PM
**To:** nrolo21@hotmail.com <nrolo21@hotmail.com>
**Subject:** Letter from Bishop Daly

Good afternoon,

Please see attached letter from Bishop Daly.  Thank you.

*Janet Voye*
Executive Assistant *to*
**Most Reverend Thomas A. Daly**
**Bishop of Spokane**
PO Box 1453
Spokane, WA  99210
(509) 358-7305

Disclaimer: The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

ROLOVICH00001398



# CATHOLIC DIOCESE OF SPOKANE
## Office of the Bishop

August 20, 2021

To Whom it may concern:

I have known Nick Rolovich since the summer of 1987. As a newly ordained priest for the Archdiocese of San Francisco, I was assigned to Our Lady of Loretto parish in Novato, CA. At the same time, Nick's parents, Mike and Lori, and their three children moved from San Francisco to the northern most town in Marin County. Prior to his enrollment at Our Lady of Loretto, Nick was a student at Holy Name Catholic school in San Francisco.

The Rolovich family was involved in the parish and regularly attended weekend Mass. In the summer prior to Nick going to the eighth grade, I was assigned to teach at Marin Catholic High School. A year later, Nick entered Marin Catholic. Nick's athletic skills in both football and baseball were often covered in the local press. However, less known was his work as a retreat leader in the Campus Ministry program.

Nick left the area for college, but I would see him and several of his classmates from both Our Lady of Loretto and Marin Catholic whenever he returned to Marin. As with most young people raised in Catholic homes and educated in Catholic schools, young adulthood is a period of questioning, searching, and infrequent involvement in the practice of one's faith. I would say this defined Nick and most of his classmates during their twenties.

Ten years ago, I was ordained a bishop and left Marin to serve in the Diocese of San Jose. When Nick and his wife began their family, Nick contacted me to baptize his children. The birth of children is often the time when a young person reconnects with the religion of their youth.

For the last six years, I have been the Catholic Bishop of Spokane. Our diocese includes the town of Pullman and the Catholic Newman center of St. Thomas More. Once Nick was settled in his new coaching position and relocated his family to Pullman, he contacted me. I am also aware that Nick has introduced himself to Fr. Paul Heric, the Catholic chaplain to WSU. I see this as an expression of a renewed commitment to his relationship to God and the Church.

Finally, I write this letter to shed light on one man's life of faith. I realize this is not easily explained nor often appreciated in the secular society and time in which we live. However, I believe Nick Rolovich is a man of faith who sincerely tries to live his life in a manner that seeks God's will. In time, I hope others will also see this important aspect of Nick's life.

Most Reverend Thomas A. Daly
Catholic Diocese of Spokane

---

PO Box 1453    ◆    Spokane, WA 99210-1453    ◆    (509) 358-7305    ◆    www.dioceseofspokane.org

ROLOVICH00001399

# EXHIBIT NN

# Lisa Gehring

# Rolovich v. Washington State University, et al.

# August 20, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham  |  Everett  |  Tacoma  |  Olympia  |  Yakima  |  Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: transcripts@buellrealtime.com

Case: 25-761, 09/15/2025, DktEntry: 54.5, Page 42 of 270

Case 2:22-cv-00319-TOR    ECF No. 98    filed 10/14/24    PageID.2123    Page 320 of 421

Rolovich v. Washington State University, et al.                                    Lisa Gehring

Page 65

A. Okay.

Q. When -- "What if someone refuses to get vaccinated," it says to "all employees," and then the following sentence, "Employees who refuse will be subject to nondisciplinary dismissal.
" Does that apply to some or all WSU employees?

MR. COATES: Object to form.

THE WITNESS: Based on what's written here, I would interpret "to all employees."

Q. (BY MR. KNIFFIN) I want to go to another part of this document. This is the big fat one marked as 72 (indicating). Looking at the bottom of page 14 on the paragraph that continues onto 15, it's numbered paragraph 31, so what I see here are parallel sections. There's one that begins -- 29 talks about religious -- excuse me -- medical exemptions, and then 31 talks about religious exemptions.
So this section says, "An employee who has a sincerely-held religious belief that prevents them from being vaccinated may request an accommodation." Do you see that text?

A. Um-hmm. Yes.

Q. Okay. And there's this language that we talked about before about the interactive accommodation request,

Page 66

and now at the end of that paragraph there's a little icon of a Word document; and I want to look at that document with you right now, Exhibit 76.

(Exhibit No. 76 - Metadata, Guidance on Evaluating Religious Accommodation Requests, Bates WSU_21195 through WSU_21199 - marked for identification.)

Q. (BY MR. KNIFFIN) Let's go off the record and I'll give you a chance to take a look at this document, familiarize yourself with it.

VIDEOGRAPHER: Okay. Off the record at 12:41 P.M.

(Pause in proceedings.)

THE WITNESS: (Reading.)

(Discussion off the record.)

VIDEOGRAPHER: Back on the record at 12:43 P.M.

Q. (BY MR. KNIFFIN) Lisa, have you now had a chance to review this document we've marked as Exhibit 76?

A. Yes.

Q. Do you recognize this document?

A. No.

Q. What was your role in developing the process for evaluating religious exemption requests from the COVID-19 vaccine mandate?

Page 67

A. Putting together a team of Employment Services Unit, and we did have a member external to HR who also was -- was on the team. That team developed the process in which we would receive the religious accommodation requests, review the requests, and then do the outreach to the supervisor to determine what accommodation, if any, could be made.

Q. Did you play a role in developing the standards that would be used for the Review Committee in looking at exemption requests?

A. Yes; we established guidelines.

Q. But you don't recall specifically reviewing this document before?

A. I don't recall this specific document. What gives me pause is when it says, "Please note this guidance is intended for Washington State agencies and it's not intended for broader use." I can't say I didn't review it; I just don't specifically recall it.

Q. Why does that phrase come to your attention?

A. Because "Higher Education" is not referred to as an agency. A Washington State agency is general government, whereas Higher Education was typically carved out.

Q. When we get a break, I'll take a look. I believe on this guidance here on the first page it says -- it

Page 68

defines "state agency" and there's -- I'll look through it when we have a break --

A. Okay.

Q. -- but I think when I clicked through there, some of those charts included the universities.

A. Okay.

Q. But we can come back to that.

A. Sure.

Q. On the substance of this, did you review other documents similar to this that tried to summarize the law and what -- what employers are expected to do and what they're not expected to do when evaluating religious exemption requests?

MR. COATES: Object to form.

THE WITNESS: I don't recall the specific documents that I would review, but that would be a typical process.

Q. (BY MR. KNIFFIN) What do you remember reviewing as -- as part of your work in developing standards for the religious exemption review process?

A. Reviewing the proclamation itself.

Q. Anything else?

A. I -- I don't recall the specific documents that I would have reviewed. I'm assuming that the state had provided some guidance, and I don't recall the order

17 (Pages 65 to 68)

Rolovich v. Washington State University, et al.                                    Lisa Gehring

Page 69

in which it arrived, but I do recall the turnaround time between when we had to do the proclamation and complete these processes was very quick.

Q. Yes.

A. So we were going fast and to -- to get everything in place, especially with Workday.

Q. I've seen either in e-mails, or in other conversations that I've had, that -- I know you guys were under extraordinary pressure; and part of it was because WSU started school before other state universities, is that right?

A. I don't know the quarter versus semester, but I know we are one of the few on a semester.

Q. I just remember that you guys were obviously under extreme pressure in doing this.

Was there one go-to person who, within HRS, who was really responsible for wrapping his or her mind around what employee -- what employers are supposed to do and not supposed to do when they're evaluating religious exemption requests?

MR. COATES: Object to form.

THE WITNESS: As providing oversight to that -- that unit, that responsibility was my responsibility, along with my team. And then we also had a member from the Human -- I can't remember their

Page 70

name, it's changed -- Compliance and Civil Rights, Dan Record, who also assisted in that process, and then also in consultation with our division office of the Attorney General's Office.

Q. Okay. I want to look at paragraph 1 on this document. Do you see that, "What is the definition of religion?"

A. Yes.

Q. First para- -- first sentence there, "Under federal and state law, religion is defined broadly."

That statement, is that consistent with your understanding of how religion is to be interpreted under law?

A. Yes.

Q. That paragraph continues, "A religious belief may be individualistic, and it also includes religious beliefs that are new, uncommon, not part of a formal church or sect, or only held by a small number of people." Does that sentence reflect your understanding of the law?

A. Yes.

Q. In the bullet points, under 2, "How should an agency or organization evaluate a request for religious accommodations," take a look at those bullet points, there's four of them, and take me -- and then I'd like you to tell me whether you agree or disagree with

Page 71

those statements.

A. Whether I disagree or agree with the --

Q. Yeah.

A. -- bullet points?

Q. So -- so each of those statements is an answer to the question, "How should an agency or organization evaluation a request for religious accommodation?" Let's just look at the first one: "Presume a religious belief to be sincerely held."

Do you agree with that statement?

A. Yes.

Q. Is it your belief that the process you helped develop at WSU followed that principle?

MR. COATES: Object --

THE WITNESS: Yes.

Q. (BY MR. KNIFFIN) Same thing for the second bullet point, "Be cognizant that religious beliefs are not static and are susceptible to change over the course of a person's life."

Did WSU's process seek to follow that principle?

A. Yes.

MR. COATES: Object to form.

Q. (BY MR. KNIFFIN) How so? Was there anything particular you did, was there anything in your

Page 72

guidance that reflected that principle we just read?

MR. COATES: Object to form.

THE WITNESS: Without looking at the form specifically to recall what was the information that we asked of the employees to complete the religious accommodation, I don't recall each question that was on that form.

Q. (BY MR. KNIFFIN) The third bullet point, "Remember the fact that an individual is not a frequent observer of their faith, or had not previously made their faith public, does not necessarily limit its sincerity."

Do you -- Did WSU's process seek to honor that principle?

MR. COATES: Object to form.

THE WITNESS: Yes.

Q. (BY MR. KNIFFIN) And then finally, "An accommodation does not have to be limited to what is requested by the employee."

Is that your understanding as well?

A. Yes.

Q. On page 4 of that document there's some resources listed in the bottom half of the page. Do you recall whether any of those resources were things that you or your colleagues in HRS used in developing or in implementing the processes at WSU for evaluating

18 (Pages 69 to 72)

Rolovich v. Washington State University, et al.                    Lisa Gehring

Page 121

A.  Um-hmm.

Q.  -- and so that's the most important part of all this; is trying to understand, for me, what happened between this e-mail and this policy which says, "If sincerely-held religious belief is confirmed..." Okay? And your e-mails to Chris Mulick in which you describe this as a separate step in the process.

So what I'm trying to figure out is, in a general matter, what was your policy. And most importantly for me in this instance, how did we get from this (indicating) to a termination letter less than two weeks later that said, "We determined you were not sincere" but Nick Rolovich was never contacted. That's what I'm trying to figure out, and.

We'll get to those details in a little bit right now. But what seems very clear to me from this internal procedures, from your e-mail to Chris Mulick, is that should not have happened under your procedures. And I'm asking if there's anything I'm missing.

MR. COATES:  Object -- Are you done, Eric?

Q.  (BY MR. KNIFFIN)  How -- Is there anything in here that permits WSU to find an employee insincere without the employee being contacted?

MR. COATES:  Object to form. Foundation.

Page 122

Vague.

You can answer.

THE WITNESS:  So the -- those guidelines are HRS internal guidelines, and so the committee review happens first. Then it goes on to that second step in which the department is notified. In this particular case, then some concerns were raised in relation to the sincerely-held religious belief.

Q.  (BY MR. KNIFFIN)  How do you know that?

A.  And that, I'll have to say, I would disclose attorney-client-privileged communication.

MR. COATES:  Oh. Then in that case, I'll instruct you not to disclose --

Q.  (BY MR. KNIFFIN)  Okay. Did you know --

MR. KNIFFIN:  I'm sorry, I didn't mean to step on you.

MR. COATES:  I was just telling her not to reveal the contents of any attorney-client communication.

Q.  (BY MR. KNIFFIN)  Did you know that Nick Rolovich's sincerity was challenged in October '21 before he was fired?

THE WITNESS:  I'm trying to walk that line of what's attorney-client-privileged communication.

MR. COATES:  Okay. You want -- then do we

Page 123

want to take just a quick minute --

THE WITNESS:  Yes.

MR. COATES:  -- to figure what you can say?

THE WITNESS:  Yes.

MR. COATES:  Is that all right?

MR. KNIFFIN:  One second.

Q.  (BY MR. KNIFFIN)  Did the Review Committee discuss whether Nick Rolovich was sincere after this e-mail went out on October 6th?

MR. COATES:  Again, I'll pose an objection. Do not reveal the contents of any communications with the Attorney General's office.

THE WITNESS:  And I think we need to discuss this because --

MR. KNIFFIN:  Okay. No. No, we're not going to take a break. This --

MR. COATES:  I can't --

MR. KNIFFIN:  Hold on.

MR. COATES:  I can't speak to her to figure out the extent of the privilege?

MR. KNIFFIN:  I want to understand, before we leave right here --

MR. COATES:  Do you want to ask if the AGO was involved?

Q.  (BY MR. KNIFFIN)  Is there anything in the policies or

Page 124

procedures here that says that anyone other than the Review Committee can find an applicant insincere?

A.  In the HRS internal guidelines, it addresses reviewing the paper that's submitted (indicating). And then if on paper there was questions, then we would follow up. The internal guidelines aren't as specific to address, once a department is notified, if a department has concerns.

Q.  Because that's not part of these procedures, is it?

MR. COATES:  Object to form.

THE WITNESS:  It -- it's the -- The guidelines were written very Step 1, Step 2. It -- it can't possibly take into -- every potential circumstance that might come up from Step 1 to Step 2 or within Step 1 or within Step 2.

MR. KNIFFIN:  This is Exhibit 87.

(Exhibit No. 87 - WSU Insider article - marked for identification.)

Q.  (BY MR. KNIFFIN)  This is not an internal procedure document. This is a publication from the WSU Communications Staff that was put on the WSU Insider on October 8th, '21. I would like you to look at page 3 of this document.

A.  (Reading.)

Q.  Have you reviewed this document before?

31 (Pages 121 to 124)

Case: 25-761, 09/15/2025, DktEntry: 54.5, Page 45 of 270

Case 2:22-cv-00319-TOR   ECF No. 98   filed 10/14/24   PageID.2126   Page 323 of 421

Rolovich v. Washington State University, et al.                                    Lisa Gehring

Page 125

A. I don't recall this particular one.

Q. I don't have them at the ready here, but there were 20 e-mails about, maybe more than that, that went around through the Communications department at the university and HRS fine-tuning this language, putting comments on it.

I want you to look at this and tell me if there's anything in this document that allows HRS to reopen a sincere determination after the process moves on to Step 2.

MR. COATES: Object to form. Foundation. Misstates the document.

THE WITNESS: (Reading.)

Can you ask your question again?

Q. (BY MR. KNIFFIN) Is there anything in this document that permits or anticipates the Review Committee reopening the sincerity determination after it had been completed?

MR. COATES: Same objections.

THE WITNESS: No, but I wouldn't expect that in a Communications article.

Q. (BY MR. KNIFFIN) Why not?

A. It's a media article. I think it's an article summarizing the process.

Q. Lisa, I've probably looked at 20,000 documents in this

Page 126

litigation. I've seen nothing that describes, anticipates in any way that HRS can go back and reopen a sincerity determination after moving on to Step 2. Is there anything you would point me to?

MR. COATES: Object to form.

THE WITNESS: We -- HR would have the expectation -- It would be as if an employee went through this process, and even though the committee may have determined it's a sincerely-held religious belief based on the document that was submitted, and gone through the accommodation process; and as soon as we contact a supervisor, if a supervisor would stop and say, "Hey, wait a second here" --

Q. (BY MR. KNIFFIN) Um-hmm.

A. -- they're saying that that's not the case, the employee is saying maybe -- I mean -- and this is just an example -- that they lied, we would have an expectation that a supervisor would let us know if the information wasn't sincere. Even though it's not documented in the guidelines, that any time a -- if there's something happening that is not consistent with the expectation that the employee is being honest in the process, that a supervisor should let us know.

So that would be an example of, even though it may not be, "Yes, supervisors, if you question it,

Page 127

let us know," we would expect if they had any concerns that they would let HR know.

Q. Where would I find a record that would tell me how often HRS or the Review Committee entertained objections or concerns about sincerity after an e-mail like this, Exhibit 81, had been sent out?

MR. COATES: Object to form.

THE WITNESS: Where there would be a record?

Q. (BY MR. KNIFFIN) Um-hmm.

MR. COATES: Same objection.

THE WITNESS: I -- I don't know specifically the type of record there would be.

Q. (BY MR. KNIFFIN) We'll look at this later, but WSU produced to us a spreadsheet of -- I don't know -- 600 or so different applications for medical or religious exemptions, and it doesn't provide all the information I hoped for. It provides some. It doesn't provide that.

And one thing I'd like to know is -- Well, let's start here: This document describes a blind review process, correct?

A. As Step 1, yes.

Q. Okay. So the first part -- the first step is the blind review, right? Correct?

A. The -- Yes.

Page 128

Q. Okay.

A. The reviewing of the information was a blind review of the sincerely-held religious belief.

Q. And it sounds like you're saying that in Nick Rolovich's instance, after Step 1 was completed, which is indicated by Exhibit 86, this e-mail going out. So Exhibit 79 says, "If sincerely-held religious belief is confirmed," that's when this e-mail goes out.

A. Um-hmm.

Q. I'd like to know how would I know if there were any other instances in which that confirmation was revisited or overturned?

MR. COATES: Object to form.

Q. (BY MR. KNIFFIN) How would I know that?

MR. COATES: Same objection.

THE WITNESS: I don't recall if there was documentation or -- I honestly don't recall. Again, I wasn't as directly involved in Step 2 of the process, so if supervisors did notify in Step 2 of a concern, I don't -- I'm not -- I'm not sure I was notified if they were.

Q. (BY MR. KNIFFIN) Um-hmm.

A. Yeah.

Q. Would Bonnie be a good person to ask that question?

32 (Pages 125 to 128)

# EXHIBIT OO

# Phil Weiler

# Rolovich v. Washington State University, et al.

# August 1, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: transcripts@buellrealtime.com

Rolovich v. Washington State University, et al.                                      Phil Weiler

Page 61

stories over the years. I do see that I'm quoted in the article, and I don't have any reason to believe he made the quote up, so, yes, I'm -- this may have been one of the times that I've spoken -- I spoke with him.

Q.  And I'll direct your attention to the bottom of -- let's just call it Page 3, where it says, "If an exemption request is approved in the blind review process, the employee (Rolovich) would discuss with the supervisor (Chun) whether his or her duties can still be performed according to" -- is it Weiler or Weiler?

A.  Weiler, yes.

Q.  Weiler -- "according to Weiler."
Is -- do you see that?

A.  I do, yeah.

Q.  And do you -- sitting here now, do you agree that that's what you told Mr. Wilner for the story?

A.  I believe he misunderstood what I said because my belief would be that the employee would not have to talk to their supervisor. That, in this case, I guess human resource services would talk to the supervisor. So it's a nuance, but I think his -- I think he's technically incorrect.

Q.  So you're -- what you're saying is the employee himself would not communicate directly with the supervisor. The next step would be for HRS to say, "We've

Page 62

approved the exemption, now we are coming to you to determine if you can provide a reasonable accommodation"?

MR. PEKELIS:  Object to form. foundation.

THE DEPONENT:  The way that you described it is the way I understood the process to work.

(Exhibit No. 7 introduced.)

Q.  (By Mr. Freimann) Let's move to Tab B. We'll mark this as Exhibit 7, and I apologize that the print is pretty small.

A.  All right.

Q.  This is also a story by Jon Wilner dated October 7th, 6:29 p.m. Do you see that?

A.  I see it, yup.

Q.  And do you recall if you were consulted or quoted in this particular story?

A.  As I mentioned, I've talked with Jon Wilner on a variety of stories over the years. I assume, again, if I'm quoted here directly, then -- then, yes, we had a conversation.

Q.  All right. And I'll direct your attention to the bottom of the first page under the header "If Rolovich's exemption request is approved." Do you see that?

A.  I do, yes.

Q.  The next line is, "If the blind review results

Page 63

in the approval of Rolovich's exemption request, the process would enter a second phase."
That's consistent with your understanding?

A.  Yes. I guess I want to continue to read to make sure I understand what Wilner is referring to when he says "a second phase."

Q.  And I think if we jump a paragraph --

MR. PEKELIS:  Sorry. Michael, he just asked for an opportunity to continue to read. I ask that you give -- give it to him.

MR. FREIMANN:  Fair enough.

(Deponent reviews exhibit.)

THE DEPONENT:  All right. I think I've read the -- the necessary parts.

Q.  (By Mr. Freimann) Skipping two paragraphs from where we were, at the bottom of the first page, "An approved request would be sent to the human resources department, which would identify the employee in question and send an email to his or her supervisor indicating the exemption had been approved."
Do you see that?

A.  I do, yes.

Q.  And that's what you relayed to Mr. Wilner?

A.  Yes. That was my understanding of how the process would work.

Page 64

Q.  Okay. And then the next paragraph, "At this -- at that point, according to Weiler, the supervisor would determine if the unvaccinated employee could be capable of keeping the public safe and performing his or her job effectively."
Is that, once again, what you relayed to Mr. Wilner?

MR. PEKELIS:  Object to form.

THE DEPONENT:  Yes. That was, again, how -- my understanding of how the process would function.

(Exhibit No. 8 introduced.)

Q.  (By Mr. Freimann) All right. Let's jump to the next one, Tab C, and mark this as Exhibit 8. And this is communication from WSU dated October 8, 2021. Is this something that you prepared?

A.  I'd have to read it. I might have had one of my employees prepare it. I don't recall if I wrote it myself or not.

Q.  Okay. Well, just to save time, I'm going to -- I'm going to refer you to a couple paragraphs, and I just want to make sure that it still jives with what you understood the process to be.
So if we jump to the -- the medical and religious exemptions on Page 3, do you see that?

A.  I do, yeah.

16 (Pages 61 to 64)

# EXHIBIT PP

# Bonnie Dennler (AWAITING CONFIDENTIAL DESIGNATIONS)

# Rolovich v. Washington State University, et al.

# August 21, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham  |  Everett  |  Tacoma  |  Olympia  |  Yakima  |  Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Rolovich v. Washington State University, et al.                    Bonnie Dennler (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 105

What this document tells me, I believe, is that there's two categories here on this of people whose supervisors would have been informed about their religious exemption request: The people who were accommodated and the people who were denied an accommodation.

Is that your understanding of this document?

MR. COATES: Object to form.

A. Yes. That would be the two categories that would have received this.

BY MR. KNIFFIN:

Q. So I've already got a decent handle on how the Athletics Department and the university as a whole treated the football coaches, and there's just a handful of other ones.

So if the university would have ever overturned a sincerity determination by the review committee, I think it would have to be one of these people that were denied an accommodation. Is that your understanding of this document?

MR. COATES: Object to form. Foundation.

A. I think -- I think so. I apologize. I think, based on what you're asking, based on this document, that group of individuals that were denied for accommodation -- not all of them. Some of them were

Page 106

questioned on their sincerity.

BY MR. KNIFFIN:

Q. Do you know of anyone else in this denied accommodation camp, can you recall anybody else besides Nick Rolovich, where the supervisor/department challenged the person's sincerity?

A. I just can't be 100 percent positive. I do believe -- I -- I believe it's possible that -- some of the others on that list, but I just cannot recall without -- I can't recall specifically. And specifically the Nursing in Spokane. Those are the two that I cannot recall.

Q. You said the two in the Nursing at Spokane? Is that what you said?

A. No, I said the two. One in, I think the Nursing --

Q. Okay.

A. -- and then I think there was one in Spokane.

Q. Yeah, there's an administrative professional. It doesn't say the campus, but it says the -- I don't know what that -- category that is.

A. But I -- again, I -- what I'm trying to express and answer is that there were other departments, and I cannot recall if it was those other individuals that were also denied for accommodation or individuals that

Page 107

were approved, where the department did express concerns regarding sincerity. And in those instances we followed the process and followed up -- worked with the attorneys and met as a group with that department in each of those situations. And what I recall is they were each different from each other. They were all unique, they were all individually reviewed based on the information presented.

Q. You said -- and I don't want to put words in your mouth. You said, we followed -- or the process was followed in those instances?

A. I said a similar -- sorry.

Q. Go ahead. Go ahead.

A. I said we followed a similar process in following up with the attorneys.

Q. Where --

A. If a question came in from the department we would loop in and consult with the attorneys.

Q. Is that process set out anywhere?

MR. COATES: Object to form.

A. It would have just been our internal processes we were working through the religious accommodation requests.

BY MR. KNIFFIN:

Q. Okay. So this document, 79, that we have been

Page 108

looking at -- it's somewhere in the pile. So this was the procedures that Lisa was proposing to you as final months later, in December. And when I look at 3A, it seems to me it's quite specific. "If sincerely religious belief is confirmed -- good -- HRS will notify employing department," Exhibit 80, "to determine if an accommodation would pose an undue hardship or fundamental altership -- alteration of position."

3B, "HRS will notify Environmental Health and Safety of accommodation requests."

So 3A and 3B are talking about the accommodation requests, which makes sense because 3 is reasonable accommodation.

The process that you're talking about, where can I find that detailed?

MR. COATES: Object to form.

A. I don't know where it would be detailed.

BY MR. KNIFFIN:

Q. The October --

A. There was a lot that we were working through.

BY MR. KNIFFIN:

Q. The October 8 WSU Insider piece that we looked at, that details the procedures, and that stuff is not explained there.

Phil Weiler had extensive interviews with

27 (Pages 105 to 108)

Rolovich v. Washington State University, et al.          Bonnie Dennler (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 109

reporters, and there were a lot of newspaper articles that went out that went into great detail and talked about the procedures, and I don't see it there.

Lisa worked with Chris Mulick, as we talked about, that he reached out to her and asked her to help him brief the governor on the processes. It's not mentioned there.

Is there anywhere I can go to see the procedures that you are saying were followed after Pat Chun challenged Nick Rolovich's sincerity?

MR. COATES: Object to form. Foundation.

A. Outside of this document, I don't know if that would have been documented any other way, but the department raising concerns, whether it be on the Rolovich case or the others, in my mind created a situation that we needed follow-up for how to proceed in those situations, and that's when and why we engaged the department in the conversation to follow up with them appropriately on the questions that they had, or sought guidance from legal counsel in those cases.

BY MR. KNIFFIN:

Q. So is it fair to say that if I wanted to know how those cases were handled, I'd have to talk to a WSU attorney?

MR. COATES: Object to form.

Page 110

A. I just don't know anywhere else where it would have been documented who those individuals were or what things...

BY MR. KNIFFIN:

Q. So aside from talking to a WSU attorney, is there any way for me to get that information?

MR. COATES: Object to form.

A. Not that I can think of.

BY MR. KNIFFIN:

Q. You said the first thing that you believe you did after you received the sincerity memo from Pat Chun was to call probably Nathan Deen; right?

A. I believe so.

Q. Did you have any conversations among the review committee members after receiving that memo about whether Nick Rolovich had a sincere religious belief?

MR. COATES: And I'll just pose an objection here to the extent that it calls for any communications with Nathan, like with the committee members. Obviously, if he wasn't there, then you can answer the question.

A. I cannot recall exactly what I did or who I talked with, but Lisa and I worked very closely together on a lot, and I would have talked to Lisa, and we would have talked to the attorneys. Just based on the

Page 111

processes that I engaged in at the time, that would have been the normal process, and -- and who those conversations would have been with.

BY MR. KNIFFIN:

Q. How many times do you think you talked to attorneys in connection with this Pat Chun memo and Nick Rolovich's case?

MR. COATES: I'll state an objection. You can answer how many times, but just don't reveal the contents of any communications with attorneys.

BY MR. KNIFFIN:

Q. Was it more than two?

A. It would have been multiple times, and I think it would have been probably more than -- more than five times. I --

Q. And were all those conversations between when you received the Pat Chun sincerity memo and when Nick was fired on October 18th?

MR. COATES: Object to form. Foundation.

A. I do not recall if there were any meetings prior, but I -- the ones I recall were after the memo. I can- -- I cannot recall if there was any additional conversations with Nathan.

////

Page 112

BY MR. KNIFFIN:

Q. Did you have any inkling that this memo or a memo like it was going to be coming from Pat Chun?

MR. COATES: The same objection not to reveal any contents of any communications with the AGO. To the extent you can answer without revealing those communications, you may proceed.

A. I do believe I did, and I think it was because Anne had just let me know that they were working on a follow-up to the email and would be providing information to us. I -- so I do think I was aware that information would be coming from Athletics and that they were reviewing information.

BY MR. KNIFFIN:

Q. Were you aware at this time that Kirk Schulz and the regents had been discussing a plan with regard to Nick Rolovich?

MR. COATES: Object to form.

A. No.

BY MR. KNIFFIN:

Q. Had you ever seen a written plan about what the university was planning to do with -- regarding to Nick Rolovich?

MR. COATES: Same objection.

A. No.

28 (Pages 109 to 112)

# EXHIBIT QQ

**Platform:** SMS-MMS-IMS    **Name:** CHAT - NR0000001 - 00677 - 2021/07/24    **Timezone:** UTC+0000

 Nick Rolovich <(509) 595-5272>

 Father Paul <+15095998437>

---

2021/07/24

Nick Rolovich <(509) 595-5272>

Father Paul, Nick Rolovich here.  Liam sent me your number.  I appreciate you thinking about me.

04:17:10 am

Father Paul <+15095998437>

Hi Nick, always!  Please know if you ever need anything please let me know. Your under allot of pressure an scrutiny an Sometimes it's nice to have someone to talk through it. Also, Liam Abraham and Victor are fine young man. God bless Nick and now I'm praying for you. Father Paul

04:20:38 am

Nick Rolovich <(509) 595-5272>

Liked "Hi Nick, always!  Please know if you ever need anything please let me know. Your under allot of pressure an scrutiny an Sometimes it's nice to have someone to talk through it. Also, Liam Abraham and Victor are fine young man. God bless Nick and now I'm praying for you. Father Paul"

04:37:08 am

Do you have time today?

02:42:41 pm

Father Paul <+15095998437>

I do. I will be in my office around 9am

02:43:38 pm

It's behind the Coug.

02:43:53 pm

4-SER-685

ROLOVICH00110790

Nick Rolovich <(509) 595-5272>

I'm not sure in person is a smart thing right now
02:44:13 pm

Father Paul <+15095998437>

Ok.
02:45:07 pm

I am free at 9 to talk on the phone.
02:45:36 pm

When is a good time for you
02:46:11 pm

Nick Rolovich <(509) 595-5272>

9 should work
02:46:21 pm

Father Paul <+15095998437>

Psalm 139 is
A passage for you an your family.
05:18:39 pm

Nick I gave father Kyle your phone number he should be texting to set up a time to talk.  Blessings
06:45:21 pm

4-SER-686

ROLOVICH00110791

# EXHIBIT RR

**Chat with <5053011787,8082182313> and 5 more addresses on July 13, 2021**

All Parties: 5053011787,8082182313; Unknown;
    Bill SR Stutzmann <+18082182313>; David Fox <+15053011787>

**Earliest item: 2021-07-13 06:54:13**
**Latest item: 2021-07-13 20:40:23**

**Tuesday 13 July 2021**

ROLOVICH00059433
ROLOVICH00059433

Instant Message : Native Messages          Time: 06:54:13
From: 5053011787,8082182313

Comical. How many of our associates will line up for this?



ROLOVICH00059434
ROLOVICH00059434

Instant Message : Native Messages                    Time: 06:56:39
From: 5053011787,8082182313



Instant Message : Native Messages                    Time: 06:58:47
From: Unknown

3rd dose

ROLOVICH00059435
ROLOVICH00059435

Instant Message : Native Messages          Time: 07:00:12
From: 5053011787,8082182313

6/22 day before Mcafee was $wacked

ROLOVICH00059436
ROLOVICH00059436

Instant Message : Native Messages     Time: **07:00:56**
From: 5053011787,8082182313

File (hide): 207ab7c6b758c9f···.png (85.31 KB, 873x515,
873:515, Screenshot_2021_07_11_2_21....png) (h) (u)

>>14111434
>6:22 PM timestamp on that tweet
>6/22 was the day before McAfee died
>pics rel
>oh wait, I'm overthinking it again
>or am i
#checkmate indeed
well played, vlad

*Disclaimer: this post and the subject matter and contents thereof -
text, media, or otherwise - do not necessarily reflect the views of the
Bkun administration.*

ROLOVICH00059437
ROLOVICH00059437

Instant Message : Native Messages   Time: 07:06:33
From: 5053011787,8082182313



ROLOVICH00059438
ROLOVICH00059438

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 07:07:47

Bring it Howie



**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 07:23:48

https://www.thegatewaypundit.com/2021/07/maricopa-county-voter-indicted-accused-casting-ballot-dead-mothers-name/

ROLOVICH00059439

ROLOVICH00059439

Instant Message : Native Messages                    Time: 07:26:15
From: 5053011787,8082182313

Damn they're all going down



ROLOVICH00059440

ROLOVICH00059440

Instant Message : Native Messages                                    Time: 09:16:59
From:

Thimerosal, a mercury-containing preservative used in vaccines, has been the fo
of intense scrutiny. Thimerosal is no longer used as a preservative in any childh
vaccine routinely used in the U.S. with the exception of some vials of the influen
vaccine. Because of the fear by parents that thimerosal contained in vaccines mi
have harmed their children, numerous studies have been conducted to address t
concern. These large, controlled studies have not found evidence of harm. To rea
about some of these studies, go to the "Thimerosal (mercury) and vaccines" sectic
our vaccine safety references page.

⊖ Manufacturing by-products ►

Because vaccines are made from viruses and bacteria, some chemicals and cell by
products used during vaccine production may remain in the final preparation in
minute quantities. Some examples include antibiotics, DNA, egg proteins, fetal
tissues, formaldehyde, human proteins, and yeast. 👆 👆                    👆

Concerns have also been voiced about SV40, a virus found in cells used to grow tl
poliovirus vaccine during the 1950s and 1960s. However, these concerns were
proven to be unfounded.

⊕ CDC's Pink Book - Vaccine Ingredients

⊕ References

ROLOVICH00059441
ROLOVICH00059441

Instant Message : Native Messages                    Time: 09:18:07
From:

Thimerosal, a mercury-containing preservative used in vaccines, has been the f
of intense scrutiny. Thimerosal is no longer used as a preservative in any childh
vaccine routinely used in the U.S. with the exception of some vials of the influen
vaccine. Because of the fear by parents that thimerosal contained in vaccines mi
have harmed their children, numerous studies have been conducted to address t
concern. These large, controlled studies have not found evidence of harm. To rea
about some of these studies, go to the "Thimerosal (mercury) and vaccines" secti
our vaccine safety references page.

⊖ Manufacturing by-products ►

Because vaccines are made from viruses and bacteria, some chemicals and cell b
products used during vaccine production may remain in the final preparation in
minute quantities. Some examples include antibiotics, DNA, egg proteins, fetal
tissues, formaldehyde, human proteins, and yeast.

Concerns have also been voiced about SV40, a virus found in cells used to grow t
poliovirus vaccine during the 1950s and 1960s. However, these concerns were
proven to be unfounded.

⊕ CDC's Pink Book - Vaccine Ingredients

⊕ References

Instant Message : Native Messages                    Time: 12:10:49
From: 5053011787,8082182313

https://t.me/CodeMonkeyZ/694

ROLOVICH00059442
ROLOVICH00059442

Instant Message : Native Messages                    Time: 12:15:27
From: 5053011787,8082182313



Instant Message : Native Messages                    Time: 12:15:39
From: 5053011787,8082182313

Boom

>The Plan is so much bigger and more brilliant
than I ever realized
> He baited them into doing what perhaps
wasn't suppose to happen for another 5-10
years.

Agenda21 >>> Agenda30
Agenda30 >>> Agenda21

Their evil plan has been derailed. Now they are
trying to salvage what is left of it.

*Disclaimer: this post and the subject matter and contents thereof -
text, media, or otherwise - do not necessarily reflect the views of the
8kun administration.*

ROLOVICH00059443
ROLOVICH00059443

Instant Message : Native Messages                    Time: 12:16:13
From: 5053011787,8082182313

Unknown [https://archive.is/KllQbj]
Unknown [https://archive.is/AEQgp]
Milton Loice Moran, 48 [https://archive.is/PiJpR]
Anthony Travis Bodda, 21 [https://archive.is/eQ8HB]
Alexander Jones, 36
Unknown [https://archive.is/eAHK7]
Michael Jarrod Bakkela, 41 [https://archive.is/DGEGz]
[https://archive.is/Vr0Tj] [https://archive.is/mqJnl]
Jonathan Maas, 44 [https://archive.is/Hw9JK]
Combat tactics, Mr. Ryan. By turning into the path of the torpedo,
the Captain closed the distance before it could arm itself.
Q

Q !UW.yye1fxo  ID: ee2415  No.97705                    567
Jan 19 2018 17:46:02 (EST)

Anonymous  ID: a27ebf  No.97686
Jan 19 2018 17:44:43 (EST)

>>97639

Any insight into the Fake News Awards?
Hard to believe POTUS would have to reschedule 10 days later
just to tweet a link, unless something else was happening there.
Was our work here successful for what you needed from us?

>>97686
Combat tactics.
Q

ROLOVICH00059444
ROLOVICH00059444

Instant Message : Native Messages                    Time: 12:17:01
From: 5053011787,8082182313



ROLOVICH00059445
ROLOVICH00059445

Instant Message : Native Messages    Time: 12:17:23
From: 5053011787,8082182313

> Sometimes you can't TELL the public the truth.
> YOU MUST SHOW THEM.

Boy have we been shown.

> Crimes against children unite all humanity [cross party lines]?
> Difficult truths.

Crimes against children = COVID-19 vaccination? (pop control)

The Plan is so much bigger and more brilliant than I ever realized. Even I struggle to cope with the naked authoritarianism on display. When The People learn the truth about COVID + Vax, they won't wait for law enforcement or the military. They will hunt these people down and lynch them in the streets.

Disclaimer: this post and the subject matter and content thereof - text, media, or otherwise - do not necessaril... ...ect the views of the 8ku...

Instant Message : Native Messages    Time: 14:21:01
From: Unknown

Trauma

Instant Message : Native Messages    Time: 16:26:12
From:

https://www.stopworldcontrol.com/

Instant Message : Native Messages    Time: 16:53:05
From: Unknown

Seems to be heating up daily

ROLOVICH00059446
ROLOVICH00059446

Instant Message : Native Messages                    Time: 16:56:26
From: 5053011787,8082182313

WW3 isn't for everyone 😉

Instant Message : Native Messages                    Time: 17:31:19
From: 5053011787,8082182313

https://www.dailymail.co.uk/health/article-9784519/Moderna-launches-
clinical-trial-testing-COVID-vaccine-safe-pregnant-women.html

Instant Message : Native Messages                    Time: 17:31:25
From: 5053011787,8082182313

What woman would volunteer for this?

Instant Message : Native Messages                    Time: 17:36:46
From: 5053011787,8082182313

This is all insane!!!

Instant Message : Native Messages                    Time: 17:41:46
From: 5053011787,8082182313



ROLOVICH00059447
ROLOVICH00059447

Instant Message : Native Messages                Time: 17:45:55
From: 5053011787,8082182313



Instant Message : Native Messages                Time: 17:55:34
From: 5053011787,8082182313

The president of Haiti was assassinated on July 7th. He opposed distribution of the covid vaccine.

On July 9th, Jen Psaki said, "Haiti is one of the countries that is — will be receiving vaccines from the United States. We will be prepared to deliver those, hopefully as early as next week.

ROLOVICH00059448
ROLOVICH00059448

Instant Message : Native Messages                    Time: 17:55:37
From: 5053011787,8082182313

https://www.whitehouse.gov/briefing-room/press-
briefings/2021/07/09/press-briefing-by-press-secretary-jen-psaki-july-9-
2021/

Instant Message : Native Messages                    Time: 18:07:00
From: 5053011787,8082182313

'Dasting

Instant Message : Native Messages                    Time: 18:13:19
From: 5053011787,8082182313

Whether you're a flat earther or not you have to love this chick's
storytelling



Instant Message : Native Messages                    Time: 18:14:55
From: 5053011787,8082182313

😂

ROLOVICH00059449
ROLOVICH00059449

Instant Message : Native Messages                    Time: 18:19:40
From: 5053011787,8082182313

It's habbening



Instant Message : Native Messages                    Time: 18:42:00
From: 5053011787,8082182313

https://youtu.be/bg3h5oARWhI

Instant Message : Native Messages                    Time: 18:43:22
From: 5053011787,8082182313

I pray someone comes to my door

ROLOVICH00059450
ROLOVICH00059450

Instant Message : Native Messages                    Time: 18:52:51
From: 5053011787,8082182313

😂



Instant Message : Native Messages                    Time: 18:55:50
From: 5053011787,8082182313

5x5 from God himself

ROLOVICH00059451

Instant Message : Native Messages    Time: 19:03:56
From: 5053011787,8082182313

https://twitter.com/6ft7300/status/1415031267670769669

---

Instant Message : Native Messages    Time: 19:19:09
From: 5053011787,8082182313

That was great

---

Instant Message : Native Messages    Time: 19:27:43
From: 5053011787,8082182313

https://breaking-news.ca/canada-prohibits-all-vaxxed-pilots-from-flying-
the-corona-vax-is-a-medical-trial-and-such-vaccinations-are-ruled-to-
ground-all-pilots/

---

Instant Message : Native Messages    Time: 19:27:43
From: 5053011787,8082182313

Clown world

---

Instant Message : Native Messages    Time: 19:29:01
From: 5053011787,8082182313

https://nationalfile.com/report-united-airlines-tells-pilots-to-take-vax-or-
be-grounded-indefinitely/

---

Instant Message : Native Messages    Time: 19:29:03
From: 5053011787,8082182313

Clown world

4-SER-707

ROLOVICH00059452
ROLOVICH00059452

Instant Message : Native Messages          Time: 19:30:32
From: 5053011787,8082182313

It's habbening

## Michigan Attorney Drops HUGE BOMBSHELL Update: Evidence of Voting Machines Breached in Michigan

Stefanie revealed evidence of voting machines breached in Michigan during the election.

Here is the video if the live-stream is cut off.
https://rumble.com/vjsv8v-live-at-5-pm-cdt-bombshell-report-michigan-election-2020-case-with-atty.-st.html

https://www.thegatewaypundit.com/2021/07/breaking-michigan-attorney-drops-huge-bombshell-election-fraud-tonight-6-pm-et-live-stream-video/

ROLOVICH00059453
ROLOVICH00059453

Instant Message : Native Messages                    Time: 19:31:22
From: 5053011787,8082182313



ROLOVICH00059454
ROLOVICH00059454

Instant Message : Native Messages                    Time: 19:33:27
From: 5053011787,8082182313



Instant Message : Native Messages                    Time: 19:35:11
From: 5053011787,8082182313

https://nationalfile.com/breaking-voterga-finds-thousands-of-fraudulent-biden-votes-in-georgia-has-photo-evidence-of-falsified-tally-sheets/

Instant Message : Native Messages                    Time: 19:35:13
From: 5053011787,8082182313

It's habbening

ROLOVICH00059455
ROLOVICH00059455

**Instant Message : Native Messages**          Time: 19:35:25
From: Unknown

Who is Ruby Freeman

**Instant Message : Native Messages**          Time: 19:37:24
From: 5053011787,8082182313

Her and her daughter are GA election workers that stayed with a couple of others when the "pipe broke" and are on video running same ballots through machines multiple times. Pulled suitcases from under tables etc.,Soon to be convict

**Instant Message : Native Messages**          Time: 19:37:52
From: 5053011787,8082182313





MORE FOLDS THAN A FORGED GEORGIA BALLOT

**Instant Message : Native Messages**          Time: 19:43:56
From: 5053011787,8082182313

Holy f everything is dropping

ROLOVICH00059456
ROLOVICH00059456

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:43:56

https://t.me/KanekoaTheGreat/799

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:45:57

There's no hope for these people, GA ballots released to publish to digg on, it's just a matter of time now

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:45:57

https://t.me/KanekoaTheGreat/811

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:46:03

Public

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:46:45

https://t.me/RealGenFlynn/342

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:47:10

I don't know, GA may beat MI

4-SER-712

ROLOVICH00059457

ROLOVICH00059457

Instant Message : Native Messages                    Time: 20:27:30
From: 5053011787,8082182313

MyPillow might be spot on with his Aug 13 prediction



ROLOVICH00059458
ROLOVICH00059458

Instant Message : Native Messages          Time: 20:40:23
From: 5053011787,8082182313

Have not confirmed this is real yet



**End Thread**

ROLOVICH00059459

ROLOVICH00059459

Thread Statistics

**Instant Message Count:** 59

**ROLOVICH00059460**
ROLOVICH00059460

# EXHIBIT SS

Platform: SMS-MMS-IMS    Name: CHAT - NR0000001 - 00749 - 2022/08/26    Timezone: UTC+0000

Chris Smith <+14155155215>    Nick Rolovich <(415) 328-6745>

2022/08/26

Chris Smith <+14155155215>

Tucker is reporting on vax poison tonight. It's mainstream now
03:24:21 am

Nick Rolovich <(415) 328-6745>

They will pay.
03:44:12 am

Chris Smith <+14155155215>


03:50:55 am

Nick Rolovich <(415) 328-6745>

And money will not be the currency.  The payment will haunt their souls
03:52:16 am

Good wins
03:52:23 am

Chris Smith <+14155155215>

But the money will help and I pray we both win
03:53:55 am



EXHIBIT 197
ROLOVICH
10/4/2024
Buell Realtime Reporting
206-287-9066

ROLOVICH00110649

# EXHIBIT TT

**Chat with <5053011787,8082182313> and 5 more addresses on July 23, 2021**

All Parties: Bill SR Stutzmann <+18082182313>; 5053011787,8082182313; Unknown; David Fox <+15053011787>

**Earliest item: 2021-07-23 05:49:05**
**Latest item: 2021-07-23 23:06:22**

**Friday 23 July 2021**

Instant Message : Native Messages    Time: 05:49:05
From: Unknown

Nothin

Instant Message : Native Messages    Time: 05:49:22
From: 5053011787,8082182313

I was just getting ready to look

Instant Message : Native Messages    Time: 05:51:14
From: 5053011787,8082182313

▶Anonymous 07/23/21 (Fri) 06:50:37 ID: 526f1e **(3)**
No.14181274

>>14180892
The US  sends lots of money to both Africa and
Asia to kill babies

When Trump stopped it
Swedish pm and Canada pm pick up the tab

til bidan restored the moneys jan 20 2021

*Disclaimer: this post and the subject matter and contents thereof -
text, media, or otherwise - do not necessarily reflect the views of the
8kun administration.*

4-SER-719

ROLOVICH00059920

Instant Message : Native Messages          Time: 06:04:01
From: 5053011787,8082182313

> ▶Anonymous 07/23/21 (Fri) 06:53:55 ID: 9e85e7 **(1)**
> No.14181300 >>14181305 >>14181323
>
> So… no McAfee file drop yet.
>
> That's because anons should be focused on
> the Arizona audit.
>
> Don't let the noise distract.
>
> *Disclaimer: this post and the subject matter and contents thereof -*
> *text, media, or otherwise - do not necessarily reflect the views of the*
> *8kun administration.*

Instant Message : Native Messages          Time: 06:09:29
From: 5053011787,8082182313

https://media.8kun.top/file_store/593e233385b47f65ae0c7899fc6c7882
56df3b39669ab90be96c026afa0087ba.mp4

Instant Message : Native Messages          Time: 06:09:30
From: 5053011787,8082182313

WTAF?

Instant Message : Native Messages          Time: 06:10:42
From: 5053011787,8082182313



4-SER-720

ROLOVICH00059921

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: **06:10:51**



4-SER-721

ROLOVICH00059922

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: **06:11:05**



ROLOVICH00059923

**Instant Message : Native Messages**                    Time: 06:11:40
**From:** 5053011787,8082182313

> ▶**Anonymous** 07/23/21 (Fri) 06:32:19 ID: 2b6996 **(3)**
> No.14181172
>
> >>14181109
> Every C19 variant was an op code, that sounds right.
>
> *Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

**Instant Message : Native Messages**                    Time: 06:13:16
**From:** 5053011787,8082182313

Had not seen this , spoofy af...



> ▶**Anonymous** 07/23/21 (Fri) 06:20:26 ID: 7dc96e **(6)**
> No.14181094  >>14181145
> File (hide): 02504558c27379d⋯.png (475.37 KB, 1060x807, 1060:807, ClipboardImage.png) (h) (u)
>
> another house explosion....something is happening
> strange how all these homes are suddenly exploding, and the one in TX investigators think was intentional, imagine that...
>
> *Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

ROLOVICH00059924

Instant Message : Native Messages          Time: **06:13:40**
From: 5053011787,8082182313

6 houses exploding in a month

PRINCETON, Minn. — Authorities say an explosion and fire at a house in Princeton Thursday left one person dead and two others with unknown injuries.
https://www.twincities.com/2021/07/22/1-dead-2-injured-in-house-explosion-and-fire-in-princeton/

LACKAWANNA, N.Y. — The investigation is underway into what caused a Lackawanna house to explode Tuesday morning, leaving one woman dead.
https://www.wgrz.com/article/news/local/crews-respond-to-explosion-in-lackawanna/71-ef88b7c5-c365-410e-8754-334e725a3fca

PLANO, Texas — The explosion that destroyed a house in suburban Dallas and heavily damaged the two next door, injuring six people, may not have been an accident, officials said Wednesday.
https://www.usatoday.com/story/news/nation/2021/07/22/texas-house-explosion-people-may-have-been-intentional-not-gas-leak/8057057002/

COATESVILLE, Pa. (CBS) — Two adults and four children were injured in a two-alarm fire in Chester County on Wednesday, July 21. Emergency crews were called to the 400 block of Hibernia Road in Coatesville for a report of an explosion with entrapment around 11:45 a.m.
https://www.wearecentralpa.com/news/regional-news/house-explosion-in-chester-county-leaves-six-injured/

4-SER-724

ROLOVICH00059925

Instant Message : Native Messages          Time: 06:13:52
From: 5053011787,8082182313

GREENVILLE COUNTY, S.C. —
A man burned following a house explosion
earlier this month died from his injuries
Tuesday, according to Coroner Parks Evans,
with the Greenville County Coroner's Office.
https://www.wyff4.com/article/man-burned-
in-greenville-county-house-explosion-dies-
coroner-says/37082413#

MILWAUKEE — There was an explosion that
happened inside a home at the corner of North
18th Street and Keefe Avenue in Milwaukee
around 1:30 p.m. Wednesday, Milwaukee
police said.
https://www.tmj4.com/news/local-
news/explosion-in-milwaukee-house

*Disclaimer: this post and the subject matter and contents thereof -
text, media, or otherwise - do not necessarily reflect the views of the
8kun administration.*

ROLOVICH00059926

**Instant Message : Native Messages**          Time: **06:14:19**
From: 5053011787,8082182313



ROLOVICH00059927

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 06:14:53

Gotta be something

even moar
WARREN, Mich. – Authorities in Warren are dealing with the aftermath of a suspected house explosion Sunday evening.
It happened at a residence on Villa Pointe Drive, near Schoenherr Road.
https://www.clickondetroit.com/news/local/2021/07/04/house-explodes-in-warren-fire-crews-on-scene/

If You Live in These States, Prepare for More of This Deadly Spider, Experts Say
Some Grocery Stores Pulling Ben & Jerry's Off Shelves After Brand Announces…

CAMILLA, Ga. (WALB) - A Camilla woman was killed in an accidental fire Monday night, according to the Georgia Commissioner of Insurance and Safety Fire's office.
https://www.msn.com/en-us/news/crime/gas-explosion-house-fire-kills-camilla-woman/ar-AALmC8p?ocid=BingNewsSearch

North Carolina – FAMILY WIPED OUT Four found shot dead 'including adopted kids' after 'explosion' at house
https://www.thesun.co.uk/news/15461939/four-found-shot-dead-explosion-at-house/

The brick chimney is all that's left standing amid smouldering ruins after an explosion levelled a Saskatoon home and killed one person.
https://ca.news.yahoo.com/explosion-destroys-saskatoon-house-no-160917347.html

Sheriff: 2 killed in Albany County house explosion
BERNE, N.Y. (AP) — Authorities are investigating a house explosion that killed an

4-SER-727

ROLOVICH00059928



**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: **06:15:37**

ROLOVICH00059929

Instant Message : Native Messages          Time: 06:20:49
From: 5053011787,8082182313

▶Anonymous  07/23/21 (Fri) 06:46:07 ID: 57ace1 (1)
No.14181249  >>14181264

" the end won't be for everyone"

Q .....
No shit. The absolute disaster of the current
USA administration is fucking the whole world
up.
Anon is a USA expat living in Australia. May as
well be Oz.

Severe lockdowns in Australia, over a pitiful
amount of ' cases'.
Emergency mask mandates changed
overnight. Police are power hungry
knuckleheads here.
I just spoke with a lawyer regarding
constitutional rights over this shit.
Know what he said????
" That's the least of our worries, they're making
vaccines mandatory next, because no one will
challenge it in court, takes  at least 12k a day ,
For a barrister.

FOR THE LOVE OF GOD, SAY SOMETHING
Q.

Wtf do we do?
Handed them our guns years ago, ( not that I
had any, too young then).
How the fuck are we supposed to deal with
this.
Is it still wwg1wga???
Cause it's seemingly fucked.

-Anon

4-SER-729

ROLOVICH00059930

Instant Message : Native Messages                    Time: 06:27:40
From: 5053011787,8082182313

Anons seem to be insinuating that the homes exploding are drone strikes 🤔



▶Anonymous 07/23/21 (Fri) 06:58:10 ID: 79c99c (16)
No.14181327  >>14181363  >>14181396  >>14181403
>>14181408  >>14181418

File (hide): 1fb516c5a942cb9···.png (401.66 KB, 831x624,
277:208, Opera_Snapshot_2021_07_23_….png) (h) (u)

>>14181313
>>14181285
What are the odds two
UAVs **POINTR48** and **RICO23**
and RICO23 using **0717** as a squawk code **o7**
**Q**

*Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

Instant Message : Native Messages                    Time: 06:28:30
From: 5053011787,8082182313

o7 is a salute on the board

ROLOVICH00059931

Instant Message : Native Messages                    Time: 06:30:38
From: 5053011787,8082182313

https://www.iatkos.in/2021/07/whackd-secure-live-video-uplink.html

Instant Message : Native Messages                    Time: 06:31:15
From: 5053011787,8082182313



ELECTION INTEGRITY

OAN ARIZONA SENATE CALLS TO DECERTIFY ELECTION

**Ariz. Senate calls to decertify election**

Arizona state senators are calling to decertify the election after a large number of discrepancies and irregularities were found in the Maricopa audit.

ROLOVICH00059932

Instant Message : Native Messages                    Time: 06:35:52
From: 5053011787,8082182313

▶Anonymous 07/23/21 (Fri) 07:02:45 ID: 79c99c (18)
No.14181357  >>14181378
File (hide): 3fbeeff8b8e058d⋯.png (18 KB, 442x194, 221:97,
Opera_Snapshot_2021_07_23_....png) (h) (u)

717
Q !UW.yye1fxo 02/10/2018 06:33:36  ID: 89220c
Archive Bread/Post Links:  325849 / 326006
Direct Link: 326006

Public: FBI/DOJ/O-WH/SD
Private: Clowns Clowns Clowns
Expand your thinking.
Q

>>14180971
>>14181336
>>14181038
0717 squawk code tracking Q post 0717

Public: FBI/DOJ/O-WH/SD
Private: Clowns Clowns Clowns
Expand your thinking.
Q

*Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

Instant Message : Native Messages                    Time: 06:47:26
From: Unknown

What is the video link? Mcafees?

Instant Message : Native Messages                    Time: 06:49:30
From: 5053011787,8082182313

Yes, original countdown opened vid link which started some other clock. Could be something but probably needs to be approached as Larpy initially so we don't get distracted. AZ Senators now calling for decertification.

ROLOVICH00059933

Instant Message : Native Messages                    Time: 07:36:08
From: 5053011787,8082182313

Info on Trump speech tomorrow

Instant Message : Native Messages                    Time: 07:36:08
From: 5053011787,8082182313

https://t.me/real_DonaldJTrump/13779

4-SER-733

ROLOVICH00059934

Instant Message : Native Messages                    Time: **08:17:58**
From: **5053011787,8082182313**

🤔



ROLOVICH00059935

Instant Message : Native Messages                    Time: 08:19:08
From: 5053011787,8082182313



Instant Message : Native Messages                    Time: 12:39:40
From: 5053011787,8082182313

https://tapnewswire.com/2021/07/fully-vaccinated-people-are-65-more-likely-to-be-hospitalised-1540-more-likely-to-die-due-to-covid-19-than-people-who-are-unvaccinated-according-to-latest-public-health-england-data/

Instant Message : Native Messages                    Time: 13:29:56
From: 5053011787,8082182313

404_Not_Found (@4_04_Not_Found) Tweeted:

Google whistleblower, Zach Vorhies says that Google/YouTube has blacklists censoring CURES FOR CANCER.

He also went on to explain that they were also censoring any information that showed the Vegas shooter (Stephen Paddock) was a Democrat, when in fact he was anti-Trump. https://t.co/kdktPTy7bU https://twitter.com/4_04_Not_Found/status/1418232858108473346?s=20

4-SER-735

ROLOVICH00059936

Instant Message : Native Messages          Time: 13:30:12
From: 5053011787,8082182313


404_Not_Found
@4_04_Not_Found                            ...

Google whistleblower, Zach Vorhies says that Google/YouTube has blacklists censoring CURES FOR CANCER.

He also went on to explain that they were also censoring any information that showed the Vegas shooter (Stephen Paddock) was a Democrat, when in fact he was anti-Trump.



REAL AMERICA'S  ZACH VORHIES
0:53 · 3.7K views stleblower
IC OPENER                                  WAR ROOM PANDEMIC

11:33 AM · Jul 22, 2021 · Twitter Web App

**Evil has no limits, don't ever forget they want us sick or dead**

https://twitter.com/4_04_Not_Found/status/141 82328581084733346?s=20

*Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

ROLOVICH00059937

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 13:31:30

Anonymous 07/23/21 (Fri) 11:38:09 ID: c43654 **(10)**
No.14182975  >>14182998  >>14183001  >>14183186
File (hide): 20ae212dcd767c1···.jpg (194.04 KB, 840x452,
210:113, kff_covid_data_3719768345_....jpg) (h) (u)



Percent of Total Population that Has Received at Least One COVID-19 Vaccine Dose by Race/Ethnicity, March 1 to July 19, 2021

>>14182841

>The remaining unvaxed in the black and brown communities are driving the fascists bonkers.

The states with low vaccination rates also tend to have larger minority populations. And blacks are the least likely racial or ethnic group to have been vaccinated, with Hispanics the second least likely

https://issuesinsights.com/2021/07/23/who-are-the-real-covid-vaccine-refuseniks-hint-its-not-what-youve-been-told/

---

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 13:33:10

https://issuesinsights.com/2021/07/23/who-are-the-real-covid-vaccine-refuseniks-hint-its-not-what-youve-been-told/

ROLOVICH00059938

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 13:33:20



ROLOVICH00059939

Instant Message : Native Messages   Time: 14:04:18
From: 5053011787,8082182313





AP Photo/Jonathan J. Cooper

EYES ON!!

The auditors, volunteers, and other members are leaving the coliseum after completing both the hand recount and paper evaluation of nearly 2.1 million ballots in the massive county.

Police helped protect, secure, and transport the ballots to a secure location.

https://conservativebrief.com/nears-completion-46141/

*Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the*

---

Instant Message : Native Messages   Time: 14:07:12
From: 5053011787,8082182313

https://conservativebrief.com/nears-completion-46141/

ROLOVICH00059940

Instant Message : Native Messages                           Time: 14:40:32
From: 5053011787,8082182313



9 KB JPG

I made it clear that through my lawyer I would begin to demand the status of all other employee's health condition in regards to other forms of communicable diseases. We would be demanding information on employee's with aids, hepatitis, flu, STDs, measles, mumps, and so on. My lawyer already had the papers drawn up so I could serve him the first day he tried it and part of the suit would be to force the company to make immediate policies to section off employees who had any illness they could spread, including the common cold. If they were going to take responsibility in stopping the spread of covid-19 in the building they were now liable for the spread of anything else.

Within 24 hours we were all informed that they would no longer demand to see our papers.

---

Instant Message : Native Messages                           Time: 14:41:35
From: 5053011787,8082182313

https://www.dailymail.co.uk/news/article-9817861/Covid-26th-leading-cause-death-England-June.html

---

Instant Message : Native Messages                           Time: 14:41:36
From: 5053011787,8082182313

Remember guise it's all just fear porn, we ain't crazy

---

Instant Message : Native Messages                           Time: 14:43:15
From: Unknown

I need some help. Shit is getting pretty hot for me

---

4-SER-740

ROLOVICH00059941

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 14:44:10

We're you able to get in touch with Sidney's guy. I think that is your best avenue

Instant Message : Native Messages
From: Unknown

Time: 14:44:24

Not yet

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 14:44:53

Those people and AFLDrs are powerful af. You gotta reach out.

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 14:45:32

You can't fight this on your own. Those people know how to do this. Text him right now

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 14:46:20

They're forcing you to get counsel, that group is the best out there

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 14:47:32

That group wrote a letter to hospital group in Montana and immediately they backed off on all their bs

4-SER-741

ROLOVICH00059942

**Instant Message : Native Messages**                    Time: 15:37:10
From: 5053011787,8082182313

▶Anonymous  07/23/21 (Fri) 16:17:28 ID: 417810 **(1)**
No.14184586  >>14184641  >>14184693  >>14184706
File (hide): 8ea372248b95091⋯.png (35.92 KB, 576x216, 8:3,
NCSWC.PNG) (h) (u)

NOTHING CAN STOP WHAT IS COMING.

NOTHING.

WWG1WGA!!!

Q

Frens, Would not hurt to prepare for another
lockdown, masks, bare shelves at the stores
and Antifa riots within weeks . Makes sense
when you think about it, their back is against
the wall, they are cornered, voting fraud  is
coming and they have no other moves, D5
Now comes the PAIN & NCSWIC

*Disclaimer: this post and the subject matter and contents thereof -
text, media, or otherwise - do not necessarily reflect the views of the
8kun administration.*

**Instant Message : Native Messages**                    Time: 15:52:11
From: 5053011787,8082182313

https://nationalfile.com/wisconsin-movement-for-forensic-audit-
develops-in-legislature-as-citizens-flood-capitol-with-affidavits/

4-SER-742

ROLOVICH00059943

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 15:56:51

▶**Anonymous** 07/23/21 (
No.14184103 >>14184329
YouTube embed. Click thumbnail t



**Vikings part ways with vax refusing assistant coach…**

REPORT: Vikings Coach Rick Dennison Leaves The Team After Refusing To Get The Coronavirus Vaccine

According to ESPN, Dennison has left the team after refusing to get the coronavirus vaccine. The vaccine is mandatory for all coaches, front office executives and scouts, according to the same report.

It's believed that Dennison is the first person in the NFL to lose his job for refusing to get the vaccine.
https://dailycaller.com/2021/07/23/report-vikings-coach-rick-dennison-gone-coronavirus-vaccine/

▶**Anonymous** 07/23/21 (Fr
15:32:43 ID: 18bbb1 **(14)**
No.14184329

>>14184103
He'll make more $$$$$ in the lawsuit.

Disclaimer: this post and the su j
matter and contents thereof - t xt
media, or otherwise - do not
necessarily reflect the views of th
8kun administration.

4-SER-743

ROLOVICH00059944

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 15:59:42

https://media.8kun.top/file_store/1491d030cd26cad8f644b1cf66d6ac1d4485ec634897fd211da127daab079851.mp4

---

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 15:59:42

"Milked like a c cow"

---

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 16:36:46

OK look at how they're doing this, lying.

CDC says that 85% of new cases are Delta variant, sounds scary right?

85% sound scary until you realize that it's 26 people in New York State, a population of 20 million,

They probably had 30 "new cases" so the 26 comprised 85%!!!

This my friends, is how you gin up sufficient fear, to foment a Civil War between the vaccinated in the unvaccinated

---

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 16:44:17

1)

Nephew had J&J shot. Currently in hotel in Clemson , SC quarantined for 10 days with Covid. Sounds like shit.

2)

My sister in law, his mother , is 58. Took Phizer vax, hasn't had her monthly cycle in quite some time... until today.

Fucking vax. And we're the crazy ones

ROLOVICH00059945

Instant Message : Native Messages                    Time: 17:19:50
From: 5053011787,8082182313



Instant Message : Native Messages                    Time: 17:32:52
From: 5053011787,8082182313

https://thenationalpulse.com/analysis/why-the-debt-ceiling-matters-to-deplorables/

ROLOVICH00059946

Instant Message : Native Messages          Time: 17:33:15
From: 5053011787,8082182313



**Raheem J. Kassam** ✔
@RaheemKassam

"There are no examples of fiat currency schemes surviving. None."

Why The Debt Ceiling Matters To Deplorables.
🔗 thenationalpulse.com

11:09 AM · Jul 22, 2021 · Twitter Web App

4-SER-746

ROLOVICH00059947

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: **18:20:00**



ROLOVICH00059948

Instant Message : Native Messages          Time: 18:40:34
From: 5053011787,8082182313



**Justin Hart**
@justin_hart

Leaked hospital deets on vaxxed patients! Anyone want to guess why "99% of all hospitalized patients with #COVID19 are unvaccinated!" ?

Because it's policy NOT to test vaccinated people when they come in.

Scripps
Corporate Command Center Approved    Date: 6.15.21; v24.6    Δ = Change in document
**COVID and Flu Testing**

ROLOVICH00059949

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 18:40:38



**Justin Hart**
@justin_hart

Leaked hospital deets on vaxxed patients! Anyone want to guess why "99% of all hospitalized patients with #COVID19 are unvaccinated!" ?

Because it's policy NOT to test vaccinated people when they come in.


Scripps
Corporate Command Center Approved    Date: 6.15.21; v24.6    Δ = Change in document
**COVID and Flu Testing**

**Instant Message : Native Messages**
From: 5053011787,8082182313

Time: 19:50:47





4-SER-749

ROLOVICH00059950

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:50:47

6 minutes

Must watch

---

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 19:57:34

Whoa.

---

Instant Message : Native Messages
From: 5053011787,8082182313

Time: 20:20:47

We knew this day would come.... buckle up, we're close

---

Instant Message : Native Messages
From:

Time: 20:22:35

Vakseen fascism is the apotheosis of neoliberalism. Under vakseen fascism the state owns your body, Pharma is the state, Pharma uses human bodies as toxic profit factories, life itself is ultimately discarded as waste, and a bunch of bougie grifters help manage and cover up the genocide in return for a share of the loot. What's profoundly weird though is that the left academics who have been screaming the loudest about the dangers of neoliberalism for the past 50 years are mostly silent on vakseen fascism because they are so culturally & financially captured that they have unwittingly become part of the bougie grifter class themselves.

4-SER-750

ROLOVICH00059951

**Instant Message : Native Messages**
From:

Time: **20:23:07**



4-SER-751

ROLOVICH00059952

| Instant Message : Native Messages From: | Time: 20:27:28 |
|---|---|



| Instant Message : Native Messages From: 5053011787,8082182313 | Time: 21:39:59 |
|---|---|

Time will tell

| Instant Message : Native Messages From: 5053011787,8082182313 | Time: 21:39:59 |
|---|---|

https://t.me/CodeMonkeyZ/863

| Instant Message : Native Messages From: 5053011787,8082182313 | Time: 21:46:15 |
|---|---|

Anonymous (ID: yOddsRD ) 🇺🇸 04/14/20(Tue)16:52:04 No.253472179 ▶

/pol has known this since January. leaked chinese treatment protocols caused for heparin and IV vitamin c (to counter heparin resistance?). hypercoagulation was reported with SARS-1 as well.
>https://www.atsjournals.org/doi/pdf/10.1164/ajrccm.182.3.436

high fibrinogen probably linked to high levels of inflammation caused by advanced disease processes. widely seen in stage III and IV cancer patients.

4-SER-752

ROLOVICH00059953

Instant Message : Native Messages                                    Time: 21:46:58
From: 5053011787,8082182313



Instant Message : Native Messages                                    Time: 21:47:58
From: 5053011787,8082182313

ROLOVICH00059954

Instant Message : Native Messages          Time: 21:48:26
From: 5053011787,8082182313

Goes with those graphics

>>14185869
Unlike you, I've done my homework.
Micrioclotting is causing the myocarditis.
There's literally NOTHING that is going to fix
this. Nothing.

BTW like I told the idiot compter guy..(who has
a pcaemaker...) "if you start experiencing the
same stymptoms you had before you got the
pacemaker, get the D-dime test as all the other
test in the world show normal when in fact the
micro clots have begun. I should have told
hinm to ask now for a baseline D-dime test so
when he starts having other issues they have
something to compare...but honestly it's
pointless. he's already got a pacemaker. Don't
you get it?-

https://www.washingtonpost.com/health/2020/0
4/22/coronavirus-blood-clots/
https://archive.is/6byG1
>One doctor replied that one of his patients
had a strange blood problem. Despite being
put on anticoagulants, the patient was still
developing clots. A second said she'd seen
something similar. And a third. Soon, every
person on the text chat had reported the same
thing.

https://archive.is/JHhG8
>A coronavirus patient thought he was
recovering. Then doctors found blood clots in
his lungs — a new and potentially deadly
complication of the virus.

Its been proven it can cause myocarditis, so
definitely corona is causing cardiac arrests

https://archive.is/AgfcG

Disclaimer: this post and the subject matter and contents thereof -
text, media, or otherwise do not necessarily reflect the views of the

ROLOVICH00059955

Instant Message : Native Messages                    Time: 21:49:44
From: 5053011787,8082182313

> Anonymous  07/23/21 (Fri) 19:54:40 ID: eb3ee0 **(16)**
> No.14185804  >>14185811  >>14186010
>
> >>14185774
> >>14185782
>
> I dunno if its just me or some in-built BS detection, but the annual 'flu vax' has always seemed like more of a psychological comfort than anything else.  The difference before now was, people didn't care if you had the vaccine or not, it was totally personal choice.  They didn't walk around in mortal fear of dying as they do now.
>
> So A+ job on the PSYOP to the medical puppetmasters this time around.
>
> *Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

Instant Message : Native Messages                    Time: 21:50:12
From: 5053011787,8082182313

This ^^^^

> Anonymous  07/23/21 (Fri) 20:30:55 ID: 3bc3c0 **(26)**
> No.14186010  >>14186017
>
> >>14185804
>
> The flu shots were conditioning folks for the coming storm.....
>
> *Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

Instant Message : Native Messages                    Time: 21:51:08
From: Unknown

Yep

ROLOVICH00059956

Instant Message : Native Messages    Time: 21:56:26
From: 5053011787,8082182313

Wow any word about this?



**KXLY**.COM    NEWS  WEATHER  SPORTS  OBITS
SPOKANE ▸ COEUR D'ALENE

## Fire near Grand Coulee causes road closures

Posted: July 22, 2021 6:56 PM

Updated: July 22, 2021 8:12 PM by Matthew Kincanon

Interesting that the Coulee Dam gunfire occured a few hours after a reported fire required the Washington State DOT to close roads and State Troopers to evacuate Steamboat Rock State Park so *firefighting aircraft could operate.*

Then people were watching and taping aircraft firing weapons...not dropping water.

Hmmm.

*Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

Instant Message : Native Messages    Time: 21:57:14
From: Unknown

I saw a helo with a scooper flying today

4-SER-756

ROLOVICH00059957

Instant Message : Native Messages                         Time: 21:58:42
From: 5053011787,8082182313

Holy fuck



>>14185921
Here's one where you can see the flashes from either an aircraft or a grunt so stupid he fires without a flash hider on top of a hill. Incoming in 3,2,1...boom. Darwin's little helper.

*Disclaimer: this post and the subject matter and contents thereof - text, media, or otherwise - do not necessarily reflect the views of the 8kun administration.*

Instant Message : Native Messages                         Time: 21:59:15
From: 5053011787,8082182313

Trying to send video

ROLOVICH00059958

Instant Message : Native Messages          Time: 21:59:37
From: 5053011787,8082182313

See if this works

Instant Message : Native Messages          Time: 21:59:37
From: 5053011787,8082182313

https://media.8kun.top/file_store/f9212360cdc7761b77228b1f46bcd850
f482d14a34e604591bb692529330eb48.mp4

4-SER-758

ROLOVICH00059959

Instant Message : Native Messages                    Time: 22:00:44
From: 5053011787,8082182313

## Coulee Dam vulnerable to bombing

— Nov 29th, 1996

>>14186335

Coulee Dam vulnerable to bombing

— Nov 29th, 1996

COULEE DAM (AP)  A small group of determined saboteurs who knew just where to place explosives at Grand Coulee Dam could cause catastrophic destruction downstream, a federal report says.

The worst-case scenario would drain much of Lake Roosevelt, the reservoir behind the Columbia River dam, according to the recent 20-page report from the federal Office of Managing Risk and Public Safety.

Security is a low priority and is considered after water and power issues and making access convenient for employees, contractors and tourists, the report said.

As recently as last year, "there was a strong foundation on which to build an effective physical security program," the report said.

"Unfortunately, management emphasis on areas other than security has seriously degraded the level of security at Grand Coulee Dam."

If the 11 spillgates that span the top of the dam were to fail while Lake Roosevelt was full, 2.2 million acre-feet of water, the top 30 feet of the

Instant Message : Native Messages                    Time: 22:01:44
From: 5053011787,8082182313

That's fully automatic gunfire

4-SER-759

ROLOVICH00059960

Instant Message : Native Messages
From: Unknown
Time: 22:03:09

Yes it is

Instant Message : Native Messages
From: 5053011787,8082182313
Time: 22:03:10

Where is it?

Instant Message : Native Messages
From: Unknown
Time: 22:03:19

North of us.

Instant Message : Native Messages
From: 5053011787,8082182313
Time: 22:03:38

WTF

Instant Message : Native Messages
From: 5053011787,8082182313
Time: 22:03:43

Columbia River?

Instant Message : Native Messages
From: 5053011787,8082182313
Time: 22:03:49

Sounds like Falluja

Instant Message : Native Messages
From: Unknown
Time: 22:04:18

West of Spokane

Instant Message : Native Messages
From: 5053011787,8082182313
Time: 22:04:58

So auto gunfire tonight in Spokane area and last week Blackhawks in downtown Seattle... oh but we're the crazy ones

4-SER-760

ROLOVICH00059961

Instant Message : Native Messages
From:

Time: 23:04:39

https://thehighwire.com/videos/in-remembrance-victims-of-the-covid-vaccine/

Instant Message : Native Messages
From:

Time: 23:06:22

https://rumble.com/vhwzqp-shocking-alicia-smith-a-mother-of-two-shares-the-horrors-of-her-covid-19-va.html

**End Thread**

Thread Statistics
**Instant Message Count:** 93

ROLOVICH00059962

# EXHIBIT UU

- **Utah State v. WSU (Home, 9/04/2021)**

1. Rolovich Dep. at 141:16-143:4, Dep. Ex. 186, (KHON, *Washington State University parts ways with former UH football coach Nick Rolovich*, October 18, 2021 (*available at* https://www.khon2.com/sports/washington-state-university-parts-ways-with-former-uh-football-coach-nick-rolovich/*)*



Washington State head coach Nick Rolovich speaks with an official, not pictured, during the second half of an NCAA college football game against Utah State, Saturday, Sept. 4, 2021, in Pullman, Wash. (AP Photo/Young Kwak)

**Read Less**

- **Portland State v. WSU (Home, 9/11/2021)**

2. Rolovich Dep. at 143:5-24, Dep. Ex. 187 (Original Video Produced at WSU_00035742)



3. Rolovich Dep. at 143:25-144:16, Dep. Ex. 187 (Original Video Produced at WSU_00035742)



4. Rolovich Dep. at 144:17-145:2, Dep. Ex. 187 (Original Video Produced at WSU_00035742)





5. Rolovich Dep. at 145:3-22, Dep. Ex. 187 (Original Video Produced at WSU_00035742)



6. Rolovich Dep. at 146:2-17, Dep. Ex. 187 (Original Video Produced at WSU_00035743)



7.  Rolovich Dep. at 146:18-23, Dep. Ex. 187 (Original Video Produced at WSU_00035743)



- **WSU v. Utah (Away, 9/25/2021)**

8. Rolovich Dep. at 146:24-147:14, Dep. Ex. 187 (Original Video Produced at WSU_00035746)



- **WSU v. Cal (Away, 10/02/2021)**

9. Rolovich Dep. at 147:15-148:7, Dep. Ex. 187 (Original Video Produced at WSU_00035748)



10. Rolovich Dep. at 148:8-149:12, Dep. Ex. 187 (Original Video Produced at WSU_00035748)



11. Rolovich Dep. at 149:13-17, Dep. Ex. 187 (Original Video Produced at WSU_00035748)



12. Rolovich Dep. at 150:2-10, Dep. Ex. 187 (Original Video Produced at WSU_00035749)



13. Rolovich Dep. at 150:11-151:3, Dep. Ex. 187 (Original Video Produced at WSU_00035749)



14. Rolovich Dep. at 151:4-152:4, Dep. Ex. 187 (Original Video Produced at WSU_00035749)





- **OSU v. WSU (Home, 10/09/2021)**

15. Rolovich Dep. at 152:5-153:6, Dep. Ex. 187 (Original Video Produced at WSU_00035750)



16. Rolovich Dep. at 153:7-9, Dep. Ex. 187 (Original Video Produced at WSU_00036298)



- **Stanford v. WSU (Home, 10/16/2021)**

17. Rolovich Dep. at 153:10-19, Dep. Ex. 187 (Original Video Produced at WSU_00035751)



18. Rolovich Dep. at 153:20-154:6, Dep. Ex. 187 (Original Video Produced at WSU_00035751)



ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>                    Plaintiff,<br><br>    v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>                    Defendant. | NO. 2:22-cv-00319-TOR<br><br>DEFENDANT'S STATEMENT OF DISPUTED MATERIAL FACTS |

Pursuant to LCR 56(c)(1)(B), and in response to Plaintiff Nicholas Rolovich's Statement of Material Facts Not in Dispute, ECF. No 89, Defendant Washington State University (WSU or the University) respectfully submits this Statement of Disputed Material Facts.

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 1
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

4-SER-775

1.    ECF No. 89 ¶ 6: WSU disputes Rolovich's characterization of his conversations with Fr. Paul Heric regarding his decision not to be vaccinated against COVID-19. On August 17, 2021, Rolovich's agent, Thayer Evans, sent Rolovich a template religious exemption letter from the National Catholic Bioethics Center (NCBC) that stated that "[v]accination is not morally obligatory in principle and so must be voluntary," "[a] person is morally required to obey his or her sure conscience," and "if a Catholic comes to an informed and sure judgment in conscience that he or she should not receive a vaccine, then the Catholic Church requires that the person follow this certain judgment of conscience and refuse the vaccine." Def.'s Statement of Material Facts Not in Dispute (SOMF) ¶¶ 148–49; Coates Decl., Ex. Y. It was not until after he received the NCBC template that Rolovich met with Fr. Paul to discuss conscience-based objections to the COVID-19 vaccine and "came to understand that [he] had a religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination." ECF No. 89-2 ¶ 16; SOMF ¶ 150; Coates Decl., Ex. A at 247:11–23, 256:13–17, 257:5–258:3, Ex. Z.

2.    ECF No. 89 ¶ 7: WSU disputes Rolovich's characterization of his text message exchange with Fr. Paul. The text message exchange did not include any reference to Rolovich stating "that he was determined to follow what he understood as his religious obligation to decline." Rather, Fr. Paul's comments

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 2
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

related solely to Rolovich's statement that he believed he was going to be fired. The text message exchange is as follows:

> Fr. Paul: This is the root of marriage
>
> Fr. Paul: [image with the quote "There is no greater force against evil in the world than the love of a man and woman in marriage."]
>
> Rolovich: They are gonna fire me Father.
>
> Fr. Paul: Do you know that for sure.
>
> Rolovich: Yes.
>
> Rolovich: Not at all.
>
> Fr. Paul: Ok. Then know you have my support. Your [sic] a man of great courage an [sic] conviction.

ECF. No 89-3 at 12–13.

3. ECF No. 89 ¶ 12: WSU disputes that Bishop Daly "released a public letter" regarding Rolovich. There is no evidence in the record that Bishop Daly publicly released the referenced letter. Rather, Bishop Daly's executive assistant emailed the letter to Rolovich, who forwarded the letter to his agent. Coates Decl., Ex. MM.

4. ECF No. 89 ¶ 14: WSU disputes Rolovich's characterization that he "came to understand that he had a religious obligation as a Catholic to follow his conscience and decline to take the COVID vaccination" as a result of "Fr. Paul's

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 3
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

counsel and through Rolovich's study of the Catholic materials." As explained above, Rolovich reached out to Fr. Paul to discuss conscience-based objections to the COVID-19 vaccine only after Rolovich received the NCBC religious exemption template from his agent that referenced such objections. *See supra* ¶ 1.

5.    ECF No. 89 ¶ 20: Defendant disputes Rolovich's characterization of the religious exemption request he submitted to WSU. Although it appears that the religious exemption form submitted by Rolovich was based on the NCBC template, that template was provided to Rolovich by his agent, Thayer Evans, and was edited by Rolovich's legal counsel, Brian Fahling. Coates Decl., Exs. CC, DD; SOMF ¶¶ 149, 156. Rolovich has produced no documents supporting his contention that he himself modified the NCBC template, and Rolovich testified that he does not recall making any edits to the exemption request. Coates Decl.. Ex. A at 237:1–3.

6.    ECF No. 89 ¶ 22: WSU disputes that Rolovich's exemption request "articulated two separate religious grounds for his exemption request." Although Defendant agrees that the document cited speaks for itself, whether Rolovich's stated objections are "religious" in nature is not a question of fact but a question of law for the Court to determine. *See Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988).

7.    ECF No. 89 ¶ 27: WSU disputes Rolovich's characterization of the article published to the WSU Insider on October 8, 2021, as representative of the

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 4
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

official process WSU established to review employee requests for religious accommodations. As explained in her deposition by Lisa Gehring, the former Assistant Vice President of WSU's Human Resource Services (HRS), this article included a summary of the accommodation review process developed by WSU that was prepared by WSU's Communications staff and did not represent an official process or procedure document prepared by HRS. Coates Decl., Ex. NN at 124:19–125:24.

8.     ECF No. 89 ¶ 28: WSU again states that the WSU Insider article speaks for itself, but disputes any characterization of the article as representing WSU's official policy or procedure for assessing religious accommodation requests. *See supra* ¶ 7.

9.     ECF No. 89 ¶ 29: WSU again states that the WSU Insider article speaks for itself, but disputes any characterization of the article as representing WSU's official policy or procedure for assessing religious accommodation requests. *See supra* ¶ 7.

10.     ECF No. 89 ¶ 30: WSU again states that the WSU Insider article speaks for itself, but disputes any characterization of the article as representing WSU's official policy or procedure for assessing religious accommodation requests. *See supra* ¶ 7.

11.     ECF No. 89 ¶ 31: WSU again states that the WSU Insider article speaks for itself, but disputes any characterization of the article as representing

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 5
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

WSU's official policy or procedure for assessing religious accommodation requests. *See supra* ¶ 7.

12.     ECF No. 89 ¶ 32: WSU again states that the WSU Insider article speaks for itself, but disputes any characterization of the article as representing WSU's official policy or procedure for assessing religious accommodation requests. *See supra* ¶ 7.

13.     ECF No. 89 ¶ 33: WSU disputes Rolovich's characterization of the article published by sportswriter Jon Wilner as representative of the official process WSU established to review employee requests for religious accommodations. As explained in the deposition of Phil Weiler, Vice President of Marketing at WSU, the article represents a summary of the accommodation review process as understood by Weiler at the time, but is not representative of the official policy or procedure of WSU. Coates Decl., Ex. OO at 62:11-64:10.

14.     ECF No. 89 ¶ 34: WSU again states that the article by Jon Wilner speaks for itself, but disputes any characterization of the article as representing WSU's official policy or procedure for assessing religious accommodation requests. *See supra* ¶ 13.

15.     ECF No. 89 ¶ 35: WSU states that the article by Jon Wilner speaks for itself, but disputes any characterization of the article as representing WSU's official policy or procedure for assessing religious accommodation requests. *See supra* ¶ 13.

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 6
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

16. ECF No. 89 ¶ 36: WSU disputes Rolovich's contention that the State Human Resources Division (SHR) guidance document included as Exhibit I to the Declaration of Eric Kniffin, ECF No. 89-10, was "relied" upon by WSU in developing its religious accommodation review process. Rolovich cites no support in the record for his contention that WSU "relied on" Exhibit I specifically. When asked about Exhibit I, former HRS Assistant Vice President Gehring testified that she did not recognize the document and that she did not recall ever reviewing it. Coates Decl., Ex. NN at 66:4–69:3.

17. ECF No. 89 ¶ 37: WSU again states that the SHR guidance document speaks for itself, but disputes any contention that WSU was required to or did rely upon the document to develop its religious accommodation review processes. *See supra* ¶ 16.

18. ECF No. 89 ¶ 38: WSU again states that the SHR guidance document speaks for itself, but disputes any contention that WSU was required to or did rely upon the document to develop its religious accommodation review processes. *See supra* ¶ 16.

19. ECF No. 89 ¶ 39: WSU again states that the SHR guidance document speaks for itself, but disputes any contention that WSU was required to or did rely upon the document to develop its religious accommodation review processes. *See supra* ¶ 16.

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 7
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

20.    ECF No. 89, ¶ 40: WSU again states that the SHR guidance document speaks for itself, but disputes any contention that WSU was required to or did rely upon the document to develop its religious accommodation review processes. *See supra* ¶ 16.

21.    ECF No. 89 ¶ 41: WSU disputes Rolovich's characterization of Exhibit J to the Kniffin Declaration, ECF No. 89-11. Rather than stating that HRS had concluded that Rolovich's religious exemption request was "based on a sincerely held religious belief," ECF No. 89 ¶ 41, Exhibit J states that the "information submitted through written and/or oral communications" by Rolovich "support[ed] the accommodation request based on a sincerely held religious belief" and that "we are considering approving [Rolovich's] request," ECF No. 89-11 at 3. Exhibit J specifically seeks additional information and input from the Athletics Department on Rolovich's accommodation request. *Id.* at 3–4; Declaration of Teddi Phares in Support of Def.'s Cross-MSJ (Phares Decl.) ¶ 23; Declaration of Anne McCoy in Support of Def.'s Cross-MSJ (McCoy Decl.) ¶ 33.

22.    ECF No. 89 ¶ 42: WSU disputes Rolovich's characterization of Exhibit K to the Kniffin Declaration, ECF No. 89-12, as "challenging the review committee's conclusion that Rolovich's exemption request was based on a sincere religious belief." As explained above in Paragraph 21, Rolovich misrepresents Exhibit J to the Kniffin Declaration, which does not state that the

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 8
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

review committee made any "conclusion" regarding whether Rolovich's exemption request "was based on a sincere religious belief." ECF No. 89 ¶ 42. Rather, Exhibit J expressly seeks additional input from the Athletics Department. ECF No. 89-11 at 3–4. WSU does not dispute that Exhibit K is a letter from the WSU Athletics Department providing additional information to HRS regarding Rolovich's request for a religious accommodation that would not otherwise have been available to HRS, which was proper as part of the accommodation review process. McCoy Decl. ¶ 42; Phares Decl. ¶ 23; Chun Decl. ¶¶ 73, 77.

23.    ECF No. 89 ¶ 45. WSU disputes Rolovich's characterization that former HRS employee Bonnie Dennler "promptly notified legal counsel" when she received the October 13, 2021, memorandum from the Athletics Department. Rather, Dennler testified in her deposition that she was not "100 percent sure" when she contacted legal counsel regarding the letter and "would be speculating" that it was the same day HRS received the letter. ECF No. 89-13 at 95:15–23.

24.    ECF No. 89 ¶ 46: WSU disputes Rolovich's characterization of the deposition testimony of Bonnie Dennler included as Exhibit L to the Kniffin Declaration, ECF No. 89-14. First, Exhibit L does not include the full deposition excerpts cited by Rolovich in Paragraph 46. *See* Kniffin Decl., Ex. L at 4. Further, the testimony cited by Plaintiff indicates that Dennler believed that she spoke to a WSU attorney regarding Rolovich's religious accommodation request, that she could "not recall what I did or who I talked with" specifically, and that "the

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 9
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

normal process" would have included conversations with counsel. Coates Decl., Ex. PP at 108:22–111:24.

25. ECF No. 89 ¶ 48: WSU states that the October 18, 2021, email from HRS to Rolovich speaks for itself. However, WSU clarifies that the email stated that HRS was "unable to approve [Rolovich's] request" for a religious accommodation because it would "pose an undue hardship to the University and/or a threat to [Rolovich] and others to allow [Rolovich] to remain in [his] position unvaccinated." ECF No. 89-15 at 3.

26. ECF No. 89 ¶ 49: WSU disputes Rolovich's misleading characterization of the "Written Notice of Intent to Terminate for Just Cause," which is attached as Exhibit O to the Kniffin Declaration, ECF No. 89-16. Exhibit O does not state that Rolovich's "'personal decision to forego a COVID-19 vaccination' amounted to a 'deliberate and serious violation[]' of his contractual duties," as Rolovich falsely asserts. ECF No. 89 ¶ 49. Rather, the letter clearly explains that Rolovich's inability to perform his contractual duties as head football coach, as detailed in the letter, amounted to a violation of the terms of his contract, which prohibited Rolovich "from engaging in 'deliberate and serious violations' of [his] duties, or 'refusal or unwillingness to perform such duties in good faith and to the best of [his] abilities." ECF No. 89-16 at 3–4.

27. ECF No. 89 ¶ 51: WSU disputes Rolovich's characterization of the letter attached as Exhibit P to the Kniffin Declaration as Chun "reject[ing]

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 10
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich's appeal." As explained in the letter, Chun conducted a "careful review and consideration" of the documents Rolovich submitted on appeal and determined that Rolovich "violated each of the sections of [his] contract outlined in the Notice of Intent to Terminate for Cause and that these violations were deliberate, serious, and seriously prejudicial to the University and the football program, thereby warranting termination for just cause." ECF No. 89-17 at 2, 7.

DATED this 14th day of October, 2024.

PACIFICA LAW GROUP LLP

s/Zachary J. Pekelis
Zachary J. Pekelis WSBA #44557
Ai-Li Chiong-Martinson, WSBA #53359
Erica P. Coray, WSBA #61987
W. Scott Ferron, WSBA #61154
Special Assistant Attorneys General
1191 Second Ave., Suite 2000
Seattle, WA 98101


ROBERT W. FERGUSON
Attorney General

Spencer W. Coates, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404

*Counsel for Defendant*
*Washington State University*

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 11
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

4-SER-785

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a notice of Electronic Filing to all parties in the case who are registered users.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 14th day of October, 2024.

Erica Knerr, Legal Assistant

DEFENDANT'S STATEMENT OF
DISPUTED MATERIAL FACTS - 12
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

4-SER-786

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1700

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>                          Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>                          Defendant. | No. 2:22-cv-00319-TOR<br><br>DEFENDANT'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>December 3, 2024<br>Without Oral Argument |

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ
No. 2:22-cv-00319-TOR

4-SER-787

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   FACTUAL AND PROCEDURAL HISTORY ......................................3

      A.   The COVID-19 Pandemic in Washington and at WSU.....................4

      B.   Rolovich's Opposition to the COVID-19 Vaccines...........................4

      C.   The Delta Surge and Proclamation 21-14 .......................................6

      D.   Rolovich's Request for a Religious Accommodation.........................6

      E.   WSU Denies Rolovich's Accommodation Request............................7

      F.   Rolovich's Separation from WSU and Administrative
           Appeals ............................................................................................9

      G.   Procedural History...........................................................................9

III.  ARGUMENT.............................................................................................9

      A.   Summary Judgment Standard............................................................9

      B.   WSU is Entitled to Summary Judgment on the Title VII
           and WLAD Claims .........................................................................10

           1.   Title VII and WLAD standards.................................................10

           2.   Rolovich cannot establish his prima facie case .......................11

                a.   Rolovich's Partial MSJ should be denied
                     because the sincerity of his asserted
                     religious beliefs is disputed ....................................11

                b.   As a matter of law, Rolovich's conscience-
                     based objection does not establish a
                     religious conflict with COVID-19
                     vaccination ...............................................................14

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - i
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

3.    WSU is entitled to summary judgment because it could not accommodate Rolovich without undue hardship ................................................................16

a.    Title VII's undue hardship standard ....................................17

b.    Rolovich's increased risk of contracting and transmitting COVID-19 constitutes an undue hardship ................................................................18

c.    The economic costs of accommodating Rolovich constitute an undue hardship ...............................23

i.    Travel costs ...................................................23

ii.    Canceled games ...........................................24

iii.    Lost donations ..............................................25

d.    Other burdens would have imposed an undue hardship ................................................................26

e.    WSU correctly determined that masking and distancing were not reasonable accommodations for Rolovich ...........................................30

C.    WSU Is Entitled to Summary Judgment on the Breach of Contract Claim ................................................................38

D.    WSU Is Entitled to Summary Judgment on the Wage-Withholding Claim ................................................................38

IV.    CONCLUSION ................................................................40

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - ii
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# TABLE OF AUTHORITIES

## Federal Cases

*Africa v. Pennsylvania,*
   662 F.2d 1025 (1981) ...............................................................................16

*Antredu v. Mass. Dep't of Youth Servs.,*
   --- F. Supp. 3d ----, No. CV 22-12016-WGY,
   2024 WL 1539725 (D. Mass. Apr. 9, 2024).........................................22

*Bartholomew v. Washington,*
   No. 3:23-CV-05209-DGE, 2024 WL 1426308 (W.D. Wash. Mar. 26, 2024).....15

*Bhatia v. Chevron U.S.A., Inc.,*
   732 F.2d 1382 (9th Cir. 1984) (per curiam) .........................................17

*Bordeaux v. Lions Gate Ent., Inc.,*
   703 F. Supp. 3d 1117 (C.D. Cal. 2023) ......................................... passim

*Callahan v. Woods,*
   658 F.2d 679 (9th Cir. 1981) ................................................. 12, 13, 16

*Caruano v. Bayhealth Med. Ctr., Inc.,*
   714 F. Supp. 3d 461 (D. Del. 2024) .....................................................16

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .............................................................. 9, 10

*Children's Health Defense v. Rutgers,*
   93 F.4th 66 (3d Cir. 2024) .................................................. 3, 4, 5

*Conner v. Raver,*
   No. 22-CV-08867-JST, 2023 WL 5498728 (N.D. Cal. Aug. 24, 2023) ..............22

*Doe v. San Diego Unified Sch. Dist.,*
   19 F.4th 1173 (9th Cir. 2021) ................................................. 17, 21

*EEOC v. GEO Grp., Inc.,*
   616 F.3d 265 (3d Cir. 2010) ............................................... 17, 18, 21

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - iii
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*,
279 F.3d 49 (1st Cir. 2002) .................................................................................. 11, 12

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*,
877 F.3d 487 (3d Cir. 2017) ..................................................................................15

*Finn v. Humane Soc'y of United States*,
No. GLR-23-2107, 2024 WL 1765702 (D. Md. Apr. 24, 2024)..........................15

*Gardner-Alfred v. Fed. Res. Bank of N.Y.*,
No. 22-CV-1585 (LJL), 2023 WL 6214863 (S.D.N.Y. Sept. 25, 2023)....... 12, 13

*Garrison v. Merch. & Gould, P.C.*,
No. 09-CV-1728-JPD, 2011 WL 887749 (W.D. Wash. Mar. 10, 2011) .............39

*Groff v. DeJoy*,
600 U.S. 447 (2023) ......................................................................................... 17, 25

*Heller v. EBB Auto Co.*,
8 F.3d 1433 (9th Cir. 1993) ....................................................................................10

*Howe v. Mass. Dep't of Corr.*,
No. 4:22-CV-40119-MRG, 2024 WL 3536830 (D. Mass. July 25, 2024) ..........22

*Kushner v. NYC Dep't of Educ.*,
No. 22-CV-5265 (DLI) (VMS), 2023 WL 6214236
(E.D.N.Y. Sept. 25, 2023) ......................................................................................22

*Lavelle-Hayden v. Legacy Health*,
--- F. Supp. 3d ----, No. 3:22-CV-01752-IM, 2024 WL 3822712
(D. Or. Aug. 14, 2024)............................................................................................21

*Lee v. Seasons Hospice*,
696 F. Supp. 3d 572 (D. Minn. Sept. 29, 2023) ....................................................26

*MacDonald v. Or. Health & Sci. Univ.*,
No. 3:22-CV-01942-IM, 2024 WL 3316199 (D. Or. July 5, 2024)....................22

*Mason v. Gen. Brown Cent. Sch. Dist.*,
851 F.2d 47 (2d Cir. 1988) ....................................................................................14

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - iv
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*McCarthy v. Boston Med. Ctr.*,
　No. 22-11886-RGS, 2024 WL 185392 (D. Mass. Jan. 17, 2024).........................16

*Mohamed v. Full Life Care*,
　No. C22-1010-KKE, 2024 WL 4371584 (W.D. Wash. Oct. 2, 2024).................21

*Moore v. Effectual Inc.*,
　No. 3:23-CV-05210-DGE, 2024 WL 1091689 (W.D. Wash. Mar. 13, 2024).....13

*Petersen v. Snohomish Reg'l Fire & Rescue*,
　No. C22-1674 TSZ, 2024 WL 278973 (W.D. Wash. Jan. 25, 2024)...................22

*Slater v. Behavioral Health Res.*,
　No. 23-5270 RJB,2024 WL 4290289 (W.D. Wash. Sept. 25, 2024)...................22

*Sutton v. Providence St. Joseph Med. Ctr.*,
　192 F.3d 826 (9th Cir. 1999) ........................................................................10

*Tawnsaura Grp., LLC v. Maximum Human Performance, LLC*,
　No. CV 12-07189 SJO (AGRx), 2013 WL 11011698
　(C.D. Cal. Sept. 12, 2013) ............................................................................21

*Together Emps. v. Mass Gen. Brigham Inc.*,
　573 F. Supp. 3d 412 (D. Mass. 2021)...................................................... 17, 26

*Trueblood v. Valley Cities Counseling & Consultation*,
　No. C23-0269JLR, 2024 WL 3965926 (W.D. Wash. Aug. 28, 2024)................34

*United States v. Seeger*,
　380 U.S. 163 (1965) ......................................................................................11

*Welsh v. United States*,
　398 U.S. 333 (1970) ......................................................................................15

*White v. Univ. of Washington*,
　No. 2:22-CV-01798-TL, 2024 WL 1241063 (W.D. Wash. Mar. 22, 2024).........17

*Wisconsin v. Yoder*,
　406 U.S. 205 (1972) ......................................................................................14

*Wright v. Belfor USA Group*,
　No. C24-0907-JCC, 2024 WL 3917157 (W.D. Wash. Aug. 22, 2024) ..............39

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - v
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Zimmerman v. PeaceHealth*,
701 F. Supp. 3d 1099 (W.D. Wash. 2023) ...........................................................39

*Zuccaro v. MobileAccess Networks, Inc.*,
No. C11-272 MJP, 2012 WL 261342 (W.D. Wash. Jan. 30, 2012)......................39

**State Cases**

*Kumar v. Gate Gourmet, Inc.*,
325 P.3d 193 (Wash. 2014) ...............................................................................10

*Suarez v. State*,
552 P.3d 786 (Wash. 2024) ................................................................................10

**Federal Statutes**

42 U.S.C. § 2000e-2 ...............................................................................................1

**State Statutes**

RCW 49.48........................................................................................... 38, 39

RCW 49.52........................................................................................... 38, 39

RCW 49.60.180...................................................................................................1

**Federal Rules**

Fed. R. Civ. P. 56(a).............................................................................................9

Fed. R. Evid. 201(b)..............................................................................................3

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - vi
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## I.    INTRODUCTION

Throughout his adult life, Plaintiff Nicholas Rolovich has declined to receive vaccinations of any kind because of his preference for "holistic" medicine, his belief in his own "natural immunity," and his concerns about vaccine safety. Consistent with this history, even at the height of the COVID-19 pandemic, Rolovich refused to comply with Defendant Washington State University's (WSU) employee vaccination requirement—a choice that put others at risk. Then WSU's head football coach, Rolovich's job was dynamic and demanding, requiring near-constant engagement in person with hundreds (or more) of individuals every week. Relying on the authoritative public health guidance available at the time, WSU's Athletics Department understood that allowing a college football coach to continue unvaccinated in his highly interpersonal position would have significantly increased the risk of him contracting COVID-19 and transmitting the virus to others. Thus, the Athletics Department denied Rolovich's request for an accommodation that would have entitled him to remain in his head coaching job unvaccinated.

At the time of WSU's decision, COVID-19 had already killed 750,409 Americans. The global death toll was nearly 5 million. Rolovich's unvaccinated status posed a direct threat to the health and safety of the student-athletes and other employees he led and worked closely with every day. Unlike other WSU employees who received accommodations, Rolovich's job was plainly not one that could be performed effectively via Zoom or in isolation.

For that reason and others, WSU is entitled to summary judgment on all Rolovich's claims. First and foremost, WSU's undue hardship defense to his claims

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 1
Case No. 2:22-cv-00319-TOR                    4-SER-794

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

under Title VII, 42 U.S.C. § 2000e-2, and the Washington Law Against Discrimination (WLAD), RCW 49.60.180, is dispositive. WSU's two *unrebutted* scientific experts demonstrate that, in the relevant fall 2021 time period, unvaccinated individuals were more likely—by orders of magnitude—to contract and transmit COVID-19. Accordingly, both experts conclude, accommodating Rolovich would have significantly increased the risk of his contracting and spreading COVID-19 to others.

WSU's experts also confirm that this danger could not have been adequately reduced by masking, social distancing, or other mitigation measures. Not only are those measures less effective than vaccination, but Rolovich's testimony that he could not coach effectively while masking—as well as his well-documented history of flaunting and denigrating masking rules—show that he would not (or could not) have followed those measures. This public-health justification alone establishes WSU's undue hardship defense as a matter of law, as numerous courts have held in entering summary judgment on Title VII claims by unvaccinated employees whose jobs required regular in-person interaction—from firefighters to teachers to television actors. A football coach poses the same type of health and safety danger.

WSU's undue hardship defense is also supported by its *unrebutted* economic expert's finding that accommodating Rolovich—as well as seven unvaccinated assistant football coaches who also requested accommodations—would have cost WSU hundreds of thousands of dollars in separate travel arrangements alone. In addition, WSU would have faced losing millions more in revenue from games canceled due to an outbreak on the football team. Accommodating Rolovich would

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 2
Case No. 2:22-cv-00319-TOR

4-SER-795

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

also have damaged WSU's recruitment efforts, donation receipts, and reputation—all seriously jeopardizing the football program's long-term success.

Second, the undisputed record shows that Rolovich's "conscience"-based objection to COVID-19 vaccination—even if sincerely held—is not religious in nature, but is premised on his long-held (and secular) vaccine hesitancy and years-long consumption throughout the COVID-19 pandemic of anti-vaccine and anti-government literature and media. Numerous courts addressing similar anti-vaccine viewpoints have rejected plaintiffs' attempts to recast secular objections in religious terms, as Rolovich seeks to do here.

Rolovich's remaining claims fall with his Title VII and WLAD claims: since Rolovich was unvaccinated and not legally entitled to a religious accommodation from the vaccination requirement, he was ineligible to work for WSU and unable to fulfill his contractual obligations to the University, which properly terminated him for just cause. WSU therefore did not breach Rolovich's employment agreement or wrongfully withhold any wages from him. For those reasons and those explained below, the Court should deny Rolovich's Motion for Partial Summary Judgment (Partial MSJ), ECF No. 88, and enter judgment for WSU on all claims.

## II.    FACTUAL AND PROCEDURAL HISTORY

The evidence in support of this Motion is set forth in WSU's Statement of Material Facts Not in Dispute (SOMF) filed herewith. WSU also requests that the Court take judicial notice of basic facts regarding the COVID-19 pandemic. *See* Fed. R. Evid. 201(b); *Children's Health Defense v. Rutgers*, 93 F.4th 66, 71 (3d Cir. 2024). A brief factual summary follows.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 3
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## A. The COVID-19 Pandemic in Washington and at WSU

COVID-19 is a respiratory disease caused by a virus that is airborne, highly contagious, and can cause serious illness or death. *See* SOMF ¶¶ 12–17. On February 29, 2020, Governor Jay Inslee proclaimed a state of emergency due to the COVID-19 pandemic. *Id.* ¶ 19.

Pursuant to a statewide "Stay Home" order in March 2020, WSU shifted operations so that almost all work and instruction were done remotely. *Id*. ¶¶ 20–22. The pandemic's disruption was challenging for WSU, and its Athletics Department lost significant revenue from foregone ticket sales, parking and concessions, and tournament participation. *Id.* ¶¶ 25–33.

Although remote instruction continued during WSU's 2020 fall semester, many students—including student-athletes—chose to live on campus. *Id.* ¶ 34. This caused several outbreaks during the 2020–21 school year, making WSU a major driver of Whitman County's high COVID-19 case counts. *Id.* Because of an outbreak on the football team in fall 2020, WSU's game against Stanford was canceled, as was the Apple Cup the following week. *Id.* ¶ 31. The football team was also connected to another major outbreak in March 2021. *Id.* ¶¶ 35–36.

## B. Rolovich's Opposition to the COVID-19 Vaccines

Rolovich was announced as WSU's new head football coach in January 2020. *Id.* ¶ 9. Throughout the COVID-19 pandemic, he frequently opined that the virus did not present a significant public health risk and that the pandemic was part of a conspiracy between government officials and public figures like George Soros and Bill Gates. *Id.* ¶ 52. Soon after the FDA authorized the vaccines for emergency use

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 4
Case No. 2:22-cv-00319-TOR

4-SER-797

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

in late 2020 and early 2021, Rolovich began expressing doubts about their safety, efficacy, and regulatory approval processes. *Id.* Before August 17, 2021, however, none of Rolovich's hundreds of text messages and emails about the COVID-19 vaccines with friends, family members, and coworkers mentioned any religious objection to the vaccines. *Id.* ¶ 54.

Between April and June 2021, Rolovich spoke with other WSU employees about his opposition to the vaccines, including then-WSU Athletics Director Patrick Chun, then-Deputy Athletics Director Bryan Blair, and then-defensive coordinator Jake Dickert. *Id.* ¶¶ 53, 66, 71, 74–76. Rolovich expressed his fears of the vaccines' adverse health consequences and his doubts about their efficacy, but again, did not raise any religious objections in these discussions. *Id.* ¶¶ 54, 61–62, 66, 71.

On June 11, 2021, the Pac-12 conference announced that all football media day attendees would need to be vaccinated against COVID-19. *Id.* ¶¶ 72–74. On July 21, Rolovich tweeted: "I have elected not to receive a COVID-19 vaccine for reasons which will remain private." *Id.* ¶ 77–78. His announcement generated significant negative media attention nationally and locally. *Id.* ¶ 79. Hundreds of WSU alumni and donors wrote to express their disapproval of Rolovich's position, and many threatened to withhold future donations. *Id.* ¶ 80. At the time, WSU's policy required employees to be vaccinated against COVID-19 before the upcoming academic year unless they claimed an exemption for medical, religious, or "philosophical/personal" reasons. *Id.* ¶¶ 43, 47–49.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 5
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**C. The Delta Surge and Proclamation 21-14**

Rolovich's announcement in July 2021 coincided with the highly infectious "Delta variant" becoming the dominant COVID-19 strain. *Id.* ¶ 83. COVID-19 cases reached then-unprecedented levels, and hospitalizations and deaths also surged. *Id.* ¶¶ 84–86. According to contemporaneous CDC data, the vaccines proved highly effective at preventing the virus's spread and severe disease, particularly with the Delta variant. *Id.* ¶¶ 87–90.

On August 9, 2021, Governor Inslee issued Proclamation 21-14 (together with subsequent iterations, the Proclamation). *Id.* ¶ 92. The Proclamation initially prohibited healthcare workers and most state employees from working after October 18, 2021, without being fully vaccinated against COVID-19, unless they had an approved accommodation for a religious or medical reason. *Id.* On August 20, the Governor extended the Proclamation to the education sector (including WSU). *Id.* ¶ 94. The Proclamation superseded WSU's policy which previously allowed exemptions for non-religious philosophical/personal reasons. *Id.* ¶ 95.

**D. Rolovich's Request for a Religious Accommodation**

On August 16, 2021, Chun and Blair informed Rolovich that the Proclamation would soon be extended to cover WSU, and that accommodations would be permitted for medical or religious reasons only. *Id.* ¶ 147. The next day, Rolovich's agent, Thayer Evans, sent him a template of a vaccine mandate religious exemption request from the website of the National Catholic Bioethics Center (NCBC). *Id.* ¶¶ 148–49. The NCBC exemption request template invoked the "Church's teaching" that a Catholic "must obey the judgment of his or her own informed and certain

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 6
Case No. 2:22-cv-00319-TOR          4-SER-799

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

conscience." *Id.* Later that day, Rolovich spoke with Father Paul Heric, a Catholic priest he'd met a few weeks earlier. *Id.* ¶ 150. It was only then, Rolovich testified, that he first realized he had a "religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination." *Id.* ¶ 150. A few days later, Evans wrote in a text message to Rolovich and his attorney: "Since Nick's not going to get the shot and we can't find a doctor to write him a note, I think [a religious exemption] is the best alternative strategy we have." *Id.* ¶ 155.

On August 18, 2021, the Governor announced the extension of the Proclamation to educational workers. *Id.* ¶ 93. The following day, Rolovich informed Chun and Blair he would pursue a religious accommodation. *Id.* ¶¶ 151–53. On October 4, Rolovich emailed a religious exemption request to WSU's Human Resource Services (HRS). *Id.* ¶ 158. The request was based on the NCBC template his agent had shared with him, which his attorney then edited. *Id.* ¶¶ 148–49, 156. Rolovich did not personally draft or edit his exemption request. *Id.* ¶ 157.

**E. WSU Denies Rolovich's Accommodation Request**

On October 6, 2021, HRS notified Chun and then-Deputy Athletics Director Anne McCoy that Rolovich's exemption request "support[ed] the accommodation request based on a sincerely held religious belief." *Id.* ¶ 160. HRS advised that it was the Athletics Department's responsibility "to determine if the employee is able to perform essential functions of the position and meet the COVID-19 safety measures consistent with the recommendations of the state and protect the health and safety of the WSU community as part of this accommodation request." *Id.* ¶¶ 161–62. In total, eight football coaches and staff sought religious accommodations. *Id.* ¶ 163.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 7
Case No. 2:22-cv-00319-TOR

4-SER-800

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Chun, McCoy, and Blair worked together to evaluate Rolovich and the other football employees' job duties, relying on public health data and guidance available at the time, to determine whether they could be accommodated without endangering others. *Id.* ¶¶ 164–67. The Athletics Department leadership also considered a memo prepared by WSU Environmental Health & Safety (EH&S) assessing the football employees' positions and identifying the minimum public health requirements that would have to be followed for them to continue working. *Id.* ¶¶ 170–81.

It is undisputed that the job of head football coach involves frequent in-person contacts and interactions with a wide range of individuals—including student-athletes, assistant coaches, other Athletics Department personnel, donors and boosters, and members of the media. *Id.* ¶ 8. It is also undisputed (or at least unrebutted) that, in fall 2021, unvaccinated persons posed a materially higher risk of contracting and transmitting COVID-19. *Id.* ¶¶ 194–95.

Thus, Chun ultimately determined—with McCoy and Blair's agreement—that Rolovich could not be accommodated without undue hardship to WSU. Chun set forth his reasoning in several memos to HRS, focusing on the increased risk that an unvaccinated football coach would pose of contracting and spreading COVID-19 to others. *Id.* ¶¶ 168, 182. Chun also provided a memo to HRS explaining that "Rolovich has made several statements that cast doubt on his claimed sincerely held religious belief" against COVID-19 vaccination, including his long-expressed fears of the vaccines' potential adverse health effects. *Id.* ¶ 169.

On October 18, 2021, HRS informed Rolovich that his religious accommodation request was denied because WSU could not accommodate him

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 8
Case No. 2:22-cv-00319-TOR                4-SER-801

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

without experiencing an undue hardship. *Id.* ¶¶ 183–84. HRS also explained that, based on his past comments regarding vaccination and the timing of his accommodation request, WSU had reason to question whether Rolovich's sincerely held religious beliefs conflicted with COVID-19 vaccination. *Id.* ¶ 185.

## F. Rolovich's Separation from WSU and Administrative Appeals

Shortly thereafter, Chun and Blair delivered Rolovich a letter stating that WSU was terminating his employment for just cause pursuant to the terms of his employment contract. *Id.* ¶¶ 186–87. Through counsel, Rolovich submitted a detailed appeal to Chun. *Id.* ¶ 188. On November 12, 2021, Chun denied the appeal. *Id.* ¶ 189. On December 6, 2021, WSU President Kirk Schulz denied Rolovich's second-level appeal, and his termination became final. *Id.* ¶¶ 191–92.

## G. Procedural History

The early procedural history of the case is set forth in WSU's Motion to Dismiss (MTD), ECF No. 22 at 12. After the Court's ruling, ECF No. 33, Rolovich filed a Second Amended Complaint (SAC), ECF No. 53. Four claims remain: Title VII, WLAD, breach of contract, and wage withholding.

**III.    ARGUMENT**

## A. Summary Judgment Standard

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant demonstrates the absence of a genuine issue of material fact, the opposing party must set forth specific facts showing a genuine issue. *Celotex Corp.*

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 9
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*v. Catrett*, 477 U.S. 317, 322–24 (1986). If the nonmoving party fails, "Rule 56(c) mandates the entry of summary judgment." *Id.* at 322.

**B. WSU is Entitled to Summary Judgment on the Title VII and WLAD Claims**

**1. Title VII and WLAD standards**

To establish a prima facie case of failure to accommodate religion under Title VII, the plaintiff has the burden to show that "(1) a bona fide religious belief of the employee conflicted with an employment policy; (2) the employee informed the employer of the conflict; and (3) 'the employer threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements.'" ECF No. 33 at 8 (quoting *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). The standard under the WLAD is substantially similar. *See id.* at 12 (citing *Kumar v. Gate Gourmet, Inc.*, 325 P.3d 193 (Wash. 2014)); *see also Suarez v. State*, 552 P.3d 786, 795 (Wash. 2024).[1]

If the employee "establishe[s] a prima facie case, the burden shifts to the defendant to demonstrate 'either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" ECF No. 33 at 9–10 (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999)).

---

[1] For that reason, WSU addresses Rolovich's Title VII and WLAD claims together, using "Title VII" to refer to both statutes.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 10
Case No. 2:22-cv-00319-TOR

4-SER-803

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## 2. Rolovich cannot establish his prima facie case

### a. Rolovich's Partial MSJ should be denied because the sincerity of his asserted religious beliefs is disputed

Rolovich cannot establish the first element of his prima facie case as a matter of law at this stage, and certainly not by relying on a single, vague, self-serving declaration. It is well settled that the *sincerity* of a Title VII plaintiff's religious beliefs is an issue of fact not properly resolved on a motion for summary judgment. *See, e.g.*, *United States v. Seeger*, 380 U.S. 163, 185 (1965) (recognizing that "the threshold question of sincerity" of plaintiff's religious beliefs "is, of course, a question of fact"); *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56–57 (1st Cir. 2002) ("Credibility issues such as the sincerity of an employee's religious belief are quintessential fact questions [which] should be reserved for the factfinder at trial, not for the court at summary judgment.") (cleaned up). Tellingly, Rolovich fails to cite a single case awarding summary judgment to the *employee* on his prima facie case where the employer disputed the sincerity of his asserted objections to COVID-19 vaccination. *See* ECF No. 88 at 14.

Here, the record sharply undercuts Rolovich's self-serving and vague assertions of a religious objection to vaccination. Rolovich freely and frequently expressed *secular* concerns about COVID-19 vaccines in late 2020 and early 2021 to friends, family members, and coworkers. *See* SOMF ¶¶ 50–53. Indeed, Rolovich and his friends communicated constantly—often multiple times per day— expressing anti-vaccine disinformation, including that the vaccines were

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 11
Case No. 2:22-cv-00319-TOR

4-SER-804

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"experimental" and a "hoax," that world leaders who opposed the vaccines had "died unexpectedly," that the vaccines were "a bio-weapon," and that the vaccines enabled "naked authoritarianism," "vakseen [sic] fascism," and "crimes against children." Declaration of Spencer Coates (Coates Decl.), Exs. K, L, RR, TT. Following his separation from WSU, Rolovich continued to voice such secular alarm over the vaccines, even going so far as to ominously state that those allegedly responsible for the COVID-19 "vax poison" "will pay . . . and money will not be the currency." Coates Decl., Ex. SS.

By comparison, in the thousands of pages of written communications about COVID-19 that Rolovich has produced in discovery, in *none* does he invoke a *religious* objection to the vaccines. *Id.*, Exs. B–M; SOMF ¶ 52; Declaration of Renée DiResta, Ex. A (DiResta Rep.) ¶ 50. Given the sheer volume of communications reflecting Rolovich's secular vaccine skepticism, a reasonable jury would at least doubt the sincerity of his realization (the day after he learned of the Proclamation) that he also had religious objections to the vaccines. *See, e.g.*, *Gardner-Alfred v. Fed. Reserve Bank of N.Y.*, No. 22-CV-1585 (LJL), 2023 WL 6214863, at *16 (S.D.N.Y. Sept. 25, 2023) (granting summary judgment to employer where plaintiff "generally opposed the vaccine on non-religious grounds," "exchanged messages . . . regarding what were claimed to be the harmful side effects to the vaccine," and "viewed the Covid-19 vaccine as something to be avoided").

The timing of Rolovich's purported epiphany makes it even less credible. *See, e.g.*, *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981) ("The existence of a longstanding philosophical belief which has only recently, and to the claimant's

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 12
Case No. 2:22-cv-00319-TOR

4-SER-805

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

advantage, taken on theological overtones could certainly give rise to reasonable suspicion of dissimulation."). After Pac-12 media day, Rolovich and his agent, Thayer Evans, discussed getting him paperwork to support a *medical* exemption from WSU's vaccination requirement. SOMF ¶ 134–36. When that plan fizzled, Evans shared with Rolovich and his attorney a religious exemption template from the National Catholic Bioethics Center (NCBC). *Id*. ¶ 148–49. The NCBC template states: "if a Catholic comes to an informed and sure judgment in conscience that he or she should not receive a vaccine, then the Catholic Church requires that the person follow this certain judgment of conscience and refuse the vaccine." *Id.* Hours later, Rolovich went to meet with Father Paul. *Id.* ¶ 150. Only *then* did Rolovich conveniently "understand his disquiet in terms of Catholic teaching on the moral conscience." ECF No. 88 at 12; SOMF ¶ 150.

In light of that suspect chronology—and Rolovich's copious written communications expressing his medical, scientific, and political objections to the COVID-19 vaccines—a jury could easily disbelieve that he belatedly "discerned" a separate religious basis for his longstanding opposition to the vaccines. ECF No. 53 ¶ 24. Indeed, WSU submits that no reasonable jury would find Rolovich's conveniently timed religious epiphany to have been sincere. *See, e.g.*, *Moore v. Effectual Inc.*, No. 3:23-CV-05210-DGE, 2024 WL 1091689, at *9 (W.D. Wash. Mar. 13, 2024) (granting summary judgment to employer where plaintiff "had scientific and political objections to the vaccine that he attempted to 'fit' to his religious beliefs in order to potentially qualify for a religious exemption"); *Gardner-Alfred*, 2023 WL 6214863, at *15–16 (same where plaintiff "solicited the vaccine

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 13
Case No. 2:22-cv-00319-TOR

4-SER-806

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

exemption letter on the eve of the Vaccination Policy and for the purpose of obtaining an exemption" and "[n]o reasonable jury thus would be able to conclude that her claimed religious beliefs were anything other than contrived").[2]

In short, Rolovich has not and cannot establish that he is entitled to summary judgment "as to his prima facie case for the Title VII failure to accommodate claim." ECF No. 88 at 2. His Partial MSJ should be denied.

### b. As a matter of law, Rolovich's conscience-based objection does not establish a religious conflict with COVID-19 vaccination

As explained above, Rolovich is not entitled to summary judgment as to his prima facie case because the *sincerity* of his religious beliefs is a question of fact. But whether those asserted beliefs establish a *religious* conflict with COVID-19 vaccination is a question of law. *See Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972)). And under the governing law—even assuming arguendo Rolovich honestly believes he

---

[2] Certainly, no reasonable jury would credit Rolovich's asserted religious belief that "accepting the vaccine will make me complicit in the abortions that produced the human cell lines from which" the COVID-19 vaccines were supposedly "derived." ECF No. 88 at 13. While that language appears in Rolovich's exemption request, it is undisputed that Rolovich neither wrote nor edited that request. SOMF ¶¶ 156–57. And there is no evidence Rolovich ever *mentioned* that particular objection to anyone, whether in conversation or anywhere in his thousands of pages of written communications about the vaccines. *Id.* ¶ 52–54, 61–62, 66, 71.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 14
Case No. 2:22-cv-00319-TOR          4-SER-807

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"had a religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination," ECF No. 89-2 ¶ 16—that sweeping conscience-based objection does not establish an actual religious conflict with vaccination.

In the leading pre-pandemic Title VII case on employee vaccination requirements, the Third Circuit affirmed the dismissal of a former hospital employee's complaint because it determined his opposition to the flu vaccine was not "religious in nature," despite the employee's assertion that getting vaccinated "would violate his conscience as to what is right and what is wrong." *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 492, 494 (3d Cir. 2017). Because the employee "simply worrie[d] about the health effects of the flu vaccine, disbelieve[d] the scientifically accepted view that it is harmless to most people, and wishe[d] to avoid this vaccine," his objection to the vaccine did not "'occupy . . . a place parallel to that filled by God in traditionally religious persons.'" *Id*. at 491–92 (cleaned up) (quoting *Welsh v. United States*, 398 U.S. 333, 340 (1970)).

Consistent with *Fallon*, since the pandemic, dozens of federal courts have rejected similar conscience-based objections to COVID-19 vaccination requirements. *See, e.g.*, *Finn v. Humane Soc'y of United States*, No. GLR-23-2107, 2024 WL 1765702, at *4 (D. Md. Apr. 24, 2024) (dismissing Title VII claim where plaintiff's "entire religious exemption request is essentially a statement that her religion requires that she listen to her conscience and act according to personal preference"); *Bartholomew v. Washington*, No. 3:23-CV-05209-DGE, 2024 WL 1426308, at *4 (W.D. Wash. Mar. 26, 2024) (same where objection was based on belief that "[a]s an individual Christian, and as an expression of your belief, you are

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 15
Case No. 2:22-cv-00319-TOR

4-SER-808

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

commanded to not allow anything to enter your body that violates your conscience"); *McCarthy v. Boston Med. Ctr.*, No. 22-11886-RGS, 2024 WL 185392, at *1 (D. Mass. Jan. 17, 2024) (same where "the cited basis for [plaintiff's] opposition to vaccination appears to be the dictates of her own conscience, which she maintains that her religion requires her to follow"); *see also* ECF No. 22 at 30–31; ECF No. 31 at 12–13 n.3. The principle underlying these decisions is that "[a]llowing [a] [p]laintiff the ability to object to anything that 'goes against . . . her 'conscience' would amount to the type of 'blanket privilege' that does not qualify as religious belief." *Caruano v. Bayhealth Med. Ctr., Inc.*, 714 F. Supp. 3d 461, 469 (D. Del. 2024) (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (1981)).

Rolovich's conscience-based objection is indistinguishable. To be sure, "a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one." *Callahan*, 658 F.2d at 684. But Rolovich's conscience-based objection to the vaccines does not merely *coincide* with his health-based and other secular objections; it is entirely *derivative* of them. Thus, even assuming his conscience-based objection is *sincere*, it does not establish a *religious* conflict with the vaccine requirement under Title VII, defeating his claim on the first element of his prima facie case.

### 3. WSU is entitled to summary judgment because it could not accommodate Rolovich without undue hardship

Ultimately, the Court need not even address the prima facie elements of Rolovich's Title VII claim because WSU is entitled to summary judgment on the basis of its complete defense of undue hardship.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 16
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### a. Title VII's undue hardship standard

An "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). In assessing undue hardship, a court "must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact," and "in the common-sense manner that it would use in applying any such test." *Id.* at 470–71. The analysis must also account for the "aggregate effects when multiple employees are granted the same accommodation." *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022).

Noneconomic costs, such as an "accommodation's effect on co-workers," are relevant to the undue hardship analysis. *Groff*, 600 U.S. at 472. Like other circuits, the "Ninth Circuit has long recognized valid safety concerns as establishing undue hardship." *White v. Univ. of Washington*, No. 2:22-CV-01798-TL, 2024 WL 1241063, at *8 (W.D. Wash. Mar. 22, 2024) (citing *Bhatia v. Chevron U.S.A., Inc.*, 732 F.2d 1382, 1384 (9th Cir. 1984) (per curiam)); *see also Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021) ("[A]n employee's request for an exemption from a COVID-19 vaccination mandate can be denied on the ground that . . . such an exemption would pose an undue hardship by . . . increasing the risk of the spread of COVID-19 to other employees or to the public.") (cleaned up); *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 17
Case No. 2:22-cv-00319-TOR

4-SER-810

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

hardship . . . ."); EEOC, *Religious Discrimination*, https://www.eeoc.gov/religious-discrimination (last visited Oct. 9, 2024) ("An accommodation may cause undue hardship if it . . . compromises workplace safety.").

### b. Rolovich's increased risk of contracting and transmitting COVID-19 constitutes an undue hardship

There is no genuine dispute as to the heightened public health risk an unvaccinated head football coach would have posed in October 2021—at the height of the Delta surge—to himself and those around him. As a matter of law, an accommodation that would materially exacerbate the spread of a deadly virus, particularly during a once-a-century global health crisis, cannot be "reasonable," and constitutes an undue hardship under Title VII.

The undisputed record establishes that football coaches at WSU—and especially the head football coach—faced a heightened risk of contracting and spreading COVID-19 due to their frequent and close in-person contacts. *See* SOMF ¶¶ 4–8. The head coach routinely works in close proximity to hundreds of individuals: players, assistant coaches, Athletics Department staff, members of the media, opposing coaches and players, and others. *Id*. He attends practices, training sessions, and games, and in each setting interacts closely with others. *Id.* ¶ 4. Coaches also travel with the team, stay in the same hotel as the team, and eat meals with the team. *Id.* Before and after games, the head coach has media responsibilities and gives interviews to the press. *Id.* ¶ 7. The head coach also meets with donors—in fact, he is usually the most in-demand University employee for donor engagement. *Id*. ¶¶ 6, 8. In his declaration, WSU's current head football coach, Jake Dickert,

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 18
Case No. 2:22-cv-00319-TOR

4-SER-811

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

walks through a typical week of his job: he interacts with "perhaps 1,000 or more" people in a variety of environments, mostly face-to-face and in close proximity. Declaration of Jacob Dickert (Dickert Decl.) ¶¶ 26–39. No doubt the same was true for Rolovich, who testified that whenever he encountered his players or football staff, his leadership strategy was to never "pass them in person without engaging them." SOMF ¶ 11.

In short, each week an unvaccinated head football coach would have hundreds or thousands of opportunities to contract COVID-19 while performing his official duties. And if he were to contract COVID-19, either at work or in his personal life, he would risk infecting hundreds or thousands of individuals: students, coworkers, staff, donors, and other members of the WSU community. SOMF ¶¶ 194–95.

Rolovich's unvaccinated status also increased the risk of him missing practices, training sessions, meetings, and games, if he either contracted COVID-19 or interacted with someone who had. The very fact that Rolovich was unvaccinated made him more likely to *test* positive for COVID-19—not only because unvaccinated persons were more susceptible to infection but because of mandatory testing requirements for *unvaccinated* staff only. Declaration of Dr. Guy Palmer, Ex. A (Palmer Rep.) ¶ 62. Under EH&S's "minimum" countermeasures, even a close contact with someone testing positive would have compelled Rolovich to quarantine for 14 days—and for *24 days* if the close contact were in his household. SOMF ¶¶ 178–79. In the wrong 24-day period, that would have left WSU's football team leaderless for one-third of its season. *Id*. ¶ 180. As Chun testifies, "[t]he risk of our head football coach contracting COVID-19, potentially developing severe disease,

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 19
Case No. 2:22-cv-00319-TOR

4-SER-812

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and needing to take significant time away from work, would have been seriously harmful to the football team." Declaration of Patrick Chun (Chun Decl.) ¶ 69.

The heightened public health risk of having an unvaccinated head football coach in October 2021 is established by the *unchallenged* expert testimony of WSU's two scientific experts: Dr. John Lynch, the Associate Medical Director of Harborview Medical Center and leader of the Medical-Technical Team for University of Washington Medicine's COVID-19 Emergency Operations Center; and, Dr. Guy Palmer, WSU's Chief Science Advisor for its COVID-19 response and a world-renowned expert in vaccines and zoonotic diseases (those that, like COVID-19, spread between humans and animals). Their findings include that: (1) numerous public health authorities at the time of WSU's accommodation decision had concluded that the COVID-19 vaccines were safe and effective at reducing the transmissibility of the virus and the likelihood of severe disease, hospitalization, and death (particularly against the Delta variant dominant in fall 2021), *see* SOMF ¶¶ 194–95; (2) vaccination was the single most effective strategy for mitigating the spread of the virus, *id.* ¶ 194; and (3) other countermeasures such as masking (which was already required of Rolovich, but often disregarded) or frequent COVID-19 testing would not have sufficiently mitigated the risk of unvaccinated coaches spreading the virus, *id.* ¶¶ 194–95.

Based on those findings, Dr. Lynch concludes that "allowing Rolovich and seven other football coaches or professionals to continue working in their positions unvaccinated in the fall of 2021 would have significantly increased the risk of their contracting and transmitting COVID-19 to . . . other football coaches, Athletics

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 20
Case No. 2:22-cv-00319-TOR          4-SER-813

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Department staff, student-athletes, members of the media, WSU donors, and others." *Id.* ¶ 194. And Dr. Palmer—who wholly agrees with Dr. Lynch's opinions, *id.* ¶ 195—concludes that "granting accommodations to Mr. Rolovich and the other coaches would have resulted in a significantly greater risk of them getting infected with COVID-19 and transmitting it to others." *Id.*

Rolovich did not disclose any scientific experts. Therefore, Dr. Lynch's and Dr. Palmer's detailed findings and conclusions are unrebutted and must be treated as undisputed for the purposes of summary judgment. *See, e.g.*, *Tawnsaura Grp., LLC v. Maximum Human Performance, LLC*, No. CV 12-07189 SJO (AGRx), 2013 WL 11011698, at *6 (C.D. Cal. Sept. 12, 2013) ("Because Plaintiff has not attempted to rebut the factual assertions made by Defendant's expert, Plaintiff has failed to show that there is a genuine dispute as to [those facts]"). Accordingly, there is no genuine dispute that, had WSU allowed Rolovich and seven other football coaches and staff to continue working in their positions unvaccinated, it would have materially increased the risk of their contracting and spreading COVID-19 to students, coworkers, donors, or other members of the WSU community. This alone creates an undue hardship. *Doe*, 19 F.4th at 1180.

In a wide variety of employment contexts, many courts in this Circuit have granted summary judgment on undue hardship based on the increased risk of unvaccinated employees infecting coworkers or others with COVID-19. *See, e.g.*, *Mohamed v. Full Life Care*, No. C22-1010-KKE, 2024 WL 4371584, at *2 (W.D. Wash. Oct. 2, 2024) (mental health services coordinator); *Lavelle-Hayden v. Legacy Health*, --- F. Supp. 3d ----, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *2–3,

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 21
Case No. 2:22-cv-00319-TOR

4-SER-814

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*15 (D. Or. Aug. 14, 2024) (phone operator, safety security officer, and other jobs involving "direct, in-person contact with patients and coworkers"); *Slater v. Behavioral Health Res.*, No. 23-5270 RJB, 2024 WL 4290289, at *1, *5 (W.D. Wash. Sept. 25, 2024) (office specialist); *MacDonald v. Or. Health & Sci. Univ.*, No. 3:22-CV-01942-IM, 2024 WL 3316199, at *2, *12 (D. Or. July 5, 2024) (nurse); *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674 TSZ, 2024 WL 278973, at *1, *7 (W.D. Wash. Jan. 25, 2024) (firefighters); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1121, 1135–36 (C.D. Cal. 2023) (television actor).

Courts in other circuits have also found undue hardship on the same grounds. *See, e.g.*, *Howe v. Mass. Dep't of Corr.*, No. 4:22-CV-40119-MRG, 2024 WL 3536830, at *1, *6 (D. Mass. July 25, 2024) (corrections officer); *Antredu v. Mass. Dep't of Youth Servs.*, --- F. Supp. 3d ----, No. CV 22-12016-WGY, 2024 WL 1539725, at *1, *5 (D. Mass. Apr. 9, 2024) (juvenile offender case worker); *Kushner v. NYC Dep't of Educ.*, No. 22-CV-5265 (DLI) (VMS), 2023 WL 6214236, at *1, *5 (E.D.N.Y. Sept. 25, 2023) (public school teacher); *Conner v. Raver*, No. 22-CV-08867-JST, 2023 WL 5498728, at *1, *6 (N.D. Cal. Aug. 24, 2023) (executive assistant). In all these cases, the critical factor was that the employee's "unvaccinated presence would have imposed 'substantial increased costs in relation to the conduct of [the employer's] particular business' by creating a health and safety risk." *Kushner*, 2023 WL 6214236, *5 (quoting *Groff*, 600 U.S. at 470).

WSU is entitled to summary judgment for the same reason. Rolovich's job as head football coach undisputedly required frequent interactions with students, coworkers, donors, and others. Unrebutted expert testimony establishes that his

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 22
Case No. 2:22-cv-00319-TOR

4-SER-815

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

unvaccinated status materially increased the risk of him contracting and spreading COVID-19, and that no other possible accommodation would have negated that risk. Thus, accommodating Rolovich—and the seven other football employees who requested accommodations—would have imposed an undue hardship on WSU. Summary judgment is warranted on this basis alone.

### c. The economic costs of accommodating Rolovich constitute an undue hardship

Accommodating Rolovich would have also forced WSU to incur significant financial costs: (i) providing separate travel accommodations to allow for proper distancing from the rest of the team and staff; (ii) lost revenue resulting from canceled games in the event of another COVID-19 outbreak on the football team; and (iii) the loss of significant contributions from donors who expressed disappointment and anger at WSU for compromising community safety by allowing Rolovich to continue coaching while unvaccinated.

### i. Travel costs

During the football season, the team travels extensively by charter plane and charter bus. To protect the health and safety of student-athletes and football staff, at a minimum Rolovich and the other unvaccinated football coaches would have been required to maintain six feet of distance from others. Palmer Rep. ¶ 59; Chun Decl. ¶ 78, Ex. T. Distancing would not have been possible on flights and buses, so WSU would have had to charter separate flights and buses to accommodate the unvaccinated coaches—just as EH&S's "minimum" countermeasures provided. *See* SOMF ¶ 178; Palmer Rep. ¶ 59; Chun Decl. ¶ 84.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 23
Case No. 2:22-cv-00319-TOR

4-SER-816

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

The cost to charter separate flights would have been approximately $28,000 per game, totaling $168,000 for all six away games. SOMF ¶ 196. Separate buses would have totaled approximately $28,500 for the season. *Id.* ¶ 197. These costs, totaling approximately $196,500, alone constitute an undue economic hardship. *See Bordeaux*, 703 F. Supp. 3d at 1137 ($300,000 to accommodate actor on set would be undue hardship for major international entertainment company).

### ii.  Canceled games

Additionally, allowing Rolovich and the other unvaccinated coaches to continue working would have risked significant lost revenue from ticket sales and media rights due to canceled games. It is undisputed that unvaccinated coaches would have significantly increased the risk of a COVID-19 outbreak among the football team. SOMF ¶¶ 194–95; Chun Decl. ¶ 82. This was not a remote possibility—during the 2020 season, one COVID-19 outbreak forced the team to cancel two games. SOMF ¶ 31.

WSU's economic expert reviewed revenue from ticket sales for fiscal years 2018 through 2020 and conservatively estimated the lost revenue from ticket sales alone from one canceled game at $1.25 million. SOMF ¶ 198. If a bowl game had been canceled, lost ticket sale revenue would have reached approximately $1.8 million. *Id.* ¶ 199.

The economic impact of canceled games also encompasses lost media-rights revenues. *Id.* ¶ 200. Media-rights revenues—those realized from the Pac-12 conference's contracts with broadcasters—are the largest income source for WSU's

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 24
Case No. 2:22-cv-00319-TOR

4-SER-817

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

football program. *Id.* WSU's economic expert conservatively estimated media-rights revenue lost from one canceled game at approximately $170,000. *Id.* ¶ 201.

Overall, then, if WSU had been forced to cancel one regular season game and one bowl game, it would have incurred over $3 million in losses from ticket sales and media-rights revenue. SOMF ¶¶ 198–201. If six games and a bowl game were canceled, losses would have reached $10 million. *Id.*

Such losses are analogous to the undue hardship found in *Bordeaux*. There the court specifically considered the costs of temporarily shutting down production of a television show—which the actor plaintiff's unvaccinated status made more likely— and determined that projected losses of $1.5 to 3 million would constitute an undue hardship to the production company. 703 F. Supp. 3d at 1128, 1137, 1139–40. The same reasoning applies here, particularly where WSU had already suffered financial losses from games canceled due to COVID-19 outbreaks during the 2020 season. SOMF ¶ 29–33. These millions of dollars in potential losses would undoubtedly be "substantial" in the context of WSU's business. *See Groff*, 600 U.S. at 471.

### iii. Lost donations

Accommodating Rolovich also risked the loss of significant revenue from WSU donors. Donor contributions to the WSU Athletics Department generally range from $2.3 to 3.8 million each year. SOMF ¶ 204. Once Rolovich's vaccine refusal became publicly known, many donors—including several that had previously given millions to WSU—expressed anger and disappointment that Rolovich was endangering the WSU community. *Id.* ¶¶ 79–80, 205–06. Multiple major donors explicitly threatened to withhold further giving based on Rolovich's vaccine stance,

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 25
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

including one donor who canceled a planned $1 million bequest to the university. *Id.* ¶ 206.

In sum, the economic burdens of accommodating Rolovich were substantial. This, too, conclusively establishes undue hardship.

### d. Other burdens would have imposed an undue hardship

In assessing undue hardship, courts consider not just directly quantifiable economic costs, but also non-economic harms like reputational and institutional damage. *Lee v. Seasons Hospice*, 696 F. Supp. 3d 572, 579–80 (D. Minn. Sept. 29, 2023) ("reputational damage" can "create an undue hardship"); *Together Emps.*, 573 F. Supp. 3d at 435 (same). Undisputed facts show that accommodating Rolovich would have damaged WSU's football program and reputation.

***First***, Rolovich's unvaccinated status limited his ability to recruit high school and junior college players, a critical requirement for the football program's long-term success. SOMF ¶ 5; Declaration of Anne McCoy (McCoy Decl.) ¶ 17; Chun Decl. ¶ 17. Indeed, Rolovich's limited ability to recruit was apparent early in the 2021 recruiting cycle; his recruiting activities in 2020 and 2021 lagged far behind those of his successor over a similar time period. SOMF ¶¶ 69–70; Declaration of Brad Corbin ¶¶ 6–9.

This discrepancy is at least partially attributable to COVID-19 restrictions in 2021, including vaccination requirements. In 2021, many state and local jurisdictions (including some where Rolovich had conducted his few recruiting visits the previous year) mandated masking and social distancing—measures that

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 26
Case No. 2:22-cv-00319-TOR

4-SER-819

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich had proven incapable of consistently honoring. SOMF ¶ 68; *see infra* subsection II.B.3.e. Several jurisdictions also restricted or barred unvaccinated visitors from accessing school facilities. SOMF ¶ 68; McCoy Decl., Exs. D–E.

With these restrictions, Rolovich's limited ability to meet recruits in their homes or schools would have hindered the football program's long-term success— a hardship compounded by Rolovich being the only unvaccinated Pac-12 head coach in 2021, putting him at an immediate conference disadvantage. *See* SOMF ¶ 82; Chun Decl. ¶ 55. Nor did Rolovich demonstrate the ability or capacity to bridge the gap by relying on phone or video recruiting, which is less effective than in-person recruiting. McCoy Decl. ¶¶ 17, 49–51; Chun Decl. ¶ 64; Dickert Decl. ¶ 20. Furthermore, after any recruiting trips, Rolovich would have had to quarantine for five days upon his return to campus because he was unvaccinated, and thus would have been unable to participate in practices and other football activities. SOMF ¶ 67. Such absences would have hindered team development. Chun Decl. ¶ 40, Ex. A.

**Second**, accommodating Rolovich would have further damaged WSU's reputation with donors, fans, alumni, and the public at large. Meeting face-to-face with donors, for instance, is critical to WSU's Athletics program, and Rolovich would have been unable to accomplish this effectively while unvaccinated in 2021. SOMF ¶ 6; Chun Decl. ¶¶ 23, 50, 53; McCoy Decl. ¶ 19. Because of donor uproar and other local health restrictions on the unvaccinated, WSU had to cancel a number of previously scheduled in-person donor events for Rolovich, including the "Kickoff with the Cougs" event on August 26, 2021, multiple donor dinners, and the Coaches' Luncheon the Friday before home games. SOMF ¶ 81. Given the many donors

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 27
Case No. 2:22-cv-00319-TOR

4-SER-820

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

already curbing their giving, Rolovich's inability to cultivate new donors through in-person interactions would likely have compounded the economic challenges facing WSU.

Similarly, Rolovich's ability to interact with fans, the media, and the football team itself in 2021 was significantly limited because of his unvaccinated status, and would have continued to be for the remainder of the 2021 season. Being unvaccinated, Rolovich was barred from attending Pac-12 media day, a signature event for generating excitement about the upcoming season. SOMF ¶¶ 72–74, 82; Chun Decl. ¶¶ 45–46. For the same reason, Rolovich could not attend the Coaches' Show broadcast in person and had to conduct that weekly interview by Zoom, which reduced fan attendance. Chun Decl. ¶ 70. Worse, the distancing, masking, testing, and quarantining requirements that applied only to unvaccinated persons caused Rolovich to miss numerous team meetings and constrained his interactions with his coaching staff and team. Chun Decl. ¶ 66; Dickert Decl. ¶ 44.

**Finally**, there is no reasonable dispute that Rolovich's announcement of his unvaccinated status in July 2021 was met with a large—and overwhelmingly negative—public reaction that reflected poorly on WSU.[3] SOMF ¶¶ 79–80, 205. After Rolovich's announcement, WSU was bombarded by hundreds of messages from donors, students, parents, alumni, and concerned Washingtonians outraged by

---

[3] Soon after his announcement, one metric used regularly by WSU to survey public sentiment reported that Rolovich's vaccine stance was the single largest driver of negative WSU coverage in years. Bones Rep. at 34; Coates Decl., Ex. EE.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 28
Case No. 2:22-cv-00319-TOR

4-SER-821

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich's anti-vaccine stance and public flouting of public safety measures. SOMF ¶¶ 80, 205; Chun Decl. ¶¶ 49–53; Declaration of Kirk Schulz (Schulz Decl.) ¶¶ 25–28; Declaration of Adam Ganders ¶ 5; Declaration of Mitchell Straub ¶¶ 10–15. Many questioned how a world-class scientific research university with a medical school, a global health school, and significant science-based research funding could credibly claim to prioritize community health and safety while employing an unvaccinated head football coach. Schulz Decl. ¶¶ 22, 36. These complaints continued, and in many cases worsened, as the football season began and thousands of WSU fans witnessed Rolovich frequently remove his mask during televised games in contravention of Pac-12, WSU, and local health requirements. SOMF ¶¶ 125–26; McCoy Decl. ¶¶ 30, 54; Chun Decl. ¶ 67. WSU had ample reason to believe that continuing to employ Rolovich would have increased the reputational and institutional damage it had already suffered.

In sum, accommodating Rolovich as head football coach would have imposed an undue hardship on WSU four times over—by damaging its community's health and safety, its finances, its football team, and its reputation.[4] Because undue hardship

---

[4] WSU is not alone in appreciating the undue hardship in having an unvaccinated head football coach, as evidenced by Rolovich's admitted inability to secure a coaching job with at least four other universities—the University of Nevada, the University of Hawaii, and two private Christian universities in Texas—because he was unvaccinated. SOMF ¶¶ 213–15.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 29
Case No. 2:22-cv-00319-TOR

4-SER-822

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

is a complete defense to Rolovich's WLAD and Title VII claims, WSU is entitled to summary judgment on those claims.

### e. WSU correctly determined that masking and distancing were not reasonable accommodations for Rolovich

Rolovich claims that he "could have been accommodated" by "requiring countermeasures to ensure his safety and others he may be in contact with," such as masking and distancing. ECF No. 53 ¶ 106. According to Rolovich, he "successfully performed his job as head coach while following countermeasures required of him by WSU because of his vaccination status." *Id.* ¶ 107. The undisputed facts refute both those assertions.

***First***, as Dr. Lynch's and Dr. Palmer's unrebutted scientific findings establish, "[v]accination was and is the single best tool available for stemming the spread of COVID-19 and its variants," and alternative mitigation measures like masking ("whether viewed in isolation or together") would not have been "an adequate substitute for vaccination." SOMF ¶¶ 194, 195.

***Second***, not only were countermeasures like masking and distancing insufficient to mitigate the risk of Rolovich contracting and spreading COVID-19, it is undisputed that Rolovich could not do his job effectively while following them. *See, e.g.*, *Bordeaux*, 703 F. Supp. 3d at 1127 (undue hardship where "the nature of Plaintiff's work required close, unmasked contact with other[s]"). Despite Pac-12 and WSU requirements that unvaccinated coaches wear masks during games and practices, in his deposition Rolovich admitted to repeatedly removing his to effectively communicate with players, coaches, and officials. SOMF ¶¶ 120–26.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 30
Case No. 2:22-cv-00319-TOR

4-SER-823

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Indeed, in six of the seven games he coached in 2021, Rolovich was caught on camera flagrantly removing his mask—usually in close proximity to other people:



*Washington State head coach Nick Rolovich speaks with an official, not pictured, during the second half of an NCAA college football game against Utah State, Saturday, Sept. 4, 2021, in Pullman, Wash. (AP Photo/Young Kwak)*



DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 31
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750





DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 32
Case No. 2:22-cv-00319-TOR

4-SER-825

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750





Coates Decl., Ex. UU.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 33
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

4-SER-826

In his deposition, Rolovich justified these—and thirteen more recorded mask-removals—as necessary for communication with players, coaches, or officials. SOMF ¶¶ 127–29. Rolovich testified that removing his mask was necessary "to make sure they heard me" in a noisy "football stadium with 30,000 people." *Id.* ¶ 129. Rolovich explained that unmasking was not only necessary to "un-muffle [his] voice," but also to "mak[e] sure [players were] able to understand body language of the importance of whatever I was communicating," and to allow them to "read[] lips" when he was "sending in plays and/or information." *Id.* Rolovich further justified his actions by arguing that masks reduced oxygen flow and exacerbated the "party headaches" he had from yelling during games. *Id.* ¶ 131.

Rolovich's inability to wear a mask continuously while coaching is not surprising. It is undisputed that a head football coach must speak frequently during games, often at loud volumes, in close proximity to dozens of other players, coaches, and officials. *Id.* ¶ 4. Because Rolovich admitted he had to remove even his cloth face covering to be heard, wearing an N95 respirator (as EH&S's memo prescribed) would undoubtedly have proven even more cumbersome. *Id.* ¶¶ 176–77. But WSU could not reasonably accommodate a coach who needed to violate state masking law, Pac-12 rules, or WSU's own safety requirements to do his job effectively. *See Trueblood v. Valley Cities Counseling & Consultation*, No. C23-0269JLR, 2024 WL 3965926, at *13 (W.D. Wash. Aug. 28, 2024) ("Even a 'danger' of violating the law suffices to show undue hardship.") (quoting *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006)).

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 34
Case No. 2:22-cv-00319-TOR

4-SER-827

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

***Third***, Rolovich's statements show that he not only found masking impracticable during games—but objectionable as a matter of principle. Even *before* the Proclamation, Rolovich was lackadaisical at best, and often openly contrarian, about masking rules. McCoy Decl. ¶ 27; Chun Decl. ¶ 33. In 2020, Rolovich openly mocked WSU's request that he wear a mask during media interviews; when a colleague texted a picture of Rolovich wearing his mask on his forehead while on set, Rolovich joked, "They told me to wear a mask":



Coates Decl., Ex. P.

Rolovich's hostility to masks only intensified after vaccines became available. During a donor trip to Seattle in May 2021, when Washington announced that *vaccinated* persons could remove their masks in public, Rolovich promptly removed

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 35
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

his in a hotel lobby, and proceeded to dine maskless with several major donors without informing them he was unvaccinated. SOMF ¶¶ 111–14. At one wine bar, Rolovich misled staff to gain entry when asked if he was vaccinated. *Id*. ¶¶ 115–16. Rolovich then removed his mask, stayed for an hour, and posed for a maskless picture with a WSU alumna who worked at the wine bar (and was entirely unaware of Rolovich's unvaccinated status):



*Id.* ¶ 116; Kennedy Decl., Ex. A.

On July 17, 2021, when state law still required unvaccinated persons to wear face coverings in public, Rolovich was photographed at an indoor football game not only unmasked, but while posing for photos and blowing through a vuvuzela:

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 36
Case No. 2:22-cv-00319-TOR

4-SER-829

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750



SOMF ¶ 118; Chun Decl., Exs. L (cicle added), M.

Rolovich's position on masks—as well as vaccination—is summarized succinctly in this text message he sent on July 11, 2021:



Coates Decl., Ex. M.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 37
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

The record is replete with other examples of both Rolovich's noncompliance with and obvious disagreement with masking as a COVID-19 safety measure, including his deposition testimony acknowledging his "concern [with] the detriments of masking to your general health." Coates Decl., Ex. A at 127:16–17; SOMF ¶¶ 109, 119, 209–11, 215. Simply put, Rolovich's longstanding and volitional noncompliance with masking rules showed that he could not—or would not—fulfill his coaching duties while distanced and without removing his mask.

**C. WSU Is Entitled to Summary Judgment on the Breach of Contract Claim**

Rolovich's claim for breach of contract also fails as a matter of law. ECF No. 53 ¶¶ 98–111. This Court has already ruled that "Plaintiff's breach of contract claim rests on the determination of whether Plaintiff's exemption and accommodation would have imposed an undue hardship," and is "appropriately resolved at summary judgment." ECF No. 33 at 27–28. Because Rolovich did not have a bona fide religious belief that conflicted with an employment policy and because accommodating Rolovich would have imposed an undue hardship, WSU had just cause for termination, and his contract claim accordingly fails.[5]

**D. WSU Is Entitled to Summary Judgment on the Wage-Withholding Claim**

Summary judgment is also warranted on Rolovich's wage-withholding claim, whether it arises under RCW 49.52 or RCW 49.48. ECF No. 53 ¶¶ 112–17. As this Court confirmed, RCW 49.52 claims are not actionable where a "bona fide" dispute

---

[5] Rolovich's contract claim also fails for the additional reasons explained in WSU's Motion to Dismiss. *See* ECF No. 22 at 49–51; ECF No. 31 at 24–27.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 38
Case No. 2:22-cv-00319-TOR

4-SER-831

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

exists over whether all or a portion of the wages must be paid. ECF No. 51 at 7. Accordingly, violations are typically found only "where an employer consciously withholds a quantifiable and undisputed amount of accrued pay," such as a failure to pay wages or issue regular paychecks. *Wright v. Belfor USA Group*, No. C24-0907-JCC, 2024 WL 3917157, at *4 (W.D. Wash. Aug. 22, 2024) (citations omitted). Indisputably, WSU paid Rolovich for the pay periods in which he actually worked. SOMF ¶ 189. And the record is clear that WSU had a "bona fide dispute" over its obligation to pay Rolovich liquidated damages—because it rightly believed it had just cause to terminate his employment. That alone defeats Rolovich's RCW 49.52 claim. *See, e.g.*, *Garrison v. Merch. & Gould, P.C.*, No. 09-CV-1728-JPD, 2011 WL 887749, at *10 (W.D. Wash. Mar. 10, 2011) (granting summary judgment for employer that "acted on its genuine belief that it was not obligated to pay [plaintiff] additional compensation under the contract"); *Zuccaro v. MobileAccess Networks, Inc.*, No. C11-272 MJP, 2012 WL 261342, at *4 (W.D. Wash. Jan. 30, 2012) ("genuine question" as to contractual requirement was sufficient to defeat wage-withholding claim).

Any claim for wage theft under RCW 49.48 fares no better. ECF No. 53 ¶¶ 121–24. To prevail on this claim, Rolovich cannot simply point to damages associated with his other claims; he must allege that WSU "did not pay [him] for all hours worked before [he was] placed on leave or illegally deducted an amount from [his] paychecks." *Zimmerman v. PeaceHealth*, 701 F. Supp. 3d 1099, 1117 (W.D. Wash. 2023). Rolovich cannot establish any right to liquidated damages because he was rightly fired for just cause, as explained above. And because WSU undisputedly

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 39
Case No. 2:22-cv-00319-TOR

4-SER-832

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

did not withhold any wages from Rolovich for the pay periods when he actually worked for WSU, his claim fails as a matter of law.

## IV.   CONCLUSION

WSU respectfully requests that the Court enter summary judgment in WSU's favor on all claims, and deny Rolovich's Partial MSJ.

I certify that this memorandum contains 9,140 words, in compliance with the Court's Order of September 18, 2024, ECF No. 86.

DATED this 14th day of October, 2024.

PACIFICA LAW GROUP LLP

*s/Zachary J. Pekelis*
Zachary J. Pekelis WSBA #44557
Ai-Li Chiong-Martinson, WSBA #53359
Erica P. Coray, WSBA #61987
W. Scott Ferron, WSBA #61154
Special Assistant Attorneys General
1191 Second Ave., Suite 2000
Seattle, WA 98101

ROBERT W. FERGUSON
Attorney General

Spencer W. Coates, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404

*Counsel for Defendant*
*Washington State University*

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 40
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

4-SER-833

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of October, 2024, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

DATED this 14th day of October, 2024.

_____
Erica Knerr, Legal Assistant

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 41
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

BRIAN FAHLING, WSBA #18894
Law Office of Brian Fahling
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326

ERIC KNIFFIN
Kniffin Law PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903
(719) 212-4391

ERIC JOB SEESE
Frost Brown Todd LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH, | NO. 2:22-cv-00319 |
| Plaintiff, | |
| v. | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| WASHINGTON STATE UNIVERSITY, | |
| Defendant. | |
| | September 23, 2024 |
| | Without Oral Argument |

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

STANDARD OF REVIEW ....................................................................................2

ARGUMENT..........................................................................................................2

    A.  The Court need only find that Rolovich had a bona fide religious objection to the vaccine mandate to grant partial summary judgment. ........................................................................................4

    B.  Title VII and First Amendment caselaw carefully circumscribe the Court's role in resolving this question. ................................................5

    C.  An employer cannot defeat a failure to accommodate claim by emphasizing the plaintiff's non-religious considerations. .....................6

    D.  The question before the Court is instead whether Rolovich has articulated a religious belief with specificity. .....................................11

CONCLUSION.....................................................................................................14

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - i

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Addisu v. Fred Meyer, Inc.,*
 198 F.3d 1130 (9th Cir. 2000) ...................................................................................... 2

*Beuca v. Washington State Univ.,*
 No. 2:23-CV-0069-TOR, 2023 WL 3575503 (E.D. Wash. May 19, 2023)...... 3, 4, 5, 6

*Bolden-Hardge v. Off. of California State Controller,*
 63 F.4th 1215 (9th Cir. 2023) ...................................................................................... 4

*Brown v. Alaska Airlines, Inc.,*
 2:22-cv-668, 2024 WL 235058 (W.D. Wash. May 22, 2024)………………………..3

*Burton v. Legacy Health,*
 No. 3:23-CV-01528-JR, 2024 WL 1241612 (D. Or. Feb. 28, 2024), ........................ 11

*Burwell v. Hobby Lobby Stores, Inc.,*
 573 U.S. 682 (2014) ...................................................................................................... 4

*Callahan v. Woods,*
 479 F. Supp. 621 (N.D. Cal. 1979)................................................................................ 8

*Callahan v. Woods,*
 658 F.2d 679 (9th Cir. 1981) ................................................................................ 8, 9, 11

*Denton v. Shriners Hosp. for Child.,*
 No. 3:23-CV-00826-JR, 2024 WL 10782803 (D. Or. Feb. 8, 2024) ......................... 12

*Doe v. San Diego Unified Sch. Dist.,*
 19 F.4th 1173 (9th Cir. 2021) .................................................................................... 6, 7

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
 575 U.S. 768 (2015)……………………………………………………...……………3

*Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.,*
 877 F.3d 487 (3d Cir. 2017) ......................................................................................... 7

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - ii

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

*Hernandez v. Comm'r*,
490 U.S. 680 (1989) ...................................................................................... 11

*Kennedy v. Bremerton Sch. Dist.*,
991 F.3d 1004 (9th Cir. 2021) ......................................................................... 3

*Kennedy v. U.S. Citizenship & Immigr. Servs.*,
871 F. Supp. 2d 996 (N.D. Cal. 2012) ............................................................ 2

*Lyons v. England*,
307 F.3d 1092 (9th Cir. 2002) ......................................................................... 3

*Maggio v. Oregon Health & Sci. Univ.*,
No. 3:23-CV-00116-JR, 2024 WL 665991 (D. Or. Jan. 8, 2024), ............................ 11

*Marshall v. Kaiser Found. Health Plan of the Northwest*,
No. 3:23-CV-01324-JR, 2024 WL 1913647 (D. Or. Apr. 16, 2024) ........................ 5, 7

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018) ..................................................................................... 6

*Parks v. Ethicon, Inc.*,
No. 20CV989-LL-RBB, 2022 WL 17972162 (S.D. Cal. Aug. 30, 2022) .................... 2

*Quinn v. Legacy Health*,
No. 3:23-CV-00331-JR, 2023 WL 10354251 (D. Or. June 16, 2023) ...................... 12

*Stephens v. Legacy-GoHealth Urgent Care*,
2023 WL 7612395 (D. Or. Oct. 23) ................................................................ 11

*Sturgill v. Am. Red Cross*,
No. 22-CV-11837, 2023 WL 8701293 (E.D. Mich. Dec. 15, 2023) ........................ 10

*Sturgill v. Am. Red Cross*,
2024 WL 1556186 (6th Cir. 2024). ................................................................ 10

*Sturgill v. Am. Red Cross*,
No. 24-1011, 2024 WL 3886589 (6th Cir. Aug. 21, 2024) ......................... 4, 10, 11

*Texas Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981) ......................................................................................... 3

*Thomas v. Review Board*,
450 U.S. 707 (1981) ..................................................................................... 4, 6

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - iii

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972). ...................................................................................................... 9

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - iv

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

# Other Authorities

EEOC, *Compliance Manual, Section 12: Religious Discrimination* (Jan. 15, 2021).. 7

EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (Oct. 25, 2021) .................................................... 7

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - v

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

**INTRODUCTION**

Nick Rolovich ("Rolovich") holds a bona-fide religious belief that conflicted with Washington State University's ("WSU") 2021 COVID-19 vaccine requirement. Rolovich explained these religious convictions in his application for a religious exemption. P's Stmt. Undisputed Material Facts (P's Stmt.) ¶¶ 19–26. WSU's review committee, applying standards developed by the Washington Attorney General's Office and with that office's assistance available upon request, P's Stmt. ¶ 29, determined that Rolovich's exemption request was "based on a sincerely held religious belief." P's Stmt. ¶ 41. WSU's leadership—which was under substantial pressure from WSU alumni, supporters, and employees, among others, P's Stmt. ¶ 18—abruptly reversed course and instead found that Rolovich did "not have a sincerely held religious belief that conflicts with the University's vaccine requirement."[1] P's Stmt. ¶ 51.

Under the constraints placed on courts by Title VII caselaw, and applicable First Amendment caselaw, no reasonable jury could find that Rolovich has failed to meet his *prima facie* burden under his Title VII failure to accommodate claim. The

---

[1] Despite Plaintiff's best efforts, discovery has not revealed any details regarding (a) who at WSU made the decision that Plaintiff's opposition was not religious in nature and (b) the process by which WSU did an about-face on its initial determination that Plaintiff's exemption request was based on a sincerely held religious belief. This is because WSU has invoked the attorney-client over the hundreds of documents and numerous conversations through which that decision was reached. *See, e.g.*, P's Stmt. ¶¶ 45–46.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 1

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

4-SER-841

undisputed evidence in the record establishes (a) that Rolovich held a religious belief, (b) that belief conflicted with an employment requirement (the vaccine requirement or mandate), and (c) WSU terminated him for his inability to comply with the vaccine mandate. Although there is a dispute as to whether WSU could accommodate Rolovich's objection without "undue hardship," which will require resolution at trial, the Court should grant partial summary judgment in favor of Rolovich as to his *prima facie* case for the Title VII failure to accommodate claim. Such a ruling will streamline the issues for resolution at trial, promote judicial economy, and conserve the litigation resources of the Parties.

<strong>STANDARD OF REVIEW</strong>

For a motion seeking partial summary judgment, courts apply the same standard as a motion seeking summary judgment of the entire case. *Kennedy v. U.S. Citizenship & Immigr. Servs.*, 871 F. Supp. 2d 996, 1006 (N.D. Cal. 2012). A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *See,* Fed.R.Civ.P. 56(a); *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000).. Motions for partial summary judgment serve judicial economy by narrowing the issues for trial. *Parks v. Ethicon, Inc.*, No. 20CV989-LL-RBB, 2022 WL 17972162, at *2 (S.D. Cal. Aug. 30, 2022).

<strong>ARGUMENT</strong>

"To establish religious discrimination on the basis of a failure-to-accommodate theory," a plaintiff

> must first set forth a *prima facie* case that (1) he had a bona-fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 2

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

4-SER-842

discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement.

*Kennedy v. Bremerton Sch. Dist.*, 991 F.3d 1004, 1022 (9th Cir. 2021), *rev'd on other grounds*, 597 U.S. 507 (2022); *see also Beuca v. Washington State Univ.*, No. 2:23-CV-0069-TOR, 2023 WL 3575503, at *2 (E.D. Wash. May 19,2023), *rev'd on other grounds*, No. 23-35395 (9th Cir. Jul. 18, 2024). "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).[2]

The Parties' dispute was limited to the first element of Rolovich's *prima facie* case. There is no dispute that Rolovich satisfies the second element: Rolovich's application for a religious exemption informed WSU of the conflict between his religious beliefs and the vaccine mandate. P's Stmt. ¶¶ 19–26. Likewise, there is no dispute that Rolovich satisfies the third element: WSU terminated Rolovich's employment because of his inability to cooperate with the vaccine mandate. P's Stmt. ¶ 49.

---

[2] A failure to accommodate claim is a type of disparate treatment claim. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015); *see also Brown v. Alaska Airlines, Inc.*, 2:22-cv-668, 2024 WL 235058, *14, n. 5 (W.D. Wash. May 22, 2024) ("It is clear that 'failure-to-accommodate' is not a separate cause of action under Title VII, but a theory on which a plaintiff may bring its disparate treatment claim.").

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 3

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

**A. The Court need only find that Rolovich had a bona fide religious objection to the vaccine mandate to grant partial summary judgment.**

While the question as to whether Rolovich's reasons for opposing the vaccine mandate count as a "bona fide religious belief" involve questions of fact, this inquiry is carefully circumscribed by the Title VII and First Amendment law. In *Thomas v. Review Board of the Indiana Employment Security Division,* the Supreme Court reversed the Indiana Supreme Court's determination that Thomas' opposition to working on tank turrets was based on a "personal philosophical choice rather than a religious choice." 450 U.S. 707, 715–16 (1981). Just last month, the Sixth Circuit cited *Thomas* in reversing the district court's ruling that an employee's opposition to receiving a COVID vaccine was not based on a bona fide religious belief but rather "medical in nature." *Sturgill v. Am. Red Cross*, No. 24-1011, 2024 WL 3886589, *4 (6th Cir. Aug. 21, 2024). The Sixth Circuit found the district court's analysis— disregarding the plaintiff's stated religious reason for seeking an accommodation on the basis that the court judged the plaintiff's rationale "medical in nature"—was "contrary to our First Amendment jurisprudence, which commands that courts may not question the veracity of one's religious beliefs." *Id*. "In sum, that there may be both religious and secular reasons for an act does not elevate the latter over the former[.]" *Id*. at 5. As this Court has recognized, "both the Ninth Circuit and the Supreme Court have cautioned against second-guessing the reasonableness of an individual's asserted religious beliefs." *Beuca*, 2023 WL 3575503, at *2 (citing *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023), *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014)).

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 4

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

WSU claimed Rolovich "[did] not have a sincerely held religious belief that conflicts with the University's vaccine requirement." P's Stmt. ¶ 51. WSU further claimed that Rolovich's "personal or philosophical beliefs do not give an individual a basis to claim a religious exemption." P's Stmt. ¶ 51. *See also* ECF No. 31 at 2 ("Rolovich's stated vaccine objections are not religious in nature."); P's Stmt. ¶¶ 55, 56 (conclusions of WSU's experts).

However, this determination occurred after WSU's review committee had already concluded that Rolovich's exemption request was "based on a sincerely held religious belief." P's Stmt. ¶ 41. The challenge to WSU's conclusion occurred after the Athletics' Department questioned WSU's review committee's finding. P's Stmt. ¶ 44. Rolovich's stated religious belief in his exemption request and his discussions with colleagues should not conflate one over the other, and Rolovich's religious belief should not be subject to second-guessing. *Beuca*, 2023 WL 3575503, at *2.

### B. Title VII and First Amendment caselaw carefully circumscribe the Court's role in resolving this question.

District courts in this circuit "have grappled with the contours of the first *prima facie* element." *Marshall v. Kaiser Found. Health Plan of the Northwest*, No. 3:23-CV-01324-JR, 2024 WL 1913647, at *3 (D. Or. Apr. 16, 2024), *R.& R. adopted sub nom. Marshall v. Kaiser Found. Health Plan of the Nw.*, No. 3:23-CV-1324-JR, 2024 WL 1912540 (D. Or. May 1, 2024). Courts must take into account that "Title VII broadly defines religion." *Id*. Additionally, given the constraints grounded in both the Establishment Clause and the Free Exercise Clause, "American courts are loath to tell a person that his interpretation of his faith is a wrong one." *Id*. (citations omitted).

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 5

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

"[T]he resolution of [whether a belief is religious] is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas*, 450 U.S. at 714. "Courts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715. *See also Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 n.3 (9th Cir. 2021) ("We may not and do not question the legitimacy of Jill Doe's religious beliefs regarding COVID-19 vaccinations."). The government's negative appraisal of an individual's professed religious beliefs can itself violate the First Amendment. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018) (commission violated Phillips' Free Exercise rights when it characterized his religious beliefs "as merely rhetorical—something insubstantial and even insincere").

As discussed above, Rolovich established a religious belief in his request for exemption from the vaccine mandate, and that such religious belief conflicted with the vaccine mandate. As such, it is proper as a matter of law to grant summary judgment on the first element of Rolovich's Title VII failure to accommodate claim.

### C. An employer cannot defeat a failure to accommodate claim by emphasizing the plaintiff's non-religious considerations.

The Equal Employment Opportunity Commission ("EEOC") guidance and binding precedent preclude this Court from concluding on this basis that Rolovich lacks a bona fide religious belief. The law is clear: no quantity of evidence about an employee's scientific or political beliefs would itself justify a government employer

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 6

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

or a court to conclude that the employee lacks a bona fide religious belief that conflicts with an employment requirement. WSU denies that Rolovich's opposition to the vaccine mandate is "religious in nature" because it contends that he had frequently voiced "opposition to the vaccine" based on his "own 'scientific' research and making statements mirroring several specific online conspiracy theories." P's Stmt. ¶ 51.

The EEOC has firmly opined that while "Title VII does not protect objections to a COVID-19 vaccination requirement that are *purely* based on social, political, or economic views or personal preferences." *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (Oct. 25, 2021), available at https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L (emphasis added). As the EEOC states in its Compliance Manual, "overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system." EEOC, *Compliance Manual, Section 12: Religious Discrimination*, § 12-I(A)(1) (Jan. 15, 2021) (citing *Fallon v. Mercy Catholic Med. Ctr. of Se. P*a., 877 F.3d 487, 492 (3d Cir. 2017), collecting other cases).

The Ninth Circuit has relied on this EEOC guidance, as did WSU in reviewing religious exemption requests. *Doe*, 19 F.4th at 1180; P's Stmt. ¶¶ 38–40. *See also Marshall*, 2024 WL 1913647 at *3-4 (citing the EEOC's "overlap" principle before noting that "while plaintiff may have also relied on his medical and/or secular beliefs surrounding the safety of the COVID-19 vaccine and the sanctity of his body, it cannot be denied that he expressly identified his religious belief that 'abortion is murder.'").

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 7

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

This principle was embedded in Ninth Circuit precedent long before the COVID-19 pandemic. *Callahan v. Woods* turned on whether Callahan had a sincere religious belief to support his First Amendment claim, which sought to protect his right to refrain from getting his daughter a social security number. 658 F.2d 679 (9th Cir. 1981). The Ninth Circuit reversed the district court's finding that plaintiff's belief was non-religious, identifying two principal errors in the district court's analysis. First, the district court found that Callahan's "aversion to identification numbers predated by many years his religious awakening." *Id*. at 684. But, the Ninth Circuit rejected the district court's "underlying premise that a long-held secular belief invalidates First Amendment protection for a related but newly-alleged religious belief." *Id*. While there is a possibility that a person "seeking to advance a secular interest might, if frustrated in his pursuit, decide to mask the cause in religious garb," "the presence of longstanding secular objections" did not itself invalidate his claim. *Id*. This factor only goes to the plaintiff's sincerity: whether the "theological overtones" to his objection were "fictitious trappings for longstanding secular concerns." *Id*. As the government did not claim Callahan had "attempted to perpetrate a sham" on it or the court, *Callahan v. Woods*, 479 F. Supp. 621, 624 (N.D. Cal. 1979), the Ninth Circuit found for Callahan. *Callahan*, 658 F.2d at 684.

Second, the Ninth Circuit found the district court erred by rejecting Callahan's assertion of religion in his claim based on its assessment that his opposition to the "use of numbers as identifiers" was rooted more in his "dehumanizing" experience in prison than "his subsequent religious activity." *Callahan*, 479 F. Supp. at 625. The Ninth Circuit held that "a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one." *Callahan*, 658

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 8

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

F.2d at 684. This directly goes to Rolovich's religious belief here as asserted in his Title VII failure to accommodate claim, and WSU's improper determination that other personal or philosophical beliefs invalidated Rolovich's religious beliefs that conflicted with the vaccine mandate.

The Ninth Circuit also relied on *Wisconsin v. Yoder*, where the Amish community's religious objection to mandatory public education was rooted in its practical judgment that "high school tends to emphasize intellectual and scientific accomplishments, self-distinction, competitiveness, worldly success, and social life with other students," and that this environment would "place[] Amish children in an environment hostile to Amish beliefs." *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972). The Ninth Circuit emphasized that the Amish's negative appraisal of the local high school did not undermine its Free Exercise Claim. *Callahan*, 658 F.2d at 684. Similarly,

> [t]he devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork. Such personal considerations are irrelevant to an analysis of the claimants' free exercise rights, so long as their religious motivation requires them to keep the Sabbath and avoid pork products. Religious duties need not contradict personal values or preferences in order to be protected.

*Id*. The court concluded that, even if it "might be argued that Callahan's personal animus toward numbers would itself have been enough to motivate his refusal," his sincere religious objection "would provide a separate and sufficient reason for his action, one that . . . merits constitutional protection." *Id*. at 684–85. Accordingly, the Ninth Circuit reversed the district court, finding that plaintiff's religious objections "are sincerely held and religious in nature." *Id.* at 687.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 9

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

4-SER-849

Applied to this case, the relevant issue is not—as WSU would have it—whether Rolovich made too many public statements in "the realm of safety concerns and conspiracy concerns" and not enough "religious objections to vaccinations" in the months leading up to his termination. *C.f.* P's Stmt. ¶ 55. The issue is instead whether Rolovich had a bona fide religious belief that "would provide a separate and sufficient reason" for his refusal to take a COVID vaccine. Here, as in *Callahan*, the answer to that question is plainly yes.

*Callahan* remains relevant in Title VII failure to accommodate cases involving COVID-19 vaccine mandates. Last month, in *Sturgill*, the Sixth Circuit rejected an employer's argument that closely parallels WSU's rationale for rejecting Rolovich's exemption request. 2024 WL 3886589. Like WSU, the American Red Cross argued that Sturgill's conflict did not qualify for Title VII protection because her "objection to the COVID-19 vaccine sounded in medical and personal judgments." *Sturgill, Plaintiff-Appellant, v. American Red Cross*, Defendant-Appellee., 2024 WL 1556186, at *13–14. Like WSU, Sturgill's employer argued that she opposed the mandate "because she views the vaccine to be unsafe not because it offends her moral conscience due to a practice or observance that is religious in nature." *Id*. at *21–22. "She has not cited to any tenet of the Lutheran church that opposes western medicine in general or the COVID vaccine specifically. *Id*. at *22–23.

The district court agreed with Sturgill's employer, finding that her opposition to receiving a COVID vaccine were "medical" in nature. *Sturgill v. Am. Red Cross*, No. 22-CV-11837, 2023 WL 8701293, at *8 (E.D. Mich. Dec. 15, 2023). Valid religious objections, the court reasoned, are those that "ha[ve] nothing to do with their belief in its safety." *Id*. The Sixth Circuit roundly rejected the district court's analysis as

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 10

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

"contrary to our First Amendment jurisprudence, which commands that courts may not question the veracity of one's religious beliefs." *Sturgill*, 2024 WL 3886589 at *4. The Sixth Circuit further established that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith." *Id*. (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)). "In sum," the court said, "that there may be both religious and secular reasons for an act <u>does not elevate the latter over the former</u>." *Id*. at 5 (emphasis added) (citing *Callahan*, 658 F.2d at 684).

### D. The question before the Court is instead whether Rolovich has articulated a religious belief with specificity.

As noted above, Title VII failure to accommodate claims do not fail because a plaintiff's articulated religious objections are also rooted in scientific or personal judgments. Instead, when courts have ruled against plaintiffs in COVID-19 vaccine failure to accommodate claims, it is because the plaintiffs failed to adequately articulate their religious exemptions. *See, e.g., Stephens v. Legacy-GoHealth Urgent Care*, 2023 WL 7612395, 4-6 (D. Or. Oct. 23), *R.& R. adopted sub nom. Stephens v. Legacy Health*, No. 3:23-CV-00206-SB, 2023 WL 7623865 (D. Or. Nov. 14, 2023) (describing "[g]eneral references to Christianity" as "conclusory"); *Maggio v. Oregon Health & Sci. Univ.*, No. 3:23-CV-00116-JR, 2024 WL 665991, at 6 (D. Or. Jan. 8, 2024), *R.& R. adopted*, No. 3:23-CV-116-JR, 2024 WL 665089 (D. Or. Feb. 16, 2024) (citing case where Title VII plaintiff dismissed after invoking "vaguely religious language"); *Burton v. Legacy Health*, No. 3:23-CV-01528-JR, 2024 WL 1241612, at *3 (D. Or. Feb. 28, 2024), *R. & R. adopted*, No. 3:23-CV-1528-JR, 2024 WL 1241450 (D. Or. Mar. 22, 2024) (citing case dismissing Title VII claim where

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 11

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

4-SER-851

plaintiff failed to "describe any particular beliefs [or] provide even a perfunctory explanation as to how her beliefs conflict with receiving a COVID-19 vaccine").

Conversely, courts recognize a bona fide religious belief when Title VII plaintiffs' objections are rooted in identified religious teachings and when their religious convictions were developed through study and consultation with religious authorities. *See Quinn v. Legacy Health*, No. 3:23-CV-00331-JR, 2023 WL 10354251, at *5 (D. Or. June 16, 2023), *R. & R. adopted*, No. 3:23-CV-00331-JR, 2024 WL 620344 (D. Or. Feb. 13, 2024) (noting plaintiff's invocation of "her anti-abortion stance, guidance from spiritual leaders, and the use of fetal cells in developing Covid-19 vaccines"); *Denton v. Shriners Hosp. for Child.*, No. 3:23-CV-00826-JR, 2024 WL 1078280, at *3 (D. Or. Feb. 8, 2024), *R. & R. adopted*, No. 3:23-CV-826-JR, 2024 WL 1075324 (D. Or. Mar. 12, 2024) ("invocation of an anti-abortion stance, guidance from spiritual leaders, and the use of fetal cells in developing COVID-19 vaccines appropriately alleged a bona fide religious belief.").

Rolovich brought his troubled conscience to a Catholic priest, who listened to his concerns and helped him understand his disquiet in terms of Catholic teaching on the moral conscience. P's Stmt. ¶¶ 4–10, 14–15. By the time Rolovich submitted his request for a religious exemption, Rolovich had also conferred his bishop, whom he had known for more than thirty years. P's Stmt. ¶¶ 11–13. Rolovich's exemption request was also based on his review of the Catechism of the Catholic Church and other Catholic teaching materials from his own diocese, the National Catholic Bioethics Center, the United States Conference of Catholic Bishops (USCCB), and the Vatican. P's Stmt. ¶¶ 8, 9, 20, 26.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 12

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

Rolovich detailed the nature of his religious convictions in the request for a religious exemption he submitted to WSU on October 4, setting out two main reasons, each grounded in Catholic doctrine. P's Stmt. ¶¶ 21–26. First, he explained,

> The Roman Catholic Church teaches that I am required to refuse a medical intervention, including a vaccination, when my conscience has come to sure judgment that, as in this case, accepting the vaccine will make me complicit in the abortions that produced the human cell lines from which currently available vaccines are ultimately derived.

P's Stmt. ¶ 22.

Second, Rolovich grounded his religious opposition on the Catholic Church's teaching concerning therapeutic proportionality, a principle which states that Catholics are obliged to make "an assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods." P's Stmt. ¶ 23.

Rolovich also provided detailed annotations to support his exemption request, with paragraph or footnote-specific references to the Catechism of the Catholic Church, a document from the Vatican's Congregation for the Doctrine of the Faith entitled "Note on the Morality of Using some Anti-COVID-19 Vaccines," and from the USCCB's "Ethical and Religious Directives for Catholic Health Services." P's Stmt. ¶ 26.

WSU's review committee, following the procedures that WSU had publicly committed itself to, and applying standards that were developed in concert with the Washington Attorney General's office, found that Rolovich's exemption request was "based on a sincerely held religious belief." P's Stmt. ¶ 41. Finally, if there was

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 13

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

remaining any grounds to doubt his sincerity, Rolovich held fast to his convictions, at great risk to his public reputation, his professional prospects, and his livelihood.

None of the arguments that WSU gave for terminating Rolovich unseats these facts. Nothing has been uncovered in discovery and WSU's expert witnesses have not identified anything in their reports that disputes these facts of Rolovich's religious belief. Under the legal principles set out above, the undisputed facts show that Rolovich has satisfied his *prima facie* burden under a Title VII failure to accommodate claim. No reasonable jury could deny that Rolovich had a bona fide religious belief that conflicted with WSU's vaccine mandate.

## CONCLUSION

For the reasons provided above, Plaintiff Nicholas Rolovich respectfully requests that the Court grant

a) summary judgment on the first element of Rolovich's *prima facie* case for the Title VII failure to accommodate claim, that Rolovich has a religious belief which conflicted with WSU's vaccine mandate.

b) summary judgment on the second element of Rolovich's *prima facie* case for his Title VII failure to accommodate claim, that Rolovich informed WSU of his religious belief and conflict.

c) summary judgment on the third element of Rolovich's *prima facie* case for his Title VII failure to accommodate claim, that Rolovich was terminated by WSU for Rolovich's inability to comply with the vaccine mandate, a job requirement.

DATED this 23rd day of September, 2024.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 14

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

**LAW OFFICE OF BRIAN FAHLING**

 /s/ Brian Fahling
Brian Fahling WSBA #18894
559 Old Mill Rd
Sandpoint, ID 83864
Tele: 425.802.7326
Email: bfahling@fahlinglaw.com

**KNIFFIN LAW PLLC**

/s/ Eric Kniffin
Eric Kniffin CO Bar # 48016
102 S. Tejon Street, Suite 1100
Colorado Springs, CO 80903
Tele: 719-212-4391
Email: eric@kniffin.law
*Admitted pro hac vice*

**FROST BROWN TODD LLP**

/s/ E. Job Seese
E. Job Seese, CO Bar # 48379
Michael A. Freimann, CO Bar #35430
Mamie Ling, CO Bar #49483
Meredith Grant, CO Bar #59667
1801 California Street, Suite 2700
Denver, CO 80202
Tele: 303.623.9000
jseese@fbtlaw.com
mfreimann@fbtlaw.com
mling@fbtlaw.com
mgrant@fbtlaw.com
Tel.: (303) 406-4990
*Admitted pro hac vice*

*Attorneys for Plaintiff*

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 15

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of September, 2024, I electronically filed the forgoing MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that none of the represented parties are non-CM/ECF participants.

By:   /s/ E. Job Seese
E. Job Seese

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
NO. 2:22-cv-00319-TOR - 16

**LAW OFFICE OF BRIAN FAHLING**
559 Old Mill Rd
Sandpoint, ID 83864
(425) 802-7326
E: bfahling@fahlinglaw.com

4-SER-856

BRIAN FAHLING, WSBA #18894
Law Office of Brian Fahling
8124 NE 166th St
Kenmore, WA 98028
(425) 802-7326

Eric Kniffin CO, Bar #48016
5678 102 S. Tejon Street, Suite 1100
Colorado Springs, CO 80903
Office: 719-212-4391

E. JOB SEESE, CO Bar # 48379
1601 19th Street, Suite 1000
Tele: 303.623.9000
Denver, CO 80202
(303) 623-9000
*Admitted pro hac vice*                    Honorable Thomas O. Rice

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>    Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY, an agency of the State of Washington; PATRICK CHUN, Director of Athletics for Washington State University, in his individual capacity; and JAY INSLEE, Governor, in his official capacity,<br><br>    Defendants. | NO. 2:22-cv-00319<br><br>**PLAINTIFF'S MOTION TO AMEND**<br><br>**9/15/2023**<br>**Without Oral Argument** |

## INTRODUCTION

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiff Nick Rolovich respectfully requests that the Court grant him leave to file a Second Amended Complaint to clarify that he is pursuing a claim for damages under Washington's Wrongful Withholding of Wages statute. Specifically, Plaintiff seeks to amend his First Amended Complaint ("FAC") to insert a new Paragraph 102 that will state as follows:

> WSU's improper "just cause" termination of Mr. Rolovich was done to avoid paying him liquidated damages, as required by his contract with WSU if he had been properly terminated under the 'without cause' provision, this in violation of RCW 49.48, *et seq.,* RCW 49.52, *et seq.*

Plaintiff has conferred with Defendant, which opposes the requested amendment.

## LEGAL STANDARD

Rule 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." "Rule 15's policy of favoring amendments to pleadings should be applied with extreme liberality, guided by the underlying purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or technicalities." *Young v. Hawaii*, 992 F.3d 765, 868 (9th Cir. 2021) (en banc) (cleaned up), vacated on other grounds 142 S. Ct. 2895 (2022).

The court considers five factors in assessing the propriety of leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). "Absent prejudice, or a strong showing of any of the remaining [factors], there exists a presumption under

Rule 15(a) in favor of granting leave to amend." *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 985 (9th Cir. 2011) (citation omitted).

## FACTUAL BACKGROUND

On November 14, 2022, Plaintiff filed a complaint in Whitman County Superior Court. ECF No. 1-1 at 4-32 (Complaint). On December 9, 2022, Plaintiff filed his First Amended Complaint in the same court. *Id*. at 73-104 (FAC).

Plaintiff's First Amended Complaint abandoned specific *factual assertions* regarding a withholding of wages claim that alleged Defendant withheld, without his consent, ten percent of his salary from May 15, 2020 through July 30, 2020. ECF No. 1-1 at 17, 26-27 (Complaint). Plaintiff's FAC continued to allege, however, that "this action . . . arises under the laws of the State of Washington . . . including RCW 49.48, *et seq.,* RCW 49.52, *et seq.*)" (collectively, "state wage law claims"). ECF No. 1-1 at 80 (FAC). The FAC's Prayer for Relief likewise retained Plaintiff's request that the Court "[a]ward double damages as provided for in RCW 49.52, *et seq.*" *Id.* at 110. The FAC did not, however, specify which alleged facts supported the state wage law claims.

During the August 9 telephonic Scheduling Conference, counsel for Plaintiff asked the Court for guidance as to the best way to clarify that Plaintiff is still pursuing his state wage law claims. Further to the Court's directive, Plaintiff now files this motion and respectfully seeks leave to amend his FAC to state with specificity the factual allegations set forth in his FAC upon which his state wage law claims are predicated.

## ARGUMENT

As indicated above, Plaintiff has previously amended his complaint. As shown below, all of the other factors listed by the Ninth Circuit, and the overall policy behind Rule 15, support Plaintiff's request.

### A.    Plaintiff has proceeded in good faith.

Most importantly, Plaintiff has acted in good faith in alleging and prosecuting the state wage law claims. In every substantive brief Plaintiff has filed in this Court, he has clearly indicated his understanding that the FAC set out claims under Washington's wage claim laws and his intent to pursue such claims:

- ECF No. 12 at 2 ("This action arises under the laws of Washington State and the United States, specifically . . . RCW 49.48, *et seq*., RCW 49.52, *et seq*. (Wrongful Withholding of Wages)");

- ECF No. 14 at 3 n.2 ("Defendants' list is not exclusive. For example, it excludes Rolovich's wage claims. *See* ECF 1-1 ¶ 2 and Prayer for Relief.");

- ECF No. 28 at 8 ("Below, Rolovich highlights some of the most important of these alleged facts and shows why the Court, assuming that each of these facts are true, can draw the reasonable inference that Defendants WSU and Chun are liable for breaching Rolovich's contract [and] violating the Wrongful Withholding of Wages statute.");

- *Id*. at 16-17 ("The only question that this Court must answer for this claim is whether Rolovich has pled sufficient facts to support his claim for . . . violation of the Wrongful Withholding of Wages statute."); and

- *Id*. at 19-20 ("WSU's breach resulted in violations of RCW 49.48, *et seq.,* and RCW 49.52, *et seq.*, by unlawfully terminating Rolovich for 'just cause' to avoid paying him the wages owed if he had been dismissed 'without cause.'").

**B.      Plaintiff's motion does not reflect undue delay.**

Nor has the Plaintiff unduly delayed in filing the present motion, which is brought well in advance of the September 29, 2023 deadline to amend pleading. Also, as catalogued above, Plaintiff has consistently signaled to Defendant and this Court that it is seeking damages under the Washington Withholding of Wages statute and his understanding that his FAC clearly pled such a claims.

The above should suffice to address the "undue delay" analysis. Plaintiff further notes, however, that he promptly raised with Defendant's counsel Plaintiff's intent to seek relief from the Court to address the Court's statement in the background section of its ruling on Defendant's motions to dismiss that Plaintiff's FAC "abandoned the state wage law claim." ECF No. 33 at 6. Specifically, Plaintiff's counsel raised the issue during the parties' July 19 Rule 26(f) meet and confer. After Defendant eventually informed Plaintiff that it would oppose such a request for relief, Plaintiff sought guidance from the Court during the August 9 scheduling conference as to the appropriate avenues to address. Now, just a week later, Plaintiff files this motion.

**C.      Amendment would not prejudice Defendant.**

Granting Plaintiff leave to amend his complaint would not prejudice Defendant. This is true for three reasons. First, as explained above, Defendant has long been on notice of Plaintiff's intention to pursue this wage claim under the FAC. Second, if Defendant was unclear as to Plaintiff's intention, it has had several opportunities to seek clarity on this matter. As Plaintiff noted elsewhere, Defendant could have filed a Fed. R. Civ. P. 12(e) motion for a more definite statement regarding Plaintiff's claims under RCW 49.48, *et seq.,* and RCW 49.52, *et seq*. ECF

No. 28 at 20, fn. 5. Defendant could also have sought a motion to strike Plaintiff's request in his Prayer for Relief for double damages under RCW 49.52, *et seq.* ECF No. 1-1 at 103. Similarly, Defendant could have moved to dismiss Plaintiff's state wage law claims; it did not.

Third, Defendant would not be prejudiced because the evidentiary issues implicated by Plaintiff's state wage law claims are already well within the scope of the litigation: the same factual issues will also underlie Plaintiff's breach of contract claims. This can be confirmed by a cursory review of the topics outlined in the parties' joint status report and discovery plan, ECF No. 38.

As Plaintiff stated in his Motion for Remand, "each of his claims is interrelated with, arises from, and goes directly to the enforcement and construction of the employment agreement between WSU and himself." ECF No. 12 at 2. As Plaintiff stated in opposition to Defendant's motion to dismiss, to prevail on his state wage law claims, he need prove only that Defendant "unlawfully terminating [him] for 'just cause' to avoid paying him the wages owed if he had been dismissed 'without cause.'" ECF No. 28 at 19-20.

In light of the above, and given that the Court denied Defendant's motion to dismiss Plaintiff's contract claim, ECF No. 33 at 28, permitting Plaintiff to amend his FAC will not cause any cognizable prejudice to Defendant.

### D.     Amendment would not be futile.

During the Court's August 9 telephonic scheduling conference, Defendant argued that Plaintiff should not be granted leave to amend, as any claims under Washington's wage claim statutes would be futile, citing *Gunsul v. Boeing Co.*, No.

C15-95RAJ, 2015 WL 11254742, at *3 (W.D. Wash. June 24, 2015), and *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203-04 (9th Cir. 2002).

Defendant misread these cases as applied here. As the Ninth Circuit indicated in *United States v. Corinthian Colleges*, which the Court cited throughout its motion to dismiss order,[1] a court's role under the futility analysis is narrow: "Under futility analysis, dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." 655 F.3d 984, 995 (9th Cir. 2011) (cleaned up).

The cases proffered by Defendant do not demonstrate that Plaintiff's state law wage claims "could not be saved by any amendment." They merely show, at most, that Plaintiff could not succeed on his state law wage claims without succeeding on his contract claim. The district court in *Gunsul* interpreted the Ninth Circuit's decision in *Hemmings* as holding that "RCW Ch. 49.52 does not apply" where "the obligation to pay wages stems not from 'statute, ordinance, or contract,' but rather from a retrospective jury verdict." *Gunsul*, 2015 WL 11254742, at *3 (citing *Hemmings*, 285 F.3d at 1203). Thus, the district court held, Washington law does not entitle a plaintiff to "double damages for wage withholding" where the plaintiff's right to such wages is based merely on a finding that the employer unlawfully discriminated against plaintiff. *Id*.

The court in *Hemmings* held a jury verdict that an employer "willfully and intentionally violated federal and state anti-discrimination statutes" did not entitle the plaintiff to "double damages pursuant to RCW § 49.52.070." 285 F.3d at 1203-

---

[1] ECF No. 33 at 7, 21, 26.

04. The court in *Gunsul* held that even if plaintiff prevailed in her claim under Washington's Family Leave Act or the federal Family and Medical Leave Act, that would not entitle her relief under Washington's wage withholding statutes. 2015 WL 11254742 at *1, *3-4. But neither case suggests that Plaintiff may not pursue relief under Washington's wage withholding statute if he proves that Defendant was obliged to pay him liquidated damages under his employment contract and improperly claimed it had "just cause" to terminate him to avoid paying him those damages.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant him leave to file a Second Amended Complaint.

DATED this 17th day of August, 2023.

**LAW OFFICE OF BRIAN FAHLING**

By:     */s/ Brian Fahling*
        Brian Fahling WSBA #18894
        8124 NE 166th Street
        Kenmore, WA 98028
        Tele: 425.802.7326

**KNIFFIN LAW PLLC**

By:     */s/ Eric Kniffin*
        Eric Kniffin CO Bar # 48016
        102 S. Tejon Street, Suite 1100
        Colorado Springs, CO 80903
        Tele: 719-212-4391
        Email: eric@kniffin.law
        *Admitted pro hac vice*

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**

By:     */s/ E. Job Seese*
        E. Job Seese, CO Bar # 48379
        1601 19th Street, Suite 1000
        Tele: 303.623.9000
        Email: jseese@lewisroca.com
        Denver, CO 80202
        (303) 623-9000
        *Admitted pro hac vice*

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of August, 2023, I electronically filed the forgoing PLAINTIFF'S MOTION TO AMEND with the Clerk of Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that none of the represented parties are non-CM/ECF participants.

By:___*/s/ E. Job Seese*_____
E. Job Seese, Esq.

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NICHOLAS ROLOVICH,                    ) Case No. 2:22-cv-00319-TOR
                                      )
                    Plaintiff,        ) May 11, 2023
                                      ) Spokane, Washington
vs.                                   )
                                      ) Motion Hearing
WASHINGTON STATE UNIVERSITY, an       )
agency of the State of                ) Pages 1 - 35
Washington; PATRICK CHUN,             )
Director of Athletics for             )
Washington State University, in       )
his individual capacity; and          )
JAY INSLEE, Governor, in his          )
official capacity,                    )
                                      )
                    Defendants.       )
_____

BEFORE THE HONORABLE THOMAS O. RICE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:              BRIAN FAHLING
                                Attorney at Law
                                Law Office of Brian Fahling
                                8124 NE 116th Street
                                Kenmore, WA 98028

                                ERIC JOB SEESE
                                Attorney at Law
                                Lewis Roca Rothberger Christie
                                1601 19th Street
                                Suite 1000
                                Denver, CO 80202

For the Defendants WSU and      ZACHARY J. PEKELIS
Chun:                           Attorney at Law
                                Pacifica Law Group
                                1191 2nd Avenue
                                Suite 2000
                                Seattle, WA 98101

2

For the Defendants WSU and          SPENCER W. COATES
Chun:                               Attorney at Law
                                    Attorney General's Office
                                    800 Fifth Avenue
                                    Suite 2000
                                    Seattle, WA 98104

For the Defendant Inslee:           CRISTINA SEPE
                                    Attorney at Law
                                    Washington State Office of the
                                    Attorney General
                                    Solicitor Generals Office
                                    1125 Washington Street SE
                                    PO Box 40100
                                    Olympia, WA 98504-0100

Official Court Reporter:            CRYSTAL L. HICKS, CRR, RPR
                                    United States District Courthouse
                                    P.O. Box 700
                                    Spokane, Washington 99210
                                    (509) 458-3434

Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.

(Court convened on May 11, 2023, at 10:58 a.m.)

THE COURTROOM DEPUTY:  The matter now before the Court is Nicholas Rolovich v. Washington State University et al., Case No. 2:22-cv-0319-TOR.  This is the time set for a motion hearing.

Counsel, please state your appearance for the Court and record, beginning with the plaintiff.

MR. FAHLING:  Your Honor, I'm Brian Fahling representing Nicholas Rolovich, and my cocounsel here today is Job Seese.

THE COURT:  Good morning.

MR. SEESE:  Good morning, Judge.

MR. PEKELIS:  Good morning, your Honor.  Zach Pekelis representing the WSU defendants, Washington State University, Patrick Chun, along with my cocounsel, Spencer Coates.

THE COURT:  Good morning.

MS. SEPE:  Good morning, your Honor.  Cristina Sepe on behalf of Governor Inslee.

THE COURT:  Good morning to you.

We have two motions before the Court; a motion to dismiss Governor Inslee and a motion to dismiss.  So I'll hear from the defendants first at the podium.

MS. SEPE:  Your Honor, what I hope to be an easy argument this morning because both the governor and plaintiff agree that the governor should be dismissed from this case.  You

can see that at plaintiff's response at ECF No. 28 at footnote one.  The governor requests that he be dismissed with prejudice for all of the reasons stated in the motion.  And so if the Court has no further questions, we'll yield to Mr. Pekelis.

THE COURT:  All right.  Thank you.

MS. SEPE:  Thank you.

MR. PEKELIS:  Good morning.  May it please the Court. Zach Pekelis for defendants WSU and Patrick Chun.  This case is one of approximately 1,000 cases in the federal and state court systems challenging COVID-19 vaccination mandates. Overwhelmingly, these cases have been unsuccessful, and plaintiff Nick Rolovich's case is illustrative as to why.

After a kitchen sink approach and shifting legal theories, Mr. Rolovich fails to state a plausible claim for relief on any of his four remaining claims.  That is, of the original 19 claims he brought against all three defendants, the four that he has neither expressly conceded should be dismissed or forfeited by failing to defend in his response to our motions.

Rolovich's Title VII and WLAD claims against WSU failed because Rolovich has not pled the most basic element of a failure to accommodate religion theory.  That is opposition to the COVID-19 vaccines stem from beliefs that are actually religious in nature.

The basis of Mr. Rolovich's vaccine opposition has been a moving target since he first announced his opposition more than

two years ago.  Initially, as he acknowledges in his complaint, he relied on exclusively on personal and nonreligious reasons.  Then, he submitted a religious exemption form that contained a fairly detailed explanation of his so-called religious beliefs.  Then, in his appeal of his termination -- of the termination decision, he didn't say anything whatsoever about his religious beliefs.  Finally, in his complaint, originally filed in state court, he again said absolutely nothing about his religious beliefs.

So what he's landed on now in his first Amended Complaint is a grab-bag of pseudoscientific skepticism coupled only with a few vague conclusory references to his religion and conscience that in no way eliminate any specific religious-based objection to the COVID-19 vaccines.

Adopting Rolovich's sweeping theory here that simply referring to one's conscience is sufficient to state a religious objection would render every citizen a law unto himself, in the words of the Supreme Court in *Smith*, and it would effectively preclude courts from distinguishing between bona fide religious beliefs, which are protected under Title VII of the Constitution, from secular ones, which aren't.  But Rolovich cannot rewrite the law, and his allegations fall far short of what Title VII, the WLAD, and the free exercise require to establish a bona fide religious belief.

Next, Rolovich gives no reason why WSU athletics director

Patrick Chun should be in this case.  Like other officials implementing public sector vaccine policies, Chun is entitled to qualified immunity from suit, and that's not just a defense to liability of course.  It's immunity from suit entirely.  It's Rolovich's burden and not Chun's to identify clearly-established law showing beyond question that Chun's individual actions as alleged in the complaint were unconstitutional.

But Rolovich fails to cite even one case remotely on point. To the contrary, the governing law shows that Chun's time-pressured decision making during the deadliest pandemic in American history in implementing the State's vaccine mandate, which is itself as this Court has held undisputedly constitutional, violated neither the free exercise clause nor the due process clause of the U.S. Constitution.

And I'd refer the Court to two very on-point cases; the *Doe v. Board of Regents of University of Colorado* case, which we cite, and the *Haywood v. University of Pittsburgh* case.  The first for the free exercise principle, and the second for the due process principle.  Mr. Rolovich doesn't even attempt to distinguish those cases.  And even if there were uncertainty as to the state of the law, and there really isn't, qualified immunity affords Chun a wide berth, barring Rolovich's claims at the threshold.

Finally, Rolovich's contract claim against WSU fails because the University had just cause as a matter of law to

terminate his employment.  It's true that just cause often raises a factual question, but not here.  Just cause can be adjudicated here on the pleadings because it is undisputed, based on the facts alleged in the complaint, that on October 18th, 2021, Mr. Rolovich was not vaccinated against COVID-19 and had not received nor was he entitled to an exemption and accommodation from the proclamation.  Therefore, it's undisputed that he was legally ineligible to continue working for WSU.

As a matter of Washington law, an employer has just cause to discharge a worker who is legally disqualified from remaining in his job.  Rolovich's contract claim, like his others, should be dismissed with prejudice.

Unless the Court has any questions, I'll reserve the remainder of my time for rebuttal.

THE COURT:  All right.  Thank you.

MR. FAHLING:  May it please the Court.  Good morning, your Honor.

If I were left to simply read the papers of defendants, I wouldn't recognize my case.  And what the Court just heard was an exposition on somebody's case, but it's not ours.  It points in the direction of ours.  It says these claims were raised, and we're entitled to a motion the dismiss.

So we start with the premise, as the Court knows, that it's a motion to dismiss.  And has the plaintiff stated facts, sufficient facts, that would lead the Court to be able to infer

plausibility that some claim is being asserted there. It doesn't -- even if the Court would think that the claim were slim or little chance of success. It comes down to we're in a motion to dismiss posture. We are not in a summary judgment posture. It won't be the Court's job to weigh evidence or credibility today. The Court's job is going to be, as the Court knows, is to look at the facts that were actually alleged and then make a decision on plausibility as to whether or not those facts meet the plausibility standard with respect to the claims alleged or even not alleged but that appear in the facts.

And then, if the Court concludes, it says, you know, I just don't think that plausibly we can get there, the Court would -- is required to grant an opportunity to amend, unless it would be just absolutely impossible to resolve the question.

So we're just at that stage. We're not at the summary judgment stage, and we're not going to battle over what the evidence is in the sense of who is right and who is wrong. We're simply going to assume the truth of the matters asserted with respect to the allegations and go from there.

So I'll start in reverse order with the breach of contract. And this is -- the breach of contract and the covenant good faith and fair dealing, this is where all roads from those claims lead. We've said from the very beginning that this breach of contract just cause firing, everything comes back to that, and I'll explain to the Court why first from our facts.

We pled -- there's no dispute that we have a legitimate contract, duties owed on each side, with respect to that. There's no dispute that there's a just cause provision with respect to termination. We also know there's no dispute with respect to the without cause provision and liquidated damages or severance pay that flows from that. So already, we know that there is a contract, and we know that there's a discussion now about they say as a matter of law. I would submit to the Court they're inviting the Court into error by suggesting that the Court could determine today as a matter of law on a motion to dismiss.

So as we move down, if we look at -- and this is evidence that the Court can consider, to infer plausibility. The just cause that's defined in paragraph 4.1 of the employment agreement is different than when the courts say, okay, there was a just cause for dismissal in some employee handbook, and then there's this general arbitrary and capricious kind of standard that we look at. The bar is not that low here, and the reason it's not that low is because WSU itself has set the bar high. Properly so, right? Just cause has got to be different than without cause.

So as we just kind of walk through these provisions in 4.1 for just cause, there has to be deliberate and serious violations of the duties that are set out in 1.2. There have to be deliberate and serious violations of any other terms and

conditions of agreement not remedied after 14 days notice.  Any act of misconduct including criminal conduct, active dishonesty, theft of University property, moral turpitude, subordination, sexual abuse, et cetera.

4.4, intentional or major violation of University or Pac-12 law, rules, regulations, conduct seriously prejudicial to the best interest of the University, prolonged absent without consent from the supervisor.

So the bar is high here, and the reason I say that they kind of tie themselves to the signification if you will of these high level acts of misconduct is because, in 4.1, it says, "Just cause shall include in addition to and as examples of its normally understood meaning in employment contracts."  So it's not just normally understood, meaning outside of employment contracts.  When you set out to define what is indeed a serious violation, that bar is raised up, as it aught to be, because without cause -- otherwise, without cause becomes meaningless. We can simply do this.

Additional evidence that the Court can consider in determining plausibility with respect to just cause is we've also pled that WSU has or did induce some of their other coaches to enter into employment agreements that included a requirement that they abide by all federal, state, local, and WSU health regulations and policies that might be imposed.  And I would say that the Court could draw the inference of plausibility with

respect to University did that because they were in the middle of COVID. They anticipated a vaccine mandate, and they wanted to be able to -- they think that a violation of that provision would allow them to dismiss with just cause these other coaches. I don't happen to agree with that argument, but I think it's pretty -- let me put it this way. It's certainly a reasonable inference from the evidence that the Court can make.

And what happens then with the case of the *Bordeaux* case -- I don't know if the Court has had a chance to read that out of the Central District of California, this is -- it was a case -- 2019 I think. No. 2022. Where this was an actress, but she -- there was an argument about whether she was getting an extension to her contract or a renewal. And the Court said, well, if it's an extension, then you can't change the terms by putting in a vaccine mandate because that's a material change in the contract. But if it's just a renewal, then that's a new contract, and you can put in whatever you want.

But the imposition of a materially different term and a requirement that she abide by it the Court said could be a breach of contract. So we can, I think, reasonably infer from that, the plausibility that the claim that we have argued about the lack of just cause is certainly viable, at least at the motion to dismiss stage.

And I don't know if I mentioned, but Mr. Rolovich of course didn't sign such a contract. And, you know, in the State of

Washington, the cases are legion, frankly, about the duty of good faith does not extend to obligate a party to accept material change in the terms of its contract or inject substantive terms under the parties' contract.

And the whole idea is the parties get what they bargain for. And if something new is imposed, as a requirement, then that wasn't agreed to, then that's a breach of contract. And here, it really is a big deal. Mr. Rolovich lost the job of his dreams, and it was based upon a, in our estimation, a fundamentally wrong basis, an unlawful basis with respect to the just cause termination.

So, for instance, our pleadings can be read, I think plausibly to say that they could have just told Mr. Rolovich, look, Nick, we don't agree with your position, you know, we just -- you know, we're going to let you go. That's without cause. They had every right to do that within the terms of the contract, but I think the Court can reasonably infer that when they chose to go under these set of facts, when they chose to go the just cause route, they fundamentally violated the contract. And as we'll see in just a minute, Mr. Rolovich is or at least it can be plausibly inferred that they violated the additional rights that we're talking about.

I would note, too, for the Court that the State has not or WSU has not moved to dismiss on the unlawful wages claims that we have in the pleadings. And admittedly, those were truly

notice pleading claims because we simply cited the statute at the beginning as one of our claims and at the end of our pleading with respect to the prayer for relief. We did clean that up a little bit in our response to the stay, identifying that it was the liquidated damages that was withheld wrongfully, wrongfully from Mr. Rolovich by the unlawful just cause termination.

And so the decision as to whether just cause was present, I know counsel for the University says the Court should be decisive today and enter into the fray with respect to what the evidence shows and then making a decisive or a dispositive judgment. But, you know, clearly in *Martin v. Wheeler*, most recently that I'm aware of any way, in the Western District of Washington, the Court says when there is a dispute as to whether just cause existed or whether it was -- would have been proper to do without cause, that's a question for the trier of fact. It's just that simple, and especially at this stage.

Summary judgment, of course, you know, there's a lot of things that they raise that I think both parties will be asking this Court with respect to cross motions on summary judgment, but right now, it's really all about plausibility, plausibility, plausibility; what have we alleged?

And there's a -- the Title VII and Washington law against discrimination, the facts have been alleged. I mean, there's no question about it. The -- we say that Mr. Rolovich was -- his

sincerity has already been determined by the University.

The human resources division, the panel that they set up, they sent an email in August -- October 6th. This is all in the pleadings, allegedly. They sent this email on October 6th to Mr. Chun, and the email said this: Nicholas Rolovich, you know, we've evaluated -- I'm paraphrasing -- we've evaluated in good faith his request for an exemption, and we have determined, after reviewing his exemption request, that he has a sincere religious belief.

And in that email, there wasn't an invitation to Mr. Chun to, oh, by the way, let's step into the fray and come back and tell us how we were wrong. And, in fact, the blind review process that the University set up, as we allege in our complaint, was just that. It was two parts. The first part was: Are they sincere in their religious belief? Clearly, HR has said yes, no question about it. Boom. That's the end of -- the Court can reasonably infer then that that should have been the end of the matter.

Next step, accommodation. We've decided that he's sincere. Now we have to decide whether we can accommodate him. And the University, in addition to being printed on their website, the vice president of communications, Phil Weiler for WSU, some press asks them specifically, well, how is Nick Rolovich's request going to be handled? He said, well, it's a two-part process. First, we'll determine whether his -- the panel will

determine whether his, in a blind review, whether his religious beliefs are sincere. If they are sincere, they make that finding. That's done. Next, we go to accommodation, and then a decision is made about accommodation.

What the State seems to have done or what WSU seems to have done is just collapsed everything into one. This is clearly a two-step process. It was to be a blind review. There was never an invitation. There was nothing in the policy that says a supervisor can come back and undue what the human rights -- or human resources services has done. So we've definitely alleged that there's been a violation here with respect to Title VII. Mr. Rolovich's religious beliefs were found to be sincere. And they acted in a way that was utterly contrary to the law.

And the first amendment has, whether it's under Section 1983 or in Title VII, has always recognized a free exercise claim. I mean, there's no question that Mr. -- the Court can plausibly infer that Mr. Rolovich's religious beliefs do in fact implicate the free exercise clause and the provisions of Title VII. It's just -- does the Court think there's a plausible inference to be made and a possible claim that can be -- arise out of that, even if the Court thinks it's unlikely at this early, early, early stage?

With respect to the section 1984 against -- or 83 against Mr. Chun, there's the due process as applied component and the free exercise. And I just, if the Court will permit me, and I

*Rolovich v. WSU et al. / Case No. 2:22-cv-00319-TOR*
*Motion Hearing / May 11, 2023*
16

know I'm going much longer than counsel for the University did. But if the Court would permit me to read the actual facts that were alleged and not the ones that they choose to ignore or just choose to use the lusory statement they have no facts or they're just conclusory.

On May 24, 2021, and this is in paragraph 31 of the first amendment complaint, after Rolovich told Chun that he did not intend to get a COVID-19 vaccine, Chun claimed that he was worried about Rolovich's mental health and accused him of having extreme views.

Now, as I move on, your Honor, this is all in the context of the unconstitutional conditions doctrine. That is not a doctrine that has to be pled. In fact, I'm not familiar. I'm sure it has been specifically, but it arises in the context of behavior that was used to coerce an individual to forego their right, their enumerated rights, or one of their enumerated rights, and first amendment clearly is one of those rights that one cannot be forced to give up. And that's the *Koontz* decision. It's very clear. It's 2013, and it points back 25 years and says, this doctrine, it's an overarching principle, right, that says the government cannot be permitted to use coercion to force people to give up their constitutional -- their enumerated constitutional rights.

So what I'm going to describe here that we described in our complaint is all factual from which the Court can draw

reasonable inferences up to a plausible claim.

March 27th, three days later, Rolovich was called to a 3:00 p.m. meeting in Chun's office where Chun told Rolovich that his beliefs were making him incapable of leading his players. Chun also tried to get Rolovich into counseling because he -- he wanted to get him into counseling because he believed that Rolovich had mental health issues. Chun then suggested that Rolovich should talk to Chun's wife because she had been in a couple of different religions he referred to as cults.

It goes on. Chun told -- on October 16th, Chun told Rolovich that Governor Inslee was intending to issue a vaccine mandate that would eliminate the personal exemption from the coaching staff's declaration of vaccination status. Chun warned Rolovich that any religious exemption request he submitted would be scrutinized to no end and that Inslee's mandate would have a high threshold for religious exemptions moving forward and that Rolovich could be expected to be fired with cause on October 19th.

Now, this is still before the mandate came down. He's prejudging, making a decision. The Court can plausibly infer from that evidence that it's done for Nick. If you don't get the vaccine, if you don't succumb to these pressure tactics, we're not considering anything, you're out of here and for cause.

August 19, 2021, Rolovich was summoned to another meeting

with Chun and assistant athletics director Bryan Blair.  Chun told Rolovich that he had four choices; get the vaccine, don't get the vaccine and get fired, claim an exemption, or resign right now.  Rolovich told Chun that he was not resigning and that he wanted to coach the team.

Chun continued:  But you say you don't care about the money, and why don't you just resign?  Chun then accused Rolovich of having situational integrity and called Rolovich a con man, accusing him of being selfish.  Chun then stated that Rolovich's objections to receiving the vaccine were causing Chun and President Schultz reputational damage.

Chun then stated that all Rolovich had to do was get vaccinated.  Chun admitted his efforts to get Rolovich to take the vaccine in the past had been coercive.  Then Chun, at the same August 19th meeting, pressed Rolovich again about the vaccine, and Rolovich replied that he believed he had privacy rights and did not feel comfortable telling Chun about his reasons for declining to receive a COVID vaccine.  Chun then demanded Rolovich tell him what his answer would be.

During the same meeting, Chun also told Rolovich that Governor Inslee did this just to come after Rolovich and WSU and that he had two options, and these are the important points again, to get vaccinated or resign.  Chun then admitted that the Board of Regents wanted Rolovich fired.  Chun and Blair told Rolovich that they were in a time crunch and had to decide if he

was going to coach that season.  They said they did not want to start a season with Rolovich if they thought they may have to fire him on October 18th.

Rolovich responded that he would seek a religious exemption right then if one was available.  Chun and Blair then got even more heated with Chun saying if Rolovich got the religious exemption, he would forever question his character.  Chun and Blair both talked about the early days of the pandemic and that Rolovich had not mentioned his faith, and Rolovich responded that he did not see the point, as he does not see his faith and science as exclusive.  Chun and Blair then stressed that the University's religious exemption would be hard to get and that there was no guarantee that Rolovich's request would be approved.

So during this whole period, Mr. Chun in particular, and Mr. Blair was involved as well, those are hardcore statements; you're going to get fired with cause if you don't take the vaccine.  And I don't know that I can think of any situation where an employer could say that to their employee and not be in violation of the law when the employee is -- and a lot of this happened even before the vaccine or all of it before the vaccine mandate.  And Mr. Rolovich did express his concerns, his religious concerns.

But, you know, with a supervisor, that's another Title VII problem is this supervisor probing, probing, probing, trying to

find out what's going on, what's going on.  That's not the business of the supervisor.  It's are you going to get vaccinated, okay, and we're going to have to deal with it when it comes up.  And the Court can plausibly infer that the way they dealt with it did result in a Title VII violation, WLAD violation, and Mr. Chun certainly does not have qualified immunity at this stage of the game, based upon that coercive -- those coercive actions by him.  If that's not coercive, then coercive needs to be redefined.

And so the back to the plausibility and the motion to dismiss, and that's where we are.  And it's kind of -- we want to continue to -- I know the Court knows that.  But it's good to keep in mind because when you listen to the State, there's all this evidentiary issues jumping out.  There's all these conclusions, these sincerity determinations or credibility determinations that they want you to make rather than simply looking at our complaint.  What did we allege and do those facts as alleged speak to a possible -- the claims that we have made?

Again, as I said, even if the Court thinks, I don't think so, it's unlikely, it's still something that the Court must do.  Even if it doesn't think it's likely, the Court must say no, no, your motion to dismiss will be denied because they have alleged sufficient facts.

And I would also note, getting back to the sincerity question, and like I said, all of this really does tie in -- it

*Rolovich v. WSU et al. / Case No. 2:22-cv-00319-TOR*
*Motion Hearing / May 11, 2023*
21

just dumps right into the just cause. HRS made a sincerity determination. On that basis alone, and I suspect this will be from us on, quite possibly, on a motion for summary judgment, it's clear that Mr. Rolovich's beliefs were determined by Washington State University to be sincere, and they can't undo that. And the way they undid it was to violate his due process rights.

And the termination for just cause, there's a fairly recent case out of the Middle District of Pennsylvania, *Peters v. Pittsburgh University*, and it is quite similar. I think in the State's or in WSU's briefing, they referred to it as superficially similar. Well, the contracts were -- there was a just cause provision. There was a without cause provision with liquidated damages. And each party, like in Nick's case, the, you know, if Nick would have walked away, he would have owed a lot of money to the University. If they let him go without cause, they owe him a lot of money, depending on how much time is remaining on the contract.

Same thing was true in the *Peters* case. And now the added twist for that was this was even in the context of significant domestic battery violations. He was contending that he should have been dismissed without cause. And the Court said, look, he was dismissed with just cause, and that confers a property interest under the procedural due process clause, the fact that he was dismissed with just cause, because that is what courts

*Rolovich v. WSU et al. / Case No. 2:22-cv-00319-TOR*
*Motion Hearing / May 11, 2023*

22

look at was just cause like part of the -- well, not just a part, but there was just cause provision in the termination.

And so the *Peters* case is, you know, it's really on all fours with Nick's with respect to the question of whether or not he has a property interest, which we do need to show in the -- with respect to the due process claim. And I believe we've done that or we have plausibly asserted that interest, that property interest. Again, the Court doesn't have to say you're absolutely right. You don't have to make those determinations, your Honor. You just look and say they plead enough, and I would submit to the Court that we have pled enough.

I also wanted to respond to the State and say we don't oppose their motion to dismiss. We were not oppositional to that once we put our footnote in saying we agree, you know, these claims can go. So Governor Inslee should be dismissed on that basis.

All right. Does the Court have any questions for me or should I sit down?

THE COURT: Can you simplify to me, what are your causes of action --

MR. FAHLING: Causes of action --

THE COURT: -- that you're continuing to move forward on?

MR. FAHLING: All right. We're going forward on Count One, which is the breach of contract and implied covenant of

good faith and fair dealing, WSU only.  We're proceeding on Count Two, which is the Washington law against discrimination, WSU only.  We're proceeding on Title VII, again, WSU only. That's Count Four.  And then Count Five is the individual capacity claims against Patrick Chun for free exercise and due process violations, and that's against him only, and I think that's --

THE COURT:  Is that a 1983 claim?

MR. FAHLING:  Yes, sir.

THE COURT:  All right.  And those are the only causes of action you're proceeding forward on?

MR. FAHLING:  Yes.

THE COURT:  All right.  I don't have any other questions.

MR. FAHLING:  Thank you, your Honor.

MR. PEKELIS:  Well, I'm glad we have some agreement at least as to the claims that are still in this case, but not of course the claims that should still be in this case.  I'm going to begin with Title VII and WLAD because it's much more logical to begin with the statutory and constitutional claims because really the contract claim hinges on them, at least on this posture.

So counsel's point, his argument that sincerity has already been determined by the University here, it both misses the point and is entirely wrong.  We're not arguing about sincerity, as

we've made clear in our briefs.  The question is -- we agree that the Court must, for the purposes of the motion to dismiss, assume that the asserted beliefs in the complaint are sincerely held.  It need not and should not assume that they are religious in nature.  That's the nature of the dispute on the Title VII claim.

Moreover, to the extent counsel is arguing that somehow the initial approval of his religious exemption and the finding by the blind review panel that he had a sincerely held religious belief, that that would somehow estop the University from arguing the point here is completely wrong.  It's of course plaintiff's burden to plausibly plead each element of his claim, including that he had a sincerely-held belief of a religious nature, and there's no authority for the proposition that the University should somehow be estopped from challenging the adequacy of his pleading or the evidence in support thereof later in the case.

And I cite the *Passarella* case, which directly addressed that question, holding that there is no authority for the idea that an employer is estopped from arguing that an employee's beliefs are not religious because it approved a prior religious exemption request.

So then to the main point, which is whether the beliefs asserted in the complaint are in fact religious in nature. Again, the beliefs have kind of shifted over time, as I

*Rolovich v. WSU et al. / Case No. 2:22-cv-00319-TOR*          25
*Motion Hearing / May 11, 2023*

explained in my case in chief, in my argument in chief.  Today, as it stands in the first Amended Complaint, it's sort of a two-step belief that he's asserting to be religious.

And let me back up and say Mr. Rolovich admits that some or many of his beliefs are not, in terms of his opposition to COVID-19, are not religious.  So the points he makes about it being unsafe and an experimental vaccine is questioning whether vaccine -- the Pfizer vaccine approved for emergency use is in fact the same vaccine that was fully approved by the FDA. Obviously, those are pseudoscientific or health-based beliefs that are not religious in nature, and we don't understand Mr. Rolovich to be arguing that they are.

So what does he say is really his religious belief?  It's really a two-part belief.  The first is that he says, at some time in the Summer of 2021, Rolovich discerned it would violate his conscience to receive the COVID-19 vaccine, and, two, that as a practicing Catholic, he is morally obliged to obey his conscious.  That's it.  That's his assertion of his religious beliefs.

So to take the first part, the conscience element of it, it's well established in the case law that simply asserting that your conscious forbids you to perform something, to perform an act or comply with a particular policy is not sufficient to assert a religious belief under the governing law.  And that stems from the *Fallon* case in the Third Circuit where the

plaintiff said essentially what Mr. Rolovich says, that it would violate his conscious to receive the flu vaccine, and the Third Circuit said, no, that's an isolated moral teaching, not a comprehensive system of beliefs about fundamental or ultimate matters.

The *Ulrich* case, very similar. Again, this is in the COVID context. The belief -- the plaintiff held the belief that her body is a temple, but the Court said, no, that is fungible enough to basically cover anything she trains it on.

And finally, the *Passarella* case, again, very similar. Plaintiff said, it goes against my conscious to receive the vaccine; therefore, I abide by that because I know it is a message from God. And, again, the Court in *Passarella* said, no, that isn't sufficient to allege a sincerely-held religious belief.

So does it change it in any meaningful way that Rolovich says that his particular religious belief commands him to obey his conscience? The answer is no. What he's doing here is essentially trying to end run around the *Fallon* principle, and that isn't sufficient because he's alleging that there's this general tenant out there; I must obey my conscious. But it's really -- what makes his opposition to the COVID-19 vaccine's discreet is that it's his personal belief that his conscious doesn't allow it.

So in the *Finkbeiner* case, for example, the plaintiffs

*Rolovich v. WSU et al. / Case No. 2:22-cv-00319-TOR*                    27
*Motion Hearing / May 11, 2023*

allege that, as Christians, they had the God-given right to make their own choices regarding what is good or bad.  But of course it was their own determination of what is good or bad that actually led them to oppose the COVID-19 vaccines.  The Court said, no, you're just asking for a blanket privilege and a limitless excuse to avoid unwanted obligations, not sufficient to allege a bona fide religious belief.

And the *NM v. Hebrew Academy Long Beach* case, again, very similar.  There is no question that the plaintiffs in that case were devout Orthodox Jews.  That wasn't disputed, but there was only a tenuous connection, the Court found, between their allegations about what Judaism provided and their opposition to the vaccines for their children.  So, again, the Court held there was no fundamental religious belief asserted by those plaintiffs, even though it had no doubt about the sincerity of their commitment to their Jewish faith.

Moving on, unless the Court has any questions about Title VII and the WLAD, I'll move on to the 1983 claims.  So, first of all, if the Court concludes, as we assert, that there is no bona fide religious belief asserted on the face of the complaint, that answers the 1983 free exercise claim because if you can't assert a sincerely-held religious belief for Title VII purposes, you aren't asserting one for First Amendment purposes as well. So that's perhaps the neatest, cleanest way to address the free exercise claim.

But even if the Court reaches it, it's clear that the complaint does not plausibly allege personal violations of the free exercise clause by Chun, and it certainly does not avoid qualified immunity for him because it doesn't say any clearly-established law that would suggest to a reasonable person in Chun's specific circumstances, faced with once-in-a-generation pandemic that he was violating any constitutional provision.

So it's -- plaintiffs don't dispute that to establish a free exercise violation, you have to provide plausible allegation of unlawful animus or motive. So and the U.S. Supreme Court has explained that that's -- it's a higher standard than for other types of claims. In the *Crawford-El* case, the Supreme Court said that the Court may require plaintiff to put forward specific nonconclusory factual allegations that establish improper motive causing the cognizable injury.

And the Court was also careful to point out what improper motive means for the purposes of qualified immunity in 1983. The primary focus is not on any possible animus directed at the plaintiff. Rather, it's the intent to disadvantage all members of a class that includes the plaintiff. So, and in that context, it's clear that there's no plausible allegation that Chun harbored a discriminatory animus against the group that Mr. Rolovich claims to belong to religion-wise.

So Mr. Fahling took us through kind of the allegations in the complaint, but what he failed to mention was a critical allegation, which is that Rolovich admits he never informed Chun or anyone else at the University of the religious -- the purportedly religious basis to his vaccine objection until August 19, 2021.  And all of the allegations that you heard from Mr. Fahling, which supposedly events antireligious animus, they all came before August 19, 2021, when, as far as Chun knew, based on the allegations in the complaint, Mr. Rolovich's opposition to the vaccines was personal or pseudoscientific, but not religious.

As the Eleventh Circuit has held, an employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion. It's a fairly logical principle.  The case is *Lubetsky v. Applied Card System* 296 F.3d 1301.

So the response further elucidates this point by -- Mr. Rolovich's response to our motion that is, stating, by August 16th, Chun had already made up his mind that he was going to terminate Rolovich.  In other words, Chun had made up his mind, allegedly, to terminate Rolovich on August 16th, three days before Mr. Rolovich admits that Chun knew anything about his religious beliefs.  That does not state a plausible free exercise claim.

So the clearly-established law, I mean, you heard literally

nothing from Mr. Rolovich today or in his response brief about what the clearly-established law would be to inform Chun objectively that his actions might be violating the free exercise clause, nor could they.  It's clear from the face of the complaint that Mr. Chun did not believe Mr. Rolovich to have a religious based -- a genuine religious-based objection to the COVID-19 vaccines.

So how could someone in his position believe that he were violating the free exercise clause by engaging in religious discrimination if he doesn't believe that the motivating factor of the employee is actually religious in nature.  So Mr. Rolovich really pleads himself out of the free exercise claim.

In the due process context, so this is, again, been a bit of a shifting theory over time in the course of his -- in the course of these proceedings.  Initially, the due process theory appeared to be that he had a due process right, a protectable property or liberty interest in the accommodation or the exemption itself.

And then in our motion, we cited cases, including a decision from then Judge Sotomayor, stating there is no protectable liberty or property interest in a statutory accommodation request.  So then they veered courses in their response and saying now, well, no, we have a -- he had a protected liberty or property interest in the liquidated damages

in his contract, and they cite the *Peters* case for that. Respectfully, we believe that the *Peters* case is wrong, and the -- oddly, the *Haywood* case from the same district is directly on point.

So but even if the Court kind of says, well, I want to go with *Peters*, the fact that these two decisions are -- may -- perhaps intention shows that there is no clearly-established law on this point.

And I would also point the Court to a decision of then Judge Breyer. This is *Bleeker v. Dukakis* 665 F.2d, which states that a mere breach of a contractual right is not a deprivation of property without constitutional due process of law. And Justice Breyer explained that those types of claims where an employee is saying, you breached my contract with me, are better heard as just that, breach of contract claims.

And finally, that brings me to the breach of contract claim. So, and before I get there, I just want to note, the unlawful wage withholding claim is not in this case. In the original complaint, there is an unlawful wage withholding claim that was clearly pleaded as a separate cause of action. And then there were separate factual allegations that actually went along with that where Mr. Rolovich essentially alleged that, before his separation, he had been deprived of wages that he was owed.

In the Amended Complaint, those allegations are gone, and

the unlawful wage withholding claim under state law is also gone.  So he has not provided adequate notice of that the claims should remain in the case.  To the contrary, everything about the pleading history suggests that he's deliberately omitting it.

In any event, even if it were in the case, the unlawful wage withholding claim is derivative of the contract claim itself.  It cannot establish, under the facts alleged, an unlawful wage withholding, unless he prevails on the breach of contract, and he can't.  The general framework under Washington law for addressing just cause is I think undisputed.  It's one which is not for any arbitrary, capricious, or illegal reason, and which is one based on facts, one, supported by substantial evidence, and, two, reasonably believed by the employer to be true.

I heard Mr. Fahling questioning I think whether this general framework should apply, given that the contract does provide specific grounds for dismissal.  But the Washington Supreme Court has clearly answered that question, and the *Gaglidari v. Denny's* case, the Supreme Court held that this general framework still applies, even when the contract provides specific grounds for termination.  So we know that that framework applies, and the fact that the contract specifically says that the -- just cause has its normally-understood meaning in employment contracts.

So assuming the Court agrees with us that Mr. Rolovich was not entitled to a religious exemption as a matter of law, he has no contract claim either because the just cause standard, it can mean a lot, but it certainly means that an employer has just cause to terminate an employee's employment when he's not legally eligible to work for that employer any longer.

And Mr. Rolovich's counsel cited the *Bordeaux* case in California for the proposition that, well, where the employer changes its policies to adopt a vaccine mandate, that's in effect an amendment to the contract. The *Bordeaux* case is clearly distinguishable because that occurred in the private employer context where the private employer adopted its own vaccine mandate and sought to implement it as part of the contract.

Here, the state law changed, and where WSU is subject to state law, clearly had to abide by it. It wasn't WSU's decision. It was an overarching change that applied to every state employer, as well as every healthcare employer and every educational employer at the time. So *Bordeaux* is simply not on point.

What is on point is the Washington Supreme Court's decision in Comfort and Fleming Insurance Brokers, which we cite, which provides that good cause covers causes inherent in and related to the qualifications of the employee. Here, that clearly applies. Mr. Rolovich, under state law, was no longer qualified

to work for the University because he wasn't vaccinated and wasn't entitled to a religious accommodation.

Just reviewing my notes briefly to make sure I hit all the issues. Oh, let me just veer back to the Title VII, if you'll forgive me, your Honor.

Mr. Fahling said that, effectively, what Chun said was, you're going to be fired if you don't get the vaccine, that's a violation of the free exercise clause. But as this Court has recognized and many courts, including the Ninth Circuit in the *Santa Fe* case in the Second Circuit and the *We the Patriots* case, a vaccine mandate doesn't violate the free exercise clause, even when it contains no religious exemption.

So it's illogical to state that if you're saying -- especially at a point when Mr. Chun did not believe that Mr. Rolovich had a religious basis for his opposition to the vaccines. It's certainly no violation of law to say you're going to be fired if you don't comply with this undisputedly-constitutional vaccine mandate.

Unless the Court has questions, we ask that it dismiss the complaint with prejudice.

THE COURT: I have no questions.

Thank you, Counsel, for your arguments. I'm going to sort through this and get you a written decision as promptly as I can. We'll be in recess.

(Court adjourned on May 11, 2023, at 11:48 a.m.)

C E R T I F I C A T E

I, CRYSTAL L. HICKS, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 8th day of June, 2023.

_____
CRYSTAL L. HICKS, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington