**No. 25-761**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

NICHOLAS ROLOVICH,

*Plaintiff-Appellant,*

v.

WASHINGTON STATE UNIVERSITY;
PATRICK CHUN,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
For the Eastern District of Washington
Case No. 2:22-cv-319-TOR
The Honorable Thomas O. Rice, United States District Judge

---

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 5 OF 5

---

NICHOLAS W. BROWN
  *Attorney General*
SPENCER W. COATES
  *Assistant Attorney General*
WASHINGTON ATTORNEY
GENERAL'S OFFICE
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404
*spencer.coates@atg.wa.gov*

ZACHARY J. PEKELIS
ERICA CORAY
W. SCOTT FERRON
  *Special Assistant Attorneys General*
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 245-1700
*zach.pekelis@pacificalawgroup.com*

*Counsel for Defendants-Appellees*

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>           Plaintiff,<br><br>   v.<br><br>WASHINGTON STATE UNIVERSITY, et al.,<br><br>           Defendants. | NO. 2:22-cv-00319-TOR<br><br>WSU DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS<br><br>May 11, 2023<br>With Oral Argument: 11:00 a.m.<br>Spokane Courtroom 902 |

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................... 1

II.   ARGUMENT ........................................................................... 2

    A.  Rolovich Fails to State Title VII and WLAD Claims (Counts II, IV) ................................................................. 2

        1.  Rolovich's stated vaccine objections are not religious in nature ................................................................. 2

        2.  Rolovich does not plausibly allege a disparate treatment claim ............................................................. 7

        3.  The Court need not reach WSU's undue hardship defense .... 9

    B.  The § 1983 Claim Against Chun Fails as a Matter of Law (Count V)................................................................. 9

        1.  Rolovich fails to plead a plausible free exercise violation ... 10

        2.  Rolovich fails to plead a plausible due process violation ..... 14

        3.  Rolovich has no viable "unconstitutional conditions" claim 16

    C.  Rolovich's Contract Claim Fails as a Matter of Law (Count I).. 17

        1.  "Just cause" includes a failure to meet a legal job requirement ........................................................... 18

        2.  Rolovich does not plausibly allege WSU's reason was insincere ............................................................. 19

        3.  Rolovich has no wrongful wage withholding claim............. 20

    D.  Leave to Amend Should Be Denied........................................... 20

III.  CONCLUSION ...................................................................... 20

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

i

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

5-SER-904

# TABLE OF AUTHORITIES

**Federal Cases**

*Alvarado v. City of San Jose*,
94 F.3d 1223 (9th Cir. 1996) ...................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................4, 10, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................4

*Blackwell v. Lehigh Valley Health Network*,
No. 5:22-CV-03360-JMG, 2023 WL 362392 (E.D. Pa. Jan. 23, 2023)...........3

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020)...................................................................7

*Chuang v. Univ. of Cal. Davis, Bd. of Trustees*,
225 F.3d 1115 (9th Cir. 2000)...................................................................7

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ...................................................................10

*Crawford–El v. Britton*,
523 U.S. 574 (1998) ...................................................................11

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
No. 21-CV-02637-RM-KMT, 2022 WL 4547563
(D. Colo. Sept. 29, 2022)...................................................................14

*Donovan v. Biden*,
603 F. Supp. 3d 975 (E.D. Wash. 2022)...................................................................11

*EEOC v. Abercrombie & Fitch*,
575 U.S. 768 (2015) ...................................................................7

*Everson v. Bd. of Educ. of Ewing Twp.*,
330 U.S. 1 (1947)...................................................................13

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

ii

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

5-SER-905

*Fallon v. Mercy Catholic Med. Ctr. of Se. Penn.,*
   877 F.3d 487 (3d Cir. 2017) ...........................................................................9

*Greisen v. Hanken,*
   925 F.3d 1097 (9th Cir. 2019) ......................................................................14

*Haywood v. Univ. of Pitt.,*
   Civil Action No. 11-1200, 2012 WL 591746 (W.D. Pa. Feb. 22, 2012) .......15

*Hittle v. City of Stockton,*
   No. 2:12-CV-00766-TLN-KJN, 2018 WL 1367451
   (E.D. Cal. Mar. 16, 2018) ...............................................................................7

*Hogue v. Scott,*
   2:20-CV-218, 2021 WL 6050864 (D. Vt. Dec. 21, 2021) .............................14

*Kendall v. Visa U.S.A., Inc.,*
   518 F.3d 1042 (9th Cir. 2008) ......................................................................20

*Leake v. Raytheon Techs. Corp.,*
   No. CV-22-00436-TUC-RM, 2023 WL 2242857
   (D. Ariz. Feb. 27, 2023) ..............................................................................7, 8

*Legaretta v. Macias,*
   603 F. Supp. 3d 1050 (D.N.M. 2022) ............................................................17

*Linden v. X2 Biosystems,*
   2019 WL 13240852  (W.D. Wash. Jan. 25, 2019) .........................................19

*Marsh v. Cnty. of San Diego,*
   680 F.3d 1148 (9th Cir. 2012) ......................................................................10

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973) ........................................................................................8

*Moran v. Selig,*
   447 F.3d 748 (9th Cir. 2006) ...........................................................................8

*Nelson v. Dinca,*
   No. 3:21-CV-1457-RJB-MLP, 2022 WL 1284538
   (W.D. Wash. Apr. 29, 2022) ..........................................................................12

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

iii

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

5-SER-906

*NM v. Hebrew Acad. Long Beach*,
155 F. Supp. 3d 247 (E.D.N.Y. 2016)...................................................6

*Ochei v. The Mary Manning Walsh Nursing Home Co.*,
No. 10 Civ. 2548(CM)(RLE), 2011 WL 744738 (S.D.N.Y. Mar. 1, 2011).....8

*Ohio Adult Parole Auth. v. Woodard*,
523 U.S. 272 (1998) ...................................................17

*Pac. Mech. Corp. v. City of San Luis Obispo*,
359 F. App'x 720 (9th Cir. 2009)...................................................14

*Passarella v. Aspirus, Inc.*,
No. 22-CV-287-JDP, 2023 WL 2455681 (W.D. Wis. Mar. 10, 2023)........5, 6

*Perez v. Zahara*,
332 F. App'x 214 (5th Cir. 2009)...................................................13

*Peters v. University of Pittsburgh*,
No. 2:18-CV-732, 2019 WL 109402 (W.D. Pa. Jan. 4, 2019)................15, 16

*Peterson v. Hewlett-Packard Co.*,
358 F.3d 599 (9th Cir. 2004) ...................................................2

*Puget Soundkeeper All. v. APM Terminals Tacoma LLC*,
545 F. Supp. 3d 893 (W.D. Wash. 2021) ...................................................1

*Sagendorf-Teal v. Cnty. of Rensselaer*,
100 F.3d 270 (2d Cir. 1996) ...................................................13

*Schneider v. Cal. Dep't of Corr.*,
151 F.3d 1194 ...................................................17

*Shakur v. Schriro*,
514 F.3d 878 (9th Cir. 2008) ...................................................11

*Shoemaker v. Cnty. of Glenn*,
No. 2:10-CV-01625 JAM–KJN, 2010 WL 4835751
(E.D. Cal. Nov. 22, 2010)...................................................18

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

iv

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Smith v. Biden*,
  No. 1:21-CV-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021)....................17

*Sweaney v. Ada Cnty.*,
  119 F.3d 1385 (9th Cir. 1997) ........................................................................13

*Thomas v. Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981) ........................................................................................4

*Troulliet v. Gray Media Grp., Inc.*,
  No. CV 22-5256, 2023 WL 2894707 (E.D. La. Apr. 11, 2023) .................5, 8

*Ulrich v. Lancaster Gen. Health*,
  No. CV 22-4945, 2023 WL 2939585 (E.D. Pa. Apr. 13, 2023)......................5

*United States v. Seeger*,
  380 U.S. 163 (1965) ........................................................................................3

*Vance v. Barrett*,
  345 F.3d 1083 (9th Cir. 2003) ......................................................................17

*Williams v. Brown*,
  567 F. Supp. 3d 1213 (D. Or. 2021)..............................................................17

*Winans v. Cox Auto., Inc.*,
  No. CV 22-3826, 2023 WL 2975872 (E.D. Pa. Apr. 17, 2023)......................2

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ........................................................................................4

*Wise v. Inslee*,
  No. 2:21-CV-0288-TOR, 2022 WL 1243662
  (E.D. Wash. Apr. 27, 2022)..................................................................8, 12, 13

*Wolcott v. Bd. of Rabbis of N. & S. Cal.*,
  738 F. App'x 538 (9th Cir. 2018)....................................................................4

WSU DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CASE NO. 2:22-cv-00319-TOR

v

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**State Cases**

*Baldwin v. Sisters of Providence in Wash., Inc.*,
    769 P.2d 298 (Wash. 1989) ...............................................................18

*Dice v. City of Montesano*,
    128 P.3d 1253 (Wash. Ct. App. 2006) .............................................20

*Gaglidari v. Denny's Restaurants, Inc.*,
    815 P.2d 1362 (Wash. 1991) ...........................................................18

**Federal Statutes**

42 U.S.C. § 1983...............................................................................1, 9

**Other Authorities**

Equal Emp. Opportunity Comm'n, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, July 12, 2022, https://bit.ly/3VAZBWb ...................................................................3

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

vi

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## I.   INTRODUCTION

Of the 13 claims the FAC alleges against the WSU Defendants, Rolovich now expressly concedes that six should be dismissed (three against each Defendant): Count III (state constitutional claim), Count VI (a free exercise-based § 1983 claim), and Count VII (a due process-based § 1983 claim). *See* Resp. in Opp. to WSU Defs.' Mot. to Dismiss (Resp.) at 2 n.1. Rolovich also effectively concedes to dismissal of his three claims against Chun—under Title VII and WLAD (which disallow supervisor liability) and for breach of a contract to which Chun is not a party—by failing to respond to the WSU Defendants' arguments on those claims. WSU Defs.' Mot. to Dismiss (Mot.) at 14, 22, 38–39; *see, e.g.*, *Puget Soundkeeper All. v. APM Terminals Tacoma LLC*, 545 F. Supp. 3d 893, 898 (W.D. Wash. 2021) (silence amounts to concession).

The four remaining claims also fail as a matter of law. The Title VII and WLAD claims against WSU fail because the beliefs Rolovich identifies as having motivated his opposition to the COVID-19 vaccines are not religious in nature. The § 1983 claim against Chun fails because Rolovich has not (1) pleaded a plausible violation of his free exercise or due process rights; (2) identified individual participation by Chun in any such violation; and (3) overcome Chun's qualified immunity. And the contract claim against WSU fails because the University's decision to terminate Rolovich's employment agreement (the Agreement) due to his noncompliance with a legal condition of state employment fits squarely within the definition of "just cause" under Washington law and the Agreement itself. The Court should dismiss the Complaint with prejudice.

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

1

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## II.    ARGUMENT

### A.    Rolovich Fails to State Title VII and WLAD Claims (Counts II, IV)

Rather than address the fatal flaw in Rolovich's Title VII and WLAD claims, his Response rebuts a strawman argument regarding the sincerity of his beliefs. Resp. at 15–16, 20. But the deficiency in these claims is not the factual question of whether Rolovich's anti-vaccine beliefs are insincere. It is that he has not plausibly alleged as a matter of law that those beliefs—sincere or not—are *religious* in nature. This dooms his Title VII and WLAD claims at the threshold.[1]

#### 1.    Rolovich's stated vaccine objections are not religious in nature

To plausibly allege "a bona fide religious belief," a plaintiff must offer more than "conclusory allegations . . . with no concrete, relevant particulars." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603, 606 (9th Cir. 2004). Thus, Rolovich must do more than intone his "sincere religious beliefs required him not to get the COVID vaccine." Resp. at 15. Instead, he must identify particular beliefs entitled to Title VII's protection because they are "religious in nature." *See, e.g.*, *Winans v. Cox Auto., Inc.*, No. CV 22-3826, 2023 WL 2975872, at *4 (E.D. Pa. Apr. 17, 2023) ("While we accept as true that Plaintiff has concerns with the COVID-19 vaccine, we cannot reasonably infer . . . that his concerns are religious in nature."). For three reasons, Rolovich has failed to do so.

---

[1] Rolovich agrees that the same standards govern religious discrimination claims under Title VII and WLAD. Resp. at 20. For brevity, the WSU Defendants use the term "Title VII" hereinafter to refer to both statutes.

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

2

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

First, the supposedly "scientific" bases of Rolovich's opposition to the COVID-19 vaccines, FAC ¶ 30, obviously do not qualify as religious beliefs. *E.g.*, *Blackwell v. Lehigh Valley Health Network*, No. 5:22-CV-03360-JMG, 2023 WL 362392, at \*1–3, \*7–8 (E.D. Pa. Jan. 23, 2023). A religious belief is one that "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *United States v. Seeger*, 380 U.S. 163, 165–66 (1965). Neither Rolovich's concerns with the "potential risks" of taking what he calls an "experimental vaccine"[2] nor his apparent theory that the FDA-approved Pfizer vaccine is biologically distinct from the Pfizer vaccine authorized for emergency use, remotely qualify as religious beliefs protected by Title VII. FAC ¶¶ 50–57; *see Seeger*, 380 U.S. at 165 (definition of religion "exclude[s] essentially political, sociological, or philosophical views"); Equal Emp. Opportunity Comm'n, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* § L.2, July 12, 2022, https://bit.ly/3VAZBWb ("[O]bjections to a COVID-19 vaccination requirement that are purely based on . . . nonreligious concerns (including about the possible effects of the vaccine), do not qualify as religious beliefs[.]"). And Rolovich is dead wrong that determining whether his "objections were religious or scientific *is* a sincerity inquiry." Resp. at 15. At this stage, the Court presumes that

_____

[2] The point is not that it is misleading to use the term "experimental" for FDA-approved vaccines received by more than 5.5 billion people (although it is). Resp. at 3 n.3. The point is that this term reflects a scientific belief, not a religious one.

WSU DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CASE NO. 2:22-cv-00319-TOR

3

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich's allegations of sincerity are true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But it should not accept his conclusory assertion that his beliefs are "religious" just because he labels them so. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (plaintiff must provide "more than labels and conclusions").

Neither of the two cases cited by Rolovich supports his theory that, to survive a motion to dismiss, "it is enough" to plead in conclusory fashion "that his religious beliefs are sincere." Resp. at 16. In the first, the plaintiff was a Jehovah's Witness who believed that creating materials for tanks violated his religious objection to participating in war. *Thomas v. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 709 (1981). In the second, a Jewish plaintiff believed he needed certain artifacts to complete his daily morning prayers and prison officials refused to let him have access to them. *Wolcott v. Bd. of Rabbis of N. & S. Cal.*, 738 F. App'x 538, 539 (9th Cir. 2018). In each case, the plaintiff explained his specific beliefs and the religious nature thereof. Neither case remotely suggests that a court must uncritically accept a plaintiff's characterization of his beliefs as religious in nature when his own description of them shows that they are not.

Second, Rolovich's claim that "it would violate his conscience to receive any available COVID-19 vaccine," FAC ¶ 24, does not constitute a religious belief protected by Title VII. As explained in the Motion, Title VII does not provide a blanket "conscience veto" that excuses an employee from complying with any job requirement with which he disagrees. *See* Mot. at 18–21; *see also Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972) ("Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

4

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests."); *Alvarado v. City of San Jose*, 94 F.3d 1223, 1230 (9th Cir. 1996) ("We are hard put to imagine a more unworkable definition of religion" than one "which includes any symbol or belief to which an individual ascribes 'serious or almost-serious' spiritual significance."). For this reason, numerous courts have dismissed Title VII claims based on "conscience"-based objections to vaccination requirements. *See* Mot. at 18–21 (collecting cases). The Response totally fails to address these cases or explain how Rolovich's own "conscience"-based objection is somehow different.[3]

---

[3] Since the Motion was filed, other federal courts have dismissed Title VII claims on similar grounds. *See Ulrich v. Lancaster Gen. Health*, No. CV 22-4945, 2023 WL 2939585, at *6 (E.D. Pa. Apr. 13, 2023) (dismissing Title VII claim for failure to plead a bona fide religious belief where plaintiff's "citation to a 'religious faith' that her body is 'a temple of the Holy Spirit' . . . is . . . fungible enough to cover anything she trains it on") (cleaned up); *Troulliet v. Gray Media Grp., Inc.*, No. CV 22-5256, 2023 WL 2894707, at *5 (E.D. La. Apr. 11, 2023) (same where complaint's "allegations suggest that [plaintiff's] beliefs regarding the COVID-19 vaccine were based on purely secular considerations or were merely a matter of personal preference," not her religious beliefs); *Passarella v. Aspirus, Inc.*, No. 22-CV-287-JDP, 2023 WL 2455681, at *6 (W.D. Wis. Mar.

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

5

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Third, Rolovich's talismanic invocation of Catholicism does not transform his vague, conscience-based vaccine objection into a cognizably religious one. That Rolovich is a "practicing Catholic" and "cites the Catechism of the Catholic Church" does not save his claim because the FAC does not connect his vaccine opposition to any Catholic practice or tenet. Resp. at 5, 15; *see, e.g.*, *NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 258 (E.D.N.Y. 2016) ("[T]he Court does not doubt that NM and her husband hold a genuine and sincere belief that they should not vaccinate the Minors. . . . [But] these beliefs were formed with a primary view toward the children's health, and not their religion."). Because Rolovich's opposition stems from his scientific views or his amorphous "conscience"-based objection (neither of which qualifies as a religious belief), the fact that he also happens to be Catholic is irrelevant. *See, e.g.*, *Passarella*, 2023 WL 2455681, at *6 ("the use of religious vocabulary does not elevate a personal medical judgment to a matter of protected religion"). As such, Rolovich fails to state a Title VII failure-to-accommodate claim.[4]

---

10, 2023) (same where plaintiffs "refused the vaccine based on their personal judgments about vaccine safety and not for religious reasons").

[4] A declaration of Rolovich's attorney attaches the form Rolovich submitted to WSU to request a religious exemption and accommodation. ECF No. 29, Ex. 1. The FAC tellingly omits any reference to the form's stated vaccine objection, and in neither the FAC nor the Response does Rolovich adopt his form's rationales.

WSU DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CASE NO. 2:22-cv-00319-TOR

6

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**2.    Rolovich does not plausibly allege a disparate treatment claim**

Rolovich's Title VII claim is based on an alleged failure to accommodate, not disparate treatment. *See* FAC ¶¶ 76–89, 128 (discussing accommodation). The Response characterizes Rolovich's Title VII claim as a "failure-to-accommodate claim," Resp. at 20, while at the same time citing Title VII disparate treatment cases (and in one case, without notation, to the dissent). Resp. at 20–21 (citing *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1775 (2020) (Alito, J., dissenting); *EEOC v. Abercrombie & Fitch*, 575 U.S. 768, 773–74 (2015)).

The Complaint's failure to include a disparate treatment claim is a basis for dismissal in itself. *See Hittle v. City of Stockton*, No. 2:12-CV-00766-TLN-KJN, 2018 WL 1367451, at *8 (E.D. Cal. Mar. 16, 2018) (dismissing Title VII complaint for failing to disclose whether plaintiff was pursuing failure-to-accommodate or disparate treatment theory). And even if Rolovich had alleged a disparate treatment theory, it would fail for at least three additional reasons.

First, a disparate treatment claim requires the plaintiff to demonstrate (among other things) that he "belongs to a protected class." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000). Because Rolovich has failed to allege that his vaccine opposition derived from any sincerely held beliefs that were religious in nature, he has also failed to demonstrate that he belongs to a protected class. *See, e.g.*, *Leake v. Raytheon Techs. Corp.*, No. CV-22-00436-TUC-RM, 2023 WL 2242857, at *5 (D. Ariz. Feb. 27, 2023) (dismissing disparate treatment claim where "Plaintiffs never alleged they were members of any protected class, or what their religious beliefs

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

7

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

were"; "Plaintiffs simply state that some employees rejected the vaccination due to their 'sincere religious belief that the human body is God's temple'").

Second, to establish a prima facie case of disparate treatment under the method of *McDonnell Douglas Corp. v. Green*, the plaintiff must show "that they are similarly situated to those employees [that were treated more favorably] in all material respects." 411 U.S. 792, 802 (1973); *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). The FAC contains no allegations regarding any other WSU employee who received more favorable treatment than Rolovich with respect to an accommodation request, let alone one who is similarly situated "in all material respects." *Id.*; *see, e.g.*, *Leake*, 2023 WL 2242857, at *5 (dismissing disparate treatment claim where plaintiffs "fail to demonstrate they were treated any differently from other vaccination-exempt employees"); *Troulliet*, 2023 WL 2894707, at *6 n.4 (similar).

Third, Rolovich alleges no facts that would support an inference that WSU terminated his employment "because of" his religious beliefs, rather than because of his failure to get vaccinated or secure an accommodation by the deadline. *See Wise v. Inslee*, No. 2:21-CV-0288-TOR, 2022 WL 1243662, at *8 (E.D. Wash. Apr. 27, 2022) (dismissing Title VII claim because "there is no indication that Plaintiffs faced adverse employment decisions due to their sincerely held religious beliefs rather than a failure to comply with the Proclamation"). The FAC generally claims that WSU "disapprov[ed] of Mr. Rolovich's sincerely-held religious" beliefs, but fails to allege specific facts that remotely reflect this alleged animus. FAC ¶ 127; *see, e.g.*, *Ochei v. The Mary Manning Walsh Nursing*

WSU DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CASE NO. 2:22-cv-00319-TOR

8

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Home Co.*, No. 10 Civ. 2548(CM)(RLE), 2011 WL 744738, at *3 (S.D.N.Y. Mar. 1, 2011) ("naked assertions by plaintiff that some protected demographic factor motivated an employment decision, without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's membership in a protected class, are simply too conclusory to withstand a motion to dismiss.").

**3.     The Court need not reach WSU's undue hardship defense**

Rolovich is mistaken that the undue hardship defense "is not a complete defense" to a Title VII failure-to-accommodate claim, and his reliance on disparate treatment cases for that assertion is misplaced. Resp. at 20–21; *cf.* Mot. at 15 (citing cases dismissing failure-to-accommodate claims at pleading stage under undue hardship). In any event, since Rolovich's Title VII claim independently fails because his vaccine opposition is not religious in nature, the Court need not reach the undue hardship question at this stage. *See, e.g.*, *Fallon v. Mercy Catholic Med. Ctr. of Se. Penn.,* 877 F.3d 487, 493 (3d Cir. 2017) (affirming dismissal of Title VII claim without addressing undue hardship).

**B.     The § 1983 Claim Against Chun Fails as a Matter of Law (Count V)**

Rolovich fundamentally misunderstands the federal qualified immunity standard, as demonstrated at the outset by his reliance on an inapt Washington case on the state law of respondeat superior. Resp. at 16. Ignoring the governing standard, Rolovich vaguely muses that WSU's and Chun's actions together violated his free exercise and procedural due process rights, as well as the unpled "unconstitutional conditions" doctrine. *Id.* at 16–20. For each theory, Rolovich fails to show either that (1) he has adequately alleged a violation of a

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

9

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

constitutional right; or (2) Chun's conduct, viewed objectively, violated clearly established law. The burden is on Rolovich, not Chun, to prove each element. *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012). Rolovich fails to meet his burden, requiring dismissal of Count V and of Chun as a Defendant.

### 1.    Rolovich fails to plead a plausible free exercise violation

Rolovich does not dispute that, to state a free exercise claim against Chun, "Rolovich 'must plead sufficient factual matter to show' Chun acted 'not for a neutral . . . reason but for the purpose of discriminating on account of [Rolovich's] religion.'" Mot. at 28 (quoting *Iqbal*, 556 U.S. at 677). Instead of responding to the WSU Defendants' argument that the FAC alleges no specific facts plausibly showing that Chun acted against Rolovich because of his religious beliefs, Rolovich asks the Court to look "more broadly" at the FAC and the documents incorporated by reference[5] to "infer" that "WSU and Chun attempted to coerce and compel Rolovich to get vaccinated" and that "WSU then terminated him (as alleged) as a [sic] because of his religious beliefs." Resp. at 16–17.

---

[5] Rolovich argues that the WSU Defendants' submission of certain "extrinsic evidence" is "procedurally improper," but without moving to strike or even identifying the supposedly offending material (which he himself cites). Resp. at 1, 8, 9, 15. A motion to dismiss can rely on materials incorporated into a complaint by reference. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). Rolovich does not deny that the materials are so incorporated.

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

10

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

5-SER-919

This hazy sketch fails to state a free exercise claim, for many reasons. First, the claim suffers from the same flaw as the Title VII claim: Rolovich does not plausibly allege that his vaccine opposition stemmed from sincerely held *religious* beliefs. *See, e.g.*, *Donovan v. Biden*, 603 F. Supp. 3d 975, 984 (E.D. Wash. 2022) (dismissing free exercise challenge to vaccine mandate where "Plaintiffs' allegations do not identify the religious activities they were engaged in, or how those activities were substantially burdened by the Executive Orders"); *see also Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (Free Exercise Clause implicated only when a practice burdens sincere religious beliefs).

Second, Rolovich must identify *specific* actions by Chun that plausibly reflect anti-religious discrimination, but instead offers only vague assertions of a secret animus, which is legally insufficient. *See Crawford–El v. Britton*, 523 U.S. 574, 598 (1998) (requiring "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury" in order to survive a motion to dismiss) (cleaned up). Though Chun was a decisionmaker in the denial of Rolovich's request for an accommodation, the FAC alleges no facts suggesting Rolovich's religious beliefs factored into the decision. The reasons given by WSU all objectively center on the difficulty of accommodating an unvaccinated head football coach amid a deadly pandemic given the travel, recruiting, and other in-person requirements of the position. Pekelis Decl., Exs. D, G; FAC ¶¶ 69–70. Rolovich's allegations that Chun expressed "worr[y] about Rolovich's mental health" and "accused him of having *extreme views*" are not remotely probative of religious animus. Resp. at 5 (citing FAC ¶ 31). By Rolovich's own

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

11

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

account, those purported remarks came months *before* Rolovich ever mentioned religion as a basis for his anti-vaccine stance to Chun. Similarly, Rolovich asserts that "*by August 16* Chun had already made up his mind that he was going to terminate Rolovich with 'just cause.'" Resp. at 21 (emphasis added). But that was three days *before* Rolovich first hinted at a religious basis for his vaccine opposition. FAC ¶¶ 38–41. Thus, even under Rolovich's own version of the facts, Chun's decision could not possibly have been motivated by an animus against Rolovich's religious beliefs.

Third, and relatedly, Rolovich points to no specific instance of how Chun "attempted to coerce and compel Rolovich to get vaccinated" in a way that would plausibly violate the Free Exercise Clause. Resp. at 17. True, the FAC alleges that Chun urged Rolovich to comply with the Proclamation by getting vaccinated. *See, e.g.*, FAC ¶¶ 31–34, 38. But as this Court has held, the Proclamation was neither unconstitutional nor coercive. *See Wise*, 2022 WL 1243662, at *5 ("[T]he Proclamation does not require individuals to get vaccinated; it simply creates employment requirements for certain state workers."); *see also Nelson v. Dinca*, No. 3:21-CV-1457-RJB-MLP, 2022 WL 1284538, at *2 (W.D. Wash. Apr. 29, 2022) (mandate was not "so restrictive that it would tend to 'coerce' individuals into being vaccinated despite their religious beliefs").

Nor do the FAC's allegations permit the inference that Chun urged Rolovich to get vaccinated *because of* his religious beliefs, for the FAC does not allege that Chun was ever informed of Rolovich's purportedly religious anti-vaccine beliefs. *See* Mot. at 29. To the contrary, Rolovich himself admits he did

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

12

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

not mention religion before the August 19 meeting; did not relay any specifics regarding his religious beliefs to Chun at that meeting; and did not meet again with Chun before submitting his exemption request. FAC ¶¶ 38–42, 45–47.

Finally, even if Rolovich could survive the qualified immunity analysis's first prong, he would fail the second. Rolovich cites no case, let alone any "clearly established law," that makes any of Chun's *individual* actions, viewed objectively, constitutionally suspect. Chun's alleged acts all relate to his role implementing a neutral and generally applicable vaccine mandate that is itself consistent with the Free Exercise Clause. *Wise*, 2022 WL 1243662, at *4. Again, Rolovich must "offer more than general conclusory allegations"; he must show "that the particular facts of his case support a claim of clearly established right." *Sweaney v. Ada Cnty.*, 119 F.3d 1385, 1389 (9th Cir. 1997) (citations omitted).

Rolovich resoundingly fails in this regard. The three cases he cites have nothing to do with vaccine mandates, religious exemptions, or anything remotely relevant to this case's facts. Resp. at 17. The first is an Establishment Clause case concerning a law authorizing public school buses to transfer students to parochial schools. *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15–16 (1947). The second is an unpublished Fifth Circuit case containing only a bare-bones summary of a police department's firing of a "fundamentalist Christian." *Perez v. Zahara*, 332 F. App'x 214, 215 (5th Cir. 2009) (per curiam). And the third case concerns a probation officer who claimed she was fired because of protected *speech*, not religion. *Sagendorf-Teal v. Cnty. of Rensselaer*, 100 F.3d 270, 276 (2d Cir. 1996). None of these cases is legally or factually analogous to this one,

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

13

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

let alone sufficiently on-point to give Chun "clear notice" that his implementation of a legally binding policy in the circumstances he faced violated clearly established law. *Greisen v. Hanken*, 925 F.3d 1097, 1108–09 (9th Cir. 2019).

Instead, case law actually addressing "the unprecedented nature and global scope of the Covid-19 pandemic as well as its devastating impacts" points the opposite way: supervisors implementing generally applicable vaccine mandates do not violate the First Amendment's Free Exercise Clause. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, No. 21-CV-02637-RM-KMT, 2022 WL 4547563, at *5 (D. Colo. Sept. 29, 2022) (granting motion to dismiss on basis of qualified immunity where "existing precedent" would not have "placed the[] Defendants on notice that they were violating Plaintiffs' rights by enforcing the University's vaccination policies"); *cf. Hogue v. Scott*, 2:20-CV-218, 2021 WL 6050864, at *4 (D. Vt. Dec. 21, 2021) (officials implementing COVID-19 restrictions "did not violate clearly established federal law" in responding to "a public health emergency" and were entitled to qualified immunity). Rolovich's single page of argument fails to carry his burden on his free exercise theory.

### 2.    Rolovich fails to plead a plausible due process violation

The Response next asserts that Rolovich had a "property interest in his contract's liquidated damages provision"—a theory that appears nowhere in Count V. Resp. at 17. This theory also finds no support in the Ninth Circuit or elsewhere. *See, e.g.*, *Pac. Mech. Corp. v. City of San Luis Obispo*, 359 F. App'x 720, 721 (9th Cir. 2009) (affirming dismissal of due process claim for liquidated damages where the plaintiff had "no present entitlement" to the money);

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

14

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Haywood v. Univ. of Pitt.*, No. 11-1200, 2012 WL 591746, at *4 (W.D. Pa. Feb. 22, 2012) ("[P]laintiff's interest in the liquidated damages or continued employment . . . is not protected under the Constitution.").

Further, even if Rolovich had a property interest at stake, he fails to show how Chun's individual actions deprived him of constitutionally adequate process. The only Chun-specific argument Rolovich makes is that "Chun's disruption and violation of WSU's blind review process constituted a violation of procedural due process." Resp. at 18. But as explained in the Motion, none of Chun's alleged conduct could plausibly constitute an improper "disruption" or "violation" given Rolovich's admission that WSU's review process left it up to each employee's department—not EH&S or the committee undertaking the first "blind review" screening step—to determine whether an accommodation was possible without undue hardship. FAC ¶¶ 61–62; Mot. at 29–31, 36–38. Thus, even if Rolovich had a protectable interest (and he does not), because he received all the process he was due, he cannot maintain a claim against Chun.

However, even if he could, it would still not defeat Chun's qualified immunity, because Rolovich again fails to meet his burden to point to "clearly established law" showing that a reasonable supervisor in Chun's position would know his conduct was unlawful. Most of the due process cases cited in the Response provide only high-level recitations of general due process protections, and bear no similarity to this case. Resp. at 18–19. The only seemingly analogous case cited by Rolovich is *Peters v. University of Pittsburgh*, No. 2:18-CV-732, 2019 WL 109402 (W.D. Pa. Jan. 4, 2019). Although superficially similar on its

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

15

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

facts (involving a college sports coach allegedly terminated for "just cause"), the case has nothing to do with qualified immunity, religious exemptions, or the process for accommodation reviews. *Id.* Instead, the only issue was whether the Plaintiff's due process claim could be dismissed pursuant to Rule 12(c) where "the University ha[d] not yet advanced any argument as to the sufficiency of the procedural safeguards provided to plaintiff prior to the termination of his contract." *Id*. at *6. *Peters* does nothing to undercut the cases cited by the WSU Defendants showing that Rolovich has no due process claim against Chun for his involvement in the accommodation process. *See* Mot. at 33–34.

### 3.    Rolovich has no viable "unconstitutional conditions" claim

Rolovich's Response also invokes the "unconstitutional conditions" doctrine, vaguely positing that Chun somehow violated this doctrine in his efforts to get Rolovich to comply with WSU's vaccination requirement. Resp. at 19.[6]

---

[6] This unpled claim features new attacks on Chun, claiming he "relentlessly attacked Rolovich's religious beliefs," and "told him with certainty any request for religious exemption would be denied before Chun knew under what standards the exemption would be provided." Resp. at 19. According to the FAC, however, Chun did not even know Rolovich's religious beliefs at any relevant time, much less "relentlessly attack" them. FAC ¶ 46. Nor did he tell Rolovich "with certainty" his request would be denied, only that an accommodation would be "hard to get and that there was no guarantee that [it] would be approved." *Id.*

WSU DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CASE NO. 2:22-cv-00319-TOR

16

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

This new claim may be disregarded because it appears nowhere in the FAC. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998).

In any event, this unpled claim also fails as a matter of law. An "unconstitutional conditions" claim must derive from a plaintiff's successful identification of fundamental rights elsewhere. *See Vance v. Barrett*, 345 F.3d 1083, 1088 (9th Cir. 2003); *see also Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 286 (1998) (declining to reach unconstitutional conditions claim where there was no underlying constitutional violation). Thus, courts presented with unconstitutional conditions arguments in vaccine mandate cases have rejected them. *See, e.g.*, *Legaretta v. Macias*, 603 F. Supp. 3d 1050, 1071 (D.N.M. 2022) (no unconstitutional conditions claim where mandate does not violate fundamental right); *Smith v. Biden*, No. 1:21-CV-19457, 2021 WL 5195688, at *8 (D.N.J. Nov. 8, 2021) (same). This Court should, too.[7]

**C.    Rolovich's Contract Claim Fails as a Matter of Law (Count I)**

Rolovich's claims for breach of contract and the "implied covenant" of good faith and fair dealing also fail because WSU had "just cause" to terminate

---

[7] Rolovich also makes passing reference to a "liberty interest in refusing unwanted medical treatment." Resp. at 19–20. Even if the Court were to consider this unpled claim, it would fail because conditioning employment on vaccination is constitutionally permissible and a far cry from forced medical treatment. *See Williams v. Brown*, 567 F. Supp. 3d 1213, 1226 (D. Or. 2021) (collecting cases).

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

17

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich's employment and Rolovich has not alleged any facts to plausibly suggest that WSU's justification for firing him for cause was insincere.

### 1.    "Just cause" includes a failure to meet a legal job requirement

Rolovich argues that whether WSU had just cause is not properly decided on a motion to dismiss, but this is incorrect based on the Agreement's unambiguous language. "Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous." *Shoemaker v. Cnty. of Glenn*, No. 2:10-CV-01625 JAM–KJN, 2010 WL 4835751, at *2 (E.D. Cal. Nov. 22, 2010), *aff'd*, 490 F. App'x 894 (9th Cir. 2012) (cleaned up). Here, the Agreement provides that "Just Cause" has its "normally understood meaning in employment contracts." ECF No. 1-1 at 42, § 4.1. In Washington, termination for "just cause" is "one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d 298, 304 (Wash. 1989). Rolovich's noncompliance with the Proclamation squarely fits this definition. *See* Mot. at 40 (collecting cases).

Rolovich's argument that the Agreement did not specifically require him to receive the COVID-19 vaccine falls flat. Resp. at 12. To demand that an employment agreement specify every possible "just cause" scenario with fine-grained particularity defies logic, which is why the Agreement itself gives "Just Cause" its "*normally understood meaning* in employment contracts." ECF No. 1-1 at 42, § 4.1 (emphasis added); *see also Gaglidari v. Denny's Restaurants, Inc.*, 815 P.2d 1362, 1369 (Wash. 1991) (applying the "general framework of just

WSU DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CASE NO. 2:22-cv-00319-TOR

18

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

cause" even "where the contract provides specific grounds for dismissal"). In any event, the Agreement *does* specifically require Rolovich to "comply with and support all rules, regulations, policies, and decisions established or issued by the University" and to "abide by all provisions of law." ECF No. 1-1 at 36, § 1.2.1. Rolovich's failure to comply with the Proclamation (by becoming vaccinated or receiving an accommodation) meant he could not legally fulfill a legal condition of his employment. That is just cause for termination.

### 2.    Rolovich does not plausibly allege WSU's reason was insincere

Next, Rolovich baselessly claims that he was fired not based on his noncompliance with the Proclamation, but "because of his sincere religious beliefs." Resp. at 13. However, just as Rolovich fails to plausibly allege that his termination stemmed from anti-religious animus, he does not plausibly allege that WSU's stated reason—his failure to meet a legal job requirement—was insincere. *See supra* subsections II.A.2, B.1. As in *Linden v. X2 Biosystems*, Rolovich's allegations "fail to show that [WSU's] stated reason for termination . . . was not arrived at in good faith or was not a fair and honest reason" and "the existence of other *possible* reasons for the termination . . . does not show that the stated reason was not fair and honest or that [WSU was] not acting in good faith in this instance." No. C17-966 RSM, 2019 WL 13240852, at *3–4 (W.D. Wash. Jan. 25, 2019).[8] This meets the second prong of Washington's "just cause" standard.

_____

[8] Rolovich tries to avoid *Linden* by asserting that the FAC's "alleged facts . . . show that [WSU] terminated him illegally." Resp. at 11. But "the tenet that a

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

19

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**3.    Rolovich has no wrongful wage withholding claim**

Finally, Rolovich argues that, in addition to his breach of contract claim, he has stated a claim for the wrongful withholding of wages, because the liquidated damages he was allegedly owed under the contract amount to wages under Washington law. Resp. at 14 n.5. But Rolovich fails to acknowledge that the FAC *omitted* the wrongful wage withholding claim contained in his original complaint. Mot. at 12 n.10. And that claim is entirely derivative of Rolovich's breach of contract claim which, as explained above, fails as a matter of law. *See Dice v. City of Montesano*, 128 P.3d 1253, 1259 (Wash. Ct. App. 2006). Any wrongful wage withholding claim must fail along with Rolovich's contract claim.

**D.    Leave to Amend Should Be Denied**

In a footnote, Rolovich requests leave to amend. Resp. at 10. But because he fails to identify any additional factual allegations that would cure his claims' numerous legal deficiencies, amendment would be futile and leave should be denied. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir. 2008).

**III.    CONCLUSION**

For the reasons stated above and in the Motion, the WSU Defendants respectfully request that the Court dismiss the FAC with prejudice.

_____

court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And as detailed above, Rolovich has failed as a matter of law to plead facts that, even if true, would make WSU's termination of his employment "illegal[]." *See supra* Sections II.A–B.

WSU DEFENDANTS' REPLY IN          20          PACIFICA LAW GROUP LLP
SUPPORT OF MOTION TO DISMISS                          1191 SECOND AVENUE, SUITE 2000
CASE NO. 2:22-cv-00319-TOR                              SEATTLE, WA  98101-3403
                                                                          TELEPHONE: (206) 245-1700
                                                                          FACSIMILE: (206) 245-1750

DATED this 3rd day of May, 2023.

ROBERT W. FERGUSON
Attorney General

*/s/ Zachary J. Pekelis*
ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700
Zach.Pekelis@PacificaLawGroup.com

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Spencer.Coates@atg.wa.gov
*Attorneys for Defendants Washington
State University and Patrick Chun*

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

21

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 3rd day of May, 2023, at Seattle, Washington.

_/s/ Zachary J. Pekelis_
ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General

WSU DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO DISMISS
CASE NO. 2:22-cv-00319-TOR

22

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE, SUITE 2000
SEATTLE, WA  98101-3403
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

BRIAN FAHLING, WSBA #18894
Law Office of Brian Fahling
8124 NE 166th St
Kenmore, WA 98028
(425) 802-7326

ERIC KNIFFIN
Kniffin Law PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903
(719) 212-4391

ERIC JOB SEESE
Lewis Roca Rothgerber Christie LLP
1601 19th Street, Suite 1000
Denver, CO 80202
(303) 623-9000

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH, | NO. 2:22-cv-00319 |
| Plaintiff, | |
| v. | **RESPONSE IN OPPOSITION TO WSU DEFENDANTS' MOTION TO DISMISS** |
| WASHINGTON STATE UNIVERSITY, et al., | |
| Defendants. | May 11, 2023<br>With Oral Argument: 11 a.m.<br>Courtroom 902 |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................i

INTRODUCTION ........................................................................................... 1

SUMMARY OF ARGUMENT.......................................................................... 1

FACTS AS PLED BY ROLOVICH ................................................................. 2

    A.  Washington State and WSU React to the COVID Pandemic ........................ 3

    B.  Rolovich's Employment Contract with WSU ................................................. 4

    C.  WSU and Chun's Interacts with Rolovich regarding Vaccination, Demonstrate Coercive Conduct toward Rolovich and his Religious Beliefs................................................................................................................ 5

    D.  WSU Establishes Process for Evaluating Religious Exemption Requests........................................................................................................... 7

    E.  Rolovich Submits, and WSU Evaluates, His Application for Religious Exemption.......................................................................................... 8

    F.  WSU Confirms its Decisions through Rolovich's Administrative Appeal............................................................................................................. 9

STANDARD OF REVIEW................................................................................ 9

ARGUMENT................................................................................................... 10

    I.  Rolovich has adequately pled that WSU breached his employment contract. .... 10

        A.  Whether Defendants had "just cause" to terminate Rolovich is a question of fact not amenable to a motion to dismiss. ................................. 11

        B.  Rolovich has adequately pled his contract claims....................................... 12

        C.  Rolovich has sufficiently pled that a sincere religious belief precluded him from complying with Defendants' mandate.......................................... 15

    II.  Rolovich has adequately pled under § 1983 that Chun violated his First Amendment right to free exercise and Fourteenth Amendment right to procedural due process. ....................................................................... 16

        A.  Under the pled allegations, Chun violated Rolovich's clearly-established free exercise rights. ...................................................................... 16

B.  Under the pled allegations, Chun violated Rolovich's clearly-established due process rights by unlawfully depriving him of his property interest in his contract's liquidated damages provision. ................ 17

C.  Chun's actions toward Rolovich also violated the unconstitutional conditions doctrine. ...................................................................... 19

III.  Rolovich has adequately pled that Defendants violated his rights under Title VII and WLAD ............................................................................... 20

A.  Rolovich has adequately pled a failure-to-accommodate claim. ................... 20

B.  "Undue hardship" is not a complete defense to a failure-to-accommodate claim." .................................................................... 20

CONCLUSION ..................................................................................... 22

## TABLE OF AUTHORITIES

Page

**Cases**

*Anspach v. Philadelphia, Dept. of Public Health,*
  503 F.3d 256 (3rd Cir. 2007) ........................................................ 13

*Armstrong v. Reynolds,*
  22 F.4th 1058 (9th Cir. 2022) ...................................................... 19

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................... 10

*Badgett v. Security State Bank,*
  116 Wash. 2d 563 (1991) ............................................................. 13

*Bathke v. City of Ocean Shores,*
  No. C19-5338 BHS, 2020 WL 4816035 (W.D. Wash. Aug. 19, 2020) ................. 11, 14

*Betchard-Clayton, Inc. v. King,*
  41 Wash. App. 887 (1985), review denied, 104 Wash. 2d 1027 (1985) ........ 12

*Bordeaux v. Lion's Gate Entertainment, Inc.,*
  2022 WL 19076668 (C.D. Cal. Dec. 28, 2022) .............................. 12

*Bostock v. Clayton Cnty., Georgia,*
  140 S. Ct. 1731 (2020) ................................................................ 21

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) ..................................................................... 19

*Crider v. Spectrulite Consortium, Inc.,*
  130 F.3d 1228 (7th Cir. 1997) ..................................................... 11

*Cruzan v. Director, Missouri Dep't of Health,*
  497 U.S. 261 (1990) ..................................................................... 20

*Dice v. City of Montesano,*
  131 Wash. App. 675 (2006) .......................................................... 14

*Doe v. United States Dept. of Justice,*
  753 F.2d 1092 (D.C. Cir. 1985) ................................................... 10

*Doster v. Kendall*,
   54 F.4th 398 (6th Cir. 2022) ................................................................ 13

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*,
   575 U.S. 768 (2015) ............................................................................ 22

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ............................................................ 10

*Everson v. Bd. of Ed. of Ewing Twp.*,
   330 U.S. 1 (1947) ................................................................................ 17

*Fallon v. Mercy Cath. Med. Ctr. Of Se. Pa.*,
   877 F.3d 487 (3d Cir. 2017) ............................................................... 15

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ............................................................................ 18

*Hanson v. Carmona*,
   525 P.3d 940 (Wash. 2023) (en banc) ................................................ 17

*Johnson v. City of Shelby, Miss.*,
   574 U.S. 10 (2014) .............................................................................. 10

*Jones v. Bd. of Governors of Univ. of N.C.*,
   704 F.2d 713 (4th Cir. 1983) .............................................................. 18

*Koala v. Khosla*,
   931 F.3d 887 (9th Cir. 2019) ................................................................ 9

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   570 U.S. 595 (2013) ............................................................................ 20

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) .............................................................. 10

*Linden v. X2 Biosystems*,
   No. C17-966 RSM, 2019 WL 13240852 (W.D. Wash. Jan 28, 2019) .......... 11

*Lund v. Grant County Public Hosp. Dist. No. 2*,
   85 Wash. App. 223 (1997) ............................................................ 11, 14

*McDougal v. County of Imperial*,
   942 F.2d 668 (9th Cir. 1991) ................................................................ 9

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) ...................................................................................... 9

*Nw. lndep. Forest Mfrs. v. Dep't of Labor & Indus.*,
    78 Wash. App. 707 (1995) ........................................................................................ 12

*Perez v. Zahara,*
    332 Fed. Appx. 214 (5th Cir. 2009) ...................................................................... 13, 17

*Peters v. Univ. of Pittsburgh*,
    No. 2:18-cv-732, 2019 U.S. Dist. LEXIS 1318 (W.D. Pa. Jan. 4, 2019) ...................... 19

*Phillips v. Collings*,
    256 F.3d 843 (8th Cir. 2001) .................................................................................... 22

*Sagendorf–Teal v. Cnty. of Rensselaer*,
    100 F.3d 270 (2d Cir.1996) ...................................................................................... 18

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) .................................................................................. 10

*Thomas v. Review Board*,
    450 U.S. 707 (1981) .................................................................................................. 16

*Torcaso v. Watkins*,
    367 U.S. 488 (1961) .................................................................................................. 17

*United Fin. Cas. Co. v. Coleman*,
    173 Wash. App. 463 (2013) ...................................................................................... 13

*Washington v. Harper,*
    494 U.S. 210 (1990) .................................................................................................. 21

*Wolcott v. Bd. of Rabbis of N. & S. California*,
    738 F. App'x 538 (9th Cir. 2018) .............................................................................. 16

**Statutes**

RCW 49.48, *et seq.* ...................................................................................................... 15

RCW 49.52, *et seq.* ...................................................................................................... 15

5-SER-937

## INTRODUCTION

Nick Rolovich, WSU's then-head football coach, concluded it would violate his conscience—and his moral duty as a Catholic—to receive a COVID vaccine. His contract did not require him to take a COVID vaccine, and the Governor's vaccine mandate exempted WSU employees with sincere religious objections.

Nevertheless, Rolovich's boss, Defendant Chun, preemptively decided that Rolovich's religious objection would result in his termination and overrode the University's "blind review" process to make sure it reached his predetermined outcome. This led to Rolovich's termination "for just cause" and the deprivation of his contractual liquidated damages.

Under these pled facts, does Rolovich state a cognizable claim?

## SUMMARY OF ARGUMENT

Rolovich has never disputed that WSU had the right to terminate him. Indeed, college head football coaches get fired all the time. But what WSU cannot do is terminate him for "just cause," and thereby avoid the liquidated damages required under the contract, because he had a sincere religious objection to receiving a COVID vaccine.

Defendants' motion misconstrues the pertinent legal issues and draws the Court's attention to extrinsic evidence that is not properly the subject of judicial notice. Besides being procedurally improper, Defendants' reliance on their purported "factual" record is unfairly one-sided and incomplete. This appears to be an attempt to skew the information available for the Court's consideration to dispose of this case in a summary-judgment style at an early stage before discovery or even initial disclosures have been completed.

However, the motion to dismiss standard is clear, and the task before the Court at this early stage of litigation is simple. The facts alleged by Rolovich—in his First Amended Complaint ("FAC") and in the documents incorporated into that Complaint by reference—meet and exceed the Rule 12(b)(6) plausibility standard. Below, Rolovich highlights some of the most important of these alleged facts and shows why the Court, assuming that each of these facts are true, can draw the reasonable inference that Defendants WSU and Chun are liable for breaching Rolovich's contract, breaching the implied covenant of good faith and fair dealing, violating the Wrongful Withholding of Wages statute, violating Rolovich's rights under the First and Fourteenth Amendment, violating Title VII, and violating Washington's Law Against Discrimination.[1]

Rolovich has pled sufficient facts to state claims for the relief requested. Defendants' Motions to Dismiss must be denied in its entirety, excepting those claims identified in footnote 1.

### FACTS AS PLED BY ROLOVICH

The basic outline of Rolovich's pled case is as follows. These facts are spelled out in greater detail in the First Amended Complaint, ECF No. 1-1 pp. 73-104

[1] Plaintiff does not oppose dismissal of Governor Inslee, in his official Capacity, as a party-defendant. Mr. Rolovich does not oppose Defendant WSU's and Mr. Chun's motions to dismiss the following claims: Count III (Wash. Const. art. I, § 11), Count VI Free Exercise Clause of U.S. Const., amend. I), and Count VII (Due Process Clause of U.S. Const., amend. XIV).

("FAC"), and the exhibits incorporated into the FAC by reference, especially Rolovich's administrative appeals.[2]

### A. Washington State and WSU React to the COVID Pandemic

Less than two months after WSU hired Rolovich, Washington State entered a State of Emergency due to the COVID virus. *Id*. ¶ 21. In early 2021, the federal government granted an Emergency Use Authorization ("EUA") for experimental COVID vaccines.[3]

On August 20, 2021, Governor Inslee issued Proclamation 21-14.1, which states in relevant part,

> Workers for operators of Educational Settings . . . *are not required to get vaccinated* against COVID-19 under this Order if they are unable to

[2] *See* Declaration of Brian Fahling (Fahling Decl.), filed by Rolovich subsequent to this response. Attached to that Declaration are Exhibit 1 (Rolovich Religious Exemption Request Form submitted to HRS) and Exhibit 2 (Rolovich administrative appeal to WSU President Shultz with attachments). FAC incorporates each of these exhibits by reference. *See* FAC ¶¶ 63 (Ex. 1) and 5 (Ex. 2).

[3] Though Defendants suggest it is probative that Rolovich described available vaccines as "experimental" (ECF 22 at 7, 16, 20), the FDA, NIH, and WHO all use this term. *See* FDA, Understanding the Regulatory Terminology of Potential Preventions and Treatments for COVID-19 (Oct. 20, 2020), http://bit.ly/43gRKkd; NIH, Experimental coronavirus vaccine is safe and produces immune response (July 21, 2020), http://bit.ly/43opJHa; WHO, Coronavirus disease (COVID-19): Vaccine research and development (Aug. 10, 2021), http://bit.ly/43xIpoe. Rolovich asks the Court to take judicial notice of these government records. *See* ECF No. 22 at 2.

do so because of a disability or if the requirement to do so conflicts with their sincerely held religious beliefs, practice, or observance.

(emphasis added). WSU referenced this Proclamation and its successor, 21-14.2, in correspondence regarding Rolovich's request for an exemption and in its letter terminating his employment.

### B. Rolovich's Employment Contract with WSU

Rolovich's contract with WSU and the State of Washington was set to expire on June 30, 2025. ECF No. 1-1 at 38 (Employment Agreement). The contract provided that WSU could terminate Rolovich for "just cause" if he was found to be in violation of the just cause provisions set forth in the contract. The grounds for "just cause" termination are specified in great detail. *Id.* at 41-42. If WSU terminated Rolovich for "just cause," "all obligations of the University to make further payments under th[e] Agreement and/or to provide any other consideration . . . [would] cease." *Id*. at 43. The contract also provided that WSU could terminate Rolovich "without cause" at any time, but such a termination entitled Rolovich to "liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of [the] Agreement." *Id.* at 44.

Around July 2021, WSU induced some of its football coaches to sign new employment agreements with provisions requiring them to "follow all federal, state, and local health directives, as well as university policies related to health and safety. FAC ¶ 22. Rolovich, however, did not sign an amendment to his employment agreement requiring him to follow health directives or university policies related to health and safety; his contract with WSU has no such provisions. *Id*. ¶ 23.

**C. WSU and Chun's Interacts with Rolovich regarding Vaccination, Demonstrate Coercive Conduct toward Rolovich and his Religious Beliefs**

On May 24, 2021, after Rolovich told Chun that he did not intend to get a COVID-19 vaccine, Chun claimed that he was worried about Rolovich's *mental health* and accused him of having *extreme views* regarding many issues. FAC ¶ 31.

Three days later, Rolovich was called to a 3 p.m. meeting at Chun's office, where Chun told Rolovich that his *beliefs were making him incapable of leading his players*. *Id.* Chun also tried to get Rolovich into counseling because he believed that Rolovich had mental health issues. *Id.* ¶ 32. Chun then suggested that Rolovich should talk to Chun's wife because she had been in a couple different religions he referred to as "cults." *Id.*

On August 3, 2021, seventeen days before Governor Inslee mandated that all state employees be vaccinated, Kathryn Leathers, Governor's Office General Counsel, discussed exemptions to the planned mandate with the Governor's staff: "Of possible exemptions [to the vaccine mandate]: medical for sure; and religious (if we have to; if yes, as narrow as possible)." *Id*. ¶ 36. Rolovich is a practicing Catholic. *Id.* ¶ 25.

On August 16, 2021, four days before the mandate was imposed, Rolovich was called to an urgent meeting with Chun and Deputy Director of Athletics, Bryan Blair. *Id.* ¶ 34. At this meeting, Chun told Rolovich that Governor Inslee was intending to issue a vaccine mandate that would eliminate the "personal exemption" from the coaching staff's declaration of vaccination status. *Id.* Chun *warned* Rolovich that any religious exemption request he submitted would be *scrutinized to no end*, and that Inslee's mandate would have a "*high threshold*" for religious

exemptions moving forward, *id.,* and that Rolovich *could be expected to be fired with cause* on October 19. *Id.* ¶ 35.

On August 19, 2021, Rolovich was summoned to another meeting with Chun and Assistant Athletics Director Bryan Blair. *Id.* ¶ 38. Chun told Rolovich that he had four choices: 1. Get the vaccine; 2. Don't get the vaccine and get fired; 3. Claim an exemption; or 4. Resign right now. *Id.* Rolovich told Chun that he was not resigning and that he wanted to coach the team. *Id.* Chun continued, "but *you say you don't care about the money*" and "*why don't you just resign*?" *Id.* Chun then accused Rolovich of having situational integrity*,* and called Rolovich a "con-man," accusing him of being selfish. *Id.* Chun then stated that Rolovich's objections to receiving the vaccine were causing Chun and President Schulz reputational damage. *Id.* Chun then stated that all Rolovich had to do is get vaccinated. *Id. Chun admitted his efforts get Rolovich to take the vaccine in the past had been coercive. Id.* ¶ 39.

Chun pressed Rolovich again about the vaccine, and Rolovich replied that he believed he had privacy rights and did not feel comfortable telling Chun about his reasons for declining to receive a COVID vaccine. *Id.* Chun then demanded that Rolovich tell him what his answer would be. *Id*. During the same meeting, Chun also told Rolovich that Governor Inslee "did this" just to come after Rolovich and WSU, and that he "only had two options: *get vaccinated or resign. Id.* ¶ 40. Chun then admitted that the Board of Regents wanted Rolovich fired. *Id.*

Rolovich had refrained from bringing his religious beliefs into his conversations with Chun about COVID vaccines. *Id.* ¶ 41. Rolovich did not feel comfortable talking about his faith because it is a very personal matter to him, and he was uncomfortable talking about his religious beliefs with his supervisor. *Id.* Rolovich

was also uncomfortable because he did not know how WSU would react to him sharing his religious opposition to medical research based on aborted fetal tissue, given that WSU professors have in the past publicly defended such research. *Id.* ¶ 42.

Rolovich asked Chun and Blair about the University's process for requesting a religious exemption from a vaccine mandate. Chun and Blair said they did not know details about the University's process, *id.*, nevertheless, Chun then told Rolovich that he needed to have his religious exemption approved by August 29, the Sunday before the Utah State game. *Id.* ¶ 43.

Chun and Blair told Rolovich that they were in a time crunch and had to decide if he was going to coach that season. *Id.* ¶ 44. They said they did not want to start a season with Rolovich if they thought they may have to fire him on Oct 18th, pursuant to the Governor's mandate. *Id.*

Rolovich responded that he would seek a religious exemption right then if one was available. *Id.* ¶ 45. Chun and Blair then got even more heated, with Chun saying if Rolovich got the religious exemption, he would forever question his character. *Id.* Chun and Blair both talked about the early days of the pandemic, and that Rolovich had not mentioned his faith, Rolovich responded that he did not see the point, as he does not see faith and science as exclusive. *Id.* Chun and Blair then stressed that the University's religious exemption would be hard to get and that there was no guarantee that Rolovich's request would be approved. *Id.* ¶ 46.

**D. WSU Establishes Process for Evaluating Religious Exemption Requests**

Shortly after the vaccine mandate, WSU published procedures for evaluating religious exemption requests, the procedures established a blind review process for

the requests. *See generally, id.* ¶¶ 59-62. For employees, the exemption requests go through a two-step process. *Id.* ¶ 61. The first is the blind review. *Id.* Then, if an exemption is approved, the request moves to a separate accommodation review step. *Id.* WSU Vice President for Communications, Phil Weiler, describe how the process would be applied to Rolovich's request: "if the blind review results in the approval of Rolovich's request [by the reviewing committee] . . . an email [i]s sent to his/her supervisor indicating the exemption had been approved." *Id.* ¶ 62.

### E. Rolovich Submits, and WSU Evaluates, His Application for Religious Exemption

On September 28, 2021, Rolovich submitted his application for a religious exemption to HRS. *Id.* ¶ 63; Fahling Decl. Ex. 1 (Rolovich Religious Exemption Request Form submitted to HRS).

On October 6, 2021, HRS notified Chun that "WSU has engaged in a good faith review of the information submitted through written and/or oral communications, which support the accommodation request based on a sincerely held religious belief." ECF No. 23 at 26, Email from WSU's HRS to Mr. Chun and Ms. Anne McCoy re Nick Rolovich, *see also* FAC ¶¶ 64-65.

Given that HRS had already found Rolovich sincere and granted him a religious exemption, step one of the "two-step process"). *Id.* ¶ 61. As such, when HRS wrote Chun, it merely asked him to consider whether he believed Rolovich's accommodation request could be granted. *Id.* Chun responded to HRS stating that the athletics department could not accommodate Rolovich, *id.* ¶ 66, but Chun then interfered with WSU's stated "blind review" policy: he improperly added a third step to the two-step process, telling HRS that he did not believe that Rolovich's religious

beliefs were sincere, *id*. ¶ 67, an opinion that resulted in HRS "question[ing] the assertion that [Rolovich's] sincerely held religious beliefs are in conflict with the University's vaccine requirement." On those grounds, HRS denied his religious exemption. ECF No. 23 at 48 (Oct. 18, 2021, email from HRS to Rolovich notifying him that his religious exemption had been denied).

### F. WSU Confirms its Decisions through Rolovich's Administrative Appeal

As required under the contract, Rolovich appealed WSU's determination first to Chun and then to WSU President Schulz. FAC ¶ 5, Fahling Decl. Ex. 2 (Rolovich administrative appeals). On December 6, 2021, WSU President Kirk H. Schulz notified Rolovich that his "just cause" termination was final. ECF No. 23 at 62-64.

### STANDARD OF REVIEW

On a motion to dismiss, the Court must "accept the complaint's well-pleaded factual allegations as true and construe all inferences in the plaintiff's favor." *Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019). "It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *McDougal v. County of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991). The question for the Court is whether the "non-conclusory, factual content, and reasonable inferences from that content" are "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (cleaned up).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009). "It may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Starr v. Baca*, 652 F.3d

1202, 1215 (9th Cir. 2011) (cleaned up). A Rule 12(b)(6) motion will not be granted merely because plaintiff requests a remedy to which he or she is not entitled. "[I]t need not appear that the plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985). Thus, a complaint should not be dismissed because plaintiff relies on an incorrect or imperfectly stated legal theory if the facts alleged any legal theory. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11-12 (2014).[4]

"A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment. [However, a district court abuses its discretion when it takes] judicial notice of disputed matters of fact to support its ruling." *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001).

## ARGUMENT

### I.   Rolovich has adequately pled that WSU breached his employment contract.

WSU's assertion that it had "just cause" to terminate Rolovich, and therefore did not breach the contract, is not a matter to be resolved in a motion to dismiss. The only question that this Court must answer for this claim is whether Rolovich has pled sufficient facts to support his claim for breach of contract, breach of the implied

---

[4] To the extent the Court finds any aspect of the Complaint lacking, Plaintiff seeks leave to amend. Rule 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (cleaned up).

covenant of good faith and fair dealing, and violation of the Wrongful Withholding of Wages statute. Rolovich has done so.

### A. Whether Defendants had "just cause" to terminate Rolovich is a question of fact not amenable to a motion to dismiss.

Defendants claim that Rolovich's contract claim is amenable to a motion to dismiss because "[w]hether the undisputed facts of a particular case establish just cause is a question of law for the court." ECF No. 22 at 39 (quoting *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1228, 1242 (7th Cir. 1997)). *Crider* is contrary to Washington law. Under Washington law, "[i]n a wrongful termination case, whether an employer properly determined it had just cause for termination is a question for the trier of fact." *Bathke v. City of Ocean Shores*, No. C19-5338 BHS, 2020 WL 4816035, at *6 (W.D. Wash. Aug. 19, 2020) (quoting *Lund v. Grant County Public Hosp. Dist. No. 2*, 85 Wash. App. 223, 228-29 (1997)).

*Linden v. X2 Biosystems* does not state otherwise. *See* ECF No. 22 at 40 (citing *Linden v. X2 Biosystems*, No. C17-966 RSM, 2019 WL 13240852, at *3-4 (W.D. Wash. Jan 28, 2019)). That court granted a motion to dismiss because the plaintiffs' "allegations fail to show that Defendants' stated reason for termination—that Defendants lacked the funds to continue paying them—was not arrived at in good faith or was not a fair and honest reason" and failed to allege "that their terminations were arbitrary, capricious, or illegal." *Linden*, 2019 WL 13240852 at *3-4. Rolovich has alleged facts that, if proven, would show that Defendants terminated him illegally. *Linden* therefore does not apply.

**B. Rolovich has adequately pled his contract claims.**

From the foregoing facts, all facts alleged in the complaint, and the documents properly submitted by Defendants and Rolovich, the Court can reasonably infer that he has adequately pled the following contract claims, *any one of which* is adequate to defeat Defendants' motion:

**(1)** Defendants had a contractual duty to Rolovich, they breached that duty, and that breach proximately caused the plaintiff damage. *Nw. lndep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wash. App. 707, 712 (1995).

**(2)** The contract did not require Rolovich to receive a COVID vaccination because he was exempt under the Governor's Proclamation's plain terms: Rolovich was "not required to get vaccinated against COVID-19" because "the requirement to do so conflict[ed] with [his] sincerely held religious beliefs." *See* Fahling Decl. at 15-16 (quoting Governor's Proclamation 21-14.1).

**(3)** Defendants' actions to amend other coaches' contracts but not Rolovich's (FAC ¶¶ 21-23) indicates that Rolovich's contract did not require him to comply with the vaccination mandate. He was therefore unlawfully terminated with "just cause" for failing to comply with a condition that was not in his contract. *See Bordeaux v. Lion's Gate Entertainment, Inc.*, No. 2:22-cv-04244-SVW-PLA, 2022 WL 19076668 at *1, 8 (C.D. Cal. Dec. 28, 2022) (Defendants' "inclusion of a condition not contained in the original contract, a vaccine compliance mandate, could be considered a breach the agreement."); *see also Betchard-Clayton, Inc. v. King*, 41 Wash. App. 887, 890 (1985), *review denied*, 104 Wash. 2d 1027 (1985) ("the duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract [or] inject substantive terms into the parties'

contract"); *Badgett v. Security State Bank*, 116 Wash. 2d 563, 570 (1991) ("The duty to cooperate exists only in relation to performance of a specific contract term"); *United Fin. Cas. Co. v. Coleman*, 173 Wash. App. 463, 473 (2013) ("the law does not obligate a party to accept a material change in the terms of its contract" (cleaned up)).

(4) Though WSU and Chun treated Rolovich's termination as a "just cause" termination (depriving him of the liquidated damages he otherwise would have been entitled to under the contract), Defendants terminated him because of his sincere religious beliefs, thus violating his clearly established constitutional rights under the Free Exercise Clause of the First Amendment. *See Perez v. Zahara*, 332 Fed. Appx. 214, 215 (5th Cir. 2009); *see also Anspach v. Philadelphia, Dept. of Public Health*, 503 F.3d 256, 272 (3rd Cir. 2007) ("It is clear that governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion . . . is the evil prohibited by the Free Exercise Clause. The concept is a simple one. In essence, the state may not compel an individual to act contrary to his religious beliefs."); *Doster v. Kendall*, 54 F.4th 398, 418 (6th Cir. 2022) ("Because the Surgeon General has denied the appeals of most Plaintiffs, they face a choice between violating their religious beliefs by taking the vaccine or 'risking' a sanction by failing to follow an order.").

(5) WSU's breach resulted in violations of RCW 49.48, *et seq.,* and RCW 49.52, *et seq.* (Wrongful Withholding of Wages, *see* FAC ¶¶ 2, 34), by unlawfully terminating Rolovich for "just cause" to avoid paying him the wages owed if he had

been dismissed "without cause."[5] *See Dice v. City of Montesano*, 131 Wash. App. 675, 689 (2006) ("[T]he three months' salary due Dice constitutes 'wages' because it derives solely from Dice's employment contract with the City and the amount was calculated according to his employment earnings at the time of discharge.") (cleaned up).

Plaintiff has sufficiently pled facts supporting a claim for relief for a breach of contract claim, a breach of implied covenant of good faith and fair dealing, and a violation of Washington's Wrongful Withholding of Wages statute. Rolovich has plainly alleged that Defendants acted illegally in terminating him. Therefore, *Bathke* and *Lund* apply: "whether [Defendants] properly determined it had just cause for termination is a question for the trier of fact."

---

[5] Defendants did not file a Fed. R. Civ. P. 12(e) Motion for a More Definite Statement regarding Plaintiff's claims, including Plaintiffs claims under RCW 49.48, *et seq.,* and RCW 49.52, *et seq.*, *see* FAC ¶¶ 2, 34 (Wrongful Withholding of Wages). Defendants' unlawful "just cause" termination of Mr. Rolovich denied him his right to liquidated damages under the "without cause" provision of his contract with WSU. Liquidated damages constitute "wages" because they were derived solely from Mr. Rolovich's employment contract with WSU and the amount was calculated according to his employment earnings at the time of discharge. *See Dice*, 131 Wash. App. at 689.

**C. Rolovich has sufficiently pled that a sincere religious belief precluded him from complying with Defendants' mandate.**

There is no dispute that Rolovich did not receive a COVID vaccine. But *why* he did not get vaccinated is critical to his contract claims, as well as other his other claims addressed below. Rolovich has alleged that his sincere religious beliefs required him not to get the COVID vaccine.

Defendants spend several pages contending that Rolovich has not pled "any religious beliefs against vaccination." ECF No. 22 at 16-21. Defendants—state actors *subject to the First Amendment*—argue that Rolovich's alleged religious convictions *don't count*. They claim that Rolovich's Complaint, which cites the Catechism of the Catholic Church, fails to connect his stated religious objection to a "comprehensive system of beliefs about fundamental or ultimate matters." *Id*. at 19 (quoting *Fallon v. Mercy Catholic Medical Center*, 877 F.3d 487, 492 (3d Cir. 2017)). Defendants argue that Rolovich's objections are really rooted "in his own pseudo-scientific concerns." *Id*. at 16.

Delving into whether Rolovich's objections were religious or scientific *is* a sincerity inquiry. That is how the law understands it, and that is how Defendants understand it. *See* ECF No. 23 at 33 (Chun argues to HRS that Rolovich's statement that "his decision not to be vaccinated was based on the conclusions he reached following his own research" "cast[s] doubt on his claimed sincerely held religious belief."). Likewise, arguing that Rolovich's objections *weren't really* religious because of when he filed his exemption request (ECF No. 22 at 7, 31) *is* a sincerity inquiry—in other words, a *quintessential* factual inquiry. As such, these intrinsically *factual* arguments cannot be considered in a motion to dismiss.

It is worth briefly noting, however, that Defendants' arguments misunderstand how religious convictions are formed. Just as the plaintiff's religious objections in *Thomas v. Review Board* depended on his understanding of the potential uses of steel sheets and steel tank turrets, 450 U.S. 707, 710 (1981), Rolovich's religious objections depended on his assessment of factual matters, including those referenced in Defendants' motion.

For purposes of the present motion, it is enough that Rolovich has pled that his religious beliefs are sincere. FAC ¶¶ 24-29. *See Wolcott v. Bd. of Rabbis of N. & S. California*, 738 F. App'x 538, 539 (9th Cir. 2018) (reversing district court dismissal based on failure to allege sincerely held religious belief).

## II. Rolovich has adequately pled under § 1983 that Chun violated his First Amendment right to free exercise and Fourteenth Amendment right to procedural due process.

As noted above, Rolovich is asserting § 1983 claims only against Chun. As shown here, the alleged facts permit reasonable inferences that Chun violated Rolovich's free exercise and due process rights. From these alleged facts it can be reasonably inferred that Chun is not entitled to qualified immunity. It is settled that

> [R]espondeat superior case law establishes that an employee taking an act within the scope of their government employment is an act of the governmental entity. Therefore, acts within the scope of employment are done within one's official capacity whether one is sued in their individual or official capacity.

*Hanson v. Carmona,* 525 P.3d 940, 943 (Wash. 2023) (en banc).

### A. Under the pled allegations, Chun violated Rolovich's clearly-established free exercise rights.

From the summation provided in the factual background section above, and more broadly from the facts alleged in the FAC and other documents incorporated into the

Complaint by reference, the Court can reasonably infer the following: (a) if (as alleged) WSU and Chun attempted to coerce and compel Rolovich to get vaccinated, and (b) WSU then terminated him (as alleged) as a because of his religious beliefs, (c) then WSU and Chun violated Rolovich's clearly established constitutional rights under the Free Exercise Clause of the First Amendment. At least since 1947, the law protecting the free exercise of religion has been clearly established: "[n]o person can be punished for entertaining or professing religious beliefs or disbeliefs." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15–16 (1947). This constitutional right is also well established in the government employment context. *Perez,* 332 Fed. Appx. at 215 (affirming district court's denial of qualified immunity at summary judgment stage: "if Defendants terminated him because of his religious beliefs—then Defendants would have violated [plaintiff's] clearly established constitutional rights under the Free Exercise Clause of the First Amendment.") (citing *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961)); *Sagendorf–Teal v. Cnty. of Rensselaer*, 100 F.3d 270, 276 (2d Cir. 1996) (rejecting defendant's qualified immunity defense because "[t]he right to be free of adverse employment action by a public employer for the exercise of First Amendment rights was firmly established prior to the discharge in this case.").

### B. Under the pled allegations, Chun violated Rolovich's clearly-established due process rights by unlawfully depriving him of his property interest in his contract's liquidated damages provision.

The Fourteenth Amendment to the U.S. Constitution prohibits government from depriving people of liberty or property without procedural due process. One aspect of this constitutional right is that government cannot terminate employees who have a "for cause" provision in their employment contracts except through the reasoned

application of a rule of law, something that requires that the decision be made by a neutral decisionmaker. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion).

Chun's disruption and violation of WSU's blind review process constituted a violation of procedural due process. *Jones v. Bd. of Governors of Univ. of N.C.*, 704 F.2d 713, 717 (4th Cir. 1983) ("while the source of procedural guarantees is found solely in the due process clause, it is well recognized that significant departures from state procedures may evince procedural due process violations."). Also, Rolovich clearly had an entitlement to, and a property interest in, the liquidated damages he would have received if he had been terminated "without cause." The "[k]ey to a property interest determination is whether the person alleging a due process violation has an entitlement to the benefit at issue, conferred through statute, regulation, contract, or established practice." *Armstrong v. Reynolds*, 22 F.4th 1058, 1067 (9th Cir. 2022).

"In general, a law establishes a property interest in employment if it restricts the grounds on which an employee may be discharged." *Armstrong*, 22 F.4th at 1068 (cleaned up). Here, Rolovich's contract specified what counted as "just cause." Rolovich has alleged that his contract—unlike other coaches—was not amended to make following health directives a condition of employment. FAC ¶¶ 21-23. Nor is it conceivable that government could have "just cause" to terminate an employee with a sincere religious objection to a new demand placed on him. *See also Peters v. Univ. of Pittsburgh*, No. 2:18-cv-732, 2019 U.S. Dist. LEXIS 1318, at *12 (W.D. Pa. Jan. 4, 2019) (the "University was alleged to have terminated plaintiff for just cause. Those allegations are sufficient to state a deprivation of a property interest for

purposes of a procedural due process claim. . .[and] it may be reasonably inferred that plaintiff was terminated pursuant to the just-cause clause, which confers a property interest to plaintiff in his employment, and not the unilateral-termination clause, which allows termination without just cause accompanied by payments of liquidated damages."); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538-39 (1985) (recognizing a property right created by a for-cause termination provision).

### C. Chun's actions toward Rolovich also violated the unconstitutional conditions doctrine.

Rolovich has pled that Chun persistently threatened him with termination for "just cause," relentlessly attacked Rolovich's religious beliefs, and told him with certainty any request for religious exemption would be denied before Chun knew under what standards the exemption would be provided. Rolovich has pled that Chun did this to coerce him into getting a vaccine. It can be inferred from these allegations that yielding to the vaccine requirement created a hostile work environment and unconstitutional conditions burdening his First and Fourteenth Amendment rights. These coercive actions provide further evidence of the free exercise and due process violations outlined above.

The unconditional conditions doctrine "forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them" *Koontz v. St. Johns River Water Mgmt. Dist*., 570 U.S. 595, 606 (2013). *See also Memorial Hosp. v. Maricopa Cty*., 415 U.S. 250 (1974) ("[an] overarching principle, known as the unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up"). Moreover, there is a constitutionally protected liberty interest in refusing

unwanted medical treatment. *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 278 (1990); *see also, Washington v. Harper,* 494 U.S. 210, 229 (1990) (A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]").

### III. Rolovich has adequately pled that Defendants violated his rights under Title VII and WLAD.

#### A. Rolovich has adequately pled a failure-to-accommodate claim.

The parties agree that to state a claim under Title VII and WLAD, Rolovich must plausibly allege he had a sincere religious belief that conflicted with Defendants' vaccine mandate. *See* ECF No. 22 at 22 (citing cases). As shown above, Rolovich has pled that he had a sincere religious belief that precluded him from complying with the Governor's and WSU's vaccine mandate. *See supra* § I.C. As such, he has adequately pled this claim.

#### B. "Undue hardship" is not a complete defense to a failure-to-accommodate claim."

Rolovich has pled that WSU could have safely accommodated him. FAC ¶¶ 65-86. But even if the Court could find based on the pleadings that accommodating Rolovich would have caused WSU an undue hardship, that would not—as Defendants claim—be a "complete defense." ECF No. 22 at 14. "[A]n employer cannot escape liability by showing that discrimination on a prohibited ground was not its sole motivation. So long as a prohibited ground was a motivating factor, the existence of other motivating factors does not defeat liability." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1775 (2020). "If the applicant actually requires an accommodation of that religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer

violates Title VII." *E.E.O.C. v. Abercrombie & Fitch*, 575 U.S. 768, 773-74 (2015). Furthermore, by August 16 Chun had already made up his mind that he was going to terminate Rolovich with "just cause" (FAC ¶¶ 34-35), clearly indicating that he had no intention of accommodating Rolovich's sincere religious beliefs. *See Phillips v. Collings*, 256 F.3d 843, 850-51 (8th Cir. 2001) ("[A]lthough [defendant] contends she did in fact accommodate [plaintiffs] religious beliefs, her recommendation that he be terminated because he requested 'not being assigned work that is counter to his religious' beliefs aptly reveals she had no intention of accommodating them.").

Here, Rolovich has alleged that Defendants demonstrated animus against Rolovich's religious beliefs and that that animus was a motivating factor in WSU's decision to overrule its own internal experts' finding that Rolovich could be safely accommodated. *See, e.g.*, FAC ¶ 65-67, 102-03, 106, 110, 114. Rolovich has thus sufficiently pled that Defendants' failure to accommodate his sincere religious beliefs violated his rights under Title VII and WLAD.

## CONCLUSION

For the reasons provided above, the WSU Defendants' motion to dismiss should be denied.

DATED this 12th day of April, 2023.

**LAW OFFICE OF BRIAN FAHLING**

By:_____/s/ Brian Fahling_____
    Brian Fahling WSBA #18894
    8124 NE 166th Street
    Kenmore, WA 98028
    Tele: 425.802.7326

**KNIFFIN LAW PLLC**

By:_____/s/ Eric Kniffin_____
    Eric Kniffin CO Bar # 48016
    102 S. Tejon Street, Suite 1100
    Colorado Springs, CO 80903
    Tele: 719-212-4391
    Email: eric@kniffin.law
    *Admitted pro hac vice*

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**

By:_____/s/ E. Job Seese_____
    E. Job Seese, CO Bar # 48379
    1601 19th Street, Suite 1000
    Tele: 303.623.9000
    Email: jseese@lewisroca.com
    Denver, CO 80202
    (303) 623-9000
    *Admitted pro hac vice*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of April, 2023, I electronically filed the forgoing RESPONSE IN OPPOSITION TO DEFENDANTS WSU'S AND CHUN'S MOTION TO DISMISS with the Clerk of Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that none of the represented parties are non-CM/ECF participants.

By:____/s/ Eric Kniffin_____
Eric Kniffin

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>                    Plaintiff,<br><br>v.<br><br>WASHINGTON STATE<br>UNIVERSITY, et al.,<br><br>                    Defendants. | NO.  2:22-CV-00319-TOR<br><br>WSU DEFENDANTS'<br>MOTION TO DISMISS<br><br>May 11, 2023<br>With Oral Argument: 11:00 a.m.<br>Spokane Courtroom 902 |

WSU DEFENDANTS' MOTION TO DISMISS
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

TABLE OF CONTENTS

I.    INTRODUCTION.......................................................................................... 1

II.   FACTS ........................................................................................................ 2

      A.   The COVID-19 Pandemic and Washington's Response.................... 3

      B.   The Delta Surge and Proclamation 21-14.......................................... 4

      C.   WSU's Implementation of the Proclamation...................................... 5

      D.   Rolovich Requests a Religious Exemption and Accommodation...... 6

      E.   The Department Determines It Cannot Accommodate Rolovich ...... 8

      F.   WSU Denies Rolovich's Request and Begins the Separation
           Process ............................................................................................. 10

      G.   WSU Denies Rolovich's Appeal and Terminates His Employment.. 11

      H.   Rolovich's Lawsuit .......................................................................... 12

III.  ARGUMENT ............................................................................................ 13

      A.   Legal Standard ................................................................................. 13

      B.   The Complaint Fails to State a Title VII Claim (Count IV)............... 14

           1.   Rolovich has no Title VII claim against Chun .......................... 14

           2.   The Complaint fails to state a Title VII claim against WSU ...... 14

      C.   The Complaint Fails to State a WLAD Claim (Count II) ................. 22

      D.   Rolovich's § 1983 Claims Must Be Dismissed (Counts V and VI)... 22

           1.   WSU cannot be sued under § 1983........................................... 23

           2.   Rolovich fails to state a § 1983 claim against Chun.................. 24

WSU DEFENDANTS' MOTION TO DISMISS - i
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

3.    Chun has qualified immunity .................................................... 26

E.    The Complaint Fails to State a Due Process Claim ........................... 35

F.    Rolovich Has No Claim Under the State Constitution (Count III) .... 38

G.    Rolovich's Contract Claims Must Be Dismissed (Count I) ............... 38

IV.    CONCLUSION ....................................................................... 40

WSU DEFENDANTS' MOTION TO DISMISS - ii
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

TABLE OF AUTHORITIES

**Federal Cases**

*Addison v. Amazon.com, Inc.*
  No. CV 22-01071 (FLW), 2022 WL 2816946 (D.N.J. July 19, 2022)...............18

*Africa v. Pennsylvania*
  662 F.2d 1025 (3d Cir. 1981) .................................................................20

*Akers v. Brookdale Univ. Hosp. & Med. Ctr.*
  No. CV06-00350(3MC)(VVP), 2006 WL 2355842 (E.D.N.Y. Aug. 15,
  2006) .........................................................................................................40

*Alvarado v. City of San Jose*
  94 F.3d 1223 (9th Cir. 1996) .................................................................18

*Ansonia Bd. of Educ. v. Philbrook*
  479 U.S. 60 (1986) ..................................................................................14

*Ashcroft v. al-Kidd*
  563 U.S. 731 (2011) ................................................................................32

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ........................................................ 13, 23, 28, 29

*Aukamp-Corcoran v. Lancaster Gen. Hosp.*
  No. CV 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022)............................31

*Bacon v. Woodward*
  No. 2:21-CV-0296-TOR, 2021 WL 5183059 (E.D. Wash. Nov. 8, 2021)..........29

*Balint v. Carson City*
  180 F.3d 1047 (9th Cir. 1999) ...............................................................14

*Bartlett v. N.Y. State Bd. of Law Examiners*
  970 F. Supp. 1094 (S.D.N.Y. 1997) .......................................................36

*Black v. Grant Cnty. Pub. Util. Dist.*
  No. 2:17-CV-365-RMP, 2019 WL 2617236  (E.D. Wash. June 26, 2019).........22

WSU DEFENDANTS' MOTION TO
DISMISS - iii
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Blackwell v. Lehigh Valley Health Network*
  No. 5:22-CV-03360-JMG, 2023 WL 362392 (E.D. Pa. Jan. 23, 2023)........ 20, 21

*Brox v. Woods Hole, Martha's Vineyard & Nantucket Steamship Auth.*
  590 F. Supp. 3d 359 (D. Mass. 2022)...................................................................15

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*
  508 U.S. 520 (1993) ...........................................................................................28

*Church v. Biden*
  No. CV 21-2815 (CKK), 2022 WL 1491100 (D.D.C. May 11, 2022) ..................3

*City & Cnty. of S.F. v. Sheehan*
  575 U.S. 600 (2015) ...........................................................................................26

*City of Oklahoma City v. Tuttle*
  471 U.S. 808 (1985) ...........................................................................................23

*Cloutier v. Costco Wholesale Corp.*
  390 F.3d 126 (1st Cir. 2004) ..............................................................................16

*Comfort & Fleming Ins. Brokers, Inc. v. Hoxsey*
  613 P.2d 138, 141 (Wash. Ct. App. 1980) ..........................................................40

*Conservation Force v. Salazar*
  646 F.3d 1240 (9th Cir. 2011)............................................................................13

*Cousins v. Lockyer*
  568 F.3d 1063 (9th Cir. 2009)............................................................................30

*Crayon v. Asuncion*
  No. CV 20-0192-JFW (AS), 2020 WL 4904866 (C.D. Cal. June 26, 2020).......21

*Crider v. Spectrulite Consortium, Inc.*
  130 F.3d 1238 (7th Cir. 1997)............................................................................39

*D'Cunha v. Northwell Health Sys.*
  No. 1:22-CV-0988 (MKV), 2023 WL 2266520 (S.D.N.Y. Feb. 28, 2023).........15

*Davis v. Scherer*
  468 U.S. 183 (1984) ...........................................................................................30

WSU DEFENDANTS' MOTION TO DISMISS - iv
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Davis Wire Corp. v. Teamsters Loc. Union No. 117*
  152 F. Supp. 3d 1326 (W.D. Wash. 2015) ...........................................................39

*Doe v. San Diego Unified Sch. Dist.*
  19 F.4th 1173 (9th Cir. 2021) ............................................................................33

*Does 1-2 v. Hochul*
  --- F. Supp. 3d ----, No. 21-CV-5067(AMD) (TAM), 2022 WL 4637843
  (E.D.N.Y. Sept. 30, 2022) ..................................................................................15

*Does 1-6 v. Mills*
  16 F.4th 20 (1st Cir. 2021) ............................................................................. 4, 15

*Egelkrout v. Aspirus, Inc.*
  No. 22-CV-118-BBC, 2022 WL 2833961 (W.D. Wis. July 20, 2022)................21

*Emp't Div., Dep't of Hum. Res. of Or. v. Smith*
  494 U.S. 872 (1990) ...........................................................................................19

*Engle v. Isaac*
  456 U.S. 107 (1982) ...........................................................................................38

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*
  877 F.3d 487 (3d Cir. 2017) ......................................................................... 18, 19

*Felarca v. Birgeneau*
  891 F.3d 809 (9th Cir. 2018)..............................................................................32

*Florida v. Dep't of Health & Hum. Servs.*
  19 F.4th 1271 (11th Cir. 2021)............................................................................3

*Gamble v. Pac. NW Reg'l Council of Carps.*
  No. 2:14-cv-455RSM, 2015 WL 402782 (W.D. Wash. Jan. 29, 2015)...............13

*Groff v. DeJoy*
  143 S. Ct. 646 (2023) .........................................................................................14

*Grubbs v. Arizona*
  No. CV-20-02369-PHX-DJH, 2021 WL 4552419 (D. Ariz. Oct. 5, 2021).........16

*Harlow v. Fitzgerald*
  457 U.S. 800 (1982) ...........................................................................................26

WSU DEFENDANTS' MOTION TO DISMISS - v
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Hightower v. City & Cnty. of S.F.*
  No. C-12-5841 EMC, 2013 WL 361115 (N.D. Cal. Jan. 29, 2013) ....................13

*Hunter v. Sup. Ct. of N.J.*
  951 F. Supp. 1161 (D.N.J. 1996)..........................................................................30

*Jacobs v. Clark Cnty. School Dist.*
  526 F.3d 419 (9th Cir. 2008)................................................................................38

*Kane v. de Blasio*
  --- F. Supp. 3d ----, No. 21 CIV. 7863 (NRB), 2022 WL 3701183
  (S.D.N.Y. Aug. 26, 2022).....................................................................................15

*King v. Cnty. of L.A.*
  885 F.3d 548 (9th Cir. 2018)..................................................................................2

*Leake v. Raytheon Techs. Corp.*
  No. CV-22-00436-TUC-RM, 2023 WL 2242857 (D. Ariz. Feb. 27, 2023)........18

*Lilly v. Univ. of Cal.-San Diego*
  No. 21-CV-1703 TWR (MSB), 2022 WL 11337682 (S.D. Cal. Oct. 19,
  2022) ....................................................................................................................27

*Linden v. X2 Biosystems, Inc.*
  No. C17-966 RSM, 2019 WL 13240852 (W.D. Wash. Jan. 25, 2019) ..............40

*Love v. N.J. Dep't of Corr.*
  No. CIV.A. 10-1714 (GEB), 2011 WL 345964 (D.N.J. Jan. 31, 2011) ..............21

*Lowe v. Mills*
  No. 1:21-CV-00242-JDL, 2022 WL 3542187 (D. Me. Aug. 18, 2022) ..............15

*LSO, Ltd. v. Stroh*
  205 F.3d 1146 (9th Cir. 2000)..............................................................................26

*Magden v. Easterday Farms*
  No. 2:16-CV-00068-JLQ, 2017 WL 1731705 (E.D. Wash. May 3, 2017)..........14

*Mass. Corr. Officers Federated Union v. Baker*
  567 F. Supp. 3d 315 (D. Mass. 2021).....................................................................4

*Miller v. Maxwell's Int'l Inc.*
  991 F.2d 583 (9th Cir. 1993).................................................................................14

WSU DEFENDANTS' MOTION TO DISMISS - vi
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Monaco v. Liberty Life Assur. Co.*
  No. C06-07021 MJJ, 2007 WL 420139 (N.D. Cal. Feb. 6, 2007) ........................39

*O'Hailpin v. Hawaiian Airlines, Inc.*
  583 F. Supp. 3d 1294 (D. Haw. 2022) ...................................................................15

*Pearson v. Callahan*
  555 U.S. 223 (2009) .............................................................................. 26, 27

*Pedreira v. Ky. Baptist Homes for Child., Inc.*
  579 F.3d 722 (6th Cir. 2009) ................................................................................17

*Peterson v. Hewlett-Packard Co.*
  358 F.3d 599 (9th Cir. 2004) ................................................................................16

*Reynaga Hernandez v. Skinner*
  969 F.3d 930 (9th Cir. 2020) ................................................................................23

*S. Cal. Gas Co. v. City of Santa Ana*
  336 F.3d 885 (9th Cir. 2003) ................................................................................23

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*
  44 F.4th 867 (9th Cir. 2022) .................................................................................32

*Shafer v. Cnty. of Santa Barbara*
  868 F.3d 1110 (9th Cir. 2017) ..............................................................................32

*Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*
  4 F.4th 747 (9th Cir. 2021) .....................................................................................3

*Sprewell v. Golden State Warriors*
  266 F.3d 979 (9th Cir. 2001) ................................................................................26

*Stamm v. N.Y.C. Transit Auth.*
  No. 04-CV-2163 (SLT), 2006 WL 1027142 (E.D.N.Y. Feb. 7, 2006) ...............37

*Steckman v. Hart Brewing, Inc.*
  143 F.3d 1293 (9th Cir. 1998) ..............................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  551 U.S. 308 (2007) ................................................................................. 2, 13

WSU DEFENDANTS' MOTION TO
DISMISS - vii
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Together Employees v. Mass Gen. Brigham Inc.*
 573 F. Supp. 3d 412 (D. Mass. 2021)....................................................................16

*Trans World Airlines, Inc. v. Hardison*
 432 U.S. 63 (1977) ...............................................................................................14

*Turner v. Ass'n of Apt. Owners of Wailea Point Vill.*
 739 F. App'x 874 (9th Cir. 2018).........................................................................17

*United States v. Seeger*
 380 U.S. 163 (1965) .............................................................................................19

*Walker v. Newsom*
 No. 2:20-cv-2243 TLN AC P, 2022 WL 1190458 (E.D. Cal. Apr. 21,
 2022)......................................................................................................................37

*We the Patriots USA, Inc. v. Hochul*
 17 F.4th 266, *opinion clarified*, 17 F.4th 368 (2d Cir. 2021)...............................15

*Wise v. Inslee*
 No. 2:21-CV-0288-TOR, 2021 WL 4951571 (E.D. Wash. Oct. 25, 2021)...........5

*Wise v. Inslee*
 No. 2:21-CV-0288-TOR, 2022 WL 1243662 (E.D. Wash. Apr. 27, 2022). 28, 33,
 37

**State Cases**

*Baldwin v. Sisters of Providence in Wash., Inc.*
 769 P.2d 298 (Wash. 1989) ..................................................................................39

*Blinka v. Wash. State Bar Ass'n*
 36 P.3d 1094 (Wash. Ct. App. 2001) ....................................................................38

*Casper v. Securitas Sec. Servs. USA*
 No. 57235-1-I, 2007 WL 809933 (Wash. Ct. App. Mar. 19, 2007)
 (unpublished)........................................................................................................39

*Kumar v. Gate Gourmet, Inc.*
 325 P.3d 193 (Wash. 2014)...................................................................................22

*Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*
 899 P.2d 6 (Wash. Ct. App. 1995) ........................................................................38

WSU DEFENDANTS' MOTION TO
DISMISS - viii
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Reynolds v. Pierce Transit*
No. 18881-3-II, 1996 WL 533602 (Wash. Ct. App. Sept. 20, 1996)...................40

**Federal Statutes**

42 U.S.C. § 1983 ................................................................... 2, 12, 22, 23

Title VII, 42 U.S.C. § 2000e .......................................................... 2, 14

**State Statutes**

RCW ch. 49.60 ...................................................................................2

**Federal Rules**

Fed. R. Civ. P. 12(b)(6)................................................................. 2, 13

Fed. R. Civ. P. 8(a)(2) .................................................................. 19, 21

Fed. R. Evid. 201 ...............................................................................2

**Other Authorities**

U.S. Centers for Disease Control and Prevention, COVID Data Tracker,
http://bit.ly/3LadJ5s................................................................3

U.S. Centers for Disease Control and Prevention, *Monitoring Incidence of
COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status —
13 U.S. Jurisdictions, April 4–July 17, 2021* (Sept.
17, 2021), http://bit.ly/3YQ9tMM.........................................4

U.S. Centers for Disease Control and Prevention, *Overview of COVID-19
Vaccines* (Nov. 1, 2022), http://bit.ly/3FdTjVv .......................4

U.S. Food and Drug Administration, *FDA Authorizes Booster Dose of
Pfizer-BioNTech COVID-19 Vaccine for Certain Populations* (Sept. 22,
2021), http://bit.ly/3l2nEiY ....................................................3

U.S. Food and Drug Administration, *FDA Authorizes Pfizer-BioNTech
COVID-19 Vaccine for Emergency Use in Children 5 through 11 Years of
Age* (Oct. 29, 2021), http://bit.ly/3ZSWgmb.........................3

WSU DEFENDANTS' MOTION TO DISMISS - ix
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

U.S. Food and Drug Administration, *Janssen COVID-19 Vaccine* (May 11, 2022), http://bit.ly/3l3SnvW ................................................................................3

Washington State Department of Health, *COVID-19 Data Dashboard* ...............3, 4

**Constitutional Provisions**

Wash. Const. art. 1, § 11 .............................................................. 2, 12, 38

WSU DEFENDANTS' MOTION TO DISMISS - x
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## I.    INTRODUCTION

This is the rare case in which the plaintiff accuses his employer of discriminating against him based on his religious beliefs but, instead of identifying any truly *religious* beliefs, his complaint invokes junk science, conspiracy theories, and other purely secular opinions to explain his opposition to the COVID-19 vaccines. Plaintiff Nicholas Rolovich was the head football coach at Defendant Washington State University (WSU or the University) until December 2021. At that time, an emergency gubernatorial proclamation required state employees to be fully vaccinated against COVID-19, unless they qualified for a medical or religious exemption that could be reasonably accommodated. Throughout the spring and summer of 2021, Rolovich consistently and publicly expressed his refusal to get vaccinated. But he never claimed a *religious* reason for his refusal until he applied for a religious exemption and accommodation less than one week before the deadline. WSU denied Rolovich's request, determining that it could not accommodate him without experiencing an undue hardship. WSU also questioned whether he had sincerely held religious beliefs precluding compliance with the vaccine requirement. WSU then terminated Rolovich's employment for just cause.

Rolovich now claims that Defendants WSU, its Athletics Director Patrick Chun (together, the WSU Defendants), and Governor Jay Inslee discriminated against him on the basis of his religious beliefs. Yet his First Amended Complaint (FAC or Complaint) fails to even generally describe the nature of those beliefs.[1] For that reason, and because accommodating Rolovich would have imposed an undue

---

[1] The Complaint is appended to the Notice of Removal. ECF No. 1-1 at 73–104.

WSU DEFENDANTS' MOTION TO DISMISS - 1
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

hardship on WSU, the Complaint fails to state a claims under Title VII, 42 U.S.C. § 2000e, or the Washington Law Against Discrimination, RCW ch. 49.60 (WLAD).

Rolovich's other claims are also deficient. His claims under 42 U.S.C. § 1983—alleging violations of the Free Exercise Clause and Due Process Clause—fail for a variety of reasons, including because WSU is not a "person" that may be sued under § 1983 and because Rolovich fails to allege unconstitutional conduct by Chun individually, who in any event has qualified immunity. Rolovich's amorphous due process claim fails because he has not plausibly alleged a deprivation of a liberty or property interest or that he received constitutionally inadequate process. Rolovich has no viable claim under article I, section 11 of the Washington Constitution, which does not allow a private right of action for damages based on constitutional violations. Finally, Rolovich's breach of contract claims must be dismissed because Chun is not a party to Rolovich's employment agreement and WSU had "just cause" to discharge Rolovich because (among other reasons) he did not meet a legal requirement of continued employment. For those reasons, the Court should dismiss the Complaint with prejudice.

## II.   FACTS

This factual summary is based on the Complaint, documents it references, and judicially noticeable facts. *See* Fed. R. Civ. P. 12(b)(6); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The WSU Defendants ask the Court to take judicial notice of the government records and data cited herein—including from the U.S. Food and Drug Administration (FDA), the U.S. Centers for Disease Control and Prevention (CDC), and the Washington State Department of Health (DOH). *See* Fed. R. Evid. 201; *King v. Cnty. of L.A.*, 885 F.3d 548, 555 (9th Cir. 2018).

WSU DEFENDANTS' MOTION TO DISMISS - 2
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**A.  The COVID-19 Pandemic and Washington's Response**

In response to the pandemic, "[g]overnments at all levels instituted restrictions to curb the transmission of the virus." *Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*, 4 F.4th 747, 752 (9th Cir. 2021). Even with those restrictions, COVID-19 has killed over 1.1 million Americans—including over 15,500 Washingtonians[2]— making it the "deadliest disease in American history." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1275 (11th Cir. 2021) (cleaned up).

On February 29, 2020, amidst the initial COVID-19 outbreak in Washington, Governor Inslee proclaimed a state of emergency. *Slidewaters*,  4 F.4th at 752; Procl. 20-05. Between December 2020 and February 2021, the FDA issued Emergency Use Authorizations ("EUAs") for three COVID-19 vaccines developed by Pfizer, Moderna, and Johnson & Johnson ("J&J").[3] FDA gave full approval to Pfizer's vaccine for people 16 and older on August 23, 2021, and to Moderna's for people 18 and older on January 31, 2022. *Church v. Biden*, No. CV 21-2815 (CKK), 2022 WL 1491100, at *2 (D.D.C. May 11, 2022). The CDC considers the vaccines to be

[2] CDC, COVID Data Tracker, http://bit.ly/3LadJ5s (last visit Mar. 12, 2023); DOH, *COVID-19 Data Dashboard*, Disease Activity and Testing, https://bit.ly/3AKV0Gq (last update Mar. 8, 2023).

[3] FDA, *FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 through 11 Years of Age* (Oct. 29, 2021), http://bit.ly/3ZSWgmb; FDA, *Janssen COVID-19 Vaccine* (May 11, 2022), http://bit.ly/3l3SnvW; FDA, *FDA Authorizes Booster Dose of Pfizer-BioNTech COVID-19 Vaccine for Certain Populations* (Sept. 22, 2021), http://bit.ly/3l2nEiY.

WSU DEFENDANTS' MOTION TO DISMISS - 3
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

safe and effective in reducing the risk of severe illness or death due to COVID-19.[4]

**B.  The Delta Surge and Proclamation 21-14**

In summer 2021, the "Delta variant" emerged—a new, highly infectious COVID-19 strain. *See Does 1-6 v. Mills*, 16 F.4th 20, 26–27 (1st Cir. 2021). Twice as infectious as earlier variants, *id.*, Delta spread like wildfire, causing Washington's daily case count to jump from a low of 329 on June 28 to 4,449 on September 7, 2021.[5] While "no vaccine is 100% effective," the COVID-19 vaccines proved highly effective at preventing the virus's spread and severe disease—particularly with the Delta variant. *Mass. Corr. Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 319–20 (D. Mass. 2021). According to a September 2021 CDC report (when Delta was dominant), unvaccinated people were 5 times more likely to contract, 10 times more likely to be hospitalized with, and 11 times more likely to die from COVID-19 than fully vaccinated people.[6] Despite such stark disparities, the Delta surge coincided with a steady decline in vaccination rates.[7] In August 2021, nearly 30% of eligible Washingtonians were unvaccinated. Procl. 21-14 at 2.

On August 9, 2021, Governor Inslee issued Proclamation 21-14 (together with subsequent iterations, the Proclamation), prohibiting healthcare providers and most

---

[4] CDC, *Overview of COVID-19 Vaccines* (Nov. 1, 2022), http://bit.ly/3FdTjVv.

[5] DOH, *COVID-19 Data Dashboard*, Disease Activity and Testing, *supra* note 2.

[6] CDC, *Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status — 13 U.S. Jurisdictions, April 4–July 17, 2021* (Sept. 17, 2021), http://bit.ly/3YQ9tMM.

[7] DOH, *COVID-19 Data Dashboard*, Vaccinations, *supra* note 2.

WSU DEFENDANTS' MOTION TO DISMISS - 4
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

state employees from working after October 18, 2021, without being fully vaccinated against COVID-19, *i.e.*, at least two weeks post-final dose. Procl. 21-14.[8] When it took effect, the Proclamation applied to at least 681,000 workers across the three covered sectors—state government, health care, and education. *Wise v. Inslee*, No. 2:21-CV-0288-TOR, 2021 WL 4951571, at *1 (E.D. Wash. Oct. 25, 2021). The Proclamation required covered employers to evaluate requests for medical and religious exemptions and provide reasonable accommodations as required by state and federal antidiscrimination statutes. Procl. 21-14.2 at 5–6. Covered employers had to "conduct[] an individualized assessment and determination of each individual's need and justification for an accommodation." *Id.* at 6. And covered employers were "prohibited from providing accommodations" if "based on false, misleading, or dishonest grounds or information" or "the personal preference of the individual," rather than "an inability to get vaccinated because of a disability or a conflict with a sincerely held religious belief, practice, or observance." *Id.*

### C.  WSU's Implementation of the Proclamation

Before the Governor issued the Proclamation, WSU's COVID-19 vaccine policy had allowed employees to claim an exemption merely by asserting they had a medical reason or "personal/religious" objection. FAC ¶ 33. The Proclamation superseded this policy by providing no exemption for "personal" reasons beyond sincerely held religious beliefs. Declaration of Zachary J. Pekelis (Pekelis Decl.),

---

[8] *See* Office of Gov. Jay Inslee, Proclamations, https://www.governor.wa.gov/office-governor/official-actions/proclamations (last visit Mar. 15, 2023).

WSU DEFENDANTS' MOTION TO DISMISS - 5
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Ex. A.[9] To implement the Proclamation, WSU instructed employees to provide proof of vaccination or request an exemption by October 4, 2021, the last day to get the final dose to be considered fully vaccinated by the October 18 deadline. *Id.*

The University evaluated requests for religious exemptions and accommodations in a two-step process. FAC ¶ 61. First, a committee of staff from WSU Human Resources Services (HRS) and the Office of Civil Rights and Compliance reviewed the exemption request to determine whether it was based on a "sincerely held religious belief." FAC ¶¶ 60–61; Pekelis Decl., Ex. B. That first step was generally "blind"—i.e., "the identities of the individuals requesting exemptions are unknown to the members of the review committee"—unless "additional information is needed through follow-up contact." Pekelis Decl., Ex. B at 20. The second step was a "separate accommodation review." *Id.* at 21. That step determined "whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community." *Id.* The ultimate accommodation decision was left to each employee's assigned department. *Id.*, Ex. C; FAC ¶ 62.

**D.  Rolovich Requests a Religious Exemption and Accommodation**

In January 2020, WSU hired Rolovich as its head football coach. FAC ¶ 11. In May 2021, Rolovich informed Chun that he did not plan to become vaccinated against COVID-19. *Id.* ¶ 31. Rolovich claims to have had multiple "reasons for refusing to receive a COVID vaccine"—"religious, personal, and scientific." *Id.* ¶ 30. Yet the Complaint grounds Rolovich's refusal in pseudo-scientific

---

[9] The Complaint incorporates Exhibits A through K to the Pekelis Declaration by reference. *See* FAC ¶¶ 5, 60 & n.4, 61 & n.5, 62–70, 91–93; Pekelis Decl. ¶¶ 3–13.

WSU DEFENDANTS' MOTION TO DISMISS - 6
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

arguments. *See, e.g.*, *id.* ¶ 57 (citing his concerns with "potential risks" in taking what he calls an "experimental vaccine"); *id.* ¶¶ 50–56 (suggesting that Pfizer vaccine approved by FDA is biologically distinct from Pfizer vaccine authorized for emergency use). In contrast, the Complaint contains strikingly few (and vague) references to Rolovich's religious beliefs. He cryptically alleges that, at some point during "summer of 2021," he "discerned that it would violate his conscience to receive any available COVID-19 vaccine," and that, as a "practicing Catholic," he is "morally obliged to obey his conscience." *Id.* ¶¶ 24, 25, 28. But the Complaint nowhere explains how Rolovich's religious beliefs actually prevented him from being vaccinated against COVID-19.

Rolovich never mentioned a religious objection to WSU before August 19, 2021, when he first asked Chun and Deputy Athletics Director Bryan Blair about WSU's religious exemption process. *Id.* ¶ 41. Rolovich does not allege that he told Chun and Blair the nature of any supposed religious objection at that August 19 meeting (or at any point thereafter). On September 28—over a month after the August 19 meeting and just six days before the October 4 deadline—Rolovich finally sent a request for a religious exemption and accommodation to HRS. *Id.* ¶ 63.

The first-step panel determined that, based only on its blind review of Rolovich's request form, he had stated a "sincerely held religious belief" preventing him from being vaccinated against COVID-19. *Id.* ¶ 64. HRS notified Chun in an email on October 6, 2022, instructing the Athletics Department (the Department) "to determine if the employee is able to perform essential functions of the position and meet the COVID-19 safety measures consistent with the recommendations of the state and protect the health and safety of the WSU community." Pekelis Decl., Ex.

WSU DEFENDANTS' MOTION TO DISMISS - 7
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

C at 25. HRS suggested various "terms and conditions" for potential accommodation, such as requiring Rolovich to mask and "distance from others on WSU property." *Id.* HRS asked Chun to "contact the HRS Exemptions team . . . to let us know" if "[y]ou have no concern with this request," "[i]f you are **NOT** able to accommodate this request with the above recommendations," or "[i]f you have any questions or would like to meet to discuss further." *Id.* at 26.

### E. The Department Determines It Cannot Accommodate Rolovich

On October 13, 2021, the Department submitted two memos to HRS. FAC ¶¶ 66–67; Pekelis Decl., Exs. D–E. The first memo concluded that, by remaining unvaccinated—regardless of the reason—Rolovich "would not be able to perform the essential functions of his job" with the suggested accommodations, as it "would create an undue hardship on the . . . Department and WSU as a whole." Pekelis Decl., Ex. D at 28. The memo noted that his "[c]oaching duties require close contact with student-athletes as well as other Department personnel and the public." *Id.* at 30. Without being vaccinated, Rolovich was unable to safely (or legally) perform many of the head football coach's core duties at that point in the pandemic, such as to (1) "recruit at a Pac-12 level due to restrictions placed on unvaccinated visitors by various states, counties and school districts"; (2) "entertain official recruit visitors to WSU's campus while masked and social distanced"; (3) "attend[] individual position meetings"; (4) "safely engage one-on-one with players or assistant coaches"; and (5) "fulfill media and fundraising obligations," such as the "Pac-12 Football Media Day in Los Angeles," the "WSU Football Coaches Show," "pep rallies," and "live donor meetings." *Id.* at 28–30. The Department also expressed "concerns regarding [Rolovich's] ability to comply with" a face-covering requirement, noting that he had

WSU DEFENDANTS' MOTION TO DISMISS - 8
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"frequently removed [his] mask to coach" while players and other coaches were "in close proximity." *Id.* at 30.

The second memo countered HRS's "initial conclusion that Rolovich . . . demonstrate[d] a sincerely held religious belief against being vaccinated for COVID-19." *Id.*, Ex. E at 32. The Department noted that Rolovich had repeatedly "made it clear to Pat Chun . . . and many [others] . . . that he was unwilling to take the vaccine based on his independent research," which led Rolovich to conclude that the vaccine was "not safe" and "would negatively impact his mortality." *Id.* Rolovich had also "been vocal and consistent in his opinions and skepticisms about the COVID-19 virus and the full nature of the public health emergency," asserting that the "government[,] and therefore the vaccine[,] could not be trusted." *Id.* It was only after the Proclamation—and after Rolovich "was unable to secure the necessary documentation" to support a "medical exemption"—that he first "mentioned religion in reference to seeking an exemption." *Id.* at 32–33. The Department recommended "re-evaluation of [Rolovich's] claimed sincerely held religious belief." *Id.* at 33.

To assist the Department in its accommodation decision, WSU Environmental Health & Safety ("EH&S") provided a memo assessing the "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with." Pekelis Decl., Ex. F at 35. EH&S's memo listed four pages of interventions, including maintaining at least six feet of distance when possible, wearing a mask in all WSU facilities and an N95 respirator whenever within six feet of others for longer than ten minutes, and renting additional buses or booking additional flights. *Id.* at 39–42. EH&S noted that its role was *not* to "determine whether these interventions and countermeasures fundamentally alter

WSU DEFENDANTS' MOTION TO DISMISS - 9
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

the employee's job and cannot be accommodated." *Id.* at 35.

The Department responded to EH&S that it "remained concerned that [Rolovich] cannot safely and effectively perform his assigned duties and that accommodation in these circumstances would create an undue hardship for WSU Athletics." *Id.*, Ex. G at 44. The Department observed that "[f]requent close physical proximity to and contact with others is an inherent part of coaching" and that social distancing is "exceedingly difficult on buses, and could require that a coach travel separately in between airports, hotels, and stadiums," which is "not practical" and "creates a financial burden." *Id.* Furthermore, "[a]lmost all recruiting travel is done via commercial flights"—where social distancing is impossible—and coaches "directly enter recruit homes, high schools or other training facilities." *Id.*

**F.  WSU Denies Rolovich's Request and Begins the Separation Process**

On October 18, 2021, HRS informed Rolovich by email that WSU had denied his request for an accommodation. FAC ¶ 90; Pekelis Decl., Ex. H at 47. The email stated: "[b]ased upon the nature of [the] head coaching responsibilities and core job functions and activities, the University has determined [Rolovich] cannot safely and effectively do [his] job without undue hardship to the University." Pekelis Decl., Ex. H at 47. HRS also noted that, due to Rolovich's "prior statements to WSU staff and others regarding vaccination" and "the timing of [his] request for a religious accommodation, the University questions the assertion that [his] sincerely held religious views conflict with the University's vaccine requirement." *Id.*

Under Rolovich's employment agreement (the Agreement), termination "without cause" entitled Rolovich to liquidated damages, while termination "for just cause" did not. ECF No. 1-1 at 43. The Agreement gives the term "Just Cause" its

WSU DEFENDANTS' MOTION TO DISMISS - 10
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"normally understood meaning in employment contracts." *Id.* at 41. It also lists various non-exclusive "examples," including "[a]ny act of misconduct by Employee, including . . . an act of dishonesty . . . [or] insubordination, or . . . endangering others"; "[a]n intentional or major violation . . . of any law, rule, [or] regulation . . . which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program"; and "Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program." *Id.* at 41–42.

In a meeting on October 18, 2021, Chun provided Rolovich with a "Written Notice of Intent to Terminate for Just Cause." FAC ¶ 93. The notice explained that Rolovich's "decision to forego a COVID-19 vaccination has impacted [his] ability" to perform his contractual duties for a variety of reasons, including his inability to attend fundraising and media events, limited engagement with players and assistant coaches, negative impact on recruiting, and "poor planning, lack of communication, and a void in leadership." Pekelis Decl., Ex. I at 51–52.

### G. WSU Denies Rolovich's Appeal and Terminates His Employment

Rolovich challenged Chun's decision through the process set out in the Agreement—first in a November 2, 2021, letter from his attorney to Chun, and then in an appeal to University President Kirk Schulz. FAC ¶ 5; Pekelis Decl., Exs. J–K. Both Chun and Schulz denied Rolovich's appeals. FAC ¶ 5. In Schulz's denial letter, he explained that because Rolovich had not been vaccinated against COVID-19 nor received an accommodation, under the Proclamation he was "no longer eligible to engage in work for the University"—a fact that, "by itself, provides just cause for termination under the Agreement." Pekelis Decl., Ex. K at 61–62. Schulz further found that Rolovich had "been limited in [his] ability to fully perform certain

WSU DEFENDANTS' MOTION TO DISMISS - 11
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

essential job duties," resulting in "contract violations" such as "conduct seriously prejudicial to the best interests of the University." *Id.* at 62. Schulz agreed with Chun that "maintaining the prior status quo would result in an undue hardship on the University by creating unnecessary risk to the safety of its students and staff, . . . members of the press, potential athletic recruits, donors, and [others]," "given the myriad duties and close contacts necessary to perform [Rolovich's] job duties." *Id.* WSU terminated Rolovich's employment for just cause effective December 6. FAC ¶ 5.

### H. Rolovich's Lawsuit

Rolovich filed (but did not serve) his original complaint in Whitman County Superior Court on November 14, 2022, naming WSU, Chun, and the Governor as Defendants. ECF No. 1-1 at 4. On December 9, Rolovich filed and served the FAC. *Id.* at 73. It contains seven causes of action, six of which are against all three Defendants: (1) breach of contract and the implied covenant of good faith and fair dealing; (2) religious discrimination under the WLAD; (3) a damages claim under article 1, section 11 of the Washington Constitution; (4) religious discrimination under Title VII; (5) a 42 U.S.C. § 1983 claim against Chun only; (6) a § 1983 claim against all Defendants; and (7) a federal due process claim. FAC ¶¶ 98–149.[10]

On December 14, 2022, Defendants removed the case to federal court. ECF No. 1. Rolovich filed a motion to remand on January 17, 2023, ECF No. 12, which this Court denied on March 8, ECF No. 16.

---

[10] Although the unserved original complaint contained a state-law wage withholding claim, the FAC omits this claim. *Compare* ECF No. 1-1 at 29, *with id.* at 95–102.

WSU DEFENDANTS' MOTION TO DISMISS - 12
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### III.   ARGUMENT

**A. Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When ruling on the motion, "courts must consider the complaint in its entirety, as well as other sources . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.*, 551 U.S. at 322.

The Court may take notice of "legislative facts" in deciding a Rule 12(b)(6) motion, particularly "when construing or applying the Constitution" or "statutes." *Hightower v. City & Cnty. of S.F.*, No. C-12-5841 EMC, 2013 WL 361115, at *3 (N.D. Cal. Jan. 29, 2013) (cleaned up). Whether a complaint states a claim for relief "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (cleaned up). Dismissal may be based on either "the lack of a cognizable legal theory or absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). "Leave to amend need not be granted, and dismissal may be ordered with prejudice, if amendment would be futile," such as when a claim "fails as a matter of law." *Gamble v. Pac. NW Reg'l Council of Carpenters*, No. 2:14-cv-455RSM, 2015 WL 402782, at *2, *7 (W.D. Wash. Jan. 29, 2015) (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998)).

WSU DEFENDANTS' MOTION TO DISMISS - 13
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### B.  The Complaint Fails to State a Title VII Claim (Count IV)

#### 1.  Rolovich has no Title VII claim against Chun

Any Title VII claim against Chun should be dismissed with prejudice because individual employees cannot be liable under the statute. *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993); *Magden v. Easterday Farms*, No. 2:16-CV-00068-JLQ, 2017 WL 1731705, at *5 (E.D. Wash. May 3, 2017) (collecting cases).

#### 2.  The Complaint fails to state a Title VII claim against WSU

##### a.  Accommodating Rolovich would have imposed an undue hardship

As Rolovich acknowledges, WSU denied his accommodation request because it found that an unvaccinated head football coach "could not 'safely and effectively do [his] job without undue hardship to the University.'" FAC ¶ 92. The "undue hardship" defense is a complete defense to a Title VII failure-to-accommodate claim. *See* 42 U.S.C. § 2000e(j). An accommodation causes "undue hardship" if it would "result[] in 'more than a *de minimis* cost' to the employer." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67 (1986) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)).[11] This "could include additional costs in the form of lost efficiency" or "more than a de minimis impact on coworkers." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (cleaned up).

Numerous federal courts have held that accommodating employees' religiously based opposition to COVID-19 vaccines would impose undue hardships on employers in a wide range of sectors. *See, e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20, 36

---

[11] The Supreme Court has accepted a case in which it has been asked to reconsider the *Hardison* standard. *See Groff v. DeJoy*, 143 S. Ct. 646 (2023) (granting cert).

WSU DEFENDANTS' MOTION TO DISMISS - 14
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(1st Cir. 2021) (denying preliminary injunction because accommodating healthcare workers by allowing them to remain unvaccinated against COVID-19 would cause employer to suffer undue hardship); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 292, *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) (per curiam) (same); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309–10 (D. Haw. 2022) (same for airline employees); *Brox v. Woods Hole, Martha's Vineyard & Nantucket Steamship Auth.*, 590 F. Supp. 3d 359, 366–67 (D. Mass. 2022) (same for ferry workers). At the time WSU denied Rolovich's accommodation request, unvaccinated people were five times more likely to contract COVID-19—and ten times more likely to die from it—than those who were fully vaccinated. *Supra* Section II.B. Allowing the head football coach to remain unvaccinated would have increased the risk of exposing others with whom he came into close contact— including WSU staff and student-athletes—to the virus, "which is obviously a significant hardship." *Does 1-2 v. Hochul*, --- F. Supp. 3d ----, No. 21-CV-5067(AMD) (TAM), 2022 WL 4637843, at *16 (E.D.N.Y. Sept. 30, 2022) (dismissing Title VII claim with prejudice because accommodating plaintiff's religious beliefs opposing COVID-19 vaccination would pose undue hardship); *see also D'Cunha v. Northwell Health Sys.*, No. 1:22-CV-0988 (MKV), 2023 WL 2266520, at *3 (S.D.N.Y. Feb. 28, 2023) (same); *Kane v. de Blasio*, --- F. Supp. 3d ----, No. 21 CIV. 7863 (NRB), 2022 WL 3701183, at *13 (S.D.N.Y. Aug. 26, 2022) (same); *Lowe v. Mills*, No. 1:21-CV-00242-JDL, 2022 WL 3542187, at *9–10 (D. Me. Aug. 18, 2022) (same). Accommodating Rolovich would also have increased travel costs, harmed recruiting and fundraising, and damaged WSU's reputation and donor commitments—which also represent

WSU DEFENDANTS' MOTION TO DISMISS - 15
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

substantial burdens. FAC ¶ 70; Pekelis Decl., Exs. D, G; *Together Employees v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) (rejecting Title VII challenge to vaccine policy and noting "[r]eputational effects on an employer can also impose an undue hardship") (citing *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 136 (1st Cir. 2004)).

For those reasons, Rolovich's Title VII claim fails as a matter of law under the undue hardship defense, and the Court should dismiss the claim with prejudice.

**b. Rolovich fails to identify any religious beliefs against vaccination**

Rolovich's Title VII claim against WSU fails for a separate, independent reason: the Complaint does not allege facts establishing that Rolovich's opposition to the COVID-19 vaccines stemmed from beliefs that were religious in nature. Instead, the Complaint couches Rolovich's objection in his own pseudo-scientific concerns over the "potential risks of taking" what he calls an "experimental vaccine." FAC ¶ 57. Title VII affords no protection to such purely secular opinions.

To state a Title VII religious discrimination claim on a failure-to-accommodate theory, "a plaintiff must plausibly allege that '(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer . . . subjected him to an adverse employment action because of his inability to fulfill the job requirement.'" *Grubbs v. Arizona*, No. CV-20-02369-PHX-DJH, 2021 WL 4552419, at *4 (D. Ariz. Oct. 5, 2021) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004)). Here, Rolovich fails to allege the most basic

WSU DEFENDANTS' MOTION TO DISMISS - 16
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

element of a religious discrimination claim: a bona fide *religious* belief.[12]

Instead, Rolovich alleges in a conclusory fashion that "it would violate his conscience to receive any available COVID-19 vaccine" and that he "holds sincere religious beliefs that precluded him from receiving any of the COVID-19 vaccines available during the times relevant to this complaint." FAC ¶¶ 24, 121. But at no point does he allege *what* his beliefs are, *how* those beliefs are linked to his religion, or *why* those beliefs precluded him from being vaccinated. These omissions are fatal to his Title VII claim. *See, e.g.*, *Turner v. Ass'n of Apt. Owners of Wailea Point Vill.*, 739 F. App'x 874, 877 (9th Cir. 2018) (affirming grant of summary judgment on Title VII claim because plaintiff could not establish actual conflict between religious belief and work requirement); *Pedreira v. Ky. Baptist Homes for Child., Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) (affirming dismissal where plaintiff had "not alleged any particulars about her religion that would even allow an inference that she was discriminated against on account of her religion"); *Leake v. Raytheon Techs. Corp.*,

---

[12] The Complaint's only hint of a religious belief is the allegation that Rolovich "was uncomfortable because he did not know how WSU would react to him sharing his religious opposition to medical research based on aborted fetal tissue, given that WSU professors have in the past publicly defended such research." *Id.* ¶ 42. The Complaint does not connect this statement to vaccines in general or any COVID-19 vaccine in particular, nor allege that such "opposition" was what *actually* motivated Rolovich's vaccine objection. Instead, this allegation attempts to explain why Rolovich supposedly did not mention religion at all to WSU until extremely late in the process—not the nature of his purported religious objection.

WSU DEFENDANTS' MOTION TO DISMISS - 17
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

No. CV-22-00436-TUC-RM, 2023 WL 2242857, at *5 (D. Ariz. Feb. 27, 2023) (dismissing Title VII challenge to COVID-19 vaccination policy where "Plaintiffs never alleged they were members of any protected class, or what their religious beliefs were"); *Addison v. Amazon.com, Inc.*, No. CV 22-01071 (FLW), 2022 WL 2816946, at *5 (D.N.J. July 19, 2022) (dismissing Title VII claim because "Plaintiff fails to provide any additional information about the nature of her beliefs, and therefore, she cannot establish that she held sincere religious beliefs").

The leading Title VII case on vaccination requirements is directly on point. In it, the Third Circuit affirmed the dismissal of a former hospital employee's Title VII lawsuit because it determined his opposition to flu vaccination—which the hospital required of its employees—was not "religious in nature." *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 494 (3d Cir. 2017). Fallon believed that "if he yielded to coercion and consented to the hospital['s] mandatory policy, he would violate his conscience as to what is right and what is wrong." *Id.* at 492. This objection did not constitute a religious belief, which must (1) "address[] fundamental and ultimate questions having to do with deep and imponderable matters," (2) be "comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching," and (3) be accompanied by "certain formal and external signs" of religion. *Id.* at 491 (cleaned up).[13] Fallon's "beliefs do not occupy a place in his life similar to that occupied by a more traditional faith," his "objection to vaccination is . . . not religious and not protected by Title VII," so the court dismissed his claim. *Id.* at 492.

---

[13] The Ninth Circuit has adopted this definition in the Establishment Clause context. *See, e.g.*, *Alvarado v. City of San Jose*, 94 F.3d 1223, 1229–30 (9th Cir. 1996).

WSU DEFENDANTS' MOTION TO DISMISS - 18
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich's alleged religious objection is indistinguishable from Fallon's. Rolovich alleges that it "would violate his conscience to receive . . . [the] vaccine," FAC ¶ 24, just as Fallon claimed "he must follow his conscience and refuse the influenza vaccine," *Fallon*,  877 F.3d at 492. And like Fallon, Rolovich fails to connect this "isolated moral teaching"—namely, vaccine opposition—to a "comprehensive system of beliefs about fundamental or ultimate matters." *Id.*

The only real difference in Rolovich's framing of his anti-vaccination belief is his assertion that "a Catholic is morally obliged to obey his conscience." FAC ¶ 28. This additional gloss is irrelevant. Whatever his belief system, a Title VII plaintiff must do more than make a conclusory allegation that his objection is based on "conscience." He must provide a short and plain statement as to *how* that objection is actually "religious in nature," as opposed to "'essentially political, sociological, or philosophical.'" *Fallon*, 877 F.3d at 490 (quoting *United States v. Seeger*, 380 U.S. 163, 165 (1965)); Fed. R. Civ. P. 8(a)(2). Were the law otherwise, a plaintiff could state a Title VII religious discrimination claim simply by asserting that his "conscience" forbids compliance with any generally applicable workplace policy, with no further elaboration or explanation—and "in effect to permit every citizen to become a law unto himself." *Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (cleaned up).

Recent cases concerning COVID-19 vaccine mandates support this sensible rule. *See, e.g., Finkbeiner v. Geisinger Clinic*, --- F. Supp. 3d ----, No. 4:21-CV-01903, 2022 WL 3702004, at *2–4 (M.D. Pa. Aug. 26, 2022) (plaintiff's allegation that she was "a Christian and hold[s] a sincere religious belief that I have a God given right to make my own choices regarding what is good or bad for me" had

WSU DEFENDANTS' MOTION TO DISMISS - 19
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"fail[ed] to establish sincere religious opposition" because it was "an 'isolated moral teaching' . . . not a comprehensive system of beliefs about fundamental or ultimate matters,'" and that indulging "'God given right to make [her] own choices'" would "amount to 'a blanket privilege' and a 'limitless excuse for avoiding all unwanted . . . obligations.'") (quoting *Fallon*, 877 F.3d at 492; *Africa v. Pennsylvania*, 662 F.2d 1025, 1030–31 (3d Cir. 1981)); *Blackwell v. Lehigh Valley Health Network*, No. 5:22-CV-03360-JMG, 2023 WL 362392, at *1-3, *7-8 (E.D. Pa. Jan. 23, 2023) (plaintiff's allegation that "'her religious beliefs forbid[] insertion of an unwanted foreign object into her body,'" was insufficient to state religious objection, but instead indicated that she "challenge[d] Defendant's *factual* and *scientific* basis for imposing the testing requirement," and "suggest[ed] the basis for Plaintiff's belief is 'political, sociological, or philosophical' – and not religious.") (quoting *Fallon*, 877 F.3d at 490); *Brox*, 590 F. Supp. 3d at 366 n.7 (finding "idiosyncratic" and without "grounding in religious practice" plaintiff's stated reasons for opposing vaccine mandate, including that "Jesus tells me that it is unwise to put the COVID vaccine into my body, his creation" and "I believe my God will guide me and protect me and [God] has told me not to get the vaccine at this time").

Rolovich's Complaint describes his vaccine objection in terms strikingly similar to those plaintiffs' objections. Rolovich's asserted belief that he "'must always obey the certain judgment of his conscience,'" FAC ¶ 28, essentially seeks "a blanket privilege" and a "limitless excuse for avoiding all unwanted obligations," *Finkbeiner*, 2022 WL 3702004, at *4 (cleaned up). And Rolovich's own statements (such as his concerns over "the potential risks of taking [an] experimental vaccine," FAC ¶ 57), "only reinforces that [his] opposition stems from [his] medical beliefs,"

WSU DEFENDANTS' MOTION TO DISMISS - 20
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Finkbeiner*, 2022 WL 3702004, at *4, and "suggests that the basis for [his] belief is political, sociological, or philosophical – and not religious," *Blackwell*, 2023 WL 362392, at *8; *see also Egelkrout v. Aspirus, Inc.*, No. 22-CV-118-BBC, 2022 WL 2833961, at *3 (W.D. Wis. July 20, 2022) ("[P]laintiff makes no claim that the testing requirement conflicted with her genuinely held religious beliefs. Instead, plaintiff opposed the testing for personal and medical reasons . . . .").

In sum, Rolovich's Complaint fails to spell out his religious objection with sufficient clarity to satisfy Rule 8(a)(2). It is not enough for Rolovich to vaguely reference his exemption request form (which he does not attach or quote), for the operative facts must be stated in the Complaint itself. *Crayon v. Asuncion*, No. CV 20-0192-JFW (AS), 2020 WL 4904866, at *2 n.6 (C.D. Cal. June 26, 2020) ("[T]o state a claim, Plaintiff cannot rely simply on facts contained within exhibits and attachments; he must instead allege the essential facts within the body of the complaint itself, and thus provide fair notice to Defendants of the claims against them") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 & n.3 (2007)). As a practical matter, Defendants cannot test the sincerity of Rolovich's claimed religious beliefs if he does not disclose them in his initial pleading; otherwise, they could become a "moving target" throughout litigation. *See Love v. N.J. Dep't of Corr.*, No. CIV.A. 10-1714 (GEB), 2011 WL 345964, at *12 (D.N.J. Jan. 31, 2011) (expressing difficulty in determining sincerity of plaintiff's "unique religious beliefs" that kept evolving such that the court could not discern them "with any degree of certainty [or] predict with any reasonable approximation"). As the only concrete beliefs alleged in the Complaint supporting Rolovich's vaccine opposition are not religious in nature, his Title VII claim fails as a matter of law and must be dismissed.

WSU DEFENDANTS' MOTION TO DISMISS - 21
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## C.  The Complaint Fails to State a WLAD Claim (Count II)

Rolovich's WLAD claim fails for the same reasons as his Title VII claim. The elements of a religious discrimination claim are the same under WLAD as Title VII, and Washington courts look to federal cases to guide their interpretations of WLAD. *See Kumar v. Gate Gourmet, Inc.*, 325 P.3d 193, 203 (Wash. 2014); *Black v. Grant Cnty. Pub. Util. Dist.*, No. 2:17-CV-365-RMP, 2019 WL 2617236, at \*7 (E.D. Wash. June 26, 2019), *aff'd in part and rev'd in part on other grounds*, 820 F. App'x 547 (9th Cir. 2020). Just as with Title VII, WLAD requires the plaintiff to establish a sincerely held and bona fide religious belief that conflicts with a requirement of employment. *See Kumar*, 325 P.3d at 203 ("a plaintiff establishes a prima facie claim of failure to accommodate religious practices by showing that (1) he or she had a bona fide religious belief, the practice of which conflicted with employment duties; (2) he or she informed the employer of the beliefs and the conflict; and (3) the employer responded by subjecting the employee to threatened or actual discriminatory treatment."). As described above, Rolovich has not plausibly alleged that he holds a truly *religious* belief, that this belief conflicted with a job requirement, and that the belief was the basis for his separation. Accordingly, his WLAD claim also fails as a matter of law and should be dismissed.

## D.  Rolovich's § 1983 Claims Must Be Dismissed (Counts V and VI)

The Complaint pleads two separate claims under 42 U.S.C. § 1983—one against all Defendants invoking the Free Exercise Clause (Count VI), FAC ¶¶ 140–46, and the other against Defendant Chun invoking free exercise and due process rights (Count V), *id.* ¶¶ 130–39. Both of these claims fail as a matter of law.

As a threshold matter, § 1983 "creates no substantive rights; it merely

WSU DEFENDANTS' MOTION TO DISMISS - 22
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Specifically, "Section 1983 provides for liability against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (quoting 42 U.S.C. § 1983). As a predicate to § 1983 liability, each defendant must be a "person" acting "under color of [law]," 42 U.S.C. § 1983, and must also "integrally participate in the unlawful [conduct]," *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020). Thus, the plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Under these principles, Rolovich's § 1983 claims fail as to each WSU Defendant, for three reasons. First, the claim against WSU must be dismissed because it is not a "person" under § 1983. Second, the Complaint states no claim against Chun because it does not plausibly allege his personal involvement in any constitutional violation. Third, even if there were such allegations, the claims against Chun must be dismissed because he has qualified immunity.

**1. WSU cannot be sued under § 1983**

No § 1983 claim may lie against WSU because it is statutorily exempt from liability. A state, its agencies, and its officials who are sued in their official capacities are not "persons" for purposes of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). A "state university is an arm of the state entitled to Eleventh Amendment immunity," and thus "not [a] 'person[] within the meaning of § 1983.'" *Riser v. WSU*, No. 2:18-CV-0119-TOR, 2018 WL 4955206, at *2 (E.D. Wash. Oct.

WSU DEFENDANTS' MOTION TO DISMISS - 23
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

12, 2018) (quoting *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007)). For that reason, this Court recently dismissed a similar § 1983 claim against WSU as "futile." *Doe v. Elson S. Floyd Coll. of Med. at WSU*, No. 2:20-CV-00145-SMJ, 2020 WL 11036961, at *3 (E.D. Wash. Dec. 30, 2020). The Court should do the same here and dismiss Rolovich's § 1983 claim against WSU with prejudice.

### 2. Rolovich fails to state a § 1983 claim against Chun

Rolovich also fails to plausibly allege facts supporting § 1983 claims against Chun. In Count V, which asserts a § 1983 claim against Chun only, Rolovich pleads nothing close to the required level of detail under *Iqbal* and *Twombly* to make out a viable claim. FAC ¶¶ 130–39. A § 1983 plaintiff must allege both that (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985). The complaint must set forth the "specific injury-causing act or omission of" each individual defendant. *Holt v. McDonnell*, No. CV 15-9632 R(JC), 2016 WL 7217572, at *4 (C.D. Cal. Dec. 12, 2016); *see also Brown v. Morgan*, No. C16-5975 RBL-TLF, 2017 WL 3454572, at *2 (W.D. Wash. Aug. 11, 2017) ("A plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant, and he must allege an affirmative link between the injury and the conduct of that defendant.") (citing *Rizzo v. Goode*, 423 U.S. 362, 371–72, 377 (1976)). "Vague and conclusory allegations of official participation in a civil rights violation are not sufficient to withstand a motion to dismiss." *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

WSU DEFENDANTS' MOTION TO DISMISS - 24
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Count V against Chun contains no specific factual allegations—only a threadbare recitation of the rights asserted (free exercise and due process). FAC ¶¶ 134–37. Instead of identifying the specific conduct by Chun that allegedly infringed these rights, Rolovich argues vaguely that Chun "acted with willful malice, and/or intentionally and in gross disregard of Mr. Rolovich's constitutional rights, and/or in reckless disregard of Mr. Rolovich's constitutional rights." *Id.* ¶ 138. Rolovich's failure to identify what these allegedly unconstitutional "act[s]" were requires dismissal of Count V. *See Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018) (to state § 1983 claim, complaint "must isolate the allegedly unconstitutional acts of each defendant; otherwise the complaint does not provide adequate notice as to the nature of the claims against each") (cleaned up).

Count VI, Rolovich's § 1983 claim against all Defendants, is equally deficient. It alleges no Chun-specific conduct, focusing instead on the constitutionality of the Proclamation itself and its purported "creation of a formal mechanism for granting exemptions." FAC ¶¶ 142–43. Rolovich fails to single out any acts Chun personally took in violation of the Due Process Clause or the Free Exercise Clause. The Complaint thus fails to state a § 1983 claim against Chun.[14]

---

[14] Although this claim asserts that all Defendants "terminated him . . . because Mr. Rolovich had informed Defendants that religious convictions precluded him from receiving a COVID-19 vaccine," FAC ¶ 144, this conclusion is not supported by the facts alleged in the Complaint—and the documents it incorporates by reference—which demonstrate that Rolovich was fired because he was unvaccinated and WSU determined he could not reasonably be accommodated without undue

WSU DEFENDANTS' MOTION TO DISMISS - 25
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### 3. Chun has qualified immunity

Even if the Complaint included allegations against Chun sufficient to state a claim (it does not), the § 1983 claim against him is still barred because he is entitled to qualified immunity. A public official sued in an individual capacity may assert a defense based on qualified immunity. *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015).[15] With qualified immunity, a defendant has immunity from suit provided his conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts consider two questions: (1) whether the facts, taken in the light most favorable to the non-moving party, show that the official's conduct violated a constitutional right, and (2) whether the allegedly violated right was "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Once a defendant raises this defense, "the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). The qualified immunity

---

hardship to WSU. *See, e.g.*, *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (courts need not accept as true allegations that "contradict matters properly subject to judicial notice or by exhibit" or are "conclusory, unwarranted deductions of fact, or unreasonable inferences"; "a plaintiff can . . . plead himself out of a claim by including unnecessary details contrary to his claims.").

[15] The Complaint makes clear that Chun is sued "in his individual capacity only," FAC ¶ 13, though it simultaneously asserts that "[a]t all times relevant to this complaint, Patrick Chun was acting as an agent of WSU," *id.*

WSU DEFENDANTS' MOTION TO DISMISS - 26
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

issue "should be decided as early as possible in litigation—preferably before discovery—as it is a complete immunity from suit, not solely a defense to liability." *Lilly v. Univ. of Cal.-San Diego*, No. 21-CV-1703 TWR (MSB), 2022 WL 11337682, at *11 (S.D. Cal. Oct. 19, 2022) (citing *Pearson*, 555 U.S. at 231–32).

Looking beyond Count V's empty and generic recitations, the descriptions of Chun's conduct largely fall into three categories: (1) Chun's meetings over several months in 2021 with Rolovich regarding his vaccination status, FAC ¶¶ 30–46; (2) Chun's involvement in reviewing Rolovich's request for an accommodation, *id.* ¶¶ 64–70; and (3) Chun's involvement in the decisions to deny Rolovich's request for an accommodation and terminate his employment for just cause, *id.* ¶¶ 90–96.[16] Even taking all allegations as true, and importing them into his § 1983 claim, Rolovich's Complaint fails both prongs of the qualified immunity analysis.

### a.    Rolovich does not plead a constitutional violation by Chun

Rolovich's Complaint fails to show how any of the alleged instances of Chun's conduct violated either the Free Exercise Clause or the Due Process Clause.

### i.  Chun did not violate Rolovich's free exercise rights

As to free exercise, Rolovich fails to show how the action of any defendant, including Chun, amounted to unconstitutional "discriminat[ion] . . . because of [Rolovich's] religious beliefs." FAC ¶ 134. "Where the claim is invidious discrimination in contravention of the First . . . Amendment[]," the Supreme Court's "decisions make clear that the plaintiff must plead and prove that the defendant acted

---

[16] Rolovich also attacks Chun for alleged violations of WSU's COVID-19 protocols, which do not appear to relate to Rolovich in any way. *See* FAC ¶¶ 71–75.

WSU DEFENDANTS' MOTION TO DISMISS - 27
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

with discriminatory purpose." *Iqbal*, 556 U.S. at 676 (citing, inter alia, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540–41 (1993) (opinion of Kennedy, J.)). Such "purposeful discrimination" requires that a "decisionmaker[] undertak[e] a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* at 676–77 (cleaned up). It follows that, to state a claim against Chun for a free exercise violation, Rolovich "must plead sufficient factual matter to show" Chun acted "not for a neutral . . . reason but for the purpose of discriminating on account of . . . [Rolovich's] religion." *Id.* at 677.

As explained above in the context of Title VII and WLAD, Rolovich does not plausibly allege facts showing that Chun acted against him *because of* his religious beliefs. *See supra* Section III.B. Instead, the Complaint demonstrates that Rolovich was fired not because of his religion, but because he was unvaccinated against COVID-19, which was a condition for continued employment, and because the Department determined that accommodating him would pose an undue hardship given his job duties as head football coach. None of those facts remotely suggests intentional discrimination on the basis of Rolovich's religion. *Wise v. Inslee*, No. 2:21-CV-0288-TOR, 2022 WL 1243662, at *8 (E.D. Wash. Apr. 27, 2022) (dismissing Title VII and § 1983 claims because "there is no indication that Plaintiffs faced adverse employment decisions due to their sincerely held religious beliefs rather than a failure to comply with the Proclamation").

Nor does any Chun-specific allegation suggest that religious animus motivated his actions. For instance, the Complaint alleges that Chun "made a number of statements" that "demonstrated his hostility toward Mr. Rolovich's expressed religious, personal, and scientific reasons for refusing to receive a COVID vaccine."

WSU DEFENDANTS' MOTION TO DISMISS - 28
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

FAC ¶ 30. But it fails to identify any actions Chun took that reflected "hostility" to Rolovich's "religious reasons," as opposed to Chun's frustration at Rolovich's longstanding refusal to get vaccinated. Notably, the Complaint does not even allege that Chun was ever aware of whatever "religious reasons" Rolovich had for opposing the vaccine when he allegedly formed a "predetermination" to terminate him if he did not get vaccinated. FAC ¶ 110. Quite the opposite: Rolovich expressly admits that before August 19, 2021, he "had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines." FAC ¶ 41. Nothing in the Complaint supports an inference of any "discriminatory purpose" on the part of Chun, which is a prerequisite to a claim of "invidious discrimination" under the Free Exercise Clause. *Iqbal*, 556 U.S. at 676.[17]

### ii. Chun did not violate Rolovich's due process rights

The Complaint also fails to tie Chun's actions to any plausible due process violation. As explained below, Rolovich has no viable due process claim against the WSU Defendants. *See infra* Section III.E. But even if he had one, Chun's individual actions would not establish any violation. For instance, even if Chun—as Rolovich's supervisor—"inserted" himself into the accommodation determination, FAC at 16, it would not violate the Due Process Clause, which "does not require a hearing before a particular decision maker." *Hunter v. Sup. Ct. of N.J.*, 951 F. Supp. 1161, 1181

---

[17] As this Court has already held, an employer's neutral and generally applicable vaccine requirement is not a free exercise violation. *See, e.g.*, *Bacon v. Woodward*, No. 2:21-CV-0296-TOR, 2021 WL 5183059, at *4 (E.D. Wash. Nov. 8, 2021). Logically, nor is Chun's role in implementing such a requirement a violation.

WSU DEFENDANTS' MOTION TO DISMISS - 29
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(D.N.J. 1996), *aff'd*, 118 F.3d 1575 (3d Cir. 1997) (unreported) (citing *Opp Cotton Mills v. Administrator*, 312 U.S. 126, 152 (1941)). To the extent Rolovich's theory is that Chun did not follow WSU's own policies for processing exemption and accommodation requests, his Complaint does not state a cognizable claim. A government official's failure to follow internal administrative policies—or even state statutory or regulatory provisions—does not trigger a due process violation. *See, e.g.*, *Davis v. Scherer*, 468 U.S. 183, 194 & n.12 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) ("state departmental regulations do not establish a federal *constitutional* violation").

In any event, Chun's involvement in the accommodation decision was perfectly consistent with WSU's policies. As Rolovich acknowledges, after the initial blind review of the exemption request, at the second step the employee's "supervisor would determine if the unvaccinated employee would be capable of 'keeping the public safe' and perform his/her job effectively" with a reasonable accommodation. FAC ¶ 62. In other words, it was "for the Athletics Department to decide whether it was 'able to accommodate [Rolovich's] request.'" *Id.* ¶ 65. As the head of the Department, Chun's involvement is neither surprising nor prohibited— and comes nowhere close to a constitutional due process violation.

Nor does the allegation that Chun "improperly influence[d] and interfere[d] with the final decision made in [the] blind review process" finding that Rolovich had a sincerely held religious belief. FAC ¶ 91. Again, Rolovich admits that the ultimate authority on whether to grant an accommodation was the affected department, not

WSU DEFENDANTS' MOTION TO DISMISS - 30
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

EH&S or the blind screening panel. FAC ¶¶ 62, 66. And nothing in WSU's policy forbade Chun from questioning the sincerity of Rolovich's stated religious objections based on information not available to the panel—including Rolovich's prior inconsistent statements to Chun and the last-minute timing of his religious exemption request. *Id.* ¶¶ 45, 67; Pekelis Decl., Ex. E; *see, e.g.*, *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. CV 19-5734, 2022 WL 507479, at *4 (E.D. Pa. Feb. 18, 2022) (because plaintiff's "claimed religious objection to vaccination occurred within a few days of her submitting a request for a religious exemption," court found "the timing of Plaintiff's development of religious issues with vaccination to be suspicious and . . . this timing points to a lack of sincerity in her religious beliefs").

Finally, even if Rolovich could possibly have a cognizable due process interest at stake in the blind review panel's finding (and he does not), he admits that the finding was not actually overturned. Although HRS wrote in its denial letter that "the University *questions* the assertion that [Rolovich's] sincerely held religious views conflict with the University's vaccine requirement," his accommodation request was ultimately denied because the Department found he "could not 'safely and effectively do [his] job without undue hardship to the University." FAC ¶¶ 91, 92 (emphasis added); *see* Pekelis Decl., Ex. H. Whatever "influence" Chun tried to exert on the blind review panel finding, it was not determinative in the Department's denial of Rolovich's accommodation request.

### b. Chun's conduct violated no clearly established law

Even if Rolovich could link Chun's conduct to a constitutional violation with the required specificity (he can't), Chun would still be entitled to qualified immunity because he did not violate clearly established law. As the Supreme Court has

WSU DEFENDANTS' MOTION TO DISMISS - 31
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"repeatedly" stated, courts are "not to define clearly established law at a high level of generality." *Sheehan*, 575 U.S. at 613 (cleaned up). Instead, "[t]he law must have been clear enough that *every* reasonable official would know he or she was violating the plaintiff's rights." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018) (cleaned up). This "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Precedent must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

Count V does not state with any specificity what "clearly established law" Chun allegedly violated. Instead, it gestures vaguely at Rolovich's "constitutional right to the free exercise of religion, to be free from governmental hostility directed at his religion, and his right to due process and equal protection under the law," without further explanation as to what these rights mean in this context. FAC ¶ 139. This is precisely the sort of "high level of generality" that federal courts have found insufficient to defeat qualified immunity. *See, e.g.*, *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 890 (9th Cir. 2022) (allegation "that the state cannot condition a benefit or impose a penalty based on a person's adherence or non-adherence to a religious belief" was too "general" and "avoid[ed] the crucial question whether the official acted reasonably in the particular circumstances that he or she faced") (quotations omitted); *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 830–31 (2d Cir. 1996) (reversing district court's conclusion that "the contours of the right to be free from religious discrimination and an employer's duty

WSU DEFENDANTS' MOTION TO DISMISS - 32
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to make reasonable accommodation for religious observance are clearly defined," which defined the right "at too abstract a level of generality").

No facts alleged anywhere in the Complaint indicate that Chun violated any clearly established law. For instance, Rolovich has no constitutional right to a religious exemption from the Proclamation's generally applicable vaccine requirement (which was a clear condition of employment), or to an accommodation (which WSU determined would have caused an undue hardship given Rolovich's position as head football coach). *See Wise*, 2022 WL 1243662 at *3–6. Instead, the "clearly established law" is just the opposite: the State may establish generally applicable vaccine requirements *without* affording a religious exemption. *Id.*; *see, e.g.*, *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1178 (9th Cir. 2021) ("Limitation of the medical exemption in this way serves the primary interest for imposing the mandate—protecting student 'health and safety'—and so does not undermine the District's interests as a religious exemption would.").

Likewise, Chun's involvement in the accommodation decision did not violate clearly established law. Recently, a court considered and rejected a similar challenge to a university's denial of employees' requests for exemptions and accommodations from a vaccination requirement. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, No. 21-CV-02637-RM-KMT, 2022 WL 4547563, at *6 (D. Colo. Sept. 29, 2022). The court held that qualified immunity protected all supervisor defendants from liability for their roles in the terminations, finding no "clearly established law" that enforcing a vaccine policy violates the First Amendment. *Id.* ("Plaintiffs have not pointed to any Supreme Court or Tenth Circuit authority holding that the First Amendment was ever violated by any vaccination policy."). The same is true here.

WSU DEFENDANTS' MOTION TO DISMISS - 33
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Next, although Rolovich accuses Chun of "influenc[ing] and interfer[ing] with" either the blind review panel's first-step finding or the accommodation process, FAC ¶ 91, no case law (let alone clearly established law) makes such conduct constitutionally suspect. The Free Exercise Clause did not require WSU or Chun to adhere inflexibly to an initial sincerely-held belief finding based on a committee's "blind review" or to defer to accommodation ideas from external departments like EH&S. Nor does Chun's own involvement in the accommodation process violate any clearly established due process precedent. *See, e.g.*, *Sadid v. Vailas*, 936 F. Supp. 2d 1207, 1216, 1231–32 (D. Idaho 2013) (university president's participation in pre-termination proceeding did not violate clearly established law even where he had been publicly attacked by terminated employee).

Finally, even accepting Rolovich's contention that the Department's accommodation determination was incorrect, *see* FAC ¶¶ 76–89, this would not defeat Chun's qualified immunity. Chun and the Department's determination that Rolovich could not be accommodated was supported by multiple objective justifications, including Rolovich's inability to safely lead practices, conduct fundraising, travel and recruit players, or interface with the media without being vaccinated. FAC ¶¶ 69–70. If that determination were somehow in error, Rolovich still could not show that it was unreasonable in light of the "far-reaching" protections of qualified immunity. *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998). The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229. As WSU's Athletics Director making difficult and time-pressured judgments in the midst of the pandemic

WSU DEFENDANTS' MOTION TO DISMISS - 34
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(during the Delta surge), Chun benefits from the "government interest in avoiding unwarranted timidity on the part of those engaged in the public's business." *Filarsky v. Delia*, 566 U.S. 377, 390 (2012); *see Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) ("holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties"); *see also Univ. of Colo.*, 2022 WL 4547563, at *5 ("Given the unprecedented nature and global scope of the Covid-19 pandemic as well as its devastating impacts, the Court finds the allegations in the Complaint do not establish that these Defendants acted unreasonably in light of existing precedent and in the specific context of this case.").

Ultimately, Rolovich can identify no case law—or even established constitutional principles—that defeat Chun's qualified immunity. No reasonable official confronted with the objective circumstances with which Chun was presented would believe that his conduct violated the law (because it did not). Thus, Chun is immune from Rolovich's § 1983 claims, which should be dismissed with prejudice.

**E.  The Complaint Fails to State a Due Process Claim**

While "due process" is passingly mentioned in the § 1983 claims (Counts V–VI), Count VII alleges standalone procedural due process violations against all Defendants. FAC ¶ 149 (alleging that WSU's policies "granted WSU officials unfettered discretion to disregard the process they created"). This claim fails as a matter of law and should be dismissed with prejudice for multiple reasons.

First, no due process claim lies against WSU for the same reason no § 1983 claim lies against WSU. Claims that state agencies violated the U.S. Constitution must be brought under § 1983. *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914,

WSU DEFENDANTS' MOTION TO DISMISS - 35
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

917 (9th Cir. 2003); *Azul-Pacifico, Inc. v. City of L.A.*, 973 F.2d 704, 705 (9th Cir. 1992). WSU is not a "person" under § 1983, so it cannot be sued for damages for alleged constitutional violations. *See Lake Tahoe*, 318 F.3d at 918 (construing equal protection claim against state agency under § 1983 and dismissing it).

With respect to Chun, Rolovich's claims also fail. Again, Rolovich's claim here is best construed as another § 1983 claim (since this is the only available avenue), and it fails for many of the same reasons Count V did, including that Chun has qualified immunity. *See supra* subsections III.D.2–3.

Even without those barriers, the Complaint would still not state any viable due process claim against either WSU Defendant. Rolovich had no property interest, for instance, in the religious accommodation he requested but did not receive. To qualify as a constitutionally protected interest, a person must have a "legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see, e.g.*, *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) (plaintiffs failed to show a property interest in state-issued certificate). An "abstract need" or a "unilateral expectation" is not enough. *Thornton*, 425 F.3d at 1164. Here, Rolovich was never granted a religious accommodation; at most, the university informed him that it was "considering approving" his request. FAC ¶ 61. As such, he never attained a protected interest in it. The "failure to grant [a plaintiff's requested] accommodations" under the Americans With Disabilities Act does not "amount[] to a sufficient liberty or property interest under the due process clause to give plaintiff a claim." *Bartlett v. N.Y. State Bd. of Law Examiners*, 970 F. Supp. 1094, 1142 (S.D.N.Y. 1997) (Sotomayor, J.), *aff'd in part, vacated in part on other grounds*, 156 F.3d 321 (2d Cir. 1998), *cert. granted, judgment vacated*, 527 U.S.

WSU DEFENDANTS' MOTION TO DISMISS - 36
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1031 (1999), *and aff'd in part, vacated in part on other grounds*, 226 F.3d 69 (2d Cir. 2000); *see also Walker v. Newsom*, No. 2:20-cv-2243 TLN AC P, 2022 WL 1190458 at *6 (E.D. Cal. Apr. 21, 2022) (same); *Stamm v. N.Y.C. Transit Auth.*, No. 04-CV-2163 (SLT), 2006 WL 1027142, at *9 (E.D.N.Y. Feb. 7, 2006) (same).

Moreover, even if Rolovich had a protectable interest, the process Rolovich received was constitutionally sufficient. Where, as here, "a policy is generally applicable, employees are not entitled to process above and beyond the notice provided by the enactment and publication of the policy itself." *Wise*, 2022 WL 1243662, at *5 (cleaned up). Here, not only was the Proclamation enacted and published, but WSU specifically notified Rolovich well in advance that it would be implementing the Proclamation. FAC ¶¶ 15, 36, 45. Rolovich had ample opportunity to request an exemption, which he ultimately did at the last minute. His termination became final after two stages of appeal, and was ultimately approved by WSU's president. *Id.* ¶ 5. As of October 18, 2021, the Proclamation's effective date, Rolovich had not taken the vaccine and WSU had denied his requested accommodation. *Id.* ¶ 90. The Proclamation thus prohibited WSU from allowing Rolovich to continue working, and he was accordingly discharged. *Id.* ¶ 93. The process Rolovich received was far more than the "enactment and publication" notice to which he was entitled. *Wise*, 2022 WL 1243662, at *5.

Finally, Rolovich's accusation that WSU officials "disregard[ed] the process they created . . . and, therefore, abridged Mr. Rolovich's right to due process" is inapposite. FAC ¶ 149. As explained above, WSU complied with its own policies and procedures—but even if it had not, that would not constitute a violation of federal due process. *Jacobs v. Clark Cnty. School Dist.*, 526 F.3d 419, 441 (9th Cir.

WSU DEFENDANTS' MOTION TO DISMISS - 37
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2008) (school district did not violate the due process clause by implementing a dress code without following its regulations requiring parental notification); *see also Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process."). Lacking any legal basis, Rolovich's procedural due process claim should be dismissed with prejudice.

### F. Rolovich Has No Claim Under the State Constitution (Count III)

Rolovich's vague state constitutional claim appears to be wholly derivative of his other claims, and fails as a matter of law not just for the reasons discussed above, but also because it seeks damages only. *See* FAC ¶¶ 115–18. There is no private right of action for damages under article I, section 11 of the Washington Constitution because Washington does not recognize causes of action for damages based on constitutional violations. *Blinka v. Wash. State Bar Ass'n*, 36 P.3d 1094, 1102 (Wash. Ct. App. 2001). Count III should be dismissed with prejudice.

### G. Rolovich's Contract Claims Must Be Dismissed (Count I)

Finally, Rolovich's claims for breach of contract and breach of the "implied covenant" of good faith and fair dealing fail as to both WSU and Chun. As to Chun, the reason is simple: he is not a party to the Agreement. *See* FAC ¶ 16; ECF 1-1 at 36. Rolovich does not allege that Chun breached the Agreement. *See* FAC ¶¶ 98–111. Nor could he have, for "a breach of contract is actionable only if the contract imposes a duty." *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995). With no contractual duties owed by Chun in his individual capacity, the contract claim against him fails as a matter of law. *See, e.g., Monaco v. Liberty Life Assur. Co.*, No. C06-07021 MJJ, 2007 WL 420139, at *4 (N.D. Cal. Feb. 6, 2007) (dismissing contract claim because "the Complaint reveals that [the

WSU DEFENDANTS' MOTION TO DISMISS - 38
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

defendant] is . . . not a party to the insurance contract"). Similarly, "a claim for breach of the implied covenant of good faith and fair dealing arises where there is an enforceable contract in place between the parties." *Davis Wire Corp. v. Teamsters Loc. Union No. 117*, 152 F. Supp. 3d 1326, 1330 (W.D. Wash. 2015).

Rolovich's contract claim against WSU also must be dismissed. The crux of this claim is the allegation that "WSU breached its contract with Mr. Rolovich because it did not have just cause to terminate" his employment. FAC ¶ 101. The Agreement gives the term "Just Cause" its "normally understood meaning in employment contracts." ECF No. 1-1 at 43. In Washington, a termination for "just cause" is "one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d 298, 304 (Wash. 1989). As many courts have recognized, "'[j]ust cause is a flexible concept, embodying notions of equity and fairness.'" *Casper v. Securitas Sec. Servs. USA*, No. 57235-1-I, 2007 WL 809933, at *3 (Wash. Ct. App. Mar. 19, 2007) (unpublished) (quoting *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1242 (7th Cir. 1997)). And "[w]hether the undisputed facts of a particular case establish just cause is a question of law for the court." *Crider*, 130 F.3d at 1242.

WSU's decision to discharge Rolovich for just cause rested on multiple grounds, at least one of which is undisputed and apparent on the face of the Complaint: as of October 18, 2021, Rolovich was not vaccinated against COVID-19, had not received an exemption and accommodation, and was thus legally prohibited from working at WSU. (And Rolovich was not entitled to an exemption and accommodation under any statutory or constitutional provision. *See supra*

WSU DEFENDANTS' MOTION TO DISMISS - 39
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Sections III.B–F.) As WSU's president explained in denying his appeal, Rolovich was "no longer eligible to engage in work for the University"—which, "by itself, provides just cause for termination under the Agreement." Pekelis Decl., Ex. K at 61–62; *see, e.g.*, *Akers v. Brookdale Univ. Hosp. & Med. Ctr.*, No. CV06-00350(3MC)(VVP), 2006 WL 2355842, at *3 (E.D.N.Y. Aug. 15, 2006) ("It seems axiomatic if an employee fails to fulfill an express, material condition of her employment . . . , that must constitute 'cause' for termination."); *Reynolds v. Pierce Transit*, No. 18881-3-II, 1996 WL 533602, at *6 (Wash. Ct. App. Sept. 20, 1996) (unpublished) (transit agency had "just cause" because plaintiff "could not perform his job as a bus driver"); *Comfort & Fleming Ins. Brokers, Inc. v. Hoxsey*, 613 P.2d 138, 141 (Wash. Ct. App. 1980) ("good cause" termination covers "causes inherent in and related to the qualifications of the employee or a failure to properly perform some essential aspect of the employee's job function") (citations omitted). Nor does Rolovich's conclusory and speculative allegation that WSU acted with nefarious ulterior motives, *see* FAC ¶ 127, salvage his contract claim. *See, e.g.*, *Linden v. X2 Biosystems, Inc.*, No. C17-966 RSM, 2019 WL 13240852, at *3–4 (W.D. Wash. Jan. 25, 2019) (dismissing breach of contract claim because there was "no plausible inference Plaintiffs were terminated without just cause"; "the existence of other *possible* reasons for the termination and the absence of prior precedent does not show that the stated reason was not fair and honest or that Defendants were not acting in good faith in this instance"). For those reasons, the contract claim against WSU must also be dismissed with prejudice.

## IV.   CONCLUSION

The WSU Defendants ask the Court to dismiss the Complaint with prejudice.

WSU DEFENDANTS' MOTION TO DISMISS - 40
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

DATED this 15th day of March, 2023.

ROBERT W. FERGUSON
Attorney General

s/ Zachary J. Pekelis
ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700
Zach.Pekelis@PacificaLawGroup.com

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Spencer.Coates@atg.wa.gov


*Attorneys for Defendant Washington State University and Patrick Chun*

WSU DEFENDANTS' MOTION TO DISMISS - 41
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**CERTIFICATE OF SERVICE**

On the 15th day of March, 2023, I caused to be served, via ECF electronic service, a true copy of the foregoing Motion to Dismiss upon all counsel registered for e-service.

DATED this 15th day of March, 2023.

_____
Erica Knerr

WSU DEFENDANTS' MOTION TO DISMISS - 42
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>        Plaintiff,<br><br>  v.<br><br>WASHINGTON STATE UNIVERSITY, an agency of the State of Washington; PATRICK CHUN, Director of Athletics for Washington State University, in his individual capacity; and JAY INSLEE, Governor, in his official capacity,<br><br>        Defendants. | NO.<br><br>NOTICE OF REMOVAL |

TO:     NICHOLAS ROLOVICH, Plaintiff;

AND TO:   BRIAN FAHLING and ERIC KNIFFIN, Counsel for Plaintiff;

AND TO:   CLERK OF THE ABOVE-ENTITLED COURT.

PLEASE TAKE NOTICE that without waiving any procedural or substantive defenses, Defendants Washington State University (WSU) and Patrick Chun hereby remove Plaintiff Nicholas Rolovich's lawsuit filed on November 14, 2022, in the State of Washington Whitman County Superior Court, under Cause No. 22-2-00244-38, to the United States District Court for the Eastern District of Washington (Spokane Division). Defendant Jay Inslee consents to removal. Defendants WSU and Chun provide the following short, plain statement of the grounds for removal:

1.      Plaintiff filed this action in Whitman County Superior Court on November 14, 2022.[1] Because this Court is the United States District Court for the district and division embracing the place where the state court action is pending, it is the appropriate court for removal pursuant to 28 U.S.C. § 1441(a).

2.      Plaintiff served Defendants with the First Amended Complaint and Summonses on December 9, 2022. This Notice is therefore timely and appropriate because it is "filed within 30 days after the receipt by the defendant, through service or otherwise, . . . or within 30 days after the service of summons upon the defendant . . . ." 28 U.S.C. § 1446(b)(1).

3.      This is a civil action brought in state court of which this Court has original jurisdiction under 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, including the Free Exercise Clause

---

[1]Plaintiff did not serve Defendants the original Complaint.

(U.S. Const. amend. I); the Due Process Clause (U.S. Const. amend. XIV, § 1); 42 U.S.C. § 1983; and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)). Removal is therefore appropriate under 28 U.S.C. § 1441(a).

4.      Removal is also appropriate under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between Plaintiff and all Defendants and the amount in controversy pertaining to Plaintiff's claims exceeds $75,000.00. Plaintiff is a citizen of California, where he currently resides. *See* 1st Am. Compl. ¶ 11. All Defendants are Washington citizens: Defendant WSU is a public university of the State of Washington; Defendant Chun resides in Pullman, Washington; and Defendant Inslee resides in Olympia, Washington, and is sued in his official capacity as Governor of the State of Washington. Thus, complete diversity of citizenship exists.

5.      As to the amount in controversy, Plaintiff's employment contract with Defendant WSU provided for an annual base salary of $2 million. *Id.* ¶ 15. Plaintiff alleges that "WSU was required to pay liquidated damages in an amount equal to sixty percent of his remaining base salary" and that "[w]hen he was terminated, [Plaintiff] had approximately three and one-half years remaining on his contract." *Id.* ¶ 99; *see also id.* ¶ 15. Plaintiff seeks "liquidated damages, as provided for in the employment contract," "monetary and/or economic damages" for alleged "loss of past and future income, wages, compensation, job security and other benefits of employment," and "punitive damages" under

42 U.S.C. § 1983, Title VII, and Wash. Rev. Code § 49.60 *et seq.* 1st Am. Compl. at 31. The amount in controversy thus far exceeds the statutory minimum of $75,000.00.

6.     Defendant Inslee is separately represented, and "consent[s] to the removal of the action." 28 U.S.C. § 1446(b)(2)(A).

7.     This Court has personal jurisdiction over Plaintiff and all Defendants.

8.     In compliance with 28 U.S.C. § 1446(a), Defendants have attached as an exhibit a true and complete copy of all process, pleadings, and orders filed or served upon Defendants in Whitman County Superior Court Cause No. 22-2-00244-38. *See* **Exhibit A**.

9.     In compliance with 28 U.S.C. § 1446(d), a copy of this notice (without Exhibit A) will be filed with the Whitman County Superior Court and served on Plaintiff's counsel in conjunction with this filing.

DATED this 14th day of December 2022.

ROBERT W. FERGUSON
Attorney General

*/s/Spencer W. Coates*
SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Spencer.Coates@atg.wa.gov

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700
Zach.Pekelis@PacificaLawGroup.com
*Attorneys for Defendants Washington*
*State University and Patrick Chun*

### Notice of Consent:

Defendant Governor Jay Inslee, in his official capacity, hereby consents to removal.

ROBERT W. FERGUSON
Attorney General

*/s/Alicia O. Young*
ALICIA O. YOUNG, WSBA #35553
CRISTINA SEPE, WSBA #53609
Deputy Solicitors General
1125 Washington St. SE, PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Alicia.Young@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Defendant Governor*
*Jay Inslee*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Brian Fahling
Law Office of Brian Fahling
8124 NE 166th Street
Kenmore, WA 98028
bfahling@fahlinglaw.com

Eric Kniffin
Lewis Roca
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO 80907
ekniffin@lewisroca.com
*Counsel for Plaintiff*

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 14th day of December 2022, at Seattle, Washington.

*/s/Spencer W. Coates*
SPENCER W. COATES, WSBA #49683
Assistant Attorney General
*Attorney for Defendants Washington
State University and Patrick Chun*

5-SER-1019

Attorney General of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Spencer.Coates@atg.wa.gov

# Exhibit A



FILED

NOV 14 2022

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

**CIVIL**

_____WHITMAN_____ COUNTY SUPERIOR COURT
Case Information Cover Sheet (CICS)

**Case Number** 22-2-00244-   **Case Title** Rolovich v. Wash. St. Univ., et al.

**Attorney Name** _____Brian Fahling_____   **Bar Membership Number** _18894_

Please check one category that best describes this case for indexing purposes.  Accurate case indexing not only saves time in docketing new cases, but helps in forecasting needed judicial resources.  Cause of action definitions are listed on the back of this form.  Thank you for your cooperation.   _Form updated 6/27/2022_

| | | | | | |
|---|---|---|---|---|---|
| ☐ | ABJ | Abstract of Judgment | ☐ | PRG | Property Damage – Gangs |
| ☐ | ABL | Abusive Litigation | ☐ | PRP | Property Damages |
| ☐ | ALR | Administrative Law Review | ☐ | QTI | Quiet Title |
| ☐ | ALRJT | Administrative Law Review-Jury Trial (L&I) | ☐ | RDR | Relief from Duty to Register |
| ☐ | BAT | Ballot Title | ☐ | RFR | Restoration of Firearm Rights |
| ☐ | CHN | Non-Confidential Change of Name | ☐ | SDR | School District-Required Action Plan |
| ☐ | CBC | Contractor Bond Complaint | ☐ | SER | Subdivision Election Process Law Review |
| ☐ | COL | Collection | ☐ | SPC | Seizure of Property-Commission of Crime |
| ☐ | CON | Condemnation | ☐ | SPR | Seizure of Property-Resulting from Crime |
| ☐ | COM | Commercial | ☐ | TAX | Employment Security Tax Warrant |
| ☐ | CPO | Civil Protection Orders | ☐ | TAX | L & I Tax Warrant |
| ☐ | CRP | Pet. for Cert. of Restoration of Opportunity | ☐ | TAX | Licensing Tax Warrant |
| ☐ | DOL | Appeal Licensing Revocation | ☐ | TAX | Revenue Tax Warrant |
| ☐ | ECP | Enforce Canadian DV Protection Order | ☐ | TMV | Tort – Motor Vehicle |
| ☐ | EOM | Emancipation of Minor | ☐ | TRJ | Transcript of Judgment |
| ☐ | FJU | Foreign Judgment | ☐ | TTO | Tort – Other |
| ☐ | FOR | Foreclosure | ☐ | TXF | Tax Foreclosure |
| ☐ | FPO | Foreign Protection Order | ☐ | UND | Unlawful Detainer – Commercial |
| ☐ | INJ | Injunction | ☐ | UND | Unlawful Detainer – Residential |
| ☐ | INT | Interpleader | ☐ | VEP | Voter Election Process Law Review |
| ☐ | LCA | Lower Court Appeal – Civil | ☐ | VVT | Victims of Motor Vehicle Theft-Civil Action |
| ☐ | LCI | Lower Court Appeal – Infractions | ☐ | WDE | Wrongful Death |
| ☐ | LUPA | Land Use Petition Act | ☐ | WHC | Writ of Habeas Corpus |
| ☐ | MAL | Other Malpractice | ☐ | WMW | Miscellaneous Writs |
| ☐ | MED | Medical Malpractice | ☐ | WRM | Writ of Mandamus |
| ☐ | MHA | Malicious Harassment | ☐ | WRR | Writ of Restitution |
| ☒ | MSC2 | Miscellaneous – Civil | ☐ | WRV | Writ of Review |
| ☐ | MST2 | Minor Settlement – Civil  (No Guardianship) | ☐ | XRP | Extreme Risk Protection Order |
| ☐ | PCC | Petition for Civil Commitment (Sexual Predator) | ☐ | XRU | Extreme Risk Protection Order Under 18 |
| ☐ | PFA | Property Fairness Act | | | |
| ☐ | PIN | Personal Injury | | | |
| ☐ | PRA | Public Records Act | | | |

**APPEAL/REVIEW**

**Administrative Law Review**-Petition to the superior court for review of rulings made by state administrative agencies.

**Appeal of a Department of Licensing Revocation**-Appeal of a DOL revocation (RCW 46.20.308(9)).

**Lower Court Appeal-Civil**-An appeal for a civil case; excludes traffic infraction and criminal matters.

**Lower Court Appeal-Infractions**-An appeal for a traffic infraction matter.

**CONTRACT/COMMERCIAL**

**Breach of Contract**-Complaint involving monetary dispute where a breach of contract is involved.

**Contractor Bond Complaint**-Complaint for claim against a contractor or subcontractor bond.

**Commercial Contract**-Complaint involving monetary dispute where a contract is involved.

**Commercial Non-Contract**-Complaint involving monetary dispute where no contract is involved.

**Third Party Collection**-Complaint involving a third party over a monetary dispute where no contract is involved.

**PROTECTION ORDER**

**Civil Protection Orders** – Petition seeking protection from harmful or threatening behavior. (Chapt. 7.105 RCW) (Eff. 7/1/2022).

**Enforce Canadian DV Protection Order** – Petition seeking order granting recognition and enforcement of Canadian DV PO. (Chapt. 26.55 RCW)

**Extreme Risk Protection Order**-Petition to restrict ownership, possession, custody or control of a firearm or concealed weapons permit.

**Extreme Risk Protection Order Under 18**-Petition to restrict access, possession, purchase, custody or control of a firearm by a minor.

**Foreign Protection Orders**-Any protection order of a court of the United States, or of any state, territory, or tribal land, which is entitled to full faith and credit in this state.

**JUDGMENT**

**Abstract Only**-A certified copy of a judgment docket from another superior court, an appellate court, or a federal district court.

**Foreign Judgment**-Any judgment, decree, or order of a court of the United States, or of any state or territory, which is entitled to full faith and credit in this state.

**Judgment, Another County**-A certified copy of a judgment docket from another superior court within the state.

**Judgment, Another State**-Any judgment, decree, or order from another state that is entitled to full faith and credit in this state.

**Tax Warrants** -A notice of assessment by a state agency creating a judgment/lien in the county in which it is filed. (Four types available.)

**Transcript of Judgment**-A certified copy of a judgment from a court of limited jurisdiction to a superior court in the same county.

**OTHER COMPLAINT/PETITION**

**Abusive Litigation-** Request to restrict a current or former intimate partner party from filing abusive litigation for the purposes of harassing, intimidating, or maintaining contact with the other party

**Ballot Title**-Action for review of the ballot title (RCW 29A.36.090).

**Petition for Certificate of Restoration of Opportunity-**Request for order that is intended to facilitate obtaining housing and employment (RCW 9.97.020).

**Change of Name-**Petition for a change of name. If change is confidential due to domestic violence/anti-harassment see case type 5 instead.

**Deposit of Surplus Funds**-Deposit of money or other item with the court.

**Emancipation of Minor-**Petition by a minor for a declaration of emancipation.

**Injunction**-Complaint/petition to require a person to do or refrain from doing a particular thing.

**Interpleader**-Petition for the deposit of disputed earnest money from real estate, insurance proceeds, and/or other transaction(s).

**Malicious Harassment-**Suit involving damages resulting from malicious harassment.

**Minor Settlements**-Petition for a court decision that an award to a minor is appropriate when no letters of guardianship are required (e.g., net settlement value $25,000 or less).

**Petition for Civil Commitment (Sexual Predator)-**Petition for the involuntary civil commitment of a person who 1) has been convicted of a sexually violent offense whose term of confinement is about to expire or has expired, 2) has been charged with a sexually violent offense and who has been determined to be incompetent to stand trial who is about to be released or has been released, or 3) has been found not guilty by reason of insanity of a sexually violent offense and who is about to be released or has been released, and it appears that the person may be a sexually violent predator.

**Property Damage-Gangs-**Complaint involving damage to property related to gang activity.

**Public Records Act-**Actions filed under RCW 42.56.

**Relief from Duty to Register**-Civil action requesting relief from duty to register as a sex offender. Petition can address the registration obligation that arises from multiple cases. RCW 9A.44.142, 9A.44.143.

**Restoration of Firearms Rights-**Petition seeking restoration of firearms rights under RCW 9.41.040 and 9.41.047. *(Eff. 9-2-2014)*

**School District-Required Action Plan**-Petition filed requesting court selection of a required action plan proposal relating to school academic performance.

**Seizure of Property from the Commission of a Crime**-Seizure of personal property that was employed in aiding, abetting, or commission of a crime, from a defendant after conviction.

**Seizure of Property Resulting from a Crime-**Seizure of tangible or intangible property that is the direct or indirect result of a crime, from a defendant following criminal conviction (e.g., remuneration for, or contract interest in, a depiction or account of a crime).

**Subdivision Election Process Review-**Petition seeking court acknowledgement of compliance (RCW 29A.92).

**Subpoenas**-Petition for a subpoena.

**Voter Election Law Review-**Action filed by voters requesting review of Voting Rights Act (RCW 29A.92).

**PROPERTY RIGHTS**

**Condemnation**-Complaint involving governmental taking of private property with payment, but not necessarily with consent.

**Foreclosure**-Complaint involving termination of ownership rights when mortgage or tax foreclosure is involved; ownership is not in question.

**Land Use Petition**-Petition for an expedited judicial review of a land use decision made by a local jurisdiction (RCW 36.70C.040).

**Property Fairness**-Complaint involving the regulation of private property or restraint of land use by a government entity brought forth by Title 64 RCW.

**Quiet Title**-Complaint involving the ownership, use, or disposition of land or real estate other than foreclosure.

**Unlawful Detainer**-Complaint involving the unjustifiable retention of lands or attachments to land, including water and mineral rights.

**TORT, MEDICAL MALPRACTICE**

**Hospital**-Complaint involving injury or death resulting from a hospital.

**Medical Doctor**-Complaint involving injury or death resulting from a medical doctor.

**Other Health Care Professional-**Complaint involving injury or death resulting from a health care professional other than a medical doctor.

**TORT, MOTOR VEHICLE**

**Death**-Complaint involving death resulting from an incident involving a motor vehicle.

**Non-Death Injuries** -Complaint involving non-death injuries resulting from an incident involving a motor vehicle.

**Property Damage Only**-Complaint involving only property damages resulting from an incident involving a motor vehicle.

**TORT, NON-MOTOR VEHICLE**

**Asbestos**-Complaint alleging injury resulting from asbestos exposure.

**Other Malpractice**-Complaint involving injury resulting from other than professional medical treatment.

**Personal Injury**-Complaint involving physical injury not resulting from professional medical treatment, and where a motor vehicle is not involved.

**Products Liability**-Complaint involving injury resulting from a commercial product.

**Property Damages**-Complaint involving damage to real or personal property excluding motor vehicles.

**Victims of Motor Vehicle Theft**-Complaint filed by a victim of car theft to recover damages. (RCW 9A.56.078).

**Wrongful Death**-Complaint involving death resulting from other than professional medical treatment.

**WRIT**

**Writ of Habeas Corpus**-Petition for a writ to bring a party before the court.

**Writ of Mandamus**-Petition for writ commanding performance of a particular act or duty.

**Writ of Restitution**-Petition for a writ restoring property or proceeds; not an unlawful detainer petition.

**Writ of Review**-Petition for review of the record or decision of a case pending in the lower court; does not include lower court appeals or administrative law reviews.

**Miscellaneous Writs**

FILED

NOV 14 2022

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

NICHOLAS ROLOVICH,

    Plaintiff,

v.

WASHINGTON STATE UNIVERSITY,
an agency of the State of Washington;
PATRICK CHUN, Director of Athletics for
Washington State University, in his
individual capacity; and JAY INSLEE,
Governor, in his official capacity,

    Defendants.

No. **22-2-00244-38**

**COMPLAINT**

## I. INTRODUCTION

1.    Plaintiff Nicholas Rolovich brings this action to vindicate his federal and state constitutional, statutory, and contractual rights, which rights were violated by Defendants, causing Mr. Rolovich significant and ongoing damages.

2.    This action arises under the laws of the United States, specifically, 42 U.S.C. §§ 1983, 1988, 42 U.S.C. § 2000e, *et seq.*, and the First and Fourteenth Amendments to the United States Constitution. This action also arises under the laws of the State of Washington, including RCW 49.60 *et seq.* (Washington Law Against Discrimination ("WLAD")), RCW 49.48, *et seq.,* RCW 49.52, *et seq.*, Article I, section 9 of the Washington Constitution, and state contract law.

COMPLAINT - 1

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

## II. JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to RCW 2.08.010.

4.     Venue is proper in this district pursuant to RCW 4.12.025(1) because Washington State University's ("WSU") principal business is located in Whitman County and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and constitutional violations alleged herein, occurred in Whitman County. Additionally, the Employment Agreement between Mr. Rolovich and WSU requires that any litigation regarding enforcement or construction of the terms of the Agreement be filed in Whitman County Superior Court.

## III.  EXHAUSTION OF ADMINISTRATIVE PROCEDURES/REMEDIES

**1.     WSU Administrative Process**

5.     Pursuant to Mr. Rolovich's employment agreement with WSU, he was required to appeal his termination, first, to Mr. Chun, and upon Mr. Chun's denial of the appeal, to WSU President, Kirk Schulz. Mr. Rolovich timely appealed to Mr. Chun, and then President Schulz. President Schulz denied Mr. Rolovich's appeal on December 6, 2021.

**2.     Equal Employment Opportunity Commission/Washington State Human Rights Commission**

6.     On or about February 14, 2022, Mr. Rolovich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act 1964, 42 U.S.C. §§ 2000 *et seq*. Because the Washington State Human Rights Commission ("WHRC") is a designated Fair Employment Practices Agency ("FEPA") in partnership with the EEOC, Mr. Rolovich's EEOC filing (dual filing) fulfills the State's requirement that a 49.60.030, *et seq.,* claim be filed with the State prior to any court filing. The State and federal claims arise out of the same facts alleged herein.

COMPLAINT - 2

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

7. On or about August 16, 2022, Mr. Rolovich received, from the Department of Justice, Civil Rights Division ("DOJ"), a Notice of Right to Sue Within 90 Days in response to his previously filed charge of discrimination with the EEOC. This complaint has been filed within 90 days of Mr. Rolovich's receipt of the DOJ Notice of Right to Sue.

**3.      Department of Enterprise Services—Office of Risk Management (Tort Claim)**

8. On or about April 27, 2022, Mr. Rolovich filed a tort claim with the State of Washington Department of Enterprise Services, Office of Risk Management.

9. More than 60 days has elapsed from the date of filing Mr. Rolovich's tort claim. RCW 4.92.110.

10. Any and all prerequisites to the filing of this lawsuit shave been met.

**IV. PARTIES**

11. Plaintiff Nicholas Rolovich was Head Football Coach for WSU from January 14, 2020, until he was terminated on December 6, 2021. He currently resides in Northern California.

12. Washington State University is an agency of the State of Washington, with a principal place of business located at Pullman, Washington. WSU has approximately 7,000 employees.

13. Defendant Patrick Chun is Athletics Director for WSU.  He is sued in his individual capacity only. At all times relevant to this complaint, Patrick Chun was acting as an agent of WSU.

14. Defendant Jay Inslee is the governor of the State of Washington. He is sued in his official capacity.

**V. STATEMENT OF FACTS**

15. Washington State University ("WSU) terminated head football coach Nicholas Rolovich after he had refused to be vaccinated because of his religious and personal beliefs. WSU claimed that Mr. Rolovich's refusal to be vaccinated gave the University "just

COMPLAINT - 3

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

cause" to terminate him. By claiming that it had just cause to terminate Mr. Rolovich, WSU did not have to pay him liquidated damages as provided for in the employment agreement. The liquidation clause required WSU to pay Mr. Rolovich sixty percent of his $2,000,000+ base salary for the approximately three and one-half years remaining on his approximately five-year contract.

**A.    The Employment Agreement Between WSU and Mr. Rolovich**

16.    On January 14, 2020, Mr. Rolovich entered into an employment agreement with Washington State University to serve as its head football coach. (A true and correct copy of the employment agreement is attached hereto as EXHIBIT A, and incorporated herein.) The Agreement was to expire on June 30, 2025. WSU's termination of Mr. Rolovich became final on December 6, 2021, when President Schulz denied Mr. Rolovich's final appeal.

17.    The agreement provides that WSU could terminate Mr. Rolovich "without cause" at any time, but if WSU terminated him without cause, it would be required to pay "liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of [the] Agreement." At the time of his termination, Mr. Rolovich had approximately three and one-half more years to serve as WSU's head football coach.

18.    The agreement also provides that WSU could terminate Mr. Rolovich for "just cause" if he was found to be in violation of the just cause provisions set forth in the contract. If WSU terminated Mr. Rolovich for just cause, "all obligations of the University to make further payments under th[e] Agreement and/or to provide any other consideration . . . [would] cease."

19.    The employment agreement sets forth the following grounds for "just cause" termination of Mr. Rolovich:

> **4.1 Termination by University for just cause**. The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as

COMPLAINT - 4

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

examples of its normally understood meaning in employment contracts, any of the following:

**4.1.1** Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

**4.1.2** Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

**4.1.3** Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

**4.1.4** An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

**4.1.5** Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

**4.1.6** Prolonged absence from duty without the consent of Employee's supervisor.

COMPLAINT - 5

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

20.     Nothing in Mr. Rolovich's employment agreement with WSU contemplates a scenario where WSU could claim "just cause" to terminate him because he refused to violate his religious faith, conscience, or bodily integrity.

**B.     Unlike Other WSU Football Coaches, Mr. Rolovich's Agreement Did Not Include Provisions Requiring Him to Follow State and Federal Health and Safety Guidelines**

21.     Less than two months after Mr. Rolovich entered into his employment contract with WSU, on February 29, 2020, Governor Inslee issued the first of nearly 500 proclamations related to COVID-19, declaring a State of Emergency in the State of Washington.

22.     On or about July 2021, WSU induced some of its football coaches to sign new employment agreements with provisions requiring them to "follow all federal, state, and local health directives, as well as university policies related to health and safety."

23.     Mr. Rolovich never signed an amendment to his employment agreement requiring him to follow health directives or university policies related to health and safety. His contract with WSU contains no such provisions.

**C.     WSU Willfully and Improperly Withheld Wages from Mr. Rolovich**

24.     In or around the summer of 2020, WSU approached Mr. Rolovich and asked him whether he would, in light of the effect of the COVID-19 pandemic on WSU's finances, agree to allow WSU to take out and keep ten percent of his wages.

25.     Mr. Rolovich orally agreed to WSU's proposed ten percent withholding, but only on the condition that WSU not withhold ten percent from his assistant coaches.

26.     Nevertheless, WSU did withhold ten percent from the salaries of its assistant football coaches, who were induced to sign new agreements reflecting the ten percent withholding from their salaries. Despite having violated the conditions set by Mr. Rolovich, WSU withheld ten percent from Mr. Rolovich's salary from May 15, 2020 through July 30, 2020.

COMPLAINT - 6

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**D.    Mr. Chun's/WSU's Hostility Toward Mr. Rolovich**

27.    As set forth below, Mr. Chun made a number of statements to Mr. Rolovich that demonstrated his hostility toward Mr. Rolovich's expressed religious, personal, and scientific reasons for refusing to receive a COVID vaccine. Even before Governor Inslee issued his vaccine Mandate, Mr. Chun told Mr. Rolovich that his request for a religious exemption would be denied and he would be fired with cause unless he agreed to comply with the vaccine mandate.

28.    On or around May 24, 2021, Mr. Chun, after Mr. Rolovich said that he was not planning on getting a COVID-19 vaccine, claimed that he was worried about Mr. Rolovich's mental health and accused him of having extreme views regarding many issues.

29.    On or about May 27, 2021, Mr. Rolovich was called to a 3 p.m. meeting at Mr. Chun's office. Mr. Chun told Mr. Rolovich that his beliefs were making him incapable of leading his players. Mr. Chun also tried to get Mr. Rolovich into counseling because he believed that the Mr. Rolovich had mental health issues. Mr. Chun suggested that Mr. Rolovich should talk to Mr. Chun's wife because she had been in a couple different religions he referred to as "cults".

30.    In August 2020, before Governor Inslee's issued a vaccine mandate for state employees, WSU had its employees check boxes on a computer form to designate their reason for not wanting to be vaccinated. The form provided for a medical exemption and a personal/religious exemption. Mr. Rolovich checked the personal/religious box.

31.    On August 16, 2021, Mr. Rolovich was called to an urgent meeting with Mr. Chun and Deputy Director of Athletics, Bryan Blair. At this meeting, Mr. Chun told Mr. Rolovich that Governor Inslee was intending to issue a vaccine mandate that would eliminate the "personal exemption" from the coaching staff's declaration of vaccination status. Mr. Chun warned Mr. Rolovich that any religious exemption request he submitted

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 7

would be scrutinized to no end, and that Inslee's mandate would have a "high threshold" for religious exemptions moving forward.

32.     At that same meeting, Mr. Chun confidently told Mr. Rolovich that if he did not get the vaccine, he could be expected to be fired with cause on October 19, 2021.

33.     Mr. Chun's predictions about how WSU would treat requests for religious exemptions are consistent with the State's vaccine mandate policy as set forth in an August 3, 2021 email from Kathryn Leathers, Governor's Office General Counsel, to staff with the Attorney General's Office.[1] In that email she explained: "Of possible exemptions [to the vaccine mandate]: medical for sure; and religious (if we have to; if yes, as narrow as possible)."

34.     WSU's statistics on vaccination exemptions reflect the Governor's policy, as well as WSU's bias against religious exemptions: By early October 2021, WSU had approved requests for medical exemptions at almost twice the rate of religious exemption requests ("437 employees have requested religious exemptions. Only 98 have been granted so far. Just over 100 employees have requested medical exemptions of which 41 have been granted so far.")[2]

35.     On August 19, 2021, Mr. Rolovich was summoned to a meeting with Mr. Chun. Assistant Athletics Director Bryan Blair also was present at the meeting. Mr. Chun told Mr. Rolovich that he had four choices: 1. Get the vaccine; 2. Don't get the vaccine and get fired; 3. Claim an exemption; or 4. Resign right now. Mr. Rolovich told Mr. Chun that he was not resigning and that he wanted to coach the team. Mr. Chun said, "but you say you don't care about the money" and "why don't you just resign?" Mr. Chun then accused Mr. Rolovich of having situational integrity. Mr. Chun also called Mr. Rolovich

---

[1] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

[2] Erin Robinson, WSU granting fewer religious exemptions than the state as a whole, KXLY Spokane (Oct. 13, 2021), https://www.kxly.com/wsu-granting-fewer-religious-exemptions-than-the-state-as-a-whole/.

COMPLAINT - 8

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

a "con-man" and accused him of being selfish. Mr. Chun then stated that Mr. Rolovich's objections to receiving the vaccine were causing Mr. Chun and President Schulz reputational damage. Mr. Chun then stated that all Mr. Rolovich had to do is get vaccinated.

36.    At the same meeting, Mr. Chun admitted his efforts to get Mr. Rolovich to take the vaccination in the past had been coercive, and Mr. Rolovich responded that the present meeting was much more coercive than earlier meetings. Mr. Chun pressed Mr. Rolovich again about the vaccine, and Mr. Rolovich said that he believed he had privacy rights and did not feel comfortable telling Mr. Chun about his reasons for declining to receive a COVID-19 vaccine. Mr. Chun then demanded that Mr. Rolovich tell him what his answer would be.

37.    Mr. Chun then stated that Governor Inslee "did this" just to come after Mr. Rolovich and WSU. Based on the context of Mr. Chun's statement, Mr. Rolovich understood "did this" to mean that Governor Inslee was trying to force Mr. Rolovich's hand with his new mandate because he was angry that the highest paid and one of the highest profile State employees had asserted personal or religious objections to his vaccine mandate. Mr. Chun also admitted to Mr. Rolovich that the Board of Regents wanted him fired. At this point in their heated exchange, Mr. Chun modified his earlier statement: he now said that Mr. Rolovich only had two options: get vaccinated or resign.

38.    Up to this point, Mr. Rolovich had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines. Mr. Rolovich did not feel comfortable talking about his faith because it is a very personal matter to him and he was uncomfortable talking about his religious beliefs with his supervisor.

39.    Mr. Rolovich also was uncomfortable because he did not know how WSU would react to him sharing his religious opposition to medical research based on aborted fetal tissue, given that WSU professors have in the past publicly defended such research. However, after Mr. Chun made it clear that WSU intended to terminate him, Mr. Rolovich

COMPLAINT - 9

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

asked Mr. Chun and Mr. Blair about the University's process for requesting a religious exemption from a vaccine mandate. Mr. Chun and Mr. Blair said they did not know details about the University's process. They said they had been on the phone with WSU's Human Resource Services ("HRS") about that topic earlier in the day. Mr. Rolovich also had emailed HRS about the process by this time, but no one had any answers because the Governor had not yet made his proclamation.

40.     Mr. Chun then told Mr. Rolovich that he needed to have his religious exemption approved by August 29, the Sunday before the Utah State game. Mr. Rolovich asked who at WSU would review and approve religious exemption requests. Mr. Chun and Mr. Blair said they did not know. Mr. Rolovich asked them when the religious exemption application would be available. They said they did not know. Mr. Rolovich then responded that he feared the University would not be able to approve his exemption by Mr. Chun's August 29 deadline, given that the University's policy had not even been made public, let alone made available to him.

41.     Mr. Chun and Mr. Blair told Mr. Rolovich that they were in a time crunch and had to make a decision if he was going to coach that season. They said they did not want to start a season with Mr. Rolovich if they thought they may have to fire him on Oct 18th, pursuant to the Governor's mandate.

42.     Mr. Rolovich responded that he would seek a religious exemption right then if one was available. Mr. Chun and Mr. Blair then got even more heated and started to question Mr. Rolovich's character. Mr. Chun said if Mr. Rolovich got the religious exemption, he would forever question his character. Mr. Chun and Mr. Blair both talked about the early days of the pandemic, and that Mr. Rolovich had not mentioned his faith. Mr. Rolovich said that he did not see the point, as he does not see faith and science as exclusive.

43.     Mr. Chun and Mr. Blair then stressed that the University's religious exemption would be hard to get and that there was no guarantee that Mr. Rolovich's request

COMPLAINT - 10

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

would be approved. Mr. Rolovich again asked what the criteria was going to be. They said they did not know.

44.     Mr. Rolovich did not feel comfortable talking about his faith because his faith is a very personal matter to him and because he was uncomfortable talking about his religious beliefs with his supervisor.

45.     On August 20, 2021, Governor Inslee issued Proclamation 21-14.1, which required all state employees to be fully vaccinated by October 18, 2021.

46.     Governor Inslee's Proclamation mandated vaccination for state employees "even when the only vaccines available are those authorized under U.S. Food and Drug Administration Emergency Use Authorizations."

**E.     Governor Inslee and WSU Mandated That Coach Rolovich and All State Employees Accept an Experimental Vaccine**

47.     At all times relevant to this Complaint, the only vaccines available to Washington State employees were vaccines authorized under U.S. Food and Drug Administration Emergency Use Authorizations. According to DailyMed, a publication of the National Institute of Medicine, the only FDA-approved vaccine—Comirnaty—was not available to the American public:

SEPTEMBER 13, 2021
Pfizer received FDA BLA license for its COVID-19 vaccine

Pfizer received FDA BLA license on 8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY). At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed 2 new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename.

At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution. As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels.[3]

---

[3] *Pfizer received FDA BLA license for its COVID-19 vaccine*, DailyMed (Sept. 13, 2021), https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (Last visited

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 11

48.     On August 23, 2021, the United States Food and Drug Administration ("FDA") issued two separate letters pertaining to two separate COVID-19 vaccines. One letter, addressed to Pfizer Inc., concerned the Pfizer-BioNTech COVID-19 Vaccine. Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021), ("Pfizer Letter") (A true and correct copy of the Pfizer Letter is attached hereto as EXHIBIT B and incorporated herein). The other letter, addressed to BioNTech Manufacturing GmbH, concerned the COMIRNATY vaccine. Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), ("BioNTech Letter") (A true and correct copy of the BioNTech Letter is attached hereto as EXHIBIT C and incorporated herein).

49.     In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted Emergency Use Authorization (EUA) for the Pfizer-BioNTech COVID-19 Vaccine. (Pfizer Letter at 1.) It also notes that the EUA was continued on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2).

50.     The FDA stated in the Pfizer Letter that, although it had granted the COMIRNATY vaccine full approval "for certain uses," the Pfizer-BioNTech COVID-19 Vaccine was still only authorized under an EUA. (Pfizer Letter at 2).

51.     At all times relevant to this Complaint, the Pfizer-BioNTech COVID-19 Vaccine remained available only under the authorization of an EUA. (Pfizer Letter).

52.     The Federal Food, Drug, And Cosmetic Act provides that subject to the limitations referenced and described in U.S.C. § 360bbb-3, the Secretary of Health and Human Services "may authorize the introduction into interstate commerce, during the effective period of a declaration [of emergency or threat justifying emergency authorized

Nov. 8, 2022); *see also,* Summary Basis of Regulatory Action – Comirnaty, FDA (Nov. 8, 2021) ("November 8 Comirnaty SBRA") at 5, available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022 ("In the U.S., there are no licensed vaccines or anti-viral drugs for the prevention of COVID-19."), available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022).

COMPLAINT - 12

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

use] under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an 'emergency use.'" 21 U.S.C. § 360bbb-3(a)(1). As an essential part of the explicit statutory conditions for EUA, the EUA Statute mandates that all individuals to whom the EUA product may be administered be given the option to accept or refuse administration of the product:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:
>
> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> (I)  that the Secretary has authorized the emergency use of the product;
>
> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
>
> (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A).

53.     The statutorily required Fact Sheets for each of the EUA COVID-19 vaccines acknowledge that individuals cannot be compelled to accept or receive the vaccine. *See, e.g.*, Pfizer-BioNTech, Fact Sheet for Recipients and Caregivers (June 25, 2021), https://www.fda.gov/media/144414/download ("It is your choice to receive or not to receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.").

54.     WSU never explained to Mr. Rolovich the potential risks of taking the experimental vaccine.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 13

55.     WSU never gave Mr. Rolovich the option to accept or decline the experimental vaccine, telling him only that he would be fired for just cause if he refused.

**F.     WSU Established a Blind Review Process for Exemption Requests**

56.     In the weeks that followed Governor Inslee's August 20, 2021, proclamation creating a COVID-19 vaccine mandate for State employees, WSU established procedures as to how employees could request, and how the University would consider and approve or deny requests for religious and/or medical exemptions from the vaccine mandate.

57.     WSU published its procedures for evaluating requests for religious exemptions from the vaccine mandate on the University's website.[4] Part of this policy is expressed in the form of FAQs. In that context, the University represented that HRS would not share the details of an employee's request for an exemption with the employee's supervisor or manager:

> **I am requesting a medical or religious exemption, what will my supervisor/manager see as my exemption reason?**
>
> The Workday process will show as 'in-process' when an exemption is requested and will be updated to 'complete' once reviewed and accepted. HRS will work directly with employees regarding their requested exemption as needed.

58.     The University described its process in more detail in an October 8, 2021, statement posted on its website:

> The requests for religious exemptions are evaluated in a 'blind' review process, meaning the identities of the individuals requesting exemptions are unknown to the members of the review committee except in instances when additional information is needed through follow-up contact. Separate review committees were created for students and employees. . . .
>
> For employees, the exemption requests go through a two-step process. The first is the blind review. Then, if an exemption is approved, the request moves to a separate accommodation review step where a determination is made

---

[4] WSU, Human Resource Services, COVID-19 Vaccination Verification (Oct. 12, 2021), available at https://web.archive.org/web/20211103092159/https://hrs.wsu.edu/covid-19/vax-verification  (last visited Nov. 10, 2022).

COMPLAINT - 14

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community.[5]

59.   Phil Weiler, WSU vice president for communications, reiterated the process WSU would use to handle exemption requests:

> If the blind review results in the approval of Rolovich's exemption request, the process would enter a second phase. . . . An approved request would be sent to the human resources department, which would identify the employee in question and send an email to his/her supervisor indicating the exemption had been approved.[6]

At that point, according to Weiler, the supervisor would determine if the unvaccinated employee would be capable of "keeping the public safe" and perform his/her job effectively. *Id.*

### G.   WSU's Blind Review Process Determined that Mr. Rolovich's Religious Beliefs Were Sincere and Granted his Request for a Religious Exemption

60.   On September 28, 2021, Mr. Rolovich completed his application for a religious exemption and submitted it to HRS.

61.   On October 6, 2021, HRS notified Mr. Chun that the University had completed its "good faith review" process and had determined that Mr. Rolovich was entitled to a religious exemption from the COVID-19 vaccine requirement because it found that he had articulated a "sincerely held religious belief" that prevented him from complying with the Governor's mandate.

62.   HRS then informed Mr. Chun that it was "considering approving the employee's request (for accommodation) subject to the following terms and conditions,"

---

[5] Nearly 90% of WSU Employees are Vaccinated, WSU, Oct. 8, 2021, https://everett.wsu.edu/nearly-90-of-wsu-employees-are-vaccinated/ (last visited Nov. 10, 2022).

[6] Jon Wilner, Would WSU actually fire Nick Rolovich? Examining the exemption review process with the vaccine mandate deadline approaching, Mercury News, Oct. 7, 2021, https://www.mercurynews.com/2021/10/07/would-wsu-actually-fire-nick-rolovich-examining-the-exemption-review-process-as-vaccine-mandate-deadline-approaches/ (last visited Nov. 10, 2022).

COMPLAINT - 15

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

summarizing a proposed list of accommodations, including mask wearing, social distancing, and testing requirements. HRS said the next step would be for the Athletics Department to decide whether it was "able to accommodate this request with the above recommendations." HRS stated in that email that it would not reach out to Mr. Rolovich until the University's "decision on the Religious Accommodation is finalized." HRS requested that the Athletics Department respond to its proposed accommodations by October 8.

**H.      Chun Improperly Inserted Himself Into the Process and Compelled the WSU to Overturn Its Determination that Mr. Rolovich's Religious Beliefs Were Sincere**

63.      Mr. Chun, writing on behalf of the WSU Athletics Department, responded to HRS on October 13 with two memoranda. The first memorandum told HRS that it had rejected HRS' proposed accommodations and had determined that "the department is not able to accommodate this request."

64.      Mr. Chun's and the Athletics Department's second memorandum challenged HRS' conclusion that "Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being vaccinated for COVID-19." That challenge was based on the Athletics Department's assertion that "Rolovich had made several statements that cast doubt on his claimed sincerely held religious belief." The memorandum stated that the fact that Rolovich had articulated other reasons for refusing a COVID vaccination before he had told Mr. Chun about his religious objections to the available COVID vaccines "support[ed] re-evaluation of the claimed sincerely-held religious belief."

65.      On October 14, 2021, Department of Environmental Health and Safety ("EH&S") issued a memorandum to Mr. Chun with extensive detail about how it had used its "expertise in environmental and occupational health and safety" to make an "individualized assessment" of Mr. Rolovich's working environment and formulate a list of "reasonable and

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 16

necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

66.   Mr. Chun, writing on behalf of the Athletics Department, subsequently wrote HRS a memorandum, copying EH&S, that rejected EH&S' recommendations. Mr. Chun/Athletics Department rejected EH&S' assessment that its recommendations would "ensure the safety of the employee and others the employee may be in contact with."

67.   The Mr. Chun and the Athletics Department also rejected EHS's proposed accommodations on the basis that having an unvaccinated head coach "would create an undue hardship for WSU Athletics given his assigned duties and responsibilities." The memorandum states, in part:

- "WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff."

- "[B]ecause employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches)."

- "The damage to the mission and reputation of the University posed by this situation cannot be understated [*sic*], nor can it be resolved by accommodation."

**I.   Mr. Rolovich's Compliance with WSU Protocols, and Mr. Chun's Violation of WSU Protocols, Undermine Mr. Chun's Given Reasons for Not Accommodating Mr. Rolovich's Religious Convictions**

68.   During the pandemic, WSU imposed protocols it hoped would mitigate the transmission of Covid among its employees and students. Mr. Rolovich was required to follow specific protocols developed for him because he was unvaccinated. Days before Mr. Rolovich informed Mr. Chun that he intended to seek a religious exemption from the vaccine Mandate, Mr. Chun said that he was confident that Mr. Rolovich could safely coach WSU's football team.

COMPLAINT - 17

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

69.     The Seattle Times reported that Mr. Rolovich was "undergoing daily COVID-19 testing and wears a mask. Chun said the coach is adhering to all protocols."[7] "WSU athletic director Pat Chun, who is vaccinated, made it clear Wednesday that he backs his coach, saying Rolovich is the right person for the job despite the two being diverged on the vaccine decision." *Id*.

70.     Mr. Chun, however, did not follow WSU's Covid protocols. Four days after he fired Mr. Rolovich for allegedly "undermin[ing] the University's efforts to promote student safety," Mr. Chun was caught violating masking regulations at a donor event;[8] days later Mr. Chun was caught violating masking regulations while in the locker room with WSU football players.[9]

71.     When a local politician pointed out Mr. Chun's double-standard, Mr. Chun went to the City Councilor's place of business, launched a vulgar tirade, and threatened violence in front of the City Councilor's teenage daughter. Mr. Chun became so angry that the police got involved and decided that Mr. Chun would be "permanently trespassed" from the City Councilor's businesses.[10]

[7] Scott Hanson, WSU in 'strict COVID management' after football coach Nick Rolovich's decision to not get vaccinated, Spokesman Review, Aug. 13, 2021, https://www.spokesman.com/stories/2021/aug/13/wsu-in-strict-covid-management-after-football-coac/ (last visited Nov. 10, 2022).

[8] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/ (last visited Nov. 10, 2022).

[9] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664 (last visited Nov. 10, 2022). Mr. Chun's conduct violated both the University's and host Arizona State University's masking policies. *See* Arizona State University, Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

[10] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-trespassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html (last visited Nov. 10, 2022); Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/ (last visited Nov. 10, 2022).

COMPLAINT - 18

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

72.     On November 19, 2021, a local reporter noted that Mr. Chun was disregarding masking rules at a WSU basketball game in Idaho.[11]

**J.      Stanford Public Health and Infectious Disease Expert States that WSU Could Have Safely Accommodated Mr. Rolovich**

73.     Dr. Bhattacharya, a former Professor of Medicine (20+ years) and current Professor of Health Policy at Stanford University School of Medicine submitted a 29 page declaration to Mr. Chun and President Schulz on behalf of Mr. Rolovich. The Declaration provided scientific evidence in support of his conclusion that WSU could keep its employees safe while granting exemptions for those whose medical conditions and religious convictions prevent them from receiving a COVID vaccine.

74.     Dr. Bhattacharya also is a research associate at the National Bureau of Economic Research, and Director of Stanford's Center for Demography and Economics of Health and Aging. Dr. Bhattacharya holds an M.D. and Ph.D. from Stanford University. He has published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. Dr. Bhattacharya's research has been cited in the peer-reviewed scientific literature more than 11,600 times.

75.     Dr. Bhattacharya has dedicated his professional career to the analysis of health policy, including infectious disease epidemiology and policy, and the safety and efficacy of medical interventions. He has both studied extensively and commented publicly on the necessity and safety of vaccine requirements for those who have contracted and recovered from COVID-19 (individuals who have "natural immunity"). Dr. Bhattacharya is intimately familiar with the emergent scientific and medical literature on this topic and pertinent government policy responses to the issue both in the United States and abroad.

---

[11] Katie Daviscourt, WSU athletic director caught violating COVID protocols after firing head football coach for refusing vaccine, Post Millennial, Nov. 19, 2021, https://thepostmillennial.com/wsu-athletic-director-violating-covid-firing-coach (last visited Nov. 10, 2022).

COMPLAINT - 19

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

76.     Dr. Bhattacharya also is the primary co-author of the Great Barrington Declaration, which describes an alternate policy of focused protection. His co-authors of the Declaration include Prof. Martin Kulldorff of Harvard University and Prof. Sunetra Gupta of Oxford University. Over 12,000 epidemiologists and public health professionals and 35,000 medical professionals had co-signed the Declaration by the time Mr. Rolovich was terminated.

77.     WSU produced no evidence, let alone scientific evidence, that the accommodation plans developed by EH&S would not be effective for Mr. Rolovich.

78.     In his declaration, Dr. Bhattacharya noted, "According to a meta-analysis by Dr. John Ioannidis of every seroprevalence study conducted to date of publication with a supporting scientific paper (74 estimates from 61 studies and 51 different localities worldwide), the median infection survival rate—the inverse of the infection fatality rate—from COVID-19 infection is 99.77%. For COVID-19 patients under 70, the meta-analysis finds an infection survival rate of 99.95%. A separate meta-analysis by other scientists independent of Dr. Ioannidis' group reaches qualitatively similar conclusions.

79.     Dr. Bhattacharya continued, "A study of the seroprevalence of COVID-19 in Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the infection survival rate in a preprint companion paper: 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65."

80.     Those numbers are consistent with what the US CDC has reported. A US CDC report found between 6 and 24 times more SARS-CoV-2 infections than cases reported between March and May 2020. Correspondingly, the CDC's estimate of the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate. For people ages 20-49 years, it was 0.02%, meaning that young adults have a 99.98% survivability rate. For people age 50-69 years, it was 0.5%, meaning this age group

COMPLAINT - 20

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

has a 99.5% survivability rate. Finally, for people ages 70+ years, it was 5.4%, meaning seniors have a 94.6% survivability rate.

81.    Dr. Bhattacharya stated, "It has been found that vaccinated individuals are at least as likely as unvaccinated individuals to be shedding live virus. Data from studies indicate that vaccinated and unvaccinated individuals infected with the Delta variant might transmit infection. Importantly, it has been shown that infectious SARS-CoV-2 is frequently found even in vaccinated persons."

82.    Also, the CDC reported in July 2021 that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated, leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[12]

83.    Dr. Bhattacharya noted that "[a]symptomatic individuals are an order of magnitude less likely to infect others than symptomatic individuals, even in intimate settings such as people living in the same household where people are much less likely to follow social distancing and masking practices that they follow outside the household. Spread of the disease in less intimate settings by asymptomatic individuals—including in the context of the WSU work environment—is likely to be even less likely than in the household."

84.    Dr. Bhattacharya concluded that the best empirical evidence shows that the probability that an asymptomatic individual will spread the disease is very low. And because the overwhelming majority of WSU employees were vaccinated in the fall of 2021, they faced even less risk from any of their asymptomatic, unvaccinated coworkers who receive an accommodation from WSU for religious or medical reasons.[13]

[12] *See* Joel Achenbach, CDC Reversal on Indoor Masking Prompts Experts to Ask, "Where's the Data?" Wash. Post, July 28, 2021, wapo.st/2THpmIQ (last visited Nov. 10, 2022).

[13] President Schulz had said that nearly 90 percent of WSU employees and 97 percent of students were vaccinated. Chuck Culpepper, Washington State Football Coach Nick Rolovich Fired after Failing to Comply with Vaccine Mandate, Washington Post, Oct. 18, 2021, https://www.washingtonpost.com/sports/2021/10/18/nick-rolovich-washington-state-fired-covid-mandate/. *See also* Donald G. McNeil, Jr., How Much Herd Immunity Is Enough?, NY Times, Dec. 24, 2020 (updated Sept. 22, 2021), https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html ("Dr. Fauci

COMPLAINT - 21

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

85.     When Mr. Rolovich was asymptomatic, he—like all other asymptomatic individuals—presented an almost 0% chance of infecting others with COVID-19.

86.     In Dr. Bhattacharya's expert opinion, derived from his personal scientific investigations, and his examination and analysis of a multitude of scientific studies, WSU could have safely accommodated Mr. Rolovich and other unvaccinated employees.

**K.     WSU's Termination of Mr. Rolovich as Head Coach**

87.     Mr. Rolovich arrived at a meeting on October 18, 2021, and one minute before that meeting, at 4:29, while waiting for Mr. Chun, Mr. Rolovich received an email from HRS Exemptions notifying him that the University was "unable to approve your request for an exemption and accommodation based on a sincerely held religious belief, practice, or observance."

88.     Though the HRS panel had already determined that Mr. Rolovich's religious beliefs were sincere and granted him a religious exemption on that basis, HRS allowed Mr. Chun to improperly influence and interfere with the final decision made in its blind review process. Mr. Chun notified HRS that he disagreed with HRS's determination regarding Mr. Rolovich's sincerity, and, as a result, HRS reversed its determination, stating, "[b]ased on your comments, in conjunction with the timing of your request for a religious accommodation, the University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement."

89.     HRS also reversed its position that Mr. Rolovich's sincere religious beliefs could be accommodated by WSU, adopting Mr. Chun and the Athletics Department's position that Mr. Rolovich could not "safely and effectively do [his] job without undue hardship to the University."

---

noted, a herd-immunity figure at 90 percent or above is in the range of the infectiousness of measles. 'I'd bet my house that Covid isn't as contagious as measles,' he said.").

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 22

90. At the October 18 meeting, Mr. Chun served Mr. Rolovich with Written Notice of Intent to Terminate with Just Cause.

91. Mr. Chun had a security officer, who was present during the meeting, escort Mr. Rolovich from the building and to Mr. Rolovich's truck.

92. Mr. Chun did not permit Mr. Rolovich to return to his office to retrieve his private property.

93. Mr. Chun did not permit Mr. Rolovich to speak with his WSU football players after the meeting.

94. As a direct and proximate result of WSU's, Governor Inslee's, and Mr. Chun's actions, Mr. Rolovich has suffered, and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, and compensation and benefits for which he is entitled to an award of monetary damages.

**COUNT I**
**BREACH OF CONTRACT**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

95. Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

96. Pursuant to the terms of WSU's employment contract with Mr. Rolovich, WSU could terminate him with just cause (as defined in the contract), or without cause, but if it terminated Mr. Rolovich without cause, WSU was required to pay liquidated damages in an amount equal to sixty percent of his remaining base salary. When he was terminated, Mr. Rolovich had approximately three and one-half years remaining on his contract.

97. WSU terminated Mr. Rolovich in December 2021, claiming that it had just cause to do so, and on that basis denied that it owed Mr. Rolovich any further compensation under Mr. Rolovich's employment agreement.

98. WSU breached its contract with Mr. Rolovich because it did not have just cause to terminate Mr. Rolovich.

COMPLAINT - 23

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

99.    WSU violated its own policies by allowing HRS to be improperly and unlawfully influenced by Mr. Chun, who persuaded HRS to reverse its determination that Mr. Rolovich's religious beliefs regarding Covid vaccines were sincere.

100.    Mr. Rolovich reasonably relied upon WSU's representation that it would follow a blind review process in determining whether a request for a religious exemption from the vaccine mandate was grounded in a sincere religious belief.

101.    Mr. Rolovich's determination that he could not receive a COVID-19 vaccine without violating his religious convictions was not a deliberate and serious violation of his contractual duties, it was not an act of misconduct, or an intentional or major violation or repeated instance of secondary violations, nor was it prejudicial to the best interests of the University or its athletic program. It was an act of faith, of conscience.

102.    By taking punitive action against Mr. Rolovich for raising a religious objection that the University's own process deemed sincere, WSU breached its employment agreement with Mr. Rolovich.

103.    After HRS determined that Mr. Rolovich's religious beliefs were sincere, both HRS and EH&S determined that Mr. Rolovich's sincere religious beliefs could be accommodated by requiring countermeasures to ensure his safety and others he may be in contact with.

104.    For approximately a year prior to his termination, Mr. Rolovich had successfully performed his job as head coach while following countermeasures required of him by WSU because of his vaccination status.

105.    Mr. Chun rejected the HRS and EH&S accommodation protocols developed for Mr. Rolovich, without ever seeking input from Mr. Rolovich.

106.    Mr. Rolovich's sincere religious beliefs could have been accommodated as was clearly demonstrated by HRS, and especially EH&S, whose expertise in environmental and occupational health and safety" made an "individualized assessment" of Mr. Rolovich's

COMPLAINT - 24

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

working environment and formulated a list of "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

107.    WSU's refusal to seek input from Mr. Rolovich on his religious accommodation, a duty imposed by law, was a breach of its employment agreement with Mr. Rolovich, as was Mr. Chun's predetermination before Governor Inslee's vaccine mandate that Mr. Rolovich would be fired with cause if he did not get vaccinated.

108.    WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

### COUNT II
### WASHINGTON LAW AGAINST DISCRIMINATION
### RCW 49.60 *et seq.*

109.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

110.    A substantial factor in WSU's decision to terminate Mr. Rolovich "for just cause" was his religious beliefs (creed) as expressed by him in seeking a religious exemption from Governor Inslee's vaccine mandate.

111.    An individual's exercise of religious beliefs in a decision not to be vaccinated, or take medicine, cannot lawfully serve as the basis for a just cause termination.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 25

**COUNT III**
**WASHINGTON CONSTITUTION, ARTICLE 1, SECTION 11**
**DISCRIMINATION AGAINST RELIGION/CONSCIENCE**

112.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

113.    The Washington State Constitution guarantees Mr. Rolovich "[a]bsolute freedom of conscience in all matters of religious sentiment, belief, and worship." The same constitutional provision states that "no one shall be molested or disturbed in person or property on account of religion."

114.    Defendants, by their conduct and words, discriminated against Mr. Rolovich because he acted according to his conscience, guided by his religion, in refusing to be vaccinated.

115.    Defendants' threat to fire Mr. Rolovich with "just cause" if he did not take an experimental vaccine was a disturbing and unlawful assault upon Mr. Rolovich's conscience, bodily integrity, and religious faith.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT IV**
**WRONGFUL WITHHOLDING OF WAGES**
**RCW 49.52, *et. seq.*, and RCW 49.48.010, *et seq.***

116.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

117.    From May 15, 2020 to July 15, 2020, WSU improperly and unlawfully withheld approximately ten percent of Mr. Rolovich's wages.

118.    WSU had a pre-existing duty under contract to pay Mr. Rolovich the specific compensation as set forth in the employment contract.

COMPLAINT - 26

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

### COUNT V
### VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*

119. Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

120. Title VII of the Civil Rights Act of 1964 prohibits WSU from discriminating against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C. §2000e-2(a).

121. Mr. Rolovich holds sincere religious beliefs that precluded him from receiving any of the COVID-19 vaccines available during the times relevant to this complaint.

122. Mr. Rolovich notified WSU of those beliefs by requesting a religious exemption and reasonable accommodations from the vaccine mandate.

123. WSU's HRS panel, pursuant to the University's established policies and protocol, determined that Mr. Rolovich had sincere religious beliefs that precluded him from taking the vaccine, thereafter notifying the Athletics Department (Mr. Chun) of its determination.

124. The HRS panel, having concluded that Mr. Rolovich's religious beliefs were sincere, asked only for Mr. Chun's input on whether Mr. Rolovich's sincere religious beliefs could be accommodated.

125. Both HRS and EHS determined that WSU could accommodate Mr. Rolovich's sincere religious beliefs.

126. WSU failed to engage with Mr. Rolovich in the interactive process set forth in the EEOC's Compliance Manual on Religious Discrimination before concluding that it would not accommodate his request for a religious exemption.

COMPLAINT - 27

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

127.    WSU's disapproval of Mr. Rolovich's sincerely-held religious reasons for refusing to receive a COVID-19 vaccine was one of the University's motives for its discriminatory treatment of Mr. Rolovich.

128.    Accommodating Mr. Rolovich's religious beliefs would not have resulted in an undue hardship on WSU's operations.

129.    WSU's discriminatory actions were intentional and/or reckless and in violation of Title VII.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT VI**
**42 U.S.C., SECTION 1983**
**First Amendment-Free Exercise of Religion and Fourteenth Amendment-Due Process**
**(Defendant Chun only, in his Individual Capacity)**

130.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

131.    All of the acts of Defendant Chun were conducted by him under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

132.    The law regarding the free exercise of religion in employment is well established.

133.    The law regarding due process in employment is well established.

134.    Defendant Chun knew the First Amendment prohibits government officials from discriminating against an employee because of his religious beliefs.

135.    Defendant Chun knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

136.    Defendant Chun knew the Fourteenth Amendment prohibits government from denying an employee due process.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 28

137.    Defendant Chun knew the Fourteenth Amendment prohibits government officials from denying an employee his right to due process.

138.    Defendant Chun acted with willful malice, and/or intentionally and in gross disregard of Mr. Rolovich's constitutional rights, and/or in reckless disregard of Mr. Rolovich's constitutional rights.

139.    As a direct and proximate result of Defendant Chun's actions, Mr. Rolovich has been deprived of his constitutional right to the free exercise of religion, to be free from governmental hostility directed at his religion, and his right to due process and equal protection under the law.

WHEREFORE, Plaintiff prays for damages against Defendant Chun as provided for by law.

**COUNT VII**
**42 U.S.C., SECTION 1983**
**(First Amendment-Free Exercise of Religion)**

140.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

141.    All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

142.    Defendants granted twice as many medical exemptions as religious exemptions to WSU employees, reflecting Defendants' discriminatory policy to grant religious exemptions as narrowly as possible.

143.    The creation of a formal mechanism for granting exemptions renders WSU's vaccine mandate not generally applicable because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 29

144. Defendants ultimately denied Mr. Rolovich's religious exemption request, terminated him, and improperly claimed it had just cause to do so, because Mr. Rolovich had informed Defendants that religious convictions precluded him from receiving a COVID-19 vaccine.

145. Mr. Rolovich's religious conviction to not be vaccinated cannot be punished by WSU by terminating him with just cause.

146. The actions of Defendants, as alleged herein, are unconstitutional abridgements of Mr. Rolovich's rights to the free exercise of religion secured by the First and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT VIII.**
**FOURTEENTH AMENDMENT-DUE PROCESS (As Applied)**

147. Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

148. All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

149. Defendants' policies, as administratively construed and applied against Mr. Rolovich, granted WSU officials unfettered discretion to disregard the process they created for determining whether a religious exemption would be granted and, therefore, abridged Mr. Rolovich's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

COMPLAINT - 30

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

      a.    Assume jurisdiction over this action;

      b.    Award damages in an amount to be determined at trial plus pre and post-judgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

      c.    Award liquidated damages, as provided for in the employment contract;

      d.    Award punitive damages, as provided for under 42 U.S.C. § 1983, Title VII, RCW 49.60 *et seq.* and as otherwise provide for under federal and state law;

      e.    Award double damages as provided for in RCW 49.52, *et seq.*;

      f.    Award damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus pre and post-judgment interest;

      g.    Award an offset for the adverse federal income tax consequences resulting from damages and award of attorneys' fees;

      h.    Award costs that Plaintiff has incurred in this action, including but not limited to expert witness fees, as well as reasonable attorneys' fees and costs to the fullest extent permitted by federal and state law; and

COMPLAINT - 31

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

i.      Award such other and further relief as the Court may deem just and proper.

DATED this 11th day of November, 2022.


By   /s Brian Fahling

Brian Fahling
WSBA #18894
LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: 425.802.7326
E-mail: bfahling@fahlinglaw.com


By   /s Eric Kniffin

Eric Kniffin
CO Bar #48016
(Pending Admission *Pro Hac Vice*)
LEWIS ROCA
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO 80907
T: 719-386-3017
E-mail: ekniffin@lewisroca.com

Attorneys for Plaintiff


COMPLAINT - 32

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**EMPLOYMENT AGREEMENT**

This Employment Agreement (Agreement) is made between Washington State University (University) and Nicholas R. Rolovich (Employee), and it cancels and replaces any and all prior employment agreements or understandings, whether in writing or otherwise, between these two parties.

1.     **Employment Position**

1.1.   **Employment as Employee of University.** Employee shall serve as the Head Coach of the University's Intercollegiate Football Program (Football) and shall perform the duties outlined in Section 1.2 herein during the term of this Agreement. Employee is subject to and governed by the terms and conditions of the Agreement.

1.2    **Description of Employee's responsibilities**

1.2.1   **Recognition of duties.** Employee agrees to devote Employee's best efforts to the performance of their duties for the University, and to comply with and support all rules, regulations, policies, and decisions established or issued by the University. Employee agrees to abide by all provisions of law, including the Washington State Ethics in Public Service Law, RCW 42.52. Employee also agrees during the term of this Agreement that Employee will not engage, directly or indirectly, in any business that would detract from Employee's ability to apply their best efforts to the performance of their duties hereunder. Employee also agrees not to usurp any economic opportunities of the University.

1.2.1.1   **General duties and responsibilities.** Employee agrees to undertake and perform properly, efficiently, to the best of Employee's ability, and consistent with the standards of the University all duties and responsibilities (as defined in Section **1.2.1.2** and/or Athletic Director) attendant to the position of Head Coach of the University's Football Program. Employee further agrees to abide by and comply with the constitution, bylaws, and interpretations of the National Collegiate Athletic Association (NCAA) and Pac-12 Conference (Pac-12), Title IX of the Education Amendments Act of 1972 (Title IX) including, but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA, Pac-12 and University policy, and all NCAA, Pac-12, and University rules and regulations relating to the conduct and administration of the Football Program as now constituted or as may be amended during the term hereof. In the event Employee becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, Employee shall promptly report the same to the Athletic Director, Director of Compliance, or Faculty Athletic Representative of the University, and cooperate and comply with any related inquiries or investigations. Employee agrees to adhere to, respect, and to follow the academic standards and requirements of the University in regard to the recruitment and eligibility of prospective and current student-athletes for the Football Program. All academic standards, requirements, and policies of the University shall also be observed by Employee at all times.

1.2.1.2   **Specific duties and responsibilities.** Employee is accountable for the following list of specific duties and responsibilities. This list supplements Employee's other general duties and responsibilities provided elsewhere in this Agreement.

a.   Integrate the Football program into the whole spectrum of academic life to complement the University and its mission in the state and community;

b.   Evaluate, recruit, train, and develop student-athletes to compete successfully against major college competition in a quality Division I Football program;

1

**#15.42**

c. Maintain a competitive Football program consistent with the Athletic Director's goals, which will reasonably be established upon consultation with Employee;

d. Cooperate with and support the University's faculty and administrative officials to ensure that student-athletes participating in the Football program meet all academic requirements;

e. Conduct the Football program with integrity and maintain financial responsibility consistent with the Football program budget, standards, and reasonable expectations of the Athletic Department and the University;

f. Recommend to the Athletic Director the appointment and discharge of assistant Football coaches and all other contracted staff specific to Football. Employee and the Athletic Director shall consult regarding those issues and make reasonable efforts to reach agreement. The Athletic Director shall then make the final decision;

g. Manage the Football program, including, but not limited to, assisting the Athletic Director, or his designee, with Football budget preparation and administration, and the supervision and evaluation of the Football program's staff;

h. Under the direction of the Athletic Director, participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program;

i. Serve as director of instructional youth Football programs to be held in athletic facilities at the University's Pullman campus if deemed applicable;

j. The Athletic Director or his designee may reasonably assign other duties from time to time that are consistent with customary duties of a Head Football Coach at a Division I Football program;

k. Cooperate with any investigation relating to the University's athletic programs, including the Football Program;

l. Ensure full compliance with Title IX of the Education Amendments Act of 1972 (Title IX), including but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA and Pac-12 policy and univeristy policies and regulations; and

m. Any other reasonable duties as assigned by the Athletic Director.

1.3    **Employee subject to discipline for violations of NCAA rules and regulations.** If Employee is found to be in violation of NCAA rules and regulations, including, but not limited to, the ethical conduct expectations as stated in NCAA Bylaws 10.1, 11.1.1, 11.1.2, 11.1.2.1, and 19.01.2, whether while employed by the University or during prior employment at another NCAA member institution, Employee shall be subject to disciplinary or corrective action as set forth through the NCAA enforcement procedures. Further, the University may suspend Employee for a period of time, without pay, or may terminate employment as provided in Section 4.1 hereof if Employee is found to have been involved in or condoned a major violation or a pattern of uncorrected secondary violations of NCAA, Pac-12, or University rules and regulations.

2

**#15.43**

1.4 **Reporting relationship.** Employee shall report to the Athletic Director, or to such other person as the Athletic Director may designate.

1.5 **Staffing.** The University will provide Employee with a full-time staff as allowed by NCAA and Pac-12 rules.

## 2. Term of Employment

The University hereby employs and Employee accepts employment for the period beginning on January 14, 2020 and ending on June 30, 2025, subject, however, to prior termination in accordance with the provisions set forth in Section 4. Employee is solely responsible for obtaining legal employment status in the United States and is required to report legal status to University. Employee must immediately inform University if legal employment status is denied or revoked. The University may terminate this agreement if Employee is unable to maintain legal employment status in the U.S. On or before May 31, 2025, Employee will receive written notification from the University of its intent to renew or not renew the Agreement. If Employee obtains new employment commencing prior to June 30, 2025, Employee shall notify University immediately, and all payments and fringe benefits under this Agreement shall cease on the date Employee's new employment commences.

## 3. Compensation

In consideration for the promises he has made in entering into this Agreement, Employee shall be entitled to the compensation set forth herein. All payments from the University are subject to normal deductions and withholding for state, local, and federal taxes and for any retirement or other benefits to which Employee is entitled or in which Employee participates, and are subject to the terms and conditions of Section 4 concerning termination of this Agreement.

3.1 **Base salary.** The base salary paid by the University to Employee for services and satisfactory performance of the terms and conditions of this Agreement shall be at the annual salary rate of $2,000,000 payable by the University in accord with payroll dates and procedures applicable to University employees generally. Employee shall be eligible for consideration for salary increases to the base salary that are authorized and funded by the state of Washington, subject to a determination by the Athletic Director.

3.2 **Compensation for all collateral opportunities.** University shall pay Employee supplemental compensation in the amount of $1,000,000 each employment year for the term of this contract in consideration of any collateral opportunity available to Employee as a Head Coach of the Football team. This supplemental compensation is intended to reflect income paid by third parties to the University for the types of collateral opportunities described herein. Employee is entitled to receive additional compensation directly from third parties for collateral opportunities not arranged by or in conflict with arrangements made previously by the University with the understanding that Employee must receive prior written approval from the University, which approval shall not be unreasonably withheld. University agrees to pay Employee said compensation in accordance with payroll dates and procedures applicable to general University employees.

3.3 **Fringe benefits.** During the term of this Agreement, the University will provide Employee with the fringe benefits described in this Section 3.2 and no others.

3.3.1 **Standard University fringe benefits.** Employee shall be entitled to the standard University fringe benefits, including group life insurance, family medical coverage, and retirement plan contributions. Retirement contributions shall be made in accordance with the retirement plan selected by Employee and offered through the University. If any benefit/consideration is based in whole or in part upon the salary paid to Employee, such benefit/consideration shall be made without including any collateral compensation or

3

**#15.44**

incentive or supplemental compensation. Notwithstanding the above, Employee shall not accrue nor be entitled to use annual leave.

3.3.2   **Expenses**. The University will reimburse Employee at the rate authorized by state law and University regulations for all travel and out-of-pocket expenses reasonably incurred by Employee for the purpose of and in connection with the performance of Employee's duties under this Agreement.

3.3.3   **Vehicle**. During the term of this Agreement, the University may provide Employee with either: (a) a donated vehicle on a loan basis; or (b) a stipend in the amount of $450 per month in lieu of a donated vehicle. The University has the sole discretion to determine whether to provide the use of the loaned vehicle or the stipend. Employee shall use, maintain, and service any vehicle provided in compliance with the University's written policies and procedures regarding courtesy cars, as those policies now exist or may be amended. The University's courtesy car program is structured as an "accountable plan" for tax purposes, and Employee understands and agrees that Employee shall be taxed on the annual percentage of personal use of the vehicle, which will be calculated from the mileage records submitted by Employee. Employee shall not remove any dealer identification markings placed on the vehicle for promotional purposes.

3.3.4   **Tickets**. University will provide Employee with use of a 12-seat family suite in Martin Stadium for each WSU home Football contest, and up to twenty (20) tickets for each home, away and post-season Football contest in which the University's Football team competes during the term of this Agreement. Tickets to each home game of each of the University's other varsity intercollegiate athletic teams will be provided in non-priority seating sections according to the provisions of the athletic department's ticket policy for staff members. Employee understands and acknowledges that the value of tickets and passes may be considered income to Employee and will be so reported by the University. Employee also understands that the use of tickets and passes will be subject to normal compliance review for complimentary tickets.

3.3.5   **Guest Travel**. Employee may bring spouse and two guests with the Football team on all away team travel trips; or, Employee may bring spouse and dependent children on all away team travel trips on a space available basis. Employee cannot bring two guests and dependent children on the same away team travel trip, however, dependent children can be considered as part of the permissible two guests. Employee, spouse and any guests or children must be traveling with team on the same trip. The University will pay as compensation to Employee all travel and lodging costs associated with bringing spouse and guests or children on the road trips and related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 Conference regulations. Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and guests or children to the contest, including airfare, ground transportation, lodging, and cost of admission to the games and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University. Travel expenses shall be paid in accordance with applicable IRS regulations.

3.3.6   **Guest travel for post-season competition**. Whenever Employee attends post-season athletic competition because the Football team is participating in the event, Employee may elect to bring their spouse and dependent children, regardless of age, to the event and related activities. The University will pay as compensation to Employee all costs associated with bringing Employee's spouse or partner and dependent children to the event and its related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 regulations. Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and dependent children to the event, including, but not limited to, airfare, other travel costs such as rental car or bus fare,

4

**#15.45**

lodging, subsistence, and cost of admission to the game and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University.

3.3.7   **Alaska Lounge.** The University will pay Employee's membership dues to the Alaska Airlines Lounge. Employee understands and acknowledges that the value of this membership may be considered income to the Employee and will be so reported by the University.

3.3.8   **Parking.** The University will provide Employee with two (2) permits for parking purposes for each of the University's home Football contests in Pullman, Washington. Employee understands and acknowledges that the value of tickets and passes may be considered income to the Employee and will be so reported by the University.

3.3.9   **One-time payment.** The University will pay Employee a one-time payment of $561,803 (five hundred sixty-one thousand, eight hundred and three dollars) in order to reimburse Employee for payment of contractual buy-out obligation to former employer. Employee is solely responsible for satisfying any contractual obligations to the former employer. Employee understands and acknowledges that this payment shall be subject to standard withholding applicable to salary payments for Employee's position at the University.

3.3.10   **Golf club membership.** The University, as additional compensation, will pay Employee's membership dues at the Palouse Ridge Country Club. The University will also pay the Employee's fee for joining the club, if any. Employee understands and acknowledges that the value of such membership may be considered income to the Employee and will be so reported by the University.

3.3.11   **On-campus summer camp.** The University has the exclusive right to operate summer youth Football camps on its campus using University facilities. Pursuant to Section 1.2.1.2(i) hereof and subject to Section 3.3.11 hereof, Employee shall direct and participate in the University's summer Football camps. Notwithstanding the provisions of Section 4.3.2 hereof, the coaches of the University's Football program will be compensated for their performance of duties in said on-campus summer camps consistent with athletic department policies.

3.3.12   **Outside income.** Employee may be compensated for outside activities appropriate to the promotion of athletic programs, provided such activities do not conflict or interfere with the discharge of duties under this Agreement. Employee must receive prior approval from the Athletic Director, or from such other person as the Athletic Director may designate, for all such outside compensation. Such activities must comply with the state ethics law and University policy.

3.4   **Incentive Compensation.** Each employment year during the term of this Agreement, in addition to the base salary and supplemental compensation, the University shall pay Employee any applicable incentive compensation as provided in Section 3.4. The University shall pay Employee incentive compensation for an employment year within a reasonable time (generally, 30 days) after the University has determined the amount of the payment and whether the conditions of payment have been met. The University shall annually pay Employee the incentive compensation for the following achievement(s):

| Achievement | Amount of Incentive Payment |
|---|---|
| • Pac-12 North Champion * | $50,000 |
| • Pac-12 Conference Champion * | $100,000 (non-inclusive) |
| • Final National Ranking Top 25 (CFP, AP, USA Today) * | $50,000 |
| • Final National Ranking Top 10 (CFP, AP, USA Today,) * | $100,000 (non-inclusive) |

5

**#15.46**

- Pac-12 Public School Graduation Rate #1 *          $25,000
  *(based on the WSU Football NCAA GSR)*
- Pac-12 Public School Graduation Rate Top 4 *       $15,000 (non-inclusive)
  *(based on the WSU Football NCAA GSR)*

- 7+ Regular Season wins <u>and</u> participation in Bowl Game   $25,000
  <u>not</u> Sugar, Rose, Orange, Cotton, Peach, Fiesta *

- Sugar, Rose, Orange, Cotton, Peach or Fiesta Bowl Game *   $100,000 (non-inclusive)

- College Football Playoff appearance *              $200,000 (non-inclusive)

- National Championship Game appearance*             $300,000 (non-inclusive)

- National Championship Game victory*                $400,000 (non-inclusive)

- Pac-12 Coach of the Year                           $25,000
- National Coach of Year (AP, AFCA)**                $50,000

*One Payment only in each incentive category for highest level reached
**One Payment only, even if multiple awards

4.  **Termination**

4.1  **Termination by University for just cause**. The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as examples of its normally understood meaning in employment contracts, any of the following:

4.1.1   Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

4.1.2   Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

4.1.3   Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

4.1.4   An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation

6

**#15.47**

by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

4.1.5   Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

4.1.6   Prolonged absence from duty without the consent of Employee's supervisor.

4.2   **Determination of Just Cause and hearing provision**. Just Cause sufficient to satisfy the provisions of Section 4.1 shall initially be determined in good faith by the Athletic Director of the University. The Athletic Director shall give Employee written notice of the provisions of the Agreement alleged to have been violated, together with a statement of the factual basis for those allegations. Employee will have fifteen (15) calendar days within which to respond to the Athletic Director, in writing, with reasons Employee should not be terminated. The Athletic Director, after considering any response provided by Employee, will issue a decision regarding termination for Just Cause. If a summary suspension has been issued in accordance with paragraph 4.3.1, the Athletic Director must issue a decision regarding termination within five (5) calendar days of receipt of Employee's response. If a summary suspension has not been ordered, the Athletic Director shall issue a decision regarding termination within ten (10) calendar days of receipt of Employee's response.

Employee's right to receive any payment under this Agreement, including all portions of Section 3, shall cease the day following the issuance of the decision to terminate for Just Cause.

4.3   **Appeal of termination for Just Cause**. Employee may appeal the Athletic Director's decision to terminate for Just Cause to the University President or designee. Such appeal must be made in writing within fifteen (15) calendar days' notice of the Athletic Director's determination and must contain a statement of the reasons Employee requests the President to set aside the decision to terminate for Just Cause. Employee must provide a copy of the appeal to the Athletic Director at the time it is delivered to the Office of the President. The Athletic Director may, within seven (7) calendar days of receipt of the notice of appeal, provide to the President an additional written statement supporting the Athletic Director's decision and shall provide the President with: 1) the written notice of termination sent to Employee; 2) Employee's written response, if any; and 3) the written decision of termination. The President may allow oral statements in the President's discretion. The President shall render a final decision within thirty (30) calendar days of receiving the materials provided by the Athletic Director, which shall be the final decision of the University.

Employee shall not be entitled to receive any compensation under this Agreement pending the appeal. Should Employee be reinstated by the President, Employee shall be entitled to back pay for compensation not paid during the pendency of the appeal.

4.3.1   **Summary suspension**. Once the preliminary determination of intent to terminate for Just Cause is made, the Athletic Director shall have the administrative authority to order suspension of Employee from Employee's duties and salary pending termination of this Agreement, provided that notice of any such suspension shall be delivered to Employee in writing, detailing the reasons for such suspension. This notice may be contained in the same document as the written notice of termination. Summary suspension may also be imposed if the Athletic Director finds that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. The Athletic Director has the authority to issue immediate summary suspension if facts show that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. Employee may respond to the notice of summary suspension together with Employee's response, if any, to the notice of termination.

Employee shall not be entitled to receive any compensation under this Agreement during the summary suspension period.

7

**#15.48**

**4.3.2**   **University's obligations upon termination for Just Cause.** In the event this Agreement is terminated for Just Cause in accordance with the provisions of Sections 4.1 and 4.2, all obligations of the University to make further payments under this Agreement and/or to provide any other consideration shall cease. In no case shall the University be liable to Employee for the loss of any collateral business opportunities or any other benefits, perquisites, or athletically-related income from any other source, nor shall Employee be liable to the University for the loss of any such collateral business opportunities. Employee will be paid all compensation earned up to the date of termination for Just Cause.

**4.4**   **Termination by University without Just Cause.** The University reserves the right to terminate this Agreement prior to its normal expiration without cause. Termination by the University without cause shall be effectuated by delivering to Employee written notice, signed by the President of the University or by the Athletic Director or such other person as the President may designate, of the University's intent to terminate this Agreement without cause. In such event, University will pay Coach liquidated damages, in lieu of any and all other legal remedies or equitable relief.

**4.4.1**   **Liquidated damages upon termination by University without Just Cause.** The parties agree that actual damages resulting from termination without just cause would be difficult to calculate and that the payment of liquidated damages by University to Employee shall constitute sufficient and reasonable compensation to Employee for any loss, damages, or injury suffered by Employee because of termination without just cause by University. The parties further agree that the payment of liquidated damages shall not be construed as a penalty.

If the University terminates this Agreement without just cause at any time prior to June 30, 2025, the University shall pay Employee liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of this Agreement specifically in Section 3.1. This payment shall be paid in full, either in one lump sum or a series of payments at the discretion of the University, by no later than March 15 of the calendar year following the effective date of termination, In no case shall the University be liable for the loss of any business opportunities or any other benefits, perquisites, supplemental income or athletically related income from any other source. The parties intend that the provisions of this Agreement comply with, or meet an exemption from, Section 409A of the Code, and the regulations thereunder and all provisions of this Agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties thereunder, and neither party shall have the right to accelerate, defer or otherwise modify the manner of payment of any amount set forth in this Section 5.01(e), except for the University's right to determine the payment schedule. Employee shall have no mitigation obligation and WSU shall have no offset rights against any compensation earner or received by Employee subsequent to such termination.

**4.5**   **Termination by Employee**

**4.5.1**   **Written notice by Employee.** Employee may terminate this Agreement during its term by giving the University fourteen (14) calendar days' advance written notice of the termination, or affirmatively communicates to the Director of Athletics or their delegate of an intention to leave or accept a coaching position elsewhere. Payment of remaining salary will cease on the date Employee submits a resignation, fails to report to work, or otherwise engages in actions that clearly establish employment with another party.

**4.5.2**   **Liquidated damages upon termination by employee.** Employee recognizes that University is making a highly valuable investment in their continued employment by entering into this Agreement and that investment would be lost if they were to resign prior to the expiration of this Agreement. The parties agree actual damage to University in such case would be extremely difficult to calculate. The parties further agree that the payment

8

**#15.49**

of liquidated damages by Employee and acceptance by University shall constitute sufficient and reasonable compensation to University for injury and that it shall be enforceable as liquidated damages and not as a penalty.

If Employee terminates this Agreement during the initial term of this Agreement, Employee shall pay liquidated damages to the University as follows:
- On or before June 30, 2021: $8,000,000
- July 1, 2021, through June 30, 2022 (inclusive): $6,000,000
- July 1, 2022, through June 30, 2023 (inclusive): $5,000,000
- July 1, 2023, through June 30, 2024 (inclusive): $2,000,000
- July 1, 2024, through June 30, 2025 (inclusive): $1,000,000

**5.     Restriction on Competition**

Employee agrees and specifically promises that Employee will neither directly nor indirectly through an agent actively seek, negotiate for, or accept employment, under any circumstances, as a coach or in any other capacity related to intercollegiate athletics with any member institution of the NCAA or with any football team participating in any professional league or conference in the United States or elsewhere requiring performance of duties prior to the expiration date of the term of this Agreement or any extension without first notifying the Athletic Director and obtaining permission from the Athletic Director to seek such described employment opportunities, such permission to not be unreasonably withheld.

**6.     Choice of Law**

This Agreement has been entered into under, and shall be governed by, the laws of the State of Washington. In the event that either party for the enforcement or construction of any of the provisions of this Agreement commences litigation, the actions shall be brought in the Superior Court of the State of Washington and the venue shall be in Whitman County, Washington.

**7.     Alternate Dispute Resolution**

Except as otherwise provided in this Agreement, when a dispute arises between the parties and it cannot be resolved by direct negotiation, the parties agree to participate in good faith mediation. The mediator shall be chosen by agreement of the parties. If the parties cannot agree on a mediator, the parties shall use a mediation service that selects the mediator for the parties. The cost of the mediation, if any, shall be shared equally by the parties, unless otherwise agreed. The parties agree that mediation shall precede any action in a judicial tribunal.

Nothing in this Agreement shall be construed to limit the parties' choice of a mutually acceptable alternative resolution method such as a disputes hearing, a Disputes Resolution Panel, or arbitration.

**8.     Merger Clause**

This Agreement supersedes all prior understandings and agreements, oral or written, regarding Employee's employment by the University, including University handbooks or manuals.

**9.     Amendments to Agreement**

This Agreement may be amended at any time only by a written instrument duly approved by the University through its designated representative and accepted by Employee, such approval and acceptance to be acknowledged in writing.

9

**#15.50**

10. **Acknowledgment**

Employee acknowledges that Employee has read and understands the foregoing provisions of this Agreement and that such provisions are reasonable and enforceable and that Employee agrees to abide by this Agreement and the terms and conditions set forth herein. Employee further acknowledges that Employee has been provided an opportunity to seek the advice of legal counsel before entering into this Agreement.

11. **Severability**

If any provision of this Agreement is found to be unenforceable, either in whole or in part, then such provision shall be deemed amended to delete or modify, as necessary, the offending provision or provisions or to alter the bound thereof in order to render said provision valid and enforceable. The remainder of this Agreement will not be affected, and will remain in full force and effect to the extent provided by law.

**IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT.**

WASHINGTON STATE UNIVERSITY                    EMPLOYEE

_____                    _____
Patrick Chun                                   Nicholas R. Rolovich
Director of Athletics
Date:    April 7, 2020                          Date:    Apr 6, 2020


_____
Kirk H. Schulz
Office of the President
Date: _____


Approved as to form: _____
Office of the Attorney General
Date:    9/10/20

10

**#15.51**

August 23, 2021

Pfizer Inc.
Attention:  Ms. Elisa Harkins
500 Arcola Road
Collegeville, PA  19426

Dear Ms. Harkins:

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act or the Act), the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes Coronavirus Disease 2019 (COVID-19).[1]  On the basis of such determination, the Secretary of HHS on March 27, 2020, declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic, pursuant to Section 564 of the Act (21 U.S.C. 360bbb-3), subject to terms of any authorization issued under that section.[2]

On December 11, 2020, the Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) for emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19 for individuals 16 years of age and older pursuant to Section 564 of the Act.  FDA reissued the letter of authorization on: December 23, 2020,[3] February 25, 2021,[4] May

---

[1] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3. February 4, 2020.

[2] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 18250 (April 1, 2020).

[3] In the December 23, 2020 revision, FDA removed reference to the number of doses per vial after dilution from the letter of authorization, clarified the instructions for vaccination providers reporting to VAERS, and made other technical corrections.  FDA also revised the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) to clarify the number of doses of vaccine per vial after dilution and the instructions for reporting to VAERS. In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and the Fact Sheet for Recipients and Caregivers were revised to include additional information on safety monitoring and to clarify information about the availability of other COVID-19 vaccines.

[4] In the February 25, 2021 revision, FDA allowed flexibility on the date of submission of monthly periodic safety reports and revised the requirements for reporting of vaccine administration errors by Pfizer Inc. The Fact Sheet for Health Care Providers Administering Vaccine (Vaccination Providers) was revised to provide an update to the storage and transportation temperature for frozen vials, direct the provider to the correct CDC website for information on monitoring vaccine recipients for the occurrence of immediate adverse reactions, to include data from a developmental toxicity study, and add adverse reactions that have been identified during post authorization use.  The Fact Sheet for Recipients and Caregivers was revised to add adverse reactions that have been identified during post authorization use.

10, 2021,[5] June 25, 2021,[6] and August 12, 2021.[7]

On August 23, 2021, FDA approved the biologics license application (BLA) submitted by BioNTech Manufacturing GmbH for COMIRNATY (COVID-19 Vaccine, mRNA) for active immunization to prevent COVID-19 caused by SARS-CoV-2 in individuals 16 years of age and older.

On August 23, 2021, having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, FDA is reissuing the August 12, 2021 letter of authorization in its entirety with revisions incorporated to clarify that the EUA will remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses, and to authorize use of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved BLA. In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to provide updates on expiration dating of the authorized Pfizer-BioNTech COVID-19 Vaccine and to update language regarding warnings and precautions related to myocarditis and pericarditis. The Fact Sheet for Recipients and Caregivers was updated as the Vaccine Information Fact Sheet for Recipients and Caregivers, which comprises the Fact Sheet for the authorized Pfizer-BioNTech COVID-19 Vaccine and information about the FDA-licensed vaccine, COMIRNATY (COVID-19 Vaccine, mRNA).

Pfizer-BioNTech COVID-19 Vaccine contains a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2 formulated in lipid particles. COMIRNATY (COVID-19 Vaccine, mRNA) is the same formulation as the Pfizer-BioNTech COVID-19 Vaccine and can be used interchangeably with the Pfizer-BioNTech COVID-19 Vaccine to provide the COVID-19 vaccination series.[8]

---

[5] In the May 10, 2021 revision, FDA authorized Pfizer-BioNTech Vaccine for the prevention of COVID-19 in individuals 12 through 15 years of age, as well as for individuals 16 years of age and older. In addition, FDA revised the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) to include the following Warning: "Syncope (fainting) may occur in association with administration of injectable vaccines, in particular in adolescents. Procedures should be in place to avoid injury from fainting." In addition, the Fact Sheet for Recipients and Caregivers was revised to instruct vaccine recipients or their caregivers to tell the vaccination provider about fainting in association with a previous injection.

[6] In the June 25, 2021 revision, FDA clarified terms and conditions that relate to export of Pfizer-BioNTech COVID-19 Vaccine from the United States. In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to include a Warning about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine. The Fact Sheet for Recipients and Caregivers was updated to include information about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine.

[7] In the August 12, 2021 revision, FDA authorized a third dose of the Pfizer-BioNTech COVID-19 Vaccine administered at least 28 days following the two dose regimen of this vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

[8] The licensed vaccine has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

For the December 11, 2020 authorization for individuals 16 years of age and older, FDA reviewed safety and efficacy data from an ongoing phase 1/2/3 trial in approximately 44,000 participants randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control. The trial has enrolled participants 12 years of age and older.  FDA's review at that time considered the safety and effectiveness data as they relate to the request for emergency use authorization in individuals 16 years of age and older.  FDA's review of the available safety data from 37,586 of the participants 16 years of age and older, who were followed for a median of two months after receiving the second dose, did not identify specific safety concerns that would preclude issuance of an EUA.  FDA's analysis of the available efficacy data from 36,523 participants 12 years of age and older without evidence of SARS-CoV-2 infection prior to 7 days after dose 2 confirmed the vaccine was 95% effective (95% credible interval 90.3, 97.6) in preventing COVID-19 occurring at least 7 days after the second dose (with 8 COVID-19 cases in the vaccine group compared to 162 COVID-19 cases in the placebo group).  Based on these data, and review of manufacturing information regarding product quality and consistency, FDA concluded that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective.  Additionally, FDA determined it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 16 years of age and older.  Finally, on December 10, 2020, the Vaccines and Related Biological Products Advisory Committee voted in agreement with this conclusion.

For the May 10, 2021 authorization for individuals 12 through 15 years of age, FDA reviewed safety and effectiveness data from the above-referenced, ongoing Phase 1/2/3 trial that has enrolled approximately 46,000 participants, including 2,260 participants 12 through 15 years of age.  Trial participants were randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control.  FDA's review of the available safety data from 2,260 participants 12 through 15 years of age, who were followed for a median of 2 months after receiving the second dose, did not identify specific safety concerns that would preclude issuance of an EUA.  FDA's analysis of SARS-CoV-2 50% neutralizing antibody titers 1 month after the second dose of Pfizer-BioNTech COVID-19 Vaccine in a subset of participants who had no serological or virological evidence of past SARS-CoV-2 infection confirm the geometric mean antibody titer in participants 12 through 15 years of age was non-inferior to the geometric mean antibody titer in participants 16 through 25 years of age.  FDA's analysis of available descriptive efficacy data from 1,983 participants 12 through 15 years of age without evidence of SARS-CoV-2 infection prior to 7 days after dose 2 confirm that the vaccine was 100% effective (95% confidence interval 75.3, 100.0) in preventing COVID-19 occurring at least 7 days after the second dose (with no COVID-19 cases in the vaccine group compared to 16 COVID-19 cases in the placebo group).  Based on these data, FDA concluded that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in individuals 12 through 15 years of age. Additionally, FDA determined it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 12 through 15 years of age.

For the August 12, 2021 authorization of a third dose of the Pfizer-BioNTech COVID-19 Vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise, FDA reviewed safety and effectiveness data reported in two manuscripts on solid organ transplant recipients.  The first study was a single arm study conducted in 101 individuals who had undergone various solid organ transplant procedures (heart, kidney, liver, lung, pancreas) a median of 97±8 months earlier.  A third dose of the Pfizer-BioNTech COVID-19 Vaccine was administered to 99 of these individuals approximately 2 months after they had received a second dose.  Levels of total SARS-CoV-2 binding antibodies meeting the pre-specified criteria for success occurred four weeks after the third dose in 26/59 (44.0%) of those who were initially considered to be seronegative and received a third dose of the Pfizer-BioNTech COVID-19 Vaccine; 67/99 (68%) of the entire group receiving a third vaccination were subsequently considered to have levels of antibodies indicative of a significant response.  In those who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 events were reported.  A supportive secondary study describes a double-blind, randomized-controlled study conducted in 120 individuals who had undergone various solid organ transplant procedures (heart, kidney, kidney-pancreas, liver, lung, pancreas) a median of 3.57 years earlier (range 1.99-6.75 years).  A third dose of a similar mRNA vaccine (the Moderna COVID-19 vaccine) was administered to 60 individuals approximately 2 months after they had received a second dose (i.e., doses at 0, 1 and 3 months); saline placebo was given to 60 individuals or comparison.  The primary outcome was anti-RBD antibody at 4 months greater than 100 U/mL.  This titer was selected based on NHP challenge studies as well as a large clinical cohort study to indicate this antibody titer was  protective.  Secondary outcomes were based on a virus neutralization assay and polyfunctional T cell responses.  Baseline characteristics were comparable between the two study arms as were pre-intervention anti-RBD titer and neutralizing antibodies.  Levels of total SARS-CoV-2 binding antibodies indicative of a significant response occurred four weeks after the third dose in 33/60 (55.0%) of the Moderna COVID-19 vaccinated group and 10/57 (17.5%) of the placebo individuals.  In the 60 individuals who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 adverse events were reported. Despite the moderate enhancement in antibody titers, the totality of data (i.e., supportive paper by Hall et al. demonstrated efficacy of the product in the elderly and persons with co-morbidities) supports the conclusion that a third dose of the Pfizer-BioNTech COVID-19 vaccine may be effective in this population, and that the known and potential benefits of a third dose of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine for immunocompromised individuals at least 12 years of age who have received two doses of the Pfizer-BioNTech COVID-19 Vaccine and who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19, as described in the Scope of Authorization section of this letter (Section II) and subject to the terms of this authorization.  Additionally, as specified in subsection III.BB, I am authorizing use of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA when used to provide a two-dose regimen for individuals aged 12 through 15 years, or

to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

## I.      Criteria for Issuance of Authorization

I have concluded that the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19 when administered as described in the Scope of Authorization (Section II) meets the criteria for issuance of an authorization under Section 564(c) of the Act, because:

A. SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

B. Based on the totality of scientific evidence available to FDA, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19, and that, when used under the conditions described in this authorization, the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine when used to prevent COVID-19 outweigh its known and potential risks; and

C. There is no adequate, approved, and available[9] alternative to the emergency use of Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19.[10]

## II.     Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited as follows:

- Pfizer Inc. will supply Pfizer-BioNTech COVID-19 Vaccine either directly or through authorized distributor(s),[11] to emergency response stakeholders[12] as directed by the U.S.

---

[9] Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA.  Additionally, there are no products that are approved to prevent COVID-19 in individuals age 12 through 15, or that are approved to provide an additional dose to the immunocompromised population described in this EUA.

[10] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[11] "Authorized Distributor(s)" are identified by Pfizer Inc. or, if applicable, by a U.S. government entity, such as the Centers for Disease Control and Prevention (CDC) and/or other designee, as an entity or entities allowed to distribute authorized Pfizer-BioNTech COVID-19 Vaccine.

[12] For purposes of this letter, "emergency response stakeholder" refers to a public health agency and its delegates that have legal responsibility and authority for responding to an incident, based on political or geographical boundary lines (e.g., city, county, tribal, territorial, State, or Federal), or functional (e.g., law enforcement or public health range) or sphere of authority to administer, deliver, or distribute vaccine in an emergency situation.  In some cases (e.g., depending on a state or local jurisdiction's COVID-19 vaccination response organization and plans), there might be overlapping roles and responsibilities among "emergency response stakeholders" and "vaccination providers" (e.g., if a local health department is administering COVID-19 vaccines; if a pharmacy is acting in an

government, including the Centers for Disease Control and Prevention (CDC) and/or other designee, for use consistent with the terms and conditions of this EUA;

- The Pfizer-BioNTech COVID-19 Vaccine covered by this authorization will be administered by vaccination providers[13] and used only to prevent COVID-19 in individuals ages 12 and older; and
- Pfizer-BioNTech COVID-19 Vaccine may be administered by a vaccination provider without an individual prescription for each vaccine recipient.

This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide a two-dose regimen for individuals aged 12 through 15 years, or to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

**Product Description**

The Pfizer-BioNTech COVID-19 Vaccine is supplied as a frozen suspension in multiple dose vials; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. The Pfizer-BioNTech COVID-19 Vaccine does not contain a preservative.

Each 0.3 mL dose of the Pfizer-BioNTech COVID-19 Vaccine contains 30 mcg of a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2. Each dose of the Pfizer-BioNTech COVID-19 Vaccine also includes the following ingredients: lipids (0.43 mg (4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2[(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (0.9% Sodium Chloride Injection) contributes an additional 2.16 mg sodium chloride per dose.

---

official capacity under the authority of the state health department to administer COVID-19 vaccines). In such cases, it is expected that the conditions of authorization that apply to emergency response stakeholders and vaccination providers will all be met.

[13] For purposes of this letter, "vaccination provider" refers to the facility, organization, or healthcare provider licensed or otherwise authorized by the emergency response stakeholder (e.g., non-physician healthcare professionals, such as nurses and pharmacists pursuant to state law under a standing order issued by the state health officer) to administer or provide vaccination services in accordance with the applicable emergency response stakeholder's official COVID-19 vaccination and emergency response plan(s) and who is enrolled in the CDC COVID-19 Vaccination Program. If the vaccine is exported from the United States, a "vaccination provider" is a provider that is authorized to administer this vaccine in accordance with the laws of the country in which it is administered. For purposes of this letter, "healthcare provider" also refers to a person authorized by the U.S. Department of Health and Human Services (e.g., under the PREP Act Declaration for Medical Countermeasures against COVID-19) to administer FDA-authorized COVID-19 vaccine (e.g., qualified pharmacy technicians and State-authorized pharmacy interns acting under the supervision of a qualified pharmacist). See, e.g., HHS. *Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration*. 85 FR 79190 (December 9, 2020).

The dosing regimen is two doses of 0.3 mL each, 3 weeks apart.  A third dose may be administered at least 28 days following the second dose of the two dose regimen of this vaccine to individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

The manufacture of the authorized Pfizer-BioNTech COVID-19 Vaccine is limited to those facilities identified and agreed upon in Pfizer's request for authorization.

The Pfizer-BioNTech COVID-19 Vaccine vial label and carton labels are clearly marked for "Emergency Use Authorization." The Pfizer-BioNTech COVID-19 Vaccine is authorized to be distributed, stored, further redistributed, and administered by emergency response stakeholders when packaged in the authorized manufacturer packaging (i.e., vials and cartons), despite the fact that the vial and carton labels may not contain information that otherwise would be required under the FD&C Act.

Pfizer-BioNTech COVID-19 Vaccine is authorized for emergency use with the following product-specific information required to be made available to vaccination providers and recipients, respectively (referred to as "authorized labeling"):

- Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers): Emergency Use Authorization (EUA) of Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)

- Vaccine Information Fact Sheet for Recipients and Caregivers About COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease (COVID-19).

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine, when used to prevent COVID-19 and used in accordance with this Scope of Authorization (Section II), outweigh its known and potential risks.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19 when used in accordance with this Scope of Authorization (Section II), pursuant to Section 564(c)(2)(A) of the Act.

Having reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, I have concluded that Pfizer-BioNTech COVID-19 Vaccine (as described in this Scope of Authorization (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of Pfizer-BioNTech COVID-19 Vaccine under this EUA must be consistent with, and may not exceed, the terms of the Authorization, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section III).  Subject to the terms of this EUA and

under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), Pfizer-BioNTech COVID-19 Vaccine is authorized to prevent COVID-19 in individuals 12 years of age and older as described in the Scope of Authorization (Section II) under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

## III.    Conditions of Authorization

Pursuant to Section 564 of the Act, I am establishing the following conditions on this authorization:

Pfizer Inc. and Authorized Distributor(s)

A. Pfizer Inc. and authorized distributor(s) will ensure that the authorized Pfizer-BioNTech COVID-19 Vaccine is distributed, as directed by the U.S. government, including CDC and/or other designee, and the authorized labeling (i.e., Fact Sheets) will be made available to vaccination providers, recipients, and caregivers consistent with the terms of this letter.

B. Pfizer Inc. and authorized distributor(s) will ensure that appropriate storage and cold chain is maintained until delivered to emergency response stakeholders' receipt sites.

C. Pfizer Inc. will ensure that the terms of this EUA are made available to all relevant stakeholders (e.g., emergency response stakeholders, authorized distributors, and vaccination providers) involved in distributing or receiving authorized Pfizer-BioNTech COVID-19 Vaccine. Pfizer Inc. will provide to all relevant stakeholders a copy of this letter of authorization and communicate any subsequent amendments that might be made to this letter of authorization and its authorized labeling.

D. Pfizer Inc. may develop and disseminate instructional and educational materials (e.g., video regarding vaccine handling, storage/cold-chain management, preparation, disposal) that are consistent with the authorized emergency use of the vaccine as described in the letter of authorization and authorized labeling, without FDA's review and concurrence, when necessary to meet public health needs during an emergency. Any instructional and educational materials that are inconsistent with the authorized labeling are prohibited.

E. Pfizer Inc. may request changes to this authorization, including to the authorized Fact Sheets for the vaccine. Any request for changes to this EUA must be submitted to Office of Vaccines Research and Review (OVRR)/Center for Biologics Evaluation and Research (CBER). Such changes require appropriate authorization prior to implementation.[14]

---

[14] The following types of revisions may be authorized without reissuing this letter: (1) changes to the authorized labeling; (2) non-substantive editorial corrections to this letter; (3) new types of authorized labeling, including new fact sheets; (4) new carton/container labels; (5) expiration dating extensions; (6) changes to manufacturing

F.  Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):
- Serious adverse events (irrespective of attribution to vaccination);
- Cases of Multisystem Inflammatory Syndrome in children and adults; and
- Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer Inc.

These reports should be submitted to VAERS as soon as possible but no later than 15 calendar days from initial receipt of the information by Pfizer Inc.

G.  Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals in accordance with a due date agreed upon with the Office of Biostatistics and Epidemiology (OBE)/CBER beginning after the first full calendar month after authorization.  Each periodic safety report is required to contain descriptive information which includes:
- A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations (e.g., pregnant women), and adverse events of special interest;
- A narrative summary and analysis of vaccine administration errors, whether or not associated with an adverse event, that were identified since the last reporting interval;
- Newly identified safety concerns in the interval; and
- Actions taken since the last report because of adverse experiences (for example, changes made to Healthcare Providers Administering Vaccine (Vaccination Providers) Fact Sheet, changes made to studies or studies initiated).

H.  No changes will be implemented to the description of the product, manufacturing process, facilities, or equipment without notification to and concurrence by FDA.

I.  All manufacturing facilities will comply with Current Good Manufacturing Practice requirements.

J.  Pfizer Inc. will submit to the EUA file Certificates of Analysis (CoA) for each drug product lot at least 48 hours prior to vaccine distribution.  The CoA will include the established specifications and specific results for each quality control test performed on the final drug product lot.

K.  Pfizer Inc. will submit to the EUA file quarterly manufacturing reports, starting in July 2021, that include a listing of all Drug Substance and Drug Product lots produced after issuance of this authorization.  This report must include lot number, manufacturing site, date of manufacture, and lot disposition, including those lots that

processes, including tests or other authorized components of manufacturing; (7) new conditions of authorization to require data collection or study.  For changes to the authorization, including the authorized labeling, of the type listed in (3), (6), or (7), review and concurrence is required from the Preparedness and Response Team (PREP)/Office of the Center Director (OD)/CBER and the Office of Counterterrorism and Emerging Threats (OCET)/Office of the Chief Scientist (OCS).

were quarantined for investigation or those lots that were rejected.  Information on the reasons for lot quarantine or rejection must be included in the report.

L.  Pfizer Inc. and authorized distributor(s) will maintain records regarding release of Pfizer-BioNTech COVID-19 Vaccine for distribution (i.e., lot numbers, quantity, release date).

M.  Pfizer Inc. and authorized distributor(s) will make available to FDA upon request any records maintained in connection with this EUA.

N.  Pfizer Inc. will conduct post-authorization observational studies to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, along with deaths and hospitalizations, and severe COVID-19.  The study population should include individuals administered the authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (12 years of age and older), populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities.  The studies should be conducted in large scale databases with an active comparator.  Pfizer Inc. will provide protocols and status update reports to the IND 19736 with agreed-upon study designs and milestone dates.

## Emergency Response Stakeholders

O.  Emergency response stakeholders will identify vaccination sites to receive authorized Pfizer-BioNTech COVID-19 Vaccine and ensure its distribution and administration, consistent with the terms of this letter and CDC's COVID-19 Vaccination Program.

P.  Emergency response stakeholders will ensure that vaccination providers within their jurisdictions are aware of this letter of authorization, and the terms herein and any subsequent amendments that might be made to the letter of authorization, instruct them about the means through which they are to obtain and administer the vaccine under the EUA, and ensure that the authorized labeling [i.e., Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Vaccine Information Fact Sheet for Recipients and Caregivers] is made available to vaccination providers through appropriate means (e.g., e-mail, website).

Q.  Emergency response stakeholders receiving authorized Pfizer-BioNTech COVID-19 Vaccine will ensure that appropriate storage and cold chain is maintained.

## Vaccination Providers

R.  Vaccination providers will administer the vaccine in accordance with the authorization and will participate and comply with the terms and training required by CDC's COVID-19 Vaccination Program.

S.  Vaccination providers will provide the Vaccine Information Fact Sheet for Recipients and Caregivers to each individual receiving vaccination and provide the necessary information for receiving their second dose and/or third dose.

T.  Vaccination providers administering the vaccine must report the following information associated with the administration of the vaccine of which they become aware to VAERS in accordance with the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers):
   - Vaccine administration errors whether or not associated with an adverse event
   - Serious adverse events (irrespective of attribution to vaccination)
   - Cases of Multisystem Inflammatory Syndrome in children and adults
   - Cases of COVID-19 that result in hospitalization or death

   Complete and submit reports to VAERS online at https://vaers.hhs.gov/reportevent.html.  The VAERS reports should include the words "Pfizer-BioNTech COVID-19 Vaccine EUA" in the description section of the report.  More information is available at vaers.hhs.gov or by calling 1-800-822-7967.  To the extent feasible, report to Pfizer Inc. by contacting 1-800-438-1985 or by providing a copy of the VAERS form to Pfizer Inc.; Fax: 1-866-635-8337.

U.  Vaccination providers will conduct any follow-up requested by the U.S government, including CDC, FDA, or other designee, regarding adverse events to the extent feasible given the emergency circumstances.

V.  Vaccination providers will monitor and comply with CDC and/or emergency response stakeholder vaccine management requirements (e.g., requirements concerning obtaining, tracking, and handling vaccine) and with requirements concerning reporting of vaccine administration data to CDC.

W.  Vaccination providers will ensure that any records associated with this EUA are maintained until notified by FDA.  Such records will be made available to CDC, and FDA for inspection upon request.

Conditions Related to Printed Matter, Advertising, and Promotion

X.  All descriptive printed matter, advertising, and promotional material, relating to the use of the Pfizer-BioNTech COVID-19 Vaccine shall be consistent with the authorized labeling, as well as the terms set forth in this EUA, and meet the requirements set forth in section 502(a) and (n) of the FD&C Act and FDA implementing regulations.

Y.  All descriptive printed matter, advertising, and promotional material relating to the use of the Pfizer-BioNTech COVID-19 Vaccine clearly and conspicuously shall state that:

- This product has not been approved or licensed by FDA, but has been authorized for emergency use by FDA, under an EUA to prevent Coronavirus Disease 2019 (COVID-19) for use in individuals 12 years of age and older; and
- The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner.

Condition Related to Export

Z.  If the Pfizer-BioNTech COVID-19 Vaccine is exported from the United States, conditions C, D, and O through Y do not apply, but export is permitted only if 1) the regulatory authorities of the country in which the vaccine will be used are fully informed that this vaccine is subject to an EUA and is not approved or licensed by FDA and 2) the intended use of the vaccine will comply in all respects with the laws of the country in which the product will be used. The requirement in this letter that the authorized labeling (i.e., Fact Sheets) be made available to vaccination providers, recipients, and caregivers in condition A will not apply if the authorized labeling (i.e., Fact Sheets) are made available to the regulatory authorities of the country in which the vaccine will be used.

Conditions With Respect to Use of Licensed Product

AA. COMIRNATY  (COVID-19 Vaccine, mRNA) is now licensed for individuals 16 years of age and older. There remains, however, a significant amount of Pfizer-BioNTech COVID-19 vaccine that was manufactured and labeled in accordance with this emergency use authorization. This authorization thus remains in place with respect to that product for the previously-authorized indication and uses (i.e., for use to prevent COVID-19 in individuals 12 years of age and older with a two-dose regimen, and to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise).

BB. This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide a two-dose regimen for individuals aged 12 through 15 years, or to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise. Conditions A through W in this letter apply when COMIRNATY (COVID-19 Vaccine, mRNA) is provided for the uses described in this subsection III.BB, except that product manufactured and labeled in accordance with the approved BLA is deemed to satisfy the manufacturing, labeling, and distribution requirements of this authorization.

IV.    **Duration of Authorization**

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

--/S/--

_____

RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

Enclosures

Our STN:  BL 125742/0                                    **BLA APPROVAL**

BioNTech Manufacturing GmbH                              August 23, 2021
Attention:  Amit Patel
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

Dear Mr. Patel:

Please refer to your Biologics License Application (BLA) submitted and received on May 18, 2021, under section 351(a) of the Public Health Service Act (PHS Act) for COVID-19 Vaccine, mRNA.

**LICENSING**

We are issuing Department of Health and Human Services U.S. License No. 2229 to BioNTech Manufacturing GmbH, Mainz, Germany, under the provisions of section 351(a) of the PHS Act controlling the manufacture and sale of biological products.  The license authorizes you to introduce or deliver for introduction into interstate commerce, those products for which your company has demonstrated compliance with establishment and product standards.

Under this license, you are authorized to manufacture the product, COVID-19 Vaccine, mRNA, which is indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

The review of this product was associated with the following National Clinical Trial (NCT) numbers:  NCT04368728 and NCT04380701.

**MANUFACTURING LOCATIONS**

Under this license, you are approved to manufacture COVID-19 Vaccine, mRNA drug substance at Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC, 1 Burtt Road, Andover, Massachusetts.  The final formulated product will be manufactured, filled, labeled and packaged at Pfizer Manufacturing Belgium NV, Rijksweg 12, Puurs, Belgium and at Pharmacia & Upjohn Company LLC, 7000 Portage Road, Kalamazoo, Michigan.  The diluent, 0.9% Sodium Chloride Injection, USP, will be manufactured at Hospira, Inc., (b) (4)                                    and at Fresenius Kabi USA, LLC, (b) (4)                                .

5-SER-1079

You may label your product with the proprietary name, COMIRNATY, and market it in 2.0 mL glass vials, in packages of 25 and 195 vials.

We did not refer your application to the Vaccines and Related Biological Products Advisory Committee because our review of information submitted in your BLA, including the clinical study design and trial results, did not raise concerns or controversial issues that would have benefited from an advisory committee discussion.

**DATING PERIOD**

The dating period for COVID-19 Vaccine, mRNA shall be 9 months from the date of manufacture when stored between -90ºC to -60ºC (-130ºF to -76ºF).  The date of manufacture shall be no later than the date of final sterile filtration of the formulated drug product (at Pharmacia & Upjohn Company LLC in Kalamazoo, Michigan, the date of manufacture is defined as the date of sterile filtration for the final drug product; at Pfizer Manufacturing Belgium NV in Puurs, Belgium, it is defined as the date of the (b) (4)

Following the final sterile filtration, (b) (4)

, no reprocessing/reworking is allowed without prior approval from the Agency.  The dating period for your drug substance shall be (b) (4) when stored at (b) (4)  We have approved the stability protocols in your license application for the purpose of extending the expiration dating period of your drug substance and drug product under 21 CFR 601.12.

**FDA LOT RELEASE**

Please submit final container samples of the product in final containers together with protocols showing results of all applicable tests.  You may not distribute any lots of product until you receive a notification of release from the Director, Center for Biologics Evaluation and Research (CBER).

**BIOLOGICAL PRODUCT DEVIATIONS**

You must submit reports of biological product deviations under 21 CFR 600.14.  You should identify and investigate all manufacturing deviations promptly, including those associated with processing, testing, packaging, labeling, storage, holding and distribution.  If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, you must submit a report on Form FDA 3486 to the Director, Office of Compliance and Biologics Quality, electronically through the eBPDR web application or at the address below. Links for the instructions on completing the electronic form (eBPDR) may be found on CBER's web site at https://www.fda.gov/vaccines-blood-biologics/report-problem-center-biologics-evaluation-research/biological-product-deviations:

Food and Drug Administration
Center for Biologics Evaluation and Research
Document Control Center

10903 New Hampshire Ave.
WO71-G112
Silver Spring, MD 20993-0002

## MANUFACTURING CHANGES

You must submit information to your BLA for our review and written approval under 21 CFR 601.12 for any changes in, including but not limited to, the manufacturing, testing, packaging or labeling of COVID-19 Vaccine, mRNA, or in the manufacturing facilities.

## LABELING

We hereby approve the draft content of labeling including Package Insert, submitted under amendment 74, dated August 21, 2021, and the draft carton and container labels submitted under amendment 63, dated August 19, 2021.

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, please submit the final content of labeling (21 CFR 601.14) in Structured Product Labeling (SPL) format via the FDA automated drug registration and listing system, (eLIST) as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the Package Insert submitted on August 21, 2021.  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As* at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

## CARTON AND CONTAINER LABELS

Please electronically submit final printed carton and container labels identical to the carton and container labels submitted on August 19, 2021, according to the guidance for industry *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-regulatory-submissions-electronic-format-certain-human-pharmaceutical-product-applications.

All final labeling should be submitted as Product Correspondence to this BLA STN BL 125742 at the time of use and include implementation information on Form FDA 356h.

## ADVERTISING AND PROMOTIONAL LABELING

You may submit two draft copies of the proposed introductory advertising and promotional labeling with Form FDA 2253 to the Advertising and Promotional Labeling Branch at the following address:

Food and Drug Administration
Center for Biologics Evaluation and Research
Document Control Center
10903 New Hampshire Ave.
WO71-G112
Silver Spring, MD 20993-0002

You must submit copies of your final advertising and promotional labeling at the time of initial dissemination or publication, accompanied by Form FDA 2253 (21 CFR 601.12(f)(4)).

All promotional claims must be consistent with and not contrary to approved labeling. You should not make a comparative promotional claim or claim of superiority over other products unless you have substantial evidence or substantial clinical experience to support such claims (21 CFR 202.1(e)(6)).

**ADVERSE EVENT REPORTING**

You must submit adverse experience reports in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80), and you must submit distribution reports at monthly intervals as described in 21 CFR 600.81.  For information on adverse experience reporting, please refer to the guidance for industry *Providing Submissions in Electronic Format —Postmarketing Safety Reports for Vaccines* at  https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-submissions-electronic-format-postmarketing-safety-reports-vaccines.  For information on distribution reporting, please refer to the guidance for industry *Electronic Submission of Lot Distribution Reports* at http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-MarketActivities/LotReleases/ucm061966.htm.

**PEDIATRIC REQUIREMENTS**

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are deferring submission of your pediatric studies for ages younger than 16 years for this application because this product is ready for approval for use in individuals 16 years of age and older, and the pediatric studies for younger ages have not been completed.

Your deferred pediatric studies required under section 505B(a) of the Federal Food, Drug, and Cosmetic Act (FDCA) are required postmarketing studies.  The status of these postmarketing studies must be reported according to 21 CFR 601.28 and section 505B(a)(4)(C) of the FDCA.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

Label your annual report as an "**Annual Status Report of Postmarketing Study Requirement/Commitments**" and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements under section 506B of the FDCA are released or fulfilled.  These required studies are listed below:

1.  Deferred pediatric Study C4591001 to evaluate the safety and effectiveness of COMIRNATY in children 12 years through 15 years of age.

    Final Protocol Submission:  October 7, 2020

    Study Completion:  May 31, 2023

    Final Report Submission:  October 31, 2023

2.  Deferred pediatric Study C4591007 to evaluate the safety and effectiveness of COMIRNATY in infants and children 6 months to <12 years of age.

    Final Protocol Submission:  February 8, 2021

    Study Completion:  November 30, 2023

    Final Report Submission:  May 31, 2024

3.  Deferred pediatric Study C4591023 to evaluate the safety and effectiveness of COMIRNATY in infants <6 months of age.

    Final Protocol Submission:  January 31, 2022

    Study Completion:  July 31, 2024

    Final Report Submission:  October 31, 2024

Submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Submit final study reports to this BLA STN BL 125742.  In order for your PREA PMRs to be considered fulfilled, you must submit and receive approval of an efficacy or a labeling

5-SER-1083

supplement.  For administrative purposes, all submissions related to these required pediatric postmarketing studies must be clearly designated as:

- **Required Pediatric Assessment(s)**

We note that you have fulfilled the pediatric study requirement for ages 16 through 17 years for this application.

**POSTMARKETING REQUIREMENTS UNDER SECTION 505(o)**

Section 505(o) of the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute (section 505(o)(3)(A), 21 U.S.C. 355(o)(3)(A)).

We have determined that an analysis of spontaneous postmarketing adverse events reported under section 505(k)(1) of the FDCA will not be sufficient to assess known serious risks of myocarditis and pericarditis and identify an unexpected serious risk of subclinical myocarditis.

Furthermore, the pharmacovigilance system that FDA is required to maintain under section 505(k)(3) of the FDCA is not sufficient to assess these serious risks.

Therefore, based on appropriate scientific data, we have determined that you are required to conduct the following studies:

4. Study C4591009, entitled "A Non-Interventional Post-Approval Safety Study of the Pfizer-BioNTech COVID-19 mRNA Vaccine in the United States," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  August 31, 2021

   Monitoring Report Submission:  October 31, 2022

   Interim Report Submission:  October 31, 2023

   Study Completion:  June 30, 2025

   Final Report Submission:  October 31, 2025

5. Study C4591021, entitled "Post Conditional Approval Active Surveillance Study Among Individuals in Europe Receiving the Pfizer-BioNTech Coronavirus

Disease 2019 (COVID-19) Vaccine," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  August 11, 2021

Progress Report Submission:  September 30, 2021

Interim Report 1 Submission:  March 31, 2022

Interim Report 2 Submission:  September 30, 2022

Interim Report 3 Submission:  March 31, 2023

Interim Report 4 Submission:  September 30, 2023

Interim Report 5 Submission:  March 31, 2024

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

6. Study C4591021 substudy to describe the natural history of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  January 31, 2022

   Study Completion:  March 31, 2024

   Final Report Submission:  September 30, 2024

7. Study C4591036, a prospective cohort study with at least 5 years of follow-up for potential long-term sequelae of myocarditis after vaccination (in collaboration with Pediatric Heart Network).

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  November 30, 2021

   Study Completion:  December 31, 2026

Final Report Submission:  May 31, 2027

8.  Study C4591007 substudy to prospectively assess the incidence of subclinical myocarditis following administration of the second dose of COMIRNATY in a subset of participants 5 through 15 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this assessment according to the following schedule:

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

9.  Study C4591031 substudy to prospectively assess the incidence of subclinical myocarditis following administration of a third dose of COMIRNATY in a subset of participants 16 to 30 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  November 30, 2021

Study Completion:  June 30, 2022

Final Report Submission:  December 31, 2022

Please submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Please submit final study reports to the BLA.  If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement to this BLA STN BL 125742.  For administrative purposes, all submissions related to these postmarketing studies required under section 505(o) must be submitted to this BLA and be clearly designated as:

- **Required Postmarketing Correspondence under Section 505(o)**
- **Required Postmarketing Final Report under Section 505(o)**
- **Supplement contains Required Postmarketing Final Report under Section 505(o)**

Section 505(o)(3)(E)(ii) of the FDCA requires you to report periodically on the status of any study or clinical trial required under this section.  This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise

5-SER-1086

undertaken to investigate a safety issue.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

You must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing requirement;
- the original milestone schedule for the requirement;
- the revised milestone schedule for the requirement, if appropriate;
- the current status of the requirement (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status for the study or clinical trial.  The explanation should include how the study is progressing in reference to the original projected schedule, including, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

We will consider the submission of your annual report under section 506B of the FDCA and 21 CFR 601.70 to satisfy the periodic reporting requirement under section 505(o)(3)(E)(ii) provided that you include the elements listed in section 505(o) and 21 CFR 601.70.  We remind you that to comply with section 505(o), your annual report must also include a report on the status of any study or clinical trial otherwise undertaken to investigate a safety issue.  Failure to periodically report on the status of studies or clinical trials required under section 505(o) may be a violation of FDCA section 505(o)(3)(E)(ii) and could result in regulatory action.

**POSTMARKETING COMMITMENTS SUBJECT TO REPORTING REQUIREMENTS UNDER SECTION 506B**

We acknowledge your written commitments as described in your letter of August 21, 2021 as outlined below:

10. Study C4591022, entitled "Pfizer-BioNTech COVID-19 Vaccine Exposure during Pregnancy: A Non-Interventional Post-Approval Safety Study of Pregnancy and Infant Outcomes in the Organization of Teratology Information Specialists (OTIS)/MotherToBaby Pregnancy Registry."

    Final Protocol Submission:  July 1, 2021

Study Completion:  June 30, 2025

Final Report Submission:  December 31, 2025

11. Study C4591007 substudy to evaluate the immunogenicity and safety of lower dose levels of COMIRNATY in individuals 12 through <30 years of age.

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

12. Study C4591012, entitled "Post-emergency Use Authorization Active Safety Surveillance Study Among Individuals in the Veteran's Affairs Health System Receiving Pfizer-BioNTech Coronavirus Disease 2019 (COVID-19) Vaccine."

Final Protocol Submission:  January 29, 2021

Study Completion:  June 30, 2023

Final Report Submission:  December 31, 2023

13. Study C4591014, entitled "Pfizer-BioNTech COVID-19 BNT162b2 Vaccine Effectiveness Study - Kaiser Permanente Southern California."

Final Protocol Submission:  March 22, 2021

Study Completion:  December 31, 2022

Final Report Submission:  June 30, 2023

Please submit clinical protocols to your IND 19736, and a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMC sequential number for each study/clinical trial and the submission number as shown in this letter.

If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement.  Please use the following designators to prominently label all submissions, including supplements, relating to these postmarketing study commitments as appropriate:

- **Postmarketing Commitment – Correspondence Study Update**
- **Postmarketing Commitment – Final Study Report**
- **Supplement contains Postmarketing Commitment – Final Study Report**

5-SER-1088

For each postmarketing study subject to the reporting requirements of 21 CFR 601.70, you must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing commitment;
- the original schedule for the commitment;
- the status of the commitment (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status including, for clinical studies, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

**POST APPROVAL FEEDBACK MEETING**

New biological products qualify for a post approval feedback meeting.  Such meetings are used to discuss the quality of the application and to evaluate the communication process during drug development and marketing application review.  The purpose is to learn from successful aspects of the review process and to identify areas that could benefit from improvement.  If you would like to have such a meeting with us, please contact the Regulatory Project Manager for this application.

Sincerely,

| | |
|---|---|
| Mary A. Malarkey | Marion F. Gruber, PhD |
| Director | Director |
| Office of Compliance | Office of Vaccines |
|   and Biologics Quality |   Research and Review |
| Center for Biologics | Center for Biologics |
|   Evaluation and Research |   Evaluation and Research |

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>          Plaintiff,<br><br>   v.<br><br>WASHINGTON STATE UNIVERSITY,<br>et al.,<br><br>          Defendants. | NO. 22-2-00244-38<br><br>NOTICE OF APPEARANCE OF COUNSEL<br><br>**(CLERK'S ACTION REQUIRED)** |

TO:       CLERK OF THE ABOVE-ENTITLED COURT

AND TO:    BRIAN FAHLING and ERIC KNIFFIN, Counsel for Plaintiff

PLEASE TAKE NOTICE that Defendant Washington State University, by and through its attorneys, Robert W. Ferguson, Attorney General, SPENCER W. COATES, Assistant Attorney General, and ZACHARY J. PEKELIS, Special Assistant Attorney General, without waiving objections as to improper service, jurisdiction, or venue, hereby enters its appearances in the above-entitled action and requests that notice of any and all further proceedings in said action be served upon the undersigned counsel at the address stated below.

**TRANSMISSION BY FAX OR BY ELECTRONIC MAIL DOES NOT CONSTITUTE SERVICE, UNLESS AGREED IN WRITING OR UNLESS OTHERWISE REQUIRED BY COURT RULE.**

DATED this 15th day of November 2022.

ROBERT W. FERGUSON
Attorney General

*/s/ Spencer W. Coates*
SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
Spencer.Coates@atg.wa.gov

*/s/ Zachary J. Pekelis*
ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404
(206) 245-1700
Zach.Pekelis@PacificaLawGroup.com

*Attorneys for Defendant Washington State University*

**DECLARATION OF SERVICE**

I hereby declare that on this day I caused the foregoing document to be served, via U.S. Mail, postage prepaid, via Consolidated Mail Services, and via electronic mail, on the following:

Brian Fahling
Law Office of Brian Fahling
8124 NE 166th Street
Kenmore, WA 98028
bfahling@fahlinglaw.com

Eric Kniffin
Lewis Roca
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO 80907
ekniffin@lewisroca.com

*Counsel for Plaintiff*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 15th day of November 2022, at Seattle, Washington.

*/s/ Spencer W. Coates*
SPENCER W. COATES, WSBA #49683
Assistant Attorney General

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

NICHOLAS ROLOVICH,

     Plaintiff,

v.

WASHINGTON STATE UNIVERSITY,
an agency of the State of Washington;
PATRICK CHUN, Director of Athletics for
Washington State University, in his
individual capacity; and JAY INSLEE,
Governor, in his official capacity,

     Defendants.

No.  22-2-00244-38

**FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

1. Plaintiff Nicholas Rolovich brings this action to vindicate his federal and state constitutional, statutory, and contractual rights, which rights were violated by Defendants, causing Mr. Rolovich significant and ongoing damages.

2. This action arises under the laws of the United States, specifically, 42 U.S.C. § 1983, 42 U.S.C. § 1988, 42 U.S.C. § 2000e, *et seq*., and the First and Fourteenth Amendments to the United States Constitution. This action also arises under the laws of the State of Washington, including RCW 49.60 *et seq.* (Washington Law Against Discrimination ("WLAD")), RCW 49.48, *et seq.,* RCW 49.52, *et seq.*, Article I, section 9 of the Washington Constitution, and state contract law.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 1

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to RCW 2.08.010.

4. Venue is proper in this district pursuant to RCW 4.12.025(1) because Washington State University's ("WSU") principal business is located in Whitman County and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and constitutional violations alleged herein, occurred in Whitman County. Additionally, the Employment Agreement between Mr. Rolovich and WSU requires that any litigation regarding enforcement or construction of the terms of the Agreement be filed in Whitman County Superior Court.

## III. EXHAUSTION OF ADMINISTRATIVE PROCEDURES/REMEDIES

**1. WSU Administrative Process**

5. Pursuant to Mr. Rolovich's employment agreement with WSU, he was required to appeal his termination, first, to Mr. Chun, and upon Mr. Chun's denial of the appeal, to WSU President, Kirk Schulz. Mr. Rolovich timely appealed to Mr. Chun, and then President Schulz. President Schulz denied Mr. Rolovich's appeal on December 6, 2021.

**2. Equal Employment Opportunity Commission/Washington State Human Rights Commission**

6. On or about February 14, 2022, Mr. Rolovich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act 1964, 42 U.S.C. §§ 2000 *et seq*. Because the Washington State Human Rights Commission ("WHRC") is a designated Fair Employment Practices Agency ("FEPA") in partnership with the EEOC, Mr. Rolovich's EEOC filing (dual filing) fulfills the State's requirement that a 49.60.030, *et seq.,* claim be filed with the State prior to any court filing. The State and federal claims arise out of the same facts alleged herein.

COMPLAINT - 2

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

7.     On or about August 16, 2022, Mr. Rolovich received, from the Department of Justice, Civil Rights Division ("DOJ"), a Notice of Right to Sue Within 90 Days in response to his previously filed charge of discrimination with the EEOC. This complaint has been filed within 90 days of Mr. Rolovich's receipt of the DOJ Notice of Right to Sue.

**3.     Department of Enterprise Services—Office of Risk Management (Tort Claim)**

8.     On or about April 27, 2022, Mr. Rolovich filed a tort claim with the State of Washington Department of Enterprise Services, Office of Risk Management.

9.     More than 60 days has elapsed from the date of filing Mr. Rolovich's tort claim. RCW 4.92.110.

10.    Any and all prerequisites to the filing of this lawsuit have been met.

### IV. PARTIES

11.    Plaintiff Nicholas Rolovich was Head Football Coach for WSU from January 14, 2020, until he was terminated on December 6, 2021. He currently resides in Northern California.

12.    Washington State University is an agency of the State of Washington, with a principal place of business located at Pullman, Washington. WSU has approximately 7,000 employees.

13.    Defendant Patrick Chun is Athletics Director for WSU. He is sued in his individual capacity only. At all times relevant to this complaint, Patrick Chun was acting as an agent of WSU.

14.    Defendant Jay Inslee is the governor of the State of Washington. He is sued in his official capacity.

### V. STATEMENT OF FACTS

15.    Washington State University ("WSU) terminated head football coach Nicholas Rolovich after he had refused to be vaccinated because of his religious and personal beliefs. WSU claimed that Mr. Rolovich's refusal to be vaccinated gave the University "just

COMPLAINT - 3

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

cause" to terminate him. By claiming that it had just cause to terminate Mr. Rolovich, WSU did not have to pay him liquidated damages as provided for in the employment agreement. The liquidation clause required WSU to pay Mr. Rolovich sixty percent of his $2,000,000+ base salary for the approximately three and one-half years remaining on his approximately five-year contract.

**A.      The Employment Agreement Between WSU and Mr. Rolovich**

16.      Mr. Rolovich's employment as head coach of the WSU football commenced with a Memorandum of Understanding ("MOU"), dated January 13, 2020. The financial terms of the MOU were the same as found in the employment agreement entered into between Mr. Rolovich and WSU in April 2020. (A true and correct copy of the employment agreement is attached hereto as EXHIBIT A, and incorporated herein.) The Agreement was to expire on June 30, 2025. WSU's termination of Mr. Rolovich became final on December 6, 2021, when President Schulz denied Mr. Rolovich's final appeal.

17.      The agreement provides that WSU could terminate Mr. Rolovich "without cause" at any time, but if WSU terminated him without cause, it would be required to pay "liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of [the] Agreement." At the time of his termination, Mr. Rolovich had approximately three and one-half more years to serve as WSU's head football coach.

18.      The agreement also provides that WSU could terminate Mr. Rolovich for "just cause" if he was found to be in violation of the just cause provisions set forth in the contract. If WSU terminated Mr. Rolovich for just cause, "all obligations of the University to make further payments under th[e] Agreement and/or to provide any other consideration . . . [would] cease."

19.      The employment agreement sets forth the following grounds for "just cause" termination of Mr. Rolovich:

COMPLAINT - 4

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**4.1 Termination by University for just cause**. The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as examples of its normally understood meaning in employment contracts, any of the following:

**4.1.1** Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

**4.1.2** Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

**4.1.3** Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

**4.1.4** An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

**4.1.5** Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

**4.1.6** Prolonged absence from duty without the consent of Employee's supervisor.

COMPLAINT - 5

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

20.    Nothing in Mr. Rolovich's employment agreement with WSU contemplates a scenario where WSU could claim "just cause" to terminate him because he refused to violate his religious faith, conscience, or bodily integrity.

**B.    Unlike Other WSU Football Coaches, Mr. Rolovich's Agreement Did Not Include Provisions Requiring Him to Follow State and Federal Health and Safety Guidelines**

21.    Less than two months after Mr. Rolovich entered into his employment contract with WSU, on February 29, 2020, Governor Inslee issued the first of nearly 500 proclamations related to COVID-19, declaring a State of Emergency in the State of Washington.

22.    On or about July 2021, WSU induced some of its football coaches to sign new employment agreements with provisions requiring them to "follow all federal, state, and local health directives, as well as university policies related to health and safety."

23.    Mr. Rolovich never signed an amendment to his employment agreement requiring him to follow health directives or university policies related to health and safety. His contract with WSU contains no such provisions.

**C.    Mr. Rolovich Discerns that His Religiously-Informed Conscience Precludes him from Receiving Available COVID-19 Vaccines**

24.    By the summer of 2021, Mr. Rolovich discerned that it would violate his conscience to receive any available COVID-19 vaccine.

25.    Mr. Rolovich is a practicing Catholic.

26.    The Catechism of the Catholic Church teaches that each person has a duty to develop a well-formed conscience, which "formulates its judgments according to reason."

27.    The Catechism teaches that, in developing their conscience, Catholics must draw upon the Word of God, prayer, personal experience, the advice of others, and the teaching of the Church.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 6

28.     The Catechism teaches that one "must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself." In other words, a Catholic is morally obliged to obey his conscience.

29.     As a Catholic, Mr. Rolovich drew upon his study of the Bible, personal prayer, personal experience, personal study, advice from others, advice from a Catholic priest, and the teachings of the Church in concluding that his conscience precluded him from receiving any available COVID-19 vaccine.

**D.     Mr. Chun's/WSU's Hostility Toward Mr. Rolovich**

30.     As set forth below, Mr. Chun made a number of statements to Mr. Rolovich that demonstrated his hostility toward Mr. Rolovich's expressed religious, personal, and scientific reasons for refusing to receive a COVID vaccine. Even before Governor Inslee issued his vaccine Mandate, Mr. Chun told Mr. Rolovich that his request for a religious exemption would be denied and he would be fired with cause unless he agreed to comply with the vaccine mandate.

31.     On or around May 24, 2021, Mr. Chun, after Mr. Rolovich said that he was not planning on getting a COVID-19 vaccine, claimed that he was worried about Mr. Rolovich's mental health and accused him of having extreme views regarding many issues.

32.     On or about May 27, 2021, Mr. Rolovich was called to a 3 p.m. meeting at Mr. Chun's office. Mr. Chun told Mr. Rolovich that his beliefs were making him incapable of leading his players. Mr. Chun also tried to get Mr. Rolovich into counseling because he believed that the Mr. Rolovich had mental health issues. Mr. Chun suggested that Mr. Rolovich should talk to Mr. Chun's wife because she had been in a couple different religions he referred to as "cults".

33.     In August 2020, before Governor Inslee issued a vaccine mandate for state employees, WSU had its employees check boxes on a computer form to designate their

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 7

Case 2:22-cv-00319   ECF No. 1-1   filed 12/14/22   PageID.87   Page 80 of 110

reason for not wanting to be vaccinated. The form provided for a medical exemption and a personal/religious exemption. Mr. Rolovich checked the personal/religious box.

34.    On August 16, 2021, Mr. Rolovich was called to an urgent meeting with Mr. Chun and Deputy Director of Athletics, Bryan Blair. At this meeting, Mr. Chun told Mr. Rolovich that Governor Inslee was intending to issue a vaccine mandate that would eliminate the "personal exemption" from the coaching staff's declaration of vaccination status. Mr. Chun warned Mr. Rolovich that any religious exemption request he submitted would be scrutinized to no end, and that Inslee's mandate would have a "high threshold" for religious exemptions moving forward.

35.    At that same meeting, Mr. Chun confidently told Mr. Rolovich that if he did not get the vaccine, he could be expected to be fired with cause on October 19, 2021.

36.    Mr. Chun's predictions about how WSU would treat requests for religious exemptions are consistent with the State's vaccine mandate policy as set forth in an August 3, 2021 email from Kathryn Leathers, Governor's Office General Counsel, to staff with the Attorney General's Office.[1] In that email she explained: "Of possible exemptions [to the vaccine mandate]: medical for sure; and religious (if we have to; if yes, as narrow as possible)."

37.    WSU's statistics on vaccination exemptions reflect the Governor's policy, as well as WSU's bias against religious exemptions: By early October 2021, WSU had approved requests for medical exemptions at almost twice the rate of religious exemption requests ("437 employees have requested religious exemptions. Only 98 have been granted so far. Just over 100 employees have requested medical exemptions of which 41 have been granted so far.")[2]

---

[1] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

[2] Erin Robinson, WSU granting fewer religious exemptions than the state as a whole, KXLY Spokane (Oct. 13, 2021), https://www.kxly.com/wsu-granting-fewer-religious-exemptions-than-the-state-as-a-whole/.

COMPLAINT - 8

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

38.     On August 19, 2021, Mr. Rolovich was summoned to a meeting with Mr. Chun. Assistant Athletics Director Bryan Blair also was present at the meeting. Mr. Chun told Mr. Rolovich that he had four choices: 1. Get the vaccine; 2. Don't get the vaccine and get fired; 3. Claim an exemption; or 4. Resign right now. Mr. Rolovich told Mr. Chun that he was not resigning and that he wanted to coach the team. Mr. Chun said, "but you say you don't care about the money" and "why don't you just resign?" Mr. Chun then accused Mr. Rolovich of having situational integrity. Mr. Chun also called Mr. Rolovich a "con-man" and accused him of being selfish. Mr. Chun then stated that Mr. Rolovich's objections to receiving the vaccine were causing Mr. Chun and President Schulz reputational damage. Mr. Chun then stated that all Mr. Rolovich had to do is get vaccinated.

39.     At the same meeting, Mr. Chun admitted his efforts to get Mr. Rolovich to take the vaccination in the past had been coercive, and Mr. Rolovich responded that the present meeting was much more coercive than earlier meetings. Mr. Chun pressed Mr. Rolovich again about the vaccine, and Mr. Rolovich said that he believed he had privacy rights and did not feel comfortable telling Mr. Chun about his reasons for declining to receive a COVID-19 vaccine. Mr. Chun then demanded that Mr. Rolovich tell him what his answer would be.

40.     Mr. Chun then stated that Governor Inslee "did this" just to come after Mr. Rolovich and WSU. Based on the context of Mr. Chun's statement, Mr. Rolovich understood "did this" to mean that Governor Inslee was trying to force Mr. Rolovich's hand with his new mandate because he was angry that the highest paid and one of the highest profile State employees had asserted personal or religious objections to his vaccine mandate. Mr. Chun also admitted to Mr. Rolovich that the Board of Regents wanted him fired. At this point in their heated exchange, Mr. Chun modified his earlier statement: he now said that Mr. Rolovich only had two options: get vaccinated or resign.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 9

41.     Up to this point, Mr. Rolovich had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines. Mr. Rolovich did not feel comfortable talking about his faith because it is a very personal matter to him and he was uncomfortable talking about his religious beliefs with his supervisor.

42.     Mr. Rolovich also was uncomfortable because he did not know how WSU would react to him sharing his religious opposition to medical research based on aborted fetal tissue, given that WSU professors have in the past publicly defended such research. However, after Mr. Chun made it clear that WSU intended to terminate him, Mr. Rolovich asked Mr. Chun and Mr. Blair about the University's process for requesting a religious exemption from a vaccine mandate. Mr. Chun and Mr. Blair said they did not know details about the University's process. They said they had been on the phone with WSU's Human Resource Services ("HRS") about that topic earlier in the day. Mr. Rolovich also had emailed HRS about the process by this time, but no one had any answers because the Governor had not yet made his proclamation.

43.     Mr. Chun then told Mr. Rolovich that he needed to have his religious exemption approved by August 29, the Sunday before the Utah State game. Mr. Rolovich asked who at WSU would review and approve religious exemption requests. Mr. Chun and Mr. Blair said they did not know. Mr. Rolovich asked them when the religious exemption application would be available. They said they did not know. Mr. Rolovich then responded that he feared the University would not be able to approve his exemption by Mr. Chun's August 29 deadline, given that the University's policy had not even been made public, let alone made available to him.

44.     Mr. Chun and Mr. Blair told Mr. Rolovich that they were in a time crunch and had to make a decision if he was going to coach that season. They said they did not want to start a season with Mr. Rolovich if they thought they may have to fire him on Oct 18th, pursuant to the Governor's mandate.

COMPLAINT - 10

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

45.     Mr. Rolovich responded that he would seek a religious exemption right then if one was available. Mr. Chun and Mr. Blair then got even more heated and started to question Mr. Rolovich's character. Mr. Chun said if Mr. Rolovich got the religious exemption, he would forever question his character. Mr. Chun and Mr. Blair both talked about the early days of the pandemic, and that Mr. Rolovich had not mentioned his faith. Mr. Rolovich said that he did not see the point, as he does not see faith and science as exclusive.

46.     Mr. Chun and Mr. Blair then stressed that the University's religious exemption would be hard to get and that there was no guarantee that Mr. Rolovich's request would be approved. Mr. Rolovich again asked what the criteria was going to be. They said they did not know.

47.     Mr. Rolovich did not feel comfortable talking about his faith because his faith is a very personal matter to him and because he was uncomfortable talking about his religious beliefs with his supervisor.

48.     On August 20, 2021, Governor Inslee issued Proclamation 21-14.1, which required all state employees to be fully vaccinated by October 18, 2021.

49.     Governor Inslee's Proclamation mandated vaccination for state employees "even when the only vaccines available are those authorized under U.S. Food and Drug Administration Emergency Use Authorizations."

**E.     Governor Inslee and WSU Mandated That Coach Rolovich and All State Employees Accept an Experimental Vaccine**

50.     At all times relevant to this Complaint, the only vaccines available to Washington State employees were vaccines authorized under U.S. Food and Drug Administration Emergency Use Authorizations. According to DailyMed, a publication of the National Institute of Medicine, the only FDA-approved vaccine—Comirnaty—was not available to the American public:

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 11

SEPTEMBER 13, 2021
Pfizer received FDA BLA license for its COVID-19 vaccine

Pfizer received FDA BLA license on 8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY). At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed 2 new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename.

At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution. As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels.[3]

51.     On August 23, 2021, the United States Food and Drug Administration ("FDA") issued two separate letters pertaining to two separate COVID-19 vaccines. One letter, addressed to Pfizer Inc., concerned the Pfizer-BioNTech COVID-19 Vaccine. Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021), ("Pfizer Letter") (A true and correct copy of the Pfizer Letter is attached hereto as EXHIBIT B and incorporated herein). The other letter, addressed to BioNTech Manufacturing GmbH, concerned the COMIRNATY vaccine. Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), ("BioNTech Letter") (A true and correct copy of the BioNTech Letter is attached hereto as EXHIBIT C and incorporated herein).

52.     In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted Emergency Use Authorization (EUA) for the Pfizer-BioNTech COVID-19 Vaccine. (Pfizer

_____

[3] *Pfizer received FDA BLA license for its COVID-19 vaccine*, DailyMed (Sept. 13, 2021), https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (Last visited Nov. 8, 2022); *see also,* Summary Basis of Regulatory Action – Comirnaty, FDA (Nov. 8, 2021) ("November 8 Comirnaty SBRA") at 5, available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022 ("In the U.S., there are no licensed vaccines or anti-viral drugs for the prevention of COVID-19."), available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022).

COMPLAINT - 12

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

Letter at 1.) It also notes that the EUA was continued on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2).

53. The FDA stated in the Pfizer Letter that, although it had granted the COMIRNATY vaccine full approval "for certain uses," the Pfizer-BioNTech COVID-19 Vaccine was still only authorized under an EUA. (Pfizer Letter at 2).

54. At all times relevant to this Complaint, the Pfizer-BioNTech COVID-19 Vaccine remained available only under the authorization of an EUA. (Pfizer Letter).

55. The Federal Food, Drug, And Cosmetic Act provides that subject to the limitations referenced and described in U.S.C. § 360bbb-3, the Secretary of Health and Human Services "may authorize the introduction into interstate commerce, during the effective period of a declaration [of emergency or threat justifying emergency authorized use] under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an 'emergency use.'" 21 U.S.C. § 360bbb-3(a)(1). As an essential part of the explicit statutory conditions for EUA, the EUA Statute mandates that all individuals to whom the EUA product may be administered be given the option to accept or refuse administration of the product:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:
>
> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> (I) that the Secretary has authorized the emergency use of the product;
>
> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
>
> (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 13

21 U.S.C. § 360bbb-3(e)(1)(A).

56.     The statutorily required Fact Sheets for each of the EUA COVID-19 vaccines acknowledge that individuals cannot be compelled to accept or receive the vaccine. *See, e.g.*, Pfizer-BioNTech, Fact Sheet for Recipients and Caregivers (June 25, 2021), https://www.fda.gov/media/144414/download ("It is your choice to receive or not to receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.").

57.     WSU never explained to Mr. Rolovich the potential risks of taking the experimental vaccine.

58.     WSU never gave Mr. Rolovich the option to accept or decline the experimental vaccine, telling him only that he would be fired for just cause if he refused.

**F.     WSU Established a Blind Review Process for Exemption Requests**

59.     In the weeks that followed Governor Inslee's August 20, 2021, proclamation creating a COVID-19 vaccine mandate for State employees, WSU established procedures as to how employees could request, and how the University would consider and approve or deny requests for religious and/or medical exemptions from the vaccine mandate.

60.     WSU published its procedures for evaluating requests for religious exemptions from the vaccine mandate on the University's website.[4] Part of this policy is expressed in the form of FAQs. In that context, the University represented that HRS would not share the details of an employee's request for an exemption with the employee's supervisor or manager:

> **I am requesting a medical or religious exemption, what will my supervisor/manager see as my exemption reason?**
>
> The Workday process will show as 'in-process' when an exemption is requested and will be updated to 'complete' once reviewed and accepted. HRS

---

[4] WSU, Human Resource Services, COVID-19 Vaccination Verification (Oct. 12, 2021), available at https://web.archive.org/web/20211103092159/https://hrs.wsu.edu/covid-19/vax-verification (last visited Nov. 10, 2022).

COMPLAINT - 14

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

will work directly with employees regarding their requested exemption as needed.

61.     The University described its process in more detail in an October 8, 2021, statement posted on its website:

> The requests for religious exemptions are evaluated in a 'blind' review process, meaning the identities of the individuals requesting exemptions are unknown to the members of the review committee except in instances when additional information is needed through follow-up contact. Separate review committees were created for students and employees. . . .
>
> For employees, the exemption requests go through a two-step process. The first is the blind review. Then, if an exemption is approved, the request moves to a separate accommodation review step where a determination is made whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community.[5]

62.     Phil Weiler, WSU vice president for communications, reiterated the process WSU would use to handle exemption requests:

> If the blind review results in the approval of Rolovich's exemption request, the process would enter a second phase. . . . An approved request would be sent to the human resources department, which would identify the employee in question and send an email to his/her supervisor indicating the exemption had been approved.[6]

At that point, according to Weiler, the supervisor would determine if the unvaccinated employee would be capable of "keeping the public safe" and perform his/her job effectively.

*Id.*

---

[5] Nearly 90% of WSU Employees are Vaccinated, WSU, Oct. 8, 2021, https://everett.wsu.edu/nearly-90-of-wsu-employees-are-vaccinated/ (last visited Nov. 10, 2022).

[6] Jon Wilner, Would WSU actually fire Nick Rolovich? Examining the exemption review process with the vaccine mandate deadline approaching, Mercury News, Oct. 7, 2021, https://www.mercurynews.com/2021/10/07/would-wsu-actually-fire-nick-rolovich-examining-the-exemption-review-process-as-vaccine-mandate-deadline-approaches/ (last visited Nov. 10, 2022).

COMPLAINT - 15

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**G.   WSU's Blind Review Process Determined that Mr. Rolovich's Religious Beliefs Were Sincere and Granted his Request for a Religious Exemption**

63.   On September 28, 2021, Mr. Rolovich completed his application for a religious exemption and submitted it to HRS.

64.   On October 6, 2021, HRS notified Mr. Chun that the University had completed its "good faith review" process and had determined that Mr. Rolovich was entitled to a religious exemption from the COVID-19 vaccine requirement because it found that he had articulated a "sincerely held religious belief" that prevented him from complying with the Governor's mandate.

65.   HRS then informed Mr. Chun that it was "considering approving the employee's request (for accommodation) subject to the following terms and conditions," summarizing a proposed list of accommodations, including mask wearing, social distancing, and testing requirements. HRS said the next step would be for the Athletics Department to decide whether it was "able to accommodate this request with the above recommendations." HRS stated in that email that it would not reach out to Mr. Rolovich until the University's "decision on the Religious Accommodation is finalized." HRS requested that the Athletics Department respond to its proposed accommodations by October 8.

**H.   Chun Improperly Inserted Himself Into the Process and Compelled WSU to Overturn Its Determination that Mr. Rolovich's Religious Beliefs Were Sincere**

66.   Mr. Chun, writing on behalf of the WSU Athletics Department, responded to HRS on October 13 with two memoranda. The first memorandum told HRS that it had rejected HRS' proposed accommodations and had determined that "the department is not able to accommodate this request."

67.   Mr. Chun's and the Athletics Department's second memorandum challenged HRS' conclusion that "Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being

COMPLAINT - 16

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

vaccinated for COVID-19." That challenge was based on the Athletics Department's assertion that "Rolovich had made several statements that cast doubt on his claimed sincerely held religious belief." The memorandum stated that the fact that Rolovich had articulated other reasons for refusing a COVID vaccination before he had told Mr. Chun about his religious objections to the available COVID vaccines "support[ed] re-evaluation of the claimed sincerely-held religious belief."

68.     On October 14, 2021, Department of Environmental Health and Safety ("EH&S") issued a memorandum to Mr. Chun with extensive detail about how it had used its "expertise in environmental and occupational health and safety" to make an "individualized assessment" of Mr. Rolovich's working environment and formulate a list of "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

69.     Mr. Chun, writing on behalf of the Athletics Department, subsequently wrote HRS a memorandum, copying EH&S, that rejected EH&S' recommendations. Mr. Chun/Athletics Department rejected EH&S' assessment that its recommendations would "ensure the safety of the employee and others the employee may be in contact with."

70.     The Mr. Chun and the Athletics Department also rejected EHS's proposed accommodations on the basis that having an unvaccinated head coach "would create an undue hardship for WSU Athletics given his assigned duties and responsibilities." The memorandum states, in part:

- "WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff."

- "[B]ecause employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches)."

COMPLAINT - 17

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

- "The damage to the mission and reputation of the University posed by this situation cannot be understated [*sic*], nor can it be resolved by accommodation."

**I.     Mr. Rolovich's Compliance with WSU Protocols, and Mr. Chun's Violation of WSU Protocols, Undermine Mr. Chun's Given Reasons for Not Accommodating Mr. Rolovich's Religious Convictions**

71.     During the pandemic, WSU imposed protocols it hoped would mitigate the transmission of Covid among its employees and students. Mr. Rolovich was required to follow specific protocols developed for him because he was unvaccinated. Days before Mr. Rolovich informed Mr. Chun that he intended to seek a religious exemption from the vaccine Mandate, Mr. Chun said that he was confident that Mr. Rolovich could safely coach WSU's football team.

72.     The Seattle Times reported that Mr. Rolovich was "undergoing daily COVID-19 testing and wears a mask. Chun said the coach is adhering to all protocols."[7] "WSU athletic director Pat Chun, who is vaccinated, made it clear Wednesday that he backs his coach, saying Rolovich is the right person for the job despite the two being diverged on the vaccine decision." *Id*.

73.     Mr. Chun, however, did not follow WSU's Covid protocols. Four days after he fired Mr. Rolovich for allegedly "undermin[ing] the University's efforts to promote student safety," Mr. Chun was caught violating masking regulations at a donor event;[8] days later Mr. Chun was caught violating masking regulations while in the locker room with WSU football players.[9]

---

[7] Scott Hanson, WSU in 'strict COVID management' after football coach Nick Rolovich's decision to not get vaccinated, Spokesman Review, Aug. 13, 2021, https://www.spokesman.com/stories/2021/aug/13/wsu-in-strict-covid-management-after-football-coac/ (last visited Nov. 10, 2022).

[8] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/ (last visited Nov. 10, 2022).

[9] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664 (last visited Nov. 10, 2022). Mr. Chun's conduct violated both the University's and host Arizona State University's masking policies. *See* Arizona State University, Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

COMPLAINT - 18

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

74.    When a local politician pointed out Mr. Chun's double-standard, Mr. Chun went to the City Councilor's place of business, launched a vulgar tirade, and threatened violence in front of the City Councilor's teenage daughter. Mr. Chun became so angry that the police got involved and decided that Mr. Chun would be "permanently trespassed" from the City Councilor's businesses.[10]

75.    On November 19, 2021, a local reporter noted that Mr. Chun was disregarding masking rules at a WSU basketball game in Idaho.[11]

**J.    Stanford Public Health and Infectious Disease Expert States that WSU Could Have Safely Accommodated Mr. Rolovich**

76.    Dr. Bhattacharya, a former Professor of Medicine (20+ years) and current Professor of Health Policy at Stanford University School of Medicine submitted a 29 page declaration to Mr. Chun and President Schulz on behalf of Mr. Rolovich. The Declaration provided scientific evidence in support of his conclusion that WSU could keep its employees safe while granting exemptions for those whose medical conditions and religious convictions prevent them from receiving a COVID vaccine.

77.    Dr. Bhattacharya also is a research associate at the National Bureau of Economic Research, and Director of Stanford's Center for Demography and Economics of Health and Aging. Dr. Bhattacharya holds an M.D. and Ph.D. from Stanford University. He has published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others.

---

[10] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-trespassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html (last visited Nov. 10, 2022); Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/ (last visited Nov. 10, 2022).

[11] Katie Daviscourt, WSU athletic director caught violating COVID protocols after firing head football coach for refusing vaccine, Post Millennial, Nov. 19, 2021, https://thepostmillennial.com/wsu-athletic-director-violating-covid-firing-coach (last visited Nov. 10, 2022).

COMPLAINT - 19

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

Dr. Bhattacharya's research has been cited in the peer-reviewed scientific literature more than 11,600 times.

78.     Dr. Bhattacharya has dedicated his professional career to the analysis of health policy, including infectious disease epidemiology and policy, and the safety and efficacy of medical interventions. He has both studied extensively and commented publicly on the necessity and safety of vaccine requirements for those who have contracted and recovered from COVID-19 (individuals who have "natural immunity"). Dr. Bhattacharya is intimately familiar with the emergent scientific and medical literature on this topic and pertinent government policy responses to the issue both in the United States and abroad.

79.     Dr. Bhattacharya also is the primary co-author of the Great Barrington Declaration, which describes an alternate policy of focused protection. His co-authors of the Declaration include Prof. Martin Kulldorff of Harvard University and Prof. Sunetra Gupta of Oxford University. Over 12,000 epidemiologists and public health professionals and 35,000 medical professionals had co-signed the Declaration by the time Mr. Rolovich was terminated.

80.     WSU produced no evidence, let alone scientific evidence, that the accommodation plans developed by EH&S would not be effective for Mr. Rolovich.

81.     In his declaration, Dr. Bhattacharya noted, "According to a meta-analysis by Dr. John Ioannidis of every seroprevalence study conducted to date of publication with a supporting scientific paper (74 estimates from 61 studies and 51 different localities worldwide), the median infection survival rate—the inverse of the infection fatality rate— from COVID-19 infection is 99.77%. For COVID-19 patients under 70, the meta-analysis finds an infection survival rate of 99.95%. A separate meta-analysis by other scientists independent of Dr. Ioannidis' group reaches qualitatively similar conclusions.

82.     Dr. Bhattacharya continued, "A study of the seroprevalence of COVID-19 in Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the

COMPLAINT - 20

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

infection survival rate in a preprint companion paper: 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65."

83.     Those numbers are consistent with what the US CDC has reported. A US CDC report found between 6 and 24 times more SARS-CoV-2 infections than cases reported between March and May 2020. Correspondingly, the CDC's estimate of the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate. For people ages 20-49 years, it was 0.02%, meaning that young adults have a 99.98% survivability rate. For people age 50-69 years, it was 0.5%, meaning this age group has a 99.5% survivability rate. Finally, for people ages 70+ years, it was 5.4%, meaning seniors have a 94.6% survivability rate.

84.     Dr. Bhattacharya stated, "It has been found that vaccinated individuals are at least as likely as unvaccinated individuals to be shedding live virus. Data from studies indicate that vaccinated and unvaccinated individuals infected with the Delta variant might transmit infection. Importantly, it has been shown that infectious SARS-CoV-2 is frequently found even in vaccinated persons."

85.     Also, the CDC reported in July 2021 that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated, leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[12]

86.     Dr. Bhattacharya noted that "[a]symptomatic individuals are an order of magnitude less likely to infect others than symptomatic individuals, even in intimate settings such as people living in the same household where people are much less likely to follow social distancing and masking practices that they follow outside the household. Spread of the

---

[12] *See* Joel Achenbach, CDC Reversal on Indoor Masking Prompts Experts to Ask, "Where's the Data?" Wash. Post, July 28, 2021, wapo.st/2THpmIQ (last visited Nov. 10, 2022).

COMPLAINT - 21

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

disease in less intimate settings by asymptomatic individuals—including in the context of the WSU work environment—is likely to be even less likely than in the household."

87. Dr. Bhattacharya concluded that the best empirical evidence shows that the probability that an asymptomatic individual will spread the disease is very low. And because the overwhelming majority of WSU employees were vaccinated in the fall of 2021, they faced even less risk from any of their asymptomatic, unvaccinated coworkers who receive an accommodation from WSU for religious or medical reasons.[13]

88. When Mr. Rolovich was asymptomatic, he—like all other asymptomatic individuals—presented an almost 0% chance of infecting others with COVID-19.

89. In Dr. Bhattacharya's expert opinion, derived from his personal scientific investigations, and his examination and analysis of a multitude of scientific studies, WSU could have safely accommodated Mr. Rolovich and other unvaccinated employees.

**K.    WSU's Termination of Mr. Rolovich as Head Coach**

90. Mr. Rolovich arrived at a meeting on October 18, 2021, and one minute before that meeting, at 4:29, while waiting for Mr. Chun, Mr. Rolovich received an email from HRS Exemptions notifying him that the University was "unable to approve your request for an exemption and accommodation based on a sincerely held religious belief, practice, or observance."

91. Though the HRS panel had already determined that Mr. Rolovich's religious beliefs were sincere and granted him a religious exemption on that basis, HRS allowed Mr. Chun to improperly influence and interfere with the final decision made in its blind review process. Mr. Chun notified HRS that he disagreed with HRS's determination

---

[13] President Schulz had said that nearly 90 percent of WSU employees and 97 percent of students were vaccinated. Chuck Culpepper, Washington State Football Coach Nick Rolovich Fired after Failing to Comply with Vaccine Mandate, Washington Post, Oct. 18, 2021, https://www.washingtonpost.com/sports/2021/10/18/nick-rolovich-washington-state-fired-covid-mandate/. *See also* Donald G. McNeil, Jr., How Much Herd Immunity Is Enough?, NY Times, Dec. 24, 2020 (updated Sept. 22, 2021), https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html ("Dr. Fauci noted, a herd-immunity figure at 90 percent or above is in the range of the infectiousness of measles. 'I'd bet my house that Covid isn't as contagious as measles,' he said.").

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 22

regarding Mr. Rolovich's sincerity, and, as a result, HRS reversed its determination, stating, "[b]ased on your comments, in conjunction with the timing of your request for a religious accommodation, the University questions the assertion that your sincerely held religious views conflict with the University's vaccine requirement."

92. HRS also reversed its position that Mr. Rolovich's sincere religious beliefs could be accommodated by WSU, adopting Mr. Chun and the Athletics Department's position that Mr. Rolovich could not "safely and effectively do [his] job without undue hardship to the University."

93. At the October 18 meeting, Mr. Chun served Mr. Rolovich with Written Notice of Intent to Terminate with Just Cause.

94. Mr. Chun had a security officer, who was present during the meeting, escort Mr. Rolovich from the building and to Mr. Rolovich's truck.

95. Mr. Chun did not permit Mr. Rolovich to return to his office to retrieve his private property.

96. Mr. Chun did not permit Mr. Rolovich to speak with his WSU football players after the meeting.

97. As a direct and proximate result of WSU's, Governor Inslee's, and Mr. Chun's actions, Mr. Rolovich has suffered, and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, and compensation and benefits for which he is entitled to an award of monetary damages.

**COUNT I**
**BREACH OF CONTRACT**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

98. Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

99. Pursuant to the terms of WSU's employment contract with Mr. Rolovich, WSU could terminate him with just cause (as defined in the contract), or without cause, but if

COMPLAINT - 23

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

it terminated Mr. Rolovich without cause, WSU was required to pay liquidated damages in an amount equal to sixty percent of his remaining base salary. When he was terminated, Mr. Rolovich had approximately three and one-half years remaining on his contract.

100.    WSU terminated Mr. Rolovich in December 2021, claiming that it had just cause to do so, and on that basis denied that it owed Mr. Rolovich any further compensation under Mr. Rolovich's employment agreement.

101.    WSU breached its contract with Mr. Rolovich because it did not have just cause to terminate Mr. Rolovich.

102.    WSU violated its own policies by allowing HRS to be improperly and unlawfully influenced by Mr. Chun, who persuaded HRS to reverse its determination that Mr. Rolovich's religious beliefs regarding Covid vaccines were sincere.

103.    Mr. Rolovich reasonably relied upon WSU's representation that it would follow a blind review process in determining whether a request for a religious exemption from the vaccine mandate was grounded in a sincere religious belief.

104.    Mr. Rolovich's determination that he could not receive a COVID-19 vaccine without violating his religious convictions was not a deliberate and serious violation of his contractual duties, it was not an act of misconduct, or an intentional or major violation or repeated instance of secondary violations, nor was it prejudicial to the best interests of the University or its athletic program. It was an act of faith, of conscience.

105.    By taking punitive action against Mr. Rolovich for raising a religious objection that the University's own process deemed sincere, WSU breached its employment agreement with Mr. Rolovich.

106.    After HRS determined that Mr. Rolovich's religious beliefs were sincere, both HRS and EH&S determined that Mr. Rolovich's sincere religious beliefs could be accommodated by requiring countermeasures to ensure his safety and others he may be in contact with.

COMPLAINT - 24

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

107. For approximately a year prior to his termination, Mr. Rolovich had successfully performed his job as head coach while following countermeasures required of him by WSU because of his vaccination status.

108. Mr. Chun rejected the HRS and EH&S accommodation protocols developed for Mr. Rolovich, without ever seeking input from Mr. Rolovich.

109. Mr. Rolovich's sincere religious beliefs could have been accommodated as was clearly demonstrated by HRS, and especially EH&S, whose expertise in environmental and occupational health and safety" made an "individualized assessment" of Mr. Rolovich's working environment and formulated a list of "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

110. WSU's refusal to seek input from Mr. Rolovich on his religious accommodation, a duty imposed by law, was a breach of its employment agreement with Mr. Rolovich, as was Mr. Chun's predetermination before Governor Inslee's vaccine mandate that Mr. Rolovich would be fired with cause if he did not get vaccinated.

111. WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

## COUNT II
## WASHINGTON LAW AGAINST DISCRIMINATION
### RCW 49.60 *et seq.*

112. Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

COMPLAINT - 25

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

113.    A substantial factor in WSU's decision to terminate Mr. Rolovich "for just cause" was his religious beliefs (creed) as expressed by him in seeking a religious exemption from Governor Inslee's vaccine mandate.

114.    An individual's exercise of religious beliefs in a decision not to be vaccinated, or take medicine, cannot lawfully serve as the basis for a just cause termination.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT III**
**WASHINGTON CONSTITUTION, ARTICLE 1, SECTION 11**
**DISCRIMINATION AGAINST RELIGION/CONSCIENCE**

115.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

116.    The Washington State Constitution guarantees Mr. Rolovich "[a]bsolute freedom of conscience in all matters of religious sentiment, belief, and worship." The same constitutional provision states that "no one shall be molested or disturbed in person or property on account of religion."

117.    Defendants, by their conduct and words, discriminated against Mr. Rolovich because he acted according to his conscience, guided by his religion, in refusing to be vaccinated.

118.    Defendants' threat to fire Mr. Rolovich with "just cause" if he did not take an experimental vaccine was a disturbing and unlawful assault upon Mr. Rolovich's conscience, bodily integrity, and religious faith.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 26

**COUNT IV**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.***

119. Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

120. Title VII of the Civil Rights Act of 1964 prohibits WSU from discriminating against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C. §2000e-2(a).

121. Mr. Rolovich holds sincere religious beliefs that precluded him from receiving any of the COVID-19 vaccines available during the times relevant to this complaint.

122. Mr. Rolovich notified WSU of those beliefs by requesting a religious exemption and reasonable accommodations from the vaccine mandate.

123. WSU's HRS panel, pursuant to the University's established policies and protocol, determined that Mr. Rolovich had sincere religious beliefs that precluded him from taking the vaccine, thereafter notifying the Athletics Department (Mr. Chun) of its determination.

124. The HRS panel, having concluded that Mr. Rolovich's religious beliefs were sincere, asked only for Mr. Chun's input on whether Mr. Rolovich's sincere religious beliefs could be accommodated.

125. Both HRS and EHS determined that WSU could accommodate Mr. Rolovich's sincere religious beliefs.

126. WSU failed to engage with Mr. Rolovich in the interactive process set forth in the EEOC's Compliance Manual on Religious Discrimination before concluding that it would not accommodate his request for a religious exemption.

127. WSU's disapproval of Mr. Rolovich's sincerely-held religious reasons for refusing to receive a COVID-19 vaccine was one of the University's motives for its discriminatory treatment of Mr. Rolovich.

COMPLAINT - 27

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

128. Accommodating Mr. Rolovich's religious beliefs would not have resulted in an undue hardship on WSU's operations.

129. WSU's discriminatory actions were intentional and/or reckless and in violation of Title VII.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT V**
**42 U.S.C., SECTION 1983**
**First Amendment-Free Exercise of Religion and Fourteenth Amendment-Due Process**
**(Defendant Chun only, in his Individual Capacity)**

130. Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

131. All of the acts of Defendant Chun were conducted by him under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

132. The law regarding the free exercise of religion in employment is well established.

133. The law regarding due process in employment is well established.

134. Defendant Chun knew the First Amendment prohibits government officials from discriminating against an employee because of his religious beliefs.

135. Defendant Chun knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

136. Defendant Chun knew the Fourteenth Amendment prohibits government from denying an employee due process.

137. Defendant Chun knew the Fourteenth Amendment prohibits government officials from denying an employee his right to due process.

COMPLAINT - 28

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

138.    Defendant Chun acted with willful malice, and/or intentionally and in gross disregard of Mr. Rolovich's constitutional rights, and/or in reckless disregard of Mr. Rolovich's constitutional rights.

139.    As a direct and proximate result of Defendant Chun's actions, Mr. Rolovich has been deprived of his constitutional right to the free exercise of religion, to be free from governmental hostility directed at his religion, and his right to due process and equal protection under the law.

WHEREFORE, Plaintiff prays for damages against Defendant Chun as provided for by law.

### COUNT VI
### 42 U.S.C., SECTION 1983
### (First Amendment-Free Exercise of Religion)

140.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

141.    All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

142.    Defendants granted twice as many medical exemptions as religious exemptions to WSU employees, reflecting Defendants' discriminatory policy to grant religious exemptions as narrowly as possible.

143.    The creation of a formal mechanism for granting exemptions renders WSU's vaccine mandate not generally applicable because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude.

144.    Defendants ultimately denied Mr. Rolovich's religious exemption request, terminated him, and improperly claimed it had just cause to do so, because Mr. Rolovich had

COMPLAINT - 29

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

informed Defendants that religious convictions precluded him from receiving a COVID-19 vaccine.

145.    Mr. Rolovich's religious conviction to not be vaccinated cannot be punished by WSU by terminating him with just cause.

146.    The actions of Defendants, as alleged herein, are unconstitutional abridgements of Mr. Rolovich's rights to the free exercise of religion secured by the First and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT VII**
**FOURTEENTH AMENDMENT-DUE PROCESS (As Applied)**

147.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

148.    All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

149.    Defendants' policies, as administratively construed and applied against Mr. Rolovich, granted WSU officials unfettered discretion to disregard the process they created for determining whether a religious exemption would be granted and, therefore, abridged Mr. Rolovich's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

COMPLAINT - 30

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

a.    Assume jurisdiction over this action;

b.    Award damages in an amount to be determined at trial plus pre and post-judgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

c.    Award liquidated damages, as provided for in the employment contract;

d.    Award punitive damages, as provided for under 42 U.S.C. § 1983, Title VII, RCW 49.60 *et seq.* and as otherwise provide for under federal and state law;

e.    Award double damages as provided for in RCW 49.52, *et seq.*;

f.    Award damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus pre and post-judgment interest;

g.    Award an offset for the adverse federal income tax consequences resulting from damages and award of attorneys' fees;

h.    Award costs that Plaintiff has incurred in this action, including but not limited to expert witness fees, as well as reasonable attorneys' fees and costs to the fullest extent permitted by federal and state law; and

COMPLAINT - 31

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

   i.   Award such other and further relief as the Court may deem just and proper.

   DATED this 9th day of December, 2022.

By   /s Brian Fahling

   Brian Fahling
   WSBA #18894
   LAW OFFICE OF BRIAN FAHLING
   8124 NE 166th St
   Kenmore, WA 98028
   T: 425.802.7326
   E-mail: bfahling@fahlinglaw.com


By   /s Eric Kniffin

   Eric Kniffin
   CO Bar #48016
   (Pending Admission *Pro Hac Vice*)
   LEWIS ROCA
   90 S. Cascade Ave., Suite 1100
   Colorado Springs, CO 80907
   T: 719-386-3017
   E-mail: ekniffin@lewisroca.com

   Attorneys for Plaintiff

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 32

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

| NICHOLAS ROLOVICH, | No. 22-2-00244-38 |
| --- | --- |
| Plaintiff, | |
| v. | SUMMONS (20 days) |
| WASHINGTON STATE UNIVERSITY, an agency of the State of Washington; PATRICK CHUN, Director of Athletics for Washington State University, in his individual capacity; and JAY INSLEE, Governor, in his official capacity, | |
| Defendants. | |

**TO:   WASHINGTON STATE UNIVERSITY**

A lawsuit has been started against you in the above-entitled court by the above-named plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and by serving a copy upon the person signing this summons within 20 days after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where plaintiff is entitled to what she or he asks for because you have not responded. If you serve a notice of

//

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SUMMONS - 1

appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that the plaintiff file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon the person signing this summons. Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court, or the service on you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 9th day of December, 2022.

By _____

Brian Fahling
WSBA #18894
LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: 425.802.7326
E-mail: bfahling@fahlinglaw.com

Attorney for Plaintiff

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SUMMONS - 2

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

NICHOLAS ROLOVICH,

    Plaintiff,

v.

WASHINGTON STATE UNIVERSITY,
an agency of the State of Washington;
PATRICK CHUN, Director of Athletics for
Washington State University, in his
individual capacity; and JAY INSLEE,
Governor, in his official capacity,

    Defendants.

**No. 22-2-00244-38**

**SUMMONS (20 days)**

**TO:   PATRICK CHUN, Director of Athletics for Washington State University**

A lawsuit has been started against you in the above-entitled court by the above-named plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and by serving a copy upon the person signing this summons within 20 days after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where plaintiff is entitled to what she or he asks for because you have not responded. If you serve a notice of

//

SUMMONS - 1

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that the plaintiff file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon the person signing this summons. Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court, or the service on you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 9th day of December, 2022.

By _____

Brian Fahling
WSBA #18894
LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: 425.802.7326
E-mail: bfahling@fahlinglaw.com


Attorney for Plaintiff

SUMMONS - 2

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

NICHOLAS ROLOVICH,

     Plaintiff,

v.

WASHINGTON STATE UNIVERSITY,
an agency of the State of Washington;
PATRICK CHUN, Director of Athletics for
Washington State University, in his
individual capacity; and JAY INSLEE,
Governor, in his official capacity,

     Defendants.

**No. 22-2-00244-38**

**SUMMONS (20 days)**

**TO:    GOVERNOR JAY INSLEE**

A lawsuit has been started against you in the above-entitled court by the above-named plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and by serving a copy upon the person signing this summons within 20 days after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where plaintiff is entitled to what she or he asks for because you have not responded. If you serve a notice of

//

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SUMMONS - 1

appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that the plaintiff file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon the person signing this summons. Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court, or the service on you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 9th day of December, 2022.

By _____

Brian Fahling
WSBA #18894
LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: 425.802.7326
E-mail: bfahling@fahlinglaw.com

Attorney for Plaintiff

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SUMMONS - 2

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
NICHOLAS ROLOVICH

**DEFENDANTS**
WASHINGTON STATE UNIVERSITY, et al.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Whitman
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brian Fahling, Law Office of Brian Fahling
8124 NE 166th St, Kenmore, WA 98028 (425) 825-7326

Attorneys *(If Known)*
Spencer W. Coates, Zachary J. Pekelis

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | **PERSONAL INJURY** | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 365 Personal Injury - Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 370 Other Fraud | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 380 Other Personal Property Damage | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [x] 442 Employment | [ ] 510 Motions to Vacate Sentence | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | | [ ] 550 Civil Rights | | |
| | | [ ] 555 Prison Condition | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | |

Additional LABOR and IMMIGRATION items:
[ ] 710 Fair Labor Standards Act
[ ] 720 Labor/Management Relations
[ ] 740 Railway Labor Act
[ ] 751 Family and Medical Leave Act
[ ] 790 Other Labor Litigation
[ ] 791 Employee Retirement Income Security Act
**IMMIGRATION**
[ ] 462 Naturalization Application
[ ] 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*
- [ ] 1 Original Proceeding
- [x] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 2000(e)
Brief description of cause:
Employment Discrimination - Religious

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
December 14, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Spencer W. Coates

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)  Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)  County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)  Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.  Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.  Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.  Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.  Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.  Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.