

T  206.245.1700
401 Union Street, Suite 1600
Seattle, WA 98101-2668
pacificalawgroup.com

Zachary J. Pekelis
zach.pekelis@pacificalawgroup.com

October 2, 2025

**<u>VIA CM/ECF Electronic Filing System</u>**

Molly C. Dwyer, Clerk of Court
United States Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

Re:   Appellees' FRAP 28(j) letter
      *Rolovich v. Washington State University*, Case No. 25-761

Dear Ms. Dwyer:

Appellees bring the Court's attention to *Detwiler v. Mid-Columbia Medical Center*, --- F.4th ----, No. 23-3710, 2025 WL 2700000 (9th Cir. Sept. 23, 2025), which affirmed dismissal of a Title VII failure-to-accommodate-religion claim because the plaintiff failed to "sufficiently articulate a bona fide religious belief in conflict with her former employer's [COVID-19] testing requirement." *Id.* at *7. Detwiler asserted her body was a "temple of God," explaining: (1) "It [was] against [her] faith and [her] conscience to commit sin;" (2) it was a sin to "participate in COVID testing that causes harm;" and (3) COVID-19 testing caused harm because it would "alter [her] DNA and has been proven to cause cancer." *Id.* at *3. Affirming dismissal, this Court explained that "some inquiry into the religious or secular nature

of a belief is necessary to prevent religious labels from becoming carte blanche to ignore any obligation." *Id.* at *6. A plaintiff "must plead a sufficient nexus between [their] religion and the specific belief in conflict with the work requirement." *Id.*

What was true at the pleading stage in *Detwiler* is true at summary judgment here. In Rolovich's summary judgment declarations, the only purportedly religious conflict with vaccination he identified was his "religious obligation as a Catholic to follow my conscience and decline to take a COVID vaccination." 1-ER-1161. In discovery, Rolovich produced thousands of communications expressing secular objections (including health concerns and conspiracy theories) against vaccination. *See* Answering Br. at 46–47. Rolovich's "follow-my-conscience" objection, coupled with his various secular objections to the vaccine, does not represent a "specific belief in conflict with the [vaccination] requirement," for the same reason that Detwiler's did not create a conflict with the testing requirement. *Detwiler*, 2025 WL 2700000 at *6 ("Invocations of broad, religious tenets cannot, on their own, convert a secular preference into a religious conviction."). If Rolovich's "broad belief" that he must follow his conscience "[w]ere sufficient to state a prima facie claim for a religious exemption, there would be no bounds on otherwise-secular preferences that an employee could characterize as religious and therefore demand an employer accommodate." *Id.* at *11.

*I certify that a copy of the foregoing was served on Appellants via counsel by filing the document on October 2, 2025 in the Court's PACER/ECF system, and that it contains 350 words.*

DATED this 2nd day of October, 2025.

PACIFICA LAW GROUP LLP

By: <u>s/ Zachary J. Pekelis</u>
    Zachary J. Pekelis, WSBA No. 44557
    Erica Coray, WSBA No. 61987
    W. Scott Ferron, WSBA No. 61154

401 Union Street, Suite 1600
Seattle, WA 98101
(206) 245-1700
Zach.pekelis@pacificalawgroup.com
Erica.Coray@pacificalawgroup.com
Scott.Ferron@pacificalawgroup.com

Special Assistant Attorneys General
Attorneys for Appellees Washington State University and Patrick Chun

2025 WL 2700000
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

SHERRY H. DETWILER, Plaintiff - Appellant,
v.
MID-COLUMBIA MEDICAL CENTER;
CHERI MCCALL, an individual; DOES,
1 through 50, Defendants - Appellees.

No. 23-3710
|
Argued and Submitted June
13, 2025 Portland, Oregon
|
Filed September 23, 2025

SUMMARY[**]

Employment Discrimination /
Religious Accommodation

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

 **\*1**  Affirming the district court's dismissal, for failure to state a claim, of an employment discrimination action under Title VII and the parallel Oregon state statute, the panel held that the plaintiff failed sufficiently to plead a bona fide religious belief that conflicted with her employer's policy implementing the Oregon Health Authority's administrative rule requiring healthcare workers to be vaccinated against COVID-19, absent an approved exemption.

The employer approved the plaintiff's request for a religious exemption from vaccination. As part of that accommodation, it required the plaintiff to wear personal protective equipment while in the office and to submit to weekly antigen testing for COVID-19. The plaintiff sought a further accommodation of exemption from the weekly antigen testing on the basis that because her research showed that the testing swab was carcinogenic, its use would conflict with her Christian belief in protecting her body as the temple of the Holy Spirit. The employer, however, denied the plaintiff's requested accommodations of saliva testing or full-time remote work and later terminated her employment.

The panel held that for a claim of religious discrimination, the plaintiff must first plead a prima facie case of failure to accommodate her religion. If she meets her burden, then the employer must show that it was nonetheless justified in refusing to accommodate. A plaintiff can meet her prima facie burden by demonstrating that she had a bona fide religious belief, the practice of which conflicted with an employment duty; she informed her employer of the belief and conflict; and the employer threatened her with or subjected her to discriminatory treatment, including discharge, because of her inability to fulfill the job requirements. Where an employee seeks an accommodation, she must plead facts sufficient to show that the accommodation request also springs from a bona fide religious belief. Looking to First Amendment doctrine, the panel held that the district court does not examine the sincerity or the reasonableness of a belief. Instead, the court need only determine if a plaintiff has pled enough facts to plausibly show that her belief is religious, rather than purely secular.

The panel concluded that the plaintiff's complaint did not sufficiently articulate a bona fide religious belief in conflict with her former employer's testing requirement because her belief that the antigen testing swab was carcinogenic was personal and secular, premised on her interpretation of medical research. Disagreeing with other circuits, the panel declined to adopt a lenient approach allowing a complaint to survive with merely conclusory statements about the religious nature of a belief. The panel concluded that the plaintiff, by asserting a general religious principle and linking that principle to her personal, medical judgment via prayer alone, did not state a claim for religious accommodation.

Dissenting, Judge VanDyke wrote that the majority adopted a flawed mode of analysis purporting to distinguish a category of purely secular claims incidentally linked to a general religious principle from a category of truly religious claims. Judge VanDyke wrote that he would follow other circuits and assume as true the plaintiff's allegation that she requested

a religious exemption from the COVID-19 testing requirement, her employer rejected that request, and she was fired because she declined to be tested. As pled, her religious beliefs plainly constituted a fundamental element of her objection to antigen testing.

D.C. No. 3:22-cv-01306-JR

Appeal from the United States District Court for the District of Oregon Karin J. Immergut, District Judge, Presiding

**Attorneys and Law Firms**

COUNSEL Matthew B. McReynolds (argued), Pacific Justice Institute, Sacramento, California; Ray D. Hacke, Pacific Justice Institute, Salem, Oregon; for Plaintiff-Appellant.

William G. Lockwood (argued), Diane Lenkowsky, and Julie B. Haddon, Gordon Rees Scully Mansukhani LLP, Portland, Oregon; for Defendants-Appellees.

Before: John B. Owens and Lawrence VanDyke, Circuit Judges, and Richard Seeborg, Chief District Judge.[*]

[*] The Honorable Richard Seeborg, United States Chief District Judge for the Northern District of California, sitting by designation.

**OPINION**

SEEBORG, Chief District Judge:

**\*2** Some sacrifice of total autonomy is a natural consequence of gainful employment. Even in the best of times, job obligations may conflict with one's personal preferences. That said, an employment contract does not terminate the right to exercise one's religion. Federal and state legislatures protect workers from discrimination, harassment, and harms that rise above mere conflict with an employee's predilections.

In response to the COVID-19 pandemic, employers across the country instituted vaccine and testing requirements to comply with government mandates. These policies have surfaced the tension between individual beliefs and the demands of the workplace. Employees across the country have filed suits challenging these relatively new obligations, and many assert these policies amount to religious discrimination. Courts must tread carefully in evaluating these claims. On the one hand, courts have long safeguarded the rights of religious believers, even when their beliefs are not mainstream, traditional, or even internally consistent. On the other hand, legislatures crafted religious discrimination statutes of limited scope, striking a balance between individual entitlements and the reality of the workplace. Accordingly, lower courts must consistently enforce pleading requirements to respect this legislative intent.

This appeal from the dismissal of a religious discrimination claim asks what is sufficient to plead a bona fide religious belief under Title VII and the parallel Oregon state statute. To be sure, assertions of religious belief are entitled to deference, particularly at the pleading stage. However, courts have not uniformly agreed on a standard for evaluating the nature of a belief. Supreme Court guidance in the First Amendment context, considered alongside the requirements of federal pleading, reflects that references to generic religious principles cannot transform a specific secular preference into a basis for a religious discrimination claim. Broad invocations of religion cannot shield employees from any unwanted job obligation. Accordingly, we affirm the trial court's dismissal of this action for failure to state a claim.

**I.**

Sherry M. Detwiler worked as a Privacy Officer and the Director of Health Information for Defendant-Appellee Mid-Columbia Medical Center ("MCMC"), a hospital in The Dalles, Oregon, from September 14, 2020, through December 20, 2021. In her own words, Detwiler is a practicing Christian who believes her body is a temple of the Holy Spirit and sincerely believes she has a "religious duty to avoid defiling her 'temple' by taking in substances that the Bible explicitly condemns or which could potentially cause physical harm to her body."

On September 28, 2021, Detwiler sought a religious exemption from MCMC's policy implementing the

Oregon Health Authority's ("OHA") administrative rule. The OHA required healthcare workers to be vaccinated against COVID-19, absent an approved exemption. Detwiler, relying on sources she found online, determined that COVID-19 vaccines were created from fetal cell lines and contained "neurotoxins, attenuated viruses, carcinogens, chemical wastes, and other potentially harmful substances." She then informed MCMC that her Christian beliefs against abortion and the introduction of harmful substances into her body conflicted with the vaccine requirement.

MCMC approved Detwiler's request for a religious exemption from vaccination on October 1, 2021.

**\*3** As part of that accommodation, MCMC required Detwiler to wear personal protective equipment while in the office and to submit to weekly antigen testing for COVID-19. MCMC's test required a participant to insert a cotton swab dipped in ethylene oxide ("EtO") into one's nostril, swirl the swab against the skin to collect a sample from the nasal tissue, and then submit the swab to a lab for analysis.

Detwiler requested a further accommodation, this time seeking an exemption from the weekly antigen testing. Detwiler informed MCMC that she found "multiple sources indicating that EtO is a carcinogenic substance." In her second accommodation request, Detwiler cited to her belief that her body is a "temple of God," stating:

> It is against my faith and my conscience to commit sin. Sin is anything that violates the will of God, as set forth in the Bible, and as impressed upon the heart of the believer by the Holy Spirit. In order to keep myself from sin, and receive God's direction in my life, I pray and ask God for wisdom and direction daily. As part of my prayers, I have asked God for direction regarding the current COVID testing requirement. As I have prayed about what I should do, the Holy Spirit has moved on my heart and conscience that I must not participate in COVID testing that causes harm. If I were to go against the moving of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience ...

> Ethylene Oxide (EtO) is carcinogenic to humans. There is clear evidence that EtO is genotoxic and evidence supports a mutagenic mode of action, key precursor events are anticipated to occur in humans and progress to tumors, including evidence of chromosome damage in humans exposed to EtO ...

> ... As a Christian protecting my body from defilement according to God's law, I invoke my religious right to refuse any testing which would alter my DNA and has been proven to cause cancer. I find testing with carcinogens and chemical waste to be in direct conflict with my Christian duty to protect my body as the temple of the Holy Spirit.

Detwiler proposed MCMC allow her either to submit to saliva testing for COVID-19 or to work remotely full-time. She believed the latter accommodation to be reasonable because she had previously attended and conducted meetings via videoconference, and expected most of her other duties would not require her physical presence at the MCMC facility.

On October 19, 2021, Cheri McCall, MCMC's Chief Human Resources Officer, informed Detwiler that MCMC had granted her request for an exemption from the vaccine requirement but denied her requested accommodations of saliva testing or full-time remote work. McCall explained saliva testing would be impractical because test results would take 24 to 36 hours, and MCMC might ask Detwiler to appear for same-day in-person work. McCall further explained full-time remote work would create "a hardship on [Detwiler's] department and team," citing increased complaints and dissatisfaction with Detwiler's work during remote periods in the height of the pandemic. Finally, McCall informed Detwiler MCMC was placing her on unpaid leave until October 30, 2021, or until she complied with the vaccine mandate or the terms of her approved religious exemption.

MCMC later extended this deadline and offered Detwiler the alternative option to accept reassignment to a different role. Detwiler had until December 20, 2021, to agree to antigen testing or to be reassigned. Because she did neither, MCMC terminated Detwiler's employment on December 20, 2021.

**\*4** Detwiler filed her First Amended Complaint ("FAC") on November 4, 2022, against MCMC and Cheri McCall, as well as unnamed Doe defendants. Detwiler sought damages for Defendants' averred religious discrimination in violation of Title VII of the Civil Rights Act of 1964 and Oregon's parallel anti-discrimination statute, Or. Rev. Stat. § 659A.030. She sued the individual Defendants for aiding and abetting MCMC's alleged discrimination.

On November 18, 2022, Defendants filed a motion to dismiss the FAC for failure to state a claim. Defendants argued Detwiler's objection to antigen testing stemmed from her secular, medical judgment rather than a bona fide religious belief. On December 20, 2022, the assigned magistrate judge issued her findings and recommendations ("F&R"), concluding the district court should grant Defendants' motion to dismiss. The magistrate judge held that although Detwiler's complaint was "couche[d] in religious terms," the FAC demonstrated her request for accommodation was based on her "secular, non-religious belief that nasal swab testing contains hazardous materials." She then determined that because Detwiler's underlying claim of religious discrimination failed, her claims against the individual Defendants were similarly insufficient. The district judge adopted the F&R in full and dismissed the FAC without prejudice.

Detwiler filed her Second Amended Complaint ("SAC") on July 19, 2023. The SAC clarified: "[w]hile [Detwiler] declined to submit to nasal swab testing, at least in part, due to medical and/or scientific judgment, she also exercised religious judgment" and her belief "that her body is a temple of the Holy Spirit [is] rooted in religion, as it is based on a biblical passage namely, 1 Corinthians 6:19-20." Detwiler also asserted she confirmed this opposition to testing via personal prayer.

Defendants filed another motion to dismiss, and the magistrate judge again recommended dismissal, this time with prejudice. The court "readily accept[ed]" Detwiler's bona fide religious belief that her body is a temple of the Holy Spirit but noted Detwiler's "specific determination of what is harmful ... was not, in this case, premised on the Bible or any other religious tenet or teaching, but rather on her research-based scientific medical judgments." Again, because Detwiler failed to plead the underlying claim, the court also recommended dismissal of the aiding and abetting claims.

The magistrate judge further recommended denying leave to amend because Detwiler had not set forth any new facts that cured the FAC's deficiencies. Because Detwiler had the opportunity to plead additional facts and failed to do so, the magistrate judge concluded no such facts existed.

On November 2, 2023, the district court adopted the magistrate judge's recommendation in full and dismissed the case with prejudice. The district court entered its final judgment on the same day. Detwiler timely appealed.

## II.

The Ninth Circuit has not yet endorsed a test for determining the nature, whether religious or secular, of a belief underlying a Title VII claim. That said, cases from the First Amendment context, guidance from the Equal Employment Opportunity Commission ("EEOC"), and a slew of district court cases offer a logical approach. While Detwiler would embrace a standard by which a pleading passes muster whenever a practice is labeled "religious," a complaint must do more than rest on an unadorned conclusion.

**\*5** Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle the complainant to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. See *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, a court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Detwiler brought her claims under Title VII of the Civil Rights Act of 1964 and Oregon's parallel

state law. Both statutes make it unlawful for an employer to discriminate against an individual based on their religion. 42 U.S.C. § 2000e-2; Or. Rev. Stat. § 659A.030(1)(a). Employers are required to accommodate employees' religious beliefs unless doing so would impose an undue hardship. 42 U.S.C. § 2000e(j); Or. Rev. Stat. § 659A.030(1)(a).

Claims of failure to accommodate a religious objection are analyzed under a burden-shifting framework. *See Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023); *Dawson v. Entek Intern.*, 630 F.3d 928, 935 (9th Cir. 2011) (holding federal framework also applies to discrimination claims brought under Or. Rev. Stat. § 659A.030). The plaintiff must first plead a prima facie case of failure to accommodate her religion. *Bolden-Hardge*, 63 F.4th at 1222. If the plaintiff meets her burden, the employer must show it was nonetheless justified in refusing to accommodate. *See id.* A plaintiff can meet her prima facie burden by demonstrating "(1) [s]he had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) [s]he informed [her] employer of the belief and conflict; and (3) the employer threatened [her] with or subjected [her] to discriminatory treatment, including discharge, because of [her] inability to fulfill the job requirements." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993). Where an employee seeks an accommodation, she must plead facts sufficient to show the accommodation request also springs from a bona fide religious belief. *See Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682–83 (9th Cir. 1998).

Evaluating the first factor of the prima facie case is a delicate inquiry. Title VII defines religion to include all aspects of observance and practice, as well as belief. *Id.* at 681 (citing 42 U.S.C. § 2000e(j)). However, this protection is not limitless and does not encompass secular preferences. *Id.* at 682.

The EEOC interprets Title VII and existing caselaw to conclude an employee's request for an exemption from a COVID-19 vaccination mandate can be denied if "the employee's objection ... is not religious in nature." *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, U.S. Equal Emp. Opportunity Comm'n (Mar. 1, 2022), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ("EEOC Guidelines"); [1] *see also Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021) (citing same EEOC guidelines). Accordingly, a plaintiff fails to state a prima facie case if the belief motivating her accommodation request is not, in fact, religious.

[1] At some point between May 7, 2025, and May 16, 2025, the EEOC archived this webpage. It now begins with the disclaimer: "This is archived content from the U.S. Equal Employment Opportunity Commission. The information here may be outdated and links may no longer function." The EEOC has not since updated its guidelines, and therefore this opinion treats the available information as merely persuasive.

**\*6** While as previously noted, the Ninth Circuit has not yet endorsed a test for determining whether a belief is religious or secular, this court regularly looks to First Amendment doctrine for guiding principles to assess a plaintiff's assertions of religious belief. *See, e.g., Keene v. City and Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at \*2 (9th Cir. May 15, 2023) (relying on *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981)); *Bolden-Hardge*, 63 F.4th at 1223.

Courts need not accept entirely conclusory assertions of religious belief. *See Bolden-Hardge*, 63 F.4th at 1223 (relying on *Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1016–17 (9th Cir. 2016) (holding the same in a free exercise matter)); *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972) (noting "purely secular considerations" do not merit constitutional protections for religion)). Indeed, some inquiry into the religious or secular nature of a belief is necessary to prevent religious labels from becoming carte blanche to ignore any obligation. *See, e.g., Yoder*, 406 U.S. at 215–16. Yet courts have struggled to draw a line between the religious and the secular. *See Callahan v. Woods*, 658 F.2d 679, 687 (9th Cir. 1981) (noting for First Amendment purposes that "[a] secular experience can stimulate a spiritual response; lives are not so compartmentalized that one can readily keep the two separate.").

To be sure, courts may not substitute their own judgment for that of the believer's. *See* Heller, 8 F.3d at 1438 ("[I]t is no business of courts to say ... what is a religious practice or activity."). Nor can they adjudge the reasonableness of a belief under the guise of a purely legal assessment of the sufficiency of the claim. *See id.* Whether a belief is religious should not "turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas, 450 U.S. at 714. So too with Title VII protections. *See* Bolden-Hardge, 63 F.4th at 1223 (relying on *Thomas* in the Title VII context); Keene, 2023 WL 3451687, at *2 (same).

Overlap between secular and religious bases for a belief poses a particular problem. A belief grounded in overlapping secular and religious considerations is "presumably protected" in the constitutional context. Callahan, 658 F.2d at 684. The EEOC guidelines echo this principle, stating "overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system and is not simply an isolated teaching." EEOC Guidelines. The challenge lies in distinguishing purely secular concerns from preferences that overlap with a bona fide religious belief.

### III.

A plaintiff seeking a religious exemption must plead a sufficient nexus between her religion and the specific belief in conflict with the work requirement. To survive a motion to dismiss, a plaintiff need not establish her belief is consistent, widely held, or even rational. However, a complaint must connect the requested exemption with a truly religious principle. Invocations of broad, religious tenets cannot, on their own, convert a secular preference into a religious conviction. To hold otherwise would destroy the pleading standard for religious discrimination claims, allowing complainants to invoke magic words and survive a dismissal without stating a prima facie case.

 **\*7** This standard does not direct lower courts to examine the sincerity or the reasonableness of a belief. Instead, courts need only determine if a plaintiff has pled enough facts to show her belief is religious, rather than purely secular. This analysis, while respecting plaintiffs' well-pled assertions of religious conviction, requires claims of religious discrimination to meet the same level of plausibility as any other prayer for relief.

Applying the typical plausibility standard here, Detwiler's SAC does not sufficiently articulate a bona fide religious belief in conflict with her former employer's testing requirement. The deference owed to Detwiler's claims, both in procedural posture and due to their averred religious nature, cannot cure the deficiencies in her complaint.

The district court dismissed Detwiler's SAC for failure to state a prima facie case. Detwiler asserts the lower court erred on multiple fronts. She primarily urges this panel to adopt an extremely permissive standard for assessing the nature of a Title VII claimant's beliefs. In support of such a standard, she relies on comments in First Amendment cases, where this circuit and others have emphasized the significant deference courts should give to a plaintiff's professed belief or belief system. Some Circuits have adopted this approach in the employment discrimination context, allowing a complaint to survive with merely conclusory statements about the religious nature of a belief. However, such a standard contravenes federal pleading requirements and elevates claims of religious discrimination over all other prayers for relief.

Detwiler also obfuscates the belief at issue. The District Court acknowledged the sincerity and religiosity of Detwiler's belief in her body as a temple and even the implied prohibition on ingesting harmful substances. Therefore, at issue is Detwiler's belief that the testing swab is harmful, and specifically that EtO is a carcinogen. This belief is personal and secular, premised on her interpretation of medical research. In essence, Detwiler labels a personal judgment based on science as a direct product of her general religious tenet. Yet, her alarm about the test swab is far too attenuated from the broad principle to treat the two as part of a single belief. Moreover, Detwiler does not present a case where a religious belief overlaps with a medical one. Without Detwiler's opinion that EtO is carcinogenic and therefore harmful, she has no conflict with MCMC's COVID-19 testing requirement—her

secular judgment offers the sole basis of her objection. This concern about the harmful nature of EtO has no relationship with her religious beliefs.

Identifying Detwiler's operative belief makes clear that she has not plead a prima facie case. Detwiler's other arguments also fall short. She next avers that the district court erred in examining at all whether her objection was religious or secular. This overstates the law: a district court must make a determination about the source of a belief to examine a plaintiff's prima facie case. *See, Bolden-Hardge*, 63 F.4th at 1223 ("[Deference to assertions of religious belief] does not mean that courts must take plaintiffs' conclusory assertions of violations of their religious beliefs at face value."); *Tiano*, 139 F.3d at 682 ("Title VII does not protect secular preferences."); *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988) ("[A] threshold inquiry into the 'religious' aspect of particular beliefs and practices cannot be avoided if we are to determine what is in fact based on religious belief, and what is based on secular or scientific principles." (citations and quotations omitted)).

**\*8** Detwiler then claims the district court improperly determined her belief was secular, in contravention of this court's recent opinion in *Bolden-Hardge*, 63 F.4th at 1223. However, *Bolden-Hardge* examined whether the plaintiff's religious belief conflicted with her employment duty, rather than religious nature of the objection itself. *Id.* The *Bolden-Hardge* court opined that the lower court's role was "to determine whether the line drawn represents an honest conviction" and reiterated that, particularly at the motion to dismiss phase, "the burden to allege a conflict with religious beliefs is fairly minimal. *Id.* (relying on *Thomas*, 450 U.S. at 716). The district court here acted in accordance with *Bolden-Hardge*, examining Plaintiff's prima facie case for a religious belief in conflict with her employment duties. Detwiler has not met that minimal burden here.[2]

[2] Detwiler also relies on this Court's unpublished opinion in *Keene*, in which this court reversed the lower court's decision to deny a preliminary injunction to COVID-19 vaccine objectors. 2023 WL 3451687 at \*1. Without explaining its reasoning, the district court concluded plaintiffs did not demonstrate sincere religious beliefs in conflict with receiving the vaccine. *Id.* The panel interpreted this silence as the district court "erroneously [holding] that Appellants had not asserted sincere religious beliefs because their beliefs were not scientifically accurate." *Id.*
*Keene* provides no help to Detwiler because there the lower court did not actually examine the religious nature of the plaintiffs' opposition to the COVID-19 vaccine and provided no reasoning as to why plaintiffs failed to plead a prima facie case. *See id* at \*2. The district court here, by contrast, clearly outlined Detwiler's complaint's deficiency. More importantly, the claimants in *Keene* pled a specific religious belief in opposition to receiving the vaccination—their opposition to the use of fetal cells used in developing the available vaccines— and identified the religious basis for their objection to vaccination as their Christian faith's opposition to abortion. *Id.*

Beyond *Bolden-Hardge*, Detwiler relies on cases outside the employment arena, as well as decisions from other circuits, in support of her lenient standard. In particular, she relies on this circuit's reasoning in *Callahan*, a First Amendment case, which held "[s]o long as one's faith is religiously based at the time it is asserted, it should not matter, for constitutional purposes, whether that faith derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible." 658 F.2d at 687.

Of more relevance here, however, are the numerous district courts—many within this circuit—that have held when the religious principles are too broad, and the connection to personal, medical judgments are too tenuous, plaintiffs have not pled a religious belief. Plaintiffs in those actions regularly invoke the same Christian belief as does Detwiler—that their bodies are temples of the Holy Spirit. Many then explain they reached their opposition to vaccination or testing by conducting their own research and individual prayer. Because these exemption requests are fundamentally predicated on concerns about health consequences, district courts have generally dismissed these Title VII claims.

Lower courts have held plaintiffs cannot "couch" their personal, secular beliefs in religious terms to claim Title VII protections. *See, e.g., Medrano v. Kaiser Permanente*, No. 8:23-cv-02501-DOC-ADSX, 2024 WL 3383704, at *4 (C.D. Cal. July 10, 2024)[3]; *Trinh v. Shriners Hosps. for Child.*, No. 3:22-cv-01999-SB, 2023 WL 7525228, at *7 (D. Or. Oct. 23, 2023). Courts have expressed concerns with a professed religious belief so broad as "to cover anything [plaintiffs] train[ ] it on." *Ulrich v. Lancaster Gen. Health*, No. 22-cv-4945, 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13, 2023) (quoting *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465 (M.D. Pa. 2022)). In the words of one court, "it takes more than a generalized aversion to harming the body to nudge a practice over the line from medical to religious." *Geerlings v. Tredyffrin/Easttown Sch. Dist.*, No. 21-cv-4024, 2021 WL 4399672, at *7 (E.D. Pa. Sept. 27, 2021); *see also Kather v. Asante Health Sys.*, No. 1:22-cv-01842-MC, 2023 WL 4865533, at *1, *5 (D. Or. July 28, 2023) (distinguishing plaintiffs who sufficiently tied vaccine objections to religion from those who made only secular legal and economic objections to a vaccine mandate).

[3]   The plaintiff in this case has appealed the dismissal of the complaint, but that panel has not yet heard argument or issued a decision. *See* 9th Cir. Docket No. 24-6278.

**\*9** Invocation of prayer, without more, is still insufficient to elevate personal medical judgments to the level of religious significance. *See, e.g., Coates v. Legacy Health*, No. 3:23-cv-00931-JR, 2024 WL 1181827, at *5–6 (D. Or. Jan 8, 2024). Indeed, crediting every secular objection bolstered by a minimal reference to prayer as religious "would amount to a blanket privilege and a limitless excuse for avoiding all unwanted obligations." *Finkbeiner*, 623 F. Supp. 3d at 465 (internal citations and quotations omitted); *see also Ledezma v. Optum Servs., Inc.*, No. 23-cv-06691-VC, 2025 WL 327743, at *1 (N.D. Cal. Jan. 29, 2025) (reaching the same conclusion at summary judgment); *Hand v. Bayhealth Med. Ctr., Inc.*, No. 22-cv-1548-RGA, 2024 WL 359245, at *5 (D. Del. Jan. 31, 2024), *aff'd sub nom. McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870, at *1 (3d Cir. Nov. 15, 2024), *cert. denied sub nom. Harvey v. Bayhealth Med. Ctr., Inc.*, No. 24-996, 2025 WL 1787737, at *1 (U.S. June 30, 2025).

Concern over this limitless expansion also appears in First Amendment precedents. In *Wisconsin v. Yoder*, the Supreme Court observed "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." 406 U.S. at 215–16. The Ninth Circuit has endorsed this necessary limiting principle. *See Callahan*, 658 F.2d at 683 ("It is of course imaginable that in some circumstances a person might assert a First Amendment claim and attempt to justify it with a religious belief which, though sincerely held, was simply irrelevant to the claim.") (relying on *Yoder*, 406 U.S. at 215–16).

Other circuits have been similarly wary of allowing plaintiffs to anoint their claims with a divine mandate. *See, e.g., Africa v. Pennsylvania*, 662 F.2d 1025, 1030–31 (3d Cir. 1981). Beginning with *Africa*, the Third Circuit has regularly declined to accept assertions of religious belief wholesale. *See, e.g., Gatto v. Johnson & Johnson Servs., Inc.*, No. 24-1992, 2025 WL 816732, at *2 (3d Cir. Mar. 14, 2025); *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 490–91 (3d Cir. 2017); *McDowell*, 2024 WL 4799870, at *2 (affirming dismissal of pleadings that failed to "provide facts from which we can plausibly infer that Plaintiffs' objections ... are based on religious beliefs and not on their personal, secular, and medical beliefs").[4]

[4]   Recently, district courts in this Circuit have looked to the Third Circuit's *Africa* test as a starting point to determine the nature of a belief. *See, e.g., Medrano*, 2024 WL 3383704, at *3; *Stephens v. Legacy-GoHealth Urgent Care*, No. 3:23-cv-00206-SB, 2023 WL 7612395, at *4 (D. Or. Oct. 23, 2023). In *Africa*, the Third Circuit formulated three indicia of a religion: whether a plaintiff's claimed religion 1) addresses "fundamental and ultimate questions having to do with deep and imponderable matters"; 2) is comprehensive in nature; and 3) has certain recognizable formal and external signs. 662 F.2d at 1032; *see also Alvarado v. City*

*of San Jose*, 94 F.3d 1223, 1230 (9th Cir. 1996) (endorsing the *Africa* test in the First Amendment context).

To be sure, the *Africa* factors are of limited applicability here. That test was designed to evaluate objections based on less well-established religions. *Africa*, 662 F.2d at 1032. The religiosity of Detwiler's underlying Christian belief system is not at issue. The *Africa* cases are instead helpful in articulating a concern with the ballooning religious discrimination claims. *See id.* at 1031 (relying on *Yoder*, 406 U.S. at 215–16).

**\*10** *Gatto* is strikingly similar to this case. *See Gatto*, 2025 WL 816732, at \*2. Gatto objected to her employer's testing requirement based on her views that her body is a temple of the Holy Spirit which would be violated by nasal swab tests. *Id.* The Third Circuit concluded her objections were not religious in nature and affirmed the dismissal of her complaint. *See id.* (relying on *Fallon* 877 F.3d at 488, 492 and *Africa*, 662 F.2d at 1033–34). Like the plaintiffs in *Fallon* and *Africa*, Gatto had secular beliefs about what was or was not healthy. *See id.* These ideas were not entitled to Title VII protections because her belief that her body is a temple lacked a sufficient nexus to her health concerns with testing. *See, e.g., id.* (relying on *Yoder*, 406 U.S. at 216, to observe that a "subjective evaluation and rejection of the contemporary secular [and medical] values accepted by the majority" are claims that "would not rest on a religious basis"). Such bare allegations give rise to, at most, the "mere possibility" that religious beliefs informed objections to the vaccine and to testing. *McDowell*, 2024 WL 4799870, at \*2 (relying on *Iqbal*, 556 U.S. at 678–79).

Expanding Title VII claims runs the risk of stretching these statutory protections far beyond their intended use. To allow such claimants to go forward without limits would "impermissibly cloak with religious significance [plaintiff's] fundamentally secular objections ... and thereby create a blanket privilege whenever an employee invokes scripture." *Gatto*, 2025 WL 816732, at \*3 (internal quotations and citations omitted).

Despite this concern, several circuits have adopted Detwiler's proposed lenient standard. In *Ringhofer v. Mayo Clinic, Ambulance*, the Eighth Circuit considered religious exemption requests advanced by two plaintiffs who objected to their employer's vaccine mandate and testing alternative. 102 F.4th 894 (8th Cir. 2024). One employee explained that because "her body is a temple for the Holy Spirit that she is duty bound to honor," "[s]he does not believe in putting unnecessary vaccines or medications into her body," and the other that "[s]hifting my faith from my Creator to medicine is the equivalent of committing idolatry." *Id.* at 902. The Eighth Circuit reversed the dismissal of these plaintiffs' Title VII claims, concluding, "[b]y connecting their objection to testing to specific religious principles," the plaintiffs satisfied their burden at the pleading stage. *Id.*

The Sixth Circuit has also concluded a plaintiff stated a claim when she refused vaccination "as a result of her beliefs" and personal prayer. *Lucky v. Landmark Med. of Mich.*, 103 F.4th 1241, 1243 (6th Cir. 2024). The court emphasized that Title VII's language did not, contrary to the district court's conclusion, require the plaintiff to explain in more depth how any particular tenet of her religion prohibited vaccination. *See id.* The panel determined that Title VII, when read against the federal pleading requirements, required only that the plaintiff allege facts "supporting an inference that her refusal to be vaccinated ... was an 'aspect' of her 'religious observance' or 'practice' or 'belief.' " *Id.* (quoting 42 U.S.C. § 2000e(j)).

Similarly, a divided panel of the Seventh Circuit determined that "[c]ourts should not undertake to dissect religious beliefs ... because [they] are not articulated with the clarity and precision that a more sophisticated person might employ." *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1011 (7th Cir. 2024) (quoting *Thomas*, 450 U.S. at 715). Accordingly, the majority concluded the plaintiff's use of religious vocabulary was sufficient to connect her medical judgment to a religious belief. *See id.* at 1011.

These decisions—though less pervasive in the federal circuits than the dissent portrays—offer Title VII protections to the secular implementation of high-level, religiously inspired goals.[5] *See id.* at 1014 (Rovner, J., dissenting) (expressing this concern with the majority's reasoning). This threshold is far too permissive. Take, for example, a claimant who believes her body is a temple. She then interprets that belief

as a requirement to exercise daily and finds evidence suggesting that such exercise is most effective when done in the morning. While the generic principle and the claimant's chosen implementation are both understandable, they are not equivalent. She may prefer to exercise in the mornings, but she is not entitled to an exemption from attendance at early meetings. Nothing in her religion conflicts with morning work requirements. Instead, such a plaintiff relies on personal and practical preferences rather than a religious mandate. Even though her belief in her body as a temple is religious, the rationale for her specific exemption request is not.

5     The cases from the First, Fifth, Sixth, and Seventh Circuits—cited by the dissent for the proposition that today's decision departs from a national consensus—adjudicate challenges to vaccine mandates, not testing requirements. *See Bazinet v. Beth Isr. Lahey Health, Inc.*, 113 F.4th 9, 13 (1st Cir. 2024); *Wright v. Honeywell Int'l, Inc.*, No. 24-30667, 2025 WL 2218131, at *1 (5th Cir. Aug. 5, 2025); *Lucky v. Landmark Med. of Mich., P.C.*, 103 F.4th 1241, 1242 (6th Cir. 2024); *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1007 (7th Cir. 2024).

**\*11** The same is true here. To allow Detwiler's claim to go forward would open the door to unlimited religious discrimination claims. Such a deluge would certainly generate negative consequences. Employers incur costs in the administration of religious accommodation requests and the early stages of litigation. Courts would face greater numbers of these claims, allocating further judicial resources to complaints with no merit whatsoever. Detwiler offers no limiting principle within her proposed standard. Therefore, courts in this circuit must hold assertions of religious belief to the routine plausibility standard and examine whether there is any nexus between religion and a plaintiff's viewpoint.

Ultimately, Detwiler's objection to testing is grounded in the secular belief that the nasal swabs in antigen tests are carcinogenic. She failed to plead facts demonstrating her belief in the harmfulness of the swabs was related to her Christian faith. Detwiler's references to prayer and a broad belief that her body is a temple do not render her medical evaluation of the swabs religious. Such personal preferences are not entitled to Title VII protections.

## IV.

Detwiler, by asserting a general religious principle and linking that principle to her personal, medical judgment via prayer alone, did not state a claim for religious accommodation. Detwiler's proposed standard would result in an unmanageable expansion of Title VII protections. If Detwiler's assertions were sufficient to state a prima facie claim for a religious exemption, there would be no bounds on otherwise-secular preferences that an employee could characterize as religious and therefore demand an employer accommodate. The District Court properly determined Detwiler's objection was based on her secular belief, not a religious one. Accordingly, the dismissal of Detwiler's complaint for failure to state a claim is hereby affirmed.

**AFFIRMED.**

VANDYKE, Circuit Judge, dissenting:
Plaintiff Sherry Detwiler alleges that Mid-Columbia Medical Center ("MCMC") discriminated against her religious beliefs in violation of Title VII by denying her an exemption from MCMC's policy requiring her to undergo a nasal-swab test for COVID-19. The district court dismissed the complaint with prejudice for failure to state a claim. But Detwiler pled with sufficient specificity to show her claim has facial plausibility, satisfying her minimal burden. The majority errs by concluding otherwise.

The majority adopts a flawed mode of analysis that purports to distinguish a category of "purely secular" claims incidentally "link[ed]" to "a general religious principle" (which are not cognizable) from "truly religious" claims (which are cognizable). That approach is unworkable and will necessarily embroil courts in resolving intractable questions about how much of a claimant's religiously motivated objection is "truly religious," versus how much of the objection derives from an erroneous "personal judgment based on science." Effectively all religiously motivated actions could be characterized as based on some

"general religious principle" combined with some view of how the world factually (or "scientifically," or "medically," or "actually"—pick your preferred adverb) works. Because of this, the majority's new test ultimately allows judges to divine what is "really doing the work" in someone's sincere religious objection. Is it the claimant's "truly religious" belief, or is it just a merely "*general* religious principle" combined with the claimant's wrongheaded view of reality?

While I'm sure my colleagues in the majority don't intend this result, it should be clear that such a test is just a pathway for right-thinking judges to decide which religious claims merit protection, and which are too benighted to qualify. I would avoid that path. Following instead the majority of other circuits that have evaluated claims indistinguishable from Detwiler's, I would reverse the district court's order dismissing her complaint and allow her claim to proceed.

I.

**\*12** On a motion to dismiss, "[w]e accept the plaintiff's allegations as true and view them in the light most favorable to her." *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017). A complaint survives a motion to dismiss if it alleges "enough facts to state a claim to relief that is plausible on its face." *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Id.* (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

Title VII "requires employers to accommodate the religious practice of their employees." *Groff v. DeJoy*, 600 U.S. 447, 453 (2023). To establish a prima facie claim for religious discrimination based on a failure to accommodate, an employee must show that (1) she had a bona fide religious belief that conflicted with an employment duty, (2) she informed her employer of the conflict, and (3) the employer subjected her to an adverse employment action because she could not fulfill the employment duty. *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).

Detwiler alleges, and therefore we must assume as true, that she requested a religious exemption from the COVID-19 testing requirement, MCMC rejected that request, and Detwiler was fired because she declined to be tested. All that is left for us to determine is whether Detwiler pled sufficient facts to support an inference that her opposition to the testing was an aspect of "religious observance and practice" or "belief." 42 U.S.C. § 2000e(j). In my view, as pled, Detwiler's religious beliefs plainly constitute a fundamental element of her objection.

Both the text of Title VII and EEOC guidance applying the statute confirm that an employee can object on a mixture of religious and nonreligious grounds—a partially secular objection can still survive a motion to dismiss if some element of the objection is plausibly connected to religion. Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Id.* We have noted the breadth of this definition: "[t]he very words of the statute ('*all aspects* of religious observance and practice ....') leave little room for ... a limited interpretation." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993) (first ellipsis in original) (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978)). The EEOC has interpreted the definition accordingly: religious exemptions from workplace policies may consist of both religious and secular elements. *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, U.S. EEOC (Mar. 1, 2022), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ("[O]verlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system and is not simply an isolated teaching."). There is nothing improper under Title VII about an employee objecting to an employer's mandate on the grounds that it both violates her religious beliefs *and* is unhealthy. What is improper is for a court to parse a sincere religious objection into separate "religious" and "secular" elements and then dismiss the complaint because the secular part is not religious.

**\*13** The district court found that Detwiler's "specific determination of what is harmful ... was not, in this

case, premised on the Bible or any other religious tenet or teaching." In making this determination, the district court erred by artificially segregating Detwiler's "religious" and "secular" beliefs. As a result, the district court ruled on the religiosity of Detwiler's belief that the chemical on the nasal swabs is carcinogenic. But the relevant question in this case is whether Detwiler's belief *that she cannot be swabbed* is religious. If the district court had considered the correct question in this case (examining Detwiler's failure-to-accommodate claim as a whole), it would have concluded that the facts as alleged "allow[ ] the court to draw the reasonable inference" that the beliefs in question were sufficiently religious. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Detwiler made clear that she believed her religion forbade her from being tested by nasal swab, a belief reached through careful study and prayer. "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). And "a judge's disbelief of a complaint's factual allegations" may not affect his decision on a motion to dismiss. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). The district court ignored such admonitions, instead determining that Detwiler's "request for alternate accommodations stems from her belief that nasal swab testing contains hazardous materials" and that her belief was "secular" and "non-religious." The court granted that Detwiler's belief is the result of her own religious experience (prayer), but concluded that it could not plausibly be considered a religious belief. In doing so, the district court disregarded the explicitly religious elements of Detwiler's claim, precedent forbidding courts from determining the validity of a party's interpretation of his own religious experience, *see W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."), and federal pleading standards, *Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " (quoting *Twombly*, 550 U.S. at 570)).

Furthermore, in concluding that Detwiler's beliefs are not "premised on the Bible or any other religious tenet or teaching," the district court engaged in analysis that the Supreme Court has repeatedly rejected. Detwiler presented scriptural support that she interpreted as forbidding her from undergoing a nasal swab. In concluding that Detwiler's beliefs are not premised on the Bible, the district court necessarily rejected her interpretation of Scripture. Supreme Court precedent bars such a heavy-handed judicial intrusion into the legitimacy of religious beliefs. *See, e.g., Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether" a party "correctly perceived the commands of their ... faith. Courts are not arbiters of scriptural interpretation."); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014) (emphasizing that "federal courts have no business addressing [ ]whether the religious belief asserted ... is reasonable"); *Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 833 (1989) (warning that the orthodoxy of a claimant's belief is "irrelevant"); *United States v. Ballard*, 322 U.S. 78, 86 (1944) ("Religious experiences which are as real as life to some may be incomprehensible to others.").

**\*14** By affirming the district court, the majority creates a circuit split. When faced with the question of whether religious objections to COVID-19 policies mirroring Detwiler's objection were sufficiently pled, our sister circuits have consistently answered in the affirmative. *See Bazinet v. Beth Isr. Lahey Health, Inc.*, 113 F.4th 9, 15–17 (1st Cir. 2024); *Wright v. Honeywell Int'l, Inc.*, No. 24-30667, 2025 WL 2218131, at \*3 (5th Cir. Aug. 5, 2025); *Lucky v. Landmark Med. of Mich., P.C.*, 103 F.4th 1241, 1243–44 (6th Cir. 2024); *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901–02 (8th Cir. 2024); *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009 (7th Cir. 2024); *Brokken v. Hennepin Cnty.*, 140 F.4th 445, 451–52 (8th Cir. 2025). While many of these cases dealt with requested exemptions to vaccine mandates as opposed to testing requirements, they are not distinguishable. In *Ringhofer v. Mayo Clinic, Ambulance*, for instance, plaintiffs' exemption request cited concerns that COVID vaccines were created using fetal cells and

argued that "[plaintiffs'] anti-abortion beliefs, rooted in religion, prevent using [the resulting] product." 102 F.4th at 898. The majority attempts to distinguish such claims, calling "opposition to the use of fetal cells" a "specific religious belief." But so is Detwiler's Scripture-based belief that her body is a temple. The objection in *Ringhofer* and cases involving objections to COVID vaccines based on the belief that they were developed using fetal cells takes the exact same form as Detwiler's: a factual belief about the world (vaccines are made with fetal cells; nasal swab chemicals cause cancer) that puts an employment requirement (vaccine mandates; required swab testing) in tension with an underlying religious belief (the Bible forbids abortion; the Bible requires Christians to safeguard their bodies). When faced with this parallel objection, the Eighth Circuit found that the *Ringhofer* plaintiffs "adequately connect[ed] their refusal of the vaccine with their religious beliefs." *Id.* at 901; *see also, e.g., Bazinet*, 113 F.4th at 16 (finding that an employee who believed COVID vaccines were developed with fetal cells lines had "sufficiently pleaded a religious belief that conflicts with receiving the COVID-19 vaccine"); *Passarella*, 108 F.4th at 1009 (holding that employees' vaccination exemption requests were connected to their "Christian beliefs regarding the sanctity of the human body"); *Wright*, 2025 WL 2218131, at *1, *3 (concluding that "a reasonable jury could find that [the plaintiff] held at least a mixed motive for his vaccine refusal" based on his belief that "[the] creator gave [him] gift to choose" what to put in his body).[1]

[1] The Third Circuit is the only federal court of appeals other than ours to reject a claim like this, but it reached its conclusion in an unpublished decision. *See McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024).

Implicitly recognizing that these cases are not meaningfully distinguishable from Detwiler's, the majority simply criticizes them as "far too permissive." But that criticism puts our court at odds with every published circuit court decision on this issue, an action we should avoid absent a compelling reason. *See United States v. Cuevas-Lopez*, 934 F.3d 1056, 1067 (9th Cir. 2019) ("[A]bsent a strong reason to do so, we will not create a direct conflict with other circuits." (alteration in original) (quoting *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987))). This court long ago recognized that we (and other circuits) have interpreted Title VII generously because that is what the statute's broad text requires. *See EBB Auto Co.*, 8 F.3d at 1438 (emphasizing that "the very words of the statute ... leave little room for ... a limited interpretation" (quoting *Redmond*, 574 F.2d at 900)). The text being too "permissive" for the majority's preferences is not the sort of "strong reason" that justifies creating a lop-sided circuit split.

II.

The majority's idiosyncratic approach relies heavily on a court's dubious ability to separate "purely secular" beliefs from "truly religious" beliefs from mixtures of religious and secular beliefs. For the category of "mixed beliefs"—which I suspect is how so-called "secular" beliefs could essentially always be characterized—the majority's approach requires the even more dubious ability to judicially ascertain *how much* of a given belief is "truly religious" (and not merely a "broad, religious tenet[ ]," which per the majority is apparently not religious enough) versus how much of a claimed belief is "secular." And then the majority's approach requires judges to draw a line for when the "secular" portion of a religious belief becomes too significant, such that it defeats a Title VII claim. To work well, the majority's mode of analysis must be capable of objective, impartial, and consistent application. If not, such analysis opens wide the door to the discriminatory treatment of religious beliefs. Those beliefs christened by a judge as "truly religious" will be protected, and those condemned as too mixed with "secular" beliefs will be left unprotected. The majority's approach requires the impossible—we are judges, not theologians or philosophers. Judges are ill-equipped to parse mixed claims into the "truly religious" and "purely secular" silos that the majority purports to discern.

*15 First, many philosophers would tell us that our scientific views depend on more fundamental beliefs—philosophical or religious—about the nature of reality. *See, e.g.*, Alister E. McGrath, *Re-Imagining Nature: The Promise of a Christian Natural Theology* 56 (2016) (arguing that religion provides "a framework or lens through which we may 'see' the world" in

explaining how religion shapes Christians' scientific views). Disentangling the "purely secular" from this religious backdrop is far more difficult than the majority appears to assume. Consider Christian Scientists, who believe that "human experiences show the falsity of all material things" and that "error, sin, sickness, disease, [and] death ... [are] the false testimony of false material sense." Mary Baker Eddy, *Science and Health with Key to the Scriptures* 108 (Christian Sci. Bd. of Dirs. 2015) (1875). Under this arguably *Matrix*-like view of reality, where everything bad is merely an illusion of "false material sense," foundational religious beliefs will inevitably shape beliefs that the majority would deem "purely secular." Or take certain Buddhist schools of thought, which question humans' ability to accurately perceive reality and which view many physical phenomena (like disease) as stemming from different causes than what the mainstream scientific perspective would discern. Chogyal Namkhai Norbu, *The Crystal and the Way of Light: Sutra, Tantra, and Dzogchen* 99–100 (2000) ("[We] are utterly unaware of our own true condition, so that we experience a radical separation between our person ... and that which we take for an external world."); *id.* at 32 ("Certain illnesses, such as cancer, are caused by disturbances of the energy, and cannot be cured simply by surgery or medication. Similarly, many mental illnesses ... are caused by poor circulation of energy."). Alternatively, imagine a traditional Christian who believes that the existence of a rational God means that the world is governed by rational, scientifically discernable laws. When she accepts scientific findings, she is doing so partly because her religious presuppositions guide her to trust scientific findings. *See generally* Nancy R. Pearcey & Charles B. Thaxton, *The Soul of Science: Christian Faith and Natural Philosophy* (1994). The religious beliefs of the individuals in these examples shape the weight that they afford to any given "secular" scientific view.

In the same way, discerning "purely religious" beliefs may not be as easy as the majority apparently thinks. Knowledge of science may shape a person's religious views. Consider a Christian's opposition to abortion, which stems not only from Scripture but from a scientific understanding of fetal development. The majority's "truly religious" category seems to capture only rare cases like where a religious adherent claims her deity spoke directly to her. Outside of that type of scenario, scientific and religious views feed into each other in innumerable, nonobvious ways. Pinning our analysis on the hope of cleanly delineating "purely secular" and "truly religious" views is unrealistic.

Recognizing that many (if not all) so-called "secular" beliefs involve religious and non-religious components, what the majority's analysis must account for is not whether a claim is "purely secular," but instead how to distinguish between claims that are "sufficiently secular" versus "sufficiently religious." The majority fails to provide a workable distinction. The majority's reasoning boils down to this: if a nonreligious conclusion is the but-for cause of the ultimate belief, the ultimate belief is not religious and therefore not protected by Title VII. Because Detwiler's "secular" conclusion that nasal swabs are carcinogenic is the but-for cause of refusing to be swabbed, her refusal must be secular too. But the majority can't consistently apply its approach. When distinguishing vaccine exemption cases involving objections to the alleged use of fetal cells in the vaccines, the majority ignores the fact that those vaccine objections, too, depend on disputed factual claims. The Bible says nothing about the hotly disputed factual question of whether fetal cells are used in COVID vaccines. Only "secular" sources can answer that question, which under the majority's framework would make those "secular" beliefs the but-for cause of the ultimate refusal to take the vaccine—just like Detwiler's "secular" beliefs about nasal swabs being carcinogenic. Yet the majority inexplicably characterizes opposition to COVID vaccines based on their development using fetal cells as a "religious belief" properly protected under Title VII. The majority's inconsistent application of its own analysis illustrates that cases will end up turning on judges' personal assessments of whether a claim is or is not "religious," embroiling courts in unprincipled line-drawing to decide when a belief is " 'primarily' or 'mostly' or 'minimally' or 'tangentially' " religious. *Passarella*, 108 F.4th at 1010. That's a dangerous development, particularly in an area that the Supreme Court has warned is beyond "the judicial ken to question." *Hernandez*, 490 U.S. at 699.

**\*16** The majority's approach has other undesirable results, too. Apart from the judicial manipulability of

the approach, it inherently discriminates against more traditional religious claims while privileging more exotic ones. If an employee requests an exemption by claiming that God spoke directly to him, the majority's analysis would apparently allow it: such a request would be "truly religious" in the majority's analysis. Yet someone with a sincere religious belief coupled with an arguably incorrect "secular" view of how the world works, as in this case, gets no protection. The majority's analysis also allows secular components of a religious objection to effectively trump the undisputedly religious aspects. The majority makes the religiosity of mixed beliefs turn on a judge's view of the correctness of the scientific, nonreligious part of the belief. Because Detwiler's belief that nasal swab chemicals can cause cancer is not the mainstream view, the majority ignores the religious components of her objection. So if there is ever a component of a religious objection that a court considers factually suspect, that will trump whatever elements of the objection are religious. But if scientific research suddenly discovered that nasal swabs *do*, in fact, cause cancer, for example, suddenly Detwiler's objection would ripen into a cognizable religious claim. The fact that, under the majority's approach, the cognizability of many Title VII religious claims will turn entirely on whether they comport with mainstream "secular" beliefs should give us pause. Instead of protecting religious beliefs that depart from secular orthodoxy, the majority's approach makes the latter the judge of the former.

The majority is not shy about why it prefers a less "permissive" reading of Title VII, notwithstanding the statute's capacious definition of "religion." Underlying the majority's parsimonious reading of Title VII is a fear of "open[ing] the door to unlimited religious discrimination claims." But there is good reason to prefer the approach in other circuits over the majority's. First, and most importantly, the more permissive interpretation of "religion" applied by our sister circuits simply gives effect to the broad language of Title VII. *EBB Auto Co.*, 8 F.3d at 1438; *Passarella*, 108 F.4th at 1009. The statute's broad definition of religion—"all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j)— easily encompasses even "mixed" beliefs with more attenuated links to religion. And of course, if the majority is in fact correct that the broad definition of "religion" in Title VII is "too permissive" and thus leads to overprotection of religious liberty with disastrous results, Congress is free to address the problem by amending Title VII. We should not judicially construct the statute just because we think Congress struck the wrong balance.

Second, the majority's attempt to judicially cabin Title VII's supposedly too-permissive protection of religious objections does not even fix the problem the majority is concerned about. The majority worries that allowing a claim like Detwiler's would allow anyone to "transform a specific secular preference into a basis for a religious discrimination claim." But the majority's approach does not eliminate that concern— all a claimant needs to do is say that "God directly told me not to do the thing I also have a specific secular objection against." *See, e.g., Lucky*, 103 F.4th at 1243 (reversing the district court's dismissal of a plaintiff's claim when the plaintiff pled that "God spoke to [her] in her prayers and directed her that it would be wrong to receive the COVID-19 vaccine" (alteration in original)). The concern that allowing religious exemptions from generally applicable laws will lead to abuses of that protection is neither new nor unfounded. *See Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) (expressing concerns about "mak[ing] the professed doctrines of religious belief superior to the law of the land" (quoting *Reynolds v. United States*, 98 U.S. 145, 167 (1878))). But courts must respect the balance struck by Congress, and it is up to Congress—not us —to fix Title VII if its broad definition of "religion," properly applied, results in an unmanageable "deluge" of requests for a religious accommodation.

Third, applying Title VII's broad definition of religion properly respects the Supreme Court's repeated admonitions that courts are ill-suited to be religious arbiters. *See Hobby Lobby*, 573 U.S. at 724 (warning against assessing the reasonableness of religious beliefs); *Frazee*, 489 U.S. at 833 (warning against assessing the orthodoxy of religious beliefs). As explained, the majority's parsing of religious claims into "truly religious" and "secular" components is impossible—or at least practically unadministrable— and will inevitably lead to discriminatory treatment of religious claims. If Congress asked us to engage in such fine grading of religious claims, we would do our best consistent with our constitutional obligations.

But Congress defined "religion" broadly in Title VII. It is the majority that seeks to artificially limit that definition, and in doing so pits secular orthodoxy against the religious beliefs of Title VII claimants.

\* \* \*

**\*17** Detwiler pled that her religion teaches that her body is a temple and that a nasal swab would violate the religious principles that govern how she treats that temple. Her objection is grounded in Scripture, prayer, and religious experience. Those grounds directly connect Detwiler's rejection of the nasal swab to religious principles and support a plausible inference of religious beliefs protected under Title VII—the only conclusion consistent with the published decisions of other federal courts of appeals. Detwiler pled with sufficient specificity to show her claim has facial plausibility, making dismissal improper. The majority's artificial parsing of Detwiler's beliefs into religious and "purely secular" components, and then its reliance on the "secular" component to reject her Title VII claim, suffers from a host of problems ranging from the philosophical to the practical. But the biggest shortcoming with the majority's approach is textual: Title VII's generous and inclusive definition of "religion" cannot be reconciled with the majority's miserly approach. Accordingly, I respectfully dissent.

Opinion by Judge Seeborg;

Dissent by Judge VanDyke

**All Citations**

--- F.4th ----, 2025 WL 2700000