No. 25-761

In the United States Court of Appeals for the Ninth Circuit

NICHOLAS ROLOVICH,
Plaintiff-Appellant,

v.

WASHINGTON STATE UNIVERSITY, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Washington
Honorable Thomas O. Rice
(2:22-cv-319-TOR)

PLAINTIFF-APPELLANT'S REPLY BRIEF

ERIC N. KNIFFIN
KNIFFIN LAW, PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903

ERIC J. SEESE
FROST BROWN TODD LLP
1801 California St., Ste. 2700
Denver, CO 80202

JOSEPH C. DAVIS
    *Counsel of Record*
LUKE W. GOODRICH
ANGELA WU HOWARD
TIMOTHY KOWALCZYK
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*jdavis@becketfund.org*

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................. 3

   I. A reasonable jury could find for Rolovich on his
     Title VII claims. ................................................................ 3

     A. A reasonable jury could find for Rolovich on
       sincerity. ...................................................................... 3

     B. A reasonable jury could find for Rolovich on
       undue hardship. ............................................................ 8

     C. A reasonable jury could find for Rolovich on
       disparate treatment. ..................................................... 19

   II. A reasonable jury could find for Rolovich on his
     state-law claims. ............................................................. 27

III. Rolovich adequately alleged a free-exercise claim ........................ 30

CONCLUSION ............................................................................. 32

CERTIFICATE OF COMPLIANCE ..................................................... 33

CERTIFICATE OF SERVICE ............................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. Hill,*
  518 F.3d 1152 (9th Cir. 2008)........................................... 20, 21

*Anderson v. Gen. Dynamics Convair
  Aerospace Div.,*
  589 F.2d 397 (9th Cir. 1978) .............................................. 14

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) ......................................................... 31

*Baldwin v. Sisters of Providence
  in Wash., Inc.,*
  769 P.2d 298 (Wash. 1989) ............................................... 27

*Balint v. Carson City,*
  180 F.3d 1047 (9th Cir. 1999) ............................................ 16

*Berg v. Hudesman,*
  801 P.2d 222 (Wash. 1990) ............................................... 28

*Bordeaux v. Lions Gate Ent., Inc.,*
  No. 23-4340, 2025 WL 655065
  (9th Cir. Feb. 28, 2025) .................................................... 15

*Bushra v. Main Line Health, Inc.,*
  No. 24-1117, 2025 WL 1078135
  (3d Cir. Apr. 10, 2025) ..................................................... 10

*Callahan v. Woods,*
  658 F.2d 679 (9th Cir. 1981)............................................. 4, 5

*City Beverages, LLC v. Crown Imports, LLC,*
  No. 23-35010, 2023 WL 4637113
  (9th Cir. July 20, 2023) .................................................... 29

ii

*City Sols., Inc. v. Clear Channel Commc'ns,*
  365 F.3d 835 (9th Cir. 2004)............................................................ 12

*Cordova v. State Farm Ins. Cos.,*
  124 F.3d 1145 (9th Cir. 1997)......................................................... 24

*Cornhusker Cas. Ins. Co. v. Kachman,*
  553 F.3d 1187 (9th Cir. 2009)......................................................... 12

*Damiano v. Grants Pass Sch. Dist. No. 7,*
  140 F.4th 1117 (9th Cir. 2025)....................................................... 22

*Doe v. San Diego Unified Sch. Dist.,*
  19 F.4th 1173 (9th Cir. 2021) ......................................................... 13

*Does 1-3 v. Mills,*
  142 S. Ct. 17 (2021) ........................................................................ 11

*Dominguez-Curry v. Nev. Transp. Dep't,*
  424 F.3d 1027 (9th Cir. 2005)................................................... 20, 22

*Earl v. Nielsen Media Rsch., Inc.,*
  658 F.3d 1108 (9th Cir. 2011)......................................................... 24

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
  575 U.S. 768 (2015).................................................................. 17, 23

*EEOC v. Sambo's of Ga., Inc.,*
  530 F. Supp. 86 (N.D. Ga. 1981)................................................... 17

*Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.,*
  877 F.3d 487 (3d Cir. 2017) ............................................................. 8

*Fellowship of Christian Athletes v.
  San Jose Unified Sch. Dist.,*
  82 F.4th 664 (9th Cir. 2023) ........................................................... 32

*Fraser v. Goodale,*
  342 F.3d 1032 (9th Cir. 2003)......................................................... 23

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021).................................................................. 30, 32

*Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*,
    143 F.4th 51 (2d Cir. 2025) ............................................................ 5, 6, 7

*Groff v. DeJoy*,
    600 U.S. 447 (2023) ...................................... 8, 9, 11, 13, 15, 16, 17, 18

*Henry v. S. Ohio Med. Ctr.*,
    No. 24-3863, 2025 WL 2621727
    (6th Cir. Sep. 11, 2025) ..................................................................... 10

*Kizer v. St. Jude's Child.'s Rsch. Hosp.*,
    No. 24-5207, 2024 WL 4816856
    (6th Cir. Nov. 18, 2024) ................................................................ 10, 11

*Keene v. City & County of S.F.*,
    No. 24-1574, 2025 WL 341831
    (9th Cir. Jan. 30, 2025) ..................................................................... 13

*Kennedy v. Pei-Genesis*,
    No. 24-1563, 2025 WL 602159
    (3d Cir. Feb. 25, 2025) ........................................................................ 8

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
    No. 24-1942, 2025 WL 2218112
    (7th Cir. Aug. 5, 2025) ...................................................................... 18

*McMinimee v. Yakima Sch. Dist.*,
    No. 1:18-cv-3073, 2019 WL 11680199
    (E.D. Wash. Aug. 7, 2019) ................................................................ 29

*Melino v. Bos. Med. Ctr.*,
    127 F.4th 391 (1st Cir. 2025) ............................................................ 10

*Naylor v. County of Muscatine*,
    No. 24-1098, 2025 WL 2396864
    (8th Cir. 2025) .................................................................................. 15

*Petersen v. Snohomish Reg'l Fire & Rescue*,
    150 F.4th 1211 (9th Cir. 2025) ................................................. 8, 10, 11

*Ramirez v. Collier*,
595 U.S. 411 (2022) ............................................................ 7

*Rodrique v. Hearst Commc'ns, Inc.*,
126 F.4th 85 (1st Cir. 2025) ............................................. 10

*Savel v. MetroHealth Sys.*,
No. 24-4025, 2025 WL 1826674
(6th Cir. July 2, 2025) ...................................................... 10

*Silloway v. City & County of S.F.*,
117 F.4th 1070 (9th Cir. 2024) ........................................ 22

*Sturgill v. Am. Red Cross*,
114 F.4th 803 (6th Cir. 2024) ............................................ 6

*Thompson v. St. Regis Paper Co.*,
685 P.2d 1081 (Wash. 1984) ............................................. 28

*Tooley v. Martin-Marietta Corp.*,
648 F.2d 1239 (9th Cir. 1981) .......................................... 15

*United States v. Zimmerman*,
514 F.3d 851 (9th Cir. 2007) .............................................. 4

*Wise v. Child.'s Hosp. Med. Ctr. of Akron*,
No. 24-3674, 2025 WL 1392209
(6th Cir. May 14, 2025) ..................................................... 10

**Statutes**

42 U.S.C. §2000e ................................................................. 17

Wash. Rev. Code §49.52.050 ............................................. 29

Wash. Rev. Code §49.52.070 ............................................. 29

# INTRODUCTION

The district court rejected Rolovich's claims only by (1) illicitly second-guessing his sworn testimony on the sincerity of his Catholic religious beliefs; (2) failing to apply controlling Supreme Court precedent on the meaning of "undue hardship" under Title VII; and (3) entirely ignoring his separate Title VII claim of disparate treatment based on religion. Those are reversible errors. WSU falls far short of rehabilitating the district court's decision.

Tellingly, WSU invites the Court to skip sincerity, accentuating undue hardship instead. But its undue-hardship arguments fail, too. WSU invokes cases involving first responders and healthcare workers serving sick and unvaccinated patients. That is not analogous to a football coach working with healthy athletes at an overwhelmingly vaccinated university. Given the context-specific approach the Supreme Court requires, a reasonable jury could reach a different result.

Failure-to-accommodate aside, Rolovich still would reach a jury under Title VII, because WSU decisionmakers' own statements indicate they acted from hostility to his religious beliefs and to the very idea of considering his accommodation request. Unable to explain why this evidence doesn't entitle Rolovich to a jury, WSU asks the Court to ignore it—but its waiver argument is meritless, squarely contradicted by Rolovich's complaint and briefing below.

1

Even if WSU couldn't accommodate Rolovich, a reasonable jury could find it was wrong to fire him *for cause*—thus depriving him of mutually-agreed-to liquidated damages and violating Washington contract and wage-withholding laws. And Rolovich plausibly alleged that Defendant Chun's religious hostility violated bedrock Free Exercise principles. WSU's responses on those issues are meritless—on the former, collapsing Washington law into Title VII; on the latter, simply misstating Rolovich's claims.

It is no mystery why WSU fired Rolovich. It wasn't because an unvaccinated football coach posed health risks differing from the hundreds of other unvaccinated employees and football players WSU accommodated. It was because having a "high profile employee[]" remain unvaccinated, in WSU decisionmakers' view, "tarnished WSU['s] brand," 5-ER-905, 2-ER-271—and they were "pissed" that Rolovich wouldn't set aside his religious convictions to "display leadership" "for Cougar Nation." 2-ER-257, 267–70. But Title VII's prohibition on religious discrimination exists precisely to prevent faithful employees from being put to such a choice. The Court should reverse for trial.

## ARGUMENT

## I. A reasonable jury could find for Rolovich on his Title VII claims.

Title VII supports two types of religious-discrimination claims—(1) disparate treatment; and (2) failure to accommodate. Rolovich adduced sufficient evidence to reach a jury on both.

### A. A reasonable jury could find for Rolovich on sincerity.

**1.** WSU all but admits the district court's decision on sincerity is indefensible, accusing Rolovich of "tr[ying] to change the subject" by addressing it. Resp.3. But it isn't "chang[ing] the subject" to address sincerity first—the district court held sincerity "alone" a "basis" for ruling against Rolovich, only *then* turning to WSU's preferred issues. 1-ER-9.

WSU's reticence to defend its victory on sincerity is understandable: the district court's decision is indefensible. Rolovich offered abundant evidence of his sincere religious objection to the vaccine. This included a detailed (and certified-true-under-threat-of-penalty) exemption request explaining he was a baptized Catholic who believed he was prohibited from receiving the vaccine by the Catholic doctrines of therapeutic proportionality and complicity with abortion, 6-ER-1089–94; private correspondence reflecting his arrival at this belief through discussions with his priest and supporting bishop, 6-ER-1095, 1098–1158; and sworn testimony on these points, 6-ER-1159–61. Given this, the district court's

3

conclusion—that nowhere in "discovery" did "Plaintiff … invoke a religious objection to the vaccine," 1-ER-9—blinks reality.

It's also legally wrong. Where, as here, a claimant affirms his religious motivation under oath, a sincerity challenge is a "credibility" determination for a jury. *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007); Br.27. This is presumably why WSU below *conceded* the "sincerity of [Rolovich's] religious beliefs is a question of fact," Dkt.93 at 21 (emphasis omitted)—which it makes no effort to reconcile with its opposite position on appeal.

**2.** Instead, WSU emphasizes that before seeking a religious exemption, Rolovich also articulated "secular arguments against vaccination," saying this creates a "reasonable suspicion of dissimulation." Resp.46-48 (quoting *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981)). But "reasonable suspicion" is what *factfinders* resolve; the summary-judgment question is whether *no reasonable jury* could find differently. *Callahan* does not suggest otherwise. *See* 658 F.2d at 684 (factfinder might be "obliged to find [plaintiff] insincere" "*after hearing* [*his*] *testimony*" (emphasis added)). Rather, it's a leading case supporting Rolovich—explaining that "a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one," that "longstanding secular objections do[] not refute the finding of sincerity," and that a protected "belief" may have

"developed out of secular and religious elements that cannot be disentangled." *Id.* at 684, 687; Br.30-31.

WSU's next cite—to *Gardner-Alfred v. Federal Reserve Bank of New York*, 143 F.4th 51 (2d Cir. 2025)—is even worse for WSU. There, the Second Circuit *reversed* a grant of summary judgment on sincerity grounds against a Catholic objector to COVID vaccination like Rolovich. *Id.* at 63-65. Citing *Callahan*, *Gardner-Alfred* held "the district court made improper credibility determinations and overly relied on impeachment evidence in order to conclude that [plaintiff's] religious beliefs were not sincere." *Id.* Just so here; indeed, the evidence the district court "overly relied on" in *Gardner-Alfred* is analogous to what WSU invokes here. *See id.* at 58, 63 (employee "briefly requested a medical accommodation," "sought out, consumed, and shared media that opposed the Covid-19 vaccines on secular grounds," and submitted "a template letter" seeking exemption).

True, *Gardner-Alfred* also affirmed summary judgment against another employee—allegedly a member of a "virtual" organization, "the Temple of the Healing Spirit." *Id.* at 62, 67-69. But that was because her "own testimony directly contradicted her professed religious beliefs and affiliation with" that organization. *Id.* at 62. Not so here.

In any event, the record doesn't support WSU's "suspicion." WSU highlights Rolovich's *agent*'s statement that Rolovich also was interested in a medical exemption. Resp.47. But interest in a medical exemption is

5

consistent with the nature of (one of) Rolovich's religious objections—that in his circumstances, "the undesirable side-effects and burdens" of the vaccine rendered it violative of the Catholic doctrine of therapeutic proportionality. 6-ER-1092; *see also Sturgill v. Am. Red Cross*, 114 F.4th 803, 810 (6th Cir. 2024) ("apprehensions" about vaccine's "safety" "must be understood within the broader context"; "what forms Sturgill's protective view of her body are the tenets of her Christian faith").

WSU also asserts that Rolovich's earlier communications emphasized medical, scientific, and philosophical reasons for refusing the vaccine. Resp.46-47.[1] But WSU ignores the "documentary evidence" corroborating Rolovich's account of his religious beliefs and conscientious objection, *Gardner-Alfred*, 143 F.4th at 61—including how, through study of Catholic theological materials and his priest's "spiritual direction and advice," he came to understand these concerns "in light of the Catholic Church's teaching on [his] religious obligation to form and then follow [his] conscience." 6-ER-1160–61.

Importantly, Rolovich's discussions with Fr. Paul (his priest) about the vaccine began *before* Governor Inslee issued the Proclamation eliminating the "personal" exemption. *Compare* 2-ER-96–97

---

[1] Although it's beside the point here, WSU's invocation of "thousands of Telegram and text messages," Resp.46-47, elides that only a few dozen were by Rolovich and related to the vaccine. *See, e.g.*, 3-SER-447 (video of cardiologist and professor of medicine discussing vaccine); 3-SER-353–631 (links to papers posted on website of National Institutes of Health).

(Proclamation issued August 20, 2021) *with* 6-ER-1096, 1159 (discussions with Fr. Paul in July 2021). And far from WSU's narrative of Rolovich seizing on religion only after the personal exemption was eliminated and on advice of counsel, the evidence shows that Rolovich was "encouraged" to seek a religious exemption *by Fr. Paul* himself. 6-ER-1161. Though Fr. Paul initially urged Rolovich "to comply with WSU's wishes and get vaccinated," 6-ER-1160; *see* 6-ER-1140, after continued counsel with Rolovich, he came to understand how Rolovich's concerns comported with Catholic teaching on conscience, 6-ER-1160; *see* 6-ER-1113; *Ramirez v. Collier*, 595 U.S. 411, 425-26 (2022) (finding "ample evidence" of sincerity where, *e.g.*, claimant's pastor "agree[d]"); *cf. Gardner-Alfred*, 143 F.4th at 64-65 (reversing summary judgment for Catholic plaintiff even where priest *refused* to support exemption request).

**3.** WSU therefore pivots, claiming that even if a jury could find that Rolovich's religious beliefs were sincere, he didn't "establish an 'actual conflict'" between those beliefs and "COVID-19 vaccination." Resp.49-50. But this is plainly wrong: Rolovich's belief was that, because the vaccine rendered him complicit in abortions and violated therapeutic proportionality, his "sincerely held religious beliefs" in "the teachings of the Roman Catholic Church" "prohibit[ed him] from accepting" it. 6-ER-1092. That is as clear as conflicts come.

WSU's contrary argument turns on a Third Circuit decision holding that a plaintiff invoking the "moral commandment" "Do not harm your

own body" lacked "a comprehensive system of beliefs about fundamental or ultimate matters" qualifying as "religion." *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 491-93 (3d Cir. 2017); *see also Kennedy v. Pei-Genesis*, No. 24-cv-1563, 2025 WL 602159, at *1 (3d Cir. Feb. 25, 2025) (similar). But Rolovich's objection *is* part of "a comprehensive system of beliefs": Catholic teachings on complicity with abortion and therapeutic proportionality. 6-ER-1091–94. Under WSU's own precedent, then, a reasonable jury could find for Rolovich on sincerity.

### B. A reasonable jury could find for Rolovich on undue hardship.

So the burden shifts to WSU to show "undue hardship"—a standard the Supreme Court recently fortified in *Groff v. DeJoy*, 600 U.S. 447 (2023). But WSU failed to carry that burden. A jury could find that Rolovich could have been accommodated through testing, masking, and (where necessary) virtual meetings—particularly given that WSU was 95% vaccinated already and had approved 97% of sincere religious objections for hundreds of employees using accommodations like these. Br.34-38. This is perhaps why, in initially granting summary judgment for WSU, the district court applied not *Groff* but the "more than … de minimis" standard *Groff* expressly overruled. 1-ER-10–11; *see* Br.32-34; *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1218 (9th Cir. 2025) ("*Groff* raised the bar").

8

Besides articulating the right standard, *Groff* also establishes the principle that resolves this case: "hardship that is attributable to" "aversion" to a religious practice or "animosity … to the very notion of accommodating" it "cannot be considered 'undue.'" 600 U.S. at 472-73. Yet such aversion and animosity is what moved WSU here. WSU's decisionmakers were "pissed" that "Nick is going to file a religious exemption claim," 2-ER-269; "embarrassed" at having a supposedly "anti-science and anti-authority" head football coach, 2-ER-256, 317; viewed his mere "opt[ing] to use the exemption process" as a missed "opportunity … to display leadership," 2-ER-257, and decided, even before he submitted his exemption request, to teach him "a great lesson" because his beliefs supposedly "tarnished WSU['s] brand," 2-ER-254, 271.

Post hoc, WSU devised three purported undue hardships—"increased risk of spreading COVID-19"; "economic costs"; and "[r]estrictions on Rolovich's ability to perform his job duties." Resp.24-46. But WSU fails to show entitlement to summary judgment on any of them.

***"Increased risk."*** WSU first says "legitimate safety concerns, including the spread of infectious diseases, constitute undue hardship." Resp.22. But this sweeping theory is irreconcilable with the "fact-" and "context-specific" inquiry *Groff* requires. 600 U.S. at 468, 473. Underscoring the point, seven of the eight cases WSU cites involved not just "safety concerns" about COVID generally but the unique context of vaccine objectors whose job was providing "emergency, even life-saving"

9

"*medical* services" for "vulnerable patients." *Petersen*, 150 F.4th at 1218-20; *see also Henry v. S. Ohio Med. Ctr.*, No. 24-cv-3863, 2025 WL 2621727, at *8 (6th Cir. Sep. 11, 2025) ("particularly vulnerable patients whose lives could be placed at risk if they were to contract the virus") (quoting *Wise v. Child.'s Hosp. Med. Ctr. of Akron*, No. 24-cv-3674, 2025 WL 1392209, at *5 (6th Cir. May 14, 2025)); *Kizer v. St. Jude's Child.'s Rsch. Hosp.*, No. 24-cv-5207, 2024 WL 4816856, at *1 (6th Cir. Nov. 18, 2024) ("vulnerable pediatric patients"); *Savel v. MetroHealth Sys.*, No. 24-cv-4025, 2025 WL 1826674, at *2 (6th Cir. July 2, 2025) ("patient-facing" nurse "interfac[ing] with some of the hospital's sickest COVID-19 patients"); *Bushra v. Main Line Health, Inc.*, No. 24-cv-1117, 2025 WL 1078135, at *2 (3d Cir. Apr. 10, 2025) ("vulnerable patients" including "patients with COVID-19"); *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 394-96 (1st Cir. 2025) ("primary duties were providing direct care for patients in critical condition"). And in the eighth, the court emphasized the case's "unique posture," in which the plaintiff had—unlike Rolovich—"staked his undue hardship argument" entirely on his claim that the employer's evidence was inadmissible under evidence rules. *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 93-94 (1st Cir. 2025).

This case, meanwhile, involves not a nurse caring for "the hospital's sickest COVID patients" (*Savel*) or a firefighter/paramedic transporting "sick persons in their vehicles" (*Petersen*, 150 F.4th at 1219), but a football coach, whose primary duty was coaching young, healthy,

predominantly-vaccinated athletes. Under *Groff*, "courts must apply the [undue-hardship] test in a manner that takes into account all relevant factors," including "the[] practical impact" of accommodation in light of the employer's "nature." 600 U.S. at 470-71. And the practical impact of accommodation here couldn't be more different than when a city stands to lose "community-critical" "fire suppression" and "emergency, even life-saving, services," *Petersen*, 150 F.4th at 1214, 1220; or when the plaintiff's job consists precisely of caring for already-sick patients who themselves are "unable-to-be-vaccinated," *Kizer*, 2024 WL 4816856, at *5.

This aside, WSU's evidence also fails to show that its "concerns" are "legitimate" *in a near-totally vaccinated community like WSU*. As Rolovich explained, courts around the country have rejected undue-hardship defenses where the workforce was already overwhelmingly vaccinated. Br.35-36. And three Justices have recognized that denying a religious exemption when a workforce is already over 90% vaccinated is not only not "legitimate," Resp.22, but "borders on the irrational." *Does 1-3 v. Mills*, 142 S. Ct. 17, 22 (2021) (Gorsuch, J., joined by Thomas and Alito, JJ., dissenting).

In response, WSU complains the 95% vaccination rate is "cobbled together" from multiple record citations. Resp.36. But WSU conspicuously fails to dispute the number's accuracy, and it results from

simple "math" a "reasonable jury" could easily replicate. *City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 841 (9th Cir. 2004).

WSU also asserts that because this vaccination-rate argument is "scientific," it "must be supported by scientific evidence." Resp.36. But it *is* supported by scientific evidence—WSU's experts' own account of the vaccine's effectiveness. Br.35 (citing 4-ER-681 (Lynch report); 3-ER-449 (Palmer report)). If "both the vaccinated person and all of those around them are at much lower risk of infection," 4-ER-681, then the only reasonable inference a jury could draw is that the infection risk is much lower than typical in a 95% vaccinated community.

Third, WSU claims Rolovich "forfeited" this argument by not raising it below. Resp.36. Not so. In opposing summary judgment, Rolovich specifically offered evidence supporting WSU's overwhelming vaccination rate, Dkt.120-19 at 4 (President Schulz: "nearly 90 percent of WSU employees and 97 percent of our students are now vaccinated"); invoked caselaw for the proposition that summary judgment is inappropriate where the "employer's undue hardship arguments did not take into account that its workforce was over 90% vaccinated," Dkt.124 at 7-8; and argued there was no "incremental impact on public safety caused by Rolovich," *id.* at 7-12. The vaccination-rate argument was therefore "raised sufficiently for the trial court to rule on it." *Cornhusker Cas. Ins. Co. v. Kachman*, 553 F.3d 1187, 1191-92 (9th Cir. 2009).

WSU also takes issue with Rolovich's point that its purported safety concerns are undercut by the fact that it exempted fourteen *players* from its mandate and granted 97% of sincere requests for religious accommodation. Br.37-38. According to WSU, "student-athlete exemptions" are "irrelevant" because "the undue hardship analysis's 'focus … is on the *employee*.'" Resp.33.

But Rolovich's point is simple—that if an employer has already shown itself willing to tolerate a particular hardship, accepting that same "hardship" to accommodate a religious observer is less likely to be "undue." *Groff*, 600 U.S. at 469. Indeed, this Court has already relied on similar evidence to find not only a jury question but a "strong likelihood of success" on undue hardship in a COVID case like this one. *Keene v. City & County of S.F.*, No. 24-cv-1574, 2025 WL 341831, at *2 (9th Cir. Jan. 30, 2025) (no undue hardship from accommodating vaccine-objector employees where "during the relevant time period Appellants' worksite hosted thousands of appointments with members of the public, regardless of their vaccination status"). And although WSU notes it couldn't have denied student exemptions "on the basis of undue hardship," Resp.34, the Ninth Circuit case it cites suggests that it could have denied exemptions based on an even *easier* standard—"rational basis," *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021). So this distinction only *strengthens* the relevance of the student exemptions.

13

Finally, WSU accuses Rolovich of "mischaracteriz[ing] the record in claiming he only 'occasionally remov[ed] his mask to communicate in noisy environments and to drink.'" Resp.29-30. But WSU's only support is a collage of pictures of Rolovich removing his mask in noisy environments. Resp.30. In any event, while WSU suggests Rolovich's "noncompliance with masking and distancing policies" *before* it denied him an accommodation demonstrates he wouldn't have complied *after being accommodated* and as a condition of retaining his job, Resp.32, that conclusion doesn't follow. In fact Rolovich testified under oath that "I could have performed my job with reasonable accommodations" including "regular COVID-19 testing, enhanced masking, and virtual meetings when in-person attendance was not permitted." 2-ER-210; *see also Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978) ("Undue hardship cannot be proved by assumptions[.]").

***"Economic costs."*** WSU's undue-hardship defense based on the "economic costs" of accommodation likewise fails. Resp.40-45.

**1.** First, WSU repeats its claim that it would have had to "provide separate travel arrangements for Rolovich and the other unvaccinated coaches" amounting to "at least $197,000." Resp.40-41. But it's undisputed that WSU never actually required separate travel arrangements for unvaccinated members of the football program, despite being halfway into the 2021 season by the time it fired Rolovich. Br.39. "[U]ndue hardship cannot be supported by merely conceivable or

hypothetical hardships." *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981); *see also Naylor v. County of Muscatine*, No. 24-cv-1098, 2025 WL 2396864, at *3 (8th Cir. 2025) ("sufficiently 'real' chance" of claimed hardship "required … at summary judgment").

In any event, a reasonable jury could find this hypothetical number not "substantial in the overall context of [WSU's] business." *Groff*, 600 U.S. at 468. This figure is the supposed cost of separate travel across two football seasons. 5-ER-955–56. That is negligible at a university with a billion-dollar endowment—whose football program alone nets approximately $25 million in profit in a single season and pays head coaches millions each year. Br.42.

In arguing otherwise, WSU suggests this Court's (unpublished) opinion in *Bordeaux v. Lions Gate Entertainment, Inc.*, No. 23-cv-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025), found "undue hardship where [a] production company would have to spend $300,000 to accommodate [an] unvaccinated actor," Resp.40-41. But this Court did no such thing, instead resting its affirmance entirely on other grounds. 2025 WL 655065, at *1-2. Indeed, the only panel member who addressed this argument rejected it, explaining that "whether $300,000 to accommodate a leading actress in a major multi-million-dollar Hollywood production is a question for the jury." *Id.* at *3 (Lee, J., dissenting) (citing *Groff*). So too here.

15

**2.** So WSU turns elsewhere, fretting that unvaccinated coaches could have led to "game cancellations." Resp.41-43. But as Rolovich explained, this "risk" (Resp.41) was far-fetched in the extreme—only five games were canceled across all of college football in 2021, none by WSU, Br.40.

In response, WSU calls this "hindsight," noting it canceled three games "the prior season." Resp.42. But WSU is comparing a season *before* COVID vaccines were available to one when its community was *95% vaccinated*. And while WSU claims "all [it] knew" "[i]n October 2021" was what had happened in 2020, Resp.42, WSU omits that it was already seven games deep in the 2021 season at the time it fired Rolovich—and neither it nor any other school anywhere had had to cancel any game. *See* 5-ER-951 (the five canceled games were post-season "bowl games"). That is the definition of a "speculative" hardship. *Balint v. Carson City*, 180 F.3d 1047, 1056 (9th Cir. 1999).

**3.** Finally, WSU claims it would have "risked the loss of significant revenue" from donors upset by Rolovich's "vaccine opposition." Resp.43-45. But as Rolovich has explained, even assuming angry donors outweighed supportive ones, *but see* Br.41-42, Title VII doesn't permit donor distaste for religious exercise to constitute undue hardship, Br.40-41. If it did, "Title VII would be at war with itself … [because] such an approach would be giving effect to religious hostility." *Groff*, 600 U.S. at 472 (cleaned up).

16

In response, WSU argues this principle doesn't apply because the donors supposedly didn't know that Rolovich's reasons were religious. Resp.43-44. But Title VII protects "all aspects of religious *observance and practice*, as well as belief," 42 U.S.C. §2000e(j) (emphasis added)—so hostility to a religious practice *is* hostility to religion. Indeed, the Supreme Court has already held that Title VII's religious-discrimination provision "does not impose a knowledge requirement"; "[a]n employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015). Thus, an employer can't "giv[e] effect" to donors' "hostility to a religious practice or a religious accommodation," *Groff*, 600 U.S. at 472, even if the donor "does not know for certain" that the practice is religiously motivated, *Abercrombie*, 575 U.S. at 773.

And indeed, in the lower-court case *Groff* expressly disapproved of, there was no indication that customers objected to bearded restaurant managers because they associated beards with religion; rather, they objected because of concerns that "beards are unsanitary" and "a restaurant operated by a bearded manager might be lax in maintaining its standards … in other regards." *EEOC v. Sambo's of Ga., Inc.*, 530 F. Supp. 86, 89 (N.D. Ga. 1981), *abrogated by Groff*, 600 U.S. 447. Yet *Groff* rejected this undue-hardship defense anyway. The donor concerns here are even more easily rejected, reflecting mere "embarrassment," 1-SER-236, at having a head football coach who was supposedly "anti-science

and anti-authority," 2-ER-317; *see also* 1-SER-243 ("[in]consistent with th[e] university's values"); plus hostility to having an "exclusion for 'personal or religious reasons'" at all, 2-ER-333.

*Groff*'s teaching is clear and controlling here. The remedy for employers stuck between their obligation to accommodate religion and angry customers or donors who do not understand that an employee's practice is religious is to explain the accommodation obligation (and thus assuage the anger)—not to yield to uninformed anger and fire an employee because of his faith.

**Performance restrictions.** Finally, WSU fails to show that supposed "restrictions on Rolovich's ability to perform his job duties while unvaccinated" suffice to take this issue away from a jury. Resp.45-46. Below, WSU attempted to substantiate this claim by attributing a claimed recruiting shortfall to Rolovich's unvaccinated status, saying his inability to perform in-person, off-campus recruiting hampered his results in 2021. Dkt.93 at 25-26. But as Rolovich explained, this theory makes no sense as a causal matter—Rolovich was barred by NCAA COVID regulations and the ordinary recruiting schedule from performing any such recruiting activities up until the date of his firing, for reasons entirely independent of his vaccination status. Br.43-44; *see Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 24-cv-1942, 2025 WL 2218112, at *10 (7th Cir. Aug. 5, 2025) ("*Groff* requires the employer to

18

prove both that there was a hardship, and that the accommodation caused that hardship").

Conceding the point, WSU now offers a more timid theory—that because his vaccination-related limitations would "have continued" after the other restrictions expired, he "*would have put* WSU at a significant recruiting disadvantage going forward." Resp.46 (emphasis added). But this is a paradigmatically speculative hardship; at the time of Rolovich's firing WSU could not have known how long any vaccine-related limitations would last or whether they would make any difference, given that "[e]ffective recruiting for college football programs can be done in a wide variety of ways," including the virtual techniques that proliferated during the pandemic. 2-ER-204.

* * *

None of WSU's undue-hardship arguments suffice to take undue hardship from the jury. WSU was a billion-dollar university with a 95% vaccination rate that successfully accommodated hundreds of unvaccinated employees and many unvaccinated members of the football program. A reasonable jury could conclude that it could have accommodated Rolovich, too.

## C. A reasonable jury could find for Rolovich on disparate treatment.

Rolovich is also entitled to a trial on his claim of disparate treatment based on religion. Rolovich has shown far more than the "single

19

discriminatory comment" sufficient to "preclude summary judgment." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005). WSU officials repeatedly denigrated and presumed the illegitimacy of his beliefs in the days before his firing. Br.45-47.

**1.** In response, WSU says Rolovich's disparate-treatment claim fails because he "did not plead" it. Resp.51. But as Rolovich already explained, his complaint *did* plead the claim by pleading the "factual allegations" supporting it—which is all "notice pleading" requires. *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008); Br.48-49. Moreover, WSU plainly had "notice of and the opportunity to challenge" the claim, *Alvarez*, 518 F.3d at 1158; indeed, it *in fact did so*, after Rolovich briefed the claim in response to WSU's motion for summary judgment, Dkt.117 at 28-29; Dkt.126 at 17-18 & n.6.

Rather than responding to these points, WSU faults Rolovich for supposedly failing to invoke disparate treatment after WSU addressed "only a failure-to-accommodate theory" in moving to dismiss his first amended complaint. Resp.51. But Rolovich wasn't obliged to defend a claim WSU didn't address; and in any event, the *second* amended complaint is the one that proceeded to discovery and summary judgment. Dkt.53. Next, WSU complains that Rolovich "gave no hint of a traditional disparate treatment theory" in *his* motion for partial summary judgment. Resp.52. But that motion was just that—*partial*; it sought summary

judgment only "as to his *prima facie* case for the Title VII failure to accommodate claim," Dkt.88 at 8, leaving every other issue for trial.

Rolovich's complaint was clear: in addition to its failure to accommodate, "one of the University's motives for its" actions was "disapproval of [his] sincerely-held religious reasons for refusing to receive a COVID-19 vaccine." 6-ER-1235. Rolovich's opposition to summary judgment was clear, too: in addition to its failure to accommodate, WSU's "disparaging remarks" about his religious beliefs demonstrated a "discriminatory reason" for his firing, meaning that "undue hardship" wasn't a "'complete defense' to Rolovich's Title VII (and WLAD) claim." Dkt.117 at 29-30. This is precisely the disparate-treatment argument that Rolovich is making now. So that argument "was properly before the district court at summary judgment." *Alvarez*, 518 F.3d at 1158.

**2.** WSU fares no better on the merits. WSU seeks to downplay as "breathless" Rolovich's "allegations of anti-religious 'fury.'" Resp.53-54. But it was WSU's Board Chair herself who said that when she and Defendant Chun learned that "Nick is going to file a religious exemption claim," they were "pissed" and "so angry … that we cannot see straight." 2-ER-269–70; *see also* 2-ER-289 (President Schulz: "pretty pissed off" "like the rest of us"); 2-ER-293 (another Board member: "irritated as hell").

Nor are these statements alone. As Rolovich explained, the Chair and WSU's President mocked Rolovich's beliefs: "[C]an you pls tell me his devoted religion?" "I have no $&$@@ idea. Probably searching on the internet as we speak." 2-ER-269. Chun said Rolovich's "beliefs [we]re making [him] incapable of leading" his players, analogized them to the beliefs of "religio[us] … cult[s]," and told Rolovich "if [Rolovich] g[ot] the religious exemption, he [Chun] would forever question [Rolovich's] character." 4-ER-781–82, 784. Even Chun's formal notice of decision to terminate deemed Rolovich's beliefs "simply not credible" because Rolovich had cited "'scientific' research" in opposing the vaccine, 5-ER-991—expressly presupposing the illegitimacy of religious beliefs that (like Rolovich's) turn in part on an assessment of medical costs and benefits. At minimum, these "circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1155 (9th Cir. 2025).

Unable to dispute that these comments would "preclude summary judgment" under this Court's caselaw, *Dominguez-Curry*, 424 F.3d at 1039, WSU fights the summary-judgment standard itself, arguing for the Court to adopt a more innocuous interpretation of some statements and ignore others as "inadmissible hearsay." Resp.54 n.15. But on summary judgment, "reasonable inferences" are drawn for "nonmoving parties"— here, Rolovich, not WSU. *Silloway v. City & County of S.F.*, 117 F.4th 1070, 1072, 1077 (9th Cir. 2024). And the statements WSU says are

22

"hearsay" are from Rolovich's contemporaneous notes of his meetings with Chun, 4-ER-781–86, which are "mere recitations of events within [Rolovich's] personal knowledge" that Rolovich "could testify to" at trial— meaning this Court "may consider [their] contents" on summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (considering contents of plaintiff's diary).

So WSU takes a different tack, saying Rolovich's disparate-treatment claim "collapses" because "none of WSU's decisionmakers knew what Rolovich's religious beliefs even were." Resp.54. But this argument is squarely contrary to Supreme Court precedent. Title VII's "intentional discrimination provision" "does not impose a knowledge requirement"; rather, it "prohibits certain *motives*, regardless of the state of the actor's knowledge." *Abercrombie*, 575 U.S. at 773. So "an employer who acts with the motive of avoiding accommodation may violate Title VII," even if she doesn't "know for certain" an employee's religion or that the disputed practice is religious. *Id.* at 773.

In any event, a reasonable jury could find that WSU's claim of ignorance isn't true—*i.e.*, that WSU's decisionmakers *did* understand the nature of his religious beliefs. All the comments cited above post-dated the May 27, 2021, meeting at which Chun had "offered his wife as a person to talk to because she has been in a couple different religions he referred to as a cult." 4-ER-782. And Chun's notice of decision

23

unambiguously demonstrates knowledge of Rolovich's beliefs, saying "like you, I am also a practicing Catholic." 5-ER-993.

**3.** Alternatively, WSU claims its denial of Rolovich's exemption request on undue-hardship grounds constituted a "legitimate nondiscriminatory reason" for his firing. Resp.55. But as Rolovich already explained, this argument can't justify summary judgment, for at least three reasons. Br.47-48. First, "derogatory comments" themselves create "a factual question … with respect to any claim of nondiscriminatory reason." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1150 (9th Cir. 1997). Second, WSU "deviat[ed] from" its "established policy or practice" in evaluating his exemption request, *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011), treating him differently from 99.7% of other exemption requests by overriding its own blind review committee's finding of sincerity. Br.16, 48. And third, WSU had already decided to fire Rolovich before he even submitted his exemption request, Br.48, making any explanation based on the failure of that request inescapably pretextual.

WSU ignores the first two—which alone suffices to satisfy the "hardly … onerous" burden of "rais[ing] a triable issue of pretext." *Earl*, 658 F.3d at 1113. As for the third, WSU says it's a "conspiracy theory," since Chun supposedly "testified that he based his accommodation decision on available public health guidance, input from his Deputy Athletics Directors, and advice from HRS and legal counsel." Resp.56.

24

But the snippet of Chun's declaration WSU cites on this point simply doesn't say that, as the Court can see for itself. 5-ER-812. And even if it did, a reasonable jury could disbelieve it based on other evidence. For example, at the same time he told Rolovich of the impending Proclamation, Chun also informed Rolovich that any religious-exemption request he submitted would be "scrutinized to no end," so if Rolovich "didn't get the shot, [he] could expect to be fired with cause on Oct 19th 2021." 4-ER-783; *see also* 4-ER-784 ("Pat said if I get the religious exemption, he would forever question my character."). Equally revealing is Chun's private statement, made eleven days *before* Rolovich submitted his exemption request, which unequivocally indicates that Chun already knew that request would be denied:

> Our head coach has put himself in a bad situation by not getting Vax. It's going to be a great lesson for current or future coaches about decisions you can or cannot make as a head coach.

2-ER-254.

These admissions from Chun are consistent with still other statements confirming that Rolovich's firing was a foreordained conclusion. Immediately after learning that Rolovich planned to seek a religious exemption, for example, WSU's Board Chair asserted it was "time to take the reigns [sic] and in my opinion no longer protect Nick who has tarnished WSU brand"—a statement with which President Schulz "agree[d]." 2-ER-271–72; *see also* 4-ER-784 (Rolovich's notes on

25

day Rolovich confirmed intent to seek religious exemption: "[Chun] admitted regents wanted me fired"). President Schulz further opined that Rolovich had "fallen short" merely by "opt[ing] to *use* the exemption process," 2-ER-250 (emphasis added)—independent of whether he could be accommodated without undue hardship. And President Schulz had earlier dubbed WSU's approach to Rolovich the "Rolo strategy." 2-ER-290.

WSU addresses *only* the "Rolo strategy" comment, claiming that "[i]n context," it refers "either to [Governor Inslee's] Proclamation itself or to a 'communication strategy'" (Resp.55-56)—apparently, WSU doesn't know which. But this is a classic case of asking the Court to draw inferences in WSU's favor, which isn't how summary judgment works. And the comment's "context" includes WSU officials saying they were "pissed" and "so angry … that we cannot see straight," 2-ER-269; asking Schulz "What is our game plan in dealing with Rolovich?" 2-ER-292; *see* 2-ER-293 (Schulz: "We have a plan"); making derogatory comments about Rolovich's religious beliefs, overriding its own blind review committee's finding of sincerity, and saying the response to his exemption request (before he even submitted it) would be a "great lesson" for other coaches. That is more than enough for a reasonable jury to infer that the "Rolo strategy" was a strategy for terminating him.

In short, if anything is a "conspiracy theory," Resp.56, it's WSU's theory that WSU decisionmakers were "disappointed," "depress[ed],"

"pissed," and "so angry … that [they] cannot see straight" at the mere fact that Rolovich *planned to seek* a religious exemption, 2-ER-269, but then dispassionately evaluated his request without prejudging its result. Rolovich is entitled to a jury on his disparate-treatment claim.

## II. A reasonable jury could find for Rolovich on his state-law claims.

***Breach of contract.*** A reasonable jury could find that Rolovich wasn't fired for "just cause"—so WSU owes liquidated damages. Br.50. Just cause requires "a fair and honest … reason ... regulated by good faith," and not "arbitrary, capricious, or illegal." *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d 298, 304 (Wash. 1989). Here, the firing *was* illegal, as just explained. And even if weren't, a jury could find it flunks the "just cause" standard, because (1) the Governor's guidance accompanying his mandate indicated firings should be "non-disciplinary"; (2) Rolovich couldn't have been on notice when he entered the contract that his job might someday be conditioned on a novel vaccine mandate; and (3) WSU's stated reason (inability to accommodate) was pretext for its predetermined decision to fire Rolovich. Br.50-52.

WSU's counterarguments are meritless. First, WSU pretends its hands were tied, claiming its refusal to accommodate Rolovich made him "legally ineligible" to work under the Proclamation. Resp.57-59. But of course, it was WSU that wrongly determined it couldn't accommodate him. Regardless, the Proclamation didn't require a punitive, for-cause

27

firing. Rather, Governor Inslee's guidance directed that terminations were to be "non-disciplinary," 2-ER-230, which WSU's own HR witness understood to preclude firing for cause, 2-ER-226–27.

WSU now insists Inslee's guidance was "nonbinding." Resp.58. But at minimum it indicates that WSU's "just cause" determination was disproportionate and arbitrary. Br.50-51. An employee may "*justifiably rely*" on his employer's policies, held out as "fair, ... applied consistently and uniformly to each employee." *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1087-88 (Wash. 1984).

Next, WSU asserts the vaccine was "an express, material condition of [Rolovich's] employment." Resp.58. But its sole contractual support is a boilerplate provision requiring Rolovich to "abide by all provisions of law." Resp.59. A contract is interpreted in light of the parties' understandings at the time of its formation. *See Berg v. Hudesman*, 801 P.2d 222, 228-29 (Wash. 1990). And when Rolovich entered this contract (January 2020), neither WSU nor Rolovich could have anticipated an unprecedented mandate that he accept a novel medical intervention as a condition of keeping his job.

In fact, WSU's *own actions* with other employees confirm the boilerplate wasn't enough—after the pandemic began, WSU required *other* employees to *specifically* agree in their contracts to "**follow all federal, state, and local health directives**." 2-ER-218; Br.52. WSU feigns confusion on how "terms added to the contracts of *other* Athletics

employees … could change" Rolovich's contract. Resp.59. But of course they don't "change" Rolovich's contract; they inform its interpretation. *See City Beverages, LLC v. Crown Imports, LLC*, No. 23-cv-35010, 2023 WL 4637113, at *2 (9th Cir. July 20, 2023) (courts avoid superfluity "[w]hen interpreting a contract under Washington law"). WSU knew how to put Rolovich on notice of mandatory vaccination, but didn't. So even if WSU could fire Rolovich, it couldn't do so for "just cause."

**Wage withholding**. WSU is also liable for wage withholding: By in bad faith designating Rolovich's firing as for "just cause," WSU "wilfully and with intent" withheld liquidated damages it was "obligated to pay … by … contract." Wash. Rev. Code §§49.52.050(2), 49.52.070; Br.53.

WSU insists it had a "genuine ... belief" it wasn't obligated to pay Rolovich. Resp.60. But as its cited opinion explains, "willful withholding" is "the result of knowing and intentional action and not the result of a bona fide dispute as to the obligation of payment." *McMinimee v. Yakima Sch. Dist.*, No. 1:18-cv-3073, 2019 WL 11680199, at *10 (E.D. Wash. Aug. 7, 2019). A jury here could easily find that WSU's "dispute" wasn't "bona fide." As explained, the record is shot through with animus. And far from reaching a dispassionate determination that it couldn't accommodate Rolovich without undue hardship, WSU's decisionmakers decided to fire him even before receiving his exemption request. Br.47-48. That is willful wage withholding.

### III. Rolovich adequately alleged a free-exercise claim.

Finally, WSU fails to rehabilitate the dismissal of Rolovich's free-exercise claim against Chun. Chun's alleged actions—including pressuring Rolovich to violate his religious beliefs, overriding WSU's blind-review process to deny Rolovich's accommodation request, firing him based on religious hostility, and deeming the religion-based firing a "just cause" termination—violate clearly established free-exercise law. Br.55-62.

WSU's response misstates Rolovich's claims. WSU argues the "vaccine mandate[]" is "neutral and generally applicable." Resp.60. But Rolovich's claim is that Chun's *implementation* of the mandate was not neutral and generally applicable, for the reasons just stated.

Similarly, WSU says the mandate's "allowance for medical or religious exemptions" didn't vest Chun with the sort of official discretion that would trigger strict scrutiny under *Fulton*, *Thomas*, and *Sherbert*. Resp.62; *see* Br.61 (discussing these cases). But Rolovich's claim is that the discretion inhered in Rolovich's *contract*'s "just cause" provision—which is materially identical to the "'good cause' standard[s]" the Supreme Court has repeatedly held constitute "a mechanism for individualized exemptions" triggering strict scrutiny. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533-34 (2021); Br.61; *see* 6-ER-1210–12, 1237 (relevant allegations in complaint). WSU offers no response on the merits of this argument.

WSU does try to respond on hostility—endorsing the district court's conclusion that some of Chun's hostile statements don't count because they came before Rolovich spoke directly with Chun about his religious objection on August 19, 2021. Resp.61-62.

But as Rolovich already explained, numerous allegations create a plausible inference that Chun knew of the religious nature of Rolovich's objection even before this conversation, including that Chun had previously compared Rolovich's beliefs to those of "religio[us] … 'cults'"; that Rolovich had sought information about the religious exemption and checked the religious/personal box on the original exemption form; and that Chun had told Rolovich that "any religious exemption request he submitted would be scrutinized to no end." 6-ER-1214, 1267; Br.59. WSU claims this contradicts the complaint, citing an allegation that Rolovich "had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines." Resp.62 (citing 6-ER-1216). But these allegations are not contradictory—Chun could understand the religious nature of Rolovich's objection even if Rolovich "refrained from" raising it explicitly.

Finally, WSU says Chun's actions are nonetheless protected by qualified immunity, since "no case put[] Chun on notice" they were illegal. Resp.63. But there needn't be "a case directly on point" when "existing precedent … ha[s] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

And here, the key precedents—*Masterpiece* for hostility, *Fulton* for discretion—were decided in 2018 and 2021, respectively, placing the legal question beyond debate. This Court has already described those cases' principles as "bedrock requirements of the Free Exercise Clause that the government may not transgress." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (citing *Masterpiece* and *Fulton*). Government officials transgress bedrock requirements of the First Amendment at their peril.

## CONCLUSION

This Court should reverse and remand for trial.

Dated: October 6, 2025

Respectfully submitted,

*/s/ Joseph C. Davis*

ERIC N. KNIFFIN
KNIFFIN LAW, PLLC
102 S. Tejon St.
  Suite 1100
Colorado Springs, CO 80903
(719) 212-4391
*eric@kniffin.law*

ERIC J. SEESE
FROST BROWN TODD LLP
1801 California St., Ste. 2700
Denver, CO 80202

JOSEPH C. DAVIS
  *Counsel of Record*
LUKE W. GOODRICH
ANGELA WU HOWARD
TIMOTHY KOWALCZYK
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*jdavis@becketfund.org*

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 6,996 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

*/s/ Joseph C. Davis*
Joseph C. Davis

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2025, the foregoing brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's ACMS system. I certify that all participants in the case who are registered ACMS users will be served by the appellate ACMS system.

*/s/ Joseph C. Davis*
Joseph C. Davis